[ORAL ARGUMENT NOT YET SCHEDULED]

APPEAL NO. 15-5176
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

ROTHE DEVELOPMENT, INC.,

Appellant,

v.

UNITED STATES DEPARTMENT OF DEFENSE AND
UNITED STATES SMALL BUSINESS ADMINISTRATION,

Appellees.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

**BRIEF OF APPELLANT ROTHE DEVELOPMENT, INC.**

David F. Barton
D.C. Cir. Bar No. 54430
Texas State Bar No. 01853300
GARDNER LAW
745 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Telephone:  (210) 733-8191
Telecopier:  (210) 733-5538
E-Mail:  dbarton@gardnertx.com

ATTORNEY FOR APPELLANT
ROTHE DEVELOPMENT, INC.

<u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>
<u>AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Circuit Rule 28(a)(1), Counsel for Appellant, Rothe Development, Inc., a Texas corporation, certifies the following:

A.    <u>Parties and Amici</u>.

The parties to this litigation in the district court were Rothe Development, Inc., the United States Department of Defense, and the United States Small Business Administration.

Amici in the district court were Mountain States Legal Foundation, Pacific Legal Foundation, NAACP Legal Defense & Educational Fund, Asian Americans Advancing Justice | AAJC, and The Leadership Conference on Civil and Human Rights.

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Counsel for Appellant, ROTHE DEVELOPMENT, INC., a Texas corporation, also certifies the following:

1.    The full name of every party or amicus represented by me is: ROTHE DEVELOPMENT, INC.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A

- i -

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: N/A

4.      There is no such corporation as listed in paragraph 3.

5.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are: GARDNER LAW, David F. Barton.


B.      <u>Rulings Under Review</u>.

The ruling under review is the Order and Judgment entered by the district court, Judge Ketanji Brown Jackson, on June 5, 2015 [Doc #75 in the district court] denying Plaintiff's Motion in Limine; granting Defendants' Motions in Limine; denying Plaintiff's Motion for Summary Judgment; granting Defendants' Cross-Motion for Summary Judgment; and entering judgment for Defendants. The Order and Judgment was accompanied by a memorandum opinion issued the same day [Doc #74]. The opinion has not been published in the Federal Supplement. It is available on Lexis at 2015 U.S. Dist. LEXIS 72925.

C.    <u>Related Cases</u>. After a diligent search, no related cases have been
identified and counsel is unaware of any related cases.


/s/ David F. Barton
David F. Barton
D.C. Cir. Bar No. 54430
Texas State Bar No. 01853300
GARDNER LAW
745 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Telephone:  (210) 733-8191
Telecopier:  (210) 733-5538
E-Mail:  dfb@tglf.com

ATTORNEY FOR APPELLANT
ROTHE DEVELOPMENT, INC.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ... i

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS ................................................................. iv

TABLE OF AUTHORITIES ........................................................ viii

GLOSSARY ............................................................................ xi

STATEMENT OF JURISDICTION .............................................. 1

STATEMENT OF THE STANDARD OF REVIEW .................... 1

STATEMENT OF THE ISSUES ................................................. 1

STATEMENT OF THE CASE .................................................... 1

    A.  *Statement of Facts* ............................................................ 1

    B. *Procedural History* ........................................................ 6

    C. *Ruling Presented for Review* ...................................... 7

SUMMARY OF THE ARGUMENT ........................................... 8

ARGUMENT .......................................................................... 10

I.  SECTION 8(a)'s RACIAL CLASSIFICATION .................... 10

II.  STRICT SCRUTINY DEFINES THE BURDENS OF PROOF AND
THE SUMMARY JUDGMENT RULE APPLIES TO THOSE
BURDENS .......................................................................... 10

III. CONGRESS DID NOT STATE A VALID COMPELLING INTEREST
............................................................................................. 12

    A.  *Summary* ............................................................ 12

*B. Grounds for Reversal* ....................................................... 14

   1. The 1978 enactment documents state that the purpose is to increase business ownership. ........................................................ 15

   2. None of the other legislative documents vary the purpose stated in 1978 or supply a valid compelling interest. .................................. 16

      *a. Not in the pre-1978 documents* ................................. 16
      *b. Not in the 1980 amendment document* .................................... 17
      *c. Not in the 1988 amendment document* .................................... 17
      *d. Not in the pre-1988 amendment documents* ............................ 18

   3. Increasing business ownership by race is racial balancing. .......... 18

   4. Congress's stated purpose for section 8(a)'s racial classification lacks even a proximate connection to a remedy for racial discrimination ................................................................. 19

*C. Relief Requested* ................................................................. 23


IV. POST-ENACTMENT EVIDENCE ....................................................... 24

*A. Summary* ......................................................................... 24

*B. Grounds for Reversal* ....................................................... 25

   1. Post-enactment evidence is irrelevant. ........................................ 25

   2. Post-enactment evidence is admissible because the Constitution provides otherwise ....................................................... 26

   3. Post-enactment evidence lacks probative value under strict scrutiny ................................................................................. 28

   4. The district court's other arguments are unpersuasive ................. 33

      *a. The age of the statute does not permit post-enactment evidence* ................................................................................. 33

     *b. Supreme Court case law controls over the Courts of Appeals* ................................................................. 33

     *c. None of Defendants' statistical disparity data is submitted in the SBA reports* ............................................ 34

     *d. The district court admits that post-enactment expert reports are unnecessary* ............................................ 34

  *C. Relief Requested* ................................................................. 36

**V. CAUSALITY** ............................................................. 36

  *A. Summary* .................................................................... 36

  *B. Grounds for Reversal* ..................................................... 38

    1. All data preceding the most recent decade is stale ...................... 38

    2. There is no evidence of direct discrimination by Defendants ....... 38

    3. There is no evidence of passive participation in discrimination by Defendants ................................................................... 39

     *a. Defendants do not passively finance discrimination every time they participate in the economy* ............................... 39

     *b. Section 8(a)'s racial classification targets the symptom rather than the cause, which is too attenuated* ................................... 40

     *c. There is no evidence section 8(a)'s racial classification can remedy alleged barriers to entry to the economy as a whole* .. 43

    4. There is no causal connection between the post-enactment data and Defendants' own procurement programs ..................................... 43

     *a. The Rubinovitz reports do not bridge the causal gap between Defendants' local and state data and their own federal procurement programs* ............................................. 44

     *b. Defendants rely on an unconstitutional extrapolation to infer effects on their own contracting from alleged discrimination in local and state contracting* ....................................... 47

     *c. The district court also erred by ignoring other missing causal connections* ............................................. 49

C. *Relief Requested* ................................................................. 52

VI. NONDELEGATION ............................................................ 52

A. *Summary* ......................................................................... 52

B. *Grounds for Reversal* ........................................................ 54

1. Congress cannot delegate the power to racially classify .............. 54

a. *Strict scrutiny bars such delegations for the same reasons as post-enactment evidence* ........................................... 54
b. *The Supreme Court has barred such delegations independently* ............................................................. 55

2. Alternatively, the delegation here lacks any intelligible principle ........................................................................ 55

3. The delegation cannot rely on Executive authority to save it ....... 58

a. *There is no Article II inherent power* ........................... 58
b. *Section 8(a)'s racial classification originated from unconstitutional Executive action* ............................... 58

C. *Relief Requested* ................................................................ 59

VII. THE DISTRICT COURT FAILED TO INDEPENDENTLY ASSESS ROTHE'S EVIDENTIARY ARGUMENTS AGAINST THE RECORD IN THIS CASE ...................................................................... 60

VIII. CONCLUSION ................................................................. 64

CERTIFICATE OF COMPLIANCE .......................................... post

ADDENDUM ......................................................................... post

CERTIFICATE OF SERVICE .................................................. post

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

\* *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995)…………………
...........................10, 11, 12, 15, 16, 17, 19, 23, 27, 30, 33, 41, 42, 47, 58, 59

*Associated General Contractors of Ohio, Inc. v. Drabik,* 214 F.3d 730 (6th Cir. 2000)..................................................................................17, 28, 39, 52

*Butera v. Dist. of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ........................ 1

\* *City of Richmond v. J.A. Croson Co*., 488 U.S. 469 (1989)............................
..... 13, 14, 15, 19, 22, 23, 28, 31, 33, 36, 39, 40, 41, 42, 44, 45-46, 47, 49, 51

*Dynalantic v. Department of Defense*, 115 F.3d 1012 (D.C. Cir. 1997)...... 10

*Dynalantic v. Department of Defense*, 885 F.Supp.2d 237 (D.D.C. 2012)9,14

*Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996)........................... 20, 42

*Frontiero v. Richardson,* 411 U.S. 677 (1973)............................................. 22

*Humphrey v. Baker*, 848 F. 2d 211 (D.C. Cir. 1988) ................................... 55

*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986)......................... 60

*In re Prempro Products Liab. Litig.,* 514 F.3d 825 (8th Cir. 2008)............. 63

*Kornhass Construction, Inc. v. Oklahoma*, 140 F.Supp.2d 1232 (W.D. Okla. 2001)......................................................................................... 16

*Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2009)........................................................................................... 54

*Miller v. Johnson,* 515 U.S. 900 (1995) ...................................................... 14

*Morton v. Mancari*, 417 U.S. 535 (1974)..................................................... 53

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).................................... 57

\* *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2008)....................................................................10-11, 19, 43

*Paroline v. United States*, 134 S.Ct. 1710 (2014) ............................19-20, 42

*Railway Express Agency, Inc. v. New York*, 336 U.S. 106 (1949) ......... 13, 23

\*   *Rothe Development Corp. v. Department of Defense*, 262 F.3d 1306 (Fed. Cir. 2001) *(Rothe III)* ................................................................. 17-18, 28, 31

\*   *Rothe Development Corp. v. Department of Defense*, 545 F.3d 1023 (Fed. Cir. 2008) *(Rothe VII)*…………………………………………………….. ……………8, 11, 17, 28-29, 30, 31, 33, 36, 37, 38, 40, 46, 48, 49, 50, 51, 60

*Schuette v. BAMN,* 134 S.Ct. 1623 (2014)…………………………………55

\*   *Shaw v. Hunt*, 517 U.S. 899 (1996) ........ 11, 12, 13, 18, 23, 26, 27, 32, 33, 44

\*   *Shelby County v. Holder,* 133 S.Ct. 2612 (2013) ..... 27, 28, 29, 30, 33, 60, 64

*Shelby County v. Holder,* 679 F.3d 848 (D.C. Cir. 2012)…………..............29

*Tennessee v. Lane*, 541 U.S. 509 (2004)……………………………..29

\*   *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507 (2015)..................... 11, 37, 41, 44

*United States v. Virginia*, 518 U.S. 515 (1986)..................................... 13, 23

*Whitman v. American Trucking Ass'n*, 531 U.S. 457 (2001) ............ 55-56, 57

*WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032 (8th Cir. 2011) ...................................................................................................... 62

*Wygant v. Jackson Bd. of Education*, 476 U.S. 267 (1986) ....... 11, 26, 31, 49

(cont'd)

## Constitution, Statutes, Regulations, and Rules

\* U.S. Const. Art. I, § 1…………………………………………………………54

\* U.S. Const. amend. V……………………………………………………...…3

15 U.S.C. § 631(f) ................................................................... 12

15 U.S.C. § 631(f)(1) ...................................... 1, 2, 3, 10, 12, 52, 53, 56, 59

15 U.S.C. § 636(j)(10) ................................................................ 2

15 U.S.C. § 637(a)(1) ........................................................... 2, 3, 10

15 U.S.C. § 637(a)(4) ................................................................ 2

15 U.S.C. § 637(a)(5) ....................................................... 1, 2, 3, 10, 52, 56

15 U.S.C. § 644(g)(1) ......................................................... 1, 2, 10

28 U.S.C. § 1291 ....................................................................... 1

28 U.S.C. § 1331 ....................................................................... 1

Pub. L. No. 95-507, § 202, 92 Stat. 1757 (1978) ........................... 1

Pub. L. No. 96-302, § 118, 94 Stat. 833 (1980) ........................... 17

Pub. L. 100-656, 102 Stat. 3853 (1988) .................................... 17

13 C.F.R. § 124.103(b) ......................................................... 3, 53

Fed. R. Civ. P. 56(a) .............................................................. 12

Fed. R. Civ. P. 56(c)(1)(B) ...................................................... 12

Fed. R. Evid. 401 ........................................................... 25, 26, 46

Fed. R. Evid. 402 ........................................................... 25, 26, 28

Fed. R. Evid. 702 ................................................................... 62

## Other Authorities

\* Drew S. Days, III, *Fullilove*, 96 YALE L.J. 453 (1987) ...................... 42, 59

Authorities on which we chiefly rely are marked with asterisks.

All pertinent applicable statutes and regulations are contained in the

Addendum to this Brief.

## <u>GLOSSARY</u>

Defendants –    Defendants in the district court, who are the Appellees in this Court, i.e., the United States Department of Defense, and United States Small Business Administration

DoD –    Department of Defense

NAICS –    North American Industry Classification System

SBA –    Small Business Administration

SDB -    Small Disadvantaged Business; not all SDBs are 8(a) firms

8(a) firm -    A participant in the SBA business development program that is subject to section 8(a)'s racial classification as defined in the statement of facts in this brief; all 8(a) firms are SDBs.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has

jurisdiction under 28 U.S.C. § 1291. Notice of appeal was filed on June 10, 2015,

from the final order and judgment disposing of all claims dated June 5, 2015.

A000016, A00067.

## STATEMENT OF THE STANDARD OF REVIEW

Summary judgment is reviewed *de novo*; preclusion of expert testimony for

abuse of discretion. *Butera v. DC*, 235 F.3d 637, 647 & 661 (D.C.Cir.2001).

## STATEMENT OF THE ISSUES

Is section 8(a)'s racial classification facially unconstitutional?

Were the district court's rulings regarding the inclusion and exclusion of post-

enactment expert testimony erroneous?

## STATEMENT OF THE CASE

### A. *Statement of Facts*

Section 8(a)'s racial classification has never been reauthorized. It was enacted

in 1978 and amended in 1980 and 1988. Pub. L. No. 95-507, § 202, 92 Stat. 1757,

1761 (codified as amended at 15 U.S.C. §§ 631(f)(1), 637(a)(5) & 644(g) (2012)).[1]

---

[1]     All citations to the United States Code herein are to the 2012 edition.

Section 8(a) defines "socially disadvantaged" individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5).

The statute also contains an additional racial classification in a presumption that all individuals who are members of certain racial groups are socially disadvantaged. *Id*. § 631(f)(1).

Finally, under the statute, benefits flow from the status conferred by the definition and presumption, through a statutory duty and goal to award a certain percentage of prime- and sub-contracts to socially disadvantaged small business concerns via competition restricted to those concerns. *Id*. §§ 637(a)(1)(A)-(C) (duty); 637(a)(1)(D) (restricted competition) & 644(g) (goals).[2]

---

[2]    "Eligible program participants" are those eligible to receive contracts under 15 U.S.C. § 637(a). *Id*. § 636(j)(10). Thus, the only "small business concerns" eligible to receive 8(a) contracts are:

    (1)    those small business concerns that are "socially and economically disadvantaged," *id*. § 637(a)(1)(B), meaning those more than "51% owned by one or more socially and economically disadvantaged individuals," *id*. § 637(a)(4)(i)(I); or

    (2)    those outright "owned and controlled by socially and economically disadvantaged individuals." *Id*. § 637(a)(1)(C).

The definition, the presumption, and the goal, taken together, comprise "section 8(a)'s racial classification" (also referred to herein as the "racial classification of section 8(a)" or the "statutory racial classification"), which, as set out above, is used to qualify firms and to exclude non-8(a) firms from bidding. A000519-A000520.

The racial classification denies Rothe equal protection under U.S. Const. amend. V. A000502-A000503, A000517.

Section 8(a)'s racial classification purports to authorize the Executive to classify members of groups by race without regard to their individual qualities. 15 U.S.C. §637(a)(5).

Further, Congress purported to authorize the inclusion of unspecified "other minorities" designated by the Small Business Administration ("SBA") as presumptively subject to section 8(a)'s racial classifications, and the SBA has designated at least one. 15 U.S.C. § 631(f)(1); *see also* 13 C.F.R. § 124.103(b) ("Subcontinent Asian American").

Section 8(a)'s racial classification applies whenever the SBA deems it "necessary." 15 U.S.C. § 637(a)(1). A000020.

Section 8(a)'s racial classification contains no standards for determining the scope (which races, to what degree), extent (which industries, where geographically) and term of its application.  A001007.

3

Congress's stated purpose in enacting section 8(a)'s racial classification was solely to increase business ownership by minorities. A002214, A003265.

Congress has never defined, in section 8(a)'s racial classification or elsewhere, how and when alleged barriers to market entry for minority businesses will be remedied by section 8(a)'s racial classification, or the point at which minority business ownership in the economy as a whole will be remedied by section 8(a)'s racial classification. A001006-A001007.

There is no statistical evidence in any legislative document submitted to Congress within the past 10 years that identifies or shows (1) where and to what degree an alleged barrier to market entry for minority firms has been eliminated or lessened on account of section 8(a)'s racial classification or Defendants' procurement; or (2) where and to what degree minority business formation has been demonstrably and sustainably affected on account of section 8(a)'s racial classification or Defendants' procurement. A001007-A001008.

Section 8(a)'s racial classification contains no mechanism by which actual federal procurement data is required to be used in order to determine where, to what degree, and for which races the racial classification will be applied in federal procurement. A001008.

The legislative documents for the 1978 enactment of section 8(a)'s racial classification contain no statistical benchmarks, benchmark study, or other

4

quantitative baseline regarding the presence or absence of discrimination against all races in all industries and markets nationwide. A001008.

Congress has not reviewed whether race-neutral means would be appropriate in lieu of section 8(a)'s racial classification since 1978. A001008.

Congress has never used the post-enactment evidence in this case to update or modify the scope, terms, duration, or goal of section 8(a)'s racial classification. A001007.

The *post hoc* compelling interest for section 8(a) asserted by Defendants in this litigation is to remedy disparate impact discrimination that creates barriers to minority contractor participation in the economy. A000609-A000610, A000768.

Defendants purport to justify their litigation position with local and state disparity studies. A000733-A000768.

There is no evidence that Defendants were discriminating in the selection of their own prime contractors, or that their prime contract awardees were discriminating against subcontractors. A001005-A001006.

There is no evidence of ongoing systematic, nationwide discrimination by federal, state, or local government contracting officers in the decision to award prime contracts. A001005.

Rothe is a woman-owned small business concern that satisfies the applicable SBA size requirements for its industry with respect to net worth and number of employees. A000082, A001090.

Rothe bids on small business contracts in its area of expertise, nationwide, including contracts with DoD. A000082-A000083.

Defendants have let and continue to let numerous contracts in Rothe's area of expertise that have been set aside under section 8(a) using the racial classification, which has foreclosed a not insignificant portion of Rothe's potential business opportunities. A000083-A000085.

Rothe would otherwise, but is not permitted to compete for such contracts against small businesses that benefit from the section 8(a)'s racial classification when the contracts are set aside. A000083-A000085.

B. *Procedural History*

The parties briefed motions in limine regarding post-enactment expert reports and cross-motions for summary judgment on the merits of the case. A000146-A000267, A000493-A002120.

With respect to the limine, Rothe argued that (a) post-enactment experts were unnecessary, but that if such experts produced reports, then (b) in the alternative, Rothe could move for exclusion and challenge those expert reports, including with rebuttal experts. A000135-A000141, A000171, A000231. That is

what occurred. *Id*. Defendants also challenged Rothe's rebuttal experts. A000146, A000190.

With respect to the merits, Defendants produced a substantial volume of legislative documents as well as a series of local and state disparity studies. The parties excerpted the disparity studies per citation in the exhibits to their summary judgment briefing. The parties contested the legal effect of the legislative documents, disparity studies, and expert reports in their briefs.

The district court held an oral argument, A002121, and subsequently issued its final order and judgment with opinion denying Rothe's motions and granting Defendants' motions. A000067,A000018.

## C. *Ruling Presented for Review*

The order and judgment on the parties' cross-motions for summary judgment and motions in limine, with accompanying opinion. A000067,A000018.

## SUMMARY OF THE ARGUMENT

This case is about (1) Congress's failure to bring a statutory racial classification into compliance with subsequent Supreme Court precedent (and Federal Circuit decisions that Rothe itself prevailed in) and (2) the district court's erroneous and illegitimate decisions to substitute *post hoc* Executive and Judicial rationales, data, and evidence for those compliance gaps.

Rothe challenges the facial constitutionality of the racial classification enacted in 1978 to set aside federal contracts under section 8(a) of the Small Business Act. The racial classification lacks a valid compelling interest and is not narrowly tailored. The legislative record here does not state a valid compelling interest. Post-enactment evidence may not supply or support that interest. Required causal relationships between Congress's stated purpose, the racial classification, and the data alleged to justify it are absent. Congress has unlawfully delegated a purported authority to create additional racial classifications and determine their scope, extent and term under the statute to the Small Business Administration ("SBA"). Rothe need not establish that no set of circumstances exists under which the racial classification would be valid to prevail. *Rothe Development Corp. v. DoD*, 545 F.3d 1023, 1032 (Fed. Cir. 2008) (*Rothe VII*). However, for each of these reasons, section 8(a)'s racial classification is unconstitutional in all circumstances and the Court should render judgment for Rothe.

8

The district court, in a perfunctory opinion addressing the merits for only 16 pages, ducked some of these arguments, and made legal errors with respect to the rest. The district court also adopted and hid behind the post-enactment judicial findings of the same district court that it inherited this case from, *Dynalantic v. DoD*, 885 F.Supp.2d 237 (D.D.C. 2012).[3] Rothe's experts were erroneously excluded, and Defendants' experts erroneously admitted.

By adopting *Dynalantic*, the district court failed to independently assess the record *in this case*, particularly with respect to the balance of the issues Rothe raised, many of which were not addressed in *Dynalantic*.

Consequently, if the Court does not render judgment on the first set of issues above, the Court will need to remand the case with instructions based on the disposition of the issues in this appeal, for the district court to apply those instructions to the existing summary judgment record.

---

[3]      On appeal to this Court, Defendants settled *Dynalantic* for $1,000,000 and a guaranteed term during which the racial classification would not apply to the plaintiff's industry. Case No. 95-cv-02301-EGS (D.D.C.), Doc# 259 at 2-3.

ARGUMENT

I. SECTION 8(a)'s RACIAL CLASSIFICATION

Rothe challenges section 8(a)'s racial classification in its entirety, A000493-A000497, not just the definition as the district court erroneously states. A000025-A000026, A000031-A000032. The statutory definition and presumption are used throughout the statute, including in the statutory goal. 15 U.S.C. § 637(a)(5) (definition); *Id*. § 631(f)(1) (presumption), §§ 637(a)(1)(A)-(C) (duty); 637(a)(1)(D) (restricted competition) & 644(g) (goals). Such elements of a statutory racial classification are not immune from a facial challenge, even though they may also have other non-race-conscious requirements. *Dynalantic v. DoD*, 115 F.3d 1012, 1016 (D.C. Cir. 1997).

II. STRICT SCRUTINY DEFINES THE BURDENS OF PRODUCTION AND PROOF AND THE SUMMARY JUDGMENT RULE APPLIES TO THOSE BURDENS

It is undisputed that the section 8(a) statute contains the racial classification identified above, and therefore that statutory racial classification is subject to judicial review under strict scrutiny. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 226 (1995) (*Adarand*).

Under strict scrutiny, statutory racial classifications are presumptively unconstitutional and unworthy of deference. *Adarand*, 515 U.S. at 223-224; *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 744

10

(2008) (*Parents Involved*) ("Such deference is fundamentally at odds with our equal protection jurisprudence.")

To survive a facial challenge under strict scrutiny, section 8(a)'s racial classification "must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235.

The compelling interest prong turns on "whether the legislative body had a 'strong basis in evidence' to believe that remedial action based on race was necessary." *Rothe Development Corp. v. Department of Defense*, 545 F.3d 1023, 1036 (Fed. Cir. 2008) (*Rothe VII*); *Wygant v. Jackson Bd. of Educ*. 476 U.S. 268, 277-278 (1986). When enacting statutory racial classifications for federal procurement, Congress must first "identify [the] discrimination [to be remedied], public or private, with some specificity." *Rothe VII*, 545 F.3d at 1036. "To be a compelling interest, [Defendants] must show that . . . alleged objective was the legislature's 'actual purpose' for the discriminatory classification." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4. Congress must then articulate "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236. For justifications based on disparate impact data, this now requires a causal connection to Defendants' own federal procurement. *Texas Dept. of Housing and Cmty Affairs v. Inclusive Communities Project, Inc*., 135 S.Ct. 2507, 2523 (2015) (*Texas DHCA*). Similarly, Congress must

11

narrowly tailor the statutory racial classification with "strong evidence" showing, among other things, "the relationship of the stated numerical goals to the relevant labor market." *Adarand*, 515 U.S. at 236.

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rothe may make this showing "by . . . showing . . . the absence or presence of a genuine dispute." Fed R. Civ. P. 56(c)(1)(B).


## III. CONGRESS DID NOT STATE A VALID COMPELLING INTEREST

### A. *Summary*

The enactment of section 8(a)'s racial classification occurred in 1978. It has been amended twice, in 1980 and 1988, but it has never been formally reauthorized.

Congress never stated a valid compelling interest in the legislative documents surrounding the 1978 enactment and the 1980 and 1988 amendments. A000522,A000532; A001028-A001046. Congress sought to offset or racially balance societal discrimination through section 8(a)'s racial classification, not to directly remedy identified discrimination. 15 U.S.C. § 631(f); A000550,A001032; *Shaw*, 517 U.S. at 909 ("[T]he discrimination must be 'identified discrimination.' …[T]hey must identify that discrimination, public or private, with some specificity

12

before they may use race-conscious relief."), *citing City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 499, 500, 504, 505, 507 & 509 (1989) (*Croson*).  The only purpose that Congress supported with evidence was to increase business ownership by minorities, A002214, which is not a compelling interest. *Croson*, 488 U.S. at 498 (requiring "relation to some basis for believing a constitutional or statutory violation had occurred"), *id*. ("a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy"), *and id*. at 505 (lack of evidence of "identified discrimination" precludes finding of compelling interest).

Since section 8(a)'s racial classification was designed to effectuate objectives other than the elimination of the effects of racial discrimination, it cannot stand as a remedy that comports with the strictures of equal protection. A001035; *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 115 (1949) (Jackson, J., concurring); *Shaw*, 517 U.S. at 908 n.4 ("To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification"); *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

The district court erred by ignoring the actual purpose stated in the statute and the legislative documents and simply adopted the *post hoc* compelling interest that Defendants asserted in their brief. A000057. The district court also erroneously relied on the *Dynalantic* district court's conclusory judicial finding.[4] A000057; A001060; *see also* 885 F.Supp. 2d at 287 (conclusory judicial finding that "Section 8(a) is designed, in relevant part, to remedy identifiable 'racial or ethnic prejudice or cultural bias' "). How the district court "arrives at the legal conclusion that a racial classification is 'designed to further remedial goals,' without first engaging in an examination of the factual basis for its enactment *and the nexus between its scope and that factual basis*, we are not told." *Croson*, 488 U.S. at 494-495 (emphasis added).

## B. Grounds for Reversal

When a governmental entity seeks to justify race-based action, the Courts do not accept the government's mere assertion that the action is necessary as a means to an end. *Miller v. Johnson*, 515 U.S. 900, 922 (1995). Indeed, "the history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis." *Id*; A001028.

---

[4]     As this Court will come to understand is the pattern, the Executive and the Judiciary have overreached to fill gaps in the Congressional record that the law does not permit them to fill.

Instead, the Courts insist that Congress articulate "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236. "The test ensures that the means chosen 'fit' the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Adarand*, 515 U.S. at 226; *Croson*, 488 U.S. at 493 (plurality op. of O'Connor, J.).

## 1. The 1978 enactment documents state that the purpose is to increase business ownership

The legislative documents expressly articulate a purpose that does not "fit" section 8(a)'s racial classification. The 1978 enactment documents[5] show that Congress' goal in enacting section 8(a)'s racial classification was "developing businesses owned by socially and economically disadvantaged persons" and "to increase the level of business ownership by minorities so that they would have a better opportunity to materially share in the competitive free enterprise." A002214.

> The bill is designed to foster business ownership by socially and economically disadvantaged persons and to promote the viability of businesses run by such persons by providing contract, financial, technical and management assistance.

A002214.

The conference committee report is forthright that section 8(a)'s racial classification will not remedy any alleged discrimination. Rather, "the procurement

---

[5]     A001029; A002199; A003214; A03244; A004193; A004196.

15

authority under section 8(a) of the Small Business Act will be used *only* as a tool for helping to develop these businesses." A003264. The conference committee report further states that section 8(a)'s racial classification "will be used *solely* for economic and business development" of 8(a)s. A003265 (emphasis added). That is not a constitutional compelling interest. *Kornhass Constr. v. Oklahoma*, 140 F. Supp. 2d 1232, 1240 (W.D. Okla. 2001) (holding that statutory racial classification based solely on encouraging development of minority businesses per legislative statement of intent was not based on past discrimination, and therefore, in light of prevailing Supreme Court case law, lacked a justifiable compelling interest).

## 2. None of the other legislative documents vary the purpose stated in 1978 or supply a valid compelling interest.

### a. *Not the pre-1978 documents*

No contrary purpose is stated in the pre-1978 legislative documents because those documents, by definition, do not address section 8(a)'s racial classification. In any case, none of the pre-1978 documents in the record[6] merit consideration by the Court, because reliance on institutional memory to fill evidentiary gaps is illegitimate under strict scrutiny and error by the district court.[7] A001036.

---

[6]    A001036; A002431; A002468; A002783; A002827; A002866; A004200; A004637; A004728.

[7]    Whether or not reliance on institutional memory was wrong before, the rules indisputably changed after *Adarand*. *See Adarand*, 515 U.S. at 237 ("[O]ur decision today alters the playing field in some important respects. . . The Court of Appeals, following . . . *Fullilove*, analyzed the case in terms of intermediate scrutiny. . . . The

The use of purported institutional memory, rather than legislative documents pertaining to the enactment itself, is standardless, and runs afoul of basic strict scrutiny requirements mandating that the necessary evidence of justification be before Congress at the time of enactment and be directly connected to the specific racial classification being adopted. *Adarand*, 515 U.S. at 229; *Shaw*, 517 U.S. at 908 n.4; *Rothe Development v. Dept. of Defense*, 262 F.3d 1306, 1327 (Fed. Cir. 2001) (*Rothe III*); *Rothe VII*, 545 F.3d at 1039.

### b. Not the 1980 amendment document

Congress added Asian Pacific Americans as a socially disadvantaged group to section 8(a)'s racial classification by amendment in 1980. Pub. L. No. 96-302, § 118, 94 Stat. 833 (1980). A001044. Congress did not vary the purpose from 1978. A003274.

### c. Not the 1988 amendment documents

Congress amended the Small Business Act in 1988.[8] Pub. L. 100-656, 102 Stat. 3853 (1988). This was not a reauthorization that was "equivalent to simultaneously allowing a statute to lapse and re-enacting it." *Rothe III*, 262 F.3d at

---

Court of Appeals did not decide the question whether the interests served . . . are properly described as 'compelling.' "); *see also Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) (recognizing "but the Supreme Court has since required more" than institutional memory).

[8]    A002249; A006179; A006540.

1322 n.15; A001044. However, it did touch upon some portions of section 8(a)'s racial classification, including the goal. A002281-A002283.

In 1988, Congress was still articulating the purpose of the statute as "the major source of business development and government contracting for the nation's minority business community." A002283. There were also some hearing witnesses who characterized the goal of the statute as the offset of past discriminatory effects, through the creation of competitive minority-owned businesses. A006395.

### d. Not the pre-1988 amendment documents

None of the pre-1988 documents[9] merit consideration for the same institutional memory reasons, *supra*, Part III.B.2.a. A001045.

Even so, in those documents, Congress referred to section 8(a)'s racial classification solely as an offset to racially balance the economy as a whole. A005715 (purpose "*to help offset* the economic disadvantage") (emphasis added). A004092. (purpose "*to correct the imbalance* caused by discrimination") (emphasis added).

### 3. Increasing business ownership by race is racial balancing

The legislative documents cited above confirm that, at most, the purpose of section 8(a)'s racial classification is to *offset* or racially balance alleged societal

---

[9]     A003274; A003282; A003345; A003658; A004075; A004940; A005558; A005740; A005902.

18

discrimination from other sources besides the actual award of government contracts by federal, state, or local governments. A002214 ("minority small businesses have had an especially difficult time in fully participating in the economic system"). Because section 8(a)'s racial classification is not connected to discrimination of any kind, it is unconstitutional. *Croson*, 488 U.S. at 498 & 505; A001033.

Thus, instead of identifying and eliminating racial injustice at its sources, Congress established an arbitrary level of compensation to counterbalance prior societal wrongs. Such racial balancing has been, and will always be, unconstitutional. *Parents Involved*, 551 U.S. at 729-732 ("We have many times over reaffirmed that "racial balance is not to be achieved for its own sake" and "remedying past societal discrimination does not justify race-conscious government action.").

### 4. Congress's stated purpose for section 8(a)'s racial classification lacks even a proximate connection to a remedy for racial discrimination

The legislative documents show that Congress did not articulate "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236; A000523-A000551; A001033-A001035.

Here, there is nothing close to even proximate cause, which requires the causal factors and the result to be reasonably foreseeable. *Paroline v. United States*, 134 S.Ct. 1710, 1719 (2014). Instead, "the causal link between conduct and result is so

19

attenuated that the consequence is more aptly described as mere fortuity." *Id.*, *citing Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838-839 (1996).

The 1978 legislative documents do not state whether section 8(a)'s racial classification can create more minority businesses (and how). Only the intended effect, an offset to societal discrimination, is stated. That effect—which is not a compelling interest—is completely random, depending as it does on numerous business viability factors that section 8(a)'s racial classification cannot control or remedy. There is no connection between Congress' stated objectives and the statutory racial classification it enacted. A001035. Indeed, neither the statute nor the record contain any standards defining how or when the stated purpose of developing minority-owned businesses would be achieved as a result of section 8(a)'s racial classification.

Similarly, the effect of section 8(a)'s racial classification on alleged discrimination in the marketplace, if any (which is denied), is equally random. There is no connection between any alleged evidence of discrimination and section 8(a)'s racial classification as a remedy for such discrimination. Congress did not connect section 8(a)'s racial classification to specific identified discrimination in 1978, or at any time since, because that was not its stated objective. Congress' stated objective was "to increase the level of business ownership by minorities." A002212.

20

In a single sentence, the only conclusion of discrimination in the entire document, the 1978 Senate committee report "recognizes the pattern of social and economic discrimination that continues to deprive racial and ethnic minorities, and others, of the opportunity to participate fully in the free enterprise system." A002212. No specifics regarding the source or nature of the discrimination, nor any statistics defining the necessary scope of the remedy, were given.

The 1978 Senate committee report further directs the SBA to take into account "the historic past discrimination of minorities as a group in their efforts to participate in the free enterprise system" when firms apply to participate in the 8(a) program and obtain the benefits of section 8(a)'s racial classification.  A002213. But neither the report nor the statute contain any standards, particularly quantitative standards, for how this is to occur.

Finally, the statute's presumption of social disadvantage is expressly and exclusively based on administrative convenience and conclusory stereotypes contained in a House committee report. A003233-A003234 (extending across-the-board preference for "effective and uniform program administration" based on the allegedly "valid assumption that most minorities are disadvantaged in business.").[10]

---

[10]     As the conference committee report reflects, a proposed rebuttable presumption of social disadvantage was dropped from section 8(a)'s racial classification for the across-the-board, unrebuttable presumption in the House committee report. A003265-A003266. The presumption of economic disadvantage

*Cf. Croson*, 488 U.S. at 508 ("the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification"), *citing Frontiero v. Richardson*, 411 U. S. 677, 690 (1973) (plurality opinion) ("[W]hen we enter the realm of 'strict judicial scrutiny,' there can be no doubt that 'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality.")

Nor did Congress, in the text of the statute or in its findings, *connect* section 8(a)'s racial classification, which applies to the award of federal prime contracts, to remedying discrimination in the actual award of prime contracts by any level of government—federal, state, or local.

There is no compelling interest in federal agencies using a racial classification of their own to counterbalance the direct discrimination of only state or local entities, as opposed to addressing such discrimination head on, through a remedy with the requisite "exact connection" to the problem. *Croson*, 488 U.S. at 505 ("We have never approved the extrapolation of discrimination in one jurisdiction from the experience of another").

---

remained rebuttable in the conference committee report and in the final bill. A003264.

22

Instead, Congress has focused on a problem much further removed from the award of federal contracts, the business ownership and participation rates of minorities in the economic system as a whole. A002212, A002214, A003265. Far from the "most exact connection" required by *Adarand*, 515 U.S. at 226 & 236, the lack of causal relationship here invites the stereotypes, conclusory statements, and invocations of bureaucratic convenience that pervade the House committee report's attempt to justify the presumption of social disadvantage. A003233-A003234. Section 8(a)'s racial classification does exactly what its sponsors said it would not, functioning "merely to channel contracts at a random pace to a preconceived group of eligibles for the sake of social or political goals." A004197; A003265-A003266; *but see* A004194 (admitting that "since 1969, the 8(a) program has been used as the primary method of the Federal Government to channel its contracts to the socially and economically disadvantaged.").

## C. *Relief Requested*

Congress did not state a valid compelling interest in the legislative documents or make the requisite "most exact connection" between the purpose it did state and identified discrimination. *Croson*; *Adarand*. The district court's failure to even acknowledge Congress's actual stated purpose and adoption of a *post hoc* litigation purpose was error. *Railway Express Agency, Inc.*; *Shaw; Virginia*. This Court should render judgment for Rothe.

23

# IV. POST-ENACTMENT EVIDENCE

## A. Summary

All of Defendants' statistical data, including expert reports, post-date the 1978 enactment and the 1980 and 1988 amendments.[11]  Congress never relied on that data to formulate section 8(a)'s racial classification. Nor has Congress provided any mechanism or formula to connect that data to the operation of the racial classification. These are two of the fundamental flaws that render section 8(a)'s racial classification facially unconstitutional. A000526,A000546.

To divert attention away from what Congress failed to do in the statute, the district court improperly admitted and credited Defendants' post-enactment evidence, including expert reports. A000037-A000046; A000060. This was error, for at least three reasons. A000172-A000174; A000526-A000531; A001046-A001052.

---

[11]     Defendants rely on post-enactment documents submitted to Congress at random times, and in some cases even for the reauthorization of other statutes. *See e.g.*, A007480. For reasons that should be obvious, A001046-A001047, such documents cannot be relied on to justify section 8(a)'s racial classification. There is no purpose stated for the "data dumps" of disparity studies nor recommendation for their use.  They serve only Defendants' post-hoc litigation position, and must be rejected.

First, post-enactment evidence is irrelevant. It is of no consequence in determining an action and does not tend to make a fact more or less probable than it would be without the evidence. Fed. R. Evid. 401.

Second, even if relevant (which is denied), post-enactment evidence is inadmissible because the United States Constitution provides otherwise, pursuant to Supreme Court case law. Fed. R. Evid. 402, and cases cited *infra*, Part IV.B.2.

Third, even if admissible (which is denied), that same Supreme Court case law considers only evidence before Congress to be probative under strict scrutiny. *Id*.

The district court paid lip service to Supreme Court case law requiring the alleged evidence justifying section 8(a)'s racial classification to be before Congress at the time of enactment. A000040. The district court failed to acknowledge that same case law had any impact on the relevance, admissibility, or probative value of Defendants' post-enactment evidence. Indeed, the district court focused only on relevance and failed to analyze admissibility and probative value entirely. A000040.

B. *Grounds for Reversal*

**1. Post-enactment evidence is irrelevant**

Post-enactment evidence cannot be "of consequence in determining the action" within the meaning of Fed. R. Evid. 401. Post-enactment evidence has nothing to do with the actions Congress actually took based on the record before it

at the time. Those actions are reflected in the text of the statutory racial classification itself.

Further, post-enactment evidence lacks probative value under Fed. R. Evid. 401. It does not have "any tendency to make a fact more or less probable than it would be without the evidence." *Id*. The legal inadequacy of the evidence before Congress cannot be varied, cured, or altered by the Defendants or their agents in litigation. The Defendants' burden is to show whether that record, not some other record they create *post hoc*, satisfies strict scrutiny or not. *Shaw*, 517 U.S. at 909-910; *Rothe VII*, 545 F.3d at 1036 (noting that Defendants "first bea[r] a burden to produce strong evidence supporting the legislature's decision to employ race-conscious action.").

## 2. Post-enactment evidence is inadmissible because the Constitution provides otherwise

For analogous reasons, post-enactment evidence is inadmissible pursuant to the Constitution. Fed. R. Evid. 402. For constitutional claims, when analyzing legislatively-enacted racial classifications under strict scrutiny, the Supreme Court has explicitly limited its discussion of the evidence to the record before the legislative body at the time of enactment:

> *The institution that makes the racial distinction* must have had a "strong basis in evidence" to conclude that remedial action was necessary, "*before* it embarks on an affirmative action program."

*Shaw*, 517 U.S. 899, 910 (emphasis in original), *quoting Wygant*, 476 U.S. at 277.

> [T]he *legislature* must have had a strong basis in evidence to support [the] justification before it implements the [racial] classification.

*Shaw*, 517 U.S. at 908 n.4 (emphasis added).

With respect to federal statutory racial classifications, the Supreme Court has spoken exclusively in terms of Congress, and no other branch:

> *"Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute."* . . . "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification" . . . These passages make a persuasive case for requiring strict scrutiny of *congressional* racial classifications.

*Adarand*, 515 U.S. at 229 (emphasis added); *see also id.*, 515 U.S. at 229 (requiring that "the reasons for any such classification *be clearly identified* and unquestionably legitimate").  Here, the legislative record provides neither a clear identification of discrimination nor legitimate evidentiary support.

The Supreme Court recently reiterated that the definitional responsibility for remedial racial classifications in federal statutes rests on the shoulders of Congress alone, at the time of enactment and reauthorization. *Shelby County v. Holder*, 133 S.Ct. 2612, 2631 (2013) ("Congress could have updated the coverage formula at that time, but did not do so. Its failure to act leaves us today with no choice but to declare § 4(b) unconstitutional.") (emphasis added).

27

> *Congress* must ensure that the legislation it passes to remedy that problem speaks to current conditions.

*Shelby County*, 133 S.Ct. at 2631 (emphasis added).

These cases state a Constitutional rule, enforceable under Fed. R. Evid. 402, to render post-enactment evidence inadmissible.

### 3. Post-enactment evidence lacks probative value under strict scrutiny

Rothe incorporates the discussion from Part IV.B.2, *supra*, by reference in this section.

Alternatively, even if the cases cited in Part IV.B.2, *supra*, do not state a Constitutional rule, they hold that post-enactment evidence is not probative under strict scrutiny.

> Thus, *Shaw* makes clear that the quantum of evidence that is ultimately necessary to uphold racial classifications must have actually been before the legislature at the time of enactment. In light of *Shaw*, we conclude that if the pre-reauthorization evidence is insufficient to maintain the program when the program is challenged as reauthorized, the program must be invalidated, regardless of the extent of post-reauthorization evidence. When a program that has been reauthorized is challenged, all evidence available to the appropriate legislative body prior to reauthorization must be considered in assessing the program's constitutionality. Requiring a 'strong basis in evidence' before the legislature enacts or reauthorizes a racial classification is essential for verifying that a program is truly "remedial" in design.

*Rothe III*, 262 F.3d 1306, 1327-1328 & n.20, *citing Croson*, 488 U.S. at 493 (plurality op., O'Connor, J.), *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 738 (6th Cir. 2000); *see also Rothe VII*, 545 F.3d at 1039 ("For

evidence to be relevant in the strict scrutiny analysis, it must be proven to have been before Congress . . . It would be error for the district court to rely on studies without a finding that they were put before Congress").

The Supreme Court's decision in *Shelby County* is an object lesson for this Court that post-enactment evidence lacks probative value. A panel of this Court made an obvious grasp at post-enactment evidence to make its own judicial findings—never made by Congress—to justify the coverage formula that triggered the remedial provisions of the statute. *See Shelby County v. Holder*, 679 F.3d 848, 877-878 (D.C. Cir. 2012) (overreaching to consider additional cases of alleged discrimination in expert report that was completed after statute was reauthorized and that was not included in legislative record) and *id*. at 880 (flippantly asserting that "we consider all probative record evidence of recent discrimination" without acknowledging Supreme Court precedent that the evidence must have been before Congress in order to have probative value at all), *rev'd* 133 S.Ct. at 2631. The panel was soundly rebuffed by the Supreme Court. *Compare* 679 F.2d at 878 (citing purported reliance on post-enactment evidence in *Tennessee v. Lane*, 541 U.S. 509, 524-25 nn.6-9 & 13 (2004)), *with* 133 S.Ct. at 2625 ("Those conclusions *are not ours alone*. *Congress* said the same when it reauthorized the Act in 2006. . .") (emphasis added), *id*. at 2629 (instructing that the Court cannot "try [its] hand at updating the statute [it]sel[f]"), and *id*. at 2631. The Supreme Court measured

29

Congress's use of race in the coverage formula against the record Congress had, and did not allow the litigants to invent a new record with post-hoc evidence offered by the Executive or others. *Shelby County,* 133 S.Ct. at 2629 & 2631. Neither the Supreme Court majority nor the dissent even *discussed* the panel's post-enactment evidence. *Cf.* A000041.

The legitimacy concerns identified by the Supreme Court in *Adarand* and quoted above, 515 U.S. at 229, illustrate precisely why *post hoc* findings by the Judiciary and Executive are illegitimate and inadmissible and lack probative value— they reflect contempt for the separation of powers to further a politically preferred outcome. That was the problem with the panel's overreaching in *Shelby County* and it is the problem with the district court here.

Admitting post-enactment evidence for the purpose of demonstrating a compelling interest in enacting a statutory racial classification results in an end run around the cursory, deficient record that Congress considered. A000528. It allows for a perpetual moving target of post-enactment evidence selected and created by the Defendants themselves. That displaces Congress' constitutional responsibilities and makes Congress unaccountable. It also perpetually obfuscates the statutory racial classification from meaningful Judicial review because the Executive's moving target of post-enactment evidence has no Congressionally approved baseline. *See Rothe VII*, 545 F.3d at 1049-1050 (lack of baseline prevents effective judicial review

of statutory racial classification, particularly whether its goal is narrowly tailored, rendering it unconstitutional). Congress cannot identify when to stop the program it if it did not articulate the starting point, which it did not.

Fundamentally, the bar to post-enactment evidence is about establishing a baseline at the time the racial classification is enacted and verifying that a program is truly remedial in design. *Croson*, 488 U.S. at 493; *Rothe VII*, 545 F.3d at 1049-1050; A001050. Stated differently, the baseline is necessary to determine if the presumption or identification of the classified races, the goal, the definition and amount of preference afforded by the racial classification, and its temporal and spatial scope, are all exactly connected to a valid remedial purpose that is identified by Congress and narrowly tailored. *Id.*; *see also Wygant,* 476 U.S. at 294 (holding that a plaintiff's demonstration that a racial classification is "keyed to a . . . goal that itself has no relation to the remedy" is enough to show unconstitutionality).

Executive selection of post-enactment evidence cannot set the baseline for race-based remedial action, and it cannot update the baseline. *Croson*, 488 U.S. at 493; *Rothe VII*, 545 F.3d at 1049-1050; *Rothe III*, 262 F.3d at 1327; A001050. The disparity study and other statistical data change constantly and Defendants themselves, in their own selection process, have not set a baseline and have no means to update the studies themselves. Defendants are dependent on the local and state disparity study industry to continue to produce studies, at random intervals, and then

31

have no means or standards to measure remedial progress or lack of progress from one study to the next, even in the same jurisdiction, but especially not in the federal jurisdiction required here.[12] Nor is there any mechanism to address which studies Defendants elect to rely on. Studies from inconvenient jurisdictions or jurisdictions that become inconvenient over time can too easily be ignored or discarded.

When it enacts a statutory racial classification, Congress is also required to narrowly tailor the statute to the evidence before it. *Shaw*, 517 U.S. at 915 ("Where, as here, we assume avoidance of § 2 liability to be a compelling state interest, we think that *the racial classification would have to realize that goal*; *the legislative action must, at a minimum*, remedy the anticipated violation or achieve compliance to *be narrowly tailored*."); A000529.

Executive actors cannot narrowly tailor a Legislative act with post-enactment evidence. *Shaw*, 517 U.S. at 917 (rejecting argument that legislative redistricting act is narrowly tailored "as long as racially polarized voting exists where the district is ultimately drawn" even if that is not the same location as the data that served as a "strong basis in evidence" and "compelling interest" for the redistricting act at the time of enactment). The statute, on its face, cannot and does not become more or

---

[12]    The disparity studies cannot even be reconciled with one another. A000538-A000540. For the same reason, a disparity study arms race between the parties would be irrelevant.

less narrowly tailored based on fluctuations in post-enactment evidence that the Executive collects solely for the purpose of defending litigation or any other purpose. *Shelby County*, 133 S.Ct. at 2627 & 2629 (statutory coverage formula tailors race-based remedy to jurisdictions exhibiting cause and effect of discrimination; the Court cannot "try [its] hand at updating the statute [it]sel[f]" with post-enactment evidence).

### 4. The district court's other arguments are unpersuasive

#### a. The age of the statute does not permit post-enactment evidence

It is no answer that the statute is old. The Supreme Court changed the rules in *Croson* and *Adarand*. Just as in *Shelby County*, Congress has failed to act to come into compliance, even after the Federal Circuit struck down a procurement statute involving these same Defendants in 2008. *Rothe VII*.

#### b. Supreme Court case law controls over the Courts of Appeals

Rothe distinguished the cases that the district court relied on, which yield to the Supreme Court precedent cited above. A000250-A000251; A000530; A001051. The district court's cases all either predate or rely on precedent that predates *Adarand* and *Shaw*, or involved plaintiffs that did not challenge post-enactment evidence. *Id*.

33

*c. None of Defendants' statistical disparity data is submitted in the SBA reports*

Further, Congress certainly does not "review the 8(a) program on a continuing basis." *Cf.* A000041. The district court points to various SBA annual reports that they submit, *id.*, but there is no evidence that Congress does anything relevant with these reports. Defendants do not submit disparity study or other statistical data of the type they rely on to *post hoc* justify a compelling interest in the enactment of section 8(a)'s racial classification as part of the these annual reports. Thus, there is no inquiry of any kind, by Congress or in the reports themselves, into whether section 8(a)'s racial classification is remedying anything (and if so, how, where, and to what degree), whether it should continue as presently structured, or whether it should be modified to conform to actual data. A001082.

*d. The district court admits that post-enactment expert reports are unnecessary*

The district court in *Dynalantic* made its own post-enactment judicial findings without relying on any aggregation of disparity studies or *post hoc* report from any expert. *Dynalantic* made findings that Congress never has—and certainly malfeasance of that degree must be rejected—but *post hoc* experts would not have cured that error.  Yet the district court here adopted those same findings. A000059. That action, while itself erroneous, also shows that no post-enactment expert reports were necessary. Accordingly, they should have been excluded.

Instead, the district court attempts to muddy the waters by selectively citing a portion of a proposed schedule that predated the parties' motions in limine, to insinuate that Rothe somehow agreed to post-enactment experts. A000030. This defies logic. A review of the entire document cited by the district court reveals Rothe's argument that *none* of Defendants' post-enactment discovery was necessary.[13] A000136-A000138. However, because Defendants were going to produce post-enactment expert reports *regardless* of whether the Court granted them additional post-enactment discovery, Rothe mentioned that in the proposed schedule. A000138. There is no concession that such experts were proper, relevant, admissible, or probative, and certainly no waiver, as demonstrated by the subsequent motions in limine and summary judgment briefs. A000171-A000174; A000526-A000531; A001046-A001052. This Court cannot constitutionally accept insinuations of such a spurious nature as those alleged by the district court regarding the claims in this case, where Defendants seek to discriminate one citizen against another.

---

[13]    Rothe consistently and repeatedly argued that (a) post-enactment experts were unnecessary, but that if such experts produced reports, then (b) in the alternative, Rothe could move for exclusion and challenge those expert reports, including with rebuttal experts. A000135-A000141, A000171, A000231. That is exactly what occurred.

*C. Relief Requested*

None of the legislative documents through the 1988 amendment contain any statistics that comply with strict scrutiny. *Croson*, 488 U.S. at 501 & 507-508; *Rothe VII*, 545 F.3d at 1047-1048. They are therefore insufficient as a matter of law to serve as a strong basis in evidence for section 8(a)'s racial classification. *Croson*, 488 U.S. at 501-503 & 509; *Rothe VII*, 545 F.3d at 1036-1048.

Without post-enactment evidence, Defendants lack the statistical data necessary to meet their burden of production under strict scrutiny. *Id.* Accordingly section 8(a)'s racial classification lacks a compelling interest and cannot be narrowly tailored on this record, and this Court should render judgment for Rothe.

# V. CAUSALITY

*A. Summary*

Defendants do not directly or passively participate in discrimination. Thus, there is no relationship between the federal statute (section 8(a)'s racial classification) and the post-enactment local and state disparity data that Defendants have produced in this litigation to justify it.

That causal gap is yet another fundamental reason that section 8(a)'s racial classification is facially unconstitutional (even if the post-enactment evidence is allowed, which it should not be).

36

The Rubinovitz reports cannot bridge that causal gap. And neither Congress nor Defendants have, nor can they provide, the necessary causal connection, at any stage of the analysis.

Although the causality issue was the centerpiece of Rothe's argument, A000523-A000551, A001039-A001043, A001075-A001084, the district court ducked and hid from it, relying entirely on an adoption-by-reference of the district court's decision in *Dynalantic*. A000059. That was error. The causality issue is not addressed in *Dynalantic*.

Dispositive of this appeal, the Supreme Court has since adopted Rothe's argument for a "robust causality requirement" that ensures that evidence of "a defendant's policy or policies causing that disparity" is a prerequisite for a successful claim of (and thus, implicitly, any race-based remedy for) disparate impact discrimination. *Texas Dept. of Housing and Cmty Affairs v. Inclusive Communities Project, Inc*., 135 S.Ct. 2507, 2523 (2015) (*Texas DHCA*); A000523. The missing causal link between the post-enactment disparity data and Defendants' own procurement has vast consequences, which Rothe catalogued, and which the district court ignored. *See Rothe VII*, 545 F.3d at 1048 ("This lacuna is quite significant").

### B.  Grounds for Reversal

#### 1.  All data preceding the most recent decade is stale

Staleness "relates to whether the data itself is 'outdated,' . . . not [to] whether Congress was aware of the data." *Rothe VII*, 545 F.3d at 1032. In *Rothe VII*, reports that were 8, 9, and 10 years old at the time of the most recent reauthorization in that case were held to be stale by the district court, and Defendants did not challenge that finding on appeal. *Rothe VII*, 545 F.3d at 1037. Thus, all of the legislative documents in this case (including statistics or statistical studies or reports referenced therein) that precede the most recent decade are stale and of no probative value. A001046; A001183-A001185. The district court failed to address Rothe's staleness argument with regard to Defendants' alleged evidence.

#### 2.  There is no evidence of direct discrimination by Defendants

Defendants have admitted to two district courts and the Federal Circuit that there is no non-stale evidence of ongoing systematic, nationwide discrimination by Defendants or federal, state, or local government contracting officers generally in the award of contracts. A001005-A001006; *Dynalantic v. Dept. of Defense*, No. 95-CV-2301-EGS, Doc #178-3 ¶¶ 108-09, 111-12 (Pl's Statement of undisputed material facts) & Doc #191 at 75 (Defs Resp. to Pl's Statement of undisputed material facts at p. 14); *Rothe VII*, 545 F.3d at 1048-1049. Defendants have offered no contrary evidence here. The district court failed to see this as a problem.

### 3. There is no evidence of passive participation in discrimination by Defendants

Because there is no evidence of direct discrimination by Defendants, passive participation is a required finding that Congress must make for a compelling interest to exist. *Croson*, 488 U.S. at 486-92, 500 (government bears the burden of demonstrating a "strong basis in evidence for its conclusion that remedial action was necessary" by showing either that the government itself discriminated in the past or was a passive participant in private industry's discriminatory practices), *id*. at 497 (under either theory, "*findings* of a constitutional or statutory violation must be made.") (emphasis added); *see also Associated General Contractors of Ohio*, 214 F.3d at 735 (same). Congress has failed to make that finding. Nor is a passive participation theory supported by post-enactment evidence. A000531; A001039.

#### a. *Defendants do not passively finance discrimination every time they participate in the economy*

Alleged barriers to competitive access to the economic system as a whole[14] do not establish Defendants' passive participation in discrimination. A001039. Defendants assert that:

1. The economy as a whole is excluding races benefitted by section 8(a)'s racial classification through barriers to access;

---

[14] *E.g*., A002441-A002442 (lack of access to capital and lack of business experience); A002681-A002682 (same); A004232-A004233 (inability to obtain surety bonds); A000776-A000803.

2. The federal government is potentially[15] passively participating in that exclusionary, discriminatory economic system—otherwise known as the American economy—every time it procures a good or service in the nationwide marketplace; and

3. Therefore, Defendants experience lower participation rates by minority contractors and subcontractors in their procurement.

A000523-A000524; A000768 ("Indeed a key rationale for the advent of public sector programs was public entities' need to avoid becoming passive participants in *economy-wide* private sector discrimination.") (emphasis added).

These alleged barriers are not equivalent to racial discrimination in the award of any government contract, much less a federal government contract. The record does not show that Defendants' procurement makes the alleged barriers *worse* or even affects the barriers at all. Defendants never disaggregate these alleged barriers from the economy as a whole and tie them specifically to government contracting at any level.  A000804 (concluding "these disparities therefore are consistent with the presence [of] discrimination in the business market.").

b. *Section 8(a)'s racial classification targets the symptom rather than the cause, which is too attenuated*

The alleged barriers are exogenous factors alleged to exclude firms *from* the economy as a whole and any specific industry within it (and thus *from* the

---

[15]     Terms like "potentially," "consistent with," "goal of economic development" or to substantially improve the economic position," and other such generalizations do not comport with strict scrutiny's requirement for Congress to specifically identify discrimination. *Croson*, 488 U.S. at 504; *Rothe VII*, 545 F.3d at 1036.

government contracting marketplace), rather than discrimination arising from *within* any specific government contracting program at any level of government, or even from *within* any specific private contractors. A001041.

Thus, Defendants' position is that procurement agencies are not truly alleged to passively finance the alleged discriminators, but rather the incidental beneficiaries of the alleged discriminators, whom the alleged discriminators are said to insulate from minority competition by acting as industry gatekeepers. That is not enough to show Defendants passively participate in discrimination. *Croson*, 488 U.S. at 499 (historical exclusion of blacks from skilled construction trade unions and training programs by industry gatekeepers is not "identified discrimination" justifying racial classification in government procurement); *Adarand*, 515 U.S. at 236 (requiring the "most exact connection" between evidence of justification and racial classification); *Texas DHCA,* 135 S.Ct. at 2523 (requiring causal connection to Defendants' own policy). Rather, Defendants' position should be rejected because it is in direct conflict with *Croson*, *Adarand*, and *Texas DHCA*, *supra*, and implicitly seeks to overrule those cases.

Using section 8(a)'s racial classification to set aside federal prime contracts as a means to target such alleged barriers addresses the incidental beneficiary rather than the alleged discriminator. It targets the symptom rather than the cause. It is too far removed from the required exact connection to remedying prior discrimination

41

by the governmental unit involved. *Adarand*, 515 U.S. at 236; *Croson*, 488 U.S. at 492. There is not even proximate cause. *Paroline*, 134 S.Ct. at 1719; *Exxon Co., U.S.A.*, 517 U.S. at 838-839.

Setting aside contracts for award pursuant to section 8(a)'s racial classification *temporarily* circumvents an alleged barrier to participation in the economy, for the life of the contract, without eliminating the barrier. Even to the extent that an 8(a) award makes it easier for a firm to participate in the economy in the future, such as by providing a record of past performance that would make it easier to obtain bonding, that merely indicates that the alleged barriers were not in fact rooted in racial discrimination to begin with.

The carve-out for passive participation as a basis for race-based remedial action in *Croson* is limited to "a system of racial exclusion practiced by elements of [a specific] industry," which receives funds directly from the procuring agencies. *Croson*, 488 U.S. at 492. Passive participation cannot be extrapolated to amorphous multi-factor exclusion from the economy as a whole, to third-party transactions involving industry gatekeepers.[16] A001042; *Croson*, 488 U.S. at 499.

---

[16]     Congress of course has the power to address alleged discrimination by industry gatekeepers head-on, through a different means than section 8(a)'s racial classification. It is the requirement of an exact nexus that bars the means chosen here. *Adarand*, 515 U.S. at 226 & 236; A001473,A001503; Days, *Fullilove*, 96 YALE L.J. 453, 483 (1987).

> c. *There is no evidence section 8(a)'s racial classification can remedy alleged barriers to entry to the economy as a whole*

Moreover, even if the Court were to extrapolate "passive participation" to the economy as a whole, there is no evidence in the record that federal agencies are competent to remove these alleged barriers through the award of their own prime contracts. A001043. Congress never made that connection. There is no evidence that section 8(a)'s racial classification can or does impact the alleged barriers. *See Parents Involved*, 551 U.S. at 744 (requiring "evaluation of the actual impact" by enactors of racial classifications to "sho[w] that these racial classifications are necessary to achieve the . . . stated goals."). This renders the alleged barriers unable to be remedied by section 8(a)'s racial classification except by sheer chance, as admitted by Defendants' own expert:

> These public sector programs, standing alone, will not solve the problem of business discrimination.

A007244 (Testimony of Jon Wainwright).

## 4. There is no causal connection between the post-enactment data and Defendants' own procurement programs.

With the exception of the Robert Rubinovitz reports, all of Defendants post-enactment litigation position statistical disparity data is local and state data. None of it is from their own procurement programs.

*Disparity* data is not, standing alone, evidence of *identified discrimination* that can support a race-based remedy in Defendants' federal procurement. *Shaw*, 517 U.S. at 909 ("the discrimination must be 'identified discrimination.'"); *Croson*, 488 U.S. at 499, 500, 504, 505, 507 & 509. The alleged compelling interest that the Defendants assert for section 8(a)'s racial classification remedies is nothing less than a claim of disparate impact discrimination against the economy as a whole. Yet it is uncontested in the record that Defendants have not themselves engaged in such discrimination. Thus, Defendants do not allege that discrimination by the federal government is causing the disparities in the federal data in the Rubinovitz reports. Defendants allege the federal data reflects the effect of discrimination in the nationwide marketplace. But they cannot point to a federal policy of discrimination that is causing the state or local disparities, nor can they point to reliable specific allegations of federal discrimination. *Texas DHCA*, 135 S.Ct. at 2523. Accordingly, Rothe's arguments to exclude or afford no weight to the Rubinovitz reports should have been sustained. A000176-A000178.

> a. *The Rubinovitz reports do not bridge the causal gap between Defendants' local and state data and their own federal procurement programs.*

The original Rubinovitz report compares his estimates for "the odds of winning a contract for [small disadvantaged businesses (SDBs)] not participating in the 8(a) business development program . . . relative to the odds of winning contracts

by firms that were not identified as SDBs." A000918. That comparison might answer whether the 8(a) program increased the odds of federal contract awards for SDBs in FY 2012. But it does not answer whether there was discrimination by the federal government.[17]

The additional Rubinovitz report compares his estimates of "contracting outcomes for non-8(a) minority-owned SDBs compared to all other small businesses." A000944. This additional report is essentially the complement of the first, and unsurprisingly the result follows from the first, i.e., if the 8(a) program increases the odds of a contract award to a minority owned SDB firm, in his view, then the more competitive setting outside of the 8(a) program would tend to have less favorable odds.

Thus, the Rubinovitz reports deal in disparities in federal contract awards, but are not linked to discrimination in any way. The comparisons that he makes, even limited as they are to FY 2012, are not the ones required to infer discrimination under the *Croson* dicta, which reads:

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.

---

[17]     Nor does it answer whether, for which races, where, and to what degree the 8(a) statute was affecting local and state disparity data.

*Croson*, 488 U.S. at 509 (emphasis added). That is because the *Croson* dicta require the statistically significant disparity to be coupled with anecdotal or other evidence of discrimination in order for the inference of discrimination to arise.[18] *Id.* at 509 ("evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified"); *see also Rothe VII*, 545 F.3d at 1046. The Defendants have not produced any anecdotal evidence for federal contracting in FY 2012 nor do Rubinovitz's reports refer to any.  The Defendants have also not produced any individual specific instances of discrimination by the federal government in its own contracting, particularly throughout the entire scope of Rubinovitz's comparison, which spans all industries where federal contracts were awarded in FY 2012.

Rubinovitz's statistical disparities can only be relevant if they can bridge the gap to strong evidence of "identified discrimination" by satisfying the *Croson* dicta. But the Defendants have produced no evidence for him to bridge this gap to their local and state data with, and he cites none. His report should have been excluded or given no weight. Fed. R. Evid. 401(a)-(b).

---

[18]     Neither of the comparisons made by Rubinovitz purports to be an attempt to prove discrimination by statistical disparity alone. *See Croson*, 488 U.S. at 501 ("[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination under Title VII"). A000177. That case cannot be made on this record.

>     b.  *Defendants rely on an unconstitutional extrapolation to infer effects on their own contracting from alleged discrimination in local and state contracting.*

Even with the Rubinovitz reports, Defendants have to make an extrapolation, from those few local and state contracting markets and sectors they have alleged significant statistical disparities in, to infer discrimination nationwide, including in the predominant number of local and state contracting markets and sectors where there is contrary evidence in the studies themselves or no evidence of discrimination at all. A000541-A000545.

Defendants' extrapolation is unconstitutional because it "does little to define the scope of any injury to minority contractors . . . or the necessary remedy [and] could justify a preference of any size or duration." *Croson*, 488 U.S. at 505 ("[W]e have never approved the extrapolation of discrimination in one jurisdiction from the experience of another."). Any holding to the contrary would conflict with—and must yield to—*Adarand*'s requirement for "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236.

As a practical matter, given the random geographic and industry coverage of the Defendants' local and state disparity studies, the extrapolation is impossible to make. A000538-A000541 (discussing why a collective inference from the data is impossible); A001069-A001073; A000183-A000184.

47

Hiding behind *Dynalantic* and ducking Rothe's arguments, the district court made this unconstitutional extrapolation anyhow. A000057-A000059; A000541-000544. The extrapolation purports to justify an across-the-board racial classification that provides a perpetual preference in equal measure for all of the classified races, nationwide. *Id*. Accordingly, discrimination or the lingering effects thereof is erroneously inferred to cause every statistically significant disparity in local and state prime- and sub-contract awards. *Id*. This leads to a set of absurd inferences that are not justified by a strong basis in evidence:

(1) Every prime contract award by Defendants passively finances discrimination against all races;

(2) All of Defendants' prime contract awardees discriminate or have discriminated against subcontractors of all races, in equal measure, nationwide;

(3) All local and state project owners discriminate in the award of prime contracts; and

(4) All local and state prime contractors discriminate against subcontractors.

A000542. Such speculation of discrimination from the scant disparities is limitless and exceeds even the scope of Defendants' own procurement. Moreover, the speculation that local and state prime- and sub-contractors are an acceptable proxy for Defendants' own prime- and sub-contractors is dubious. *Rothe VII*, 545 F.3d at 1049 ("we are skeptical that this bare likelihood would be sufficient to establish DoD's "passive participation" in discrimination within the meaning of *Croson*").

### c. The district court also erred by ignoring other missing causal connections

There is no statistical evidence showing the effects on Defendants' procurement from the causal relationships they allege, because there are no benchmarks. A000545. Defendants attempted to collect this data in 1998, but they do not have it now. *Rothe VII*, 545 F.3d at 1037 & 1049-50.

Congress had no valid statistical yardstick for comparison in the original enactment, and still doesn't. A000547. Nor do any of the current regulations supply such a mechanism. Thus, "it is almost impossible to assess whether [the statute] is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way." *Croson*, 488 U.S., at 507.

The lack of benchmarks makes it impossible to determine whether the contracting goal contained in section 8(a)'s racial classification bears any relationship to the "share of contracts minorities would receive in the absence of discrimination." *Rothe VII*, 545 F.3d at 1049-50; A000546. This means that there is no causal relationship, whatsoever, between the statutory racial classification and a remedy for the alleged discrimination, such that by setting aside a certain percentage of prime or sub-contracts using the racial classification, the alleged discrimination would be remedied. In other words, the remedial effect of section 8(a)'s racial classification is speculative and entirely random. *See Wygant*, 476 U.S. 267, 294 (1986) (plurality) (O'Connor, J.) (holding that a plaintiff's demonstration that a

49

racial classification is "keyed to a . . . goal that itself has no relation to the remedy" is enough to show unconstitutionality).

Nor is there any anecdotal evidence that would suggest that participation *in Defendants' procurement programs specifically* was being adversely affected in the manner Defendants allege. *See Rothe VII*, 545 F.3d at 1048 (describing such omission as "significant."). A000546.

There is also no statutory duty or mechanism, and no identified data source in the original enactments, for Defendants to narrowly and flexibly tailor the use of the statutory racial classification in response to actual marketplace conditions (including in their own procurement programs). Section 8(a)'s racial classification is structurally impervious to fluctuations in the data throughout its entire scope. It cannot be flexible or limited in duration if its continued operation is divorced from any connection to relevant data. A000548.

In other words, Congress still cannot quantify the alleged lingering effects of Defendants' alleged "passive participation" in discrimination; nor can Congress measure the remedial impact of applying section 8(a)'s racial classifications to Defendants' section 8(a) contracts; thus, there is no feedback mechanism to update to narrowly tailor the statute and Defendants' use of its programs over time. Congress has never made such comparisons because it has never held hearings or

made findings regarding section 8(a)'s racial classifications that were supported by strong statistical evidence.[19]

Further, Congress made no finding that, if justified, the preferences in the statute and implementing regulations should be in the same equal proportion for every race or member of a racial group. A000549. As in *Croson*, the statutory racial classification's numerical goal has no relationship to the local and state data, nor could it. *Croson*, 488 U.S. at 508.

Finally, Congress has never revisited the required inquiry of whether race-neutral methods are appropriate, because the lack of causal relationships noted above deprive it of any means to answer that question. The only alleged evidence on point

---

[19]    There is no evidence that the local and state disparity studies cited by Defendants have any connection to any Congressional finding(s) with respect to the enactment or amendment of section 8(a)'s racial classification, because the studies were never before Congress. *Rothe VII*, 545 F.3d at 1038 ("we are hesitant to conclude that the mere mention of a statistical study in a speech on the floor of the House of Representatives or the Senate is sufficient to put the study "before Congress" for purposes of Congress' obligation to amass a "strong basis in evidence" for race-conscious action"); *Id.* at 1039-1040 ("Beyond their mere mention, there is no indication that these studies were debated or reviewed by members of Congress. . ."); *Croson*, 488 U.S. at 509 ("Proper findings . . . are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects.") (referring to "how many minority enterprises are present" in the relevant market; "the level of their participation" in the procurement program in question; and "evidence that qualified minority contractors have been passed over" for contracts or subcontracts, "either as a group or in any individual case."). The Court cannot "defer to Representatives . . . about the studies' probative value." *Rothe VII*, 545 F.3d at 1047 ("We cannot merely recite statements made by members of Congress alleging a finding of discriminatory effects and the need to address those effects. . .").

51

predates the 1978 enactment. A001081. The district court erred in holding that was

enough. A000058; *cf. Associated General Contractors of Ohio*, 214 F.3d at 737-738

("even if such data had been sufficient to justify the statute twenty years ago, it

would not suffice to continue to justify it forever.").

## C. Relief Requested

For all of the reasons stated in this Part, the Court should render judgment for

Rothe.

## VI. NONDELEGATION

## A. Summary

When it codified section 8(a)'s racial classification in 1978, Congress

purported to authorize defendant SBA to enact additional racial classifications—

specifically, to (1) determine whether an individual is "socially disadvantaged" such

that they "have been subjected to racial or ethnic prejudice or cultural bias because

of their identity as a member of a group without regard to their individual qualities,"

15 U.S.C. § 637(a)(5); and (2) to designate additional racial minority groups as

socially disadvantaged, 15 U.S.C. § 631(f)(1). Currently, "Black Americans,

Hispanic Americans, Native Americans . . . Asian Pacific Americans . . . and other

minorities" designated by the SBA[20] are presumed socially disadvantaged. 15 U.S.C. § 631(f)(1). [21]

Congress cannot delegate the power to racially classify. Alternatively, even if Congress can delegate it, the delegation here lacks the requisite intelligible principle. A000551-A000555; A001053-A001057.

The district court failed to completely address Rothe's argument on nondelegation, and erroneously ignored the aspects that it found inconvenient. A000062-A000065. Specifically, the attempt to delegate section 8(a)'s racial classification necessarily requires Defendants to determine for whom, and for how long, and to what degree preference should apply within a race. A000555. Thus, the nondelegation analysis does not end with the question of whether the SBA can define race (which Rothe argues it cannot). The analysis must also address why Congress provided no standards for the scope, extent, and term of the preference that corresponds to any race that the Defendants attempt to define and classify under the statute.

---

[20]     In 1982, the SBA determined that "Asian Indian Americans," now known as "Subcontinent Asian Americans" are a presumptively socially disadvantaged group. 13 C.F.R. §124.103(b). A000551-A000552.

[21]      "Indian tribes" and "Native Hawaiian Organizations" by law are not "racial" groups, and therefore are not part of section 8(a)'s racial classification. *Morton v. Mancari*, 417 U.S. 535 (1974). Rothe does not challenge the "Indian tribes" and "Native Hawaiian Organizations" classifications. A000072.

B. *Grounds for Reversal*

### 1. Congress cannot delegate the power to racially classify

#### a. *Strict scrutiny bars such delegations for the same reasons as post-enactment evidence*

"A delegation need not be tested in isolation as the statutory language may derive content from the purpose of the Act, its factual background, and the statutory context." *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30 (D.C. Cir. 2009). But the district court strenuously avoids any mention of the most important statutory context here, which is strict scrutiny. Strict scrutiny clearly constrains what can be lawfully delegated consistent with Article I, § 1 of the Constitution.

Promulgation of a racial classification by the SBA pursuant to such an open-ended delegation can never satisfy the Constitutional requirements of strict scrutiny, which require that the evidence in support of the racial classification be placed before Congress at the time of enactment. *See* discussion, *supra*, Part IV (barring post-enactment evidence). It follows that any attempt to delegate that evidentiary responsibility by statute would run afoul of strict scrutiny. Thus, Congress lacks the authority to delegate those powers at all.

An open-ended delegation of authority to enact racial classifications is unconstitutional, precisely because there is no evidence before Congress at the time of the purported delegation that could justify or tailor a racial classification for any group the SBA might subsequently determine is presumptively disadvantaged. The

Subcontinent Asian Americans classification has existed since 1982 and has never been in compliance with the strict scrutiny requirements of *Croson* and *Adarand*. The district court erroneously gave it a free pass.

### b. The Supreme Court has barred such delegations independently

To define discrimination against individuals on account of their race requires standards to define the terms of membership in a race. The district court holds that the SBA is empowered to define race according to the historical examples Congress specifically chose in the statute, which it claims provide an "intelligible principle." The Supreme Court expressly disagrees. *Schuette v. BAMN*, 134 S.Ct. 1623, 1634-35 (2014) (plurality op. of Kennedy, J.). If the Supreme Court felt that clear standards for racial classification currently existed within the statutes of the United States (and may they never), it would have said so. Instead, the Supreme Court said there are "*no clear legal standards or accepted sources* to guide" such a decision. *BAMN*, 134 S.Ct. at 1635 (emphasis added). Delegations of authority "providing *no standards* to constrain administrative discretion" are unconstitutional, and section 8(a)'s racial classification is no exception. *See Humphrey v. Baker*, 848 F.2d 211, 217 (D.C. Cir. 1988) (emphasis added). A000552.

### 2. Alternatively, the delegation here lacks any intelligible principle

> In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency. Article I, § 1, of the Constitution vests all legislative Powers herein granted . . . in a Congress of the United States. This text permits no delegation of

> those powers, and so we repeatedly have said that when Congress
> confers decisionmaking authority upon agencies Congress must lay
> down by legislative act an intelligible principle to which the person
> or body authorized to act is directed to conform. . . .Whether the
> statute delegates legislative power is a question for the courts.

*Whitman v. American Trucking Ass'n*, 531 U.S. 457, 472-473 (2001) (internal

citations omitted).

The 8(a) statute's definition (15 U.S.C. § 637(a)(5)) and presumption (15

U.S.C. § 631(f)(1)) do not provide the requisite "intelligible principle." Rather, they

provide no basis to even begin to define what constitutes a "racial," "ethnic," or

"other minority" group—nor should our laws ever contain such a definition—much

less determine how all of the members of such groups had "been subjected to racial

or ethnic prejudice or cultural bias because of their identity as a member." *See* 15

U.S.C. § 637(a)(5) (stating that definitional requirement).  The legislative documents

here admit that there is no such intelligible principle—only hope that SBA will come

up with standards where Congress has provided none:

> The conferees *intend*, and it is our purpose, that the primary
> beneficiaries of this program will be minorities. The criteria *should
> be* so interpreted. . . . [W]e hope that SBA will narrowly confine the
> use of the "cultural bias" test . . . .

A004194 (emphasis added). In turn, that points up the lack of standards to define the

scope, extent, and term of the 8(a) remedy that will attach to any racial classification

once it is promulgated by the SBA (and which have attached to the Subcontinent

Asian Americans classification since 1982).

56

Abdication of legislative responsibility is not delegation. The Constitutional safeguards of strict scrutiny, inherent in a properly documented legislative process that squarely and expressly considers the racial classifications being authorized, are subverted when a Court must guess what Congress meant by "other minorities" or "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities"—for whom, and for how long, and to what degree, etc. "The very choice of which portion of the power to exercise . . . would itself be an exercise of the forbidden legislative authority." *Whitman*, 531 U.S. at 473 (opinion of the Court); *see also id.* at 487 (Thomas, J. concurring) ("there are cases in which the principle is intelligible and yet the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative'").

The purported delegation to the SBA of the power to racially classify suffers from the same defects as the delegation in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418 & 430 (1935). It confers unlimited discretion to decide on the scope, extent, and term of the racial classification for the classified race just as the delegation in *Panama Refining* conferred unlimited discretion on the President to decide whether a state law had been violated. Nor does the delegation here require any factual findings.

57

### 3.  The delegation cannot rely on Executive authority to save it

#### a.  There is no Article II inherent power

Wholly Executive racial classifications, even if promulgated under maximum Article II powers, are unconstitutional. *Adarand*, 515 U.S. at 236 (maj. op.) (referring to historical approval of Executive classifications in Japanese internment cases as "another such error"); *id*. at 275 (Ginsburg, J. dissenting) ("Such a classification, history and precedent instruct, properly ranks as prohibited."). Because the naked exercise of Executive authority to classify by race would be unconstitutional today, *Adarand*, 515 U.S. at 236, it follows that Congress cannot delegate that same discretion in section 8(a)'s racial classification.

#### b.  Section 8(a)'s racial classification originated from unconstitutional Executive action

It follows from *Adarand* that there is no authority for the SBA to racially classify on its own. *Adarand*, 515 U.S. at 236. Indeed the statute was enacted in part to cure this very defect. Before, section 8(a)'s racial classification was purportedly promulgated solely by a 1968 Executive Order. The Senate committee report for the 1978 enactment admits:

> One of the underlying reasons for the failure of this effort is that the program has no legislative basis.

A002212. The record further admits that,

> the program [in the Executive Orders] was hastily contrived in reaction to the rather vocal demonstrations of that time. It was not

58

> intended to achieve any preconceived goal of economic
> development or to substantially improve the economic position of
> disadvantaged people in our society.

A004194.

There simply was no constitutional basis for the promulgation of section 8(a)'s racial classification by the Executive in 1968.[22] *Adarand*, 515 U.S. at 236. The district court fails to explain why there is suddenly one for racial classifications by SBA now.

The district court's disposition of the post-enactment evidence, causality, and nondelegation issues return us to the unconstitutional Executive racial classifications of 1968. Congress may as well have never enacted the statute.

### C. Relief Requested

For these reasons, the Constitution forbids such delegations and renders them inoperative. The racial classification of section 8(a) is a facially unconstitutional delegation of Congressional power to the Executive. And for that reason, the presumption in 15 U.S.C. § 631(f)(1) that any "other minorities" designated by the

---

[22]    Indeed, one of the fundamental problems was that the Executive action lacked the "reasoned and deliberate" consideration characteristic of a transparent, legitimate, legislative process. *See* A001473, A001489-A001490, Days, *Fullilove*, 96 YALE L.J. at 469-470 (1987) ("Without a careful examination of the facts and alternatives, the legislation may be misdirected and fail to assist those most deserving of aid, may assist those who are able to operate without such preferences, may harm others unjustifiably, and may operate, even under the best of circumstances, longer than necessary.").

Executive fall within the racial classification of section 8(a) is inoperative. This Court should render judgment accordingly, and enjoin the Subcontinent Asian Americans classification.

### VII. THE DISTRICT COURT FAILED TO INDEPENDENTLY ASSESS ROTHE'S EVIDENTIARY ARGUMENTS AGAINST THE RECORD IN THIS CASE

The *Dynalantic* district court made its own post-enactment judicial findings, *contra Shelby County*, 133 S.Ct. at 2629 (instructing that the Court cannot "try [its] hand at updating the statute [it]sel[f]"). The *Dynalantic* district court did not address many of Rothe's arguments. Still others were not considered *as made by Rothe*. The *Dynalantic* record is not before this Court. Yet the district court here adopted *Dynalantic's* findings in lieu of independently assessing Rothe's numerous evidentiary arguments against this record, which was error. A000059; A000496; *Rothe VII*, 545 F.3d at 1040-1041.

Where a district court has "failed to make findings of fact essential to a proper resolution of the legal question," the proper course is remand. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Therefore, if this Court does not render judgment for Rothe on Parts III-VI, *supra*, it must remand, for the district court to assess the following evidentiary arguments against the existing record,[23] which should not be reopened:

---

[23]     Specifically, the evidence produced by Defendants in their cross-motion.

1. The inability to draw a collective inference from the disparity studies. A000538; A001069-A001073; A001104-A001106; A001172-A001434; A001675-A001843

2. The inability to disaggregate alleged barriers to market entry from race-neutral variables and superseding causes. A001062; A001523-A001526.

3. Methodological defects regarding regression analysis and controlling for firm capacity in the disparity studies. A000532-A000538; A001065.

4. Methodological defects regarding anecdotal statements in the disparity studies. A001064; A001527.

5. Overestimation of minority firm availability in the disparity studies. A001067-A001068.

6. Underestimation of minority firm utilization in the disparity studies. A001068; A001083; A001096-A001103.

7. Inconsistent availability criteria in the disparity studies. A001069-A001072; A001675-A001843.

8. Aggregation of data resulting in overly generalized conclusions, including among industry sectors, by Defendants' experts. A001073; A001104-A001106; A001172-A001434.

Finally, the District Court abused its discretion in excluding the expert reports of Dale Patenaude and John Sullivan, Esq., or failing to consider them as lay evidence. A000048. This holding is reviewed for abuse of discretion.

The district court excluded Patenaude because he was not an expert on disparity analysis. A000047. But Patenaude, who has bid federal contracts over a career spanning four decades, didn't have to be in order to rebut the federal contracting data *inputs* to the Rubinovitz reports. Patenaude is proficient and reliable

in downloading government contracting data and performing basic math, and proved those qualifications in his deposition. The district court admits as much when it credits his standing affidavit and summary judgment declaration. A000048,A000062. The affidavit and declaration are filled with his calculations on the number, dollar volume, and percentage of 8(a) sole source and 8(a) competitive awards for Rothe's NAICS codes for multiple fiscal years. A000082-A000086; A001090-A001107.

Patenaude made similar calculations in his expert reports. A001438-A001440; A001851-A001852. His basic arithmetic using the Defendants' own data, proves (1) that the average contract value awarded to an 8(a) firm exceeds that awarded to non-8(a) SDB firms, which exceeds that awarded to small firms that are not 8(a) or SDBs at all; and (2) that the amount of SDB awards is not limited by competition, disparity, discrimination or for any other reason but the government-wide goal. A000232-A000233. These are material facts that tend to rebut Mr. Rubinovitz's assertions that statistical disparities in federal small business procurement can only be explained by racial discrimination.

Patenaude used his qualifications and specialized knowledge to reliably identify the inputs to his basic arithmetic, and that type of simple deductive reasoning is enough to admit his testimony as an expert under Fed. R. Evid. 702. *WWP, Inc. v. Wounded Warriors Family Support, Inc*., 628 F.3d 1032, 1040 (8th

Cir. 2011); *In re Prempro Prods. Liab. Litig*., 514 F.3d 825, 831 (8th Cir. 2008) (admitting expert testimony that represented "an exercise in basic math using simple deductive reasoning" was not an abuse of discretion); A000236-A000238. It was an abuse of discretion for the district court to fail to consider Patenaude's reports as expert or lay testimony. They should be considered if the case is remanded.

The district court also erred in excluding the expert reports of John Sullivan, Esq. First, the district court wrongly stated that Sullivan believed that bidding is the only way to derive availability. A000050. There is no evidence to support that. Sullivan stated bidding is only a factor, among others, to consider. A000432 (deposition pages 74-75). Second, the district court twists the facts to turn an imprecision by Defendants' expert Jon Wainwright against Sullivan. *Compare* A000050 *with* A000423. Sullivan corrected that aspect of his report in his deposition. A000423.

Finally, the District Court criticized Sullivan for speculating on various aspects of the 107 studies presented in this matter, when, in fact, Wainwright relied on speculation of equal gravity from the same studies. A00050; A000183-A000186; A000254-A000259. The district court's exclusion of Sullivan was an unsupported abuse of discretion. His reports should be considered on remand.

## VIII. CONCLUSION

Neither the Court nor the Defendants can save section 8(a)'s never re-authorized racial classification, now or in the future. *Shelby County*, 133 S.Ct. at 2629 (instructing that the Court cannot "try [its] hand at updating the statute [it]sel[f]").

The Court should reverse the district court and render judgment for Rothe. *See* discussion, *supra*, Parts III-VI. Alternatively, in the event the Court does not render judgment, the Court should remand the case with instructions, for the district court to apply those instructions to the existing summary judgment record.

Respectfully submitted,

/s/ David F. Barton
    David F. Barton
    D.C. Cir. Bar No. 54430
    Texas State Bar No. 01853300
    GARDNER LAW
    745 E. Mulberry Ave., Ste 500
    San Antonio, Texas 78212
    Telephone:  (210) 733-8191
    Telecopier:  (210) 733-5538
    E-Mail:  dfb@tglf.com

    ATTORNEY FOR APPELLANT
    ROTHE DEVELOPMENT, INC.

<u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,796 words, in Times New Roman 14 point font, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B) and D.C. Cir. R. 32(a)(1), as counted using the word-count function of Microsoft Office 2013 software.

/s/ David F. Barton_____
       David F. Barton

# ADDENDUM

## Table of Contents

Statutory Provisions

15 U.S.C. § 631(f)…………………………………………………………1

15 U.S.C. § 636(j)(10) & (j)(10)(B)………………………………………..3

15 U.S.C. § 637(a)(1)………………………………………………………4

15 U.S.C. § 637(a)(4)………………………………………………………6

15 U.S.C. § 637(a)(5)………………………………………………………7

15 U.S.C. § 637(a)(6)………………………………………………………7

15 U.S.C. § 637(a)(16)……………………………………………………..9

15 U.S.C. § 644(g)………………………………………………………...10

Regulations

13 C.F.R. § 124.103………………………………………………………13

**15 U.S.C. § 631(f) Findings; purpose**

(1) with respect to the Administration's business development programs the Congress finds—

(A) that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy;

(B) that many such persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control;

(C) that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities;

(D) that it is in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups;

(E) that such conditions can be improved by providing the maximum practicable opportunity for the development of small business concerns owned by members of socially and economically disadvantaged groups;

(F) that such development can be materially advanced through the procurement by the United States of articles, equipment, supplies, services, materials, and construction work from such concerns; and

(G) that such procurements also benefit the United States by encouraging the expansion of suppliers for such procurements, thereby encouraging competition among such suppliers and promoting economy in such procurements.

1

(2) It is therefore the purpose of section 637(a) of this title to—

(A) promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals so that such concerns can compete on an equal basis in the American economy;

(B) promote the competitive viability of such concerns in the marketplace by providing such available contract, financial, technical, and mangement assistance as may be necessary; and

(C) clarify and expand the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals.

**15 U.S.C. § 636 (j) Financial assistance for projects providing technical or management assistance; areas of high concentration of unemployment or low-income; preferences; manner and method of payment; accessible services; program evaluations; establishment of development program; coordination of policies**

(10) There is established within the Administration a small business and capital ownership development program (hereinafter referred to as the ''Program'') which shall provide assistance exclusively for small business concerns eligible to receive contracts pursuant to section 637(a) of this title. The program, and all other services and activities authorized under this subsection and section 637(a) of this title, shall be managed by the Associate Administrator for Minority Small Business and Capital Ownership Development under the supervision of, and responsible to, the Administrator.

. . .

(B) Small business concerns eligible to receive contracts pursuant to section 637(a) of this title shall participate in the Program.

3

**15 U.S.C. § 637. Additional powers**

**(a) Procurement contracts; subcontracts to disadvantaged small business concerns; performance bonds; contract negotiations; definitions; eligibility; determinations; publication; recruitment; construction subcontracts; annual estimates; Indian tribes**

(1) It shall be the duty of the Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate—

(A) to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers obligating the Administration to furnish articles, equipment, supplies, services, or materials to the Government or to perform construction work for the Government. In any case in which the Administration certifies to any officer of the Government having procurement powers that the Administration is competent and responsible to perform any specific Government procurement contract to be let by any such officer, such officer shall be authorized in his discretion to let such procurement contract to the Administration upon such terms and conditions as may be agreed upon between the Administration and the procurement officer. Whenever the Administration and such procurement officer fail to agree, the matter shall be submitted for determination to the Secretary or the head of the appropriate department or agency by the Administrator. Not later than 5 days from the date the Administration is notified of a procurement officer's adverse decision, the Administration may notify the contracting officer of the intent to appeal such adverse decision, and within 15 days of such date the Administrator shall file a written request for a reconsideration of the adverse decision with the Secretary of the department or agency head. For the purposes of this subparagraph, a procurement officer's adverse decision includes a decision not to make available for award pursuant to this subsection a particular procurement requirement or the failure to agree on the terms and conditions of a contract to be awarded noncompetitively under the authority of this subsection. Upon receipt of the notice of intent to appeal, the Secretary of the department or the agency head shall suspend further action regarding the procurement until a written decision on the Administrator's request for reconsideration has been issued by such Secretary or agency head, unless such officer makes a written determination that urgent and compelling circumstances which significantly affect interests of the United States will not permit waiting for a reconsideration of the adverse decision. If the Administrator's request for reconsideration is denied, the Secretary of the department or agency head shall specify the reasons why the selected firm was determined to be incapable to perform the procurement requirement, and the

findings supporting such determination, which shall be made a part of the contract file for the requirement. A contract may not be awarded under this subsection if the award of the contract would result in a cost to the awarding agency which exceeds a fair market price;

   (B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns for construction work, services, or the manufacture, supply, assembly of such articles, equipment, supplies, materials, or parts thereof, or servicing or processing in connection therewith, or such management services as may be necessary to enable the Administration to perform such contracts;

   (C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals which has completed its period of Program Participation as prescribed by section 636(j)(15) of this title, if—

      (i) the contract will be awarded as a result of an offer (including price) submitted in response to a published solicitation relating to a competition conducted pursuant to subparagraph (D); and

      (ii) the prospective contract awardee was a Program Participant eligible for award of the contract on the date specified for receipt of offers contained in the contract solicitation; and

   (D)(i) A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible Program Participants if—
      (I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and

      (II) the anticipated award price of the contract (including options) will exceed $5,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and $3,000,000 (including options) in the case of all other contract opportunities.

   (ii) The Associate Administrator for Minority Small Business and Capital Ownership Development, on a nondelegable basis, is authorized to approve

5

a request from an agency to award a contract opportunity under this sub-section on the basis of a competition restricted to eligible Program Participants even if the anticipated award price is not expected to exceed the dollar amounts specified in clause (i)(II). Such approvals shall be granted only on a limited basis.

. . .

(4)(A) For purposes of this section, the term ''socially and economically disadvantaged small business concern'' means any small business concern which meets the requirements of subparagraph (B) and—

  (i)    which is at least 51 per centum unconditionally owned by—

    (I) one or more socially and economically disadvantaged individuals,
    (II) an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or
    (III) an economically disadvantaged Native Hawaiian organization, or

  (ii) in the case of any publicly owned business, at least 51 per centum of the stock of which is unconditionally owned by—

    (I) one or more socially and economically disadvantaged individuals,
    (II) an economically disadvantaged Indian tribe (or a wholly owned business entity of such tribe), or
    (III) an economically disadvantaged Native Hawaiian organization.

(B) A small business concern meets the requirements of this subparagraph if the management and daily business operations of such small business concern are controlled by one or more—

  (i) socially and economically disadvantaged individuals described in subparagraph (A)(i)(I) or subparagraph (A)(ii)(I),
  (ii) members of an economically disadvantaged Indian tribe described in subparagraph (A)(i)(II) or subparagraph (A)(ii)(II), or
  (iii) Native Hawaiian organizations described in subparagraph (A)(i)(III) or subparagraph (A)(ii)(III).

(C) Each Program Participant shall certify, on an annual basis, that it meets the requirements of this paragraph regarding ownership and control.

6

(5) Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities.

(6)(A) Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities the Administration shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual. In determining the economic disadvantage of an Indian tribe, the Administration shall consider, where available, information such as the following: the per capita income of members of the tribe excluding judgment awards, the percentage of the local Indian population below the poverty level, and the tribe's access to capital markets.

(B) Each Program Participant shall annually submit to the Administration—

> (i) a personal financial statement for each disadvantaged owner;
> (ii) a record of all payments made by the Program Participant to each of its disadvantaged owners or to any person or entity affiliated with such owners; and
> (iii) such other information as the Administration may deem necessary to make the determinations required by this paragraph.

(C)(i) Whenever, on the basis of information provided by a Program Participant pursuant to subparagraph (B) or otherwise, the Administration has reason to believe that the standards to establish economic disadvantage pursuant to subparagraph (A) have not been met, the Administration shall conduct a review to determine whether such Program Participant and its disadvantaged owners continue to be impaired in their ability to compete in the free enterprise system due to diminished capital and credit opportunities when compared to other concerns in the same business area, which are not socially disadvantaged.

  (ii) If the Administration determines, pursuant to such review, that a Program Participant and its disadvantaged owners are no longer economically disadvantaged for the purpose of receiving assistance under this subsection, the Program Participant shall be graduated pursuant to section 636(j)(10)(G) of this title subject to the right to a hearing as provided for under paragraph (9).

7

(D)(i) Whenever, on the basis of information provided by a Program Participant pursuant to subparagraph (B) or otherwise, the Administration has reason to believe that the amount of funds or other assets withdrawn from a Program Participant for the personal benefit of its disadvantaged owners or any person or entity affiliated with such owners may have been unduly excessive, the Administration shall conduct a review to determine whether such withdrawal of funds or other assets was detrimental to the achievement of the targets, objectives, and goals contained in such Program Participant's business plan.

(ii) If the Administration determines, pursuant to such review, that funds or other assets have been withdrawn to the detriment of the Program Participant's business, the Administration shall—

> (I) initiate a proceeding to terminate the Program Participant pursuant to section 636(j)(10)(F) of this title, subject to the right to a hearing under paragraph (9); or

> (II) require an appropriate reinvestment of funds or other assets and such other steps as the Administration may deem necessary to ensure the protection of the concern.

(E) Whenever the Administration computes personal net worth for any purpose under this paragraph, it shall exclude from such computation—

> (i) the value of investments that disadvantaged owners have in their concerns, except that such value shall be taken into account under this paragraph when comparing such concerns to other concerns in the same business area that are owned by other than socially disadvantaged persons;
> (ii) the equity that disadvantaged owners have in their primary personal residences, except that any portion of such equity that is attributable to unduly excessive withdrawals from a Program Participant or a concern applying for program participation shall be taken into account.

. . .


  (16)(A) The Administration shall award sole source contracts under this section to any small business concern recommended by the procuring agency offering the contract opportunity if—

8

(i) the Program Participant is determined to be a responsible contractor with respect to performance of such contract opportunity;

(ii) the award of such contract would be consistent with the Program Participant's business plan; and

(iii) the award of the contract would not result in the Program Participant exceeding the requirements established by section 636(j)(10)(I) of this title.

(B) To the maximum extent practicable, the Administration shall promote the equitable geographic distribution of sole source contracts awarded pursuant to this subsection.

**15 U.S.C. § 644(g) Goals for participation of small business concerns in procurement contracts**

(1) GOVERNMENTWIDE GOALS.—

(A) ESTABLISHMENT.—The President shall annually establish Governmentwide goals for procurement contracts awarded to small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women in accordance with the following:

> (i) The Governmentwide goal for participation by small business concerns shall be established at not less than 23 percent of the total value of all prime contract awards for each fiscal year.

> (ii) The Governmentwide goal for participation by small business concerns owned and controlled by service-disabled veterans shall be established at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year.

> (iii) The Governmentwide goal for participation by qualified HUBZone small business concerns shall be established at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year.

> (iv) The Governmentwide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

> (v) The Governmentwide goal for participation by small business concerns owned and controlled by women shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

 (B) ACHIEVEMENT OF GOVERNMENTWIDE GOALS.—Each agency shall have an annual goal that presents, for that agency, the maximum practicable opportunity for small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and

economically disadvantaged individuals, and small business concerns owned and controlled by women to participate in the performance of contracts let by such agency. The Small Business Administration and the Administrator for Federal Procurement Policy shall, when exercising their authority pursuant to paragraph (2), insure that the cumulative annual prime contract goals for all agencies meet or exceed the annual Governmentwide prime contract goal established by the President pursuant to this paragraph.

(2)(A) The head of each Federal agency shall, after consultation with the Administration, establish goals for the participation by small business concerns, by small business concerns owned and controlled by service-disabled veterans, by qualified HUBZone small business concerns, by small business concerns owned and controlled by socially and economically disadvantaged individuals, and by small business concerns owned and controlled by women in procurement contracts of such agency. Such goals shall separately address prime contract awards and subcontract awards for each category of small business covered.

(B) Goals established under this subsection shall be jointly established by the Administration and the head of each Federal agency and shall realistically reflect the potential of small business concerns, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to perform such contracts and to perform subcontracts under such contracts.

(C) Whenever the Administration and the head of any Federal agency fail to agree on established goals, the disagreement shall be submitted to the Administrator for Federal Procurement Policy for final determination.

(D) After establishing goals under this paragraph for a fiscal year, the head of each Federal agency shall develop a plan for achieving such goals at both the prime contract and the subcontract level, which shall apportion responsibilities among the agency's acquisition executives and officials. In establishing goals under this paragraph, the head of each Federal agency shall make a consistent effort to annually expand participation by small business concerns from each industry category in procurement contracts and subcontracts of such agency, including participation by small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and

11

small business concerns owned and controlled by women.

(E) The head of each Federal agency, in attempting to attain expanded participation under subparagraph (D), shall consider—

    (i) contracts awarded as the result of unrestricted competition; and

    (ii) contracts awarded after competition restricted to eligible small business concerns under this section and under the program established under section 637(a) of this title.

(F)(i) Each procurement employee or program manager described in clause (ii) shall communicate to the subordinates of the procurement employee or program manager the importance of achieving goals established under subparagraph (A).

(ii) A procurement employee or program manager described in this clause is a senior procurement executive, senior program manager, or Director of Small and Disadvantaged Business Utilization of a Federal agency having contracting authority.

**13 C.F.R. § 124.103 Who is socially disadvantaged?**

(b) Members of designated groups.

(1) There is a rebuttable presumption that the following individuals are socially disadvantaged: Black Americans; Hispanic Americans; Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State recognized Indian Tribe); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal); and members of other groups designated from time to time by SBA according to procedures set forth at paragraph (d) of this section. Being born in a country does not, by itself, suffice to make the birth country an individual's country of origin for purposes of being included within a designated group.

(2) An individual must demonstrate that he or she has held himself or herself out, and is currently identified by others, as a member of a designated group if SBA requires it.

(3) The presumption of social disadvantage may be overcome with credible evidence to the contrary. Individuals possessing or knowing of such evidence should submit the information in writing to the Associate Administrator for Business Development (AA/BD) for consideration.

13

CERTIFICATE OF SERVICE

I certify that on October 13, 2015, I served a copy of this brief and addendum to the following counsel of record through the Court's CM/ECF system.

Teresa Kwong
Marc L. Gross
Department of Justice
Civil Rights Division
Appellate Section
950 Pennsylvania Ave., NW, RFK 3726
Washington, D.C. 20530
*Attorneys for Appellees*

I also certify, pursuant to Fed. R. App. P. 25(d)(2) and 31(b) and Circuit Rule 31(b), that eight copies of this brief and addendum are being sent by overnight delivery to the Court on October 13, 2015, and two copies of this brief and addendum are being sent to counsel for Appellees, in addition to the electronic filing.

/s/ David F. Barton
David F. Barton