[ORAL ARGUMENT NOT YET SCHEDULED]

APPEAL NO. 15-5176
_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

Rothe Development, Inc.

Appellant,

v.

United States Department of Defense and
United States Small Business Administration,

Appellees.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

APPENDIX

Volume 1

David F. Barton
D.C. Cir. Bar No. 54430
Texas State Bar No. 01853300
GARDNER LAW
745 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

Attorney for Appellant
Rothe Development, Inc.

Appeal No. 15-5176


Rothe Development, Inc. v.
United States Department of Defense and
United States Small Business Administration

Appendix
Table of Contents

| Date Filed | D.Ct. Doc # | Description | Appendix Volume | Appendix Page # |
|---|---|---|---|---|
| | | **Docket Sheet, Order Appealed From, and Pleadings** | | |
| 6/10/2015 | | Copy of Docket Sheet | 1 | 1 |
| 6/10/2015 | 76 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 75 Order on Motion in Limine, Order on Motion for Summary Judgment, by ROTHE DEVELOPMENT, INC. | 1 | 16 |
| 6/5/2015 | 74 | MEMORANDUM OPINION denying Plaintiff's 45 Motion in Limine; granting Defendants' 44 46 Motions in Limine; denying Plaintiff's 55 Motion for Summary Judgment; and granting Defendants' 64 Cross−Motion for Summary Judgment. | 1 | 18 |
| 6/5/2015 | 75 | ORDER denying Plaintiff's 45 Motion in Limine; granting Defendants' 44 46 Motions in Limine; denying Plaintiff's 55 Motion for Summary Judgment; and granting Defendants' 64 Cross−Motion for Summary Judgment. | 1 | 67 |
| 5/9/2012 | 1 | COMPLAINT against All Defendants ( Filing fee $ 350 receipt number 0090−2928398) filed by ROTHE DEVELOPMENT, INC. | 1 | 68 |
| 5/9/2012 | 1-1 | AFFIDAVIT of Dale Patenaude and Atch 1−5 | 1 | 80 |
| 7/16/2012 | 14 | ANSWER to Complaint by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. | 1 | 118 |
| | | | | |
| | | | | |
| | | **Portions of Record relating to Rothe's position regarding expert discovery** | | |
| 7/20/2012 | 15 (pg 6 only) | Excerpt from RESPONSE TO ORDER OF THE COURT re Order on Motion to Stay, and Scheduling Recommendations filed by ROTHE DEVELOPMENT, INC. | 1 | 135 |
| 8/24/2012 | 21 | RESPONSE TO ORDER OF THE COURT re Order on Motion to Consolidate Cases, and Scheduling Recommendations filed by ROTHE DEVELOPMENT, INC. | 1 | 136 |
| 3/05/2013 | 30 (pgs 1-6 only) | Excerpt from Memorandum in opposition to re 29 MOTION for Extension of Time to Complete Discovery by 150 Days filed by ROTHE DEVELOPMENT, INC. | 1 | 140 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | **Motions in Limine, Responses, and Replies (without attachments)** | | |
|---|---|---|---|---|
| 01/31/2014 | 44 | MOTION in Limine by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION re: Plaintiff's expert Dale Patenaude (Braniff, Andrew) (Entered: 01/31/2014) | 1 | 146 |
| 01/31/2014 | 45 | MOTION in Limine *(Exclude or Limit Expert Testimony)* by ROTHE DEVELOPMENT, INC. (Barton, David) (Entered: 01/31/2014) | 1 | 171 |
| 01/31/2014 | 46 | MOTION in Limine *to Exclude Report of John Sullivan* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION | 1 | 190 |
| 02/14/2014 | 48 | RESPONSE re 45 MOTION in Limine *(Exclude or Limit Expert Testimony)* of Dr. Jon Wainwright and Dr. Robert Rubinovitz filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. | 1 | 217 |
| 02/14/2014 | 49 | RESPONSE re 44 MOTION in Limine, 46 MOTION in Limine *to Exclude Report of John Sullivan and memorandum of points and authorities in opposition* filed by ROTHE DEVELOPMENT, INC. | 1 | 231 |
| 02/21/2014 | 50 | REPLY to opposition to motion re 45 MOTION in Limine *(Exclude or Limit Expert Testimony)* filed by ROTHE DEVELOPMENT, INC. | 1 | 245 |
| 02/21/2014 | 51 | REPLY to opposition to motion re 44 MOTION in Limine , 46 MOTION in Limine *to Exclude Report of John Sullivan* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. | 1 | 261 |
| | | | | |
| | | | | |
| | | **Exhibits Related to the Parties' Motions in Limine That Are Not Duplicated Elsewhere in the Summary Judgment Filings** | | |
| 01/31/2014 | 44-9 | Deposition of Dale Patenaude | 1 | 268 |
| 01/31/2014 | 44-10 | Wikipedia entry for Logarithms | 1 | 341 |
| 01/31/2014 | 45-4 | Excerpts from Deposition of Robert Rubinovitz | 1 | 343 |
| 01/31/2014 | 45-5 | Excerpts from Denver Disparity Study | 1 | 352 |
| 01/31/2014 | 45-6 | Excerpts from Alaska Disparity Study | 1 | 354 |
| 01/31/2014 | 46-8 | Expert Report of John Sullivan | 1 | 356 |
| 01/31/2014 | 46-9 | Excerpts from Deposition of John Sullivan | 1 | 412 |
| 01/31/2014 | 46-10 | CV of John Sullivan | 1 | 456 |
| 01/31/2014 | 46-11 | Order in AGC v. Caltrans | 1 | 463 |
| 01/31/2014 | 46-12 | Excerpt from Sullivan Report in Kevcon v. United States | 1 | 469 |
| 01/31/2014 | 46-13 | Excerpt of Transcript of preliminary injunction hearing in Kevcon v. United States | 1 | 483 |
| | | | | |
| | | | | |
| | | **The Summary Judgment Filings and Argument** | | |
| 5/15/2014 | 55 | MOTION for Summary Judgment by ROTHE DEVELOPMENT, INC. | 1 | 493 |
| 5/15/2014 | 55-1 | Statement of Facts | 1 | 499 |
| 5/15/2014 | 56 | MEMORANDUM re 55 MOTION for Summary Judgment filed by ROTHE DEVELOPMENT, INC. by ROTHE DEVELOPMENT, INC. | 1 | 512 |
| 5/15/2014 | 56-1 | Exhibit (Excerpt Depo. of John Sullivan) | 1 | 558 |

| | | | | |
|---|---|---|---|---|
| | 65 | RESPONSE re 55 MOTION for Summary Judgment and Cross Motion for Summary Judgment filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. | 1 | 565 |
| 6/16/2014 | 65-1 | Memorandum in Support | 1 | 568 |
| 6/16/2014 | 65-2 | Statement of Facts | 1 | 662 |
| 6/16/2014 | 65-3 | Proposed Order | 1 | 691 |
| 6/16/2014 | 65-4 | Appx. A – Decl. of Calvin Jenkins | 1 | 693 |
| 6/16/2014 | 65-5 | Appx. B – Congressional Evidence (placeholder) | 1 | 696 |
| 6/16/2014 | 65-6 | Appx. C – CV of Jon Wainwright | 1 | 697 |
| 6/16/2014 | 65-7 | Appx. D – Report of Jon Wainwright And Appendices | 1 (report) 2 (appxs) | 708 808 |
| 6/16/2014 | 65-8 | Appx. E – Reply Report of Jon Wainwright | 2 | 868 |
| 6/16/2014 | 65-9 | Appx. F – CV of Robert Rubinovitz | 2 | 911 |
| 6/16/2014 | 65-10 | Appx. G – Report of Robert Rubinovitz | 2 | 916 |
| 6/16/2014 | 65-11 | Appx. H – Suppl Report of Robert Rubinovitz | 2 | 943 |
| 6/16/2014 | 65-12 | Appx. I – Decl. of Denise Hoban | 2 | 956 |
| 6/16/2014 | 65-13 | Appx. J – Decl. of Janice Lisa Romney | 2 | 962 |
| 6/16/2014 | 65-14 | Appx. K – Reply Report of Robert Rubinovitz | 2 | 967 |
| 6/16/2014 | 65-15 | Appx. L – Excerpts from Disparity Studies | 2 | 971 |
| 7/18/2014 | 68 | RESPONSE re 64 Cross MOTION for Summary Judgment and Response to Plaintiff's Motion filed by ROTHE DEVELOPMENT, INC. | 2 | 990 |
| 7/18/2014 | 68-1 | Response to Defendant's Statement of Material Facts and Statement of Additional Material Facts | 2 | 993 |
| 7/18/2014 | 68-2 | Memorandum in Support | 2 | 1010 |
| 7/18/2014 | 68-3 | Proposed Order | 2 | 1088 |
| 7/18/2014 | 68-4 | Decl of Dale Patenaude and Atchs 1–8 | 2 | 1090 |
| 7/18/2014 | 68-5 | Decl. of Dale Patenaude Atch 7 (large) | 2 | 1219 |
| 7/18/2014 | 68-6 | Expert Report of Dale Patenaude | 2 | 1435 |
| 7/18/2014 | 68-7 | Excerpts from Deposition of Dale Patenaude | 2 | 1461 |
| 7/18/2014 | 68-8 | NASA PIC 11–01 | 2 | 1466 |
| 7/18/2014 | 68-9 | Days Fullilove 96 YALE LJ 453 | 2 | 1473 |
| 7/18/2014 | 68-10 | SBA OIG Report 10–08 | 2 | 1506 |
| 7/18/2014 | 68-11 | Excerpts from AK and AZ DOT Disparity Studies | 2 | 1523 |
| 7/18/2014 | 68-12 | Hanson 88 CORNELL L REV 1433 | 2 | 1527 |
| 7/18/2014 | 68-13 | USCCR Report | 3 | 1575 |
| 7/18/2014 | 68-14 | Excerpts from Listed Disparity Studies | 3 | 1675 |
| 7/18/2014 | 68-15 | Excerpts from AK, San Antonio, Dayton, Houston, and KY Disparity Studies | 3 | 1815 |
| 7/18/2014 | 68-16 | Suppl Expert Report of Dale Patenaude | 3 | 1844 |
| 8/01/2014 | 72 | REPLY to opposition to motion re 64 Cross MOTION for Summary Judgment filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. | 3 | 1865 |
| 8/01/2014 | 72-1 | Appx. A - Excerpts from Deposition of Dale Patenaude | 3 | 1892 |
| 8/01/2014 | 72-2 | Appx. B - Excerpts of Houston Disp. Study | 3 | 1901 |

| 8/01/2014 | 72-3 | Appx. C - Excerpts from Deposition of Robert Rubinovitz | 3 | 1905 |
|---|---|---|---|---|
| 8/01/2014 | 72-4 | Appx. D - Decl. of Denise Hoban | 3 | 1909 |
| 8/01/2014 | 72-5 | Response to Rothe's Statement of Additional Material Facts | 3 | 1924 |
| 8/01/2014 | 72-6 | Appx. A to Response to Addtl Facts - Congressional Evidence (placeholder) | 3 | 1932 |
| 8/01/2014 | 72-7 | Appx. B to to Response to Addtl Facts – Excerpts from State Disparity Studies | 3 | 1933 |
| 8/01/2014 | 72-8 | Appx. C to Response to Addtl Facts – Excerpts from Local Disparity Studies | 3 | 1964 |
| 8/01/2014 | 72-9 | Appx. D to Response to Addtl Facts – U.S. Small Business Administration Office of Business Development FY 2012 408 Report to the Congress (same as ROTHE081566) | 3 | 1973 |
| 10/20/2014 | 73 | Transcript of Oral Argument | 3 | 2121 |
| | | | | |
| | | | | |
| | | **Defendants' Congressional Reports, Hearings, and Agency Documents cited in the Parties' Summary Judgment Filings** | | |
| | | S. Rep. No. 95-1070 (1978) | 3 | 2199 |
| | | S. Rep. No. 100-394 (1988) | 3 | 2249 |
| | | H.R. Rep. No. 92-1615 (1972) | 4 | 2431 |
| | | H.R. Rep. No. 92-1626 (1972) | 4 | 2468 |
| | | H.R. Rep. No. 94-468 (1975) | 4 | 2783 |
| | | H.R. Rep. No. 94-840 (1976) | 4 | 2827 |
| | | H.R. Rep. No. 94-1791 (1977) | 4 | 2866 |
| | | H.R. Rep. No. 95-949 (1978) | 4 | 3214 |
| | | H.R. Rep. No. 95-1714 (1978) | 4 | 3244 |
| | | H.R. Rep. No. 96-998 (1980) | 5 | 3274 |
| | | H.R. Rep. No. 97-956 (1982) | 5 | 3282 |
| | | H.R. Rep. No. 98-1086 (1984) | 5 | 3345 |
| | | H.R. Rep. No. 99-332 (1985) | 5 | 3658 |
| | | H.R. Rep. No. 100-460 (1987) | 6 | 4075 |
| | | 118 Cong. Rec. 21810 (1972) | 6 | 4191 |
| | | 124 Cong. Rec. 34097 (1978) | 6 | 4193 |
| | | 124 Cong. Rec. 35408 (1978) | 6 | 4196 |
| | | 159 Cong. Rec. S4981-82 (daily ed. June 2013) | 6 | 4198 |
| | | Small Business Administration's 8(a) Subcontracting Program--Minority Enterprise: Hearing Before the Subcommittee on Government Procurement of the Select Commission on Small Business, 92d Congress (1971) | 6 | 4200 |
| | | Small Business Legislation-1975: Hearing Before the Subcommittee on Small Business of the S. Commission on Banking, Housing, and Urban Affairs, 94th Congress (1975) | 6 | 4637 |
| | | Minorities and Women as Government Contractors, U.S. Civil Rights Commission (1975) | 6 | 4728 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| | | Investigation into the 8(a) Program of the Small Business Administration: Hearings Before the Subcommittee on Federal Spending Practices and Open Government of the S. Committee on Government Affairs, 95th Congress (1979) | 7 | 4940 |
| | | Small and Minority Business in the Decade of the 1980s (Part I): Hearings Before the H. Committee on Small Business, 97th Congress (1981) | 7 (part) 8 (part) | 5558 5740 |
| | | Small and Disadvantaged Business Participation in Military Construction Programs: Hearing Before the Military Installations and Facilities Subcommittee of the H. Committee on Armed Services 99th Congress (1986) | 8 | 5902 |
| | | Minority Business Development Program Reform Act of 1987: Hearings Before the S. Committee on Small Business, 100th Congress (1988) | 8 (part) 9 (part) | 6179 6540 |
| | | Minority Entrepreneurship: Assessing the Effectiveness of SBA's Programs for the Minority Business Community: Hearing Before the S. Committee on Small Business and Entrepreneurship, 110th Congress (2007) | 9 | 6913 |
| | | Access to Federal Contracts: How to Level the Playing Field: Hearing Before the S. Committee on Small Business and Entrepreneurship, 110th Congress (2007) | 9 | 7032 |
| | | How Information Policy Affects the Competitive Viability of Small and Disadvantaged Business in Federal Contracting: Hearing Before the Subcommittee on Info Policy, Census, and National of the H. Committee on Oversight and Government Reform, 110th Congress (2008) | 9 | 7211 |
| | | The Minority Business Development Agency: Enhancing the Prospects for Success: Hearing Before the Subcommittee on Commerce, Trade, and Consumer Protection of the H. Commission on Energy and Commerce, 111th Congress (2009) | 9 (part) 10 (part) | 7326 7339 |
| | | The DOT's Disadvantaged Business Enterprise Program: Hearing Before the H. Committee on Transportation and Infrastructure, 111th Congress (2009) | 10 | 7480 |
| | | Closing the Gap: Exploring Minority Access to Capital and Contracting Opportunities: Hearing Before the S. Committee on Small Business and Entrepreneurship, 111th Congress (2011) | 10 | 7898 |
| | | Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's Capital Markets: Hearing before S. Committee on Small Business Entrepreneurship, 111th Congress (2012) | 10 (part) 11 (part) | 7999 8139 |

| | | | | |
|---|---|---|---|---|
| | | Field Hearing in Queens, New York: Underserved Small Business Community: Providing Access to Federal Programs: Hearing Before the Subcommittee on Contracting and Workforce of the H. Committee on Small Business, 113th Congress (2014) | 11 | 8265 |
| | | Partnership Agreement Between the U.S. Small Business Administration and the U.S. Department of Defense (Sept. 27, 2012) | 11 | 8315 |
| | | SBA Office of Bus. Dev., 8(a) Program 2010 Annual Report to Congress (2010) | 11 | 8326 |
| | | Small Business Goaling Report Fiscal Year 2012 (Mar. 19, 2013) | 11 | 8350 |
| | | | | |
| | | Certificate of Service | 11 | end |
| | | | | |

APPEAL,CLOSED,TYPE–C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:12–cv–00744–KBJ</u>

ROTHE DEVELOPMENT, INC. v. DEPARTMENT OF
DEFENSE et al
Assigned to: Judge Ketanji Brown Jackson
Demand: $0
Cause: 28:1331 Fed. Question

Date Filed: 05/09/2012
Date Terminated: 06/08/2015
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**ROTHE DEVELOPMENT, INC.**            represented by   **David F. Barton**
GARDNER LAW
745 East Mulberry Avenue
Suite 500
San Antonio, TX 78212
(210) 733–8191
Email: <u>dfbarton@gardner.sa.com</u>
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEPARTMENT OF DEFENSE**            represented by   **Andrew G. Braniff**
UNITED STATES DEPARTMENT OF
JUSTICE
Patrick Henry Building
950 Pennsylvania Avenue, NW
Room 4520
Washington, DC 20530
(202) 514–9229
Fax: (202) 514–1005
Email: <u>andrew.braniff@usdoj.gov</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Franklin Van Horn**
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street NW
Room E4226
Washington, DC 20530
(202) 252–2506
Fax: (202) 252–2599
Email: <u>daniel.vanhorn@usdoj.gov</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel R. Hranitzky**
U.S. DEPARTMENT OF JUSTICE
Civil Rights Division – Employment
Litigation
950 Pennsylvania Avenue, NW
PHB Room 4030
Washington, DC 20530
(202) 305–1642
Fax: (202) 514–1005
Email: rachel.hranitzky@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barbara Ann Schwabauer**
U.S. DEPARTMENT OF JUSTICE
Civil Rights Division
601 D Street, NW
Room 4017
Washington, DC 20579
(202) 305–3034
Email: barbara.schwabauer@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Patricia L. Stasco**
U.S. DEPARTMENT OF JUSTICE
Civil Rights Division, Employment
LItigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353–2297
Email: patricia.stasco@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **SMALL BUSINESS ADMINISTRATION** | represented by | **Andrew G. Braniff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Daniel Franklin Van Horn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel R. Hranitzky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Barbara Ann Schwabauer**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Patricia L. Stasco**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**PACIFIC LEGAL FOUNDATION**              represented by   **Joshua P. Thompson**
                                                          PACIFIC LEGAL FOUNDATION
                                                          930 G Street
                                                          Sacramento, CA 95814
                                                          (916) 419–7111
                                                          Fax: 916–419–7747
                                                          Email: jpt@pacificlegal.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**MOUNTAIN STATES LEGAL**                 represented by   **Steven James Lechner**
**FOUNDATION**                                            MOUNTAIN STATES LEGAL
                                                          FOUNDATION
                                                          2596 South Lewis Way
                                                          Lakewood, CO 80227–2705
                                                          (303) 292–2021
                                                          Fax: (303) 292–1980
                                                          Email: lechner@mountainstateslegal.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**NAACP LEGAL DEFENSE &**                 represented by   **Andy Liu**
**EDUCATIONAL FUND, INC.**                                CROWELL & MORING, L.L.P.
                                                          1001 Pennsylvania Avenue, NW
                                                          Washington, DC 20004–2505
                                                          (202) 624–2500
                                                          Fax: (202) 628–5116
                                                          Email: aliu@crowell.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**ASIAN AMERICANS ADVANCING**            represented by   **Andy Liu**
**JUSTICE**                                               (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**LEADERSHIP CONFERENCE ON**             represented by   **Andy Liu**
**CIVIL AND HUMAN RIGHTS**                                (See above for address)
                                                          *LEAD ATTORNEY*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/09/2012 | 1 | | COMPLAINT against All Defendants ( Filing fee $ 350 receipt number 0090–2928398) filed by ROTHE DEVELOPMENT, INC.. (Attachments: # 1 Affidavit Affidavit of Dale Patenaude and Atch 1–5, # 2 Civil Cover Sheet, # 3 Summons)(Barton, David) (Entered: 05/09/2012) |
| 05/09/2012 | 2 | | NOTICE OF RELATED CASE by ROTHE DEVELOPMENT, INC.. Case related to Case No. 95–CV–2301. (Barton, David) (Entered: 05/09/2012) |
| 05/09/2012 | 3 | | Corporate Disclosure Statement by ROTHE DEVELOPMENT, INC.. (Barton, David) (Entered: 05/09/2012) |
| 05/09/2012 | 4 | | MOTION for Summary Judgment by ROTHE DEVELOPMENT, INC. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support Memorandum of Points and Authorities, # 3 Text of Proposed Order)(Barton, David) (Entered: 05/09/2012) |
| 05/09/2012 | | | Case Assigned to Judge Emmet G. Sullivan. (ls, ) (Entered: 05/10/2012) |
| 05/10/2012 | 5 | | ERRATA *(Corrected Summonses for Issuance)* by ROTHE DEVELOPMENT, INC.. (Barton, David) (Entered: 05/10/2012) |
| 05/10/2012 | 6 | | ELECTRONIC (4) SUMMONS Issued as to DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Consent Form)(ls, ) (Entered: 05/10/2012) |
| 05/21/2012 | 7 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 5/15/2012. Answer due for ALL FEDERAL DEFENDANTS by 7/14/2012. (Attachments: # 1 Exhibit Mailing receipt and return receipt)(Barton, David) (Entered: 05/21/2012) |
| 05/21/2012 | 8 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 05/15/2012. (Attachments: # 1 Exhibit Mailing receipt and return receipt)(Barton, David) (Entered: 05/21/2012) |
| 05/21/2012 | 9 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DEPARTMENT OF DEFENSE served on 5/14/2012; SMALL BUSINESS ADMINISTRATION served on 5/14/2012 (Attachments: # 1 Exhibit Mailing receipts and delivery confirmations)(Barton, David) (Entered: 05/21/2012) |
| 05/29/2012 | 10 | | MOTION to Stay 4 MOTION for Summary Judgment by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # 1 Text of Proposed Order)(Van Horn, Daniel) . (Entered: 05/29/2012) |
| 05/30/2012 | 11 | | RESPONSE re 10 MOTION to Stay *Plaintiff's Motion for Summary Judgment and Memorandum of Points and Authorities* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # 1 Text of Proposed Order)(Barton, David) (Entered: 05/30/2012) |
| 06/07/2012 | 12 | | NOTICE of Appearance by Andrew G. Braniff on behalf of DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Braniff, Andrew) |

Case 1:12-cv-00744-RBW   Document 13   Filed 03/28/13   Page 5 of 5?

USCA Case #15-5176   Document #1555337   Filed 06/18/2015   Page 12 of 814

| | | | |
|---|---|---|---|
| | | | (Entered: 06/07/2012) |
| 06/11/2012 | 13 | | REPLY to opposition to motion re 10 MOTION to Stay *Plaintiff's Motion for Summary Judgment* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Braniff, Andrew) (Entered: 06/11/2012) |
| 06/27/2012 | | | MINUTE ORDER. Pending before the Court is 13 defendants' motion to stay plaintiff's motion for summary judgment, which was filed simultaneously with the Complaint, until defendants respond to the Complaint and the Court enters a scheduling order. Defendants argue that the summary judgment motion is premature because they have not had an opportunity to respond to the Complaint, much less take discovery, and accordingly request that the Court stay the motion for summary judgment until such time as it enters a scheduling order. Plaintiff opposes the motion to stay, but concedes that it would be appropriate to first convene a status or scheduling conference in order to (1) determine what, if any, discovery is necessary, (2) discuss whether consolidation with Dynalantic v. DoD and SBA, Case 95–2301, is appropriate, and (3) establish a schedule. Defendants agree with plaintiff's recommendation that a status/scheduling conference be held. Accordingly, in light of the parties' agreement that continued briefing of the motion for summary judgment should be delayed until at least following a scheduling/status conference, it is ORDERED that plaintiff's motion for summary judgment is stayed pending further order of the Court. It is further ORDERED that defendants shall respond to the Complaint by no later than July 16, 2012. It is FURTHER ORDERED that, by no later than July 20, 2012, the parties shall submit a joint status report and recommendation for further proceedings, containing the parties' positions as to matters (1) – (3) set forth above. In the event that counsel are unable to agree on a joint recommendation, each party shall file an individual recommendation by that time. The Court will hold a status/scheduling hearing in this case on July 26, 2012 at 1:00 PM in Courtroom 24A. Signed by Judge Emmet G. Sullivan on June 27, 2012. (lcegs4) (Entered: 06/27/2012) |
| 07/03/2012 | | | Set/Reset Deadlines/Hearings: Answer due by 7/16/2012, Status Report due by 7/20/2012; Status Conference set for 7/26/2012 01:00 PM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 07/03/2012) |
| 07/16/2012 | 14 | | ANSWER to Complaint by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION.(Braniff, Andrew) (Entered: 07/16/2012) |
| 07/20/2012 | 15 | | RESPONSE TO ORDER OF THE COURT re Order on Motion to Stay,,,,,,, *and Scheduling Recommendations* filed by ROTHE DEVELOPMENT, INC.. (Barton, David) (Entered: 07/20/2012) |
| 07/20/2012 | 16 | | MOTION to Consolidate Cases *and Statement of Points and Authorities* by ROTHE DEVELOPMENT, INC. (Attachments: # 1 Text of Proposed Order)(Barton, David) (Entered: 07/20/2012) |
| 07/20/2012 | 17 | | RESPONSE TO ORDER OF THE COURT re Order on Motion to Stay,,,,,,, *and Consolidation, Discovery and Scheduling Recomendations* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Braniff, Andrew) (Entered: 07/20/2012) |
| 07/23/2012 | | | MINUTE ORDER. The Court, sua sponte, cancels the hearing scheduled for July 26, 2012. In the event the Court is unable to resolve the pending motion to consolidate or to issue a scheduling order without a hearing, the Court will |

| | | |
|---|---|---|
| | | advise the parties and reschedule the hearing for a mutually agreeable date and time. Signed by Judge Emmet G. Sullivan on July 23, 2012. (lcegs4) (Entered: 07/23/2012) |
| 07/31/2012 | 18 | RESPONSE re 16 MOTION to Consolidate Cases *and Statement of Points and Authorities* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Braniff, Andrew) (Entered: 07/31/2012) |
| 08/06/2012 | 19 | REPLY to opposition to motion re 16 MOTION to Consolidate Cases *and Statement of Points and Authorities* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # 1 Exhibit Order Denying Defs' Mtn to Limit Scope of Relief in Rothe's 2323 Case, # 2 Exhibit Final Judgment in Rothe's 2323 Case)(Barton, David) (Entered: 08/06/2012) |
| 08/10/2012 | 20 | NOTICE to court by ROTHE DEVELOPMENT, INC. (td, ) (Entered: 08/13/2012) |
| 08/16/2012 | | MINUTE ORDER. On August 15, 2012, this Court issued an Order and Memorandum Opinion resolving the parties' cross−motions for summary judgment in DynaLantic Corp. v. Dep't of Defense, Case No. 95−2301. In relevant part, this Court ruled that the Section 8(a) program, 15 U.S.C. 637(a) et seq., and its accompanying regulations, is constitutional on its face. In light of the foregoing, Rothe's 16 Motion to Consolidate with the DynaLantic matter is DENIED. In light of the developments in the DynaLantic matter, the parties are directed to update their status reports and recommendations for further proceedings. The parties are specifically directed to address whether this matter should be stayed pending the expiration of the time limits for filing appeals of the Court's August 15, 2012 ruling in the DynaLantic matter. The parties shall file a joint supplemental status report and recommendations by no later than September 5, 2012. In the event that counsel are unable to agree on a joint recommendation, each party shall file an individual recommendation by that time. SO ORDERED. Signed by Judge Emmet G. Sullivan on August 16, 2012. (lcegs4) (Entered: 08/16/2012) |
| 08/16/2012 | | Set/Reset Deadlines: Status Report due by 9/5/2012 (clv, ) (Entered: 08/16/2012) |
| 08/24/2012 | 21 | RESPONSE TO ORDER OF THE COURT re Order on Motion to Consolidate Cases,,,, *and Scheduling Recommendations* filed by ROTHE DEVELOPMENT, INC.. (Barton, David) (Entered: 08/24/2012) |
| 09/05/2012 | 22 | RESPONSE TO ORDER OF THE COURT re Order on Motion to Consolidate Cases,,,, *Proposed Sceduling Order* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Attachments: # 1 Appendix Proposed Report/Schedule, # 2 Appendix Alternate Proposed Report/Schedule)(Braniff, Andrew) (Entered: 09/05/2012) |
| 09/18/2012 | 23 | SCHEDULING ORDER. The parties are directed to read the attached order in its entirety. Signed by Judge Emmet G. Sullivan on September 18, 2012. (lcegs4) (Entered: 09/18/2012) |
| 09/18/2012 | 24 | AMENDED SCHEDULING ORDER. The parties are directed to follow this Amended Scheduling Order, and to disregard the original scheduling order issued earlier today. Signed by Judge Emmet G. Sullivan on September 18, 2012. (lcegs4) (Entered: 09/18/2012) |

| 09/18/2012 | | Set/Reset Deadlines/Hearings: Amended Pleadings due by 10/4/2012; fact discovery due by 12/6/12; expert Discovery due by 3/4/2013. Plaintiff Rule 26a1 due by 9/25/2012. Defendant Rule 26a1 due by 9/25/2012. Plaintiff Rule 26b4 due by 2/4/2013. Defendant Rule 26b4 due by 1/7/2013. Status Report due by 1/31/13 and 3/12/2013; Status Conference set for 3/19/2013 12:45 PM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 09/18/2012) |
|---|---|---|
| 10/24/2012 | 25 | NOTICE of Appearance by Rachel R. Hranitzky on behalf of All Defendants (Hranitzky, Rachel) (Entered: 10/24/2012) |
| 10/24/2012 | 26 | NOTICE of Appearance by Rachel R. Hranitzky on behalf of All Defendants (Hranitzky, Rachel) (Entered: 10/24/2012) |
| 11/26/2012 | 27 | Joint MOTION for Leave to File *Request for Extension of Expert Discovery Deadlines by 60 days* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # 1 Text of Proposed Order)(Hranitzky, Rachel) (Entered: 11/26/2012) |
| 12/18/2012 | | MINUTE ORDER granting 27 parties' joint request for extension of time and amending 24 Amending Scheduling Order as follows. The defendants' expert disclosures in this matter shall be made by no later than March 8, 2013. Plaintiff's expert disclosures shall be made by no later than April 5, 2013. Expert discovery shall be completed no later than May 6, 2013. The status hearing scheduled for March 19, 2013 is hereby continued to May 21, 2013 at 11:30 AM. The parties are directed to file a joint status report, including a joint recommendation for further proceedings, by no later than May 13, 2013. SO ORDERED. Signed by Judge Emmet G. Sullivan on December 18, 2012. (lcegs4) (Entered: 12/18/2012) |
| 12/20/2012 | | Set/Reset Deadlines/Hearings: Defendant's expert disclosures due by 3/8/13; plaintiff's expert disclosures due by 4/5/13; Expert Discovery due by 5/6/2013; Status Report due by 5/13/2013; Status Conference set for 5/21/2013 11:30 AM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 12/20/2012) |
| 01/30/2013 | 28 | STATUS REPORT *OF PARTIES* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Hranitzky, Rachel) (Entered: 01/30/2013) |
| 03/01/2013 | 29 | MOTION for Extension of Time to Complete Discovery *by 150 Days* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Braniff, Andrew) (Entered: 03/01/2013) |
| 03/05/2013 | 30 | Memorandum in opposition to re 29 MOTION for Extension of Time to Complete Discovery *by 150 Days* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # 1 Text of Proposed Order)(Barton, David) (Entered: 03/05/2013) |
| 03/08/2013 | 31 | REPLY to opposition to motion re 29 MOTION for Extension of Time to Complete Discovery *by 150 Days* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Braniff, Andrew) (Entered: 03/08/2013) |
| 03/25/2013 | | MINUTE ORDER granting 29 defendants' motion for extension of time to complete expert discovery. While the Court is sensitive to Rothe's desire for a |

| | | | |
|---|---|---|---|
| | | | prompt adjudication on the merits, adjudication of this important constitutional issue must be based upon a record which the parties have had the opportunity to fully develop. Defendants' expert disclosures pursuant to Fed. R. Civ. P. 26(a)(2) shall be made no later than August 8, 2013; plaintiff's expert disclosures shall be made no later than September 9, 2013; and expert discovery shall be completed by no later than October 9, 2013. The Court further notes Rothe's contention that it has not been provided with "the evidence submitted to Congress" and relied on by defendants to support their defenses in this matter. The parties are directed to confer forthwith regarding such evidence, and to make every effort to resolve their dispute without seeking further intervention by the Court. In light of the foregoing, the status hearing previously scheduled for May 21, 2013 is hereby continued to October 23, 2013 at 12:30 PM. The parties are directed to file a joint status report, including a joint recommendation for further proceedings, by no later than October 17, 2013. SO ORDERED.Signed by Judge Emmet G. Sullivan on March 25, 2013. (lcegs4) (Entered: 03/25/2013) |
| 03/25/2013 | | | Set/Reset Deadlines/Hearings: Expert iscovery due by 10/9/2013; Plaintiff Rule 26a2 due by 9/9/2013; Defendant Rule 26a2 due by 8/8/2013; Status Report due by 10/17/2013; Status Conference set for 10/23/2013 12:30 PM in Courtroom 24A before Judge Emmet G. Sullivan. (clv, ) (Entered: 03/25/2013) |
| 04/05/2013 | | | Case directly reassigned to Judge Ketanji Brown Jackson. Judge Emmet G. Sullivan no longer assigned to the case. (gt, ) (Entered: 04/05/2013) |
| 04/30/2013 | | | MINUTE ORDER: The Status Conference previously set for 10/23/2013 at 12:30 PM is hereby VACATED and RESCHEDULED to 10/22/2013 at 10:00 AM in Courtroom 17 before Judge Ketanji Brown Jackson. The parties are directed to file a joint status report, including a joint recommendation for further proceedings, by no later than 10/15/2013. Signed by Judge Ketanji Brown Jackson on 4/30/2013. (lckbj2) (Entered: 04/30/2013) |
| 08/21/2013 | 32 | | MOTION for Protective Order by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Braniff, Andrew) (Entered: 08/21/2013) |
| 08/21/2013 | | | MINUTE ORDER REFERRING 32 MOTION for Protective Order filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION to a Magistrate Judge for resolution. Signed by Judge Ketanji Brown Jackson on 08/21/2013. (lckbj1) (Entered: 08/21/2013) |
| 08/21/2013 | 33 | | CASE REFERRED to Magistrate Judge Deborah A. Robinson for Motion 32 for Protective Order for resolution. (kb) (Entered: 08/23/2013) |
| 08/26/2013 | 34 | | RESPONSE re 32 MOTION for Protective Order *and Memorandum of Points and Authorities* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # 1 Affidavit Affidavit of Dale Patenaude, # 2 Text of Proposed Order)(Barton, David) (Entered: 08/26/2013) |
| 09/06/2013 | | | Set/Reset Hearings: Hearing on 32 Defendants' Motion for Entry of a Protective Order set for Monday, September 16, 2013 at 10:30 a.m. in Courtroom 4 before Magistrate Judge Deborah A. Robinson. (lcdar1) (Entered: 09/06/2013) |
| 09/11/2013 | 35 | | MOTION for Order *to Dismiss without Prejudice Defenants' Motion for a Protective Order* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # 1 Exhibit A)(Braniff, Andrew) (Entered: |

| | | 09/11/2013) |
|---|---|---|
| 09/11/2013 | | MINUTE ORDER by Magistrate Judge Deborah A. Robinson on 9/11/2013 granting <u>35</u> Stipulated Motion for Voluntary Dismissal Without Prejudice of Defendants' Motion for a Protective Order. (lcdar1) (Entered: 09/11/2013) |
| 09/11/2013 | | MINUTE ORDER by Magistrate Judge Deborah A. Robinson on 9/11/2013: It is hereby ORDERED that Defendants' Motion for Entry of a Protective Order Regarding Data Underlying Defendants' Expert Report <u>32</u> is DENIED WITHOUT PREJUDICE. *See* Stipulated Motion for Voluntary Dismissal Without Prejudice of Defendants' Motion for a Protective Order (Document No. 35) (requesting that the motion be "dismissed" without prejudice). It is FURTHER ORDERED that the hearing scheduled for September 16, 2013 is CANCELLED. (lcdar1) (Entered: 09/11/2013) |
| 10/01/2013 | <u>36</u> | MOTION to Stay *of Discovery Due to Lapse of Appropriations* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # <u>1</u> Text of Proposed Order)(Braniff, Andrew) (Entered: 10/01/2013) |
| 10/01/2013 | | MINUTE ORDER granting <u>36</u> Motion to Stay in light of lapse of appropriations. For good cause shown, it is hereby ORDERED that this case is STAYED. Counsel for Defendant shall notify the Court as soon as Congress has appropriated funds for the Department of Justice; at that point, the Court will enter an order resetting the applicable deadlines, which will be extended day–for–day with the duration of the lapse in appropriations. Signed by Judge Ketanji Brown Jackson on 10/1/2013. (lckbj1) (Entered: 10/01/2013) |
| 10/07/2013 | | MINUTE ORDER. In light of the lapse of appropriations, the status conference previously scheduled for October 22, 2013, at 10:00 AM is hereby VACATED. The Court will reschedule the status conference after counsel notifies the Court that the lapse of appropriations has ended. Signed by Judge Ketanji Brown Jackson on 10/7/2013. (lckbj1) (Entered: 10/07/2013) |
| 10/18/2013 | <u>37</u> | NOTICE *of Appropriation of Funds* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION re Order, (Braniff, Andrew) (Entered: 10/18/2013) |
| 10/21/2013 | | MINUTE ORDER. Defendants have provided notice that appropriations for funding the Department of Justice have been restored. (Notice, ECF No. 37.) Pursuant to the Court's order of October 1, 2013, this case is no longer stayed, and all deadlines in this matter are extended for 16 days, such that the all expert discovery shall be completed by 10/25/2013. It is further ORDERED that a Status Conference is hereby set for 11/6/2013 at 10:15 AM in Courtroom 17 before Judge Ketanji Brown Jackson. The parties are directed to file a joint status report, including a joint recommendation for further proceedings, by no later than 10/31/2013. Signed by Judge Ketanji Brown Jackson on 10/21/2013. (lckbj3) (Entered: 10/21/2013) |
| 10/21/2013 | | Set/Reset Deadlines/Hearings: All expert discovery completed by 10/25/2013. Joint Status Report due by 10/31/2013. Status Conference set for 11/6/2013 at 10:15 AM in Courtroom 17 before Judge Ketanji Brown Jackson. (gdf) (Entered: 10/21/2013) |
| 10/21/2013 | <u>38</u> | |

| | | NOTICE of Appearance by Patricia L. Stasco on behalf of DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Stasco, Patricia) (Entered: 10/21/2013) |
|---|---|---|
| 10/30/2013 | 39 | STATUS REPORT *Joint* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Attachments: # 1 Text of Proposed Order)(Braniff, Andrew) (Entered: 10/30/2013) |
| 11/04/2013 | | MINUTE ORDER. Upon consideration of 39 Parties' Joint Status Report, it is hereby ORDERED that expert discovery shall be completed by November 15, 2013. All other deadlines in the case, including the status conference on November 6, 2013, shall remain as scheduled. Signed by Judge Ketanji Brown Jackson on 11/04/2013. (lckbj2) (Entered: 11/04/2013) |
| 11/06/2013 | | Minute Entry for proceedings held before Judge Ketanji Brown Jackson: Status Conference held on 11/6/2013. Discovery due on 11/22/2013. Daubert Motions are due on or before 12/31/2013. Vacate Judge Sullivan's stay order with regard to the pending motion 4 Motion for Summary Judgment, and Denied without prejudice. (Court Reporter Scott Wallace) (dr) (Entered: 11/06/2013) |
| 11/06/2013 | 40 | ORDER regarding status conference held on November 6, 2013. See attached order for details. Signed by Judge Ketanji Brown Jackson on 11/06/2013. (lckbj2) (Entered: 11/06/2013) |
| 12/16/2013 | 41 | MOTION for Leave of Court to Reopen Expert Discovery (Verified) by ROTHE DEVELOPMENT, INC. (Attachments: # 1 Exhibit Excerpts from Tr. of Depo. of Jon Wainwright, # 2 Text of Proposed Order)(Barton, David) . (Entered: 12/16/2013) |
| 12/21/2013 | 42 | RESPONSE re 41 MOTION – *for Leave of Court to Reopen Expert Discovery (Verified)* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Attachments: # 1 Exhibit A. Wainwright Report, # 2 Exhibit B. Sullivan Report, # 3 Exhibit C. Wainwright Rebuttal Report, # 4 Exhibit D. Rubinowitz Report and Supplement)(Braniff, Andrew) (Entered: 12/21/2013) |
| 12/23/2013 | 43 | ORDER denying in part and granting in part 41 Motion to Reopen Discovery. See attached order for details. Signed by Judge Ketanji Brown Jackson on 12/23/2013. (lckbj2) (Entered: 12/23/2013) |
| 01/05/2014 | | Set/Reset Deadlines: Daubert and related motions due by 1/31/2014. (gdf) (Entered: 01/05/2014) |
| 01/31/2014 | 44 | MOTION in Limine by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Ex. A, Rubinovitz Report, # 4 Exhibit Ex. B, Rubinovitz Supplemental Report, # 5 Exhibit Ex. C, CV of Dr. Rubinovitz, # 6 Exhibit Ex D: Patenaude Report, # 7 Exhibit Ex. E, Rubinovitz Rebuttal, # 8 Exhibit Ex F: Patenaude Supplement, # 9 Exhibit Ex. G, Patenaude Dep., # 10 Exhibit Ex. H, Wikipedia entry for Logarithms)(Braniff, Andrew) (Entered: 01/31/2014) |
| 01/31/2014 | 45 | MOTION in Limine *(Exclude or Limit Expert Testimony)* by ROTHE DEVELOPMENT, INC. (Attachments: # 1 Exhibit Exh 1 Wainwright Report, # 2 Exhibit Exh 2 Rubinovitz Orig Report, # 3 Exhibit Exh 3 Rubinovitz Addtl |

| | | |
|---|---|---|
| | | Analysis, # <u>4</u> Exhibit Exh 4 Excerpts from Rubinovitz deposition, # <u>5</u> Exhibit Exh 5 Excerpts from NERA Denver study, # <u>6</u> Exhibit Excerpts from D Wilson AK study, # <u>7</u> Text of Proposed Order)(Barton, David) (Entered: 01/31/2014) |
| 01/31/2014 | <u>46</u> | MOTION in Limine *to Exclude Report of John Sullivan* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # <u>1</u> Memorandum in Support, # <u>2</u> Text of Proposed Order, # <u>3</u> Exhibit Ex. A, Wainwright Report, # <u>4</u> Exhibit Ex. B, CV of Dr. Wainwright, # <u>5</u> Exhibit Ex. C, Rubinovitz Report, # <u>6</u> Exhibit Ex. D, Rubinovitz Supplemental Report, # <u>7</u> Exhibit Ex. E, CV of Dr. Rubinovitz, # <u>8</u> Exhibit Ex. F, Sullivan Report, # <u>9</u> Exhibit Ex. G, Sullivan Deposition, # <u>10</u> Exhibit Ex. H, Sullivan CV, # <u>11</u> Exhibit Ex. I, Associated Gen. Contractors of America v. California, # <u>12</u> Exhibit. J, Excerpt of Kevcon Inc. v. United Sta, # <u>13</u> Exhibit Ex. K, Excerpt of Transcript, # <u>14</u> Exhibit Ex. L, Wainwright Reply)(Braniff, Andrew) (Entered: 01/31/2014) |
| 02/11/2014 | <u>47</u> | NOTICE *Joint of Dynalantic Dismissal and Status Report* by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION re <u>40</u> Order (Attachments: # <u>1</u> Appendix Dynalantic Order of Dismissal)(Braniff, Andrew) (Entered: 02/11/2014) |
| 02/12/2014 | | MINUTE ORDER setting summary judgment briefing schedule. It is hereby ORDERED that the parties shall abide by the following briefing schedule in this matter: Plaintiff's Motion for Summary Judgment, which shall be no longer than 45 pages, is due by May 15, 2014; Defendants' Cross–Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment, which shall be no longer than 90 pages, is due by June 16, 2014; Plaintiff's Response to Defendants' Cross–Motion for Summary Judgment and Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment, which shall be no longer than 70 pages, is due by July 18, 2014; Defendants' Reply to Plaintiff's Response to Defendants' Cross–Motion for Summary Judgment, which shall be no longer than 25 pages, is due by August 1, 2014. Signed by Judge Ketanji Brown Jackson on 2/12/2014. (lckbj1) (Entered: 02/12/2014) |
| 02/14/2014 | <u>48</u> | RESPONSE re <u>45</u> MOTION in Limine *(Exclude or Limit Expert Testimony) of Dr. Jon Wainwright and Dr. Robert Rubinovitz* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Braniff, Andrew) (Entered: 02/14/2014) |
| 02/14/2014 | <u>49</u> | RESPONSE re <u>44</u> MOTION in Limine , <u>46</u> MOTION in Limine *to Exclude Report of John Sullivan and memorandum of points and authorities in opposition* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # <u>1</u> Exhibit Suppl Rpt of Patenaude, # <u>2</u> Exhibit Orig Rpt of Patenaude, # <u>3</u> Exhibit Deposition of Patenaude, # <u>4</u> Exhibit Rpt of Sullivan, # <u>5</u> Text of Proposed Order)(Barton, David) (Entered: 02/14/2014) |
| 02/21/2014 | <u>50</u> | REPLY to opposition to motion re <u>45</u> MOTION in Limine *(Exclude or Limit Expert Testimony)* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # <u>1</u> Exhibit Exhibit 1 part 1/2, # <u>2</u> Exhibit Exhibit 1 part 2/2)(Barton, David) (Entered: 02/21/2014) |
| 02/21/2014 | <u>51</u> | REPLY to opposition to motion re <u>44</u> MOTION in Limine , <u>46</u> MOTION in Limine *to Exclude Report of John Sullivan* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Braniff, Andrew) |

| | | | (Entered: 02/21/2014) |
|---|---|---|---|
| 03/11/2014 | 52 | | ENTERED IN ERROR.....MEMORANDUM by ROTHE DEVELOPMENT, INC.. (Barton, David) Modified on 3/12/2014 (jf, ). (Entered: 03/11/2014) |
| 03/12/2014 | | | NOTICE OF CORRECTED DOCKET ENTRY: Document No. re 52 Memorandum was entered in error and counsel was instructed to refile said pleading as a proper pleading. (Counsel should review LCvR 5.1 (b) CORRESPONDENCE WITH COURT)(jf, ) (Entered: 03/12/2014) |
| 03/20/2014 | 53 | | NOTICE *Advisory to the Court Vacation Notice* by ROTHE DEVELOPMENT, INC. (Barton, David) (Entered: 03/20/2014) |
| 04/15/2014 | 54 | | NOTICE of Appearance by Barbara Ann Schwabauer on behalf of DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Schwabauer, Barbara) (Entered: 04/15/2014) |
| 05/15/2014 | 55 | | MOTION for Summary Judgment by ROTHE DEVELOPMENT, INC. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Text of Proposed Order)(Barton, David) (Entered: 05/15/2014) |
| 05/15/2014 | 56 | | MEMORANDUM re 55 MOTION for Summary Judgment filed by ROTHE DEVELOPMENT, INC. by ROTHE DEVELOPMENT, INC.. (Attachments: # 1 Exhibit Exhibit 1 to Rothe MSJ Memorandum (Tr. of Depo of John Sullivan at 90–94))(Barton, David) (Entered: 05/15/2014) |
| 05/21/2014 | 57 | | MOTION for Leave to File *Amicus Curiae Brief* by PACIFIC LEGAL FOUNDATION (Attachments: # 1 Exhibit Amicus Curiae Brief of Pacific Legal Foundation in Support of Plaintiff Rothe Development, Inc., # 2 Exhibit Disclosure of Corporate Affiliations and Financial Interests)(Thompson, Joshua) (Entered: 05/21/2014) |
| 05/21/2014 | 58 | | NOTICE of Appearance by Joshua P. Thompson on behalf of PACIFIC LEGAL FOUNDATION (Thompson, Joshua) (Entered: 05/21/2014) |
| 05/22/2014 | 59 | | MOTION for Leave to File *Amicus Curiae Brief* by MOUNTAIN STATES LEGAL FOUNDATION (Attachments: # 1 Text of Proposed Order, # 2 Proposed Amicus Curiae Brief, # 3 Corporate Disclosure Statement)(Lechner, Steven) (Entered: 05/22/2014) |
| 05/22/2014 | 60 | | NOTICE of Appearance by Steven James Lechner on behalf of MOUNTAIN STATES LEGAL FOUNDATION (Lechner, Steven) (Entered: 05/22/2014) |
| 05/23/2014 | | | MINUTE ORDER granting 57 Motion for Leave to File Amicus Brief by Pacific Legal Foundation; and granting 59 Motion for Leave to File Amicus Brief by Mountain States Legal Foundation. Signed by Judge Ketanji Brown Jackson on 05/23/2014. (lckbj2) (Entered: 05/23/2014) |
| 05/23/2014 | 61 | | AMICUS BRIEF by PACIFIC LEGAL FOUNDATION. (jf, ) (Entered: 05/26/2014) |
| 05/23/2014 | 62 | | AMICUS BRIEF by MOUNTAIN STATES LEGAL FOUNDATION. (jf, ) (Entered: 05/26/2014) |
| 05/23/2014 | 63 | | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by MOUNTAIN STATES LEGAL FOUNDATION (jf, ) (Entered: 05/26/2014) |

| 05/30/2014 | | MINUTE ORDER setting Motion Hearing on Daubert motions and Cross−Motions for Summary Judgment for 9/25/2014 at 10:00 AM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 5/30/2014. (lckbj1) (Entered: 05/30/2014) |
|---|---|---|
| 06/16/2014 | <u>64</u> | Cross MOTION for Summary Judgment *by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION (Attachments: # <u>1</u> Memorandum in Support Memorandum in Support, # <u>2</u> Statement of Facts Statement of Facts, # <u>3</u> Text of Proposed Order Draft Order, # <u>4</u> Appendix Appendix A, # <u>5</u> Appendix Appendix B, # <u>6</u> Appendix Appendix C, # <u>7</u> Appendix Appendix D, # <u>8</u> Appendix Appendix E, # <u>9</u> Appendix Appendix F, # <u>10</u> Appendix Appendix G, # <u>11</u> Appendix Appendix H, # <u>12</u> Appendix Appendix I, # <u>13</u> Appendix Appendix J, # <u>14</u> Appendix Appendix K, # <u>15</u> Appendix Appendix L)(Braniff, Andrew) Modified on 6/16/2014 (jf, ). (Entered: 06/16/2014)* |
| 06/16/2014 | | ent (jf, ) (Entered: 06/16/2014) |
| 06/16/2014 | <u>65</u> | RESPONSE re <u>55</u> MOTION for Summary Judgment *and Cross Motion for Summary Judgment* filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Attachments: # <u>1</u> Memorandum in Support Memorandum in Support, # <u>2</u> Statement of Facts, # <u>3</u> Text of Proposed Order, # <u>4</u> Appendix A, # <u>5</u> Appendix B, # <u>6</u> Appendix C, # <u>7</u> Appendix D, # <u>8</u> Appendix E, # <u>9</u> Appendix F, # <u>10</u> Appendix G, # <u>11</u> Appendix H, # <u>12</u> Appendix I, # <u>13</u> Appendix J, # <u>14</u> Appendix K, # <u>15</u> Appendix L)(Braniff, Andrew) (Entered: 06/16/2014) |
| 07/16/2014 | <u>66</u> | NOTICE of Appearance by Andy Liu on behalf of NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., ASIAN AMERICANS ADVANCING JUSTICE | AAJC, THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS (Liu, Andy) (Entered: 07/16/2014) |
| 07/16/2014 | <u>67</u> | MOTION for Leave to File *Amicus Curiae Brief* by ASIAN AMERICANS ADVANCING JUSTICE | AAJC, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., THE LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS (Attachments: # <u>1</u> Proposed Amicus Curiae Brief, # <u>2</u> Corporate Disclosure Statement)(Liu, Andy) (Entered: 07/16/2014) |
| 07/18/2014 | <u>68</u> | RESPONSE re <u>64</u> Cross MOTION for Summary Judgment *and Response to Plaintiff's Motion* filed by ROTHE DEVELOPMENT, INC.. (Attachments: # <u>1</u> Statement of Facts Response to Defs Statement of Material Facts, # <u>2</u> Memorandum in Support Memorandum in Support, # <u>3</u> Text of Proposed Order Proposed Order, # <u>4</u> Exhibit Exh 1 Decl of Dale Patenaude and Atchs 1–8, # <u>5</u> Exhibit Exh 1 Decl. of Dale Patenaude Atch 7 (large), # <u>6</u> Exhibit Exh 2 Expert Report of Dale Patenaude, # <u>7</u> Exhibit Exh 3 Excerpts of Patenaude deposition, # <u>8</u> Exhibit NASA PIC 11–01, # <u>9</u> Exhibit Days Fullilove 96 YALE LJ 453, # <u>10</u> Exhibit SBA OIG Report 10–08, # <u>11</u> Exhibit Excerpts from AK and AZ DOT studies, # <u>12</u> Exhibit Hanson 88 CORNELL L REV 1433, # <u>13</u> Exhibit USCCR Report, # <u>14</u> Exhibit Excerpts from Listed Disparity Studies, # <u>15</u> Exhibit Excerpts from AK COSA Dayton Houston KY studies, # <u>16</u> Exhibit Suppl Expert Report of Dale Patenaude)(Barton, David) (Entered: 07/18/2014) |
| 07/18/2014 | <u>69</u> | REPLY to opposition to motion re <u>55</u> MOTION for Summary Judgment filed by ROTHE DEVELOPMENT, INC.. (Attachments: # <u>1</u> Statement of Facts Response to Defs Statement of Material Facts, # <u>2</u> Memorandum in Support |

| | | |
|---|---|---|
| | | Memorandum in Support, # 3 Text of Proposed Order Proposed Order, # 4 Exhibit Exh 1 Decl of Dale Patenaude and Atchs 1–8, # 5 Exhibit Exh 1 Decl. of Dale Patenaude Atch 7 (large), # 6 Exhibit Exh 2 Expert Report of Dale Patenaude, # 7 Exhibit Exh 3 Excerpts of Patenaude deposition, # 8 Exhibit NASA PIC 11–01, # 9 Exhibit Days Fullilove 96 YALE LJ 453, # 10 Exhibit SBA OIG Report 10–08, # 11 Exhibit Excerpts from AK and AZ DOT studies, # 12 Exhibit Hanson 88 CORNELL L REV 1433, # 13 Exhibit USCCR Report, # 14 Exhibit Excerpts from Listed Disparity Studies, # 15 Exhibit Excerpts from AK COSA Dayton Houston KY studies, # 16 Exhibit Suppl Expert Report of Dale Patenaude)(Barton, David) (Entered: 07/18/2014) |
| 07/23/2014 | | MINUTE ORDER granting 67 Motion for Leave to File Amicus Curiae Brief. Signed by Judge Ketanji Brown Jackson on 07/23/2014. (lckbj1) (Entered: 07/23/2014) |
| 07/23/2014 | 70 | AMICUS BRIEF by ASIAN AMERICANS ADVANCING JUSTICE, LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.. (jf, ) (Entered: 07/24/2014) |
| 07/23/2014 | 71 | LCvR 7.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests NONE by ASIAN AMERICANS ADVANCING JUSTICE, LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. (jf, ) (Entered: 07/24/2014) |
| 08/01/2014 | 72 | REPLY to opposition to motion re 64 Cross MOTION for Summary Judgment *filed by DEPARTMENT OF DEFENSE, SMALL BUSINESS ADMINISTRATION. (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C, # 4 Appendix D, # 5 Statement of Facts, # 6 Appendix A for Statement of Facts, # 7 Appendix B for Statement of Facts, # 8 Appendix C for Statement of Facts, # 9 Appendix D for Statement of Facts)(Braniff, Andrew) . (Entered: 08/01/2014)* |
| 08/25/2014 | | MINUTE ORDER. The Motion Hearing previously set for 9/25/2014 at 10:00 AM is hereby VACATED and RESCHEDULED to 10/20/2014 at 2:00 PM in Courtroom 17 before Judge Ketanji Brown Jackson. Signed by Judge Ketanji Brown Jackson on 8/25/2014. (lckbj2) (Entered: 08/25/2014) |
| 10/17/2014 | | Set/Reset Hearings: Motion Hearing set for 10/20/2014 at 2:00 PM in Courtroom 17 before Judge Ketanji Brown Jackson. (gdf) (Entered: 10/17/2014) |
| 10/20/2014 | | Minute Entry for proceedings held before Judge Ketanji Brown Jackson: Motion Hearing held on 10/20/2014. Oral arguments heard re 55 MOTION for Summary Judgment 44 MOTION in Limine 64 Cross MOTION for Summary Judgment 45 MOTION in Limine Exclude or Limit Expert Testimony 46 MOTION in Limine to Exclude Report of John Sullivan. Motions taken under advisement. (Court Reporter Barbara De Vico.) (zsm) (Entered: 10/20/2014) |
| 11/03/2014 | 73 | TRANSCRIPT OF PROCEEDINGS before Judge Ketanji Brown Jackson held on 10–20–14; Page Numbers: 1–78. Date of Issuance:11–3–14. Court Reporter/Transcriber Barbara DeVico, Telephone number 202–354–3118, Court Reporter Email Address : Barbara_DeVico@dcd.uscourts.gov.<P></P>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After |

| | | | |
|---|---|---|---|
| | | | 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed or ASCII) may be purchased from the court reporter.<P>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<P></P> Redaction Request due 11/24/2014. Redacted Transcript Deadline set for 12/4/2014. Release of Transcript Restriction set for 2/1/2015.(DeVico, Barbara) (Entered: 11/03/2014) |
| 06/05/2015 | 74 | 18 | MEMORANDUM OPINION denying Plaintiff's 45 Motion in Limine; granting Defendants' 44 46 Motions in Limine; denying Plaintiff's 55 Motion for Summary Judgment; and granting Defendants' 64 Cross–Motion for Summary Judgment. See attached Memorandum Opinion for details. Signed by Judge Ketanji Brown Jackson on 6/5/2015. (lckbj2) (Entered: 06/05/2015) |
| 06/05/2015 | 75 | 67 | ORDER denying Plaintiff's 45 Motion in Limine; granting Defendants' 44 46 Motions in Limine; denying Plaintiff's 55 Motion for Summary Judgment; and granting Defendants' 64 Cross–Motion for Summary Judgment. See attached Order for details. Signed by Judge Ketanji Brown Jackson on 6/5/2015. (lckbj2) (Entered: 06/05/2015) |
| 06/10/2015 | 76 | 16 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 75 Order on Motion in Limine,,, Order on Motion for Summary Judgment,,,,,, by ROTHE DEVELOPMENT, INC.. Filing fee $ 505, receipt number 0090–4130984. Fee Status: Fee Paid. Parties have been notified. (Barton, David) (Entered: 06/10/2015) |
| 06/10/2015 | 77 | | NOTICE *Certificate Regarding Transcript* by ROTHE DEVELOPMENT, INC. re 76 Notice of Appeal to DC Circuit Court, (Barton, David) (Entered: 06/10/2015) |

USCA Case #15-5176    Document #1558557    Filed: 06/19/2015    Page 23 of 814

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
ROTHE DEVELOPMENT, INC.,                        )
   Plaintiff,                                   )
)
v.                                              ) Civil Action No. 12-CV-744-KBJ
)
DEPARTMENT OF DEFENSE                            )
and SMALL BUSINESS ADMINISTRATION               )
   Defendants.                                  )
_____)

## NOTICE OF APPEAL

Pursuant to Fed. R. App. P. 4(a), notice is given that ROTHE DEVELOPMENT, INC.,

Plaintiff in the above-named proceeding, hereby appeals to the United States Court of Appeals

for the District of Columbia Circuit, from the Order and Judgment [Doc #75] denying Plaintiff's

Motion in Limine; granting Defendants' Motions in Limine; denying Plaintiff's Motion for

Summary Judgment; granting Defendants' Cross-Motion for Summary Judgment; and entering

judgment for Defendants, entered on June 5, 2015.

Dated June 10, 2015                              Respectfully submitted,


                                 /s/ David F. Barton
                                 David F. Barton
                                 District Court Bar No. TX0096
                                 D.C. Circuit Bar No. 54430
                                 Texas Bar No. 01853300
                                 **GARDNER LAW**
                                 745 E. Mulberry Avenue, Suite 500
                                 San Antonio, Texas 78212-3149
                                 Telephone: (210) 733-8191
                                 Telecopier: (210) 733-5538
                                 Email: dfbarton@gardner.sa.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing and all attachments and exhibits was served in accordance with the Federal Rules of Civil Procedure, on this 10th day of June, 2015, to the following persons:

Andrew G. Braniff                             *VIA E-FILING*
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
-and-
Barbara A. Schwabauer                    *VIA E-FILING*
United States Department of Justice
Civil Rights Division, Employment Litigation Section
601 D Street, NW
PHB Room 4017
Washington, D.C. 20579
*Attorneys for Defendants*

/s/ David F. Barton
David F. Barton

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROTHE DEVELOPMENT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-cv-0744 (KBJ) |
| | ) |
| DEPARTMENT OF DEFENSE, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (2012), establishes a business development program for "socially and economically disadvantaged small business concerns[.]" *Id.* § 637(a)(1)(B). Plaintiff Rothe Development, Inc. ("Rothe" or "Plaintiff") is a small business based in San Antonio, Texas that has filed the instant action against the Department of Defense ("DOD") and the Small Business Administration (collectively, "Defendants") to challenge the constitutionality of the Section 8(a) program on its face. (*See* Compl., ECF No. 1, ¶ 1.) Rothe argues that the statute's definition of "socially disadvantaged" small business owners, 15 U.S.C. § 637(a)(5), is a racial classification that violates Rothe's right to equal protection under the Due Process Clause of the Fifth Amendment of the United States Constitution. (*See* Compl. ¶¶ 1–2.) Rothe also claims that Section 8(a) violates the nondelegation doctrine. (*See id.*; *see also id.* ¶ 30.)

The constitutional challenge that Rothe brings in the instant case is nearly identical to the challenge brought in the case of *DynaLantic Corp. v. United States Department of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012). The plaintiff in

*DynaLantic* sued the DOD, the Small Business Administration, and the Department of the Navy alleging, *inter alia*, that Section 8(a) was unconstitutional both on its face and as applied to the military simulation and training industry. *See DynaLantic*, 885 F. Supp. 2d at 242. The *DynaLantic* court disagreed with the plaintiff's facial attack; it explained in a lengthy opinion the reasoning behind the Court's conclusion that the Section 8(a) program is facially constitutional. *See id.* at 248–80, 283–91. Here, Rothe relies on substantially the same record evidence and nearly identical legal arguments, and it urges this Court to strike down the race-conscious provisions of Section 8(a) on their face and thus to depart from *DynaLantic*'s holding in the context of the instant case. (*See, e.g.*, Mot. Hr'g Tr., Oct. 20, 2014, at 27:21 (Plaintiff's counsel asserting that the *DynaLantic* court "was just wrong").)

Before this Court at present are the parties' cross-motions for summary judgment, as well as the parties' motions to limit or exclude the proffered testimony of each other's expert witnesses—commonly referred to as "*Daubert* motions" based on the Supreme Court's seminal ruling on the admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As explained fully below, this Court concludes that Defendants' experts meet the relevant qualification standards under Federal Rule of Evidence 702 and offer what appear to be reliable and relevant opinions; therefore, Plaintiff's *Daubert* motion to exclude Defendants' proffered expert testimony will be **DENIED**. By contrast, this Court finds sufficient reason to doubt the qualifications of one of Plaintiff's experts and to question the reliability of the testimony of the other; consequently, Defendants' *Daubert* motions to exclude Plaintiff's expert testimony will be **GRANTED**. With respect to the cross-motions for

summary judgment, this Court agrees with the *DynaLantic* court's reasoning, and thus this Court, too, concludes that Section 8(a) is constitutional on its face. Accordingly, Plaintiff's motion for summary judgment will be **DENIED**, Defendants' cross-motion for summary judgment will be **GRANTED**, and judgment will be entered in Defendants' favor. A separate order consistent with this memorandum opinion will follow.

## I.  BACKGROUND

### A.  The Section 8(a) Program

Congress enacted the Small Business Act of 1953 ("the Act"), 15 U.S.C. §§ 631–57s, in order to encourage and develop the "capacity of small business" in America, and thereby to promote national "economic well-being" and "security[.]" 15 U.S.C. § 631(a) (1958). Section 8(a) of the Act grants the Small Business Administration the authority to acquire procurement contracts from other government agencies and to award or otherwise arrange for performance of those contracts by small businesses "whenever [the agency] determines such action is necessary[.]" *Id.* § 637(a). This authority remained "dormant for a decade" after the Act's passage, *DynaLantic*, 885 F. Supp. 2d at 253, but over the course of many years and after a series of executive orders and legislative amendments, *see id.* at 253–57, the current Section 8(a) program emerged with the express purpose of helping socially and economically disadvantaged individuals who own small businesses "compete on an equal basis in the American economy[,]" 15 U.S.C. § 631(f)(2)(A) (2012).

The Section 8(a) program provides small businesses that socially and economically disadvantaged individuals own—the Small Business Administration refers to such businesses as "small disadvantaged businesses" or "SDBs," *see* Small

Disadvantaged Business Program, 73 Fed. Reg. 57,490 (Oct. 3, 2008)—with valuable "technological, financial, and practical assistance, as well as support through preferential awards of government contracts[,]" *DynaLantic*, 885 F. Supp. 2d at 243; *see also* 15 U.S.C. § 636(j)(10)(A); 13 C.F.R. § 124.404.[1]  SDBs can receive myriad types of assistance and support under the Section 8(a) program, including help "develop[ing] and maintain[ing] comprehensive business plans[,]" 15 U.S.C. § 636(j)(10)(A)(i); "nonfinancial services" such as "loan packaging, [] financial counseling, [] accounting and bookkeeping assistance, [] marketing assistance, and [] management assistance[,]" *id.* § 636(j)(10)(A)(ii); assistance "obtain[ing] equity and debt financing[,]" *id.* § 636(j)(10)(A)(iii); and the opportunity to compete for certain government contracts that are limited to Section 8(a) program participants, *see id.* § 637(a)(1)(D).  Moreover, once admitted into the Section 8(a) program, participating SDBs may stay in the program for up to nine years, provided that they continue to meet the eligibility criteria for qualifying for—and remaining in—the program.  *See id.* § 636(j)(10)(C); 13 C.F.R. § 124.2.  Specifically, at all times applicants and participants must: (1) be a "small" business, as that term is defined in 13 C.F.R. § 121, *see* 13 C.F.R. §§ 124.101, 124.102; (2) demonstrate their business's potential to succeed, *see id.* § 124.101; and (3) have a majority owner or owners who are current U.S. residents and citizens of good character, and who are also "socially and economically disadvantaged" as the statute defines those terms, *id.*

---

[1] A business may obtain SDB status by virtue of applying for and participating in the Section 8(a) program—and only SDBs may participate in the Section 8(a) program—however, a small business may also be deemed an "SDB" for purposes of government contracting *without* participating in the Section 8(a) program.  *See, e.g.*, Small Disadvantaged Business Program, 73 Fed. Reg. at 57,491–92.  In other words, a small business must be an SDB to participate in the Section 8(a) program, but it need not participate in the program to be an SDB.

The dispute in the instant case centers on the statutory definition of "socially disadvantaged individuals." Section 637 of Title 15 of the U.S. Code defines "[s]ocially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5); *see also id.* § 631(f)(1)(B) (individuals may be "socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control"). Pursuant to the statute, "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities[.]" *Id.* § 631(f)(1)(C). Thus, the statute establishes "a rebuttable presumption" that members of these particular groups, and certain other groups, are "socially disadvantaged[,]" 13 C.F.R. § 124.103(b)(1), and if an individual business owner is not a member of a presumptively socially disadvantaged group, then he or she "must establish individual social disadvantage by a preponderance of the evidence[,]" *id.* § 124.103(c)(1). *See also id*. § 124.103(c)(2) (explaining that sufficient "[e]vidence of individual social disadvantage" has several "elements[,]" including "[a]t least one objective distinguishing feature that has contributed to social disadvantage" and "[p]ersonal experiences of substantial and chronic social disadvantage in American society").

In addition to defining "socially disadvantaged individuals[,]" the statute also defines "[e]conomically disadvantaged individuals[.]" 15 U.S.C. § 637(a)(6)(A). These are "socially disadvantaged individuals whose ability to compete in the free

enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* Factors that determine economically disadvantaged status include "income for the past three years[,] . . . personal net worth, and the fair market value of all assets, whether encumbered or not." 13 C.F.R. § 124.104(c). As explained, a small business that can demonstrate its ability to succeed and that is owned by an individual citizen of good character who is considered socially and economically disadvantaged within the statutory definitions is eligible to participate in the Section 8(a) program. *See id.* § 124.101.

The Section 8(a) program is but "one of a number of government-wide programs [that are] designed to encourage the issuance of procurement contracts to" certain small businesses, *DynaLantic*, 885 F. Supp. 2d at 244 (citing 15 U.S.C. § 644), including businesses that are owned by women, businesses that are owned by service-disabled veterans, and businesses that are located in historically underutilized business zones, known as "HUBZones." *See* 15 U.S.C. § 637(m) (establishing procurement program for woman-owned small businesses); *id.* § 657f (establishing procurement program for small businesses owned by service-disabled veterans); *id.* § 657a (establishing contracting assistance and procurement program for HUBZone small businesses). As part of the legislative scheme that governs the Section 8(a) business development program and similar programs directed toward developing opportunities for small businesses in America, Congress has specifically directed the President to "establish [annual] Government-wide goals for procurement contracts awarded to [various] small business concerns[.]" *Id.* § 644(g)(1)(A). With respect to SDBs in particular, Congress

has specified that the goal for participation "shall be established at not less than 5

percent of the total value of all prime contract and subcontract awards for each fiscal

year." *Id.* § 644(g)(1)(A)(iv).[2] The participation goals with respect to other small

business programs are similar—*see, e.g.*, *id.* § 644(g)(1)(A)(v) ("not less than 5

percent" for woman-owned small businesses); *id.* § 644(g)(1)(A)(ii) ("not less than 3

percent" for small businesses owned by service-disabled veterans); *id.*

§ 644(g)(1)(A)(iii) ("not less than 3 percent" for HUBZone small businesses)—and all

of the statutory targets are "aspirational" and not mandatory, *DynaLantic*, 885 F. Supp.

2d at 244 (quotation marks omitted).

### B. Rothe's Claim

Rothe is a Texas corporation that operates in the computer services industry and

bids on and performs government procurement contracts on a nationwide basis. (*See*

Affidavit of Dale Patenaude ("Patenaude Aff."), Ex. 1 to Pl.'s Compl., ECF No. 1-1, at

3; *see also* Defs.' Statement of Material Facts & Resp. to Pl.'s SOF ("Defs.' SOF"),

ECF No. 64-2, ¶ II.23; Pl.'s Resp. to Defs.' Statement of Material Facts ("Pl.'s SOF

Resp."), ECF No. 68-1, ¶ I.1.)[3] Rothe employs approximately 120 individuals (*see*

Patenaude Aff. at 3), and it allegedly qualifies as a woman-owned small business under

the Act and its accompanying regulations (*see id.*; Pl.'s SOF Resp. ¶ I.1). According to

Plaintiff, Rothe derives "[a]pproximately 85-90%" of its annual gross income from

government contracts. (Patenaude Aff. at 4; *see also* Pl.'s Statement of Material Facts

---

[2] This five percent goal relates to *all* SDBs, not just those that are Section 8(a) participants, and thus this figure includes, but is not limited to, procurement contracts awarded to Section 8(a) program participants. *See DynaLantic*, 885 F. Supp. 2d at 244–45.

[3] Page numbers throughout this memorandum opinion—except for deposition page numbers—refer to those that the Court's electronic filing system assigns.

("Pl.'s SOF"), ECF No. 55-1, ¶ 24.) Specifically, Rothe bids on and performs DOD and military contracts that, for the most part, fit into one of the following five North American Industry Classification System ("NAICS") codes: Custom Computer Programming Services (541511); Computer Systems Design Services (541512); Computer Facilities Management Services (541513); Other Computer Related Services (541519); and Facilities Support Services (561210). (Patenaude Aff. at 3–4.)[4] Rothe does not participate in the Section 8(a) program and does not allege that it has ever applied to the program or otherwise sought certification as an SDB. (*See* Patenaude Aff. at 2; Pl.'s SOF ¶ 18; *see also* Defs.' SOF ¶ II.18.)

Rothe filed the instant action against the DOD and the Small Business Administration on May 9, 2012. (*See* Compl.) The gravamen of Rothe's complaint is that the Section 8(a) program "prevents Rothe from bidding on [DOD] contracts" on the basis of race in violation of Rothe's rights under the equal protection component of the Due Process Clause of the Fifth Amendment (*id.* ¶ 2), and that the program is an unconstitutional delegation of authority to the Small Business Administration "to make or enact racial classifications" (*id.* ¶ 30). Accordingly, Rothe seeks (1) a declaratory judgment that the definition of "socially disadvantaged individuals" as set forth in the

---

[4] The NAICS code system "is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy." U.S. Census Bureau, *North American Industry Classification System: Introduction to NAICS*, http://www.census.gov/eos/www/naics/index.html (last visited June 5, 2015). It is a "2- through 6-digit hierarchical classification system," meaning that "[e]ach digit in the code is part of a series of progressively narrower categories, and the more digits in the code signify greater classification detail." U.S. Census Bureau, *North American Industry Classification System: Frequently Asked Questions*, http://www.census.gov/eos/www/naics/faqs/faqs.html (last visited June 5, 2015). In each code, "[t]he first two digits designate the economic sector, the third digit designates the subsector, the fourth digit designates the industry group, the fifth digit designates the NAICS industry, and the sixth digit designates the national industry." *Id.* Some federal agencies use NAICS codes in the course of awarding government contracts to small businesses. *See, e.g.*, 15 U.S.C. § 644(a).

statutes pertaining to the Section 8(a) program is unconstitutional on its face (*see id.* ¶¶ 52–54); (2) a permanent injunction that prevents Defendants from using the "socially disadvantaged individuals" definition to exclude Rothe from bidding on contracts reserved for Section 8(a) participants (*see id.* ¶¶ 56–59); and (3) an award of reasonable attorneys' fees, costs, and expenses (*see id.* ¶¶ 61–64).

Notably, as mentioned earlier, the legal claims in Rothe's complaint are nearly identical to the facial constitutional claim in the second amended complaint that was filed in *DynaLantic Corp. v. Department of Defense*, a case that was pending in this district when Rothe's complaint was filed. *See* Second Am. Compl., DynaLantic v. Dep't of Defense, 885 F. Supp. 2d 237 (D.D.C. 2012) (No. 95-cv-2301) ("DynaLantic's Second Am. Compl."). Given the similarity of the two cases—and also the fact that the *DynaLantic* court considered and reached the merits of the constitutional claim—a brief description of the facts, circumstances, and holding of *DynaLantic* is warranted.

### C. *DynaLantic Corp. v. Department of Defense*

In *DynaLantic*, a small business that bid on and performed contracts and subcontracts in the military simulation and training industry—but that did not participate in the Section 8(a) program and was not an SDB—sued the DOD, the Small Business Administration, and the Department of the Navy alleging, *inter alia*, that the statutory provisions of Section 8(a) limiting certain contract awards to "small business concerns owned and controlled by 'socially and economically disadvantaged individuals'" were unconstitutional on their face and also as applied to the industry in which the plaintiff operated. DynaLantic's Second Am. Compl. ¶ 9; *see also DynaLantic*, 885 F. Supp. 2d at 246–47. Specifically, DynaLantic argued that the challenged provisions prevented it and other small businesses "from competing for

federal procurements . . . on the basis of race, thereby 'violat[ing] DynaLantic's rights under . . . the equal protection component of the Due Process Clause of the Fifth Amendment of the Constitution.'" *DynaLantic*, 885 F. Supp. 2d at 247 (second alteration in original) (quoting DynaLantic's Second Am. Compl. ¶ 23). After extensive discovery, briefing, and submissions by amici, the Court (Sullivan, J.) granted summary judgment on the facial constitutional claim in favor of the government, and granted summary judgment on the as-applied claim to DynaLantic. *See id.* at 248–83.

With respect to the applicable legal standards, the Court explained that to prevail on its facial constitutional claim DynaLantic would have to "'establish that no set of circumstances exist[ed] under which the [challenged provisions] would be valid.'" *Id.* at 249 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Moreover, because constitutional validity in a particular circumstance turned on the application of strict scrutiny to the admittedly race-conscious provisions at issue, the government would have to show both the existence of a compelling governmental interest underlying the challenged provisions (supported by a strong basis in evidence that race-based remedial action was required to further such interest) and that the challenged provisions were narrowly tailored to achieve the articulated compelling interest. *See id.* at 250–51.

The Court then engaged in a detailed examination of the challenged statutory provisions, the arguments of the parties and their amici, relevant precedent, and the extensive record evidence, including disparity studies on racial discrimination in federal contracting across various industries. *See id.* at 251–80, 283–91. Ultimately, the Court concluded "that Congress ha[d] a compelling interest in eliminating the roots of racial

10
**A000027**

discrimination in federal contracting, funded by federal money[,]" and also that the government "ha[d] established a strong basis in evidence to support its conclusion that remedial action was necessary to remedy that discrimination" insofar as it provided "extensive evidence of discriminatory barriers to minority business formation . . . [and] minority business development," as well as "significant evidence that, even when minority businesses are qualified and eligible to perform contracts in both the public and private sectors, they are awarded these contracts far less often than their similarly situated non-minority counterparts." *Id.* at 279. The Court also found that DynaLantic had failed "to present credible, particularized evidence that undermined the government's compelling interest [or that] demonstrated that the government's evidence 'did not support an inference of prior discrimination and thus a remedial purpose.'" *Id.* (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 293 (1986) (O'Connor, J., concurring)).

With respect to narrow tailoring, the *DynaLantic* court considered several factors, including: "(1) the efficacy of alternative, race-neutral remedies, (2) flexibility, (3) over- or under-inclusiveness of the program, (4) duration, (5) the relationship between numerical goals and the relevant labor market, and (6) the impact of the remedy on third parties." *Id.* at 283 (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality and concurring opinions)). Upon consideration of all of these factors, *see id.* at 283–91, the Court concluded that "the Section 8(a) program is narrowly tailored on its face[,]" *id.* at 291. Consequently, because the government had demonstrated that Section 8(a)'s race-conscious provisions were narrowly tailored to further a compelling state interest, the Court held that strict scrutiny was satisfied in the

context of "the construction industry . . . [and] in other industries such as architecture
and engineering, and professional services as well[,]" *id.* at 279–80, and because
DynaLantic had thus failed to meet its burden to show that the challenged provisions
were unconstitutional in all circumstances, the Court held that Section 8(a) was
constitutional on its face and entered summary judgment on the facial constitutional
claim in the government's favor, *see id.* at 293.[5]

The parties in *DynaLantic* cross-appealed to the United States Court of Appeals
for the District of Columbia Circuit in October of 2012. *See* Defs.' Notice of Appeal,
DynaLantic v. Dep't of Defense, 885 F. Supp. 2d 237 (D.D.C. 2012) (No. 95-cv-2301),
ECF No. 252; Pl.'s Notice of Cross-Appeal, DynaLantic v. Dep't of Defense, 885 F.
Supp. 2d 237 (D.D.C. 2012) (No. 95-cv-2301), ECF No. 254. On January 31, 2014, this
Court stayed proceedings in the instant case pending resolution of the *DynaLantic*
appeal. (*See* Order, Dec. 23, 2013, ECF No. 43, at 1.) However, on February 11, 2014,
the parties in this matter notified this Court that the D.C. Circuit had dismissed
*DynaLantic* after the parties in that case reached a settlement and withdrew their appeal.
(*See* Joint Notice of Dismissal of *DynaLantic* & Status Report, ECF No. 47, at 1–2.)

### D. Procedural History

As noted, Rothe filed its action challenging the facial constitutionality of the
Section 8(a) program on May 9, 2012, while the *DynaLantic* case was still pending in

---

[5] The Court reached a different conclusion with respect to DynaLantic's as-applied challenge.
Specifically, because "defendants concede[d] that they d[id] not have evidence of discrimination in [the
military simulation and training] industry[,]" the Court concluded that "the government ha[d] not met
its burden to show a compelling interest in remedying discrimination in [that] industry[.]" *DynaLantic*,
885 F. Supp. 2d at 280, 283. Consequently, the Court granted summary judgment in DynaLantic's
favor on its as-applied challenge. *See id.* at 282 ("The fact that Section 8(a) is constitutional on its face
. . . does not give the [government] carte blanche to apply it without reference to the limits of strict
scrutiny. Rather, agencies have a responsibility to decide if there has been a history of discrimination
in the particular industry at issue[.]").

the district court—both actions were treated as related cases and assigned to the same

district judge.  That judge permitted discovery to proceed in the instant matter at the

parties' urging (*see* Scheduling Order, Sept. 18, 2012, ECF No. 23, at 2; *see also* Pl.'s

Suppl. Resp. to the Court's Minute Orders & Scheduling Recommendations, ECF

No. 21, at 4; Defs.' Suppl. Resp. to the Court's Minute Orders & Scheduling

Recommendations, ECF No. 22, at 5), and discovery continued even after the

*DynaLantic* opinion upholding the facial constitutionality of the Section 8(a) program

issued.  The instant action was transferred to the undersigned on April 5, 2013, while

discovery was still underway.  (*See* Minute Entry, Apr. 5, 2013; *see also* Am.

Scheduling Order, ECF No. 24, at 2; Minute Order, Dec. 18, 2012 (extending discovery

period); Minute Order, Mar. 25, 2013 (same).)

     During the discovery period, the parties prepared and exchanged expert reports

regarding evidence of discrimination in government contracting.  Defendants retained

two experts, who testified, broadly speaking, that socially disadvantaged and minority-

owned small businesses are significantly less likely, statistically, to win government

contracts than their non-minority and non-SDB counterparts (*see* Report of Defs.'

Expert Robert N. Rubinovitz ("Rubinovitz Report"), ECF No. 44-3, at 12; Additional

Analysis by Dr. Robert Rubinovitz ("Rubinovitz Suppl. Report"), ECF No. 44-4, at 2),

and that minority-owned businesses across the country are substantially underutilized in

government contracting—a phenomenon that, according to these experts, cannot be

explained by nondiscriminatory factors (*see* Report of Defs.' Expert Jon Wainwright

("Wainwright Report"), ECF No. 46-3, at 27, 97).  Plaintiff also engaged two experts,

and Plaintiff's experts maintained that Defendants' experts' conclusions were incorrect

largely because their data and methods were flawed.  (*See, e.g.*, Report of Pl.'s Expert
Dale Patenaude ("Patenaude Report"), ECF No. 49-2, at 2; Report of Pl.'s Expert John
Charles Sullivan ("Sullivan Report"), ECF No. 49-4, at 11–12, 23–37.)

A series of *Daubert* motions followed: specifically, Rothe filed a single motion
to exclude or limit the testimony of Defendants' experts Robert Rubinovitz and Jon
Wainwright (*see* Pl.'s Mot. to Exclude or Limit Test. of Defs.' Experts & Mem. in
Supp. ("Pl.'s *Daubert* Br."), ECF No. 45) on the grounds that their testimony is both
unreliable and irrelevant to the factual matters at hand.  Defendants filed two separate
motions to exclude the reports and testimony of Plaintiff's experts Dale Patenaude and
John Charles Sullivan.  (*See* Defs.' Mot. in Limine to Exclude the Expert Reports &
Test. of Pl.'s Expert Dale Patenaude ("Defs.' Patenaude *Daubert* Mot."), ECF No. 44;
Defs.' Mot. in Limine to Exclude the Testimony and Ops. of Pl.'s Expert John Charles
Sullivan, Esq. ("Defs.' Sullivan *Daubert* Mot."), ECF No. 46.)  In essence, Defendants
contend that Plaintiff's experts are not qualified to testify as experts and that their
proffered testimony is unreliable.  (*See* Defs.' Mem. in Supp. of Defs.' Patenaude
*Daubert* Mot. ("Defs.' Patenaude *Daubert* Br."), ECF No. 44-1, at 9–19; Defs.' Mem. in
Supp. of Defs.' Sullivan *Daubert* Mot. ("Defs.' Sullivan *Daubert* Br."), ECF No. 46-1,
at 9–20.)

Rothe then filed a motion for summary judgment with respect to its claim that
the definition of "socially disadvantaged individual" as it appears in the Act and is used
in the context of administering the Section 8(a) program is unconstitutional on its face.
(*See* Pl.'s Mot. for Summ. J., ECF No. 55.)  Rothe's motion argues, first, that Section
8(a)'s definition of socially disadvantaged individuals "is unconstitutional racial

balancing, for which there is no compelling interest, and for which narrow tailoring is impossible"; and second, that the definition violates the nondelegation doctrine insofar as it "lack[s] any intelligible principle to limit the Executive's discretion in deciding whether racial, ethnic or cultural bias has occurred or even what constitutes a racial, ethnic, or cultural group."  (Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s MSJ Br."), ECF No. 56, at 7.)

Defendants responded by filing a cross-motion for summary judgment (Defs.' Cross-Mot. for Summ. J., ECF No. 64), in which Defendants maintain that "Rothe's facial challenge is identical to that brought and rejected in *DynaLantic* . . . and fails for the same reasons" (Defs.' Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. & Resp. to Pl.'s Mot. for Summ. J. ("Defs.' MSJ Br. & Resp."), ECF No. 64-1, at 13). Specifically, Defendants assert that (1) the government has a compelling "interest in 'breaking down barriers to minority business development created by discrimination and its lingering effects'" (*id.* (quoting *DynaLantic*, 885 F. Supp. 2d at 251)); (2) there is "a 'strong basis in evidence to support [the government's] conclusion that remedial action was necessary'" to further that interest (*id.* (quoting *DynaLantic*, 885 F. Supp. 2d at 279)); and (3) the statute is narrowly tailored and "designed to minimize the burden on non-minority firms" (*id.* at 14 (citing *DynaLantic*, 885 F. Supp. 2d at 290)). Defendants also argue that the Section 8(a) program conforms to the nondelegation doctrine because the statute defines "socially disadvantaged individuals" and sets forth Congress' relevant findings, and it also articulates the policies underlying the program—all of which serve to guide the Small Business Administration in implementing the program.  (*See id.* at 90.)

This Court held a hearing on the parties' *Daubert* and cross summary judgment motions on October 20, 2014.

## II.    DAUBERT MOTIONS

This Court will address the parties' *Daubert* arguments first, because "[i]f the Court finds [an expert's] opinions to be clearly unreliable, it may disregard his reports in deciding whether plaintiffs have created a genuine issue of material fact." *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 35 (D.D.C. 2004) (citing *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000)); *see also Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 84 (D.D.C. 2001) (addressing evidentiary motions first, "[s]ince a motion for summary judgment requires an examination of the entire record, including all pleadings and all admissible evidence").

As concerns Defendants' experts, Rothe contends that Rubinovitz's and Wainwright's testimony is irrelevant because it has not been submitted to Congress (*see* Pl.'s *Daubert* Br. at 4), and that it contains both inadmissible legal conclusions—such as whether the strong basis in evidence requirement has been met (*see id.* at 10, 12)— and unreliable opinions regarding statistical facts (*see id.* at 16–17 (arguing that Defendants' experts have analyzed contracting data using fewer than all six-digits of only some NAICS codes such that not every industry and subsector is captured)).  For their part, Defendants contend that neither Patenaude nor Sullivan qualifies as an expert in any field of scientific knowledge that is pertinent to the instant case (*see* Defs.' Patenaude *Daubert* Br. at 9–12; Defs.' Sullivan *Daubert* Br at 9–14), and that Patenaude's and Sullivan's testimony is unreliable because both experts rely on inaccurate data and employ methods in their critiques of Rubinovitz and Wainwright that are speculative and scientifically unproven (*see* Defs.' Patenaude *Daubert* Br. at

12–19; Defs.' Sullivan *Daubert* Br. at 14–20).  Defendants further contend that

Sullivan's testimony contains impermissible legal opinions, such as whether the

disparity studies at issue are legally sufficient to justify the Section 8(a) program.  (*See*

Defs.' Sullivan *Daubert* Br. at 20.)

      For the reasons that follow, this Court finds that Rubinovitz's and Wainwright's

expert reports are reliable and potentially helpful to the trier of fact, and thus properly

admitted, while Patenaude's and Sullivan's testimony fails to conform with the

applicable legal standards related to expert qualifications and reliability, and therefore

must be excluded.

## A. Legal Standard For Admitting Expert Evidence

      Federal Rule of Evidence 702 governs the admissibility of expert evidence.  It

provides that:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of
> an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and
> methods; and
>
> **(d)** the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "imposes a special obligation on a trial judge to 'ensure

that any and all scientific testimony . . . is not only relevant, but reliable.'"  *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (alteration in original) (quoting *Daubert*,

509 U.S. at 589).  Thus, federal courts have a "basic gatekeeping obligation" with

respect to expert testimony.  *Id.*

Rule 702 requires that an expert be qualified to testify on the basis of "knowledge, skill, experience, training, or education[,]" and thus encompasses "not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Fed. R. Evid. 702 advisory committee's note (1972) (internal quotation marks and citation omitted). While "a person who holds a graduate degree typically qualifies as an expert in his or her field[,]" *Khairkhwa v. Obama*, 793 F. Supp. 2d 1, 11 (D.D.C. 2011), such formal education is not required and "an expert may still be qualified on the basis of his or her practical experience or training[,]" *Robinson v. District of Columbia*, No. 09-cv-2294, 2014 WL 6778330, at *4 (D.D.C. Dec. 2, 2014). However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note (2000). Regardless of the basis on which a witness purports to qualify as an expert, as part of its gatekeeping function the court must assess whether a proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline." *Daubert*, 509 U.S. at 592.

Once the court is satisfied that the witness is an expert within the meaning of Rule 702, "[u]nder *Daubert* the district court is required to address two questions, first whether the expert's testimony is based on 'scientific knowledge,' and second, whether the testimony 'will assist the trier of fact to understand or determine a fact in issue.'" *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1126 (D.C. Cir. 2001) (quoting *Daubert*,

509 U.S. at 592). With respect to the first prong, "the district court's focus is on the methodology or reasoning employed." *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). Specifically, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also Ambrosini*, 101 F.3d at 133 ("'In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.'" (quoting *Daubert*, 509 U.S. at 590)).

There are several factors that courts typically consider in making a scientific validity determination: "(1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community." *Ambrosini*, 101 F.3d at 134 (citing *Daubert*, 509 U.S. at 593–94.) This "inquiry is a 'flexible one,' no one factor is dispositive, and the four-factor list is not exhaustive." *United States v. Machado-Erazo*, 950 F. Supp. 2d 49, 52 (D.D.C. 2013) (internal quotation marks and citation omitted). Moreover, whatever factors a court considers, "[t]he trial judge in all cases of proffered expert testimony must find that [the testimony] is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note (2000).

The second *Daubert* prong relates to relevance and is fairly straightforward. *See Ambrosini*, 101 F.3d at 134 (citing *Daubert*, 509 U.S. at 593–94). "The district court must determine whether the proffered expert testimony 'is sufficiently tied to the facts

of the case that it will aid the [factfinder] in resolving a factual dispute.'" *Id.* (quoting *Daubert*, 509 U.S. at 591). Where, as here, a party moves to exclude expert testimony, "[t]he party seeking to introduce expert testimony must demonstrate its admissibility by a preponderance of the evidence." *Harris v. Koenig*, 815 F. Supp. 2d 6, 8 (D.D.C. 2011) (citing *Daubert*, 509 U.S. at 592 n.10). "The presumption under the Rules is that expert testimony is admissible once a proponent makes the requisite threshold showing; further disputes go to weight, not admissibility." *Machado-Erazo*, 950 F. Supp. 2d at 52.

### B.  The Proffered Expert Evidence In The Instant Case

1. Rubinovitz's Testimony Is Reliable, Relevant, And Admissible

Robert Rubinovitz holds a Ph.D. in economics from the Massachusetts Institute of Technology and currently serves as the Deputy Chief Economist at the United States Department of Commerce. (*See* Rubinovitz Report at 2.) Using regression analysis, Rubinovitz claims to have isolated the effect of minority ownership on the likelihood of a small business receiving government contracts. (*See id.* at 10–12; *see also* Rubinovitz Suppl. Report at 2.)[6] Specifically, Rubinovitz used a "logit model" (Rubinovitz Report at 10), to examine government contracting data for fiscal year 2012 that he collected from the General Services Administration's System for Award Management, the Federal Procurement Data System, the Small Business Administration, and other public and private sources (*see id.* at 4–9 (discussing sources)), in order to determine "whether the data show any difference in the odds of contracts being won by minority-owned small

---

[6] Regression analysis is a widely accepted statistical tool and a common evidentiary feature in federal courts, particularly in the context of discrimination cases. *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 400–01 (1986) (discussing admissibility of regression analyses in Title VII cases).

businesses, particularly those identified as SDBs and those that are part of the 8(a) program, relative to other small businesses" (*id.* at 10).  Rubinovitz controlled for other variables that could "influence the odds of whether or not a given firm wins a contract" (*id.* at 11)—such as business size, age, and level of security clearance (*see id.*)—and concluded that "the odds of minority-owned small firms and non-8(a) SDB firms winning contracts were lower than small non-minority and non-SDB firms" (*id.* at 12).  In particular, "the odds of an SDB firm winning a contract is roughly 11 percent lower than other types of small businesses, while small minority-owned firms, regardless of whether they are SDBs or in the 8(a) program, had roughly 30 percent lower odds of winning a contract than other firms."  (*Id.*)  In addition, Rubinovitz found that "non-8(a) minority-owned SDBs are statistically significantly less likely to win a contract in industries accounting for 94.0% of contract actions, 93.0% of dollars awarded, and in which 92.2% of non-8(a) minority-owned SDBs are registered[,]" and that "[t]here is no industry where non-8(a) minority owned SDBs have a statistically significant advantage in terms of winning a contract from the federal government."  (Rubinovitz Suppl. Report at 2.)  This Court has considered Rothe's objections to Rubinovitz's testimony, and concludes that the testimony is fully admissible under Rule 702.

First of all, Rubinovitz's qualifications to testify as an expert are undisputed (*see* Hr'g Tr. at 17:18–18:1 (Plaintiff's counsel conceding that Defendants' experts are qualified)), and this Court finds that Rubinovitz is, indeed, qualified "by knowledge, skill, experience, training, [and] education[,]" Fed. R. Evid. 702.  As for the reliability of Rubinovitz's testimony, this Court rejects Rothe's contention that Rubinovitz's expert opinion is based on insufficient data, *i.e.*, that his analysis of data related to a

subset of the relevant industry codes is too narrow to support his scientific conclusions. (*See, e.g.*, Pl.'s *Daubert* Br. at 16–17.)  It is well established that a court may not exclude an expert's otherwise reliable and relevant testimony simply because, without more, the testimony is insufficient to prove a proponent's *entire* case.  *See, e.g.*, *McReynolds*, 349 F. Supp. 2d at 35 ("'[T]he question before [the Court] is not whether the reports proffered by plaintiffs prove the entire case; it is whether they were prepared in a reliable and statistically sound way, such that they contained relevant evidence that a trier of fact would have been entitled to consider.'" (second alteration in original) (quoting *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000))).

Moreover, Rubinovitz specifically addresses Rothe's critique about his data set, explaining that, from a mathematical perspective, excluding certain NAICS codes and analyzing data at the three-digit level actually *increases* the reliability of his results. For example, because "NAICS is a hierarchical classification system" and "industry classifications become more narrowly defined—and more sparsely populated" as "more digits are added to the code," Rubinovitz explains that he opted to "use codes at the three-digit level as a compromise[,] balancing the need to have sufficient data in each industry grouping and the recognition that many firms can switch production within the broader three-digit category." (Rubinovitz Report at 5.)  Rubinovitz also excluded "[c]ertain NAICS industry groups" from his regression analyses "because of incomplete data, irrelevance, or because data issues in a given NAICS group prevented the regression model from producing reliable estimates[.]" (*Id.* at 7; *see also id.* at 8 (listing NAICS codes not included in analyses).)  This Court finds that Rubinovitz's reasoning with respect to the exclusions and assumptions he makes in the analysis are

fully explained and scientifically sound; thus, his exclusions are not a valid basis for concluding that his expert testimony is unreliable. *Cf. Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known.").

Rothe also contends that, even if Rubinovitz's testimony is reliable, it should be deemed irrelevant to this Court's assessment of Section 8(a)'s constitutionality because it is *new* evidence, in the sense that Rubinovitz's testimony was not before Congress at the time it enacted or reauthorized Section 8(a). (*See* Pl.'s *Daubert* Br. at 4 ("The law is now very clear that post-reauthorization evidence is precluded and that experts are neither required for, nor relevant to, the required causal relationships between the alleged data before Congress and the statutory racial classification that Congress enacted." (citing *Rothe Dev. Corp. v. Dep't of Defense*, 545 F.3d 1023, 1031, 1040–41 (Fed. Cir. 2008))).) The issue of the relevance of post-enactment evidence is one that has been raised repeatedly in the context of constitutional challenges to federal statutes, *see, e.g.*, *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. 2000); *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade Cnty.*, 122 F.3d 895, 911–12 (11th Cir. 1997); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003–04 (3d Cir. 1993), and "nearly every circuit to consider this question has held that reviewing courts" need *not* limit themselves to the particular evidence that Congress relied upon when it enacted the statute at issue, *DynaLantic*, 885 F. Supp. 2d at 257. Thus, although Rothe is correct to point out that, where Congress "makes [a] racial distinction [it] must have had a strong basis in evidence to conclude that remedial action was necessary *before* it embarks on an affirmative action program[,]" *Shaw v.*

*Hunt*, 517 U.S. 899, 910 (1996) (emphasis in original) (internal quotation marks and

citation omitted); (*see also* Pl.'s MSJ Br. at 15), this statement of the Supreme Court

does not mean that post-enactment evidence is irrelevant to constitutional review;

indeed, as the *DynaLantic* court concluded, "[p]ost-enactment evidence is particularly

relevant when, as here, the statute is over thirty years old and the evidence used to

justify Section 8(a) is stale for purposes of determining a compelling interest in the

present[,]" *DynaLantic*, 885 F. Supp. 2d at 258. This Court agrees, and it too concludes

that Rothe's post-enactment relevance argument is rendered even less persuasive given

the fact that the Act requires the Small Business Administration to "report annually to

Congress on the status of small disadvantaged businesses generally and the Section 8(a)

program in particular[,]" and "thus, the statute itself contemplates that Congress will

review the 8(a) program on a continuing basis." *Id.*[7]

This Court also disagrees with Rothe's assertion that Rubinovitz's testimony

should be excluded as irrelevant because it contains an inadmissible legal conclusion.

(*See* Pl.'s *Daubert* Br. at 12.) Rothe points to an excerpt from Rubinovitz's deposition

where Rubinovitz was asked if the results of his analyses are "consistent with a finding

that SDBs face discrimination" (*id.* (citation omitted)), and Rubinovitz answered in the

affirmative—"[i]t would be consistent with that finding, yes" (*id.* (citation omitted)).

Rothe insists that such testimony "cannot properly assist the trier of fact" in

---

[7] The Supreme Court's opinion in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), which struck down the Voting Rights Act's formula for selecting jurisdictions subject to preclearance procedures, is not to the contrary. In *Shelby County*, the Supreme Court found that Congress reverse-engineered the formula to cover particular jurisdictions rather than base the formula on compiled record evidence, *Shelby County*, 133 S. Ct. at 2629, and the Court did not even *discuss*, much less rule upon, the issue of the admissibility of post-enactment evidence. Consequently, Rothe's reliance on *Shelby County* in this context is misplaced. (*See, e.g.*, Pl.'s MSJ Br. at 16 ("The *Shelby County* case reversed and clearly rejected the approval of post-enactment evidence by the D.C. Circuit Court of Appeals.").)

understanding the evidence or determining facts in issue and thus is not relevant under

*Daubert*.  (*Id.* at 2); *see also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d

1207, 1212 (D.C. Cir. 1997).  But it is clear beyond cavil that an expert may give "his

'opinion as to facts that, if found, would support a conclusion that the legal standard at

issue was satisfied[.]'"  *Kapche v. Holder*, 677 F.3d 454, 464 (D.C. Cir. 2012) (quoting

*Burkhart*, 112 F.3d at 1212–13).  And Rothe has not demonstrated that Rubinovitz did

anything more than that here.  That is, Rubinovitz was not asked directly to state his

opinion on the legal issue—*i.e.*, whether SDBs face discrimination sufficient to justify

race-based remedial action—but instead, the carefully-worded question asked

Rubinovitz to opine as to whether *the results of his analysis* were "consistent" (or,

presumably, inconsistent) with the presence of discrimination.  (Pl.'s *Daubert* Br. at 12

(citation omitted).)  In the absence of any binding precedents that cast doubt on the

admissibility of Rubinovitz's answer, this Court finds that Rubinovitz's testimony is

relevant insofar as it will assist the factfinder in determining whether the data presented

shows that the applicable legal standards in this case have been met.

In sum, Rubinovitz qualifies as an expert, and his testimony is both reliable and

relevant.  Therefore, this Court will admit and consider Rubinovitz's expert testimony

when evaluating the parties' cross-motions for summary judgment.

### 2. Wainwright's Testimony Is Reliable, Relevant, And Admissible

Defendants' second expert witness, Jon Wainwright, is a senior vice president at

NERA Economic Consulting and holds a Ph.D. in economics from the University of

Texas at Austin.  (*See* Wainwright Report at 7.)  Wainwright represents that he has

"served as the project director and principal investigator for more than 30 studies of

business discrimination" (*id.*), and he has also testified before Congress regarding

business discrimination on several occasions (*see id.* at 8). Wainwright's report in the
instant case primarily concerns disparity studies, which are studies designed to measure
the availability and utilization of minority-owned businesses ("MBEs") in government
contracting. (*See id.* at 13 ("A disparity analysis of public spending is simply a
comparison of MBE utilization to MBE availability in various categories of contracting
relevant to a given agency.").) Wainwright reviewed the results of 107 studies
conducted since the year 2000, all but 32 of which were submitted to Congress. (*See id.*
at 16.) Specifically, Wainwright examined the disparity indexes for these studies,
which he calculated "by dividing the respective MBE utilization percentage by its
associated MBE availability percentage, and multiplying the result by 100." (*Id.* at 28.)
In his expert report, Wainwright explains that "[a] disparity index of 100 or more
indicates that MBEs are being utilized at or above their estimated availability level[,]"
while "[a] disparity index of less than 100 indicates that MBEs are being utilized below
their estimated availability level." (*Id.*) Significantly for present purposes, Wainwright
states that "[a] disparity index of 80 or lower is commonly taken as a strong indicator
that discrimination is adversely affecting MBEs." (*Id.* (citing 29 C.F.R. § 1607.4(d)).)
In Wainwright's opinion, the disparity studies he examined share a "widespread finding
of substantial underutilization of MBEs throughout the United States" across several
industries. (*Id.* at 27.)

 This Court has considered the proffered expert testimony and the relevant
admissibility factors and finds that Wainwright's testimony is admissible. Rothe does
not contest that Wainwright is qualified to testify as an expert (*see* Hr'g Tr. at 17:18–
18:1), and Defendants have demonstrated that Wainwright's testimony is both reliable

and relevant. In particular, Wainwright's clearly-explained methodology appears to be scientifically valid, and his testimony regarding such a large body of record evidence will assist the factfinder in determining whether the data shows that the applicable legal standards in this case have been satisfied. *See Ambrosini*, 101 F.3d at 134.

Rothe's arguments to the contrary largely mirror the arguments Rothe makes in attacking Rubinovitz's testimony, and are similarly unpersuasive. For instance, Rothe once again contends that post-enactment evidence is inadmissible *per se*. (*See, e.g.*, Pl.'s *Daubert* Br. at 4 ("The reports—and thus the testimony—of Defendants' experts were never placed before or considered by Congress, which renders them irrelevant as a matter of United States Constitutional law, and therefore inadmissible under [the] Federal Rules of Evidence[.]" (citations omitted)).) As explained above, this Court rejects Rothe's argument against post-enactment evidence and adopts instead the *DynaLantic* court's holding that such evidence is not only admissible but also particularly relevant in the circumstances presented here. *See DynaLantic*, 885 F. Supp. 2d at 258. Consequently, this Court also rejects Rothe's argument that, to the extent that Wainwright's expert "report mixes disparity studies that were allegedly before Congress with ones that were not[,]" Wainwright's testimony is unreliable and inadmissible. (Pl.'s *Daubert* Br. at 15.)

Rothe further maintains that Wainwright's testimony is inadmissible because "the final paragraph of Mr. Wainwright's report is a legal conclusion." (*Id.* at 10; *see also id.* ("The Wainwright report, at best, is ultimately the same legal conclusion the *Dynalantic* court drew[.]").) In that paragraph, Wainwright concludes that (1) "the studies submitted to Congress, taken as a whole, provide strong evidence of large,

adverse, and often statistically significant disparities between minority participation in business enterprise activity and the availability of those businesses"; (2) "these disparities are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination"; and (3) "these disparities therefore are consistent with the presence [of] discrimination in the business market." (Wainwright Report at 97.)  Contrary to Rothe's assertion, Wainwright is not testifying that Section 8(a) survives strict scrutiny; instead, he is offering his expert opinion about what, if anything, the studies he examined demonstrate.  (*See, e.g.*, *id.* at 7 (explaining that the studies "contain significant evidence of large and adverse disparities facing minority business enterprises" and that such disparities "are consistent with the presence of discrimination and its lingering effects in the small business contracting environment").)  Even setting aside the fact that the appropriate remedy for an alleged statement of legal opinion is to exclude only that particular portion of testimony, *see, e.g.*, *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) (excluding expert's opinions only "to the extent that they are phrased in terms of inadequately explored legal criteria or otherwise tell the [trier of fact] what result to reach" (internal quotation marks and citation omitted)), Wainwright's "opinion[s] as to facts that, if found, would support a conclusion that the legal standard at issue [has been] satisfied" may be admitted as expert testimony when all other requirements for admissibility are met, as explained above, *Kapche*, 677 F.3d at 464 (internal quotation marks and citation omitted).

Finally, Rothe argues that Wainwright's testimony is unreliable because of alleged flaws in the disparity studies that form the basis of Wainwright's expert report.

(*See* Pl.'s *Daubert* Br. at 13–14.)  Specifically, Rothe asserts that "the disparity studies do not all classify the same industries in the same way" (*id.* at 13), and that "[n]o collective inference can be drawn when the same industries are placed in different industry groups in different studies" (*id.* at 14).  But even if Rothe's contentions are correct, an attack on the underlying disparity studies does not necessitate the remedy of exclusion; rather, it is clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible [scientific] evidence." *Daubert*, 509 U.S. at 596; *see also Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 7 (D.D.C. 1996) ("[I]t is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak." (internal quotation marks and citation omitted)).  In its gatekeeping function, this Court must be focused solely on the reliability and relevance of the testimony that an expert witness proffers, and it is up to the factfinder "to determine whether [an expert's] opinions are suspect because facts upon which he relied were shown to be inaccurate or unproven." *SEC v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) (footnote omitted).

Accordingly, this Court concludes that Wainwright's expert testimony is admissible evidence, and the Court will consider it when assessing the pending cross-motions for summary judgment.

### 3. Patenaude Is Not Qualified To Testify As A Rebuttal Expert Here

Rothe's first expert witness, Dale Patenaude, is the vice president of Rothe and the husband of Rothe's president, Suzanne Patenaude.  (*See* Patenaude Report at 2; Patenaude Aff. at 2.)  Patenaude holds an undergraduate degree in electrical engineering from the University of Texas at Austin and has worked in government contracting—at

Rothe—since 1972.  (*See* Patenaude Report at 2.)  "During that time[,]" Patenaude

states, "it has been [his] job, avocation and passion to review and analyze . . . data on

small and small disadvantaged businesses for the purpose of knowing where contracts

were being distributed in order to better understand the bid process for federal

government contracts[.]"  (*Id.*)  Patenaude also states that he "operate[s] [his] own

consulting business that provides this same type of econometric analysis consulting to

other businesses to improve their business and bidding efficiencies."  (*Id.*)

Rothe offers Patenaude's testimony "as a response to the errors and omissions in

the reports served by Defendants[.]"  (Pl.'s Resp. to Defs.' *Daubert* Mots. ("Pl.'s

*Daubert* Resp."), ECF No. 49, at 1.)  However, it is undisputed that Patenaude does not

have any formal education or training in statistical or econometric analysis (*see* Dep. of

Dale Patenaude ("Patenaude Dep."), ECF No. 44-9, at 34:3–11), and he has never

worked with regression models prior to this case (*id.* at 45:12–14).  Thus, Patenaude

purports to refute Rubinovitz's testimony "by using basic addition, subtraction,

multiplication, and division[.]"  (Pl.'s *Daubert* Resp. at 2.)  Moreover, Patenaude's

report does not address the statistical significance of any of his calculations.  (*See*

Patenaude Dep. at 50:3–7 ("I didn't do any statistics that required computation of

statistical significance.  Mine were 100 percent significant because they weren't

statistics."); *see also id.* at 16:4–6 (conceding that Patenaude "can't really explain"

"how statistical significance is computed").)

Based on Patenaude's own admissions regarding his lack of training, education,

knowledge, skill, and experience in any statistical or econometric methodology,

Patenaude is plainly unqualified to testify as an expert with respect to Rubinovitz's or

Wainwright's reports.  *See, e.g.*, *Arias v. DynCorp*, 928 F. Supp. 2d 10, 17 (D.D.C.

2013) (finding expert was not qualified under Rule 702, notwithstanding expert's

"impressive credentials," because "plaintiffs [did] not demonstrate[] how [expert's]

academic and professional experiences ma[d]e him qualified to testify" about the

particular factual questions at issue); *Sykes v. Napolitano*, 634 F. Supp. 2d 1, 8 (D.D.C.

2009) (finding purported expert was not qualified under Rule 702 where expert did "not

offer 'expert' testimony based on his years of experience" but "[i]nstead . . . decide[d]

credibility on an incomplete written record, offer[ed] conclusions that have no basis in

fact revealed from his report, and advocate[d] for the Plaintiff rather than providing

expertise to the fact-finder").  It is also apparent that, even if Patenaude did have the

required skill and training to testify as an expert, Rothe has not shown that Patenaude's

testimony here employs "the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field[,]" *Kumho Tire Co.*, 526 U.S. at 152, and thus

his testimony is also unreliable.  Consequently, Patenaude's expert testimony in the

instant case is inadmissible, and this Court will exclude his expert report in its entirety.[8]

      4.  <u>Sullivan's Testimony Is Unreliable And Inadmissible</u>

      Rothe's second expert witness, John Sullivan, holds a J.D. from the University of

Maryland Law School and an undergraduate degree in English and writing from Loyola

College in Baltimore, Maryland.  (*See* Sullivan Report at 50; Dep. of John Charles

Sullivan ("Sullivan Dep."), ECF No. 46-9, at 10:8–21.)  Sullivan has published various

---

[8] This does not mean, of course, that Patenaude is disqualified from testifying to facts within his
personal knowledge and experience, as a lay witness. *See* Fed. R. Evid. 602.  Thus, this Court has
considered and relied upon the representations of fact regarding such matters as the scope of Rothe's
business that are included in the Patenaude affidavit that Plaintiff submitted in conjunction with its
Complaint.

articles on affirmative action and government contracting (*see* Sullivan Report at 51),

has worked on several disparity studies with his colleague George LaNoue (*see id.*; *see*

*also* Sullivan Dep. at 15:21–16:1 (explaining that Sullivan and LaNoue "worked in

tandem")), and has also testified before Congress regarding a particular disparity study

that the Commerce Department conducted in 1998 (*see* Sullivan Report at 53).  Sullivan

acknowledges that he is neither an economist nor a statistician, and that he does not

hold a degree in either field.  (*See* Sullivan Dep. at 9:16–10:1.)

In the proffered expert report, Sullivan purports to "apply [his] extensive

experience and research in the field of disparity studies to examine the record offered

by the government to support its 8(a) program."  (Sullivan Report at 5.)  Specifically,

Sullivan criticizes the vast majority of disparity studies analyzed in Wainwright's report

for, *inter alia*, examining state and local—as opposed to federal—contracting (*see id.* at

3), for utilizing census data (*see id.* at 7, 11–13), and for relying on otherwise "stale"

information (*id.* at 13).  Sullivan also repeats Rothe's arguments against post-enactment

evidence and against analyzing NAICS codes at anything less than the 6-digit level.

(*See id.* at 6 ("Studies that are not before Congress cannot be used to justify a

Congressional program."); *id.* at 4 ("The proper level of analysis should be the precise

six digit NAICS level[.]").)  Ultimately, Sullivan concludes that the record in the

instant case "while hefty, is not sufficient.  It does not justify the racial preferences of

the [Small Business Administration]'s 8(a) program."  (*Id.* at 48.)

This Court finds that, even assuming that Sullivan is qualified to testify as an

expert on disparity studies based on his experience, Rothe has failed to demonstrate by

a preponderance of the evidence that Sullivan's testimony is reliable.  *See Heller v.*

*District of Columbia*, 952 F. Supp. 2d 133, 141 (D.D.C. 2013) ("'[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express[.]'" (quoting *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (emphasis in original))). Sullivan's preferred methodology for conducting disparity studies—including his assertion that the only proper way to determine the availability of minority-owned businesses is to count those contractors and subcontractors that actually perform or bid on contracts (*see* Sullivan Report at 33)—appears to be well outside of the mainstream in this particular field. (*See, e.g.*, Sullivan Dep. at 94:22–95:9 (Sullivan recalls only one disparity study he has ever encountered that he "felt was done properly")); *see also Groobert v. President & Dirs. of Georgetown Coll.*, 219 F. Supp. 2d 1, 9 (D.D.C. 2002) (explaining that expert testimony may be "unreliable when an expert chooses to utilize her own unique methodology rather than the proper analysis which is well-known and respected" (citations omitted)). Moreover, Sullivan acknowledged during his deposition that portions of his report were based either on mistaken assumptions (*see* Sullivan Dep. at 38:20–39:13 (retracting certain opinions because Sullivan "misunderstood" Wainwright's testimony)) or on speculation (*see id.* at 42:21–43:11 (admitting that he "did not do any math" and was "speculating" when he concluded that the availability percentages in certain disparity studies were "'likely overstated'")). And Rothe has not shown that Sullivan's critique of Wainwright's testimony is otherwise reliable. *See Romero v. ITW Food Equip. Grp., LLC*, 987 F. Supp. 2d 93, 105–06 (D.D.C. 2013) (excluding expert testimony based on speculation as unreliable).

Therefore, this Court cannot find that Sullivan's proffered testimony "is properly grounded, well-reasoned, and not speculative[.]" Fed. R. Evid. 702 advisory committee's note (2000); *see also Heller*, 952 F. Supp. 2d at 140 ("The trial judge has 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" (quoting *Kumho Tire Co.*, 526 U.S. at 152)); *Groobert*, 219 F. Supp. 2d at 8 ("General acceptance in the community is an important factor in evaluating an expert's methodology and courts particularly emphasize this *Daubert* factor when reliability focuses on experience." (citing *Kumho Tire Co.*, 526 U.S. at 158)); *Ambrosini*, 101 F.3d at 134 ("[T]he *Daubert* analysis . . . focuses on the court's 'gatekeeper' role as a check on 'subjective belief' and 'unsupported speculation.'" (quoting *Daubert*, 509 U.S. at 590)).

Consequently, this Court will exclude Sullivan's testimony from its consideration of the parties' cross-motions for summary judgment.

## III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

The plaintiff in *DynaLantic* asserted (as Rothe does here) that the race conscious provisions of Section 8(a) rendered the statute unconstitutional on its face, and the *DynaLantic* court fully and thoroughly analyzed the plaintiff's legal position. *See DynaLantic*, 885 F. Supp. 2d at 251–80, 283–91. Although not binding on this Court, *DynaLantic* is persuasive recent precedent from this district, and inasmuch as Rothe seeks to re-litigate the legal issues presented in that case, this Court declines Rothe's invitation to depart from the *DynaLantic* court's conclusion that Section 8(a) is constitutional on its face. This Court also finds that Rothe has failed to show that there is any genuine issue of material fact with respect to whether the Section 8(a) program

violates the nondelegation doctrine, as explained below; thus, this Court concludes that
Defendants are entitled to summary judgment as a matter of law.

## A. Applicable Legal Standard For Summary Judgment

Federal Rule of Civil Procedure 56 makes clear that summary judgment is
appropriate only if there is "no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court's role in
deciding a summary judgment motion is not to "determine the truth of the matter, but
instead [to] decide only whether there is a genuine issue for trial." *Barnett v. PA
Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks and
citation omitted).  "A fact is material if it 'might affect the outcome of the suit under
the governing law,' and a dispute about a material fact is genuine 'if the evidence is
such that a reasonable jury could return a verdict for the non-moving party.'" *Steele v.
Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986)).

In determining whether there is a genuine dispute about material facts, the court
must view the evidence in the light most favorable to the non-moving party and draw all
reasonable inferences in that party's favor.  *See, e.g.*, *Grosdidier v. Broad. Bd. of
Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013); *see also Wiley v.
Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  The moving party may successfully
support its motion by identifying those portions of the record that it believes
demonstrate the absence of a genuine dispute of material fact.  Fed. R. Civ. P.
56(c)(1)(A).  The non-moving party, for its part, must show more than "[t]he mere
existence of a scintilla of evidence in support of" its position; rather, "there must be
evidence on which the jury could reasonably find for the [non-moving party]."

*Anderson*, 477 U.S. at 252. Further, the non-moving party "may not rest upon mere allegations or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks omitted).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989) (alteration in original) (internal quotation marks and citation omitted). "In assessing each party's motion, all underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *Vaughan v. Amtrak*, 892 F. Supp. 2d 84, 91–92 (D.D.C. 2012) (internal quotation marks and citation omitted).

## B. The Section 8(a) Program Is Constitutional On Its Face

The Supreme Court repeatedly has noted that "[f]acial challenges are disfavored for several reasons[,]" not the least of which is that such challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (internal quotation marks and citation omitted); *see also Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010) ("'A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully.'" (quoting *Salerno*, 481 U.S. at 745)). Accordingly, it is clear that plaintiffs advancing facial constitutional challenges must satisfy certain heightened standards in order to prevail, even though

"the precise standard for facial challenges remains 'a matter of dispute[.]'" *Gen. Elec. Co.*, 610 F.3d at 117 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

The parties in the instant case, like the parties in *DynaLantic*, disagree about which legal standard applies to this particular facial challenge. (*See* Pl.'s MSJ Br. at 11–12; Defs.' MSJ Br. & Resp. at 27–29); *see also DynaLantic*, 885 F. Supp. 2d at 249. Specifically, Defendants insist that the Supreme Court's decision in *United States v. Salerno* requires Rothe to show that "no set of circumstances exists under which [Section 8(a)] would be valid[,]" *Salerno*, 481 U.S. at 745, in order to prevail (*see* Defs.' MSJ Br. & Resp. at 27), while Rothe relies on the Federal Circuit's decision in *Rothe Development Corp. v. Department of Defense*, 545 F.3d at 1032, for the proposition that *Salerno*'s so-called "no-set-of-circumstances" test is inapplicable here (*see* Pl.'s MSJ Br. at 11–12; *see also* Mountain States Legal Found.'s Br. as Amici Curiae in Supp. of Pl., ECF No. 62, at 12 (arguing that "this Court is not obligated to follow the 'no-set-of-circumstances' test" because "the D.C. Circuit has not truly re-examined [its] applicability" in light of subsequent Supreme Court precedent)).

Faced with these same conflicting positions, the *DynaLantic* court held that the *Salerno* test applies to facial challenges to the Section 8(a) program because "the *Salerno* test has been adopted by this Circuit and [continually] cited with approval[.]" *DynaLantic*, 885 F. Supp. 2d at 249–50. This Court, too, is persuaded that, in order to justify invalidating all applications of the broad statutory program at issue, Plaintiff must satisfy *Salerno*'s no-set-of-circumstances test, or show that Section 8(a) lacks "any plainly legitimate sweep" because there are not "many circumstances" in which "the statute's application would be constitutional[.]" *Gen. Elec. Co.*, 610 F.3d at 117

(internal quotation marks and citation omitted); *see also Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) ("To succeed in a typical facial attack, [a plaintiff] must establish 'that no set of circumstances exists under which [the challenged statutory provisions] would be valid or that the statute lacks any plainly legitimate sweep.'" (quoting *Stevens*, 559 U.S. at 472)).

This Court also agrees with the *DynaLantic* court (and the parties) that, "to the extent that the Section 8(a) program relies on race-conscious criteria," this Court must employ "strict scrutiny" to determine whether its application is constitutional in a particular circumstance. *DynaLantic*, 885 F. Supp. 2d at 250. As explained above, the Section 8(a) program is specifically directed toward "socially disadvantaged individuals" and that category of persons is presumptively determined by reference to race. 15 U.S.C. §§ 637(a)(5); *see also id.* §§ 631(f)(B), 631(f)(1)(C); 13 C.F.R. § 124.103(b)(1). There is no question that "'[r]acial classifications'" such as the ones at issue here "'are constitutional only if they are narrowly tailored measures that further compelling governmental interests.'" *DynaLantic*, 885 F. Supp. 2d at 250 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)). (*See also* Defs.' MSJ Br. & Resp. at 26 ("[T]he presumption of social disadvantage in the Small Business Act is race-conscious and is subject to strict scrutiny."); Pl.'s MSJ Br. at 9 ("It is undisputed that the section 8(a) statute contains [a] racial classification . . . and therefore that statutory racial classification is subject to judicial review under strict scrutiny.").)

The requirements for satisfying strict scrutiny—*i.e.*, a compelling government interest and narrow tailoring—are well established. To demonstrate a compelling

interest, Defendants must make two showings: "[f]irst, the government must 'articulate a legislative goal that is properly considered a compelling government interest.'" *DynaLantic*, 885 F. Supp. 2d at 250 (quoting *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003)). Previously recognized compelling government interests include "'remedying the effects of past or present racial discrimination[.]'" *Id.* (quoting *Shaw*, 517 U.S. at 909). Second, the government must "demonstrate a strong basis in evidence supporting its conclusion that race-based remedial action was necessary to further that interest." *Id.* (internal quotation marks and citation omitted). In so doing, the government need not "conclusively prov[e] the existence of racial discrimination in the past or present[,]" *id.* (citing *Wygant*, 476 U.S. at 292 (O'Connor, J., concurring)), and "[t]he government may rely on both statistical and anecdotal evidence, although anecdotal evidence alone cannot establish a strong basis in evidence for the purposes of strict scrutiny[,]" *id.* at 250–51 (citing *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 321 F.3d 950, 977 (10th Cir. 2003)). If the government makes both showings, the burden shifts to the plaintiff "to present 'credible, particularized evidence' to rebut the government's 'initial showing of a compelling interest.'" *Id.* at 251 (quoting *Concrete Works*, 321 F.3d at 959); *see also id.* ("Notwithstanding the initial burden of initial production that rests with the government, the ultimate burden of proof remains with the challenging party to demonstrate the unconstitutionality of an affirmative-action program." (internal quotation marks, alterations, and citation omitted)).

Once a compelling interest is established, the government must further "show that 'the means chosen to accomplish the government's asserted purpose [are]

specifically and narrowly framed to accomplish that purpose.'" *Id.* at 283 (alteration in original) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003)). Courts consider several factors to determine whether challenged race-conscious remedial measures are narrowly tailored, including: "(1) the efficacy of alternative, race-neutral remedies, (2) flexibility, (3) over- or under-inclusiveness of the program, (4) duration, (5) the relationship between numerical goals and the relevant labor market, and (6) the impact of the remedy on third parties." *Id.* (citing *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality and concurring opinions)).

With the relevant legal standards in mind and consistent with the *DynaLantic* court's reasoning and conclusion, this Court finds that there are no genuine issues of material fact regarding the facial constitutionality of the Section 8(a) program for several reasons. First, the government has articulated an established compelling interest for the program—namely, remedying "race-based discrimination and its effects[.]" (Defs.' MSJ Br. & Resp. at 35); *see also DynaLantic*, 885 F. Supp. 2d at 279 (concluding that "Congress has a compelling interest in eliminating the roots of racial discrimination in federal contracting, funded by federal money"). Defendants have also shown a strong basis in evidence that furthering this interest requires race-based remedial action—specifically, evidence regarding discrimination in government contracting, which, as the *DynaLantic* court found, consisted of "extensive evidence of discriminatory barriers to minority business formation, . . . [and] forceful evidence of discriminatory barriers to minority business development," *DynaLantic*, 885 F. Supp. 2d at 279. In *DynaLantic*, the Court further found that the government had "provided significant evidence that, even when minority businesses are qualified and eligible to

perform contracts in both the public and private sectors, they are awarded these contracts far less often than their similarly situated non-minority counterparts." *Id.* Defendants have relied upon that same evidence in the instant case, and they have also presented expert testimony that corroborates the *DynaLantic* evidence—*i.e.*, Wainwright and Rubinovitz have testified that minority-owned small businesses have faced, and continue to face, significant disadvantages in government contracting that cannot be explained by nondiscriminatory factors (*see, e.g.*, Rubinovitz Report at 12; Wainwright Report at 27, 97)—and Rothe has failed to rebut this evidence with credible and particularized evidence of its own, *see Wygant*, 476 U.S. at 293 (O'Connor, J., concurring).

Furthermore, Defendants have established that the Section 8(a) program is narrowly tailored to achieve the established compelling interest.  As the *DynaLantic* court discussed at great length, the Section 8(a) program satisfies all six dimensions of narrow tailoring.  First, alternative race-neutral remedies have proved unsuccessful in addressing the discrimination targeted here.  *See DynaLantic*, 885 F. Supp. 2d at 283–84 ("Congress attempted to use race-neutral measures to foster and assist minority owned businesses for at least twenty-five years prior to incorporating a race-conscious component in Section 8(a), and these race-neutral measures failed to remedy the effects of discrimination on minority small business owners.").  Second, the Section 8(a) program is appropriately flexible.  *See id.* at 285–86 (finding that Section 8(a) "imposes no quotas at all[,] . . . provides for aspirational goals and imposes no penalties for failing to meet them[,]" contains a rebuttable presumption of social disadvantage based on race, and thus makes race a "relevant" but not "determinative factor" in program

participation).  Third, Section 8(a) is neither over- nor under-inclusive.  *See id.* at 286

("Section 8(a) does not provide that every member of a minority group is

disadvantaged.  Admittance . . . is based not only on social disadvantage, but also on an

individualized inquiry into economic disadvantage. . . .  [And] a firm owned by a non-

minority may qualify as socially and economically disadvantaged." (citation omitted)).

Fourth, the Section 8(a) program "impose[s] temporal limits on every individual's

participation that fulfill the [durational] aspect of narrow tailoring."  *Id.* at 287

(discussing the program's "strict durational limits" on participation, and the Small

Business Administration's "continual[] reassess[ment]" of participants' eligibility).

Fifth, the relevant aspirational goals for SDB contracting participation are numerically

proportionate, in part because "[t]he evidence presented established that minority firms

are ready, willing, and able to perform work equal to two to five percent of government

contracts in industries including but not limited to construction."  *Id.* at 289.  And sixth,

the fact that the Section 8(a) program reserves certain contracts for program

participants "does not, on its face, create an impermissible burden on non-participating

firms."  *Id.* at 290; *see also id.* (discussing various "provisions [in Section 8(a)]

designed to minimize the burden on non-minority firms").

Accordingly, this Court concurs with the *DynaLantic* court's conclusion that the

strict scrutiny standard has been met, and that the Section 8(a) program is facially

constitutional despite its reliance on race-conscious criteria.  *See id.* at 293.  In so

holding, this Court incorporates by reference the reasoning in Parts III.A through

III.D.1.(c) and Part III.E of the *DynaLantic* memorandum opinion, and adopts it as its

own.  *See id.* at 251–80, 283–91.

This means that Rothe's insistence that "[S]ection 8(a)'s racial classification is unconstitutional racial balancing, for which there is no compelling interest, and for which narrow tailoring is impossible" (Pl.'s MSJ Br. at 7) is unavailing, and for good reason.  With respect to the compelling interest factor, Rothe does not appear to dispute that the government has a compelling interest in eliminating discrimination in federal contracting; instead, Rothe maintains that Defendants have failed to show a strong basis in evidence that race-based remedial action is necessary to achieve that interest largely because—as Rothe repeatedly has argued—post-enactment evidence is irrelevant, and the disparity studies on which Defendants rely are flawed.  (*See id.* at 37–43, 48–60.) This Court has already rejected Rothe's argument against post-enactment evidence and adopted instead the *DynaLantic* court's holding that such evidence is not only admissible but also particularly relevant in the circumstances presented here.  *See supra*, Part II.B.2.  And this Court also finds that "[o]n balance," the disparity studies on which Defendants and their experts rely "reveal large, statistically significant barriers to business formation among minority groups that cannot be explained by factors other than race[,]" *DynaLantic*, 885 F. Supp. 2d at 261, and "demonstrat[e] that discrimination by prime contractors, private sector customers, suppliers and bonding companies continues to limit minority business development[,]" *id.* at 263; *see also id.* ("While the studies are not uniform in nature, methodology, or results, they contain powerful evidence that discrimination fosters a decidedly uneven playing field for minority business entities seeking to compete in federal contracting." (internal quotation marks and citation omitted)).

Moreover, the record evidence clearly shows "that qualified, eligible minority-owned firms are excluded from contracting markets, and accordingly provide[s] powerful evidence from which an 'inference of discriminatory exclusion could arise.'" *Id.* at 268 (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 503 (1989)).  To the extent that Rothe argues that the relevant legislative history does not support the conclusion that Congress had a strong basis in evidence to enact the race-conscious provisions of Section 8(a) (*see* Pl.'s MSJ Resp. & Reply at 19–37), this Court disagrees, and instead concurs with the *DynaLantic* court's conclusion that, "[b]ased on the evidence before Congress with respect to both the Public Works Employment Act of 1977, and, a year later, the heavily overlapping legislative history of Section 8(a), . . . Congress had a strong basis in evidence to conclude the use of race-conscious measures was necessary in, at least, some circumstances."  *DynaLantic*, 885 F. Supp. 2d at 274.

With respect to narrow tailoring, Rothe is both factually and legally misguided when it argues that Section 8(a)'s race-conscious provisions cannot be narrowly tailored because they "appl[y] across the board in equal measure, for all preferred races, in all markets and sectors."  (Pl.'s MSJ Br. at 11; *see also* Pl.'s MSJ Resp. & Reply at 66–68.)  This assertion is factually incorrect because, as the *DynaLantic* court noted, "[t]he presumption that a minority applicant is socially disadvantaged may be rebutted if [the Small Business Administration] is presented with credible evidence to the contrary[,]" *DynaLantic*, 885 F. Supp. 2d at 285, and, indeed, "[a]ny person may present 'credible evidence' challenging an individual's status as socially or economically disadvantaged[,]" *id.* at 286 (quoting 13 C.F.R. § 124.103(c)).  Rothe has also failed to cite any legal precedent that holds that Congress is categorically prohibited from

fashioning a race-conscious remedial statute that is unlimited in industrial or geographic scope.  In this regard, Rothe appears to be proceeding under the misconception that "narrow" tailoring necessarily means a remedy that is laser-focused on a single segment of a particular industry or area, rather than the common understanding that the "narrowness" of the narrow-tailoring mandate relates to *the relationship* between the government's interest and the remedy it prescribes.  *See Grutter*, 539 U.S. at 333.

Rothe is also mistaken when it argues that the Section 8(a) program should be struck down as not narrowly tailored because purported "overutilization of 8(a) firms in Rothe's primary NAICS codes imposes an undue burden on Rothe[.]"  (Pl.'s MSJ Resp. & Reply at 15.)  With this argument, Rothe invites the Court to compare the "percentage of total small business dollars in federal procurement that 8(a) firms in Rothe's NAICS codes are being awarded . . . to the overall availability of 8(a) firms in Rothe's NAICS codes" and argues that this comparison demonstrates that, far from being underutilized, Section 8(a) program participants in those NAICS codes actually receive a disproportionate share of federal contracting dollars.  (*Id.* at 13.)  Even if this is true—and this Court has significant doubts about the accuracy of Rothe's calculations—Rothe's allegations pertain to a mere five NAICS codes and at best give rise to an as-applied critique; they are manifestly insufficient to warrant invalidation of Section 8(a) *on its face* and in its entirety.

### C.  Section 8(a) Does Not Violate The Nondelegation Doctrine

Undaunted, Rothe also contends that, by enacting the Section 8(a) program, Congress has unconstitutionally delegated legislative authority to the executive branch—*i.e.*, that Section 8(a) violates the nondelegation doctrine.  (*See* Pl.'s MSJ Br.

at 40–44.)  Rooted in the principle of separation of powers and derived from Article I of

the Constitution, "[t]he nondelegation doctrine prohibits Congress from making

unbridled delegations of authority" to other branches.  *Mich. Gambling Opp'n v.*

*Kempthorne*, 525 F.3d 23, 34 (D.C. Cir. 2008); *see also Mistretta v. United States*, 488

U.S. 361, 371–72 (1989).  Indeed, the Supreme Court has explained repeatedly that

Congress may only "confer[] decisionmaking authority upon agencies[,]" *Whitman v.*

*Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001), if it also provides "'an intelligible

principle to which the person or body authorized to [act] is directed to conform[,]'" *id.*

(first alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276

U.S. 394, 409 (1928)).

Here, Rothe maintains that Section 8(a) contains insufficient guidance "to limit

the [Small Business Administration's] discretion in deciding whether racial, ethnic or

cultural bias has occurred or even what constitutes a racial, ethnic, or cultural group."

(Pl.'s MSJ Br. at 7.)  Rothe is wrong for at least two reasons.  First, Congress has

specifically defined "[s]ocially disadvantaged individuals" as "those who have been

subjected to racial or ethnic prejudice or cultural bias because of their identity as a

member of a group without regard to their individual qualities[,]" 15 U.S.C.

§ 637(a)(5), and it has further explained that "many such persons are socially

disadvantaged because of their identification as members of certain groups that have

suffered the effects of discriminatory practices or similar invidious circumstances over

which they have no control[,]" *id.* § 631(f)(1)(B).  The statute pertaining to the Section

8(a) program also supplies examples of "such groups includ[ing], but [ ] not limited to,

Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific

Americans, [and] Native Hawaiian Organizations[.]" *Id.* § 631(f)(1)(C). Thus, Congress has provided clear, intelligible direction regarding who can be deemed "socially disadvantaged" for the purpose of the statute. What is more, Congress has provided additional context by explaining that one purpose of the Section 8(a) program is to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals so that such concerns can compete on an equal basis in the American economy[.]" *Id.* § 631(f)(2)(A); *see also Mich. Gambling Opp'n*, 525 F.3d at 30 (noting that "a delegation need not be tested in isolation" and that courts may examine "the purpose of the Act, its factual background and the statutory context" in addition to "the statutory language" itself (internal quotation marks and citation omitted)). Thus Rothe's assertion that the statute "confers *unlimited* discretion to decide whether racial or ethnic prejudice or cultural bias has occurred with respect to a given group" (Pl.'s MSJ Br. at 42 (emphasis added)) is simply incorrect.

Second, the circumstances under which the nondelegation doctrine applies to invalidate a statute are exceedingly limited. This Court notes that the Supreme Court has "found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). Indeed, "[c]ourts 'have almost never felt qualified to second-guess Congress regarding the

permissible degree of policy judgment that can be left to those executing or applying the law.'" *Mich. Gambling Opp'n*, 525 F.3d at 30 (quoting *Whitman*, 531 U.S. at 474–75).

In sum, because the statute that Congress enacted to establish the Section 8(a) program contains specific definitions and a statement of purpose, and because it is also well settled in this jurisdiction that "[o]nly the most extravagant delegations of authority, [such as] those providing no standards to constrain administrative discretion," are to be "condemned . . . as unconstitutional[,]" *Humphrey v. Baker*, 848 F.2d 211, 217 (D.C. Cir. 1988), this Court concludes that Rothe has failed to show a genuine issue of material fact as to whether Section 8(a) violates the nondelegation doctrine.[9]

## IV.   CONCLUSION

For the reasons discussed above, this Court concludes that the testimony of Defendants' expert witnesses is relevant and reliable, and the Court has considered that testimony in its review of the parties' cross-motions for summary judgment.  By contrast, this Court has found that one of Plaintiff's proffered experts is not qualified to render an expert opinion with respect to the statistical and economic analyses at issue in this case, and the Plaintiff's other expert witness has proffered testimony that is

---

[9] Rothe's reliance on *Schuette v. Coalition to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary*, 134 S. Ct. 1623 (2014), to support its nondelegation argument is misplaced.  (*See* Pl.'s MSJ Resp. & Reply at 45.)  *Schuette* concerned an Equal Protection Clause challenge to a popularly enacted amendment to Michigan's state constitution, not a nondelegation challenge.  *See Schuette*, 134 S. Ct. at 1629.  Moreover, the plurality opinion in *Schuette* expressed concern about (and noted the Court's prior rejection of) "the assumption that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Id.* at 1634 (quoting *Shaw v. Reno*, 509 U.S. 630 (1993)).  Section 8(a) makes no such assumption.

unreliable and thus not admissible for purposes of this Court's evaluation of whether there is a genuine issue of material fact with respect to Plaintiff's underlying constitutional claim.  Accordingly, Plaintiff's *Daubert* motion is **DENIED**, and Defendants' *Daubert* motions are **GRANTED**.

The Court also concludes that, in light of the record and the legal arguments presented in this case, and in reliance on the reasoning and holding of *DynaLantic* (which this Court has adopted in relevant part), Plaintiff's facial constitutional challenge to the Section 8(a) program fails.  Defendants have demonstrated a compelling interest for the government's racial classification, and the purported need for remedial action is supported by strong and unrebutted evidence, and Defendants have also shown that the Section 8(a) program is narrowly tailored to further its compelling interest.  Moreover, Plaintiff has failed to show either that no set of circumstances exists in which the Section 8(a) program would be constitutional or that the statutory program lacks any plainly legitimate sweep; therefore, there is no genuine issue that the Section 8(a) program's race-conscious provisions are constitutional on their face.  Thus, as set forth in the accompanying order, Plaintiff's motion for summary judgment is **DENIED**, and Defendants' cross-motion for summary judgment is **GRANTED**.

DATE:  June 5, 2015                     *Ketanji Brown Jackson*
                                        KETANJI BROWN JACKSON
                                        United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROTHE DEVELOPMENT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 12-cv-0744 (KBJ) |
| | ) |
| DEPARTMENT OF DEFENSE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## **ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiff's [45] Motion in Limine is **DENIED**, and Defendants'

[44] [46] Motions in Limine are **GRANTED**.  It is

**FURTHER ORDERED** that Plaintiff's [55] Motion for Summary Judgment is

**DENIED**, Defendants' [64] Cross-Motion for Summary Judgment is **GRANTED**, and

judgment is entered in favor of Defendants.

DATE:  June 5, 2015        *Ketanji Brown Jackson*

                              KETANJI BROWN JACKSON
                              United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ROTHE DEVELOPMENT, INC.,                    )
    4614 Sinclair Road                     )
    San Antonio, TX 78222                  )
Plaintiff,                                  )
                                           )
v.                                          ) Civil Action No. 12-CV-744
                                           )
DEPARTMENT OF DEFENSE                        )
    1000 Defense Pentagon                  )
    Washington, DC 20301-1000              )
and                                         )
SMALL BUSINESS ADMINISTRATION               )
    409 3rd Street, SW                     )
    Washington, DC 20416                   )
Defendants.                                 )
_____)

## ORIGINAL COMPLAINT

Plaintiff, ROTHE DEVELOPMENT, INC. ("ROTHE"), alleges the following against

Defendants DEPARTMENT OF DEFENSE ("DoD"), and SMALL BUSINESS

ADMINISTRATION ("SBA") (jointly "Defendants"):

## NATURE OF THE ACTION

1.     ROTHE files this action to obtain a declaration that the racial classification of section

8(a) of the Small Business Act, defined herein, is facially unconstitutional.

2.     The racial classification of section 8(a) prevents ROTHE from bidding on Defendants'

contracts on an equal footing, in violation of the equal protection component of the Due Process

Clause of the Fifth Amendment of the Constitution, in violation of Article I section 1 of the

Constitution, and in violation of ROTHE's rights under same.

3.      Therefore, as further relief, ROTHE also requests that the Court prospectively enjoin all uses of the racial classification of section 8(a) by Defendants that prevent ROTHE from bidding on Defendants' contracts on an equal footing.

4.      ROTHE also requests its costs, attorneys fees, and expenses in this action under the Equal Access to Justice Act, 28 U.S.C. § 2412.

5.      ROTHE is not required to and does not seek to enjoin any specific solicitation or contract or pursue any as-applied challenge. It brings solely a facial constitutional challenge in this action.

6.      ROTHE seeks no money damages.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and the laws of the United States.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A) & (B). The official residence of all defendants for venue purposes is the District of Columbia. In addition, a substantial part of the unconstitutionality of the challenged racial classification arises from omissions that occurred in the District of Columbia.

## PARTIES

9.      Plaintiff ROTHE DEVELOPMENT, INC., 4614 Sinclair Road, San Antonio, Texas 78222, is a Texas corporation.

10.     Defendant DEPARTMENT OF DEFENSE, 1000 Defense Pentagon, Washington, DC 20301-1000, is an Executive department of the United States.

11.     Defendant SMALL BUSINESS ADMINISTRATION, 409 3rd Street, SW, Washington, DC 20416 is an agency under the general direction and supervision of the President.

## **FACTS**

### Section 8(a)'s Racial Classification

12.     SBA's 8(a) program was established through an amendment to the Small Business Act on October 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as amended at 15 U.S.C. § 637 (2006)).[1]

13.     The stated purposes of the 8(a) program include "promot[ing] the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals" and "clarify[ing] and expand[ing] the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2) (2006).

14.     The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id*. § 637(a)(5).

15.     "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities . . . ." and are thus a subset of the socially disadvantaged. *Id*. § 637(a)(6)(A).

16.     According to the statute, "[t]he [g]overnment-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." *Id*. § 644(g)(1).

---

[1]     All citations to the United States Code are to the 2006 code edition.

17.     The statute provides:

It shall be the duty of the [Small Business] Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate—

(A) to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers . . . . In any case in which the Administration certifies to any officer of the Government having procurement powers that the Administration is competent and responsible to perform any specific Government procurement contract to be let by any such officer, such officer shall be authorized in his discretion to let such procurement contract to the Administration upon such terms and conditions as may be agreed upon between the Administration and the procurement officer. . . . ;
(B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns . . . . ;
(C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals . . . .

*Id*. § 637(a)(1)(A)-(C).

18.     The statute then provides that "[a] contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible [p]rogram [p]articipants" if certain criteria are met. *Id*. § 637(a)(1)(D).

19.     "Eligible program participants" are those eligible to receive contracts under § 637(a). *Id*. § 636(j)(10).

20.     The only "small business concerns" eligible to receive 8(a) contracts are:

(1)     those small business concerns that are "socially and economically disadvantaged," *id*. § 637(a)(1)(B), meaning those more than "51% owned by one or more socially and economically disadvantaged individuals," *id*. § 637(a)(4)(i)(I); or

(2)     those outright "owned and controlled by socially and economically disadvantaged individuals." *Id*. § 637(a)(1)(C).

21.     The definition of the term "socially disadvantaged" contains a racial classification. *Id*. § 637(a)(5) (defining socially disadvantaged individuals as "those who have been subjected to

racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities.").

22.     The statute also contains an additional racial classification in a presumption that all individuals who are members of certain racial groups are socially disadvantaged. *Id*. § 631(f) ("such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans . . .  Asian Pacific Americans . . . and other minorities").[2]

23.     In addition to the racial groups presumed socially disadvantaged under the statutory presumption, the Small Business Administration has purported to designate additional racial groups as socially disadvantaged. 13 C.F.R. § 124.103(b).

24.     Under the statute, benefits flow from the status conferred by the definition and presumption, through a statutory goal to award a certain percentage of prime- and sub-contracts to socially disadvantaged small business concerns.  *Id*. §§ § 637(a)(1)(D) & 644(g)(1).

<u>Denial of Equal Protection</u>

25.     The definition, the presumption, and the goal, taken together, comprise the "racial classification of section 8(a)" ("section 8(a)'s racial classification" or the "statutory racial

---

[2]     Congressional amendments in 1986 (Pub. L. No. 99-272, § 18015, 100 Stat. 370) and 1988 (Pub. L. No. 100-656, § 207, 102 Stat. 3861, as amended by Pub. L. No. 101-37, § 6, 103 Stat. 72) also added "Indian tribes" and "Native Hawaiian Organizations" to the races deemed presumptively socially disadvantaged by 15 U.S.C. § 631(f)(1). However, ROTHE does not challenge the classifications "Indian tribes" and "Native Hawaiian Organizations" in this action. ROTHE understands the distinction in law drawn between "Native American" as a racial classification, on one hand, and an entity the United States has treaty or trust obligations towards, such as an "Indian tribe" or a "Native Hawaiian Organization" on the other. *Cf. Morton v. Mancari*, 417 U.S. 535 (1974) (legislation that singles out federally recognized Indian tribes is Constitutional "where the preference is reasonable and rationally designed to further Indian self-government"). ROTHE is only challenging the *racial* classification of section 8(a), which by definition includes only those groups currently classified by law as being "racial" groups:  Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities to be determined by the SBA (to date, Subcontinent Asian Americans).

classification") which denies ROTHE an equal footing to bid on Defendants' contracts and which ROTHE challenges as facially unconstitutional in this action.

26.     Defendants did not, and do not, have a compelling governmental interest that justifies section 8(a)'s racial classification.

27.     Assuming *arguendo* that Defendants had a legitimate compelling interest, the statutory racial classification is not narrowly tailored to meet any such compelling interest.

28.     The Defendants cannot produce evidence that shows "the most exact connection between justification and classification," required by strict scrutiny; i.e., Defendants cannot show a relevant causal relationship between their alleged evidence and the racial classification of section 8(a), whether in terms of a "compelling interest" to enact the racial classification or "narrow tailoring" of its scope. Moreover, there is no causal relationship between the racial classification and any remedy for alleged discrimination.

29.     Defendants cannot produce "a strong basis in evidence" to demonstrate the racial classification of section 8(a) is supported by a compelling interest, i.e., that it is supported by probative evidence that satisfies strict scrutiny.

<u>Violation of Non-Delegation Doctrine</u>

30.     The racial classification of section 8(a), whether with the definition alone or with the definition and the presumption together or otherwise, is a facially unconstitutional delegation of Congressional power to SBA, to the extent it purports to delegate the authority to make or enact racial classifications for "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities" (definition, 15 U.S.C. § 637(a)) or "other minorities" (presumption, 15 U.S.C. § 631(f)).

<u>Injury to Rothe</u>

31.    The facts that establish Rothe's standing are those set forth in the Affidavit of ROTHE Vice President and corporate representative Dale Patenaude and attachments 1-5 thereto, attached to this Original Complaint and cited and incorporated herein by reference.

32.    Section 8(a)'s racial classification denies ROTHE the equal protection of the laws to the extent it prevents ROTHE from competing for Defendants contracts on an equal footing with members of racial groups that receive benefits under the racial classification. Aff. of Patenaude at 2.

33.    The denial of equal protection includes the exclusion of ROTHE from contracting opportunities that ROTHE would otherwise, but is not permitted to compete for, because it cannot participate in and has no desire to participate in the section 8(a) program and thus is not a beneficiary of section 8(a)'s racial classification. *Id*. at 2 & 5.

34.    The denial of equal protection includes the purported designation of additional racial groups as socially disadvantaged by the SBA, which prevents ROTHE from bidding on an equal footing with members of those designated racial group(s). *Id*. at 2.

35.    The unconstitutional delegation of authority to SBA to designate additional racial groups as socially disadvantaged is also an independent injury to ROTHE, insofar as it confers *any* competitive benefits on the racial groups designated by SBA—regardless of whether those benefits, conferred through section 8(a)'s racial classification, are themselves unconstitutional as a denial of equal protection. *Id*. at 2.

36.    ROTHE is a small business concern that satisfies the applicable SBA size requirements for its industry with respect to net worth and number of employees. *Id*. at 3.

37.     ROTHE bids on small business contracts in its area of expertise, nationwide, including contracts with DoD. *Id*. at 3-4.

38.     In terms of bid frequency, ROTHE has historically and will continue to bid annually on approximately $100 million of contracts in its area of expertise, in order to yield approximately $10 million of annual gross income. *Id*. at 3.

39.     Approximately 85-90% of ROTHE's annual gross income is derived from contracts with DoD. *Id*. at 4.

40.     Defendants have let numerous contracts in ROTHE's area of expertise that have been set aside under section 8(a) using the racial classification, and the number and dollar value of those contracts is increasing relative to similar contracts not set aside under section 8(a). *Id*. at 4-5.

41.     Data from the federal government's own procurement data system cited in the Affidavit of Dale Patenaude demonstrates that section 8(a)'s racial classification has foreclosed a not insignificant portion of ROTHE's potential business opportunities. *Id*. at 5-6.

42.     Defendants have not stopped letting and are likely to continue to let contracts involving ROTHE's area of expertise that are set aside under section 8(a) using the racial classification. *Id*. at 4 & 6.

43.     Thus, sometime in the near future ROTHE will want to bid on another government contract that pertains to its area of expertise that Defendants will have set aside under section 8(a) using the racial classification. *Id*. at 4 & 6.

44.     ROTHE is able and ready to bid on contracts and a discriminatory statutory racial classification prevents it from doing so on an equal basis. *Id*. at 6.

45.     ROTHE would otherwise, but is not permitted to compete for such contracts against small businesses that benefit from the section 8(a)'s racial classification when the contracts are set aside. *Id*. at 5.

46.     If Defendants are not enjoined, they will continue to violate ROTHE's Constitutional rights.

### Identification of Causes of Action and Sources of Relief

47.     The Constitution itself provides a cause of action for equal protection claims. *Bolling v. Sharpe*, 347 U.S. 497 (1954); *Davis v. Passman*, 442 U.S. 228 (1979); U.S. Const. Amend. V. The Court may order the relief in 28 U.S.C. § 2201 and 2202.

48.     The Constitution itself provides a cause of action for nondelegation claims. U.S. Const. Art. 1 § 1. The Court may order the relief in 28 U.S.C. § 2201 and 2202.

49.     The Administrative Procedure Act provides a second cause of action for the same relief on the nondelegation claim. ROTHE has suffered legal wrong to the extent SBA has purported to exercise what power Congress has unconstitutionally delegated, and thus has a cause of action under 5 U.S.C. § 702, for the relief available pursuant to 5 U.S.C. § 706(2)(B) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity.")

50.     All conditions precedent to the filing of this action have occurred.

### FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

51.     ROTHE hereby incorporates all preceding paragraphs.

52.     The racial classification of section 8(a) prevents ROTHE from bidding on Defendants' contracts on an equal footing, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment of the Constitution.

53.     The racial classification of section 8(a) is also an unconstitutional delegation of legislative authority to Defendant SBA in violation of Article I section 1 of the Constitution, not only because it prevents ROTHE from bidding on Defendants' contracts on an equal footing, but because the mere act of racially classifying (and thus extending the benefits of the racial classification to the designated racial groups) is a legislative power that cannot be and was not lawfully delegated under Article I, section 1 of the Constitution.

54.     Pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706(2), the Court is requested to adjudge, decree, declare, and hold the same unlawful and facially unconstitutional.

## SECOND CLAIM FOR RELIEF
### (Injunctive Relief)

55.     ROTHE hereby incorporates all preceding paragraphs.

56.     ROTHE is directly injured by the unconstitutional racial classification of section 8(a), and will suffer additional irreparable harm if the racial classification of section 8(a) remains in effect.

57.     ROTHE has no adequate remedy at law.

58.     The balance of hardships and the public interest favor injunction of the unconstitutional racial classification of section 8(a).

59.     Pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 706(2), the Court is requested to permanently enjoin Defendants' use of section 8(a)'s racial classification to the extent it prevents ROTHE from competing for Defendants' contracts on an equal footing, and set it aside as facially unconstitutional.

## THIRD CLAIM FOR RELIEF
### (Costs, Attorneys Fees, and Expenses Pursuant to 28 U.S.C. § 2412)

60.     ROTHE hereby incorporates all preceding paragraphs.

61.     ROTHE has been forced to retain attorneys to vindicate its constitutional rights and interests, and to vindicate its interests on a level playing field before Defendants generally.

62.     ROTHE satisfies all party eligibility requirements under 28 U.S.C. § 2412. Affidavit of Dale Patenaude at 3.

63.     The position of Defendants is not substantially justified. Any defense of this action by Defendants is vexatious, litigation-multiplying, in bad faith, for purposes of delay, and unconscionable.

64.     Pursuant to 28 U.S.C. § 2412, the Court is requested to award costs and reasonable attorneys' fees and expenses in its discretion or as mandated by statute.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF ROTHE DEVELOPMENT, INC. RESPECTFULLY REQUESTS THAT THIS COURT ISSUE A JUDGMENT TO:

1.     Declare that section 8(a)'s racial classification is facially unconstitutional.

2.     Permanently enjoin Defendants' use of section 8(a)'s racial classification to the extent it prevents ROTHE from competing for Defendants' contracts on an equal footing, and set it aside as facially unconstitutional.

3.     Award Plaintiff its costs of this action and attorneys' fees and expenses; and

4.     Grant such other relief as the Court deems just and proper.

Dated May 9, 2012.                    Respectfully submitted,

                                      /s/ David F. Barton
                                      David F. Barton
                                      District Court Bar No. TX0096
                                      Texas Bar No. 01853300
                                      **GARDNER LAW**
                                      745 E. Mulberry Avenue, Suite 500
                                      San Antonio, Texas 78212-3149
                                      Telephone: (210) 733-8191

Telecopier: (210) 733-5538
Email: dfbarton@gardner.sa.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

ROTHE DEVELOPMENT, INC.,                     )
   Plaintiff,                                         )
                                                      )
v.                                                        ) Civil Action No. 12-CV-744
                                                      )
DEPARTMENT OF DEFENSE and            )
SMALL BUSINESS ADMINISTRATION    )
   Defendants.                                      )

———————————————————————

## AFFIDAVIT OF DALE PATENAUDE

STATE OF TEXAS            §
                          §
COUNTY OF BEXAR         §

BEFORE ME, the undersigned authority, on this day personally appeared Dale Patenaude, the undersigned affiant, who swore on his/her oath that the following facts are true:

"My name is Dale Patenaude, I am a resident of Bexar County, Texas.  I am over the age of eighteen (18) years of age, of sound mind, capable of making this affidavit and fully competent to testify to the matters stated herein.  I have personal knowledge of the facts stated herein, and they are all true and correct.

"I am the Vice President and corporate representative for ROTHE DEVELOPMENT, INC. ("ROTHE"), Plaintiff in the above-captioned case. I have worked at ROTHE since 1972. I have been Vice President of ROTHE since April 15, 1997. Prior to that time I worked as a consultant from 1991-1997 and as an employee from 1972 to 1990. I have managed DoD and other government communications contracts since 1972. As Vice President of ROTHE, I assist in preparing the bid proposals, and assist in negotiations with the project owner and/or general contractor. I have 40 years of government contract management experience since 1972 and consider myself an expert in the field.

"The purpose of this affidavit is to state facts that, following discussions of the facts relevant to this case and counsel from my attorneys in this matter, Gardner Law, they informed me establish ROTHE's injury from, and standing to challenge as facially unconstitutional, the "racial classification of section 8(a)" ("section 8(a)'s racial classification" or the

"statutory racial classification"), which denies ROTHE an equal footing to bid on Defendants' contracts. The immediately foregoing sentence and the following content of this affidavit do not and are not meant to do anymore than inform the Court of ROTHE's injury, and provide a reasonable assessment of how ROTHE believes it has been harmed and deprived of its Constitutional rights and is not meant to in any way make a legal analysis or offer a legal opinion on any subject. This affidavit informs the Court of what has actually happened to ROTHE and information I have gathered that apply to the facts of this case as stated in ROTHE's complaint, nothing more. Any legal opinion that follows therefrom is solely within the Court's control.

"Section 8(a)'s racial classification injures ROTHE and denies ROTHE the equal protection of the laws to the extent it prevents ROTHE from competing for Defendants' contracts on an equal footing with members of racial groups that receive benefits under the racial classification.

"ROTHE has been injured by being excluded from contracting opportunities that ROTHE would otherwise, but is not permitted to compete for, because it is not and does not desire to be a participant in the section 8(a) program and thus is not a beneficiary of section 8(a)'s racial classification.

"The injury includes the purported designation of additional racial groups as socially disadvantaged by the SBA, which prevents ROTHE from bidding on an equal footing with members of those designated racial group(s). The conferring of *any* competitive benefits on the racial groups designated by SBA is also independently injurious to ROTHE to the extent those benefits have been unlawfully or unconstitutionally conferred.

"As the DEPARTMENT OF DEFENSE ("DoD") is well-aware, DoD used to confer benefits in its procurement through statutory racial classifications in the former 10 U.S.C. § 2323. ROTHE was the successful plaintiff in litigation against DoD that culminated in a 2009 final judgment on the merits holding former 10 U.S.C. § 2323 facially unconstitutional. More recently, from 2010-2012, ROTHE challenged a DoD decision to insource a contract that ROTHE was performing for one of the DoD military departments, the Air Force.

"It should be noted that during the *Rothe* litigation involving former 10 U.S.C. § 2323, DoD conducted an extensive deposition of my wife Suzanne Patenaude (the President of ROTHE) and me for a full day, on ROTHE's standing to challenge statutory racial classifications in DoD procurement. Finding nothing useful in the depositions, DoD then made additional challenges to ROTHE's standing through its briefs. Each time, the courts rejected DoD's arguments. Because, as stated herein, nothing

material has changed from then to now in how ROTHE is injured by statutory racial classifications in DoD procurement, in ROTHE's status as a small business concern or its EAJA eligibility, or in the type of business ROTHE conducts, and to avoid retreading the same ground, I incorporate those depositions from the *Rothe* litigation by reference here. The injury from the judicially-determined unlawful and unconstitutional former 10 U.S.C. § 2323 is the same type of injury that Rothe suffers as a result of the facts addressed herein.

"ROTHE is a Texas Corporation registered with the Texas Secretary of State. ROTHE bids on and performs prime- and sub-contracts primarily in five North American Industry Classification System (NAICS) sectors:

**Table 1: Rothe's Primary NAICS Sectors**

| NAICS Code (2007) | Description | 13 C.F.R. 121.201 Size Std (Annual Receipts) |
|---|---|---|
| 541511 | Custom Computer Programming Services | $25.5 million |
| 541512 | Computer Systems Design Services | $25.5 million |
| 541513 | Computer Facilities Management Services | $25.5 million |
| 541519 | Other Computer Related Services | $25.5 million |
| 561210 | Facilities Support Services | $35.5 million |

"ROTHE is a small business concern within the meaning of the Small Business Act and the Small Business Administration regulations. The Small Business Administration specifically found that ROTHE was small in August 2011 when denying a size protest that had been brought against one of ROTHE's joint venture affiliates. I have attached a copy of that decision as **Attachment 1** (see page 5 of the decision, which is page 7 of the fax), and incorporate it by reference here. In addition, I have attached the same 2010 balance sheet ROTHE submitted to the SBA as **Attachment 2**, and the most recent 2011 balance sheet as **Attachment 3**, and incorporate both by reference here. There have been no material changes in ROTHE's size since the SBA's decision.

"In addition, for purposes of the Equal Access to Justice Act, ROTHE's net worth (total equity), as shown in **Attachment 3**, is less than $7,000,000. ROTHE currently has 119 employees, as shown in **Attachment 4**, incorporated by reference here.

"On an annual basis, ROTHE has approximately $10 million in gross income from all contracts. To obtain that income, on average, ROTHE must bid approximately $100 million in total contracts, since not every bid will be successful and since contract amounts may fluctuate depending on the term and nature of the contract.

"ROTHE bids on and performs prime contracts nationwide, primarily in the above five NAICS sectors, that are let directly by DoD and by the military departments (Army, Navy, Air Force) under DoD's civilian control.[1] ROTHE also bids on and performs subcontracts nationwide let by awardees of DoD and the military departments. Approximately 85-90% of ROTHE's annual gross income is derived from such prime- and subcontracts, with each type of contract (prime and sub-) comprising a roughly equal share of ROTHE's business. These prime- and subcontracts are typically unrestricted competition or set aside for small business, but they are not set aside under section 8(a)'s racial classification or any other program that relies on statutory racial classifications that would exclude ROTHE from bidding on an equal footing.

"In terms of bid frequency, ROTHE has historically bid on approximately $90-$100 million of such contracts yearly, where statutory racial preferences applicable to DoD have not precluded ROTHE from bidding on an equal footing. ROTHE plans to continue to bid on such contracts in the near future, given that most of its business is derived from such contracts.

"As far as ROTHE is aware, and as discussed below, DoD currently requires, and will continue to require well into the future, services in the five primary NAICS sectors that ROTHE serves. However, the number of DoD and DoD military department contracts in ROTHE's five primary NAICS sectors that ROTHE would be eligible to bid on equal footing for (i.e., not set aside under section 8(a)'s racial classification) has been declining since 2008. This data is publicly available in the Government Services Administration's Federal Procurement Data System (FPDS), http://www.fpds.gov, incorporated by reference for purposes here.

"What is happening is that the contracts ROTHE would otherwise be eligible to bid on are increasingly being set aside pursuant to section 8(a)'s

---

[1]     Where "DoD" and the "military departments" are separately indicated, "DoD" shall include all units and commands under DoD's control except for the military departments. As discussed herein, ROTHE is injured by all of DoD's uses of section 8(a)'s racial classification that deny ROTHE an equal footing when bidding, including those uses of 8(a) by the military departments. The difference in injury from ROTHE's perspective is immaterial and indistinguishable, since ROTHE performs and has performed contracts for DoD units like the Defense Information Systems Agency (DISA) and USTRANSCOM, as well as for military departments like the Air Force. More importantly, ROTHE would like to perform more work for both, but section 8(a)'s racial classification prevents it from competing for such work. Undoubtedly, however, someone may wonder why ROTHE did not also sue one of the military departments, in addition to DoD. The data and discussion herein provide the answer: DoD's use of 8(a) is sufficient in and of itself to give rise to ROTHE's injury.

racial classification. The publicly available data I have reviewed in FPDS shows that since 2008, DoD procurement expenditures in contracts set aside pursuant to section 8(a)'s racial classification have grown markedly:

**Table 2: FPDS Data on DOD 8(a) Contract Expenditures ($)
and Number of Contracts (#), FY 2009-2011
NAICS Codes 541511, 541512, 541513, 541519 and 561210**

| Year | DoD 8(a) contracts ($) | DoD 8(a) contracts (#) | DoD military depts 8(a) contracts ($) | DoD military depts 8(a) contracts (#) |
|------|------------------------|------------------------|---------------------------------------|---------------------------------------|
| FY 2008 | $164,648,496 | 300 | $1,341,088,515 | 2791 |
| FY 2009 | $272,791,874 | 419 | $1,577,769,484 | 3441 |
| FY 2010 | $262,909,053 | 502 | $1,596,210,249 | 3024 |
| FY 2011 | $318,614,397 | 497 | $1,667,002,921 | 3106 |

"The "goal" in section 8(a)'s racial classification is based on a percentage of annual contract awards, but it is cast in terms of yearly expenditures not the annual number of contracts awarded. The FPDS therefore tracks contract expenditures not contract awards. It is not possible to determine exactly how many contract awards were made during these years (as opposed to contracts in existence, which are reported in the table above). However, it is clear that because the expenditures are increasing each year, the contract award amounts must be greater than the expenditures. For FY 2011, this would indicate that combined DoD and DoD military department contract awards pursuant to section 8(a)'s racial classification total roughly $2,000,000,000 for FY2011, in ROTHE's five NAICS sectors alone. Rothe would like to compete for these contracts, but cannot, because it is not a participant in the 8(a) program and has no desire to become one.

"The foregoing DoD set asides pursuant to section 8(a)'s racial classification dwarf ROTHE's historic bid frequency. Removing the 8(a) set aside from $100 million of the contract volumes shown in the table above would have a substantial effect on ROTHE's business, because by historical patterns, it would yield $10 million in annual gross income for ROTHE. However, ROTHE is foreclosed from even pursuing this $10 million in contract opportunity by section 8(a)'s racial classification.

"To add to the injury, the publicly available data I have reviewed in FPDS shows that DoD has removed most of these contracts from the competitive realm entirely when using section 8(a)'s racial classification, by making sole source awards.

**Table 3: FPDS data on 8(a) Sole Source vs. 8(a) Competitive Awards**
**by Dollar Amount ($), Number of Contracts (#) and Percentage of Total (%)**
**NAICS Codes 541511, 541512, 541513, 541519 and 561210**

| DoD units and commands | | | | |
|---|---|---|---|---|
| Year | Sole Source ($) | Sole Source (#) | Competed $ | Competed (#) |
| FY 2010 | $168,832,951 | 353 | $94,076,102 | 149 |
| % of total | 64.22% | 70.32% | | |
| | | | | |
| FY 2011 | $186,419,414 | 357 | $132,194,982 | 140 |
| % of total | 58.51% | 71.83% | | |
| DoD military departments | | | | |
| FY 2010 | $1,011,295,239 | 1777 | $584,915,010 | 1247 |
| % of total | 63.36% | 58.76% | | |
| | | | | |
| FY 2011 | $1,004,887,480 | 1643 | $662,115,442 | 1463 |
| % of total | 60.28% | 52.90% | | |

"The foregoing data in Tables 2 and 3 proves that DoD and the military departments it controls have not stopped letting and are likely to continue to let prime contracts (and prime contracts that result in the letting of subcontracts) involving the five NAICS codes that ROTHE primarily performs that are set aside under section 8(a)'s racial classification.

"ROTHE is able and ready to bid on such contracts, and a continuing basis from this time forward, as has been the case in the past, ROTHE will want to bid on another DoD prime- or subcontract within the five NAICS sectors that it primarily performs that DoD will have set aside under section 8(a)'s racial classification.

"ROTHE hopes that section 8(a)'s racial classification will be struck down as facially unconstitutional in this litigation before DoD has the opportunity to further injure ROTHE by setting aside another $2 billion in contracts within ROTHE's five NAICS sectors, as it did this past year.

"In closing, I would like to bring to the Court's attention and to the Defendants' attention something that I believe is an additional factor in ROTHE's injury, and that is the federal government's own admissions regarding the severe and ongoing problems with data management and data analysis in the 8(a) program. These admissions are quoted repeatedly and at length in an excerpt from a conference paper I have attached as **Attachment 5**. These are not matters of how the statutory racial classification is applied. Rather, they are fundamental structural issues that speak to why section 8(a)'s racial classification is facially unconstitutional, illegitimate and injurious to ROTHE. The government's admissions and data reported in the conference paper amplify the

unsupported nature of the statutory racial classification's alleged causal relationships. It is bad enough that the alleged remedial effect of section 8(a)'s racial classification is nonexistent and that preference is provided in equal degree for any preferred racial group, to the exclusion of ROTHE. But worse, through the government's admissions in its own reports cited and quoted in the conference paper, we see that the lack of properly supported causal connections underlying section 8(a)'s racial classification deprives SBA of the data it would need for any such program to ever be constitutionally legitimate throughout its entire scope. These are further symptoms—lingering effects, if you will—of facial unconstitutionality that can only be remedied by setting aside the statutory racial classification itself.

Further Affiant sayeth not.

ROTHE DEVELOPMENT, INC.

_____
Dale Patenaude, Vice-President

SUBSCRIBED AND SWORN to me on the ___8th___ day of ___May___, 2012, to certify which witness my hand and official seal.

MARGARET D. GALLEGOS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 10-10-2012

_____
NOTARY PUBLIC,
STATE OF TEXAS

USCA Case #15-5176      Document #1577653         Filed: 10/13/2015      Page 94 of 814

# ATTACHMENT 1



U. S. SMALL BUSINESS ADMINISTRATION
*Government Contracting, Area V*
4300 Amon Carter Boulevard, Suite 116
Fort Worth, TX 76155
(817) 684-5300
fax (817) 684-5310

Area V, Dallas
Colorado
Texas
New Mexico
Oklahoma
Louisiana
Arkansas

August 15, 2011

James Sharp
RX Joint Venture, LLC
4614 Sinclair
San Antonio, TX 78222

Subject:      Size Determination Case No.: 05-2011-062
              Task Order: HTC711-11-F-D038
              Solicitation No.: HTC711-R-D0001 (GSA Alliant SB GWAC)
              Procuring Activity: Scott AFB, IL
              NAICS: 541513
              Size Standard: $25 million

Dear Mr. Sharp:

The Small Business Administration (SBA) has made a formal size determination that RX Joint
Venture, LLC, is a small business for the subject procurement. A copy of the formal size
determination is enclosed.

Any person adversely affected by this decision may appeal to SBA's Office of Hearings and Appeals
(OHA). An appeal petition must be filed in accordance with 13 CFR Part 134 and sent to the
following address:

<div style="text-align:center">

Office of Hearings and Appeals
U.S. Small Business Administration
409 Third Street S.W.
Washington, DC 20416

</div>

There is no required format for an appeal petition but it must include the information below. If the
appellant does not provide all this information, a summary dismissal may result.

An appeal petition must include the following information:

- the Area Office which issued the size determination;
- the solicitation or contract number;
- name, address and telephone number of the contracting officer;
- the date the size determination was received;
- a full and specific statement as to why the size determination is alleged to be in error, together
  with argument supporting such allegations; and
- the name, address, telephone number and signature of the appellant or its attorney.

A copy of the OHA regulations (13 CFR Part 134) can be obtained from our website at

http://www.sba.gov/oha/sizenewmenu.html and then click on "Rules of Procedure." Please read them carefully for very specific filing instructions.

If additional information is needed, please contact Stephanie Lewis at (817) 684-5303 or stephanie.lewis@sba.gov.

Sincerely,

*Thomas A Clarke*

for

Robert C. Taylor
Area Director

Enclosures:     Size Determination 05-2011-062

Cc:

Jesse Ayala, President
X Technologies, Inc.
100 Sandau, Suite 300
San Antonio, TX  78216-5831

Terri Francoeur, Chief
DPO Services Support Brand and Contracting Officer
USTRANSCOM/TCAQ-D
508 Scott Drive, Building 1900W
Scott AFB, IL  62225

## SIZE DETERMINATION
## CASE NUMBER 05-2011-065

| | |
|---|---|
| Size Determination of: | RX Joint Venture, LLC |
| NAICS code: | 541513 |
| Size Standard: | $25 Million |

This size determination is issued by the Area V Office of Government Contracting (Area Office V) of the Small Business Administration (SBA) pursuant to 13 CFR 121.1002.

## HISTORY OF THE PROCUREMENT

On March 4, 2011, Scott Air Force Base (AFB) issued a Request for Proposal (RFP) number HTC11-11-R-D0001 with the intent to award a firm-fixed price, with a labor-hour contract line item, task order against the GSA Alliant Small Business Government-wide Acquisition Contract (GWAC) contract to provide Corporate Services Support: Infrastructure Management (CSS:IM) for USTRANSCOM at Scott AFB.

Offerors were solicited only from Alliant Small Business GWAC prime contractors that are small businesses. Offerors were required to certify their size status with the order.[1] The assigned NAICS code was 541513 which has a corresponding small business size standard is $25 million.

The Alliant Small Business GWAC is a competitive multiple award, indefinite-delivery, indefinite quantity small business set-aside contract. It is a ten year (five year base, with a five-year option) contract with a maximum contract value of $15 billion. The contract is designed to provide flexible and responsive information technology (IT) services and IT services-based solutions to federal agencies worldwide, while strengthening competitive opportunities in federal contracting for small businesses.

On June 30, 2011, Scott AFB awarded task order HTC711-11-F-D039 to RX Joint Venture, LLC (RXJV). RXJV is an Alliant Small Business GWAC holder under contract GS-06F-0655Z.

On July 12, 2011, Scott Air Force Base (AFB) forwarded a size protest to Area Office V. The protest was filed by Computer World Service Corporation (CWS) on July 8, 2011, by its legal counsel.

For GWACs, a size protest can be filed against an order when the Contracting Officer has required size certifications in connection with the individual order. 13 CFR 121.1004(a)(3)(iii); see *Size Appeal of Safety and Ecology*, SBA SIZ-5177 (2010).

---

[1] The solicitation stated, "Offers are solicited only from Alliant Small Business GWAC prime contractors that have not re-represented as other than small in accordance with FAR 52.219-28, Post-Award Small Business Program Re-representation. Offerors shall utilize Attachment 9 for re-representation. In addition, only current small businesses, under NAICS code 541513 (small business size standard of $25M), will be eligible for task order award."

1

The protest alleges that RXJV is a large business because one of its joint venture members, Rothe Development, "is a member of a conglomerate of affiliated government contractors named Rothe VTran Services, LLC; Rothe Enterprises Inc.; Rothe Joint Venture, LP; Rothe Development, Inc.; Rohmann Services, Inc. (formerly Rothe Industries, Inc); Rothe Computer Solutions, LLC; Rothe Venture Management, LLC; and Rothe Enterprise Manufacturing, LP." The protest also alleges that NCI is an ostensible subcontractor because Rothe Development does not have extensive information technology experience. NCI is the incumbent contractor.

On July 13, 2011, Area Office V sent a letter to RXJV requiring that it submit the following documents within three working days after receipt of the letter: a response to the allegations in the protest; identification of all tasks that NCI will be performing under the subject procurement; a copy of the subcontracting agreement; a list of joint ventures that the joint venture partners have submitted offers on; SBA Form 355 for the joint venture, Rothe Development and X Technologies; organizational documents; and financial statements and Federal tax returns for the last three completed fiscal years prior to its offer for the joint venture, Rothe Development and X Technologies, and affiliates of all parties.

On July 14, 2011, RXJV requested a three-day extension which was granted by SBA and the Contracting Officer.

On July 19, 2011, Area Office V received a letter from RXJV's legal counsel pointing out that the size protest was filed by Computer World Service Corporation, who is not a company on the GSA Alliant GWAC. CWS is one of the joint venture partners of SBD Alliant, LLC.[2] There was no mention of SBD Alliant in the protest.[3]

Area Office V agreed and dismissed the protest on July 21, 2011 (Size Determination 05-2011-062). A joint venture member of a joint venture is not itself the offeror. The joint venture is the offeror. CWS is not an interested party under 13 CFR 121.1001(a)(1)(i). However, the Area Director, Area Office V, elected to convert it to an Area Director protest in accordance with his authority to do so in 13 CFR 121.1001(a)(1)(iii). This became Size Determination 05-2011-065.

RXJV submitted its information to Area Office V in a timely manner. X Technologies, Inc. submitted its information under separate cover.

## DATE SIZE IS BEING DETERMINED

For the subject GWAC order, size is determined as of the date the offeror submits its size self-certification with its offer, including price. 13 CFR 121.404(a). As stated above, a size self-

---

[2] The Contracting Officer indicated that, per SBD Alliant's joint venture agreement, CWS is not the managing partner of the joint venture. Although the joint venture agreement allows for another managing partner to be designated, the protest did not indicate that CWS was the managing partner. SBD Alliant (not CWS) is the GWAC Alliant SB contract-holder under #GS-06-0656Z.

[3] RXJV's letter also indicates that the CCR profile of one of SBD Alliant's joint venture members, Information Innovators, Inc., indicates it is a large business for the $25 million size standard. Since SBD Alliant is not the apparent successful offeror for the task order, and the protest is being dismissed, a size determination on SBD Alliant at this time is moot.

2

certification was required with the task order proposal. The relevant date for size determination purposes is March 22, 2011.

## EVIDENCE

RX JV is a joint venture that was specifically formed to bid on the GSA Alliant Small Business contract. Under the GWAC, RXJV has bid on seven task orders (and has only won the subject task order). It has also bid on a Navy War College contract for which it did not win.

RXJV's partners are Rothe Development and X Technologies, Inc. (X Technologies). The joint venture agreement is dated March 29, 2006, and revised December 4, 2006. There is no approved SBA Mentor-Protégé Agreement between the companies. RXJV was not awarded any business until 2011.

Rothe Development, Inc.

A previous size determination on Rothe Enterprises was completed by Area Office V in 2008. This determination found the following companies affiliated:

  (1) Rothe Development, Inc., including:
        a. Rothe Computer Solutions, LLC dba Rohmann Joint Venture, a joint venture between Rothe Development and Rohmann Services, Inc. (RSI)); and
        b. RXJV (subject joint venture)
  (2) Rothe Enterprises, Inc.;
  (3) Rothe Venture Management, LLC;
  (4) Rothe VTRAN Services, LLC; and
  (5) Rothe Joint Venture, LP.

On April 20, 2011, Rothe Enterprise Manufacturing, LLC, was formed. This company was sold on July 15, 2011.

Rothe Development acknowledges affiliation with these six companies (the five listed above and Rothe Enterprise Manufacturing LLC). These companies are all owned by Suzanne Patenaude, or her husband Dale Patenaude, or one of the companies owned by Suzanne Patenaude. Therefore, Area Office V confirms that they are affiliates based on common ownership and an identity of interest between family members. 13 CFR 121.103(c), (f).

Rothe Development must also include its proportionate share of receipts from its joint ventures, RXJV and Rothe Computer Solutions, LLC dba Rohmann Joint Venture.[4] Rothe Development's proportionate share of Rothe Computer Solutions, LLC dba Rohmann Joint Venture is 40%. RSI is the managing partner. Rothe Development's proportionate share of RXJV is 60%.

---

[4] Rothe Computer Solutions, LLC dba Rohmann Joint Venture has won two contracts.

3

The following companies had no revenue from 2008-2010[5]:

> RXJV
> Rothe Joint Venture, LP
> Rothe Venture Management, LLC
> Rothe Enterprise Manufacturing LLC[6]
> Rothe VTRAN Services, LLC

The three entities with revenue are:

> Rothe Development, Inc.
> Rothe Enterprises, Inc.
> Rothe Computer Solutions, LLC dba Rohmann Joint Venture

Average annual receipts are calculated in accordance with 13 CFR 121.104. Federal tax returns for 2008, 2009, and 2010, were provided for these three companies. The average annual receipts of Rothe Development, including Rothe Enterprises and its proportionate share of joint venture revenue from Rothe Computer Solutions, LLC dba Rohmann Joint Venture, are less than $25 million.

The protestor raises the allegation that Rothe Development is affiliated with Rohmann Services, Inc. (RSI), who is Rothe Development's joint venture partner in Rothe Computer Solutions, LLC dba Rohmann Joint Venture. As a matter of history, SBA Government Contracting has issued several size determinations, beginning in 1992 that address this issue. In a formal size determination issued by SBA on October 2, 1992, RSI and Rothe Development were found to be affiliated. After that, the relationship between the two companies was severed and on April 26, 1993, SBA found no affiliation between the companies. This severance between the businesses was again confirmed in size determinations issued on January 23, 1998, March 7, 2006, and September 20, 2008.[7] Once again, Area Office V finds no basis for a general affiliation between Rothe Development and RSI. None of the Rothe companies own any voting stock in RSI. Suzanne Patenaude owns only non-voting stock in RSI and is not a member of the board of directors so has no power to control RSI. Dale Patenaude was an original director of RSI but his directorship ended eighteen years ago. All RSI's voting stock is owned by Ron Boone, Donna Mendoza, and Jim Crow. None of these individuals own stock, or are officers or board members of any of the Rothe companies. The Rothe companies and RSI only do business together under the Rothe Computer Solutions, LLC dba Rohmann Joint Venture. Outside the joint venture, there is no common management, common facilities, family relationships, or contractual relationships.

---

[5] The absence of revenue for these five companies is supported by the three years' Federal tax returns for these entities.

[6] Even if Rothe Manufacturing had any revenue, it wouldn't be applicable to this determination since this company was started after the date that size is being determined. As of March 22, 2011, this company had not yet been created.

[7] Size Determinations 05-1998-018 on Rohmann Services, Inc.; 4-2006-56 on Rohmann Services, Inc.; 06-SD-93-047 on Rohmann Services, Inc.; 06-SD-92-056 on Rohmann Service, Inc.; and 05-2008-062 on Rothe Enterprises, Inc.

4

X Technologies

X Technologies was incorporated in the State of Texas on October 16, 1998. It is solely owned
by Jesse Ayala, who also serves as its President. X Technologies was a participant in SBA's 8(a)
program from April 2000 to April 2009.

Mr. Ayala is also sole owner of Skyport X, LLC (Skyport X), a real estate non-residential leasing
business that began in January 2009. X technologies is a tenant of the building and occupies
33% of the square footage of Skyport X's property.

Average annual receipts are calculated in accordance with 13 CFR 121.104. Federal tax returns
for X Technologies and Skyport X for 2008, 2009, and 2010, were provided. The average
annual receipts of X Technologies are less than $25 million.

**SIZE CALCULATION**

As stated, RXJV is a joint venture. 13 CFR 121.103(h)(3)(i) states that there is an exception to
the affiliation between joint venture members when, for a procurement with a receipts-based size
standard, the value of the procurement, including options, exceeds half the size standard
corresponding to the NAICS code assigned to the contract. The procuring agency stated that the
base order value plus four options exceeds $17 million. $17 million is at least half the size
standard (half of $25 million is $12.5 million). This order meets the dollar threshold required so
the joint venture is considered small so long as each concern is small for the $25 million size
standard, which Rothe Development and X Technologies both are.

**OSTENSIBLE SUBCONTRACTING**

CWS' protest also alleged that NCI Information Systems, Inc. (NCI) was an ostensible
subcontractor. The ostensible subcontracting rule in 13 CFR 121.103(h)(4) states that a
subcontractor will be treated as a joint venture partner if it is performing the primary and vital
requirements of the contract, or the prime contractor is unduly reliant upon the subcontractor.

To complete its evaluation, Area V carefully reviewed RXJV's proposal and teaming agreement.

RXJV and NCI entered a teaming agreement for purposes of the subject contract. The agreement
is signed by both parties on February 17, 2011, and contains a Pre-Award Statement of
Responsibilities (Exhibit A) and Subcontract Statement of Work(Exhibit B). The teaming
agreement states that RXJV will be the prime contractor and NCI will be a subcontractor to
RXJV. It sets forth that:

- Each party will bear its respective costs,
- RXJV will be responsible for coordination and leadership of all interactions with
  USTRANSCOM,
- RXJV will be responsible for coordination of the proposal and other solicitation-response
  activities,

5

- At RXJV's request, NCI shall make available personnel as necessary to support pre-award activities;
- NCI shall have the opportunity for technical roles including:
  - Task 2 – USTRANSCOM Global Command, Control, Communications, and Computer System (C4) Coordination Center (GCCC) Operations Support,
  - Task 3 – Common Computing Environment (CCE) Support, and
  - Task 4 – Automated Data Processing Equipment (ADPE) Asset Management.
- RXJV shall retain a minimum of 51% at all times and NCI's workshare shall be not less than 47% (exclusive of any material cost).

RXJV asserts that NCI is not an ostensible subcontractor because:

- Rothe has over twenty years experience with two different contracts that are almost identical to the subject order's requirements;
- Rothe will perform the primary and vital requirements of the contract;
- Rothe is not unduly reliant upon NCI;
- Experienced Rothe managers from three other Rothe contracts were key to the planning stages of the bid submission;
- Rothe performs all key/lead management duties (as shown in Exhibit A and B of the teaming agreement);
- Rothe has the key technical duties;
- Rothe will perform a majority of the work;
- NCI will perform approximately 40% of the burdened labor dollars and 39% (13 of 33) of the Full Time Employees (FTEs);
- NCI is only providing people for the contract;
- The teaming agreement states that NCI will be a subcontractor; and
- Rothe is providing all the materials.

RXJV asserts that it decided to pursue this task order because "this type of work in a DOD environment is exactly the type of work and services that we have provided to Minneapolis ARS and Columbus AFB network control centers for over 20 years." RXJV had made the decision to bid on the contract regardless of whether or not it could find a suitable subcontractor.

The Performance Work Statement (PWS) defined four primary task areas/functions:

Task 1: Contract Level and Task Order Management
Task 2: USTRANSCOM Global Command, Control, Communications, and Computer System (C4) Coordination Center (GCCCC) Operations Support
Task 3: Common Computing Environment (CCE) Support
Task 4: Automated Data Processing Equipment (ADPE) Asset Management

Rothe's proposal indicates that each of the four major functional areas is managed by RXJV personnel. The proposal states that Mr. Shackleford, an RXJV employee, is named as the on-site overall Project Manager/Task Order Manager. He is also the on-site Technical Lead and principal point of contact for technical issues, primary point of contact for all contract-related support, and will directly interface with the Government COR (Contracting Officer

6

Representative). He will also manage personnel, coordinate/implement work management processes, and serve as the focal point-of-contact for meeting the PWS requirements and all contract issues.

Rothe Development also included an organization chart in its proposal. The organizational chart includes individuals by name. It clearly indicates that John Shackelford (Rothe employee) is the overall Project Manager/Task Order Manager (top of organizational chart). Each of the four functional task areas is also headed up by a named Rothe employee. NCI's involvement is in Task 2 and Task 3 and NCI employees are located at the third tier and below. The three most senior members are classified as Network Specialist Masters and are Rothe employees. The highest ranking subcontractor employees (NCI) are the System Admin IIIs. These individuals all report to an RXJV employee. The subcontractor employees are scattered across the contract. RXJV's organizational chart shows 20 RXJV employees and 13 NCI employees. RXJV states that it will perform approximately 61% of the work (burdened labor hours).

The proposal included four past performance references: two from RXJV and two from NCI (one being the incumbent contract). RXJV's past performance includes a contract it has performed for over twenty years for Information Technology/Communications-Computer System Services, including help desk support, to the 934th Airlift Wing at the Minneapolis Air Reserve Station. This contract supports 400 full-time personnel, and 1100-1500 Air Force Reservists. RXJV's second past performance is for a contract that Rothe Enterprises (wholly owned by Rothe Development) performed for Columbus AFB's Communications Center. It provided site management of Command, Control, Communications, Computer and Intelligence (C4I) information resources for decision-makers, war fighters and other site users. This effort supports network and desktop resources located in 75 buildings throughout the installation with over 200 network devices, 60 enterprise servers, and Air Force networked desktop, printer and scanning equipment.

Considering a totality of the circumstances, Area Office V finds that NCI is not an ostensible subcontractor. RXJV is not unduly reliant upon NCI, nor are the NCI employees performing the primary and vital requirements of the contract. The evidence demonstrates RXJV has its own similar past performance; RXJV is managing the contract; NCI is not in charge of any function area and is in a supporting role in two of the four major areas; and NCI's role is limited to specific personnel positions. While NCI is the incumbent contractor, it is evident that RXJV pursued this contract independent of a relationship with NCI (as an Alliant SB GWAC contractor) and is managing the contract.

## CONCLUSION

RX Joint Venture, LLC, is found to be "a small business concern" for the subject procurement and is eligible for contract award, from a size standpoint.

*Thomas A Clarke*

for Robert C. Taylor
Area Director, Area V

7

ATTACHMENT 2

**Balance Sheet**
As of 12/31/2010

Rothe Development, Inc. (RDI)

| Assets | | |
|---|---|---|
| **Current Assets** | | |
| Compass Bank 78035439 | 141,765.61 | |
| Compass Bank 78035447 | 22,138.68 | |
| Cafeteria Plan Benefits Acct | 5,216.76 | |
| Undeposited Cash On Hand | 632.72 | |
| Petty Cash | 500.00 | |
| Accounts Receivable - Trade | 516,594.51 | |
| Accounts Receivable - Employee | 73.64 | |
| Prepaid Insurance-Liability | 23,958.32 | |
| Prepaid W/C pending audit | 457.03 | |
| Prepaid Insurance - W/C | 33,993.54 | |
| Inventory - Cal Lab | 2,703.04 | |
| Inventory - Engineering | 15,232.77 | |
| Work in Progress | 23,247.88 | |
| **Total Current Assets:** | | 786,514.50 |
| **Fixed Assets** | | |
| Land | 105,600.00 | |
| Buildings | 415,663.10 | |
| Portable Buildings | 7,168.50 | |
| Hub Zone Building | 603,410.95 | |
| Cars & Trucks | 92,945.09 | |
| Furn & Equipt-Computer Solut. | 16,686.16 | |
| Furniture & Equipment | 1,348,718.38 | |
| Accumulated Depreciation | -1,793,316.54 | |
| Loan Fees | 9,705.50 | |
| Accumulated Amortization | -3,558.72 | |
| **Total Fixed Assets:** | | 803,022.42 |
| **Other Assets** | | |
| Investment - Mutual Funds | 4,374.61 | |
| Rothe Venture Management, LLC | 23,366.49 | |
| Investment - Rothe JV, LLP | 1,941,612.75 | |
| Account Receivable - R.E.I. | 4,215,317.40 | |
| A/R- Rothe Comp Solutions LLC | 5,872.34 | |
| Account Receivable Rohmann Services | 75,447.55 | |
| Invest-Rohmann Services Inc | 35,650.36 | |
| Invest-Rohmann Joint Venture, LLC | 234,556.00 | |
| Invest-RX Joint Venture | 2,317.95 | |
| **Total Other Assets:** | | 6,538,515.45 |
| **Total Assets:** | | 8,128,052.37 |

A000098

Balance Sheet
As of 12/31/2010

Rothe Development, Inc. (RDI)

Liabilities

Current Liabilities

| | | | |
|---|---|---|---|
| Mortgage Payable - Current | | 14,303.66 | |
| Notes Payable - Current | | 58,285.13 | |
| Accounts Payable-Trade | | 209,290.23 | |
| Insurance Payable | | 57,360.48 | |
| Payroll Taxes Payable | | 31,097.29 | |
| Accrued Franchise Taxes Pay | | 23,313.08 | |
| Accrued Sales Taxes Payable | | 3,326.40 | |
| Other Accrued Liabilities | | 4,796.89 | |
| Wages-Payable | | 243,739.44 | |
| Fringe Benefits-Payable | | 202,498.69 | |
| Emp IRA & 401K Payable | | 24,322.10 | |
| Loan Payable - L Patenaude | | 127,647.39 | |
| | Total Current Liabilities: | | 999,980.78 |

Long Term Liabilities

| | | | |
|---|---|---|---|
| Mortgage Payable - Long-term | | 259,799.15 | |
| Notes Payable - Long-term | | 190,798.50 | |
| A/P REI-Intercompany Labor | | 728,859.13 | |
| Accounts Payable-R.E.I. | | 46,180.61 | |
| Loans From Stockholders | | 53,700.00 | |
| | Total Long Term Liabilities: | | 1,279,337.39 |
| | Total Liabilities: | | 2,279,318.17 |

Equity

| | | | |
|---|---|---|---|
| Common Stock | | 1,700.00 | |
| Additional Paid In Capital | | 232,258.20 | |
| Retained Earnings - C Corp | | 597,328.89 | |
| Retained Earnings-Current Year | | 545,410.44 | |
| Retained Earnings - S Corp | | 4,471,450.01 | |
| Unrealized Gain/Loss on Stock | | 586.66 | |
| | Total Equity: | | 5,848,734.20 |
| | Total Liabilities & Equity: | | 8,128,052.37 |

A000099

ATTACHMENT 3

**Balance Sheet**
As of 12/31/2011

Rothe Development, Inc. (RDI)

| Assets | | |
|---|---:|---:|
| **Current Assets** | | |
| Compass Bank 78035439 | 497,172.46 | |
| Compass Bank 78035447 | 149,250.05 | |
| Cafeteria Plan Benefits Acct | 5,291.50 | |
| Petty Cash | 300.00 | |
| Accounts Receivable - Trade | 288,316.19 | |
| Accounts Receivable - Employee | 816.86 | |
| Prepaid Insurance-Liability | 22,764.74 | |
| Prepaid W/C pending audit | 7,024.18 | |
| Prepaid Insurance - W/C | 15,973.22 | |
| Inventory - Cal Lab | 2,027.28 | |
| Inventory - Engineering | 15,477.99 | |
| **Total Current Assets:** | | 1,004,414.47 |
| **Fixed Assets** | | |
| Land | 105,600.00 | |
| Buildings | 415,663.10 | |
| Portable Buildings | 7,168.50 | |
| Hub Zone Building | 603,410.95 | |
| Cars & Trucks | 44,633.71 | |
| Furn & Equipt-Computer Solut. | 16,686.16 | |
| Furniture & Equipment | 1,105,059.98 | |
| Accumulated Depreciation | -1,565,899.28 | |
| Loan Fees | 9,705.50 | |
| Accumulated Amortization | -5,499.84 | |
| **Total Fixed Assets:** | | 736,528.78 |
| **Other Assets** | | |
| Investment - Mutual Funds | 4,170.54 | |
| Rothe Venture Management, LLC | 23,366.49 | |
| Investment - Rothe JV, LLP | 1,941,612.75 | |
| Account Receivable - R.E.I. | 4,222,506.41 | |
| A/R- Rothe Comp Solutions LLC | 8,133.22 | |
| Account Receivable Rohmann Services | 104,431.00 | |
| Invest-Rohmann Services Inc | 35,650.36 | |
| Invest-Rohmann Joint Venture, LLC | · 195,333.58 | |
| Invest-RX Joint Venture | 132,096.23 | |
| **Total Other Assets:** | | 6,667,300.58 |
| **Total Assets:** | | 8,408,243.83 |

**A000101**

**Balance Sheet**
As of 12/31/2011

Rothe Development, Inc. (RDI)

Liabilities

Current Liabilities

| | | |
|---|---:|---:|
| Mortgage Payable - Current | 15,245.68 | |
| Notes Payable - Current | 63,285.84 | |
| Accounts Payable-Trade | 338,585.53 | |
| Insurance Payable | 35,415.03 | |
| Payroll Taxes Payable | 71,834.50 | |
| Accrued Sales Taxes Payable | 2,318.12 | |
| Wages-Payable | 203,134.83 | |
| Fringe Benefits-Payable | 189,185.72 | |
| Accrued Bonuses Payable | 63,348.41 | |
| Loan Payable - L Patenaude | 127,647.39 | |
| **Total Current Liabilities:** | | 1,110,001.05 |

Long Term Liabilities

| | | |
|---|---:|---:|
| Mortgage Payable - Long-term | 244,791.39 | |
| Notes Payable - Long-term | 127,689.24 | |
| A/P REI-Intercompany Labor | 776,511.93 | |
| Accounts Payable-R.E.I. | 9,021.04 | |
| Notes Payable Rohmann Services, Inc. | 320,000.00 | |
| Loans From Stockholders | 53,700.00 | |
| **Total Long Term Liabilities:** | | 1,531,713.60 |
| **Total Liabilities:** | | 2,641,714.65 |

Equity

| | | |
|---|---:|---:|
| Common Stock | 1,700.00 | |
| Additional Paid In Capital | 232,258.20 | |
| Retained Earnings - C Corp | 597,328.89 | |
| Retained Earnings-Current Year | -39,565.37 | |
| Retained Earnings - S Corp | 5,016,860.45 | |
| Distributions - S Corp | -42,426.00 | |
| Unrealized Gain/Loss on Stock | 373.01 | |
| **Total Equity:** | | 5,766,529.18 |
| **Total Liabilities & Equity:** | | 8,408,243.83 |

A000102

ATTACHMENT 4

Case 1:12-cv-00744 Document 1-1 Filed 05/09/12 Page 2 of 3 Rothe Development, Inc.

EMPLOYEE LISTING Case #15-5176     Document #1577653          Filed: 10/13/2015     Page 111 of 814
ACTIVE EMPLOYEES ONLY

| EMPLOYEE NUMBER | NAME |
|---|---|
| 01 - 0000103 | Simola, Mary Ann |
| 01 - 0000113 | Koenig, Colleen Marie |
| 01 - 0000123 | Kilian, John P. |
| 01 - 0000153 | Lutze, James A. |
| 01 - 0000206 | Patenaude, Dale C. |
| 01 - 0000207 | Patenaude, Suzanne B. |
| 01 - 0000209 | Sharp, James B. |
| 01 - 0000257 | McCarthy, Todd S. |
| 01 - 0000273 | Groskreutz, Glenn R. |
| 01 - 0000283 | Kilian, Philip D. |
| 01 - 0000295 | Souter, Judy D. |
| 01 - 0000296 | Guerrero, Eduardo |
| 01 - 0000298 | Rothe, William D |
| 01 - 0000299 | Campbell, Sherise N. |
| 01 - 0000300 | Reese, Marcia |
| 11 - 0001105 | Everett, Floyd G. |
| 11 - 0001108 | Price, Ronald |
| 11 - 0001109 | Rodriguez, David |
| 11 - 0001111 | Sanchez, Samuel |
| 11 - 0001112 | Yates, Kevin |
| 11 - 0001114 | Odermann, Roland J. |
| 11 - 0001117 | Santiago, Jesus |
| 12 - 0000107 | Mendoza, Jose A. |
| 12 - 0000109 | Stemmermann, Peter J. |
| 12 - 0000124 | Wright, Will R. |
| 12 - 0000232 | Vargas, Carlos J. |
| 12 - 0000290 | Seguin, Ignacio |
| 12 - 0000291 | Griffith, Kayla M. |
| 12 - 0000297 | Fuentes, Roy A. |
| 12 - 0000301 | Parnell, Steven K. |
| 15 - 0005001 | Clickner, Robert E. |
| 15 - 0005003 | Evans, Robert B. |
| 15 - 0005005 | Gumm, Sr, Shannon J. |
| 15 - 0005009 | Segura, Noe |
| 15 - 0005012 | Ortega, III, Enrique |
| 15 - 0005013 | Pickens, Sr, Curtis W. |
| 15 - 0005014 | McMartin, Christopher W. |
| 15 - 0005016 | Molina, Trinidad |
| 15 - 0005020 | Hall, III, Thomas H. |
| 15 - 0005030 | Schumacher, David W |
| 15 - 0005032 | Adams, Bruce E. |
| 15 - 0005034 | Cortez, Juan Ruben |
| 15 - 0005036 | Vega, Reyes |
| 15 - 0005040 | Parker, Vernon R. |
| 15 - 0005041 | Erickson, Cherie Rae |
| 15 - 0005044 | Oliphant, Candice M. |
| 15 - 0005045 | Brown, Traci T. |
| 15 - 0005046 | Green, Bill |
| 15 - 0005051 | Garza, Albert |
| 15 - 0005052 | Pelache, Pete |

*ACTIVE EMPLOYEES ONLY*

| EMPLOYEE NUMBER | NAME |
|---|---|
| 15 - 0005053 | Hill, John W. |
| 15 - 0005054 | Levis, Mary Therese |
| 15 - 0005056 | Vontur, Lorraine M. |
| 15 - 0005059 | Nettles, Daniel Wayne |
| 15 - 0005062 | Brewer, Charles E. |
| 15 - 0005063 | Horn, Jay B. |
| 15 - 0005065 | Shipley, Scott D. |
| 15 - 0005066 | Shelton, Kyle L. |
| 17 - 0017092 | Posey, Steven M. |
| 18 - 0018005 | Lewis, David T. |
| 18 - 0018007 | Jones, Carol J. |
| 18 - 0018008 | Cantu, Gabriel |
| 22 - 0000002 | Chamberlain, James J. |
| 22 - 0000003 | Parnell, Donna Michell |
| 22 - 0000004 | Johnson, Michael E. |
| 22 - 0000005 | Knutson, Jason S. |
| 22 - 0000006 | Knutson, Krystal |
| 22 - 0000007 | Trevino, Gregory |
| 22 - 0000008 | Mortensen, Rhonda K. |
| 22 - 0002209 | Appling, Jesse |
| 22 - 0002210 | Hartman, James |
| 22 - 0002211 | Sculthorp, Robin R. |
| 22 - 0002212 | Townsend, Charles J. |
| 27 - 0002706 | Castillo, John M. |
| 27 - 0002707 | Little, Samuel E. |
| 27 - 0002711 | Sandoval, Joel M. |
| 27 - 0002713 | Gantzler, Richard |
| 27 - 0002717 | Garcia, Gloria J. |
| 27 - 0002718 | Dunn, Jack M. |
| 27 - 0002724 | Glover, Richard A. |
| 27 - 0002725 | Reed, Grant |
| 27 - 0002727 | Laa, Christopher A |
| 27 - 0002732 | Chacon, Bruno |
| 27 - 0002737 | Lineback, Jan Anthony |
| 27 - 0002739 | Moody, Jonathan D. |
| 27 - 0002741 | Rangel, Luis |
| 27 - 0002743 | Elizondo, Adrian |
| 27 - 0002744 | Sheppard, Charles |
| 27 - 0002748 | Hindert, Brian L. |
| 27 - 0002749 | Petitt, William |
| 27 - 0002750 | Nava, Cesar |
| 27 - 0002754 | Bocanegra, David |
| 27 - 0002756 | Reeder, Colt |
| 27 - 0002760 | Baumgardner, Tyson |
| 27 - 0002762 | Hutchinson, Clayton |
| 27 - 0002765 | Kroptavich, Walter L. |
| 27 - 0002766 | Le, David H. |
| 27 - 0002767 | Zabriskie, Misty A. |
| 27 - 2702729 | Mote, Thomas W. |
| 27 - 2702733 | Slone, Joseph B. |

**A000105**

EMPLOYEE LISTING

*ACTIVE EMPLOYEES ONLY*

| EMPLOYEE NUMBER | NAME |
|---|---|
| 27 - 2702734 | Lewis, John Richard |
| 27 - 2702738 | Johnson, Renaldo M. |
| 27 - 2702740 | Kim, Moon S |
| 27 - 2702746 | Robinson, Uneeda J. |
| 27 - 2702751 | Osborne, Kellen O. |
| 27 - 2702753 | Rabb, Thalita L. |
| 27 - 2702757 | Gilmore, Jamie P. |
| 27 - 2702758 | Seibert, Richard |
| 27 - 2702759 | Nelson, James |
| 27 - 2702763 | Bassett, Melanie |
| 27 - 2702764 | Harris, Charity L. |
| 27 - 2702768 | Lewis, Quindarius |
| 27 - 2702769 | Jerido, Terrence |
| 27 - 2702770 | Hayhurst, Benjamin |
| 28 - 0002801 | Chiasson, Michael D. |
| 28 - 0002802 | Elmore, Sheila M. |
| 28 - 0002803 | Hoover, Charlie D. |
| 28 - 0002804 | Wilbanks, Teri L. |
| 28 - 0002805 | Taylor, James M. |

ATTACHMENT 5

*Excerpt from Conference Paper*

CAN SBA's SMALL BUSINESS PROCUREMENT PREFERENCE PROGRAMS
BECOME TRULY DATA-DRIVEN?©
David F. Barton[1]
*Presented at the San Antonio Chapter of the Federal Bar Association (FBA)*
*Military City USA Government Contract Law Symposium,*
*April 12-13, 2012, San Antonio, Texas*

## IV. EXISTING DATA QUALITY PROBLEMS IN THE 8(a) AND 8(d) PROGRAMS

Before discussing the data necessary to analyze the cause-effect relationships described above, however, one must confront another reality: The quality of the data that the federal government actually has regarding small "socially and economically disadvantaged" firms is not very good, by its own admission.[2] There are two primary reasons: (1) abundant fraud, which continues to plague the 8(a) and 8(d) programs despite recurring cycles of investigation, new regulations, and promises of enforcement; and (2) simple lack of proper data collection and lack of data analysis.

### A. Abundant Fraud

The SBA's problems with fraud at the entry and exit stages of the 8(a) and 8(d) programs are well known and longstanding.

At the entry stage, they consist primarily of fraud in reporting economic disadvantage (including such elements as firm size or individual net worth) and fraud in affiliation (such as comingling of assets and improper joint-ventures, mentor-protégé agreements, and outright pass-throughs). Additional exceptions, such as those applicable to Native American tribes, particularly Alaska Native Corporations, created additional opportunities for fraud that became widely publicized during the Jack Abramoff and Ted Stevens bribery prosecutions.

At the exit stage, some firms have evaded compliance with graduation requirements and avoided termination of program participation for as long as possible.

All of this fraud has been documented repeatedly by government oversight agencies and auditors. Below is a sampling of some of the findings:

---

[1]      Shareholder, Gardner Law, San Antonio, TX; Email: dfb@tglf.com. Assistance provided by Brian Pietruszewski, Gardner Law, San Antonio, TX; Email: brp@tglf.com.
[2]      SBA Office of the Inspector General Report 10-08, *SBA's Efforts to Improve the Quality of Acquisition Data in the Federal Procurement Data System* (2010).

1. Program Entry

Government Accountability Office, *8(a) PROGRAM: The Importance of Effective Fraud Prevention Controls*, GAO #11-440T (March 3, 2011).

- Ineligible firms are participating in the 8(a) program. We identified 14 firms that received set-aside or sole-source 8(a) contracts worth $325 million through fraud or abuse. These 14 firms received another $1.2 billion in other federal obligations since entering the 8(a) program.

- Examples include underreporting adjusted net worth and serving as a "pass-through" for non-8(a) companies.

- We obtained 8(a) certification for one bogus firm using fabricated documentation and fictitious owner information.

Government Accountability Office, *SMALL BUSINESS ADMINISTRATION: Steps Have Been Taken to Improve Administration of the 8(a) Program, but Key Controls for Continued Eligibility Need Strengthening*, GAO #10-353 (March 2010).

- Estimated Percentage of Time That SBA Did Not Complete Selected Annual Review Procedures Relating to 8(a) Eligibility

  o Taking action when a firm exceeded industry averages for economic success by notifying firms that exceeded four of seven industry averages for 1 year (intended to make firms aware they may be subject to early graduation ) – 26% of the time.

- SBA retained an estimated 7 percent of the firms we sampled, in which there was no evidence that staff reviewed the firms' net worth. In some cases, the SBA retained firms in the program despite their exceeding the net worth limits.

- SBA did not maintain an accurate list of Mentor-Protégé Program participants. Specifically, the headquarters office has had difficulty verifying which firms actively participate in the program. An SBA headquarters official responsible for the program stated that staff added firms to a working list based on agreements once they were approved at headquarters. However, this list is not systematically updated when mentor-protégé agreements are extended or dissolved, which occurs at the district office level instead of at headquarters.

- Because there is no list of active mentor-protégé agreements, SBA may not be able to properly monitor 8(a) protégé firms that submit agreements with more than one mentor, or mentors that submit agreements with more than one 8(a) protégé.

Government Accountability Office, *8(a) PROGRAM: Fourteen Ineligible Firms Received $325 Million in Sole-Source and Set-Aside Contracts*, GAO #10-425 (March 2010).

- The 14 case studies in this report reflect the entire range of fraud that pervades the 8(a) and 8(d) programs.[3]

Elliot Smith, Danielle Ivory and Gopal Ratnam, *Wealthy Enriched by Double-Dipping in Disadvantaged Plan*, BLOOMBERG (Feb. 20, 2012).

- 12 repeat 8(a) program participants have received $412 million in preferential contracts and more than $1 billion in total government awards.

- The SBA certified multiple companies at a single address more than 100 times since 1990.

- At the time, the SBA said it didn't have the capability to detect businesses enrolled in the program at a common address.

Government Accountability Office, *FEDERAL CONTRACTING: Monitoring and Oversight of Tribal 8(a) Firms Need Attention*, GAO #12-84 (January 2012).

- Federal dollars obligated to tribal 8(a) firms grew from $2.1 billion in fiscal year 2005 to $5.5 billion in 2010, a greater percentage increase than non-tribal 8(a) obligations (160 percent versus 45 percent).

- Obligations to 8(a) firms owned by Alaska Native Corporations (ANC) represented the majority of tribal obligations every year during the period, rising to $4.7 billion in 2010.

- While tribal 8(a) firms comprised 6.2 percent of total 8(a) firms, their obligations accounted for almost a third of total 8(a) obligations in fiscal year 2010.

- Over the 6-year span, sole-source contracts remained the primary source of growth, representing at least 75 percent of all tribal 8(a) obligations in a given year.

- In March 2011, SBA revised 8(a) regulations to clarify program rules, correct misinterpretations, and address program issues. Although a positive step, SBA

---

[3]     *See also* Government Accountability Office, *SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS PROGRAM: Case Studies Show Fraud and Abuse Allowed Ineligible Firms to Obtain Millions of Dollars in Contracts*, GAO #10-108 (October 2009); Government Accountability Office, *SMALL BUSINESS ADMINISTRATION: Additional Actions Are Needed to Certify and Monitor HUBZone Businesses and Assess Program Results*, GAO #08-643 (June 2008).

will have difficulty enforcing new regulations pertaining to tribal 8(a) follow-on contracts and joint ventures given the information currently available.

- We found no evidence of regular and systematic monitoring of the limitations on subcontracting. Some of these contracts had large dollar values, up to $500 million.

- SBA does not have critical data it needs to implement or enforce compliance with new restrictions on agencies' ability to award sole-source follow-on contracts to firms under the same tribal entity and restrictions on work performed by the non-8(a) partner in a joint venture.

2. Program Exit

Government Accountability Office, *8(a) PROGRAM: The Importance of Effective Fraud Prevention Controls*, GAO #11-440T (March 3, 2011).

- We also determined that SBA staff responsible for annually assessing firm eligibility allowed 3 firms to remain in the 8(a) program and receive contracts despite clear evidence provided by company officials during annual reviews that showed they were no longer eligible.

Congressional Research Service, *"Disadvantaged" Small Businesses: Definitions and Designations for Purposes of Federal and Federally Funded Contracting Programs*, CRS #R40987 (January 3, 2011).

- In contrast, Indian tribes, Alaska Native Corporations, Native Hawaiian Organizations, and Community Development Corporations may confer eligibility upon multiple 8(a) firms, which may participate in the 8(a) Program concurrently (subject to certain limitations on the primary industries in which they operate) or at different times.

3. SBA Awareness

Moreover, SBA seems to have been aware of these problems internally for some time, ranking them as the number 1 and number 6 management challenges for the last three fiscal years:

Challenge 1. Procurement flaws allow large firms to obtain small business awards and agencies to count contracts performed by large firms towards their small business goals.

Challenge 6. The Section 8(a) Business Development program needs to be modified so more firms receive business development assistance, standards for determining economic disadvantage are justifiable, and SBA ensures that firms follow 8(a) regulations when completing contracts.

SBA Office of the Inspector General, Top Management Challenges for FY 2010, 2011, and 2012. Available at http://www.sba.gov/office-of-inspector-general/875.

Indeed, challenge number 1 has been number one since FY 2006. *Id*. In addition, challenge number 6 has also been present in modified form since that time.

> Challenge 6. The 8(a) program needs enhanced business development processes, objectively defined eligibility standards, upgraded training and information systems, improved graduation procedures, and better oversight of contractor compliance with program regulations.

SBA Office of the Inspector General, Top Management Challenges for FY 2008 and 2009. *See also id*. for FY 2006 and 2007 (as challenge 7).

The issues have also been identified time and again in the following management reports, available at: http://archive.sba.gov/ig/onlinelibrary/oigreports/gc/index.html

> 5-04 – Review of the Small Disadvantaged Business Certification Program, 11/4/04
> 5-14 – SBA Business Procurement Awards Are Not Always Going to Small Businesses, 2/24/05
> 5-18 – Review of the Mentor-Protégé Program, 04/18/05
> 5-16 – Review of Selected Small Business Procurements, 3/8/05
> 5-15 – Large Businesses Receive Small Business Awards, 2/24/05
> 6-19 – Review of a Company's 8(a) Business Development Program Eligibility, 3/20/06
> 6-18 – The Central Contractor Registration Needs Large Business and Small Business Designation Improvements, 3/21/06
> 6-15 – Audit Of Monitoring Compliance With 8(a) Business Development Regulations During 8(a) Business Development Contract Performance, 3/16/06
> 5-24 – Criteria for Overcoming the Presumption of Social Disadvantage is Needed, 9/28/05
> 6-19 – Review of a Company's 8(a) Business Development Program Eligibility, 3/20/06
> 6-27 – Compliance with 8(A) Business Development Program Requirements, 9/8/06
> 7-27 – Size Determinations Made By District Offices, 6/27/07
> 8-14 – Non-Native Managers Secured Millions of Dollars From 8(a) Firms Owned by Alaska Native Corporations Through Unapproved Agreements, 8/7/08
> 9-15 – Participation in the 8(A) Program by Firms Owned by Alaska Native Corporations, 7/10/09
> 10-07 – Audit of SBA Regulations Relating to Unconditional Ownership Requirements for Indian Tribes, 1/25/10
> 10-11 – Irregularities Involving Alaska Native Technologies, LLC, 4/29/10

*B. Simple Lack of Proper Data Collection and Lack of Data Analysis*

Notwithstanding the abundant fraud, data management for the 8(a) and 8(d) programs faces a more fundamental problem: Staggering error rates in the data that is collected.

SBA Office of the Inspector General Report 10-08, *SBA's Efforts to Improve the Quality of Acquisition Data in the Federal Procurement Data System* (2010) ("SBA 2010 IG Report"), compared FY 2008 and 2009 data entered by reporting agencies in the Federal Procurement Data System – Next Generation (FPDS), http://www.fpds.gov, with actual data in the contract files.

Federal contracting data is entered into the Federal Procurement Data System-Next Generation (FPDS) by acquisition agencies, each of which has primary responsibility for the quality of the data that they submit to the system.[4] After each fiscal year, submitting departments and agencies purport to verify to the Office of Federal Procurement Policy, in the Office of Management and Budget, that their procurement data is properly entered into the system.

Contracting information captured in FPDS is used by SBA in preparation of annual Small Business Goaling Reports (SBGRs). In turn, these reports are used to evaluate federal agencies' performance under socioeconomic procurement preference programs, and achievement of goals under those programs. Logically, if the data is inaccurate there is no way to determine what level of remedial action is necessary or if the program is even achieving it.

The following data reflect the magnitude of erroneous reporting.

[PURPOSELY BLANK]
[SEE NEXT PAGE]

---

[4]     SBA, *Frequently Asked Questions – Small Business Goaling*, available at
http://archive.sba.gov/idc/groups/public/documents/sba_homepage/sbgr_frequently_asked_question.pdf

| Table 3: OIG Calculations of SBA's FY 2009 FPDS Data Error Projections for Contract Actions | | | |
|---|---|---|---|
| | Incomplete or Inaccurate Data Elements in Sample of 35 | Projected Number of Errors in Universe of 303 Contract Actions | |
| | | Lower Limit at 90Percent Confidence | Upper Limit at 90-Percent Confidence |
| Number of Contract Actions with Errors | 34 | 266 | 303 |

| Table 4: OIG Calculations of SBA's FY 2009 FPDS Data Error Rates by Data Element | | | |
|---|---|---|---|
| | Number of Incomplete or Inaccurate Data Elements in Sample of 35 | Projected Number of Errors in Universe of 303 Contract Actions | |
| Data Elements | | Lower Limit at 90-Percent Confidence | Upper Limit at 90-Percent Confidence |
| 1 Procurement Identifier | 4 | 13 | 72 |
| 2 Referenced Indefinite Delivery Vehicle | 8 | 38 | 111 |
| 3 Date Signed | 9 | 45 | 121 |
| 4 Completion Date | 5 | 18 | 82 |
| 5 Last Date to Order | 9 | 45 | 121 |
| 6 Action Obligation | 4 | 13 | 72 |
| 7 Base and All Options Value | 9 | 45 | 121 |
| 8 Funding Agency Identifier | 4 | 13 | 72 |
| 9 Fees Paid for Use of IDV | 4 | 13 | 72 |
| 10 Type of Contract | 7 | 32 | 102 |
| 11 Description of Requirement | 5 | 18 | 82 |
| 12 Principal NAICS Code | 15 | 89 | 174 |
| 13 DUNS | 8 | 38 | 111 |
| 14 Place of Performance Zip Code | 15 | 89 | 174 |
| 15 Extent Competed | 11 | 58 | 139 |
| 16 Type of Set Aside | 6 | 25 | 92 |
| 17 Contracting Officer's Business Size Selection | 8 | 38 | 111 |
| 18 IDV/Award Type | 10 | 51 | 130 |

SBA IG Report at 12 (Tables 3 and 4).

The results of the SBA 2010 IG Report were eye opening, to say the least. The error rates reported are staggering. The SBA Inspector General found:

[T]hat SBA certified to the accuracy of its FY 2008 contracting data, although 92 percent of the contract actions in our sample contained one or more inaccurate or incomplete data elements in FPDS. While SBA had developed a data quality plan for FY 2008, it did not fully implement the plan, which contributed to the errors identified. Further, due to the volume

of errors identified in FPDS, it appears that contracting personnel did not review FPDS data inputs to ensure they reflected accurate information, as required by the Federal Acquisition Regulations (FAR).

SBA 2010 IG Report at 2.

The NAICS code[5] was the data element that was most frequently left blank.

SBA 2010 IG Report at 7.

These results indicate that SBA's contracting personnel continue to insufficiently review the data entered into FPDS to ensure the data is correct and that all required fields are completed. Since SBA contract actions in FPDS contain information not matching the data in the contract files, inaccurate information is being made available to Congress.
. . .
Shortly after OMB issued its guidance, SBA issued an information notice regarding the certification of FPDS data and provided guidance to SBA contracting personnel on ensuring data quality. However, this notice does not contain sufficient detail regarding the steps that will be taken to ensure data is reviewed for accuracy and completeness. This level of detail will be needed to meet OMB's new guidance for improving and validating the accuracy of FPDS data.

*Id*.

## V. IMPLICATIONS AND FURTHER DATA MANAGEMENT AND DATA ANALYSIS NEEDS AFTER *ROTHE*

As noted in the SBA 2010 IG Report quoted above, and as reflected in some of the GAO reports,[6] the Small Business Administration's regular response to what its own management reports clearly acknowledge as systemic problems has been a cycle of relying on tweaking its regulations or guidance and promising that will finally solve the problem "this time." Yet that hasn't solved the problems.

If there is no confidence in the quality of information reported for geography (zip code), market and sector (NAICS code), or contract value, the statutory racial classification of "socially and economically disadvantaged" can never be constitutionally

---

[5]      NAICS stands for North American Industry Classification System, a method of categorizing industries and sectors by numeric code.

[6]      *E.g.*, Government Accountability Office, *8(a) PROGRAM: The Importance of Effective Fraud Prevention Controls*, GAO #11-440T (March 3, 2011).

reauthorized or applied, because there is no reliable feedback mechanism to narrowly tailor it based on the effect of actual contract awards.[7]

Now SBA says it is going to produce a new database for the 8(a) program. SBA headquarters officials told GAO in 2011 they are currently in the initial stages of developing the requirements for a new system intended to provide "necessary data" on 8(a) firms, and estimate that it will be operational between September 2012 and January 2013.[8]

Even if the new database is accurate and free of fraud, it suffers the immediate handicap of only applying to the SBA 8(a) program. Yet it is the procuring agencies themselves whose contracting actions allegedly passively finance racial discrimination in the nationwide marketplace and thus allegedly justify the statutory racial classification. Without resolving the problems in FPDS, the new 8(a) database gets the federal government no closer to validly reauthorizing or applying the statutory racial classification for "socially and economically disadvantaged individuals."

Conceptually, even if FDPS data became accurate, there would remain the task of properly analyzing the data it contains. At a minimum, after *Rothe*, this would entail accurately tracking contract awards by agency, 5-digit or 6-digit NAICS code, and geography, and tracking 8(a) and 8(d) program participants by geography, race, 5-digit or 6-digit NAICS code, proposal submission, and contract award. With this information, at least a rough comparison to identified discrimination[9] within a particular agency, geography, or NAICS code could occur, and the effect of contract awards within that same criteria could be determined.

This is not likely to occur any time soon. If the federal government does not commit to such a truly data-driven approach to the 8(a) and 8(d) program, the judiciary

---

[7]    Not that SBA has been providing such data to Congress in the first place, or that Congress has done any independent data evaluation to determine if the scope of the 8(a) and 8(d) programs should be narrowed, neither of which have occurred. This proves, ultimately, that Congress and the agencies do not care what that data is or whether the statutory racial classification is successfully remedying discrimination, which is the strongest possible evidence that it is "in fact motivated by . . . simple racial politics" and thus unconstitutional. *Croson*, 488 U.S. at 493.

[8]    As stated in Government Accountability Office, FEDERAL CONTRACTING: Monitoring and Oversight of Tribal 8(a) Firms Need Attention, GAO #12-84 (January 2012).

[9]    The collection of data reflecting identified discrimination, whether by direct evidence or statistical means, is discussed in the *Rothe* opinion but is beyond the scope of this paper, which is concerned with the data that the government must have in order to make a valid comparison showing that its procurement programs have been affected and to establish any cause-effect relationship on any such identified discrimination from its remedial statutory racial classifications.

Keep in mind that even with accurate data, the general premise, without going into what could be yet another fully developed briefing document, is that disparity does not by itself equate to discrimination.  Without reliable, sworn anecdotal evidence of supportable discrimination, statistics still exist in a vacuum that cannot warrant discrimination of one citizen against another for whatever reason.

will render the statutory racial classification for "socially and economically disadvantaged individuals" inoperative in short order.[10] Even without the statutory racial classification, the rest of the 8(a) and 8(d) program, if it cannot be done properly with reliable data, should wind up not being done at all.

---

[10]     Congressional Research Service, *Rothe Development Corporation v. Department of Defense: The Constitutionality of Federal Contracting Programs for Minority-Owned and Other Small Businesses* (Mar. 16, 2009). The only reason for the delay to date has been difficulty in finding a contracting firm aware of the likelihood of success and willing to undertake the litigation expense.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
ROTHE DEVELOPMENT, INC.,                    )
     Plaintiff,                            )
                                            )
          v.                       )   Civil Action No. 12-CV-744(EGS)
                                            )
DEPARTMENT OF DEFENSE                        )
     and                                   )
SMALL BUSINESS ADMINISTRATION               )
     Defendants.                           )
_____)

<u>**ANSWER**</u>

    The United States Department of Defense and the Small Business

Administration (collectively "Federal Defendants"), through their undersigned

attorneys, hereby answer the Complaint of Plaintiff Rothe Development, Inc. as

follows:

    1.    Federal Defendants admit that in this proceeding Plaintiff has filed a

        complaint seeking declaratory relief that portions of Section 8(a) of the

        Small Business Act are unconstitutional.

    2.    The allegations in paragraph 2 contain arguments or conclusions of law

        which Federal Defendants are not required to admit nor deny. To the

        extent that a response is required, Federal Defendants deny that Section

        8(a) of the Small Business Act is unconstitutional.

3.     Federal Defendants admit that Plaintiff seeks the relief listed in paragraph 3 and deny the remainder of the allegations.

4.     Federal Defendants admit that Plaintiff seeks the relief listed in paragraph 4. Federal Defendants deny that Rothe is entitled to such relief.

5.     The allegations in paragraph 5 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny. To the extent that a response is required, Federal Defendants admit that Rothe has not in this complaint challenged the letting of a specific contract.

6.     Federal Defendants admit that Plaintiff does not seek monetary damages in this complaint.

7.     Federal Defendants admit that jurisdiction is proper in this Court.

8.     Federal Defendants admit that venue is proper in this Court. Federal Defendants deny the remainder of the allegations in paragraph 8.

9.     Federal Defendants are without information sufficient to form an opinion as to the allegations in paragraph 9.

10.    Federal Defendants admit that the Department of Defense is an executive department that is part of the Executive Branch and deny the remainder of the allegations in paragraph 10. The proper address to contact

Defendant Department of Defense is:  1400 Defense Pentagon, Washington DC 20301-1400.

11.     Federal Defendants admit that the Small Business Administration is an Agency that is part of the Executive Branch and is under the general direction and supervision of the President and deny the remainder of the allegations in paragraph 11.  The proper address to contact Defendant Small Business Administration is:  409 3rd St SW, Washington DC 20416.

12.     Federal Defendants admit paragraph 12.

13.     To the extent that the allegations in paragraph 13 purport to quote from and paraphrase a federal statute, Federal Defendants respectfully refer the Court to the text of the federal statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

14.     To the extent that the allegations in paragraph 14 purport to quote from and paraphrase a federal statute, Federal Defendants respectfully refer the Court to the text of the federal statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

3

USCA Case #15-5176   Document #1577653   Filed: 10/13/2015   Page 128 of 814

15.     To the extent that the allegations in paragraph 15 purport to quote from and paraphrase a federal statute, Federal Defendants respectfully refer the Court to the text of the federal statute for a full, complete and accurate statement of its contents. To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

16.     To the extent that the allegations in paragraph 16 purport to quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the federal statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

17.     To the extent that the allegations in paragraph 17 purport to quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the federal statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

18.     To the extent that the allegations in paragraph 18 purport to paraphrase and quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

A000121

19.   To the extent that the allegations in paragraph 19 purport to paraphrase and quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.

20.   To the extent that the allegations in paragraph 20 purport to paraphrase and quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute but deny that Plaintiff's allegations that these are the only small business concerns eligible to receive 8(a) contracts.

21.   To the extent that the allegations in paragraph 21 purport to paraphrase and quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  Additionally, the allegations in paragraph 20 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute and deny the remainder of the allegations in paragraph 21.

5

22.     To the extent that the allegations in paragraph 22 purport to paraphrase and quote from a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.  Additionally, Federal Defendants also admit that Rothe states in footnote 2 of its complaint that it does not intend to challenge the inclusion of Indian tribes and Native Hawaiian Organizations in the SBA 8(a) program.

23.     To the extent that the allegations in paragraph 23 purport to paraphrase a federal regulation, Federal Defendants respectfully refer the Court to the text of the regulation for a full, complete and accurate statement of its contents.  Additionally, the allegations in paragraph 23 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the remainder of the allegations in paragraph 23.

24.     To the extent that the allegations in paragraph 24 purport to paraphrase a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  Additionally, the allegations in paragraph 24 contain arguments or conclusions of law which Federal Defendants are not required to admit

A000123

nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

25.    The allegations in paragraph 25 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations other than to admit that Rothe is challenging portions of the SBA 8(a) program.

26.    The allegations in paragraph 26 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

27.    The allegations in paragraph 27 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

28.    The allegations in paragraph 28 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

29.    The allegations in paragraph 29 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

A000124

30.     To the extent that the allegations in paragraph 30 purport to paraphrase and quote a federal statute, Federal Defendants respectfully refer the Court to the text of the statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute.  Additionally, the allegations in paragraph 30 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

31.     Federal Defendants admit that Plaintiff has submitted an affidavit and attachments purporting to establish standing.  The allegations in the remainder of paragraph 31 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  Federal defendants are without sufficient information to admit or deny the facts the affidavit.

32.     The allegations of paragraph 32 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

33.     The allegations in paragraph 33 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  Federal Defendants lack sufficient information to admit or deny the Plaintiff's

A000125

allegations as to what programs it can or is interested in participating in. To the extent a response is required to the remainder of the allegations, Federal Defendants deny the allegations.

34.   The allegations in paragraph 34 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

35.   The allegations in paragraph 35 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations and also assert that the allegation fails to state a claim upon which relief can be granted.

36.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 36.

37.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 37.

38.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 38.

39.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 39.

40.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 40.

41.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 41. To the extent a response is required, Federal Defendants deny the allegations.

42.   Federal Defendants admit that they use the SBA 8(a) program as one means of letting contracts and intend to continue to do so.  Federal Defendants lack sufficient information to admit or deny the Plaintiff's allegations as its areas of expertise. To the extent a response is required to the remainder of the allegations, Federal Defendants admit the remainder of the allegations in paragraph 42.

43.   Federal Defendants are without information sufficient to form a belief as to the truth of the allegations in paragraph 43.

44.   Federal Defendants admit that they use the SBA 8(a) program in the NAICS codes that Rothe operates and intend to continue to do so.  The Federal Defendants are without information sufficient to form a belief as to the truth of the allegations regarding Rothe's status in paragraph 44. Federal Defendants deny the remainder of the allegations in paragraph 44.

A000127

45.   The Federal Defendants are without information sufficient to form a belief as to the truth of the allegations regarding Rothe's status in paragraph 45.  Federal Defendants deny remainder of the allegations the allegations in paragraph 45.

46.   The allegations in paragraph 46 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations in paragraph 46.

47.   The allegations in paragraph 47 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants respectfully refer the Court to the text of the cited cases for a full, complete and accurate statement of their contents.

48.   The allegations in paragraph 48 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny. To the extent a response is required, Federal Defendants respectfully refer the Court to the text of the cited statutes for a full, complete and accurate statement of their contents.

49.   To the extent that the allegations in paragraph 49 purport to paraphrase and quote a federal statute, Federal Defendants respectfully refer the

A000128

Court to the text of the statute for a full, complete and accurate statement of its contents.  To the extent a response is required, Federal Defendants admit that the quoted language is found within the statute. Additionally, the allegations in paragraph 49 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

50.     The allegations in paragraph 50 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.

51.     To the extent that paragraph 51 restates previous allegations, Federal Defendants respectfully refer the Court to their responses to those paragraphs.

52.     The allegations in paragraph 52 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny. To the extent a response is required, Federal Defendants deny the allegations.

53.     The allegations in paragraph 53 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

54.     The allegations in paragraph 54 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the

A000129

extent a response is required, Federal Defendants admit that Plaintiff is seeking the relief requested but deny that it is due that relief.

55.   To the extent that paragraph 55 restates previous allegations, Federal Defendants respectfully refer the Court to their responses to those paragraphs.

56.   The allegations in paragraph 56 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

57.   The allegations in paragraph 57 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

58.   The allegations in paragraph 58 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

59.   The allegations in paragraph 59 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants admit that Plaintiff is seeking the relief requested but deny that it is due that relief.

A000130

60.     To the extent that paragraph 60 restates previous allegations, Federal Defendants respectfully refer the Court to their responses to those paragraphs.

61.     Federal Defendants admit that Plaintiff has retained attorneys.  The remainder of the allegations in paragraph 61 contains arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

62.     The allegations in paragraph 62 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

63.     The allegations in paragraph 63 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants deny the allegations.

64.     The allegations in paragraph 64 contain arguments or conclusions of law which Federal Defendants are not required to admit nor deny.  To the extent a response is required, Federal Defendants admit that Plaintiff is seeking the relief requested but deny that it is due that relief.

## PRAYER FOR RELIEF

1. Admit that Plaintiffs seek the relief set out in paragraphs 1, 2, 3, 4.  Federal

   Defendants deny that Plaintiffs are entitled to that relief or to any relief in

   this matter.


## FIRST AFFIRMATIVE DEFENSE

Section 8(a) of the Small Business Act is lawful and constitutional.

## SECOND AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.


Date: July 16, 2012

/s/    Daniel F. Van Horn
DANIEL F. VAN HORN, D.C. Bar No. 924092
Acting Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-7168
daniel.vanhorn@usdoj.gov


DELORA L. KENNEBREW
Chief
SHARYN A. TEJANI
Special Litigation Counsel
/s/   Andrew G. Braniff
ANDREW G. BRANIFF
Attorney
Employment Litigation Section
Civil Rights Division
United States Department of Justice

15

950 Pennsylvania Ave. NW
PHB Room 4520
Washington, D.C. 20044-4403
(202) 514-9229
andrew.braniff@usdoj.gov

OF COUNSEL:

ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

A000133

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 16th day of July 2012, I electronically filed the foregoing Answer by using the CM/ECF system

<u>/s/ Andrew G. Braniff</u>

A000134

In the event the Defendants are permitted to supplement their prior expert reports in Dynalantic to address a supplemented record, Rothe does not anticipate needing to depose those experts, because their testimony was not before Congress at the time of enactment or reauthorization, or is otherwise immaterial. If Rothe has objections to Defendants' expert testimony, it will make those objections in its briefs.

Rothe does not anticipate retaining experts or rebuttal experts, but is prepared to do so if necessary, accompanied by proper disclosure pursuant to FRCP 26, and in such event, Rothe would move to amend the schedule accordingly.

### III. SCHEDULING RECOMMENDATIONS

Defendants' proposed schedule contemplates such numerous irrelevancies as Initial Disclosures due by August 6, 2012, which Defendants plainly do not intend to make in any meaningful manner, since they are requesting inordinate time to "discover" alleged additional evidence before Congress and file that record.[1] Defendants' proposed schedule is one that will occupy this Court's time with repeated discovery battles until the Court puts its foot down to preclude Defendants from pursuing discovery of unnecessary facts untethered to ultimate issues, as discussed above.

This case is in a procedural posture to proceed much more rapidly in a manner that conserves judicial resources. In this response to the Court's Minute Order and its Motion to Consolidate Civil Actions (Dkt #16), ROTHE has provided the Court with

---

[1]     The truth is that Defendants do not really know what evidence they are seeking, because Congress has not considered relevant evidence directly addressing section 8(a)'s racial classification and the continuing viability of the 8(a) program during that time. Thus, Defendants believe they must scour the entire Congressional Record, looking for disparity studies that were discussed with reference to *any* federal program, no matter how irrelevant to section 8(a)'s racial classification, and they want the Court to grant them more delay (beyond the stay they already have in the June 27 Minute Order) to do that, which is inexcusable.

Because the Court's recent opinion in *Dynalantic* does not resolve the causal arguments made by ROTHE, those arguments must be adjudicated on their merits.

*B. None of Defendants' Proposed Discovery is Necessary*

ROTHE incorporates by reference its arguments regarding Defendants' proposed discovery from its prior scheduling recommendations, Dkt #15, as well as from its briefing on the motion to consolidate, Dkt #s 16 and 19, and summarizes those arguments here.

Most importantly, Defendants admit that all of their discovery is sought to determine how section 8(a)'s racial classification *applies to* ROTHE. Dkt #17 at 2 ("Defendants will need to conduct fact and expert discovery in order to properly defend the constitutionality of the Section 8(a) Business Development Program *insofar as it is applied to Plaintiff*") (emphasis added).

But there is no as-applied claim in this case, as ROTHE has repeatedly pointed out to the Court. Dkt #1 at 1-2 ¶¶1-6; Dkt #15 at 2-4; *see also* Dkt #19 in its entirety.

Consequently, none of Defendants' proposed discovery relates to their ability to respond to ROTHE's arguments on the merits.

Nor is there even a colorable argument that Defendants need discovery regarding ROTHE's standing. Defendants filed an answer, not a motion to dismiss, on July 16. Dkt #14. In that answer, Defendants admit jurisdiction. Dkt #14 at 2. Defendants do not challenge ROTHE's standing in this Court at all. They have not filed a motion to dismiss or otherwise alleged that the affidavit of ROTHE's corporate representative is insufficient on its face to support standing under the controlling law expressed by the Court of Appeals in *Dynalantic v. Dep't of Defense*, 115 F.3d 1012, 1016 (D.C. Cir. 1997). Nor have they identified any facts in that affidavit that are unclear such that they would require facts not already in their possession, as ROTHE discussed in detail in its response to the Court's June 27, 2012 Minute Order. Dkt #15 at 2-4.

As ROTHE has noted, the Supreme Court case that formed the basis for the Court of Appeals' opinion in *Dynalantic* is what ultimately reveals the error in Defendants' arguments regarding their alleged need for discovery, whether with respect to standing or for the merits:

> [I]in *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993), the U.S. Supreme Court held that an association of several contractors had standing to bring a facial challenge to an ordinance containing a racial classification affecting procurement, without regard to whether any of those contractors had actually bid on a particular City of Jacksonville contract. Defendants here argue that an individual contractor bringing a facial challenge can never challenge the entire statutory racial classification, yet the Defendants here would also require more evidence for the standing of that individual contractor than the Supreme Court required for an entire association in the *City of Jacksonville* case (which was none, apart from the willingness to bid and the exclusion caused by the racial classification on its face). *Id.* at 666. Defendants' erroneous assertion that *more* standing evidence is required (and therefore discovery should purportedly be had) is contrary to the controlling law on standing in a facial constitutional challenge.

Dkt #19 at 5 n.3.

> See *City of Jacksonville*, 508 U.S. at 666 ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."). Although Defendants' argument here pertains to the merits, specifically whether section 8(a)'s racial classification is narrowly tailored, the *City of Jacksonville* case once again illustrates how absurd results would flow from Defendants' position. If Defendants were correct, which is denied, *City of Jacksonville* would mean that having a lot of plaintiffs would be more likely to result in a lot of "burden" from the statutory classification—thus making the success and scope of relief in a facial challenge depend on the number and activity level of the plaintiffs, when a facial challenge does not depend on those factors at all.

Dkt #19 at 7-8 n.4.

It is undeniable that a plaintiff may challenge the facial constitutionality of section 8(a)'s racial classification in this court and seek relief on the merits as to its entire scope. *Dynalantic*, No. 95-2301-EGS (Dkt #248, Aug. 15, 2012). Whether the plaintiff is entitled to lesser relief depends on whether it has brought an as-applied claim, which ROTHE has not.

There is no factual showing with respect to how section 8(a)'s racial classification applies to ROTHE that will alter whether that statutory racial classification is unconstitutional in all circumstances under *Salerno*'s nonetheless erroneous test. If *any one* of the causal relationships discussed in ROTHE's motion for partial summary judgment and memorandum is missing from Defendants' evidence, section 8(a)'s racial classification cannot be applied at all. Accordingly, because none of Defendants' discovery has any relevance to a facial claim, the Court should issue an order to DENY that discovery and set deadlines to for Defendants to produce their alleged evidence and respond to ROTHE's pending dispositive motion.

*C. No Stay is Warranted, Because One is Already in Effect*

The original stay from the Court's June 27, 2012 Minute Order remains in effect. It will be lifted when the Court issues the scheduling order, which it should do as expeditiously as possible.

Whether an appeal is taken from the Court's recent opinion in *Dynalantic* has no effect on the need for this case to move forward. Any post-judgment motions or appeals or cross-appeals pursued by Defendants in *Dynalantic* have no impact on this case now and are no excuse for delay or further stay here.

## IV. CONCLUSION AND RELIEF REQUESTED

ROTHE respectfully requests that the Court ADOPT the recommendations herein by Minute Order or by written order(s) as expeditiously as possible, and enter a scheduling order with the following deadlines calculated from the date of the scheduling order:

**+ 60 days**          Defendants' record and expert report, Defendants' response to the MSJ, and any combined cross-motion (i.e., cross-motion and response).

**+ 90 days**         Rothe's response to any cross-motion, and reply to response to MSJ (i.e.,

response-reply).

**+ 100 days**        Defendants' reply regarding any cross-motion.

Dated August 24, 2012                          Respectfully submitted,


                                               /s/ David F. Barton
                                               David F. Barton
                                               District Court Bar No. TX0096
                                               Texas Bar No. 01853300
                                               **GARDNER LAW**
                                               745 E. Mulberry Avenue, Suite 500
                                               San Antonio, Texas 78212-3149
                                               Telephone: (210) 733-8191
                                               Telecopier: (210) 733-5538
                                               Email: dfbarton@gardner.sa.com

## CERTIFICATE OF SERVICE

        This is to certify that a true and correct copy of the foregoing and all attachments and
exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure, on this 24th
day of August, 2012, to all parties, by electronic filing (CM/ECF), as follows:

Daniel F. Van Horn                             *VIA CM/ECF*
Acting Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C. 20530


Andrew G. Braniff                              *VIA CM/ECF*
Attorney
Employment Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave. NW
PHB Room 4520
Washington, D.C. 20044-4403
*Attorneys for Defendants*


                                               /s/ David F. Barton
                                               David F. Barton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
ROTHE DEVELOPMENT, INC.,                             )
     Plaintiff,                                      )
                                                    )
v.                                                   ) Civil Action No. 12-CV-744-EGS
                                                    )
DEPARTMENT OF DEFENSE and                            )
SMALL BUSINESS ADMINISTRATION                        )
     Defendants.                                     )
_____)

### PLAINTIFF'S OPPOSITION AND MEMORANDUM OF POINTS AND AUTHORITIES TO DEFENDANTS' MOTION FOR LEAVE OF COURT TO EXTEND DISCOVERY DEADLINES

Pursuant to D.D.C. LCvR 7(b), Plaintiff ROTHE DEVELOPMENT, INC. ("ROTHE") files this, its Opposition and Memorandum of Points and Authorities to Defendants' Motion for Leave of Court to Extend Discovery Deadlines (Dkt #29), and states:

1.      The motion for leave should be denied because Defendants have not shown good cause for an extension of time.  Fed. R. Civ. P. 16(b); LCvR 16.4(a).

2.      Defendants' Motion and this Opposition confirm ROTHE's imprimatur to the Court as ROTHE predicted in its own scheduling recommendations on July 20, 2012:

> Defendants' proposed schedule is one that will occupy this Court's time with repeated discovery battles until the Court puts its foot down to preclude Defendants from pursuing discovery of unnecessary facts untethered to ultimate issues, as discussed above.

Plaintiff's Scheduling Recommendations, Dkt #15 at 6.

3.      Defendants request an astounding five month extension for two irrelevant reports—one (Wainwright) that is foreclosed by the Congressional record, and one (Bloomberg) that even Defendants admit has no connection to this case. *Cf*. Dkt #29 at 3.

USCA Case #15-5176      Document #1577653         Filed: 10/13/2015      Page 148 of 814

## I. THE WAINWRIGHT REPORT IS IRRELEVANT, DOES NOT REQUIRE THE TIME DEFENDANTS HAVE REQUESTED, AND "MAY NOT" REQUIRE ANY ADDITIONAL TIME AT ALL

4.      As to the first report, Defendants' purported expert Jon Wainwright does not need five additional months "to conduct a complete review of evidence submitted to Congress related to this matter," for several reasons. *Cf.* Dkt #29 at 1.

5.      As an initial matter, Defendants refuse to produce "the evidence submitted to Congress" to ROTHE, even though they have had nearly a year to assemble it and even though it should have been provided with Defendants' Rule 26(a) initial disclosures which were due back on September 25, 2012. Scheduling Order, Dkt #24 at 2; Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring production of "a copy . . . of all documents . . . that the disclosing party has . . . and may use to support its claims or defenses."). Defendants now admit they have definitively identified this evidence, yet, again, they have not produced it to ROTHE. Dkt #29-1, Aff. of Braniff at ¶4-5. **ROTHE requests that the Court ORDER Defendants to produce "the evidence submitted to Congress" to ROTHE immediately.**

6.      Further, in conference on this motion Defendants first stated to ROTHE that Mr. Wainwright could likely have his post-hoc report on the "the evidence submitted to Congress" completed within the time standard of the Court's Scheduling Order, as alluded to in the Braniff Affidavit, Dkt 29-1, at ¶5, but they could not be certain.  Then they said it could be produced within a month, yet now the request is for five months. No independent explanation is provided regarding why Mr. Wainwright needs all five months, since his report is not said to be contingent on Defendants' second proposed irrelevant report. *Cf.* Dkt #29 & 29-1. He "may not" need any extra time at all. Dkt #29-1,

Aff. of Braniff at ¶5 ("he may not be able to finish the report by the March 8, 2013 deadline"). To the extent Defendants would like Mr. Wainwright to comment on the results of the second report they claim to need, Mr. Wainwright could submit a supplemental report at that time.

7.      Mr. Wainwright need not submit any report, however, because any such report is irrelevant. It was never placed before or considered by Congress. *Rothe Development Corp. v. Department of Defense*, 262 F.3d 1306, 1327 (Fed. Cir. 2001) (*Rothe III*) ("The quantum of evidence that is ultimately necessary to uphold racial classifications must have actually been before the legislature"); *Rothe Development Corp. v. Department of Defense* (*Rothe VII*), 545 F.3d at 1039 ("For evidence to be relevant in the strict scrutiny analysis, it must be proven to have been before Congress . . . It would be error for the district court to rely on studies without a finding that they were put before Congress"). The evidence of whether Congress properly weighed the evidence before it has existed since the time of its introduction to Congress, whatever that evidence might be, regardless of the fact that Defendants have not produced that evidence, although the procedural rules require them to do so.

8.      Mr. Wainwright cannot vary, supplement, or alter the legal inadequacies of the disparity studies that were allegedly before Congress when section 8(a)'s racial classification was reauthorized—studies that Defendants claim Mr. Wainwright is reviewing, but which they still have not yet produced or disclosed to ROTHE. Dkt #29-1, Aff. of Braniff at ¶4-5.  A post hoc evaluation of the studies Congress reviewed when enacting or reauthorizing section 8(a)'s racial classification cannot be helpful to the

Court. A post hoc report would have nothing to do with the actions Congress actually took based on whatever studies were allegedly before it at the time.

9.  The Court's memorandum opinion in the *Dynalantic* case, No. 95-CV-2301-EGS Dkt #222, demonstrates that post-hoc expert reports are unnecessary to the adjudication of this case on the merits. Mr. Wainwright, who has authored some of the disparity studies allegedly before Congress, submitted a purported expert report in *Dynalantic*. The Court's memorandum opinion cited it a grand total of once, Dkt #222 at 87-88. Moreover, the citation was in the context of a methodological dispute, not as a source of statistical evidence to uphold section 8(a)'s racial classification on its face. *Id*.

10.  ROTHE posits that Defendants primary objective in its request for extension is its hope to draw the Court into Defendants' infinite loop of delay, since it offered no support for its expert's alleged "unforeseen delays in his schedule," with no further explanation of what was unforeseen and what specific impact that had on anything.  That is not "good cause." Further, evidence before Congress is required to uphold the statutory racial classification.  *Rothe III*, *Rothe VII*, *supra*. But by asserting a purported need for irrelevant reports, Defendants delay adjudication on the merits, delay relief for ROTHE and delay disclosure of their chosen evidence allegedly before Congress, all for an indefinite period at their purported experts' convenience.

11.  The lack of meaningful citation to Mr. Wainwright's report in the *Dynalantic* opinion—as distinguished from his actual testimony before Congress—demonstrates there is no reason why disclosure of the Defendants' alleged evidence before Congress should be delayed by a post-hoc opinion regarding that evidence. If Mr. Wainwright also wants to debate the law and make the same methodological argument that the Court cited

in *Dynalantic*, that is his prerogative (at least until further objection is made), but not at ROTHE's expense of time and delay.

## II. THE BLOOMBERG REPORT DOES NOT EVEN RELATE TO A CLAIM IN THIS CASE

12.     In *Dynalantic*, this Court analyzed industry-specific evidence because there was an as-applied claim. *Dynalantic*, No. 95-CV-2301-EGS, Dkt #222 at 59 ("The first claim is DynaLantic's facial challenge to the statute. . . The second claim is DynaLantic's challenge to the Section 8(a) program as applied to the military simulation and training industry.").

13.     There is no as-applied claim in this case, as ROTHE has repeatedly pointed out to the Court. Dkt #1 at 1-2 ¶1-6; Dkt #15 at 2-4; Dkt #19 in its entirety; Dkt #21 at 2.

14.     Now the Defendants finally agree: There is no as-applied claim in this case. Dkt #29 at 3 ("Plaintiff has not yet specifically alleged an as-applied challenge.").

15.     There is nothing else to figure out. Defendants' plea for five months of delay to generate a report on industry specific evidence from three years ago (2010) simply because they can, i.e., allegedly because "it [the data] is available," is ludicrous.[1]

16.     Moreover, the data is not available because it is not even clear whether Bloomberg will be producing it, and if so, how many times it will have been manipulated since 2010 and by whom. Dkt #29-1, Aff. of Braniff at ¶6-9. Certainly persons other than the unnamed Department of Commerce witness that Defendants hope to offer the report

---

[1]     During conference, Defendants informed Rothe that the data they seek to have analyzed by their second, yet unnamed, expert contains what is commonly referred to as Census/POMs data.  Obviously not wanting to get sidetracked into an argument upon the fact that this data is unhelpful to any constitutional evaluation of statistics in the context of this case, as Defendants fully know, they failed to mention this data source in their motion for extension.

into evidence through will be the ones responsible for its contents. *Id*. The repeated gaps in the chain of custody and numerous manipulations by persons inside and outside of the Executive Branch render the database unreliable for any purpose. The Defendants are now literally attempting to recreate data that was never before Congress and present it in a manipulated form that has never before seen the light of day, all of it totally irrelevant to ROTHE's facial challenge.

## III. DEFENDANTS' MOTION SHOULD BE DENIED CONSISTENT WITH THE SCHEDULING ORDER IN EFFECT

17.     The Scheduling Order in effect, Dkt #24 (as modified by the Minute Order of Dec. 18, 2012), states in part:

> The parties are advised that requests for extensions of time will also be viewed with disfavor and will not be granted as a matter of course.
> . . .
> *All dates in this Order are firm* and may not be altered by the parties without seeking leave of the Court. Any request for an extension of time shall be made by filing a motion and *shall state whether any prior extensions of time have been granted and whether the extension will impact any other scheduled dates*.

Dkt #24 at 1 & ¶10 (emphasis added).

18.     Defendants' motion glosses over the fact that ROTHE and the Court have already assented to one extension of time for Defendants' expert disclosures, which was granted by minute order on December 18, 2012. *Cf*. Dkt #29 at 1.

19.     Defendants' prior request for extension was made on November 26, 2012, Dkt #27, which we now learn is about the same time they made initial contact with their purported experts. Dkt #29-1, Aff. of Braniff at ¶¶3 & 6 (noting Nov. 29 contract date for Wainwright and Nov. 27 identification of Department of Commerce witness). In essence, the first extension the Court granted to Defendants was for the sixty days they wasted

USCA Case #15-5176      Document #1577653         Filed: 10/13/2015      Page 153 of 814

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| ROTHE DEVELOPMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12-cv-00744-KBJ |
| | ) | |
| DEPARTMENT OF DEFENSE | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SMALL BUSINESS ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF PLAINTIFF'S EXPERT DALE PATENAUDE

This Court should exclude the expert reports and testimony of Plaintiff Rothe Development Inc.'s designated "expert," Dale Patenaude pursuant to Federal Rules of Evidence 401, 402, and 702, and applicable case law.  As demonstrated in the attached Memorandum, Mr. Patenaude is not an economist or statistician; he has no training or experience in regression analysis; and he has not published anything in these areas (or on any other topics).  For these reasons, and others explained in the Memorandum, neither Mr. Patenaude nor his reports meet the reliability requirements Federal Rules of Evidence and thus his expert reports and testimony as an expert witness should be excluded.

Date:  January 31, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
PATRICIA L. STASCO
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Motion to Exclude the Reports and Testimony Plaintiff's Expert Dale Patenaude, was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on January 31, 2014:

David F. Barton
Gardner Law
745 East Mulberry Avenue
Suite 500
San Antonio, Texas  78212

/s/Andrew G. Braniff
Andrew G. Braniff
Senior Trial Attorney
U.S. Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

A000148

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ROTHE DEVELOPMENT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:12-cv-00744-KBJ |
| ) | |
| DEPARTMENT OF DEFENSE ) | |
| ) | |
| and ) | |
| ) | |
| SMALL BUSINESS ADMINISTRATION, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
## TO EXCLUDE THE REPORTS AND TESTIMONY
## OF PLAINTIFF'S EXPERT DALE PATENAUDE

## I.     INTRODUCTION

This Court should exclude the expert reports and testimony of Plaintiff Rothe

Development Inc.'s designated "expert," Dale Patenaude.  Mr. Patenaude is the Vice President of

Rothe and manages the company's bidding for government contracts.  While Mr. Patenaude may

be passionate about this case and possess substantial knowledge about managing a small

government contracting business, he lacks sufficient knowledge or skill to rebut the opinions of

Defendants' expert, Robert N. Rubinovitz, Ph.D.  Mr. Patenaude is not an economist or

statistician, has no formal education or training in these areas, and has no experience doing

regression analyses.  He has never been certified as an expert witness or submitted an expert

report for litigation, much less one concerning the economic methodologies employed in Dr.

Rubinovitz's Report.  And, given Mr. Patenaude's financial interest in the outcome of this litigation, his views are inherently biased.

Because of Mr. Patenaude's lack of qualifications, the rebuttal and supplemental expert reports (hereinafter "the Reports") he submitted do not meet the required legal standards for reliability.  The Reports include multiple errors, misperceptions, and material copied directly from Wikipedia.com.  The method of analysis Mr. Patenaude advances, which he admits is a "simplistic look that data," and his conclusions are based on theories that have not been subject to peer review and publication, are untested, and are not generally accepted in any field. Pursuant to Federal Rules of Evidence 401, 402, and 702, and applicable case law, Mr. Patenaude's expert testimony and Reports are inadmissible and should be excluded in their entirety.

## II.    FACTUAL BACKGROUND

This case challenges the Small Business Administration's ("SBA") business development program authorized by Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a).  The SBA's 8(a) program provides small businesses owned by socially and economically disadvantaged individuals an opportunity to gain a foothold in federal contracting by providing management and technical assistance and by limiting a small number of federal contracting opportunities to 8(a) firms.[1]  Businesses in the 8(a) program are generally (but not always) owned by persons belonging to groups presumed by the statute to be socially disadvantaged (*i.e.,* Blacks, Hispanics, Asians, and Native Americans).  15 U.S.C. § 637(d)(3)(C).  Regardless of how a business owner

---

[1] According to the Federal Procurement Data System, of the $404 billion that the United States spent in small business eligible procurement actions, $16 billion, or 4%, were spent in the 8(a) program.  2012 Fiscal Year Small Business Goaling Report, available at https://www.fpds.gov/ (last visited on January 30, 2012).  Similarly, $16 billion, or 4%, were spent with Women-Owned Small Businesses like Rothe.  *Id.*

A000150

shows social disadvantage, the owner must also meet the criteria regarding personal net worth and the size of the business.  15 U.S.C. § 637(a)(6)(A).  A business may stay in the 8(a) program for a maximum of nine years; if, during that time, the owner's wealth exceeds the net worth ceiling or the business's earnings or size exceed the standard for "small" in the relevant industry, the business must graduate the program early.  13 C.F.R. §§ 124.2 & 124.102.

Plaintiff seeks a declaration that the presumption of social disadvantage for certain racial groups is facially unconstitutional.  Dkt. 1 at ¶1.  As Defendants will show, however, the use of race-conscious criteria as one method to qualify businesses as socially disadvantaged for inclusion in the 8(a) program serves the compelling interest of breaking down barriers to minority business development created by discrimination and its lingering effects.  The 8(a) program thereby ensures that federal contracting is not perpetuating the effects of racial discrimination and that the federal government is not acting as a passive participant in a racially discriminatory system.  Only one year ago, another District Judge in this District found the 8(a) program facially constitutional.  *See DynaLantic Corp. v. U.S. Dept. of Defense*, 885 F.Supp.2d 237 (D.D.C. 2012) (J. Sullivan).

Defendants submitted Dr. Rubinovitz's Report to Plaintiff on August 8, 2013 and Dr. Rubinovitz's Supplemental Report to Plaintiff on October 25, 2013.  Ex. A, Rubinovitz Report; Ex. B, Rubinovitz Additional Analysis ("Supplemental Report").  Dr. Rubinovitz has a Ph.D. in economics from the Massachusetts Institute of Technology and is the Deputy Chief Economist at the U.S. Department of Commerce.  Ex. C, CV of Dr. Rubinovitz.  Dr. Rubinovitz's analyses show that small minority-owned businesses are statistically significantly less likely to win a government contract in 2012 in the vast majority of industries, including the ones in which Plaintiff contracts.

For his study, Dr. Rubinovitz determined which firms were interested in contracting with the federal government based on their registering with the Systems for Award Management ("SAM"), which is a requirement for being a federal contractor.  Ex. A, Rubinovitz Report at 3. SAM data includes information regarding the firm such as the industry (North American Industrial Classification System ("NAICS")) code in which the company works, the date the business started, the average number of employees, annual receipts, the legal type of organization used by the business, small disadvantaged business ("SDB") [2] status, minority-ownership status, and women-ownership status.  *Id.* at 4.  Dr. Rubinovitz also obtained data from SBA to determine the size standards for "small businesses" in various NAICS codes and to determine which businesses were in the 8(a) program.  *Id.* at 5.  He then conducted regression analyses where he controlled for industry based on three digit NAICS codes, business age, business size (in terms of both average number of employees and annual receipts), business form, and security clearance, and compared the likelihood of minority-owned businesses receiving a federal contract verses similar non-minority-owned businesses.  *Id.* at 14, Table 3. Dr. Rubinovitz expressed the outcome in odds ratios—the odds that a minority-owned business would receive a contract when compared to a similar non-minority-owned business.  *Id.*  For this calculation, if the two businesses had an equal chance, the ratio should be one (1).  *Id.*  In addition to calculating the ratio, Dr. Rubinovitz also determined if the ratio was statistically significant: that is whether one could say with confidence that the calculated ratio is actually different from one (1).  *Id.*

---

[2] Small Disadvantaged Businesses ("SDBs") are small businesses owned by socially and economically disadvantaged individuals.  The majority of SDBs are owned by minorities.  Ex. A, Rubinovitz Report at Table 1.  Businesses in the 8(a) program are a subset of SDBs.

A000152

Dr. Rubinovitz conducted three calculations, each with a slightly different definition of what constitutes a minority-owned business.  Regardless of the definition, the pattern of his results remains constant:  in the vast majority of industries, minority-owned businesses were less likely to win a federal contract, usually to a statistically significant degree.  In fact, there were no NAICS codes where minority-owned businesses were statistically significantly more likely to win a contract.  *Id.* at 10.

First, Dr. Rubinovitz evaluated the likelihood of non-8(a) minority-owned SDBs winning a contract compared to other small businesses.  Ex. B, Rubinovitz Supplemental Report.  According to Dr. Rubinovitz:

> non-8(a) minority owned SDBs are statistically significantly less likely to win a contract in industries accounting for 94% of all contract actions, 93% of all dollars awarded, and in which 92.2% of non-minority owned SDBs are registered. There is no industry where non-8(a) minority owned SDBs have a statistically significant advantage in terms of winning a contract from the federal government.

*Id.*

Dr. Rubinovitz conducted the same analysis but this time he compared all non-8(a) SDBs (not just those owned by minorities)[3] to all other similar small businesses.  Ex. A, Rubinovitz Report at 15, Table 4.  As shown in Table 4 of his Report, "in virtually every industry the odds of non-8(a) SDBs [winning a contract] are lower, all else equal, than other firms."  *Id.*  Finally, in Table 4(a), Dr. Rubinovitz contrasted the likelihood of a small minority-owned firm (SDB, 8(a) or small minority-owned firms that do not identify as being an SDB or are not part of the 8(a) program) winning a contract compared to similar businesses.  *Id.* at Table 4(a).  Again, he found that minority-owned firms were less likely to win contracts in the vast majority of industries

---

[3]  Table 1 of Dr. Rubinovitz's Report shows the breakdown of SDBs by ownership characteristics.

**A000153**

where the federal government lets contracts and spends money and where most minority-owned businesses are available.  *Id.*

On September 9, 2013, Plaintiff submitted the Report of Dale Patenaude purporting to rebut elements of Dr. Rubinovitz's Report.  Ex. D, Patenaude Report at 1.  In particular, Mr. Patenaude asserts that Dr. Rubinovitz uses improper methods and reaches erroneous results, and in an attempt to rebut the findings of Dr. Rubinovitz, Mr. Patenaude provides his "own simplistic look at the data."  *Id.* at 1 & 9.

On October 25, 2013, Defendants submitted Dr. Rubinovitz's Rebuttal Report.  Ex. E, Rubinovitz Rebuttal.  Dr. Rubinovitz's Rebuttal documents several serious errors in Mr. Patenaude's Report.  Ex. E, Rubinovitz Rebuttal at 1.  For example, as further discussed *infra* at 13-14, Dr. Rubinovitz notes that Mr. Patenaude's statements about how to interpret the results of Dr. Rubinovitz's Report demonstrate a lack of understanding of basic econometrics concepts such as logarithms.  *Id.*

Also on October 25, 2013, Plaintiff submitted Mr. Patenaude's Supplemental Report to Defendants, in which Mr. Patenaude assesses the data upon which Dr. Rubinovitz based his opinions.  Ex. F, Patenaude Supp. at 1-9.  Mr. Patenaude's supplemental Report repeats the fundamental errors in analysis that plague his initial submission.  *See infra* at 18-19, n.5.  On November 21, 2013, Defendants deposed Mr. Patenaude.  During the deposition, Mr. Patenaude recanted some of his assertions in the Patenaude Reports, admitted that several of his conclusions were mere speculation, contradicted some of the opinions asserted in his Reports, and admitted that he did not have an educational or professional background in economics or statistics.  Ex. G, Patenaude Dep. at 32:17-24, 34:6-11, 37:5-11, 65:23-66:18, 94:21-95:20, 101:6-102:11, 103:20-104:12, 121:12-122:1, 122:24-123:19.

A000154

### III.    LEGAL STANDARD

Trial judges must be the gatekeepers to exclude unreliable and unhelpful expert

testimony.  *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592 (1993); *see also Kumho*

*Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (holding that the gatekeeping

obligation applies to all expert testimony, not just scientific testimony).  Pursuant to FRE 104(a),

the admissibility of an expert's testimony must be established by a preponderance of the

evidence.  *Daubert*, 509 U.S. at 593; FRE 702 and Advisory Committee Notes (2000 amends.).

First, a witness must be qualified as an expert by "knowledge, skill, experience, training

or education."  FRE 702.  A qualified expert may then testify if:  (1) his or her testimony is

sufficiently reliable, and (2) if his or her scientific, technical, or specialized knowledge will

"assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id*.; *see also*

*Daubert*, 509 U.S. at 592; *U.S. v. Law*, 528 F.3d 888, 912 (D.C. Cir. 2008); *Ambrosini v.*

*Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996); *Parsi v. Daioleslam*, 852 F.Supp.2d 82, 85

(D.D.C. 2012).

The reliability of an expert's testimony depends upon several factors such as whether:

(1) "the [expert's] testimony is based on sufficient facts or data"; (2) "the testimony is the

product of reliable principles and methods"; and (3) that "the expert has reliably applied the

principles and methods to the facts of the case."  FRE 702 and Advisory Committee Notes (2000

amends.).  Courts also consider (1) whether the theory or technique can be and has been tested;

(2) whether the theory or technique has been subjected to peer review and publication; (3) the

method's known or potential rate of error; and (4) whether the theory or technique finds general

acceptance in the relevant scientific community.  *Ambrosini*, 101 F.3d at 912 (citing *Daubert*,

509 U.S. at 593-94).  While these factors may be considered, the list is not exhaustive, and the

factors may not apply in every case.  *Id.*; *see also Kumho*, 526 U.S. at 150-151 (explaining that

the factors may or may not be pertinent depending on the nature of the issue, the expert's

particular expertise, and the subject of the expert's testimony).

While the reliability inquiry is flexible, nonetheless, in all cases the trial judge must

determine that the proffered expert testimony "'is properly grounded, well-reasoned and not

speculative before it can be admitted.'"  *Estate of Gaither v. District of Columbi*a, 831 F.Supp.2d

56, 62 (D.D.C.2011) (quoting FRE 702 Advisory Committee Notes (2000 amends.)).  Mr.

Patenaude's proposed testimony fails each element of the *Daubert* inquiry.

## IV.   ARGUMENT

### A.   Mr. Patenaude Lacks the Requisite Knowledge, Experience, or Education to Qualify as an Expert.

A witness must possess knowledge, skill, experience, training, or education to qualify as

an expert and provide testimony.  FRE 702.  Mr. Patenaude fails this test.

#### 1.   Mr. Patenaude Cannot Qualify as an Expert on Dr. Rubinovitz's Regression Analyses.

Mr. Patenaude asserts opinions regarding Dr. Rubinovitz's methods for analyzing the

likelihood of minority-owned businesses winning government contracts.  However, Mr.

Patenaude does not possess the required "skills, experience, training, or education" to qualify as

an expert to testify on this topic.  FRE 702.  To critique the methodology and conclusions of Dr.

Rubinovitz's regression analyses and put forth this own analysis, Mr. Patenaude must have

education or training in economics or statistics, or at the very least experience working with

regression analyses and econometrics.  However, Mr. Patenaude does not possess any of this

experience or training.

A000156

Mr. Patenaude is not an economist or statistician.  Ex. G, Patenaude Dep. at 32:17-24.

He has never even taken a class in economics.  *Id*. at12:7-21.  He has no training in econometrics

or statistical or economic analysis.  *Id*. at 34:6-11.  Mr. Patenaude has never written an article on

economics that has appeared in a journal, magazine, or newspaper.  *Id*. at 15:14-25.  He has not

spoken publicly as an expert in economics, statistics, or econometrics.  *Id*. at 16:1-3.

Rather, Mr. Patenaude's education is in electrical engineering.  He earned a B.S. in

electrical engineering in 1971.  *Id*. at 12:7-13.  Since 1972 he has worked for Plaintiff Rothe as

an electrical engineer and manager of service of contracts.  *Id*. at 14:18-25.  He is currently the

Vice President and corporate representative of Rothe.  Mr. Patenaude readily admits that he has

no background in economics:

> Q. Do you think that special training or education is
> important for dealing with issues in statistics or
> econometrics?
> A. If I wanted to do work as an economist, I think it
>  would be appropriate that I took some economist courses, but
> I don't primarily do work as an economist. I run a
> business. . .

*Id*. at 34:15-35:9.

None of Mr. Patenaude's education or work experience has provided him with sufficient

knowledge of econometrics, statistics, or regression analysis to testify as an expert here.  When

asked in his deposition to explain how statistical significance is computed, Mr. Patenaude

responded, "I can't really explain that."  *Id*. at 16:4-6.  Nor could he accurately define statistical

significance.  *Id*. at 16:7-17:11.  When asked how often he has worked with regression analysis

outside of this case, he admits, "I really haven't."  *Id*. at 45:12-14.  He admits that none of his

work with Rothe or his other companies involves statistics.  *Id*. at 27:21-24.  Nor does he use any

statistical analysis computer programs in his day-to-day business.  *Id*. at 43:21-23.  Mr.

Patenaude testified that "the biggest math in terms that I do is all the bids and proposals," specifically, "I spend most of my time on business proposals working on the cost part of the thing." *Id.* at 27:21-24, 28:7-8.

Mr. Patenaude's disparagement of Dr. Rubinovitz's use of logarithms in Dr. Rubinovitz's regression analyses (Ex. D, Patenaude Rep. at 2,6 & 7) exemplifies Mr. Patenaudes's lack of experience and education in the area of regression analysis.  In addition to being incorrect as a matter of statistics (*see infra* at 13-15 and Rubinovitz Rebuttal Report (Ex. E at 1-2)), the discussion of logarithms in Mr. Patenaude's Report includes language copied directly from Wikipedia.com.  *See, e.g., Hamilton v. Menard, Inc.*, 2011 WL 3652449, at *2–*3 (N.D. Ohio Aug. 19, 2011) (stating that "while Wikipedia may be appropriate in some contexts, it is inappropriate for someone who offers himself as an expert to rely upon Wikipedia . . .").  Mr. Patenaude's Report states:

> Logarithms were introduced by John Napier in the early 17th century as a means to simplify calculations. They were rapidly adopted by navigators, scientists, engineers, and others to perform computations more easily, using slide rules and logarithm tables.

Ex. D, Patenaude Report at 5.  The Wikipedia.com entry for logarithms states:

> Logarithms were introduced by John Napier in the early 17th century as a means to simplify calculations. They were rapidly adopted by navigators, scientists, engineers, and others to perform computations more easily, using slide rules and logarithm tables.

Ex. H, *Wikipedia entry for Logarithms*, (available at http://en.wikipedia.org/wiki/Logarithm (last visited on January 30, 2014)).  Mr. Patenaude also states that, "logarithms are occasionally used by statisticians to reduce wide-ranging quantities to smaller scopes such as in sound measurement."  Ex. D, Patenaude Report at 6.  Wikipedia's definition of "logarithm" includes the statement, "Logarithmic scales reduce wide-ranging quantities to smaller scopes.  For

A000158

example, the decibel is a logarithmic unit quantifying sound pressure and signal power ratios."

Ex. H, *Wikipedia Entry for Logarithms*.  During his deposition, Mr. Patenaude stated that he got

the definition of logarithms from the internet, that he could not remember the website, but that "it

looked very authoritative."  Ex. G, Patenaude Dep. at 92:17-93:5.

     Mr. Patenaude's experience and education simply cannot qualify him as an expert to

respond to Dr. Rubinovitz's Report.  Because Mr. Patenaude lacks the necessary knowledge

required by FRE 702, the Court should exclude his Reports and testimony.

        2.      <u>Mr. Patenaude Cannot Qualify as an Expert on SBA's 8(a) Program.</u>

In his deposition, Mr. Patenaude states that he considers himself an expert in the 8(a)

program. Ex G, Patenaude Dep. at 51:22-24.  To the extent that this is even a proper topic for an

expert opinion, Mr. Patenaude has no education, training, or experience to qualify him as an

expert in this area.  None of this education or training focused on the 8(a) program.  He has never

worked at the SBA.  He has never applied to participate the 8(a) program.  *Id.* at 51:25-52:2.

Defendants acknowledge that because Rothe Enterprises, Inc. is a HUBZone Business,

(13 C.F.R. §126.200), and Rothe Development, Inc. is a Woman-Owned Small Business, (13

C.F.R. §127.200, Patenaude Dep. at 26-27), Mr. Patenaude has substantial experience in

registering and operating small businesses that participate in specialized government

procurement programs.  That experience, however, does not translate into expertise that will help

the trier of fact determine the constitutionality of the SBA 8(a) program.  Therefore, to the extent

Mr. Patenaude purports to provide expert opinions on the 8(a) program, the Court should also

exclude these opinions.

A000159

3.      Mr. Patenaude Has Never Been Accepted as an Expert.

Given his background, it is unsurprising that Mr. Patenaude has never been qualified as

an expert witness on the topics included in Dr. Rubinovitz's Report.  Ex. G, Patenaude Dep. at

25:7-12.  In fact, he has not previously submitted an expert report in any case on any topic.  *Id*. at

25:19-26:7.

**B.      Mr. Patenaude's Opinions Are Not Reliable Because his Methods are Wholly Unsupported and Based on his Subjective Belief.**

Even if Mr. Patenaude could meet the requirements regarding experience and training, his

Reports should be excluded because they are utterly unreliable.  Mr. Patenaude uses unsupported

seat-of-the-pants calculations to form his opinions about Dr. Rubinovitz's economic analyses and

results and to assert his own analysis and conclusions.  Mr. Patenaude's opinions have little or no

basis in fact or data.  His theories have not been subject to peer review or publication, are

untested, and are not generally accepted.

1.      Mr. Patenaude's Opinions Are Not Grounded in Facts or Data.

Mr. Patenaude's opinions about Dr. Rubinovitz's regression analyses and his "own

simplistic look at the data" are merely his personal theories with no basis in economics, statistics,

or any other field.  As the DC Circuit Court explained, the trial court must ensure that an expert

has a "grounding in the methods and procedure of science, rather than a subjective belief or

unsupported speculation" for the expert's testimony to be reliable and thus admissible.  *Meister*

*v. Medical Engineering Corp*., 267 F.3d 1123, 1127 (D.C. Cir. 2001).  Mr. Patenaude's analysis

cannot meet this standard.

Mr. Patenaude asserts that the purpose of his Report is "to show that the results of Mr.

[sic] Rubinovitz's expert report . . . and in particular his analysis of federal procurement data are

wrong because of the methods he used."  Ex. D, Patenaude Report at 1.  First, Mr. Patenaude

12

criticizes Dr. Rubinovitz's use of logarithms in his regression analyses, asserting that it results in "huge distorted undervaluation in the differences between two numbers" and "incorrect comparisons in the context of this case." *Id*. at 6.  This is simply untrue.  A leading econometrics textbook states that logarithms are *the most popular device* in econometrics for estimating a non linear relationship in a linear way.  Ex. E, Rubinovitz Rebuttal at 1.  As Dr. Rubinovitz explains, logarithms are used because relationships between two coefficients in a regression analysis are not linear – *i.e.* not constant.  He uses the example of the odds of a firm with $2 million in sales versus a firm with $1 million in sales winning a contract relative to a firm with $10 million in sales versus a firm with $9 million in sales winning a contract.  The firm with $2 million in sales would have twice as many resources as the $1 million firm, while the $10 million firm would have only a slight 11% advantage in resources over the $9 million firm.  If one were to look at only the differences in sales, in both situations the increase in size is $1 million, but the impact of that same sale increase is much larger for the $1 million/$2 million pair.  Because a logarithm adjusts for the lack of linearity, it more accurately provides the odds of winning based on a percentage increase in firm size as opposed to just a straight dollar for dollar comparison.  *Id*. at 1-2.  Indeed, Mr. Patenaude admits in his deposition that all regression models of which he is aware use logarithms.  Ex. G, Patenaude Dep. at 75:7-9.  Mr. Patenaude's false assertions regarding logarithms have no valid grounding in economics or statistics.

Second, as part of his critique of Dr. Rubinovitz's use of logarithms, Mr. Patenaude claims there is a direct, one-for-one relationship between the size of a company and its ability to win a contract.  Thus, according to Mr. Patenaude, logarithms, which account for the non-linearity of relationships within a regression, should not be used.  According to Mr. Patenaude, "A ten million a year company is *as much as ten times more likely* to win a contract than a one

**A000161**

million dollar a year company because of vastly greater resources to use in the bid proposal

process." Ex. D, Patenaude Report at 7 (emphasis added). When asked for the basis of the "as

much as ten times more likely" conclusion, Mr. Patenaude cannot cite any statistical analysis or

underlying data:

> Q. What do you base that opinion on?
> A. Well, I -- I said it very -- very specifically. A
> $10 million company has to win $10 million worth of
> contracts every year to stay the same value. A $1 million
> company only has to win $1 million in business. So it's --
> it's -- it may be said in the wrong -- slightly different
> way to say it's probably ten times more likely to win more
> dollar -- you know, they're going to win ten times more
> dollars to stay the same size, not necessarily ten times
>  more contract because some of the contracts could be bigger.
> But they're going to win ten times more dollars to stay the
> same size than the one that's the one million. That's
> really the way it should be said.
> Q. And that's based on your business experience or
>  just looking at -- thinking about the numbers?
> A. It's based on business experience. It's based on
> logic. I went through the problem of winning. I went
> through the problem of having a business that started off
> when we were like a million dollars and two million and
> three million and four million and five million and $10
> million. It's a lot of work to keep $10 million worth of
> business coming in every year, a whole lot more work than it
> is to keep $1 million worth of business coming in a year.
> You've got to have – I've got four people now that do
> nothing but bids and proposals. When we're at $1 million a
> year, I did it all my myself. Okay. I wrote technical
> proposals. I wrote -- I did cost proposals. I did past
> performance. I did all of this stuff by myself. I had one
> secretary that helped once in awhile. Okay. You know, $10
> million, you've got four people to do that. It's just a lot
> more work.

Ex. G, Patenaude Dep. at 101:6-102:11. Contrary to the tested mathematical methodology used

by Dr. Rubinovitz to determine the likelihood of firms winning a contract, Mr. Patenaude uses

only his own intuition.  His views regarding Dr. Rubinovitz's conclusions amount to pure speculation in the guise of expert opinion.

Third, Mr. Patenaude critiques Dr. Rubinovitz for using the NAICS codes of firms at the three-digit level instead of the six-digit level.  Ex. D, Patenaude Report at 7-8.  Dr. Rubinovitz's Report states that he used the codes at the three-digit level to have enough data in each industry grouping and to recognize that many firms can switch production within the three-digit category. Ex. A, Rubinovitz Report at 4.  While Mr. Patenaude disagrees with Dr. Rubinovitz's decision, Mr. Patenaude admits that he failed to do any calculations to determine if there were enough data to do the calculations at the six-digit level or whether firms can switch production within a three digit code.  Ex. G, Patenaude Dep. at 65:23-66:18.[4]

Fourth, Mr. Patenaude asserts that Dr. Rubinovitz's analysis should have considered the size and age of a company because "bigger older companies win more bids than younger companies."  Ex. D, Patenaude Report at 6.  In fact, contrary to Mr. Patenaude's opinion, Dr. Rubinovitz *does* consider the size and age of the companies that he analyzed.  Dr. Rubinovitz holds these values constant in the regression analyses.  Ex. A, Rubinovitz Report at 14, Table 3. However, Mr. Patenaude seems to believe that controlling for these factors in the regression analysis is not enough.  Rather, he argues that Dr. Rubinovitz's analyses should have ignored that actual data and assumed that a "ten year old company purely by its age is . . .  probably three or four times more likely" to win a contract than a one year old company.  Ex. D, Patenaude Report at 6.  Once again, Mr. Patenaude fails to cite any basis for his opinion.  *Id*.  When asked in his deposition for the basis of his statistic regarding the relationship between age and winning

---

[4] Indeed, given that Rothe works in several six digit codes which have the same three digit prefix, Mr. Patenaude's experience supports Dr. Rubinovitz determination.  Ex. I, Patenaude Aff. at 3 (Rothe works in the following NAICS codes: 541511, 541512, 541513, 541519, 561210).

A000163

a contract, Mr. Patenaude admits that it was an estimate based just on his experience and that he did not review the statistics used by Dr. Rubinovitz.  Ex. G, Patenaude Dep. at 94:21-95:20.

Fifth, several of Mr. Patenaude's opinions are unreliable because they are self-contradictory.  Mr. Patenaude critiques Dr. Rubinovitz's calculations because Dr. Rubinovitz uses as his starting point all of the businesses included in the SAM data without removing those firms that Mr. Patenaude claims are too small for government contracting.  For example, according to Mr. Patenaude, "[i]t is my professional opinion that it is not realistic to bid on Government contracts if you are doing less than $100,000 a year in business."  Ex. F, Patenaude Supp. at 5.  In his deposition, Mr. Patenaude confirms this statement and explains that he reached the conclusion because such companies are too small to compete:

> Q. What -- what leads you to believe that -- to make
> that -- that they wouldn't bid on a contract if they're
> doing less than $100,000 a year? What makes you come to
> that conclusion or reach that opinion?
> A. You don't have the resources to -- you know, if you
> We've been doing $100,000 a year, you can have at most two
> to three people, okay, unless you're all janitors or
> something. But you could have at most two or three people,
> so you don't have the people to go out and do the bids and
> proposals. One of the problems Wainwright [sic] missed out when
> he talks about his one person thing, he misses out on the
> idea that the bidding and proposing process is huge. It's
> big burdensome task and -- and you're sitting around with
> $100,000 and may have one or two people, small working,
> That's a big task.

Ex. G, Patenaude Dep. at 121:12-122:1.  Mr. Patenaude offers no facts or data to support his opinion, but relies on just his personal belief.  Mr. Patenaude goes on, though, to contradict this already unreliable opinion and shows that SAM data revenue numbers are not an accurate indicator of a business's willingness to compete.  He testifies that in 2003, when the annual receipts for Rothe were zero and would have appeared in the SAM data as zero, the firm placed

A000164

bids on government contracts.  *Id*. at 122:24-123:19.  Mr. Patenaude also admitts that Roman

Joint Ventures, for which he is Vice President, and RX Joint Ventures, for which he is President,

also had no revenue when they bid on government contracts.  *Id*. at 37:5-11; 123:23-124:22.

Relatedly, Mr. Patenaude opines that it is unrealistic to believe that firms reporting less

than ten employees could compete for government contracts, and thus, Dr. Rubinovitz should

have excluded these firms from his calculations.  Ex. F, Patenaude Supp. at 6.  Once again, Mr.

Patenaude's actions contradict his already unreliable opinion.  He admits that when Roman Joint

Ventures and RX Joint Ventures were started, each business had no employees, yet they still bid

for government contracts.  Ex. G, Patenaude Dep. at 128:13-18.  Mr. Patenaude then admits that

his opinions that firm that earn less than $100,000 and firms with zero to 10 employees could not

compete for government contracts are not to be relied upon:

> Q. So there are other circumstances where companies
> with zero employees or companies with less than 100,000
> would be bidding on lots of projects?
> A. *Sure*.

*Id*. at 129:6-9 (emphasis added).  In sum, Mr. Patenaude offers no factual basis for his wildly

speculative opinions that even he admits in his deposition are untrue.  Such blatantly unreliable

opinions will not help the trier of fact and should not be admitted.

2.    Mr. Patenaude's Own Approach Is Unreliable and Untested.

In addition to criticizing Dr. Rubinovitz's methods and results, Mr. Patenaude offers his

own analysis that he calls "my own simplistic look at the data." Ex. D, Patenaude Report at 9.

Unlike Dr. Rubinovitz, he does not consider age, firm size, or number of employees in his

analysis.  He states that he does "not do any manipulation of the data" and uses the published

annual overall SBA data, rather than the contract specific information used by Dr. Rubinovitz.

*Id*.  Mr. Patenaude admits that his "look at the data" is a very unsophisticated method that could

not be called statistical analysis.  Ex. G, Patenaude Dep. at 49:23-25.  When asked if he

computed statistical significance for his analysis, Mr. Patenaude replied, "No.  I didn't do any

statistics that required computation of statistical significance," and then added, "[m]ine were 100

percent significant because they weren't statistics."  *Id*. at 50:1-8.

Mr. Patenaude's approach, which cannot qualify as an expert method, consists of taking

the total amount of prime contract dollars he states were awarded to 8(a) firms in 2012 and

dividing it by the current number of businesses in the 8(a) program as of August 12, 2013.  Ex.

D, Patenaude Report at 9.  This simple calculation, he claims, yields an average dollar amount of

contracts per 8(a) firm.  Mr. Patenaude then does division to determine the percentage of total

2012 contract dollars that the 8(a) firms, SDB firms and non-SDB firms won.  *Id*.  He then

asserts that the disparity in these percentages is relevant.  *Id*.

Dr. Rubinovitz points out several errors in Mr. Patenaude's approach and conclusions

regarding the average size of contracts won by 8(a) firms, SDBs, and other small businesses.  Ex.

E, Rubinovitz Rebuttal at 2.  He notes that Mr. Patenaude's analysis purposely does not take into

account age, firm size, or number of employees because Mr. Patenaude believes if one controlled

for them, "then the lack of significance of disparities gets much worse."  *Id*.  However, Mr.

Patenaude provides no evidence to support his statement or his approach.  In contrast, as Dr.

Rubinovitz explains, a regression analysis is indeed needed to disentangle the effects of these

other variables from the variable being tested – the effect of minority ownership.  *Id*.

Moreover, Dr. Rubinovitz notes that even if one accepted Mr. Patenaude's approach, the

results are wrong because Mr. Patenaude incorrectly calculates the dollar value of contracts won

by 8(a) firms, SDBs, and non-SDBs.  *Id*. at 2-3.  Mr. Patenaude uses the Goaling Report's "8(a)

Procedure Dollar" data to calculate the average award per 8(a) firm.  *Id*.  Dr. Rubinovitz points

18

out, however, that the Goaling Report does not include contracts won by 8(a) firm outside of the

8(a) program in its 8(a) dollar figure.  Instead, the Goaling Report counts the contract dollars

won by 8(a) firms in open competition as dollars won by SDB firms.  *Id.*  By not accounting for

this fact, Mr. Patenaude has an incorrectly high value for SDB contract size. *Id.*  Dr. Rubinovitz

arrives at the correct average value for non-8(a) contracts won by non-8(a) SDBs by analyzing

each contract individually.  Dr. Rubinovitz finds:

> If the value of contracts won by 8(a) firms and by non-8(a) SDBs is calculated
> correctly then the average value of contracts by non-8(a) SDBs ($78,399) would
> be smaller than the value stated by Mr. Patenaude ($499,203) and would, in fact,
> be much lower, not higher, than the average value of contracts won by non-SDBs
> ($416,727).

Ex. E, Rubinovitz Rebuttal at 3.  Because of this error, Mr. Patenaude's subsequent

opinions concerning the lack of a disparity in contracting dollars won by SDBs are also

erroneous and unreliable.[5]

### 3. Mr. Patenaude's Financial Stake in the Outcome of this Litigation Undermines His Impartiality.

Mr. Patenaude is the Vice President of Rothe, the Plaintiff company in this case.  He is

also the President or major owner of several other related small businesses.  Mr. Patenaude

claims that the 8(a) program reduces the number of contracts for which he can compete.  As the

owner of the business involved in this litigation, Mr. Patenaude simply cannot be considered an

objective expert witness.

---

[5]  Mr. Patenaude repeats this error in calculating the size of contracts won by "8(a) Firms
Alone."  Ex. F, Patenaude Supp. at 7-8.  In that calculation, Mr. Patenaude assumes, incorrectly,
that 8(a) firms do not contract outside of the 8(a) program and therefore arrives at an incorrect
result for his average size of contract awarded to 8(a) firms.

## V.      CONCLUSION

Neither Mr. Patenaude nor his Reports meet the requirements of FRE 702 and thus his Reports and testimony should be excluded.  Mr. Patenaude is not an economist or statistician; he has no training or experience in regression analysis; and he has not published anything in these areas (or on any other topics).  Mr. Patenaude invented his method, or "look" as he calls it, but the calculations from his method are inaccurate and he offers no rationale for why his method of analysis is the most appropriate one to employ in this circumstance or that his "simplistic look at the data" is generally accepted in any field.  For these reasons, Defendants request that the Court exclude the expert testimony and opinions of Mr. Patenaude.

Date:  January 31, 2014

                          Respectfully submitted,

                          DELORA L. KENNEBREW, Chief
                          SHARYN A. TEJANI, Deputy Chief

                          /s/ Andrew G. Braniff
                          ANDREW G. BRANIFF
                          PATRICIA L. STASCO
                          Senior Trial Attorneys
                          United States Department of Justice
                          Civil Rights Division, Employment Litigation Section
                          950 Pennsylvania Avenue, NW
                          Patrick Henry Building, Room 4030
                          Washington, D.C.  20530
                          Telephone:  202.514.9229
                          Facsimile:  202.514.1005
                          Andrew.Braniff@usdoj.gov

                          DANIEL F. VAN HORN
                          Chief, Civil Division
                          United States Attorney's Office
                          Room E-4816
                          555 Fourth Street, N.W.
                          Washington, D.C.  20530

A000168

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

A000169

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Memorandum in Support of Defendant's Motion to Exclude the Expert Reports and Testimony of Plaintiff's Expert Dale Patenaude, was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on January 31, 2014:

David F. Barton
Gardner Law
745 East Mulberry Avenue
Suite 500
San Antonio, Texas  78212

<u>/s/Andrew G. Braniff</u>
Andrew G. Braniff
Senior Trial Attorney
U.S. Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

USCA Case #15-5176     Document #1577653        Filed: 10/13/2015      Page 178 of 814

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————————

)
ROTHE DEVELOPMENT, INC.,             )
   Plaintiff,                         )
                                   )
v.                                ) Civil Action No. 12-CV-744-KBJ
                                 )
DEPARTMENT OF DEFENSE and      )
SMALL BUSINESS ADMINISTRATION )
   Defendants.                   )
—————————————————————————)

### PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT TESTIMONY OF DEFENDANTS' EXPERTS AND MEMORANDUM IN SUPPORT

Pursuant to D.D.C. LCvR 7, Fed. R. Evid. 104, and the deadlines established by the Court in ECF No. 43, Plaintiff ROTHE DEVELOPMENT, INC. ("ROTHE") files this, its Motion to Exclude or Limit Testimony of Defendants' Experts and Memorandum in Support thereof, and states as follows:

I. MOTION

ROTHE moves this Court to exclude or limit the testimony of Defendants' experts Jon Wainwright and Robert N. Rubinovitz in this case, because their testimony is inadmissible, in whole or in part, under Fed. R. Evid. 401, 402, and 702.

Pursuant to D.D.C. LCvR 7(m), ROTHE has conferred with Defendants on this motion and Defendants informed ROTHE that they oppose this motion.

The reports of Defendants' experts Jon Wainwright and Robert N. Rubinovitz are attached as **Exhibits 1 (Wainwright), 2 (Rubinovitz original report) and 3 (Rubinovitz additional analysis)**, respectively, and are incorporated herein by reference.

The following deposition excerpts are also attached and incorporated herein by reference: **Exhibit 4 (Excerpts from Rubinovitz deposition)** at 94:3-10 & 96-97.

## II. POINTS AND AUTHORITIES

*A. Standard of Review*

1. Relevance

Under Fed. R. Evid. 402, "Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Irrelevant evidence is not admissible."

"Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

2. Legal conclusions by experts

To evaluate expert testimony, the Federal Rules of Evidence provide that "[a] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

The D.C. Circuit applies a two-part test for determining the admissibility of expert testimony under Rule 702(a): the witness (1) must be qualified, and (2) must be capable of assisting the trier of fact. *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F. 3d 1207, 1211 (D.C. Cir. 1997).

Expert testimony that consists of legal conclusions cannot properly assist the trier of fact, and thus it is not admissible. *Id*. at 1212. This is because the trier of fact is presumed to not require the parties' assistance as to the law and because legal

conclusions are not "scientific, technical, or other specialized knowledge" under Rule 702(a):

> The word "knowledge" connotes more than subjective belief or unsupported speculation. The term applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 590 (1993).

Thus, the trial court must limit expert testimony so as not to allow experts to testify regarding legal conclusions by offering opinions on what the law requires when applied to a set of facts, or by testifying as to the governing law. *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."); *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) (same).

In particular, with respect to the legal conclusion of discrimination, the D.C. Circuit has followed the Sixth Circuit and expressly held that "an expert cannot testify as to whether 'discrimination' occurred." *Burkhart*, 112 F. 3d at 1212, *citing Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). "In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Id*. at 1213.

### 3. Insufficient facts and data for reliable expert opinion

Qualified expert testimony must also be "based on sufficient facts or data" and be "the product of reliable principles and methods," to be admissible. Fed.R.Evid.702(b)-(c).

*B. The Reports and Testimony of Both of Defendants' Experts Are Irrelevant*

The law is now very clear that post-reauthorization evidence is precluded and that experts are neither required for, nor relevant to, the required causal relationships between the alleged data before Congress and the statutory racial classification that Congress enacted. *Rothe Dev. Corp. v. Dep't of Defense*, 545 F.3d 1023, 1031 & 1040-1041 (Fed. Cir. 2008) (*Rothe VII*).

The reports—and thus the testimony—of Defendants' experts were never placed before or considered by Congress, which renders them irrelevant as a matter of United States Constitutional law, and therefore inadmissible under Federal Rules of Evidence 401 and 402. *Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996) ("the *legislature* must have had a strong basis in evidence to support [the] justification before it implements the [racial] classification.") (emphasis added); *Rothe Development Corp. v. Department of Defense*, 262 F.3d 1306, 1327 (Fed. Cir. 2001) (*Rothe III*) ("The quantum of evidence that is ultimately necessary to uphold racial classifications must have actually been before the legislature"); *Rothe VII*, 545 F.3d at 1039 ("For evidence to be relevant in the strict scrutiny analysis, it must be proven to have been before Congress . . . It would be error for the district court to rely on studies without a finding that they were put before Congress").

Further, the reports lack probative value under Fed. R. Evid. 401. They do not have "any tendency to make a fact more or less probable than it would be without the evidence." *Id*. In fact, the evidence of whether Congress properly weighed the alleged data and connected that alleged data to the statute it enacted has existed since the time the data was allegedly introduced before Congress. Defendants' experts cannot vary,

supplement, or alter the legal inadequacies of the disparity studies that were allegedly before Congress when section 8(a)'s racial classification was enacted or reauthorized.

Defendants' experts do not and cannot make the alleged facts contained in the disparity studies more or less probable. The only relevant threshold inquiry for the Court is whether the disparity studies taken as a whole, on their face, are sufficient to discharge Defendants' legal burden under strict scrutiny or not. *Shaw*, 517 U.S. at 909-910; *Rothe VII*, 545 F.3d at 1036 (noting that Defendants "first bea[r] a burden to produce strong evidence supporting the legislature's decision to employ race-conscious action.").

Thus, a post hoc evaluation of the studies Congress reviewed when enacting or reauthorizing section 8(a)'s racial classification cannot be "of consequence in determining the action," underscoring the irrelevance of Defendants' experts under Fed. R. Evid. 401. A post hoc report would have nothing to do with the actions Congress actually took based on whatever studies were allegedly before it at the time. Those actions are reflected in the text of the statutory racial classification itself.

The Court's memorandum opinion in the *Dynalantic* case, No. 95-CV-2301-EGS Dkt #248, demonstrates that post-hoc expert reports are irrelevant to the adjudication of this case on the merits. Mr. Wainwright, who has authored some of the disparity studies allegedly before Congress, submitted a purported expert report in *Dynalantic*. The Court's memorandum opinion cited it a grand total of once, Dkt #248 at 87-88. Moreover, the citation was in the context of a methodological dispute, not as a source of statistical evidence to uphold section 8(a)'s racial classification on its face. *Id*.

The lack of meaningful citation to Mr. Wainwright's report in the *Dynalantic* opinion—as distinguished from his actual testimony before Congress, which is part of the

evidence in this case—demonstrates that post-hoc expert reports are not probative and are not of consequence in determining the action, which is why they are inadmissible. Fed. R. Civ. P. 401.

Mr. Rubinovitz's report and testimony are irrelevant and inadmissible under Fed. R. Civ. P. 401 and 402 for the additional reason that none of the data he relies on was ever before Congress. Rather, he analyzed "data on government contracts for small businesses for FY 2012." **Exhibit 2** at 1.  Obviously, Congress took none of that data into consideration when it enacted or reauthorized the statutory racial classification being challenged in this case.

Mr. Rubinovitz's report and testimony also fail to make a relevant comparison. His original report compares his estimates for "the odds of winning a contract for [small disadvantaged businesses (SDBs)] not participating in the 8(a) business development program . . . relative to the odds of winning contracts by firms that were not identified as SDBs." **Exhibit 2** at 2. That comparison, if it answers anything or anything relevant, which it does neither, might answer whether, based on his analysis (which ROTHE disputes the substance of for other reasons), the 8(a) program increased the odds of federal contract awards for SDBs in FY 2012.

His additional report compares his estimates of "contracting outcomes for non-8(a) minority-owned SDBs compared to all other small businesses." **Exhibit 3** at 1. This additional report is essentially the complement of the first, and it is no surprise that the result follows from the first, i.e., if the 8(a) program increases the odds of a contract award to a minority owned SDB firm, in his view, then the more competitive setting outside of the 8(a) program would tend to have less favorable odds.

But Mr. Rubinovitz's comparisons are simply irrelevant to the legal question of whether section 8(a)'s racial classification was justified by the required strong evidence of "identified discrimination" when Congress enacted or reauthorized it and make no attempt to relate the report to Congress's actions. *Shaw*, 517 U.S. at 909 ("the discrimination must be 'identified discrimination.'"), *citing City of Richmond v. J.A. Croson*, 488 U.S. 469, 499, 500, 505, 507 & 509 (1989) (*Croson*); *see also Croson*, 488 U.S. at 504 ("they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief."). Mr. Rubinovitz's report deals in disparities in federal awards, but is not linked to discrimination in any way. Thus, the comparison that he makes, even limited as it is to FY 2012, is not the one required to infer discrimination under the *Croson* dicta, which reads:

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.

*Croson*, 488 U.S. at 509 (emphasis added). That is because the *Croson* dicta require the statistically significant disparity to be coupled with anecdotal or other evidence of discrimination in order for the inference of discrimination to arise.[1] *Id*. at 509 ("evidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical

---

[1]     Neither of the comparisons made by Mr. Rubinovitz purports to be an attempt to prove discrimination by statistical disparity alone. *See Croson*, 488 U.S. at 501 ("[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination under Title VII"). That is because this is not a Title VII case and because Mr. Rubinovitz's comparisons are between 8(a) SDBs and non-8(a) SDBs, and between non-8(a) SDBs and all federal small business contractors, not between *all* SDBs and the population as a whole or all contractors. The latter comparisons are ones that might be relevant in a Title VII case, if properly proven, which cannot and need not be done here, where they are irrelevant. *Id*.

proof, lend support to a local government's determination that broader remedial relief is justified"); *see also Rothe VII*, 545 F.3d at 1046. The Defendants have not produced any anecdotal evidence for federal contracting in FY 2012 nor does Mr. Rubinovitz's report refer to any.  The Defendants have also not produced any individual specific instances of discrimination by the federal government in its own contracting, particularly throughout the entire scope of Mr. Rubinovitz's comparison, which spans all industries where federal contracts were awarded in FY 2012.

Mr. Rubinovitz's statistical disparities can only be relevant if they can bridge the gap to "identified discrimination" by satisfying the *Croson* dicta. But the Defendants have produced no evidence for him to bridge this gap with, and he cites none. In other words, absent that bridge, Mr. Rubinovitz's findings and conclusions do not have "any tendency to make a fact more or less probable than it would be without the evidence," nor are any of the facts and comparisons in his report "of consequence in determining the action." Fed. R. Evid. 401(a)-(b).

Finally, candor requires that ROTHE address the *realpolitik* of the separation of powers issues raised by Defendants' irrelevant expert reports.

The truth is that Congress has never considered relevant evidence directly addressing section 8(a)'s racial classification and its continuing viability, ever since it was enacted in 1978. As the Court is aware, United States Constitutional law has changed since that time. *Compare Fullilove v. Klutznick*, 448 U. S. 448 (1980) *with Adarand v. Peña*, 515 U.S. 200 (1995). The change in the law has forced Defendants to scour the entire Congressional Record, looking for disparity studies that were discussed with reference to *any* federal program at *any* time, no matter how irrelevant to section 8(a)'s

racial classification. But even those are insufficient as a matter of law. Therefore,

Defendants, as representatives of the Executive, urge the Judiciary to join them in

subverting Congress' role entirely, through the illegal admission of post-enactment

evidence, such as Defendants' expert reports.

The frank and undeniable effect of illegally admitting post-enactment evidence is

to enable the Executive and the Judiciary to do Congress's work for it, while arriving at

their own politically preferred "nationwide" finding of identified discrimination to justify

the statutory racial classification, which even post-enactment evidence cannot justify.

This inverts the parties' respective burdens of proof and subverts the strict scrutiny

standard of review, which is why it is reversible error in its most glaring form. *Shaw*, 517

U.S. at 909-910; *Rothe VII*, 545 F.3d at 1036 (noting that Defendants "first bea[r] a

burden to produce strong evidence supporting the legislature's decision to employ race-

conscious action.").

Indeed, when the Judiciary teams with the Executive to admit the Executive's

post-enactment evidence, the requirement that the record before Congress articulate "the

most exact connection between [the alleged evidence of] justification and [the statutory

racial] classification" on its face is replaced with a moving target defined by the

Executive. *See Adarand*, 515 U.S. at 236 (stating the requirement). For all practical

purposes, it places the statutory racial classification beyond Judicial review, because each

time review is requested the target will be moved by Executive fiat. A moving target

permits, and practically requires, a given district judge to assess the nationwide scope of a

statutory racial classification in terms of whatever post-enactment evidence the parties

can generate, transforming the strict scrutiny analysis into a statistical arms race that

means nothing, because there is no post-enactment snapshot of data for the entire country at a single point in time. In turn, the constitutionality of the statutory racial classification is left to turn on whether a given district judge admitting post-enactment evidence deems the evidence sufficient, even though that same moving target plainly will not and cannot be used by the Executive to narrowly tailor.

For all of these reasons, the admission of post-enactment evidence such as Defendants' expert reports and testimony is irrelevant and a certain reversible error for district courts reviewing statutory racial classifications.

It is unsurprising, then, that the *Dynalantic* court did not rely on Defendants' expert reports for its substantive findings, and cited those reports only once in its entire opinion. No. 95-CV-2301-EGS Dkt #248 at 87-88. This Court may think it can thread the needle the same way. It really can't. The Rubinovitz report simply has no place in the *Dynalantic* opinion, or any opinion on a statutory racial classification, at all. The Wainwright report, at best, is ultimately the same legal conclusion the *Dynalantic* court drew, following a different type of aggregation of the various disparities studies that the Government apparently claims only an expert can perform, as compared to how the *Dynalantic* court itself considered the evidence as a whole. *See* **Exhibit 1** at 91 (pdf pg 96). Since the *Dynalantic* court considered the evidence as a whole anyhow, it is telling that it did not rely on Mr. Wainwright's aggregation in lieu of its own analysis.

C.  *The Reports and Testimony of Both of Defendants' Experts Contain Inadmissible Legal Conclusions That Should be Excluded*

The final paragraph of Mr. Wainwright's report is a legal conclusion:

> After reviewing this material, I conclude that the studies submitted to Congress, taken as a whole, provide *strong evidence* of large, adverse, and often statistically significant disparities between minority participation in

business enterprise activity and the availability of those businesses. Based upon the studies as well as upon the additional analyses I conducted for this report, I *further conclude that these disparities are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination*, and that *these disparities therefore are consistent with the presence [of] discrimination* in the business market. I find this to be the case in construction markets, construction-related professional services markets, and other professional services markets, including those in which the plaintiff operates. When I also include the smaller number of studies in the record that have not yet been submitted to Congress, I reach the same general conclusions.

**Exhibit 1** at 91 (pdf page 96) (emphasis added). In this paragraph, Mr. Wainwright first concludes that Defendants' evidence satisfies Defendants' initial burden of proof to produce a strong basis in evidence under strict scrutiny. See *Shaw*, 517 U.S. at 909-910; *Rothe VII*, 545 F.3d at 1036 (noting that Defendants "first bea[r] a burden to produce strong evidence supporting the legislature's decision to employ race-conscious action."). Mr. Wainwright then goes on to conclude that the alleged disparities stated in the studies he reviewed satisfy the *Croson* dicta and give rise to a nationwide inference of identified discrimination in four highly generalized business market categories. *See Croson*, 488 U.S. at 509. His conclusion that "these disparities therefore are consistent with the presence [of] discrimination" is an unqualified assertion that the disparity studies and the anecdotal data they contain constitute "identified discrimination" within the meaning of United States Constitutional law. *See Shaw*, 517 U.S. at 909; *Croson*, 488 U.S. at 499, 500, 505, 507 & 509.

In all of these conclusions in the final paragraph of his report, Mr. Wainwright is stating legal conclusions he has drawn by applying the law to the facts, which is impermissible. *Christiansen*, 332 F.3d at 1283; *McIver*, 470 F.3d at 562. In this Circuit, "an expert cannot testify as to whether 'discrimination' occurred." *Burkhart*, 112 F. 3d at

1212. Accordingly, the final paragraph of Mr. Wainwright's report is inadmissible and should be excluded on that basis.

The final paragraph of Mr. Wainwright's report is also an inadmissible legal conclusion under Fed. R. Evid. 702(a) because it is not helpful to the trier of fact and it is not "scientific, technical, or other specialized knowledge." *Burkhart*, 112 F. 3d 1207, 1211-1212; *Daubert*, 509 U.S. at 590. Therefore, it should also be excluded on that basis.

Although Mr. Rubinovitz's report itself does not state any ultimate legal conclusions, he was expressly asked to state one by Defendants' counsel and did so in his deposition testimony:

```
 3   Q.   Okay.  He also asked you about the results
 4   in your report.  Are the results in your report
 5   consistent with a finding that SDBs face
 6   discrimination?
 7      A.   Yes.
 8          MR. BARTON:  Objection.
 9          THE WITNESS:  It would be consistent with
10   that finding, yes.
```

**Exhibit 4** (Excerpts from Rubinovitz deposition) at 94:3-10.[2] This legal conclusion suffers the same defects as the one in Mr. Wainwright's report, namely that it is an expert opinion on the presence of discrimination, contra to this Circuit's precedent in *Burkhart*, 112 F. 3d at 1212. The inclusion of the phrase "consistent with" in no way alters or renders admissible the legal conclusion, because the very assertion implies that the expert has applied the legal standard for discrimination to the alleged facts at hand, which is itself impermissible. *Christiansen*, 332 F.3d at 1283; *McIver*, 470 F.3d at 562.

---

[2]     Counsel objected based on the witness conferring with Defendants' counsel regarding the question prior to the deposition. **Exhibit 4** (Excerpts from Rubinovitz deposition) at 96-97 ("In my prep, when we prepared for this last week, they asked me that question.").

D.  *The Reports and Testimony of Both of Defendants' Experts Lack Sufficient Data to Justify the Statutory Racial Classification Throughout its Entire Scope*

Neither the Wainwright report nor the Rubinovitz report are "based on sufficient facts or data" to be admissible under Fed. R. Evid. 702(b). That is because each report generalizes and extrapolates conclusions from less than all industries in federal contracting to the entirety of federal contracting, in order to reach an inadmissible (and incorrect) legal conclusion that there is "identified discrimination" throughout the entire scope of federal contracting, thus purporting to justify the statutory racial classification throughout that same scope. *See generally* **Exhibits 1, 2, and 3**. Some state and local disparity studies, as the Wainwright report notes, contain numerous industry groups. **Exhibit 1** at 19 (pdf pg 24). But not all do. More significantly, the disparity studies do not all classify the same industries in the same way, depriving Mr. Wainwright of the necessary data predicate for his aggregation, collective inference, and ultimate legal conclusion of nationwide identified discrimination.

By one of literally hundreds of examples, the 2006 Denver disparity study,[3] conducted by Mr. Wainwright's own firm and cited by him in Table 1 of his report (**Exhibit 1** Table 1) uses the old Standard Industrial Classification (SIC) code system, and includes the category SIC 1799 Special Trade Contractors, n.e.c. (not elsewhere classified) under the industry group "Professional Services."[4] Yet SIC 1799 corresponds to four separate industries under the 2007 North American Industry Classification System

---

[3]     NERA Economic Consulting, Denver Study (May 5, 2006).

[4]     Denver Study at 60 (Table 4.2), attached as **Exhibit 5** and incorporated herein by reference.

(NAICS).[5]  The 2008 State of Alaska disparity study (also cited by Mr. Wainwright in

**Exhibit 1** Table 1),[6] in turn, includes each of these four NAICS industries under the

industry group "Construction," instead of "Professional Services."[7] No collective

inference can be drawn when the same industries are placed in different industry groups

in different studies.

> The inability to draw a collective inference goes to the heart of why the evidence

alleged to support section 8(a)'s racial classification is insufficient as a matter of law,

because:

> As the Fifth Circuit has explained, there is no "precise mathematical
> formula to assess the quantum of evidence that rises to the Croson 'strong
> basis in evidence' benchmark." *W.H. Scott Constr. Co.* [*v. City of
> Jackson*], 199 F.3d [206,] 218 n. 11 [(5th Cir. 1999)]. Rather, "[t]he
> sufficiency of a [legislature's] findings of discrimination in a local
> industry," or for that matter in a state-wide or nationwide industry, "must
> be evaluated on a case-by-case basis." *Id.*

*Rothe VII*, 545 F.3d at 1049. But the sufficiency of Defendants' alleged evidence, and

whether it supports Defendants' alleged collective inference of discrimination in local

and state contracting, cannot be evaluated in terms of a nationwide industry, or even

nationwide industry groups, because the disparity studies themselves do not consistently

define such things, much less offer a means of weighing results between different studies.

---

[5]      The corresponding NAICS codes are 238320 (Painting and Wall Covering
Contractors), 238150 (Glass and Glazing Contractors), 562910 (Remediation Services),
238990 (All Other Special Trade Contractors).
http://www.census.gov/eos/www/naics/concordances/concordances.html (last visited
Apr. 19, 2013) (providing tables for the conversion of 1987 SIC to 2002 NAICS and
2002 NAICS to 2007 NAICS).

[6]      D. Wilson Consulting Group, LLC, Alaska Study (Jun. 6, 2008).

[7]      Alaska Study at Page 5-2, attached as **Exhibit 6** and incorporated herein by
reference.

Accordingly, Mr. Wainwright's report, which purports to aggregate the results of the disparity studies and draw a collective nationwide inference or finding of identified discrimination, must be excluded because it lacks sufficient facts or data" to support such extrapolations and be admissible under Fed. R. Evid. 702(b).

Before turning to the lack of sufficient facts and data in Mr. Rubinovitz's report, ROTHE further notes that Mr. Wainwright's aggregation of the results of various disparity studies "is not the product of reliable principles and methods." Fed. R. Evid. 702(c). That is because his report mixes disparity studies that were allegedly before Congress with ones that were not. *See* **Exhibit 1** at 10 (pdf pg 15) (discussing the various reports relied upon). That is a problem because the set of the 32 studies that Mr. Wainwright admits were not before Congress were picked at his own discretion. That is evidence of bias on the part of the expert, and is not a reliable methodology.

Mr. Wainwright's conclusion is based upon aggregations relating to the 107 studies cited in his report, which includes 32 reports that were never submitted to Congress along with the 75 reports submitted to various parts of Congress by someone, but for which there is no evidence in the record that shows they were analyzed in any constitutionally valid way. *See* **Exhibit 1** at 10 (pdf pg 15) (discussing the various reports relied upon).    Nevertheless, he makes a collective nationwide conclusion of discrimination for the 75 studies submitted to Congress, but then tries to bolster that legal conclusion by aggregating that data with the 32 studies he chose himself.  *See* **Exhibit 1** at 91 (pdf pg 96) ("When I also include the smaller number of studies in the record that have not yet been submitted to Congress, I reach the same general conclusions."). That is unacceptable under Rule 702.

With the aforementioned aggregation of (1) 75 reports submitted to Congress, whether analyzed by Congress or not, with (2) a set of 32 reports that were never known about by Congress in any context, selected by Mr. Wainwright himself, there is no way to glean any reliable or relevant evidence from the Wainwright report, because the inclusion of the 32 reports taints his ultimate conclusion (which is itself an inadmissible legal conclusion for the reasons stated *supra*, Part II.C).   For this reason alone it is not possible to exclude in part or admit in part anything from the Wainwright report.

Mr. Rubinovitz's report is much more forthcoming with respect to its lack of sufficient facts or data. Mr. Rubinovitz *expressly* dropped several NAICS industry codes from his analysis due to lack of sufficient data, see **Exhibit 2** Table 2, yet in his deposition he still gave a legal conclusion intended to support section 8(a)'s racial classification through its entire nationwide scope in all industries.

Moreover, the industry analysis that Mr. Rubinovitz did do was at a highly generalized, three digit NAICS level. *See* **Exhibit 2** at 12 ("Table 4 provides a summary of the results when the same model is estimated separately for each three-digit NAICS code and Table 5 provides a more detailed list of the industry-by-industry estimates (Table 6 defines the NAICS codes used in Table 5)."). That lumps numerous widely disparate industries together, as can be seen by reviewing the NAICS codes themselves or by simply referring to the examples listed in Tables 2 and 3 of Mr. Wainwright's report. See http://www.census.gov/eos/www/naics/ (Census NAICS website); *see also* **Exhibit 1** at Tables 2-3. There is no compelling reason why, for instance, that data for a Structural

Steel and Precast Concrete Contractor should be lumped together with a Roofing Contractor, a Painter, and a Tile and Terrazzo Contractor. *Cf.* **Exhibit 1** at Table 2.

While Mr. Wainwright may have attempted to aggregate a data set that is not complete (i.e. does not match the scope of the statutory racial classification), Mr. Rubinovitz has simply reported results that are not based on more detailed industry classifications (i.e. five or six digit NAICS codes) at all. Yet the *Dynalantic* court instructs us that it is at a much more specific (i.e., five or six digit NAICS code) level where section 8(a)'s racial classification is applied and is to be applied. No. 95-CV-2301-EGS Dkt #248 at 127 (enjoining Defendants from "awarding procurements for military simulators"); *Id.* Dkt #247 (same); *Id.* Dkt #259 (settlement modifying injunction to enjoin Defendants from "award[ing] prime contracts under the Section 8(a) program (competitive and sole source) for the purchase of military simulation and military simulation training."). Mr. Rubinovitz's report is not based on and does not have this data. His highly generalized conclusions cannot be disaggregated or extrapolated downwards to more detailed industry groups, nor has he attempted to do so. For those reasons, his report is useless under *Dynalantic* and should be excluded under Fed. R. Evid. 702(b), because it does not contain "sufficient facts or data" to justify the statutory racial classification in all of the detailed industry classifications throughout its entire scope.

ROTHE notes here another *realpolitik* consequence to these admissibility arguments with respect to the Constitutionally-prescribed separation of powers. It is no small irony that Defendants will, as they have repeatedly done without success, insist on ROTHE meeting an inapplicable "no set of circumstances" burden of persuasion under

*United States v. Salerno,* 481 U.S. 739 (1987). In *Salerno*, the Court stated that, to win a facial challenge under a rational basis standard of review, a challenger "must establish that no set of circumstances exists under which the Act would be valid." *Id*. at 745. That burden does not apply and is "a pronouncement of limited relevance here, at most describing a conclusion that could result from the application of the strict scrutiny test." *Rothe VII*, 545 F.3d at 1032. However, the true irony is that again the Executive is asking the Judiciary to lower its own initial burden of proof to produce a strong basis in evidence under strict scrutiny throughout the entire scope of the statutory racial classification. *See Shaw*, 517 U.S. at 909-910; *Rothe VII*, 545 F.3d at 1036 (noting that Defendants "first bea[r] a burden to produce strong evidence supporting the legislature's decision to employ race-conscious action."). As *Dynalantic* makes clear, section 8(a)'s racial classification cannot be constitutionally applied in detailed industry sectors where the Defendants lack a strong basis in evidence. The Wainwright and Rubinovitz reports do not contain sufficient data or evidence to meet that burden throughout the entire scope of section 8(a)'s racial classification (and that is why they should be excluded). However, the legal conclusions urged by both Wainwright and Rubinovitz nevertheless purport to cover that entire scope, even though it is clear from their own reports and data that there are numerous industry sectors where section 8(a) cannot be constitutionally applied simply due to lack of data or insufficient data.

## III. CONCLUSION AND RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Plaintiff ROTHE DEVELOPMENT, INC. requests that the Court GRANT this Motion to Exclude or Limit Testimony of Defendants' Experts and enter the enclosed Proposed Order. In the

alternative, the Court should GRANT IN PART this Motion and limit the testimony of

Defendants' Experts where it is found to be inadmissible under Fed. R. Evid. 401, 402, or

702.

Dated January 31, 2014.                               Respectfully submitted,


                                                      /s/ David F. Barton
                                                      David F. Barton
                                                      District Court Bar No. TX0096
                                                      Texas Bar No. 01853300
                                                      **GARDNER LAW**
                                                      745 E. Mulberry Avenue, Suite 500
                                                      San Antonio, Texas 78212-3149
                                                      Telephone: (210) 733-8191
                                                      Telecopier: (210) 733-5538
                                                      Email: dfbarton@gardner.sa.com




                         **<u>CERTIFICATE OF SERVICE</u>**

        This is to certify that a true and correct copy of the foregoing and all attachments
and exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure,
on this 31st day of January 2014, to all parties, by electronic filing (CM/ECF), as follows:

Andrew G. Braniff                          *VIA CM/ECF*
Patricia L. Stasco
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
*Attorneys for Defendants*


                                                      /s/ David F. Barton
                                                      David F. Barton

USCA Case #15-5176     Document #1577653     Filed: 10/13/2015     Page 197 of 814

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ROTHE DEVELOPMENT, INC.,                       ) | |
|                                                ) | |
|       Plaintiff,   ) | |
|                                                ) | |
| v.                                             ) | Civil Action No. 1:12-cv-00744-KBJ |
|                                                ) | |
| DEPARTMENT OF DEFENSE                           ) | |
|                                                ) | |
| and                                            ) | |
|                                                ) | |
| SMALL BUSINESS ADMINISTRATION,                 ) | |
|                                                ) | |
|       Defendants.  ) | |
| _____ ) | |

### MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQ.

This Court should exclude the expert reports and testimony of Plaintiff Rothe Development Inc.'s designated "expert," John Charles Sullivan pursuant to Federal Rules of Evidence 401, 402, and 702, and applicable case law.  No federal district court has ever accepted Mr. Sullivan as an expert witness regarding the methodologies employed by Defendants' experts, Jon Wainwright, Ph.D. and Robert Rubinovitz, Ph.D.  Mr. Sullivan, who has a law degree but no degree or even course work in economics or statistics, cannot reproduce the mathematical processes used in Defendants' Reports and lacks the basic education and experience necessary to opine on the economic and statistical analyses that form the bases of Dr. Wainwright's and Dr. Rubinovitz's Reports.  For these reasons, and others explained in the Memorandum, neither Mr. Sullivan nor his reports meet the reliability requirements Federal Rules of Evidence and thus his expert reports and testimony should be excluded.

Date:  January 31, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
PATRICIA L. STASCO
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Motion to Exclude the Reports and Testimony Plaintiff's Expert John Sullivan, was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on January 31, 2014:

David F. Barton
Gardner Law
745 East Mulberry Avenue
Suite 500
San Antonio, Texas  78212

/s/Andrew G. Braniff
Andrew G. Braniff
Senior Trial Attorney
U.S. Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

A000192

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ROTHE DEVELOPMENT, INC., Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:12-cv-00744-KBJ |
| DEPARTMENT OF DEFENSE and SMALL BUSINESS ADMINISTRATION, Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE**

## I. INTRODUCTION

This Court should exclude the rebuttal Report of Plaintiff Rothe Development Inc.'s designated "expert," John Charles Sullivan. Although plaintiffs in other litigation have proffered Mr. Sullivan as an expert, no federal district court has ever accepted Mr. Sullivan as an expert witness regarding the methodologies employed by Defendants' experts, Jon Wainwright, Ph.D. and Robert Rubinovitz, Ph.D. Mr. Sullivan, who has a law degree but no degree or even course work in economics or statistics, cannot reproduce the mathematical processes used in Defendants' Reports and lacks the basic education and experience necessary to opine on the economic and statistical analyses that form the bases of Dr. Wainwright's and Dr. Rubinovitz's Reports. Furthermore, Mr. Sullivan's conclusions lack any scientific basis, are admittedly incorrect or pure speculation, are based on flawed, untested, and unreliable principles, or are

simply legal positions.  Pursuant to Federal Rules of Evidence 401, 402, and 702 and applicable

case law, Mr. Sullivan's testimony is inadmissible and should be excluded in its entirety.

## II.        FACTUAL BACKGROUND

This case challenges the Small Business Administration's ("SBA") business development

program authorized by Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a).  The SBA's

8(a) program provides small business owned by socially and economically disadvantaged

individuals an opportunity to gain a foothold in federal contracting by providing management

and technical assistance and by limiting a small number of federal contracting opportunities to

8(a) firms.[1]  Businesses in the 8(a) program are generally (but not always) owned by persons

belonging to groups presumed by the statute to be socially disadvantaged (*i.e.,* Blacks, Hispanics,

Asians, and Native Americans).  15 U.S.C. 637(d)(3)(C).  Regardless of how a business owner

shows social disadvantage, the owner must also meet the criteria regarding personal net worth

and the size of the business.  15 U.S.C. 637(a)(6)(A).  A business may stay in the 8(a) program

for a maximum of nine years; if, during that time, the owner's wealth exceeds the net worth limit

or the business's earnings or size exceed the standard for "small" in the relevant industry, the

business must graduate the program early.  13 C.F.R. §§ 124.2 & 124.102.

Plaintiff seeks a declaration that the presumption of social disadvantage for certain racial

groups is facially unconstitutional.  Dkt. 1 at ¶1.  As Defendants will show, however, the use of

race-conscious criteria as one method to qualify businesses as socially disadvantaged for

inclusion in the 8(a) program serves the compelling interest of breaking down barriers to

---

[1]  According to the Federal Procurement Data System, of the $404 billion that the United States spent in small business eligible procurement actions, $16 billion, or 4%, were in the 8(a) program. 2012 Fiscal Year Small Business Goaling Report, available at https://www.fpds.gov/ (last visited on January 30, 2012).  Similarly, $16 billion, or 4%, were spent with Women-Owned Small Businesses like Rothe Development Inc.  *Id.*

A000194

minority business development created by discrimination and its lingering effects.  The 8(a)

program thereby ensures that federal contracting is not perpetuating the effects of racial

discrimination and that the federal government is not acting as a passive participant in a racially

discriminatory system.  Only one year ago, another District Judge in this District found the 8(a)

program facially constitutional.  *See DynaLantic Corp. v. U.S. Dept. of Defense*, 885 F.Supp.2d

237 (D.D.C. 2012) (J. Sullivan).

On March 8, 2013, Defendants submitted Dr. Wainwright's Report to Plaintiff.  Ex. A,

Wainwright Report.  Dr. Wainwright is a Senior Vice President with NERA Economics

Consulting and has been the principal researcher on more than 30 studies regarding business

discrimination.  *Id.* 1-2; Ex. B, CV of Dr. Wainwright.  He has a Ph.D. in economics from the

University of Texas.  *Id.*

In his Report, Dr. Wainwright reviewed the results of more than 107 disparity studies,

most of which were submitted to Congress.  These disparity studies cover 142 public contracting

entities in 35 states encompassing 89% of the national population.  Ex. A, Wainwright Report at

10, 20.  Generally, disparity studies gather utilization data from public contracting entities and

compare that data to the availability of minority-owned businesses.  A properly done disparity

study accounts for the geographic region, the industries involved, the amounts spent, and the

availability of minority- and non-minority-owned businesses.  *Id.* at 3-9.  Different experts

conducted the studies reviewed by Dr. Wainwright in his Report; thus the methodologies vary.

The results, however, do not.  Overwhelmingly, the studies found minority-owned businesses

were underutilized compared to their availability in public contracting.  *Id.* at 21, 25-35 (Table 5)

(reporting the disparity indexes from the studies), 36-54 (highlighting findings from the studies

by industry and geographic region).  Dr. Wainwright's Report also reviewed the regression

analyses[2] he conducted regarding business formation rates and business earnings, both of which show significant differences between minorities and non-minorities even when key factors were held constant.  *Id.* at 63-82.  Dr. Wainwright concluded that this evidence and the other studies reviewed in his Report:

> provide strong evidence of large, adverse, and often statistically significant disparities between minority participation in business enterprise activity and the availability of those businesses. Based upon the studies as well as upon the additional analyses I conducted for this report, I further conclude that these disparities are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination, and that these disparities therefore are consistent with the presence discrimination in the business market.

*Id.* at 91.

Defendants submitted Dr. Rubinovitz's Report to Plaintiff on August 8, 2013 and Dr. Rubinovitz's Supplemental Report to Plaintiff on October 25, 2013.  Ex. C, Rubinovitz Report; Ex. D, Rubinovitz Additional Analysis ("Supplemental Report").  Dr. Rubinovitz has a Ph.D. in economics from the Massachusetts Institute of Technology and is the Deputy Chief Economist at the U.S. Department of Commerce.  Ex. E, CV of Dr. Rubinovitz.  Dr. Rubinovitz's analyses show that small minority-owned businesses are statistically significantly less likely to win a government contract in 2012 in the vast majority of industries, including the ones in which Plaintiff contracts.

---

[2] Dr. Wainwright defines regression analysis thusly:
> Regression analysis is a type of statistical analysis that examines the correlation between two variables ("regression") or three or more variables ("multiple regression" or "multivariate regression") in a mathematical model by determining the line of best fit through a series of data points.  In simpler terms, regression analysis is a statistical technique allowing the comparison between certain business outcomes, such as business formation, business earnings, or loan denials, and minority status, while holding other, potentially non-discriminatory factors, such as geographic location, industry affiliation, education, age, or balance sheets, constant.

Ex. A, Wainwright Report at 64.

For his study, Dr. Rubinovitz determined which firms were interested in contracting with the federal government based on their registering with the Systems for Award Management ("SAM"), which is a requirement for being a federal contractor.  Ex. C, Rubinovitz Report at 3. SAM data includes information regarding the firm such as the industry (North American Industrial Classification System ("NAICS")) code in which the company works, the date the business started, the average number of employees, annual receipts, the legal type of organization used by the business, small disadvantaged business ("SDB")[3] status, minority-ownership status, and women-ownership status.  *Id.* at 4.  Dr. Rubinovitz also obtained data from SBA to determine the size standards for "small businesses" in various NAICS codes and to determine which businesses were in the 8(a) program.  *Id.* at 5.  He then conducted regression analyses where he controlled for industry based on three digit NAICS codes, business age, business size (in terms of both average number of employees and annual receipts), business form, and security clearance, and compared the likelihood of minority-owned businesses receiving a federal contract verses similar non-minority-owned businesses.  *Id.* at 14, Table 3. Dr. Rubinovitz expressed the outcome in odds ratios—the odds that a minority-owned business would receive a contract when compared to a similar non-minority-owned business.  *Id.*  For this calculation, if the two businesses had an equal chance, the ratio should be one (1).  *Id.*  In addition to calculating the ratio, Dr. Rubinovitz also determined if the ratio was statistically significant: that is whether one could say with confidence that the calculated ratio is actually different from one (1).  *Id.*

---

[3] Small Disadvantaged Businesses ("SDBs") are small businesses owned by socially and economically disadvantaged individuals.  The majority of SDBs are owned by minorities.  Ex. C, Rubinovitz Report at Table 1.  Businesses in the 8(a) program are a subset of SDBs.

Dr. Rubinovitz conducted three calculations, each with a slightly different definition of what constitutes a minority-owned business.  Regardless of the definition, the pattern of his results remains constant:  in the vast majority of industries, minority-owned businesses were less likely to win a federal contract, usually to a statistically significant degree.  In fact, there were no NAICS codes where minority-owned businesses were statistically significantly more likely to win a contract.  *Id.* at 10.

First, Dr. Rubinovitz evaluated the likelihood of non-8(a) minority-owned SDBs winning a contract compared to other similar small businesses.  Ex. D, Rubinovitz Supplemental Report. According to Dr. Rubinovitz:

> non-8(a) minority owned SDBs are statistically significantly less likely to win a contract in industries accounting for 94% of all contract actions, 93% of all dollars awarded, and in which 92.2% of non-minority owned SDBs are registered. There is no industry where non-8(a) minority owned SDBs have a statistically significant advantage in terms of winning a contract from the federal government.

*Id.*

Dr. Rubinovitz conducted the same analysis but this time he compared all non-8(a) SDBs (not just those owned by minorities)[4] to all other similar small businesses.  Ex. C, Rubinovitz Report at 15, Table 4.  As shown in Table 4 of his Report, "in virtually every industry the odds of non-8(a) SDBs [winning a contract] are lower, all else equal, than other firms."  *Id.*  Finally, in Table 4(a), Dr. Rubinovitz contrasted the likelihood of a small minority-owned firm (SDB, 8(a) or small minority-owned firms that do not identify as SDBs or are not part of the 8(a) program) winning a contract compared to similar businesses.  *Id.* at Table 4(a).  Again, he found that minority-owned firms were less likely to win contracts in the vast majority of industries where

---

[4]  Table 1 of Dr. Rubinovitz's Report shows the breakdown of SDBs by ownership characteristics.

A000198

the federal government lets contracts and spends money and where most minority-owned

businesses are available.  *Id.*

On September 9, 2013, Plaintiff submitted the rebuttal Report of Mr. Sullivan responding

to Dr. Wainwright's Report and to a lesser extent, Dr. Rubinovitz's Report.  Ex. F, Sullivan

Report at 1.  Mr. Sullivan criticized the disparity studies relied upon by Dr. Wainwright (and

Congress) and the statistical methods used in those disparity studies and by Dr. Wainwright.  *Id.*

at 7-16, 22-46.  Mr. Sullivan opined that Dr. Wainwright's Report was "disconnected" from the

8(a) program at issue in this case.  *Id.* at 16-21, 41-42.  Mr. Sullivan also claimed that Dr.

Rubinovitz's Report does not support the need for the 8(a) program.  *Id.* at 46.

In October 2013, Defendants submitted rebuttal Reports to Plaintiff and in November

2013, Defendants deposed Mr. Sullivan.  During his deposition, Mr. Sullivan recanted some of

the conclusions and assertions in the Sullivan Report, admitted that some of his conclusions were

simply speculation, and admitted that he did not have an educational or professional background

in economics or statistics.  Ex. G, Sullivan Dep.at 9, 39-40, & 43.  Repeatedly during the

deposition, Mr. Sullivan admitted he had not conducted any independent quantitative analysis to

support his conclusions in the Sullivan Report.  *Id.* at 43, 50 & 87.  Defendants' rebuttal Reports

and the deposition of Mr. Sullivan demonstrate time and time again that Mr. Sullivan's Report is

unreliable and not admissible as expert testimony.

## III.   LEGAL STANDARD

Trial judges must be the gatekeepers to exclude unreliable and unhelpful expert

testimony.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); *see also Kumho*

*Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999) (holding that the gatekeeping

obligation applies to all expert testimony, not just scientific testimony).  Pursuant to FRE 104(a),

the admissibility of an expert's testimony must be established by a preponderance of the

evidence.  *Daubert*, 509 U.S. at 593; FRE 702 and Advisory Committee Notes (2000 amends.).

First, a witness must be qualified as an expert by "knowledge, skill, experience, training

or education."  FRE 702.  A qualified expert may then testify if:  (1) his or her testimony is

sufficiently reliable, and (2) if his or her scientific, technical, or specialized knowledge will

"assist the trier of fact to understand the evidence or to determine a fact in issue."  *Id.*; *see also*

*Daubert*, 509 U.S. at 592; *U.S. v. Law*, 528 F.3d 888, 912 (D.C. Cir. 2008); *Ambrosini v.*

*Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996); *Parsi v. Daioleslam*, 852 F.Supp.2d 82, 85

(D.D.C. 2012).

The reliability of an expert's testimony depends upon several factors such as whether:

(1) "the [expert's] testimony is based on sufficient facts or data"; (2) "the testimony is the

product of reliable principles and methods"; and (3) that "the expert has reliably applied the

principles and methods to the facts of the case."  FRE 702 and Advisory Committee Notes (2000

amends.).  Courts also consider (1) whether the theory or technique can be and has been tested;

(2) whether the theory or technique has been subjected to peer review and publication; (3) the

method's known or potential rate of error; and (4) whether the theory or technique finds general

acceptance in the relevant scientific community.  *Ambrosini*, 101 F.3d at 912 (citing *Daubert*,

509 U.S. at 593-94).  While these factors may be considered, the list is not exhaustive, and the

factors may not apply in every case.  *Id.*; *see also Kumho*, 526 U.S. at 150-151 (explaining that

the factors may or may not be pertinent depending on the nature of the issue, the expert's

particular expertise, and the subject of the expert's testimony).

While the reliability inquiry is flexible, nonetheless, in all cases the trial judge must

determine that the proffered expert testimony "'is properly grounded, well-reasoned and not

speculative before it can be admitted.'" *Estate of Gaither v. District of Columbi*a, 831 F.Supp.2d 56, 62 (D.D.C.2011) (quoting F.R.E. 702 Advisory Committee Notes (2000 amends.)).

Finally, because the proffered testimony must also assist the trier of fact in understanding the evidence or determining a fact at issue in the case, legal conclusions generally should be excluded. *Halcomb v. Washington Metropolitan Area Transit Authority*, 526 F.Supp.2d 24, 27 (D.D.C.2007).  Mr. Sullivan's proposed testimony fails each element of the *Daubert* inquiry.

## IV.   ARGUMENT

### A.   Mr. Sullivan Lacks the Requisite Knowledge, Experience, or Education to Qualify as an Expert.

A witness must possess knowledge, skill, experience, training, or education to qualify as an expert and provide testimony.  FRE 702.  Mr. Sullivan fails this test.

### 1.   Mr. Sullivan Has Never Been Accepted as Expert.

No federal court has ever accepted Mr. Sullivan as an expert in a proceeding involving disparity studies.[5]  This is not for lack of trying.  The plaintiff in *Associated Gen. Contractors of America v. California Dep't. of Transportation et al.*, (No. 2:09-cv-01622) (E.D.Ca) ("*AGC*"), recently offered Mr. Sullivan as an expert in a case involving the constitutionality of a race-conscious minority business program in California.  As in this case, Mr. Sullivan criticized the disparity study used to support the California program.  In response to the defendant-intervenor's motion to exclude the testimony and opinions of Mr. Sullivan, the plaintiff did not file an opposition.  Rather, the plaintiff voluntarily withdrew any reliance on or reference to Mr. Sullivan, his opinions, or his expert Report in plaintiff's motion for summary judgment.  Ex. I,

---

[5]  Mr. Sullivan inaccurately testified that he was "accepted as an expert" in *Ohio Contractors Association v. Cincinnati*, a 1998 case listed on his curriculum vitae as expert witness work.  Ex. H, Sullivan CV at 6; Ex. G, Sullivan Dep. at 24:2-11.  However, as Mr. Sullivan admits, the case settled less than a week after he was deposed, and thus the court never accepted him as an expert. Ex. G, Sullivan Dep. at 12-18.

A000201

*Associated Gen. Contractors of America v. California Dept. of Transportation et al.*, No. 2:09-cv-01622, Dkt No. 96, Mar. 18, 2011.  The district court subsequently found the program constitutional and granted summary judgment for the defendants.  The Ninth Circuit upheld the decision.  *Associated Gen. Contractors of America v. California Dep't of Transp.*, 713 F.3d 1187 (9th Cir. 2013).

　　Mr. Sullivan was also offered as an expert for the plaintiff in *Kevcon, Inc. v. United States*, 89 Fed.Cl. 152 (Ct. Fed.Cl. 2009), a different case concerning a constitutional challenge to the 8(a) program.  As in this case, Mr. Sullivan sought to review Dr. Wainwright's conclusions that the disparity studies before Congress showed large, adverse, and often statistically significant disparities between minority-owned business availability and utilization, and that those differences were consistent with the presence of discrimination.  Ex. J, Excerpt of *Kevcon, Inc. v. United States* Expert Report of John Sullivan, November, 2009, at 1.  As part of its ruling against the plaintiff's request for a preliminary injunction, the Court of Federal Claims struck Mr. Sullivan's affidavit.  According to the court, Mr. Sullivan's affidavit provided improper legal conclusions.  The court explained that if the government's evidence included studies that involved data and statistics, "the Court would welcome assistance from an expert in the *area of statistics* to understand how to interpret those studies.  That is proper expert testimony in a case like this[.]"  Ex. K, Excerpt of Transcript of Preliminary Injunction Hearing in *Kevcon Inc. v. United States*, No. 09-625C, Nov. 30, 2009, Dkt No. 41 (emphasis added).  Mr. Sullivan was not qualified to provide such testimony in that case; the same is true here.

　　　　2.　　Mr. Sullivan Cannot Qualify as an Expert on Disparity Studies.

　　Mr. Sullivan's Report is replete with his opinions regarding disparity studies and their methodologies, despite the fact that he lacks the requisite "skill, experience, training or

-10-

**A000202**

education" to qualify as an expert to testify on these topics.  FRE 702.  As described *supra* p. 3,

disparity studies analyze a public entity's contracting, determine the availability of minority- and

non-minority-owned businesses for that contracting, and compare the availability with

utilization.  Expertise regarding the methods and principles used in disparity studies requires

education or training in economics or statistics, or at least extensive experience creating disparity

studies:  Mr. Sullivan possesses none of these.

    Mr. Sullivan lacks education or training in economics or statistics.  Mr. Sullivan is not an

economist or a statistician, nor does he have a degree in economics or statistics.  Ex. G, Sullivan

Dep. at 9:16-10:1.  Rather, he is an attorney with undergraduate degree in English.  *Id.*  at 9:10-

11, 10:8-21.  Mr. Sullivan has never even taken a class in economics, and when asked in his

deposition if he had taken a statistics class, he responded that in 1997 he audited a class on

research methods that "included some statistics."  *Id.* at 9:18-19, 10:1-7.  When asked what

educational training he has that qualifies him as an expert on disparity studies, Mr. Sullivan

responded:

> I have my legal degree, and I have some
> training in math.  Obviously, to be a college
> graduate you have to take a class or two, and, of
> course, the English background has been extremely
> helpful.

*Id.* 10:22-11:8.  A legal degree, a class or two of college math, and a degree in English is likely

the background of many practicing attorneys.  It is not sufficient training or education to qualify

as an expert regarding studies of disparities in government procurement across multiple

industries demonstrating results consistent with the presence of racial discrimination.

    Mr. Sullivan also lacks sufficient experience to qualify him under FRE 702 to testify

regarding the disparity studies in Dr. Wainwright's Report.  When asked about his role in the

A000203

five disparity studies with local governments listed prominently on the first page of his

curriculum vitae, Mr. Sullivan admitted that he was not the primary consultant on any of the

projects, that he did not collect data for the majority of the work, and that two of the five projects

involved no substantive work.  Ex. H, Sullivan CV at 1; Ex. G, Sullivan Dep. at 12:1-13:5,

14:21-22, 15:1-16, 16:12-21, 17:9-13, 17:14-22, 18:22-19:10.  When questioned about the

statistical work performed on one of these projects, Mr. Sullivan testified that his work consisted

of adding and dividing numbers only.  *Id.* at 20:20-21:17.  Finally, the most recent disparity

study "activity" listed on Mr. Sullivan's curriculum vitae concluded 13 years ago.  Ex. H,

Sullivan CV at 1.

> 3.      Mr. Sullivan Cannot Qualify as an Expert on the Statistical Analyses
>         Used by Defendants' Experts.

Mr. Sullivan also lacks sufficient education or experience to qualify him under FRE 702

to testify regarding the regression analyses in Dr. Wainwright's and Dr. Rubinovitz's Reports.

In addition to his lack of education regarding economics and statistics, Mr. Sullivan admitted that

he has never conducted a regression analysis.  Ex. G, Sullivan Dep. at 19:11-13, 78:18-79:1.  In

fact, he testified that he does not even know how a regression analysis is run or what software to

use:

> Q. I just want to clarify his last question.
> When Mr. Barton said that your inability to do a
> regression analysis I think was part of his
> question, that might have been assuming facts in
> evidence. Are you able to do a regression analysis?
> A. I have never done one. I think I could
> acquire the skill.
> Q. If you were going to do one, do you know
> what method you would use?
> A. No.
> Q. Do you know what type of software you
> might use?
> A. No.

A000204

*Id.* at 110:4-16.  He has never calculated statistical significance, another hallmark of Drs. Wainwright and Rubinovitz's Reports, nor done statistical sampling for any data, a tool used by Dr. Wainwright in his Report.  *Id.*  at 19:14-18, 22:9-10.

              4.     <u>Mr. Sullivan Cannot Qualify as an Expert on the SBA's 8(a) Program.</u>

Mr. Sullivan also claimed to be an expert on the 8(a) program.  Ex. G, Sullivan Dep. at 29:2-5 ("I consider myself an expert in the connection between a program like 8(a) and evidence offered as evidence in discrimination.").  First, it is not clear that such an expertise even exists. Mr. Sullivan admitted this himself.  When asked if he could identify anyone else whom he would consider to be an expert on the link between the remedy for discrimination and the 8(a) program, Mr. Sullivan testified, "I won't.  I don't know anyone else who's ever opined on it truthfully." *Id.* at 29:17-30:1.

Second, as discussed more below, to the extent that Mr. Sullivan claims expertise in the *constitutionality* of the 8(a) program, that "expertise" constitutes an inadmissible legal opinion. *Halcomb*, 526 F.Supp.2d at 27.  In fact, in claiming this expertise, Mr. Sullivan admitted that he relied on his legal training to opine on the link between evidence of discrimination and the remedy that may be provided by the 8(a):

> Q. What in your legal background leads you to
> make that conclusion?
> A. Focusing on the legal background, dating
> back to the Croson decision through Adarand, there's
> always a requirement that a remedy be narrowly
> tailored, and I think that is part of narrow
> tailoring. The remedy has to be shaped by the
> evidence. Evidence that's not before Congress can't
> be influencing Congress.

Ex. G, Sullivan Dep. at 34:10-21.

A000205

Even assuming such an expertise exists and is not a legal conclusion, Mr. Sullivan lacks any special training or knowledge that could qualify him as an expert on the 8(a) program. Nothing in his curriculum vitae shows any specialized training or extensive experience with the program.  Ex. H, Sullivan CV.

Just as he did in *AGC* and *Kevcon,* Mr. Sullivan is offering opinions that he lacks sufficient education or experience to provide.  Simply put, Mr. Sullivan is an attorney with an undergraduate degree in English, who may have taken a few college math courses, and whose experience with disparity studies is limited to five projects over a decade ago.  His work on those projects consisted of "assisting" and doing addition and division, but not substantive manipulation of data such as sampling, running regressions, or computing statistical significance. He is not qualified to give expert testimony on the methods and principles used in disparity studies or the regression analyses and other statistical tools used by the Defendants' experts in this case.

**B.     Mr. Sullivan's Opinions Are Not Reliable Because His Data is Incorrect and His Methods Are Unique, Ad Hoc, and Speculative.**

Mr. Sullivan's Report cannot meet the standards of FRE 702 and *Daubert.*  Pursuant to both the rule and case law, the trial court must ensure that the expert has a "grounding in the methods and procedure of science, rather than a subjective belief or unsupported speculation" for the expert's testimony to be reliable and thus admissible.  *Meister v. Medical Engineering Corp*., 267 F.3d 1123, 1127 (D.C. Cir. 2001).  Mr. Sullivan cannot meet these criteria.  Mr. Sullivan peppers his opinions with egregious errors, and he uses techniques and theories to arrive at his opinions that are practiced only by him, have not been subject to peer review or publication, are not generally accepted, and have not been and cannot be tested.

      1.     <u>Mr. Sullivan's Opinions Are Based on Incorrect Facts.</u>

Mr. Sullivan's attacks on Dr. Wainwright's Report contained several serious errors.  For example, Mr. Sullivan alleged that Dr. Wainwright's analysis included disparities regarding women, a group that is not part of the 8(a) program.  Ex. F, Sullivan Report at 17-19.  Mr. Sullivan used this conclusion to question Dr. Wainwright's results because, according to Mr. Sullivan, some, if not all, of the underutilization reported by Dr. Wainwright could be underutilization of white women.[6]  *Id.* at 18 ("This means that in every disparity study in this record white women – who are not as a group eligible for 8(a) – are part of the availability calculations and are part of the disparity ratios derived from these availability percentages.").  This conclusion by Mr. Sullivan is simply false.  Indeed, Dr. Wainwright's Report *explicitly* stated the he only included disparity studies in Table 1 of the Report if their results were sufficiently disaggregated to allow him to identify utilization, availability, and disparity index estimates for minorities separately from those for white women.  Ex. L, Wainwright Reply at 13-14.

When asked about this passage of his Report during his deposition, Mr. Sullivan admitted that he misunderstood Dr. Wainwright's Report, and that he was incorrect in his Report when he stated that women were included in the availability numbers:

> Q. And do you understand that the studies that
> Dr. Wainwright looked at included white women
> in their numbers for availability?
> A. I do now, since I've read his reply brief. I
> misunderstood what he had done, and here was
> the source of my confusion. In his report, his first,
> he uses the acronym MBE. Now, the MBE also
> includes some disparity studies that covered DBEs,

---

[6] There is a separate program enacted to ensure equal contracting opportunities for small, women owned businesses: the 8(m) program.  15 U.S.C. § 637(m).  That program is not challenged in this litigation.

> so I termed MBE as being an umbrella term that
> also included women. That's not how he, in parts
> of the report he intended it that way, but in other
>  parts he didn't, so he did actually, in Table 5,
> as he says in the rebuttal, he did just look at
> minorities, and, so, for that reason *I retract this*
> *criticism. I simply did not understand what he tried to do.*

Ex. G. Sullivan Dep. at 39:1-13 (emphasis added).

Mr. Sullivan also questioned Dr. Wainwright's use of studies regarding transportation programs because, according to Mr. Sullivan, the personal net worth limits for owners of businesses in the 8(a) program and the transportation programs are different.  Ex.  F, Sullivan Report at 19-20.  Thus, according to Mr. Sullivan, Dr. Wainwright's Report included businesses that are too large to be part of the 8(a) program.  As Dr. Wainwright showed, however, even this basic fact is false.  The personal net worth limit for participation in the transportation program, which covered many of the disparity studies analyzed in Dr. Wainwright's Report, was $750,000 at the time that the studies were done.  Ex. L, Wainwright Reply at 14-16.  This figure is exactly the same as the personal net worth limit for continued eligibility in the 8(a) program; thus the businesses in the transportation studies are similar to SBA 8(a) firms.  *Id.*

In addition, Mr. Sullivan admitted he did not conduct any independent analysis to support his claim that the differences in business sizes resulted in an "overstated availability" of minority-owned businesses; indeed he admitted that this claim was simply speculation on his part:

> Q. Did you do any math to support your
> conclusion that the availability percentages
> are "likely overstated" because of this change in
> the net worth between the DOT DBE program and the
> SBA 8(a) program?
> A. I did not do any math. I was working on
> the assumption that new entries into federal
> programs are more likely to be a minority and,

therefore, more likely to have lower net worth, but
I don't know that. There's a certain unknowability
there.
Q. So, you're speculating --
A. Fair enough. I am speculating, yes.

Ex. G, Sullivan Dep. at 42:21-43:11.

Mr. Sullivan also criticized Dr. Wainwright's Report because, according to Mr. Sullivan,

the state and local government studies Dr. Wainwright used did not match federal procurement.

Ex. F, Sullivan Report at 2.  Again, Dr. Wainwright's Reply proved Mr. Sullivan wrong on the

facts.  Dr. Wainwright compared the industries covered in the disparity studies he used with

federal contracting and found a significant overlap.  Ex. L, Wainwright Reply at 2-4.

2.    Mr. Sullivan's Opinions Are not Supported by Data.

In many places, Mr. Sullivan disparaged the studies conducted or cited by Dr.

Wainwright based solely on Mr. Sullivan's opinion, and he failed to support his claims with any

type of original analysis.  For example, Mr. Sullivan stated that the studies in Dr. Wainwright's

Report incorrectly used data that combined prime contractors and subcontractors to determine

utilization and disparity ratios.  Ex. G, Sullivan Dep. at 49:4-10.  When asked if he recalculated

any of the disparity indexes using the numbers he believed would be more accurate, he admitted

he did not.  *Id.* at 49:11-18, 50:7-13, 69:22-70:9.  In fact, he admitted that except for two studies,

*he did not even examine the data used in the studie*s.  *Id.*

Later in his Report, Mr. Sullivan stated that survey responses from 3,651 firms used in a

study relied upon by Dr. Wainwright were "not enough to establish a nationwide pattern of

discrimination."  Ex. F, Sullivan Report at 40.  However, Mr. Sullivan provided no data or

citations to support his opinion regarding the appropriate response rate and size for a survey.  In

his deposition, he admitted that he could not name any economic theory or study that supported

-17-

**A000209**

his conclusion regarding the proper response rate for a statistically sound sample.  Ex. G,

Sullivan Dep. at 81:19-82:8.  When asked to apply his methodology to a hypothetical survey of

10,000 firms, Mr. Sullivan responded that to draw any conclusions, he would want to have

survey responses from all 10,000 firms.  *Id.* at 82:9-16.  When pushed, even Mr. Sullivan

admitted that this requirement was fictional:

> Q. But there's no specific methodology that
> you use to arrive at that number?
> A. No, sir.
> Q. That one to one [ratio of participants and survey respondents]?
> A. No, sir.

*Id.* at 82:20-84:6.

### 3.    Mr. Sullivan's Methods and Principles Are Not Accepted in the Field.

Disparity studies compare a public entity's use of minority-owned businesses to the

availability of such businesses.  Much of Mr. Sullivan's Report criticized the way availability of

firms was determined by Dr. Wainwright and by the authors of the disparity studies upon which

Dr. Wainwright (and Congress) relied.  Ex. F, Sullivan Report at 10-11, 15, 22-36; Ex. G,

Sullivan Dep. at 74:2-75:3.  Dr. Wainwright's Report contained an extended discussion of

availability, how he measures it, and the types of adjustments other studies often make.  Ex. A,

Wainwright Report at 3-7.  Mr. Sullivan, however, accepts none of these methods of measuring

availability.  According to Mr. Sullivan, the appropriate measure of availability is to count only

those prime contractors that actually bid on projects and those subcontractors that actually work

on projects.  Ex. F, Sullivan Report at 10-11, 15, 22-36; Ex. G, Sullivan Dep. at 74:2-75:3.  In

reality, the methodology Mr. Sullivan advocates is followed by Mr. Sullivan, and possibly his

business partner George LaNoue, alone.

In his deposition, Mr. Sullivan admitted that his methodology is not widely accepted in

the field:

> Q. Of those over 100 [disparity studies] that you've
> analyzed, have any of them used a methodology to
> determine the availability of the DBE firms in a
> marketplace with which you agree?
> A.       I think not.
> …
> Q. Are there any disparity studies that are
> used in the Wainwright report that only use the
> firms that have actually bid to define their
> availability?
> A. No.

Ex. G, Sullivan Dep. at 33:5-9, 92:2-6.  In fact, Mr. Sullivan stated that of all of the disparity

studies he has encountered, he can remember *only one* that he believed was done properly:

> Q. Based on your phrase "done properly," have
> you ever encountered a disparity study that you felt
> was done properly?
> A. Remember I mentioned the St. Petersburg
> study. My recollection is they did a pretty, he,
> Dr. Mongkuo, did a pretty good job of putting
> together availability and utilization.
> Q. Is that the only one you can recall at
> this moment?
> A. That I'm thinking of right now, yes.

*Id.* at 94:22-95:9.  Mr. Sullivan's methodology is out of the mainstream of what is accepted in

the field, and thus, unreliable.

Notably, Dr. Wainwright's methodology is well tested, and courts in several jurisdictions

have accepted it.  *See, e.g., Concrete Works of Colorado, Inc. v. City and County of Denver*, 321

F.3d 950 (10th Cir. 2003) (upholding a race-based contracting program based in part on Dr.

Wainwright's NERA study); *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715 (7th Cir. 2007)

(upholding a race-based contracting program based in part on Dr. Wainwright's NERA study).

Indeed, in *Concrete Works*, the Tenth Circuit engaged in a lengthy explanation of the

-19-

methodology used by Dr. Wainwright and described that method as "sophisticated." In the end,

that court concluded that Dr. Wainwright's study supported a race-conscious contracting

program and that the program was constitutional.  *Concrete Works,* 321 F.3d at 978.

### C.      Mr. Sullivan's Legal Conclusions Will Not Assist the Trier of Fact.

At bottom, what Mr. Sullivan really wants to offer the Court are his legal conclusions.  As

a matter of law, these conclusions should be excluded because they do not "assist the trier of fact

to understand the evidence or to determine a fact in issue."  FRE 702.

For example, Mr. Sullivan stated that the disparity studies analyzed by Dr. Wainwright

that were not before Congress should have been excluded because "[s]tudies that are not before

Congress cannot be used to justify a Congressional program."  Ex. F, Sullivan Report at 5.  In his

deposition, Mr. Sullivan admitted that his legal expertise led him to this conclusion:

> Q. Is there anything in your legal background
> that leads you to make that conclusion?
> A. Yes.
> Q. What in your legal background leads you to
> make that conclusion?
> A. Focusing on the legal background, dating
> back to the Croson decision through Adarand, there's
> always a requirement that a remedy be narrowly
> tailored, and I think that is part of narrow
> tailoring. The remedy has to be shaped by the
> evidence. Evidence that's not before Congress can't
> be influencing Congress.

Ex. G, Sullivan Dep. at 34:10-21.

Mr. Sullivan also opined on whether the studies used by Dr. Wainwright were

sufficiently connected to the 8(a) program to serve as a justification for the program.  This

opinion really concerns whether there is a sufficient basis in evidence for the 8(a) program—an

issue for the Court to determine.  In fact, in the *Kevcon* case, which addressed the

constitutionality of the SBA 8(a) program as well, the Court of Federal Claims struck Mr.

Sullivan's affidavit because it consisted of legal conclusions noting: "the Court strikes the affidavit of Mr. Sullivan again at this stage of the proceedings because the Court will not accept a legal opinion from an expert." Ex. K, *Kevcon* Hearing Tr. at 57. As in *Kevcon*, Mr. Sullivan is providing legal conclusions, rather than offering information that helps the trier of fact make such determinations; this Court should exclude his opinions.

### D.    Mr. Sullivan's Critique of Dr. Rubinovitz's Report is Equally Unavailing.

Mr. Sullivan criticisms of Dr. Rubinovitz's Report are simply his opinions with no facts or data to support his claims. As explained *supra* pp.4-6, Dr. Rubinovitz's Report relied on regression analyses to determine the odds of minority-owned businesses winning federal contracts when compared to similar non-minority-owned businesses. Mr. Sullivan, by his own admission, has never conducted a regression analysis and does not know how to conduct one. Ex. G, Sullivan Dep. at 110. Mr. Sullivan did not attempt to do any original calculations to dispute Dr. Rubinovitz's conclusions or conduct a regression analysis that accounted for additional factors. The best Mr. Sullivan could muster was a broadside against Dr. Rubinovitz's Report: "[t]he conclusion to be drawn there from [the 11% disparity in contracting outcomes for SDBs] is unknown and unknowable, considering the source of the data used." This type of attack is unhelpful to the finder of fact and, in essence, is the legal conclusion that the Plaintiff hopes the Court will draw.

In his response to Dr. Rubinovitz, Mr. Sullivan also claimed that "[t]here is no evidence in the record of the Small Business Administration or the Department of Defense discriminating in the award of 8(a) contracts. And, even if there were such evidence, the most effective remedy would be directed at the government, not companies like Rothe." Ex. F, Sullivan Report at 45. It is not clear what Mr. Sullivan means by the lack of evidence regarding discrimination in the

8(a) program, but again, this is legal conclusion and not one that addresses the actual analysis in Dr. Rubinovitz's Report.  Thus, the portions of Mr. Sullivan's Report that respond to Dr. Rubinovitz's Report should be excluded as well.

## V.   CONCLUSION

Neither Mr. Sullivan nor his Report meets the requirement of FRE 702, and thus the Court should exclude his Report and testimony.  Mr. Sullivan does not possess the education or experience to qualify him to opine on disparity studies or Defendants' Reports supporting the use of the SBA's 8(a) program.  In addition, his testimony is unreliable and filled with inadmissible legal conclusions.  For these reasons, Defendants request that the Court exclude the Report, testimony, and opinions of Mr. Sullivan.


Date:  January 31, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
PATRICIA L. STASCO
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.

A000214

Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

A000215

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Motion to Exclude the Testimony and Opinions of Plaintiff's Expert John Charles Sullivan, Esquire was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on January 31, 2014:

> David F. Barton
> Gardner Law
> 745 East Mulberry Avenue
> Suite 500
> San Antonio, Texas  78212

> <u>/s/Andrew G. Braniff</u>
> ANDREW G. BRANIFF, Senior Trial Attorney
> U.S. Department of Justice
> Civil Rights Division, Employment Litigation Section
> 950 Pennsylvania Avenue, NW
> Patrick Henry Building, Room 4030
> Washington, D.C.  20530
> Telephone:  202.514.9229
> Facsimile:  202.514.1005
> Andrew.Braniff@usdoj.gov

**A000216**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                      )
ROTHE DEVELOPMENT, INC.,                              )
                                                      )
                          Plaintiff,                  )
                                                      )
v.                                                    )        Civil Action No. 1:12-cv-00744-KBJ
                                                      )
DEPARTMENT OF DEFENSE                                 )
                                                      )
and                                                   )
                                                      )
SMALL BUSINESS ADMINISTRATION,                        )
                                                      )
                          Defendants.                 )
_____)

**RESPONSE TO PLAINTIFF'S MOTION IN LIMINE TO
EXCLUDE THE TESTIMONY AND OPINIONS
<u>OF DR. JON WAINWRIGHT AND DR. ROBERT RUBINOVITZ</u>**

This Court should deny Plaintiff's Motion in Limine to exclude the reports and opinions

of Defendants' experts, Dr. Jon Wainwright and Dr. Robert Rubinovitz.  The opinions of these

experts meet the reliability and relevance standards of Federal Rules of Evidence 401, 402, and

702, and applicable case law.  Plaintiff's arguments concerning the appropriateness of post-

enactment evidence, its attacks on Dr. Rubinovitz's and Dr. Wainwright's methodology and

ultimate conclusions, and its digression regarding the "realpolitik of the separation of powers"

are misplaced and unpersuasive in a *Daubert* review of expert evidence.

**I.      Defendants' Expert Reports Rely on Established Scientific Methods and Will
         Assist the Trier of Fact.**

Plaintiff seeks to have this Court exclude the reports and testimony of Defendants'

experts' by shifting the Court's focus from the substance and methodology of the reports to

extraneous matters such as whether the conclusions reached by the experts support a political

agenda.  *Plaintiff's Mot. To Exclude or Limit Test.* ("Pl. Mot."), Dkt. Entry No. 45, at pp. 4-10,

17.  However, for a *Daubert* motion, the focus must be on the court's gate keeping function to

analyze expert evidence and determine whether the evidence is relevant and reliable.  *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993).  Scientific testimony is reliable if

it is based on " 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the

methods and procedures of science.  Similarly, the word 'knowledge' connotes more than

subjective belief or unsupported speculation." *Id.* at 590 (footnote omitted).  In short,

"[p]roposed testimony must be supported by appropriate validation— i.e., 'good grounds,' based

on what is known." *Id.*  At the *Daubert* stage, a court is examining methodology, not

conclusions, and determining whether the testimony will assist the trier of fact.  *Daubert*, 509

U.S. at 595, 591.  *Daubert* lists a number of factors that a court may consider in determining

whether to admit or exclude expert testimony: "realpolitik" and a party's disagreement with the

opposing expert's conclusions are not among them.

    The expert reports submitted by Defendants easily meet the required legal standards.  *See*

Def. Mot. in Limine to Exclude Expert Reports and Test. of Plaintiff's Expert John Sullivan,

Dkt. Entry No. 46 at 3-7 ("Def. Mot. In Limine-John Sullivan").  In fact, applying the

appropriate *Daubert* principles*,* another district court in a similar case just found that "Dr.

Wainwright is qualified, that his preferred methodology is scientifically reliable, and that his

opinions may be helpful to the trier of fact in understanding the issues of this case." *Midwest*

*Fence Corp. v. Dep't. of Transp., et al.*, 2014 WL 322059, *2 & *7 (N.D. Ill., January 28 2014).

## II.   Dr. Rubinovitz's Report Uses Well-Accepted Methods and Shows the Need for the 8(a) Program.

Dr. Rubinovitz's Report easily satisfies the relevance and reliability standards of a *Daubert* analysis.  Plaintiff raises no arguments with respect to Dr. Rubinovitz's qualifications. He is the Deputy Chief Economist in the Economics and Statistics Administration at the Department of Commerce and holds a Ph.D. in Economics from the Massachusetts Institute of Technology.  *See* Rubinovitz Report, Def.'s Mot. In Limine to Exclude Expert Reports and Testimony of Plaintiff's Expert Dale Patenaude, Exh. A*,* ("Rubinovitz Rep."), Dkt. Entry No. 44, at 1.  Thus he is qualified to render expert testimony in this matter.  Instead, Plaintiff seeks to disqualify Dr. Rubinovitz by arguing that  Dr. Rubinovitz's Report is not relevant because it fails to answer the ultimate "legal question of whether section 8(a)'s racial classification was justified by the required strong evidence of 'identified discrimination,'" Pl. Mot. at 7, and it "does not contain sufficient facts or data to justify the statutory racial classification in all of the detailed industry classifications throughout its entire scope." Pl. Mot. at 17.  Neither of these arguments is persuasive under the *Daubert* standard.  First and foremost, it is impermissible for an expert to opine on the ultimate legal questions in a case.  Expert opinion testimony is "otherwise admissible" when it will "assist the trier of fact" in either "understand[ing] the evidence or ... determin[ing] a fact in issue."  *See* Fed.R.Evid. 702.  Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not "otherwise admissible."  *See Weston v. WMATA*, 78 F.3d 682, 684 n. 4 (D.C.Cir.1996) (stating that "legal conclusions on domestic law ... are outside [an expert] witness' area of expertise").  As demonstrated below, Dr. Rubinovitz's testimony will assist the trier of fact in understanding the evidence in this matter and determining facts in issue.

3

A.  *Dr. Rubinovitz's Report Provides the Trier Fact with Evidence of the Need for the 8(a) Program.*

Dr. Rubinovitz's Report shows that small minority-owned businesses were statistically significantly less likely to win a federal government contract in 2012 in the vast majority of industries, including the ones in which Plaintiff contracts.   Rubinovitz Rep. at 2-14.  Dr. Rubinovitz calculated an odds ratio for non-8(a) Small Disadvantaged Businesses (SDBs) winning a federal contract while holding constant factors such as the size and age of the firm, its legal form of organization, and its level of government security clearance.  *Id.* at 2.  The odds ratio for SDBs not participating in the 8(a) business development program was roughly 11 percent lower relative to the odds of firms that were not identified as SDBs winning a contract, and this result was statistically significant.  *Id.*  In addition, Dr. Rubinovitz determined that minority owned firms (which include minority-owned small businesses, SDBs that are minority-owned and minority-owned 8(a) participants) had roughly 30 percent lower odds of winning a contract than other small firms in 2012.  *Id.*  In order to establish these results, Dr. Rubinovitz synthesized multiple government contracting databases and applied rigorous mathematical methods that are widely accepted in his field.  *See* Rubinovitz Rebuttal, Def.'s Mot. In Limine to Exclude Expert Reports and Test. Of Plaintiff's Expert Dale Patenaude, Exh. E, ("Rubinovitz Reb."), Dkt. Entry No. 44, at 2-3.

The facts and opinions in Dr. Rubinovitz's Report - namely the lower odds ratios for SDBs and minority owned businesses winning contracts - will assist the trier of fact in this case to assess whether the Defendants have established a compelling interest supported by a strong basis in evidence and whether the 8(a) program is narrowly tailored to that interest.  The factual question of the strength of that evidence and whether the statute is narrowly tailored to that evidence is directly addressed by Dr.Rubinovitz's Report.  Dr. Rubinovitz examined 80 different

4

industries and hundreds of thousands of contract actions in those industries and determined through a regression analysis that SDBs and minority owned firms were statistically significantly less likely to win a federal contract. Rubinovitz Rep. at 2-14. Specifically he determined that "minority owned firms (which include minority owned small businesses, SDBs that are minority-owned and minority owned 8(a) participants) are statistically significantly less likely to win a contract in industries accounting for 68.6% of contract actions, 81.1 % of dollars awarded, and where 84.3% of minority owned businesses are registered." *Id.* at 2-3. His methodology shows that "there is no industry where minority owned businesses have a statistically significant advantage in terms of winning a contract from the federal government." *Id.* This evidence is highly relevant and should not be excluded.

### B. Dr. Rubinovitz's Treatment of Industries for His Report Increases its Reliability.

Contrary to Plaintiff's arguments, Dr. Rubinovitz's use of three digit North American Industrial Codes ("NAICS") and exclusion of certain industrial categories makes his report more, not less, reliable. As discussed by Dr. Rubinovitz, using the three digit NAICS code "balances the need to have sufficient data in each industry grouping and the recognition that many firms can switch production within the broader three-digit category." *Id*. at 3. This is because "[o]ne of the key factors in the degree of precision of estimates of relationships between two variables is the number of observations used to estimate a model; generally, the more observations, the more precise is the estimate." *Id.* at 11-12. Therefore, in order to achieve verifiable, and reliable, results in the highest number of categories, he aggregated industries at the three digit NAICS level. *Id.*[1]

---

[1] Plaintiff is also incorrect when it states that the *DynaLantic* court used six digit NAICs code in its injunction. In its order, the *DynaLantic* court enjoined procurements "for military simulators" with no mention of NAICS codes. *See DynaLantic Corp. v. U.S. Dept. of Defense,* 885 F.Supp.2d 237, 293 (D.D.C 2012). In fact procurement in the military simulator industry could occur in multiple six digit NAICS codes including 333319, 336413, 541330 and 611512. The

5

Plaintiff's arguments concerning Dr. Rubinovitz's exclusion of certain procurement categories are similarly unpersuasive.  Dr. Rubinovitz excluded 12 industry categories from the report in order to make his results more reliable, not less.  Rubinovitz Rep. at 6-7.  These categories were dropped for a variety of reasons.  For example, Industry Code 521 was dropped because the only entity that is permitted to act as a "Money Authority" is the Federal Reserve System.  *Id.* at 6.  Private households and public administration procurements were excluded because of a lack of small business definition in the category.  *Id.*  Most significantly five categories were dropped because non-8(a) SDBs won zero contracts in those categories.  *Id.*  at fn. 10.  As Dr. Rubinovitz explained, "[t]he fact that these codes could not be included in the analysis does not mean that SDBs are successful in these industries; in fact, given the complete lack of any non-8(a) SDB winning a contract, the converse could be concluded."  *Id.*

### III.    Dr. Wainwright's Conclusions Regarding Discrimination Are Based on Facts and Sound Methodology.

Dr. Wainwright's Report, similar to Dr. Rubinovitz's, easily satisfies the relevance and reliability standards of a *Daubert* analysis.  Plaintiff again raises no arguments with respect to Dr. Wainwright's qualifications.  Nor could it.  Dr. Wainwright is Senior Vice President with NERA Economic Consulting and has conducted economic and statistical research and assisted in litigation concerning the use of affirmative action in public contracting activities since the 1989 *Croson* decision.  *See* Wainwright Report, Def.'s Mot. In Limine-John Sullivan, Exh. A, ("Wainwright Rep.") at 1-3.  He also holds a Ph.D. in Economics from the University of Texas at Austin.

---

Rubinovitz Report examined procurement in all of these categories at the three digit level – 333, 336, 541, and 611.  *See* Rubinovitz Rep. at 14-25.

A000222

Notably, Dr. Wainwright has been qualified as an expert by courts across the country to testify regarding disparity studies and minority business formation.  *Midwest Fence Corp. v. Dep't. of Transp., et al.,* 2014 WL 322059, *7 (N.D. Ill., January 28 2014);  *see also Northern Contracting, Inc., v. State of Illinois, Illinois Department Of Transportation, et al.*, No. 00 C 4515 (N.D. Il., E. Div.); *Daniel Webster, et al. v. Fulton County, et al.*, 1:96-CV-2399 (N.D. GA); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 00-CV-1026(JMRRLE) (D. Minn.); *AGC v. Caltrans*, 09-01622 (E.D. Cali.); *Kevcon v. U.S.,* 09-625C (Fed. Cl.); *Engineering Contractors Association v. Metropolitan Dade County*, 94-1848-CIV-Ryskamp (S.D. Fl.); and *Bilbo Freight Lines, Inc., et al. v. Dan Morales, et al*, H-93-3808 (S.D. TX).  Dr. Wainwright testified before Congress about discriminatory barriers to business formation faced by minorities and the underutilization of minority-owned businesses, among other topics, in 2007, 2008 and 2009; and, before the Maryland House of Delegates in 2011.[2]

Dr. Wainwright's opinions concerning the disparities in the public contracting for minority owned businesses are not, as the Plaintiff claims, "legal conclusions."  See Pl. Mot. at 11.  Dr. Wainwright used verifiable and reliable scientific methods to arrive at his opinion that the disparities in public contracting with respect to minority-owned businesses "are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination, and that these disparities therefore are consistent with the presence [of] discrimination in the business market."  Wainwright Rep. at 91.  Dr. Wainwright reviewed 107 different state and local disparity studies of public contracting entities and extracted the figures from the studies for contracting disparities in construction, construction related professional

---

[2] Dr. Wainwright also was the principal author of the National Academy of Science's Transportation Research Board/National Cooperative Highway Research Program report, entitled "*Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program.*"

A000223

services ("CPS"), and other professional services ("OPS").  *Id.* at 21.  He then analyzed these numbers to determine the disparity index in construction, CPS and OPS.   As Dr. Wainwright explained, a disparity index of 80 or lower is commonly taken as a strong indicator that discrimination is adversely affecting minority-owned businesses.  *Id.* at 22.  Dr. Wainwright determined that:

- In construction, 119 of 142 disparity indexes (84 percent) fall at or below 80, and 125 of 142 (88 percent), are less than 100.

- In CPS, 90 of 114 disparity indexes (79 percent) fall at or below 80, and 100 of 114 (88 percent), are less than 100.

- In OPS, 61 of 76 disparity indexes (80 percent) fall at or below 80, and 65 of 76 (86 percent), are less than 100.

- Combined together, 270 of 332 disparity indexes (81 percent) fall at or below 80, and 290 of 332 (87 percent) are less than 100.

*Id.* at 36.  Dr. Wainwright also noted the remarkable consistency of these numbers, despite the "studies having been undertaken by different consultants, using differing methods, at different points in time, with different budgets, and for a wide variety of state and local government agencies in a wide variety of geographic locations."  *Id.*

Dr. Wainwright's additional research on private sector economic data further supports the reliability of his opinion.  Using a regression analysis, he determined that even when other non-discriminatory attributes are held constant "the disparities in [business]formation rates between Blacks, Hispanics, Asians and Pacific Islanders, and Native Americans, on the one hand, and their non-minority male counterparts, on the other, tend to remain large, adverse, and statistically significant."  *Id.* at 64.  In addition, in 90 different cases he examined (using economic figures for different races in different geographic locations), "89 exhibited statistically significantly lower

<center>8</center>

<center>**A000224**</center>

earnings for minority business owners (99 percent)." *Id.* When he combined the numbers from these cases, he determined that "[m]inority business owner earnings across all industries average 23 percent lower than their non-minority male counterparts, again even when other non-discriminatory attributes are held constant." *Id.* Consequently, his opinion that marketplace disparities for minority businesses are "consistent with the presence [of] discrimination in the business market," is not a legal conclusion, but an opinion resulting from reliable scientific methodology.

Nor is it correct, as Plaintiff claims, that "[i]n this Circuit, 'an expert cannot testify as to whether 'discrimination' occurred.'" Pl. Mot. at 11 (citing *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F. 3d 1207, 1211 (D.C. Cir. 1997)). In *Burkhart*, the court excluded the testimony of an expert who testified that the legal standard for a violation of the Americans with Disabilities Act (ADA) and Rehabilitation Act of 1973 had been met. *Burkhart*, 112 F. 3d at 1212. While excluding the expert's legal opinion, the court explicitly stated that "an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Id.* at 1213. Dr. Wainwright has not opined on, or offered legal conclusions on, the legal standard of this case which is whether there is a compelling interest for the 8(a) program supported by a strong basis in evidence, and whether the program is narrowly tailored to that interest. Instead, he has merely offered his opinion, based on the overwhelming weight of public and private sector data accumulated over many years and multiple jurisdictions, that the disparities in public contracting are consistent with discrimination. That is not an impermissible legal conclusion.

Plaintiff's remaining arguments with Dr. Wainwright's Report do not address the ultimate admissibility or reliability of the Report, but rather go to its weight. Pl. Mot. at 15-16. For example, Plaintiff's concerns about Dr. Wainwright's use of two data points, one from a

study in Denver and one from a study in Alaska, do not, and cannot, call into to question the

scientific validity of the Report as a whole.  *Graves v. District of Columbia*, 850 F.Supp.2d 6, 11

(D.D.C.2011) (motions in limine should not be used to resolve factual disputes or ask the court

to weigh the sufficiency of evidence).  Finally, contrary to Plaintiff's assertions, (Pl. Mot. at 10)

it is not surprising that the *DyanLantic* court did not cite to an expert report by Dr. Wainwright's

in its opinion: Dr. Wainwright did *not* submit an expert report in *DynaLantic*.  Importantly, the

court did, however, rely on evidence from multiple NERA studies and cited Dr. Wainwright's

Congressional testimony several times.  *See DynaLantic Corp. v. U.S. Dept. of Defense,* 885

F.Supp.2d 237, 259, 261, 262, 264, 268 & 277 (D. D.C. 2013).

## IV.   Plaintiff's Arguments Concerning the Admission of Post-Enactment Evidence Ignore the Overwhelming Case Law in this Area.

Plaintiff's arguments concerning both experts regarding the consideration of post-

enactment evidence are wrong as a matter of law.  Pl. Mot. at 4-6, 8-10.  Although one would not

know it from reading Plaintiff's brief, courts regularly consider post-enactment evidence in cases

regarding the constitutionality of minority-owned business programs.  As Judge Sullivan found

in *DynaLantic,* "nearly every circuit to consider this question has held that reviewing courts may

also consider post-enactment evidence." *DynaLantic,* 885 F.Supp.2d at 257-258.  *See also,*

*Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1521 (10th Cir.

1994) ("The strong weight of authority endorses the admissibility of post-enactment evidence to

determine whether an affirmative action contract program complies with *Croson*."); *Adarand*

*Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. 2000); *Harrison & Burrowes Bridge*

*Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992); *Coral Const. Co. v. King County*,

941 F.2d 910, 920 (9th Cir. 1991); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of*

10

*Philadelphia*, 6 F.3d 990, 1004 (3d Cir. 1993); *Engineering Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County*, 122 F.3d 895, 911-912 (11th Cir. 1997).

The rationale for considering post-enactment evidence varies in the different cases, but, importantly, all the reasons that courts have allowed post-enactment evidence are present in this case.  For example, in *Dynalantic,* consideration of post-enactment evidence was necessary regarding the 8(a) program because the program is over thirty years old; post-enactment evidence allows Congress and the court to determine whether there continues to be a compelling interest for the program.  *DynaLantic,* 885 F.Supp.2d at 258.  Other courts have included post-enactment evidence in their analysis because the plaintiff sought injunctive relief, which is forward looking and requires an analysis of the current need for the program.  *Contractors Ass'n of Eastern Pennsylvania, Inc*., 6 F.3d at 1004.  Still others have found that a rule that bans post-enactment evidence would put municipalities in the impossible position of not acting when they have some evidence of a problem and thus risking liability for discrimination as they wait.  *Coral Const. Co.*, 941 F.2d at 920.

Courts that have considered post-enactment evidence have also relied on larger legal principles which again are equally applicable to this case.  According to the Eleventh Circuit "consideration of post-enactment evidence is appropriate when affirmative action programs are scrutinized, because '[a] violation of federal statutory or constitutional requirements does not arise with the making of a finding; it arises when the wrong is committed.'" *Engineering Contractors Ass'n of South Florida Inc*., (quoting *Wygant v. Jackson Bd. of Educ*., 476 U.S. 267, 289, (1986) (O'Connor, J., concurring).  The Second Circuit relied on the fact that reviewing post-enactment evidence is akin to a court reviewing the relevant administrative agency's

A000227

interpretation of the statute; clearly the interpretation occurred after the law was passed, but it is relevant for the determination of constitutionality. *Harrison*, 981 F.2d at 60.

Finally, even if this Court decides to follow the one case Plaintiff cites regarding post-enactment evidence and ignore the weight of the case law, Plaintiff's *Daubert* motion should still be denied. The analysis in that case determined that post-enactment evidence could not be used for the first prong of the strict scrutiny analysis, i.e. the compelling interest. *Rothe Dev. Corp. v. Dep't of Defense*, 545 F.3d 1023, 1031 (Fed. Cir. 2008). However, the evidence propounded by Defendants' experts goes to the narrow tailoring inquiry as well. For example, Dr. Rubinovitz's Report shows that there are no industries in which small minority-owned businesses outside of the 8(a) program are statistically significantly more likely to win a federal contract. *See* Rubinovitz Rep. at 2. Similarly, Dr. Wainwright's Report addresses the evidence of contracting disparities in the specific industries in which Plaintiff operates. *See* Wainwright Rep. at 19. While Defendants are considering using Dr. Rubinovitz's and Dr. Wainwright's Reports as part of the argument regarding compelling interest, it is equally likely that this evidence will be used as part of Defendants' arguments that the program is neither overly broad nor unduly burdensome to Plaintiff, which are aspects of narrow tailoring. Thus this evidence, regardless of how it is used, should not be excluded.

### V.     Conclusion

Based on the reliability and relevance of Dr. Wainwright's and Dr. Rubinovitz's expert testimony and opinions, Defendants request that this Court **DENY** Plaintiff's motion to exclude the opinions in whole or part.

Date:  February 14, 2014

Respectfully submitted,

A000228

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
PATRICIA L. STASCO
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Response to Plaintiff's Motion to Exclude Jon Wainwright's Reports and Testimony, was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on February 14, 2014:

David F. Barton
Gardner Law
745 East Mulberry Avenue
Suite 500
San Antonio, Texas  78212

/s/Andrew G. Braniff
Andrew G. Braniff
Senior Trial Attorney
U.S. Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ROTHE DEVELOPMENT, INC., | ) |
|   Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 12-CV-744-KBJ |
|  | ) |
| DEPARTMENT OF DEFENSE and | ) |
| SMALL BUSINESS ADMINISTRATION | ) |
|   Defendants. | ) |

_____)

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF'S EXPERTS AND MEMORANDUM IN SUPPORT

Pursuant to D.D.C. LCvR 7, Plaintiff ROTHE DEVELOPMENT, INC. ("ROTHE") files this, its Response to Defendants' Motions to Exclude or Limit Testimony of Plaintiff's Experts Dale Patenaude and John Sullivan and Memorandum in Support thereof, and states as follows:

### I. NO WAIVER

The arguments made here are made in the alternative to those in ROTHE's motion to exclude or limit testimony of Defendants' experts. Doc #45. In making the Response arguments herein, ROTHE in no way concedes its prior objections that expert reports are irrelevant and inadmissible in this case. *Id.* As ROTHE has consistently stated, its experts are offered solely as a response to the errors and omissions in the reports served by Defendants, in the event the Court considers expert reports over ROTHE's threshold objections. *See e.g.*, Doc #30 at 1-6 (ROTHE response to Defendants' motion for extension of time); Doc #15 at 6 (ROTHE's scheduling recommendations).

## II. RESPONSE AND POINTS AND AUTHORITIES

*A. The Court Should Not Exclude or Limit the Testimony of Mr. Patenaude*

Defendants' Motion to Exclude or Limit the Testimony of Dale Patenaude should be denied. Mr. Patenaude's reports and testimony:

(1)    identify gaps or omissions in the background data sets that Defendants' expert Mr. Rubinovitz relied on; *see* **Exhibit 1**, Suppl. Rpt. of Dale Patenaude at 1-6 (bates RDI 000145-000150); **Exhibit 2** Orig. Rpt. of Dale Patenaude at 2 ¶¶3, 7, 8 & 9 (RDI 000120); and

(2)    identify and criticize what broad categories of data that Mr. Rubinovitz did and, more importantly, did not compare; *see* **Exhibit** 1, Suppl. Rpt. of Dale Patenaude at 7 & 9 (RDI 000151, 000153).

The Defendants fault Mr. Patenaude because he goes further, and, using his mathematical knowledge from his engineering background, *proves* that Mr. Rubinovitz's conclusions are unsupported when proper data is included and when the relevant comparisons are made.

Specifically, Mr. Patenaude, simply by using basic addition, subtraction, multiplication, and division with publicly available data from the GSA's 2012 Small Business Goaling Report on the Federal Procurement Data System (FPDS) website, https://www.fpds.gov/downloads/top_requests/FPDSNG_SB_Goaling_FY_2012.pdf, concludes that the average contract value awarded to an 8(a) firm exceeds that awarded to non-8(a) SDB firms, which in turn exceeds that awarded to small firms that are not 8(a) or SDBs at all. **Exhibit 1**, Suppl. Rpt. of Dale Patenaude at 7-9 (RDI 000151-000153); **Exhibit 2** Orig. Rpt. of Dale Patenaude at 9-10 (RDI 000127-000128).

Mr. Patenaude also, simply by dividing the total small business contract award dollar value shown in the 2012 Small Business Goaling Report by the total SDB contract award dollar value in the same report, reveals a startling—and frankly, indisputable—reality of currently federal procurement practices:

> The Total SDB dollars shown in [The 2012 Small Business Goaling Report] is $32,334,377,258. This works out to 7.999992% of $404,180,126,265, which is the Total Small Business eligible dollars shown in [The 2012 Small Business Goaling Report]. In fact the Federal Government was only 32,843 dollars and 20 cents ($32,843.20) out of $404 Billion from awarding a perfect 8%. (It was "off" the 8% by only one part in 12 million). It appears that the Federal Government had to work very hard to achieve this close of a number. The accuracy of the attainment of this 8% goal achievement clearly shows that the goal is not voluntary but mandatory.
>
> The precision with which the Federal Government achieves the 8% SDB "goal" also shows that Mr. Rubinovitz's report is not credible. The amount of SDB awards is predetermined at 8% of total Small Business eligible dollars period. [The 2012 Small Business Goaling Report] proves it, beyond any doubt. The amount of SDB awards is not limited by competition, disparity, discrimination or for any other reason but the Government 8% goal which is clearly very carefully managed. *SDB firms, although they may appear to be competing against non-SDB's, are in reality competing against each other for a piece of a pre-determined SDB pie*.

**Exhibit 2** Orig. Rpt. of Dale Patenaude at 9-10 (RDI 000127-000128).

The Defendants' motion to exclude Mr. Patenaude makes it sound as though he produced a competing statistical analysis to that of Mr. Rubinovitz. He did not. Rather, Mr. Patenaude did basic arithmetic which, on its face, shows that Mr. Rubinovitz's findings might be explained by something other than racial discrimination in federal procurement.

Mr. Patenaude's basic arithmetic using the Defendants' own data, proves (1) that the average contract value awarded to an 8(a) firm exceeds that awarded to non-8(a) SDB firms, which exceeds that awarded to small firms that are not 8(a) or SDBs at all; and (2) that the amount of SDB awards is not limited by competition, disparity, discrimination or for any other reason but the Government 8% goal. These are significant factual findings that tend to rebut Mr. Rubinovitz's assertions that statistical disparities in federal small business procurement can only be explained by racial discrimination.

Mr. Rubinovitz indisputably relied on background data sets kept by the federal government for his opinion, and he used that data to make certain comparisons. *See e.g.*, Doc #44-1 at 5 (Defs' memorandum) (discussing Rubinovitz reports). The content and character of that data, and the subject matter and scope of the comparisons that were made with it, are fair game for critique for numerous reasons, not the least of which is that neither the data nor Mr. Rubinovitz's report were ever before Congress for analysis.

Mr. Patenaude is qualified to perform that critique. While Defendants' motion attacks his lack of specific qualification as an economist or statistician (which is unnecessary to his testimony), Mr. Patenaude, in his deposition, has demonstrated he is clearly qualified and competent to distinguish between the various small business classifications under federal law, the various industry classifications, and the various federal procurement databases, all which he has personal knowledge of in his direct daily experience bidding federal contracts for ROTHE. **Exhibit 3**, Deposition of Dale Patenaude at 54-56, 60-66, 129-133, 163-166.

Where the testimony is not purely scientific, its relevance and reliability are determined by examining factors applicable to the topic of the testimony. *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

Rule 702 and *Daubert* are applicable only to proposed expert opinions, however, and the requirements do not apply to a lay witness testifying to facts derived from examining evidence. More specifically, the fact that a witness may, by education or training, potentially qualify to serve as an expert witness does not compel the conclusion that his testimony constitutes an expert opinion governed by Fed. R. Evid. 702. "[W]itnesses need not testify as experts simply because they are experts—the nature and object of their testimony determines whether the procedural protections of Rule 702 apply." *United States v. Caballero*, 277 F.3d 1235, 1246 (10th Cir. 2002). Where the witness does not purport to express an expert opinion, but will testify only to facts of which he has personal knowledge, the requirements of Rule 702 and *Daubert* do not apply. *Id.* at 1247. "Indeed, it is possible for the same witness to provide both lay and expert testimony in a single case." *Id.* at 1246.

That said, although "district court[s] should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help,  . . . [g]enerally the rejection of expert testimony is the exception rather than the rule." *IBM Corp. v. BGC Partners, Inc*., 2013 LEXIS 59779 at *17-18 (S.D.N.Y. April 25, 2013); *citing U.S. v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001), *U.S. v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991), *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) and Fed. R. Evid. 702 Adv. Comm. Notes (2000).

In fact, Rule 702 applies only where the testimony or evidence consists of information that is beyond the scope of a reasonable juror's knowledge and understanding. Indeed, Rule 702 expressly provides that expert opinion testimony is admissible only "if . . . the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). When a juror would be able to understand the evidence without specialized knowledge concerning the subject, expert testimony is not required. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 593 (1993) (noting that assistance to trier of fact will depend on "whether it is within the juror's common knowledge and experience").

Pursuant to Rule 702, courts must conduct a "common-sense inquiry" into whether a juror would be able to understand certain evidence without specialized knowledge." *E.g*., *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) ("Rule 702 . . . dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject").

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*MCI Communications Corp. v. United States*, 26 F. Supp. 2d 6, 10 (D.D.C. 1996) (applying the "common-sense inquiry" and citing Fed. R. Evid. 702 Advisory Committee Note).

Mr. Patenaude used his qualifications and specialized knowledge to reliably identify the inputs to his basic arithmetic, and that type of simple deductive reasoning is

sufficient to admit his testimony as an expert under Rule 702. *IBM Corp. v. BGC Partners, Inc.*, 2013 LEXIS 59779 at *19 (S.D.N.Y. April 25, 2013) ("While it is true that the only quantitative analysis done . . . involved basic arithmetic . . . expert opinion and analyses were used to determine the appropriate inputs to these calculations"); *see also Microsoft Corporation v. Motorola, Inc.*, 2013 LEXIS 109905 at *27 (W.D. Wash., Aug. 5, 2013) (same result, *citing WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011)); *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 831 (8th Cir. 2008) (holding that district court did not abuse its discretion in admitting expert testimony that represented "an exercise in basic math using simple deductive reasoning").

    In the end, the Defendants do not seriously contest that Mr. Patenaude is permitted to use his experience, qualifications and specialized knowledge to reliably identify inputs to his basic arithmetic. Rather, they contest the weight that should be given to the results of that arithmetic. *See* Doc #44-1 at 18 (Defs' memorandum) (alleging "the results are wrong because Mr. Patenaude incorrectly calculates the dollar value of contracts won by 8(a) firms, SDBs, and non-SDBs."). The Court is not adjudicating which of the experts is correct on the substance in deciding a motion to exclude, and therefore Defendants' arguments that go to the weight of Mr. Patenaude's testimony should be deferred to the merits stage.[1] *SEC v. Johnson*, 525 F. Supp. 2d 70, 76 (D.D.C. 2007) ("It is for the jury, not the Court, to determine whether his opinions are

---

[1]     Defendants also allege that Mr. Patenaude's testimony is biased solely by virtue of his status as a party representative. Doc #44-1 at 19. However, Defendants have presented no evidence showing that bias affected the outcome of Mr. Patenaude's basic arithmetic, nor even that Mr. Patenaude has manifested any bias that has any connection to the substance of his findings or conclusions. Mr. Patenaude's testimony should not be excluded on such a conclusory basis.

suspect because facts upon which he relied were shown to be inaccurate or unproven."), citing *Micro Chemical, Inc. v. Lextron, Inc*., 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony") and *Wechsler v. Hunt Health Sys*., 381 F.Supp.2d 135, 144-45 (rejecting exclusion of an expert based on his purported reliance on "the wrong documents").

However, to the extent his testimony is not admitted as expert testimony, Mr. Patenaude could also, in the alternative, be treated as a lay witness under Fed. R. Evid. 701. *IBM Corp. v. BGC Partners, Inc*., 2013 LEXIS 59779 at *19 (S.D.N.Y. April 25, 2013), citing *Schwartz v. Fortune Mag*., 193 F.R.D. 144, 147 (S.D.N.Y. 2000) and *Rx.com Inc. v. Hartford Fire Ins. Co*., 426 F. Supp. 2d 546, 554 (S.D. Tex. 2006) ("an expert is not necessary at any stage to perform . . . arithmetic calculations").

A lay witness, counsel, and the Court itself can identify background data sets that that Mr. Rubinovitz did and did not consider, and then refer to those data sets, without doing any math at all, to determine if they have certain characteristics or omissions that would be relevant in the Court's analysis of the statutory racial classification here.

Similarly, a lay witness, counsel, and the Court itself can read the 2012 Small Business Goaling Report and see that there is data for total small business contract award dollar value shown and the total SDB contract award dollar value. The Court does not have to close its eyes or pretend that it is unaware of what the ratio between those two numbers might suggest. Eight percent is a low number. Politically, in the abstract, many people might be disturbed with that level of participation. But coupled with other information—such as, the federal government hits that eight percent figure exactly and

consistently year after year, or hits it in response to an express goal or directive—it becomes relevant, admissible evidence that tends to rebut Mr. Rubinovitz's assertion that the federal contracting data that we see today is consistent with discrimination.[2]

*B. The Court Should Not Exclude or Limit the Testimony of Mr. Sullivan*

Defendants' Motion to Exclude or Limit the Testimony of John Sullivan should also be denied.

As to Mr. Sullivan's qualifications, ROTHE disagrees with Defendants' premise that "Expertise regarding the methods and principles used in disparity studies requires education or training in economics or statistics, or at least extensive experience creating disparity studies." Doc #46-1 at 11. Defendants' premise is nothing more than a conclusory statement of argument, which, as such, must be rejected by the Court. The law does not foreclose that a person with a related educational background can become familiar with the methods and principles by reviewing or studying disparity studies, particularly in an academic context as Mr. Sullivan has done for more than 20 years. *See Kumho Tire Company*, 526 U.S. at 156 ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience")

---

[2]    Further, this assertion of consistency with discrimination is, of course, contradicted, at least by design, by Mr. Rubinovitz in his deposition:

3   Q.  Is there anything in your report that you
4   regard as evidence of discrimination?
5   A.  No, there's not anything about
6   discrimination.

Doc #45-4, Rubinovitz Deposition, at 50:3-6. It is apparent this parsing language assertion, which contradicts anything in Mr. Rubinovitz's Expert's Report,,was developed with the intervention of his counsel during preparation for Rubinovitz's deposition, since it was not reflected in any way in the Rubinovitz Expert Report. Doc #45-4, Rubinovitz Deposition at 96:17-97:17.

and Fed. R. Evid. 702 Advisory Committee Note ¶12 (Rule 702 "does not suggest that . .

. experience in conjunction with other knowledge, skill, training or education [] may not

provide a sufficient foundation for expert testimony").

> Rule 702's liberal policy of admissibility extends to the substantive as
> well as the formal qualification of experts. We have eschewed imposing
> overly rigorous requirements of expertise and have been satisfied with
> more generalized qualifications. *See Hammond v. International Harvester
> Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982) (holding that an engineer, whose
> only qualifications were sales experience in the field of automotive and
> agricultural equipment and teaching high school automobile repair,
> nevertheless could testify in a products liability action involving tractors);
> *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87-88 (3d Cir.1979) (holding
> that an expert could testify that unguarded elevator buttons constituted a
> design defect despite expert's lack of specific background in design and
> manufacture of elevators).

*In re Paoli RR Yard PCB Litigation*, 35 F. 3d 717, 741 (3d Cir. 1994); *see also* **Exhibit 4**,

Report of John Sullivan at 49-50 (his CV) (RDI 000112-000113).

Defendants also deliberately confuse the content of the report of their expert, Mr.

Wainwright, with the substance of Mr. Sullivan's critique of that report. *Cf.* Doc #46-1 at

12-13. It is not as if Mr. Sullivan is recreating Mr. Wainwright's analysis and coming up

with alternative results, yet the vast majority of Defendant's motion proceeds as though

he were. *Compare id.* (alleging Mr. Sullivan is not qualified to perform statistical

regressions) *with* **Exhibit 4**, Report of John Sullivan at 38 (RDI 000100) (acknowledging

"My analysis of the regressions in defendant's expert report does not question the

mathematical manipulations of the regressions or the variables used."). There are other,

qualitative ways for Mr. Sullivan to validly critique Mr. Wainwright's reports without

performing statistical calculations, and Mr. Sullivan has done that here. *E.g., Univ. of

Montreal Pension Plan v. Banc of America Securities, LLC*, 691 F. Supp. 2d 448, 468

n.13 (S.D.N.Y. 2010) (permitting expert to testify in general principles as to why

opposing party failed to satisfy due diligence requirements); *see also* **Exhibit 4**, Report of John Sullivan at 6-44 (RDI 000069-000107).

Defendants' objection to Mr. Sullivan's reliability focuses too narrowly on only the "scientific" aspect of expert knowledge under Fed. R. Evid. 702. *Cf.* Doc #46-1 at 14 (alleging that the expert must have "a grounding in the methods and procedure of science"). The actual language of Rule 702, however, allows for expert testimony based on "scientific, technical, or *other specialized knowledge*." Fed. R. Evid. 702 (emphasis added). Further, Rule 702 Advisory Committee Note ¶10 recognizes "some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed. R. Evid. 702 Adv. Cmte Note ¶10.

Mr. Sullivan's report makes clear that he:

(1)      would, flat out, not use many of the data sources relied upon in the disparity studies that Mr. Wainwright used, because those data sources contain well-known errors or limitations. **Exhibit 4**, Report of John Sullivan at 6-7, 10-16 & 38 (RDI 000069-000070 and RDI 000073-000079, RDI 000101);

(2)      after simply taking the disparity studies' representations on their face regarding the purpose of their findings on business formation, business earnings, loan denials, and credit problems, merely points out that there is no connection between those findings and what Mr. Wainwright's report represents the findings to support. **Exhibit 4**, Report of John Sullivan at 37-42 (RDI 000101-000105);

(3)      finds that the availability analyses in the disparity studies Mr. Wainwright relied on were flawed because of flaws in the data. **Exhibit 4**, Report of John Sullivan at 19-36 (RDI 000082-000099); and

(4)      finds that the anecdotal portions of the disparity studies employed few if any recognized safeguards in data collection. **Exhibit 4**, Report of John Sullivan at 42-44 (RDI 000105-000107).

Defendants' real objection to these findings and conclusions by Mr. Sullivan is that, compared to what he and others justifiably perceive as a sloppy, error-prone disparity study industry,[3] he is a relative voice of sanity and errs on the side of data quality. *Cf*. Doc #46-1 at 19 (alleging that Mr. Sullivan is "out of the mainstream.").

Defendants know that Mr. Sullivan's qualitative critique of the underlying disparity studies renders Mr. Wainwright's quantitative analysis of those same studies irrelevant, hence Defendants' desire to change the subject in their motion. *See* Fed. R. Evid. 702 Advisory Committee Note ¶9 ("Yet it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply those principles to the specific facts of the case.").

---

[3]      Mr. Wainwright himself was involved in a well-publicized dustup last year when he was caught copying and pasting large sections of a disparity study report from prior clients into a disparity study for the City of Cleveland. Leila Atassi, "Cleveland awards $758K no-bid contract to NERA, consultant which wrote nearly identical reports for others," CLEVELAND PLAIN-DEALER, Feb. 15, 2013, *available at* http://www.cleveland.com/cityhall/index.ssf/2013/02/city_of_cleveland_awards_75800.html (last visited Feb. 13, 2014); *see also* Editorial Board, "Cleveland disparity study too important for recycling," CLEVELAND PLAIN-DEALER, Feb. 23, 2013, *available at* http://www.cleveland.com/opinion/index.ssf/2013/02/disparity_study_too_improtant.html (last visited Feb. 13, 2014).

By reviewing and studying disparity studies as the Associate Director of the Project on Civil Rights and Public Contracts, at the University of Maryland Baltimore County, and over the course of his career, Mr. Sullivan has acquired the necessary "specialized knowledge" to critique the deficiencies of the disparity studies underlying the Wainwright report. **Exhibit 4**, Report of John Sullivan at 49-50 (CV) (RDI 000112-000113). He has done that in a report of his own, which is admissible under Rule 702.

### III. EXHIBITS

The following Exhibits are attached to this Response and are incorporated herein by reference:

**Exhibit 1**     Supplemental Report of Dale Patenaude (Oct. 25, 2013)

**Exhibit 2**     Original Report of Dale Patenaude (Sept. 9, 2013)

**Exhibit 3**     Deposition of Dale Patenaude (Nov. 21, 2013)

**Exhibit 4**     Report of John Sullivan (Sept. 9, 2013)

### IV. CONCLUSION AND RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Plaintiff ROTHE DEVELOPMENT, INC. requests that the Court DENY Defendants' Motions to Exclude or Limit Testimony of Plaintiff's Experts and enter the enclosed Proposed Order.

Dated February 14, 2014.                    Respectfully submitted,

/s/ David F. Barton
David F. Barton
District Court Bar No. TX0096
Texas Bar No. 01853300
**GARDNER LAW**
745 E. Mulberry Avenue, Suite 500
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
Email: dfbarton@gardner.sa.com

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing and all attachments and exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure, on this 14th day of February 2014, to all parties, by electronic filing (CM/ECF), as follows:

Andrew G. Braniff                              *VIA CM/ECF*
Patricia L. Stasco
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
*Attorneys for Defendants*

/s/ David F. Barton
David F. Barton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
ROTHE DEVELOPMENT, INC.,                  )
   Plaintiff,                             )
                                          )
v.                                        ) Civil Action No. 12-CV-744-KBJ
                                          )
DEPARTMENT OF DEFENSE and                 )
SMALL BUSINESS ADMINISTRATION             )
   Defendants.                            )
_____)

**PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE
TO PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT TESTIMONY OF
DEFENDANTS' EXPERTS**

Pursuant to D.D.C. LCvR 7, Plaintiff ROTHE DEVELOPMENT, INC.

("ROTHE") files this, its Reply to Defendants' Response (Doc #48) to Plaintiffs' Motion

to Exclude or Limit Testimony of Defendants' Experts Jon Wainwright and Robert

Rubinovitz (Doc #45), and states as follows:

I. REPLY

*A. Defendants Fail to Acknowledge the Controlling Supreme Court Precedent*

The United States Supreme Court has defined the Constitutional responsibilities

of Congress with respect to statutory racial classifications and remedies for identified

discrimination. It is the duty of the lower courts of the federal Judiciary to enforce those

responsibilities in the face of the type of outcome-oriented arguments from the Executive

that appear in Defendants' response.

The reports—and thus the testimony—of Defendants' experts were never placed

before or considered by Congress, which renders them irrelevant as a matter of United

States Constitutional law, and therefore inadmissible under Federal Rules of Evidence

401 and 402. The United States Supreme Court case law which compels that result from

this Court—none of it cited in Defendants' response—is as follows:

> *The institution that makes the racial distinction* must have had a "strong basis in evidence" to conclude that remedial action was necessary, "*before* it embarks on an affirmative action program."

*Shaw v. Hunt*, 517 U.S. 899, 910 (emphasis in original), *quoting Wygant v. Jackson Bd.*

*of Educ.*, 476 U.S. 267, 277 (1986).

> [T]he *legislature* must have had a strong basis in evidence to support [the] justification before it implements the [racial] classification.

*Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996) (emphasis added).

> "*Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute.*" . . . "Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification" . . . These passages make a persuasive case for requiring strict scrutiny of *congressional* racial classifications.

*Adarand v. Pena*, 515 U.S. 200, 229 (1995) (emphasis added), *quoting with approval*

Justice Stevens' dissent in *Fullilove v. Klutznick*, 448 U.S. 448, 537 & 545 (1980).

> . . . [W]e agree with Justice Stevens that, "[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification *be clearly identified* and unquestionably legitimate," and that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."

*Adarand v. Pena*, 515 U.S. 200, 229 (1995) (emphasis added), *again quoting with*

*approval* Justice Stevens' dissent in *Fullilove*.

Analogously, in the voting rights context, the law is that a statutory remedy for

identified discrimination is constitutional only if its "disparate geographic coverage is

sufficiently related to the problem that it targets." *Northwest Austin Mun. Utility Dist. v.*

*Holder*, 129 S. Ct. 2504, 2512 (2009). The Supreme Court has placed that responsibility

on the shoulders of Congress alone:

> Striking down an Act of Congress "is the gravest and most delicate duty that this Court is called on to perform." We do not do so lightly. That is why, in 2009, we took care to avoid ruling on the constitutionality of the Voting Rights Act when asked to do so, and instead resolved the case then before us on statutory grounds. But in issuing that decision, we expressed our broader concerns about the constitutionality of the Act. *Congress could have updated* the coverage formula at that time, but did not do so. Its failure to act leaves us today with no choice but to declare § 4(b) unconstitutional. The formula in that section can no longer be used as a basis for subjecting jurisdictions to preclearance.

*Shelby County v. Holder*, 133 S. Ct. 2612, 2631 (2013) (internal citation omitted)

(emphasis added).

> *Congress may draft another formula based on current conditions*. Such a formula is *an initial prerequisite to a determination that exceptional conditions still exist justifying* such an "extraordinary departure from the traditional course of relations between the States and the Federal Government." Our country has changed, and while any racial discrimination in voting is too much, *Congress* must ensure that the legislation it passes to remedy that problem speaks to current conditions.

*Shelby County*, 133 S. Ct. at 2631 (internal citation omitted) (emphasis added).

One case from the Supreme Court would be sufficient to rebut Defendants'

arguments, but obviously there are more. The *Shelby County* case is particularly

instructive for this Court in that it reversed and clearly rejected a D.C. Circuit Court of

Appeals opinion that was almost flippant in its approval of post-enactment evidence to

justify remedies for racial discrimination. *See Shelby County v. Holder*, 679 F. 3d 848,

877-878 (D.C. Cir. 2012) (overreaching to consider additional cases of alleged

discrimination in expert report that was completed after statute was reauthorized and that

was not included in legislative record) and *id.* at 880 ("we consider all probative record

evidence of recent discrimination"), *rev'd* 133 S. Ct. 2612 (2013).

It is obvious from the Supreme Court's holding in *Shelby County* that such post-enactment evidence is irrelevant and inadmissible to justify any remedy for identified discrimination, or else the Supreme Court's analysis would have gone beyond what Congress did. Instead, the Supreme Court's analysis began and ended with the evidence that was before Congress. *Shelby County*, 133 S. Ct. 2612, 2631 (2013) ("Congress could have updated the coverage formula at that time [in 2009], but did not do so. Its failure to act leaves us today with no choice"). That is an object lesson for this Court.

It is no answer to say that *Shelby County* addressed Congress' responsibilities for a purely remedial statute as opposed to a freestanding statutory racial classification like the one challenged in this case. *See* Doc #1 at 3-6 (Complaint) (defining section 8(a)'s racial classification). This Court knows that given the controlling Supreme Court precedent not only in *Shelby County* but in all of the other cases cited above, the law today is that Defendants' expert reports must be excluded. And it knows that the reason Defendants do not acknowledge this controlling precedent is because the record before Congress cannot support the outcome they seek in this case—thus, Defendants' deficient attempt to create out of whole cloth the post-enactment evidence of its experts' irrelevant reports to correct a practically-speaking non-existent Congressional record and to discriminate one citizen against another.

Here, the outcome-oriented position the Executive urges on the Judiciary is a direct attack on the Constitutional separation of powers. The Executive seeks to enlist the assistance of the Judiciary in order to make an end run around the record that Congress considered, to allow for a perpetual moving target of post-enactment evidence created by the Executive itself. That displaces Congress' constitutional responsibilities and makes

Congress unaccountable. It also perpetually obfuscates the statutory racial classification from meaningful Judicial review because the Executive's moving target of post-enactment evidence has no Congressionally approved benchmark.

That is why Defendants' blithe assertion that "post-enactment evidence allows *Congress and the court* to determine whether there continues to be a compelling interest" is utterly false, because there is no Congressionally approved benchmark for the Congress or the court to compare the Executive's post-enactment evidence to. *Cf.* Doc #48 at 11 (emphasis added). Rather, when post-enactment evidence is considered, the Judiciary abdicates and elevates the Executive over itself and Congress, making impermissible deference to the Executive an almost a *fait accompli. See Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 745 (2007) ("Such deference is fundamentally at odds with our equal protection jurisprudence.").

Defendants' assertion that they are entitled to use their experts to address narrow tailoring alone is also false, because it is simply another back door to the consideration of evidence that was never before Congress. *Cf.* Doc #48 at 12. When it enacted section 8(a)'s racial classification, Congress was required to narrowly tailor the statute to the evidence before it. *Shaw*, 517 U.S. at 915 ("Where, as here, we assume avoidance of § 2 liability to be a compelling state interest, we think that *the racial classification would have to realize that goal*; *the legislative action must, at a minimum*, remedy the anticipated violation or achieve compliance to *be narrowly tailored*."). Defendants have to know and had to have known this since the implementation of the 8(a) program and throughout the program's continued existence. Any argument contrary to the foregoing knowledge is disingenuous on all levels.

Indeed, the Supreme Court in *Shaw* directly rejected the argument that Executive actors could narrowly tailor a Legislative act with post-enactment evidence. *Shaw*, 517 U.S. at 917 (rejecting argument that legislative redistricting act is narrowly tailored "as long as racially polarized voting exists where the district is ultimately drawn" even if that is not the same location as the data that served as a "strong basis in evidence" and "compelling interest" for the redistricting act at the time of enactment.). The statute, on its face, cannot and does not become more or less narrowly tailored based on fluctuations in post-enactment evidence that the Executive collects solely for the purpose of defending litigation or any other purpose. Defendants do not, and have not ever purported to tailor section 8(a)'s racial classification on the basis of such post-enactment evidence, and, for good reason, since it is not possible to either justify or narrowly tailor a program by relying upon evidence which never existed at the time of program enactment.  ROTHE implores the Court to not permit them to do so now, in this litigation.

Defendants are left, then, to rely on lower court cases that yield to the Supreme Court precedent cited above, and therefore cannot prevent the exclusion of their experts.

Cases cited by Defendants that predate the Supreme Court's 1995 and 1996 decisions in *Adarand* and *Shaw* can be rejected out of hand. *Cf. Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992); *Coral Const. Co. v. King County*, 941 F.2d 910, 920 (9th Cir. 1991); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 1004 (3d Cir. 1993).

Similarly, *Engineering Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County*, 122 F.3d 895, 911-912 (11th Cir. 1997) and *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. 2000) both rely solely on circuit precedent that predates *Adarand* and *Shaw*.  More importantly, the Tenth Circuit's decision in *Slater* expressly states that the plaintiff in that case waived the objection. *Slater*, 228 F.3d 1147, 1173 n.14 ("the amici do not, and presumably cannot, cite the portion of the record where Adarand objected on that ground to the introduction of the studies via [post-enactment evidence]."). The Eleventh Circuit, for its part, was completely oblivious to and simply failed to acknowledge the foreclosure of post-enactment evidence by the Supreme Court's then-recent decisions in *Adarand* and *Shaw*. Instead, the Eleventh Circuit cited solely to the pre-1995 circuit precedent that *Adarand* and *Shaw* displaced. *Engineering Contractors,* 122 F.3d at 911.

That leaves only one other post-enactment evidence case that stands alone in contrast to the Supreme Court and Federal Circuit precedent that ROTHE has cited here and in its motion. That case, of course, is *Dynalantic Corp. v. Department of Defense*, 885 F.Supp.2d 237, 258 (D.D.C. 2012). The *Dynalantic* decision, which relies only on cases that ROTHE has distinguished above, takes the cynical approach that ROTHE has condemned and that Defendants are encouraging the Court to join in. That approach is to essentially say that the Supreme Court did not mean what it said in *Adarand* and *Shaw*, and hope that the outcome enabled by that result (consideration of Defendants' post-enactment evidence) can withstand Plaintiff's arguments on the merits and stand up long enough for the composition of the Supreme Court to change. The Defendants mock that realpolitik analysis and trash the real separation of powers concerns that ROTHE has

shown are present, but that is why their approach and that of the *Dynalantic* court is expedient, outcome-oriented politics, and not Supreme Court law.

*B. Defendants Cannot Avoid the Exclusion of Their Experts' Legal Conclusions*

It is, in fact true that in this Circuit, "an expert cannot testify as to whether 'discrimination' occurred." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F. 3d 1207, 1212 (D.C. Cir. 1997).

Defendants' response purports to stage a disagreement with this law, but it is just that, staged. *Cf.* Doc #48 at 9. Defendants never actually disagree with the prohibition against experts testifying as to whether "discrimination" occurred. *Id.* Instead, Defendants argue that Mr. Wainwright has done what the law allows *instead of* testifying as to whether "discrimination" occurred. *Id.*; *see also* Doc #45 at 3 (ROTHE's motion) (acknowledging this alternative).

However, neither he nor Mr. Rubinovitz has done what the law allows. Instead, Mr. Wainwright's conclusion that "these disparities therefore are consistent with the presence [of] discrimination" is an unqualified assertion that the disparity studies and the anecdotal data they contain constitute "identified discrimination" within the meaning of United States Constitutional law. *See Shaw*, 517 U.S. at 909; *City of Richmond v. J.A. Croson*, 488 U.S. at 499, 500, 505, 507 & 509. Mr. Wainwright's conclusion invokes the legal terminology and expressly asserts a conclusion as to what the legal standard is in order for Mr. Wainwright to compare his facts to it.

Similarly, Mr. Rubinovitz's similar legal conclusion, in his deposition testimony, expressly invokes the same legal terminology. Doc #45-4 at 94:3-10; *see also* Doc #45 at 12.

Therefore, exclusion of Mr. Wainwright and Mr. Rubinovitz's conclusions is required by the D.C. Circuit's decision in *Burkhart v. WMATA* and the Sixth Circuit case that it relied upon, which was *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). *Burkhart*, 112 F. 3d at 1212, *citing Torres*. The rule relied upon by both cases was that:

> The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate.

*Burkhart*, 112 F. 3d at 1212, *citing Torres*, 758 F.2d at 151.

The Sixth Circuit in *Torres* held that "the term 'discrimination' has a specialized meaning in the law and in lay use the term has a distinctly less precise meaning," and therefore excluded conclusions referencing that term while suggesting alternative conclusions *that did not use the term* "discrimination." *Torres*, 758 F.2d at 151 ("This type of question would directly address the factual issue of Dr. Malueg's intent *without implicating any legal terminology*.") (emphasis added).

Mr. Wainwright and Mr. Rubinovitz's conclusions invoke impermissible legal terminology by using the term "discrimination," which even more importantly, was used in their reports to focus on that key conclusion sought by Defendants for using that language in the first place.   For that reason, their reports must be excluded under controlling precedent.

C. *The Failure of the Disparity Studies to Use Consistent Criteria for Classifying and Grouping Industries is Fatal to the Reliability and Admissibility of Any Expert Report that Relies on Them*

The widely varying classification of industries and industry groups in the disparity studies relied on by Defendants precludes any expert from aggregating the results of the studies (or the expert's own calculations based on the findings of those studies) and making a collective finding or conclusion of their own. Doc #45 at 13-18.

The Defendants try to sweep this fatal problem under rug, alleging that this error "do[es] not, and cannot, call into [*sic*] to question the scientific validity of the Report as a whole." *Cf*. Doc #48 at 10. To the contrary, at least 27 of the 75 disparity studies relied upon by Mr. Wainwright that were allegedly before Congress, or ***36 percent***, use the old Standard Industrial Classification (SIC) code system or another industry classification system besides the North American Industry Classification System (NAICS).[1]  *Compare* Doc #45-1 at 29-40 (Wainwright Report Table 5) *with* **bold** in Footnote 1 to this Reply.

---

[1]      The relevant pages from those studies are attached in a single **Exhibit 1**, incorporated herein by reference and are as follows: (city/state/entity) (excerpt bates #) (first page of study bates #). The studies used SIC codes unless otherwise indicated.
Broward County, FL ROTHE011761-64 in 11765 (made up own classification system)
**Idaho DOT** ROTHE014117 in 13927 (used Dun & Bradstreet "D&B" codes)
Missouri ROTHE014565 in 14555
**Nevada DOT** ROTHE014730 in 14635 (used "D&B" codes)
**Phoenix** ROTHE018671-72 in 18445
**Alameda County, CA** ROTHE 018848-49 in 18779 (made up own classification system)
**California DOT** ROTHE019254 in 19148 (used "D&B" codes)
**Albany, GA** ROTHE020721 in 20591
Illinois ROTHE021007 in 21000
Prince George's County ROTHE021428 in 21291 (made up own)
Massachusetts ROTHE021959 in 21950
Essex, NJ ROTHE022716 in 22706 (mixed SIC and NAICS)
Missouri DOT ROTHE024704 in 24694
Denver ROTHE024786 in 24774
Illinois ROTHE025050 in 25043
Minnesota ROTHE025393 in 25380

In making the foregoing comparison, ROTHE was careful not to count disparity

studies twice even if they were listed in Mr. Wainwright's Table 5 more than once. *See*

---

Washington ROTHE025505 in 25492
**Tucson** ROTHE028323 in 28317
**Pima County, AZ** ROTHE028635 in 28629
NE Illinois RR ROTHE030046 in 30038
Illinois DOT ROTHE030542 in 30532
Kansas DOT ROTHE030628 in 30598 (made up own)
Maryland Aviation ROTHE031013 in 30999
Maryland Transit ROTHE031118 in 31104
Maryland Highway ROTHE031225 in 31211
**Baltimore** ROTHE031336 in 31316
**Bi-state Development Auth** ROTHE031973 in 31949
New Jersey ROTHE033236 in 33006
**North Carolina DOT** ROTHE034316 in 34043
Ohio ROTHE034648 in 34465 (made up own)
SE Penn. Transit Auth. ROTHE034795 in 34790
**Columbia, SC** ROTHE035321 in 35151
**Tenn. DOT** ROTHE036636 in 36600 (made up own)
**Dallas** ROTHE037080 in 37008
**Virginia** ROTHE038466-67 in 38366
**Wash. Suburban Sanitary (MD)** ROTHE038889 in 38852
**SoCal Regional Rail** ROTHE052639 in 52079 (used "D&B" codes)
**San Diego Metro Transit System** ROTHE053399 in 52835 (used D&B codes)
**Orange County Transp. Auth.** ROTHE054159 in 53592 (used D&B codes)
**San Diego Ass'n of Govts** ROTHE054916 in 54353 (used D&B codes)
**Oklahoma DOT** ROTHE055388-89 in 55103 (used D&B codes)
**Georgia DOT** ROTHE056856-57 in 56552 (used D&B codes)
**Milwaukee** ROTHE057124-26 in 57069
**Portland, OR** ROTHE057559-62 & 57569 in 57261 (used D&B codes)
**LA County MTA** ROTHE059011 in 58434 (used D&B codes)
**Illinois Tollway** ROTHE061249 in 61237
**Boston** ROTHE061500-01 in 61366
**Mass. Div of Capital Asset Mgmt** ROTHE061517 in 61502
**Mass. Housing Finance Agency** ROTHE061798 in 61783
**Tallahassee** ROTHE064465 in 64182
Dallas Transit ROTHE065536-37 in 65438
**State of Texas** ROTHE065810 in 65667 (various systems)
**Indiana Agencies and Univ**. ROTHE069573-82 in 69405
**Portland Dev. Comm'n** ROTHE070780-83 in 70505
Atlanta ROTHE072910 in 72817
For several other studies, it was impossible to determine what industry classification was
used because the study itself does not say. *E.g*., Greater Cleveland RTA, ROTHE074522.

Doc #45-1 at 27 (Wainwright report at 22) (explaining why a study may be listed in Table 5 more than once).

When *36 percent*, or more than a third, of the studies that Mr. Wainwright based his calculations on use a completely different industry classification system that puts the same industries in different categories (such as construction versus professional services), that by definition creates the very collective conclusion problem that ROTHE identified in its motion. Doc #45 at 13-15.

Further, the same discrepancy is also present in at least 6 of the disparity studies relied upon by Mr. Wainwright that Defendants admit were not before Congress and which Mr. Wainwright chose himself. *Compare* Doc #45-1 at 29-40 (Wainwright Report Table 5, reports marked with asterisks) *with* **bold** in Footnote 1 to this Reply.

The problem is that the classification of industries is not the same across the disparity studies. As ROTHE showed by example in its motion, different classification systems put the same industries into vastly different categories.[2]  Doc #45 at 13-15. Mr. Wainwright, when he made his calculation in his report, assumed that all of the industries in the three general categories that he chose to calculate results in (construction [CON], construction professional services [CPS], and other professional services [OPS]) were the same. Doc #45-1 at 22-24 (Wainwright Report pgs 17-19). The evidence ROTHE has presented in **Exhibit 1** in rebuttal to Defendants' effort to sweep this issue under the rug proves they were not the same, and that what Mr. Wainwright was calculating in each

---

[2]      Further, some industries are omitted in one classification system but not in another. Some classification systems are more general and some are more detailed. *See* **Exhibit 1** and Doc #45 at 14 n.5 (citing SIC to NAICS concordances website).

general category was not even remotely based on a common set of industries from study to study.

Further, ROTHE is correct that the example it gave is one of "literally hundreds of examples." Doc #45 at 13. For all of the studies cited in Footnote 1, *supra*, and excerpted in **Exhibit 1**, there are dozens of industries that are classified differently than under the NAICS. The Court would have to visit the NAICS concordances website cited in ROTHE's motion if it wanted a rough count of how many differences there are between the SIC code system and the NAICS code system, for instance. *See* Doc #45 at 14 n.5. An exact count is complicated here by the fact that some of the disparity studies omit any industry by industry list of how industries were classified, while other studies consign it to a voluminous appendix that Defendants have not produced.

ROTHE's example, in its motion, however, is more than sufficient to raise a preliminary question as to admissibility of Mr. Wainwright's testimony under Fed. R. Evid. 104. The fact that ***36 percent*** of the disparity studies allegedly before Congress classify the same industries completely differently is not only a real problem for Defendants and Mr. Wainwright, it is dispositive against Defendants, both on the issue of the admissibility of his testimony and on the merits.

This is not a matter of weight. The discrepancy is apparent on the face of the proposed testimony and on the face of the underlying reports themselves. The factfinder is being asked to admit into evidence and/or make a collective finding that the studies themselves prevent. The example ROTHE cited in its motion was that painters are classified as Construction by one study and as Professional Services in a second. Doc #45 at 13-14. A statistically significant disparity for Construction in both studies cannot

reliably support an inference that painters were subject to a statistically significant disparity in the second market. Moreover, even if there is a statistically significant disparity for Professional Services in the second study, no collective inference can be made for all of the markets and industries where there is no corresponding evidence, which is a key inference Defendants must justify to save section 8(a)'s across-the-board, nationwide racial classification. Accordingly, the Court has a duty to exclude Mr. Wainwright's report.

There can be no strong statistical basis to enact a statutory racial classification that applies to all industries on a nationwide basis if the statistical predicate (the disparity studies allegedly before Congress) places the same industries in different categories and then reports statistical results based on those categories. If we were so fortunate as to have disparity studies produced that actually reported statistics on a consistent industry by industry basis for specific individual industries, instead of just categories of industries, the categorization of industries would not matter.[3] But here, the disparity studies that Mr. Wainwright based his report on, and those subset of studies which were allegedly before Congress, report statistics in highly generalized construction [CON], construction professional services [CPS], and other professional services [OPS] categories. *See* Doc

---

[3]     We do not have such studies by virtue of a choice by the disparity study industry not to include such data in the body of the studies produced, chiefly because it would undercut the illegal, across-the-board nature of existing racial classifications in procurement statutes and ordinances, and restrict the racial classification to fewer industries. The *Dynalantic* case, which enjoined section 8(a)'s racial classification with respect to the plaintiff's specific industry, because of a lack of sufficient statistical evidence to support the enactment of a racial classification for federal procurement in that specific industry, is the preeminent example of the result that would occur if the studies reported individualized industry data. *Dynalantic*, 885 F. Supp. 2d 237, 280-283 (D.D.C. 2012).

#45-1 at 29-40 (Wainwright Report Table 5). Here, it does matter, because conclusions must be drawn separately for each industry classification system that was used.

The arbitrary classification and grouping of industries by the disparity studies underscores the unreliable, standardless nature of the entire disparity study enterprise. Further, it taints the reliability of Mr. Wainwright's findings completely, because his collective findings rely on *all* of the studies that he calculated results from. Thus, his overall results cannot be disaggregated into a reliable component (or, at least in his report's present form, a NAICS only component or a NAICS and SIC and Other component), and therefore they are wholly inadmissible.

## II. CONCLUSION AND RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Plaintiff ROTHE DEVELOPMENT, INC. requests that the Court GRANT its Motion to Exclude or Limit Testimony of Defendants' Experts (Doc #45). In the alternative, the Court should GRANT IN PART the Motion and limit the testimony of Defendants' Experts where it is found to be inadmissible under Fed. R. Evid. 401, 402, or 702.

Dated February 21, 2014.                              Respectfully submitted,

/s/ David F. Barton
David F. Barton
District Court Bar No. TX0096
Texas Bar No. 01853300
**GARDNER LAW**
745 E. Mulberry Avenue, Suite 500
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
Email: dfbarton@gardner.sa.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing and all attachments and exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure, on this 21st day of February 2014, to all parties, by electronic filing (CM/ECF), as follows:

Andrew G. Braniff                                    *VIA CM/ECF*
Patricia L. Stasco
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
*Attorneys for Defendants*

                                                    /s/ David F. Barton
                                                    David F. Barton

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

                                            )
ROTHE DEVELOPMENT, INC.,                    )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )          Civil Action No. 1:12-cv-00744-KBJ
                                            )
DEPARTMENT OF DEFENSE                       )
                                            )
and                                         )
                                            )
SMALL BUSINESS ADMINISTRATION,              )
                                            )
            Defendants.                     )
_____)

**REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS**
**IN LIMINE TO EXCLUDE THE TESTIMONY AND OPINIONS**
**OF DALE PATENAUDE AND JOHN SULLIVAN**

This Court should exclude the expert reports and testimony of Plaintiff Rothe

Development Inc.'s designated "experts," Dale Patenaude and John Sullivan.  Plaintiff's

Response essentially concedes that its experts could not qualify as experts by "knowledge, skill,

experience, training or education."  FRE 702.  In addition, Plaintiff fails to establish the expert

testimony will be: (1) sufficiently reliable, and (2) will "assist the trier of fact to understand the

evidence or to determine a fact in issue."  *Id.; see also Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579, 592 (1993); *U.S. v. Law*, 528 F.3d 888, 912 (D.C. Cir. 2008); *Ambrosini v.*

*Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996); *Parsi v. Daioleslam*, 852 F.Supp.2d 82, 85

(D.D.C. 2012).

Plaintiff appears to concede in its response that Mr. Patenaude cannot qualify as an expert

witness and instead argues that Mr. Patenaude could appropriately testify to this Court as a lay

witness.  *See Pl.'s Response to Def.'s Mot. In Limine,* Dkt. Entry No. 49, at 4-9.  Plaintiff is

correct to the extent that Mr. Patenaude, the Vice President of Rothe Development Inc.,

possesses factual knowledge about that company and can testify regarding those facts.  However,

facts concerning Rothe as a company are irrelevant to Defendants' motion to exclude Mr.

Patenaude's opinions as to Dr. Rubinovitz's report and testimony.  Plaintiff has not established

that Mr. Patenaude could provide reliable testimony on this highly technical subject and thus his

testimony concerning Dr. Rubinovitz's reports should be excluded.

Plaintiff responds to Defendants' motion to exclude Mr. Sullivan's expert report and

testimony by conceding that Mr. Sullivan does not possess the scientific or technical knowledge

to comment on the quantitative aspects of Dr. Wainwright's report.  Plaintiff argues, however,

that Mr. Sullivan is qualified to make qualitative critiques of Dr. Wainwright's report based on

his possession of "other specialized knowledge."  *See Pl.'s Response to Def.'s Mot. In Limine,*

Dkt. Entry No. 49, at 11 (citing Fed. R. Evid. 702).  Specifically, Plaintiff states that by

"reviewing and studying disparity studies . . . Mr. Sullivan has acquired the necessary

'specialized knowledge' to critique the deficiencies of the disparity studies underlying the

Wainwright report."  *Id.* at 13.  Mr. Sullivan's knowledge, however, is insufficient to qualify Mr.

Sullivan to provide expert testimony.  Mr. Sullivan admitted has not been the primary consultant

on any of the disparity projects he lists on his curriculum vitae.  *See Def.'s Mot. In Limine to*

*Exclude Sullivan,* Dkt. Entry 46 at Ex. H, Sullivan CV at 1("Sullivan CV');  *See also id.* at Ex.

G, Sullivan Dep. at 12:1-13:5, 14:21-22, 15:1-16, 16:12-21, 17:9-13, 17:14-22, 18:22-19:10

("Sullivan Dep.").   He testified that he did not collect data for the majority of the work and that

two of his five disparity study projects involved no substantive work.  *Id.* When questioned about

the statistical work performed on one of these projects, Mr. Sullivan testified that his work

2

consisted of adding and dividing numbers only.  *See* Sullivan Dep. at 20:20-21:17.  Finally, the

most recent disparity study "activity" listed on Mr. Sullivan's curriculum vitae concluded 13

years ago.  *See* Sullivan CV at 1.

Moreover, even if Mr. Sullivan's "specialized knowledge" on disparity studies could

qualify him as an expert on those reports, his testimony is nevertheless unreliable.  *Daubert* lists

several non-exhaustive factors that may be considered in assessing the reliability of an expert's

opinion.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).  These factors include

whether the expert's opinion is well accepted in the relevant community.  *Daubert*, 509 U.S. at

594; *see also McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir.2004) (affirming district

court's exclusion of expert whose theory lacked "testing, peer review, a potential error rate, and

general acceptance.").  Mr. Sullivan utterly fails this test with regard to disparity studies.  As

noted in Defendants' initial brief, Mr. Sullivan's methodology is out of the mainstream of what

is accepted in the field, is only acceptable to him and his business partner, and thus, is unreliable.

*See Defs. Motion in Limine to Exclude Sullivan,* at 19-20.  In contrast, Dr. Wainwright's

methodology is well tested, and courts in several jurisdictions have accepted it.  *See, e.g.,*

*Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950 (10th Cir. 2003)

(upholding a race-based contracting program based in part on Dr. Wainwright's NERA study);

*Northern Contracting, Inc. v. Illinois*, 473 F.3d 715 (7th Cir. 2007) (upholding a race-based

contracting program based in part on Dr. Wainwright's NERA study).

Expert testimony must also be "properly grounded, well-reasoned and not speculative

before it can be admitted.'"  *Estate of Gaither v. District of Columbi*a, 831 F.Supp.2d 56, 62

(D.D.C.2011) (quoting F.R.E. 702 Advisory Committee Notes (2000 amends.)).  Mr. Sullivan's

testimony fails at this level of review as well.  He incorrectly stated, after he reviewed and

studied the Wainwright Report, that Dr. Wainwright's report incorrectly used data that included white women owned businesses in calculating availability of minority owned businesses. *See* Sullivan Dep. at 39:1-13. He later retracted this claim. *Id.* Moreover, he merely read and reviewed the disparity studies underlying the Wainwright report; he did not analyze their contents. For example, when asked if he recalculated any of the disparity indexes in the studies using the numbers he believed would be more accurate, he admitted he did not. *Id.* at 49:11-18, 50:7-13, 69:22-70:9. In fact, he admitted that except for two studies, *he did not even examine the data used in the studie*s. *Id.* Mr. Sullivan's expert testimony on the underlying disparity studies is speculative, ungrounded and therefore, does not meet the *Daubert* standard.

Furthermore, Mr. Sullivan does not limit his expert testimony in this matter to the underlying disparity studies used in the Wainwright report. *See Def.'s Mot. In Limine to Exclude Sullivan,* Dkt. Entry 46 at Ex. F, Sullivan Report ("Sullivan Report"). Instead he additionally opines regarding the population statistics Dr. Wainwright analyzed from the U.S. Census, *see* Sullivan Report at 5-6, the Census Bureau's geographic divisions, *id.* at 7-8, the Survey of Business Owner's data, *id.* at 10-11, and the Section 8(a) Business Program. *See id.* at 6-21. He also offers expert opinions on the regression analyses performed by Dr. Wainwright on the American Community Survey business owners and earning statistics. S*ee id.* at 37-39. Finally, and without any mention of disparity studies, he opines on Dr. Rubinovitz's report. *Id.* at 45-46. None of these topics of expert testimony are related to the underlying disparity studies used by Dr. Wainwright to arrive at his opinions, which is Mr. Sullivan's supposed area of expertise, and thus should all be excluded.

Neither Mr. Sullivan nor Mr. Patenaude's testimony meets the requirement of FRE 702, and thus the Court should exclude both of their expert reports and testimony.  Neither expert possesses the education or experience to qualify him to opine on Defendants' reports supporting the use of the SBA's 8(a) program.  Their expert reports and testimony, which are inherently unreliable, should be excluded.

Date:  February 21, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
PATRICIA L. STASCO
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

A000265

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of Reply to the Response to Defendant's Motions to Exclude Dale Patenaude's  and John Sullivan's Reports and Testimony, was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on February 21, 2014:

>David F. Barton
>Gardner Law
>745 East Mulberry Avenue
>Suite 500
>San Antonio, Texas  78212

>/s/Andrew G. Braniff
>Andrew G. Braniff
>Senior Trial Attorney
>U.S. Department of Justice
>Civil Rights Division, Employment Litigation Section
>950 Pennsylvania Avenue, NW
>Patrick Henry Building, Room 4030
>Washington, D.C.  20530
>Telephone:  202.514.9229
>Facsimile:  202.514.1005
>Andrew.Braniff@usdoj.gov

A000267

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
ROTHE DEVELOPMENT, INC.,                )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        Civil Action No. 1:12-cv-00744-KBJ
                                        )
DEPARTMENT OF DEFENSE                   )
                                        )
and                                     )
                                        )
SMALL BUSINESS ADMINISTRATION,          )
                                        )
                Defendants.             )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE THE REPORTS AND TESTIMONY
OF PLAINTIFF'S EXPERT DALE PATENAUDE**

# EXHIBIT G: PATENAUDE DEPOSITION

Transcript of the Testimony of
# Dale Patenaude

### Date:
November 21, 2013

### Case:
Rothe Development, Inc. v. Department of Defense, et al

Kim Tindall and Associates, LLC
Phone: 210-697-3400
Fax: 210-697-3408
Email: ktindall@ktanda.com
Internet: www.kimtindallandassociates.com

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ROTHE DEVELOPMENT, INC.,      )
                              )
        Plaintiff(s),         )
                              )
VS.                           )NO. 12-CV-744-KBJ
                              )
DEPARTMENT OF DEFENSE and     )
SMALL BUSINESS                )
ADMINISTRATION,               )
                              )
        Defendant(s).         )


    ****************************************************

                ORAL DEPOSITION OF

                 DALE PATENAUDE

                NOVEMBER 21, 2013

    ****************************************************


         ORAL DEPOSITION of DALE PATENAUDE, produced as a

witness at the instance of the Defendant, Department of

Defense, and duly sworn, was taken in the above-styled and

numbered cause on the 21st day of November, 2013, from

9:15 a.m. to 2:01 p.m., before Barbara Kay Griffin, CSR in

and for the State of Texas, reported by machine shorthand,

at the Law Offices of GARDNER LAW, 745 E. Mulberry, Suite

500, San Antonio, Texas  78212, pursuant to the Federal

Rules of Civil Procedure and the provisions stated on the

record or attached hereto.

Electronically signed by Barbara Griffin (301-176-817-0609)                2e97a725-ee14-4199-bec5-62df23e28d12

## Page 2

```
 1         A P P E A R A N C E S
 2
    FOR THE PLAINTIFF(S):
 3
        David Barton
 4      Elizabeth Haws Connally
        GARDNER LAW
 5      745 E. Mulberry, Suite 500
        San Antonio, Texas 78212
 6
    FOR THE DEFENDANT(S), DEPARTMENT OF DEFENSE:
 7
        Andrew G. Braniff
 8      U.S. DEPARTMENT of JUSTICE
        Senior Trial Attorney
 9      Employment Litigation Division
        950 Pennsylvania Avenue, NW
10      Room 4920
        Washington, DC  20530
11
    FOR THE DEFENDANT(S), SMALL BUSINESS ADMINISTRATION:
12
        David A. Fishman
13      U.S. SMALL BUSINESS ADMINISTRATION
        Chief Counsel for Special Litigation
14      409 Third Street, S.W.
        Washington, DC  20416
15
16              * * * * * *
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1           I N D E X
 2
                    PAGE
 3
    Appearances ............................. 2
 4
    DALE PATENAUDE
 5
        Examination by Mr. Braniff ........................ 5
 6      Examination by Mr. Barton ........................ 136
        Examination by Mr. Braniff .................... 158
 7      Examination by Mr. Barton ........................ 166
 8  Changes and Signature ................................ 168
 9  Reporter's Certificate ................................ 170
10
11           E X H I B I T S
12
                    PAGE
13  NO. DESCRIPTION
14   1  Expert Report of Dale Patenaude ................... 8
15   2  Supplemental Expert Report of Dale Patenaude ...... 8
16   3  Resume of Dale Patenaude ......................... 12
17   4  Witness' Notes .................................. 32
18   5  Expert Report of Robert Rubinovitz ............... 57
19   6  Principal NAICS Code Used in the 8a Program ....... 136
20   7  SBD Documents ..................................... 136
21   8  Table 770 - Minority-Owned Firms by Kind of
        Business for 2007 ................................. 136
22
23
24
25
```

## Page 4

```
 1               DALE PATENAUDE,
 2  having been first duly sworn, testified as follows:
 3               MR. BRANIFF:  For the record, this is the
 4  deposition of Dale Patenaude in the case of Rothe v.
 5  Department of Defense, in the United States District Court.
 6  My name is Andrew Braniff.  I work for the Department of
 7  Justice.  I'm here with David Fishman, with the Small
 8  Business Administration.  This deposition is being taken
 9  pursuant to the Federal Rules of Civil Procedure.
10  Objections except as to form and privilege are reserved.
11  And, counsel, do you want to reserve the right to sign for
12  your client?
13               MR. BARTON:  No, I'll let him sign it.  He's
14  going to have to read it anyway.
15               MR. BRANIFF:  Before we start here, I just
16  want to say a few things just because this is somewhat odd.
17  Because you are also the client as well as the expert here,
18  I'm going to avoid many questions that are asked of experts
19  and that your counsel asked of our experts yesterday
20  concerning communications with the attorney and stuff.  I
21  just don't want to wade into any of those sticky issues.  If
22  at any time you feel as if my question might be requesting
23  for you to avoid your attorney-client privilege here, please
24  pause and give your counsel a chance to respond just because
25  there are multiple privilege issues in play here that aren't
```

## Page 5

```
 1  normal.
 2               THE WITNESS:  Okay.  I understand.  I think I
 3  understand.
 4               MR. BRANIFF:  Secondly, before we go through
 5  these questions, I just want to say I'm doing this with all
 6  full respect for your history and your business.  You have
 7  been in this business as long as I've been alive, and none
 8  of these questions are meant to insult or in any way
 9  disrespect your experience in this case.  Your report in
10  this case is somewhat of a challenge to the status quo of
11  expert reports and district courts.  Some of these questions
12  might seem odd, obtuse or strange to you.  Once again,
13  they're not meant without -- with any lack of respect for
14  you or your accomplishments or your business.  I know it's
15  tough to run a business.  I know you -- it's because you
16  brought this case you personally feel challenged by these
17  statutes, feel that you have been injured by the program
18  here.  And so I'm not here deposing you in that respect but
19  just as your expert qualifications and the reports that you
20  turned in.
21               THE WITNESS:  Okay.  I think I got it.
22               EXAMINATION
23  BY MR. BRANIFF:
24      Q.  Could you state your whole name for the record?
25      A.  Dale Craig Patenaude.
```

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 6

1    Q.  And what is your current address?
2    A.  13311 Serenity Lane, San Antonio, Texas, 78232.
3    Q.  And are you represented by counsel here today?
4    A.  Yes.
5    Q.  And is he here?
6    A.  Yes.
7    Q.  Are you on any medications that might affect your
8    ability to give complete and accurate testimony?
9    A.  No.
10   Q.  Are there any other reasons that might affect your
11   ability to give complete and accurate testimony?
12   A.  No.
13   Q.  Have you been deposed before?
14   A.  Yes.
15   Q.  Have you been deposed before as an expert witness?
16   A.  Yes.
17   Q.  In what case were you deposed as an expert witness?
18   A.  One of the Rothe -- one of the earlier versions of
19   Rothe.  I'm not sure.
20       THE WITNESS:  David, you might be able to tell
21   them better than me.
22   A.  Rothe one or Rothe two, three or four.  One of
23   those.
24   Q.  (BY MR. BRANIFF) Did you submit a report in that
25   case?

Page 7

1    A.  Yes.
2    Q.  Do you remember approximately the time -- was it
3    before or after 2000 do you think that was?
4    A.  Well, our first cases started in -- around '98,
5    '99.  So it was -- it was around 2000.  I'm not -- I don't
6    remember before or after.  I believe.  That's -- I don't
7    have a real solid memory of that.  It wasn't the most
8    pleasant situation in the world, so --
9    Q.  And have you been deposed in your personal capacity
10   before?
11   A.  What does that mean?
12   Q.  Have you been deposed not as an expert but as a
13   fact witness?
14   A.  Yes.
15   Q.  Was that also in the Rothe case?
16   A.  The -- it seemed to me that -- that the -- I -- I
17   -- I really -- I know they deposed my wife in the initial
18   part of the -- the Rothe case, and they -- and I believe
19   they deposed me for the purpose of determining whether or
20   not we were actually a small business and whether or not we
21   fit the criteria to file suit.  You know, it was one of
22   those -- those situations.  If that's a fact case, yes.  And
23   I've been deposed on -- on one other time associated with a
24   case -- with a suit against our company.
25   Q.  Did that suit have any relevance to the 8(a)

Page 8

1    contracting program?
2    A.  No.
3    Q.  Do you have any questions for me about the
4    deposition?
5    A.  I don't think so.
6    Q.  Okay.  Did you prepare an expert report for this
7    matter?
8    A.  Yes.
9    Q.  Is this the report?
10   A.  Yes.
11       MR. BRANIFF:  Could we have this marked as
12   Exhibit 1?
13       (Exhibit 1 marked.)
14   Q.  (BY MR. BRANIFF) Did you prepare a supplement to
15   that report?
16   A.  Yes.
17   Q.  Is this that supplement?
18   A.  Yes.
19       MR. BRANIFF:  Could we have this marked as
20   Exhibit 2?
21       (Exhibit 2 marked.)
22   Q.  (BY MR. BRANIFF) Earlier today I was given this
23   document marked RDI 000171.  Do you recognize this?
24   A.  Yes.  That's my resume.
25   Q.  Okay.  And can you confirm that I was given that

Page 9

1    today?
2    A.  Yes, because I gave it to you.
3    Q.  Did you write down -- list on your resume your
4    previous expert report that you submitted?
5    A.  I don't know.  Let me see.  I don't think I did.
6    Q.  Okay.
7        MR. BARTON:  Just to interject, I didn't
8    remember he did one or I would have included it in the
9    documents as -- it's in the Rothe case.  Do you want that?
10       MR. BRANIFF:  Not a problem.  But if we could
11   get a copy of his previous report, that would be -- that
12   would be helpful.
13   A.  That -- that case went on for so long it's very
14   difficult to remember exactly what you did back in 2000.
15   Q.  (BY MR. BRANIFF) Do you remember the -- the topics
16   of that report?  Did it involve -- what aspects of the case
17   it involved?
18   A.  Well, the whole case was about the PEA, price
19   evaluation adjustment.  So the numbers were about -- you
20   know, similar to what this was.  It was about numbers of --
21   I believe that what we wrote was about the numbers of
22   minorities and the amount of business they got and the --
23   you know, how the PDA worked and how it helped people and --
24   and I believe that there were a number of -- there may have
25   been some affidavits.  And I don't know whether that

3  (Pages 6 to 9)

Electronically signed by Barbara Griffin (301-176-817-0609)                2e97a725-ee14-4199-bec5-62df23e28d12

Page 10

1    everything I did was -- whether I did an expert report or an
2    affidavit.  Honestly at this point, I don't remember.  It's
3    so long ago.  But, you know, doing the -- doing the -- doing
4    the ongoing trial, the whole program -- the PDA program is
5    supposed to be just stopped.  It wasn't supposed to go on
6    basically because every year the -- you know, it wasn't
7    supposed to work if the government had more than 5 percent
8    worth of business to SDB, and they did every year.  And --
9    but the things kept showing up.  They kept doing them.  We
10   kept finding them.  And we report that.
11       Q.  Do you recall if any other expert reports were
12   submitted on your behalf in the Rothe case?
13       A.  I don't, but David should have whatever we
14   submitted.
15       Q.  Do you recall participating in any discussions of
16   whether or not to hire an expert in that previous Rothe
17   case?
18       A.  I believe we hired experts in the Rothe case I
19   believe.  George Leneaux.
20       Q.  And you've hired an expert in this case as well; is
21   that correct?
22       A.  Yes.
23       Q.  And who is that?
24       A.  Sullivan.  I don't remember his first name.
25           MR. BARTON:  I'd like to interject something

Page 11

1    else, and I think this is appropriate.  When you can't think
2    of something, you don't need to look at me.  Just like we
3    had the conversation with the guy yesterday.  And also
4    whatever I can say makes no difference at all.  It's only
5    what you say.  So just -- as you remember what you remember.
6           THE WITNESS:  Right.  Okay.
7           MR. BARTON:  Is that okay with y'all?
8           MR. BRANIFF:  Yeah.
9           MR. BARTON:  No objection?
10          MR. FISHMAN:  That's fine.
11       Q.  (BY MR. BRANIFF) Have you read Sullivan's report in
12   this case?
13       A.  Yes.
14       Q.  Do you have an opinion as an expert on Sullivan's
15   report?
16       A.  I liked it.  I thought it was a good report.
17       Q.  Could you have replicated it yourself?
18       A.  Some of the finer points that he did I didn't -- I
19   would not have seen as readily.  I -- I don't concentrate on
20   some of the same efforts that he does.  I have a tendency to
21   concentrate on whether -- the absolute numbers.  He has a
22   tendency to more concentrate on social science.
23       Q.  With regard to some of the math that Mr. Sullivan
24   performed in his report, could you have replicated that?
25       A.  I think so.

Page 12

1        Q.  Was there anything that he did in his report that
2    would have been beyond your ability to do?
3        A.  I don't think so.  I didn't study all of his
4    mathematics in detail.  So I don't believe there is anything
5    in there that I couldn't do, but I didn't really study it
6    all thoroughly.
7        Q.  So let's start with your education here.  You state
8    on your resume here that you hold a Bachelor of Science
9    degree in electrical engineering from the University of
10   Texas at Austin?
11       A.  Yes.
12       Q.  When did you graduate?
13       A.  '71.
14           MR. BRANIFF:  Let's go ahead and mark this as
15   Exhibit 3.
16           (Exhibit 3 marked.)
17       Q.  (BY MR. BRANIFF) Do you remember if you took any
18   courses in economics at the University of Texas at Austin?
19       A.  No.
20       Q.  You don't remember or you did not?
21       A.  I did not take any courses in economics.
22       Q.  Do you remember if you took any courses in
23   statistics?
24       A.  I took a statistical thermodynamics, and I took two
25   years of calculus and differential equations -- courses in

Page 13

1    differential equations.  And all of those were prerequisite
2    by -- you know, enough mathematics if you were getting an
3    arts and science degree.
4        Q.  Do you recall if you took Fourier transforms?
5        A.  They were in I think the differential equations
6    course.  I'm not sure whether they were -- Fourier
7    transforms is one of the things that we used a great deal in
8    electrical engineering.
9        Q.  While you were at University of Texas at Austin, do
10   you know if you published any articles that appeared in peer
11   reviewed journals?
12       A.  I -- I published a paper when I was a senior in --
13   that was in the IEEE -- in the Institute of Electrical and
14   Electronics Engineers document on a senior project we did.
15   I don't have any idea if I can find it, but I published one.
16   We developed a particular -- we did a project, and we
17   developed a novel approach to a different problem than we
18   had, and we went to a paper contest and we won -- and we won
19   several levels of paper contest.
20       Q.  Congratulations.  Subsequent to your graduation,
21   what was your next step in your career?
22       A.  For a short while, we attempted to market the
23   device that I had come up -- come up with in college.  And I
24   went and talked to several people like Hewlett Packard and
25   some other people.  It was a differential amplifier.  It was

4  (Pages 10 to 13)

Electronically signed by Barbara Griffin (301-176-817-0609)                        2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                          November 21, 2013

Page 14

1    -- I exceeded the -- I had -- we had developed a
2    differential amplifier for Schlumberger Well Services, and
3    they needed -- they needed one for a very specific problem
4    that had what's called a high common mode rejection ratio,
5    which is looking at -- you're looking at two -- two things
6    that are of the same height, and you're looking at very
7    minor differences between the two, and the common mode is
8    this thing.  And we were looking at parts per million
9    difference between two samples that were coming up from --
10   from well logging, which is you drill a long cable a couple
11   miles into the ground, and it picks up all of the 60 Hertz
12   signals.  And 60 Hertz is your normal electric lines and so
13   forth.  It picks up all that.  You're looking for very small
14   differences between the two.  And all or some of the people
15   are very impressed.  It was -- they decided that my method
16   of approach was not going to be easy to manufacture.
17        Q.   And following that, did --
18        A.   I went to work for Rothe Development.
19        Q.   That was in 1972?
20        A.   I don't remember.  I -- I almost have to go back
21   and look and see if it's in '71 or first part of '72.
22        Q.   You worked for them as an electrical engineer?
23        A.   As an electrical engineer and as manager of service
24   contracts.  I basically -- when I joined the company, there
25   were three of us, and I built the company up from scratch.

Page 15

1        Q.   In your affidavits that you've submitted as part of
2    this case, you've detailed some of the businesses that --
3    that Rothe -- the various Rothe companies worked in.  Did
4    you personally draft those affidavits?
5        A.   Uh-huh.
6        Q.   Has anything changed since you've drafted those
7    affidavits that would change the facts or anything that was
8    included in that?
9        A.   Not that I know of.  We haven't started any new
10   companies or anything in the last several months.
11       Q.   Since the IEEE article, have you written in any
12   other peer review journal articles?
13       A.   No.
14       Q.   Have you ever written an article on economics that
15   appeared in any peer reviewed --
16       A.   No.
17       Q.   -- journal or non-peer reviewed journal for that
18   matter?
19       A.   No.
20       Q.   Have you ever written an article for a newspaper or
21   an online journal or magazine?
22       A.   No.
23       Q.   Not -- not involved with economics but on any
24   topic?
25       A.   No.

Page 16

1        Q.   Have you ever spoken at an event where you were
2    recognized as an expert on economics or econometrics?
3        A.   No.
4        Q.   Can you explain for the record how statistical
5    significance is computed?
6        A.   I can't really explain that.
7        Q.   When you see statistical significance included in
8    some of the expert reports in this case, what -- what does
9    it mean to you?
10       A.   It means that they had enough data in the -- in
11   their background data, there was enough data to be able to
12   come to the results that they came to, that there was -- you
13   know, you can't -- you can't have statistical significance
14   if you have too few -- if you're dealing with contracts, for
15   instance, you need -- you need a large group of contracts to
16   be able to have statistical significance.  And if you have
17   very few contracts or very few items in your database -- in
18   your -- what you're calculating with, it's very difficult.
19   Some -- many of the -- many of these disparity reports that
20   Wainwright quotes has real problems with physical
21   significance because although they're dealing with, say, the
22   -- you know, you're dealing with the city, the still really
23   doesn't have that many large volume of contracts.  They just
24   have a few.  And -- and I know, for instance, in the City of
25   San Antonio we appear -- Rothe Development appears three or

Page 17

1    four times in the City of San Antonio as a vendor because
2    we're a vendor to -- we're a vendor to the water people, to
3    the electric companies, to the police department for
4    calibration.  Okay.  But there is only one calibration
5    vendor in San Antonio that they use and that's us.  So you
6    -- it's very difficult to come up with some statistical
7    significance about whether or not there is discrimination in
8    the calibration business in San Antonio because there is one
9    person -- there is three contracts or four contracts but
10   they're basically all with the same person and they're all
11   -- just because these different entities have different
12   kinds of money to spend, so they have to have different --
13   you know, different vehicles to spend their money.  So in
14   the cities -- in the cities -- in many of the cities, that's
15   the same situation.  How many contracts does the city need
16   for -- for garbage collection, say, or how many do they
17   need -- how many different contracts do they need for
18   someone who fills holes in the street or fixes light posts
19   that fall down?  You don't need that many contracts, so it
20   becomes very difficult to look at something like that and
21   say I have a enough data to make it statistically
22   significant.
23       Q.   Have you -- of the reports you mentioned that
24   Dr. Wainwright cited to you that have problems with
25   statistical significance, have you attempted to recalculate

5  (Pages 14 to 17)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 18

1    any of the statistical significant findings in those
2    reports?
3        A.   No, I haven't but -- but you -- when you talk about
4    Wainwright's reports, I -- I was frustrated yesterday.  I
5    was frustrated because he -- he went -- he made numerous
6    false statements about his reports.  He said -- he said that
7    all of his reports -- he said that all of his reports are
8    done at six digits and they have disparity available at six
9    digits and disparity at six digits.  And most of these other
10   reports have -- you know, have four or five digits at least
11   in them and they don't.  Okay.  They really don't.  I have
12   studied every one of his reports.  In fact, as it showed up
13   from -- in fact, I think I've probably done more work
14   looking at the details of those reports than he has.  And
15   certainly more -- more work than any of the other people
16   involved with this case.  I spent -- I spent probably 100
17   hours or 150 hours looking through when we first got those
18   reports -- looking through them in detail, and I made a
19   detailed list of data for that, which was given to David and
20   forwarded on to Sullivan, which Sullivan used as backup
21   material for his.  So at this point that's one of those
22   whatever you -- protected documents or whatever client
23   privilege documents.  But I went through and made detail
24   analysis of all of his -- or all of those things.  And when
25   you look at what Wainwright said -- and I would agree, that

Page 19

1    almost all of those reports -- every one of them that I saw
2    -- the -- I think there may be one or two in the -- in those
3    whole group of reports that aren't about construction.
4    They're all about construction.  Okay.  That's the main
5    point of those things.  And they have construction and they
6    have professional services and then maybe they have
7    something like goods and services or business services or --
8    you know, there is two or three components.  But generally
9    almost all of them have construction and professional
10   services and the professional service is related to
11   construction.  It is surveying and -- you know, construction
12   engineering and -- you know, there is three or four NAICS
13   codes that those things are.  And all of them do what I
14   described as -- and I'm sure that no one else in the whole
15   disparity business has used that terminology.  They call it
16   -- I just call it is an LG, a large group analysis.  Okay.
17   If your profession -- they take -- and they may tell you in
18   construction we have these ten NAICS codes, okay, because
19   we're building highways.  We don't have the NAICS codes for
20   building buildings.  Say it's a DOT thing, then they're not
21   talking about building highways.  So then we have building
22   codes, NAICS codes.  They do the highway thing, so they have
23   things related to highways.  And they put them -- they put
24   those in there and they may put -- they may or may not tell
25   you how many businesses are each of those NAICS codes.

Page 20

1    Generally they don't.  Generally the NAICS codes are two
2    digits or three digits if they have NAICS codes at all.  And
3    they basically normally tell you we have so many minority
4    businesses.  Some of them go into detail and say whether
5    they're black or Hispanic or whatever.  Most of them say
6    we've got so many minority businesses in this large group of
7    construction and so many minority businesses in this large
8    group of professional services, and here is what our
9    availability is and here is where our disparity is.  They
10   don't tell you what is the availability or disparity in any
11   of the NAICS associated with them.  If you listen to
12   Mr. Wainwright yesterday, he would have gotten the
13   impression that all of those people compute all of those
14   things down to five or six digits, and they don't.  Okay.
15   There is one report -- and I didn't think to look it up to
16   recall for you.  But there is only one report in the whole
17   list of 100 or something disparity reports that actually
18   does availability at six digits.  It's one of the NERA
19   reports.  Okay.  And I will say that his are better than
20   most.  But does availability at six digits but does
21   disparity at like three digits.  Okay.  There is no report
22   in any of your data that he would have you believe that does
23   availability at six digits and disparity at six digits.
24   They don't exist.  There is no data that -- that you have in
25   any disparity report which supports the idea that -- that my

Page 21

1    NAICS codes -- that there is discrimination in my NAICS
2    codes.  There is none.  I mean you have to -- the only place
3    that most of those -- most of those reports -- those 100
4    reports do is they get as close to like 541.  Okay.  And 541
5    includes all of the 5413, which is all of the -- 5413s is
6    all of the -- is all of the engineering work associated with
7    that, and most of the work in those is in that group.  Okay.
8    And -- and that's what they do.  They just say 541 includes
9    this and somehow that means that I'm automatically included
10   down here on the bottom when I have -- when there is no
11   businesses.  There is no data that says that there is
12   anybody in my NAICS codes even included.  I mean it's a
13   ludicrous leap of faith.  Okay.  And he says there is 63
14   reports that cover this stuff.  I don't know where he gets
15   that.  I mean there is 63 reports that may have professional
16   services in them, okay, but they don't have other
17   professional services.  He says there is 63 with other
18   professional services.  There aren't 63 without professional
19   services.  There is one with other professional services.
20   There is a bunch with professional services.  And I think he
21   intermixes the words other professional and professional
22   services.  And there is nothing in any of those reports that
23   gets down and says and shows in six digits that I'm -- that
24   we're discriminating in my zip codes.  There is nothing in
25   five digits that says that they're discriminating.  You have

6  (Pages 18 to 21)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                November 21, 2013

Page 22

1    to get down to three digits to say you're doing it.  And
2    almost like I said -- and almost all of it is this large
3    group and probably half of the reports are what I -- it's
4    another terminology I come up with.  It's called LUG, large
5    undefined groups.  Now when you have large undefined groups,
6    they go through and they say construction.  All right.
7    Remember, I talk about construction.  But they never tell
8    you who is in the construction.  They never tell you the
9    NAICS codes.  They never tell you six codes.  They never
10   even tell you that it's two, three or whatever the hell the
11   zip code is.  They never tell you any of that.  They just
12   say construction, professional services.  They never define
13   what they are.  They're just large groups.  Okay.  And
14   that's the kind of problem that those -- those things have.
15   I am sure that if I were a construction business and I
16   decided for some bizarre reason that I wanted to go to
17   construction -- and what I know about construction I never
18   would want to go into construction.  But say I wanted to go
19   into construction, I'm sure that if I were hindered by one
20   of those reports, I would have no problem reproving any of
21   those reports to be unconstitutional.  Not one problem at
22   all because of what we know from the other cases.  You've
23   got --
24        Q.  I'm going to stop you right here before we go any
25   further.  Could you tell the court reporter what NAICS

Page 23

1    stands for?  It's N-A-I-C-S.
2        A.  It's National -- I have to look it up.  It's --
3    it's a system that they use that the Commerce Department
4    runs that lists all of the codes for all of the businesses.
5        Q.  But when you say NAICS, you mean N-A-I-C-S?
6        A.  Yes.
7        Q.  And then when you say SIC?
8        A.  It's the Standard Industrial Code.
9        Q.  And that is S-I-C?
10       A.  Yes.
11       Q.  All capital letters?
12       A.  Yes.
13       Q.  Now, a lot of these reports that you were just
14   discussing here also included statistical sampling.  Have
15   you ever done statistical sampling?
16       A.  Actually we've done a little bit of that.  I've
17   done a little bit of that.  Not very much.
18       Q.  In what context did you do that?
19       A.  We do some -- we -- our -- our calibration
20   laboratories are -- are certified calibration laboratories
21   and in that we have to have very detailed quality control
22   plans.  And in the quality control plans for that, you have
23   to do some statistical sampling of your -- of the work.  You
24   don't necessarily have to -- you have to do certain quality
25   control measures on everything.  Okay.  And in certain ones

Page 24

1    they're almost on a random basis.  You pull out those and
2    you do statistical sampling, and you sample those and you
3    rework the job 100 percent to make sure that -- that it's
4    correct.  And you do the sampling to ensure that what the
5    work that every technician is doing is correct and the work
6    that the lab is a total problem is correct.
7        Q.  Is there a method to -- that you know of to ensure
8    that your statistical sample is accurate?
9        A.  We follow the statistical sample methods associated
10   with our quality control plan, which is based on the
11   national standard of how to do calibration laboratories.
12       Q.  Other than that, could you be more specific on that
13   answer?  Do you know a -- the method by which you would
14   ensure that a statistical sample is an accurate sample of
15   the group that you're looking at?
16       A.  I know that the -- you know, the statistical
17   sampling method that -- that we use is like -- say, it's
18   prescribed in the standards which we follow, and I trust the
19   standards we follow.  I haven't had the need to question it.
20       Q.  Do you do any polling as part of your work?
21       A.  No.
22       Q.  Have you ever been asked by a jurisdiction to
23   create a disparity study?
24       A.  No.
25       Q.  Have you ever worked on a disparity study?

Page 25

1        A.  I have not worked to create disparity studies.  I
2    have evaluated probably 100 of them for the appendix and
3    probably another hundred and -- I don't know how many are
4    here for this.  I -- I at least -- I at least know what a
5    disparity study is, which is more than I can say for
6    Mr. Rubinovitz.
7        Q.  Have you ever testified in court as an expert
8    opinion -- as an expert witness?
9        A.  I don't believe we have.  I testified once -- I
10   believe that I testified once in the Rothe case but I do not
11   believe as an expert witness.  I'm kind of fuzzy on that
12   whether we did or not.
13       Q.  Do you know what the term Daubert motion is?
14       A.  The Daubert motion is a motion to question whether
15   an expert witness is an expert witness.
16       Q.  Okay.  Do you know if a Daubert motion was filed
17   against your report -- the report that you filed in Rothe?
18       A.  I have no idea.
19       Q.  So other than statistical matters, do you know if
20   you've ever been accepted in court as an expert witness on
21   any topic?
22       A.  The only thing that I've ever done anything to
23   report as an expert witness is associated with this Rothe
24   case, which we discussed.
25       Q.  So you haven't written any expert reports for any

7  (Pages 22 to 25)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 26

1  other matters?
2      A.  I mean I've written documents but not report.  I've
3  written documents associated with our business about my
4  opinion of how to do something, but I -- you know, they were
5  -- I would consider them expert.  They were expert from the
6  standpoint of what we used them for, that I know how to run
7  a business, but nothing associated with a report.
8      Q.  Right.  So your -- you have been running this
9  business for 40 years -- or not running it, but you have
10  been associated with Rothe Development for 40 years?
11     A.  In management for 40 years.
12     Q.  Management for 40 years.  And so you would consider
13  yourself an expert in the management of small business?
14     A.  Any small business that lasts 40 years, you've got
15  to be.
16     Q.  And Rothe is a government contracting -- does Rothe
17  do most of its business in government contracting?
18     A.  We used to be about 80 or 90 percent, but now we're
19  probably down to 75 percent government contracting.  Our
20  commercial trial labs have grown much bigger.
21     Q.  And if you can just remind me, how many different
22  Rothe firms are there currently -- current?
23     A.  Your -- your main things are Rothe Development,
24  Rothe Enterprises.  And that's the HUBZone thing.  And due
25  to the -- due to the way the law is written with HUB zones,

Page 27

1  the HUBZone has to be owned by an individual.  It can't be
2  owned by a company.  Mr. Fishman should know about that.
3  And -- and so both of those companies are owned by my wife
4  The HUBZone company is not a subsidiary of Rothe
5  Development.  It's a separate owned company.  We run it as
6  sort of a subsidiary effectively, but it's legally a
7  separate company.
8      Q.  So Rothe Development, Rothe Enterprises?
9      A.  We have a number -- we have a number of joint
10  ventures.  Roman Joint Venture is a joint venture with RSI,
11  Roman Services.  And RX Joint Venture is a joint venture
12  with X Technologists.
13     Q.  Are Rothe Development and Rothe Enterprises both
14  women-owned small businesses?
15     A.  Yes.  And Rothe Enterprises is certified, but not
16  the -- you know, you've got multiple levels of women-owned
17  certification.  It's a lower level certification.
18     Q.  And do you participate in the certification
19  processes for those companies?
20     A.  Sure.
21     Q.  Do you consider your -- when you do work with these
22  companies, do any of the work involve statistics?
23     A.  No.  I do mostly -- I do -- the biggest math in
24  terms that I do is all the bids and proposals.
25     Q.  All bids and proposals?

Page 28

1      A.  Yes, the actual price part of the bids and
2  proposals.  You know, a technical proposal -- a technical
3  proposal -- in fact, most government contracting you have to
4  bid -- a great deal of government contracting you have to
5  put a technical proposal -- it may be a management proposal
6  but technical management thing, and you have to put up the
7  cost.  I spend most of my time on business proposals working
8  on the cost part of the thing.  And I also do red team
9  reviews and stuff.  You know, I read all the technical
10  because I know the technical about as good as all of my peer
11  people.  And that's one of the things that Wainwright, you
12  know, in his discussion -- but we can get into it later.  I
13  don't know when you want to talk about that.  One person --
14  the business that -- his availability analysis -- of not
15  doing availability analysis really, you know.  He uses a --
16  the -- I would look at my capacity.  You know, doesn't use
17  capacity analysis.  He just treats all of the people as --
18  as every single company with one person just the same as
19  everybody else, which is insanity.  Okay.  Because the one
20  person can't do bids.  I mean you brought up the question --
21  David brought up the question with him about bids.  I
22  looked good enough of buildings, you know, where we've had
23  buildings built and stuff like that and looked at all of the
24  -- all of the diagrams, the effort that it takes for you to
25  design a building and build a building and to think about

Page 29

1  the task associated with estimating the cost of building
2  that building.  Okay.  If you're a one-person firm -- you're
3  a one person firm out there, you -- you're working -- you've
4  got to work every day to bring enough money in to pay your
5  bills.  Okay.  And on top of that, you're supposed to go out
6  and bid a bunch of contracts too and you're talking -- and
7  he's talking about bidding contracts, which are like
8  buildings and highways.  That's insanity.  I mean that's
9  absolutely insanity.  I mean my bidding process -- you know,
10  we've got a relatively small company.  I've got three people
11  that actually -- no, it's now four people -- four people
12  full-time assigned doing nothing but bidding and proposing
13  on government contracts.  Okay.  I could afford to have four
14  people because I -- because of the size of my business.
15  Okay.  I could not afford to have a person doing business
16  proposals if I'm a one-person company because I don't have
17  time to do any work.  So I mean the idea of capacity that
18  everybody counts the same and throwing out capacity is --
19  like I say, it's insanity because you're not looking at
20  what's required to do it.  I mean he admits -- he admits
21  that, yes, for capacity for the availability analysis we're
22  going to count the one person, but they don't expect the one
23  person to get a job.  If they don't expect the one person to
24  actually get the job, then why the hell do you count them as
25  availability?  That's nonsense.  Okay.  And he just doesn't

8  (Pages 26 to 29)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 30

1    have a way to do it, so that's why he justified doing it.
2    He could take a look and see what percentage of jobs say
3    that -- you know, he could take the non-minority data and
4    say this is people that don't have discrimination
5    theoretically, and we take data from their analysis and
6    apply it to the minority somehow, you know, to come up with
7    a concept -- a method like that to get something that would
8    make some kind of reasonable availability.  The only reason
9    that he's really come up with this idea of the one person
10   counting and doing the head count is because that gives him
11   more business.  He's in the business of selling disparity
12   studies.  He's got four people up there, and what their main
13   job, purpose in life to do is sell disparity studies.  So if
14   he comes up with this approach of disparity studies, then he
15   shows more disparities his clients like that better, so he
16   can sell more disparity studies.  If he showed -- if he
17   actually did -- if he actually did capacity analysis, he
18   wouldn't have -- and he applied it in all of his disparity
19   studies, he wouldn't show half the -- half what he -- you
20   know, his -- the -- he wouldn't show half the discrimination
21   that he claims to show.
22        Q.  So do --
23        A.  He wouldn't have it.
24        Q.  Do you think that his report then is biased because
25   it helps him economically?

Page 31

1        A.  Absolutely.
2        Q.  If the 8(a) program was canceled would that help
3    your business?
4        A.  Absolutely.
5        Q.  Do you think your report is biased because it would
6    help you economically?
7        A.  I don't think so; but, of course, that's my
8    opinion.  I -- I -- the numbers I have in it -- the purpose
9    of my report is very biased.  I mean for it to show that the
10   8(a) program is discriminatory.  Okay.  The numbers I've
11   used in the -- the numbers I've used in my report are all
12   government numbers.  They're straight out of the government
13   databases.  There is nothing biased about those numbers.
14   They are the facts.  You know, it's black and white.  It's
15   hard to be biased without it.  But when you're justifying
16   not using capability analysis and you go into the idea that
17   every black person and every minority person in the country
18   is being so radically discriminated against that they're so
19   downtrodden in today's world that they couldn't possibly
20   form a business and they would form a business if they
21   didn't, that's -- that's beyond -- that's why I point -- I
22   started the question is the guy an economist.  I mean an
23   economist shouldn't come up with a theory like this.  This
24   is just -- it's wishful thinking.  Okay.  I mean it's
25   somehow -- I don't think -- I think it is -- it's almost a

Page 32

1    slur -- it's almost a racial slur to most minorities that
2    you would consider that they're -- that they're uncapable of
3    performing work because they're being so discriminated
4    against.
5        Q.  Before we move on anymore, can we have the document
6    that you referred to just when you referred to the look up
7    capacity?  Can we have that marked as our next exhibit?
8        A.  If you can see anything -- if you can read anything
9    out of --
10       Q.  Just mark it as an exhibit because I want to make
11   sure we include that as the -- as part of the documents
12   referred to during the deposition.  So that would be Exhibit
13   4.
14          (Exhibit 4 marked.)
15       A.  I made a few notes that I wanted to make sure are
16   brought up.
17       Q.  (BY MR. BRANIFF) Yeah, not a problem.  Just because
18   there was something that was specifically referred to in the
19   deposition I want to make sure it's included.  Are you -- so
20   would you consider yourself an economist?
21       A.  No.
22       Q.  Would you consider yourself a professional
23   statistician?
24       A.  No.
25       Q.  Which of the companies does the calibration work

Page 33

1    you talked earlier about?
2        A.  Rothe Development, Ed Rothe Enterprises.
3        Q.  Both of them do?
4        A.  Both of them do.
5        Q.  Do you hire people to do that calibration work for
6    you?
7        A.  Sure.
8        Q.  What qualities do you look for when you hire people
9    to do that calibration work for you?
10       A.  Almost exclusively we look for people who have had
11   past work in that field, specifically in the military.
12       Q.  Is that -- is it military -- is it -- are those on
13   government contracts with the Department of Defense that you
14   do the calibration work?
15       A.  We have people at -- at two government facilities.
16   Let me think about it now.  We have people at two government
17   facilities, and we have two commercial laboratories, one in
18   Houston, one in San Antonio and --
19       Q.  Do you look for any educational background with
20   those people that you hire to do the calibration work?
21       A.  We're mostly looking for people who have had eight
22   or ten years experience in calibration, and they have to
23   pass a certain level.  There is a certain level test for
24   electronic technicians they have to pass.  I don't remember
25   the name of the test.

9  (Pages 30 to 33)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                          November 21, 2013

Page 34

1     Q.  I got you.
2     A.  We get them to do that part of the certification.
3     Q.  Okay.  Following your schooling, have you taken any
4  specific courses in statistical or economic analysis?
5     A.  No.
6     Q.  Have you taken any training program in statistical
7  or economic analysis?
8     A.  No.
9     Q.  Have you had any training in the field of
10  econometrics?
11     A.  No.
12     Q.  Do you think that special training or education is
13  important for dealing with issues in statistics or
14  econometrics?
15     A.  If I wanted to do work as an economist, I think it
16  would be appropriate that I took some economist courses, but
17  I don't primarily do work as an economist.  I run a
18  business.  A great deal of the work that I see from
19  economists is very questionable as far as I'm concerned.  I
20  look at the -- I look at the -- I look at the -- at the
21  unemployment rate bouncing around like a ball especially
22  before elections.  Okay.  And I say that's not scientific.
23  That's -- that -- there is too much -- there is -- a great
24  deal of problem with economists is a whole lot of what
25  they're doing is social science.  It's not -- it's not

Page 35

1  objective.  It's not just hard numbers.  There is too much
2  spin almost that they can put on it.  And so it becomes --
3  and when it becomes subjective instead of objective, then --
4  then you start to question the -- the opinion that goes into
5  it and that.  You know, there is a whole lot of opinion in
6  what they look at and what they don't look at, what's
7  important and what's not important.  It's all very
8  subjective.  So -- but that's the nature of the game.
9  That's what economists do.
10     Q.  Do you think that statistical training or education
11  would be important in determining the issues concerning
12  discrimination in the contracting industry?
13     A.  I think it's one part of it.  I think it's one part
14  of it, but -- but I don't think it's the whole ball of wax.
15     Q.  What else would be involved?
16     A.  Well, I mean I think you -- you've got to be able
17  to look at the hard -- you've got to be able to look at the
18  hard numbers.  You've got to be able to crunch the hard
19  numbers, which you don't need statistics for all of it.
20  Okay.  You can't -- the problem with -- the problem with
21  most of the reviews of all of this they're looking at --
22  they're looking at a very small -- they're looking at --
23  they're looking that their point of view of it, and they
24  don't see the forest for the trees.  Okay.  And you've got
25  to look at the -- you've got to look at the forest

Page 36

1  sometimes, not just the trees.  Okay.  And they don't --
2  they don't see it.  Okay.  If y'all -- y'all said or not --
3  you didn't.  Rabinsky -- Rubinovitz.  Rubinovitz.
4     Q.  It's R-U-B-I-N-O-V-I-T-Z.
5     A.  I don't feel bad if you have to look it up.  Okay.
6  Rubinovitz -- he said that my analysis was too simple
7  because I did a head count and I didn't do a -- you know,
8  something more complicated.  But I did the same kind of
9  analysis that Wainwright did because he does -- he does a
10  happened count for -- he doesn't do capacity analysis.  He
11  said I didn't do a capacity analysis.  Well, Wainwright
12  doesn't do a capacity analysis.  So, you know, mine is -- it
13  sits with what Wainwright does.  Okay.  If you look at the
14  simple numbers -- if you just look at it just with a -- if
15  you look at a head count and the 8(a) are making five or
16  six or seven times more money than the non-8(a) is making,
17  there is something wrong with the system.  I mean
18  affirmative action is -- what I always understood
19  affirmative action to be is it's supposed to bring the
20  people who are downtrodden or the people who aren't getting
21  a fair shake -- bring them up to the same level.  The 8(a)
22  program doesn't bring you up to the same level.  It makes
23  you five times the level.  I mean it -- and what the --
24  -- and the gifts that they give to the Alaskan natives is
25  insanity.

Page 37

1     Q.  Speaking of crunching the hard numbers, you
2  mentioned that you prepare the bids for the Rothe companies
3  before?
4     A.  Yes.
5     Q.  What's your current -- do you have a different
6  title with each company or just one title or what are your
7  various titles?
8     A.  I'm vice president for both companies, and I'm
9  president of RX Joint Venture, and I'm a vice president of
10  the Roman Services -- vice president except for RX Venture
11  where I'm president.
12     Q.  Wait.  That was quick, that last one.
13     A.  Let me go over it.  RX Joint Venture I'm president
14  and the rest of them I'm vice president.  Sorry.
15     Q.  As part of the bid preparation process, what math
16  is involved in that process?
17     A.  It's mostly -- it's mostly multiplication and
18  division and some -- it's some percentages, and it's some --
19  we do some -- we do some -- we do some -- we do some
20  actually some economist kind of work in there.  We have to
21  go -- we have to go out and survey -- do surveys about what
22  -- what the salaries are in certain areas and -- you know,
23  if we're bidding on something in some place where I don't
24  currently have work in, then I've got -- we've got to go do
25  survey data about what the salaries are and come up with our

Kim Tindall and Associates, LLC       645 Lockhill Selma, Suite 200          San Antonio, Texas 78216
210-697-3400                                                                 210-697-3408

A000279

Electronically signed by Barbara Griffin (301-176-817-0609)                              2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                          November 21, 2013

| Page 38 | Page 40 |

Page 38

1  best estimation of what salaries is.  So I guess I do some
2  economist data, some economist work but --
3      Q.  Do you -- do you have a copy of a recent bid where
4  you might have done that?
5      A.  Not with me.  But I mean, you know -- and it's
6  highly proprietary.  But I mean any bid -- I can tell you
7  that any bid that we do we have to do surveys of -- of that
8  -- of what the -- what the value is on that.
9      Q.  Do you do those surveys yourself?
10     A.  I review them.  I have other people that go out
11 there and survey it, and I review it, and I'm the one that
12 decides what we're going to use.
13     Q.  How -- how do they perform those surveys?
14     A.  We've got two or three web sites that we looked at
15 and we compare at salary.com.  And we use a combination of
16 salary.com and some of the big employment sites and resumes
17 -- look at resumes.  And it sort of depends on the job.  It
18 sort of depends on how -- if it's a low level job and it has
19 people on the Wage Board Determination, then we use the Wage
20 Board Determination, if we think it's valid.  Some of the
21 Wage Board Determinations are valid and some of them aren't
22 in our opinion.  You know, you have to do an analysis of --
23 you've got a Wage Board Determination here but the salary --
24 the various salary sites and the other data you have don't
25 match, you know.  The salary.com may say this job is worth

Page 39

1  $25 and the Wage Board Determination says it's $15.  You've
2  got to worry about whether your -- whether the Wage Board
3  Determination people are up with the standards of reality.
4  And so we have to do an analysis like that to determine
5  where this -- what that stuff is valid and so forth.  They
6  generally give me -- what I generally get is a -- is a -- is
7  a -- something that would look like, you know, here is the
8  positions -- here is the position one.  And here is
9  the 25th percentile and 50th percentile, 75th percentile,
10 100th percentile, and -- and -- and our local guy is proposing
11 maybe the 50th percentile.  And why -- and he's saying why
12 he is.  Maybe he is proposing a 25th percentile for this
13 other position, and I'm the one that has to go through and
14 say, yes, we're going to bid this at the 50th percentile.
15 We're going to bid this at the 75th percentile.  We're going
16 to bid this at the 25th percentile.  Based on my past
17 experience at what we've got to deal with and what the risk
18 -- we've got to do risk analysis.  You know, you've got risk
19 associated when you do bids and proposals.  You've got risks
20 that your price is too high and you don't win the contract
21 because your price is too high, and you've got the risk that
22 the price is too low, and you're going to lose money.
23     Q.  Does this take a large part of your day -- everyday
24 bid preparation and review?
25     A.  What -- what happens is we -- when we're in the

Page 40

1  midst of a cost proposal, it takes all my time.  Okay.  But
2  I probably spend, you know -- some weeks I spend a week and
3  a -- a whole week or a week and a half on a cost proposal.
4  On -- but in my looking over the totality of my job, it's
5  probably 25 percent -- 20, 25 percent.
6      Q.  What makes up the other 75 percent?
7      A.  All the functions associated with running a
8  business with several hundred people; and in my case,
9  multiple businesses.  It's -- you know, you assume that you
10 have -- every day you assume that you've seen everything you
11 could possibly happen that an employee could do wrong, and
12 the next day they -- maybe not the next day but some length
13 of time they prove you wrong.
14     Q.  I understand.
15     A.  Right.  And so -- and there is an old saying about
16 what flows downhill.
17     Q.  I understand.
18     A.  I won't use the correct language to say what flows
19 downhill, but it's wrong.  It flows uphill.  Okay.  And the
20 big problems are the ones that I have to solve that the
21 other managers -- if they build too hot or too much of a
22 problem to solve, then I have to solve it.  I'm working very
23 hard to teach the managers to solve them so I don't have to
24 solve them.
25     Q.  In your day-to-day work, how often would you say

Page 41

1  you use logarithms?
2      A.  Well, you know, every time I use some of the -- I
3  used to use them all the time.
4      Q.  When you say used to --
5      A.  Well, I brought this thing with me.  Do you know
6  what this is?
7      Q.  A slide rule?
8      A.  A slide rule.  Have you ever used a slide rule?
9      Q.  I have.
10     A.  Do you know that slide rules basically work by
11 adding logarithms?
12     Q.  I do.
13     A.  Okay.  You understand that?
14     Q.  Yes.
15     A.  Okay.  I got this as a senior in high school.  It's
16 so long ago.  And this was, first of all, was a top of the
17 line slide rule and -- so I used this for like a year into
18 high school and a couple years in college.  And it was about
19 the time -- a little after I had this two or three years,
20 they came out with the HP scientific calculators.  I can't
21 remember the number of the scientific calculator, but I
22 ultimately ended up getting one of those.  But I used this
23 continuously for three or four years.  I used it in all the
24 engineering work I did.  I used them continuously.  Okay.
25 And if you have to do anything with electrical engineering,

                                    11  (Pages 38 to 41)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                November 21, 2013

Page 42

1   it all involves logarithms. All those 4(a) analysis,
2   logarithms, that sort of stuff. I've been using logarithms
3   for, what, 50 years. Okay. So it's not new to me. All
4   right. Now, on my everyday work today do I use logarithms?
5   Not -- not really except at some of -- some of the
6   calculations that we do now have the logarithms --
7   logarithms are part of the calculations.
8       Q.  When you say "we," do you mean --
9       A.  Necessary by the company. Okay. I mean they have
10  logarithms buried in them. Some of the way that the -- some
11  of the calculations that -- some of the ways some of the
12  calculators work have logarithms built into them still.
13  Okay. And so I understand their significance. I understand
14  what they mean. You don't -- you don't go through four
15  years worth of engineering training and not understand what
16  logarithms are. I'm sorry. You don't -- you don't forgot
17  that because -- I mean I did physics assignments. I've had
18  math -- I've had mechanics. I've had physics. I've had
19  chemistry. I did -- I used this thing for like three years
20  for the straight work, and we're talking as an engineer
21  five, six hours a day every day. It's a lot -- a lot of
22  work with that stuff. So I understand logarithms.
23          MR. BRANIFF:  Do you want to take a quick
24  break here?
25          MR. BARTON:  Sure.

Page 43

1           MR. BRANIFF:  Why don't we take a ten-minute
2   break.
3           (Recess from 10:20 to 10:33.)
4       Q.  (BY MR. BRANIFF) We're back on the record, still
5   under oath. I think the last question was concerning how
6   often in your daily business you use logarithms. How about
7   regression analysis?
8       A.  I don't really use regression analysis in any sort
9   of normal basis. Lately, though, I've been looking at a
10  whole lot of disparity studies, some of which have
11  aggression analysis. Most of them don't.
12      Q.  And that's -- you were looking at those for this
13  case?
14      A.  For this case and, you know, a hundred or so
15  disparity studies back associated with a previous case. I
16  think I know more about disparity studies than I ever want
17  to know.
18      Q.  Are you familiar with the statistical analysis
19  program known as STATA?
20      A.  No.
21      Q.  Do you in your day-to-day business use any
22  statistical analysis computer program?
23      A.  No.
24      Q.  In your day-to-day business, do you use any data
25  collection software?

Page 44

1       A.  Data collection -- would you be more explicit?
2       Q.  Do you -- do you use any data -- well, let's just
3   say do you use any sort of data analysis software on a
4   day-to-day basis?
5       A.  Data analysis software -- I mean we collect a whole
6   lot of data associated with running our business. We have
7   to collect how well we perform, what we bill, what we adapt.
8   We have the take care of billing. A whole lot of -- of
9   financial transactions going on every day associated with
10  our stuff. We've got -- we've got two cal labs --
11  commercial cal labs that are building all sorts of
12  commercial folks we've got to worry about. When you sit
13  down and you worry about running a business you've got --
14  say, here in the State of Texas you have to worry about what
15  the sales tax is for the different places where all your
16  customers are. You've got to handle -- we have to run
17  before and after analysis on all the stuff we calibrate to
18  see where it's changed and tell the customers where there is
19  sort of a disparity in their equipment, the amount of
20  calibration. We have to tell our customers when the
21  calibration -- when we do a calibration if an item is out of
22  calibration, we have to tell them how much it is so they can
23  go back and evaluate what they've used the equipment for to
24  determine whether they've got a problem with some of the
25  stuff that they used when they used this equipment to work

Page 45

1   on.
2       Q.  By "we" you mean Rothe Development, Rothe
3   Enterprises?
4       A.  All our folks.
5       Q.  Not you personally?
6       A.  I'm the one that has to look at the -- I have to
7   manage to make sure that all the people get all those
8   functions done.
9       Q.  Right. But you managed -- but you are not the one
10  who is looking at the calibration data?
11      A.  No.
12      Q.  Other than the work that you've done on this case,
13  how often have you worked with regression analysis?
14      A.  I really haven't.
15      Q.  Do you believe that you were qualified as an expert
16  to opine on the studies that Dr. Wainwright analyzed for his
17  report?
18      A.  Oh, yes.
19      Q.  Do you believe you were qualified as an expert to
20  give an expert opinion on the analysis that Dr. Rubinovitz
21  performed for his expert report?
22      A.  Yeah. I mean he did so many things wrong in his
23  report that -- that are obvious to the surface that I
24  pointed out in my report, like wrong number of SDBs. He
25  used the wrong number of SDBs. He used -- he didn't -- he

12  (Pages 42 to 45)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 46

```
 1   used -- he came up with -- with something that I can't find
 2   in any other disparity report anywhere, because it's not
 3   really a disparity report he did because he didn't even know
 4   what a disparity report is.  Okay.  That shocked and
 5   amazed me that he did not know what a disparity report is.
 6   He comes up with a probability of winning a contract.  Okay.
 7   We just -- David asked Wainwright a question yesterday
 8   what's really important, is it the number of contracts or
 9   the dollars, and Wainwright said the dollars.  Okay.  And I
10   can tell you from my personal business you don't really care
11   the exact number of contracts you have.  You care about the
12   dollars of the values of those contracts.  That's what's
13   critical to your business.  One -- one big contract worth
14   $100,000 is worth far -- you know, is worth a whole lot more
15   than 20 contracts of a thousand.  I'll clue you.  Okay.  And
16   he -- since he didn't look at the dollars, his report is
17   worthless.  He doesn't -- he doesn't get to the fact of the
18   matter.  Okay.  And he doesn't use the right number of
19   people.  He doesn't use the right group of people.  He
20   doesn't use the right data to consider.  There is an old
21   saying that -- I've been working with computer systems for a
22   long time.  I started -- I worked on my first computer
23   system as a freshman at the University of Texas.  So that
24   was back in '67.  And I have been working with computer
25   systems since '67.  I have had -- I have had contracts with
```

Page 47

```
 1   150 people working computer systems 24 hours a day, seven
 2   days a week.  The old saying is when you put junk in you get
 3   junk out.  It doesn't matter how beautiful the analysis is
 4   in the process.  You put junk in you get junk out.  He did
 5   not put the -- he did not consider the right data so he
 6   considered.  He considered the probability of winning.  Do
 7   you know why he did that?  There is two reasons he did that.
 8   I mean my analysis of that -- I mean I didn't ask him the
 9   question, but there is two reasons.  Number one, he could do
10   that within the 30 hours or so that he spent in the process.
11   I think it was 30 hours.  I don't remember exactly.  It was
12   a couple weeks ago.  Okay.  You look at what Wainwright
13   said.  He said -- he said four people doing a maximum of
14   about three studies a year.  Okay.  So that's one of the
15   third man years per study.  Okay.  That's like 2500 hours
16   that he's -- that Wainwright has been with a disparity study
17   and Rubinovitz spent -- excuse me, if I butcher his name.
18   He spent about 30 hours.  So what kind of product is that?
19   He didn't do the detailed work he needed to do and he got
20   the simple work -- it was very -- much simpler to do the
21   probability of winning.  And the only reason that you really
22   get down to doing that is my analysis that I've done looking
23   at that when you looked at my report the SDBs do -- do I
24   think win fewer contracts than the non-SDBs, but they're
25   bigger contracts, so they end up with more money.  And the
```

Page 48

```
 1   reason they win fewer is because they went bigger.  That's
 2   the life of it.  And so he picked the one thing that would
 3   show a disparity sort of -- it's not really a disparity.
 4   It's a chance of winning, which is disparity is dealing with
 5   dollars, not with chance of winning.  So he picked the -- he
 6   picked the soft spot, the easy spot.  The only thing he
 7   could show a disparity in was the chance of winning.  He
 8   couldn't show a disparity in dollars, so he didn't do it,
 9   and I don't think he had the time.  I think he -- I think
10   you pick somebody who is fully employed in another job and
11   you ask him to go do this task and you didn't have the -- I
12   don't know whether -- I don't know the workings of your
13   operation whether you could command enough of his time to do
14   the job you really needed done, but you needed to do -- you
15   needed to do something to try to prove your case.  You
16   needed to do something to the old benchmark study.  And if
17   you did the benchmark study, it still wouldn't prove your
18   case.  It still wouldn't show your problem because the basic
19   line is SDBs are not discriminated against by the federal
20   government.  You've got testimony in this case -- and I want
21   to make sure I don't differentiate and give some kind of
22   legal opinion.  But you've got testimony in this case
23   repeatedly again that said contracting officers don't
24   discriminate.  They say contracting officers don't
25   discriminate.  That's what all the testimony in the case has
```

Page 49

```
 1   shown and the Rothe case has shown in the past.  And for
 2   Rubinovitz -- if you believe Rubinovitz's chances of
 3   probability showed discrimination and you had coached him to
 4   say that an inference of discrimination, then the only
 5   person that could do that is contracting officers.  And you
 6   would be impugning the contracting officers that they
 7   somehow looked at this SDB and decided we're not going to
 8   give you this contract.  And the contracting officers are
 9   trying to give them contract -- they're trying to reach
10   their goals.  That's for the contracting officers are
11   discriminating against.  Then they're discriminating against
12   me.  They're not discriminating against them.  And if you
13   take a look at the numbers, the discrimination is reverse
14   discrimination against people like me instead of people
15   against the SDBs.  And Rubinovitz couldn't show that.  He
16   did -- I have no question about his capabilities as an
17   economist.  I have no question about his capability as a
18   math statistician.  I mean you picked a guy with imminent
19   qualifications, but he doesn't know the first thing about
20   what a disparity study is.  He admitted it that he couldn't
21   define what a disparity study -- he had never seen one
22   before.  He never worked with one.
23       Q.  Would you consider the work that you did in your
24   expert reports here as statistical analysis?
25       A.  No.
```

Dale Patenaude                                      November 21, 2013

|  | Page 50 | | Page 52 |
|---|---|---|---|

**Page 50**

1    Q.  No.  Did you compute any -- did you compute in any
2    of your analysis there statistical significance?
3        A.  No, I didn't do any statistics that required
4    computation of statistical significance.  Mine were 100
5    percent significant because they weren't statistics.  They
6    were mathematical dividing, the number of heads into the
7    number of dollars.  And that's exactly what Wainwright does
8    in his availability study at NERA.
9        Q.  Do you currently hold any licenses or
10   certifications to perform your work?
11       A.  No.  We have -- we have -- the Rothe enterprises is
12   a certified -- how do you pronounce it?  We have a
13   professional engineer working for the company, so they're
14   licensed to do professional engineering work.
15       Q.  But you are not that professional engineer?
16       A.  No.  He works for me.
17       Q.  Other than -- do you -- have you hired any
18   economist to work for you?
19       A.  No.
20       Q.  Is that intentional?
21       A.  That's very intentional.
22       Q.  Would you hold yourself out to be an expert on the
23   DBE program?  And DBE is -- D-B-E, and it stands for
24   disadvantaged business enterprise.
25       A.  Do you mean for the Department of Commerce program?

**Page 51**

1    I mean not the Department of Commerce, the transportation
2    system, the transportation people.  I know a lot about it.
3    I wouldn't consider myself an expert on that.  I think I'm
4    an expert on the ramifications of what the 8(a) program
5    does, particularly to what it does in the reverse
6    discrimination to me.  And the DBE program I -- I do not
7    know all the ramifications of how it works and so forth.  I
8    understand that the federal government when they give the
9    highway money to the states and to the various entities that
10   they give money to they pretty much specify that they have
11   to do a certain -- make sure a certain amount goes to
12   minorities.  And I don't know the specific amounts that they
13   specify to go to minorities, and I understand that to
14   justify that they have to do disparity studies to be able to
15   justify that they can do that; because if they don't do
16   disparity studies, then people like Barton will sue them in
17   court.  And I'm amazed that most of those disparity studies
18   that I've seen weren't just taken to court because -- and I
19   think the only reason they weren't is because the people --
20   they didn't run into people like me that just recent being
21   discriminated against.
22       Q.  So you would consider yourself an expert in the
23   8(a) program?
24       A.  Oh, yes.
25       Q.  Have you ever applied for any of your companies to

**Page 52**

1    be an 8(a) company?
2        A.  No.  I mean I could -- I could apply I guess
3    possibly because I have -- I have the proof that is -- that
4    the U.S. government discriminated against me in the price
5    evaluation adjustment because they ruled those laws
6    unconstitutional, and they ruled that -- you know, affected
7    me in the process, that they discriminated against me in
8    that process.  So I could I guess possibly get the social
9    part, but I wouldn't fit the economic part.  I'm not going
10   to take everything that I own and stick it -- adjust all my
11   -- adjust all my income and everything into certain -- into
12   the business and so forth so that I would fit the criteria
13   of becoming an 8(a) and quite frankly my knowledge of the
14   people that I know that have gone through that -- I know a
15   couple women who have made it in the 8(a) program as women.
16   It's -- it's ridiculously difficult for a non-minority to
17   become an 8(a) with comparison to what it is for a minority.
18   Minority you -- minority, if you fit the economic
19   classification, you say I'm a minority and that's it.  They
20   may ask you how you were discriminated against; and you say,
21   "Well, somebody called me a black -- somebody called me a
22   black person or a Negro or something when I was young," and
23   that's -- that's fits the bill.  And I know that's the case
24   because I helped a person -- I worked with a person became
25   and 8(a), and it was a Hispanic and the -- and what they had

**Page 53**

1    to do to justify social disability was they had to basically
2    say -- this guy.  It was a very interesting case because his
3    parents were reasonably well to do.  He went to Yale -- he
4    got an MBA from Harvard.  He worked for Wall Street --
5    actually in Boston, whatever they call that street up in
6    Boston is.  They worked for there for a long time and came
7    back and he started his own business.  And he went --
8    decided -- and I worked with him for a while, and he asked
9    me, "I want to become an 8(a)."  And I said, "Well, you've
10   got to fill out of these forms and so forth."  And then he
11   went and did that, and he went over and talked to the 8(a)
12   folks.  And they asked, "Well, how have you been
13   discriminated against?"  And he told him -- well, he told
14   me, and this is secondhand, of course.  He said, "Well, I
15   don't really know that I've ever been discriminated against
16   in my life.  I've got an MBA from Harvard.  I've done pretty
17   well."  He said, "Well, did anybody call you any names when
18   you were a young Mexican running around --
19   Mexican-American?"  He said, "Yeah, you know, they do that.
20   I mean that's what happens when you're -- when you're
21   young."  He said, "That's good enough."  So I mean that's --
22   but that's what happens if you're a minority.  If you're a
23   white person and you want to get in, you've got to go and --
24   say, a female tried to get in, you've got to go through an
25   analysis.  You've got to go through all those other things.

14  (Pages 50 to 53)

Dale Patenaude                                      November 21, 2013

| Page 54 | Page 56 |
|---|---|

**Page 54**

1  I talked to a person that said it took them a year to get
2  through the thing. And it's just ridiculous. I don't think
3  -- I don't think honestly that I've ever been discriminated
4  against in my life except by the federal government, so I
5  would not feel that it was appropriate to fit in that
6  program.
7      Q. You stated earlier that you are, however, part of
8  -- you do have companies -- you do for companies that are
9  part of a government contracting programs. HUBZone -- which
10  companies were --
11      A. Rothe Enterprises.
12      Q. And is Rothe Development a HUBZone?
13      A. No.
14      Q. And then you also mentioned that one was a
15  certified women-owned small business?
16      A. It's the -- it's the -- it's been about a year
17  since we had that. There is two levels of -- there is a
18  couple levels of women-owned. The -- the -- the upper level
19  of women-owned you have to go through the whole loss process
20  of, you know, showing your company and eventually and all
21  that sort of thing. And we didn't go through that. We just
22  went through the first level, and the first level just says,
23  yes, we've got a woman here that runs a company, and this is
24  the ownership of the company. That's the first level we
25  went through.

**Page 55**

1      Q. Have you ever participated in bidding on a contract
2  that was set aside for HUBZone contractors?
3      A. Sure.
4      Q. How -- how often do you --
5      A. I have a company that -- great deal of their
6  business is that. But realistically they do far more
7  business outside the -- not in the HUBZone arena. They do
8  business as a subcontractor. They do some business as a
9  subcontractor to the government, but really their biggest
10  business is commercial business that doesn't matter with
11  HUBZone law. The HUBZone -- the HUBZone is a tremendous
12  amount of difference from the 8(a). The 8(a) business the
13  only person that has to be a minority is the owner of the
14  business. On a HUBZone, your employees -- 35 percent of
15  your employees have to be living in the right socioeconomic
16  levels and in the right places that are -- so forth. So the
17  HUBZone makes really sense to me because you're actually
18  doing real -- something realistically for a number of
19  people. The 8(a) program you're doing one thing for one
20  person, the owner.
21      Q. And you said a great deal of the business was
22  HUBZone business. What do you mean by that, what
23  percentage?
24      A. No. Right now my HUBZone company doesn't have a
25  HUBZone contract. They're just doing all commercial

**Page 56**

1  business. They have had -- you know, it -- at times over
2  the past ten years 50 percent of that business was
3  government HUBZone business. Right now it's no -- no
4  government HUBZone business.
5      Q. And it's also Rothe Enterprises that's a certified
6  women-owned small business?
7      A. Yes.
8      Q. Has Rothe Enterprises received any contracts as a
9  certified women-owned small business?
10      A. No.
11      Q. Have you bid on any contracts with --
12      A. Nothing was set aside for women-owned at all.
13  Nothing at all. I mean we've gotten a few contracts that
14  were small business set asides that -- that I'm sure the
15  contracting officer counted as a woman-owned. Okay. And
16  I'm sure that they take their credits and -- and some of the
17  subcontracts we have they consider the women-owned or the
18  HUBZone to meet their socioeconomic goals.
19      Q. So you believe that some of the contracts you have
20  gotten as subcontracts have been counted by the contracting
21  officer as women-owned small business contract?
22      A. Not by the contracting officer. By the company
23  that subcontracts.
24      Q. By the company that subcontracts?
25      A. Right. And I wouldn't doubt that if -- on some of

**Page 57**

1  the contracts that we've -- we've earned but we didn't --
2  but they didn't award them to us because we're women-owned
3  business. They awarded it to us because we're small
4  business and have known competitively that they have counted
5  the credit. They said, "Okay. By the way, we can count the
6  credit." I don't think we've ever won anything at all
7  related to the fact that we're women-owned business nor have
8  we ever bid on anything related just to the fact we're
9  women-owned business.
10      Q. So this is the notorious report you were discussing
11  by Dr. Rubinovitz.
12          MR. BRANIFF: Let's have this marked as
13  Exhibit 5 I believe.
14          (Exhibit 5 marked.)
15      Q. (BY MR. BRANIFF) Do you recognize this report?
16      A. Sure.
17      Q. Is this the report that you were discussing
18  earlier?
19      A. Sure.
20      Q. On -- if you could turn to page two on the report,
21  I believe it's in the first or second full paragraph here,
22  the third line from the bottom. The report states that the
23  odds of winning a contract that are computed herein are
24  significant at the 95 percent level. In your expert
25  opinion, what does that mean?

15  (Pages 54 to 57)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 58

1    A.  That means that he had enough contracts to be able
2    to -- to -- that he had enough contracts to be able to
3    compute that he was very sure of his statistical
4    significance, that he believed in -- that he had a big
5    enough base of things to generate something that
6    statistically made sense.
7        Q.  In a --
8        A.  But still when you put garbage in, you get garbage
9    out.  You can't -- you can compute all day the wrong stuff,
10   and you're going to get the wrong stuff.
11       Q.  I understand.  If -- in determining that 95 percent
12   level, is it your expert opinion that the number of contract
13   analyzed is the most important factor in arriving at that
14   significance level?
15       A.  If you're computing the probability of winning
16   contracts, which he was doing, the number of contracts would
17   be the most important thing to get to that point.
18       Q.  Are there any other factors that could -- that
19   could determine what the level of -- that the -- what the
20   level of significance is other than number of contracts?
21       A.  Let me think about that.  I mean the method he was
22   using to -- the procedures he was using to compute the -- to
23   determine what he was computing would be significant, but
24   the number of contracts would be the most significant.  But
25   -- but all -- all you're doing there is you're saying that

Page 59

1    his -- that he had a broad enough base and that his
2    calculations were -- that the calculations were the good
3    calculation.  You weren't saying the results were
4    reasonable.
5        Q.  I understand.  I'm not asking you to accept any of
6    his conclusions here.  I'm just looking at whether or not
7    what your opinion is on his belief that his conclusions are
8    significant at the 95 percent level?
9        A.  I have no -- I have no qualms about his expertise
10   as an economist or a statistician.
11       Q.  So you didn't recreate his --
12       A.  I did not recreate that, no.  I looked at the
13   fundamental data that was wrong.
14       Q.  Okay.  Let's go to page four.  I believe we've
15   already discussed this a little bit today.  On page four,
16   Dr. Rubinovitz is discussing the difference between using
17   three and six digit NAICS codes.  Do you see that discussion
18   anywhere on the page?
19       A.  I think it's down here at the bottom.  He didn't
20   have enough data to do six.
21       Q.  I -- and that's your opinion, that he did not have
22   enough data to do six?
23       A.  I mean I think he said -- let me read it further,
24   but I think that's what he said; he didn't have enough data
25   to do six.  And the NAICS codes was another fundamental

Page 60

1    problem he did.  In SAM's you put down --
2        Q.  Let's stop just a second.  Could you say what SAM's
3    is?
4        A.  That's the -- it is the database that the
5    government uses to put -- that every person who is bidding
6    on government contracts has to put their basic information
7    into.  It's a system for award management.
8        Q.  System for award manager.  Just to clarify, do you
9    know if Rothe Development has registered in SAM's?
10       A.  We have to.  You can't bid any contracts without
11   bidding in SAM's.
12       Q.  As is Rothe Enterprises?
13       A.  Sure.
14       Q.  Go ahead and continue.
15       A.  Well, the problem is that when you put a thing down
16   -- a NAICS code in SAM's, it's not what you have necessarily
17   been doing; it's what you want to do.  It's sort of -- when
18   you put NAICS codes in, it's sort of an advertisement, and
19   you hopefully -- if you're bidding on -- say you're not
20   really doing plumbing.  That may not be a good example.  But
21   say you're not doing plumbing but you want to get a contract
22   for plumbing.  You would put down NAICS codes for plumbing
23   in SAM's so if the contracting officer looked at it they
24   might see it.  You would put the NAICS code for plumbing in
25   for SAM's so if somebody like me were looking for

Page 61

1    subcontractors we might do a search and find that.  If you
2    have a NAICS code -- a NAICS code in SAM, other people can
3    look and search and see this NAICS code come up and say,
4    "Oh, that company deals in plumbing."  I don't have to be
5    dealing in plumbing to put it in SAM's.  Nobody checks on
6    what I put in SAM's.  There is no criteria for me whether
7    it's correct or not in SAM's.  There is no punishment for me
8    if I put the wrong numbers in SAM's.  I could be using one
9    of the 15 to 20 NAICS codes I put in SAM's, and it makes no
10   difference to anybody.
11       Q.  So your -- so it's possible that companies add
12   NAICS codes to their SAM's report that they don't actually
13   do business in?
14       A.  Absolutely.  It's a known fact.  I've been dealing
15   with SAM's and the predecessor for SAM's, CCR, long enough
16   in the small business database.  I've been dealing with all
17   of those databases long enough to know that that's an
18   advertising method, and it's not a -- it's not a necessary
19   performance method.  It's not a -- there is nothing that
20   required me to say that I have to have expertise or I have
21   to have performance in this are to put my NAICS in SAM.
22       Q.  So for your SAM registry for Rothe Development, did
23   you enter any NAICS codes that you work in?
24       A.  Sure.  We put -- we have pretty much the NAICS
25   codes that we work in, and we have some NAICS codes that we

16  (Pages 58 to 61)

## Page 62

1  have worked in at some time in the past.
2      Q.  Are there any NAICS codes in your SAM registry for
3  Rothe Development you do not have expertise in?
4      A.  I really would have to take a look at it because I
5  haven't looked at it in awhile.  I mean this is something
6  that we have to upgrade every year, and I -- I think there
7  may be some that -- that -- that we haven't worked in for
8  quite awhile.  So I wouldn't think there would be an
9  accurate description necessarily of what we're doing.
10     Q.  Is it a burden -- would you describe it as
11 burdensome to have to update your SAM's registry every year?
12     A.  They made it far more burdensome lately because
13 they -- they went from CCR -- they converted a couple years
14 ago from CCR to SAM's.  And when they did, they had -- they
15 converted about half the data.  And -- and they had an
16 understaffed help desk, and it was just horrendous trying to
17 get all of your data into SAM's.  And then once you did, the
18 SAM's people go along and the government changes some --
19 they change some FAR clause some place, and so you end up
20 going about four times a year going in to SAM's to have to
21 verify that you applied in this FAR clause or that you
22 recognize or accept this FAR clause or you don't or
23 whatever.  Okay.  And so it could be a little burdensome.
24 And it's a little burdensome for us because we've got
25 multiple companies.

## Page 63

1      Q.  Right.  So you also have a SAM entry in addition
2  for Rothe Development, also for Rothe Enterprises?
3      A.  Yes.  And for RX Joint Venture and for Roman Joint
4  Venture, and all those things, yes.
5      Q.  For -- are the -- are the NAICS codes that you have
6  entered for those companies all the same, or do you think
7  that they're different?
8      A.  They're different depending on what the emphasis in
9  the company is.
10     Q.  And it's possible that there might be some NAICS
11 codes associated with those companies in the same database
12 that your company does not have current expertise in?
13     A.  Yes.
14     Q.  So back to the report -- do you -- do you know the
15 six-digit NAICS codes that your companies operate in?  You
16 don't need to repeat them now, but do you have a passing
17 knowledge of what you currently think yours are?
18     A.  The biggest ones, yes.
19     Q.  The biggest ones.  And, if you could, just relate
20 the biggest --
21     A.  The biggest ones are 541511, 541512, 541513,
22 541519.  And then I have a hard time remembering what the
23 facility support services one is.  I don't remember that
24 one.  And then we have a couple for calibration.  One of
25 them that Wainwright poured out, but that's not the one that

## Page 64

1  we normally used.  The problem with the government -- the
2  things that the -- the Small Business Administration might
3  not really like but that reality is in -- in government
4  contracting is that, you know, they have some -- some NAICS
5  codes for businesses that are really small.  And the true
6  NAICS code for calibration laboratories is like $7 million
7  or something, $7 or $8 million.  And so -- but the -- the
8  various government agencies want somebody that is bigger and
9  they want somebody with a lot more expertise and experience
10 to do that kind of job.  So they pick another NAICS code,
11 which is similar.  And I don't remember the NAICS code that
12 they use, but there is one that's about $14 million.  And
13 there's -- and then on the really big calibration
14 laboratories they don't use -- they don't use one of those
15 at all.  They use facility support services.
16     Q.  Do you know --
17     A.  But they do that, you know -- and they do it.  And
18 some contracting officers, if they really like the business
19 that's doing their job -- if they really like the business
20 that's doing their job and that business grows too big for
21 that NAICS code, they will change the NAICS code to keep
22 that business.  And that's something they're not supposed to
23 do but they do.  That's reality.
24     Q.  Do you -- let's start with the first one, 541511,
25 which I believe is a computer services NAICS code?

## Page 65

1      A.  Yes, it's -- one of them is computer services, one
2  of them is programming, one of them is operation.  And I
3  can't tell you which one is which right off the top of my
4  head.
5      Q.  Do you know about how many federal government
6  contracts are issued in the 541511 NAICS code every year?
7      A.  Billions of dollars worth.
8      Q.  Billions of dollars worth.  Do you know about how
9  many contracts it is?
10     A.  No.  I've looked it up, and it may be in one of the
11 affidavits I turned in for this case.  It probably is.  And
12 I think I've listed a number of -- I think in one of those
13 affidavits I listed a number of contracts, a number of 8(a)
14 dollars and a number of non-8(a) dollars, but I don't
15 remember off the top of my head.
16     Q.  One of the things that Dr. Rubinovitz did here in
17 -- for the three-digit NAICS code was to calculate
18 contracting outcomes in each three-digit NAICS code.  I
19 believe he has --
20     A.  Right.
21     Q.  -- the tables at the back.
22     A.  Right.
23     Q.  And in those tables, he computed that to a level of
24 statistical significance.  Do you believe in your expert
25 opinion he could have replicated that effort with six-digit

17  (Pages 62 to 65)

Electronically signed by Barbara Griffin (301-176-817-0609)                              2e97a725-ee14-4199-bec5-62df23e28d12

Page 66

1    NAICS code?
2       A. He didn't have enough data.
3       Q. You don't think he had enough data to do that?
4       A. No. Rubinovitz is not -- he's a good enough
5    statistician. He's not going to do something where -- where
6    there is -- if he did the same calculation, statistical
7    significance wouldn't have been 95 percent. He's going to
8    work at the level that's 95 percent. That's what good
9    statisticians do. And he doesn't have -- he doesn't have
10   the statistical significance to have a six-digit NAICS code,
11   so he couldn't do it.
12      Q. Did you -- did you verify that? Did you run --
13      A. No. No, he says that in his report.
14      Q. And you -- but you accepted that? You did not --
15      A. I accept that in his report. I accepted that he
16   knows enough about statisticians -- about the statistical
17   analysis. If he said in his report that he can only do it
18   at a three-digit level, that's what he could do.
19      Q. Do you think he could have done it at the
20   five-digit level?
21      A. I would presume that he would have done it at the
22   highest level he could, and that's -- the three digit was
23   it. But I don't know if he could done it with a four digit
24   or not. I did not look at the data. I did not analyze
25   that. Some of these things -- some of those NAICS codes --

Page 67

1    if you got to the six-digit level, some of the NAICS codes
2    only have eight or ten contracts in them. So, you know,
3    that -- not the 541511 but you -- the other NAICS codes
4    that's the case. So I can understand it. And there is some
5    NAICS codes that he didn't do the work at all because he
6    couldn't -- I don't remember exactly which ones they were,
7    but there were some small ones he didn't use at all. And
8    that's sort of the problem -- that's really sort of the big
9    -- the really big picture problem that you've got with doing
10   something like this, and that's why Wainwright likes to use
11   five years worth of data because only if you use four or
12   five years worth of data, you get enough data to have
13   statistical significance to do your calculations. And
14   Rubinovitz was also handicapped. He had another major,
15   major handicap, and that was he was trying to work with 2012
16   data. And he was trying to work with 2012 earlier in 2013.
17   Contracting officers don't get all their datas -- they get
18   all their data ultimately have the FPDS database. He used a
19   Dun and Brad -- a Bloomberg extract from the FPDS database.
20   The contracting people don't -- you know, they -- they have
21   a flurry of activity at the end of the year, and the
22   contracting -- from my experience looking at the FPDS
23   database -- and I've been looking at the FPDS database since
24   -- I've looked at all of their databases since 1995. In
25   fact, I have all of them on -- all of the early ones on

Page 68

1    line. Okay. I'm not -- not online but on my computer. And
2    the last couple of years we've been looking at them, and the
3    number of dollars in the FPDS database increases every month
4    for about seven or eight months, almost a year after the end
5    of the year. So he had probably -- when he was working on
6    this, he probably had maybe three quarters of the database
7    available that would -- that's probably presently right now.
8    I mean if he did his same analysis off the current database
9    right now, we would have a different number. Okay. And
10   certainly his data doesn't match the -- the -- one of the
11   other points I pointed another in the thing. You know, the
12   -- the SBA in connection with the FPDS people -- I'm not
13   sure exactly who produces it, but that building report where
14   they say how much money they actually got. I couldn't find
15   -- I couldn't match that with a data that you sent me with
16   the data that Bloomberg had. Known of those things match
17   it. They were like 20 percent off in the total dollars.
18   Okay. But somehow the SBA in about March or April or the
19   SBA in the -- FPDS database -- they go out and ring the data
20   out of everybody who put it together to make this Golden
21   report and nothing ever matches it. You know, I -- I am
22   still baffled. I am absolutely baffled how they came up
23   with -- I have to look at my report to see the number. It's
24   like 8.000 -- on the data side it was 8.000. But if you
25   took the underlying data -- you took the two values they

Page 69

1    were dividing in to get the 8 percent, it's like 8.000001 or
2    something like that. It's -- it's within $30,000 of being 8
3    percent out of $400 billion. Okay. It's amazing what -- so
4    what does that mean? That means either of you guys are
5    micromanaging the hell out of these SDB contracts to make
6    sure that they end up to be exactly 8 percent, okay, or you
7    pistol whip that number. One of the two. It's not possible
8    by random processes and by the processes that you espouse is
9    supposed to happen with rewards to SDBs ending up with a
10   number that's at that. That's not possible. Okay. And on
11   previous years leading up to the 2012, the number was always
12   like 7.85 percent or 7.9 percent, 7.94 percent. Something
13   -- just short -- just a teeny bit short of 10 percent. But
14   somehow magically they got exactly 8 percent. So did they
15   micromanage it? If they did, that hurts your position very
16   badly on this case I would think because that means they
17   awarded contracts or they didn't award contracts solely
18   based on SDB status and 8(a) status to try to reach their
19   goal. If they didn't micromanage it, did they pistol whip
20   it like they seemed to be doing in the Obama administration
21   with other numbers. Okay. So I -- I --
22          THE WITNESS: You ought to take a look at that
23   Mr. --
24          MR. FISHMAN: Fishman.
25          THE WITNESS: Fishman. Okay. Fishman. You

18  (Pages 66 to 69)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 70

1    need to take a look at that.
2        A.   You ought to go back to the SDB people and say how
3    did we end up with this 8 percent number?  What did we do to
4    end up with exactly 8 percent.  My guess -- okay.  It's
5    purely speculative.  Okay.  But my guess is they looked at
6    the number.  It was like seven eight five or seven nine or
7    something like that and they've been searching through all
8    their contracts to see if they missed any SDB ones and they
9    dug through things that they could reclassify as SDB until
10   they got to close enough to 8 percent and stopped.  That's
11   kind of what I think they did.
12       Q.   (BY MR. BRANIFF) So when you -- earlier you said
13   they could not have reached that by random numbers?
14       A.   They could not have reached it by ordinary process
15   of issuing --
16       Q.   Ordinary process.  But that's not -- you didn't --
17   you didn't look at all of the previous numbers for previous
18   years and run a statistical model in order to verify --
19       A.   No.
20       Q.   When you said this is speculating, you're guessing,
21   that's where you're saying when you say they couldn't have
22   come up with random numbers; you're speculating as to that?
23       A.   I'm saying that from what I know about statistics
24   and what I know about mathematics and what I know about the
25   government process it's impossible for them to come up with

Page 71

1    that accurate $30,000 out of something like $400 billion.
2    That's one part in 12 million of being the perfect 8
3    percent.  It's not possible by awarding 8(a) contracts and
4    SDB contracts through normal processes to get that close to
5    8 percent.  It's not possible unless you, A, micromanage all
6    of your awards, which means you're making awards based
7    solely -- or not making awards based solely on being SDB and
8    8(a)s and -- or, two, you fudge the figures.  One of the
9    two.
10       Q.   Do you have any opinion as to why it wasn't 8
11   percent in like 2009, 2010, 2011?
12       A.   Because they didn't play games.  They actually
13   presented the accurate number.  In 2012 somebody decided to
14   get real smart and decide let's make it 8 percent.  I don't
15   know whether you got a new manager.  I don't whether you got
16   a new person to do the calculations.  I don't know what they
17   did.  Okay.  I'd like to know, but that's just my curiosity.
18       Q.   I understand.
19       A.   It is -- it is -- somebody played a game there.
20   Somebody did something.  And if they macromanaged the
21   awarding of contracts to get there, that's really a problem.
22       Q.   I understand.
23       A.   If they didn't micromanage contracts, it they
24   pistol whipped it, that's another problem.  And I think
25   that's something that you should be looking into, but that's

Page 72

1    not related to the court case.
2        Q.   Do you -- let's go on to his -- keep going on his
3    report there.  On page nine Dr. Rubinovitz describes --
4        A.   Just a second.  Let me get there.  Okay.
5        Q.   He's discussing regression analysis here on page
6    nine, and at a certain point he describes his regression
7    analysis as a logic regression analysis.  Let me see.
8    Starting here where he discusses logic, he goes, "There are
9    many types of regression analysis, but the logic model is
10   widely used."
11       A.   Uh-huh.
12       Q.   Do you know if his opinion that the logic model is
13   widely used is accurate?
14       A.   I did some research after I read this, and my
15   research indicated that a lot of people use the logic model.
16   But one of the things I also have determined from looking at
17   Rubinovitz and -- and other people is the statisticians are
18   not real good about explaining why they're doing what
19   they're doing.  They're not real good about justifying
20   their position.  They're not real good about saying -- like
21   this one.  Like this thing says there are many types of
22   things, but the one that's now widely used that's why I used
23   it.  There has got to be some analysis.  If I were doing
24   this kind of work, there would be some analysis I'd have to
25   do besides why I use this model, why it fits, not that it's

Page 73

1    widely used so I'm going to use it.
2        Q.   Can you -- sitting here today, could you give a
3    good reason why the logic model should not have been used?
4        A.   No, I can't justify it shouldn't be used.  I can't
5    justify that it should be used.  But you certainly didn't
6    tell me any reason why he picked it other than it's widely
7    used, so it becomes suspect.
8        Q.   But other than his lack of an explanation, you
9    couldn't say what flaws there are with the logic model?
10       A.   Well, I mean it involves logarithms.  It involves,
11   logarithms, and you are taking the logarithm -- what caught
12   my eye to it is you're taking the size of the business and
13   you're taking logarithms of the size of the business.  And
14   logarithms of the size of the business means much less
15   difference than the size of the business than the -- than
16   the -- than it would be if you took at other things.  I mean
17   I went into great detail to say what an $8 million a year
18   business or 8.9 or something like that -- $8 million a year
19   business probably has two or three people -- like I said
20   before, they are doing business development, doing other
21   things.  They can get their things.  An $8 million business
22   has to do a lot more -- win a lot more contracts and win a
23   lot more dollars in contracts to stay at $8 million.  A $1
24   million or $2 million or $1.9 million business only has to
25   win 1.9.  A $1.9 million -- you know, there is a thing

19  (Pages 70 to 73)

Electronically signed by Barbara Griffin (301-176-817-0609)                           2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                              November 21, 2013

---

Page 74

1  called G&A.  Are you familiar with G&A?
2      Q.  I am not.  If you would --
3      A.  General and administrative expense.  Okay.  General
4  and administrative expense is -- it's a percentage of your
5  revenue.  Actually a percentage -- excuse me.  It's a
6  percentage of your expenses, not your revenue.  Percentage
7  of your expenses.  And it's -- and it's the amount of money
8  that actually goes into effectively running the business.
9  You have overhead, which overhead normally is associated
10  with direct -- with the direct cost and the indirect costs
11  associated with the direct cost.  Like you have all of these
12  people working out there and their health insurance, and
13  that's overhead.  G&A is what you pay for the corporate
14  offices, what you pay for the buildings, the -- and people
15  like me.  That's G&A.  And G&A for a government contractor
16  is generally something less than 10 percent because that's
17  about what the market allows.  Okay.  So if I'm doing $10
18  million a year worth of business, I get a G&A of about a
19  million dollars a year.  So I've got a million dollars a
20  year, so I can afford two or three people doing nothing but
21  bids and proposals.  If my business is $1.9 million a year,
22  I only have $190,000.  I can't afford two or three people
23  doing bid proposals.  So naturally I'm going to win more
24  bids than those people.  Okay.  And I'm going to probably
25  win -- if you've got, say, $2 million and $8 million, that's

Page 75

1  four times the size.  I'm going to have to win four times as
2  many jobs.  So to look at me and do the analysis on the
3  logarithm of my size versus their size is insanity because
4  the logarithm difference of those two things is like -- it's
5  not a four times difference.  It's like a one and a half
6  difference or two difference or something.
7      Q.  Are you -- are you aware of any regression models
8  that do not use logarithms?
9      A.  No.
10      Q.  If -- if there was a regression analysis that did
11  not use logarithms, would you have suggested that that would
12  have been better than the logic method?
13      A.  Well, Wainwright suggested it only he didn't use
14  regression analysis whatsoever at all.  Wainwright suggested
15  you count heads, which I strongly disagree with, but that's
16  what Wainwright would do, and I don't think you need to do a
17  regression analysis.
18      Q.  Okay.
19      A.  I don't think regression analysis was -- was
20  appropriate for this at all.  I think you could do the whole
21  thing without regression analysis.
22      Q.  That might answer our next question then on page
23  ten.  At the top here between pages nine and ten, the full
24  sentence, starts that "The model assumes that there is a
25  relationship between a variable to be explained, which is

Page 76

1  the dependent variable, and one or more explanatory, the
2  independent variables."  And then he has a formula there.
3  Do you know the difference between a dependent and an
4  independent variable?
5      A.  Sure.  I had -- I've told you I think when we
6  started off I had -- I had a whole year worth of
7  differential equations.  I think I understand the difference
8  in variables.
9      Q.  And do you have any issues with the dependent and
10  independent variables that Dr. --
11      A.  No, I understand --
12      Q.  -- Rubinovitz selected in this report?
13      A.  No.  I have -- my problem is -- again, when you get
14  down to it, is what he produced.  The probabilities don't
15  make any sense.  Looking at the same number of contracts you
16  win makes no sense.  I don't have a major problem with his
17  approach to the problem.
18      Q.  Okay.
19      A.  I have a problem with the data he used and what he
20  was trying to achieve that don't make any rational
21  difference to this court case.
22      Q.  Okay.
23      A.  Not to mention the fact that the court -- that none
24  of his report was before the court -- was before congress
25  when they did this, but, of course, that's legal.

Page 77

1      Q.  And let's go table three where he has his pooled
2  regression analysis.  Excuse me.  I apologize for being in
3  your space.
4      A.  No problem at all.
5      Q.  There you are, table three, which is on page 14.
6  He has a number of categories here.
7      A.  Uh-huh.
8      Q.  There are two columns here.  His right-hand column
9  is labeled odds ratios.
10      A.  Uh-huh.
11      Q.  Do you understand what Dr. Rubinovitz means by odd
12  ratios?
13      A.  I understand by what the -- the results that he
14  came up with were, and I -- I believe that I understand what
15  his odds ratios -- I believe I have a general understanding
16  of what he's doing.  I understand what he's coming up with.
17      Q.  Did you replicate any --
18      A.  No, I did not replicate them.  Like I said, I have
19  a -- I have a pretty good belief that he knows how to do
20  this mathematics.  I see no point in redoing something that
21  a reasonable expert should be able to do.
22      Q.  You already started talking about this, but let's
23  just -- I just want to give you a chance to clarify.  There
24  are three categories at the -- in the middle of the page
25  there.  One is log age, L-O-G age.  One is log employment,

---

Electronically signed by Barbara Griffin (301-176-817-0609)                              2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                                    November 21, 2013

| Page 78 |
|---|

1    and one log receipts -- L-O-G receipts. Could you explain
2    what you think he means by log age?
3        A.   He means -- he means by log age that he interpreted
4    the logarithm of the age of the firm, and he took the
5    logarithm of the age of the employment and logarithm of the
6    receipts, and he took and he's concurring the logarithm of
7    the age and employment and receipts in comparison to
8    referring the actual age, employment and receipts.
9        Q.   Do you believe the age of a firm is relevant to the
10   likelihood that a firm might win a contract?
11       A.   I believe that the size is far more relevant than
12   the age; but as I said in my report, if you've been around
13   for awhile, then you have a history. And if you have a
14   history, you have past performance. And in government
15   contracting, especially service contracting what I am in and
16   where most of the 8(a) program is in, you're -- you -- if
17   you've been -- you generally win -- you win some contracts;
18   and if you perform well, you keep those contracts or you
19   have a much higher probability of winning them again and --
20       Q.   Let me just -- so in your expert opinion getting
21   that contract increases your probability of getting another
22   contract?
23       A.   It's -- it's -- the probability -- the way -- the
24   way we look at it ourselves -- okay. In our company, we
25   look at the probability of winning a contract that we

| Page 79 |
|---|

1    already have. Winning it back is probably 80 percent. The
2    contract of winning a contract that we don't have that we're
3    taking it away from somebody you probably start at 50
4    percent. I mean that's a starting probable, and then you
5    have to consider other things like did they change the stuff
6    or did I like you, are you doing well. You have to figure
7    those other things into your probabilities. But your basic
8    probability is this is 30 percent better for a contract you
9    have than one you don't have.
10       Q.   So you're -- and your second contract would be
11   easier to win or you would have a higher probability of
12   winning the second contract than the first contract.
13       A.   Normally. The only problem that you have is -- is
14   that if you have a contract and you've had it for a long
15   time, you know all of the costs. Okay. And you know -- you
16   know all the cost associated with it, and you might bid a
17   more realistic cost than anybody unless that's bidding on it
18   that doesn't understand all the cost. You may be -- you may
19   have a higher probability of being underbid.
20       Q.   Right.
21       A.   But yours is the most realistic cost. Okay. The
22   government never tells you all the things that you need on a
23   government bid to be able to bid it. They don't tell you
24   all the intangibles. And -- and you've got to make
25   estimates on what those intangibles are. But I would say

| Page 80 |
|---|

1    having won a contract is much more -- having a contract is
2    what I was thinking. And the older you are the more
3    contracts you have in place. But that usually goes hand in
4    hand with size. I would say size is much more important
5    than age. Size is -- you know, total received, number of
6    employees is -- total dollars is probably the most important
7    one. Number of employees is probably second and age is
8    probably third.
9        Q.   And that's just based on your business experience
10   or --
11       A.   Based totally on my business experience.
12       Q.   Do you know if Dr. Rubinovitz's numbers comport
13   with that?
14       A.   I do not know that at all because -- but
15   Dr. Rubinovitz didn't -- doesn't know anything at all about
16   government contracting business. He has very little
17   knowledge -- he demonstrated very little knowledge in his
18   depo about any part of government contracting business.
19       Q.   Okay. Looking back through this list here, there
20   is a number of other categories in the right-hand column
21   there. Do you see the -- the category that says sole
22   proprietor?
23       A.   Uh-huh.
24       Q.   Do you know what that is -- why that category is
25   included in this report?

| Page 81 |
|---|

1        A.   I -- you know, he saw that in his data, and he put
2    it in, and it was a shock to him and a shock to me that the
3    sole proprietor has a better chance of winning a contract.
4    Okay. But I would say that a sole proprietor -- but since
5    he never looked at dollars, that's not very meaningful. I
6    looked at that and said my God. But he said he was shocked,
7    and I would agree with him that I am shocked, but I believe
8    that's possible because he -- he crunched the numbers. I
9    didn't. But -- but he didn't -- but since he didn't look at
10   dollars, that didn't tell you how meaningful that was. It
11   is -- it goes back to capacity situation. Can a -- can a
12   single person that's -- that's doing maybe $50,000 worth a
13   year -- worth of business can they really do a million
14   dollar contract? Probably not. They may have a very high
15   probability of winning more than $50,000 contracts or
16   $25,000 contracts, but that -- I doubt that they really have
17   a probability of winning $1 million or $2 million contracts,
18   but we don't know because his data doesn't tell you that.
19   Doesn't tell you squat about winning dollars.
20       Q.   Okay. So among the variables listed here, there --
21   we have various categories here, SDB not 8(a), 8(a),
22   woman-owned, minority-owned, HUBZone, services-disabled
23   veteran and other veteran. Those are the top six categories
24   there. Do you consider those variables important to winning
25   a contract? Do you think that those variables would have an

21  (Pages 78 to 81)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 82

1    impact on the probability of a contractor winning a
2    contract?
3        A.  Well, what he was trying to do was he was trying to
4    look at 8(a)s that -- I mean he was trying to look at SDBs
5    that were not 8(a)s, and he was trying to say that these
6    SDBs, if not 8(a)s, weren't doing as well effectively as
7    other non-businesses who weren't SDBs.  That was the purpose
8    of his -- the feel of what his report.  Okay.  In that
9    context, okay, the government is not supposed to provide any
10   benefit at all to SDBs that aren't 8(a)s other than
11   subcontracting programs.  Okay.  And one of the major
12   failures of his report is he didn't consider subcontracting
13   programs.  And that makes it -- that alone makes his report
14   worthless because the subcontracting dollars to SDBs who
15   aren't 8(a)s is almost as great as the prime contracting
16   dollars.  And since that dollars is almost as great, then --
17   and you don't consider it, what are you doing?  It's kind of
18   like Wainwright saying that, yeah, every single one of those
19   reports according to Wainwright considered subcontracting
20   dollars because you have to, because that's the name of the
21   game.  Why are these people even self-certified SDBs?
22   They're only self-certified SDBs for one reason, so they can
23   get subcontracting dollars under the SDB game.  So why the
24   hell are you calculating ting anything without looking at
25   the subcontracting dollars.  It's ridiculous.  That's why

Page 83

1    this is like worth the paper it's written on.  That's about
2    it.
3        Q.  The -- for the number that you just mentioned that
4    all SDBs get the same number of dollars through
5    subcontracting as prime contracting, where did you get that
6    number?
7        A.  I looked up on the SBA web site at the percentage
8    of dollars, which is -- which they say get awarded to -- to
9    -- you know, to SBDs, that percentage of dollars.  And I
10   multiplied it times the dollars which are available in the
11   pool.  And in my report, I calculate what that number is.  I
12   don't remember what it is, but it's like $15 billion or $20
13   billion, and the money that they get otherwise or only $15
14   or $20 billion, somewhere in there, that I ballpark.  So it
15   is almost the same amount of money.
16       Q.  For your firm, Rothe Enterprises, that do
17   subcontracting work?
18       A.  Sure.
19       Q.  What percentage of the business is subcontracting
20   work?
21       A.  For us right as of today it's probably 50 or -- 50
22   percent.
23       Q.  Historically is that consistent --
24       A.  Historically it's probably 25 or 30.  I know
25   businesses at NASA that don't have -- that are -- that are

Page 84

1    fairly large businesses -- I mean that have 100, 200 or 300
2    people that don't have a prime contract.  They're all
3    subcontract.  They're all SDB subcontracts.
4        Q.  The -- so other than the ones here -- but do you
5    believe that being an 8(a) would increase your odds of
6    getting a contract?
7        A.  Yes, but he didn't calculate 8(a) groups directly.
8    He didn't consider that.  8(a) groups, yes, I -- as I put my
9    dollars together and I put the report together, I showed you
10   that 8(a)s win more contracts than non-8(a)s, that 8(a)s
11   move more dollars than non-8(a)s.  That's perfectly
12   legitimate.
13       Q.  You don't believe he looked at 8(a)s?
14       A.  He said in his report that he was trying to look at
15   non-8(a)s.  He was trying to look at non-8(a)s, at least
16   that's what the rest of the report says.  He was trying to
17   look at non-8(a)s and then look at their probability of
18   winning a contract versus people who weren't SBDs, if I
19   understood it correctly.
20       Q.  Do you believe that he looked at the odds of
21   winning a contract if you're a woman-owned small business?
22       A.  He calculated it as a variable.  He did -- one of
23   the things that he doesn't tell us in his report -- he
24   doesn't tell us at all in his report -- he went through -- I
25   mean what you have to do to do one of these regression

Page 85

1    analysis is you have to go through and you've got to do a
2    lot of work prior to doing the regression analysis.  You've
3    got to go by several iterations of work.  You've got to
4    figure out on these dependent variables and independent
5    variables you've got to figure out -- like his number for
6    service-disabled veteran, you've have to go through there
7    and you've got to work -- you've got to calculate, okay,
8    I've got everybody except the service-disabled veteran,
9    whether they win or don't win.  Right?  Okay.  I don't know.
10   Okay.  Now, the service-disabled veterans is a very
11   difficult process, and I don't think that he understood all
12   the dollars in the various programs that go to various
13   people.  Some SDBs are, for instance -- some SDBs are, for
14   instance, woman-owned.  Some -- all of them -- almost 90
15   percent of them or 95 percent -- I don't know the exact
16   level of the number -- are minority owned.  Okay.  Some
17   percentage of them are HUBZone.  Okay.  But that's a smaller
18   percentage.  Some are veteran -- service-disabled veterans.
19   Their service-disabled veterans or other veterans -- they
20   have their own programs that they can win contracts on, and
21   they wouldn't necessarily be -- you could say well these
22   SBDs are awarded a contract.  They get double counting.
23   Right?
24       Q.  Right.
25       A.  And HUBZone people that's a totally separate

22  (Pages 82 to 85)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                              November 21, 2013

| Page 86 | Page 88 |

**Page 86**

1    program.  Okay.  And so I'm not sure that all of those are
2    -- I'm not sure that looking at all of this stuff -- he
3    looked at all the data he had and all the data in his -- he
4    looked at all the data in his limited database that he got
5    from Bloomberg.  The Bloomberg database does not have half
6    the database -- half the data that's in FPDS.  The database
7    you provided us has far more data in it than the database
8    that he got from Bloomberg.  He went to SAM -- it the
9    SAM's data to figure out who was an SBD and who was an 8(a)
10   and so forth and then applied it to the data at Bloomberg
11   because he didn't get the Bloomberg data that had that data
12   in it.
13       Q.  I see.
14       A.  Okay.  You know, the data you gave us for the
15   government database was much more voluminous, and we had to
16   work onto it to really put it into a big database, but it
17   told you in that database whether this was awarded to an SDB
18   or awarded to an 8(a) or whatever was awarded under the 8(a)
19   program, was it an award to an SDB -- to somebody who
20   happened to be an SDB, whatever.  They tell you all that
21   data.  The Bloomberg data didn't tell you that.
22          MR. BRANIFF:  Okay.  Can we pause here for a
23   second?
24          (Recess from 11:41 to 11:53.)
25       Q.  (BY MR. BRANIFF) Going back to our table three

**Page 87**

1    here, there were different categories there of what
2    Dr. Rubinovitz looked at in order to run his regression
3    analysis to determine likelihood of winning a contract.
4    Earlier you mentioned that you think winning a prior
5    contract was particularly relevant to whether or not you
6    would win a contract; is that correct?
7        A.  Yes.
8        Q.  Much like the phrase nothing propinques
9    propinquity, nothing is more important to winning a contract
10   than winning a contract?
11       A.  Yeah.
12       Q.  So the -- the most important thing you would put as
13   a category one is do you have -- do you have a contract;
14   and, if so, that's going to increase the likelihood of you
15   winning a contract?
16       A.  Winning that contract again.
17       Q.  How about winning other contracts with that
18   contracting officer?
19       A.  Probably, yes.  With that contracting officer, with
20   that area of the government like the Air Force.  The word
21   contracting for the Air Force is much different than
22   contracting for the Navy.  And you have to know a whole new
23   set of acronyms and a whole new set of -- just the way we do
24   things.  Okay.  And we still -- we have been very successful
25   with the Air Force.  We've been -- now we're successful with

**Page 88**

1    Transcom and now we won our first, you know, effective Navy
2    kind of job.  But it's really more Transcom between the
3    services.  But Navy likes people that have experience
4    dealing with the Navy.
5        Q.  So would you say that the more contracts you win
6    the higher the likelihood that you will win even more
7    contracts in the future?
8        A.  Yes.
9        Q.  Now, you've said that you weren't a participant in
10   the 8(a) program yourself, but are you aware of some of the
11   limitations that are put on companies that participate in
12   the 8(a) program?
13       A.  Yes.  You have -- you have limits on the -- your
14   net worth, but you don't count the money that's in your
15   house or business.  Okay.  And -- and your initial entry
16   into the 8(a) program is really -- is 250 or 300 or
17   something.  I don't know the exact number right now.  You've
18   got to be under that to fit into the program, and then
19   you've got to stay -- I think your normal net worth has got
20   to stay under 750 but not counting your house and building.
21   And so we see these 8(a)s with huge houses and all the money
22   -- all account money in their business instead having the
23   money themselves.  I remember in the guy that was -- that
24   started with us on -- on the Rothe -- on the initial Rothe
25   cases was a guy that we went up and took a look at his house

**Page 89**

1    and is -- the Asian-American -- actually Korean-American who
2    had become an 8(a) and had this -- an SDB and had this house
3    that had to be worth multiple millions of dollars in
4    northern Maryland.  When you start counting three or four
5    chimneys, you start thinking what it's worth.  And so it's
6    an anomaly, anomaly that you would have -- the house that's
7    worth that much money but you wouldn't personally -- your
8    personal net worth would be less than 750.  Okay.  So I --
9    it -- you force somebody -- to be in the 8(a) program, you
10   force them to do something that's not normal for your net
11   worth, not normal for you to be worth doing what you're
12   doing.
13       Q.  And the -- with regard to the 8(a) programs when
14   the government -- or when the federal government sets aside
15   a contract for contracting inside the 8(a) program as you as
16   a non-8(a) company, are you allowed to compete for that
17   program --
18       A.  No.
19       Q.  -- or that contract?  Excuse me.
20       A.  No.
21       Q.  For contracts that are not within the 8(a) program,
22   are you allowed to compete for those contracts?
23       A.  Generally, yes.
24       Q.  And are 8(a) programs allowed to compete for those
25   contracts?

23  (Pages 86 to 89)

Electronically signed by Barbara Griffin (301-176-817-0609)                                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                          November 21, 2013

---

Page 90

1    A.  Yes.
2    Q.  Do you know if 8(a) firms compete for contracts
3    outside the 8(a) program?
4    A.  Sure.
5    Q.  Do you know if it's common, uncommon?
6    A.  I know it's fairly common.  I know a lot of 8(a)
7    firms that don't -- that don't do much outside the 8(a)
8    program because it's -- it's -- they have so much business
9    in the 8(a) program they don't need to.  But, yes, a lot of
10   8(a) firms compete outside the 8(a) program.
11   Q.  Okay.  Let's --
12   A.  We generally don't worry as much about them if
13   they're competing against us outside the 8(a) program
14   because generally their overhead and G&A rates are higher
15   from being in the 8(a) program that they're not competitive.
16   Q.  Explain that a little more.  What do you mean their
17   overhead and G&A rates are higher?
18   A.  They pay their officers more money and they have
19   bigger, fancier buildings, and they have nicer facilities.
20   So they're paying themselves more money than -- than I am,
21   and they don't have to be as competitive inside the 8(a)
22   program as -- as I have to be.  If I were to bid the same
23   job that went for -- inside the 8(a) program and bid it
24   competitive cost the government more money than it would be
25   if somebody like me were bidding it if it were open

---

Page 91

1    competition.  That's my general experience.
2    Q.  And is it your general experience that that would
3    impair the 8(a) firms from competing outside the program?
4    A.  Yes.  There's a whole lot of 8(a)s that don't
5    graduate from the 8(a) program and they go broke.  I mean
6    they work -- they do real well but come out worth millions
7    of dollars and have $20 million, $30 million a year firm,
8    and they don't know how to compete outside the 8(a) program.
9    Q.  But while they're in the 8(a) program, does that
10   impact their ability to bid on non-8(a) contracts?
11   A.  Well, the smart ones -- the smart entrepreneur ones
12   start bidding on stuff while they're killing the 8(a)
13   program so that they can survive when they get out.  The
14   ones that -- I mean there are some people that are really
15   entrepreneurs and there's some people that aren't.  I don't
16   know whether you can teach that.  I don't know whether
17   that's God given or whatever it is.  And the people that are
18   real hustlers and go-getters, they're bidding on stuff right
19   along with everybody else.  But generally they're not as
20   competitive, at least that's what I found.
21   Q.  Let's move back to a report that we already marked
22   earlier, your report that you produced.  I believe it is
23   Exhibit 1.  This was your report.  Did you draft this
24   report?
25   A.  Sure.

---

Page 92

1    Q.  Did you rely on anyone else to use -- to produce
2    this report?
3    A.  No.
4    Q.  Did you use any outside source material to produce
5    this report?
6    A.  Well, I listed all the places I got in the data.  I
7    mean I listed -- I listed everything.  I used the SBA Golden
8    report.  I used the Small Business database.  I used the SBA
9    sized inter-tables, the government-wide performance score
10   cards.  I mean, you know, I looked at those sources.
11   Q.  Other than those sources, did you use any other
12   outside materials?
13   A.  Like what?  Like what are you talking about?
14   Q.  Dr. Rubinovitz mentioned some textbooks or
15   something like that.  Did you?
16   A.  No.
17   Q.  Okay.  So let's start on page six.  Starting with
18   the first full paragraph you state, "Logarithms are
19   occasionally used by statisticians to reduce wide-ranging
20   quantities to smaller species"?
21   A.  To smaller scopes.
22   Q.  Scopes.  Sorry.
23   A.  And I have to correct myself.  I did -- I did go
24   and look up a mathematic book that talked about logarithm
25   use, and I got that from that.  I totally forgot until I

---

Page 93

1    read that that's what I did.  I got the definition out of
2    source material.
3    Q.  Do you remember what source material it was?
4    A.  I don't.  It's something I found on the web that
5    looked very authoritative.
6    Q.  But you don't recall now what it was?
7    A.  No, I don't.  And I don't think I can reproduce it
8    necessarily.  I mean I can look and find it, but I don't
9    know what it is.
10   Q.  Okay.  Do you -- so that -- so you got that
11   statement concerning logarithms being occasionally used from
12   a source material from the web?
13   A.  Uh-huh.
14   Q.  But do you --
15   A.  I totally agree with it.
16   Q.  That's my next question.
17   A.  I totally agree with it, but I was looking to see
18   -- I was trying to find some extra justification for using
19   logarithms and to see if I could find any other reasons to
20   justify doing what he did.  And I saw this and said, you
21   know, that's exactly what's going on.  I totally agree with
22   that.
23   Q.  I mean what -- what in your -- in your expertise
24   leads you to agree with that statement that they're
25   occasionally used?

---

24  (Pages 90 to 93)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

---

Page 94

1     A.  We use -- I mean I know in my use in the
2  engineering fields you use things like logarithms for sound
3  levels.  Sound levels are all logarithms.
4     Q.  Right.
5     A.  There are some other pressure measurements that are
6  effectively logarithms.  And I -- I've seen data that --
7  that is compressed data -- that's compressed with
8  logarithms.  I've seen statistical data, you know, in
9  various economic reports and stuff, so I figured that's what
10  they do.
11     Q.  Okay.  Later in that page when you're describing
12  your values here, you say a ten year old company is three to
13  four times likely to win a contract as a -- just a second.
14  You're doing age of companies here.
15          MR. FISHMAN:  Last full paragraph.
16     Q.  (BY MR. BRANIFF) Last full paragraph --
17     A.  By its age is not -- it is not ten times more
18  likely to win a contract than a one year old company.
19     Q.  Correct.  That's what you state.
20     A.  It's probably three or four times more likely.
21     Q.  What do you base -- is that your professional
22  opinion?
23     A.  But -- yes, it is.  And it's based on -- but it's
24  also tied to the fact that a ten year old company should be
25  bigger than a one year old company.  It's more based on

---

Page 95

1  size.  And logically a company that's been around ten
2  years -- you've got to look -- at today's environment when
3  you start a small business your biggest problem is surviving
4  the first couple of years.  Your biggest problem is having
5  enough financing to make it through the first two or three
6  years.  And if you survived for ten years out there, you've
7  got to be doing something right.  You've got to know what
8  your business is generally or you wouldn't be there after
9  ten years.  Okay.  So that means you know better how to --
10  you know how to bid.  You know what the contracting
11  officer's name is.  You know who you're dealing with.
12  You're dealing with the Air Force.  You know what their
13  procedures are.  You understand those things.  In a brand
14  new company you may not understand those things.  You may
15  not understand that you have to do all these things.  You
16  may.  You may hire somebody like me to come help you or
17  something, but that's another story.
18     Q.  And that three to four times there is an estimate
19  just based on your experience?
20     A.  Just based on my experience.
21     Q.  You didn't -- you didn't look at the statistics --
22     A.  No.
23     Q.  -- that Dr. Rubinovitz put together?
24     A.  No.
25     Q.  In your -- in your paragraph there, you also used

---

Page 96

1  the phrase past performance.  Can you define past
2  performance, how you mean it in your report?
3     A.  Well, when you do a -- most bids for service type
4  contracts -- and I say that -- I really didn't say that in
5  the report, but we're really talking about more like service
6  type contracts.  And in some for other material contracts.
7  But for service contracts one of the most important criteria
8  is your past performance, is they can look at you -- you
9  have a thing called CPAR.  Are you familiar with CPAR?
10     Q.  I am not.
11     A.  It's a performance evaluation report.  Contractor
12  -- CPAR.  Contractor Performance Evaluation Reports.  And
13  the people that you're doing work for produce these reports
14  to say how well you're doing the job.  Okay.  Most service
15  kind of contracts or facility operations contracts or
16  whatever you're going to do.  They wanted -- the contracting
17  officer wants to see your past performance.  They want to
18  see your CPAR.  They want to see what kind of grades you
19  have.  Now if you don't have any past performance, you get a
20  neutral grade.  Well, the neutral grade is lower than a
21  grade of good or excellent.  So if you got a grade of good
22  or excellent on your CPARs, you win the battle of past
23  performance.  If you one -- one year -- one company
24  that's just starting out and you haven't done any IT work,
25  you don't have any past performance on that, so you get a

---

Page 97

1  lower grade.  And in some contracts these days the ones that
2  are going -- since more and more money -- as sequestration
3  coming in and budget getting tighter and all those things,
4  the two criteria, you know -- and if the contracting officer
5  doesn't have time, the two criteria most importantly are
6  cost and past performance.  It's like a past performance
7  past/fail and a dollar value.  And it may be technical
8  proposal -- technical proposal past/fail, past performance
9  past/fail, dollar value.  But your past performance is
10  generally worth at least a third to a half of the value of
11  you being awarded a contract.  And Rubinovitz didn't even
12  consider that because Rubinovitz doesn't understand this
13  business.  He's a wonderful economist, but he doesn't
14  understand this business.
15     Q.  So because of sort of the CPAR aspect of it if you
16  have good CPARs scores or consistent regular CPAR, it would
17  be easier to get contracts?
18     A.  Absolutely.
19     Q.  Excuse me.  By easier I mean more likely to win
20  contracts?
21     A.  Absolutely.  And if you have -- and conversely if
22  you have bad CPAR scores, it becomes much more difficult,
23  which means you could be in business for a long time and
24  have a real lousy chance of winning if you have lousy CPAR
25  scores.  But there is other measures of past performance

---

25  (Pages 94 to 97)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 98

1  besides CPARs.  Sometimes they'll send -- they'll want to
2  send surveys.  Okay.  You'll list all the people you have
3  contracts with, and they'll send all these contracting
4  officers, all of these surveys to tell them -- for them to
5  tell them about you.
6      Q.  And those are -- those are sent to the contracting
7  community at large?
8      A.  No, they're sent to the specific people that you've
9  done work for.
10     Q.  And you are a subcontractor and they are a prime
11 contractor, or are you talking about the contracting
12 officers?
13     A.  If you're a prime contractor, they send them to
14 your contracting officer.  If you're a subcontractor, they
15 send them to the -- whoever it is you're contracting for.
16     Q.  I see.
17     A.  Your company.  Some of the ratings that we get
18 from people are from like Raytheon, which is one of your
19 primes, or some of them are for contracting officers.
20     Q.  And that you believe plays a role in your
21 likelihood of getting a contract?
22     A.  I'd say it's at least 30 percent.  I mean but every
23 -- every bid -- every bid and things called RFPs that come
24 out -- and one of the things in an RFP is Section M.
25 Section M tells you the award criteria, and it tells you

Page 99

1  what they're going to think about when they do this award.
2  And it says how much is the past performance worth, how much
3  is the technical proposal worth, how much is the dollars,
4  how much a factor it is.  And they -- and they generally say
5  something like -- they either say past performance pass/fail
6  and lower dollar value, or they say technical is more
7  important than cost and past performance isn't as important
8  as technical.  Many criteria depending on how technical it
9  is.  If you're digging ditches, cost is more important.  If
10 you're -- if you're doing IT work, technical past history is
11 more important.
12     Q.  I see.  Have -- so you would expect there to be a
13 difference in the different NAICS codes that Dr. Rubinovitz
14 looked at even at the three-digit level for the impact that
15 the age of a company might have in those different codes?
16     A.  The age of the company should have made a much
17 bigger difference than the log of the age.  You notice when
18 he looked at that list -- that the list that you talked
19 about awhile ago there is logarithms for age.  There is
20 logarithms for size.  There's logarithms for contracts.
21 There's a logarithm for all the other things.  I mean those
22 are the only ones that have the logarithms.  That becomes
23 very suspicious.
24     Q.  Would you know how to describe whether or not a
25 company is in the 8(a) program in a logarithm?

Page 100

1      A.  No, I wouldn't.  Okay.  I mean those are ones you
2  could do logarithms.  So he took the ones he could do
3  logarithms and did it.  But that becomes questionable.
4      Q.  Nevertheless what you were just saying where
5  experience -- or the price matters more in digging ditches
6  than it would matter in computer services --
7      A.  Yeah.
8      Q.  -- you -- that could possibly show up in his
9  results at the three-digit NAICS code place?
10     A.  Yes, yes, yes.
11     Q.  You could see perhaps there being much -- that the
12 log age had zero impact in the three-digit code that might
13 deal with -- I don't know.  Name something where experience
14 is -- where price is king.  You know more than me.
15     A.  Well, a lot of products.
16     Q.  A lot of -- paper procurement?
17     A.  Paper procurement.  Things like that.
18     Q.  So you wouldn't expect log age to have any -- even
19 log age to have any impact there?
20     A.  Yeah, but then the problem with paper is it's
21 green.  Okay.
22     Q.  I'm sorry.  I don't understand.
23     A.  Does it have the right percentage of used materials
24 for whatever all those other issues -- I'm sorry.  Excuse
25 me.

Page 101

1      Q.  Okay.  Let's go on to page seven here in your
2  report.  You say that the -- a $10 million company is ten
3  times more likely to win a contract than a $1 million
4  company?
5      A.  Uh-huh.
6      Q.  What do you base that opinion on?
7      A.  Well, I -- I said it very -- very specifically.  A
8  $10 million company has to win $10 million worth of
9  contracts every year to stay the same value.  A $1 million
10 company only has to win $1 million in business.  So it's --
11 it's -- it may be said in the wrong -- slightly different
12 way to say it's probably ten times more likely to win more
13 dollar -- you know, they're going to win ten times more
14 dollars to stay the same size, not necessarily ten times
15 more contract because some of the contracts could be bigger.
16 But they're going to win ten times more dollars to stay the
17 same size than the one that's the one million.  That's
18 really the way it should be said.
19     Q.  And that's based on your business experience or
20 just looking at -- thinking about the numbers?
21     A.  It's based on business experience.  It's based on
22 logic.  I went through the problem of winning.  I went
23 through the problem of having a business that started off
24 when we were like a million dollars and two million and
25 three million and four million and five million and $10

26  (Pages 98 to 101)

Page 102

1    million.  It's a lot of work to keep $10 million worth of
2    business coming in every year, a whole lot more work than it
3    is to keep $1 million worth of business coming in a year.
4    You've got to have -- I've got four people now that do
5    nothing but bids and proposals.  When we're at $1 million a
6    year, I did it all myself.  Okay.  I wrote technical
7    proposals.  I wrote -- I did cost proposals.  I did past
8    performance.  I did all of this stuff by myself.  I had one
9    secretary that helped once in awhile.  Okay.  You know, $10
10    million, you've got four people to do that.  It's just a lot
11    more work.
12    Q.  Does that -- would you say that that ratio would
13    stay consistent regardless of the size of the company?  Like
14    when you get down to very smaller companies -- let's say
15    when you were to comparing like $100,000 company to a
16    $200,000 company, would you think that those two companies
17    would compete on a virtually equal field at that level?
18    A.  Always.
19    Q.  So that's about the same.  But if you get to a
20    higher range like when you would compare $100 million
21    company to a billion dollar company, the billion dollar
22    company might have a lot more power than the $100 million
23    company?
24    A.  Absolutely.  Absolutely.  I mean I've got some
25    friends that work for billion dollar companies, and they

Page 103

1    have whole cadres of people doing bids and proposals.  I
2    mean 100-people staff doing business proposals.
3    Q.  So it sort of depends on the size of the number?
4    A.  The size of the number.  I don't know -- I don't
5    know that -- most businesses that I know of that are
6    100,000 -- they're either 100,000 because that's all they
7    can handle and they'll stay at 100,000 for the rest of their
8    lives because they've got one or two people and that's all
9    they do.  Either that or they're trying to grow like crazy
10    and they're going to not stay at 100,000 very long.  And the
11    people are growing like crazy.  The difference between 100
12    to 200,000 doesn't make much difference.  If they're staying
13    static because that's all the work they can handle, then it
14    would probably make a big difference.
15    Q.  Okay.  We've already discussed this a little bit
16    before.  On page eight you state that you didn't think
17    Mr. Rubinovitz had enough time to do this -- to do a more
18    complete report?
19    A.  I don't know where I've seen that, but --
20    Q.  "Mr. Rubinovitz did not have the time to do a more
21    complete report even if he had the data."  What do -- what
22    do you base that opinion on?
23    A.  I look at what Wainwright said that he does in the
24    disparity report, and Wainwright said he does the disparity
25    report.  He spends about -- you know, about one and a half

Page 104

1    man years or something or whatever it works out to be.  And
2    I base -- and I knew that that's what they spent, and I knew
3    that disparity reports I had -- I had heard and I had seen
4    the disparity reports sell for a million dollars, a million
5    and a half dollars or $2 million, some of them.  So I assume
6    since they sell for that much money, that it takes a hell of
7    a lot of work to do that.
8    Q.  Right.
9    A.  Okay.  So I would assume that he was doing a
10    million -- he was trying to do a million dollar task within
11    about 30 hours, and that doesn't make sense.  It's not
12    logical.
13    Q.  Have you ever produced the type of work that
14    Dr. Rubinovitz produced here?
15    A.  I think that the numbers that I produced in my
16    report are far more significant than the numbers that he
17    produced, and I spent far less time.  But I used the -- kind
18    of the Wainwright approach of discounting heads instead of
19    doing a full regression.
20    Q.  Right.  So how much time did you spend doing your
21    initial report?
22    A.  I think probably doing my initial report I probably
23    spent probably two weeks, probably two and a half weeks.  A
24    lot more time than Wainwright did on his.
25    Q.  You say about two and a half.  Do you remember

Page 105

1    about how many hours that was?
2    A.  Yeah.  Probably about 80 hours.
3    Q.  Probably about 80 hours.  And you have -- you
4    believe that that's a -- that the numbers you produce are
5    accurate?
6    A.  I believe the numbers I produced are absolutely
7    accurate.  They're -- in the statistical significance it's
8    100 percent --
9    Q.  Right.
10    A.  -- because I really didn't do any statistics.
11    Okay.  Again, you're doing multiplication and division and
12    my -- my difficulty in producing the report is getting data.
13    Okay.  I did not have the benefit that Rubinovitz had of --
14    of getting specialized data from Bloomberg and getting
15    specialized data, which I still haven't gotten from you.
16    Okay.  I still don't have the data that has the stuff -- I
17    had to go more -- I had to go more the route of pulling it
18    down from the SBA.  And pulling it down from the SBA -- you
19    know, they limit you 5,000 firms per thing you pull down, so
20    you have to do like -- you want everybody that's an SDB -- I
21    mean everybody that's, say, an 8(a), for instance, you have
22    to pull down all the As and all the Bs and all the Cs and
23    all the ones and two and threes, nines and aggregate the
24    whole thing together and then get rid of all the
25    duplications.  You know, you've got to do all the work.

27 (Pages 102 to 105)

Electronically signed by Barbara Griffin (301-176-817-0609)                2e97a725-ee14-4199-bec5-62df23e28d12

## Page 106

1    Okay.  He didn't have that effort, so it took me a little
2    more --
3        Q.  If you hadn't had to do that, it would have
4    substantially cut down your time?
5        A.  Yeah, probably.
6        Q.  So you could have potentially -- you could have
7    gotten the report done in 30 hours as well?
8        A.  I mean it's possible I guess.  It's possible.  The
9    problem is, you know, I had to read and comprehend his
10   report too.  That's the other problem.
11       Q.  So the number -- the amount of hours is not
12   necessarily indicative of the accuracy of the report?
13       A.  I'm not saying it's indicative of the accuracy.  I
14   never questioned his accuracy.  I don't question his
15   accuracy.  I question what he produced, whether it was worth
16   -- whether it was worth the paper it was printed on because
17   the probabilities don't mean anything to anybody, number
18   one.  He didn't use -- he didn't the right number of SDBs.
19   Number two, he didn't use dollars.  He did probability
20   instead of dollars.  I mean those are -- those are the
21   biggies.  And he used logarithms when he shouldn't have used
22   them.  Those are the things that don't make a lot of sense.
23       Q.  If you -- if we go to page nine here, let's talk
24   about some of the things that you did do for your report
25   here.  You did, as you mentioned, look through the FPDS

## Page 107

1    data.  One of the things that you say here is this sentence
2    right here, which I think you've pretty much said already
3    today during our deposition, but let's just -- if you could
4    just read --
5        A.  I made my own simplistic look at the data without
6    considering in weight, age, firm, size or number of
7    employees.  I did not do any manipulation of the data and
8    only used publically available data.
9        Q.  Now when you say you do not consider the size,
10   weight or age of the number of employees, specifically why
11   did you not do that?
12       A.  Because that would have required a hell of a lot
13   more work than I had available to spend on it, and I would
14   have had to come up with -- I had to come up with a method
15   of defending -- I would have had to come up with a
16   justifiable method of defending the data that I used.  And
17   -- and that -- that being said but also the fact that the
18   data on size that was available was worthless.  The data in
19   FPDS -- not in FPDS.  In SAM -- the data on the size of
20   firms is absolutely crap.  Excuse my language.  But it's
21   garbage, the data on size.  The data on age of firms is
22   pretty accurate -- probably is, but the size is ridiculous.
23   And that's something gained as well.  Now, if you change --
24   the federal government changed the rules -- they changed
25   some regulations associated with SAM that just took effect I

## Page 108

1    think this month or in August or September some time -- I'm
2    not sure exactly what -- that said -- and I think I put it
3    in one of my reports that basically said that after that
4    point -- after that point you have to put the correct number
5    of your value of your firm; and if you get awarded the
6    contract based on the value of that data and you have
7    incorrect an value of your firm in there, it's your
8    three-year -- it's your small business through your average.
9    Then you could have, you know, face the penalty of maybe
10   paying as much as the total value of the contract.  They put
11   a hammer down to say you don't put anything more than
12   through to your average.  They never had that before.  So
13   people put too small a value in to try to -- to try to still
14   remain viable for some contacts.  Okay.  Or they put a much
15   bigger value than they were so that they appeared bigger and
16   stronger based on whatever logic they wanted to do.  And
17   there is requirement for doing it.  But conversely the
18   contracting officers were supposed to look for your
19   certification that you provided that says I'm a small
20   business for this procurement against this size standard.
21   So it's somewhat -- nobody used that data and nobody
22   recognized the data being worth anything at all, and
23   Rubinovitz picked it up and used it.  I didn't want to use
24   it because I knew it was worthless.
25       Q.  You just made some claims concerning the SAM's

## Page 109

1    data.  Based on your personal interaction with the SAM's web
2    site, do you believe that the size statements concerning
3    Rothe Development on SAM's are accurate?
4        A.  We just updated all of them to comply with the new
5    rules in the last month or so, couple months.  And we did --
6    we calculated out our three-year average and we put in our
7    three-year average.
8        Q.  So you believe that those --
9        A.  Right now they're absolutely accurate.  Prior to
10   this time, I would not suggest that they necessarily were.
11       Q.  And is that the same with Rothe Enterprises?
12       A.  Yes, because I did not pay much attention to those.
13   We'd have to update SAM's once a year just to keep current.
14   We couldn't necessarily update that value because it didn't
15   matter to anybody.
16       Q.  I think you just said, though, that the contracting
17   officers do look at SAM's to determine certain things?
18       A.  Prior to this year -- prior to August, they only
19   looked at SAM's to determine to see if you're registered.
20   They looked at SAM's to see if you're registered.  That's
21   what it is.  And SAM's also has now -- it comes from the SDB
22   web site.  It has whether you're an 8(a) or SDB or whether
23   you're a small -- it doesn't have whether you're a small
24   business.  It has whether you're HUBZone or something.  Any
25   one of those programs it has that data.  It doesn't have

Kim Tindall and Associates, LLC      645 Lockhill Selma, Suite 200              San Antonio, Texas 78216
210-697-3400                                                                        210-697-3408

A000297

Electronically signed by Barbara Griffin (301-176-817-0609)                          2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  whether you're a small business.

2      Q.  Regardless of the source of the data, you would say

3  that the size, weight or age of a -- the size, age or number

4  of employees of a firm would be relevant in the likelihood

5  of that firm winning a contract?

6      A.  If I had used -- yes, of course.  And I didn't use

7  them -- I didn't use them only because I didn't have the

8  data readily available and the time.  If I had used that

9  data -- if I had somehow found a reliable source for that

10  data and put it in, the disparities that I came up with that

11  showed reverse discrimination would have been much worse.

12      Q.  But you didn't actually do that?

13      A.  I didn't -- I didn't -- if the number is ten to

14  one, why do you need to make it 20 to 1.  Okay.

15      Q.  I'm sorry.  I don't quite understand what --

16      A.  The amount award -- and I have it -- I've got to

17  look and see -- I see where I have it down here.  The 8(a)s

18  receive on an average -- okay.  It's $1,319,246.  And let me

19  see where I have -- and the SBDs receive on an average

20  $82,000.  Okay.  No, I'm sorry, it's at $416,000.  So

21  that's a four to one ratio between the non-SDBs -- non-SDBs,

22  what they receive, 416,000, and the 8(a)s would be 1.3.  If

23  I stuck in age and everything else like that and did a

24  capacity analysis appropriately these numbers would be

25  further apart.

**Page 111**

1      Q.  That's your opinion?

2      A.  Absolutely.  I think if I'd done a capacity

3  analysis instead of 1.3 -- instead of four to one, it would

4  be like six or seven to one.

5      Q.  And for that 8(a) number there -- for the average

6  value of the contracts to 8(a)s, is that the number you got

7  from using division on the 8(a) contracts in the --

8      A.  Yes.

9      Q.  -- FPDS database?

10      A.  Yes.

11      Q.  Do you know if that includes contracts that 8(a)

12  firms won in full and open competition?

13      A.  No, that is only the dollars that the 8(a)s won in

14  8(a) competition alone.

15      Q.  So that -- so that value is 8(a) contracts awarded

16  to 8(a) forms set aside for 8(a)s?

17      A.  Yes.

18      Q.  It does not include 8(a) contracts won by 8(a)

19  firms outside of the 8(a) program?

20      A.  No.  And it's four to one without including the

21  other awards as well.

22      Q.  But do you believe that the -- is there anywhere in

23  your data here that includes the 8(a) contracts won by 8(a)

24  firms in full and open competition?

25      A.  That data is not available necessarily.  I guess I

**Page 112**

1  -- I guess I could have tried to derive it out of your --

2  your data, but the SBA -- excuse me, FPDS shows -- doesn't

3  show that the money -- if an 8(a) wins a contracts outside

4  of the 8(a) program, it shows as SDB dollars.  It doesn't

5  show it as 8(a) dollars.

6      Q.  But you believe it's included in the SDB dollars?

7      A.  It is in the SDB dollars.

8      Q.  Okay.

9      A.  I mean if -- if the contracting officer was smart

10  enough to pick it up as SDBs --

11      Q.  Right.

12      A.  And since there was a goal for them to do that, I

13  believe that they did.

14      Q.  Similar to the contracts you say you -- your

15  company has won in open competition as a HUBZone and a WOSB

16  -- if the officer awards it to you and then sees your WOSB,

17  he's going to include in it that firm -- in that category?

18      A.  Yeah.

19      Q.  And so you think the 8(a) would be in the SDB

20  category?

21      A.  Yes.

22      Q.  Okay.

23      A.  But, you know -- if you want to sit down and take a

24  look at this, the small business awarded dollars.  There is

25  33 -- 32 billion small disadvantaged business dollars and --

**Page 113**

1  I need a calculator here.

2      Q.  No, we've done it before.  I --

3      A.  The number -- the number for the small

4  disadvantaged businesses -- if you take all of them together

5  is much greater than the number of the other businesses.

6  That's all there is to it.  The non-SDBs are getting the

7  short end of the stick.  There is no doubt about it.  That's

8  all there is to it.  And if you do a capacity analysis, it's

9  worse.  It's not better for your point of view.  It's

10  worse.  The difference is between what the 8(a)s and the

11  SDBs get versus -- it's worse with the capacity analysis.

12      Q.  So you think that non-SBDs have more capacity than

13  SDBs?

14      A.  Mr. Rubinovitz said in his analysis that the

15  average non-SDB firm has $8.9 million a year worth of

16  business, and the non-SDB -- and the SBDs -- and the average

17  SDB firm is 1.2 or 2.9.  I don't know how he got that, but

18  that's what he said.

19      Q.  So you're basing that on Mr. Rubinovitz's report?

20      A.  Yes.

21      Q.  Okay.  Let's move to your supplemental expert

22  report from October 25th, 2013.  I believe we already

23  labeled that as number.

24      A.  Looks like.

25      Q.  Is this your report?

29 (Pages 110 to 113)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 114

1      A. Sure.
2      Q. Did you write this report?
3      A. Yes.
4      Q. Okay. On page two of this report, you describe
5  some of the problems with the data that we talked about
6  earlier, and you mention the DUNS numbers. And you say,
7  "This file contained DUNS data, which was redacted before it
8  was sent to me." Is that correct?
9      A. Yes.
10     Q. Okay. Are you -- do your companies have DUNS
11  numbers?
12     A. Yes.
13     Q. Do your -- and you have to apply to Dun and
14  Bradstreet -- or do you have to fill out any paperwork with
15  Dun & Bradstreet to get those numbers?
16     A. Sure.
17     Q. Are you aware of what a number is that would be
18  called a Duns plus four?
19     A. Actually -- actually I take that back. I didn't --
20  I don't think we now apply it. I'm not sure if we applied
21  to Dun and Bradstreet at that time or if we just registered
22  for CCR and you get it. There is some process you have to
23  get it, yes.
24     Q. There is -- there is a hurdle that you have to
25  cross in order to get that number?

Page 115

1      A. You have to cross, yes.
2      Q. Are you aware of what a DUNS plus four number is?
3      A. I've seen them. I haven't really paid attention to
4  them.
5      Q. Do you know if any of your companies might have one
6  of those numbers?
7      A. No, I don't think so.
8      Q. How about a parent DUNS number?
9      A. Sure.
10     Q. Are you aware of what those are?
11     A. Yes.
12     Q. Do you know if any of your companies have one of
13  those?
14     A. No, because none of our companies is subsidiaries
15  of other companies.
16     Q. Right. So you --
17     A. Because the SBA rules don't allow them to be. So
18  they have to be, you know -- my wife Susie owns Rothe
19  Development and Rothe Enterprises.
20     Q. But you would understand a parent DUNS number --
21     A. Sure.
22     Q. -- might give information about subsidiaries?
23     A. Sure.
24     Q. How about an HQ parent DUNS number? Have you ever
25  heard of that?

Page 116

1      A. HQ?
2      Q. HQ parent DUNS number.
3      A. Yeah, the headquarters number, yes. I've heard of
4  those.
5      Q. And that might give further information about a
6  company organization structure?
7      A. Yes.
8      Q. How about a domestic parent DUNS number? Have you
9  ever heard of that? No? How about a global parent DUNS
10  number?
11     A. Yeah. Okay. The global parent DUNS number I've
12  seen, and the domestic one I've seen is just the country,
13  but I haven't seen them honestly.
14     Q. And you would anticipate that all of these numbers
15  might give information about the organizational structure of
16  a company or companies?
17     A. Yes.
18     Q. Okay. That's all. Page three. Let's go on.
19     A. But I thought it was kind of interesting in the --
20  of him worrying about segregating the parent DUNS numbers
21  because realistically in the data that he's looking at he
22  was trying to look at regular SDBs. Okay. And if they're
23  truly SDBs by the definition that the -- that the -- that
24  the SBA has, they can't be subsidiaries. The only SDBs that
25  can be subsidiaries of somebody else and still be an SDB is

Page 117

1  Alaskan natives or tribal firms because they're owned by the
2  tribe. And -- but the -- but other SDBs -- if they're a
3  subsidiary of somebody else, they're not an SDB anymore.
4  And SDB firm cannot own another SDB firm and both of them be
5  SDBs. That doesn't work in your rules. So the only people
6  that really applies to is the Alaskan natives and the tribal
7  people, and that's a very small piece. That's a small piece
8  of the -- well, it's not so small. It's like 700 or 800
9  businesses out of 7,000 8(a)s. But it's not -- and I don't
10  know what the percentage of SD -- non-SDBs are because the
11  tribal companies once they get out of the 8(a) that normally
12  folds the company down and move the work over to their 8(a)
13  ones and open up another 8(a) firm and proceed.
14     Q. Okay. On page three -- we'll go on here. We
15  talked about this already a little bit today where you're
16  describing the updating process to the FPDS data. And you
17  state here that you do not believe that Dr. Rubinovitz had
18  all of the 2012 database?
19     A. Right.
20     Q. Now, we've already done that. Now when did you do
21  your FPDS calculations?
22     A. I did my initial FPDS -- I did most of my FPDS
23  calculations using FY 11 data. And I said that I used FY 11
24  data, and the reason I said I used FY 11 data was because I
25  thought it was more complete.

30 (Pages 114 to 117)

Electronically signed by Barbara Griffin (301-176-817-0609)                2e97a725-ee14-4199-bec5-62df23e28d12

Page 118

1    Q.  Okay.  When -- when do you believe in your
2    opinion --
3        A.  Except for the ones that -- except for the
4    calculations which I specifically used the Golden report
5    for, FY 2012 data but from the Golden report.
6        Q.  Correct.  When do you believe that a -- that an
7    FPDS report becomes, in your words, complete?
8        A.  About a year, year and a half.  A year gets down to
9    when it's about 5 percent, but we're still seeing -- we're
10   still seeing changes in the FPDS data for 2000 -- FY 11
11   data.
12       Q.  Would we see any changes in the FPDS that are for
13   2010?
14       A.  I think they stopped doing them after about a year
15   and a half or two years.  I saw a notice on that, and I
16   didn't really pay attention to that, but I've seen changes
17   as late as a year and a half.
18       Q.  So they can keep making changes when -- when they
19   get new contracting data?
20       A.  Right.  They find some contracting officer who
21   never bothered to file their stuff, and they kick them in
22   the butt --
23       Q.  But there is no prohibition within the FPDS
24   database that you know that prohibits them from changing
25   past data as time progresses?

Page 119

1        A.  Right.
2        Q.  Okay.  And so FPDS can continue to make changes
3    to previous years' data as the time goes on?
4        A.  Right.
5        Q.  So even you would admit that your 2011 data, while
6    perhaps more complete because it was a year later, was
7    not --
8        A.  It's all a snapshot in time.
9        Q.  It's all a snapshot in time?
10       A.  The FPS -- the FPD data -- the FPD data I've got.
11   The 8(a) data I've got.  I've been looking at that now, and
12   that number jumps up a few percent up and down every day.
13       Q.  Are there any FPDS rules that require contract --
14   in your knowledge, you know of this, that require
15   contracting officers to treat contracts -- lets
16   minority-owned companies differently than non-minority owned
17   companies with respect to recording the data of the
18   contract?
19       A.  If there are those rules, I don't know what they
20   are.
21       Q.  But you're not aware of any?
22       A.  I'm not aware of any.
23       Q.  So if it's a snapshot in time, why would the race
24   of the owner of a firm make any difference in the FPDS data,
25   or would the race of a firm make any difference.

Page 120

1        A.  In the accuracy of the data?
2        Q.  In the accuracy of data?
3        A.  I don't think it would.
4        Q.  It wouldn't matter?
5        A.  No, I mean I don't think it would.  I don't think
6    that -- with the exception of -- with the exception of this
7    very peculiar activity, which I noted to you --
8        Q.  Correct, the 8 percent.
9        A.  -- on the Golden report that things seemed to
10   happen right there to get that 8 percent number.
11       Q.  Right.
12       A.  With the exception of that, I don't -- I don't have
13   any knowledge of why an SDB contract or 8(a) contract would
14   have more likelihood or showing up in an FPDS than any other
15   contract.
16       Q.  So regardless of when you took the snapshot --
17       A.  The data should be -- the percentages should be the
18   same.
19       Q.  Right.
20       A.  My point on that thing was to say my number doesn't
21   match his because I'm using later data.  My -- I'm just
22   trying to justify why the numbers didn't match.  I wasn't
23   saying that it's wrong to use -- I'm not suggesting he used
24   the wrong thing.  It's a snapshot in time.  But then why is
25   it if you used the database that you had given us, so then

Page 121

1    we'd have the same database.
2        Q.  I understand.  On page five you state that it's in
3    your opinion that it's not realistic for a company to bid on
4    a professional contract if they're doing less than $100,000
5    in business a year at the bottom here.
6        A.  Yes.
7        Q.  Do you see that?
8        A.  Uh-huh.
9        Q.  That's your professional opinion.  You've been in
10   this business for 40 years?
11       A.  Uh-huh.
12       Q.  What -- what leads you to believe that -- to make
13   that -- that they wouldn't bid on a contract if they're
14   doing less than $100,000 a year?  What makes you come to
15   that conclusion or reach that opinion?
16       A.  You don't have the resources to -- you know, if you
17   we've been doing $100,000 a year, you can have at most two
18   to three people, okay, unless you're all janitors or
19   something.  But you could have at most two or three people,
20   so you don't have the people to go out and do the bids and
21   proposals.  One of the problems Wainwright missed out when
22   he talks about his one person thing, he misses out on the
23   idea that the bidding and proposing process is huge.  It's
24   big burdensome task and -- and you're sitting around with
25   $100,000 and may have one or two people, small working,

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 122

1  that's a big task.
2      Q.  It is a big task.  And Rothe Development is one of
3  your companies.  Now, that -- that company is an older
4  company; right?  That was --
5      A.  Oh, yeah.
6      Q.  How old is that?
7      A.  57.
8      Q.  Since the time you've been working with Rothe
9  Development, can you recall -- just ballpark what their
10 lowest annual revenues may have been in that time?
11     A.  I think when I joined the company, there were
12 probably $100,000, $150,000 a year.
13     Q.  But that's 1972 dollars?
14     A.  Yeah.  That's lot different.
15     Q.  Right.  Okay.  And -- but they've steadily grown
16 past that?
17     A.  Uh-huh.
18     Q.  Now, how about the Rothe Enterprises?  When did
19 that company start?
20     A.  Well, I mean we started out at -- I'd have to go
21 look up the last days.  It's about 2003, thereabouts.
22     Q.  When it started?
23     A.  Yes.
24     Q.  And what were the annual receipts for Rothe
25 Enterprises in 2003?

Page 123

1      A.  I mean I don't remember, but we would -- we had
2  awhile after we started.  We had no revenue.
3      Q.  No revenue.  Did you place any bids on any
4  contracts in 2003?
5      A.  Yes, but there is quite a bit of difference because
6  I told you earlier that although it's not a subsidiary, we
7  treat it like a subsidiary.  So most of the resources we use
8  it for bids and proposals.  For Rothe Enterprises -- or
9  really for Rothe Development Procedures, which is perfectly
10 fine with the -- with the -- with our good SBA rules.  They
11 don't say that you can't do that.  They don't say that you
12 can't be affiliated.  You have to announce you're an
13 affiliate.  We are affiliated.  We told the SBA that.  The
14 SBA knows that.  So we did bids and proposals for them.  We
15 run them out of our corporate office so we don't have to
16 have a duplication of staff.  We save dollars that way.
17     Q.  But in the SAM data, it would have shown up in 2003
18 as having no revenue?
19     A.  Yeah.
20     Q.  But you did place bids?
21     A.  I think we did.  I cannot tell you for sure what I
22 bid in 2003 with Rothe Enterprises.
23     Q.  And, let's see, the other ones are Roman?
24     A.  Roman Joint Venture.
25     Q.  Do you remember when that one started?

Page 124

1      A.  We got a contract in around 2003/2004 time frame I
2  believe at the Air Force Academy.  It could have been a
3  little later than that.  I'm not positive.  I don't
4  remember.  And we formed that when we bid on the Air Force
5  Academy.
6      Q.  When you got the contract, you made a new joint
7  venture.
8      A.  Actually we made the joint venture to bid on the
9  job.
10     Q.  To bid on the job.  Okay.  But obviously at the
11 time you made the bids that just created a company with no
12 revenue?
13     A.  No revenue.  But a joint venture -- when you're
14 starting like that, it's totally different than a company
15 that's starting on its own, that's got $100,000 worth of
16 revenue.
17     Q.  I understand.  I understand.  And then the last
18 one, RX, when did that start?
19     A.  RX we started it in like 2006, and it went with no
20 revenue for three years.  And we bid on all kind of work
21 with it for three years.  But, again, we had two -- two
22 joint venture partners who were supporting the effort.
23     Q.  I see.
24     A.  And we weren't putting the money into RX Joint
25 Venture and RX spending it to -- we just bid it out of our

Page 125

1  -- our portion of the contributions of it.  It was us
2  bidding and them working on bidding to -- to get the bids
3  done.  So it went effectively zero for many years.
4      Q.  So at -- at best you would say here that absent the
5  circumstances, such as the ones that you are presently
6  familiar with with Rothe Enterprises, Roman JV and RX, it's
7  not typical for a $100,000 company to bid on contracts, but
8  there are situations where that happens?
9      A.  Sure.  I mean if you're -- you know, if you're
10 bidding -- if you're purely bidding on some extremely small
11 -- you know, on the really low hanging fruit down there on
12 the bottom, I guess it's possible to stay bidding forever.
13 My point is this -- my point on this is -- there's two
14 points in this whole exercise here.  One of them is that the
15 dollar numbers associated with the annual receipts are
16 garbage.  They're garbage in the SAM's database.  They're
17 very little trustworthy.  If they were trustworthy, would
18 you have 484 firms that are doing -- let me see how many --
19 over $100 billion a year?  No, you wouldn't have that
20 because that's greater than all the business we do in the
21 country almost a year.  Okay.  Would you have -- would you
22 have $133 million -- 133 firms doing a trillion a year?  No,
23 you wouldn't have 133 firms doing a trillion a year.  That's
24 ridiculous.  Okay.  And so this number -- my point of this
25 whole chart was not that he maybe should have excluded

32 (Pages 122 to 125)

Electronically signed by Barbara Griffin (301-176-817-0609)                      2e97a725-ee14-4199-bec5-62df23e28d12

Page 126

1   really some of these people in the one and $10 things.  Part
2   of that he should have excluded those, but the rest of the
3   numbers just don't make sense.  They make no sense at all.
4   They have 304 companies that have over a million dollar -- a
5   million employees in SAM's.  Is that reasonable that there
6   is anybody -- I tell you what, there is like -- the largest
7   company in the world is like Wal-Mart.  It's $404 billion a
8   year.  That's it.  Okay.  There is like five companies that
9   are greater than $100 billion a year.  But this one says
10  there is 484.
11     Q.  Right.
12     A.  So obviously this is -- these numbers are totally
13  hosed.  Okay.  And their reliability is none.  He did not do
14  a reliability analysis of any kind.  He did not do a
15  reliability analysis like he did on his regressions.  He
16  didn't do a reliability analysis of his data.  If he had, he
17  realized it was garbage, but he didn't.  He didn't know that
18  it needed to be.  I've got experience with this to know I
19  wouldn't trust this for nothing.
20     Q.  But you do come to the -- I know you're trying to
21  make an overall point about the reliability, but you do make
22  a specific point here that you think that the firms with
23  less than $100,000 in receipts --
24     A.  Right, shouldn't be counted at all.
25     Q.  Shouldn't be counted at all.  But we've just gone

Page 127

1   through four companies --
2     A.  Yes, they were all --
3     Q.  -- three that had zero repeats that --
4     A.  That --
5     Q.  -- did that.
6     A.  I probably should have said with $100,000 worth of
7   receipts and no -- not being subsidiaries of anybody else
8   shouldn't be counted.
9     Q.  But Rothe Enterprises wasn't a subsidiary?
10    A.  No, and it's not but we treat it like it is.
11    Q.  I understand but --
12    A.  Okay.  So it's -- you're walking a tightrope here.
13    Q.  I understand.
14    A.  Yeah, okay.  I mean if you -- but it's not
15  realistic to assume in the capacity analysis of this
16  business -- it's not realistic to assume that a company with
17  $100,000 worth of annual revenue -- and that's all they have
18  and am not connected with anybody else that has big cash
19  flows is going to be really competitive in this business
20  against bigger companies.
21    Q.  Understood.  And then when you -- but there are
22  times when you would -- you could potentially -- if you're
23  living off one contract and you lose that contract or you go
24  try to renew it and you don't win it --
25    A.  You could have no contracts.

Page 128

1     Q.  You could go down to one contract and you would
2   just -- would you say that that company would be, you know,
3   putting all their efforts to get another contract or would
4   you --
5     A.  Yes, I would think so.  I think they would.
6     Q.  So it's possible that companies with no revenues
7   might bid more?
8     A.  Yes, it could if you -- unusual circumstances.  So
9   I -- so I probably should have said unless there is unusual
10  circumstances.
11    Q.  Other circumstances.
12    A.  Okay.
13    Q.  Other circumstances.  And then on the employee part
14  here just a similar -- and we can do this quickly.  When you
15  started these joint ventures -- right when you started them,
16  do you remember how many employees you had in those
17  companies when you began them?
18    A.  None.
19    Q.  None.  So that would be similar --
20    A.  But they had no employees because we were doing all
21  the work for them.  So their effective hours effort was
22  probably more like five or six employees.
23    Q.  Right.
24    A.  It wasn't really zero, the effective work, but we
25  were doing it for them.  We were subsidizing.

Page 129

1     Q.  So there's -- there's a difference at that point
2   between the actual amount of work and what the numbers
3   reflected?
4     A.  It's other circumstances.  It's stated, like I say,
5   the other one.
6     Q.  So there are other circumstances where companies
7   with zero employees or companies with less than 100,000
8   would be bidding on lots of projects?
9     A.  Sure.
10    Q.  Okay.  Do you think now any company would
11  understate their -- intentionally understate the number of
12  the amount of receipts -- intentionally understate the
13  amount of receipts in their SAM's data for any purpose?
14    A.  Prior to September, yes.
15    Q.  And what would those purposes be?
16    A.  So they -- so that they could try to give the image
17  of being under the size standard.  So they could cheat.
18    Q.  Now, in your personal experience -- I don't know
19  need to -- I don't know mean to impugn you in any way here.
20  This is just a question.  Do you have any personal
21  experience with doing that in any of your companies,
22  intentionally understating the number of receipts in your
23  SAM's data?
24    A.  No, because it doesn't make any sense.  I mean you
25  can only bid on what -- if you bid on a contract that you're

33 (Pages 126 to 129)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 130

1    actually too big to bid on correctly, you stand a very high
2    -- you stand a reasonable probability of somebody
3    complaining about your size standard.
4        Q.  As a HUBZone firm, do you have any incentive to
5    understate your annual receipts on any government --
6        A.  No.
7        Q.  -- disclosure forms?
8        A.  No.
9        Q.  As a woman-owned small business firm, do you have
10   any incentive to understate your annual receipts on any of
11   your firms?
12       A.  No.
13       Q.  So there is no -- there is no size standard impact
14   on either HUBZone or WSB?
15       A.  No, they don't have any size standard limitations
16   on HUBZone or woman-owned business if the category were
17   that.  Now, I don't know -- I haven't tried the full-blown
18   category to see if there is some sort of limitations on my
19   net worth or anything else.  We haven't looked at that.  I
20   don't know about that.  I know if I was an SDB there would
21   -- there is still no limitations on -- really you have very
22   little limitations on an SDB on your size.  You just have
23   limitations on your net worth.
24       Q.  On your net worth.  Are any of your companies
25   considered small businesses?

Page 131

1        A.  Sure, all of them.
2        Q.  They're all small businesses.  How do you keep them
3    -- how do you know -- how do you keep them small?
4        A.  They just have to be under the NAICS codes.  They
5    have to be small under the NAICS codes that you're working
6    on.
7        Q.  And that's based on number of receipts?
8        A.  Yeah.
9        Q.  Is there any advantage --
10       A.  And so -- you know, and generally you move up as
11   you grow.  You change.  NAICS codes as you're working --
12   like I told you about the calibration.
13       Q.  Is there any advantage in government contracts
14   being a small business?
15       A.  Sure.
16       Q.  So --
17       A.  There is a lot of small business set aside
18   contract, number one.  And small businesses also get the
19   subcontracting program like SDBs do.
20       Q.  So if these four companies weren't small
21   businesses, you wouldn't have those -- you wouldn't be
22   included in those -- those contracting programs?
23       A.  That's right.
24       Q.  So you do have an incentive to stay small?
25       A.  I've always looked at it -- my personal viewpoint

Page 132

1    is -- and I've had this viewpoint since the '70s when we
2    first hit our first goals of actually growing.  If you're
3    grown past the size standard, that's a good thing.  It's
4    kind of like paying taxes.  Paying taxes is no fun; but if
5    you pay a lot of taxes, that means you made a lot of money,
6    which is the goal.  So you're going to grow past standards,
7    and you're going to not be able to bid on some business, and
8    that's life.  And it's better to grow than not to grow.
9        Q.  So your personal experience in this is that you've
10   never altered your government disclosure stuff in order to
11   stay within any size standards even though you have
12   incentive to do so?
13       A.  Well, I -- like I said, I don't think there is that
14   positive of an incentive because I know that if -- I know
15   that if I bid on something -- I only bid on something that I
16   know that I'm actually under the size standard for because I
17   don't want to -- it is too much of a hassle.  I mean I've
18   been -- I've had some size standard complaints complained
19   against me that I've won every one of them with a Small
20   Business Administration, and they were placed against me
21   because somebody saw these various companies we've had out
22   here and assumed that aggregated all together they would be
23   worth too much money, and they weren't.  It's a real hassle.
24   It is a very big hassle.  It costs you -- it may cost you
25   more money than you make on a stupid contract to fight the

Page 133

1    small business standard thing.  I don't play that game.
2    Other people do.  I know plenty of people that do.
3        Q.  Would you been willing to name any of them for the
4    record here or --
5        A.  I don't think so.
6        Q.  Okay.  The -- just to verify on our numbers here on
7    the bottom of page seven, transaction mode, these were all
8    averages that you calculated using the numbers from the FPDS
9    report; is that correct?
10       A.  FPDS or -- I have to look at it.  It's either FPDS
11   or Golden report, one of the two.
12       Q.  Or the Golden.  But those are average values based
13   on -- and if you could just quickly describe how you arrived
14   at those averages to your recollection.
15       A.  The 8(a)s -- I took the total amount of 8(a)
16   dollars off the Golden report and then divided it by the
17   number of 8(a)s.  Pretty simple.  The SDB -- the SDB dollars
18   -- I took the -- including the SA -- I took the number of
19   SDB.  Okay.  And I divided by the total number of things --
20   by the total number of people.  Now, I divide that including
21   -- you know, I think that my number of SDBs is incorrect
22   here, and this number is probably incorrect and that's
23   incorrect, and I have the SDB data to give you at some
24   point -- if you don't ask for it yet, then he will -- to
25   correct these numbers a little bit.  But they don't change

34 (Pages 130 to 133)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

## Page 134

1   it enough to make any difference to the basic point. The
2   basic point is the 8(a) is getting one hell of a lot more
3   money than the non-SDBs. Okay. That's the bottom line.
4   It's supposed to be affirmative action. It's supposed to
5   bring them up to the level. But, no, it shoots them right
6   above level. That's why it's discrimination. That's why
7   you've got a lawsuit.
8       Q.   Now, are you aware of any evidence that minority
9   and non-minority businesses are differently interested in
10  competing for public contracts?
11      A.   Minority and non-minority?
12      Q.   Yeah. Is there a difference between the interest
13  in competing for public contracts between minority and
14  non-minority owned firms?
15      A.   I really don't know about just minority. I know
16  about SDBs. Okay. SDBs are different than just
17  minority-owned.
18      Q.   I understand.
19      A.   And a couple minority firms that are -- that have
20  graduated from the 8(a) program and are not SDBs anymore,
21  just firms like me, small businesses, they view life pretty
22  much the same as what I do, okay, because they don't get any
23  advantages from that other than small business. But
24  minority themselves; no; as SDBs, yes.
25      Q.   What evidence do you know that SDBs are less

## Page 135

1   interested in public contracting than non-SDBs?
2       A.   No, I don't say they're less interested in public
3   contracting. I think they're more interested in public
4   contracting.
5       Q.   Why --
6       A.   Because they've got advantages that the other --
7   that the other people don't, specifically 8(a)s. And -- or
8   in the Department of Transportation programs there is
9   horrendous advantages about being a minority-owned firm.
10  And lots of firms just -- just become registered for the
11  purpose of able to do -- to compete in that area.
12      Q.   So it's your belief that those SDBs register in the
13  SDB program so they compete for those preferential
14  contracts?
15      A.   Why would you go to the effort of doing it if you
16  weren't? Why the hell should a person go to -- to keep
17  themself -- a self-certified SDB is supposed to be the same
18  as a regular certified SDB. They're supposed to have the
19  same kind of numbers, the same kind of sizes, the same kind
20  of -- the limitations on their net. Okay. Why would you go
21  to the effort of keeping -- keeping yourself into the net
22  worth the same and all these other things if you're not
23  going to try and get some advantage out of it? I wouldn't.
24           MR. BRANIFF: Can we have just two minutes
25  just to talk, and then I'll be right back in?

## Page 136

1            (Recess from 1:00 to 1:07.)
2            MR. BRANIFF: The government has completed
3   with its direct of the witness. Pass the witness.
4            (Transfer of examination at 1:07.)
5            MR. BARTON: I've have either three or four
6   exhibits here that I'm going to go ahead and have them
7   marked.
8            (Exhibits 6 - 8 marked.)
9            MR. BARTON: And I offer these as Exhibits 6,
10  7 and 8.
11                   EXAMINATION
12  BY MR. BARTON:
13      Q.   Do you have six, seven and eight in front of you?
14      A.   Seven, six -- and what was eight?
15      Q.   Eight is --
16      A.   I've got eight, yes.
17           MR. BARTON: Okay. And I'm David Barton, and
18  I'm asking questions on behalf of Rothe Development
19  Corporation as a follow-up to the government's questioning
20  of our expert witness, Dale Patenaude, who is the vice
21  president of Rothe Development Corporation, and, as such,
22  appears to do most of the operations, part of the work.
23      Q.   (BY MR. BARTON) Now, you said that's a woman-owned
24  business; is that correct?
25      A.   Yes.

## Page 137

1       Q.   And the woman is your wife, Suzanne Patenaude?
2       A.   Yes.
3       Q.   And what are her duties with the business?
4       A.   Well, she's -- she's the president of the company.
5   She handles most of the financial part of the business, and
6   I handle most of the technical operations.
7       Q.   I've offered into evidence Exhibits 6, 7 and 8.
8   Would you just start with Number 6 and explain what that is
9   and its impact in the case?
10      A.   Okay. I -- I took Mr. Wainwright's summary report,
11  and Wainwright went through -- in his report, he said which
12  specific businesses were in construction. I start off --
13  but I guess I get ahead of myself. I start off -- I took
14  the FY 11 database, which we got from the government, and I
15  went through and I coded and I -- and I got a report of all
16  of the -- of all of the --
17      Q.   Let's step back and explain again. I got at the
18  top of this -- at the top of this document is something that
19  says 2011 Small Business Database. Would you explain that
20  in a little more detail than you just did?
21      A.   Okay. It actually -- it actually did not -- when I
22  really look at this, I looked at the Small Business Database
23  that the government gave me -- the government gave us for
24  this contract. They gave us a bunch of contracts for the
25  Small Business Administration. We took that data, and I

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 138

1  went through and I got all the 8(a) contracts.  I made a
2  report, and we put it into a database -- our own database,
3  and we listed out all the contracts that the 8(a) companies
4  got in FY 11 by NAICS code.  Okay.  And I took every 8(a)
5  NAICS that was awarded that had dollars in it.  You know,
6  positive, negative dollars but dollars in it.  Okay.  I took
7  any NAICS that didn't have any dollars at all, zero, and I
8  didn't include them on this report.  These are the only ones
9  that had dollars in the NAICS.  Okay.  So these were
10  contracts that were awarded -- or contract activity occurred
11  in all of these NAICS codes.  And if you take a look at the
12  report, the column over on the left-hand side is the number
13  of NAICS.  And you look at that.  There are 481 NAICS that
14  the 8(a) program used for 8(a) awards in FY 11.  And I took
15  the number of NAICS that Mr. Wainwright identified that his
16  reports covered.  Okay.  And his reports covered basically
17  the ones that are darkened, the ones that are -- the dark
18  color starting with 236115.  Those are the NAICS codes that
19  his report specifically said are in construction.  That
20  group in -- in the construction area -- it goes from page
21  one to two.  And I gave him a couple others that I found
22  within his reports.  I found the construction being -- I
23  mean they do -- they buy so much asphalt for construction
24  and concrete and concrete work products that I actually
25  found them in something that was covered with his -- in his

Page 139

1  reports.  And then -- and that's what I covered.  And the
2  rest of these NAICS -- and there is about 1, 2, 3, 4, 5, 6,
3  7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22,
4  23, 24, 25, 26, 27, 28, 29, 30.  There is about 30 NAICS
5  here total that his reports cover out of 481.  So if you
6  made the supposition that -- that his disparity reports
7  covered completely those NAICS codes and were validly
8  justifying those NAICS codes which -- which I certainly
9  wouldn't agree to -- but if you made that supposition, then
10  you only are covering 30 NAICS codes out of 481.  And a
11  whole lot of the -- and so the -- so the federal government
12  does not have disparity studies which cover 450 of the 481
13  NAICS codes, which the 8(a) does business in.  And that's
14  the point of this report.
15  Q.  I asked the next question, and that is on page 11
16  you have some more businesses that are shaded there.  54130.
17  Explain that.
18  A.  Oh, yes.  Page 11.  Those are the other things.  He
19  listed two areas in his reports where he gave specific NAICS
20  codes, and one of them was construction and the other was
21  the professional services.  And he specifically listed these
22  -- these areas of professional services.  And that's the
23  ones I covered as well.  So I guess I didn't count those.
24  So that's 31, 32, 33, 34, 35, 36, 37 -- 37 out of 481.
25  Q.  Now, why do you think he chose the 541310?  Did he

Page 140

1  explain yesterday why he did that?
2  A.  The 541 what?
3  Q.  310 through 380.
4  A.  He said those were covered by professional
5  services.
6  Q.  And then why did he -- did you place in there on
7  541380 that Rothe usually is in the NAICS 811219?
8  A.  I put that in because that's -- that's not really
9  one of our NAICS -- we don't usually use the testing
10  laboratories because the testing laboratories I think is one
11  that's like $7 million, and we're usually in the 811219,
12  which is a -- it's a bigger testing thing.
13  Q.  Go to Number 7.
14  A.  Because basically -- basically the point of this is
15  that realistically when you look -- when you look at all his
16  reports -- if he said all his reports are wonderful and
17  valid and great and glorious and there's no problems with
18  any of those reports, you're still only covering like 37 out
19  of 481 NAICS codes.
20  Q.  Go to Number 7 and explain the significance of it.
21  A.  We -- the first page -- the first page is we
22  gave --
23        THE WITNESS:  Brian gave you a disc last
24  night.
25        MR. BRANIFF:  Yes.

Page 141

1        THE WITNESS:  And that disc that Brian gave
2  you -- this is an explanation of what's on that disc.
3        MR. BRANIFF:  Okay.
4  A.  It says what's on each sheet and, you know, on each
5  of the six sheets, the first sheet being the most of the --
6  ones that are most to the left and second sheet and so
7  forth.  This explains what's on each sheet.
8  Q.  (BY MR. BARTON)  And where did those sheets come
9  from?
10  A.  Well, I generated those sheets.  I got -- all of
11  this data came from the SBA website.  And I think if you
12  don't look at this sheet but you look at the next sheet --
13  you look at the one with the circles, it's probably easiest
14  to explain.  What I did --
15  Q.  Let me interrupt.  You say that you generated this;
16  but before that, you said that this data was on a disc that
17  you received yesterday, is that correct, or --
18        MR. FISHMAN:  You produced.
19  A.  I gave -- I gave the file with the disc to Brian
20  and Brian put a label on it, and he gave to you them.
21  Q.  (BY MR. BARTON)  Oh, okay.
22        MR. FISHMAN:  You produced it to us yesterday.
23        MR. BARTON:  Yes.  I thought I had it longer
24  than that, so I wanted to clarify in my mind I guess.
25        HE WITNESS:  We did that around your back,

36 (Pages 138 to 141)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Page 142

```
 1   David.
 2        Q.  (BY MR. BARTON) No, I saw it coming and going.  I
 3   just -- I thought I heard you say something else when you --
 4        A.  Okay.  All right.  If you take a look at the one
 5   with the circles -- the one with the circles is actually
 6   easier to understand than the other one, but other people
 7   think it's something different.  So I took a look at the one
 8   -- I took a look at the 8(a)s first.  The first thing I did
 9   is I took a look at the 8(a)s.  And at the time I did this
10   -- and I -- and I'll say that if you looked at it today that
11   probably it's a little bit different number because 8(a)s
12   graduate and new 8(a)s are formed and so forth.  There are
13   7935 8(a)s, and some of those 8(a)s were also self-certified
14   and some of them were certified SDBs.
15        Q.  Let me interrupt you again.  I think you said 7935.
16   Be very careful when you're saying numbers.  Look at them
17   and make sure it's the number that's on there.
18        A.  7935.  Now --
19        Q.  No.  Let's go back.  I have 7635 on mine.
20        A.  You have a very old chart.
21            MR. BARTON:  I have 7635 as well.
22        A.  7635.
23        Q.  (BY MR. BARTON) On the 8(a)s.  What do you have on
24   yours?
25        A.  Well, let me look at the second page because --
```

Page 143

```
 1   let's hope we have the right -- right chart.
 2            MR. FISHMAN:  It's on the first page as well,
 3   7635 8(a)s.
 4        A.  7635.
 5        Q.  (BY MR. BARTON) And yours says 79 --
 6        A.  Okay.  Well, then I've got the old chart.  I've got
 7   the old chart here that we marked as evidence and the new
 8   chart is 76.  Give me the 76 one.  I can double check that
 9   number.
10            MR. BARTON:  Do you want to do it as whatever
11   the next number is, Number 9, or just remark that one?
12        A.  I think you need to put the right chart in, the one
13   that matches the 39 --
14            MR. BRANIFF:  Let's do the right chart.
15        A.  Sorry about that.  Let me start over again here.
16   So you take the -- I took the 8(a)s and I did -- I did a
17   data dump from the SBD website -- SBA website of the 8(a)s.
18   And, like I said, it limited me to 5,000 a shot, so I had to
19   dump all the As, all the Bs, Cs, Ds and so forth, got them
20   all in, and then I eliminate any duplicates.  Okay.  And so
21   I got all the 8(a)s.  Now some of those 8(a)s were
22   self-certified, some of them were certified SDBs.  I didn't
23   understand totally what the certified -- the rules for
24   certified SDB.  I have discovered empirically and -- you
25   know, we had -- I had to look at the data to absolutely
```

Page 144

```
 1   determine apparently what the rules are for certified SDBs.
 2   You stopped certifying SDBs in like 2008 or 2009, whenever
 3   that was that you stopped certifying SDBs.  But if you were
 4   an 8(a) prior to 2009 or 2008 -- if you were an 8(a) prior
 5   to that, you were automatically a self-certified SDB.  And
 6   if you're still an 8(a), you're still a self-certified -- I
 7   mean a certified SDB.  If you're an 8(a) prior to 2008,
 8   you're still certified and you're still an 8(a) and you're
 9   still certified SDB.  If you were an 8(a) after 2008, you're
10   not a certified SDB, which is strange and bizarre, but
11   that's the way it is.  And if you graduate from the 8(a)
12   program, it -- any time certainly or any time in the last
13   three years -- if you graduate from the 8(a) program, you
14   become a certified SDB for three years.  So it's -- so the
15   certified SDBs are a mixture of people who are 8(a)s and
16   they're non-8(a)s.  Okay.  So the next thing I did was I
17   listed -- I got the SBA website to list me all of the
18   certified SDBs, and I took from the certified SDBs -- I took
19   away all of the 8(a)s that were in that, and you had 1986
20   certified SDBs that were no longer 8(a)s.  And these are
21   mostly people that graduated from the -- that graduated from
22   the 8(a) program and for three years they're certified SDBs.
23   Okay.  So you have 79 -- 7635 plus 1986.  7935 8(a)s plus
24   1986 certified things.  Next thing I did is I dumped all of
25   the self-certified SDBs.  The self-certified SDBs turned out
```

Page 145

```
 1   to be -- there are 2900 -- 29,803 self-certified SDBs.
 2   Okay.  Of the 2900 -- well, actually there is like 32,000
 3   self-certified SDBs but some of the 8(a)s are also
 4   self-certified SDBs, and some of the certified SDBs are also
 5   self-certified SDBs.  So I took the self-certified SDBs and
 6   I subtracted from that group -- I subtracted the 8(a)s, add
 7   the people that are 8(a)s, and I subtracted the people who
 8   were certified SDBs.  So you get down to -- so your total
 9   SDB -- your total SDB number is what's shown on -- is
10   39,424, which is the sum of the self-certified SDBs that
11   aren't 8(a)s or aren't certified SDBs, the 8(a)s and the
12   certified SDBs.  And that's how you get the number.  There's
13   39,000 of them.  And Rubinovitz used 43,400 something, so he
14   -- the difference between what he used and what this number
15   is greater than 10 percent, which counts for the 10 percent
16   disparity that he claimed, which pretty much wipes out his
17   10 percent disparity, in my opinion.
18        Q.  Is that -- excuse me.  And as I recall his
19   testimony, which can be confirmed whenever we get the
20   deposition -- but he was not really sure of that number of
21   44,000, is that correct, on that question?
22        A.  No, he was very unsure of that number.  He was very
23   unsure of it.
24        Q.  And then you take -- if you take Exhibit 8 and
25   explain what that is --
```

37  (Pages 142 to 145)

Electronically signed by Barbara Griffin (301-176-817-0609)                2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

| Page 146 |
| --- |

1    A.  Exhibit 8 --
2    Q.  -- and its significance.
3    A.  Okay.  This is minority-owned firms by kind of
4  business.  Okay.  And if you look at about the third line,
5  fourth line down that says construction --
6    Q.  Let's step back one.  That's data 2007; correct?
7    A.  Yes, this is a 2007 survey of business owners.
8    Q.  And what is that 2007?  What's the significance of
9  2007?
10    A.  That's the last date that they did the survey of
11  business owners that -- that's the latest survey of business
12  owner data that I know about.  I mean that's the one I found
13  and I guess -- if they have a later one, then it's -- then I
14  -- then I probably should have used it, but it's about the
15  same.  The significance of the data is about the same if
16  there's a later one.
17    Q.  But this is the one that Mr. Wainwright used in his
18  expert's report; correct?
19    A.  This is also the one he used in his expert report,
20  so I assume it's the latest one.
21    Q.  Go ahead.
22    A.  When you go down and look at construction, that's
23  the NAICS codes 23.  Okay.  There are 551,000 firms that are
24  minority -- these are all minority businesses.  With 551,000
25  firms with -- total, 551,000 firms.  And that's 9600 -- it's

| Page 147 |
| --- |

1  really -- the receipt is in millions of dollars.  So that's
2  $96 billion worth of money.  Okay.  There are 62,000 firms
3  with employees and -- and they have -- of the 96, they have
4  74.  Okay.  So what does it mean?  You take a look at the
5  next page.  And I took and I did my dividing again.  Not a
6  -- not any kind of other special analysis or statistics or
7  anything else.  I just did dividing.  So the total minority
8  firms -- so the 551 divided into $96 billion is $174,000 per
9  firm average.  But with the paid employees -- without paid
10  employees it's $45,000.  With paid employees, it's 1.176
11  million.  So this goes back to Mr. -- so the ratio of the
12  company sizes of non-paid employees at $45,000 to the paid
13  employees is like a 26 to one ratio.  Okay.  And this shows
14  you the -- almost the -- the craziness of Mr. Wainwright's
15  position of counting all the companies just on a pure head
16  count and not counting them on a -- not doing a capacity
17  analysis.  I mean if -- if a one-person firm is only doing
18  $45,000 worth of business, that means all they're doing --
19  that's like a single person that's out there painting or
20  laying floors or a carpenter that you might hire to put up
21  bookshelves or something like that.  That's what that person
22  is.  The ones with the $1.1 million those are people
23  actually doing construction work.
24    Q.  Let me ask you a question on that.  Is that --
25  that's based on your expert opinion --

| Page 148 |
| --- |

1    A.  Right.
2    Q.  -- from your business acumen and your statistical
3  work for the last 40 years; is that correct?
4    A.  Yes.
5    Q.  Go ahead.  Do you have anything else on that?
6    A.  So it -- you know, the basic -- the bottom line is
7  when you're -- when you're doing -- when you're counting
8  firms and you're looking at these one person minority firms,
9  it's ridiculous to assume that they have availability that
10  -- anywhere in comparison to the firms with employees.  And
11  -- and for Mr. Rubinovitz -- I mean Mr. Wainwright to
12  consider that is -- just goes against all economic
13  principles that I can imagine that I know about.  It doesn't
14  make sense at all.  It's just -- but that's the way they do
15  it.
16    Q.  Going back to -- is that all on that?
17    A.  Yes, sir.
18    Q.  Going back to what Mr. Braniff was asking you -- he
19  asked you a number of things about what you do in the public
20  forum as far as writing and speaking and so on, and you
21  answered that you hadn't done anything since you were in the
22  academic realm at the University of Texas; is that correct?
23    A.  Yes.
24    Q.  And why don't you do that stuff?
25    A.  There is no -- there is -- number one, I'm

| Page 149 |
| --- |

1  extremely busy at work.  Number two, there is nothing to be
2  gained.  I'm not -- if I were to academic, there would be
3  something to be gained, but I'm not an academic.
4    Q.  What you do is apply those things that the
5  academics write about on a daily business to your business
6  on a daily basis.  Is that guess good?
7    A.  Yes.
8    Q.  When you were asked to explain statistical
9  significance, you said you couldn't.  What did you mean by
10  that because you went ahead and talked about it in
11  significant detail.
12    A.  I guess I really -- I explained that -- I ended up
13  explaining it.  I just didn't have a -- I just got kind of
14  flatfooted about what an explanation of it was.  It's --
15  it's -- statistical significance means you've got enough
16  data available to be able to -- got enough data available to
17  be able to make the appropriate calculations.
18    Q.  And you explained in detail following that?
19    A.  Right, I did.
20    Q.  You know it when you see it; correct?
21    A.  Yes.  Yes, sir.
22    Q.  You know how to calculate it if you have to
23  calculate it; correct?
24    A.  Generally, yes.
25    Q.  And kind of those same questions when he started

38  (Pages 146 to 149)

Page 150

1    talking to you about statistical sampling.  Is that the same
2    reason, that you didn't have a specific definition for
3    statistical sampling?
4        A.  Yeah.  I mean I -- yeah.
5        Q.  But you know it when you see it, and you're able to
6    explain it?
7        A.  We do the statistical sampling at work.  We do it
8    for our calibration laboratories.
9        Q.  Now, you said you aren't a professional economist
10   or statistician in the -- and you didn't say it this way.
11   I'm asking you.  I'm assuming what you meant is in the
12   academic sense; is that correct?
13       A.  Yes.
14       Q.  But you do the same kinds of things as you
15   explained on a daily basis in your work?
16       A.  I do similar things.
17       Q.  Does your work involve statistics and economic
18   analysis?
19       A.  Well, lately it certainly has, but -- lately it
20   certainly has.  We do -- you know, we do some -- I do some
21   economic analysis because I'm always worried about what the
22   -- we have so many things that are -- that are economic
23   functions that effect our business like the health care,
24   like the stuff -- I'm always following the trends on health
25   care.  I'm always following the trends on employment

Page 151

1    activities, upon what it does to our -- we have to deal with
2    a voluminous amount of data related to what we have to pay
3    people, what we have to do -- you know, what we have to pay
4    people, what's appropriate, what our costs are going to be,
5    what are forecasts are going to be.  When I do a bid and
6    it's a five-year bid, I've got to put in projections of what
7    my costs are going to be five years out there.  So I've got
8    to look at -- I do look at things like the estimations from
9    the sense -- the estimations on what they expect inflation
10   to be.  Inflation estimations and that sort of thing.
11       Q.  In my world, I always think of that as economics;
12   is that correct?
13       A.  That's economics.  Yes, it is.
14       Q.  During the time that you were talking about your
15   statistical and economic analysis with Mr. Braniff, the
16   issue of bias came up.  And I don't remember what your bias
17   was, but the statistical and economic analysis that you've
18   done in this -- would you rate that as being objective?
19       A.  Yes, there is great numbers you can't deal -- you
20   can't fudge time.  You can't do anything with them.  You
21   can't -- the type of analysis that you do with what I've
22   done is just straightforward, just no bias can be shown.
23       Q.  And you are seeking from the beginning -- were you
24   seeking from the beginning to make it objective?
25       A.  Yes.  I live in the objective world.  I -- the

Page 152

1    subjective world is more difficult.
2        Q.  There was discussion over the Wage Board Data.  Who
3    -- who does the Wage Board Data?
4        A.  The Wage Board Data is determined by the Department
5    of Labor is best I can gather.  They're the ones that issue
6    it.  Now, whether they have Commerce helps them put it
7    together, I don't know, but the Department of Labor
8    generally produces them.
9        Q.  As you gave your answer to that, you discussed how
10   often -- I don't remember whether it was often.  It seemed
11   like you said often.  The wage board determinations were not
12   what the real world objective wages you would have to pay in
13   order to be competitive in the marketplace; is that correct?
14       A.  Yes.
15       Q.  Does that make the wage board data wrong to you?
16       A.  Yes.
17       Q.  Do you run into that same issue with census data?
18       A.  Census data we -- you know, most of the census data
19   we look in such a large scale it's hard to tell whether it's
20   right or whether it's wrong.  I -- I -- I could not
21   necessarily say that any particular census data I've seen is
22   -- is incorrect.  You know, we're seeing -- the census
23   department puts out the employment level, the employment
24   statistics, and they sure don't seem to be realistic.
25       Q.  Why do you say that?

Page 153

1        A.  Well, I mean it's a big scandal just starting up
2    that said that they -- that they manipulate them like crazy
3    right before the last presidential election.
4        Q.  When you say "they," who is the "they"?
5        A.  The census department.
6        Q.  The whole department or just somebody --
7        A.  I don't know.  Someone in there that produced the
8    report.  Some scandal.
9        Q.  You said Mr. Rubinovitz improperly counted the
10   SDBs.  And when I say SDBs, I mean the SDBs, 8(a)s,
11   self-certified and so on.  I can scratch that.  I think
12   you've answered all of that.  I had some other parts to it,
13   but I don't need them.  Here is one.  Do you recall why he
14   did not calculate the 8(a)s?
15       A.  He was -- he was trying to prove -- what he was
16   trying to prove, as best I gather, he was trying to prove
17   that SDBs that were not in the 8(a) program were being --
18   were not doing as well as -- as other people who weren't
19   SDBs or 8(a)s or whatever.  That's what I gathered his
20   report was trying to prove.  And he's trying to prove that
21   they had a lower probability of winning contracts.  And I
22   have never seen -- and the other things I have never seen
23   from Rubinovitz that -- that I think we asked for them and
24   have never seen is we've never seen his list of -- his list
25   of businesses.  We've never seen his calculations which

39 (Pages 150 to 153)

Electronically signed by Barbara Griffin (301-176-817-0609)                          2e97a725-ee14-4199-bec5-62df23e28d12

Page 154

1    showed his -- the list of businesses that he considered
2    8(a)s and the list of businesses that he considered non-SDBs
3    or even the number of those businesses.
4         MR. BARTON: We've mentioned a couple of
5    things, Mr. Braniff, of documents that we haven't received,
6    that being one of them. If we put that in writing and send
7    it to you, can you get those?
8         MR. BRANIFF: We'll see -- we'll see what you
9    send over. I am more than 100 percent sure that you
10   actually do have the -- included in the documents that we
11   sent over the list of the firms that were included in
12   Dr. Rubinovitz's statement. I will be more than happy to
13   look at any request forwarded on to our experts and see if
14   we can get what you need.
15        Q. (BY MR. BARTON) Now, somehow it came up in one of
16   the questions or answers -- and I don't even remember. I
17   think it was a combination of the two of you. There was
18   mention of playing a game with the size of the business.
19   And as I was listening to that, I thought it's really not --
20   by saying it's playing a game, it's not in a bad way.
21   You're trying to meet the requirements of the SBA most of
22   the time; is that correct?
23        A. Well, you're -- when you put -- when you put --
24   what you put down in the SAM's database or the CCR before it
25   is -- is not what you're telling prior to -- you know, as of

Page 155

1    this month or last month or some time -- it's August or
2    September they went into effect. Now -- now you have to --
3    now it's really a solid number. But prior to that the SAM's
4    database was not -- you were not required by law or rule or
5    regulation to put down an accurate number. And people
6    played games with that number to try to -- to try to get a
7    better benefit in -- in attracting people to them or
8    thinking they could win contracts with it or whatever. The
9    number that you certified -- when you turn in a bid, you
10   have to certify in most cases -- if it's a small business
11   bid, you have to certify that you meet the size standard.
12   And that's the certification that is -- that you have to --
13   that you were bound to live by.
14        Q. Mr. Braniff asked you -- we got into a conversation
15   about SDBs working in the construction industry. I think it
16   was on a national level. And what I wanted to do is clarify
17   in my own mine where the SDBs generally work. You were
18   saying that SDBs -- businesses like to be SDBs because it's
19   helpful to them in -- just in the business community
20   generally I understood, is that correct, or is it just
21   construction?
22        A. If you're an SDB and you're in federal contracting,
23   you're eligible for the subcontracting for sections of the
24   subcontracting program that are -- that are -- that are --
25   that are set aside -- you know, certain amount of the

Page 156

1    subcontracting program -- a percentage of the subcontracting
2    program is specified to go to SDBs. It's usually like about
3    8 percent. And the SBA believes that they get that 8
4    percent goal. They're roughly about 8 percent. And it's
5    important if you're an SDB to get that goal. Now, if you're
6    in -- if you're in construction and you're working on the
7    highway department kind of programs, the DOT programs, then
8    you have to be a certified DBE or certified by whatever
9    state agency or whatever. You have to be -- you have to be
10   one of these MDEs or DBEs or whatever it is to meet their
11   particular criteria or the particular city criteria or
12   whatever disadvantaged thing, I mean whatever locality has
13   an advantage for you being an MBD or SDB or DBE or whatever
14   the hell you are.
15        Q. And in your expert opinion based on your business
16   acumen again, do SDBs generally work at the subcontractor
17   level because of those programs?
18        A. For -- if you're in contracting, SDBs generally --
19   or the MBEs basically do most of their work at the
20   subcontract level.
21        Q. I'm not looking for any particular answer but just
22   kind of speed up the questioning. So when -- who was it,
23   Mr. Wainwright or Mr. Rubinovitz, that didn't even consider
24   SDBs; is that correct?
25        A. Rubinovitz.

Page 157

1         Q. Or subcontracting; is that correct?
2         A. Rubinovitz.
3         Q. So he excluded subcontracting -- he would have
4    excluded a very large portion of -- it wouldn't be -- it
5    wouldn't contracts, one; it would be contracts that they
6    have. Contracts in this environment was only at the prime
7    level, but that misses -- that's why you don't dollar -- or
8    don't do contracts you win; you do dollars and --
9         A. That's right. You do dollars. But essentially it
10   wasn't in his database. I mean I -- I am still not exactly
11   sure what is it -- where I can get a hold of a database that
12   has subcontract dollars. Okay. If Mr. Rubinovitz didn't
13   have it, so he didn't use it. I don't think that he was
14   aware that the SDBs got big subcontract dollar allocations.
15   I don't think he knew about it. Okay. I went and I looked
16   at the SBA web site, and it said what the percentage of
17   dollars were. And you look on the Golden sheet, and it says
18   what the government is taking a percentage of and calculate
19   what the percentage -- what the dollars were.
20        Q. Just added, what, 8 percent?
21        A. About 8 percent of -- it's 7.7 or 7.8 or something
22   like that. It's almost 8 percent of the subcontract
23   dollars. And -- and I just -- I calculated the number. I
24   mean I just calculated the number off the -- off the
25   government data. But he didn't even know that it existed,

40   (Pages 154 to 157)

Dale Patenaude                                      November 21, 2013

Page 158

1  so he just -- he -- he left off out of his calculations half
2  the money.  And if he was just looking at awards, he left
3  off half the awards.
4          MR. BARTON:  I pass the witness and reserve
5  any further questions.
6          (Transfer of examination at 1:49.)
7              EXAMINATION
8  BY MR. BRANIFF:
9      Q.  I just want to verify some stuff on the number of
10  SDBs in your recalculation of the number of SDBs.  I believe
11  that was Exhibit 7?
12      A.  Yeah.
13      Q.  You think that Mr. Rubinovitz overstated the number
14  of SDBs by 10 percent?
15      A.  About.  You take 39,000 -- 39,424, and he used
16  about 43,400 I believe.  It's about 10 percent.
17      Q.  And you believe that that led to the 10 percent
18  figure that he -- 10 percent figure -- or 11 percent figure
19  that he ended up with in his report?
20      A.  It definitely contributed to it.
21      Q.  Do you believe that that contributed to it?
22      A.  Sure.
23      Q.  If you were to do an average -- calculate an
24  average number of contracts divided by total value of those
25  contracts or number of contractors divided by total number

Page 159

1  of contracts -- if one of those numbers was off by 10
2  percent -- 10 percent too high, 10 percent too low -- would
3  your final average that you calculate come out to be also
4  incorrect?
5      A.  By 10 percent, yes.
6      Q.  It would?
7      A.  Yes.
8      Q.  Do you believe that Mr. Rubinovitz performed an
9  average in his calculations?
10      A.  No.
11      Q.  Okay.
12      A.  I mean -- but --
13      Q.  That's fine.  You can --
14      A.  But -- but -- but he used some database of people
15  and some database of contracts, and he was 10 percent off
16  wrong in his SDB numbers.  So that means that could have
17  contribute to a 10 percent error or could have been less.
18  It could have been a 5 percent error.  We don't know, but it
19  means a significant error.
20      Q.  On his report we've previously marked as Exhibit
21  Number 5, this is where he discusses that 11 percent final
22  number that he gets.  It's on page 11.
23      A.  Uh-huh.
24      Q.  He states there that the odds of an SDB winning a
25  contract is roughly 11 percent lower than other types of

Page 160

1  small businesses.  Then he says while small minority-owned
2  firms regardless of whether or not they're SDBs or in the
3  8(a) program had roughly 30 percent lower odds of winning a
4  contract than other folks.  How would Mr. Rubinovitz's
5  alleged miscounting of SDBs have impacted that 30 percent?
6      A.  Well, it probably would have removed some of the
7  people that he counted as SDBs and moved them into the
8  minority things and would have upped the dollar values the
9  minority had.  It probably would have lowered -- it probably
10  would have lowered the -- moving the SDBs over probably
11  would have lowered the 11 percent number and probably
12  lowered the 30 percent number, both.
13      Q.  So you believe that even though the second number
14  ignored their SDB status, that would have also been impacted
15  by his miscounting of SDBs?
16      A.  Yes.
17      Q.  Do you believe that in his database he miscounted
18  SDBs due to an error in the data base of there being false
19  -- there being actual firms that were falsely labeled as
20  SDBs or firms that were there that don't actually exist that
21  were labeled as SDBs?
22      A.  I really don't know what the hell he did because
23  he's never given us the data.  But the -- but the -- but a
24  couple other points to point out.  When you're talking
25  minority firms, the people that say they're self-certified

Page 161

1  SDBs or they're certified SDBs or 8(a)s theoretically have a
2  social disadvantage and an economic disadvantage and have
3  been certified at some point are -- are claiming that
4  they're certifiable.  Okay.  Minority firms are not.
5  Minority firms are not.  You don't have any idea whether a
6  minority firm is an SDB, whether they're white owned and
7  claimed to be minority firmed, whether they're partly owned
8  by somebody else, whether they're a subsidiary or whatever.
9  Minority firms don't tell you squat about what they're
10  capable of.  When you talk minority firms and SDBs, you're
11  talking apples and oranges, and that's ridiculous.  I did
12  not -- I did not even look at the minority dollar firm
13  dollar, but I'm -- you know, I can look at that and, you
14  know -- to respond to that.  But, you know, his 11 percent
15  number, according to Mr. Wainwright's reports, you have to
16  have a 20 percent disparity to even show any inference of
17  discrimination.  So the 11 percent number falls below the 20
18  percent, so it makes no inference of discrimination
19  according to Mr. Wainwright.  That would be the assumption
20      Q.  How about according to you?  Do you think you have
21  to fall below that 20 percent number before there can be any
22  inference of discrimination?
23          MR. BARTON:  Objection.
24      A.  I find it very --
25          MR. BARTON:  Go ahead and answer.

41 (Pages 158 to 161)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                    November 21, 2013

Page 162

1      A.  I find it very difficult to assume that with any of
2  these numbers that there is any inference of discrimination
3  because -- because I look at the government contracting and
4  I look at how the government contracting is going, and the
5  only discrimination that I see in government contracting is
6  in favor of SDBs and against me, not -- not against them.
7      Q.  (BY MR. BRANIFF) Right.  No, I understand that.
8  And then on this same chart here, the second page here, I
9  was a little unclear when you were talking about the -- and
10  I think that you were trying to communicate that it was
11  unclear with the 8(a) -- with the 8(a) program.  Is it your
12  understanding that 8(a)s can be certified and self-certified
13  SDBs or was it un --
14      A.  8(a)s -- 8(a)s, if they want to go self-certify
15  themselves, they can.  All they have to do is they go over
16  to -- to self-certify yourself, you just go into SAM's and
17  say I'm self-certified.  Okay.  And some 8(a)s have chosen
18  to self-certify themselves.  For what reason, I don't know
19  but they have.  That's just the empirical data.  I didn't
20  look up the rules.  I tell you what the empirical data says.
21  Some self -- some 8(a)s are also certified SDBs.  And from
22  the data that I gather looking at it empirically if you were
23  an 8(a) prior to 2008, you're still a self -- you're a
24  certified SDB when you became an 8(a), and you're still a
25  certified SDB.  But if you became an 8(a) after 2008, you're

Page 163

1  not a certified SDB.  Why?  I don't know.  I just tell you
2  what the empirical data says.
3      Q.  I understand.  On this chart right here real quick,
4  you said you used all of the NAICS codes where there had
5  been revenues of that year?
6      A.  Yes.
7      Q.  It is possible, though, to win a contract and not
8  get any revenues in a certain given year for that contract;
9  is that correct?
10      A.  I guess it's possible.
11      Q.  You have won contracts in certain calendar years
12  and not been paid on that contract that same year; right?
13  Not you personally but Rothe --
14      A.  It is possible.
15      Q.  Right.
16      A.  But if you -- if you did that, you go from 481
17  contracts -- NAICS codes to about a thousand.  Okay.  All
18  right.  And the only way you can judge -- the only way you
19  can judge whether there is -- I mean I have to -- I mean if
20  you have a zero dollar award -- a zero dollar number -- I
21  could probably look at it.  I doubt that it would change
22  your -- I probably would run analysis to see if there are
23  8(a) awards with no dollars.  But, you know, I doubt that
24  that would make a significant change in this at all.
25      Q.  Other than at the SAM data point -- the SAM

Page 164

1  registration process, is there any other point in federal
2  contracting to your knowledge where you have to certify your
3  status or swear to your status as a small business or SDB
4  or --
5      A.  Yes.  Every time -- if -- every time you do a bid
6  and it's a small business bid, you have to tell them whether
7  you're a -- you're a -- you're an SDB or you're a small
8  business.  If it's a small business bid, you generally have
9  to certify a small business.  If you're -- and they want to
10  know if you're an SDB or 8(a) or HUDZone or whatever.  They
11  want to know that fact.  And I think the real reason they
12  want to know that is -- if it's a program that they can take
13  advantage of on their Golden chart, they want to know it so
14  they can take advantage of it.  And if it's a program that
15  you have to have some registration to qualify, they've got
16  to know it.  HUDZone set aside, they want to know your
17  HUBZone.
18      Q.  And when you fill that out, is there any -- does it
19  say I certify under oath that this is true?  Is there any
20  language to that --
21      A.  No, but the -- but the -- there is no language like
22  that, but the FAR pretty much makes it a certification.  I
23  think you -- you've got to sign -- I think signing the bid
24  said -- there is some cases -- there is some cases -- we
25  call these reps and certs.  Okay.  The Section K of RFPs.

Page 165

1  And some of those you have to sign, some of them you don't.
2  Generally signing the RFP takes care of signing that you're
3  agreeing and certifying that, because it does say I certify
4  this.
5      Q.  Okay.  And that point you have to say that you've
6  included information in that packet somewhere that you are
7  small or you are whatever?
8      A.  Right.  But you generally have to take most -- most
9  of those things are checkoffs.  You know, they've got little
10  blocks, yes block, no block.  You check that yes block, and
11  it says I'm certifying this or I'm not certifying this.
12      Q.  Are there any penalties that you're aware of lying
13  and -- being untruthful as your status in those reps and
14  certs, as you would say, or in --
15      A.  I think -- I think that there are some penalties.
16  I do not know what the penalties are because I'm not an SDB
17  or an 8(a) or whatever.  But I think if you said that you're
18  an 8(a) or not an 8(a) or say you're a certified SDB or
19  something and you're not, I assume that there is some
20  penalties involved there.  I've never had to deal with that,
21  so I'm not.  I know with a small business -- I know that the
22  small business always has been the potential penalty if
23  you're a small business and you say you're under $10 million
24  and you're not under $10 million.  Your biggest -- up to
25  this date, your biggest liability was you could face a small

42 (Pages 162 to 165)

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude
November 21, 2013

Page 166

1  business protest, and you could lose a contract.  No real
2  administrative penalty I've ever seen has been applied to
3  people prior, and that may be one in law that they could but
4  I haven't seen it.  I think too if you -- if you
5  consistently do it, though -- I do remember that if you're
6  consistently seeing it some place and -- you know, small
7  business rules.  If you consistently go out there under
8  multiple times -- say you're a small business and not, then
9  you can be disbarred.
10        MR. BRANIFF:  Okay.  That's it.
11        MR. BARTON:  I did have one more question.
12        (Transfer of examination at 2:00.)
13              EXAMINATION
14  BY MR. BARTON:
15     Q.  You mentioned previously that you had size standard
16  challenges to you.  When was the last time you were
17  certified as a small business or Rothe Development Corp.?
18     A.  I'd have to look at that, but we turned that in as
19  one of the paperworks I thought in this first case.  It was
20  -- it was about two years or three years ago.
21     Q.  That's correct from my recollection.  And that was
22  done by SBA; correct?
23     A.  Right, SBA certified us.  Yes.
24     Q.  And have you had any changes to your business model
25  since that time?

Page 167

1     A.  No.
2        MR. BARTON:  That's all.
3        MR. BRANIFF:  Thank you very much.
4        (Deposition concluded at 2:01.)
5              * * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1              CHANGES AND SIGNATURE
2  WITNESS:  DALE PATENAUDE    DATE OF DEPOSITION:  11/21/13
3  PAGE  LINE   CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 169

1        I, DALE PATENAUDE, have read the foregoing
2  deposition and hereby affix my signature that same is true
3  and correct, except as noted above.
4
        _____
5              DALE PATENAUDE, Witness
6  THE STATE OF _____ )
7  COUNTY OF _____ )
8        Before me, _____, on this day
9  personally appeared DALE PATENAUDE, known to me (or proved
10 to me under oath or through _____ ) (description
11 of identity card or other document) to be the person whose
12 name is subscribed to the foregoing instrument and
13 acknowledged to me that they executed the same for the
14 purposes and consideration therein expressed.
15        Given under my hand and seal of office this _____
16 day of _____, _____.
17
18        _____
        Notary Public in and for the State
19        of _____.
20
21
22
23
24
25

43 (Pages 166 to 169)

Dale Patenaude                                    November 21, 2013

```
                              Page 170
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2
 3    ROTHE DEVELOPMENT, INC.,   )
                                 )
 4          Plaintiff(s),        )
                                 )
 5    VS.                 )NO. 12-CV-744-KBJ
                                 )
 6    DEPARTMENT OF DEFENSE and  )
      SMALL BUSINESS             )
 7    ADMINISTRATION,            )
                                 )
 8          Defendant(s).        )
 9              REPORTER'S CERTIFICATE
                DEPOSITION OF DALE PATENAUDE
10                NOVEMBER 21, 2013
11          I, BARBARA KAY GRIFFIN, a Certified Shorthand
12    Reporter in and for the State of Texas, hereby certify to
13    the following:
14          That the witness, DALE PATENAUDE, was duly sworn by
15    the officer and that the transcript of the oral deposition
16    is a true record of the testimony given by the Witness,
17    hereinbefore.
18          I further certify that pursuant to FRCP Rule
19    30(f)(1) that the signature of the Deponent:
20          __x__ was requested by the Deponent or a party
21    before the completion of the deposition and is to be
22    returned within 30 days from date of receipt of the
23    transcript.
24          If returned, the attached Changes and Signature
25    Page contains any changes and the reasons therefore;
```

```
                              Page 171
 1          That the amount of time used by each party at the
 2    deposition is as follows:
 3          Andrew G. Braniff - 03:35
 4          David Barton - 00:43
 5          I further certify that I am neither attorney, nor
 6    counsel for, related to, nor employed by any of the parties
 7    to the action in which this testimony is taken of record in
 8    this cause, nor do I have a financial interest in the
 9    action.
10          SUBSCRIBED AND SWORN TO on this the _____ day of
11    _____, 2013.
12    _____
13          BARBARA KAY GRIFFIN, Texas CSR 2494
              Expiration Date:  12/31/14
14          Firm Registration No. 631
              Kim Tindall & Associates, LLC
15          645 Lockhill Selma, Suite 200
              San Antonio, Texas  78216
16          (210) 697-3400
17
18
19
20
21
22
23
24
25
```

44 (Pages 170 to 171)

A000313

Electronically signed by Barbara Griffin (301-176-817-0609)                    2e97a725-ee14-4199-bec5-62df23e28d12

Dale Patenaude                                              November 21, 2013

**A**

**ability** 6:8,11 12:2
91:10
**able** 6:20 16:11,16
35:16,17,18 51:14
58:1,2 77:21
79:23 132:7
135:11 149:16,17
150:5
**above-styled** 1:17
**absent** 125:4
**absolute** 11:21
**absolutely** 29:9
31:1,4 61:14
68:22 97:18,21
102:24,24 105:6
107:20 109:9
111:2 143:25
**academic** 148:22
149:2,3 150:12
**academics** 149:5
**Academy** 124:2,5
**accept** 59:5 62:22
66:15
**accepted** 25:20
66:14,15
**accomplishments**
5:14
**account** 88:22
**accuracy** 106:12,13
106:14,15 120:1,2
**accurate** 6:8,11
24:8,14 62:9 71:1
71:13 72:13 105:5
105:7 107:22
109:3,9 155:5
**achieve** 76:20
**acknowledged**
169:13
**acronyms** 87:23
**action** 36:18,19
134:4 171:7,9
**activities** 151:1
**activity** 67:21
120:7 138:10
**actual** 28:1 78:8

129:2 160:19
**acumen** 148:2
156:16
**adapt** 44:7
**add** 61:11 145:6
**added** 157:20
**adding** 41:11
**addition** 63:1
**address** 6:1
**adjust** 52:10,11
**adjustment** 9:19
52:5
**administration** 1:7
2:11,13 4:8 64:2
69:20 132:20
137:25 170:7
**administrative**
74:3,4 166:2
**admit** 119:5
**admits** 29:20,20
**admitted** 49:20
**advantage** 131:9
131:13 135:23
156:13 164:13,14
**advantages** 134:23
135:6,9
**advertisement**
60:18
**advertising** 61:18
**affect** 6:7,10
**affidavit** 10:2
**affidavits** 9:25 15:1
15:4,7 65:11,13
**affiliate** 123:13
**affiliated** 123:12,13
**affirmative** 36:18
36:19 134:4
**affix** 169:2
**afford** 29:13,15
74:20,22
**age** 77:25,25 78:2,3
78:4,5,7,8,9,12
80:5,7 94:14,17
99:15,16,17,19
100:12,18,19
107:6,10,21 110:3

110:3,23
**agencies** 64:8
**agency** 156:9
**aggregate** 105:23
**aggregated** 132:22
**aggression** 43:11
**ago** 10:3 41:16
47:12 62:14 99:19
166:20
**agree** 18:25 81:7
93:15,17,21,24
139:9
**agreeing** 165:3
**ahead** 12:14 60:14
136:6 137:13
146:21 148:5
149:10 161:25
**Air** 87:20,21,25
95:12 124:2,4
**Alaskan** 36:24
117:1,6
**alive** 5:7
**alleged** 160:5
**allocations** 157:14
**allow** 115:17
**allowed** 89:16,22
89:24
**allows** 74:17
**altered** 132:10
**amazed** 46:5 51:17
**amazing** 69:3
**amount** 9:22 44:19
51:11 55:12 74:7
83:15 106:11
110:16 129:2,12
129:13 133:15
151:2 155:25
171:1
**amounts** 51:12
**amplifier** 13:25
14:2
**analysis** 18:24
19:16 28:14,15,17
29:21 30:5,17
31:16 34:4,7 36:6
36:9,10,11,12

38:22 39:4,18
42:1 43:7,8,11,18
43:22 44:3,5,17
45:13,20 47:3,8
47:22 49:24 50:2
53:25 66:17 68:8
72:5,7,7,9,23,24
75:2,10,14,17,19
75:21 77:2 85:1,2
87:3 110:24 111:3
113:8,11,14
126:14,15,16
127:15 147:6,17
150:18,21 151:15
151:17,21 163:22
**analyze** 66:24
**analyzed** 45:16
58:13
**Andrew** 2:7 4:6
171:3
**announce** 123:12
**annual** 122:10,24
125:15 127:17
130:5,10
**anomaly** 89:6,6
**answer** 24:13 75:22
152:9 156:21
161:25
**answered** 148:21
153:12
**answers** 154:16
**anticipate** 116:14
**Antonio** 1:22 2:5
6:2 16:25 17:1,5,8
33:18 171:15
**anybody** 21:12
53:17 61:10 79:17
106:17 109:15
126:6 127:7,18
**anymore** 32:5
117:3 134:20
**anyway** 4:14
**apart** 110:25
**apologize** 77:2
**apparently** 144:1
**appear** 16:25

**Appearances** 3:3
**appeared** 13:10
15:15 108:15
169:9
**appears** 16:25
136:22
**appendix** 25:2
**apples** 161:11
**applied** 30:18
51:25 62:21 86:10
114:20 166:2
**applies** 117:6
**apply** 30:6 52:2
114:13,20 149:4
**approach** 13:17
14:16 30:14 76:17
104:18
**appropriate** 11:1
34:16 54:5 75:20
149:17 151:4
**appropriately**
110:24
**approximately** 7:2
**April** 68:18
**area** 87:20 135:11
138:20
**areas** 37:22 139:19
139:22
**arena** 55:7
**arrived** 133:13
**arriving** 58:13
**article** 15:11,14,20
15:12
**articles** 13:10
15:12
**arts** 13:3
**Asian-American**
89:1
**aside** 55:2 56:12
89:14 111:16
131:17 155:25
164:16
**asides** 56:14
**asked** 4:18,19
24:22 46:7 53:8
53:12 139:15
148:19 149:8

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 48 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 322 of 814
Dale Patenaude                                         November 21, 2013

Page 173

153:23 155:14
**asking** 59:5 136:18
148:18 150:11
**aspect** 97:15
**aspects** 9:16
**asphalt** 138:23
**assigned** 29:12
**assignments** 42:17
**associated** 7:23
20:11 21:6 24:9
25:23 26:3,7,10
29:1 39:19 40:7
43:15 44:6,9
63:11 74:9,11
79:16 107:25
125:15
**Associates** 171:14
**assume** 40:9,10
104:5,9 127:15,16
146:20 148:9
162:1 165:19
**assumed** 132:22
**assumes** 75:24
**assuming** 150:11
**assumption** 161:19
**attached** 1:24
170:24
**attempted** 13:22
17:25
**attention** 109:12
115:3 118:16
**attorney** 2:8 4:20
171:5
**attorney-client**
4:23
**attracting** 155:7
**August** 108:1
109:18 155:1
**Austin** 12:10,18
13:9
**authoritative** 93:5
**automatically** 21:9
144:5
**availability** 20:9,10
20:18,20,23 28:14
28:15 29:21,25

30:8 50:8 148:9
**available** 18:8 68:7
83:10 107:8,13,18
110:8 111:25
149:16,16
**Avenue** 2:9
**average** 108:8,12
109:6,7 110:18,19
111:5 113:15,16
133:12 147:9
158:23,24 159:3,9
**averages** 133:8,14
**avoid** 4:18,23
**award** 57:2 60:7,8
69:17 86:19 98:25
99:1 110:16
163:20
**awarded** 57:3
69:17 83:8 85:22
86:17,18,18 97:11
108:5 111:15
112:24 138:5,10
**awarding** 71:3,21
**awards** 71:6,6,7
111:21 112:16
138:14 158:2,3
163:23
**aware** 75:7 88:10
114:17 115:2,10
119:21,22 134:8
157:14 165:12
**awhile** 62:5,8 78:13
99:19 102:9 123:2
**a.m** 1:19

―――――――――――
**B**
―――――――――――
**B** 3:11
**Bachelor** 12:8
**back** 9:14 14:20
43:4,15 44:23
46:24 53:7 63:14
65:21 70:2 79:1
80:19 81:11 86:25
91:21 114:19
135:25 137:17
141:25 142:19

146:6 147:11
148:16,18
**background** 16:11
33:19
**backup** 18:20
**bad** 36:5 97:22
154:20
**badly** 69:16
**baffled** 68:22,22
**ball** 34:21 35:14
**ballpark** 83:14
122:9
**Barbara** 1:19
170:11 171:13
**Barton** 2:3 3:6,7
4:13 9:7 10:25
11:7,9 42:25
51:16 136:5,9,12
136:17,17,23
141:8,21,23 142:2
142:21,23 143:5
143:10 154:4,15
158:4 161:23,25
166:11,14 167:2
171:4
**base** 58:5 59:1
94:21 101:6
103:22 104:2
160:18
**based** 24:10 39:16
69:18 71:6,7 80:9
80:11 94:23,25
95:19,20 101:19
101:21,21 108:6
108:16 109:1
131:7 133:12
147:25 156:15
**basic** 48:18 60:6
79:7 134:1,2
148:6
**basically** 10:6
14:24 17:10 20:3
41:10 53:1 108:3
138:16 140:14,14
156:19
**basing** 113:19

**basis** 24:1 43:9
44:4 149:6 150:15
**battle** 96:22
**beautiful** 47:3
**becoming** 52:13
**began** 128:17
**beginning** 151:23
151:24
**behalf** 10:12
136:18
**belief** 59:7 77:19
135:12
**believe** 7:6,18 9:21
9:24 10:18,19
12:4 20:22 25:9
25:10,11 45:15,19
49:2 56:19 57:13
57:21 59:14 64:25
65:19,24 77:14,15
78:9,11 81:7 84:5
84:13,20 91:22
98:20 105:4,6
109:2,8 111:22
112:6,13 113:22
117:17 118:1,6
121:12 124:2
158:10,16,17,21
159:8 160:13,17
**believed** 58:4
**believes** 156:3
**benchmark** 48:16
48:17
**benefit** 82:10
105:13 155:7
**best** 38:1 125:4
152:5 153:16
**better** 6:21 20:19
30:15 75:12 79:8
81:3 95:9 113:9
132:8 155:7
**beyond** 12:2 31:21
**bias** 151:16,16,22
**biased** 30:24 31:5,9
31:13,15
**bid** 28:4 29:6 37:15
38:3,6,7 39:14,15

39:16,24 56:11
57:8 60:10 74:23
79:16,23,23 90:22
91:10 95:10 98:23
98:23 121:3,13
123:22 124:4,8,10
124:20,25 125:7
128:7 129:25,25
130:1 132:7,15,15
151:5,6 155:9,11
164:5,6,8,23
**bidding** 29:7,9,12
37:23 55:1 60:5
60:11,19 79:17
90:25 91:12,18
121:23 125:2,2,10
125:10,12 129:8
**bids** 27:24,25 28:1
28:20,21 37:2
39:19 74:21,24
96:3 102:5 103:1
121:20 123:3,8,14
123:20 124:11
125:2
**big** 38:16 40:20
46:13 58:4 64:13
64:20 67:8,9
86:16 103:14
121:24 122:1,2
127:18 130:1
132:24 153:1
157:14
**bigger** 26:20 47:25
48:1 64:8 90:19
94:25 99:17
101:15 108:15,15
127:20 140:12
**biggest** 27:23 55:9
63:18,19,20,21
95:3,4 165:24,25
**biggies** 106:21
**bill** 44:7 52:23
**billing** 44:8
**billion** 69:3 71:1
83:12,13,14
102:21,21,25

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 49 of 73
USCA Case #15-5176   Document #1577653   Filed: 10/13/2015   Page 323 of 814
Dale Patenaude                                      November 21, 2013

Page 174

112:25 125:19
126:7,9 147:2,8
**Billions** 65:7,8
**bills** 29:5
**bit** 23:16,17 59:15
69:13 103:15
117:15 123:5
133:25 142:11
**bizarre** 22:16
144:10
**black** 20:5 31:14,17
52:21,22
**block** 165:10,10,10
**blocks** 165:10
**Bloomberg** 67:19
68:16 86:5,5,8,10
86:11,21 105:14
**board** 38:19,20,21
38:23 39:1,2
152:2,3,4,11,15
**book** 92:24
**bookshelves** 147:21
**Boston** 53:5,6
**bothered** 118:21
**bottom** 21:10 57:22
59:19 121:5
125:12 133:7
134:3 148:6
**bouncing** 34:21
**bound** 155:13
**Brad** 67:19
**Bradstreet** 114:14
114:15,21
**brand** 95:13
**Braniff** 2:7 3:5,6
4:3,6,15 5:4,23
6:24 8:11,14,19
8:22 9:10,15 11:8
11:11 12:14,17
32:17 42:23 43:1
43:4 57:12,15
70:12 86:22,25
94:16 135:24
136:2 140:25
141:3 143:14
148:18 151:15

154:5,8 155:14
158:8 162:7
166:10 167:3
171:3
**break** 42:24 43:2
**Brian** 140:23 141:1
141:19,20
**bring** 29:4 36:19,21
36:22 134:5
**broad** 59:1
**broke** 91:5
**brought** 5:16 28:20
28:21 32:16 41:5
**Bs** 105:22 143:19
**budget** 97:3
**build** 28:25 40:21
**building** 19:19,20
19:21,21 28:25,25
29:1,2 44:11
68:13 88:20
**buildings** 19:20
28:22,23 29:8
74:14 90:19
**built** 14:25 28:23
42:12
**bunch** 21:20 29:6
137:24
**burden** 62:10
**burdensome** 62:11
62:12,23,24
121:24
**buried** 42:10
**business** 1:6 2:11
2:13 3:21 4:8 5:6
5:7,14,15 7:20
9:22 10:8 17:8
19:7,15 22:15
26:3,7,9,13,14,17
28:7,14 29:14,15
30:11,11 31:3,20
31:20 34:18 40:8
43:6,21,24 44:6
44:13 46:10,13
50:24 52:12 53:7
54:15 55:6,7,8,8
55:10,10,12,14,21

55:22 56:1,2,3,4,6
56:9,14,21 57:3,4
57:7,9 61:13,16
64:2,18,19,20,22
73:12,13,14,15,18
73:19,20,21,24
74:8,18,21 80:9
80:11,16,18 81:13
83:19 84:21 88:15
88:22 90:8 92:8
95:3,8 97:13,14
97:23 101:10,19
101:21,23 102:2,3
103:2 108:8,20
109:24 110:1
112:24,25 113:16
121:5,10 125:20
127:16,19 130:9
130:16 131:14,17
132:7,20 133:1
134:23 136:24
137:3,5,19,22,25
139:13 146:4,7,11
146:11 147:18
148:2 149:5,5
150:23 154:18
155:10,19 156:15
164:3,6,8,8,9
165:21,22,23
166:1,7,8,17,24
170:6
**businesses** 15:2
19:25 20:4,6,7
21:11 23:4 27:14
40:9 64:5 83:25
84:1 103:5 113:4
113:5 117:9
130:25 131:2,18
131:21 134:9,21
137:12 139:16
146:24 153:25
154:1,2,3 155:18
160:1
**busy** 149:1
**butcher** 47:17
**butt** 118:22

**buy** 138:23

─────────

|   C   |
**C** 2:1
**cable** 14:10
**cadres** 103:1
**cal** 44:10,11
**calculate** 65:17
83:11 84:7 85:7
149:22,23 153:14
157:18 158:23
159:3
**calculated** 84:22
109:6 133:8
157:23,24
**calculating** 16:18
82:24
**calculation** 59:3
66:6
**calculations** 42:6,7
42:11 59:2,2
67:13 71:16
117:21,23 118:4
149:17 153:25
158:1 159:9
**calculator** 41:21
113:1
**calculators** 41:20
42:12
**calculus** 12:25
**calendar** 163:11
**calibrate** 44:17
**calibration** 17:4,4
17:8 23:19,20
24:11 32:25 33:5
33:9,14,20,22
44:20,21,21,22
45:10 63:24 64:6
64:13 131:12
150:8
**call** 19:15,16 53:5
53:17 164:25
**called** 14:4 22:4
52:21,21 74:1
96:9 98:23 114:18
**canceled** 31:2

**capabilities** 49:16
**capability** 31:16
49:17
**capable** 161:10
**capacity** 7:9 28:16
28:17 29:17,18,21
30:17 32:7 36:10
36:11,12 81:11
110:24 111:2
113:8,11,12
127:15 147:16
**capital** 23:11
**card** 169:11
**cards** 92:10
**care** 44:8 46:10,11
150:23,25 165:2
**career** 13:21
**careful** 142:16
**carpenter** 147:20
**case** 4:4 5:9,10,16
6:17,25 7:15,18
7:22,24 9:9,13,16
9:18 10:12,17,18
10:20 11:12 15:2
16:8 18:16 25:10
25:24 40:8 43:13
43:14,15 45:12
48:15,18,20,22,25
49:1 52:23 53:2
65:11 67:4 69:16
72:1 76:21 137:9
166:19
**cases** 7:4 22:22
88:25 155:10
164:24,24
**cash** 127:18
**categories** 77:6,24
80:20 81:21,23
87:1
**category** 80:21,24
87:13 112:17,20
130:16,18
**caught** 73:11
**cause** 1:18 171:8
**CCR** 61:15 62:13
62:14 114:22

154:24
**census** 152:17,18
  152:18,21,22
  153:5
**certain** 23:24,25
  33:23,23 37:22
  51:11,11 52:11
  72:6 109:17
  155:25 163:8,11
**certainly** 18:15
  68:10 73:5 139:8
  150:19,20
**certifiable** 161:4
**Certificate** 3:9
  170:9
**certification** 27:17
  27:17,18 34:2
  108:19 155:12
  164:22
**certifications** 50:10
**certified** 23:20
  27:15 50:12 54:15
  56:5,9 135:18
  142:14 143:22,23
  143:24 144:1,7,8
  144:9,10,14,15,18
  144:18,20,22,24
  145:4,8,11,12
  155:9 156:8,8
  161:1,3 162:12,21
  162:24,25 163:1
  165:18 166:17,23
  170:11
**certify** 155:10,11
  164:2,9,19 165:3
  170:12,18 171:5
**certifying** 144:2,3
  165:3,11,11
**certs** 164:25 165:14
**challenge** 5:10
**challenged** 5:16
**challenges** 166:16
**chance** 4:24 48:4,5
  48:7 77:23 81:3
  97:24
**chances** 49:2

**change** 15:7 62:19
  64:21 79:5 107:23
  131:11 133:25
  163:21,24 168:3
**changed** 15:6 44:18
  107:24,24
**changes** 3:8 62:18
  118:10,12,16,18
  119:2 166:24
  168:1 170:24,25
**changing** 118:24
**chart** 125:25
  142:20 143:1,6,7
  143:8,12,14 162:8
  163:3 164:13
**cheat** 129:17
**check** 143:8 165:10
**checkoffs** 165:9
**checks** 61:5
**chemistry** 42:19
**Chief** 2:13
**chimneys** 89:5
**chose** 139:25
**chosen** 162:17
**circles** 141:13
  142:5,5
**circumstances**
  125:5 128:8,10,11
  128:13 129:4,6
**cited** 17:24
**cities** 17:14,14,14
**city** 16:22,24 17:1
  17:15 156:11
**Civil** 1:23 4:9
**claimed** 145:16
  161:7
**claiming** 161:3
**claims** 30:21
  108:25
**clarify** 60:8 77:23
  141:24 155:16
**classification** 52:19
**clause** 62:19,21,22
**client** 4:12,17 18:22
**clients** 30:15
**close** 21:4 70:10

71:4
**clue** 46:15
**coached** 49:3
**code** 3:19 22:11
  23:8 60:16,24
  61:2,2,3 64:6,10
  64:11,21,21,25
  65:6,17,18 66:1
  66:10 100:9,12
  138:4
**coded** 137:15
**codes** 19:13,18,19
  19:22,22,25 20:1
  20:2 21:1,2,12,24
  22:9,9 23:4 59:17
  59:25 60:18,22
  61:9,12,23,25,25
  62:2 63:5,11,15
  64:5 66:25 67:1,3
  67:5 99:13,15
  131:4,5,11 138:11
  138:18 139:7,8,10
  139:13,20 140:19
  146:23 163:4,17
**collect** 44:5,7
**collection** 17:16
  43:25 44:1
**college** 13:23 41:18
**color** 138:18
**COLUMBIA** 1:1
  170:1
**column** 77:8 80:20
  138:12
**columns** 77:8
**combination** 38:15
  154:17
**come** 13:23,23
  16:12 17:6 22:4
  30:6,9 31:23
  37:25 61:3 70:22
  70:25 91:6 95:16
  98:23 107:14,14
  107:15 121:14
  126:20 141:8
  159:3
**comes** 30:14 46:6

109:21

**coming** 14:9 77:16
  97:3 102:2,3
  142:2
**command** 48:13
**Commerce** 23:3
  50:25 51:1 152:6
**commercial** 26:20
  33:17 44:11,12
  55:10,25
**common** 14:4,7
  90:5,6
**communicate**
  162:10
**communications**
  4:20
**community** 98:7
  155:19
**companies** 15:3,10
  17:3 27:3,19,22
  32:25 37:2,8
  51:25 54:8,8,10
  61:11 62:25 63:6
  63:11,15 88:11
  94:14 102:14,16
  102:25 114:10
  115:5,12,14,15
  116:16 117:11
  119:16,17 122:3
  126:4,8 127:1,20
  128:6,17 129:6,7
  129:21 130:24
  131:20 132:21
  138:3 147:15
**company** 7:24
  14:24,25 27:2,4,5
  27:7 28:18 29:10
  29:16 37:6 42:9
  50:13 52:1 54:23
  54:24 55:5,24
  56:22,24 61:4
  63:9,12 78:24
  89:16 94:12,18,24
  94:25 95:1,14
  96:23 98:17 99:15
  99:16,25 101:2,4

101:8,10 102:13
  102:15,16,21,21
  102:22,23 112:15
  116:6,16 117:12
  121:3 122:3,4,11
  122:19 124:11,14
  125:7 126:7
  127:16 128:2
  129:10 137:4
  147:12
**compare** 38:15
  102:20
**comparing** 102:15
**comparison** 52:17
  78:7 148:10
**compete** 89:16,22
  89:24 90:2,10
  91:8 102:17
  135:11,13
**competing** 90:13
  91:3 134:10,13
**competition** 91:1
  111:12,14,24
  112:15
**competitive** 90:15
  90:21,24 91:20
  127:19 152:13
**competitively** 57:4
**complained** 132:18
**complaining** 130:3
**complaints** 132:18
**complete** 6:8,11
  103:18,21 117:25
  118:7 119:6
**completed** 136:2
**completely** 139:7
**completion** 170:21
**complicated** 36:8
**comply** 109:4
**components** 19:8
**comport** 80:12
**comprehend** 106:9
**compressed** 94:7,7
**computation** 50:4
**compute** 20:13
  50:1,1 58:3,9,22

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 51 of 73
USCA Case #15-5176   Document #1577653   Filed: 10/13/2015   Page 325 of 814
Dale Patenaude                                      November 21, 2013

Page 176

computed 16:5
57:23 65:23
computer 43:22
46:21,22,24 47:1
64:25 65:1 68:1
100:6
computing 58:15
58:23
concentrate 11:19
11:21,22
concept 30:7
concerned 34:19
concerning 4:20
35:11 43:5 93:11
108:25 109:2
concluded 167:4
conclusion 121:15
conclusions 59:6,7
concrete 138:24,24
concurring 78:6
confirm 8:25
confirmed 145:19
Congratulations
13:20
congress 76:24
Connally 2:4
connected 127:18
connection 68:12
consider 26:5,12
27:21 32:2,20,22
46:20 47:5 49:23
51:3,22 56:17
79:5 81:24 82:12
82:17 84:8 97:12
107:9 148:12
156:23
consideration
169:14
considered 47:6,6
82:19 130:25
154:1,2
considering 107:6
consistent 83:23
97:16 102:13
consistently 166:5
166:6,7

construction 19:3,4
19:5,9,11,11,18
20:7 22:6,7,8,12
22:15,17,17,18,19
137:12 138:19,20
138:22,23 139:20
146:5,22 147:23
155:15,21 156:6
contacts 108:14
contained 114:7
contains 170:25
contest 13:18,19
context 23:18 82:9
continue 60:14
119:2
continuously 41:23
41:24
contract 39:20 46:6
46:13 49:8,9 55:1
55:25 56:21 57:23
58:12 60:21 78:10
78:21,22,25 79:2
79:2,8,10,12,12
79:14 80:1,1 81:3
81:14,25 82:2
84:2,6,18,21
85:22 87:3,5,6,9
87:10,13,15,16
89:15,19 94:13,18
97:11 98:21 101:3
101:15 108:6,10
110:5 119:13,18
120:13,13,15
121:4,13 124:1,6
127:23,23 128:1,3
129:25 131:18
132:25 137:24
138:10 159:25
160:4 163:7,8,12
166:1
contracting 8:1
26:16,17,19 28:3
28:4 35:12 48:23
48:24 49:5,6,8,10
54:9 56:15,20,22
60:23 64:4,18

65:18 67:17,20,22
78:15,15 80:16,18
82:15 83:5 87:18
87:19,21,22 89:15
95:10 96:16 97:4
98:3,6,11,14,15
98:19 108:18
109:16 112:9
118:19,20 119:15
131:22 135:1,3,4
155:22 156:18
162:3,4,5 164:2
contractor 74:15
82:1 96:11,12
98:11,13
contractors 55:2
158:25
contracts 14:24
16:14,15,17,23
17:9,9,15,17,19
29:6,7,13 33:13
46:8,11,12,15,25
47:24,25 56:8,11
56:13,19 57:1
58:1,2,16,16,20
58:24 60:6,10
65:6,9,13 67:2
69:5,17,17 70:8
71:3,4,21,23
73:22,23 76:15
78:17,18 80:3
81:15,16,17 84:10
85:20 87:17 88:5
88:7 89:21,22,25
90:2 91:10 96:4,6
96:6,7,15,15 97:1
97:17,20 98:3
101:9,15 111:6,7
111:11,15,18,23
112:3,14 119:15
123:4 125:7
127:25 131:13
134:10,13 135:14
137:24 138:1,3,10
153:21 155:8
157:5,5,6,8

158:24,25 159:1
159:15 163:11,17
contribute 159:17
contributed 158:20
158:21
contributions
125:1
control 23:21,22,25
24:10
conversation 11:3
155:14
conversely 97:21
108:17
converted 62:13,15
copy 9:11 38:3
Corp 166:17
corporate 74:13
123:15
Corporation
136:19,21
correct 10:21 24:4
24:5,6 40:18 61:7
87:6 92:23 94:19
108:4 114:8 118:6
120:8 133:9,25
136:24 141:17
145:21 146:6,18
148:3,22 149:20
149:23 150:12
151:12 152:13
154:22 155:20
156:24 157:1
163:9 166:21,22
169:3
correctly 84:19
130:1
cost 28:7,8 29:1
40:1,3 74:10,11
79:16,17,18,21
90:24 97:6 99:7,9
102:7 132:24
costs 74:10 79:15
132:24 151:4,7
counsel 2:13 4:11
4:19,24 6:3 171:6
count 29:22,24

30:10 36:7,10,15
57:5 75:15 88:14
139:23 147:16
counted 56:15,20
57:4 126:24,25
127:8 153:9 160:7
counting 30:10
85:22 88:20 89:4
147:15,16 148:7
country 31:17
116:12 125:21
counts 29:18
145:15
COUNTY 169:7
couple 14:10 41:18
47:12 52:15 54:18
62:13 63:24 68:2
95:4 109:5 134:19
138:21 154:4
160:24
course 13:6 31:7
53:14 76:25 110:6
courses 12:18,21
12:22,25 34:4,16
court 1:1 4:5 22:25
25:7,20 51:17,18
72:1 76:21,23,24
170:1
courts 5:11
cover 21:14 139:5
139:12
covered 138:16,16
138:25 139:1,7,23
140:4
covering 139:10
140:18
CPAR 96:9,9,12,18
97:15,16,22,24
CPARs 96:22
97:16 98:1
Craig 5:25
crap 107:20
craziness 147:14
crazy 103:9,11
153:2
create 24:23 25:1

**created** 124:11
**credit** 57:5,6
**credits** 56:16
**criteria** 7:21 52:12
  61:6 96:7 97:4,5
  98:25 99:8 156:11
  156:11
**critical** 46:13
**cross** 114:25 115:1
**crunch** 35:18
**crunched** 81:8
**crunching** 37:1
**Cs** 105:22 143:19
**CSR** 1:19 171:13
**curiosity** 71:17
**current** 6:1 26:22
  37:5 63:12 68:8
  109:13
**currently** 26:22
  37:24 50:9 63:17
  144:12
**customers** 44:16,18
  44:20
**cut** 106:4

**D**

**D** 3:1
**daily** 43:6 149:5,6
  150:15
**Dale** 1:11,15 3:4,14
  3:15,16 4:1,4 5:25
  136:20 168:2
  169:1,5,9 170:9
  170:14
**dark** 138:17
**darkened** 138:17
**data** 16:10,11,11
  17:21 18:19 20:22
  20:24 21:11 30:3
  30:5 37:25 38:2
  38:24 43:24 44:1
  44:2,3,5,6 45:10
  46:20 47:5 59:13
  59:20,22,24 62:15
  62:17 66:2,3,24
  67:11,12,12,16,18

68:10,15,16,19,24
68:25 76:19 81:1
81:18 86:3,3,4,6,7
86:9,10,11,11,14
86:21,21 92:6
94:6,7,8 103:21
105:12,14,15,16
107:1,5,7,8,16,18
107:18,19,21,21
108:6,21,22 109:1
109:25 110:2,8,9
110:10 111:23,25
112:2 114:5,7
116:21 117:16,23
117:24,24 118:5
118:10,11,19,25
119:3,5,10,10,11
119:17,24 120:1,2
120:17,21 123:17
126:16 129:13,23
133:23 137:25
141:11,16 143:17
143:25 146:6,12
146:15 149:16,16
151:2 152:2,3,4
152:15,17,18,18
152:21 157:25
160:18,23 162:19
162:20,22 163:2
163:25
**database** 16:17
  60:4 61:16 63:11
  67:18,19,23,23
  68:3,6,8,19 86:4,5
  86:6,6,7,15,16,17
  92:8 111:9 117:18
  118:24 120:25
  121:1 125:16
  137:14,19,22
  138:2,2 154:24
  155:4 157:10,11
  159:14,15 160:17
**databases** 31:13
  61:17 67:24
**datas** 67:17
**date** 146:10 165:25

168:2 170:22
171:13
**Daubert** 25:13,14
  25:16
**David** 2:3,12 4:7
  6:20 10:13 18:19
  28:21 46:7 136:17
  142:1 171:4
**day** 1:18 29:4 39:23
  40:10,12,12 42:21
  42:21 44:9 47:1
  58:9 119:12 169:8
  169:16 171:10
**days** 47:2 97:1
  122:21 170:22
**day-to-day** 40:25
  43:21,24 44:4
**DBE** 50:23,23 51:6
  156:8,13
**DBEs** 156:10
**DC** 2:10,14
**deal** 13:7 28:4
  34:18,24 39:17
  55:5,21 100:13
  151:1,19 165:20
**dealing** 16:14,21,22
  34:13 48:4 61:5
  61:14,16 88:4
  95:11,12
**deals** 61:4
**decide** 71:14
**decided** 14:15
  22:16 49:7 53:8
  71:13
**decides** 38:12
**Defendant** 1:16
**Defendant(s)** 1:8
  2:6,11 170:8
**defending** 107:15
  107:16
**Defense** 1:6,17 2:6
  4:5 33:13 170:6
**define** 22:12 49:21
  96:1
**definitely** 158:20
**definition** 93:1

116:23 150:2
**degree** 12:9 13:3
**demonstrated**
  80:17
**department** 1:6,16
  2:6,8 4:5,6 17:3
  23:3 33:13 50:25
  51:1 135:8 152:4
  152:7,23 153:5,6
  156:7 170:6
**dependent** 76:1,3,9
  85:4
**depending** 63:8
  99:8
**depends** 38:17,18
  103:3
**depo** 80:18
**Deponent** 170:19
  170:20
**deposed** 6:13,15,17
  7:9,12,17,19,23
**deposing** 5:18
**deposition** 1:10,15
  4:4,8 8:4 32:12,19
  107:3 145:20
  167:4 168:2 169:2
  170:9,15,21 171:2
**derive** 112:1
**describe** 62:10
  99:24 114:4
  133:13
**described** 19:14
**describes** 72:3,6
**describing** 94:11
  117:16
**description** 3:13
  62:9 169:10
**design** 28:25
**desk** 62:16
**detail** 12:4 18:18
  18:23 20:4 73:17
  137:20 149:11,18
**detailed** 15:2 18:19
  23:21 47:19
**details** 18:14
**Determination**

38:19,20,23 39:1
39:3
**determinations**
  38:21 152:11
**determine** 39:4
  44:24 58:19,23
  87:3 109:17,19
  144:1
**determined** 72:16
  152:4
**determining** 7:19
  35:11 58:11
**developed** 13:16,17
  14:1
**development** 1:3
  14:18 16:25 26:10
  26:23 27:5,8,13
  33:2 45:2 54:12
  60:9 61:22 62:3
  63:2 73:20 109:3
  115:19 122:2,9
  123:9 136:18,21
  166:17 170:3
**device** 13:23
**diagrams** 28:24
**difference** 11:4
  14:9 55:12 59:16
  61:10 73:15 75:4
  75:5,6,6 76:3,7,21
  99:13,17 103:11
  103:12,14 113:10
  119:24,25 123:5
  129:1 134:1,12
  145:14
**differences** 14:7,14
**different** 13:17
  17:11,11,12,13,17
  26:21 37:5 44:15
  63:7,8 68:9 87:1
  87:21 99:13,15
  101:11 122:14
  124:14 134:16
  142:7,11
**differential** 12:25
  13:1,5,25 14:2
  76:7

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 53 of 73
USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 327 of 814
Dale Patenaude                                      November 21, 2013

Page 178

**differentiate** 48:21
**differently** 119:16
  134:9
**difficult** 9:14 16:18
  17:6,20 52:16
  85:11 97:22 152:1
  162:1
**difficulty** 105:12
**digging** 99:9 100:5
**digit** 59:17 66:22
  66:23
**digits** 18:8,9,9,10
  20:2,2,14,18,20
  20:21,23,23 21:23
  21:25 22:1
**direct** 74:10,10,11
  136:3
**directly** 84:7
**disability** 53:1
**disadvantage** 161:2
  161:2
**disadvantaged**
  50:24 112:25
  113:4 156:12
**disagree** 75:15
**disbarred** 166:9
**disc** 140:23 141:1,2
  141:16,19
**disclosure** 130:7
  132:10
**discounting** 104:18
**discovered** 143:24
**discriminate** 48:24
  48:25
**discriminated**
  31:18 32:3 48:19
  51:21 52:4,7,20
  53:13,15 54:3
**discriminating**
  21:24,25 49:11,11
  49:12
**discrimination**
  17:7 21:1 30:4,20
  35:12 49:3,4,13
  49:14 51:6 110:11
  134:6 161:17,18

161:22 162:2,5
**discriminatory**
  31:10
**discussed** 25:24
  59:15 103:15
  152:9
**discusses** 72:8
  159:21
**discussing** 23:14
  57:10,17 59:16
  72:5
**discussion** 28:12
  59:17 152:2
**discussions** 10:15
**disparities** 30:15
  110:10
**disparity** 16:19
  18:8,9 19:15 20:9
  20:10,17,21,23,25
  24:23,25 25:1,5
  30:11,13,14,16,18
  46:2,3,4,5 47:16
  48:3,3,4,7,8 49:20
  49:21 51:14,16,17
  103:24,24 104:3,4
  139:6,12 145:16
  145:17 161:16
**disrespect** 5:9
**district** 1:1,1 4:5
  5:11 170:1,1
**ditches** 99:9 100:5
**divide** 133:20
**divided** 133:16,19
  147:8 158:24,25
**dividing** 50:6 69:1
  147:5,7
**division** 2:9 37:18
  105:11 111:7
**document** 8:23
  13:14 32:5 137:18
  169:11
**documents** 3:20
  9:9 18:22,23 26:2
  26:3 32:11 154:5
  154:10

**doing** 5:5 10:3,3,3
  10:9 22:1 24:5
  28:15 29:12,15
  30:1,10 34:25
  47:13,22 55:18,19
  55:25 58:16,25
  60:17,20,21 62:9
  64:19,20 67:9
  69:20 72:18,19,23
  73:20,20 74:17,20
  74:23 77:16 79:6
  81:12 82:6,17
  85:2 89:11,12
  93:20 94:14 95:7
  96:13,14 99:10
  103:1,2 104:9,19
  104:20,22 105:11
  108:17 118:14
  121:4,14,17
  125:18,22,23
  128:20,25 129:21
  135:15 147:16,17
  147:18,23 148:7
  153:18
**dollar** 81:14 97:7,9
  99:6 101:13
  102:21,21,25
  104:10 125:15
  126:4 157:7,14
  160:8 161:12,13
  163:20,20
**dollars** 46:9,9,12
  46:16 48:5,8 50:7
  65:7,8,14,14 68:3
  68:17 73:23 74:19
  74:19 80:6 81:5
  81:10,19 82:14,16
  82:16,20,23,25
  83:4,8,9,10 84:9
  84:11 85:12 89:3
  91:7 99:3 101:14
  101:16,24 104:4,5
  106:19,20 111:13
  112:4,5,6,7,24,25
  122:13 123:16
  133:16,17 138:5,6

138:6,7,9 147:1
  157:8,9,12,17,19
  157:23 163:23
**domestic** 116:8,12
**DOT** 19:20 156:7
**double** 85:22 143:8
**doubt** 56:25 81:16
  113:7 163:21,23
**downhill** 40:16,19
**downtrodden**
  31:19 36:20
**Dr** 17:24 45:16,20
  57:11 59:16 65:16
  72:3 76:10 77:11
  80:12,15 87:2
  92:14 95:23 99:13
  104:14 117:17
  154:12
**draft** 15:4 91:23
**drafted** 15:6
**drill** 14:10
**Ds** 143:19
**due** 26:24,25
  160:18
**dug** 70:9
**duly** 1:17 4:2
  170:14
**dump** 143:17,19
**dumped** 144:24
**Dun** 67:19 114:13
  114:15,21
**Duns** 114:6,7,10,18
  115:2,8,20,24
  116:2,8,9,11,20
**duplicates** 143:20
**duplication** 123:16
**duplications**
  105:25
**duties** 137:3
**D-B-E** 50:23

————————
        **E**
————————
**E** 1:21 2:1,1,5 3:1
  3:11
**earlier** 6:18 8:22
  33:1 54:7 57:18

67:16 70:12 87:4
  91:22 114:6 123:6
**early** 67:25
**earned** 57:1
**easier** 79:11 97:17
  97:19 142:6
**easiest** 141:13
**easy** 14:16 48:6
**econometrics** 16:2
  34:10,14
**economic** 34:4,7
  52:9,18 94:9
  148:12 150:17,21
  150:22 151:15,17
  161:2
**economically** 30:25
  31:6 54:20
**economics** 12:18
  12:21 15:14,23
  16:2 151:11,13
**economist** 31:22,23
  32:20 34:15,16,17
  37:20 38:2,2
  49:17 50:18 59:10
  97:13 150:9
**economists** 34:19
  34:24 35:9
**Ed** 33:2
**education** 12:7
  34:12 35:10
**educational** 33:19
**effect** 107:25
  150:23 155:2
**effective** 88:1
  128:21,24
**effectively** 27:6
  74:8 82:6 94:6
  125:3
**effort** 28:24 65:25
  106:1 124:22
  128:21 135:15,21
**efforts** 11:20 128:3
**eight** 33:21 67:2
  68:4 70:6 103:16
  136:13,14,15,16
**either** 69:4 99:5

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 54 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 328 of 814
Dale Patenaude                                      November 21, 2013

Page 179

103:6,9 130:14
133:10 136:5
**election** 153:3
**elections** 34:22
**electric** 14:12 17:3
**electrical** 12:9 13:8
13:13 14:22,23
41:25
**electronic** 33:24
**Electronics** 13:14
**eligible** 155:23
**eliminate** 143:20
**Elizabeth** 2:4
**emphasis** 63:8
**empirical** 162:19
162:20 163:2
**empirically** 143:24
162:22
**employed** 48:10
171:6
**employee** 40:11
128:13
**employees** 55:14
55:15 80:6,7
107:7,10 110:4
126:5 128:16,20
128:22 129:7
147:3,9,10,10,12
147:13 148:10
**employment** 2:9
38:16 77:25 78:5
78:7,8 150:25
152:23,23
**ended** 41:22 149:12
158:19
**engineer** 14:22,23
42:20 50:13,15
**engineering** 12:9
13:8 19:12 21:6
41:24,25 42:15
50:14 94:2
**Engineers** 13:14
**ensure** 24:4,7,14
**enter** 61:23
**entered** 63:6
**enterprise** 50:24

**enterprises** 26:24
27:8,13,15 33:2
45:3 50:11 54:11
56:5,8 60:12 63:2
83:16 109:11
115:19 122:18,25
123:8,22 125:6
127:9
**entities** 17:11 51:9
**entrepreneur**
91:11
**entrepreneurs**
91:15
**entry** 63:1 88:15
**environment** 95:2
157:6
**equal** 102:17
**equations** 12:25
13:1,5 76:7
**equipment** 44:19
44:23,25
**error** 159:17,18,19
160:18
**especially** 34:21
78:15
**espouse** 69:8
**essentially** 157:9
**estimate** 95:18
**estimates** 79:25
**estimating** 29:1
**estimation** 38:1
**estimations** 151:8,9
151:10
**evaluate** 44:23
**evaluated** 25:2
**evaluation** 9:19
52:5 96:11,12
**event** 16:1
**everybody** 28:19
29:18 68:20 85:8
91:19 105:20,21
**everyday** 39:23
42:4
**evidence** 134:8,25
137:7 143:7
**exact** 46:11 85:15

88:17
**exactly** 9:14 47:11
50:7 67:6 68:13
69:6,14 70:4
93:21 108:2
157:10
**examination** 3:5,6
3:6,7 5:22 136:4
136:11 158:6,7
166:12,13
**example** 60:20
**exceeded** 14:1
**excellent** 96:21,22
**exception** 120:6,6
120:12
**excluded** 125:25
126:2 157:3,4
**exclusively** 33:10
**excuse** 47:17 74:5
77:2 89:19 97:19
100:24 107:20
112:2 145:18
**executed** 169:13
**exercise** 125:14
**exhibit** 8:12,13,20
8:21 12:15,16
32:7,10,12,14
57:13,14 91:23
145:24 146:1
158:11 159:20
**exhibits** 136:6,8,9
137:7
**exist** 20:24 160:20
**existed** 157:25
**expect** 29:22,23
99:12 100:18
151:9
**expense** 74:3,4
**expenses** 74:6,7
**experience** 5:9
33:22 39:17 64:9
67:22 80:9,11
88:3 91:1,2 95:19
95:20 100:5,13
101:19,21 126:18
129:18,21 132:9

**expert** 3:14,15,18
4:17 5:11,19 6:15
6:17 7:12 8:6 9:4
10:1,11,16,20
11:14 16:2,8 25:7
25:8,11,15,15,20
25:23,25 26:5,5
26:13 45:15,19,20
45:21 49:24 50:22
51:3,4,22 57:24
58:12 65:24 77:21
78:20 131:21
136:20 146:19
147:25 156:15
**expertise** 59:9
61:20 62:3 63:12
64:9 93:23
**experts** 4:18,19
10:18 154:13
**expert's** 146:18
**Expiration** 171:21
**explain** 16:4,6 78:1
90:16 137:8,17,19
139:17 140:1,20
141:14 145:25
149:8 150:6
**explained** 75:25
149:12,18 150:15
**explaining** 72:18
149:13
**explains** 141:7
**explanation** 73:8
141:2 149:14
**explanatory** 76:1
**explicit** 44:1
**expressed** 169:14
**extra** 93:18
**extract** 67:19
**extremely** 125:10
149:1
**eye** 73:12

_____
**F**
**face** 108:9 165:25
**facilities** 33:15,17
90:19

**facility** 63:23 64:15
96:15
**fact** 7:13,22 18:12
18:13 28:3 46:17
57:7,8 61:14
67:25 76:23 94:24
107:17 164:11
**factor** 58:13 99:4
**factors** 58:18
**facts** 15:7 31:14
**failures** 82:12
**fair** 36:21
**fairly** 84:1 90:6
**faith** 21:13
**fall** 17:19 161:21
**falls** 161:17
**false** 18:6 160:18
**falsely** 160:19
**familiar** 43:18 74:1
96:9 125:6
**fancier** 90:19
**far** 34:19 46:14
55:6 62:12,19,21
62:22 78:11 86:7
104:16,17 148:20
164:22
**favor** 162:6
**federal** 1:22 4:9
48:19 51:8 54:4
65:5 89:14 107:24
139:11 155:22
164:1
**feel** 4:22 5:16,17
36:5 54:5 82:8
**female** 53:24
**fewer** 47:24 48:1
**field** 33:11 34:9
102:17
**fields** 94:2
**fight** 132:25
**figure** 79:6 85:4,5
86:9 158:18,18,18
**figured** 94:9
**figures** 71:8
**file** 7:21 114:7
118:21 141:19

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 55 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 329 of 814
Dale Patenaude                                       November 21, 2013

Page 180

**filed** 25:16,17
**fill** 53:10 114:14
  164:18
**fills** 17:18
**final** 159:3,21
**financial** 44:9
  137:5 171:8
**financing** 95:5
**find** 13:15 46:1
  61:1 68:14 93:8
  93:18,19 118:20
  161:24 162:1
**finding** 10:10
**findings** 18:1
**fine** 11:10 123:10
  159:13
**finer** 11:18
**firm** 29:2,3 78:4,9
  78:10 83:16 91:7
  107:6 108:5,7
  110:4,5 112:17
  113:15,17 117:4,4
  117:13 119:24,25
  130:4,9 135:9
  147:9,17 161:6,12
  171:14
**firmed** 161:7
**firms** 3:21 26:22
  90:2,7,10 91:3
  105:19 107:20,21
  111:12,19,24
  117:1 125:18,22
  125:23 126:22
  130:11 134:14,19
  134:21 135:10
  146:3,23,25,25
  147:2,8 148:8,8
  148:10 154:11
  160:2,19,20,25
  161:4,5,9,10
**first** 4:2 7:4 10:24
  14:21 18:17 41:16
  46:22 49:19 54:22
  54:22,24 57:21
  64:24 79:12 88:1
  92:18 95:4,5

**Fishman** 2:12 4:7
  11:10 27:2 69:24
  69:24,25,25 94:15
  141:18,22 143:2
**fit** 7:21 52:9,12,18
  54:5 88:18
**fits** 52:23 72:25
**five** 18:10 20:14
  21:25 36:15,23
  42:21 67:11,12
  70:6 101:25 121:2
  126:8 128:22
  151:7
**five-digit** 66:20
**five-year** 151:6
**fixes** 17:18
**flatfooted** 149:14
**flaws** 73:9
**floors** 147:20
**flows** 40:16,18,19
  127:19
**flurry** 67:21
**folds** 117:12
**folks** 44:12 45:4
  53:12 160:4
**follow** 24:9,18,19
**following** 14:17
  34:3 149:18
  150:24,25 170:13
**follows** 4:2 171:2
**follow-up** 136:19
**force** 87:20,21,25
  89:9,10 95:12
  124:2,4
**forecasts** 151:5
**foregoing** 169:1,12
**forest** 35:24,25
**forever** 125:12
**forgot** 42:16 92:25
**form** 4:10 31:20,20
**formed** 124:4
  142:12
**forms** 53:10 111:16

130:7
**formula** 76:2
**forth** 14:13 39:5
  51:7 52:12 53:10
  55:16 86:10 141:7
  142:12 143:19
**forum** 148:20
**forwarded** 18:20
  154:13
**found** 91:20 93:4
  110:9 138:21,22
  138:25 146:12
**four** 6:22 17:1,9
  18:10 19:12 29:11
  29:11,13 30:12
  41:23 42:14 47:13
  59:14,15 62:20
  66:23 67:11 75:1
  75:1,5 89:4 94:13
  94:20 95:18
  101:25 102:4,10
  110:21 111:3,20
  114:18 115:2
  127:1 131:20
  136:5
**Fourier** 13:4,6
**fourth** 146:5
**FPD** 119:10,10
**FPDS** 67:18,19,22
  67:23 68:3,12,19
  86:6 106:25
  107:19,19 111:9
  112:2 117:16,21
  117:22,22 118:7
  118:10,12,23
  119:2,13,24
  120:14 133:8,10
  133:10
**FPS** 119:10
**frame** 124:1
**frankly** 52:13
**FRCP** 170:18
**freshman** 46:23
**friends** 102:25
**front** 136:13
**fruit** 125:11

**frustrated** 18:4,5
**fudge** 71:8 151:20
**full** 5:6 57:21 75:23
  92:18 94:15,16
  104:19 111:12,24
**fully** 48:10
**full-blown** 130:17
**full-time** 29:12
**fun** 132:4
**functions** 40:7 45:8
  150:23
**fundamental** 59:13
  59:25
**further** 22:25
  59:23 110:25
  116:5 158:5
  170:18 171:5
**future** 88:7
**fuzzy** 25:11
**FY** 117:23,23,24
  118:5,10 137:14
  138:4,14

&mdash;&mdash;&mdash; **G** &mdash;&mdash;&mdash;
**G** 2:7 171:3
**gained** 107:23
  149:2,3
**game** 35:8 71:19
  82:21,23 133:1
  154:18,20
**games** 71:12 155:6
**garbage** 17:16 58:8
  58:8 107:21
  125:16,16 126:17
**GARDNER** 1:21
  2:4
**gather** 152:5
  153:16 162:22
**gathered** 153:19
**general** 74:3,3
  77:15 91:1,2
**generally** 19:8 20:1
  20:1 39:6,6 74:16
  78:17 89:23 90:12
  90:14 91:19 95:8
  97:10 99:4 131:10

149:24 152:8
  155:17,20 156:16
  156:18 164:8
  165:2,8
**generate** 58:5
**generated** 141:10
  141:15
**George** 10:19
**getting** 13:3 36:20
  41:22 78:20,21
  84:6 97:3 98:21
  105:12,14,14
  113:6 134:2
**gifts** 36:24
**give** 4:24 6:8,11
  36:24 39:6 45:20
  48:21 49:8,9 51:8
  51:10 73:2 77:23
  115:22 116:5,15
  129:16 133:23
  143:8
**given** 8:22,25 18:19
  91:17 120:25
  160:23 163:8
  169:15 170:16
**gives** 30:10
**global** 116:9,11
**glorious** 140:17
**go** 5:4 10:5 12:14
  14:20 20:4 22:6
  22:16,18,18,24
  29:5 31:16 37:13
  37:21,21,24 38:10
  39:13 42:14 44:23
  48:11 51:13 53:23
  53:24,25 54:19,21
  59:14 60:14 62:18
  68:19 70:2 72:2
  77:1 85:1,3,6,12
  91:5 92:23 101:1
  105:17,17 106:23
  116:18 117:14
  121:20 122:20
  127:23 128:1
  135:15,16,20
  136:6 140:13,20

142:19 146:21,22
148:5 156:2
161:25 162:14,15
162:16 163:16
166:7
**goal** 69:19 112:12
132:6 156:4,5
**goals** 49:10 56:18
132:2
**God** 81:6 91:17
**goes** 35:4 51:11
72:8 74:8 80:3
81:11 119:3
138:20 147:11
148:12
**going** 4:14,18 14:16
22:24 29:22 38:12
39:14,15,15,22
44:9 49:7 52:9
58:10 62:20,20
66:5,7 72:2 73:1
74:23,24 75:1
86:25 87:14 93:21
96:19 97:2 99:1
101:13,16 103:10
112:17 127:19
132:6,7 135:23
136:6 142:2
148:16,18 151:4,5
151:7 162:4
**Golden** 68:20 92:7
118:4,5 120:9
133:11,12,16
157:17 164:13
**good** 11:16 28:10
28:22 53:21 59:2
60:20 66:4,8
72:18,19,20 73:3
77:19 96:21,21
97:16 123:10
132:3 149:6
**goods** 19:7
**gotten** 20:12 56:13
56:20 105:15
106:7
**government** 10:7

26:16,17,19 28:3
28:4 29:13 31:12
31:12 33:13,15,16
48:20 51:8 52:4
54:4,9 55:9 56:3,4
60:5,6 62:18 64:1
64:3,8 65:5 70:25
74:15 78:14 79:22
79:23 80:16,18
82:9 86:15 87:20
89:14,14 90:24
107:24 130:5
131:13 132:10
136:2 137:14,23
137:23 139:11
157:18,25 162:3,4
162:5
**government's**
136:19
**government-wide**
92:9
**go-getters** 91:18
**grade** 96:20,20,21
96:21 97:1
**grades** 96:18
**graduate** 12:12
91:5 142:12
144:11,13
**graduated** 134:20
144:21,21
**graduation** 13:20
**great** 13:7 28:4
34:18,23 55:5,21
73:17 82:15,16
140:17 151:19
**greater** 113:5
125:20 126:9
145:15
**green** 100:21
**Griffin** 1:19 170:11
171:13
**ground** 14:11
**group** 16:15 19:3
19:16 20:6,8 21:7
22:3 24:15 46:19
138:20 145:6

**groups** 22:5,5,13
84:7,8
**grow** 103:9 131:11
132:6,8,8
**growing** 103:11
132:2
**grown** 26:20
122:15 132:3
**grows** 64:20
**guess** 38:1 52:2,8
70:4,5 106:8
111:25 112:1
125:12 137:13
139:23 141:24
146:13 149:6,12
163:10
**guessing** 70:20
**guy** 11:3 31:22
39:10 49:18 53:2
88:23,25
**guys** 69:4
**G&A** 74:1,1,13,15
74:15,18 90:14,17

_____

## H

**H** 3:11
**half** 22:3 30:19,19
30:20 40:3 62:15
75:5 86:5,6 97:10
103:25 104:5,23
104:25 118:8,15
118:17 158:1,3
**hammer** 108:11
**hand** 80:3,4 169:15
**handicap** 67:15
**handicapped** 67:14
**handle** 44:16 103:7
103:13 137:6
**handles** 137:5
**hanging** 125:11
**happen** 40:11 69:9
120:10
**happened** 36:10
86:20
**happens** 39:25
53:20,22 125:8

**happy** 154:12
**hard** 31:15 35:1,17
35:18,18 37:1
40:23 63:22
152:19
**Harvard** 53:4,16
**hassle** 132:17,23,24
**Haws** 2:4
**head** 30:10 36:7,15
65:4,15 147:15
**headquarters**
116:3
**heads** 50:6 75:15
104:18
**health** 74:12
150:23,24
**heard** 104:3 115:25
116:3,9 142:3
**height** 14:6
**hell** 22:10 29:24
69:5 82:24 104:6
107:12 134:2
135:16 156:14
160:22
**help** 31:2,6 62:16
95:16
**helped** 9:23 52:24
102:9
**helpful** 9:12 155:19
**helps** 30:25 152:6
**hereinbefore**
170:17
**hereto** 1:24
**Hertz** 14:11,12
**Hewlett** 13:24
**high** 14:4 39:20,21
41:15,18 81:14
130:1 159:2
**higher** 78:19 79:11
79:19 88:6 90:14
90:17 102:20
**highest** 66:22
**highly** 38:6
**highway** 19:22 51:9
156:7
**highways** 19:19,21

19:23 29:8
**hindered** 22:19
**hire** 10:16 33:5,8
33:20 95:16
147:20
**hired** 10:18,20
50:17
**Hispanic** 20:5
52:25
**Historically** 83:23
83:24
**history** 5:6 78:13
78:14 99:10
**hit** 132:2
**hold** 12:8 50:9,22
157:11
**holes** 17:18
**honestly** 10:2 54:3
116:13
**hope** 143:1
**hopefully** 60:19
**horrendous** 62:16
135:9
**hosed** 126:13
**hot** 40:21
**hours** 18:17,17
42:21 47:1,10,11
47:15,18 104:11
105:1,2,3 106:7
106:11 128:21
**house** 88:15,20,25
89:2,6
**houses** 88:21
**Houston** 33:18
**HP** 41:20
**HQ** 115:24 116:1,2
**HUB** 26:25
**HUBZone** 26:24
27:1,4 54:9,12
55:2,7,11,11,11
55:14,17,22,24,25
56:3,4,18 81:22
85:17,25 109:24
112:15 130:4,14
130:16 164:17
**HUDZone** 164:10

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 57 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 331 of 814
Dale Patenaude                                          November 21, 2013

Page 182

164:16
**huge** 88:21 121:23
**hundred** 25:3 40:8
  43:14
**hurdle** 114:24
**hurts** 69:15
**hustlers** 91:18

———————
**I**
**idea** 13:15 20:25
  25:18 29:17 30:9
  31:16 121:23
  161:5
**identified** 138:15
**identity** 169:11
**IEEE** 13:13 15:11
**ignored** 160:14
**image** 129:16
**imagine** 148:13
**imminent** 49:18
**impact** 82:1 91:10
  99:14 100:12,19
  130:13 137:9
**impacted** 160:5,14
**impair** 91:3
**important** 34:13
  35:7,7,11 46:8
  58:13,17 80:4,6
  81:24 87:9,12
  96:7 99:7,7,9,11
  156:5
**importantly** 97:5
**impossible** 70:25
**impressed** 14:15
**impression** 20:13
**improperly** 153:9
**impugn** 129:19
**impugning** 49:6
**incentive** 130:4,10
  131:24 132:12,14
**include** 32:11
  111:18 112:17
  138:8
**included** 9:8 15:8
  16:7 21:9,12
  23:14 32:19 80:25

112:6 131:22
  154:10,11 165:6
**includes** 21:5,8
  111:11,23
**including** 111:20
  133:18,20
**income** 52:11
**incorrect** 108:7
  133:21,22,23
  152:22 159:4
**increase** 84:5 87:14
**increases** 68:3
  78:21
**independent** 76:2,4
  76:10 85:4
**indicated** 72:15
**indicative** 106:12
  106:13
**indirect** 74:10
**individual** 27:1
**Industrial** 23:8
**industry** 35:12
  155:15
**inference** 49:4
  161:16,18,22
  162:2
**inflation** 151:9,10
**information** 60:6
  115:22 116:5,15
  165:6
**initial** 7:17 88:15
  88:24 104:21,22
  117:22
**injured** 5:17
**insanity** 28:19 29:8
  29:9,19 36:25
  75:3
**inside** 89:15 90:21
  90:23
**instance** 1:16 16:15
  16:24 85:13,14
  105:21
**Institute** 13:13
**instrument** 169:12
**insult** 5:8
**insurance** 74:12

**intangibles** 79:24
  79:25
**intentional** 50:20
  50:21
**intentionally**
  129:11,12,22
**interaction** 109:1
**interest** 134:12
  171:8
**interested** 134:9
  135:1,2,3
**interesting** 53:2
  116:19
**interject** 9:7 10:25
**intermixes** 21:21
**interpreted** 78:3
**interrupt** 141:15
  142:15
**inter-tables** 92:9
**involve** 9:16 27:22
  150:17
**involved** 9:17
  15:23 18:16 35:15
  37:16 165:20
**involves** 42:1 73:10
  73:10
**issue** 151:16 152:5
  152:17
**issued** 65:6
**issues** 4:21,25
  34:13 35:11 76:9
  100:24
**issuing** 70:15
**item** 44:21
**items** 16:17
**iterations** 85:3

———————
**J**
**janitors** 121:18
**job** 24:3 29:23,24
  30:13 38:17,18,25
  40:4 48:10,14
  64:10,19,20 88:2
  90:23 96:14 124:9
  124:10
**jobs** 30:2 75:2

**joined** 14:24
  122:11
**joint** 27:9,10,10,11
  27:11 37:9,13
  63:3,3 123:24
  124:6,8,13,22,24
  128:15
**journal** 15:12,17
  15:17,21
**journals** 13:11
**judge** 163:18,19
**jumps** 119:12
**junk** 47:2,3,4,4
**jurisdiction** 24:22
**Justice** 2:8 4:7
**justifiable** 107:16
**justification** 93:18
**justified** 30:1
**justify** 51:14,15
  53:1 73:4,5 93:20
  120:22
**justifying** 31:15
  72:19 139:8
**JV** 125:6

———————
**K**
**K** 164:25
**Kay** 1:19 170:11
  171:13
**keep** 64:21 72:2
  78:18 102:1,3
  109:13 118:18
  131:2,3 135:16
**keeping** 135:21,21
**kept** 10:9,9,10
**kick** 118:21
**killing** 91:12
**Kim** 171:14
**kind** 3:21 22:14
  25:11 30:8 36:8
  37:20 47:18 48:21
  64:10 70:11 72:24
  82:17 88:2 96:15
  96:18 104:17
  116:19 124:20
  126:14 132:4

135:19,19,19
  146:3 147:6
  149:13,25 156:7
  156:22
**kinds** 17:12 150:14
**king** 100:14
**knew** 104:2,2
  108:24 157:15
**know** 5:14,15 7:17
  7:21 9:5,20,23,25
  10:3,6 13:2,10
  15:9 16:13,22,24
  17:13 18:10 19:8
  19:11,12 21:14
  22:17,22 24:7,13
  24:16,16 25:3,4
  25:13,16,19 26:4
  26:6 27:2,16 28:2
  28:9,10,12,13,15
  28:16,22 29:9
  30:3,6,20 31:14
  35:5 36:7,12
  37:22 38:5,22,25
  39:7,18 40:2,9
  41:2,5,10 43:14
  43:16,17 46:3,5
  46:14 47:7 48:12
  48:12 49:19 51:2
  51:7,12 52:6,14
  52:14,23 53:15,19
  54:20 56:1 60:9
  61:17 63:14 64:4
  64:16,17 65:5,8
  66:23 67:2,20
  68:11,21 70:23,24
  70:24 71:15,16,17
  72:12 73:25 76:3
  79:15,15,16 80:5
  80:12,14,15,24
  81:1,18 83:9,24
  85:9,15 86:14
  87:22 88:1,17
  90:2,5,6,6 91:8,16
  91:16 92:10 93:9
  93:21 94:1,8 95:7
  95:9,10,10,11,12

97:4 99:24 100:13
100:14 101:13
102:9 103:4,5,5
103:19,25 105:19
105:25 106:9
108:9 111:11
112:23 113:17
115:5,12,18
117:10 118:24
119:14,19 121:16
125:9,11 126:17
126:18,20 128:2
129:18,19 130:17
130:20,20 131:3
131:10 132:14,14
132:16 133:2,21
134:15,15,25
138:5 141:4
143:25 146:12
148:6,13 149:20
149:22 150:5,20
151:3 152:7,18,22
153:7 154:25
155:25 157:25
159:18 160:22
161:13,14,14
162:18 163:1,23
164:10,11,12,13
164:16,16 165:9
165:16,21,21
166:6
**knowledge** 52:13
63:17 80:17,17
119:14 120:13
164:2
**known** 43:19 57:4
61:14 68:16 169:9
**knows** 66:16 77:19
123:14
**Korean-American**
89:1

_____
**L**
**lab** 24:6
**label** 141:20
**labeled** 77:9 113:23

160:19,21
**Labor** 152:5,7
**laboratories** 23:20
23:20 24:11 33:17
64:6,14 140:10,10
150:8
**labs** 26:20 44:10,11
**lack** 5:13 73:8
**Lane** 6:2
**language** 40:18
107:20 164:20,21
**large** 16:15,23
19:16 20:6,7 22:2
22:4,5,13 39:23
84:1 98:7 152:19
157:4
**largest** 126:6
**lasts** 26:14
**late** 118:17
**lately** 43:9 62:12
150:19,19
**latest** 146:11,20
**law** 1:21,21 2:4
26:25 55:11 155:4
166:3
**laws** 52:5
**lawsuit** 134:7
**laying** 147:20
**leading** 69:11
**leads** 93:24 121:12
**leap** 21:13
**led** 158:17
**left** 141:6 158:1,2
**left-hand** 138:12
**legal** 48:22 76:25
**legally** 27:6
**legitimate** 84:12
**Leneaux** 10:19
**length** 40:12
**letters** 23:11
**let's** 12:7,14 44:2
57:12 59:14 60:2
64:24 71:14 72:2
77:1,22 90:11
91:21 92:17 101:1
102:14 106:23

107:3 113:21
116:18 123:23
137:17 142:19
143:1,14 146:6
**level** 27:17 33:23
33:23 36:21,22,23
38:18 54:18,22,22
54:24 57:24 58:12
58:14,17,19,20
59:8 65:23 66:8
66:18,20,22 67:1
85:16 99:14
102:17 134:5,6
152:23 155:16
156:17,20 157:7
**levels** 13:19 27:16
54:17,18 55:16
94:3,3
**LG** 19:16
**liability** 165:25
**licensed** 50:14
**licenses** 50:9
**life** 30:13 48:2
53:16 54:4 132:8
134:21
**light** 17:18
**liked** 11:16
**likelihood** 78:10
87:3,14 88:6
98:21 110:4
120:14
**likes** 67:10 88:3
**limit** 105:19
**limitations** 88:11
130:15,18,21,22
130:23 135:20
**limited** 86:4 143:18
**limits** 88:13
**line** 41:17 48:19
57:22 68:1 134:3
146:4,5 148:6
168:3
**lines** 14:12
**list** 9:3 18:19 20:17
80:19 98:2 99:18
99:18 144:17

153:24,24 154:1,2
154:11
**listed** 65:12,13
81:20 92:6,7,7
138:3 139:19,21
144:17
**listen** 20:11
**listening** 154:19
**lists** 23:4
**Litigation** 2:9,13
**little** 23:16,17
41:19 59:15 62:23
62:24 80:16,17
90:16 103:15
106:1 117:15
124:3 125:17
130:22 133:25
137:20 142:11
162:9 165:9
**live** 151:25 155:13
**lives** 103:8
**living** 55:15 127:23
**LLC** 171:14
**local** 39:10
**locality** 156:12
**Lockhill** 171:15
**log** 77:25,25 78:1,2
78:3 99:17 100:12
100:18,19
**logarithm** 73:11
75:3,4 78:4,5,5,6
92:24 99:21,25
**logarithms** 41:1,11
42:1,2,2,4,6,7,10
42:12,16,22 43:6
73:10,11,13,14
75:8,11 92:18
93:11,19 94:2,3,6
94:8 99:19,20,20
99:22 100:2,3
106:21
**logging** 14:10
**logic** 72:7,8,9,12,15
73:3,9 75:12
101:22 108:16
**logical** 104:12

**logically** 95:1
**long** 5:7 9:13 10:3
14:10 41:16 46:22
53:6 61:15,17
79:14 97:23
103:10
**longer** 141:23
144:20
**look** 11:2 14:21
17:20 18:25 20:15
23:2 28:16 30:2
32:6 33:8,10,19
34:20,20,20 35:6
35:6,17,17,25,25
36:5,13,14,15
38:17 39:7 45:6
46:16 47:12 49:13
61:3 62:4 66:24
68:23 69:22 70:1
70:17 75:2 78:24
78:25 81:9 82:4,4
84:14,15,17,17
88:25 92:24 93:8
95:2,21 96:8
103:23 106:25
107:5 108:18
109:17 110:17
112:24 116:22
122:21 133:10
137:22 138:11,13
140:15,15 141:12
141:12,13 142:4,7
142:8,9,16,25
143:25 146:4,22
147:4 151:8,8
152:19 154:13
157:17 161:12,13
162:3,4,20 163:21
166:18
**looked** 28:22,23
38:14 47:23 49:7
59:12 60:23 62:5
65:10 67:24 70:5
81:5,6 83:7 84:13
84:20 86:3,4 87:2
92:10 93:5 99:14

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 59 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 333 of 814
Dale Patenaude                                                November 21, 2013

Page 184

99:18 109:19,20
130:19 131:25
137:22 142:10
157:15
**looking** 14:5,5,6,8
14:13 18:14,17,18
24:15 29:19 33:21
35:21,22,22,23
40:4 43:9,12
45:10 47:22 59:6
60:25 67:22,23
68:2 71:25 72:16
76:15 80:19 82:24
86:2 93:17 101:20
116:21 119:11
148:8 156:21
158:2 162:22
**Looks** 113:24
**lose** 39:22 127:23
166:1
**loss** 54:19
**lot** 23:13 34:24
35:5 42:21,21
43:10 44:6,8
46:14 51:2 64:9
72:15 73:22,22,23
85:2 90:6,9 91:4
100:15,16 102:1,2
102:10,22 104:7
104:24 106:22
107:12 122:14
131:17 132:5,5
134:2 139:11
**lots** 129:8 135:10
**lousy** 97:24,24
**low** 38:18 39:22
125:11 159:2
**lower** 27:17 96:20
97:1 99:6 153:21
159:25 160:3
**lowered** 160:9,10
160:11,12
**lowest** 122:10
**ludicrous** 21:13
**LUG** 22:4
**lying** 165:12

**L-O-G** 77:25 78:1
————————
**M**
**M** 98:24,25
**machine** 1:20
**macromanaged**
71:20
**magazine** 15:21
**magically** 69:14
**main** 19:4 26:23
30:12
**major** 67:14,15
76:16 82:11
**making** 36:15,16
71:6,7 118:18
**man** 47:15 104:1
**manage** 45:7
**managed** 45:9
**management** 26:11
26:12,13 28:5,6
60:7
**manager** 14:23
60:8 71:15
**managers** 40:21,23
**manipulate** 153:2
**manipulation**
107:7
**manufacture** 14:16
**March** 68:18
**mark** 12:14 32:10
**marked** 8:11,13,19
8:21,23 12:16
32:7,14 57:12,14
91:21 136:7,8
143:7 159:20
**market** 13:22
74:17
**marketplace**
152:13
**Maryland** 89:4
**match** 38:25 68:10
68:15,16 120:21
120:22
**matches** 68:21
143:13
**material** 18:21

92:4 93:2,3,12
96:6
**materials** 92:12
100:23
**math** 11:23 27:23
37:15 42:18 49:18
**mathematic** 92:24
**mathematical** 50:6
**mathematics** 12:4
13:2,3 70:24
77:20
**matter** 8:7 15:18
46:18 47:3 55:10
100:6 109:15
120:4
**matters** 25:19 26:1
100:5
**maximum** 47:13
**MBA** 53:4,16
**MBD** 156:13
**MBEs** 156:19
**MDEs** 156:10
**mean** 7:11 16:9
21:2,12,15 23:5
26:2 28:20 29:8,9
29:17,20 31:9,22
31:24 35:16 36:17
36:23 38:5,6 42:8
42:9,14,17 44:5
45:2,22 47:8,8
49:18 50:25 51:1
52:2 53:20,21
55:22 56:13 57:25
58:21 59:23 62:5
68:8 69:4 73:10
73:16 79:4 82:4
84:1,25 90:16
91:5,14 92:7,10
93:8,23 94:1 96:2
97:19 98:22 99:21
100:1 102:24
103:2 105:21
106:8,17,20 112:9
120:5 122:20
123:1 125:9
127:14 129:19,24

132:17 138:23
144:7 146:12
147:4,17 148:11
149:9 150:4 153:1
153:10 156:12
157:10,24 159:12
163:19,19
**meaningful** 81:5,10
**means** 16:10 21:9
58:1 69:4,16 71:6
73:14 77:11 78:2
78:3,3 95:9 97:23
132:5 147:18
149:15 159:16,19
**meant** 5:8,13
150:11
**measurements**
94:5
**measures** 23:25
97:25
**mechanics** 42:18
**medications** 6:7
**meet** 56:18 154:21
155:11 156:10
**memory** 7:7
**mention** 76:23
114:6 154:18
**mentioned** 17:23
37:2 54:14 83:3
87:4 92:14 106:25
154:4 166:15
**method** 14:15 24:7
24:13,17 30:7
58:21 61:18,19
75:12 107:14,16
**methods** 24:9
**Mexican** 53:18
**Mexican-Americ...**
53:19
**micromanage**
69:15,19 71:5,23
**micromanaging**
69:5
**middle** 77:24
**midst** 40:1
**miles** 14:11

**military** 33:11,12
**million** 14:8 64:6,7
64:12 71:2 73:17
73:18,21,23,24,24
73:24,25 74:18,19
74:19,21,25,25
81:13,17,17 91:7
91:7 101:2,3,8,8,9
101:10,17,24,24
101:25,25,25
102:1,1,3,5,10,20
102:22 104:4,4,5
104:10,10 113:15
125:22 126:4,5
140:11 147:11,22
165:23,24
**millions** 89:3 91:6
147:1
**mind** 141:24
**mine** 36:12 50:4
142:19 155:17
**minor** 13:2 14:7
**minorities** 9:22
32:1 51:12,13
**minority** 20:3,6,7
30:6 31:17 52:17
52:18,18,19 53:22
55:13 85:16 134:8
134:11,13,15,19
134:24 146:24,24
147:7 148:8 160:8
160:9,25 161:4,5
161:6,7,9,10,12
**minority-owned**
3:21 81:22 119:16
134:17 135:9
146:3 160:1
**minutes** 135:24
**miscounted** 160:17
**miscounting** 160:5
160:15
**missed** 70:8 121:21
**misses** 121:22
157:7
**mixture** 144:15
**mode** 14:4,7 133:7

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 60 of 73
USCA Case #15-5176    Document #1577653     Filed: 10/13/2015    Page 334 of 814
Dale Patenaude                                       November 21, 2013

Page 185

**model** 70:18 72:9
72:12,15,25 73:3
73:9 75:24 166:24
**models** 75:7
**money** 17:12,13
29:4 36:16 39:22
47:25 51:9,10
68:14 74:7 83:13
83:15 88:14,21,22
88:23 89:7 90:18
90:20,24 97:2
104:6 112:3
124:24 132:5,23
132:25 134:3
147:2 158:2
**month** 68:3 108:1
109:5 155:1,1
**months** 15:10 68:4
109:5
**motion** 25:13,14,14
25:16
**move** 32:5 84:11
91:21 113:21
117:12 131:10
**moved** 160:7
**moving** 160:10
**Mulberry** 1:21 2:5
**multiple** 4:25 27:16
40:9 62:25 89:3
166:8
**multiplication**
37:17 105:11
**multiplied** 83:10

─────────
**N**
**N** 2:1 3:1
**NAICS** 3:19 19:12
19:18,19,22,25
20:1,2,11 21:1,1
21:12 22:9,25
23:5 59:17,25
60:16,18,22,24
61:2,2,3,9,12,21
61:23,24,25 62:2
63:5,10,15 64:4,6
64:10,11,21,21,25

65:6,17,18 66:1
66:10,25 67:1,3,5
99:13 100:9 131:4
131:5,11 138:4,5
138:7,9,11,13,13
138:15,18 139:2,4
139:7,8,10,13,19
140:7,9,19 146:23
163:4,17
**name** 4:6 5:24
10:24 33:25 47:17
82:20 95:11
100:13 133:3
169:12
**names** 53:17
**NASA** 83:25
**national** 23:2 24:11
155:16
**natives** 36:24 117:1
117:6
**naturally** 74:23
**nature** 35:8
**Navy** 87:22 88:1,3
88:4
**necessarily** 23:24
60:16 62:9 85:21
93:8 101:14
106:12 109:10,14
111:25 152:21
**necessary** 42:9
61:18
**need** 11:2 16:15,15
17:15,17,17,19
24:19 35:19 63:16
70:1 75:16 79:22
90:9 110:14 113:1
129:19 143:12
153:13 154:14
**needed** 14:3,3
47:19 48:14,14,15
48:16 126:18
**negative** 138:6
**Negro** 52:22
**neither** 171:5
**NERA** 20:18 50:8
**net** 88:14,19 89:8

89:10 130:19,23
130:24 135:20,21
**neutral** 96:20,20
**never** 22:7,8,9,9,11
22:12,17 49:21,22
79:22 81:5 106:14
108:12 118:21
132:10 153:22,22
153:24,24,25
160:23 165:20
**Nevertheless** 100:4
**new** 15:9 42:3
71:15,16 87:22,23
95:14 109:4
118:19 124:6
142:12 143:7
**newspaper** 15:20
**nicer** 90:19
**night** 140:24
**nine** 70:6 72:3,6
75:23 106:23
**nines** 105:23
**nonsense** 29:25
**non-businesses**
82:7
**non-minority** 30:3
52:16 119:16
134:9,11,14
**non-paid** 147:12
**non-peer** 15:17
**non-SBDs** 113:12
**non-SDB** 113:15,16
**non-SDBs** 47:24
110:21,21 113:6
117:10 134:3
135:1 154:2
**non-8(a)** 36:16
65:14 89:16 91:10
**non-8(a)s** 84:10,11
84:15,15,17
144:16
**normal** 5:1 14:12
43:9 71:4 88:19
89:10,11
**normally** 20:3 64:1
74:9 79:13 117:11

**northern** 89:4
**Notary** 169:18
**noted** 120:7 169:3
**notes** 3:17 32:15
**notice** 99:17 118:15
**notorious** 57:10
**novel** 13:17
**November** 1:12,18
170:10
**number** 9:24 27:9
27:9 41:21 45:24
45:25 46:8,11,18
47:9 50:6,7 55:18
58:12,16,20,24
65:12,13,13,14
68:3,9,23 69:7,10
69:11 70:3,6
71:13 76:15 77:6
80:5,7,20 83:3,4,6
83:11 85:5,16
88:17 103:3,4
106:11,17,18,19
107:6,10 108:4
110:3,13 111:5,6
113:3,3,5,23
114:17,25 115:2,8
115:20,24 116:2,3
116:8,10,11
119:12 120:10,20
125:24 129:11,22
131:7,18 133:17
133:18,19,20,21
133:22 137:8
138:12,15 140:13
140:20 142:11,17
143:9,11,11 145:9
145:12,14,20,22
148:19,25 149:1
154:3 155:3,5,6,9
157:23,24 158:9
158:10,13,24,25
158:25 159:21,22
160:11,12,13
161:15,17,21
163:20
**numbered** 1:18

**numbers** 9:19,20
9:21 11:21 31:8
31:10,11,12,13
35:1,18,19 36:14
37:1 49:13 61:8
69:21 70:13,17,22
80:12 81:8 101:20
104:15,16 105:4,6
110:24 114:6,11
114:15 115:6
116:14,20 120:22
125:15 126:3,12
129:2 133:6,8,25
135:19 142:16
151:19 159:1,16
162:2
**numerous** 18:5
**NW** 2:9
**N-A-I-C-S** 23:1,5

─────────
**O**
**oath** 43:5 164:19
169:10
**Obama** 69:20
**objection** 11:9
161:23
**Objections** 4:10
**objective** 35:1,3
151:18,24,25
152:12
**obtuse** 5:12
**obvious** 45:23
**obviously** 124:10
126:12
**occasionally** 92:19
93:11,25
**occurred** 138:10
**October** 113:22
**odd** 4:16 5:12
77:11
**odds** 57:23 77:9,15
84:5,20 159:24
160:3
**offer** 136:9
**offered** 137:7
**office** 123:15

Dale Patenaude                                        November 21, 2013

169:15
**officer** 56:15,21,22
  60:23 87:18,19
  96:17 97:4 98:14
  112:9,16 118:20
  170:15
**officers** 48:23,24
  49:5,6,8,10 64:18
  67:17 90:18 98:4
  98:12,19 108:18
  109:17 119:15
**officer's** 95:11
**offices** 1:21 74:14
**Oh** 45:18 51:24
  61:4 122:5 139:18
  141:21
**okay** 5:2,21 8:6,25
  9:6 11:6,7 17:4
  18:11 19:4,16,18
  20:14,19,21 21:4
  21:7,13,16 22:13
  23:25 25:16 28:19
  29:2,5,13,15,25
  31:10,24 34:3,22
  35:20,24 36:1,2,5
  36:13 39:8 40:1
  40:19 41:13,15,24
  42:3,9,13 46:4,6,9
  46:15,18 47:12,14
  47:15 56:15 57:5
  59:14 62:23 68:1
  68:9,18 69:3,6,10
  69:21,25 70:4,5
  71:17 72:4 74:3
  74:17,24 75:18
  76:18,22 78:24
  79:15,21 80:19
  81:4,20 82:8,9,11
  85:7,9,10,16,17
  86:1,14,22 87:24
  88:15 89:8 90:11
  92:17 93:10 94:11
  95:9 96:14 98:2
  100:1,21 101:1
  102:6,9 103:15
  104:9 105:11,13

105:16 106:1
108:14 110:14,18
110:20,20 112:8
112:22 113:21
114:4,10 116:11
116:18,22 117:14
118:1 119:2
121:18 122:15
124:10 125:21,24
126:8,13 127:12
127:14 128:12
129:10 133:6,19
134:3,16,22
135:20 136:17
137:10,21 138:4,6
138:9,16 141:3,21
142:4 143:6,20
144:16,23 145:2
146:3,4,23 147:2
147:4,13 157:12
157:15 159:11
161:4 162:17
163:17 164:25
165:5 166:10
**old** 40:15 46:20
  47:2 48:16 94:12
  94:18,24,25 122:6
  142:20 143:6,7
**older** 80:2 122:3
**once** 5:12 25:9,10
  62:17 102:9
  109:13 117:11
**ones** 23:25 40:20
  63:18,19,21 67:6
  67:7,25 70:8 84:4
  91:11,11,14 97:1
  99:22 100:1,2
  105:23 117:13
  118:3 123:23
  125:5 138:8,17,17
  139:23 141:6
  147:22 152:5
**one-person** 29:2,16
  147:17
**ongoing** 10:4
**online** 15:21 68:1

**open** 90:25 111:12
  111:24 112:15
  117:13
**operate** 63:15
**operation** 48:13
  65:2
**operations** 96:15
  136:22 137:6
**opine** 45:16
**opinion** 11:14 25:8
  26:4 31:8 35:4,5
  38:22 45:20 48:22
  57:25 58:12 59:7
  59:21 65:25 71:10
  72:12 78:20 94:22
  101:6 103:22
  111:1 118:2 121:3
  121:9,15 145:17
  147:25 156:15
**oral** 1:10,15 170:15
**oranges** 161:11
**order** 70:18 87:2
  114:25 132:10
  152:13
**ordinary** 70:14,16
**organization** 116:6
**organizational**
  116:15
**ought** 69:22 70:2
**outcomes** 65:18
**outside** 55:7 90:3,7
  90:10,13 91:3,8
  92:4,12 111:19
  112:3
**overall** 126:21
**overhead** 74:9,9,13
  90:14,17
**overstated** 158:13
**owned** 27:1,2,3,5
  85:16 117:1
  119:16 134:14
  161:6,7
**owner** 55:13,20
  119:24 146:12
**owners** 146:7,11
**ownership** 54:24

**owns** 115:18

_____

## P

**P** 2:1,1
**Packard** 13:24
**packet** 165:6
**page** 3:2,12 57:20
  59:14,15,18 72:3
  72:5 75:22 77:5
  77:24 92:17 94:11
  101:1 103:16
  106:23 114:4
  116:18 117:14
  121:2 133:7
  138:20 139:15,18
  140:21,21 142:25
  143:2 147:5
  159:22 162:8
  168:3 170:25
**pages** 75:23
**paid** 115:3 147:9,9
  147:10,12 163:12
**painting** 147:19
**paper** 13:12,18,19
  83:1 100:16,17,20
  106:16
**paperwork** 114:14
**paperworks** 166:19
**paragraph** 57:21
  92:18 94:15,16
  95:25
**parent** 115:8,20,24
  116:2,8,9,11,20
**parents** 53:3
**part** 7:18 14:21
  15:1 24:20 28:1,8
  32:11 34:2 35:13
  35:13 37:15 39:23
  42:7 52:9,9 54:7,9
  71:2 80:18 126:1
  128:13 136:22
  137:5
**participant** 88:9
**participate** 27:18
  88:11
**participated** 55:1

**participating** 10:15
**particular** 13:16
  152:21 156:11,11
  156:21
**particularly** 51:5
  87:5
**parties** 171:6
**partly** 161:7
**partners** 124:22
**parts** 14:8 153:12
**party** 170:20 171:1
**pass** 33:23,24 136:3
  158:4
**passing** 63:16
**pass/fail** 99:5
**past/fail** 97:7,8,9
**Patenaude** 1:11,15
  3:4,14,15,16 4:1,4
  5:25 136:20 137:1
  168:2 169:1,5,9
  170:9,14
**pause** 4:24 86:22
**pay** 29:4 74:13,14
  90:18 109:12
  118:16 132:5
  151:2,3 152:12
**paying** 90:20
  108:10 132:4,4
**PDA** 9:23 10:4
**PEA** 9:18
**peculiar** 120:7
**peer** 13:10 15:12
  15:15 28:10
**penalties** 165:12,15
  165:16,20
**penalty** 108:9
  165:22 166:2
**Pennsylvania** 2:9
**people** 9:23 13:24
  13:25 14:14 17:2
  18:15 20:13 28:11
  28:17 29:10,11,11
  29:14 30:4,12
  33:5,8,10,15,16
  33:20,21 36:20,20
  38:10,19 39:3

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 62 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 336 of 814
Dale Patenaude                                    November 21, 2013

Page 187

40:8 45:7 46:19
46:19 47:1,13
49:14,14 51:2,16
51:19,20 52:14
55:19 61:2 62:18
67:20 68:12 70:2
72:15,17 73:19
74:12,14,20,22,24
82:21 84:2,18
85:13,25 88:3
91:14,15,17 96:13
98:2,8,18 102:4
102:10 103:1,8,11
108:13 117:5,7
121:18,19,20,25
126:1 133:2,2,20
135:7 142:6
144:15,21 145:7,7
147:22 151:3,4
153:18 155:5,7
159:14 160:7,25
166:3
**percent** 10:7 24:3
26:18,19 40:5,5,6
50:5 55:14 56:2
57:24 58:11 59:8
66:7,8 68:17 69:1
69:3,6,12,12,12
69:13,14 70:3,4
70:10 71:3,5,11
71:14 74:16 79:1
79:4,8 83:22
85:15,15 98:22
105:8 118:9
119:12 120:8,10
145:15,15,17
154:9 156:3,4,4
157:20,21,22
158:14,16,17,18
158:18 159:2,2,2
159:5,15,17,18,21
159:25 160:3,5,11
160:12 161:14,16
161:17,18,21
**percentage** 30:2
55:23 74:4,5,6,6

83:7,9,19 85:17
85:18 100:23
117:10 156:1
157:16,18,19
**percentages** 37:18
120:17
**percentile** 39:9,9,9
39:10,11,12,14,15
39:16
**perfect** 71:2
**perfectly** 84:11
123:9
**perform** 38:13 44:7
50:10 78:18
**performance** 61:19
61:21 78:14 92:9
96:1,2,8,11,12,17
96:19,23,25 97:6
97:6,8,9,25 99:2,5
99:7 102:8
**performed** 11:24
45:21 159:8
**performing** 32:3
**person** 17:9,10
28:13,18,20 29:3
29:15,22,23,23
30:9 31:17,17
49:5 52:22,24,24
53:23 54:1 55:13
55:20 60:5 71:16
81:12 121:22
135:16 147:19,21
148:8 169:11
**personal** 7:9 46:10
89:8 109:1 129:18
129:20 131:25
132:9
**personally** 5:16
15:4 45:5 89:7
125:5 163:13
169:9
**phrase** 87:8 96:1
**physical** 16:20
**physics** 42:17,18
**pick** 48:10 64:10
112:10

**picked** 48:2,5,6
49:18 73:6 108:23
**picks** 14:11,13
**picture** 67:9
**piece** 117:7,7
**pistol** 69:7,19 71:24
**place** 21:2 37:23
62:19 80:3 100:9
123:3,20 140:6
166:6
**placed** 132:20
**places** 44:15 55:16
92:6
**Plaintiff(s)** 1:4 2:2
170:4
**plan** 24:10
**plans** 23:22,22
**play** 4:25 71:12
133:1
**played** 71:19 155:6
**playing** 154:18,20
**plays** 98:20
**pleasant** 7:8
**please** 4:23
**plenty** 133:2
**plumbing** 60:20,21
60:22,22,24 61:4
61:5
**plus** 114:18 115:2
144:23,23
**point** 10:2 18:21
19:5 31:21 35:23
72:6 77:20 108:4
108:4 113:9
120:20 125:13,13
125:24 126:21,22
129:1 133:24
134:1,2 139:14
140:14 160:24
161:3 163:25
164:1 165:5
**pointed** 45:24
68:11
**points** 11:18 68:11
125:14 160:24
**police** 17:3

**polling** 24:20
**pool** 83:11
**pooled** 77:1
**portion** 125:1
157:4
**position** 39:8,13
69:15 72:20
147:15
**positions** 39:8
**positive** 124:3
132:14 138:6
**possible** 61:11
63:10 69:7,10
71:3,5 81:8 106:8
106:8 125:12
128:6 163:7,10,14
**possibly** 31:19
40:11 52:3,8
100:8
**posts** 17:18
**potential** 165:22
**potentially** 106:6
127:22
**poured** 63:25
**power** 102:22
**predecessor** 61:15
**preferential** 135:13
**preparation** 37:15
39:24
**prepare** 8:6,14
37:2
**prerequisite** 13:1
**prescribed** 24:18
**presented** 71:13
**presently** 68:7
**president** 37:8,9,9
37:10,11,13,14
136:21 137:4
**presidential** 153:3
**pressure** 94:5
**presume** 66:21
**pretty** 51:10 53:16
61:24 77:19 107:2
107:22 133:17
134:21 145:16
164:22

**previous** 9:4,11
10:16 43:15 69:11
70:17,17 119:3
**previously** 159:20
166:15
**price** 9:18 28:1
39:20,21,22 52:4
100:5,14
**primarily** 34:17
**prime** 82:15 83:5
84:2 98:10,13
157:6
**primes** 98:19
**Principal** 3:19
**principles** 148:13
**printed** 106:16
**prior** 85:2 87:4
109:9,18,18
129:14 144:4,4,7
154:25 155:3
162:23 166:3
**privilege** 4:10,23
4:25 18:23
**probabilities** 76:14
79:7 106:17
**probability** 46:6
47:6,21 49:3
58:15 78:19,21,23
78:25 79:8,11,19
81:15,17 82:1
84:17 106:19
130:2 153:21
**probable** 79:4
**probably** 18:13,16
22:3 25:2,3 26:19
40:2,5 65:11 68:5
68:6,7 73:19
74:24 79:1,3 80:6
80:7,8 81:14
83:21,24 87:19
94:20 101:12
103:14 104:22,22
104:23,23 105:2,3
106:5 107:22
122:12 127:6
128:9,22 133:22

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 63 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 337 of 814
Dale Patenaude                                    November 21, 2013

Page 188

141:13 142:11
146:14 160:6,9,9
160:10,11 163:21
163:22
**problem** 9:10
13:17 14:3 22:14
22:20,21 24:6
32:17 34:24 35:20
35:20 40:22 44:24
48:18 60:1,15
64:1 67:8,9 71:21
71:24 76:13,16,17
76:19 77:4 79:13
95:3,4 100:20
101:22,23 106:9
106:10
**problems** 16:20
17:24 40:20 114:5
121:21 140:17
**Procedure** 1:23 4:9
**procedures** 58:22
95:13 123:9
**proceed** 117:13
**process** 29:9 37:15
37:16 47:4,10
52:7,8 54:19
70:14,16,25 85:11
114:22 117:16
121:23 164:1
**processes** 27:19
69:8,8 71:4
**procurement**
100:16,17 108:20
**produce** 92:1,4
96:13 105:4
**produced** 1:15
76:14 91:22
104:13,14,15,17
105:6 106:15
141:18,22 153:7
**produces** 68:13
152:8
**producing** 105:12
**product** 47:18
**products** 100:15
138:24

**profession** 19:17
**professional** 19:6,9
19:10 20:8 21:15
21:17,18,18,19,20
21:21,21 22:12
32:22 50:13,14,15
94:21 121:4,9
139:21,22 140:4
150:9
**program** 3:19 5:17
8:1 10:4,4 31:2,10
34:6 36:22 43:19
43:22 50:23,25
51:4,6,23 52:15
54:6 55:19 78:16
86:1,19 88:10,12
88:16,18 89:9,15
89:17,21 90:3,8,9
90:10,13,15,22,23
91:3,5,8,9,13
99:25 111:19
112:4 131:19
134:20 135:13
138:14 144:12,13
144:22 153:17
155:24 156:1,2
160:3 162:11
164:12,14
**programming** 65:2
**programs** 54:9
82:11,13 85:12,20
89:13,24 109:25
131:22 135:8
156:7,7,17
**progresses** 118:25
**prohibition** 118:23
**prohibits** 118:24
**project** 13:14,16
**projections** 151:6
**projects** 129:8
**pronounce** 50:12
**proof** 52:3
**propinques** 87:8
**propinquity** 87:9
**proposal** 28:2,3,5,5
40:1,3 97:8,8 99:3

**proposals** 27:24,25
28:2,7 29:16
39:19 74:21,23
102:5,7,7 103:1,2
121:21 123:8,14
**proposing** 29:12
39:10,12 121:23
**proprietary** 38:6
**proprietor** 80:22
81:3,4
**protected** 18:22
**protest** 166:1
**prove** 40:13 48:15
48:17 153:15,16
153:16,20,20
**proved** 169:9
**provide** 82:9
**provided** 86:7
108:19
**provisions** 1:23
**public** 134:10,13
135:1,2,3 148:19
169:18
**publically** 107:8
**published** 13:10,12
13:15
**pull** 24:1 105:19,22
**pulling** 105:17,18
**punishment** 61:7
**pure** 147:15
**purely** 70:5 125:10
**purpose** 7:19 30:13
31:8 82:7 129:13
135:11
**purposes** 129:15
169:14
**pursuant** 1:22 4:9
170:18
**put** 19:23,23,24
28:5,6 35:2 47:2,4
47:5 58:8 60:1,5,6
60:15,18,22,24
61:5,6,8,9,21,24
68:20 81:1 84:8,9
86:16 87:12 88:11
95:23 108:2,4,10

108:11,13,14
109:6 110:10
138:2 140:8
141:20 143:12
147:20 151:6
152:6 154:6,23,23
154:24 155:5
**puts** 152:23
**putting** 124:24
128:3
**p.m** 1:19

**Q**
**qualifications** 5:19
49:19
**qualified** 45:15,19
**qualify** 164:15
**qualities** 33:8
**quality** 23:21,22,24
24:10
**qualms** 59:9
**quantities** 92:20
**quarters** 68:6
**question** 4:22
24:19 25:14 28:20
28:21 31:22 35:4
43:5 46:7 47:9
49:16,17 75:22
93:16 106:14,15
129:20 139:15
145:21 147:24
166:11
**questionable** 34:19
100:3
**questioned** 106:14
**questioning** 136:19
156:22
**questions** 4:18 5:5
5:8,11 8:3 136:18
149:25 154:16
158:5
**quick** 37:12 42:23
163:3
**quickly** 128:14
133:13
**quite** 52:13 62:8

110:15 123:5
**quo** 5:10
**quotes** 16:20

**R**
**R** 2:1
**Rabinsky** 36:3
**race** 119:23,25
**racial** 32:1
**radically** 31:18
**ramifications** 51:4
51:7
**random** 24:1 69:8
70:13,22
**range** 102:20
**rate** 34:21 151:18
**rates** 90:14,17
**ratings** 98:17
**ratio** 14:4 102:12
110:21 147:11,13
**rational** 76:20
**ratios** 77:9,12,15
**Raytheon** 98:18
**RDI** 8:23
**reach** 49:9 69:18
121:15
**reached** 70:13,14
**read** 4:14 11:11
28:9 32:8 59:23
72:14 93:1 106:9
107:4 169:1
**readily** 11:19 110:8
**real** 7:7 16:20
55:18 71:14 72:18
72:19,20 91:6,18
97:24 132:23
152:12 163:3
164:11 166:1
**realistic** 79:17,21
121:3 127:15,16
152:24
**realistically** 55:6
55:18 116:21
140:15
**reality** 39:3 64:3,23
**realized** 126:17

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 64 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 338 of 814
Dale Patenaude                                      November 21, 2013

Page 189

**really** 7:17 12:5
16:6,22 18:11
28:15 30:9 42:5
43:8 45:14 46:3,8
46:10 47:21 48:3
48:14 53:15 55:9
55:17 60:20 62:4
64:3,5,13,18,19
67:8,9 71:21
81:13,16 86:16
88:2,16 91:14
96:4,5 101:18
105:10 115:3
117:6 118:16
123:9 125:11
126:1 127:19
128:24 130:21
134:15 137:22
140:8 145:20
147:1 149:12
154:19 155:3
160:22
**realm** 148:22
**reason** 22:16 30:8
47:21 48:1 51:19
73:3,6 82:22
117:24 150:2
162:18 164:11
168:3
**reasonable** 30:8
59:4 77:21 126:5
130:2
**reasonably** 53:3
**reasons** 6:10 47:7,9
93:19 170:25
**recalculate** 17:25
**recalculation**
158:10
**recall** 10:11,15
13:4 20:16 93:6
122:9 145:18
153:13
**receipt** 147:1
170:22
**receipts** 78:1,1,6,7
78:8 99:20 122:24

125:15 126:23
127:7 129:12,13
129:22 130:5,10
131:7
**receive** 110:18,19
110:22
**received** 56:8 80:5
141:17 154:5
**Recess** 43:3 86:24
136:1
**reclassify** 70:9
**recognize** 8:23
57:15 62:22
**recognized** 16:2
108:22
**recollection** 133:14
166:21
**record** 1:24 4:3
5:24 16:4 43:4
133:4 170:16
171:7
**recording** 119:17
**recreate** 59:11,12
**red** 28:8
**redacted** 114:7
**redoing** 77:20
**reduce** 92:19
**referred** 32:6,6,12
32:18
**referring** 78:8
**reflected** 129:3
**regard** 11:23 89:13
**regardless** 102:13
110:2 120:16
160:2
**register** 135:12
**registered** 60:9
109:19,20 114:21
135:10
**registration** 164:1
164:15 171:14
**registry** 61:22 62:2
62:11
**regression** 43:7,8
45:13 72:5,6,7,9
75:7,10,14,17,19

75:21 77:2 84:25
85:2 87:2 104:19
**regressions** 126:15
**regular** 97:16
116:22 135:18
**regulation** 155:5
**regulations** 107:25
**rejection** 14:4
**relate** 63:19
**related** 19:10,23
57:7,8 72:1 151:2
171:6
**relationship** 75:25
**relatively** 29:10
**relevance** 7:25
**relevant** 78:9,11
87:5 110:4
**reliability** 126:13
126:14,15,16,21
**reliable** 110:9
**rely** 92:1
**remain** 108:14
**remark** 143:11
**remember** 7:2,6
9:8,14,15 10:2,24
11:5,5 12:17,20
12:22 14:20 22:7
33:24 41:21 47:11
63:23 64:11 65:15
67:6 83:12 88:23
93:3 104:25 123:1
123:25 124:4
128:16 151:16
152:10 154:16
166:5
**remembering**
63:22
**remind** 26:21
**removed** 160:6
**renew** 127:24
**repeat** 63:16
**repeatedly** 48:23
**repeats** 127:3
**replicate** 77:17,18
**replicated** 11:17,24
65:25

**report** 3:14,15,18
5:9 6:24 8:6,9,15
9:4,11,16 10:1,10
11:11,15,16,24
12:1 20:15,16,21
20:25 25:17,17,23
26:2,7 30:24 31:5
31:9,11 45:17,21
45:23,24 46:2,3,4
46:5,16 47:23
57:10,15,17,20,22
61:12 63:14 66:13
66:15,17 68:13,21
68:23 72:3 76:12
76:24 78:12 80:25
82:8,12,13 83:11
84:9,14,16,23,24
91:21,22,23,24
92:2,5,8 96:2,5,11
101:2 103:18,21
103:24,25 104:16
104:21,22 105:12
106:7,10,12,24
113:19,22,25
114:2,4 118:4,5,7
120:9 133:9,11,16
137:10,11,15
138:2,8,12,19
139:14 146:18,19
153:8,20 158:19
159:20
**reported** 1:20
**reporter** 22:25
170:12
**Reporter's** 3:9
170:9
**reports** 5:11,19
10:11 16:8,19
17:23 18:2,4,6,7,7
18:10,12,14,18
19:1,3 20:17,19
21:3,4,14,15,22
22:3,20,21 23:13
25:25 49:24 82:19
94:9 96:12,13
104:3,4 108:3

138:16,16,22
139:1,5,6,19
140:16,16,18
161:15
**represented** 6:3
**reproduce** 93:7
**reproving** 22:20
**reps** 164:25 165:13
**request** 154:13
**requested** 170:20
**requesting** 4:22
**require** 119:13,14
**required** 29:20
50:3 61:20 107:12
155:4
**requirement**
108:17
**requirements**
154:21
**research** 72:14,15
**reserve** 4:11 158:4
**reserved** 4:10
**resources** 121:16
123:7
**respect** 5:6,13,18
119:17
**respond** 4:24
161:14
**rest** 37:14 84:16
103:7 126:2 139:2
**results** 16:12 59:3
77:13 100:9
**resume** 3:16 8:24
9:3 12:8
**resumes** 38:16,17
**returned** 170:22,24
**revenue** 74:5,6
123:2,3,18 124:12
124:13,16,20
127:17
**revenues** 122:10
128:6 163:5,8
**reverse** 49:13 51:5
110:11
**review** 15:12 38:10
38:11 39:24

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 65 of 73
USCA Case #15-5176     Document #1577653     Filed: 10/13/2015     Page 339 of 814
Dale Patenaude                                           November 21, 2013

Page 190

**reviewed** 13:11
  15:15,17
**reviews** 28:9 35:21
**rewards** 69:9
**rework** 24:3
**RFP** 98:24 165:2
**RFPs** 98:23 164:25
**rid** 105:24
**ridiculous** 54:2
  82:25 107:22
  125:24 148:9
  161:11
**ridiculously** 52:16
**right** 4:11 11:6
  22:6,24 26:8
  40:15 42:4 45:9
  46:18,19,20 47:5
  55:15,16,24 56:3
  56:25 63:1 65:3
  65:20,22 68:7,9
  79:20 83:21 85:9
  85:23,24 88:17
  91:18 94:4 95:7
  100:23 104:8,20
  105:9 106:18
  107:2 109:9
  112:11 115:16
  117:19 118:20
  119:1,4 120:10,11
  120:19 122:4,15
  126:11,24 128:15
  128:23 131:23
  134:5 135:25
  142:4 143:1,1,12
  143:14 148:1
  149:19 152:20
  153:3 157:9 162:7
  163:3,12,15,18
  165:8 166:23
**right-hand** 77:8
  80:20
**ring** 68:19
**risk** 39:17,18,18,21
**risks** 39:19
**Robert** 3:18
**role** 98:20

**Roman** 27:10,11
  37:10 63:3 123:23
  123:24 125:6
**Room** 2:10
**Rothe** 1:3 4:4 6:18
  6:19,22,22 7:15
  7:18 9:9 10:12,16
  10:18 14:18 15:3
  15:3 16:25 25:10
  25:17,23 26:10,16
  26:16,22,23,24
  27:4,8,8,13,13,15
  33:2,2 37:2 45:2,2
  49:1 50:11 54:11
  54:12 56:5,8 60:9
  60:12 61:22 62:3
  63:2,2 83:16
  88:24,24 109:3,11
  115:18,19 122:2,8
  122:18,24 123:8,9
  123:22 125:6
  127:9 136:18,21
  140:7 163:13
  166:17 170:3
**roughly** 156:4
  159:25 160:3
**route** 105:17
**RSI** 27:10
**Rubinovitz** 3:18
  25:6 36:3,3,6
  45:20 47:17 49:2
  49:15 57:11 59:16
  65:16 66:4 67:14
  72:3,17 76:12
  77:11 80:15 87:2
  92:14 95:23 97:11
  97:12 99:13
  103:17,20 104:14
  105:13 108:23
  113:14 117:17
  145:13 148:11
  153:9,23 156:23
  156:25 157:2,12
  158:13 159:8
**Rubinovitz's** 49:2
  80:12 113:19

  154:12 160:4
**rule** 41:7,8,8,17
  155:4 170:18
**ruled** 52:5,6
**rules** 1:23 4:9
  41:10 107:24
  109:5 115:17
  117:5 119:13,19
  123:10 143:23
  144:1 162:20
  166:7
**run** 5:15 26:6 27:5
  34:17 44:16 51:20
  66:12 70:18 87:2
  123:15 152:17
  163:22
**running** 26:8,9
  40:7 44:6,13
  53:18 74:8
**runs** 23:4 54:23
**RX** 27:11 37:9,10
  37:13 63:3 124:18
  124:19,24,25
  125:6
**R-U-B-I-N-O-V-...**
  36:4

**S**
**S** 2:1 3:11
**SA** 133:18
**salaries** 37:22,25
  38:1
**salary** 38:23,24
**salary.com** 38:15
  38:16,25
**sales** 44:15
**SAM** 61:2,21,22
  62:2 63:1 86:8
  107:19,25 123:17
  163:25,25
**sample** 24:2,8,9,14
  24:14
**samples** 14:9
**sampling** 23:14,15
  23:23 24:2,4,17
  150:1,3,7

**SAM's** 60:1,2,9,11
  60:16,23,25 61:5
  61:6,7,8,9,12,15
  61:15 62:11,14,17
  62:18,20 86:9
  108:25 109:1,3,13
  109:17,19,20,21
  125:16 126:5
  129:13,23 154:24
  155:3 162:16
**San** 1:22 2:5 6:2
  16:25 17:1,5,8
  33:18 171:15
**save** 123:16
**saw** 19:1 81:1
  93:20 118:15
  132:21 142:2
**saying** 39:11 40:15
  46:21 47:2 58:25
  59:3 70:21,23
  72:20 82:18 100:4
  106:13 120:23
  142:16 154:20
  155:18
**says** 21:11,13,17,23
  21:25 39:1 54:22
  66:13 72:21 80:21
  84:16 99:2 108:19
  126:9 137:19
  141:4 143:5 146:5
  157:17 160:1
  162:20 163:2
  165:11
**SBA** 68:12,18,19
  83:7 92:7,8
  105:18,18 112:2
  115:17 116:24
  123:10,13,14
  141:11 143:17
  144:17 154:21
  156:3 157:16
  166:22,23
**SBD** 3:20 86:9
  143:17
**SBDs** 83:9 84:18
  85:13,22 110:19

  113:16
**scale** 152:19
**scandal** 153:1,8
**Schlumberger** 14:2
**school** 41:15,18
**schooling** 34:3
**science** 11:22 12:8
  13:3 34:25
**scientific** 34:22
  41:20,21
**scopes** 92:21,22
**score** 92:9
**scores** 97:16,22,25
**scratch** 14:25
  153:11
**SD** 117:10
**SDB** 10:8 49:7 69:5
  69:18 70:2,8,9
  71:4,7 81:21
  82:23 84:3 86:17
  86:19,20 89:2
  105:20 109:21,22
  112:4,6,7,19
  113:17 116:25
  117:3,4,4 120:13
  130:20,22 133:17
  133:17,19,23
  135:13,17,18
  143:24 144:5,7,9
  144:10,14 145:9,9
  155:22 156:5,13
  159:16,24 160:14
  161:6 162:24,25
  163:1 164:3,7,10
  165:16,18
**SDBs** 45:24,25
  47:23 48:19 49:15
  69:9 82:4,6,7,10
  82:14,21,22 83:4
  85:13 106:18
  112:10 113:11,13
  116:22,23,24
  117:2,5 131:19
  133:21 134:16,16
  134:20,24,25
  135:12 142:14

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 66 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 340 of 814
Dale Patenaude                                           November 21, 2013

Page 191

143:22 144:1,2,3
144:15,18,18,20
144:22,25,25
145:1,3,4,4,5,5,8
145:10,11,12
153:10,10,10,17
153:19 155:15,17
155:18,18 156:2
156:16,18,24
157:14 158:10,10
158:14 160:2,5,7
160:10,15,18,20
160:21 161:1,1,10
162:6,13,21
**seal** 169:15
**search** 61:1,3
**searching** 70:7
**second** 57:21 60:2
72:4 79:10,12
80:7 86:23 94:13
141:6 142:25
160:13 162:8
**secondhand** 53:14
**Secondly** 5:4
**secretary** 102:9
**Section** 98:24,25
164:25
**sections** 155:23
**see** 9:5 14:21 16:7
30:2 32:8 34:18
35:24 36:2 44:18
59:17 60:24 61:3
68:23 70:8 72:7
77:20 80:21 86:13
88:21 93:17,19
96:17,18,18 98:16
99:12 100:11
109:19,20 110:17
110:17,19 118:12
121:7 123:23
124:23 125:18
130:18 149:20
150:5 154:8,8,13
162:5 163:22
**seeing** 118:9,10
152:22 166:6

**seeking** 151:23,24
**seen** 11:19 40:10
49:21 51:18 94:6
94:8 103:19 104:3
115:3 116:12,12
116:13 118:16
152:21 153:22,22
153:24,24,25
166:2,4
**sees** 112:16
**segregating** 116:20
**selected** 76:12
**self** 162:21,23
**self-certified** 82:21
82:22 135:17
142:13 143:22
144:5,6,25,25
145:1,3,4,5,5,10
153:11 160:25
162:12,17
**self-certify** 162:14
162:16,18
**sell** 30:13,16 104:4
104:6
**selling** 30:11
**Selma** 171:15
**send** 98:1,2,3,13,15
154:6,9
**senior** 2:8 13:12,14
41:15
**sense** 55:17 58:6
76:15,16 104:11
106:22 126:3,3
129:24 148:14
150:12 151:9
**sent** 68:15 98:6,8
114:8 154:11
**sentence** 75:24
107:1
**separate** 27:5,7
85:25
**September** 108:1
129:14 155:2
**sequestration** 97:2
**Serenity** 6:2
**service** 14:23 19:10

78:15 96:3,5,7,14
services 14:2 19:6,7
19:7,10 20:8
21:16,17,18,19,19
21:20,22 22:12
27:11 37:10 63:23
64:15,25 65:1
88:3 100:6 139:21
139:22 140:5
**services-disabled**
81:22
**service-disabled**
85:6,8,10,18,19
**set** 55:2 56:12,14
87:23,23 111:16
131:17 155:25
164:16
**sets** 89:14
**seven** 36:16 47:1
68:4 70:6,6 101:1
111:4 133:7
136:13,14
**shaded** 139:16
**shake** 36:21
**sheet** 141:4,5,6,7
141:12,12 157:17
**sheets** 141:5,8,10
**shock** 81:2,2
**shocked** 46:4 81:6
81:7
**shoots** 134:5
**short** 13:22 69:13
69:13 113:7
**shorthand** 1:20
170:11
**shot** 143:18
**show** 30:19,20,21
31:9 48:3,7,8,18
49:15 100:8 112:3
112:5 161:16
**showed** 18:12
30:16 49:3 84:9
110:11 154:1
**showing** 10:9 54:20
120:14
**shown** 49:1,1

123:17 145:9
151:22
**shows** 21:23 30:15
112:2,4 147:13
**SIC** 23:7
**side** 68:24 138:12
**sign** 4:11,13 164:23
165:1
**signals** 14:12
**signature** 3:8 168:1
169:2 170:19,24
**significance** 16:5,7
16:13,16,21 17:7
17:25 42:13 50:2
50:4 58:4,14,20
65:24 66:7,10
67:13 105:7
140:20 146:2,8,15
149:9,15
**significant** 17:22
18:1 50:5 57:24
58:23,24 59:8
104:16 149:11
159:19 163:24
**signing** 164:23
165:2,2
**similar** 9:20 64:11
112:14 128:14,19
150:16
**simple** 36:6,14
47:20 133:17
**simpler** 47:20
**simplistic** 107:5
**single** 28:18 81:12
82:18 147:19
**sir** 148:17 149:21
**sit** 44:12 112:23
**site** 83:7 109:2,22
157:16
**sites** 38:14,16,24
**sits** 36:13
**sitting** 73:2 121:24
**situation** 7:8 17:15
81:11
**situations** 7:22
125:8

**six** 18:8,8,9 20:14
20:18,20,23,23
21:23 22:9 36:16
42:21 59:17,20,22
59:25 81:23 92:17
111:4 128:22
136:13,14 141:5
**six-digit** 63:15
65:25 66:10 67:1
**size** 29:14 73:12,13
73:14,15 75:1,3,3
78:11 80:4,4,5
95:1 99:20 101:14
101:17 102:13
103:3,4 107:6,9
107:18,19,21,22
108:20 109:2
110:3,3 129:17
130:3,13,15,22
132:3,11,16,18
154:18 155:11
166:15
**sized** 92:9
**sizes** 135:19 147:12
**slide** 41:7,8,8,10,17
**slightly** 101:11
**slur** 32:1,1
**small** 1:6 2:11,13
4:7 7:20 14:13
26:13,14 27:14
29:10 35:22 54:15
56:6,9,14,21 57:3
61:16 64:2,5 67:7
84:21 92:8 95:3
108:8,13,19
109:23,23 110:1
112:24,25 113:3
117:7,7,8 121:25
125:10 130:9,25
131:2,3,5,14,17
131:18,20,24
132:19 133:1
134:21,23 137:19
137:22,25 155:10
160:1,1 164:3,6,7
164:8,9 165:7,21

165:22,23,25
166:6,8,17 170:6
**smaller** 85:17
92:20,21 102:14
**smart** 71:14 91:11
91:11 112:9
**snapshot** 119:8,9
119:23 120:16,24
**social** 11:22 34:25
52:8 53:1 161:2
**socioeconomic**
55:15 56:18
**soft** 48:6
**software** 43:25
44:3,5
**sole** 80:21 81:3,4
**solely** 69:17 71:7,7
**solid** 7:7 155:3
**solve** 40:20,22,22
40:23,24
**somebody** 48:10
52:21,21 60:25
64:8,9 71:13,19
71:20 79:3 86:19
89:9 90:25 95:16
116:25 117:3
130:2 132:21
153:6 161:8
**somewhat** 4:16
5:10 108:21
**sorry** 37:14 42:16
92:22 100:22,24
110:15,20 143:15
**sort** 27:6 38:17,18
42:2 43:8 44:3,19
48:3 54:21 60:17
60:18 67:8,8
97:15 103:3
130:18 151:10
**sorts** 44:11
**sound** 94:2,3
**source** 92:4 93:2,3
93:12 110:2,9
**sources** 92:10,11
**space** 77:3
**speaking** 37:1

148:20
**special** 2:13 34:12
147:6
**specialized** 105:14
105:15
**species** 92:20
**specific** 14:3 24:12
34:4 51:12 98:8
126:22 137:12
139:19 150:2
**specifically** 32:18
33:11 101:7
107:10 118:4
135:7 138:19
139:21
**specified** 156:2
**specify** 51:10,13
**speculating** 70:20
70:22
**speculative** 70:5
**speed** 156:22
**spend** 17:12,13
28:7 40:2,2
104:20 107:13
**spending** 124:25
**spends** 103:25
**spent** 18:16,16
47:10,17,18 104:2
104:17,23
**spin** 35:2
**spoken** 16:1
**spot** 48:6,6
**squat** 81:19 161:9
**staff** 103:2 123:16
**stand** 130:1,2
**standard** 23:8
24:11 18:20
129:17 130:3,13
130:15 132:3,16
132:18 133:1
155:11 166:15
**standards** 24:18,19
39:3 132:6,11
**standpoint** 26:6
**stands** 23:1 50:23
**start** 4:15 12:7 35:4

64:24 79:3 89:4,5
91:12 92:17 95:3
122:19 124:18
137:8,12,13
143:15
**started** 7:4 15:9
31:22 46:22 53:7
76:6 77:22 88:24
101:23 122:20,22
123:2,25 124:19
128:15,15 149:25
**starting** 72:8 79:4
92:17 96:24
124:14,15 138:18
153:1
**starts** 75:24
**STATA** 43:19
**state** 1:20 5:24 12:7
44:14 92:18 94:19
103:16 117:17
121:2 156:9 169:6
169:18 170:12
**stated** 1:23 54:7
129:4
**statement** 93:11,24
154:12
**statements** 18:6
109:2
**states** 1:1 4:5 51:9
57:22 159:24
170:1
**static** 103:13
**statistical** 12:24
16:4,7,13,16 17:6
17:25 18:1 23:14
23:15,23 24:2,8,9
24:14,16 25:19
34:4,6 35:10
43:18,22 49:24
50:2,4 58:3 65:24
66:6,10,16 67:13
70:18 94:8 105:7
148:2 149:8,15
150:1,3,7 151:15
151:17
**statistically** 17:21

58:6
**statistician** 32:23
49:18 59:10 66:5
150:10
**statisticians** 66:9
66:16 72:17 92:19
**statistics** 12:23
27:22 34:13 35:19
50:3,5 70:23
95:21 105:10
147:6 150:17
152:24
**status** 5:10 69:18
69:18 160:14
164:3,3 165:13
**statutes** 5:17
**stay** 73:23 88:19,20
101:9,14,16
102:13 103:7,10
125:12 131:24
132:11
**staying** 103:12
**steadily** 122:15
**step** 13:21 137:17
146:6
**stick** 52:10 113:7
**sticky** 4:21
**stop** 22:24 60:2
**stopped** 10:5 70:10
118:14 144:2,3
**story** 95:17
**straight** 31:12
42:20
**straightforward**
151:22
**strange** 5:12
144:10
**street** 2:14 17:18
53:4,5
**stronger** 108:16
**strongly** 75:15
**structure** 116:6,15
**stuck** 110:23
**studied** 18:12
**studies** 25:1 30:12
30:13,14,16,19

43:10,15,16 45:16
47:14 51:14,16,17
139:12
**study** 12:3,5 24:23
24:25 25:5 47:15
47:16 48:16,17
49:20,21 50:8
**stuff** 4:20 21:14
28:9,23 39:5 42:2
42:22 44:10,17,25
58:9,10 79:5 86:2
91:12,18 94:9
102:8 105:16
118:21 132:10
148:24 150:24
158:9
**stupid** 132:25
**subcontract** 84:3
156:20 157:12,14
157:22
**subcontracting**
82:11,12,14,19,23
82:25 83:5,17,19
131:19 155:23,24
156:1,1 157:1,3
**subcontractor** 55:8
55:9 98:10,14
156:16
**subcontractors**
61:1
**subcontracts** 56:17
56:20,23,24 84:3
**subjective** 35:3,8
152:1
**submit** 6:24
**submitted** 9:4
10:12,14 15:1
**subscribed** 169:12
171:10
**Subsequent** 13:20
**subsidiaries** 115:14
115:22 116:24,25
127:7
**subsidiary** 27:4,6
117:3 123:6,7
127:9 161:8

**subsidizing** 128:25
**substantially** 106:4
**subtracted** 145:6,6
 145:7
**successful** 87:24,25
**sue** 51:16
**suggest** 109:10
**suggested** 75:11,13
 75:14
**suggesting** 120:23
**suit** 7:21,24,25
**Suite** 1:21 2:5
 171:15
**Sullivan** 10:24
 11:23 18:20,20
**Sullivan's** 11:11,14
**sum** 145:10
**summary** 137:10
**supplement** 8:14
 8:17
**supplemental** 3:15
 113:21
**support** 63:23
 64:15
**supporting** 124:22
**supports** 20:25
**supposed** 10:5,5,7
 29:5 36:19 64:22
 69:9 82:9 108:18
 134:4,4 135:17,18
**supposition** 139:6
 139:9
**sure** 6:19 13:6
 19:14 22:15,19
 24:3 27:20 32:11
 32:15,19 33:7
 42:25 45:7 48:21
 51:11 55:3 56:14
 56:16 57:16,19
 58:3 60:13 61:24
 68:13 69:6 76:5
 83:18 86:1,2 90:4
 91:25 108:2 114:1
 114:16,20 115:9
 115:21,23 123:21
 125:9 129:9 131:1

131:15 142:17
 145:20 152:24
 154:9 157:11
 158:22
**surface** 45:23
**survey** 37:21,25
 38:11 146:7,10,11
**surveying** 19:11
**surveys** 37:21 38:7
 38:9,13 98:2,4
**survive** 91:13
**survived** 95:6
**surviving** 95:3
**Susie** 115:18
**suspect** 73:7
**suspicious** 99:23
**Suzanne** 137:1
**swear** 164:3
**sworn** 1:17 4:2
 170:14 171:10
**system** 23:3 36:17
 46:23 51:2 60:7,8
**systems** 46:21,25
 47:1
**S-I-C** 23:9
**S.W** 2:14

───────────────
            **T**
───────────────
**T** 3:11
**table** 3:21 77:1,5
 86:25
**tables** 65:21,23
**take** 12:21 19:17
 30:2,3,5 39:23
 42:23 43:1 44:8
 49:13 52:10 56:16
 62:4 69:22 70:1
 112:23 113:4
 114:19 138:11
 142:4 143:16
 145:24,24 147:4
 158:15 164:12,14
 165:8
**taken** 1:17 4:8 34:3
 34:6 51:18 171:7
**takes** 28:24 40:1

104:6 165:2
**talk** 18:3 22:7
 28:13 106:23
 135:25 161:10
**talked** 13:24 33:1
 53:11 54:1 92:24
 99:18 114:5
 117:15 149:10
**talking** 19:21 29:6
 29:7 42:20 77:22
 92:13 96:5 98:11
 150:1 151:14
 160:24 161:11
 162:9
**talks** 121:22
**task** 29:1 48:11
 104:10 121:24
 122:1,2
**tax** 44:15
**taxes** 132:4,4,5
**teach** 40:23 91:16
**team** 28:8
**technical** 28:2,2,5,6
 28:9,10 97:7,8
 99:3,6,8,8,10
 102:6 137:6
**technician** 24:5
**technicians** 33:24
**Technologists**
 27:12
**teeny** 69:13
**tell** 6:20 19:17,24
 20:3,10 22:7,8,9
 22:10,11,25 38:6
 44:18,20,22 46:10
 65:3 73:6 79:23
 81:10,18,19 84:23
 84:24 86:20,21
 98:4,5 123:21
 126:6 152:19
 161:9 162:20
 163:1 164:6
**telling** 154:25
**tells** 79:22 98:25,25
**ten** 19:18 33:22
 56:2 67:2 75:23

75:23 94:12,17,24
 95:1,6,9 101:2,12
 101:13,14,16
 110:13
**tendency** 11:20,22
**ten-minute** 43:1
**term** 25:13
**terminology** 19:15
 22:4
**terms** 27:24
**test** 33:23,25
**testified** 4:2 25:7,9
 25:10
**testimony** 6:8,11
 48:20,22,25
 145:19 170:16
 171:7
**testing** 140:9,10,12
**Texas** 1:20,22 2:5
 6:2 12:10,18 13:9
 44:14 46:23
 148:22 170:12
 171:13,15
**textbooks** 92:14
**Thank** 167:3
**themself** 135:17
**theoretically** 30:5
 161:1
**theory** 31:23
**thereabouts** 122:21
**thermodynamics**
 12:24
**thing** 14:8 19:20,22
 25:22 26:24 28:6
 28:8 41:5 42:19
 48:2,6 49:19 54:2
 54:21 55:19 58:17
 60:15 68:11 72:21
 73:25 75:21 87:12
 96:9 105:19,24
 120:20,24 121:22
 132:3 133:1
 140:12 142:8
 144:16,24 151:10
 156:12
**things** 4:16 10:9

13:7 14:5 18:24
 19:5,13,23 20:14
 22:14 26:23 28:11
 45:22 53:25 58:5
 63:4 64:2 65:16
 66:25 68:16 70:9
 72:16,22 73:16,21
 73:21 75:4 79:5,7
 79:22 84:23 87:24
 94:2 95:13,14,15
 97:3 98:23,24
 99:21 100:17
 106:22,24 107:1
 109:17 120:9
 126:1 133:19
 135:22 139:18
 144:24 148:19
 149:4 150:14,16
 150:22 151:8
 153:22 154:5
 160:8 165:9
**think** 5:2,21 7:3 8:5
 9:5 11:1,1,25 12:3
 13:5 18:13 19:2
 20:15 21:20 28:25
 30:24 31:5,7,25
 31:25 33:16 34:12
 34:15 35:10,13,13
 35:14,16 38:20
 43:5,16 47:11,24
 48:9,9,9 51:3,19
 54:2,3 57:6 58:21
 59:19,23,24 62:6
 62:8 63:6,17
 65:12,12 66:3,19
 69:16 70:11 71:24
 75:16,19,20 76:5
 76:7 78:2 81:25
 85:11 87:4 88:19
 93:7 99:1 102:16
 103:16 104:15,22
 107:2 108:1,2
 109:16 111:2
 112:19 113:12
 114:20 115:7
 118:14 120:3,5,5

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 69 of 73
USCA Case #15-5176   Document #1577653   Filed: 10/13/2015   Page 343 of 814
Dale Patenaude                                    November 21, 2013

Page 194

122:11 123:21
126:22 128:5,5
129:10 132:13
133:5,21 135:3
139:25 140:10
141:11 142:7,15
143:12 151:11
153:11,23 154:17
155:15 157:13,15
158:13 161:20
162:10 164:11,23
164:23 165:15,15
165:17 166:4
**thinking** 31:24
80:2 89:5 101:20
155:8
**third** 2:14 47:15
57:22 80:8 97:10
146:4
**thoroughly** 12:6
**thought** 11:16
116:19 117:25
141:23 142:3
154:19 166:19
**thousand** 46:15
163:17
**three** 6:22 14:25
16:25 17:9 19:8
19:12 20:2,21
22:1,10 29:10
38:14 41:19,23
42:19 47:14 59:17
66:22 68:6 73:19
74:20,22 77:1,5
77:24 86:25 89:4
94:12,20 95:8,25
101:25 116:18
117:14 121:18,19
124:20,21 127:3
136:5 144:13,14
144:22 166:20
**threes** 105:23
**three-digit** 65:17
65:18 66:18 99:14
100:9,12
**three-year** 108:8

109:6,7
**throwing** 29:18
**tied** 94:24
**tighter** 97:3
**tightrope** 127:12
**time** 4:22 7:2,23
28:7 29:17 40:1
40:13 41:2,3,19
46:22 48:9,13
53:6 62:1 63:22
79:15 97:5,23
103:17,20 104:17
104:20,24 106:4
108:1 109:10
110:8 114:21
118:25 119:3,8,9
119:23 120:24
122:8,10 124:1,11
142:9 144:12,12
151:14 154:22
155:1 164:5,5
166:16,25 171:1
**times** 17:1 36:16,23
56:1 62:20 75:1,1
75:5 83:10 94:13
94:17,20 95:18
101:3,12,13,14,16
127:22 166:8
**Tindall** 171:14
**ting** 82:24
**title** 37:6,6
**titles** 37:7
**today** 6:3 8:22 9:1
42:4 59:15 73:2
83:21 107:3
117:15 142:10
**today's** 31:19 95:2
**told** 53:13,13 76:5
86:17 123:6,13
131:12
**top** 29:5 41:16 65:3
65:15 75:23 81:23
137:18,18
**topic** 15:24 25:21
**topics** 9:15
**total** 24:6 68:17

80:5,6 108:10
133:15,19,20
139:5 145:8,9
146:25 147:7
158:24,25
**totality** 40:4
**totally** 80:11 85:25
92:25 93:15,17,21
124:14 126:12
143:23
**tough** 5:15
**training** 34:6,9,12
35:10 42:15
**transaction** 133:7
**transactions** 44:9
**Transcom** 88:1,2
**transcript** 170:15
170:23
**Transfer** 136:4
158:6 166:12
**transforms** 13:4,7
**transportation**
51:1,2 135:8
**treat** 119:15 123:7
127:10
**treats** 28:17
**trees** 35:24 36:1
**tremendous** 55:11
**trends** 150:24,25
**trial** 2:8 10:4 26:20
**tribal** 117:1,6,11
**tribe** 117:2
**tried** 53:24 112:1
130:17
**trillion** 125:22,23
**true** 64:5 164:19
169:2 170:16
**truly** 116:23
**trust** 24:18 126:19
**trustworthy** 125:17
125:17
**try** 48:15 69:18
108:13,13 127:24
129:16 135:23
155:6,6
**trying** 49:9,9 62:16

67:15,16 76:20
82:3,3,4,5 84:14
84:15,16 93:18
103:9 104:10
116:22 120:22
126:20 153:15,16
153:16,20,20
154:21 162:10
**turn** 57:20 155:9
**turned** 5:20 65:11
144:25 166:18
**two** 6:22 12:24 14:5
14:5,7,9,14 19:2,8
20:1 22:10 33:15
33:16,17 38:14
41:19 44:10 47:7
47:9 54:17 57:20
68:25 69:7 71:8,9
73:19 74:20,22
75:4,6 77:8 95:5
97:4,5 101:24
102:16 103:8
104:23,23,25
105:23 106:19
114:4 118:15
121:17,19,25
124:21,21 125:13
133:11 135:24
138:21 139:19
149:1 154:17
166:20
**type** 96:3,6 104:13
151:21
**types** 72:9,21
159:25
**typical** 125:7

———————
**U**
**Uh-huh** 15:5 72:11
77:7,10 80:23
93:13 101:5 121:8
121:11 122:17
159:23
**ultimately** 41:22
67:18
**un** 162:13

**uncapable** 32:2
**unclear** 162:9,11
**uncommon** 90:5
**unconstitutional**
22:21 52:6
**undefined** 22:5,5
**underbid** 79:19
**underlying** 68:25
**understaffed** 62:16
**understand** 5:2,3
40:14,17 41:13
42:13,13,15,22
51:8,13 58:11
59:5 67:4 71:18
71:22 76:7,11
77:11,13,14,16
79:18 95:13,14,15
97:12,14 100:22
110:15 115:20
121:2 124:17,17
127:11,13 134:18
142:6 143:23
162:7 163:3
**understanding**
77:15 162:12
**understate** 129:11
129:11,12 130:5
130:10
**understating**
129:22
**understood** 36:18
84:19 85:11
127:21 155:20
**unemployment**
34:21
**United** 1:1 4:5
170:1
**University** 12:9,18
13:9 46:23 148:22
**unsure** 145:22,23
**untruthful** 165:13
**unusual** 128:8,9
**update** 62:11
109:13,14
**updated** 109:4
**updating** 117:16

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 70 of 73
USCA Case #15-5176   Document #1577653   Filed: 10/13/2015   Page 344 of 814
Dale Patenaude                                    November 21, 2013

Page 195

upgrade 62:6
uphill 40:19
upped 160:8
upper 54:18
use 17:5 23:3 24:17
  28:16 38:12,15,19
  40:18 41:1,2,3
  42:4 43:6,8,21,24
  44:2,3 46:18,19
  46:20 64:12,14,14
  64:15 67:7,10,11
  72:15,25 73:1
  75:8,11,13 92:1,4
  92:11,25 94:1,1,2
  106:18,19 108:23
  110:6,7 120:23
  123:7 140:9
  157:13
uses 28:15 60:5
usually 80:3 140:7
  140:9,11 156:2
U.S 2:8,13 52:4

——————
V
——————
v 4:4
valid 38:20,21 39:5
  140:17
validly 139:7
value 38:8 97:7,9
  97:10 99:6 101:9
  108:5,6,7,10,13
  108:15 109:14
  111:6,15 158:24
values 46:12 68:25
  94:12 133:12
  160:8
variable 75:25 76:1
  76:4 84:22
variables 76:2,8,10
  81:20,24,25 85:4
  85:5
various 15:3 37:7
  38:24 51:9 64:8
  81:21 85:12,12
  94:9 132:21
vehicles 17:13

vendor 17:1,2,2,5
venture 27:10,10
  27:11,11 37:9,10
  37:13 63:3,4
  123:24 124:7,8,13
  124:22,25
ventures 27:10
  128:15
verify 62:21 66:12
  70:18 133:6 158:9
versions 6:18
versus 75:3 84:18
  113:11
veteran 81:23,23
  85:6,8,18
veterans 85:10,18
  85:19,19
viable 108:14
vice 37:8,9,10,14
  136:20
view 35:23 113:9
  134:21
viewpoint 131:25
  132:1
virtually 102:17
volume 16:23
voluminous 86:15
  151:2
VS 1:5 170:5

——————
W
——————
wade 4:21
wage 38:19,19,21
  38:23 39:1,2
  152:2,3,4,11,15
wages 152:12
Wainwright 16:20
  17:24 18:25 20:12
  28:11 36:9,11,13
  45:16 46:7,9
  47:12,16 50:7
  63:25 67:10 75:13
  75:14,16 82:18,19
  103:23,24 104:18
  104:24 121:21
  137:11 138:15

146:17 148:11
  156:23 161:19
Wainwright's 18:4
  137:10 147:14
  161:15
Wait 37:12
walking 127:12
Wall 53:4
Wal-Mart 126:7
want 4:11,16,21 5:5
  9:9 22:18 28:13
  32:10,19 42:23
  43:16 48:20 53:9
  53:23 60:17,21
  64:8,9 77:23
  96:17,18 98:1
  105:20 108:23
  112:23 132:17
  143:10 158:9
  162:14 164:9,11
  164:12,13,16
wanted 22:16,18
  32:15 34:15 96:16
  108:16 141:24
  155:16
wants 96:17
Washington 2:10
  2:14
wasn't 7:7 10:5,6
  71:10 120:22
  127:9 128:24
  157:10
water 17:2
wax 35:14
way 5:8 26:25 30:1
  42:10 57:5 78:23
  78:24 87:23
  101:12,18 123:16
  129:19 144:11
  148:14 150:10
  154:20 163:18,18
ways 42:11
web 38:14 83:7
  93:4,12 109:1,22
  157:16
website 141:11

143:17,17 144:17
week 40:2,3,3 47:2
weeks 40:2 47:12
  104:23,23
weight 107:6,10
  110:3
went 9:13 13:18,24
  14:18 18:5,23
  48:1 53:3,7,11,11
  54:22,25 62:13
  73:17 84:24 86:8
  88:25 90:23
  101:22,22 124:19
  125:3 137:11,15
  138:1 149:10
  155:2 157:15
weren't 50:5 51:18
  51:19 59:3 82:6,7
  84:18 88:9 124:24
  131:20 132:23
  135:16 153:18
we'll 117:14 154:8
  154:8
we're 17:2,2 19:19
  21:24 26:18 29:21
  33:21 37:23 38:12
  39:14,15,15,25
  42:20 43:4 49:7
  57:2,3,7,8 62:9
  79:2 87:25 96:5
  102:5 118:9,9
  140:11 152:22
we've 20:6 23:16
  28:22 29:10 37:24
  38:14 39:17,18
  44:10,10,12 54:23
  56:13 57:1,1,6
  59:14 62:24 68:2
  87:25 103:15
  113:2 117:20
  121:17 126:25
  132:21 153:24,25
  154:4 159:20
whatsoever 75:14
whip 69:7,19
whipped 71:24

white 31:14 53:23
  161:6
widely 72:10,13,22
  73:1,6
wide-ranging
  92:19
wife 7:17 27:3
  115:18 137:1
willing 133:3
win 39:20 47:24
  48:1 73:22,22,25
  74:23,25 75:1
  76:16 78:10,17,17
  79:11 84:10 85:9
  85:9,20 87:6 88:5
  88:6 94:13,18
  96:22 97:19 101:3
  101:8,10,12,13,16
  127:24 155:8
  157:8 163:7
winning 46:6 47:6
  47:21 48:4,5,7
  57:23 58:15 78:19
  78:25 79:1,2,12
  81:3,15,17,19,24
  82:1 84:18,21
  87:3,4,9,10,15,16
  87:17 97:24
  101:22 110:5
  153:21 159:24
  160:3
wins 112:3
wipes 145:16
wishful 31:24
witness 1:16 3:17
  5:2,21 6:15,17,20
  7:13 11:6 25:8,11
  25:15,15,20,23
  69:22,25 136:3,3
  136:20 140:23
  141:1,25 158:4
  168:2 169:5
  170:14,16
woman 54:23 137:1
woman-owned
  56:15,17 81:22

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 71 of 73
USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 345 of 814
Dale Patenaude                                         November 21, 2013

Page 196

84:21 85:14 130:9
130:16 136:23
**women** 52:15,15
**women-owned**
27:14,16 54:15,18
54:19 56:6,9,12
56:21 57:2,7,9
**won** 13:18,18 57:6
80:1 88:1 111:12
111:13,18,23
112:15 132:19
163:11
**wonderful** 97:13
140:16
**word** 87:20
**words** 21:21 118:7
**work** 4:6 10:7
14:18 18:13,15
21:6,7 23:23 24:5
24:5,20 27:21,22
29:4,17 32:3,25
33:5,9,11,14,20
34:15,17,18 37:20
37:24 38:2 40:25
41:10,24 42:4,12
42:20,22 44:25
45:12 47:19,20
49:23 50:10,14,18
61:23,25 66:8
67:5,15,16 72:24
83:17,20 85:2,3,7
86:16 91:6 96:13
96:24 98:9 99:10
102:1,2,11,25
103:13 104:7,13
105:25 107:13
117:5,12 124:20
128:21,24 129:2
136:22 138:24
147:23 148:3
149:1 150:7,15,17
155:17 156:16,19
**worked** 9:23 14:22
15:3 24:25 25:1
45:13 46:22 49:22
52:24 53:4,6,8

62:1,7
**working** 28:7 29:3
40:22 46:21,24
47:1 50:13 68:5
74:12 121:25
122:8 125:2 131:5
131:11 155:15
156:6
**workings** 48:12
**works** 50:16 51:7
104:1
**world** 7:8 31:19
126:7 151:11,25
152:1,12
**worried** 150:21
**worry** 39:2 44:12
44:13,14 90:12
**worrying** 116:20
**worse** 110:11 113:9
113:10,11
**worth** 10:8 38:25
42:15 46:13,14,14
65:7,8 67:11,12
74:18 76:6 81:12
81:13 83:1 88:14
88:19 89:3,5,7,8
89:11,11 91:6
97:10 99:2,3
101:8 102:1,3
106:15,16 108:22
113:15 124:15
127:6,17 130:19
130:23,24 132:23
135:22 147:2,18
**worthless** 46:17
82:14 107:18
108:24
**WOSB** 112:15,16
**wouldn't** 30:18,19
30:20,23 48:17,18
51:3 52:9 56:25
62:8 66:7 85:21
89:7 95:8 100:1
100:18 120:4
121:13 125:19,23
126:19 131:21,21

135:23 139:9
157:4,5
**write** 9:3 114:2
149:5
**writing** 148:20
154:6
**written** 15:11,14,20
25:25 26:2,3,25
83:1
**wrong** 36:17 40:11
40:13,19 45:22,24
45:25 58:9,10
59:13 61:8 101:11
120:23,24 152:15
152:20 159:16
**wrote** 9:21 102:6,7
**WSB** 130:14

## X

**x** 3:1,11 27:12
170:20

## Y

**Yale** 53:3
**yeah** 11:8 32:17
45:22 53:19 82:18
87:11 100:7,20
105:2 106:5
112:18 116:3,11
122:5,14 123:19
127:14 131:8
134:12 150:4,4
158:12
**year** 10:6,8 41:17
47:14 54:1,16
62:6,11,20 65:6
67:21 68:4,5
73:17,18 74:18,19
74:20,21 76:6
81:13 91:7 94:12
94:18,24,25 96:23
101:9 102:2,3,6
109:13,18 113:15
118:8,8,8,14,17
119:6 121:5,14,17
122:12 125:19,21

125:22,23 126:8,9
163:5,8,12
**years** 12:25 26:9,10
26:11,12,14 33:22
41:18,19,23 42:3
42:15,19 47:15
56:2 62:13 67:11
67:12 68:2 69:11
70:18 95:2,4,6,6,9
104:1 118:15
119:3 121:10
124:20,21 125:3
144:13,14,22
148:3 151:7
163:11 166:20,20
**yesterday** 4:19
11:3 18:4 20:12
46:7 140:1 141:17
141:22
**young** 52:22 53:18
53:21
**y'all** 11:7 36:2,2

## Z

**zero** 100:12 125:3
127:3 128:24
129:7 138:7
163:20,20
**zip** 21:24 22:11
**zones** 26:25

## $

**$1** 73:23 81:17
101:3,9,10 102:3
102:5
**$1,319,246** 110:18
**$1.1** 147:22
**$1.9** 73:24,25 74:21
**$10** 74:17 101:2,8,8
101:25 102:1,9
126:1 165:23,24
**$100** 102:20,22
125:19 126:9
**$100,000** 46:14
102:15 121:4,14
121:17,25 122:12

124:15 125:7
126:23 127:6,17
**$133** 125:22
**$14** 64:12
**$15** 39:1 83:12,13
**$150,000** 122:12
**$174,000** 147:8
**$190,000** 74:22
**$2** 73:24 74:25
81:17 104:5
**$20** 83:12,14 91:7
**$200,000** 102:16
**$25** 39:1
**$25,000** 81:16
**$30** 91:7
**$30,000** 69:2 71:1
**$400** 69:3 71:1
**$404** 126:7
**$416,000** 110:20
**$45,000** 147:10,12
147:18
**$50,000** 81:12,15
**$7** 64:6,7 140:11
**$8** 64:7 73:17,18,21
73:23 74:25
**$8.9** 113:15
**$82,000** 110:20
**$96** 147:2,8

## 0

**00:43** 171:4
**000171** 8:23
**03:35** 171:3

## 1

**1** 3:14 8:12,13
91:23 110:14
139:2
**1.176** 147:10
**1.2** 113:17
**1.3** 110:22 111:3
**1.9** 73:25
**1:00** 136:1
**1:07** 136:1,4
**1:49** 158:6
**10** 69:13 74:16

Case 1:12-cv-00744-KBJ   Document 44-9   Filed 01/31/14   Page 72 of 73
USCA Case #15-5176     Document #1577653     Filed: 10/13/2015     Page 346 of 814
Dale Patenaude                                                November 21, 2013

Page 197

139:3 145:15,15
145:17 158:14,16
158:17,18 159:1,2
159:2,5,15,17
**10:20** 43:3
**10:33** 43:3
**100** 18:16 20:17
21:3 24:3 25:2
50:4 84:1 103:11
105:4 154:9
**100th** 39:10
**100,000** 103:6,6,7
103:10 129:7
**100-people** 103:2
**11** 117:23,23,24
118:10 137:14
138:4,14 139:3,15
139:18 158:18
159:21,22,25
160:11 161:14,17
**11/21/13** 168:2
**11:41** 86:24
**11:53** 86:24
**12** 3:16 71:2 139:3
**12-CV-744-KBJ**
1:5 170:5
**12/31/14** 171:13
**13** 139:3
**133** 125:22,23
**13311** 6:2
**136** 3:6,19,20,21
**14** 77:5 139:3
**15** 61:9 139:3
**150** 18:17 47:1
**158** 3:6
**16** 139:3
**166** 3:7
**168** 3:8
**17** 139:3
**170** 3:9
**18** 139:3
**19** 139:3
**1972** 14:19 122:13
**1986** 144:19,23,24
**1995** 67:24

---
**2**
---
**2** 3:3,15 8:20,21
139:2
**2.9** 113:17
**2:00** 166:12
**2:01** 1:19 167:4
**20** 40:5 46:15 61:9
68:17 110:14
139:3 161:16,17
161:21
**200** 84:1 171:15
**200,000** 103:12
**2000** 7:3,5 9:14
118:10
**2003** 122:21,25
123:4,17,22
**2003/2004** 124:1
**2006** 124:19
**2007** 3:21 146:6,7,8
146:9
**2008** 144:2,4,7,9
162:23,25
**2009** 71:11 144:2,4
**2010** 71:11 118:13
**2011** 71:11 119:5
137:19
**2012** 67:15,16
69:11 71:13
117:18 118:5
**2013** 1:12,18 67:16
113:22 170:10
171:11
**20416** 2:14
**20530** 2:10
**21** 1:12 139:3
170:10
**21st** 1:18
**210** 171:16
**22** 139:3
**23** 139:4 146:23
**236115** 138:18
**24** 47:1 139:4
**2494** 171:13
**25** 40:5,5 83:24
139:4
**25th** 39:9,12,16

---
113:22
**250** 88:16
**2500** 47:15
**26** 139:4 147:13
**27** 139:4
**28** 139:4
**29** 139:4
**29,803** 145:1
**2900** 145:1,2

---
**3**
---
**3** 3:16 12:15,16
139:2
**30** 47:10,11,18 79:8
83:24 98:22
104:11 106:7
139:4,4,10 160:3
160:5,12 170:22
**30(f)(1)** 170:19
**300** 84:1 88:16
**304** 126:4
**31** 139:24
**310** 140:3
**32** 3:17 112:25
139:24
**32,000** 145:2
**33** 112:25 139:24
**34** 139:24
**35** 55:14 139:24
**36** 139:24
**37** 139:24,24
140:18
**380** 140:3
**39** 143:13
**39,000** 145:13
158:15
**39,424** 145:10
158:15

---
**4**
---
**4** 3:17 32:13,14
139:2
**4(a)** 42:1
**40** 26:9,10,11,12,14
121:10 148:3
**409** 2:14

---
**416,000** 110:22
**43,400** 145:13
158:16
**44,000** 145:21
**450** 139:12
**481** 138:13 139:5
139:10,12,24
140:19 163:16
**484** 125:18 126:10
**4920** 2:10

---
**5**
---
**5** 3:5,18 10:7 57:13
57:14 118:9 139:2
159:18,21
**5,000** 105:19
143:18
**50** 42:3 56:2 79:3
83:21,21
**50th** 39:9,11,14
**500** 1:22 2:5
**541** 21:4,4,8 140:2
**5413** 21:5
**5413s** 21:5
**54130** 139:16
**541310** 139:25
**541380** 140:7
**541511** 63:21 64:24
65:6 67:3
**541512** 63:21
**541513** 63:21
**541519** 63:22
**551** 147:8
**551,000** 146:23,24
146:25
**57** 3:18 122:7

---
**6**
---
**6** 3:19 136:8,9
137:7,8 139:2
**60** 14:11,12
**62,000** 147:2
**63** 21:13,15,17,18
**631** 171:14
**645** 171:15
**67** 46:24,25

---
**697-3400** 171:16

---
**7**
---
**7** 3:20 136:10 137:7
139:3 140:13,20
158:11
**7,000** 117:9
**7.7** 157:21
**7.8** 157:21
**7.85** 69:12
**7.9** 69:12
**7.94** 69:12
**70s** 132:1
**700** 117:8
**71** 12:13 14:21
**72** 14:21
**74** 147:4
**745** 1:21 2:5
**75** 26:19 40:6
**75th** 39:9,15
**750** 88:20 89:8
**76** 143:8,8
**7635** 142:19,21,22
143:3,4 144:23
**770** 3:21
**78212** 1:22 2:5
**78216** 171:15
**78232** 6:2
**79** 143:5 144:23
**7935** 142:13,15,18
144:23

---
**8**
---
**8** 3:14,15,21 69:1,2
69:6,14 70:3,4,10
71:2,5,10,14
120:8,10 136:8,10
137:7 139:3
145:24 146:1
156:3,3,4 157:20
157:21,22
**8a** 3:19
**8(a)** 7:25 31:2,10
36:21 51:4,23
52:1,13,15,17,25
53:9,11 55:12,12

Dale Patenaude                                    November 21, 2013

| | |
|---|---|
| 55:19 65:13 69:18 | **800** 117:8 |
| 71:3 78:16 81:21 | **811219** 140:7,11 |
| 81:21 84:5,7,8 | |
| 86:9,18,18 88:10 | **9** |
| 88:12,16 89:2,9 | **9** 139:3 143:11 |
| 89:13,15,21,24 | **9:15** 1:19 |
| 90:2,3,6,7,9,10,10 | **90** 26:18 85:14 |
| 90:13,15,21,23,23 | **95** 57:24 58:11 59:8 |
| 91:3,5,8,9,12 |   66:7,8 85:15 |
| 99:25 105:21 | **950** 2:9 |
| 109:22 111:5,7,11 | **96** 147:3 |
| 111:14,15,16,18 | **9600** 146:25 |
| 111:18,19,23,23 | **98** 7:4 |
| 112:3,4,5,19 | **99** 7:5 |
| 117:11,12,13 | |
| 119:11 120:13 | |
| 133:15 134:2,20 | |
| 138:1,3,4,14,14 | |
| 139:13 144:4,4,6 | |
| 144:7,8,9,11,13 | |
| 144:22 153:17 | |
| 160:3 162:11,11 | |
| 162:23,24,25 | |
| 163:23 164:10 | |
| 165:17,18,18 | |
| **8(a)s** 36:15 71:8 | |
| 82:4,5,6,10,15 | |
| 84:10,10,13 88:21 | |
| 91:4 110:17,22 | |
| 111:6,13,16 | |
| 113:10 117:9 | |
| 133:15,17 135:7 | |
| 142:8,9,11,12,13 | |
| 142:13,23 143:3 | |
| 143:16,17,21,21 | |
| 144:15,19,20,23 | |
| 145:3,6,7,11,11 | |
| 153:10,14,19 | |
| 154:2 161:1 | |
| 162:12,14,14,17 | |
| 162:21 | |
| **8.000** 68:24,24 | |
| **8.000001** 69:1 | |
| **8.9** 73:18 | |
| **80** 26:18 79:1 105:2 | |
|   105:3 | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ROTHE DEVELOPMENT, INC.,         )

             )

        Plaintiff,       )

             )

v.                    )      Civil Action No. 1:12-cv-00744-KBJ

             )

DEPARTMENT OF DEFENSE       )

             )

and                 )

             )

SMALL BUSINESS ADMINISTRATION,  )

             )

        Defendants.     )

_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE THE REPORTS AND TESTIMONY
OF PLAINTIFF'S EXPERT DALE PATENAUDE**

# EXHIBIT H: WIKIPEDIA ENTRY FOR LOGARITHMS

Case 1:12-cv-00744-KBJ   Document 44-10   Filed 01/31/14   Page 2 of 2
USCA Case #15-5176      Document #1577653      Filed: 10/13/2015   Page 349 of 814

# Logarithm

From Wikipedia, the free encyclopedia

The **logarithm** of a number is the exponent to which another fixed value, the base, must be raised to produce that number. For example, the logarithm of 1000 to base 10 is 3, because 1000 is 10 to the power 3: $1000 = 10 \times 10 \times 10 = 10^3$. More generally, if $x = b^y$, then $y$ is the logarithm of $x$ to base $b$, and is written $y = \log_b(x)$, so $\log_{10}(1000) = 3$.

The logarithm to base 10 ($b = 10$) is called the common logarithm and has many applications in science and engineering. The natural logarithm has the constant $e$ ($\approx 2.718$) as its base; its use is widespread in pure mathematics, especially calculus. The binary logarithm uses base 2 ($b = 2$) and is prominent in computer science.

Logarithms were introduced by John Napier in the early 17th century as a means to simplify calculations. They were rapidly adopted by navigators, scientists, engineers, and others to perform computations more easily, using slide rules



The graph of the logarithm to base 2 crosses the $x$ axis (horizontal axis) at 1 and passes through the points with coordinates (2, 1), (4, 2), and (8, 3). For example, $\log_2(8) = 3$, because $2^3 = 8$. The graph gets arbitrarily close to the $y$ axis, but does not meet or intersect it.

and logarithm tables. Tedious multi-digit multiplication steps can be replaced by table look-ups and simpler addition because of the fact—important in its own right—that the logarithm of a product is the sum of the logarithms of the factors:

$$\log_b(xy) = \log_b(x) + \log_b(y).$$

The present-day notion of logarithms comes from Leonhard Euler, who connected them to the exponential function in the 18th century.

Logarithmic scales reduce wide-ranging quantities to smaller scopes. For example, the decibel is a logarithmic unit quantifying sound pressure and voltage ratios. In chemistry, pH is a logarithmic measure for the acidity of an aqueous solution. Logarithms are commonplace in scientific formulae, and in measurements of the complexity of algorithms and of geometric objects called fractals. They describe musical intervals, appear in formulae counting prime numbers, inform some models in psychophysics, and can aid in forensic accounting.

In the same way as the logarithm reverses exponentiation, the complex logarithm is the inverse function of the exponential function applied to complex numbers. The discrete logarithm is another variant; it has applications in public-key cryptography.

**A000342**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------X
ROTHE DEVELOPMENT, INC.,           :
                                   :
        Plaintiff                  :   Civil Action No:
                                   :   12-CV-744
         -vs-                      :
                                   :   Pages 1 - 101
DEPARTMENT OF DEFENSE and          :
SMALL BUSINESS                     :
ADMINISTRATION,                    :
                                   :
        Defendant                  :
------------------------------X


Deposition of Robert N. Rubinovitz

Washington, D.C.

Monday, November 4, 2013


Reported by:  Kathleen M. Vaglica, RMR

Job No:  132788



USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 351 of 814

Page 2

1

2

3

4

5

6

7                              Monday, November 4, 2013

8                              (2:00 p.m.)

9

10    Deposition of Robert N. Rubinovitz, held at the

11    offices of:

12

13          The Center for Individual Rights

14          1233 20th Street, N.W.

15          Suite 300

16          Washington, D.C.  20036

17

18

19    Pursuant to notice, before Kathleen M. Vaglica, RMR,

20    a Notary Public in and for the District of Columbia.

21

22



```
 1                    A P P E A R A N C E S

 2

 3

 4    COUNSEL FOR PLAINTIFF

 5         DAVID F. BARTON, ESQUIRE

 6         Gardner Law

 7         745 E. Mulberry Avenue

 8         Suite 500

 9         San Antonio, TX  78212-3154

10         (210) 733-8191

11

12    COUNSEL FOR DEFENDANTS

13         ANDREW G. BRANIFF, ESQUIRE

14         Department of Justice

15         Civil Division, Classification Unit

16         1100 L Street, N.W.

17         Washington, D.C.  20530

18         (202) 616-0219

19

20    ALSO PRESENT

21         DAVID FISHMAN, ESQUIRE, SBA

22
```



Page 6

1          Thereupon,

2                    Robert N. Rubinovitz,

3     a witness, called for examination by counsel for the

4     Plaintiff and, after having been sworn by the

5     notary, was examined and testified as follows:

6          EXAMINATION BY COUNSEL FOR THE PLAINTIFF

7     BY MR. BARTON:

8          Q.   Good afternoon, Mr. Rubinovitz.

9          A.   Good afternoon.

10         Q.   It's a pleasure to have you here today.

11    And, hopefully, we'll move through this as quickly

12    as possible.  I think it is going to take a while,

13    but I'm David Barton.  I represent Rothe Development

14    Corporation as the Plaintiff in this case.  And

15    you've been called upon as an expert by the

16    government, I guess DOJ is the one that requested

17    your services, so you embroiled yourself in this by

18    choice.

19         A.   More or less.

20         Q.   Just a couple of preliminary things.  You

21    aren't on any kind of medication or anything that

22    would interfere with your thoughts?



Page 94

3       Q.   Okay.  He also asked you about the results

4    in your report.  Are the results in your report

5    consistent with a finding that SDBs face

6    discrimination?

7       A.   Yes.

8            MR. BARTON:  Objection.

9            THE WITNESS:  It would be consistent with

10   that finding, yes.

11   BY MR. BRANIFF:



USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 355 of 814

Page 96

15          EXAMINATION BY COUNSEL FOR THE PLAINTIFF

16   BY MR. BARTON:

17          Q.   Mr. Braniff asked you a question if the

18   data that you compiled was consistent with

19   discrimination, and you said that it was; is that

20   correct?

21          A.   Yes.

22          Q.   And what do you base that on?



1       A.   Just in the sense that the, my conclusions

2   show a lower likelihood of SDBs winning contracts

3   relative to other small businesses.  And, if they

4   were being discriminated against, they would also

5   have a lower likelihood.

6       Q.   But there could be other sources of it?

7       A.   Yes, there could be other reasons why,

8   absolutely.

9       Q.   How many other reasons do you think there

10  could be?

11      A.   I have no idea.

12      Q.   Had you discussed that, have you discussed

13  with DOJ, whether it be Mr. Braniff or SBA, that

14  that data is consistent with discrimination prior to

15  that question right there?

16      A.   Yeah.  In my prep, when we prepared for

17  this last week, they asked me that question.



Page 100

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3    I, Robert N. Rubinovitz, do hereby acknowledge I

 4    have read and examined the foregoing pages of

 5    testimony, and the same is a true, correct and

 6    complete transcription of the testimony given by me,

 7    and any changes and/or corrections, if any, appear

 8    in the attached errata sheet signed by me.

 9

10

11    _____          _____
12    Signature                     Date

13

14

15

16

17

18

19

20

21

22
```



Page 101

1                    CERTIFICATE OF NOTARY PUBLIC

2                    I, Kathleen M. Vaglica, the officer before

3       whom the foregoing deposition was taken, do hereby

4       certify that the witness whose testimony appears in

5       the foregoing deposition was duly sworn by me; that

6       the testimony of said witness was taken by me in

7       stenotype and thereafter reduced to typewriting

8       under my direction; that said deposition is a true

9       record of the testimony given by said witness; that

10      I am neither counsel for, related to, nor employed

11      by any of the parties to the action in which this

12      deposition was taken; and, further, that I am not a

13      relative or employee of any attorney or counsel

14      employed by the parties hereto, nor financially or

15      otherwise interested in the outcome of the action.

16

17

18                                  Notary Public in and for

19                                  District of Columbia

20

21      My Commission Expires:

22      February 14, 2016



May 5, 2006

# Race, Sex, and Business Enterprise: Evidence from Denver, Colorado

Prepared for the City and County of Denver, Colorado



## NERA
Economic Consulting

**MMC**  Marsh & McLennan Companies

ROTHE024774

USCA Case #15-5176     Document #1577652     Filed: 10/13/2015     Page 360 of 814

M/W/DBE Availability in Denver's Market Place

**Table 4.2. Professional Services—Number of Businesses and Industry Weight, by SIC Code**

| SIC Code | SIC Description | Number of Establishments | Industry Weight | Industry Weight (Cumulative) |
|---|---|---|---|---|
| 8711 | Engineering Services | 2,564 | 60.18 | 0.60 |
| 8712 | Architectural Services | 1,159 | 20.15 | 0.80 |
| 8741 | Management Services | 169 | 11.69 | 0.92 |
| 0781 | Landscape Counseling and Planning | 931 | 2.05 | 0.94 |
| 1799 | Special Trade Contractors, n.e.c. | 2,341 | 0.99 | 0.95 |
| 5065 | Electronic Parts and Equipment, n.e.c. | 524 | 0.98 | 0.96 |
| 1731 | Electrical Work | 2,319 | 0.87 | 0.97 |
| 4212 | Local Trucking Without Storage | 1,750 | 0.65 | 0.98 |
| 8734 | Testing Laboratories | 226 | 0.49 | 0.98 |
| 1542 | Nonresidential Construction, n.e.c. | 1,284 | 0.48 | 0.99 |
| 1629 | Heavy Construction, n.e.c. | 355 | 0.33 | 0.99 |
| 1794 | Excavation Work | 1,183 | 0.30 | 0.99 |
| 0782 | Lawn and Garden Services | 1,480 | 0.29 | 0.99 |
| 3993 | Signs and Advertising Displays | 456 | 0.28 | 1.00 |
| 8713 | Surveying Services | 305 | 0.27 | 1.00 |
| | TOTAL | 17,046 | | |

A000353

ROTHE024843

# Final Report

For the project entitled:

**Alaska Disadvantaged Business Enterprise Study – Availability and Disparity**
**Federal Project Number STP-000S(587) and 3-02-0000-005-2006**
**AKSAS Project Number 76463/53191**



Prepared by:

**D. Wilson Consulting Group, LLC**
Laurel Oaks Plaza
309-1 Ponce Boulevard
Jacksonville, Florida 32218

Prepared for:

**Alaska Department of Transportation and Public Facilities**
Civil Rights Office
2200 East 42nd Avenue
Anchorage, Alaska 99508

**June 6, 2008**

ROTHE013677

**ALASKA AVAILABILITY AND DISPARITY STUDY**

## Construction (Continued)

| NAICS CODES | NAICS DESCRIPTION |
|---|---|
| 236220 | Commercial and Institutional Building Construction |
| 237110 | Water and Sewer Line and Related Structures Construction |
| 237120 | Oil and Gas Pipeline and Related Structures Construction |
| 237130 | Power and Communication Line and Related Structures Construction |
| 237210 | Land Subdivision |
| 237310 | Highway, Street, and Bridge Construction |
| 237990 | Other Heavy and Civil Engineering Construction |
| 238110 | Poured Concrete Foundation and Structure Contractors |
| 562111 | Solid Waste Collection |
| 562112 | Hazardous Waste Collection |
| 238120 | Structural Steel and Precast Concrete Contractors |
| 238130 | Framing Contractors |
| 238140 | Masonry Contractors |
| 238150 | Glass and Glazing Contractors |
| 238160 | Roofing Contractors |
| 238170 | Siding Contractors |
| 238190 | Other Foundation, Structure, and Building Exterior Contractors |
| 238210 | Electrical Contractors |
| 238220 | Plumbing, Heating, and Air-Conditioning Contractors |
| 238290 | Other Building Equipment Contractors |
| 238310 | Drywall and Insulation Contractors |
| 238320 | Paint and Wall Covering Contractors |
| 238330 | Flooring Contractors |
| 238340 | Tile and Terrazzo Contractors |
| 238350 | Finish Carpentry Contractors |
| 238390 | Other Building Finishing Contractors |
| 238910 | Site Preparation Contractors |
| 238990 | All Other Specialty Trade Contractors |
| 324121 | Asphalt Paving Mixture and Block Manufacturing |
| 326299 | All Other Rubber Product Manufacturing |
| 327320 | Ready-Mix Concrete Manufacturing |
| 331210 | Iron and Steel Pipe and Tube Manufacturing from Purchased Steel |
| 332312 | Fabricated Structural Metal Manufacturing |
| 332313 | Plate Work Manufacturing |
| 332323 | Ornamental and Architectural Metal Work Manufacturing |
| 332510 | Hardware Manufacturing |
| 332996 | Fabricated Pipe and Pipe Fitting Manufacturing |
| 335129 | Other Lighting Equipment Manufacturing |
| 335313 | Switchgear and Switchboard Apparatus Manufacturing |
| 336411 | Aircraft Manufacturing |
| 336510 | Railroad Rolling Stock Manufacturing |
| 339950 | Sign Manufacturing |
| 339999 | All Other Miscellaneous Manufacturing |
| 483113 | Coastal and Great Lakes Freight Transportation |
| 483211 | Inland Water Freight Transportation |
| 484110 | General Freight Trucking, Local |
| 484121 | General Freight Trucking, Long-Distance, Truckload |
| 484122 | General Freight Trucking, Long-Distance, Less Than Truckload |
| 484220 | Specialized Freight (except Used Goods) Trucking, Local |
| 484230 | Specialized Freight (except Used Goods) Trucking, Long-Distance |
| 488390 | Other Support Activities for Water Transportation |
| 488490 | Other Support Activities for Road Transportation |
| 488510 | Freight Transportation Arrangement |
| 488999 | All Other Support Activities for Transportation |
| 532412 | Construction, Mining, and Forestry Machinery and Equipment Rental and Leasing |
| 562119 | Other Waste Collection |
| 562219 | Other Nonhazardous Waste Treatment and Disposal |
| 562910 | Remediation Services |
| 562991 | Septic Tank and Related Services |
| 562998 | All Other Miscellaneous Waste Management Services |

A000355

ROTHE013790

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ROTHE DEVELOPMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:12-cv-00744-KBJ |
| | ) | |
| DEPARTMENT OF DEFENSE | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SMALL BUSINESS ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF
<u>PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE</u>**

# EXHIBIT F: SULLIVAN REPORT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
ROTHE DEVELOPMENT, INC.,                         )
   Plaintiff,                                    )
                                                )
v.                                               ) Civil Action No. 12-CV-744-KBJ
                                                )
DEPARTMENT OF DEFENSE and                        )
SMALL BUSINESS ADMINISTRATION                    )
   Defendants.                                   )
_____)

**<u>REPORT OF PLAINTIFF'S EXPERT</u>**

John Charles Sullivan, Esq.
316B East Melrose
Baltimore, MD 21212

September 2, 2013
(served September 9, 2013)

I have been asked to review two documents: The first is the March 8, 2013 report filed in this case by defendant's expert, Jon Wainwright of NERA Economic Consulting. Defendant's expert explains his assignment in this case this way: "I have been asked to review the Minority-Owned Business Enterprise (MBE) disparity and availability studies submitted to Congress as well as other related studies and statistical materials." (Expert report, page 1)

Specifically, I am to examine whether, as defendant's expert report claims:

> Taken as a whole, my conclusion is that these materials contain significant evidence of large and adverse disparities facing minority businesses enterprises. Moreover I find that these disparities cannot be explained solely by differences between the minority and non-minority businesses in factors untainted by the effects of discrimination. Therefore, they are consistent with the presence of discrimination and its lingering effects in the small business contracting environment.

(Page 1) [and]

> After reviewing this material, I conclude that the studies submitted to Congress, taken as a whole, provide strong evidence of large, adverse, and often statistically significant disparities between minority participation in business enterprise activity and the availability of these businesses. Based upon the studies as well as the additional analyses I conducted for this report, I further conclude that these disparities are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination, and that these disparities therefore are consistent with the presence [of] discrimination in the business market.

(page 91)

1

Although the record in this case is voluminous, it is a triumph of quantity over quality. The controlling flaw of the Wainwright report, and especially its conclusion, is that the materials upon which the report is based and the report, as a whole, do not establish significant disparities sufficiently connected to the 8(a) program at issue in this case from to which to draw any particular conclusions. Much of the materials relied on in the expert report are irrelevant to this case and what is relevant is not persuasive.

Before turning to the specifics of defendant's expert report, I make two observations.

First, I stress that what the federal government defendant should have done, rather than rely on state and local disparities studies with no direct relevance to federal procurement, is to produce a reliable Benchmark Limits study.   In 1998, the Benchmark Limits study was performed by the US Departments of Justice and Commerce. This study used the outcomes of federal procurement in 74 different Standard Industrial Classification [SIC] codes. The purpose of the report was to determine "the level of minority contracting that one could reasonably expect to find in a market absent discrimination or its effects." (61 Fed. Reg. 63, 35714, June 30, 1998)

There is no successor to the 1998 Benchmark Limits study. The Benchmark Limits study is now 15 years old, rendering its data too stale to be relied upon. Unable to draw on a study which looks at federal contracting, the issue in *Rothe v. Department of Defense and Small Business Administration*, defendant's expert has instead settled for poorly done, marginally relevant disparity studies that look at contracting by states, counties, state Departments of Transportation, cities, a housing finance agency, a mosquito control district, a sewer district, airports, transit authorities, a toll highway authority, transit districts, a bi-county sanitary commission, a bi-state development agency, among others. None of these government entities provides data on direct federal procurement.  These are studies that cover anything other than direct federal government spending, as occurs in the 8(a) program at issue in this case, and consequently offer little to no support to justify the 8(a) program.

Better than the state and local disparity studies filling this record, a new Benchmark Limits study should be completed. This Benchmark Limits study should be limited to federal

2

contracting and be specific to the six digit NAICS codes levels. (NAICS stands for North American Industrial Classification System. It is the successor to the old SIC system.) For the most part, the disparity studies in this record use a limited number of industry groups at the two digit NAICS level: typically Construction, Professional Services, and Goods and Services. These two digit NAICS designations are overbroad.

To illustrate this point about NAICS codes, I will use Rothe Development. The two digit NAICS designation for Rothe is 54, Architectural, Engineering, and Other Construction Related Services. Within that classification, as the Defendant's expert's report sets out, are landscaping, drafting services, and building inspection services (pages 18 and 19), industries unrelated to what Rothe does. The proper level of analysis should be the precise six digit NAICS level: 54511, 54512, 54513, 54519, 541519, and 561210. I address this issue more fully below.

My second observation flows from the first. One reason a Benchmarks Limit study could offer a reliable source of information on potential disparities in federal contracting is that such a study would be done by the federal government. The 107 disparity studies in this record were not done by the federal government. All were done by disparity study companies, which may have a vested interest in finding disparities. Information detailing federal spending supplied by government agencies, if accurate, would eliminate that problem.

Such a document exists, at least in part. Every recipient of at least $250,000 in annual federal funds from the United States Department of Transportation must file with the USDOT a document called the Uniform Report of DBE [Disadvantaged Business Enterprise] Awards/Commitments (49 CFR 26). These Uniform Reports detail the total number of prime and subcontracts and prime and sub dollars awarded to Disadvantaged Business Enterprises (DBEs) and non-DBEs doing business with USDOT. I obtained the Uniform Reports filed by every state DOT for the most recent three year period available (federal fiscal years 2009-2011).

This limited, though significant snapshot of federal procurement shows that in terms of dollars received, DBE subcontractors were overutilized in 45 of the 48 states that reported that data. In twelve states (Delaware, Georgia, Illinois, Kentucky, Maine, Maryland, Mississippi, Missouri, New Jersey, New Mexico, South Dakota, and Wyoming) DBEs received more than

A000360

50% of all subcontracting awards, although they averaged only around 10% of availability (based on the state DOT's annual DBE goal) in those states. In eight states (Delaware, Georgia, Maryland, Mississippi, Missouri, New Jersey, South Dakota, and Wyoming) DBEs received more than 50% of dollars awarded to all subcontractors, though their average availability was only approximately 10% in those states. (See "Level Playing Fields? Utilization of DBEs in FHWA State-administered Programs," John Sullivan and George LaNoue, forthcoming.)   The dramatic overutilization shown in the Uniform Reports contrasts strongly with the fairly consistent findings of underutilization found in the disparity studies in the record of this case.

I have studied and worked with disparity studies and MWBE and DBE programs for more than 20 years. I have published widely on disparity studies, in scholarly journals, as well as newspapers and magazines. I have testified before a Congressional committee on the Benchmark Limits federal disparity. (See my CV below) In my expert report I apply my extensive experience and research in the field of disparity studies to examine the record offered by the government to support its 8(a) program. Doing so requires identifying flaws of the studies and occasionally making simple mathematical calculations.

Most of the materials in the record are 107 disparity studies, listed on pages 11 through 16 of the Wainwright expert report. The disparity study industry began in 1989, as the result of the Supreme Court decision *City of Richmond v. Croson*. (488 US 469) Since that 1989 decision, disparity studies are necessary to justify preferences in state and local contracting. Regarding the disparity studies listed in the expert report, I will address:

4

# I. IRRELEVANT MATERIALS IN DEFENDANT'S EXPERT REPORT

## A. THE IRRELEVANCY OF THE DISPARITY STUDIES NOT "SUBMITTED TO CONGRESS"

The Wainwright expert report includes more than 30 disparity studies (of 107) which were not "submitted to Congress." (Page 10) These studies, irrelevant to this case are:

City of Oakland and Oakland Redevelopment Agency; Tallahassee, Florida; Leon County, Florida; School District of Hillsborough County, Florida; Georgia Department of Transportation (2012); Illinois Department of Transportation; Kansas City, Kansas City School District, Wyandotte County, Kansas City Area Transit Authority (Missouri and Kansas); Baltimore, Maryland (2000); Boston, Massachusetts; Massachusetts Division of Capital Asset Management; Metropolitan Airports Commission (Minnesota); Metropolitan Council (Minnesota); Metropolitan Mosquito Control District; Metropolitan Sports Facilities Commission; Minnesota Department of Administration; Minnesota Department of Transportation; St. Louis, St. Louis Housing Authority, Metropolitan St. Louis Sewer District; Missouri Department of Transportation; Charlotte, North Carolina (2003); Durham and Durham County, North Carolina; Cincinnati, Ohio; Cleveland and Greater Cleveland RTA; Portland, Oregon; Oregon Department of Transportation; Portland (Oregon) Development Commission; Fort Worth, Arlington, DFW Airport, Fort Worth Independent School District, Forth Worth Transportation Authority, North Texas Tollway Authority; Houston, Texas (2012); Dallas Rapid Transportation Authority (Texas); San Antonio Water System; state of Texas (2007), Virginia Department of Transportation. (Pages 11-16)

Studies that are not before Congress cannot be used to justify a Congressional program. There is no evidence in the defendant's expert report that the disparity studies listed above and cited in the report have any connection to any Congressional findings with respect to the 8(a) program. There is no evidence in the record that Congress intended the 8(a) program to be the

5

remedy for any of the problems claimed in these disparity studies which were never submitted to Congress. These disparity studies never submitted to Congress, representing approximately one-third of the voluminous record in this case, are simply not relevant to this case. Nor is it clear why some disparity studies were submitted to Congress while others were not.

## B. FLAWED AND IRRELEVANT POPULATION DATA

On pages 2 and 3 of his expert report, Jon Wainwright states that, "Blacks, for example, represent 14.0 percent of the general population, 12.0 percent of the civilian labor force, 11.2 percent of total employment, and 12.5 percent of total money income. However, Blacks own only 7.3 percent of the nation's businesses, and these businesses earn a mere 1.25 percent of all business sales and receipts.

"For Hispanics the situation is similar; they represent almost 16.3 percent of the general population…However, Hispanics own only 8.6 percent of the nation's businesses, and those businesses earn only 3.2 percent of all business sales and receipts….

"For American Indians and Alaska Natives, the trend is similar…."Asians and Pacific Islanders might appear to be an exception….However, similar to other minority groups their share of business sales and receipts, at only 4.7 percent, is substantially lower than their proportional representation in the business population." (pages 2-3)

These statements cannot support any alleged determination of discrimination in federal contracting or any other scenario than speculation. Consequently they should have nothing to do with the enactment or reauthorization of the 8(a) program. General population rates are ultimately irrelevant to disparity studies since they fail to relate in any way to comparisons limited to those contractors which are "qualified, willing and able" to perform public contracting. General population statistics cannot meet this standard. ("Standards for the Second Generation of *Croson*-Inspired Disparity Studies," George LaNoue, *The Urban Lawyer*, Volume 2, Number 3, pp. 485 and following, summer 1994)

A000363

## C. FLAWED AND IRRELEVANT GEOGRAPHIC DIVISIONS

On page 19 of defendant's expert's report, is this statement: "the 107 studies in Table 1 span the country geographically. The Census Bureau divides the country into nine regions and nine divisions."

Since this case involves a facial challenge to the 8(a) program, it should be noted that Dale Patenaude, vice-president of Rothe Development, Inc., explains in his May 8, 2012 affidavit filed in this case: "Rothe bids on and performs prime contracts *nationwide*...that are let directly by DoD and by the military departments (Army, Navy, Air Force) under DOD's civilian control. Rothe also bids on and performs subcontracts *nationwide*..." (Affidavit, p. 4, emphasis added) There is no disparity analysis in defendant's expert report which applies to plaintiff's nationwide business.

For the following reasons the Census Bureau geographic regions and divisions are irrelevant to this case. Rothe contracts nationally, not by Census Bureau geographic regions or divisions. These divisions and regions are merely artificial, unhelpful classifications. They are irrelevant to the computer-related work Rothe performs for the DoD, which the agency contracts for around the country, as Mr. Patenaude's affidavit makes clear.

The affidavit of Mr. Patenaude is obviously important to this case, yet Mr. Wainwright's expert report seems to have overlooked it. In the affidavit Mr. Patenaude explains that Rothe Development works in five North American Industrial Classification System codes. The expert report ignores this and claims that Rothe does works in Architectural, Engineering and Other Construction Related Services.

Who knows better than Mr. Patenaude, the vice-president of Rothe, a man who has worked at Rothe Development more than forty years (Affidavit page 1), what it is that Rothe does? In his affidavit Mr. Patenaude is clear that, "Rothe bids on and performs prime- and sub-contracts primarily in five North American Industry Classification sectors (NAICS)..." These sectors are then listed: 541511, 541512, 541513, 541519, 561210 (Affidavit, page 3), keeping in mind that

7

these industries are listed for illustrative purposes intended to provide some context for Rothe's facial challenge.

Also, the listed sectors do not include Architectural, Engineering and Other Construction Related Services. All Mr. Wainwright needed to do to avoid this mistake would have been to consult the affidavit, written ten months prior to his expert report. There is no evidence of what was done regarding this issue.

This case is **not** limited to the industries in which Rothe Development works. My point here is a larger one: defendant's expert report does not supply justification for the race conscious 8(a) program, in part because the report pays too little attention to the realities of public contracting, such as the work the plaintiff does or might want to do.  Of the many thousands of disparity ratios in the 107 disparity studies, **none** of them is precise to any of the five digit NAICS codes in which Rothe Development competes for federal contracts.

## II. DISPARITY STUDIES SHOWING *OVER*UTILIZATION OF MWBE

Table 5 (pages 24-35 of defendant's expert's report) is titled "MBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. since 2000." Table 5 shows disparity ratios for each of the 107 disparity studies in three sectors of the economy: construction, construction-related professional services, and other professional services. These are all industries on the two digit NAICS level. The results are varied, depending on the study and economic sector. In five studies all three economic sectors show overutilization of MWBEs. These studies are:

OVERUTILZTION OF MWBEs

| JURISDICTION/AGENCY (Bates numbered page range) | DISPARITY STUDY AUTHOR |
|---|---|
| Tucson, Arizona (28317-28628) | Wilson Consulting |
| Pima County, Arizona (28629-28801) | Wilson Consulting |
| Minnesota Department of Administration (50481-50764) | MGT |
| Cincinnati, Ohio  (63798-63906) | Griffin & Strong |
| Milwaukee, Wisconsin (57069-57260) | Wilson Consulting |
|  |  |

8

In these studies not only was statistically significant underutilization of MWBEs not shown, but there was OVERutilization of MWBEs. Often MWBEs were massively overutilized. In the Tucson, Arizona study the construction disparity ratio was 998.53 – meaning MWBEs got construction contract dollars at nearly ten times the expected rate. That result is clearly no evidence of discrimination against MWBEs in construction. In the Minnesota Department of Administration study (50481-50764) MWBEs received more than three times their expected share of Other Professional Services. That scale of overutilization cannot be evidence of discrimination against MWBEs.

Nor is there evidence of discrimination against blacks in a disparity study for Peoria, Illinois, a study not among the 107 disparity studies but that is part of discovery documents supplied to me. The Peoria study concluded that, "While there is no evidence of discrimination by the City of Peoria, Illinois in its utilization of black-owned businesses…" (p. 36) One disparity study that is among the 107 studies, the D. Wilson Consulting company's study for Montana DOT (32140-32427), recommended a race neutral program for construction. At least in that industry the Minnesota DOT study cannot be seen as justification for the race basis 8(a) program. In the Baltimore NERA study (31316-31663), Asians were overutilized in all procurement groups. (Table 7-14, p. 217) The BBC study for a Georgia consortium in and around Albany (20591-20929) found no underutilization of MWBEs. The 2004 MGT disparity study for North Carolina Department of Transportation (34043-34464) was subjected to judicial analysis in *H.B. Rowe v. W. Lyndo Tippett*. The Fourth Circuit found that the study did not justify preferences for Asian American or Hispanic American subcontractors. (615 F.3d 233)

The inclusion of these disparity studies in the record of this case -- studies which show overutilization or which recommend race neutral rather than a race conscious remedy like the 8(a) program, or a study found by a circuit court to fail to support preferences for certain groups – is another example of the unacceptable "quantity over quality" nature of the record here. In defendant's expert report it is unacceptable that there is no consideration of what impact such variations might have or should have had on enactment or reauthorization of the 8(a) program.

9

And, as stated above, these are disparity studies covering state and local, not direct federal, procurement.

## III.  FLAWS OF DATA IN THE DISPARITY STUDIES – CENSUS,  STALE AND DEFICIENT OR INCOMPLETE DATA

### A. CENSUS DATA CANNOT SUPPLY ACCURATE AVAILABILITY

On page 8 of defendant's expert report, appears this claim: "Evidence of economy-wide discrimination in disparity studies can take several forms." Two examples are given, regression analyses (dealt with later in my report) and disparity indexes "using data from the Census Bureau's *Survey of Business Owners* (SBO)."

A disparity index (more frequently referred to as a disparity ratio) compares the availability of qualified, willing and able MWBEs and DBEs to the availability of all firms qualified, willing and able to contract with the government. The key to any properly done disparity study is its approach to measuring availability. Jon Wainwright's employer, NERA**,** recognized the importance of availability as far back as 1990, stating, "Availability analysis is the Achilles heel of *Croson* disparity studies … A defective availability analysis can make a *Croson* disparity study worthless. ("An Examination of the Existence and Sources of Disparities between the Availability and Utilization of Minority and Women-Owned Business Enterprises for New York City Procurements," draft proposal, p.3, quoted in "Who Counts? Determining the Availability of Minority Businesses for Public Contracting after *Croson*," by George LaNoue, *Harvard Journal of Law & Public Policy*," summer 1998, pp.798-99)

The Survey of Business Owners (SBO) cited in the defendant's expert report on pages 3 and 57-58 is a Census Bureau publication. The most recent data in the SBO are from 2007. (Page 3) The SBO includes all firms, even those with no paid employees and consequently limited capital and resources. There is no indication whether firms in the SBO are interested in public contracting. SBO supplies nothing more than a headcount of all businesses in a certain

10

**A000367**

geographic area. The SBO data does not show whether all firms in its data set could qualify as an 8(a) firm due to the limits on firm size and owner wealth. The SBO is an inherently overinclusive availability source.

Mason Tillman Associates, which has 22 disparity studies in the record in this case, has been critical of the use of Census data to determine availability: "A company's interest in contracting with an entity cannot be established from Census information. Thus the difficulties associated with the census preclude an accurate assessment of M/WBEs." ("Who Counts? Determining the Availability of Minority Businesses for Public Contracting after *Croson*," George LaNoue, *Harvard Journal of Law & Public Policy*, volume 21, number 3, pp. 801-02, summer 1998)  The NERA disparity studies in the record often rely on Census data. The Illinois Tollway study, for example, includes data from the 2002 SBO (p. 6). (61237-61365)

Econsult of Philadelphia produced a disparity study for that city which is not among the 107 studies listed in the defendant's expert report but which is part of the discovery materials I received. The Econsult study explains that, "The majority of the availability study used in our study comes from the Economic Census conducted every five years by the US Census Bureau. In particular, we used the Survey of Business Owners (SBO) …" (p. 41)

The whole point of the qualified, willing and able requirements for determining availability is to start with the universe of firms, then winnow down those firms until those left are those firms truly available for public contracting. Census data does none of that winnowing.

The United States Department of Transportation recognizes this flaw of Census data and suggests their recipients avoid using Census data in setting their DBE goals. In the USDOT's online advice, "Tips for Goal Setting in the Disadvantaged Business Program" USDOT states, "census data represents all the firms in your area whether or not they are ready, willing and able to perform DOT-assisted contracts." ("Setting Goals in the Federal Disadvantaged Business Enterprise Programs," George LaNoue, *George Mason University Civil Rights Law Journal*, volume 17, number 2, pp. 440-441, spring 2007.)

A000368

The United States Department of Transportation is right. Census data is not limited to those firms which are ready (the USDOT synonym for qualified), wiling and able. Consequently, disparity ratios based on Census data cannot supply evidence of discrimination.

## B. STALE DATA CANNOT SUPPORT THE 8(A) PROGRAM TODAY

While there is no judicially enforced "bright line test" for data that is too old to be informative for the 8(a) program today, much of the data in the disparity studies listed in Defendant's expert report is clearly not reasonably up to date.

Staleness has been addressed by the United States Commission on Civil Rights (UCCR): "Recommendation 1: States and localities must discard disparity studies conducted using data that is more than five years old. The results are too outdated to justify preferential awards give today. Researchers must use current data." (USCCR Briefing report, p.76)

For example, some of the tables in Chapters V and VI of NERA's New York study (15043-15336) are derived from data certainly too old to be considered reasonably up to date. One example is Table 5.3, Annual Wage Earnings Regressions, All Industries, 1992-2008. Older still is Table 5.2, Annual Wage Earnings Regressions, All Industries, 1980-1991. 1991 and 1992 are more than two decades ago and 1980 is more than three decades in the past. This data is not reasonably up to date.

Chapter VI of the NERA New York study includes "data from the Federal Reserve Board to examine the existence or otherwise of discrimination in the small business credit market for 1993, 1998, and 2003." (p. 187) The study concludes: "These data provide qualitative and quantitative evidence consistent with the presence of discrimination…" Even assuming that conclusion's accuracy, how persuasive in 2013 is data from the 1990s? How relevant to the 8a program is data from the 1990s when that stale data derives from the housing market with no evaluation of the data as it might apply to federal procurement? It cannot be relevant.

12

NERA is not the only disparity study company which relies on outdated data, as my chart below – derived from Tables 1 (pages 11-16) and Table 5 (pages 24-35) of defendant's expert report - shows:

DISPARITY STUDIES WITH STALE DATA

| JURISDICTION | DISPARITY STUDY AUTHOR | OLDEST DATA |
|---|---|---|
| Birmingham, Alabama | Pendleton, Friedberg, Wilson & Hennessey | 1999 |
| Broward County, Florida | MGT | 1991 |
| Tallahassee, Florida | MGT | 1996 |
| Georgia Department of Transportation | Boston Research Group | 1999 |
| Kentucky | Griffin & Strong | 1995 |
| Baltimore, MD | MGT | 1990 |
| Washington Suburban Sanitary Commission (Maryland) | BBC | 1999 |
| Boston, Massachusetts | Mason Tillman Associates | 1999 |
| Massachusetts Division of Capital Asset Management | NERA | 1999 |
| Bi-State Development Agency (St. Louis, Missouri) | NERA | 1997 |
| St. Louis; St. Louis Housing Authority; Metropolitan St. Louis Sewer District | MGT | 1995 |
| Durham and Durham County | Mason Tillman Associates | 1996 |

13

| North Carolina Department of Transportation (divisionally let contracts) | MGT | 1999 |
| Cleveland and Greater Cleveland RTA | Mason Tillman Associates | 1999 |
| Consolidated Government of Nashville County (Metro Purchasing; Metro Nashville Public Schools; Nashville Electric Services; Metro Development and Housing Authority; Metro Transit Authority) | Griffin & Strong | 1999 |
| Dallas, Texas | Mason Tillman Associates | 1997 |
| Dallas Area Rapid Transit Authority (Texas) | Mason Tillman | 1996 |
| Commonwealth of Virginia | MGT | 1998 |
| Virginia Department of Transportation | MGT | 1998 |
| Washington Department of Transportation | NERA | 1999 |

To repeat the question I posed above: How persuasive in 2013 is data from the 1990s? Too much time has elapsed for this stale data to be evidence of discrimination today. The United States Civil Rights Commission certainly agrees. In its May 2006 report, "Disparities as Evidence of Discrimination in Federal Contracting," the Commission recommended that "States And localities must discard disparity studies conducted using data that is more than five years old." (p. 76) Note the mandatory requirement: "must discard."

14

**A000371**

## C. DEFICIENT DATA

The Mason Tillman study for a consortium of four Kansas City government entities had no utilization data for three of those jurisdictions: the Unified Government of Wyandotte County/Kansas City, Kansas; the Kansas City, Missouri School District; and the Kansas City Area Transportation Authority. Without utilization data it is simply impossible to determine if underutilization, let alone discrimination, has occurred. On that basis alone, the data for this disparity study in the record supplies no support for the 8(a) program.

One methodological deficiency found in a number of the studies is poor subcontracting data. The disparity study done for the Commonwealth of Kentucky (30803-30998) makes this admission: "Griffin & Strong, P.C. was unable to secure subcontracting/sub-consulting dollars from the actual contract files during the data collection effort, simply because the contract files do not contain the data relative to sub-contracting or sub-consulting activities." (p. 39) The study then explains why this deficiency is so problematic: "Smaller sub-contracting opportunities are so often where much of the MWBE utilization is found." (p. 39) In other words, this problem not only weakens the accuracy and comprehensiveness of these studies, the deficiency tends to understate MWBE utilization. Understated MWBE utilization results in overstated MWBE disparities.

The NERA Maryland (62373-62695) study's subcontracting data is also incomplete and unreliable. The study is correct when it states, "Non-MBE subcontracting records are equally as important as MBE subcontracting records for purposes of evaluating contracting affirmative action at the level of detail specified by *Croson*." (p. 50) However, the study's effort at satisfying this standard failed. The study authors "embarked on a joint effort [with the State] to reconstruct five years of relevant subcontracting data." (p. 50) The State's records were so limited that while the original database of contracts totaled $16.7 billion over fiscal years 2000-2004 (p. 49), the final database used by the study included barely half that many contract dollars awarded, $8.57 billion. (p.51)

15

The Mason Tillman New Jersey study (32428-32815) likewise conceded, "None of the State Agencies, Authorities, and Commissions [covered by the study] maintained comprehensive records." (vol. II, p. 2-1)   Deficient data makes for disparity ratios which are not reliable indicators of disparity, let alone indicators of discrimination.

But even if the problem of deficient data were solved, the 107 disparity studies in the record do not address federal procurement, which is at issue in this case.


## IV. THE DISCONNECT BETWEEN THE EXPERT REPORT AND THE 8(A) PROGRAM – SOCIAL AND ECONOMIC DISADVANTAGE

In this part of my expert report I examine how the defendant's expert report is disconnected from the subject of this case, the Small Business Administration's 8(a) program. I begin by contrasting the treatment of white women in the SBA's 8(a) program with that of the USDOT's Disadvantaged Business Enterprise program and state and local MWBE programs.


### A. SOCIAL DISADVANTAGE

The Small Business Administration's 8(a) program

The 8(a) program was established in 1978, in the Small Business Act. The purpose of the Act is to assist "small business concerns owned and controlled by socially and economically disadvantaged individuals." (15 U.S.C. section 631 (f) (2)2006)

The Small Business Act defines "socially disadvantaged individuals" as those who "have been subjected to racial or ethnic prejudice because of their identity as a member of a group..." In the Act, Congress designated Black Americans, Hispanic Americans, and Native Americans to be presumptively socially disadvantaged groups in the Small Business Administration's 8(a) program. (Public Law 95-507, 92 Stat. 1760) Two years later Congress amended the Small Business Act to add Asian Pacific Americans as a presumptively disadvantaged group. (Public Law 96-302, 94 Stat. 833) In 1982, by regulation the SBA added the category now known as

16

Subcontinent Asians. (13 CFR 124.103 (b)) (I have written about this evolution of groups gaining 8(a) status as socially disadvantaged in "Presumption for Preferences: The Small Business Administration's Decisions on Groups Entitled to Affirmative Action," with George LaNoue, *Journal of Policy History*, volume 6, No. 4, pp. 439-467, 1994)

In the 8(a) program, women of color are presumed socially disadvantaged by virtue of their race or ethnicity. White women are not presumed socially disadvantaged in 8(a). This different treatment of white women is important to this case.

<u>DBE and MWBE Programs Do Include White Women as a Group</u>

The United States Department of Transportation requires its recipients of at least $250,000 in USDOT funds to develop a Disadvantaged Business Enterprise (DBE) program. (49 CFR 26) While the DBE and 8(a) programs use the same definition of racial and ethnic groups (Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent Americans) which are presumed deemed "socially disadvantaged," the groups considered socially disadvantaged differ in one vital way: in the 8(a) program white women are not considered disadvantaged, while in the DBE program (49 CFR 26.5) they are.

There are 35 disparity studies in the record covering DBE programs. The state Department of Transportation programs examined in these disparity studies are:

Alaska; Arizona; California   Colorado; Georgia;   Hawaii; Idaho; Illinois; Indiana; Maryland; Minnesota ; Missouri; Montana; Nevada; North Carolina; Oregon; Tennessee; Virginia; and Washington. The record also includes many agencies within state DOTs: Bay Area Rapid Transit in California; San Mateo County Transit District in California; Denver International Airport in Colorado; Tampa and Hillsborough Aviation Authority; Memphis International Airport; Salt Lake City International Airport ;Los Angeles County Metropolitan Transportation Authority (California);Metrolink Southern California Regional Rail Authority; Orange County Transportation Authority and  San Diego Metropolitan Transit System, both in California; Atlanta, Georgia Airport; Illinois State Toll Highway Authority; Metropolitan Airports Commission (Minnesota); Nashville International Airport Authority, both in Tennessee; Dallas Area Rapid Transit Authority (Texas).

A000374

The remainder of the 107 disparity studies in the record address state and local Minority and Women Business Enterprise (MWBE) programs. Obviously, as the acronym explains, white women are included as a group in these M*WBE* programs.

It is important to this case that the 8(a) program does not consider white women socially disadvantaged, while the DBE and MWBE programs do.

A look at the disparity studies in the record explains the importance of this difference. There are 107 disparity studies in the record – none of them is devoted to the 8(a). This means that in every disparity study in this record white women – who are not as a group eligible for 8(a) – are part of the availability calculations and are part of the disparity ratios derived from these availability percentages. About these disparity studies the defendant's expert report contends: "A disparity index of 80 or lower is commonly taken as a strong indicator that discrimination is adversely affecting MBEs." (p. 22) The problem with that conclusion is that these disparity indexes (usually referred to as disparity ratios) do not reflect the 8(a) program and so should not be used to justify the 8(a) program at issue in *Rothe v. Department of Defense and Small Business Administration.*

That sentence might be excessive if white women were only a small part of the availability percentages in the 107 disparity studies in the record. But white women consistently represent a large part of the firms seen as available in these studies. In the Denver study, for example, white women form about two-thirds of the available professional service firms (p. 71). In the Griffin & Strong study for the City of Durham and Durham County, North Carolina (63471-63626) white women outnumbered all MBE groups combined in construction, goods and supplies, and professional services. (p. 75)

A crucial disconnect arises from the fact that every one of the 107 disparity studies in the record includes white women while 8(a) does not. This disconnect means that the claim in the defendant's expert report these studies are "a strong indicator that discrimination is adversely affecting MBEs" is not persuasive. And this is true even ignoring the flaws of these studies as presented in my report. The disparity studies in the record are insufficiently related to the 8(a)

18

program at issue in *Rothe v. Department of Defense and Small Business Administration*. This disconnect gives no indication of what disparities might exist in the record. The "W" in MWBEs means that MWBEs and 8(a) firms are not interchangeable and cannot be made so.

## B.  ECONOMIC DISADVANTAGE

To be part of the 8(a) program an individual must be a member of a group which is both "socially and economically" disadvantaged. Social disadvantage was addressed above. I turn now to economic disadvantage.

"Economic disadvantage" refers both to the size of a firm and the personal net wealth of the firm's owner.

<u>Personal Net Worth of the Firm Owner</u>

It is here, with the personal wealth limitation of 8(a), that an enormous gap between 8(a) and the USDOT DBE program emerges. The 8(a) program has a much lower personal net worth cap for firm owners than do most preferential programs. In the 8(a) program, only individuals with wealth of a comparatively paltry $250,000 or less (excluding house and value of business) are eligible to enter the program. For continued 8(a) eligibility the personal net worth of the 8(a) firm owner must remain below $750,000.

In contrast, the personal net worth ceiling for federally funded DOT contracts is more than five times that, $1.32 million. (49 CFR 26.67)

As explained, 35 of the 107 studies in the record are DOT studies. In these 35 studies the personal net wealth ceiling for participating in the federally funded DOT contracts is $1.32 million, not the quarter million dollars of the 8(a) program. It is quite possible the owners of the firms deemed available by these DOT studies could well have a personal net worth of more than $250,000 but less than $1.32 million, making them eligible for a DBE program but ineligible for 8(a). A firm ineligible for the 8(a) program is not available to contract in that program.

A000376

As a result, the availability percentages of these DOT studies are likely overstated if applied to 8(a). If DBE availability is overstated, then disparity ratios based on that availability become unreliable. The extent of this availability overstatement cannot be determined – the USDOT disparity studies swelling the record in this case were not intended to be applied to the 8(a) program. But, as was true for social disadvantage and white women, the personal net worth ceiling creates a substantial disconnect between the 8(a) program and the disparity studies offered as justification for that program.

Firm Revenue Limits

Not only does the 8(a) program limit the personal net worth of a firm owner, the firm itself is capped by annual revenue as well.  In Rothe's areas of work the firm revenue limit is $25.5 million. (Affidavit of Dale Patenaude, p. 3) In other industries there are other revenue limits. Any firm with revenue above the limit for its industry is considered too big to participate in the Small Business Administration's 8(a) program for the specified NAICS codes for which these firms are too big.

Here is the importance of the firm revenue limits of the 8(a) program – On page 21, in footnote 34, the expert report explains that, "The disparity studies examined for this report included a wide range of contract sizes." This is an understatement. One of the disparity studies in the record is the 2007 study for the California Department of Transportation (19148-19686) done by BBC. This BBC study found that in the time period covered by the study, California DOT awarded 93 contracts for at least $10 million. These 93 contracts, while only a small fraction of the total number of contracts awarded, represented 64% of all dollars awarded during the time frame. (P. VI-7)

This is an important point, because very few of those contracts could be performed by an 8(a) firm. As the expert report points out, "Participants in the Section 8(a) program can receive sole-source contracts up to a ceiling of $4 million for goods and services and $6.5 million for manufacturing." (page 21) The $10 million and up contracts could not be awarded as sole source 8(a) contracts; the contracts are simply too big. And as Mr. Patenaude makes clear in his

20

affidavit, in the areas in which Rothe works (NAICS 541511, 541512, 541513, 541519, 56210), most dollars are awarded through sole source, as opposed to competitive, contracts. (Affidavit, p. 6)

Because of these 8(a) firm revenue limits, 8(a) firms cannot compete for the biggest contracts which represent so much of the total contracting dollars awarded. Firms which cannot compete for contracts are not available for those contracts. This is another example of why the disparity ratios in the studies in this record are too disconnected from the 8(a) program to be justification for that program.

It is worth noting that the defendant's expert report does not use the acronym MWBE. Instead, the 107 disparity studies are described as covering MBE firms. This is inaccurate. The DOT studies in the record are also described as analyzing MBEs. This too is inaccurate. The correct acronym for firms in USDOT programs is DBEs. As this section of my report makes clear, these are not trivial inaccuracies. MBE is not the same as MWBE. DBE is not the same as MBE. None of these three classifications of firms is the same as 8(a).

The 32 disparity studies never before Congress cannot supply the justification for the Congressionally enacted 8(a) program. Population data is irrelevant to the 8(a) program, as are the arbitrary geographic divisions of the defendant's expert report. Disparity studies showing overutilization of MWBEs are not indicators of discrimination against MWBEs. Neither are disparity ratios using Census, state or deficient data. Nor are the USDOT DBE studies in the record indicators of discrimination justifying the 8(a) program. A Benchmark Limits-type study might be, but there is no federal disparity study in the record. A Benchmark Limits kind of study might present evidence that 8(a) firms could not bid or bid successfully on 8(a) contracts due to discrimination.  The disparity studies in this record do not make this link to 8(a). A Benchmark Limits-type study might present this evidence, but there is no such study in the record.

A000378

## V. THE DISPARITY STUDY COMPANIES

Five disparity study companies account for 94 of the 107 disparity studies in Table 1 (88%) of defendant's expert report. I will deal with their work in turn, starting with D.Wilson Consulting. I will focus on availability, the heart of any well done disparity study, capacity, and disparity ratio results.

### D. WILSON CONSULTING GROUP

Wilson Consulting completed these studies in the record in this case:

Arkansas Department of Transportation and Public Facilities (2007)

Tucson, Arizona (2008)

Pima County, Arizona (2008)

Colorado Department of Transportation (2009)

Montana Department of Transportation (2009)

Milwaukee, Wisconsin (2010)

The Wilson disparity study for Milwaukee (57069-57260) began its availability computations by compiling a master list of potentially available firms from a number of sources, including lists of firms on regional chambers of commerce and lists from local community organizations (p. 4-2). The fact that a firm is on a list from a chamber of commerce or community organization is absolutely no guarantee the firm is qualified or big enough or even interested in contracting with Milwaukee.

The Milwaukee study did not calculate disparity ratios for subcontracting on City contracts. (P. 6-2) Instead, the disparity ratios combined both prime and subcontracts. The Milwaukee disparity study compared the proportion of subcontract dollars to all contract dollars, both prime and sub. Inevitably, that will likely show underutilization. The Milwaukee study hides this result by omitting what their subcontractor computation would be for non-MWBEs. This same mistake occurred in the Alaska study. (13677-18444)

22

It is true, as defendant's expert report explains on page 21, "the focus of the 8(a) program is on prime contracting." However, this central flaw of the Wilson studies, combining prime and subcontract dollars in disparity ratios, is noteworthy since it renders the findings in the Wilson studies of underutilization unpersuasive. A finding of underutilization on the prime contracting level might have offered persuasive evidence of discrimination applicable to the 8(a) program, but that evidence is not to be found in the study

D. Wilson Consulting also did the Colorado DOT (29325-29557) disparity study, a study which had, as one of its availability sources, Dun & Bradstreet data. (p. 4-3) The flaws of D&B data are set out in the next section of my report.

Combining prime and subcontracting data render the Wilson disparity studies unpersuasive as support for 8(a). Without separate disparity ratios for prime contracting and subcontracting levels, it is not possible to identify where discrimination, if any, is taking place. Prime contracts are between the government and the contractor. Subcontracts are between the prime contractor and the sub. The government is typically not directly involved. Unless it can be determined where in the public contracting process discrimination is arising, that problem cannot be remedied. For this reason, disparity ratios combining prime and subcontracting are insufficient for the race conscious remedy of the 8(a) program.

NERA

NERA, National Economic Research Associates, is an economic consulting company in Austin, Texas. NERA employs defendant's expert Jon Wainwright and which formerly employed defendant's expert Robert N. Rubinovitz. (His expert report is addressed below) There are 21 disparity studies by NERA in this record:

Minnesota DOT (2005)
Bi-State Development Agency (2005)
Washington DOT (2005)
City and County of Denver, Denver International Airport (2006)
Massachusetts Housing Finance Agency (2006)

23

**A000380**

Illinois State Toll Highway Authority (2006)
State of Maryland (2006)
Division of Capital Asset Management (Massachusetts) (2006)
Baltimore, Maryland (2007)
Memphis International Airport (2008)
Austin, Texas (2008)
Consolidated Government of Augusta-Richmond, Georgia (2009)
Salt Lake City, Utah (2009)
Northeast Ohio Regional Sewer District (2010)
Broward County, Florida (2010)
Hawaii DOT (2010)
New York state (2010)
Minneapolis, Minnesota (2010)
State of Maryland (2011)
Houston, Texas (2012)
Missouri DOT (2012)

NERA's methodology for computing availability does not vary in any vital way from study to study. In this section of my expert report I focus on the New York state (68035-68502) and the 2006 Maryland DOT (62373-62695) studies, but the points raised are applicable to all 21 NERA studies in the record.

### _Dun & Bradstreet data cannot meet Qualified, Willing and Able_

In their studies, NERA begins its availability computations with data from Dun & Bradstreet *MarketPlace*. Dun & Bradstreet is an organization which provides data about businesses.   NERA describes the Dun & Bradstreet data as a "comprehensive database of U.S. Businesses." (Maryland study, p. 69; Augusta-Richmond County, Georgia study (29715-3037, p. 57) Comprehensive it may be. But it is overinclusive since it is purely a headcount approach to availability which makes no real effort to account for qualified, willing and able, nor is that its purpose.

### _Dun & Bradstreet Qualified and able_

The NERA availability approach provides no measure of the qualifications of the firms in the database to do the kind of work that the different governments actually contract for. Maryland DOT does not use D&B data to choose firms for contracting. Neither do the Minnesota

DOT (14443-14554) nor the Massachusetts Housing Finance Agency (61783-62067) nor do any of the jurisdictions covered by the NERA studies use D&B data in this way. In his report, defendant's expert does not identify any agency or jurisdiction which uses D&B to help select its contractors.

By way of illustration: The NERA New York state lists agencies as varied as the Helen Hayes Hospital, the Long Island Railroad and the many branches of the State University of New York. (pp. 50-52; 443) The contracting needs of these agencies must be vastly different. D&B data does not concern itself with these differing needs. There is no indication any of these agencies use D&B data as a source of potential contractors.

D&B says close to nothing about which firms have the necessary bonding, licenses, or relevant experience or equipment for government contract. Clearly, D&B data contains no information regarding the ability of a firm to bid for or work on public contracting projects.

NERA's approach to availability ignores the reality that some contracts are so large not every firm can compete for them. For example, one of the highest availability percentages in the Maryland study is for Bridge, Tunnel and Elevated Highway work, 31.75%. (p. 80) It is hard to imagine, and there is no evidence to give an indication, that MBEs and WBEs could comprise nearly one-third of the number of firms in the marketplace in this specialty. It seems extraordinarily unlikely that these MWBEs, which tend to be newer and smaller firms, could seriously compete for close to one-third of the dollars awarded for these kinds of contracts, which can be very large.

In an article appearing in the *George Mason Civil Rights Law Journal*, entitled "Setting Goals in the Federal Disadvantaged Business Enterprise Programs," Dr. George LaNoue wrote this about the inherent weaknesses of D&B data: "The D&B list of firms is still over-inclusive, including many firms that would not be regarded by recipients [local governments] as qualified, willing and able to be actual competitors for contracts." (Spring 2007, number 2, p. 453)

### *Dun & Bradstreet Willing*

Nor does D&B *MarketPlace* data satisfy the "willing" component of qualified, willing and able. D&B counts minority and women owned firms, but not certified 8(a) firms. Not all

25

minority and women owned firms are interested in public contracting, yet the NERA studies assume every one, which is clearly inaccurate.

A more accurate picture can be found in the 2007 California Department of Transportation (19148-19686) study done by BBC. That study found that only one-fifth of the MWBEs identified as available were DBE-certified in 2006. BBC's follow up interviews revealed that most of those MWBEs knew about DBE certification, but chose not to pursue it. (p. III-2) If the California MWBE analysis is even close to analogous to 8(a), it can safely be concluded that most minority and women owned firms considered available by NERA are not "willing" to participate in government contracting.

### NERA'S Corrective Step

NERA studies take an additional step to deal with some of the weaknesses of Dun & Bradstreet data. The 2006 NERA Maryland study acknowledges that D&B data did not "sufficiently identify all businesses owned by minorities or women." (p. 70) To address this deficiency, the Maryland study collected directories of MBEs from a number of sources, such as the Korean MBE Association and Prince George's County Chamber of Commerce. (p. 70) In the NERA study for Augusta, Georgia one availability source was the Black Pages for Charleston, (p. 59) There is no mention in these studies of a similar step being taken for non-MWBEs. If that is correct, this step would skew results in favor of MWBEs.

### Capacity is Ignored by NERA

The United States Civil Rights Commission's May 2006 report, "Disparities as Evidence of Discrimination in Federal Contracting," made this recommendation regarding the consideration of capacity in disparity studies: "Analysts should use measures of available firms that account for the business' capacity to perform the work. At a minimum, they should examine disparity indexes by size of business. For example, instead of contrasting small minority businesses with all other firms, researchers should compare them to other small businesses….The research should attempt to include additional and more-finely tuned measures of capacity, such as revenue, number of employees or the firm's payroll." (p. 77)

<div align="center">26</div>

NERA makes no adjustment for capacity. In fact, defendant's expert report rejects the desirability to make any capacity adjustment: "It is improper to exclude firms based on the outcomes of discrimination, that is, based on the current capacity of MBEs to perform particular contracts." (page 62)  This is based on an assumption of discrimination, an assertion spelled out on page 60 of the government's expert's report: "…suppose that race and gender discrimination was ingrained in the nation's construction market."

A law review article addresses this rejection of capacity. "Deceived by Disparity Studies: Why the Tenth Circuit Failed to Apply *Croson*'s Strict Scrutiny in *Concrete Works of Colorado*," appeared in 81 *Denver University Law Review* 573 (2004). According to Teresa Lee Brown, the article's author, "The Tenth Circuit assumed MBEs were 'smaller and less experienced because of industry discrimination.' However, the court did not support this statement with any statistical evidence. The court asserted that small firm size and experience were not race-neutral factors … The Tenth Circuit's assumptions, without underlying statistical support, scarcely qualify as careful measurement." (p. 592)

Mason Tillman Associates, with 22 disparity studies in this record, provides a strong rebuttal to the NERA claim that rejecting capacity is justified. This quote is from the Mason Tillman study for New Jersey (32428-32815), which is in the record: "The second component of the [qualified, willing and able] requirement set forth in *Croson* is a firm's 'capacity' or ability to perform the contracts the agency awarded." (Volume II, p. 4-10) Given this requirement, accurately stated, assuming that all firms appearing in Dun and Bradstreet are available creates a headcount approach to availability which does not measure relative capacity.

NERA's disdain for capacity renders their disparity ratios incapable of serving as indicators of discrimination. MGT, the disparity study company with the most studies in the record, has written in its Arizona DOT study (27877-28316): "If the availability of minority and women-owned firms is overstated or understated, a distortion of the disparity determination will result." (p. 4-7-4-8) The disparity ratios in the NERA studies have been distorted to the point the ratios are not reliable indicators of discrimination.

27

## THE MASON TILLMAN ASSOCIATES STUDIES

Studies by Mason Tillman Associates of Oakland, California have been criticized by the federal Government Accountability Office. In its June 2001 report, the GAO reviewed 14 disparity studies from around the country, many of them by Mason Tillman, and found all methodologically flawed. GAO concluded, "The limited data used to calculate disparities, compounded by the methodological weaknesses, create uncertainties about the studies' findings…While not all studies suffered from every problem, each suffered enough problems to make its findings questionable." ("Disadvantaged Business Enterprises: Critical Information is Needed to Understand Program Impact," GAO Report GAO-01-586)

Here are the 22 studies by Mason Tillman in this record:

City of Durham and Durham County (2000)
Dallas, Texas (2002)
City of Cleveland and Greater Cleveland RTA (2003)
Boston, Massachusetts (2003)
Alameda County, California (2004)
New Jersey (2005)
New York City (2005)
New Jersey (2006)
Houston, Texas (2006)
Tampa and Hillsborough Aviation Authority (2006)
Kansas City consortium (Kansas and Missouri) (2006)
Tampa and Hillsborough County School District (2007)
Oakland and Oakland Redevelopment Agency (2007)
Milwaukee (2007)
Texas (2007)
Pennsylvania (2007)
Tennessee Department of Transportation (2007)
Bay Area Rapid Transit (2009)
Davenport, Iowa (2009)
Cities of Fort Worth and Arlington; DFW Airport; Fort Worth Independent School District; Fort Worth Transportation Authority; North Texas Tollway Authority (2010)
Washington Suburban Sanitary Commission (2011)
Illinois DOT (2011)

The Mason Tillman studies derive their availability through miscellaneous lists, some of which are clearly inadequate: certification lists; lists of vendors, and lists of chambers of commerce. I will focus on the Mason Tillman studies for New York City (15043-15336) and

28

New Jersey (32428-32815). As was true for NERA, the availability methodology of the Mason Tillman studies do not vary in significant ways, so points raised about the two studies are applicable to all the Mason Tillman studies in the record.

These lists used by Mason Tillman to determine availability were put together for various reasons and were never screened by the studies to determine that the firms included are qualified, willing and able to perform the particular services agencies and jurisdictions like New York City, the Illinois DOT, the Bay Area Rapid Transit and Davenport purchase. One of the availability sources for the San Francisco Bay Area Transit District disparity study (28802-29117) was the Bay Area Black Yellow Pages. (p. 7-4) The Black Yellow Pages makes no discernible effort to winnow its listed firms to those qualified, willing and able to do business with the Bay Area Rapid Transit district.

The Mason Tillman study for New Jersey uses 76 separate sources of availability.  These sources included public hearing attendees (vol. II, p.4-5) and respondents to a willingness survey (vol. II, p.4-7). Merely attending a public hearing to discuss the then upcoming disparity study offers no guarantees whatsoever that a firm is qualified and able to perform public contracts. Just as obviously, simply because a firm says it is interested in contracting with the state is no assurance the firm could do so. The New York City study lists 51 sources of availability information for MWBEs and non-MWBEs, including lists from chambers of commerce and business associations members, as well as vendors and certification lists.

The availability approach by the Mason Tillman study for New York City (15043-15336) is so illogical it yields results defying common sense.  According to the study, MWBEs, which are typically newer and smaller than their non-MWBE counterparts, are more available as prime contractors than as subcontractors. The study found there are more Asian prime contractors than Hispanic and white women owned primes combined.

The fundamental flaw of the Mason Tillman disparity studies is that the studies derive availability from lists, which cannot satisfy qualified, willing and able requirements of *Croson*. It is interesting to see what MGT, another disparity study company whose studies are in this record, has said about lists: "Reviews of existing lists, while appearing at first glance to provide a sound database, in reality do not. Not all firms place themselves on lists. …Firms go out of

<div align="center">29</div>

business but remain on lists…In summary, no way exists to develop a statistically reliable measure of the numbers and percentages of M/WBE firms in the relevant market areas over time from existing firms." (MGT of America, "Disparity Study of the Palm Beach County School District" 1995, quoted in "Who Counts? Determining the Availability of Minority Businesses in Public Contracting after *Croson*," by George LaNoue, *Harvard Journal of Law & Public Policy,* summer 1998, p.800.)

This methodological flaw has the result of inflating MWBE availability, since some lists can meet qualified, willing and able and some cannot – and the lists that can't, shape MWBE availability more than non-MWBEs. The Mason Tillman study for Tampa and Hillsborough County, Florida illustrates this. Three-fourths of the non-MWBE prime contractor availability comes from firms which actually received prime contracts. (p. 5-5) This is a perfectly reasonable availability source: any firm which got a contract is undeniably qualified, willing and able to perform that contract. In contrast, more than 60% of the MWBE availability was derived from certification lists, which may suffer from the flaws detailed above. In New York City, construction firms actually performing work for the city only accounted for 28.13% of the MWBEs considered available. (p.6-7)

The Mason Tillman study for a Kansas City consortium of four jurisdictions/agencies (63175-63470) suffers from this same problem. Certification lists account for most of MWBE availability but less than 20% of non-MWBE availability. (vol. II, p. 6-6) These lists typically indicate who owns a business, but presence on such a list creates no assurances about the qualifications of the firm on that list, or how frequently they seek public work.

### *Capacity as Addressed by Mason Tillman*

Unlike NERA, which ignores capacity, Mason Tillman tries to address capacity -- by restricting utilization to prime contracts below a certain monetary size. The company's justification for doing so is that MWBEs can compete for the smaller contracts but not necessarily the largest ones. The study for Tampa and Hillsborough County, Florida (20307-20590) only looked at contracts under $500,000. (p. 2-35) The New Jersey study also confined the utilization it examined to contracts under $500,000. (vol. II, p. 4-10) There were only 444 construction contracts over this $500,000 cap (vol. II, pp. 1-7 and 1-11) yet they accounted for

30

more than $1.88 billion, an average in excess of $4,000,000 per contract. The excluded contracts accounted for about 95% of all the state's construction contracting dollars. Put differently, the Mason Tillman study only examined about 5% of the construction dollars awarded by New Jersey, which is hardly a comprehensive examination of the state's contracting.

The New York City study limited itself to "an examination of the prime contract awards of $1,000,000 and under." (p. 6-12) This was done because, "there was demonstrated capacity of willing MWBEs to perform at this level." (p.3-4) Even assuming the accuracy of that statement, MWBEs are only half the capacity picture; the capacity of non-MWBEs should be addressed as well. The total value of these large, excluded contracts represents three-fourths of the City's construction budget, meaning 75% of the construction dollars are outside the scope of the study.

MTA studies base their availability on lists never intended to satisfy the requirements of qualified, willing and able. The lists used for MWBEs are less likely to meet these requirements than those for non-MWBEs, skewing results further. MTA's attempts at capacity in their studies fail to address much of the contracting dollars.

### MGT

MGT is a disparity company based in Tallahassee, Florida with these studies in the record:

Baltimore (2000)
Colorado Department of Transportation (2001)
Broward County, Florida (2001)
Charlotte, North Carolina (2003)
Tallahassee, Florida (2004)
Commonwealth of Virginia (2004)
North Carolina DOT (2004)
Phoenix, Arizona (2005)
Columbia, South Carolina (2006)
Oregon DOT (2007)
St. Paul and the St. Paul Housing Authority (2008)
Dayton (2008)
Leon County, Florida (2009)
Metropolitan Airports Commission (Minnesota) (2009)
Metropolitan Council (Minnesota) (2009)

A000388

Metropolitan Mosquito Control District (2009)
Metropolitan Sports Facilities Commission (2009)
Minnesota Department of Administration (2009)
Minnesota Department of Transportation (2009)
Arizona DOT (2009)
San Antonio consortium (2009)
San Antonio water system (2009)
Tulsa, Oklahoma (2010)
Texas (2010)
Commonwealth of Virginia (2010)
City of St. Louis; St. Louis Housing Authority; Metropolitan St. Louis Sewer District
Charlotte, North Carolina (2011)
Oregon Department of Transportation (2011)
Portland, Oregon (2011)

MGT's approach to availability varies by study. Their approach is more sophisticated than either NERA's or Mason Tillman's.

The 2007 MGT study for the Oregon DOT (15744-16158) derived its availability by combining lists from the Oregon DOT, the Associated General Contractors of Oregon, and the National Association of Minority Contractors. (p. 4-25) Arizona DOT (27877-28316) used the agency's vendor's list, which included firms that have worked on Arizona DOT contracts, as well as those which have not but have merely expressed an interest in doing so. (p. 7-7) Availability for the MGT Columbia, South Carolina study (35151-35988) was derived from vendors lists of a number of government agencies, including the governor's office. (p. 4-4) The study for Dayton, Ohio used (1) prime contractors which have contracted with the city; (2) prime bidders for City work; (3) bidders registered with the City and (4) firms in the City's vendors database. (p. 4-6).

Firms performing or bidding on contracts are truly available. Firms which are merely on a vendors list cannot, based upon only that evidence, be considered available. Further research would be necessary and no such research is shown by the evidence here. It is unknown if the firms on a vendors list have the qualifications to contract. A vendors list typically reveals little more than ownership, address, etc. Disparity ratios based on vendors lists cannot establish whether disparities were caused by discrimination or differences in firms.

Another weakness of MGT's approach to availability is that the company assumes that availability is precisely the same for all groups through every year of the study's time frame.

32

This is of course nonsensical. The Columbia, South Carolina study shows that for the three years of the time frame (2003-2005) and for all six groups (African Americans, Hispanic Americans, Asian Americans, Native Americans, Non-minority Women, Non-minority Firms) availability was unchanging from year to year. To illustrate: availability for Non-minority firms was precisely 72.97% in 2003 and again in 2004 and again in 2005.Availability for Hispanic Americans was 0.25% in 2003 and again in 2004 and once more in 2005. Exactly the same pattern is offered for 2001-2006 in the Dayton, Ohio study (p. 5-4) as well as the 2004 North Carolina disparity study (p. 5-10). These percentages cannot all remain precisely the same from year to year.

### *MGT Capacity Evaluation*

MGT studies do not sufficiently address capacity. MGT treated every firm on the vendors list as equally available as a prime or subcontractor. No adjustment was made for firm size; capacity was ignored. (p. 4-8) The MGT study for the Oregon DOT used headcounts taken from lists, without any controls for qualifications, size, or frequency of bidding; no adjustment was made for capacity. The MGT study for Broward County, Florida (11675-12038) used vendor data to measure availability and wound up with a total of 18,077 firms (p. 4-2), but no real effort was made to adjust that figure for capacity. The MGT study for North Carolina DOT claimed to address capacity in this way: "MGT determined the capacity of construction firms responding to a telephone survey of vendors." (p. 4-21) As with anecdotal evidence, as addressed later in my report, an unverifiable response over a phone is not a real check on capacity.

MGT studies often come to mixed results in their disparity ratios. In the Oregon study, for example, MWBEs as a group were overutilized. Within that group, African-Americans and Asian-Americans were underutilized. (For an extended analysis of the MGT studies done for the Oregon DOT and the Arizona DOT, see "Western States' Light: Restructuring the Federal Transportation Disadvantaged Business Enterprise Program," George LaNoue, *George Mason University Civil Rights Law Journal*, volume 22, number 1, pp. 1-60, fall 2011.) The MGT study for the Albany, Georgia consortium found no underutilization of MWBEs.

33

The MGT study for Charlotte, North Carolina (71250-71720) illustrates this pattern of mixed results. On professional service contracts, firms owned by Asian Americans and white women received fewer contract dollars than their numbers in the marketplace would suggest. African Americans, Hispanic Americans and Native Americans got more dollars than would be expected. African Americans and Native Americans do well on goods and supplies contracts. Here, Hispanic Americans do not do as well. Asian Americans do well on construction and architect/engineering contracts, but not so much in professional services, other services, and goods. (chapter 4) No theory of discrimination could explain these results and MGT made no such analysis. It must be the market at work. The MGT Charlotte study recommends a small business program (chapter 7), not the race and ethnic preferences of programs like 8(a).

MGT studies have not emerged unscathed from legal challenges to MWBE and DBE programs. The 2004 study for North Carolina DOT was reviewed by the Fourth Circuit in *Rowe v. North Carolina Department of Defense* (615 F.3d 233). Preferences for Hispanic American and Asian American subcontractors were found unconstitutional by the Fourth Circuit. The 2004 MGT study for the Virginia DOT was criticized by the court in *Rothe v. Department of Transportation*. (545 F.3d 1023 Fed. Cir. (2003))

There are more MGT studies in the record in this case with stale data from the 1990s (Broward County, Florida; Tallahassee, Florida (64182-64468); Baltimore, MD; a St. Louis consortium (62696-63174); North Carolina DOT) than other disparity study company. Stale data does not inform about possible discrimination in public contracting today, but just as importantly, neither has any evaluation been made by Congress as to why this outdated data has any connection to the 8(a) program today.

The MGT studies in this record too often use stale data, come to mixed results, recommend race neutral alternatives rather than race conscious preferences, and have been criticized by courts to serve as reliable indicators of discrimination justifying the 8(a) program.


BBC

BBC, headquartered in Denver, has these studies in the record:

Washington Suburban Sanitary Commission (2005)

California Department of Transportation (2007)

34

Idaho DOT (2007)

Nevada DOT (2007)

Albany, Georgia (2008)

Portland Development Commission (2009)

Metrolink-Southern California Regional Authority (2009)

Los Angeles County Metropolitan Transportation Authority (2010)

Orange County Transportation Authority (2010)

San Diego Association of Governments (2010)

San Diego Metropolitan Transit System (2010)

Indiana (various agencies) (2010)

Oklahoma Department of Transportation (2010)

Georgia DOT (2012)

Of the five major disparity study companies profiled in my expert report, BBC has the largest percentage of studies done for DBE programs: including states (California, Georgia, Idaho, Nevada, and Oklahoma) and a number of local transportation authorities. As pointed out above, studies done for DBEs do not establish discrimination against 8(a) firms. The disconnect between firms and firm owners eligible for the DBE programs and 8(a) firms is simply too large to make any kind of relevant comparison for purposes of the 8(a) program.

BBC studies often come to results that do not indicate discrimination. The BBC study for the Idaho Department of Transportation (13927-14442) revealed MWBE utilization was higher on state funded race neutral contracts than on the federally funded race conscious projects. (p. E-88) Also, white women were 77% of the total MWBE construction category and women owned firms were overutilized as both primes and subs when there were goals on federally funded work. (p. E-13) Similarly, the BBC study, "Availability and Disparity Study, Nevada Department of Transportation" (14635-25042) contains more than 100 disparity ratio tables. The tables show a patchwork of over and under-utilization of MWBEs, depending on factors like funding source and time period. The record in this case includes a study by BBC for a consortium of government

35

entities in the Albany, Georgia area, a study which found overutilization of MWBEs. (p. 7, summary report.

The Indiana BBC (69405-70504) study found overutilization for Subcontinent Asians on state construction spending (Figure 6-13) and found all MBE groups overutilized on subcontracts for the Indiana Department of Administration. (Figure 7-12) On federally funded Indiana DOT contracts two MBE groups were substantially underutilized and three substantially overutilized. (Figure 8-13) What theory of discrimination could possibly explain results as varied as that?

The Indiana disparity study started availability computations with Dun & Bradstreet *MarketPlace* data, as do the NERA studies. The hazards of D&B data are explained above. But, unlike NERA, BBC winnowed the D&B firms by removing those out of business or without valid phone numbers. BBC then interviewed firms to ask questions about capacity and willingness to do Indiana work. The Indiana study wound up with 3997 available firms. (chapter 5)

### *BBC Capacity*

Of the disparity study companies, BBC makes the most serious effort at capacity, as the Caltrans and Indiana disparity studies show. However, despite its efforts, BBC substantially underestimated non-DBE capacity.

All firm capacity came from telephone interviews in which information was supplied by people as varied as receptionists and CEOs. (Indiana – Figure F-8) There was no external verification of this data. In the Indiana study, respondents were asked if they considered themselves qualified for Indiana public contracting, but the word "qualified" was not defined in the survey. A firm's perception of itself as qualified cannot be enough to satisfy the standard of truly being qualified.

The BBC studies at least attempt to winnow firms down from the first source of availability, the very flawed Dun & Bradstreet data. However, BBC's efforts at capacity are insufficient. Also, most of the BBC studies in the record cover DBE firms, which are too disconnected from 8(a) firms to be persuasive evidence of discrimination.

36

## VI. BUSINESS FORMATION, BUSINESS EARNINGS, LOAN DENIALS AND CREDIT PROBLEMS

In his expert report on page 8, Jon Wainwright lists two types of "evidence of economy-wide discrimination in disparity studies." I have dealt with one, disparity ratios. The other is regression analysis comparing a) "business formation rates between minorities and similarly situated non-minority males," b) "the earnings of minority business owners to those of similarly situated non-minority male business owners" and c) "denial rates on commercial loans between minority and non-minority male business owners." (p. 8)

In his expert report Mr. Wainwright defines "regression analysis": "A type of statistical analysis that examines the correlation between two variables ('regression') or three or more variables 'multiple regression' or 'multivariate regression.' He goes on, "in simpler terms," to explain what regressions are: "a statistical technique allowing the comparison between certain business outcomes, such as business formation, business earnings, or loan denials, and minority status, while holding other, potentially non-discriminatory factors, such as geographic location, industry affiliation, education, age, or balance sheets, constant." (p. 64)

While most of the disparity studies in the record include regressions, not all disparity study companies contain regression analysis in their studies. Most of the regressions in the record have been produced by NERA, MGT and BBC. My analysis of the regressions in defendant's expert report does not question the mathematical manipulations of the regressions or the variables used. My analysis focuses on the sources of the data, the size of the samples, the age of the data, and the results of the regressions.

## A. PROBLEMS WITH BUSINESS FORMATION ANALYSES IN THE EXPERT REPORT

The NERA New York state disparity study describes its business formation analysis this way: "We compare self-employment rates by race and sex to determine whether minorities or

women are as likely to enter the ranks of entrepreneur as similarly situated non-minority males."
(p. 149)

While that could be an issue worth pursuing, there are problems with the data. There are two data sources for the business formation analysis in the expert report, PUMS and ACS PUMS. PUMS stands for Public Use Microdata Samples. ACS is the acronym for American Community Survey.  Both are Census Bureau publications. The weaknesses of Census data have been set out above. According to the Census Bureau website PUMS contains "records for a sample of housing units with information on the characteristics of each unit and person in it." (http;//www.census.gov) The ACS is mailed to 250,000 households monthly. Households and the characteristics of those living there are clearly disconnected from determining which businesses are qualified, willing and able to perform public contracting. There would seem to be little connection between these households and the 8(a) program; certainly none is shown in the expert report.

Another data flaw previously discussed in my report is equally applicable here: the business formation analysis in the expert report relies on stale data. The business formation rates of Tables 8-10 (pages 65-73) use the 2000 Decennial Census Five Percent PUMS from 13 years ago now.

Regarding the flaws of a business formation analysis done by Mr. Wainwright that agrees with my analysis herein, the district court in *Engineering Contractors Association of South Florida v. Dade County* was critical: "Neither the Wainwright study [on business formation rates] nor the Brimmer study are particularly probative on the central issue in this case: the extent to which Dade County is either actively or passively participating in discrimination in the local Dade County construction industry. The census data used in both studies simply represent individuals or firms located in Dade County which list themselves as being in the business of construction. The census data do not identify whether the firms have ever done work specifically in the County, or to what degree their reported sales or income stems from private versus public sources … The lack of specificity makes it difficult, if not impossible to draw accurate conclusions about where Dade County is itself a participant in race, ethnicity, and gender-conscious remedial programs." (943 F.Supp. 1546, 1573-4 (S.D. Fla. 1996)

## B. PROBLEMS WITH THE EARNINGS OF BUSINESS OWNERS ANALYSES IN THE EXPERT REPORT AND THE STUDIES

The second regression-based analysis that the expert report claims shows economy-wide discrimination is an examination of business owner earnings. Tables 11, 12, and 13 (pages 74-82) in the Wainwright report have the same stale Census Bureau data sources as the business formation tables – the 2000 PUMS.

The MGT study for New Jersey explains, in straightforward language, what that study's regression analysis for business owner earnings is intended to achieve: "There are two key questions in this analysis. Do minority and woman-owned firms tend to earn significantly less revenue than firms owned by nonminority males? If 'yes,' are their revenues due to race or gender status?"  (p. 5-18) Variables in the regression included: number of full time employees in the firm; owner's years of experience; percentage of earnings from the private sector; owner's level of education; age of company;  race of owner(s); type of business. (p. 5-21)

That study concluded that the regressions supported "the logical conclusion that established firms tend to do more business." (p. 5-28) Was there discrimination? No. Findings indicated "general parity in earnings between MWBEs and non-MWBEs." (p. 5-28) Certainly the regressions run for this New Jersey study do not support a racial preference program like 8(a).

Nor would the regressions run for the MGT study in Broward County, Florida. That study concluded, 'Hispanic American, Asian American, and Native American firms were overutilized in the private sector" (p. 5-7) and "Capacity has a direct influence on the ability of firms to earn gross revenues." (p. 5-48) The MGT study reached other mixed results: "It is noteworthy that in analyses comparing both earning elasticities and the likelihood of self-employment for nonminorities with earnings and self-employment likelihood for both Asian Americans and Hispanic Americans, these two groups often seemed to fare better than nonminority male business owners in many business categories…" (p. 7-25)

Sometimes the regressions on earnings lacked sufficient data to reach any conclusions. From the MGT study for Virginia: "The number of Native American, Hispanic American, and

39

Asian American firms in the sample were not sufficiently large to produce statistically reliable findings." (p.5-27)

The results of the business earnings regressions in the record are sufficiently mixed that I am not persuaded the results support the preferences of the 8(a) program.

## C. PROBLEMS WITH THE LOAN DENIAL RATES AND COSTS OF CREDIT ANLAYSIS

The MGT study for St. Paul and the St. Paul Housing Authority (21968-22705) illustrates one of the problems with the loan denial analyses in this expert report and the disparity studies. As the MGT study explained, a national survey of loan denial probability described in the study had a sample size of only 1085 (p. 9-11) 1085 responses for the entire country is not enough. The survey did not find minorities applying for loans to be consistently disadvantaged. "Asian American-owned businesses were substantially larger on average than white/male-owned businesses." (p. 9-8)

The CRA study for the San Mateo County Transit District (19698-19884) is commendably honest in reporting the results of its loan denial regressions: "There is no evidence indicating that female firms have higher loan denial rates than male firms in the United States. Another interesting finding is that female firms in the Pacific region relative to male firms actually have lower denial rates when compared to the rest of the country. We do not have an explanation for this finding." (p. 87) I too have no explanation for that finding. I do have a conclusion: the results of the loan denial regressions in these studies are too mixed to support a racial preference program.

The NERA studies extensively use data from the National Survey of Small Business Enterprises, conducted by the Federal Reserve Board. The 1998 survey, used by some of the NERA studies in the record, had only 3651 responding firms nationwide. (Massachusetts Housing Finance Agency study, p. 140) In contrast, as of federal fiscal year 2008, in the 8(a) program there were upwards of 10,000 firms. A survey with fewer than half as many respondents as firms in the program is not enough to establish a nationwide pattern of discrimination.

40

Table 15 of the expert report (page 90) addresses "excess cost of credit." The analysis is based on only nine jurisdictions and is claimed to show results similar to the National Survey of Small Business Finances. The most recent NSSBF is from a decade ago and this is likely to be the last since the Federal Reserve Board has cancelled all future surveys for budgetary reasons. (page 88)  A far better approach would be another Benchmark Limits study, which would be more recent and would include all federal procurement, not a sampling of respondents who may have no interest or ability to contract with the federal government.

## VII. THE PROBLEMS OF THE REGRESSION ANALYSES APLIED TO ROTHE

Defendant's expert report also includes three sets of regression analyses applied specifically to "plaintiff's lines of work." (page 83) This might have been insightful, except that the regressions seem to misrepresent what Rothe does.

Defendant's expert states in his report that he "restricted the observations in the dataset I prepared to" a number of specified Census industry codes. (page 82) One of those seems to be "NAICS sub-sector 561." (page 83) That NAICS subsector includes "travel arrangement and reservation services" and "investigation and security services." It also includes pest control, janitorial services, landscaping, and upholstery cleaning. Rothe's work with computers is nothing like any of these industries. This illustrates why disparity analysis must be done on the six NAICS digit level, as opposed to the two digit level of construction, professional, services, and goods, which is characteristic of local and state disparity studies.

Putting to the side what seems to be a clear mischaracterization of what Rothe does, the variables included in the third regression show the irrelevance of these regressions to this case. Additional factors in this regression included:
the dollar value of interest and dividend income from the year before, whether the person is married with their spouse present, whether they lived in the same house one year prior (non-movers), the number of workers in their family, the number of children present, in the household, whether their home is owned free and clear, their home's property value (zero for renters), whether they are foreign born, whether they speak English well, and whether they are a veteran. I

41

also include four variables measuring local macroeconomic conditions by state – the general population level, the unemployment rate, the number of full-time government employees, and per capita personal income. (p. 84)

Dale Patenaude's affidavit attached to the complaint in this case is clear that Rothe bids on work around the country, so the state-specific information is irrelevant. English proficiency, home ownership, spousal income and the rest may be connected to the likelihood of someone starting a successful business, but that is not sufficiently connected to the 8(a) program. If that link exists, it has not been included in this record for *Rothe v. Department of Defense and Small Business Administration*. Again, a Benchmark Limits kind of study would have been much better than this kind of statically impressive but ultimately irrelevant analysis.

### VIII. ANECDOTAL EVIDENCE

Defendant's expert report accurately observes that, "Anecdotal evidence is an important part of a disparity study to augment statistical analyses." (p. 9) As the 2004 North Carolina DOT study said: "Most disparity studies utilize anecdotal evidence along with statistical data." (p. 2-10) No race conscious contracting program has been upheld on the basis of anecdotes alone. An article by Jeffrey Hanson, "Hanging by Yarns: Deficiencies in Anecdotal Evidence Threaten the Survival of Race Based Preference Programs for Public Contractors" (88 *Cornell Law Review* 1433, July 2003), has summarized the problems with anecdotal research in disparity studies and offered some suggestions for improvement:

Anecdotal evidence should be collected from both MWBEs and non-MWBEs;

In the collection of anecdotal evidence attempts should be made to guard against "response bias" and "interview bias";

Collected anecdotes should be appropriate in time and place;

Collected anecdotes should be specifically related to public contracting;

Collected anecdotes should be industry specific;

Collected anecdotes should be group specific;

Collected anecdotes should contain adequate details of specific instances of discrimination and anonymous responses should be discouraged;

42

Attempts should be made to corroborate anecdotes of discrimination.

Of these, the one disparity studies virtually never satisfy is the last. Corroboration is vital because first, it seems a matter of basic fairness that programs such as the 8(a) program, which disadvantages people on the basis of their race and ethnicity while advantaging others, should exist only when discrimination is shown to be real. Perceptions of discrimination should not be enough. Second, unless claims of discrimination have been verified, then the right remedy cannot be fashioned. Let's say an MWBE is quoted in a disparity study as having suffered a late payment problem. That claim is verifiable.

The United States Civil Rights Commission agrees there should be an attempt to verify anecdotes. In its May 2006 report, "Disparities as Evidence of Discrimination in Federal Contracting," the Civil Rights Commission urges that anecdotes be "corroborated with other evidence." (p. 78)

In the verification process it could be investigated to determine whether non-MWBEs are experiencing the same delayed payment problem. On this subject of non-MWBEs claiming problems: the record contains four NERA studies where some minorities claimed less discrimination in business dealings than white males: Austin, Texas (17080-17374); Memphis International Airport (2008); 36251-36583); Augusta-Richmond County, Georgia (29715-30037); Northeast Ohio Regional Sewer District (67021-67391). (See "Defining Social and Economic Disadvantage: Are Government Preferential Business Certification Programs Narrowly Tailored?" George LaNoue, *University of Maryland Law Journal of Race, Religion, Gender and Class*, volume 12, number 2, p. 309, fall 2012.

Anecdotal evidence comes in a variety of forms. The 2004 MGT study for North Carolina DOT had vendor telephone surveys, personal interviews, and focus groups. (p. 6-2) The MGT study for Dayton, Ohio used a telephone survey, focus groups, personal interviews, and public hearings. (p. 6-2)

One reason for being skeptical of anecdotes in disparity studies is that the study authors exercise complete control over whom to interview and what to report. Studies may use their discretion to craft a partial or even biased picture of discrimination. In the Mason Tillman study for New York City no scientific basis was used in selecting the 74 individuals providing the

43

anecdotes. All that is said is, "The interviewees were solicited using contract and certification records." (p. 9-3)

Mason Tillman did not report it had established any limits on the age or geographic boundaries for the anecdotes it regarded useful for the study. It is possible that some of the allegations refer to events of many years ago and far away from New York City.  It is not clear how many of the interviews were actually used by Mason Tillman in the final study. All allegations are identified anonymously, a "Black female construction worker," etc. Is this one person? If so, she is quoted fifteen times. Or is this fifteen different black female construction workers? It is not possible to tell. Nor is it possible to tell in which subsections of the construction industry this woman works. Greater precision than the two digit construction industry is required.

The New York City study used no concept of legal relevance of what it reported. The study reports that a black male owner of a goods supply services company said: "The entire country was built on racism. Some may think it is not present today, but it is in a subtle way." (p. 9-7) Clearly this man's impressions, if worth anything beyond his subjective feelings, are about societal discrimination.

In the 2005 Mason Tillman New Jersey study, no scientific basis was used in selection of the 72 persons providing the anecdotes. Neither a random nor stratified sample was used. The interview sample clearly underrepresented white males and other groups while over-representing African-Americans.

Virtually all the criticisms of anecdotal evidence raised here about the New York City and New Jersey Mason Tillman disparity studies are applicable to the anecdotal material in all the studies. Most importantly I want to stress a point previously made in this section of my report. It is the single most important question concerning anecdotes: Are they true?  I did not see any indication that any of the anecdotal accounts in the disparity studies which fill out this record were verified or even seriously investigated in any way. Anecdotes alone have never supported a preference program subject to a court challenge. Also, anecdotes if properly gathered, are supplement to statistical analysis and should relate to that analysis if the anecdotes are to be persuasive. The anecdotes are not persuasive here.

44

## IX. THE RUBINOVITZ REPORT

There is a second expert report offered by defendant. This report (13 pages narrative, 13 pages statistics) is by Robert N. Rubinovitz of the Department of Commerce. Mr. Rubinovitz explains the purpose of his report this way: "My goal is to look at contracting outcomes among SDBs [Small Disadvantaged Businesses] compared to other small firms, distinguishing between the SDBs that do and do not participate in the 8(a) program." (p. 3) Later in his report he similarly explains, "The ultimate question of interest here is whether the data show any difference in the odds of contracts being won by minority-owned small businesses, particularly those identified as SDBs and those that are part of the 8(a) program, relative to other small businesses." (p.9)

To his credit, Mr. Rubinovitz, unlike Mr. Wainwright, has at least addressed federal contracting, which is at the heart of this case. However, it is not otherwise clear why this report is offered into evidence. The only way this report could be of relevance would be if the defendants, agencies of the federal government, were awarding contracts in a discriminatory manner. That is what, at most, such a disparity between SDBs and non-SDBs would show – the federal government was not awarding its contracts fairly.

There is no evidence in the record of the Small Business Administration or the Department of Defense discriminating in the award of 8(a) contracts. And, even if there were such evidence, the most effective remedy would be directed at the government, not companies like Rothe. Consequently, the Rubinovitz report is ultimately irrelevant to this case.

In his report Mr. Rubinovitz concludes that, "The odds of winning a contract for SDBs not participating in the 8(a) business development program are estimated to be roughly 11 percent lower relative to the odd of wining contracts by firms that were not identified as SDBs." (p. 2).  The conclusion to be drawn there from is unknown and unknowable, considering the source of the data used.

Never does the report claim that this result is due to discrimination, or for that matter, what it means.  It is unknown what it could mean.  What does explain this 11% disparity? The report provides a possible explanation: "Unsurprisingly, firms that participate in the 8(a)

45

program, a program in which firms generally do not have to engage in a full and open competition for contracts, but rather are awarded contracts through sheltered bidding or on a sole-source basis, had odds of winning contracts that were many times higher relative to the odds of winning contracts by other small businesses." (p.2)

"Unsurprisingly" is a well chosen word. It is indeed not at all surprising that companies spared the competitive marketplace (8(a) firms) do better than those which must compete for contracts.  The report makes no effort to determine how much, if any, of the 11% disparity is due to discrimination.  And, if the explanation is discrimination, then who is doing the discriminating? The report does not attempt an answer. This report cannot supply justification for the 8(a) program.

The Rubinovitz report also concludes that minority owned firms had roughly 30 percent lower odds of winning a contract than other small firms. (p. 2) The report explains: "Not surprisingly, there is a positive and significant increase in the odds of a small firm winning a contract as the age of the firm and the size of the firm, measured either by sales or number of employees, increases.  Firms with various levels of security clearance also had higher odds of winning contracts… Ownership structure can also influence the odds…" (p. 11)

It is true the report held these factors constant in reaching its' 11% disparity. However, the result is not linked in the report to discrimination. The only discriminatory explanation remaining would, logically, be discrimination of some kind by the federal government or its employees. If such discrimination is occurring it is not in the record either and it would be not remediated by the 8(a) preferences.

Clearly the Rubinovitz report cannot help establish a justification for the 8(a) program.


**CONCLUSION**

The record in *Rothe v. Department of Defense and Small Business Administration* is voluminous but it is not persuasive. The record is not persuasive because much of it is irrelevant: certainly the 32 disparity studies not before Congress are irrelevant to a Congressionally imposed statutory program. The many other disparity studies in the record cover local MWBE or DOT programs, not the federal 8(a) program, which has different eligibility standards. Much of the

46

data in these studies is too stale to be of much relevance to the 8(a) program today. It is clear to me that that this is a haphazard quantity over quality approach of scouring the country for disparity studies, then assuming the state and local studies relate to the federal 8(a) program, which they do not. The disparity studies are further crippled by their failure to meet the qualified, willing and able criteria for determining availability. The studies overstated MWBE and DBE availability and failed to adequately address capacity. Consequently, the disparity ratios resulting from the studies are not indicators of possible discrimination. Nor are the anecdotes in the studies, which were not investigated for accuracy. Nor are the regression-based analyses of business formation, loan denials, earnings of business owners, and Rothe's industries persuasive. Nor is the Rubinovitz report persuasive. The record in *Rothe v. Department of Defense and Small Business Administration*, while hefty, is not sufficient. It does not justify the racial preferences of the SBA's 8(a) program.

I reserve the right to supplement this expert report in the event new data or information is received.

47

**A000404**

My opinions are based on my review of the record in *Rothe v. Department of Defense and Small Business Administration*, law review articles, court opinions, and related materials. My hourly rate is $135 per hour. My qualifications are set out in my CV, below.


*John Sullivan*
_____
John Sullivan

SEPTEMBER 2, 2013
-------------------------------------------
Date

John Charles Sullivan, Esq.

316 B East Melrose

Baltimore, MD 21212

**Disparity study activity with local governments**

- I have worked with the following governments to produce disparity studies consistent with constitutional principles and to design race neutral alternatives to racial preferences in public contracting:
  Nashville, TN Metro Area (1996–2000)
  City of St. Petersburg, Florida (1998-2000)
  Portland, Oregon (1994–1995)
  State of Texas, Comptroller's Office (1994 –1995)
  Albuquerque, New Mexico (1993–1994)

**Research and Writing**

- Associate Director of the Project on Civil Rights and Public Contracts, at the University of Maryland Baltimore County. The Project contains one of the largest publicly accessible collections of disparity studies, legal opinions, and research articles on minority and women business enterprise programs in the country. Published in newspapers, magazines, law reviews, policy and other scholarly journals; see Addendum for published articles.  I have appeared before Congressional sub-committee detailing flaws of the federal disparity study.

**Educational Policy**

- Legal consultant for the U.S. Department of Education, Office of Civil Rights, 2002-05. Assigned to find ways to increase diversity in college and professional schools without using racial or gender preferences. Met with numerous university officials to discuss their admissions and diversity policies.

**<u>Education</u>**
University of Maryland Law School, Baltimore, MD
J.D., 1983
Loyola College, Baltimore, MD
B.A., 1976

49

**A000406**

## ADDENDUM – PUBLICATIONS,  LECTURES AND TEACHING EXPERIENCE

### Scholarly Articles

"Gross Presumptions: Determining Group Eligibility for Federal Procurement Preferences," (with George LaNoue) *Santa Clara Law Review*, Vol. 41, No. 1 (Winter 2000)

"Deconstructing the Affirmative Action Categories" (with George La Noue) *American Behavioral Scientist*, Volume 41, No. 7 (April 1998).

Reprinted in John Skrenntny, ed. Color Lines: Affirmative Action, Immigration and Civil Rights Options for America, University of Chicago Press, 2001.

"The Future of Florida's Preferential Public Contracting," appearing in A Report to the People of Florida About Three Aspects of Civil Rights and Florida's Governments, The Florida Public Policy Institute, 2001.

"Race Neutral Programs in Public Contracting," (with George LaNoue) *Public Administration Review*, Vol. 55, No. 4, July/August 1995.

"Presumptions for Preferences: The Small Business Administration=s Decisions on Groups Entitled to Affirmative Action," (with George LaNoue) *Journal of Policy History*, Volume 6, No. 4, Fall 1994.

"But for Discrimination how many Minority Businesses Would there Be?" (With George LaNoue) *Columbia Human Rights Law Review*, Winter1992.

### Major Articles

"Surprise Results when City Ends Preferences in Contracting," *The Philadelphia Inquirer*, October 31, 2011.

"Men Need Not Apply," *The Washington Times*, August 2, 2011, reprinted in the Jamaican Times, August 3, 2011.

"The Price of Discrimination," (with George LaNoue) *The Weekly Standard*, December 27, 2004.

"The Road's End for Racial Preferences in Public Contracting?" (With George LaNoue) *Constructor Magazine,* January 2001.

A000407

"Color Them Colorblind," *The Weekly Standard*, May 29, 2000.

"Contract Preferences beyond Their Time," *The Washington Times*, January 16, 2000.

"More Preferences for Minority Businesses," *The Wall Street Journal*, August 24, 1998.

"Defining Minorities can be Odd Business," *The Baltimore Sun*, March 8, 1998.

"The Slow Demise of Affirmative Action," *The Rocky Mountain News*, June 17, 1996.

"For a Multi-Racial Identity," *The Christian Science Monitor*," March 11, 1996.

"Immigration and African Americans," *The Social Contract*, summer 1995.

"A Case against Affirmative Action," *Fayetteville Observer Times*, February 28, 1994."

"Are Homosexuals Owed Affirmative Action?" *Providence Bulletin-Journal*, January 16, 1994.

"Businesses Use Women as Fronts," *Greensboro News & Record*, October 3, 1993.

"Immigration has Unique Cost for African Americans," *Milwaukee Star*, August 26, 1993.

"Immigration's Effect on Poor Blacks," *Chicago Tribune*, June 18, 1993.

"Golden Moments in Pigtown," *The* Baltimore *Sun*, September 15, 1992.

"The Will to Win Divides a Class," *The* Baltimore *Sun*, December 15, 1990.

Book reviews for *The Daily Record*, 1990-1991.


**Major Public Lectures or Conference Presentations**

"The Current Landscape of T-21," American Road Builders and Transportation Association, April 2003.

"Immigration and Affirmative Action," National Carrying Capacity Issues Conference, June 1993.

51

**Congressional Testimony**

Testimony before the House Subcommittee on the Judiciary, July 1998 – subject: the federal Benchmark disparity study.

**Teaching Experience**

Adjunct professor of constitutional law and civil rights law, University of Maryland Baltimore County, fall semester 2009.

Adjunct professor of constitutional law, UMBC, spring semester 2001, fall semester 2004.

Adjunct professor of constitutional law, UMBC, (co-taught) spring semester 2000.

**Disparity Study Litigation**

Hispanic Chamber of Commerce v. Milwaukee, 2011-present.

Associated General Contractors, San Diego Chapter v. California Department of Transportation, 2009-present

South Florida Chapter of the American General Contractors **v.** Broward County, 2009

GEOD v. New Jersey Transit, 2004 –2011

Mechanical Contractors v. Memphis Shelby County, 2004

ABC v. Memphis City Schools, 2003

Sherbrooke v.MnDOT, 2002

Gross Seed v. NDOT, 2002

GEOD v. State of New Jersey, 2000

Hershel Gill v. Metropolitan Dade County, 2000

Kornhaas v. State of Oklahoma, 2000

Kossman v. State of Texas, 2000

A000409

<u>BAGC v. Chicago</u>, 1999

<u>BAGC v. Cook County</u>, 1999

<u>Rothe v. DOD</u>, 1999-2008

<u>Ohio Contractors Association v. Cincinnati</u>, 1998

<u>Scott v. Jackson</u>, 1998

<u>Concrete Works v. Denver</u>, 1998

<u>Buddie v. Cuyahoga Community College</u>, 1997

<u>Houston Contractors Association v. Houston Metro</u>, 1997

<u>Prior Tire v. Atlanta School Board</u>, 1996

<u>Engineering Contractors Association of South Florida v. Metropolitan Dade County</u>, 1995

<u>McCrossan v. Cook</u>, 1996

<u>Buddie v. City of Cleveland</u>, 1995

<u>AGC v. Columbus</u>, 1995

<u>AGC v. Phoenix</u>, 1995

<u>Dynalantic v. Department of Defense</u>, 1995-present

<u>Contractors Association of Eastern Pennsylvania v. Philadelphia</u>, 1994

<u>North Shore v. New York</u>, 1994

<u>Halmar v. New York</u>, 1994

<u>Seabury Construction Corp. v. Department of Environmental Protection</u>, 1994

<u>Capelletti v. Dade County</u>, 1992

**A000410**

**Expert Witness**

Ohio Contractors Association v. Cincinnati, 1998.

Indiana Department of Transportation v. Slusser's Green Thumb, 2008.

Associated General Contractors of America, San Diego Chapter v, California Department of Transportation, 2009 – ongoing.

Kevcon, Inc. v. United States, 2010.

Rothe v. Department of Defense and Small Business Administration, 2012-ongoing.

54

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                      )

ROTHE DEVELOPMENT, INC.,         )

                                       )

            Plaintiff,           )

                                       )

v.                                      )     Civil Action No. 1:12-cv-00744-KBJ

                                       )

DEPARTMENT OF DEFENSE       )

                                       )

and                                       )

                                       )

SMALL BUSINESS ADMINISTRATION,  )

                                       )

            Defendants.         )
———————————————————————)

### MEMORANDUM IN SUPPORT OF DEFENDANTS'
### MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF
### <u>PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE</u>

# EXHIBIT G: SULLIVAN DEPOSITION

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
------------------------------X
ROTHE DEVELOPMENT, INC.,         :
                                 :
          Plaintiff              :   Civil Action No:
                                 :   12-CV-744
            -vs-                 :
                                 :   Pages 1 - 112
DEPARTMENT OF DEFENSE and        :
SMALL BUSINESS                   :
ADMINISTRATION,                  :
                                 :
          Defendant              :
------------------------------X
```

Deposition of John C. Sullivan

Washington, D.C.

Monday, November 4, 2013

Reported by:  Kathleen M. Vaglica, RMR

Job No:  132788



Page 2

```
1
2
3
4
5
6
7                    Monday, November 4, 2013
8                      (10:07 a.m.)
9
10  Deposition of John C. Sullivan, held at the offices
11  of:
12
13     The Center for Individual Rights
14     1233 20th Street, N.W.
15     Suite 300
16     Washington, D.C.  20036
17
18
19  Pursuant to notice, before Kathleen M. Vaglica, RMR,
20  a Notary Public in and for the District of Columbia.
21
22
```

Page 4

```
1                      CONTENTS
2
3   EXAMINATION OF JOHN C. SULLIVAN          PAGE
4   BY MR. BRANIFF                    5, 109
5   BY MR. BARTON                     102
6
7                   E X H I B I T S
8   NUMBER                         PAGE
9
10  1     Expert Report                  7
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 3

```
1           A P P E A R A N C E S
2
3
4   COUNSEL FOR PLAINTIFF
5      DAVID F. BARTON, ESQUIRE
6      Gardner Law
7      745 E. Mulberry Avenue
8      Suite 500
9      San Antonio, TX  78212-3154
10     (210) 733-8191
11
12  COUNSEL FOR DEFENDANTS
13     ANDREW G. BRANIFF, ESQUIRE
14     Department of Justice
15     Civil Division, Classification Unit
16     1100 L Street, N.W.
17     Washington, D.C.  20530
18     (202) 616-0219
19
20  ALSO PRESENT
21     DAVID FISHMAN, ESQUIRE, SBA
22
```

Page 5

```
1              P R O C E E D I N G S
2      Thereupon,
3            John C. Sullivan,
4   a witness, called for examination by counsel for the
5   Defendants and, after having been sworn by the
6   notary, was examined and testified as follows:
7      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
8   BY MR. BRANIFF:
9      Q.  For the record, this is the deposition of
10  John Sullivan in the case of Rothe v Department of
11  Defense, et al.  It's in the District Court for the
12  District of Columbia.  This deposition is being
13  taken pursuant to the Federal Rules of Civil
14  Procedure.  Objections except as to form and
15  privilege are reserved.  And, Counsel, at this time,
16  do you want to reserve your signature to review the
17  deposition after it's taken?
18      MR. BARTON:  Sure.
19  BY MR. BRANIFF:
20      Q.  Now, Mr. Sullivan, could you state your
21  whole name for the record?
22      A.  Sure.  My name is John Charles Sullivan.
```



Page 6

1   Q.  And your current address?
2   A.  Is 316 B, as in boy, East Melrose Avenue,
3   Baltimore, Maryland, 21212.
4   Q.  And are you represented by counsel here
5   today?
6   A.  Yes, I am.
7   Q.  Are you on any medications that might
8   affect your ability to give complete and accurate
9   testimony in this matter?
10  A.  I am not.
11  Q.  Is there any other reason that might
12  affect your ability to give complete and accurate
13  testimony?
14  A.  There is not.
15  Q.  Have you been deposed before?
16  A.  Yes, sir, I have.
17  Q.  What was the most recent time you were
18  deposed?
19  A.  Almost exactly three years ago today I was
20  deposed in California, the Cal Trans case.
21  Q.  Okay.  And do you have any questions for
22  me about this deposition?

Page 7

1   A.  Not yet.
2   Q.  Okay.  If at any time during the
3   deposition you don't understand a question, please
4   ask me to repeat it or explain it better.
5   A.  I will do so.
6   Q.  If you have any questions for your
7   attorney, please feel free to wait until we take a
8   break, feel free to ask him at that time.  And you
9   have a time, any time during the course of the
10  deposition if you want to go back and correct an
11  answer, please just say so, and we can do so.
12  A.  I will do so.
13  Q.  Okay.  Did you prepare an expert report
14  for this case?
15  A.  Yes, I did.
16  Q.  Okay.  Is this, this has already been
17  marked as Sullivan 1, the report of Plaintiff's
18  expert.  Is that the report you prepared?
19      (Sullivan Exhibit No. 1, Expert Report,
20  was marked for identification.)
21      THE WITNESS:  That is the report I
22  prepared.

Page 8

1   BY MR. BRANIFF:
2   Q.  Okay.  You can go ahead and keep that.
3   I'm going to be asking you some questions concerning
4   that report.
5   A.  Sure.
6   Q.  Is your resume or C.V. included at the end
7   of this report?
8   A.  It should be.  I'm checking now, and, yes,
9   it is.  Starting on page 49.
10  Q.  You've submitted this report on,
11  September 2 it looks like you prepared it, served it
12  on September 9.  Does that correlate with your
13  recollection?
14  A.  Well, I remember preparing it in early
15  September.  I'm sorry, but I'm not quite sure how
16  the word "served" is being used there.
17  Q.  I understand.  Have there been any changes
18  to your CV since that time that you would like to
19  bring to our attention?
20  A.  I don't believe so.  I updated it recently
21  adding an article or two, but it was nothing that
22  important that I recall.  Just updating it, I

Page 9

1   recall.
2   Q.  Now, it lists here that you have a degree
3   from the University of Maryland Law School, and
4   that's a J.D.; is that correct?
5   A.  That is correct, the class of 1983.
6      MR. BARTON:  If we could go off the record
7   for just a minute.
8      (Discussion held off the record.)
9   BY MR. BRANIFF:
10  Q.  Are you an attorney?
11  A.  I am.
12  Q.  Are you licensed in any state to practice
13  law?
14  A.  I am licensed to practice law in the state
15  of Maryland.
16  Q.  Are you an economist?
17  A.  I am not an economist.
18  Q.  Have you taken any classes in economics?
19  A.  I have not taken any classes in economics.
20  Q.  Do you have a degree in economics?
21  A.  I do not have a degree in economics.
22  Q.  Are you a statistician?



Page 10

1    A.  I am not a statistician.

2    Q.  Have you taken any classes in statistics?

3    A.  I took a class at the University of

4  Maryland, Baltimore County.  I audited in research

5  methods, which included some statistics.

6    Q.  Do you remember when that was?

7    A.  That was back in approximately 1997.

8    Q.  Your undergraduate degree on your C.V. is

9  listed as from Loyola College; is that right?

10    A.  It's now Loyola University, but it was

11  Loyola College back in my day.

12    Q.  Do you know when it changed to Loyola

13  University?

14    A.  Yes, I do, actually.  That was about four

15  years ago, and it was a, believe it or not, a big

16  brouhaha whether it was okay to change the name.  I,

17  personally, didn't care, but some people did.

18    Q.  What is your degree in from Loyola

19  College?

20    A.  I had a double major of English,

21  traditional literature major, and in writing.

22    Q.  Which of, what education do you have that

Page 11

1  you would say would qualifies you as expert on

2  disparity studies?

3    A.  I have my legal degree, and I have some

4  training in math.  Obviously, to be a college

5  graduate you have to take a class or two, and, of

6  course, the English background has been extremely

7  helpful.  There's no one discipline that is solely

8  responsible for disparity studies.

9    Q.  Other than the class you audited that you

10  mentioned, did you take any classes in statistics at

11  Loyola College or at the Maryland Law School?

12    A.  I did not take any classes in statistics

13  at Loyola College, and there were some aspects of

14  statistics to classes I took at University of

15  Maryland, but it was not a formal statistics class

16  in the traditional sense that would be used.

17    Q.  Do you think knowledge of statistics is

18  important in determining the issues of

19  discrimination in the contracting industry?

20    A.  It certainly can be.  It's not a

21  prerequisite.  It's not sufficient, but it can help

22  inform that area of investigation.

Page 12

1    Q.  The top of this first page, page 49 of the

2  exhibit, you list five different areas where you

3  have, quote, worked with the following governments

4  to produce disparity studies.  I was hoping that we

5  could go through those just a little bit.  I'm

6  curious what work specifically you did.  Let's start

7  with the top one in Nashville, Tennessee, metro

8  area.  Do you remember what work you did on that

9  disparity study?

10    A.  Generally, I do, yes.  My partner,

11  Dr. George Lanoue spelled L-A-N-O-U-E was hired to

12  help with that disparity study, and I assisted him

13  in virtually every aspect of the disparity study in

14  considering how availability was to be determined,

15  what utilization files we looked at, how would we

16  handle anecdotes.  All the various aspects of the

17  disparity study I helped Dr. Lanoue, who was the

18  consultant on that study.

19    Q.  Was he the primary consultant?

20    A.  No, I don't think he was.  I think what

21  happened was he was, if you will, a quality control

22  manager, and he was then working almost as a liaison

Page 13

1  between the government and the company who did that

2  disparity study.

3    Q.  Do you remember --

4    A.  I believe it was D.J. Miller, M-I-L-L-E-R.

5  They may have gone out of business.

6    Q.  Did you do any math as part of your

7  consulting work on that?

8    A.  Yes.  We do some basic math.  We have,

9  it's not much more than a calculator or a computer

10  would do, but there's often addition of utilization

11  data, for example, that has to be done, that sort of

12  thing, yes, so there's some very basic statistics.

13    Q.  So, you did some of those basic statistics

14  on that study?

15    A.  Yeah, it's inevitable that you do some

16  basic studies in disparity studies.

17    Q.  Did you recommend any changes to the

18  methodology that D.J. Miller used on that study?

19    A.  I believe I did.  I believe I recommended

20  that bidding analysis be done as a way of

21  determining availability.

22    Q.  Do you know if they ended up using anyone

**MAGNA**
**LEGAL SERVICES**

Page 14

1  else's?
2      A.  I do not believe they did analysis.
3      Q.  Do you recall if they ended up finding a
4  disparity in that study?
5      A.  I believe they did.
6      Q.  Do you recall if they recommended to the
7  Nashville, Tennessee, metro area whether or not they
8  should use race conscious methods in their public
9  contracting?
10     A.  I believe they did make that
11 recommendation, yes.
12     Q.  Do you agree with that recommendation?
13     A.  Truthfully, sitting here, Mr. Braniff, I
14 haven't looked at that study in a long time, and I
15 would be very reluctant to speculate.  I'd have to
16 see the details of the study.
17     Q.  Do you remember if you had an opinion at
18 the time that it was published?
19     A.  Yes, actually, I do.  My recollection is
20 that I was not impressed with the final product.
21     Q.  Did you collect any data for that study?
22     A.  I don't believe we did.

Page 15

1      Q.  In the next study, the City of St.
2  Petersburg, which is '98 to 2000, do you recall the
3  company that was --
4      A.  I do.  It was a Ph.D., and his name was
5  Maurice Mongkuo, which I believe is spelled
6  M-O-N-G-K-U-O.  He is an academic located in
7  Florida.
8      Q.  And was that a disparity study as well?
9      A.  Yes, it was.
10     Q.  And did you work with Dr. Lanoue on that
11 project as well?
12     A.  We did, and what I remember about that
13 study is we had a lot more influence on that study
14 with Dr. Mongkuo, and I believe the difference is
15 that he was working solo, and D.J. Miller had its
16 own company apparatus.
17     Q.  Did you collect any data for that study?
18     A.  I think we did.  I think we may have
19 looked at availability data.
20     Q.  When you say we may have --
21     A.  We, again, I'm sorry.  I should explain
22 that would be Dr. Lanoue and I.  We worked in tandem

Page 16

1  on these studies.
2      Q.  When you say looked at availability study
3  data, what do you mean by that?
4      A.  Boy, that's a good question.  My
5  recollection is that we got lists, and we tried to
6  cull them down to meet some sort of qualified,
7  willing and able standard.
8      Q.  Do you remember if that study ended up
9  recommending a race conscious public contracting
10 program?
11     A.  My memory is that it did not.
12     Q.  We'll move next on to the Portland,
13 Oregon, study.  Could you describe your role with
14 that study?
15     A.  Yes, that, again, was through Dr. Lanoue,
16 and what was different about Portland is we didn't
17 work on the study itself.  We worked on putting
18 together the RFP, the Request for Proposal, for that
19 study.  We worked with the Portland city attorney.
20 Her name was Madeline Wessel spelled, I believe,
21 W-E-S-S-E-L.
22     Q.  And do you recall what the result of that

Page 17

1  study was?
2      A.  We put together the RFP in ways that we
3  thought would help assure a quality product, and
4  then the RFP was put out, and it resulted in one of
5  the disparity study companies, perhaps Mason
6  Tillman, getting that work.  By that point, we were
7  out of the process, so we didn't follow it as
8  closely.
9      Q.  So, you didn't do any sort of substantive
10 work on the disparity study?
11     A.  No, just on the RFP.  As I recall, it was
12 one of the longer disparity studies ever produced.
13 It was multi-volumes.
14     Q.  The next study you have listed is the
15 State of Texas for the Controller's Office,
16 1994-'95; correct?
17     A.  Correct.
18     Q.  Do you remember what firm was the primary
19 contractor on that study?
20     A.  Yes, that was NERA, N-E-R-A, and the point
21 of contact for NERA was Mr. Wainwright's
22 predecessor, David Evans, E-V-A-N-S.

MAGNA ▶
LEGAL SERVICES

Page 18

1    Q.  Did you do any substantive work on that
2  study?
3    A.  Yeah, we did.  We tried to -- again, it
4  was sort of quality control work.  Dr. Lanoue and I
5  were involved.  I went down to Texas.  I don't
6  recall that he did, met with the folks there.  We
7  tried to push them to do good availability measures.
8  I remember that.
9    Q.  And do you recall what the result of that
10  study was?
11    A.  The result was a NERA disparity study, and
12  beyond that I can't, I can't recall much.  Let's put
13  it that way.
14    Q.  Do you recall if the study recommended any
15  race conscious --
16    A.  I believe the answer is yes, I think they
17  did recommend race conscious.
18    Q.  Do you remember having an opinion when
19  that study was produced?
20    A.  My opinion, as I recall, is that the study
21  could have been better.
22    Q.  And our last one, Albuquerque, New Mexico,

Page 19

1  1993 to 1994, what was your role on that study?
2    A.  Dr. Lanoue was a point of contact there.
3  I helped him out, although not as much with
4  Albuquerque, as I recall.  They were looking for
5  sort of general advice on how to do a disparity
6  study.
7    Q.  So, you didn't do any substantive work on
8  that study?
9    A.  I, honestly, don't remember that I did,
10  truthfully.
11    Q.  Have you ever done any regression analysis
12  as part of your work on the disparity studies?
13    A.  I have not.
14    Q.  Have you ever calculated statistical
15  significance with regard to the data you have
16  collected as part of your work on a disparity
17  studies?
18    A.  I have not.
19    Q.  As far as you remember, moving aside the
20  Portland one where it was just the RFP, in the
21  Nashville, City of Petersburg, State of Texas and
22  the Albuquerque one, do you recall if all four of

Page 20

1  those studies found a disparity?
2    A.  I don't believe St. Petersburg did.  I
3  think Nashville did.  I'm fairly certain Texas did.
4  Albuquerque probably did as well.
5    Q.  What do you think qualifies you as an
6  expert to opine that the studies and analysis upon
7  which Dr. Wainwright bases his opinion do not
8  establish significant disparities sufficiently
9  connected to the 8(a) program?
10    A.  I have been involved with disparity
11  studies in one capacity or another since 1990.  The
12  industry did not even exist until before 1989.  I
13  have researched and written in this area.  I have a
14  good bit of experience in litigation and otherwise,
15  so, based on my research and my work and my
16  experience, I believe I'm qualified to opine.
17    Q.  Have you done any statistical analysis
18  work in your expert, in creating this expert report?
19    A.  I have.
20    Q.  Could you describe the statistical
21  analysis work that you did in creating this report?
22    A.  Sure.  One of the things I did was the

Page 21

1  work on the Uniform Reports I mentioned in my expert
2  report.  I contacted every state DOT in America, and
3  I asked for their Uniform Reports of DBE awards and
4  commitments from 2009 through 2001, and that was a
5  good bit of work getting all those bureaucracies to
6  produce those documents.
7      Then, once I had them, I aggregated the
8  utilization data and then compared that, the
9  minority share of that, the DBE share I should say,
10  to the availability.
11    Q.  By dividing?
12    A.  Yes.  So, there was both addition and
13  there was division involved in this process.
14    Q.  At any point, did you calculate
15  statistical significance?
16    A.  No.  That is not connected to this
17  particular approach.
18    Q.  Do you know how statistical significance
19  is computed?
20    A.  I know something about it, yes.  And I
21  also know that it is, statistical significance is a
22  measure that's intended to show that the results are



USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 426 of 814

Page 22

1  not due to chance.  So, what I will do in my work is
2  I just accept the statistical significance as has
3  been computed by the disparity study company.  I
4  don't second guess that.
5      Q.   You have not double checked the
6  significance?
7      A.   I have not double checked the
8  significance, no.
9      Q.   Have you ever done statistical sampling?
10     A.   No.
11     Q.   Have you ever individually done a
12 disparity study for a jurisdiction?
13     A.   By individually you mean myself and no one
14 else?
15     Q.   Right.
16     A.   I have not.
17     Q.   Have you ever testified in a court as to
18 your expert opinion on a statistical matter?
19     A.   I appeared in front of an administrative
20 law judge in Indiana, and there were statistics
21 involved in that case somewhat.  Does an ALJ count?
22 It's not a federal court, but --

Page 23

1      Q.   For the purpose of this question, it
2  counts.
3      A.   Okay.  Sorry to quibble, but --
4      Q.   No, not a problem.  Feel free to ask me
5  questions.  What case was that?
6      A.   That was Slusser's, and I will need to
7  spell that for you.  S-L-U-S-S-E-R, apostrophe S,
8  Green Thumb versus Indiana DOT.
9      Q.   Do you remember the year?
10     A.   Yes, I do.  That was 2008.
11     Q.   Did you produce a report for that case?
12     A.   I did.
13     Q.   Did that case go to reach a decision?
14     A.   Yes.
15     Q.   And did the judge issue a --
16     A.   She did, yes.
17     Q.   Was your report accepted by the court in
18 that case?
19     A.   It was.
20     Q.   Have you ever written a report for a case
21 involving race conscious public contracting that was
22 not accepted by a court?

Page 24

1      A.   I have not.
2      Q.   Have you ever been accepted as an expert
3  witness on disparity studies in a court proceeding?
4      A.   Yes, I have.
5      Q.   Is that the same case?
6      A.   No.  The Indiana case involved a
7  disadvantaged business enterprise, but there was no
8  disparity study at issue.  The case where I was
9  accepted as an expert in a race conscious issue was
10 the Cincinnati case, and I believe that's the Ohio
11 contractors' case and that was 1998.
12     Q.   When you say accepted as an expert, what
13 do you understand that to mean?
14     A.   What that means is I was deposed, and I
15 was ready to testify.  As it turns out, I was
16 supposed to be on vacation.  Instead I had to fly
17 out to Cincinnati, and the case was settled the
18 morning it was supposed to start.
19     Q.   On the Slusser's versus Green Thumb case
20 where you testified before the ALJ, what was your
21 testimony in that case related to?
22     A.   Sure.  Slusser's was or still is, I

Page 25

1  assume, a firm that was run by a woman, and the
2  question was whether or not she qualified to be a
3  DBE.  And the issue became, and this was my role,
4  how to characterize her firm in terms of Census
5  NAICS codes, the North American Industrial
6  Classification System.  And that issue was all tied
7  into the size of the firm.  Firms can only be a
8  certain size in certain NAICS codes, so that's what
9  I testified to.
10     Q.   As to the, whether or not that contractor
11 should be designated a particular type of firm?
12     A.   Exactly.  It was whether or not she was a
13 landscaper or whether or not she worked as part of a
14 highway construction industry.
15     Q.   So, not a statistical matter?
16     A.   No, there were statistics involved.
17 That's not fair.  There were statistics involved in
18 how much revenue she got from various sources, for
19 example, various types of work.
20     Q.   So, numbers were involved?
21     A.   Yes.
22     Q.   But, other than looking at the numbers,

MAGNA
LEGAL SERVICES

Page 26

1    did you manipulate them?
2        A.  Yeah, we did, actually.  We had to look at
3    numbers in terms of share of revenue sort of issues.
4        Q.  Other than the case at hand, have you
5    written a report in other cases challenging
6    race-based contracting programs?
7        A.  I have.
8        Q.  Can you name those cases?
9        A.  Okay.  In 2010 I produced a report for the
10   Cal Trans case, and that was the Associated General
11   Contractors, San Diego Chapter versus California
12   Department of Transportation.  I produced a report
13   for that.  I also produced a report in 2008 for
14   Kevcon spelled K-E-V-C-O-N versus I'm guessing Small
15   Business Administration.
16       Q.  Are those the only two cases?
17       A.  That I produced a report?
18       Q.  Yes.
19       A.  Let's make sure I got them.  We've got Cal
20   Trans.  We've got Cincinnati.
21       Q.  Sorry.
22       A.  Kevcon and Slusser's I produced a report,

Page 27

1    although, again, that was a slightly different case,
2    and I was an expert in another case that settled
3    before a report was produced.
4        Q.  What year was the Cincinnati case?
5        A.  1998.
6        Q.  Okay.  Do you recall if any of those
7    reports were excluded by the court?
8        A.  They were not.
9        Q.  Do you recall if any motions were filed in
10   any of those cases to exclude those reports?
11       A.  Yes, they were.  In Kevcon and, again, in
12   Cal Trans.
13       Q.  Do you recall if the court ruled on any of
14   those motions?
15       A.  The court did not rule on either of those
16   motions.
17       Q.  On any of these reports have you hired
18   outside consultants to do your statistical work for
19   you?
20       A.  No.
21       Q.  You've done it yourself?
22       A.  I have done it myself.

Page 28

1        Q.  Have you ever appeared as an attorney in a
2    case challenging race-based public contracting
3    programs?
4        A.  Yes.  I was what they call second chair in
5    a case a couple years ago, Geod spelled G-E-O-D
6    versus New Jersey Transit.
7        Q.  Did you also prepare an expert report in
8    that case?
9        A.  I did not.
10       Q.  Did you hire an expert in that case?
11       A.  Yes, we had an expert in that case.
12       Q.  Who was your expert?
13       A.  The gentleman's name was Dr. John Lunn,
14   L-U-N-N.  He's an economist from Hope College in
15   Michigan.
16       Q.  Did Dr. Lunn produce a report?
17       A.  He did.
18       Q.  Was it accepted by the court?
19       A.  It was.
20       Q.  And he was an economist?
21       A.  Yes.
22       Q.  Do you also hold yourself out to be an

Page 29

1    expert in the 8(a) program?
2        A.  I consider myself an expert in the
3    connection between a program like 8(a) and evidence
4    offered as evidence of discrimination.  I say I have
5    an expertise in that.
6        Q.  Could you mind expounding on that a little
7    bit?
8        A.  Sure.  To me this area, what we're
9    discussing today, is a two-part analysis.  The first
10   is the evidence offered of discrimination.  The
11   disparity studies that are in the record.  Then the
12   second part of our analysis goes to, all right, even
13   assuming that discrimination has been proven, is
14   8(a) the right remedy for that discrimination.  So,
15   of that link between the two I would see myself as
16   an expert, yes.
17       Q.  Do you know anyone else who you would
18   consider to be an expert in that area?
19       A.  Of the link between remedy and --
20       Q.  And the 8(a) program?
21       A.  -- and the 8(a) program?  I'm sorry.  I
22   won't.  I don't know anyone else who's ever opined

MAGNA ▶
LEGAL SERVICES

Page 30

1    on it truthfully.
2         Q.   We skipped a period of time between your
3    education, which ended in '83, and your disparity
4    study work, which started in '96?
5         A.   No.  Actually, that's not accurate.  My
6    disparity started in 1990.
7         Q.   I apologize.  But in that time I
8    understand you have, you worked for the federal
9    government?
10        A.   I did, yes.
11        Q.   Where did you work in the federal
12   government?
13        A.   Housing and Urban Development from '85
14   through the end of '89, and most of that time I was
15   in the Baltimore office, although I was briefly in
16   Washington.
17        Q.   And what did you do there?
18        A.   I was an attorney advisor.
19        Q.   And what were your duties?
20        A.   Duties as assigned.  Anything involving
21   housing.  I did a lot of settlements of
22   multi-housing, like, apartment complexes, things

Page 31

1    like that, a lot of FHA kind of stuff.
2         Q.   Did you have any regulatory work?
3         A.   I did, yes.  Spent some time with the FAR,
4    the Federal Acquisition Regulations.  I spent some
5    time with the Code of Federal Regulations.  Those
6    things inevitably impact the work that HUD does.
7         Q.   When was the last time you worked on a
8    disparity study?
9         A.   Could you define work?
10        Q.   Well, you've listed five here where you
11   say you worked with the following governments to
12   produce disparity studies.
13        A.   You mean work as opposed to analyzed.  The
14   last time I worked on a disparity study would be
15   around the year 2000.
16        Q.   And not since?
17        A.   Not since.
18        Q.   But you have analyzed disparity studies
19   since?
20        A.   Quite a few.
21        Q.   Since that time, 2000, when you stopped
22   working on them and started analyzing them

Page 32

1    exclusively, have you come across disparity studies
2    that you approve of?
3         A.   I've come across parts of disparity
4    studies I approve of.  There are various disparity
5    study companies covered in this report, and they,
6    most of them do some things well.
7         Q.   How many disparity studies do you think
8    you've analyzed since 2000?
9         A.   It would be well over 100, I'm sure.
10        Q.   And of those 100 there wouldn't be a
11   single one that you would say did everything well?
12        A.   No.  That's correct.
13        Q.   Have you analyzed any disparity studies
14   that recommended race conscious contracting?
15        A.   Yes.
16        Q.   Have you ever analyzed a disparity study
17   that recommended race conscious contracting with
18   which you agreed with their conclusions?
19        A.   I don't believe so.
20        Q.   I didn't get a chance to compare exactly,
21   but do you know if any of the studies that you
22   worked on here were included in the studies that

Page 33

1    Dr. Wainwright used in his report?
2         A.   They were not, and for reasons having
3    nothing to do with me or him.  He set a time frame
4    to start things so there was no overlap.
5         Q.   Of those over 100 studies that you've
6    analyzed, have any of them used a methodology to
7    determine the availability of the DBE firms in a
8    marketplace with which you agree?
9         A.   I think not.
10        Q.   Okay.  Let's move to your report here.  If
11   you wouldn't mind turning to page five of Exhibit
12   Sullivan 1, which is your report.  At the bottom of
13   page five, the paragraph that starts with
14   "studies" --
15        A.   I'm with you.
16        Q.   -- could you read that first sentence
17   there?
18        A.   Should I read it into the record?
19        Q.   Yeah, go ahead.
20        A.   "Studies that are not before Congress
21   cannot be used to justify a Congressional program."
22        Q.   Is that your expert opinion?

MAGNA
000421
LEGAL SERVICES

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 429 of 814

Page 34

1    A.   Yes, it is.
2    Q.   And what expertise leads you to make that
3  opinion?
4    A.   What leads me to make that, to reach that
5  conclusion is that there has to be a link between
6  the evidence and the remedy.  8(a) is a
7  Congressional remedy.  If studies are not before
8  Congress, they could not possibly have been used to
9  shape a Congressional remedy.
10    Q.   Is there anything in your legal background
11  that leads you to make that conclusion?
12    A.   Yes.
13    Q.   What in your legal background leads you to
14  make that conclusion?
15    A.   Focusing on the legal background, dating
16  back to the Croson decision through Adarand, there's
17  always a requirement that a remedy be narrowly
18  tailored, and I think that is part of narrow
19  tailoring.  The remedy has to be shaped by the
20  evidence.  Evidence that's not before Congress can't
21  be influencing Congress.
22    Q.   Have you encountered a disparity study

Page 35

1  that you have analyzed that you felt was narrowly
2  tailored to the problem that it encountered?
3    A.   The answer to that question is likely no,
4  but, to be fair to the studies, the studies are
5  often just an analysis.  Many of them don't then
6  take the second step to the remedy.
7    Q.   Can we move on --
8    A.   Sure.
9    Q.   Can we move on to page seven?
10    A.   Okay.
11    Q.   On pages seven and eight you discuss the
12  industries that Mr. Patenaude works in?
13    A.   Correct.
14    Q.   And you note that the disparity studies
15  that were analyzed by Mr. Wainwright do not
16  correlate to these studies.  Is that an accurate --
17    A.   That is a fair restatement of my point,
18  yes.
19    Q.   Did you get a chance to read
20  Dr. Wainwright's rebuttal report?
21    A.   I did.
22    Q.   In it he performs two different, what he

Page 36

1  calls commonly used rank ordered correlation tests.
2  One of them is called Spearman's Rho.  Have you ever
3  heard of Spearman's Rho?
4    A.   I had not before that report.  I did look
5  it up a little bit, yes.
6    Q.   He also -- could you describe what it is
7  now?
8    A.   Spearman's Rho is, it's a comparison of,
9  it's rank correlation.  It's a comparison to look at
10  how well things correlate.
11    Q.   He also said he performed Kendall's tau.
12  Are you aware of what that is?
13    A.   Kendall's tau involves dissimilarity of
14  two lists.
15    Q.   Did you know what Kendall's tau was prior
16  to reading it in his report?
17    A.   No, I did not.
18    Q.   Did you perform any correlation test prior
19  to stating your opinion that the contracts that
20  Mr. Wainwright analyzed were dissimilar to the ones
21  that were performed by Mr. Patenaude's company?
22    A.   I did not.

Page 37

1    Q.   Move on to page eight.  On page eight you
2  have a list of disparity studies that were cited in
3  Dr. Wainwright's report that you state show
4  overutilization of MWBE.
5    A.   Correct.
6    Q.   Could you define overutilization?
7    A.   Yes.  Overutilization would be beyond
8  parity, I guess best illustrated by example.  If you
9  have, if minority business enterprises are
10  20 percent of the market, and they get 20 percent of
11  the utilization, then that's perfect parity.  If
12  over 25 percent, then they would be overutilized.
13    Q.   You state that this overutilization would
14  show no evidence of discrimination against MWBEs in
15  construction on page nine?
16    A.   Correct.
17    Q.   You agree with that?
18    A.   Yes.  Mr. Wainwright seemed to have
19  misunderstood what I was saying here.  I'm not
20  saying it establishes there's no discrimination out
21  there.  What I am saying is clearly, if you show
22  overutilization, you're not supporting your thesis,

MAGNA
LEGAL SERVICES

1   your conclusion that there's discrimination.

2       Q.   How would you define underutilization?

3       A.   Underutilization traditionally is defined

4   as less than 80 percent of the market.  To return to

5   our example, if minority business enterprises are

6   20 percent availability, but they only got, let's

7   say, 15 percent utilization, that would be

8   underutilization.

9       Q.   And, consequently, would underutilization

10  show evidence of discrimination?

11      A.   It possibly could.

12      Q.   It could.  Let's go to page 18.  Okay.  On

13  page 18 at the top of the page you state that the

14  107 disparity studies in the record address state

15  and local minority and women business enterprise

16  program.  Obviously, as the acronym explains, white

17  women are included in this Group in these MWBE

18  programs; is that correct?

19      A.   That's what it states here, yes.

20      Q.   And do you understand that the studies

21  that Dr. Wainwright looked at included white women

22  in their numbers for availability?

1       A.   I do now, since I've read his reply brief.

2   I misunderstood what he had done, and here was the

3   source of my confusion.  In his report, his first,

4   he uses the acronym MBE.  Now, the MBE also includes

5   some disparity studies that covered DBEs, so I

6   termed MBE as being an umbrella term that also

7   included women.  That's not how he, in parts of the

8   report he intended it that way, but in other parts

9   he didn't, so he did actually, in Table 5, as he

10  says in the rebuttal, he did just look at

11  minorities, and, so, for that reason I retract this

12  criticism.  I simply did not understand what he

13  tried to do.

14      Q.   Did you check any of his numbers in Table

15  5?

16      A.   I did, actually, yeah.

17      Q.   Can you recall which specific ones?

18      A.   Yes.  Specifically I looked at Houston,

19  and I was attracted there because there are some

20  blanks in the chart, and, so, I did look at his

21  numbers.  I tried to recreate what he had done, and

22  in Houston I could not.

1       Q.   You could not?

2       A.   No, although his source says it's page

3   191, I think, plus unpub, which I interpret to mean

4   he uses some unpublished data in there, so, there's

5   no way I could then recreate his numbers, but I did

6   attempt.

7       Q.   And is that the only one you --

8       A.   No.  I also attempted Cal Trans, because I

9   was the expert witness there, and I looked at the

10  tables he was referring to, and I could recreate

11  what he had done.

12      Q.   Move to page 19.  On 19 you have a

13  paragraph titled Personal Net Worth of the Firm

14  Owner?

15      A.   Correct.

16      Q.   At the end of that paragraph you say, "For

17  the continued 8(a) eligibility, the personal net

18  worth of the 8(a) firm owner must remain below

19  $750,000"; is that right?

20      A.   Yes.

21      Q.   Is that the same or different from the

22  U.S. DOT DBE program?

1       A.   It is different from the U.S. DBE program.

2       Q.   Do you know what the U.S. DOT DBE program

3   net worth limit is?

4       A.   It is now 1.23 million.

5       Q.   Has it always been 1.32 million?

6       A.   No.  In February of 2011 it changed to

7   1.32 from the lower amount of 750,000.

8       Q.   And that was two years ago?

9       A.   That was two-and-a-half years ago.

10      Q.   So, between 2000 and 2011 the limit

11  between the DOT DBE program and the 8(a) program

12  were the same?

13      A.   Not exactly.  As I understand it, to get

14  into the 8(a), isn't it 250 to get in?  And that's

15  not the limit for DOT.  But the stay in limit, the

16  750, that was the same for those years.

17      Q.   Between 2000 and 2007, the personal net

18  worth limit to stay in the 8(a) program was the same

19  as the net worth limit to participate in the DOT DBE

20  program?

21      A.   That is correct.

22      Q.   I'm sorry.  If I said 2007, I meant 2011

MAGNA ▶
LEGAL SERVICES

Page 42

1   in that last question.  Do you understand that?
2       A.   The question is the same, and the answer
3   is the same.
4       Q.   Okay.  What would happen to the disparity
5   indexes if you eliminated individuals with higher
6   than $750,000 net worth from the DOT DBE disparity
7   reports?
8       A.   Let me make sure I've got your
9   hypothetical.  What you want to do is you're going
10  to take out the people who are between 1.32 million,
11  because that's the ceiling, and 750,000?  The answer
12  to that question is we don't know.  You would tend
13  to think it would reduce availability because
14  there's almost certain to be some firms in that
15  window, but what that does to utilization is simply
16  unknowable.
17      Q.   How many individuals in the DOT DBE
18  program have a net worth between 750,000 and 1.32?
19      A.   I can't answer that question.  I don't
20  think anybody can.  That would be part of my point.
21      Q.   Did you do any math to support your
22  conclusion that the availability percentages

Page 43

1   are "likely overstated" because of this change in
2   the net worth between the DOT DBE program and the
3   SBA 8(a) program?
4       A.   I did not do any math.  I was working on
5   the assumption that new entries into federal
6   programs are more likely to be a minority and,
7   therefore, more likely to have lower net worth, but
8   I don't know that.  There's a certain unknowability
9   there.
10      Q.   So, you're speculating --
11      A.   Fair enough.  I am speculating, yes.
12      Q.   On page 20 you move to firm revenue
13  limits.
14      A.   Okay.
15          MR. BARTON:  Excuse me just a minute.
16  David Barton.  Clear up the speculation again.  I
17  lost that.  What was he speculating about?
18          MR. BRANIFF:  As to the number of firms
19  between 750 and 1.32 million.
20          MR. BARTON:  Okay.
21  BY MR. BRANIFF:
22      Q.   For firm revenue limits you state that the

Page 44

1   8(a) program has an annual revenue limit in the area
2   of Rothe's firm.  You state it's 25.5 million; is
3   that right?
4       A.   That's correct.
5       Q.   Do you know if the DOT DBE program has
6   firm revenue limits?
7       A.   It does.
8       Q.   Do you know if those are different than
9   the 8(a) program?
10      A.   They should be the same.
11      Q.   So, the DOT DBE program and the 8(a)
12  program have identical firm revenue limits?
13      A.   I believe that is true.
14      Q.   Let's move on to page 22.  On page 22 you
15  discuss the D. Wilson Consulting Group, which was
16  one of the companies that created the disparity
17  studies that are in Wainwright's report; is that
18  correct?
19      A.   That is correct.
20      Q.   Have you ever done any work for D. Wilson?
21      A.   I have not.
22      Q.   Have you ever worked on a case either as

Page 45

1   an expert or an attorney involving a D. Wilson
2   disparity study?
3       A.   I have.
4       Q.   Which case?
5       A.   Two cases, actually.  I was involved with
6   the Milwaukee case.  I was a consultant on that
7   case, and that was the Hispanic Chamber of Commerce
8   versus the City of Milwaukee.  And I am currently
9   involved, to the best of my knowledge, I'm involved
10  in the Montana DOT case.  I phrase it that way
11  because I did work on that last January for which I
12  have not been paid, and I don't know if that case is
13  still alive.
14      Q.   We'll start with the Milwaukee case.  Is
15  the Hispanic Chamber of Commerce a plaintiff in that
16  matter?
17      A.   They were the plaintiff in that matter.
18  The case has been settled.
19      Q.   Were you hired as an expert?
20      A.   I was not.  The expert in that case was my
21  colleague, Dr. George Lanoue.
22      Q.   Did you review that disparity study for

MAGNA
LEGAL SERVICES

Page 46

1   that case?
2       A.  I did.
3       Q.  Did the disparity study in that case
4   recommend race conscious public contracting
5   measures?
6       A.  I believe it did, yes.
7       Q.  Did you agree with those recommendations?
8       A.  I disagreed with them.
9       Q.  If you can, without going too far, could
10  you give us a couple of reasons why you disagreed
11  with those conclusions?
12      A.  Yes, one of the problems that I recollect
13  in the Milwaukee disparity study is that they
14  combined prime contractor data and subcontractor
15  data.  And that does not allow for the crafting of
16  an effective remedy because prime contracts and
17  subcontracts are awarded in very different ways.
18      Q.  When you say they combined them, do you
19  mean they combined them in determining their
20  utilization number or their availability number?
21      A.  Both.
22      Q.  In the Montana case where you were a

Page 47

1   consultant, did you review that disparity study?
2       A.  I have looked at that study, yes.
3       Q.  Did you provide an opinion as to that
4   study to your client?
5       A.  I did not.
6       Q.  Who was your client or you were the, well,
7   who was your --
8       A.  No, it's fair to say I'm assisting Dr.
9   Lanoue in that case.  The client there is Western
10  Construction I believe is the name.  Forgive me if I
11  missed that.  I've done no work in it for the better
12  part of this year.  The attorney who's handling that
13  case is a gentleman named Gary Lofland,
14  L-O-F-L-A-N-D.  He has a case coming up in front of
15  the Supreme Court, a very high profile case, and,
16  apparently, this case is not considered important,
17  so it's sitting.
18      Q.  Did you review that disparity study?
19      A.  I have looked at it, yes.
20      Q.  Did that disparity study recommend race
21  conscious public contracting measures?
22      A.  My recollection is it did for some groups.

Page 48

1       Q.  Do you recall whether or not you agreed
2   with that recommendation?
3       A.  I think the answer is I do not agree with
4   it, and forgive my vagueness, but I have not looked
5   at that particular study in some time.
6       Q.  With regard to the combination of prime
7   and subcontracting data, is it your understanding
8   that the Wainwright expert report also combines
9   prime and subcontracting data?
10      A.  In some places I believe it does, yes.
11  Some of the studies combine it.  Some do not.
12      Q.  What would be the result of a disparity
13  ratio that combined prime and subcontracting data?
14      A.  Could you be a little more precise on the
15  word "result"?
16      Q.  What is the difference between a disparity
17  ratio for, in a disparity study that just had prime
18  and subcontracting split as opposed to one that
19  would have them all in one group?
20      A.  Typically, the prime contracting disparity
21  ratios show underutilization frequently, and this is
22  based to a large degree on the research I did with

Page 49

1   the Uniform Reports.  The exact reverse is true in
2   the subcontracting level.  You will often see
3   minorities or disadvantaged businesses overutilized.
4       Q.  Were you able to identify the specific
5   studies in Dr. Wainwright's report where you believe
6   he used data that combined prime and sub?
7       A.  Yes.  The Wilson Consulting studies do
8   that, and the NERA studies do that.  Mason Tillman
9   typically separates them, and MGT typically
10  separates them.
11      Q.  Did you recreate any of the disparity
12  ratios that were printed in Wainwright's report as
13  for just prime contracting or for just
14  subcontracting in the Wilson studies?
15      A.  I did not.
16      Q.  Did you recreate the disparity ratio for
17  any of the NERA studies?
18      A.  I did not.
19      Q.  So, you are unaware of what the effect the
20  combination of both of those has specifically in
21  Dr. Wainwright's report?
22      A.  No, I don't think that's a fair

**MAGNA** ▶
**LEGAL SERVICES**

Page 50

1  conclusion.  Based on my research with the Uniform
2  Reports and based on my years of work in this area,
3  I know that it is almost inevitable that, if you're
4  going to get a disparity, it's going to occur on the
5  prime contracting level as opposed to the
6  subcontracting level.
7       Q.  Did you do any math to arrive at that
8  result with regard to Dr. Wainwright's report?
9       A.  Other than the Uniform Reports discussion
10  that we've had, the answer to that question is no.
11      Q.  So, you did not recreate the disparity
12  ratios for Wilson or NERA studies?
13      A.  Correct.
14      Q.  Is it your understanding that the 8(a)
15  program is a prime contracting or a subcontracting
16  program?
17      A.  It is a little of both.  It typically or
18  frequently works as a prime contracting program,
19  although there are some firms that get some
20  subcontract work on those contracts, but the answer
21  to your question, as I believe you're asking it, is
22  in the 8(a) program the agency awards the contract

Page 51

1  to a firm, and then the firm may or may not sub out
2  some of that work.
3       Q.  If you were looking at a disparity study
4  that analyzed prime contracting, would you feel that
5  would be relevant to analyzing the need for the 8(a)
6  program?
7       A.  It very much possibly could be, yes.
8       Q.  If you were looking at a disparity study
9  that looked at subcontracting, do you think that
10  that would be relevant to the need for the 8(a)
11  program?
12      A.  It could be.
13      Q.  Okay.  On our next page, on page 23, we
14  move to the NERA studies.
15      A.  Okay.
16      Q.  You mention that you worked with NERA on
17  the Texas study; is that correct?
18      A.  Correct.
19      Q.  Other than the Texas study, have you
20  worked on developing any other NERA study?
21      A.  I have not worked on any, I've not worked
22  with NERA on any of these studies, no.

Page 52

1       Q.  Have you ever worked on a case either as
2  an expert or an attorney involving a NERA disparity
3  study?
4       A.  I have.  I have worked on a case involving
5  the State of Maryland study and, well, that would
6  also involve, there are two State of Maryland
7  studies.  I guess those would be the only cases I
8  worked on.
9       Q.  And what role did you work on that case?
10      A.  In the Maryland case I was a consultant to
11  the law firm that brought the case, and that
12  lawyer's name was Scott Livingston,
13  L-I-V-I-N-G-S-T-O-N.  His firm is in Annapolis, and
14  he represented the construction contractors.  I
15  evaluated the disparity study for them.
16      Q.  Do you recall your evaluation of the
17  disparity study?
18      A.  To some degree, yes.
19      Q.  Would you mind relating what you --
20      A.  It is a typical NERA study, which is to
21  say it ignores capacity.  It combines prime and sub.
22  It makes no effort to investigate anecdotes.  Very

Page 53

1  characteristic of NERA.
2       Q.  Have you ever reviewed a NERA study that
3  found a disparity that you felt did so correctly?
4       A.  No.
5       Q.  How would you define capacity?
6       A.  Capacity is the capability of an
7  individual firm to complete a contract.
8       Q.  Does the capacity of a firm vary based on
9  the race of its owner?
10      A.  It shouldn't, no.
11      Q.  Would capacity of a firm vary based on the
12  gender of the owner of a company?
13      A.  Again, it should not, no.
14      Q.  Do you think an appropriate disparity
15  study should have a different capacity definition
16  dependent on the race or gender of the owner of a
17  company?
18      A.  I do not.
19      Q.  How do you define availability?
20      A.  Availability is the percentage of
21  qualified, willing and able firms for a particular
22  group to do public contracting.

MAGNA
000428
LEGAL SERVICES

1    Q.  When you say for a particular group, what
2  do you mean?
3    A.  Well, there are various racial groups,
4  African Americans, Hispanics, etc.  There's a gender
5  group, and then there's the group of white males.
6    Q.  If you apply the same capacity definition
7  to minority and non-minority owned firms, will you
8  end up either overcounting or undercounting them to
9  the same amount?
10    A.  I'm sorry.  I'm not following your
11  question.
12    Q.  If you apply one definition of capacity to
13  a group of firms in a certain geographic area, is it
14  possible that you could get an overcount of the
15  number of firms that are actually available to do a
16  certain type of work?
17    A.  I don't know that you should, if I
18  understand your question, which I'm not sure I do,
19  truthfully.  I'm sorry.
20    Q.  If you have a capacity definition that
21  overcounts the number of firms that are able to do a
22  certain type of work, will you end up with more

1  firms that are available in that district than are
2  actually available based on your definition of
3  capacity?
4    A.  Okay.  In your hypothetical what you're
5  saying is, if you have a mistaken capacity measure
6  that -- what is the impact of your mistaken capacity
7  measure?  That's where you're losing me.
8    Q.  What would be the impact of a mistaken
9  capacity measure?
10    A.  Well, if you ignored capacity, let's say,
11  as NERA so frequently does, what that's going to do
12  is count firms that are too small to do certain
13  contracting.  So, if one group has a higher
14  percentage of those too small firms, then that would
15  overestimate their capacity, and, again, this is
16  just a hypothetical, but that would be the result if
17  you misjudged capacity in some way or ignored it.
18    Q.  If you misjudged capacity, you could end
19  up with an incorrect count?
20    A.  You would.  Indeed, you would.
21    Q.  Would you only end up with incorrect count
22  for disadvantaged business owners or would you also

1  end up with incorrect count for white male owned
2  businesses?
3    A.  That depends entirely on what sort of
4  contracting we're dealing with.  In the DBE universe
5  there is a cap, and this is also true in 8(a), as we
6  discussed earlier, of the size of the firm based on
7  revenue.  So, again, it doesn't matter the skin
8  color of the owner.  Once you gets over that limit,
9  then they can't participate anymore.  So, the answer
10  to your question is it depends on which program
11  you're involved with.
12    Q.  Let's move onto 28, Mason Tillman.  Have
13  you ever worked for Mason Tillman on one of their
14  disparity studies?
15    A.  I have not.
16    Q.  Have you ever worked on a case either as
17  an expert or an attorney involving a Mason Tillman
18  disparity study?
19    A.  The New Jersey study was tangentially
20  involved in the Geod case that I described earlier.
21  That's all that I can see.
22    Q.  Do you recall the results of that case?

1    A.  The Geod case?  The government won, and
2  the plaintiffs lost.
3    Q.  Just to clarify who the plaintiffs were --
4    A.  That was my client, Geod, G-E-O-D.  They
5  were a survey company in New Jersey.
6    Q.  You say the disparity study was
7  tangentially involved?
8    A.  Yes.  It was part of the record, although
9  it didn't play much, if any, role in the actual
10  litigation or the outcome.
11    Q.  Did you read that study?
12    A.  I did.
13    Q.  Did that study recommend race conscious
14  public contracting efforts?
15    A.  It did.
16    Q.  Did you agree with those conclusions?
17    A.  I did not.
18    Q.  Why did you disagree with those
19  conclusions?
20    A.  The New Jersey Mason Tillman study, like
21  virtually all the Mason Tillman studies, is just a
22  collection of lists.  If you're on a list, you're

**MAGNA**
000427
**LEGAL SERVICES**

Page 58

1   considered qualified, willing and able, and those
2   lists might include a chamber of Commerce list or
3   the, a list of minority firms who registered with a
4   particular advocacy group.  It doesn't necessarily
5   mean those firms are capable of doing or even
6   interested in doing government contracting.
7       Q.  Do you know if New Jersey currently
8   employs race conscious contracting methods in their
9   public procurement?
10      A.  The case I was involved was New Jersey
11  Transit.  Are you asking about transit or --
12      Q.  Yes, New Jersey Transit.
13      A.  New Jersey Transit, yes, they do.
14      Q.  Other than the New Jersey case, have you
15  had an opportunity to review or analyze other Mason
16  Tillman disparity studies?
17      A.  I have.
18      Q.  Have you ever opined that a Mason Tillman
19  disparity study recommended race conscious
20  contracting and did so correctly?
21      A.  I have not.
22          MR. BARTON:  Can we take about two

Page 59

1   minutes, three minutes?
2           (Whereupon, a short recess was taken from
3   11:08 to 11:19 a.m.)
4   BY MR. BRANIFF:
5       Q.  We had just finished up with Mason
6   Tillman's studies.  On page 31 you discuss MGT.
7   Have you ever done any work developing a disparity
8   study with MGT?
9       A.  I have not.
10      Q.  Have you ever worked on a case either as
11  an expert or an attorney involving an MGT disparity
12  study?
13      A.  I have.  Shall I list them?
14      Q.  Well, we'll start -- yeah, just go ahead.
15      A.  Baltimore, Broward County, Florida; the
16  Commonwealth of Virginia disparity study was
17  involved in the previous Rothe case, North Carolina
18  DOT.  I believe that's it.
19      Q.  For the Baltimore case can you describe
20  the facts leading to your involvement in a case
21  involving that disparity study?
22      A.  As best I can recall, the case was brought

Page 60

1   by a contractors' association.  The lawyer for the
2   contractors' association was Bob Gouth, G-O-U-T-H.
3   Dr. Lanoue was the expert witness, and I assisted in
4   a variety of roles.
5       Q.  As part of those roles, did you review
6   that disparity study?
7       A.  I did.
8       Q.  Did you come to an opinion about that
9   disparity study?
10      A.  If you mean did I file an opinion with the
11  court, the answer is no.  I do recall looking at the
12  study and finding it unpersuasive.
13      Q.  Did that study recommend race conscious
14  contracting methods by the City of Baltimore?
15      A.  It did.
16      Q.  Did you agree with those recommendations?
17      A.  I did not.
18      Q.  Can you recall why you specifically --
19      A.  It's actually a little vague in my memory
20  it's been so many years, but I think their
21  availability measures didn't do a good job of
22  capturing qualified, willing and able.  My memory is

Page 61

1   that they used lists, which seldom work.
2       Q.  You say seldom work.  Can you think of an
3   example where those lists have worked?
4       A.  Absolutely.  If you have a list that is of
5   firms that have actually bid, for example, a
6   bidders' list, a true bidders' list, not firms who
7   may think about it, but who may actually bid, that
8   could very well be a good source of qualified,
9   willing and able firms.
10      Q.  Can you think of a study that has used
11  that exact method?
12      A.  A bidders' list, sitting here I cannot.
13  I'm sorry.  I believe it has been done, but it's
14  rare.
15      Q.  How about in Broward County?  Do you
16  recall what your role was in that case?
17      A.  Yes, it was.  I was second chair in
18  Broward County.  I assisted the expert, again, Dr.
19  Lanoue.  The attorney there was a gentleman named
20  Herb Schlanger, S-C-H-L-A-N-G-E-R.
21      Q.  I'm sorry.  When you say second chair, you
22  were in the role of that case as an attorney?

MAGNA ›
LEGAL SERVICES

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 436 of 814

Page 62

1      A.   Second chair is kind of a catchall term.
2   I was at the table.  I assisted the attorney.
3   However, because I'm an out-of-state lawyer, I'm not
4   Florida barred, I did not actually cross any
5   witnesses or anything like that.
6      Q.   But you did provide some legal advice
7   or --
8      A.   Yes.
9      Q.   Did you review the disparity study in that
10  case?
11     A.   I did.
12     Q.   Do you recall if you had any conclusions
13  as to that study?
14     A.   I did.  I had, my conclusions were that
15  the study did not satisfy the required qualified,
16  willing and able standard and was deficient in that
17  way.
18     Q.   Did that study recommend using race
19  conscious efforts?
20     A.   It did.
21     Q.   Did you disagree with those
22  recommendations?

Page 63

1      A.   I did.
2      Q.   Do you recall the outcome in either the
3   Baltimore case?
4      A.   I remember the outcome in both.  The
5   outcome in Baltimore is that the plaintiffs won, and
6   the program was shut down briefly, and in Broward
7   County my recollection is that it settled out.
8      Q.   Moving on to the Commonwealth of Virginia
9   case in 2004, I think when you listed that you said
10  that was involved in the Rothe matter?
11     A.   Yes, that's correct.  Maybe I'm wrong, but
12  I thought that was one of the studies that was
13  offered by the government as justification for the
14  program, and the Circuit Court said, no, we don't
15  find this study persuasive.  So, I did look at that
16  study.
17     Q.   You prepared an expert report in the Rothe
18  case?
19     A.   No, sir.  What I did was I analyzed the
20  studies and gave my recommendations and my
21  evaluations to Mr. Barton who then used them in his
22  way.

Page 64

1      Q.   You were in that role as a consulting
2   expert?
3      A.   No, I don't think I was formally admitted
4   as an expert.  I think I was merely a consultant.
5      Q.   And then the North Carolina DOT case?
6      A.   Right.  That was the Rowe case, R-O-W-E.
7   That was one of the studies at issue in that case.
8      Q.   What was your role in that case?
9      A.   My role in that case was as assistant to
10  Dr. Lanoue and to the lawyer, Kevin Parsons,
11  P-A-R-S-O-N-S.
12     Q.   Did you review that study?
13     A.   I did.
14     Q.   Did you come to any conclusions as to that
15  study?
16     A.   My recollection is that the study suffered
17  from the same defects we've discussed previously.
18  That it didn't do a good job of evaluating
19  availability.  I also don't, I also remember that
20  the anecdotes were not investigated, and I thought
21  that was a flaw.
22     Q.   Have you reviewed other MGT studies

Page 65

1   besides the ones involved in those cases?
2      A.   I have looked at them for this particular
3   case.  I've done that, yes.
4      Q.   Are any of the studies included in this
5   list studies with which you agree with the
6   conclusions they draw?
7      A.   Yeah.  There are some studies here in my
8   report.  I'm skimming it here.  Parts of the Mason
9   Tillman study.  I think they don't always recommend
10  race conscious results.  So, yeah.
11     Q.   And those are the ones you agree with?
12     A.   As I recall, the answer to that question
13  is yes.
14     Q.   Are there any studies with which you agree
15  with the methodology they employ?
16     A.   Sometimes MGT does some things well.  They
17  do actually tend to look at contracts, firms that
18  have been awarded contracts as available.  They do
19  go there, so there are some things that MGT does
20  well, but my recollection is overall none of their
21  studies do a sufficient job or few of them.  Let's
22  put it that way.

MAGNA ▶
000420
LEGAL SERVICES

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 437 of 814

Page 66

1    Q.  Except for the ones you mentioned?
2    A.  Yes, and also I think it's the Idaho study
3  done after the Western States case, so they may have
4  come to a conclusion of race neutral.  Nevada as
5  well, yeah.
6    Q.  Let's move on to our next group of
7  studies, which is the company BBC.
8    A.  Okay.
9    Q.  Which actually stands for something, but
10 we'll just call it BBC right now.  I'm not sure.
11   A.  Forgive my interruption.  Just for the
12 record, not that it matters, it stands for Brown,
13 Bortz and Cottington.
14   Q.  Have you ever worked to help BBC produce a
15 disparity study?
16   A.  I have not.
17   Q.  Have you ever worked on a case either as
18 an attorney or as an expert involving a BBC
19 disparity study?
20   A.  Yes.
21   Q.  Could you list those cases?
22   A.  The California Department of

Page 67

1  Transportation.  That's Cal Trans, as we discussed,
2  and that's the only case.
3    Q.  Did you submit an expert report in that
4  case?
5    A.  I did.
6    Q.  Do you recall what your conclusion was in
7  that expert report?
8    A.  Yes, I do.
9    Q.  Could you describe it here?
10   A.  My conclusion was that the Cal Trans BBC
11 study was not a sufficient predicate for the remedy
12 of race conscious goals.
13   Q.  Could you be more specific?  Why was it
14 not enough of a predicate?
15   A.  I thought they didn't do a good enough job
16 of dealing with capacity.  California has some
17 massive contracts.  I felt they could have done a
18 better job with the anecdotes.  They didn't
19 investigate them.  They rely on a survey, which was
20 self-answered, and no one looked into it.  A lot of
21 flaws that I thought all added up to a bottom line
22 that the Cal Trans study was not sufficiently

Page 68

1  persuasive evidence of discrimination that would
2  justify the DBE goals.
3    Q.  When you say justify the DBE goals, did
4  the study end up recommending using race conscious
5  goals?
6    A.  For some groups it did, yes.
7    Q.  Looking at the flaws in that study, were
8  you able to determine that there shouldn't be any
9  goals or just that the study wasn't enough to
10 qualify, to support the goals?
11   A.  The latter, that the study was not
12 sufficient to support the goals.
13   Q.  Did you do any independent analysis to
14 determine whether or not goals might be appropriate
15 in Cal Trans, for Cal Trans?
16   A.  I did some independent analysis, yes.
17   Q.  What was your conclusion?
18   A.  My conclusion was, by looking at the
19 biggest contracts that Cal Trans awarded, I realized
20 that that was two-thirds of all the dollars that
21 were being awarded, and these contracts were so big
22 that no DBEs bid on them, disadvantaged business

Page 69

1  enterprises bid on them, and that was two thirds of
2  all dollars awarded.
3    Q.  So, you were able to determine from that
4  number that there should not be a goal?
5    A.  That was part of my conclusion, yes.  The
6  problem is that these contracts are so big that any
7  firm who was awarded one of those contracts would
8  have annual revenues that exceeded the ceiling, and
9  they would no longer be a DBE, and that's true
10 regardless of the skin color or gender of the owner,
11 so I didn't think they should be thrown in with all
12 the other utilization data because those contracts
13 are just undoable.
14   Q.  And, when you took them out, did you
15 recalculate a disparity index?
16   A.  I did not.
17   Q.  Would that have been possible?
18   A.  Perhaps.  I don't know.  I'd have to go
19 back into the data.
20   Q.  Is there a reason why you didn't do it?
21   A.  I didn't think it was doable, truthfully.
22   Q.  For any of the disparity indexes included

MAGNA ▶
LEGAL SERVICES

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 438 of 814

Page 70

1  in Dr. Wainwright's report, did you attempt to
2  recalculate the disparity index using what you would
3  think would be more accurate availability numbers?
4      A.  I did not.  Other than the two that we
5  mentioned previously, the Cal Trans and the Houston
6  disparity studies, I did not look at any of, I
7  didn't go back to the actual pages within his
8  report, disparity studies, and try to see where the
9  numbers came from.
10     Q.  You reviewed other BBC disparity studies,
11 though, that is for this case, other than the Cal
12 Trans study?
13     A.  You're asking me have I reviewed them?
14     Q.  Yes.
15     A.  Yes.  The Indiana.  I did a critique of
16 the Indiana study.
17     Q.  For what purpose did you do that?
18     A.  I was hired by the Indiana Constructors,
19 that's an organization of builders in Indianapolis,
20 to critique their disparity study.  I've done work
21 for them for many, many years, and they asked me to
22 take a look at the study, and I did so, and then I

Page 71

1  produced a, perhaps, 40-page analysis.
2      Q.  I apologize.  I'm going to go back to Cal
3  Trans real quick.  Do you know if a Daubert motion
4  was filed concerning the report in the Cal Trans
5  case?
6      A.  It was.
7      Q.  Did the judge rule on that motion?
8      A.  The judge did not.
9      Q.  Okay.  Back to Indiana.  Who did you
10 produce the 40-page report for?
11     A.  It was for an organization named the
12 Indiana Constructors, and the gentleman I've always
13 dealt with out there is named Paul Berebitsky,
14 B-E-R-E-B-I-T-S-K-Y, and in November of 2010 I
15 contacted Paul and asked him if he would be
16 interested in getting a review of that disparity
17 study, and he agreed, and so I produced my analysis.
18     Q.  Do you recall what your analysis was of
19 that study?
20     A.  My analysis looked at all parts of the
21 study.
22     Q.  Did you have any opinion as to the

Page 72

1  recommendations of the study?
2      A.  I did.
3      Q.  What did the study recommend?
4      A.  The study recommended race conscious
5  remedy in terms of goals, and I didn't think the
6  study was done well enough to support that.
7      Q.  Were there any particular reasons why you
8  didn't think it was done well enough to support it?
9      A.  Boy.  My recollection is that the
10 utilization data was incomplete, and availability
11 wasn't persuasively done.  I also think they came to
12 patchwork results meaning some groups were
13 overutilized, some underutilized.
14     Q.  Did you recreate any of that number, any
15 of the numbers included in that report to come to
16 your own independent conclusion?
17     A.  I may have.
18     Q.  You may have or --
19     A.  Yes, sir.  I'm sorry.  I'm being truthful
20 under oath.  I may have.  I can't recall sitting
21 here right now.  I don't have the review in front of
22 me, haven't looked at it in a while, but I think I

Page 73

1  did some work like that.  That's my recollection.
2      Q.  Did your independent analysis support a
3  use of race conscious goals or not?
4      A.  No, it did not.  My independent analysis,
5  as I recall, actually showed serious overutilization
6  in some places.
7      Q.  Do you know if Indiana continues to use
8  race conscious contracting?
9      A.  They do.
10     Q.  Do you know if that study has been
11 challenged in court?
12     A.  It has not, to my knowledge.
13     Q.  Are there any BBC studies that you have
14 reviewed that have recommended race conscious public
15 procurement programs that you felt sufficiently
16 supported the use of those programs?
17     A.  No.
18     Q.  Have there been any studies done by any of
19 the firms today, MGT, Mason Tillman, NERA or Wilson
20 that you feel recommended race conscious
21 contracting, and you feel that the analysis done in
22 the disparity study supported that recommendation?

**MAGNA ▶**
**LEGAL SERVICES**

Page 74

1     A.  I do not.
2     Q.  Okay.  You have a specific critique of the
3  NERA availability measure in my report of the way
4  NERA calculates availability; is that right?
5     A.  Are you referring to the Dun and
6  Bradstreet analysis?
7     Q.  Yes.
8     A.  Yes, I do.
9     Q.  How would you go about determining the
10  availability of firms for a specific geographic
11  region?
12     A.  I would look at the bidding.  It takes
13  time and money to put together a bid, and those are
14  records that the government has.  And that would be
15  my starting point to look at those firms that have
16  actually bid.  In some I would also, when
17  appropriate, I would look at those firms which have
18  been prequalified.  Many jurisdictions have
19  prequalification, and some jurisdictions have
20  prequalifications up to different amounts, up to $1
21  million, up to $10 million.  Those firms are clearly
22  qualified, willing and able to do that work if

Page 75

1  they've gone through the effort to become
2  prequalified, and the government has agreed they are
3  qualified.  Those would be my starting points.
4     Q.  If a firm had to pay higher interest rates
5  on loans, would it make it easier or harder for that
6  firm to get prequalified for bidding?
7     A.  It would probably make it harder.  It
8  would, of course, depend on the standards of
9  prequalification for the individual jurisdictions,
10  but I suspect that would have the impact of making
11  it harder.
12     Q.  If a firm had to pay higher interest rates
13  on loans that it applied for, would it tend to
14  submit higher bids or equal bids to firms it was
15  competing with who paid lower interest rates on
16  their loans?
17     A.  That would depend on how much that firm,
18  the first firm you described paying the higher
19  rates, wanted the work.  Just because the -- it's
20  costing more money to borrow money.  That does have
21  an impact on your bottom line, of course, but it
22  depends on how much you need the work, what sort of

Page 76

1  bid you're going to come in at.
2     Q.  Have you done any studies on the impact of
3  bonding on the ability of firms to compete for
4  public contracting projects?
5     A.  I have not done any research on that.
6     Q.  Have you done any research on the impact
7  of personal net worth on the ability of firms to
8  compete for public contracts?
9     A.  I have not, no.
10     Q.  If you were to create an availability
11  number just based on the bidding list, would you
12  apply any adjustments to that list based on other
13  factors in a geographic region?
14     A.  I would.
15     Q.  What would those be?
16     A.  If a firm bids on a $10 million project
17  and another firm bids on $100,000 project, will
18  that, availability is a measure of relative
19  availability, so that much larger bid should count
20  more towards availability, because it's a share of
21  the marketplace that your availability is measuring,
22  attempting to at least, so you'd have to weight by

Page 77

1  the size of bids.
2     Q.  Is there any other weight that you would
3  apply?
4     A.  Not that I can think of sitting here.
5     Q.  Earlier in the deposition you defined
6  capacity to do something.  Do you think firms are
7  able to adjust the capacity at which they operate?
8     A.  They can adjust it some, yes, absolutely.
9  It's not infinitely elastic, but there is some
10  elasticity to a capacity.
11     Q.  Could you define what you mean by
12  elasticity of capacity?
13     A.  Yes, elasticity of capacity is the ability
14  of an individual firm to expand to meet demand.
15  Now, it's not limitless.  A construction company
16  with a pick-up truck and a box of tools will never
17  be able to build a bridge, but they could hire an
18  extra laborer, for example, to do a project.
19     Q.  Have you done any studies on the
20  elasticity of capacity in public contracting?
21     A.  I've looked into it.  I've read some
22  articles on it, and every time I get a chance to



20  (Pages 74 to 77)

Page 78

1  talk to contractors I do ask them about this issue,
2  but I've never done a formal study on it, no.
3      Q.  Do you believe that an availability
4  measure should be adjusted for the elasticity of
5  capacity?
6      A.  I don't know how you would because it
7  seems so theoretical.  I suppose it could be done,
8  perhaps, with a range of availability.
9      Q.  Okay.  On page 37 of your report we are
10 going to look at, in the business formation,
11 business earning, loan denials and credit problem
12 section, you describe the regression analysis that
13 Dr. Wainwright performs and his definition of
14 regression analysis.  How would you define a
15 regression analysis?
16     A.  I'm very satisfied with Mr. Wainwright's
17 definition.
18     Q.  In any of your expert reports have you
19 individually done a regression analysis?
20     A.  Never.
21     Q.  In any of your other work have you done a
22 regression analysis?

Page 79

1      A.  I have not.
2      Q.  Do you think that a regression analysis is
3  a helpful technique when preparing a disparity
4  study?
5      A.  Not much, truthfully.  The problem with
6  regression is that it can never pinpoint causation.
7  It can never tell where in the public contracting
8  process discrimination, if it's occurring, is
9  happening.  And, if you don't know the cause, you
10 don't know the right remedy.
11     Q.  Can you describe a technique that would
12 pinpoint the cause of a disparity?
13     A.  Yes.  You'd separate prime and sub.  You'd
14 see how firms were doing on the different levels of
15 a contracting process.  You also need to have the
16 anecdotal investigations as all, most disparity
17 studies do, but I think you need to go an extra step
18 and investigate those anecdotes to see, oh, yeah, we
19 are having trouble with banks, and they really are.
20     Q.  But you don't feel regression analysis
21 that, say, would control for the size of a firm
22 would be helpful?

Page 80

1      A.  No.  It might be helpful in a way.  It
2  might start a more precise followup of
3  investigations, but I don't think regression
4  analysis will ever be sufficient because it simply
5  does not identify causation.
6      Q.  We'll move on to page 40.  Okay.  At the
7  bottom of the page, you state, "A survey with fewer
8  than half as many respondents as firms in the
9  program is not enough to establish a nationwide
10 pattern of discrimination."  Could you explain that
11 statement?
12     A.  Sure.  I think you need enough respondents
13 to be able to craft an effective remedy.  If you
14 have a limited number of people with a particular
15 complaint, that isn't necessarily sufficient to say,
16 well, yes, the 8(a) program is the way to deal with
17 that.  At one point in, I think it's his second
18 report, Mr. Wainwright talks about a response from
19 eight native American firms as important; that's the
20 word he uses.
21         Well, I don't know that that's, important
22 would be accurate there.  How can that help you when

Page 81

1  you're talking about the 8(a) program, which is
2  nationwide, when you're only talking about a
3  comparative handful of respondents?
4      Q.  You state specifically fewer than half as
5  many respondents as firms in the program.
6      A.  Right.
7      Q.  Why did you use the phrase "fewer than
8  half as many"?
9      A.  Well, I was tying back to the 3,561 firms
10 responding nationwide, and, at the time in 2008, I
11 saw something that said there were 10,000 firms,
12 upwards of that.  I don't think that's accurate
13 anymore, but, again, it's a more descriptive way of
14 saying, look, you got less than half this many firms
15 out there answering as there are actually firms in
16 the 8(a) program, so can you really draw any firm
17 conclusions that would say, yes, the 8(a) is the
18 right remedy for these problems?
19     Q.  Is there an economic theory or an economic
20 study that would define how many respondents you
21 would need before you could make any conclusions?
22     A.  There's no economic response, and I think



Page 82

1    that illustrates the difference between the view of
2    an economist there and someone interested in
3    effective public policy?
4        Q.   So, your statement that there are fewer
5    than half as many respondents is not a, quote,
6    unquote, view of an economist?
7        A.   I can't speak for economists, so I don't
8    know.
9        Q.   What number do you think you would need --
10   let's say there were 10,000 firms.  How many, what
11   size survey would you need?
12       A.   I don't know there is any bright line
13   test, but I think you'd at least want a one-to-one
14   ratio.
15       Q.   So, you would want 10,000 responses --
16       A.   Yeah, I think that's probably --
17       Q.   -- before you could draw a conclusion?
18       A.   A conclusion whether or not this
19   particular remedy is effective, yes.
20       Q.   And absent a one-to-one ratio, you don't
21   think you could draw any conclusions?
22       A.   Again, Mr. Braniff, I wouldn't want to

Page 83

1    suggest I'm drawing a bright line test here that
2    there's an X number, but I do think there has to be
3    enough that from a public policy standpoint you
4    could say these firms are representative of the
5    problem, and the problem is sufficiently remediable
6    by this particular program of 8(a).
7        Q.   And do you know of any study that does
8    that, where there's a one-to-one ratio of -- I mean,
9    has a study ever been done that has asked each and
10   every 8(a) firm and gotten 100 percent response to
11   questions as to their contracting practices?
12       A.   You're asking a different situation than
13   we have here.  The point isn't asking the 8(a)
14   firms.  That would be a very good idea.  We're
15   talking about asking the firms that have not
16   necessarily anything to do with 8(a), all these
17   firms that are in the national survey.
18           How many of those would be sufficient?
19   I'm not going to offer a particular number, but I do
20   think a one to one is not a bad goal standard.  I
21   mean, how typical are these firms in the survey?
22   How representative are they of the firms that are

Page 84

1    interested in doing 8(a) and qualify to be 8(a)
2    firms?  I don't know.  I don't think that question
3    is knowable.
4        Q.   But there's no specific methodology that
5    you use to arrive at that number?
6        A.   No, sir.
7        Q.   That one to one?
8        A.   No, sir.
9        Q.   Okay.  On the next page, okay, higher on
10   the same page where you're discussing the,
11   Dr. Wainwright's results, page 40, with regard to
12   the earnings of business owners' analysis in his
13   expert report, your final sentence is, "The results
14   of the business earning regressions in the record
15   are sufficiently mixed that I am not persuaded by
16   the result" -- "I am not persuaded the results
17   support the preferences of the 8(a) program."  What
18   do you mean by sufficiently mixed?
19       A.   What that is is a reference to is the
20   preceding paragraphs where there are various
21   regression analyses that say, you know what?  We've
22   done this regression, and we don't find

Page 85

1    discrimination.  So, if they are not finding
2    discrimination, how does that then transfer into
3    justification for a race conscious program?
4        Q.   Okay.  But you use the word "sufficiently
5    mixed."  What do you --
6        A.   What I mean, some of the studies, and I
7    think I cite a few here, don't come to conclusions
8    of, that minorities have been disadvantaged in any
9    way.
10       Q.   And what would be, at what level would it
11   be not sufficiently mixed?  At what point, where do
12   you hit the tipping point where it becomes
13   sufficiently mixed?
14       A.   The tipping point would be that you had
15   sufficiently consistent results that would allow you
16   to craft an effective remedy.
17       Q.   And would consistent results mean every
18   regression analysis would turn out --
19       A.   No, I don't think that would be
20   necessarily true at all.  You're always going to
21   have unique local circumstances that could impact a
22   regression analysis.


MAGNA ▶
LEGAL SERVICES

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 442 of 814

Page 86

1    Q.  Can you think of a scenario where there
2  would be some outlier, some regression analysis that
3  did not turn out to show a disparity or where you
4  would still say there's enough evidence there?
5    A.  That is possible, and I think the outlier
6  was the key word there.  You could very well have a
7  situation where there are a handful of minority
8  firms that were doing extraordinarily well, perhaps
9  politically connected let's say, but the bulk of the
10  firms were not doing so well, so that might
11  justify -- we're speaking hypothetically.
12    Q.  Right.
13    A.  That might justify a race conscious
14  remedy.
15    Q.  And what method did you use when you were
16  looking at these results to determine that they were
17  sufficiently mixed?
18    A.  The only method I used was to read, and
19  they explained the results, and I looked at those,
20  and I saw some that found results that would not
21  suggest discrimination.
22    Q.  So, you didn't use a statistical method to

Page 87

1  support your answer?
2    A.  No, sir.  Somewhere in there I mention
3  that I didn't second guess or re-examine any of the
4  regression analyses.  I simply looked at the
5  results.
6    Q.  Okay.  Could there be a mathematical
7  method to determine whether or not the results here
8  are consistent?
9    A.  I suppose it's possible.
10    Q.  But you didn't apply any math to this.
11  You just read it?
12    A.  Right.  Simply, as I mentioned, because I
13  don't run regression analysis.  I simply dealt with
14  the results as they were presented me.
15    Q.  Okay.  Page 41.  Sorry.  Looking for the
16  loan denial rates.
17    A.  Take your time.
18    Q.  Okay.  We did that.  Sorry.  Are you aware
19  of any evidence that minority and non-minority owned
20  businesses are unequally interested in public
21  contracting?
22    A.  Am I aware of any evidence that suggests

Page 88

1  there's a difference in the interest level of
2  minorities as opposed to non-minorities in public
3  contracting?
4    Q.  Non-minority owned businesses.
5    A.  No, I'm not.
6    Q.  Okay.  Moving to page 45 where you discuss
7  the Rubinovitz report, you state, "The conclusion to
8  be drawn therefrom is unknown" --
9    A.  I'm sorry.  Forgive me for interrupting.
10  Where are we, please?
11    Q.  I apologize.  It's in the last full
12  paragraph.  Starts "In his report."
13    A.  Yes, got it.
14    Q.  Where you state, "The conclusion to be
15  drawn therefrom is unknown and unknowable
16  considering the source of the data used."  What is
17  it about the source of the data that's relevant to
18  this sentence?
19    A.  Okay.  The odds of winning a contract is
20  -- forgive me.  Restate your question, please.
21    Q.  What is it about the source of the data
22  that's relevant to the first clause in your

Page 89

1  sentence, "The conclusion to be drawn therefrom is
2  unknown and unknowable"?
3    A.  Because this is a less than gracefully
4  written sentence.  My point was the Rubinovitz
5  report strikes me as, ultimately, irrelevant, that
6  it doesn't establish discrimination, unless there's
7  a claim of discrimination by federal procurement
8  people, and I don't know that that's ever been
9  offered in this case.
10    Q.  What do you think the source of the data
11  was?
12    A.  It would be 8(a) records.
13    Q.  Are you aware of any other data that may
14  have been used for the report?
15    A.  Sure.  He did some, he ran some
16  regressions, as I recall, but I think it was mostly
17  the SDB records, utilization, 8(a), that kind of
18  thing.
19    Q.  Is that it?
20    A.  No.  I was just going to say I'm really
21  not happy with the way I wrote this sentence.
22  Considering the source of the data used takes the

MAGNA
LEGAL SERVICES

USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 443 of 814

Page 90

1 reader in the wrong direction.  The point is that
2 the Rubinovitz report is, ultimately, irrelevant.
3     Q.  At several points during the report you
4 bring up something called the Benchmark Study.  Do
5 you know what the source of the data for the
6 Benchmark Study was?
7     A.  That was federal procurement data.
8     Q.  Do you know if Mr. Rubinovitz used any of
9 that in the creation of his report?
10    A.  I believe he did.
11    Q.  Okay.  Let us design a study.  If you were
12 going to start from the beginning, what would be the
13 first step you would take to design a disparity
14 study?
15    A.  The heart of any well done disparity study
16 is availability.  So, I would start and focus my
17 efforts on that, which firms are qualified, willing
18 and able for the public contracting that this
19 unnamed jurisdiction is going to need.
20    Q.  And let's look at each one of those
21 individually.  How would you determine qualified?
22    A.  Qualifications are those qualifications

Page 91

1 insisted on by the government.  For example, if
2 you're going to hire a plumber to work in a public
3 school, he needs a plumbing license.  Even if you
4 have an interest in plumbing, if you don't have that
5 license, you're not qualified.
6     Q.  How would you define willing?
7     A.  Willing is showing an interest in public
8 contracting, and that's typically accomplished by
9 registering with the government in some capacity.
10    Q.  And how would you show able?
11    A.  Able is your capability of doing a
12 contract.  Do you have the necessary equipment?
13 Does the contract ask for a certain number of years
14 of experience?  Does the contract insist on a
15 certain level of prequalification, that sort of
16 thing.
17    Q.  Earlier you said one method that you could
18 approximate this availability would be to use a
19 bidders' list?
20    A.  Yes.  When I say bidders' list, I want to
21 be specific because that term is often misused.
22 When I say bidders' list, I mean firms that have

Page 92

1 actually bid.
2     Q.  Are there any disparity studies that are
3 used in the Wainwright report that only use the
4 firms that have actually bid to define their
5 availability?
6     A.  No.
7     Q.  So, based on that, you would say all of
8 the studies there were deficient?
9     A.  Now, some do use bidding, but that's just
10 one of the sources.  Unfortunately, they go outside
11 and take in all this other stuff that I wouldn't
12 necessarily consider meeting the standard of
13 qualified, willing and able, but, based on that one
14 issue, yes, they are all deficient.
15    Q.  How would you then go about defining
16 utilization?
17    A.  Utilization is both the easiest and the
18 hardest part of any disparity study.  It's easiest
19 in the sense it's simply the dollars that are
20 awarded.  Conceptually, it's the easiest.  Reality
21 is every company will tell you that they pour most
22 of their time into getting utilization data because

Page 93

1 the records are never as good as they should be.
2     Q.  And would you do anything with that
3 utilization number?  How would you manipulate it?
4     A.  I don't believe it needs to be
5 manipulated.  It is a number.  It's an X.  This is
6 the amount of dollars which have been awarded.  Now,
7 it would then need to be assigned, the share of that
8 would need to be assigned to the various groups.
9     Q.  And would you apply any adjustments to the
10 utilization number?
11    A.  Not unless it seemed that they were
12 necessary.  Sometimes there's a difference between
13 the dollars as they are awarded and the dollars as
14 they are ultimately spent.  Sometimes subcontractors
15 don't get the dollars that the records would lead
16 you to believe they do.  So, if that's a problem in
17 your jurisdiction, you need to get the actual
18 awards.
19    Q.  And then you would use that availability
20 number and the utilization number to create a
21 disparity index?
22    A.  Yes, a disparity ratio, sure.



Page 94

1    Q.   And how would you do that?
2    A.   It is availability divided by utilization.
3  So, what that means is you need to have percentages.
4  With a particular group, let's use Hispanics to make
5  the issue, what was their availability?  What share
6  of the availability did they have over their share
7  of the utilization?  And that will give you a
8  fraction.
9    Q.   If this methodology was followed and the
10 disparity index were below 80, could you draw any
11 conclusions from that?
12   A.   If it were followed properly and the
13 disparity index were below 80 and there was a
14 sufficient size, there were enough contracts in our
15 unnamed jurisdiction, I think you could draw a
16 conclusion from that surely.
17   Q.   What conclusion would you draw?
18   A.   Again, if it was done properly, you would
19 look and see that a particular group was not getting
20 what you would expect them to get.  Your next step
21 then becomes asking the question why.
22   Q.   Based on your phrase "done properly," have

Page 95

1  you ever encountered a disparity study that you felt
2  was done properly?
3    A.   Remember I mentioned the St. Petersburg
4  study.  My recollection is they did a pretty, he,
5  Dr. Mongkuo, did a pretty good job of putting
6  together availability and utilization.
7    Q.   Is that the only one you can recall at
8  this moment?
9    A.   That I'm thinking of right now, yes.
10   Q.   But the previous ones we mentioned, the
11 Cal Trans study, you would say that was not done
12 properly?
13   A.   No, I don't think they did a good job of
14 availability.  No.
15      MR. BRANIFF:  Let's go ahead and stop for
16 ten minutes here.  Then I just have a little bit
17 left.  Can we go off the record.
18      (Whereupon, a short recess was taken from
19 12:05 to 12:28 p.m.)
20 BY MR. BRANIFF:
21   Q.   Can we go to page 20 of your report?
22   A.   Okay.

Page 96

1    Q.   Just a little, some cleanup here.  In this
2  section you discuss firm revenue limits, and you
3  specifically discuss the California DOT --
4    A.   Correct.
5    Q.   -- awards.  Other than the California DOT
6  report, did you look at the revenue limits of any
7  other report cited by Dr. Wainwright?
8    A.   Could you be a little more specific?
9    Q.   Did you look to see whether or not other
10 state DOT studies included contracts that were above
11 the $6.5 million sole source --
12   A.   I did not, no.
13   Q.   For the California study you state that
14 that is 64 percent of all the dollars awarded during
15 that time frame.
16   A.   Correct.
17   Q.   And I just want to make sure we're clear
18 on this.  You did not, after finding that,
19 recalculate what the appropriate disparity index
20 could be for Cal Trans by removing all of those?
21   A.   I did not.  My purpose and my research was
22 to look at how the bidding analysis, how many

Page 97

1  nonDBEs and DBEs had bid on the big contracts, so I
2  did not recalculate it.
3    Q.   You state on this page that there is a,
4  participants in the Section 8(a) program can receive
5  sole source contracts up to a ceiling of 4 million
6  for goods and services and 6.5 million for
7  manufacturing.  Is that your understanding for all
8  participants in the 8(a) program?
9    A.   I'm not sure I follow your question.
10 That's the ceiling for those goods and services and
11 the manufacturing.  I took that from Mr. Patenaude's
12 report, did I not?  Yes, I did.
13   Q.   You mean Mr. Patenaude or Mr. Wainwright's
14 report?
15   A.   You know what?  I don't know.  It's
16 probably Mr., actually, it's probably
17 Mr. Wainwright's.
18   Q.   And it's your understanding those are the
19 limits for all participants in the Section 8(a)
20 program?
21   A.   As far as I know, that is accurate, yes.
22   Q.   And is it your understanding that



Page 98

1  participants in the Section 8(a) program can only
2  participate in being awarded 8(a) contracts that are
3  set aside as sole source contracts?
4      A.  That's not accurate.  Sometimes they are
5  awarded through sole source, and sometimes they are
6  competitively bid.  Now, Mr. Patenaude has a nice
7  chart in, I believe, his first report which shows
8  the comparison of the two, and in his industries
9  it's more prevalent that they are sole source, but
10  they are awarded under both methods.
11     Q.  Are there caps on the size of contracts
12  that can be awarded competitively to 8(a) firms?
13     A.  I believe the answer to that question is
14  yes.
15     Q.  Do you know what those caps are?
16     A.  I don't.
17     Q.  Are you aware that 8(a) firms, are you
18  aware to the extent 8(a) firms compete outside of
19  the 8(a) program?
20     A.  I'm aware that many firms do compete
21  outside the 8(a) program.
22     Q.  Have you done any research on the number

Page 99

1  of contracts that go to 8(a) firms outside of the
2  8(a) program?
3      A.  I have not.  I believe I've seen a GAO
4  report which looked at that, a related issue to
5  that, how much they rely on 8(a), but I have done no
6  independent research.
7      Q.  Okay.  Finally, let's go back to your
8  statements concerning Dr. Rubinovitz report.  I
9  think that starts on page 40.  No, it's past 40.
10  Just a second.  What page are you on for Rubinovitz?
11     A.  Mine starts at 45.
12     Q.  45, okay.  Earlier you stated that you
13  felt his conclusions were irrelevant for the
14  purposes of determining whether or not the 8(a)
15  program is supported?
16     A.  Correct.
17     Q.  Is that because of the methodology he uses
18  or the data that he uses?
19     A.  I believe it's irrelevant because of the
20  methodology that he used.
21     Q.  What specific issue do you have with his
22  methodology?

Page 100

1      A.  He is looking at awards within the federal
2  procurement system, and he is comparing awards under
3  8(a) and otherwise.  And, unless the argument is
4  that there's discrimination in the federal
5  procurement system, I don't see the relevance of
6  this as a way of establishing discrimination.
7      Q.  What methodology would you recommend using
8  the federal procurement data to determine whether or
9  not there is a sufficient basis of support for the
10  8(a) program?
11     A.  I would do something similar to the
12  Benchmark Limit Study of the nineties and look at
13  availability and utilization only within the six
14  digit industry as opposed to what they did, which
15  was the mere two digit industry level.
16     Q.  When you say that, who is they?
17     A.  I'm sorry.  They were the Department of
18  Commerce who did the Benchmark Limit Study back in
19  1998.  They did it on the two digit level.  I don't
20  think that's nearly as precise enough.
21     Q.  You would do it on the six digit level?
22     A.  Yes, I would.

Page 101

1      Q.  Do you think that the data would support
2  finding of, accurate findings in terms of
3  statistical significance if you broke down contracts
4  into the six digit level?
5      A.  I think it could, if you looked at three
6  years, and I think you should always look at least a
7  time frame of three years as opposed to one year
8  because one year is a snapshot in time, and just
9  look at the shutdown of a few weeks ago.
10  Procurement in the federal level may vary wildly.
11  So, I think, if you looked at it for three years,
12  you might well achieve statistical significance,
13  yes.
14     Q.  If there was a study that showed
15  statistically significant underutilization for a
16  certain class of contractors, for whatever reason,
17  do you think you could draw any conclusion from
18  that?
19     A.  You could conclude it needs to be
20  investigated further absolutely.
21     Q.  Okay.
22         MR. BRANIFF:  I think we're good.  That's

MAGNA ▶
LEGAL SERVICES

Page 102

1   it. That's all I have. You want redirect at all?
2       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
3   BY MR. BARTON:
4       Q. Throughout your deposition from
5   Mr. Braniff, and I'm David Barton. I represent
6   Rothe Development Corporation. As you well know,
7   you're employed by my employer; correct?
8       A. Correct.
9       Q. Throughout the deposition that Mr. Braniff
10  conducted, you repeatedly used the term "we" in
11  referring to evaluating and putting on, evaluating
12  disparity studies; is that correct?
13      A. At times I believe I did, yes.
14      Q. And you used the term "we" when you
15  referred to your testimony in cases involving
16  disparity studies; is that correct?
17      A. I don't recall that I did in terms of my
18  testimony, no. Obviously, if I was testifying, I
19  was testifying on my own. I have done a lot of work
20  with other collaborators, usually George Lanoue.
21      Q. And what's your relationship with Mr.
22  Lanoue in your evaluation of disparity studies that

Page 103

1   have been addressed here today by Mr. Braniff?
2       A. Well, it varied depending on the
3   circumstances. Typically what happened is that we
4   would have clearly defined areas of work, and George
5   might say to me I need you to look at this issue,
6   and I would go look at that issue. But that was
7   typically something I would do, and then he would
8   use it in his own work product.
9       Q. Would it be a fair analysis to say that he
10  was kind of the face of your business for a few
11  years?
12      A. For a few years he was. Not so much
13  anymore, but for the first years that's absolutely
14  true.
15      Q. And would you also regard him as one of
16  the stalwarts in this industry?
17      A. I can't think of any individual who has
18  spent as much time addressing this issue as Dr.
19  Lanoue.
20      Q. Mr. Braniff asked you if you had ever
21  personally produced a disparity study, and your
22  answer was no; is that correct?

Page 104

1       A. That's correct.
2       Q. Are disparities typically done by one
3   individual?
4       A. No disparity study could ever be done by
5   one individual. There's simply too much work
6   involved and too many different disciplines.
7       Q. Now, the Cincinnati study that you
8   referred to, was that the Cincinnati study that was
9   performed by an outfit with the name of Strong in
10  it? Do you recall?
11      A. I think the answer to that question is no.
12  You're referring to Griffin and Strong.
13      Q. Right.
14      A. And I think they did a later Cincinnati
15  study, but not the one I was involved with.
16      Q. Mr. Braniff on various occasions through
17  his deposition addressed MWBEs. What is an MWBE?
18      A. MWBE is a acronym that stands for minority
19  women business enterprise.
20      Q. And, when he was talking about MWBEs, he
21  was talking about the utilization of those and
22  referred to your report on page eight and nine, if

Page 105

1   you could take a look at that.
2       A. I'm on page eight and nine, yes.
3       Q. What would the impact of the MWBE
4   utilization have in this case?
5       A. Well, the problem with MWBE utilization is
6   that the 8(a) program does not include white women
7   as a group. So, you've got a certain disconnect
8   between the data of these disparity studies, which
9   do mostly include MWBE, and the 8(a) program, which
10  does not.
11      Q. And, as you stated throughout your report,
12  the DBE program has anomalies to it that don't align
13  in any manner with the 8(a) program; is that
14  correct?
15      A. That's correct. That is correct.
16      Q. Do you think that DBE, the disadvantaged
17  business program of DOT and MWBE data could be used
18  to evaluate the utilization of businesses in DOJ or
19  DOD contracting and procurement?
20      A. I don't see how. There's so much of a
21  disconnect between the firms that are eligible for
22  DBE, for example, and 8(a) program.

**MAGNA**
000430
LEGAL SERVICES

USCA Case #15-5176    Document #1577653    Filed: 10/13/2015    Page 447 of 814

Page 106

1    Q.  Now, I got a little confused 'cause you
2  kind of went back and forth when you and Mr. Braniff
3  were discussing the $250,000 standard as applies to
4  the 8(a) and the $750,000 standard that applies to
5  DBEs.  And my question is for somebody to join the
6  8(a) program is it your understanding that the
7  threshold is they have to have a net worth less than
8  $250,000 to get into it?
9    A.  That's correct.  And that's not counting
10  their house and not counting their business.
11    Q.  And that number, after they've been in the
12  program for some period of time, that number becomes
13  $750,000; is that correct?
14    A.  That is my understanding, yes.
15    Q.  Is it your understanding that the $750,000
16  threshold to get into the DBE program, which is
17  different than the $250,000 threshold to get into
18  the 8(a) program; is that correct?
19    A.  No, it's not.  A couple things.  The 750
20  is not a threshold.  It's a ceiling.  You have to
21  have net worth less than that.  And that 750 has
22  since been raised to 1.32 million.

Page 107

1    Q.  But that's to join the program; correct?
2    A.  You have to be less than that, yes.
3    Q.  Yes.  Have you analyzed small 8(a)
4  businesses for what their business development
5  preferences are on a year to year basis of desiring
6  to grow, not desiring to grow, either way?
7    A.  I haven't analyzed that.  It's probably a
8  fair statement that not all businesses, some
9  businesses do desire to expand.  There's no
10  question.  Other businesses don't necessarily.  It
11  would depend on their individual circumstances.
12      I've spoken with many contractors over the
13  years who have very sad stories of having
14  subcontractors they loved hiring, but they were
15  pushed to expand beyond their capabilities, and they
16  went belly up.  So, not all small firms want to
17  become bigger firms.
18    Q.  Throughout your deposition with
19  Mr. Braniff you expressed that practically all, I
20  think it may have been all, of the disparity studies
21  that you have evaluated have shortcomings in them;
22  is that correct?

Page 108

1    A.  That's a fair statement, yes.
2    Q.  And I sit here thinking that somebody
3  that's in your business, you don't have any personal
4  animus towards any of those people that do those
5  reports, do you?
6    A.  No, I do not.  I probably should have
7  stated that.
8    Q.  Is it true that it just happens that way?
9    A.  I've only met a few of the people who are
10  involved in these studies, and I've gotten along
11  with them, so there's no personal dislike here.
12    Q.  Now, Mr. Braniff also kind of dwelled on
13  regression analysis, and you stated that you don't
14  do regression analysis; is that correct?
15    A.  That's correct.
16    Q.  Is there any particular reason for that?
17    A.  There would be, I don't find regression
18  analysis to be a particularly enlightening tool.
19  So, it's not a skill that I felt was one I should
20  obtain because the regression analysis can never
21  identify causation, and that's what we're after
22  here.

Page 109

1    Q.  Do the numbers that are gathered by
2  disparity firms to do disparity studies pretty much
3  speak for themselves?
4    A.  I would think they do, yes.
5    Q.  Do you regard not being, not ever having
6  picked up the ability to do regression analysis as a
7  drawback in your business?
8    A.  I do not.  As I've said, there's no one
9  specialty that is sufficient for these disparity
10  studies.  They are multiple disciplines, and that's
11  simply not one of the disciplines in my skill set.
12      MR. BARTON:  I'll pass.
13    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
14  BY MR. BRANIFF:
15    Q.  Just want to clarify two quick things that
16  you just asked about.  When he was talking about
17  MWBEs, are you aware of the number of white women
18  owned firms that are in the 8(a) program?
19    A.  I know there are some.  As I understand
20  it, that white women can get into that program, but
21  I think more typically they are in the 8(m) program.
22    Q.  When you say some, could you be more



USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 448 of 814

Page 110

1  specific than that?
2      A.  No.  It would be a subset of the 7,700
3  approximately that are in the portfolio now.
4      Q.  I just want to clarify his last question.
5  When Mr. Barton said that your inability to do a
6  regression analysis I think was part of his
7  question, that might have been assuming facts in
8  evidence.  Are you able to do a regression analysis?
9      A.  I have never done one.  I think I could
10  acquire the skill.
11      Q.  If you were going to do one, do you know
12  what method you would use?
13      A.  No.
14      Q.  Do you know what type of software you
15  might use?
16      A.  No.
17      Q.  Okay.
18      MR. BRANIFF:  That is it.
19      (Whereupon, signature not having been
20  waived, the taking of the deposition concluded at
21  12:47 p.m.)
22            * * *

Page 111

1        ACKNOWLEDGMENT OF DEPONENT
2
3  I, John C. Sullivan, do hereby acknowledge I have
4  read and examined the foregoing pages of testimony,
5  and the same is a true, correct and complete
6  transcription of the testimony given by me, and any
7  changes and/or corrections, if any, appear in the
8  attached errata sheet signed by me.
9
10
11
    _____    _____
12  Signature            Date
13
14
15
16
17
18
19
20
21
22

Page 112

1        CERTIFICATE OF NOTARY PUBLIC
2      I, Kathleen M. Vaglica, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by any of the parties to the action in which this
12  deposition was taken; and, further, that I am not a
13  relative or employee of any attorney or counsel
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of the action.
16
17
18        Notary Public in and for
19        District of Columbia
20
21  My Commission Expires:
22  February 14, 2016



**A**

**ability** 6:8,12 76:3
   76:7 77:13 109:6
**able** 16:7 49:4
   53:21 54:21 58:1
   60:22 61:9 62:16
   68:8 69:3 74:22
   77:7,17 80:13
   90:18 91:10,11
   92:13 110:8
**absent** 82:20
**absolutely** 61:4
   77:8 101:20
   103:13
**academic** 15:6
**accept** 22:2
**accepted** 23:17,22
   24:2,9,12 28:18
**accomplished** 91:8
**accurate** 6:8,12
   30:5 35:16 70:3
   80:22 81:12 97:21
   98:4 101:2
**achieve** 101:12
**acknowledge** 111:3
**ACKNOWLED...**
   111:1
**acquire** 110:10
**Acquisition** 31:4
**acronym** 38:16
   39:4 104:18
**action** 1:4 112:11
   112:15
**actual** 57:9 70:7
   93:17
**Adarand** 34:16
**added** 67:21
**adding** 8:21
**addition** 13:10
   21:12
**address** 6:1 38:14
**addressed** 103:1
   104:17
**addressing** 103:18
**adjust** 77:7,8

**adjusted** 78:4
**adjustments** 76:12
   93:9
**Administration** 1:7
   26:15
**administrative**
   22:19
**admitted** 64:3
**advice** 19:5 62:6
**advisor** 30:18
**advocacy** 58:4
**affect** 6:8,12
**African** 54:4
**agency** 50:22
**aggregated** 21:7
**ago** 6:19 10:15 28:5
   41:8,9 101:9
**agree** 14:12 33:8
   37:17 46:7 48:3
   57:16 60:16 65:5
   65:11,14
**agreed** 32:18 48:1
   71:17 75:2
**ahead** 8:2 33:19
   59:14 95:15
**al** 5:11
**Albuquerque** 18:22
   19:4,22 20:4
**align** 105:12
**alive** 45:13
**ALJ** 22:21 24:20
**allow** 46:15 85:15
**America** 21:2
**American** 25:5
   80:19
**Americans** 54:4
**amount** 41:7 54:9
   93:6
**amounts** 74:20
**analyses** 84:21 87:4
**analysis** 13:20 14:2
   19:11 20:6,17,21
   29:9,12 35:5
   68:13,16 71:1,17
   71:18,20 73:2,4
   73:21 74:6 78:12

78:14,15,19,22
   79:2,20 80:4
   84:12 85:18,22
   86:2 87:13 96:22
   103:9 108:13,14
   108:18,20 109:6
   110:6,8
**analyze** 58:15
**analyzed** 31:13,18
   32:8,13,16 33:6
   35:1,15 36:20
   51:4 63:19 107:3
   107:7
**analyzing** 31:22
   51:5
**ANDREW** 3:13
**and/or** 111:7
**anecdotal** 79:16
**anecdotes** 12:16
   52:22 64:20 67:18
   79:18
**animus** 108:4
**Annapolis** 52:13
**annual** 44:1 69:8
**anomalies** 105:12
**answer** 7:11 18:16
   35:3 42:2,11,19
   48:3 50:10,20
   56:9 60:11 65:12
   87:1 98:13 103:22
   104:11
**answering** 81:15
**Antonio** 3:9
**anybody** 42:20
**anymore** 56:9
   81:13 103:13
**apartment** 30:22
**apologize** 30:7 71:2
   88:11
**apostrophe** 23:7
**apparatus** 15:16
**apparently** 47:16
**appear** 111:7
**appeared** 22:19
   28:1
**appears** 112:4

**applied** 75:13
**applies** 106:3,4
**apply** 54:6,12 76:12
   77:3 87:10 93:9
**approach** 21:17
**appropriate** 53:14
   68:14 74:17 96:19
**approve** 32:2,4
**approximate** 91:18
**approximately**
   10:7 110:3
**area** 11:22 12:8
   14:7 20:13 29:8
   29:18 44:1 50:2
   54:13
**areas** 12:2 103:4
**argument** 100:3
**arrive** 50:7 84:5
**article** 8:21
**articles** 77:22
**aside** 19:19 98:3
**asked** 21:3 70:21
   71:15 83:9 103:20
   109:16
**asking** 8:3 50:21
   58:11 70:13 83:12
   83:13,15 94:21
**aspect** 12:13
**aspects** 11:13 12:16
**assigned** 30:20 93:7
   93:8
**assistant** 64:9
**assisted** 12:12 60:3
   61:18 62:2
**assisting** 47:8
**Associated** 26:10
**association** 60:1,2
**assume** 25:1
**assuming** 29:13
   110:7
**assumption** 43:5
**assure** 17:3
**attached** 111:8
**attempt** 40:6 70:1
**attempted** 40:8
**attempting** 76:22

**attention** 8:19
**attorney** 7:7 9:10
   16:19 28:1 30:18
   45:1 47:12 52:2
   56:17 59:11 61:19
   61:22 62:2 66:18
   112:13
**attracted** 39:19
**audited** 10:4 11:9
**availability** 12:14
   13:21 15:19 16:2
   18:7 21:10 33:7
   38:6,22 42:13,22
   46:20 53:19,20
   60:21 64:19 70:3
   72:10 74:3,4,10
   76:10,18,19,20,21
   78:3,8 90:16
   91:18 92:5 93:19
   94:2,5,6 95:6,14
   100:13
**available** 54:15
   55:1,2 65:18
**Avenue** 3:7 6:2
**awarded** 46:17
   65:18 68:19,21
   69:2,7 92:20 93:6
   93:13 96:14 98:2
   98:5,10,12
**awards** 21:3 50:22
   93:18 96:5 100:1
   100:2
**aware** 36:12 87:18
   87:22 89:13 98:17
   98:18,20 109:17
**a.m** 2:8 59:3

**B**

**B** 4:7 6:2
**back** 7:10 10:7,11
   34:16 69:19 70:7
   71:2,9 81:9 99:7
   100:18 106:2
**background** 11:6
   34:10,13,15
**bad** 83:20



**Baltimore** 6:3 10:4
30:15 59:15,19
60:14 63:3,5
**banks** 79:19
**barred** 62:4
**Barton** 3:5 4:5 5:18
9:6 43:15,16,20
58:22 63:21 102:3
102:5 109:12
110:5
**based** 20:15 48:22
50:1,2 53:8,11
55:2 56:6 76:11
76:12 92:7,13
94:22
**bases** 20:7
**basic** 13:8,12,13,16
**basis** 100:9 107:5
**BBC** 66:7,10,14,18
67:10 70:10 73:13
**beginning** 90:12
**believe** 8:20 10:15
13:4,19,19 14:2,5
14:10,22 15:5,14
16:20 18:16 20:2
20:16 24:10 32:19
44:13 46:6 47:10
48:10 49:5 50:21
59:18 61:13 78:3
90:10 93:4,16
98:7,13 99:3,19
102:13
**belly** 107:16
**Benchmark** 90:4,6
100:12,18
**Berebitsky** 71:13
**best** 37:8 45:9
59:22
**better** 7:4 18:21
47:11 67:18
**beyond** 18:12 37:7
107:15
**bid** 61:5,7 68:22
69:1 74:13,16
76:1,19 92:1,4
97:1 98:6

**bidders** 61:6,6,12
91:19,20,22
**bidding** 13:20
74:12 75:6 76:11
92:9 96:22
**bids** 75:14,14 76:16
76:17 77:1
**big** 10:15 68:21
69:6 97:1
**bigger** 107:17
**biggest** 68:19
**bit** 12:5 20:14 21:5
29:7 36:5 95:16
**blanks** 39:20
**Bob** 60:2
**bonding** 76:3
**borrow** 75:20
**Bortz** 66:13
**bottom** 33:12 67:21
75:21 80:7
**box** 77:16
**boy** 6:2 16:4 72:9
**Bradstreet** 74:6
**Braniff** 3:13 4:4 5:8
5:19 8:1 9:9 14:13
43:18,21 59:4
82:22 95:15,20
101:22 102:5,9
103:1,20 104:16
106:2 107:19
108:12 109:14
110:18
**break** 7:8
**bridge** 77:17
**brief** 39:1
**briefly** 30:15 63:6
**bright** 82:12 83:1
**bring** 8:19 90:4
**broke** 101:3
**brought** 52:11
59:22
**brouhaha** 10:16
**Broward** 59:15
61:15,18 63:6
**Brown** 66:12
**build** 77:17

**builders** 70:19
**bulk** 86:9
**bureaucracies** 21:5
**business** 1:7 13:5
24:7 26:15 37:9
38:5,15 55:22
68:22 78:10,11
84:12,14 103:10
104:19 105:17
106:10 107:4
108:3 109:7
**businesses** 49:3
56:2 87:20 88:4
105:18 107:4,8,9
107:10
**B-E-R-E-B-I-T-S...**
71:14

---

**C**

**C** 1:11 2:10 3:1 4:3
5:1,3 111:3
**Cal** 6:20 26:10,19
27:12 40:8 67:1
67:10,22 68:15,15
68:19 70:5,11
71:2,4 95:11
96:20
**calculate** 21:14
**calculated** 19:14
**calculates** 74:4
**calculator** 13:9
**California** 6:20
26:11 66:22 67:16
96:3,5,13
**call** 28:4 66:10
**called** 5:4 36:2 90:4
**calls** 36:1
**cap** 56:5
**capabilities** 107:15
**capability** 53:6
91:11
**capable** 58:5
**capacity** 20:11
52:21 53:5,6,8,11
53:15 54:6,12,20
55:3,5,6,9,10,15

55:17,18 67:16
77:6,7,10,12,13
77:20 78:5 91:9
**caps** 98:11,15
**capturing** 60:22
**care** 10:17
**Carolina** 59:17
64:5
**case** 5:10 6:20 7:14
22:21 23:5,11,13
23:18,20 24:5,6,8
24:10,11,17,19,21
26:4,10 27:1,2,4
28:2,5,8,10,11
44:22 45:4,6,7,10
45:12,14,18,20
46:1,3,22 47:9,13
47:14,15,16 52:1
52:4,9,10,11
56:16,20,22 57:1
58:10,14 59:10,17
59:19,20,22 61:16
61:22 62:10 63:3
63:9,18 64:5,6,7,8
64:9 65:3 66:3,17
67:2,4 70:11 71:5
89:9 105:4
**cases** 26:5,8,16
27:10 45:5 52:7
65:1 66:21 102:15
**catchall** 62:1
**causation** 79:6 80:5
108:21
**cause** 79:9,12 106:1
**ceiling** 42:11 69:8
97:5,10 106:20
**Census** 25:4
**Center** 2:13
**certain** 20:3 25:8,8
42:14 43:8 54:13
54:16,22 55:12
91:13,15 101:16
105:7
**certainly** 11:20
**CERTIFICATE**
112:1

**certify** 112:4
**chair** 28:4 61:17,21
62:1
**challenged** 73:11
**challenging** 26:5
28:2
**chamber** 45:7,15
58:2
**chance** 22:1 32:20
35:19 77:22
**change** 10:16 43:1
**changed** 10:12 41:6
**changes** 8:17 13:17
111:7
**Chapter** 26:11
**characteristic** 53:1
**characterize** 25:4
**Charles** 5:22
**chart** 39:20 98:7
**check** 39:14
**checked** 22:5,7
**checking** 8:8
**Cincinnati** 24:10
24:17 26:20 27:4
104:7,8,14
**Circuit** 63:14
**circumstances**
85:21 103:3
107:11
**cite** 85:7
**cited** 37:2 96:7
**city** 15:1 16:19
19:21 45:8 60:14
**Civil** 1:4 3:15 5:13
**claim** 89:7
**clarify** 57:3 109:15
110:4
**class** 9:5 10:3 11:5
11:9,15 101:16
**classes** 9:18,19 10:2
11:10,12,14
**Classification** 3:15
25:6
**clause** 88:22
**cleanup** 96:1
**clear** 43:16 96:17



clearly 37:21 74:21
103:4
client 47:4,6,9 57:4
closely 17:8
Code 31:5
codes 25:5,8
collaborators
102:20
colleague 45:21
collect 14:21 15:17
collected 19:16
collection 57:22
college 10:9,11,19
11:4,11,13 28:14
color 56:8 69:10
Columbia 1:2 2:20
5:12 112:19
combination 48:6
49:20
combine 48:11
combined 46:14,18
46:19 48:13 49:6
combines 48:8
52:21
come 32:1,3 60:8
64:14 66:4 72:15
76:1 85:7
coming 47:14
Commerce 45:7,15
58:2 100:18
Commission
112:21
commitments 21:4
commonly 36:1
Commonwealth
59:16 63:8
companies 17:5
32:5 44:16
company 13:1 15:3
15:16 22:3 36:21
53:12,17 57:5
66:7 77:15 92:21
comparative 81:3
compare 32:20
compared 21:8
comparing 100:2

comparison 36:8,9
98:8
compete 76:3,8
98:18,20
competing 75:15
competitively 98:6
98:12
complaint 80:15
complete 6:8,12
53:7 111:5
complexes 30:22
computed 21:19
22:3
computer 13:9
Conceptually 92:20
concerning 8:3
71:4 99:8
conclude 101:19
concluded 110:20
conclusion 34:5,11
34:14 38:1 42:22
50:1 66:4 67:6,10
68:17,18 69:5
72:16 82:17,18
88:7,14 89:1
94:16,17 101:17
conclusions 32:18
46:11 57:16,19
62:12,14 64:14
65:6 81:17,21
82:21 85:7 94:11
99:13
conducted 102:10
confused 106:1
confusion 39:3
Congress 33:20
34:8,20,21
Congressional
33:21 34:7,9
connected 20:9
21:16 86:9
connection 29:3
conscious 14:8 16:9
18:15,17 23:21
24:9 32:14,17
46:4 47:21 57:13

58:8,19 60:13
62:19 65:10 67:12
68:4 72:4 73:3,8
73:14,20 85:3
86:13
consequently 38:9
consider 29:2,18
92:12
considered 47:16
58:1
considering 12:14
88:16 89:22
consistent 85:15,17
87:8
construction 25:14
37:15 47:10 52:14
77:15
Constructors 70:18
71:12
consultant 12:18
12:19 45:6 47:1
52:10 64:4
consultants 27:18
consulting 13:7
44:15 49:7 64:1
contact 17:21 19:2
contacted 21:2
71:15
CONTENTS 4:1
continued 40:17
continues 73:7
contract 50:22 53:7
88:19 91:12,13,14
contracting 11:19
14:9 16:9 23:21
26:6 28:2 32:14
32:17 46:4 47:21
48:20 49:13 50:5
50:15,18 51:4
53:22 55:13 56:4
57:14 58:6,8,20
60:14 73:8,21
76:4 77:20 79:7
79:15 83:11 87:21
88:3 90:18 91:8
105:19

contractor 17:19
25:10 46:14
contractors 24:11
26:11 52:14 60:1
60:2 78:1 101:16
107:12
contracts 36:19
46:16 50:20 65:17
65:18 67:17 68:19
68:21 69:6,7,12
76:8 94:14 96:10
97:1,5 98:2,3,11
99:1 101:3
control 12:21 18:4
79:21
Controller's 17:15
Corporation 102:6
correct 7:10 9:4,5
17:16,17 32:12
35:13 37:5,16
38:18 40:15 41:21
44:4,18,19 50:13
51:17,18 63:11
96:4,16 99:16
102:7,8,12,16
103:22 104:1
105:14,15,15
106:9,13,18 107:1
107:22 108:14,15
111:5
corrections 111:7
correctly 53:3
58:20
correlate 8:12
35:16 36:10
correlation 36:1,9
36:18
costing 75:20
Cottington 66:13
counsel 3:4,12 5:4
5:7,15 6:4 102:2
109:13 112:10,13
count 22:21 55:12
55:19,21 56:1
76:19
counting 106:9,10

counts 23:2
County 10:4 59:15
61:15,18 63:7
couple 28:5 46:10
106:19
course 7:9 11:6
75:8,21
court 1:1 5:11
22:17,22 23:17,22
24:3 27:7,13,15
28:18 47:15 60:11
63:14 73:11
covered 32:5 39:5
craft 80:13 85:16
crafting 46:15
create 76:10 93:20
created 44:16
creating 20:18,21
creation 90:9
credit 78:11
criticism 39:12
critique 70:15,20
74:2
Croson 34:16
cross 62:4
cull 16:6
curious 12:6
current 6:1
currently 45:8 58:7
CV 8:18
C.V 8:6 10:8

D

D 5:1 44:15,20 45:1
data 13:11 14:21
15:17,19 16:3
19:15 21:8 40:4
46:14,15 48:7,9
48:13 49:6 69:12
69:19 72:10 88:16
88:17,21 89:10,13
89:22 90:5,7
92:22 99:18 100:8
101:1 105:8,17
Date 111:12
dating 34:15



**Daubert** 71:3
**David** 3:5,21 17:22
  43:16 102:5
**day** 10:11
**DBE** 21:3,9 25:3
  33:7 40:22 41:1,2
  41:11,19 42:6,17
  43:2 44:5,11 56:4
  68:2,3 69:9
  105:12,16,22
  106:16
**DBEs** 39:5 68:22
  97:1 106:5
**deal** 80:16
**dealing** 56:4 67:16
**dealt** 71:13 87:13
**decision** 23:13
  34:16
**defects** 64:17
**Defendant** 1:8
**Defendants** 3:12
  5:5,7 109:13
**Defense** 1:6 5:11
**deficient** 62:16
  92:8,14
**define** 31:9 37:6
  38:2 53:5,19
  77:11 78:14 81:20
  91:6 92:4
**defined** 38:3 77:5
  103:4
**defining** 92:15
**definition** 53:15
  54:6,12,20 55:2
  78:13,17
**degree** 9:2,20,21
  10:8,18 11:3
  48:22 52:18
**demand** 77:14
**denial** 87:16
**denials** 78:11
**Department** 1:6
  3:14 5:10 26:12
  66:22 100:17
**depend** 75:8,17
  107:11

**dependent** 53:16
**depending** 103:2
**depends** 56:3,10
  75:22
**DEPONENT** 111:1
**deposed** 6:15,18,20
  24:14
**deposition** 1:11
  2:10 5:9,12,17
  6:22 7:3,10 77:5
  102:4,9 104:17
  107:18 110:20
  112:3,5,8,12
**describe** 16:13
  20:20 36:6 59:19
  67:9 78:12 79:11
**described** 56:20
  75:18
**descriptive** 81:13
**design** 90:11,13
**designated** 25:11
**desire** 107:9
**desiring** 107:5,6
**details** 14:16
**determine** 33:7
  68:8,14 69:3
  86:16 87:7 90:21
  100:8
**determined** 12:14
**determining** 11:18
  13:21 46:19 74:9
  99:14
**developing** 51:20
  59:7
**development** 1:3
  30:13 102:6 107:4
**Diego** 26:11
**difference** 15:14
  48:16 82:1 88:1
  93:12
**different** 12:2
  16:16 27:1 35:22
  40:21 41:1 44:8
  46:17 53:15 74:20
  79:14 83:12 104:6
  106:17

**digit** 100:14,15,19
  100:21 101:4
**direction** 90:1
  112:8
**disadvantaged** 24:7
  49:3 55:22 68:22
  85:8 105:16
**disagree** 57:18
  62:21
**disagreed** 46:8,10
**discipline** 11:7
**disciplines** 104:6
  109:10,11
**disconnect** 105:7
  105:21
**discrimination**
  11:19 29:4,10,13
  29:14 37:14,20
  38:1,10 68:1 79:8
  80:10 85:1,2
  86:21 89:6,7
  100:4,6
**discuss** 35:11 44:15
  59:6 88:6 96:2,3
**discussed** 56:6
  64:17 67:1
**discussing** 29:9
  84:10 106:3
**discussion** 9:8 50:9
**dislike** 108:11
**disparities** 20:8
  104:2
**disparity** 11:2,8
  12:4,9,12,13,17
  13:2,16 14:4 15:8
  17:5,10,12 18:11
  19:5,12,16 20:1
  20:10 22:3,12
  24:3,8 29:11 30:3
  30:6 31:8,12,14
  31:18 32:1,3,4,7
  32:13,16 34:22
  35:14 37:2 38:14
  39:5 42:4,6 44:16
  45:2,22 46:3,13
  47:1,18,20 48:12

48:16,17,20 49:11
  49:16 50:4,11
  51:3,8 52:2,15,17
  53:3,14 56:14,18
  57:6 58:16,19
  59:7,11,16,21
  60:6,9 62:9 66:15
  66:19 69:15,22
  70:2,6,8,10,20
  71:16 73:22 79:3
  79:12,16 86:3
  90:13,15 92:2,18
  93:21,22 94:10,13
  95:1 96:19 102:12
  102:16,22 103:21
  104:4 105:8
  107:20 109:2,2,9
**dissimilar** 36:20
**dissimilarity** 36:13
**district** 1:1,2 2:20
  5:11,12 55:1
  112:19
**divided** 94:2
**dividing** 21:11
**division** 3:15 21:13
**doable** 69:21
**documents** 21:6
**DOD** 105:19
**doing** 58:5,6 79:14
  84:1 86:8,10
  91:11
**DOJ** 105:18
**dollars** 68:20 69:2
  92:19 93:6,13,13
  93:15 96:14
**DOT** 21:2 23:8
  40:22 41:2,11,15
  41:19 42:6,17
  43:2 44:5,11
  45:10 59:18 64:5
  96:3,5,10 105:17
**double** 10:20 22:5,7
**Dr** 12:11,17 15:10
  15:14,22 16:15
  18:4 19:2 20:7
  28:13,16 33:1

35:20 37:3 38:21
  45:21 47:8 49:5
  49:21 50:8 60:3
  61:18 64:10 70:1
  78:13 84:11 95:5
  96:7 99:8 103:18
**draw** 65:6 81:16
  82:17,21 94:10,15
  94:17 101:17
**drawback** 109:7
**drawing** 83:1
**drawn** 88:8,15 89:1
**due** 22:1
**duly** 112:5
**Dun** 74:5
**duties** 30:19,20
**dwelled** 108:12
**D.C** 1:12 2:16 3:17
**D.J** 13:4,18 15:15

_____

### E
**E** 3:1,1,7 4:7 5:1,1
**earlier** 56:6,20 77:5
  91:17 99:12
**early** 8:14
**earning** 78:11
  84:14
**earnings** 84:12
**easier** 75:5
**easiest** 92:17,18,20
**East** 6:2
**economic** 81:19,19
  81:22
**economics** 9:18,19
  9:20,21
**economist** 9:16,17
  28:14,20 82:2,6
**economists** 82:7
**education** 10:22
  30:3
**effect** 49:19
**effective** 46:16
  80:13 82:3,19
  85:16
**effort** 52:22 75:1
**efforts** 57:14 62:19



90:17
**eight** 35:11 37:1,1
80:19 104:22
105:2
**either** 27:15 44:22
52:1 54:8 56:16
59:10 63:2 66:17
107:6
**elastic** 77:9
**elasticity** 77:10,12
77:13,20 78:4
**eligibility** 40:17
**eligible** 105:21
**eliminated** 42:5
**else's** 14:1
**employ** 65:15
**employed** 102:7
112:10,14
**employee** 112:13
**employer** 102:7
**employs** 58:8
**encountered** 34:22
35:2 95:1
**ended** 13:22 14:3
16:8 30:3
**English** 10:20 11:6
**enlightening**
108:18
**enterprise** 24:7
38:15 104:19
**enterprises** 37:9
38:5 69:1
**entirely** 56:3
**entries** 43:5
**equal** 75:14
**equipment** 91:12
**errata** 111:8
**ESQUIRE** 3:5,13
3:21
**establish** 20:8 80:9
89:6
**establishes** 37:20
**establishing** 100:6
**et** 5:11
**evaluate** 105:18
**evaluated** 52:15

107:21
**evaluating** 64:18
102:11,11
**evaluation** 52:16
102:22
**evaluations** 63:21
**Evans** 17:22
**evidence** 29:3,4,10
34:6,20,20 37:14
38:10 68:1 86:4
87:19,22 110:8
**exact** 49:1 61:11
**exactly** 6:19 25:12
32:20 41:13
**examination** 4:3
5:4,7 102:2
109:13
**examined** 5:6 111:4
**example** 13:11
25:19 37:8 38:5
61:3,5 77:18 91:1
105:22
**exceeded** 69:8
**exclude** 27:10
**excluded** 27:7
**exclusively** 32:1
**Excuse** 43:15
**exhibit** 7:19 12:2
33:11
**exist** 20:12
**expand** 77:14 107:9
107:15
**expect** 94:20
**experience** 20:14
20:16 91:14
**expert** 4:10 7:13,18
7:19 11:1 20:6,18
20:18 21:1 22:18
24:2,9,12 27:2
28:7,10,11,12
29:1,2,16,18
33:22 40:9 45:1
45:19,20 48:8
52:2 56:17 59:11
60:3 61:18 63:17
64:2,4 66:18 67:3

67:7 78:18 84:13
**expertise** 29:5 34:2
**Expires** 112:21
**explain** 7:4 15:21
80:10
**explained** 86:19
**explains** 38:16
**expounding** 29:6
**expressed** 107:19
**extent** 98:18
**extra** 77:18 79:17
**extraordinarily**
86:8
**extremely** 11:6
**E-V-A-N-S** 17:22

---

### F

**F** 3:5
**face** 103:10
**factors** 76:13
**facts** 59:20 110:7
**fair** 25:17 35:4,17
43:11 47:8 49:22
103:9 107:8 108:1
**fairly** 20:3
**far** 19:19 31:3 46:9
97:21
**February** 41:6
112:22
**federal** 5:13 22:22
30:8,11 31:4,5
43:5 89:7 90:7
100:1,4,8 101:10
**feel** 7:7,8 23:4 51:4
73:20,21 79:20
**felt** 35:1 53:3 67:17
73:15 95:1 99:13
108:19
**fewer** 80:7 81:4,7
82:4
**FHA** 31:1
**file** 60:10
**filed** 27:9 71:4
**files** 12:15
**final** 14:20 84:13
**Finally** 99:7

**financially** 112:14
**find** 63:15 84:22
108:17
**finding** 14:3 60:12
85:1 96:18 101:2
**findings** 101:2
**finished** 59:5
**firm** 17:18 25:1,4,7
25:11 40:13,18
43:12,22 44:2,6
44:12 51:1,1
52:11,13 53:7,8
53:11 56:6 69:7
75:4,6,12,17,18
76:16,17 77:14
79:21 81:16 83:10
96:2
**firms** 25:7 33:7
42:14 43:18 50:19
53:21 54:7,13,15
54:21 55:1,12,14
58:3,5 61:5,6,9
65:17 73:19 74:10
74:15,17,21 75:14
76:3,7 77:6 79:14
80:8,19 81:5,9,11
81:14,15 82:10
83:4,14,15,17,21
83:22 84:2 86:8
86:10 90:17 91:22
92:4 98:12,17,18
98:20 99:1 105:21
107:16,17 109:2
109:18
**first** 12:1 29:9
33:16 39:3 75:18
88:22 90:13 98:7
103:13
**FISHMAN** 3:21
**five** 12:2 31:10
33:11,13
**flaw** 64:21
**flaws** 67:21 68:7
**Florida** 15:7 59:15
62:4
**fly** 24:16

**focus** 90:16
**Focusing** 34:15
**folks** 18:6
**follow** 17:7 97:9
**followed** 94:9,12
**following** 12:3
31:11 54:10
**follows** 5:6
**followup** 80:2
**foregoing** 111:4
112:3,5
**forgive** 47:10 48:4
66:11 88:9,20
**form** 5:14
**formal** 11:15 78:2
**formally** 64:3
**formation** 78:10
**forth** 106:2
**found** 20:1 53:3
86:20
**four** 10:14 19:22
**fraction** 94:8
**frame** 33:3 96:15
101:7
**free** 7:7,8 23:4
**frequently** 48:21
50:18 55:11
**front** 22:19 47:14
72:21
**full** 88:11
**further** 101:20
112:12

---

### G

**G** 3:13 5:1
**GAO** 99:3
**Gardner** 3:6
**Gary** 47:13
**gathered** 109:1
**gender** 53:12,16
54:4 69:10
**general** 19:5 26:10
**Generally** 12:10
**gentleman** 47:13
61:19 71:12
**gentleman's** 28:13



**Geod** 28:5 56:20
57:1,4
**geographic** 54:13
74:10 76:13
**George** 12:11 45:21
102:20 103:4
**getting** 17:6 21:5
71:16 92:22 94:19
**give** 6:8,12 46:10
94:7
**given** 111:6 112:9
**go** 7:10 8:2 9:6 12:5
23:13 33:19 38:12
59:14 65:19 69:18
70:7 71:2 74:9
79:17 92:10,15
95:15,17,21 99:1
99:7 103:6
**goal** 69:4 83:20
**goals** 67:12 68:2,3
68:5,9,10,12,14
72:5 73:3
**goes** 29:12
**going** 8:3 42:9 46:9
50:4,4 55:11 71:2
76:1 78:10 83:19
85:20 89:20 90:12
90:19 91:2 110:11
**good** 16:4 18:7
20:14 21:5 60:21
61:8 64:18 67:15
83:14 93:1 95:5
95:13 101:22
**goods** 97:6,10
**gotten** 83:10
108:10
**Gouth** 60:2
**government** 13:1
30:9,12 57:1 58:6
63:13 74:14 75:2
91:1,9
**governments** 12:3
31:11
**gracefully** 89:3
**graduate** 11:5
**Green** 23:8 24:19

**Griffin** 104:12
**group** 38:17 44:15
48:19 53:22 54:1
54:5,5,13 55:13
58:4 66:6 94:4,19
105:7
**groups** 47:22 54:3
68:6 72:12 93:8
**grow** 107:6,6
**guess** 22:4 37:8
52:7 87:3
**guessing** 26:14
**G-E-O-D** 28:5 57:4
**G-O-U-T-H** 60:2

_____

**H**

**H** 4:7
**half** 80:8 81:4,8,14
82:5
**hand** 26:4
**handful** 81:3 86:7
**handle** 12:16
**handling** 47:12
**happen** 42:4
**happened** 12:21
103:3
**happening** 79:9
**happens** 108:8
**happy** 89:21
**harder** 75:5,7,11
**hardest** 92:18
**heard** 36:3
**heart** 90:15
**held** 2:10 9:8
**help** 11:21 12:12
17:3 66:14 80:22
**helped** 12:17 19:3
**helpful** 11:7 79:3
79:22 80:1
**Herb** 61:20
**hereto** 112:14
**high** 47:15
**higher** 42:5 55:13
75:4,12,14,18
84:9
**highway** 25:14

**hire** 28:10 77:17
91:2
**hired** 12:11 27:17
45:19 70:18
**hiring** 107:14
**Hispanic** 45:7,15
**Hispanics** 54:4
94:4
**hit** 85:12
**hold** 28:22
**honestly** 19:9
**Hope** 28:14
**hoping** 12:4
**house** 106:10
**housing** 30:13,21
**Houston** 39:18,22
70:5
**HUD** 31:6
**hypothetical** 42:9
55:4,16
**hypothetically**
86:11

_____

**I**

**Idaho** 66:2
**idea** 83:14
**identical** 44:12
**identification** 7:20
**identify** 49:4 80:5
108:21
**ignored** 55:10,17
**ignores** 52:21
**illustrated** 37:8
**illustrates** 82:1
**impact** 31:6 55:6,8
75:10,21 76:2,6
85:21 105:3
**important** 8:22
11:18 47:16 80:19
80:21
**impressed** 14:20
**inability** 110:5
**include** 58:2 105:6
105:9
**included** 8:6 10:5
32:22 38:17,21

39:7 65:4 69:22
72:15 96:10
**includes** 39:4
**incomplete** 72:10
**incorrect** 55:19,21
56:1
**independent** 68:13
68:16 72:16 73:2
73:4 99:6
**index** 69:15 70:2
93:21 94:10,13
96:19
**indexes** 42:5 69:22
**Indiana** 22:20 23:8
24:6 70:15,16,18
71:9,12 73:7
**Indianapolis** 70:19
**individual** 2:13
53:7 75:9 77:14
103:17 104:3,5
107:11
**individually** 22:11
22:13 78:19 90:21
**individuals** 42:5,17
**Industrial** 25:5
**industries** 35:12
98:8
**industry** 11:19
20:12 25:14
100:14,15 103:16
**inevitable** 13:15
50:3
**inevitably** 31:6
**infinitely** 77:9
**influence** 15:13
**influencing** 34:21
**inform** 11:22
**insist** 91:14
**insisted** 91:1
**intended** 21:22
39:8
**interest** 75:4,12,15
88:1 91:4,7
**interested** 58:6
71:16 82:2 84:1
87:20 112:15

**interpret** 40:3
**interrupting** 88:9
**interruption** 66:11
**investigate** 52:22
67:19 79:18
**investigated** 64:20
101:20
**investigation** 11:22
**investigations**
79:16 80:3
**involve** 52:6
**involved** 18:5 20:10
21:13 22:21 24:6
25:16,17,20 45:5
45:9,9 56:11,20
57:7 58:10 59:17
63:10 65:1 104:6
104:15 108:10
**involvement** 59:20
**involves** 36:13
**involving** 23:21
30:20 45:1 52:2,4
56:17 59:11,21
66:18 102:15
**irrelevant** 89:5
90:2 99:13,19
**issue** 23:15 24:8,9
25:3,6 64:7 78:1
92:14 94:5 99:4
99:21 103:5,6,18
**issues** 11:18 26:3

_____

**J**

**January** 45:11
**Jersey** 28:6 56:19
57:5,20 58:7,10
58:12,13,14
**job** 1:22 60:21
64:18 65:21 67:15
67:18 95:5,13
**John** 1:11 2:10 4:3
5:3,10,22 28:13
111:3
**join** 106:5 107:1
**judge** 22:20 23:15
71:7,8



**jurisdiction** 22:12 90:19 93:17 94:15
**jurisdictions** 74:18 74:19 75:9
**Justice** 3:14
**justification** 63:13 85:3
**justify** 33:21 68:2,3 86:11,13
**J.D** 9:4

**K**

**Kathleen** 1:21 2:19 112:2
**keep** 8:2
**Kendall's** 36:11,13 36:15
**Kevcon** 26:14,22 27:11
**Kevin** 64:10
**key** 86:6
**kind** 31:1 62:1 89:17 103:10 106:2 108:12
**know** 10:12 13:22 21:18,20,21 29:17 29:22 32:21 36:15 41:2 42:12 43:8 44:5,8 45:12 50:3 54:17 58:7 69:18 71:3 73:7,10 78:6 79:9,10 80:21 82:8,12 83:7 84:2 84:21 89:8 90:5,8 97:15,15,21 98:15 102:6 109:19 110:11,14
**knowable** 84:3
**knowledge** 11:17 45:9 73:12
**K-E-V-C-O-N** 26:14

**L**

**L** 3:16
**laborer** 77:18

**landscaper** 25:13
**Lanoue** 12:11,17 15:10,22 16:15 18:4 19:2 45:21 47:9 60:3 61:19 64:10 102:20,22 103:19
**large** 48:22
**larger** 76:19
**law** 3:6 9:3,13,14 11:11 22:20 52:11
**lawyer** 60:1 62:3 64:10
**lawyer's** 52:12
**lead** 93:15
**leading** 59:20
**leads** 34:2,4,11,13
**left** 95:17
**legal** 11:3 34:10,13 34:15 62:6
**let's** 12:6 18:12 26:19 33:10 38:6 38:12 44:14 55:10 56:12 65:21 66:6 82:10 86:9 90:20 94:4 95:15 99:7
**level** 49:2 50:5,6 85:10 88:1 91:15 100:15,19,21 101:4,10
**levels** 79:14
**liaison** 12:22
**license** 91:3,5
**licensed** 9:12,14
**limit** 41:3,10,15,15 41:18,19 44:1 56:8 100:12,18
**limited** 80:14
**limitless** 77:15
**limits** 43:13,22 44:6 44:12 96:2,6 97:19
**line** 67:21 75:21 82:12 83:1
**link** 29:15,19 34:5
**list** 12:2 37:2 57:22

58:2,3 59:13 61:4 61:6,6,12 65:5 66:21 76:11,12 91:19,20,22
**listed** 10:9 17:14 31:10 63:9
**lists** 9:2 16:5 36:14 57:22 58:2 61:1,3
**literature** 10:21
**litigation** 20:14 57:10
**little** 12:5 29:6 36:5 48:14 50:17 60:19 95:16 96:1,8 106:1
**Livingston** 52:12
**loan** 78:11 87:16
**loans** 75:5,13,16
**local** 38:15 85:21
**located** 15:6
**Lofland** 47:13
**long** 14:14
**longer** 17:12 69:9
**look** 26:2 36:4,9 39:10,20 63:15 65:17 70:6,22 74:12,15,17 78:10 81:14 90:20 94:19 96:6,9,22 100:12 101:6,9 103:5,6 105:1
**looked** 12:15 14:14 15:19 16:2 38:21 39:18 40:9 47:2 47:19 48:4 51:9 65:2 67:20 71:20 72:22 77:21 86:19 87:4 99:4 101:5 101:11
**looking** 19:4 25:22 51:3,8 60:11 68:7 68:18 86:16 87:15 100:1
**looks** 8:11
**losing** 55:7
**lost** 43:17 57:2

**lot** 15:13 30:21 31:1 67:20 102:19
**loved** 107:14
**lower** 41:7 43:7 75:15
**Loyola** 10:9,10,11 10:12,18 11:11,13
**Lunn** 28:13,16
**L-A-N-O-U-E** 12:11
**L-I-V-I-N-G-S-T...** 52:13
**L-O-F-L-A-N-D** 47:14
**L-U-N-N** 28:14

**M**

**M** 1:21 2:19 112:2
**Madeline** 16:20
**major** 10:20,21
**making** 75:10
**male** 56:1
**males** 54:5
**manager** 12:22
**manipulate** 26:1 93:3
**manipulated** 93:5
**manner** 105:13
**manufacturing** 97:7,11
**marked** 7:17,20
**market** 37:10 38:4
**marketplace** 33:8 76:21
**Maryland** 6:3 9:3 9:15 10:4 11:11 11:15 52:5,6,10
**Mason** 17:5 49:8 56:12,13,17 57:20 57:21 58:15,18 59:5 65:8 73:19
**massive** 67:17
**math** 11:4 13:6,8 42:21 43:4 50:7 87:10
**mathematical** 87:6

**matter** 6:9 22:18 25:15 45:16,17 56:7 63:10
**matters** 66:12
**Maurice** 15:5
**MBE** 39:4,4,6
**mean** 16:3 22:13 24:13 31:13 40:3 46:19 54:2 58:5 60:10 77:11 83:8 83:21 84:18 85:6 85:17 91:22 97:13
**meaning** 72:12
**means** 24:14 94:3
**meant** 41:22
**measure** 21:22 55:5 55:7,9 74:3 76:18 78:4
**measures** 18:7 46:5 47:21 60:21
**measuring** 76:21
**medications** 6:7
**meet** 16:6 77:14
**meeting** 92:12
**Melrose** 6:2
**memory** 16:11 60:19,22
**mention** 51:16 87:2
**mentioned** 11:10 21:1 66:1 70:5 87:12 95:3,10
**mere** 100:15
**merely** 64:4
**met** 18:6 108:9
**method** 61:11 86:15,18,22 87:7 91:17 110:12
**methodology** 13:18 33:6 65:15 84:4 94:9 99:17,20,22 100:7
**methods** 10:5 14:8 58:8 60:14 98:10
**metro** 12:7 14:7
**Mexico** 18:22
**MGT** 49:9 59:6,8





59:11 64:22 65:16
65:19 73:19
**Michigan** 28:15
**Miller** 13:4,18
15:15
**million** 41:4,5
42:10 43:19 44:2
74:21,21 76:16
96:11 97:5,6
106:22
**Milwaukee** 45:6,8
45:14 46:13
**mind** 29:6 33:11
52:19
**Mine** 99:11
**minorities** 39:11
49:3 85:8 88:2
**minority** 21:9 37:9
38:5,15 43:6 54:7
58:3 86:7 87:19
104:18
**minute** 9:7 43:15
**minutes** 59:1,1
95:16
**misjudged** 55:17
55:18
**missed** 47:11
**mistaken** 55:5,6,8
**misunderstood**
37:19 39:2
**misused** 91:21
**mixed** 84:15,18
85:5,11,13 86:17
**moment** 95:8
**Monday** 1:13 2:7
**money** 74:13 75:20
75:20
**Mongkuo** 15:5,14
95:5
**Montana** 45:10
46:22
**morning** 24:18
**motion** 71:3,7
**motions** 27:9,14,16
**move** 16:12 33:10
35:7,9 37:1 40:12

43:12 44:14 51:14
56:12 66:6 80:6
**moving** 19:19 63:8
88:6
**Mulberry** 3:7
**multiple** 109:10
**multi-housing**
30:22
**multi-volumes**
17:13
**MWBE** 37:4 38:17
104:17,18 105:3,5
105:9,17
**MWBEs** 37:14
104:17,20 109:17
**M-I-L-L-E-R** 13:4
**M-O-N-G-K-U-O**
15:6

---

**N**

**N** 3:1 5:1
**NAICS** 25:5,8
**name** 5:21,22 10:16
15:4 16:20 26:8
28:13 47:10 52:12
104:9
**named** 47:13 61:19
71:11,13
**narrow** 34:18
**narrowly** 34:17
35:1
**Nashville** 12:7 14:7
19:21 20:3
**national** 83:17
**nationwide** 80:9
81:2,10
**native** 80:19
**nearly** 100:20
**necessarily** 58:4
80:15 83:16 85:20
92:12 107:10
**necessary** 91:12
93:12
**need** 23:6 51:5,10
75:22 79:15,17
80:12 81:21 82:9

82:11 90:19 93:7
93:8,17 94:3
103:5
**needs** 91:3 93:4
101:19
**neither** 112:10
**NERA** 17:20,21
18:11 49:8,17
50:12 51:14,16,20
51:22 52:2,20
53:1,2 55:11
73:19 74:3,4
**net** 40:13,17 41:3
41:17,19 42:6,18
43:2,7 76:7 106:7
106:21
**neutral** 66:4
**Nevada** 66:4
**never** 77:16 78:2,20
79:6,7 93:1
108:20 110:9
**new** 18:22 28:6
43:5 56:19 57:5
57:20 58:7,10,12
58:13,14
**nice** 98:6
**nine** 37:15 104:22
105:2
**nineties** 100:12
**nonDBEs** 97:1
**non-minorities**
88:2
**non-minority** 54:7
87:19 88:4
**North** 25:5 59:17
64:5
**notary** 2:20 5:6
112:1,18
**note** 35:14
**notice** 2:19
**November** 1:13 2:7
71:14
**number** 4:8 43:18
46:20,20 54:15,21
69:4 72:14 76:11
80:14 82:9 83:2

83:19 84:5 91:13
93:3,5,10,20,20
98:22 106:11,12
109:17
**numbers** 25:20,22
26:3 38:22 39:14
39:21 40:5 70:3,9
72:15 109:1
**N-E-R-A** 17:20
**N.W** 2:14 3:16

---

**O**

**O** 5:1
**oath** 72:20
**Objections** 5:14
**obtain** 108:20
**Obviously** 11:4
38:16 102:18
**occasions** 104:16
**occur** 50:4
**occurring** 79:8
**odds** 88:19
**offer** 83:19
**offered** 29:4,10
63:13 89:9
**office** 17:15 30:15
**officer** 112:2
**offices** 2:10
**oh** 79:18
**Ohio** 24:10
**okay** 6:21 7:2,13,16
8:2 10:16 23:3
26:9 27:6 33:10
35:10 38:12 42:4
43:14,20 51:13,15
55:4 66:8 71:9
74:2 78:9 80:6
84:9,9 85:4 87:6
87:15,18 88:6,19
90:11 95:22 99:7
99:12 101:21
110:17
**once** 21:7 56:8
**ones** 36:20 39:17
65:1,11 66:1
95:10

**one-to-one** 82:13
82:20 83:8
**operate** 77:7
**opine** 20:6,16
**opined** 29:22 58:18
**opinion** 14:17
18:18,20 20:7
22:18 33:22 34:3
36:19 47:3 60:8
60:10 71:22
**opportunity** 58:15
**opposed** 31:13
48:18 50:5 88:2
100:14 101:7
**ordered** 36:1
**Oregon** 16:13
**organization** 70:19
71:11
**outcome** 57:10 63:2
63:4,5 112:15
**outfit** 104:9
**outlier** 86:2,5
**outside** 27:18 92:10
98:18,21 99:1
**out-of-state** 62:3
**overall** 65:20
**overcount** 54:14
**overcounting** 54:8
**overcounts** 54:21
**overestimate** 55:15
**overlap** 33:4
**overstated** 43:1
**overutilization**
37:4,6,7,13,22
73:5
**overutilized** 37:12
49:3 72:13
**owned** 54:7 56:1
87:19 88:4 109:18
**owner** 40:14,18
53:9,12,16 56:8
69:10
**owners** 55:22 84:12

---

**P**

**P** 3:1,1 5:1



page 4:3,8 8:9 12:1 12:1 33:11,13 35:9 37:1,1,15 38:12,13,13 40:2 40:12 43:12 44:14 44:14 51:13,13 59:6 78:9 80:6,7 84:9,10,11 87:15 88:6 95:21 97:3 99:9,10 104:22 105:2

pages 1:6 35:11 70:7 111:4

paid 45:12 75:15

paragraph 33:13 40:13,16 88:12

paragraphs 84:20

parity 37:8,11

Parsons 64:10

part 13:6 19:12,16 25:13 29:12 34:18 42:20 47:12 57:8 60:5 69:5 92:18 110:6

participants 97:4,8 97:19 98:1

participate 41:19 56:9 98:2

particular 21:17 25:11 48:5 53:21 54:1 58:4 65:2 72:7 80:14 82:19 83:6,19 94:4,19 108:16

particularly 108:18

parties 112:11,14

partner 12:10

parts 32:3 39:7,8 65:8 71:20

pass 109:12

patchwork 72:12

Patenaude 35:12 97:13 98:6

Patenaude's 36:21 97:11

pattern 80:10

Paul 71:13,15

pay 75:4,12

paying 75:18

people 10:17 42:10 80:14 89:8 108:4 108:9

percent 37:10,10 37:12 38:4,6,7 83:10 96:14

percentage 53:20 55:14

percentages 42:22 94:3

perfect 37:11

perform 36:18

performed 36:11 36:21 104:9

performs 35:22 78:13

period 30:2 106:12

personal 40:13,17 41:17 76:7 108:3 108:11

personally 10:17 103:21

persuaded 84:15 84:16

persuasive 63:15 68:1

persuasively 72:11

Petersburg 15:2 19:21 20:2 95:3

phrase 45:10 81:7 94:22

Ph.D 15:4

picked 109:6

pick-up 77:16

pinpoint 79:6,12

places 48:10 73:6

plaintiff 1:4 3:4 45:15,17 102:2

plaintiffs 57:2,3 63:5

Plaintiff's 7:17

play 57:9

please 7:3,7,11

88:10,20

plumber 91:2

plumbing 91:3,4

plus 40:3

point 17:6,20 19:2 21:14 35:17 42:20 74:15 80:17 83:13 85:11,12,14 89:4 90:1

points 75:3 90:3

policy 82:3 83:3

politically 86:9

portfolio 110:3

Portland 16:12,16 16:19 19:20

possible 54:14 69:17 86:5 87:9

possibly 34:8 38:11 51:7

pour 92:21

practically 107:19

practice 9:12,14

practices 83:11

preceding 84:20

precise 48:14 80:2 100:20

predecessor 17:22

predicate 67:11,14

preferences 84:17 107:5

prepare 7:13 28:7

prepared 7:18,22 8:11 63:17

preparing 8:14 79:3

prequalification 74:19 75:9 91:15

prequalifications 74:20

prequalified 74:18 75:2,6

prerequisite 11:21

PRESENT 3:20

presented 87:14

pretty 95:4,5 109:2

prevalent 98:9

previous 59:17 95:10

previously 64:17 70:5

primary 12:19 17:18

prime 46:14,16 48:6,9,13,17,20 49:6,13 50:5,15 50:18 51:4 52:21 79:13

printed 49:12

prior 36:15,18

privilege 5:15

probably 20:4 75:7 82:16 97:16,16 107:7 108:6

problem 23:4 35:2 69:6 78:11 79:5 83:5,5 93:16 105:5

problems 46:12 81:18

Procedure 5:14

proceeding 24:3

process 17:7 21:13 79:8,15

procurement 58:9 73:15 89:7 90:7 100:2,5,8 101:10 105:19

produce 12:4 21:6 23:11 28:16 31:12 66:14 71:10

produced 17:12 18:19 26:9,12,13 26:17,22 27:3 71:1,17 103:21

product 14:20 17:3 103:8

profile 47:15

program 16:10 20:9 29:1,3,20,21 33:21 38:16 40:22 41:1,2,11,11,18 41:20 42:18 43:2

43:3 44:1,5,9,11 44:12 50:15,16,18 50:22 51:6,11 56:10 63:6,14 80:9,16 81:1,5,16 83:6 84:17 85:3 97:4,8,20 98:1,19 98:21 99:2,15 100:10 105:6,9,12 105:13,17,22 106:6,12,16,18 107:1 109:18,20 109:21

programs 26:6 28:3 38:18 43:6 73:15,16

project 15:11 76:16 76:17 77:18

projects 76:4

properly 94:12,18 94:22 95:2,12

Proposal 16:18

proven 29:13

provide 47:3 62:6

public 2:20 14:8 16:9 23:21 28:2 46:4 47:21 53:22 57:14 58:9 73:14 76:4,8 77:20 79:7 82:3 83:3 87:20 88:2 90:18 91:2,7 112:1,18

published 14:18

purpose 23:1 70:17 96:21

purposes 99:14

pursuant 2:19 5:13

push 18:7

pushed 107:15

put 17:2,4 18:12 65:22 74:13

putting 16:17 95:5 102:11

P-A-R-S-O-N-S 64:11

p.m 95:19 110:21



## Q

**qualifications**
90:22,22
**qualified** 16:6
20:16 25:2 53:21
58:1 60:22 61:8
62:15 74:22 75:3
90:17,21 91:5
92:13
**qualifies** 11:1 20:5
**qualify** 68:10 84:1
**quality** 12:21 17:3
18:4
**question** 7:3 16:4
23:1 25:2 35:3
42:1,2,12,19
50:10,21 54:11,18
56:10 65:12 84:2
88:20 94:21 97:9
98:13 104:11
106:5 107:10
110:4,7
**questions** 6:21 7:6
8:3 23:5 83:11
**quibble** 23:3
**quick** 71:3 109:15
**quite** 8:15 31:20
**quote** 12:3 82:5

## R

**R** 3:1 5:1
**race** 14:8 16:9
18:15,17 23:21
24:9 32:14,17
46:4 47:20 53:9
53:16 57:13 58:8
58:19 60:13 62:18
65:10 66:4 67:12
68:4 72:4 73:3,8
73:14,20 85:3
86:13
**race-based** 26:6
28:2
**racial** 54:3
**raised** 106:22
**ran** 89:15

**range** 78:8
**rank** 36:1,9
**rare** 61:14
**rates** 75:4,12,15,19
87:16
**ratio** 48:13,17
49:16 82:14,20
83:8 93:22
**ratios** 48:21 49:12
50:12
**reach** 23:13 34:4
**read** 33:16,18
35:19 39:1 57:11
77:21 86:18 87:11
111:4
**reader** 90:1
**reading** 36:16
**ready** 24:15
**real** 71:3
**Reality** 92:20
**realized** 68:19
**really** 79:19 81:16
89:20
**reason** 6:11 39:11
69:20 101:16
108:16
**reasons** 33:2 46:10
72:7
**rebuttal** 35:20
39:10
**recalculate** 69:15
70:2 96:19 97:2
**recall** 8:22 9:1 14:3
14:6 15:2 16:22
17:11 18:6,9,12
18:14,20 19:4,22
27:6,9,13 39:17
48:1 52:16 56:22
59:22 60:11,18
61:16 62:12 63:2
65:12 67:6 71:18
72:20 73:5 89:16
95:7 102:17
104:10
**receive** 97:4
**recess** 59:2 95:18

**recollect** 46:12
**recollection** 8:13
14:19 16:5 47:22
63:7 64:16 65:20
72:9 73:1 95:4
**recommend** 13:17
18:17 46:4 47:20
57:13 60:13 62:18
65:9 72:3 100:7
**recommendation**
14:11,12 48:2
73:22
**recommendations**
46:7 60:16 62:22
63:20 72:1
**recommended**
13:19 14:6 18:14
32:14,17 58:19
72:4 73:14,20
**recommending**
16:9 68:4
**record** 5:9,21 9:6,8
29:11 33:18 38:14
57:8 66:12 84:14
95:17 112:9
**records** 74:14
89:12,17 93:1,15
**recreate** 39:21 40:5
40:10 49:11,16
50:11 72:14
**redirect** 102:1
**reduce** 42:13
**reduced** 112:7
**reference** 84:19
**referred** 102:15
104:8,22
**referring** 40:10
74:5 102:11
104:12
**regard** 19:15 48:6
50:8 84:11 103:15
109:5
**regardless** 69:10
**region** 74:11 76:13
**registered** 58:3
**registering** 91:9

**regression** 19:11
78:12,14,15,19,22
79:2,6,20 80:3
84:21,22 85:18,22
86:2 87:4,13
108:13,14,17,20
109:6 110:6,8
**regressions** 84:14
89:16
**Regulations** 31:4,5
**regulatory** 31:2
**related** 24:21 99:4
112:10
**relating** 52:19
**relationship** 102:21
**relative** 76:18
112:13
**relevance** 100:5
**relevant** 51:5,10
88:17,22
**reluctant** 14:15
**rely** 67:19 99:5
**remain** 40:18
**remediable** 83:5
**remedy** 29:14,19
34:6,7,9,17,19
35:6 46:16 67:11
72:5 79:10 80:13
81:18 82:19 85:16
86:14
**remember** 8:14
10:6 12:8 13:3
14:17 15:12 16:8
17:18 18:8,18
19:9,19 23:9 63:4
64:19 95:3
**removing** 96:20
**repeat** 7:4
**repeatedly** 102:10
**reply** 39:1
**report** 4:10 7:13,17
7:18,19,21 8:4,7
8:10 20:18,21
21:2 23:11,17,20
26:5,9,12,13,17
26:22 27:3 28:7

**28:16 32:5 33:1
33:10,12 35:20
36:4,16 37:3 39:3
39:8 44:17 48:8
49:5,12,21 50:8
63:17 65:8 67:3,7
70:1,8 71:4,10
72:15 74:3 78:9
80:18 84:13 88:7
88:12 89:5,14
90:2,3,9 92:3
95:21 96:6,7
97:12,14 98:7
99:4,8 104:22
105:11
**Reported** 1:21
**reports** 21:1,3 27:7
27:10,17 42:7
49:1 50:2,9 78:18
108:5
**represent** 102:5
**representative** 83:4
83:22
**represented** 6:4
52:14
**Request** 16:18
**required** 62:15
**requirement** 34:17
**research** 10:4
20:15 48:22 50:1
76:5,6 96:21
98:22 99:6
**researched** 20:13
**reserve** 5:16
**reserved** 5:15
**respondents** 80:8
80:12 81:3,5,20
82:5
**responding** 81:10
**response** 80:18
81:22 83:10
**responses** 82:15
**responsible** 11:8
**Restate** 88:20
**restatement** 35:17
**result** 16:22 18:9



18:11 48:12,15
50:8 55:16 84:16
**resulted** 17:4
**results** 21:22 56:22
65:10 72:12 84:11
84:13,16 85:15,17
86:16,19,20 87:5
87:7,14
**resume** 8:6
**retract** 39:11
**return** 38:4
**revenue** 25:18 26:3
43:12,22 44:1,6
44:12 56:7 96:2,6
**revenues** 69:8
**reverse** 49:1
**review** 5:16 45:22
47:1,18 58:15
60:5 62:9 64:12
71:16 72:21
**reviewed** 53:2
64:22 70:10,13
73:14
**re-examine** 87:3
**RFP** 16:18 17:2,4
17:11 19:20
**Rho** 36:2,3,8
**right** 10:9 22:15
29:12,14 40:19
44:3 64:6 66:10
72:21 74:4 79:10
81:6,18 86:12
87:12 95:9 104:13
**Rights** 2:13
**RMR** 1:21 2:19
**role** 16:13 19:1
25:3 52:9 57:9
61:16,22 64:1,8,9
**roles** 60:4,5
**Rothe** 1:3 5:10
59:17 63:10,17
102:6
**Rothe's** 44:2
**Rowe** 64:6
**Rubinovitz** 88:7
89:4 90:2,8 99:8

99:10
**rule** 27:15 71:7
**ruled** 27:13
**Rules** 5:13
**run** 25:1 87:13
**R-O-W-E** 64:6

---
**S**
---
**S** 3:1 4:7 5:1 23:7
**sad** 107:13
**sampling** 22:9
**San** 3:9 26:11
**satisfied** 78:16
**satisfy** 62:15
**saw** 81:11 86:20
**saying** 37:19,20,21
55:5 81:14
**says** 39:10 40:2
**SBA** 3:21 43:3
**scenario** 86:1
**Schlanger** 61:20
**school** 9:3 11:11
91:3
**Scott** 52:12
**SDB** 89:17
**second** 22:4 28:4
29:12 35:6 61:17
61:21 62:1 80:17
87:3 99:10
**section** 78:12 96:2
97:4,19 98:1
**see** 14:16 29:15
49:2 56:21 70:8
79:14,18 94:19
96:9 100:5 105:20
**seen** 99:3
**seldom** 61:1,2
**self-answered**
67:20
**sense** 11:16 92:19
**sentence** 33:16
84:13 88:18 89:1
89:4,21
**separate** 79:13
**separates** 49:9,10
**September** 8:11,12

8:15
**serious** 73:5
**served** 8:11,16
**services** 97:6,10
**set** 33:3 98:3
109:11
**settled** 24:17 27:2
45:18 63:7
**settlements** 30:21
**seven** 35:9,11
**shape** 34:9
**shaped** 34:19
**share** 21:9,9 26:3
76:20 93:7 94:5,6
**sheet** 111:8
**short** 59:2 95:18
**shortcomings**
107:21
**show** 21:22 37:3,14
37:21 38:10 48:21
86:3 91:10
**showed** 73:5
101:14
**showing** 91:7
**shows** 98:7
**shut** 63:6
**shutdown** 101:9
**signature** 5:16
110:19 111:12
**signed** 111:8
**significance** 19:15
21:15,18,21 22:2
22:6,8 101:3,12
**significant** 20:8
101:15
**similar** 100:11
**simply** 39:12 42:15
80:4 87:4,12,13
92:19 104:5
109:11
**single** 32:11
**sir** 6:16 63:19 72:19
84:6,8 87:2
**sit** 108:2
**sitting** 14:13 47:17
61:12 72:20 77:4

**situation** 83:12
86:7
**six** 100:13,21 101:4
**size** 25:7,8 56:6
77:1 79:21 82:11
94:14 98:11
**skill** 108:19 109:11
110:10
**skimming** 65:8
**skin** 56:7 69:10
**skipped** 30:2
**slightly** 27:1
**Slusser's** 23:6
24:19,22 26:22
**small** 1:7 26:14
55:12,14 107:3,16
**snapshot** 101:8
**software** 110:14
**sole** 96:11 97:5 98:3
98:5,9
**solely** 11:7
**solo** 15:15
**somebody** 106:5
108:2
**somewhat** 22:21
**sorry** 8:15 15:21
23:3 26:21 29:21
41:22 54:10,19
61:13,21 72:19
87:15,18 88:9
100:17
**sort** 13:11 16:6
17:9 18:4 19:5
26:3 56:3 75:22
91:15
**source** 39:3 40:2
61:8 88:16,17,21
89:10,22 90:5
96:11 97:5 98:3,5
98:9
**sources** 25:18
92:10
**speak** 82:7 109:3
**speaking** 86:11
**Spearman's** 36:2,3
36:8

**specialty** 109:9
**specific** 39:17 49:4
67:13 74:2,10
84:4 91:21 96:8
99:21 110:1
**specifically** 12:6
39:18 49:20 60:18
81:4 96:3
**speculate** 14:15
**speculating** 43:10
43:11,17
**speculation** 43:16
**spell** 23:7
**spelled** 12:11 15:5
16:20 26:14 28:5
**spent** 31:3,4 93:14
103:18
**split** 48:18
**spoken** 107:12
**St** 15:1 20:2 95:3
**stalwarts** 103:16
**standard** 16:7
62:16 83:20 92:12
106:3,4
**standards** 75:8
**standpoint** 83:3
**stands** 66:9,12
104:18
**start** 12:6 24:18
33:4 45:14 59:14
80:2 90:12,16
**started** 30:4,6
31:22
**starting** 8:9 74:15
75:3
**starts** 33:13 88:12
99:9,11
**state** 5:20 9:12,14
17:15 19:21 21:2
37:3,13 38:13,14
43:22 44:2 52:5,6
80:7 81:4 88:7,14
96:10,13 97:3
**stated** 99:12 105:11
108:7,13
**statement** 80:11



82:4 107:8 108:1
statements 99:8
states 1:1 38:19
   66:3
stating 36:19
statistical 19:14
   20:17,20 21:15,18
   21:21 22:2,9,18
   25:15 27:18 86:22
   101:3,12
statistically 101:15
statistician 9:22
   10:1
statistics 10:2,5
   11:10,12,14,15,17
   13:12,13 22:20
   25:16,17
stay 41:15,18
stenotype 112:7
step 35:6 79:17
   90:13 94:20
stop 95:15
stopped 31:21
stories 107:13
Street 2:14 3:16
strikes 89:5
Strong 104:9,12
studies 11:2,8 12:4
   13:16,16 16:1
   17:12 19:12,17
   20:1,6,11 24:3
   29:11 31:12,18
   32:1,4,7,13,21,22
   33:5,14,20 34:7
   35:4,4,14,16 37:2
   38:14,20 39:5
   44:17 48:11 49:5
   49:7,8,14,17
   50:12 51:14,22
   52:7 56:14 57:21
   58:16 59:6 63:12
   63:20 64:7,22
   65:4,5,7,14,21
   66:7 70:6,8,10
   73:13,18 76:2
   77:19 79:17 85:6

92:2,8 96:10
102:12,16,22
105:8 107:20
108:10 109:2,10
study 12:9,12,13,17
   12:18 13:2,14,18
   14:4,14,16,21
   15:1,8,13,13,17
   16:2,8,13,14,17
   16:19 17:1,5,10
   17:14,19 18:2,10
   18:11,14,19,20
   19:1,6,8 22:3,12
   24:8 30:4 31:8,14
   32:5,16 34:22
   45:2,22 46:3,13
   47:1,2,4,18,20
   48:5,17 51:3,8,17
   51:19,20 52:3,5
   52:15,17,20 53:2
   53:15 56:18,19
   57:6,11,13,20
   58:19 59:8,12,16
   59:21 60:6,9,12
   60:13 61:10 62:9
   62:13,15,18 63:15
   63:16 64:12,15,16
   65:9 66:2,15,19
   67:11,12 68:4,7,9
   68:11 70:12,16,20
   70:22 71:17,19,21
   72:1,3,4,6 73:10
   73:22 78:2 79:4
   81:20 83:7,9 90:4
   90:6,11,14,15
   92:18 95:1,4,11
   96:13 100:12,18
   101:14 103:21
   104:4,7,8,15
   stuff 31:1 92:11
   sub 49:6 51:1 52:21
   79:13
   subcontract 50:20
   subcontracting
   48:7,9,13,18 49:2
   49:14 50:6,15

51:9
subcontractor
   46:14
subcontractors
   93:14 107:14
subcontracts 46:17
submit 67:3 75:14
submitted 8:10
subset 110:2
substantive 17:9
   18:1 19:7
suffered 64:16
sufficient 11:21
   65:21 67:11 68:12
   80:4,15 83:18
   94:14 100:9 109:9
sufficiently 20:8
   67:22 73:15 83:5
   84:15,18 85:4,11
   85:13,15 86:17
suggest 83:1 86:21
suggests 87:22
Suite 2:15 3:8
Sullivan 1:11 2:10
   4:3 5:3,10,20,22
   7:17,19 33:12
   111:3
support 42:21
   68:10,12 72:6,8
   73:2 84:17 87:1
   100:9 101:1
supported 73:16,22
   99:15
supporting 37:22
suppose 78:7 87:9
supposed 24:16,18
Supreme 47:15
sure 5:18,22 8:5,15
   20:22 24:22 26:19
   29:8 32:9 35:8
   42:8 54:18 66:10
   80:12 89:15 93:22
   96:17 97:9
surely 94:16
survey 57:5 67:19
   80:7 82:11 83:17

83:21
suspect 75:10
sworn 5:5 112:5
system 25:6 100:2,5
S-C-H-L-A-N-G-...
   61:20
S-L-U-S-S-E-R
   23:7

T
T 4:7
table 39:9,14 62:2
tables 40:10
tailored 34:18 35:2
tailoring 34:19
take 7:7 11:5,10,12
   35:6 42:10 58:22
   70:22 87:17 90:13
   92:11 105:1
taken 5:13,17 9:18
   9:19 10:2 59:2
   95:18 112:3,6,12
takes 74:12 89:22
talk 78:1
talking 81:1,2
   83:15 104:20,21
   109:16
talks 80:18
tandem 15:22
tangentially 56:19
   57:7
tau 36:11,13,15
technique 79:3,11
tell 79:7 92:21
ten 95:16
tend 42:12 65:17
   75:13
Tennessee 12:7
   14:7
term 39:6 62:1
   91:21 102:10,14
termed 39:6
terms 25:4 26:3
   72:5 101:2 102:17
test 36:18 82:13
   83:1

testified 5:6 22:17
   24:20 25:9
testify 24:15
testifying 102:18
   102:19
testimony 6:9,13
   24:21 102:15,18
   111:4,6 112:4,6,9
tests 36:1
Texas 17:15 18:5
   19:21 20:3 51:17
   51:19
theoretical 78:7
theory 81:19
therefrom 88:8,15
   89:1
thesis 37:22
thing 13:12 89:18
   91:16
things 20:22 30:22
   31:6 32:6 33:4
   36:10 65:16,19
   106:19 109:15
think 11:17 12:20
   12:20 15:18,18
   18:16 20:3,5 32:7
   33:9 34:18 40:3
   42:13,20 48:3
   49:22 51:9 53:14
   60:20 61:2,7,10
   63:9 64:3,4 65:9
   66:2 69:11,21
   70:3 72:5,8,11,22
   77:4,6 79:2,17
   80:3,12,17 81:12
   81:22 82:9,13,16
   82:21 83:2,20
   84:2 85:7,19 86:1
   86:5 89:10,16
   94:15 95:13 99:9
   100:20 101:1,5,6
   101:11,17,22
   103:17 104:11,14
   105:16 107:20
   109:4,21 110:6,9
   thinking 95:9 108:2



thirds 69:1
thought 17:3 63:12
64:20 67:15,21
three 6:19 59:1
101:5,7,11
threshold 106:7,16
106:17,20
thrown 69:11
Thumb 23:8 24:19
tied 25:6
Tillman 17:6 49:8
56:12,13,17 57:20
57:21 58:16,18
65:9 73:19
Tillman's 59:6
time 5:15 6:17 7:2
7:8,9,9 8:18 14:14
14:18 30:2,7,14
31:3,5,7,14,21
33:3 48:5 74:13
77:22 81:10 87:17
92:22 96:15 101:7
101:8 103:18
106:12
times 102:13
tipping 85:12,14
titled 40:13
today 6:5,19 29:9
73:19 103:1
tool 108:18
tools 77:16
top 12:1,7 38:13
traditional 10:21
11:16
traditionally 38:3
training 11:4
Trans 6:20 26:10
26:20 27:12 40:8
67:1,10,22 68:15
68:15,19 70:5,12
71:3,4 95:11
96:20
transcription 111:6
transfer 85:2
transit 28:6 58:11
58:11,12,13

Transportation
26:12 67:1
tried 16:5 18:3,7
39:13,21
trouble 79:19
truck 77:16
true 44:13 49:1
56:5 61:6 69:9
85:20 103:14
108:8 111:5 112:8
truthful 72:19
truthfully 14:13
19:10 30:1 54:19
69:21 79:5
try 70:8
turn 85:18 86:3
turning 33:11
turns 24:15
two 8:21 11:5 26:16
29:15 35:22 36:14
41:8 45:5 52:6
58:22 69:1 70:4
98:8 100:15,19
109:15
two-and-a-half
41:9
two-part 29:9
two-thirds 68:20
TX 3:9
tying 81:9
type 25:11 54:16,22
110:14
types 25:19
typewriting 112:7
typical 52:20 83:21
typically 48:20
49:9,9 50:17 91:8
103:3,7 104:2
109:21

_____

U

ultimately 89:5
90:2 93:14
umbrella 39:6
unaware 49:19
undercounting

54:8
undergraduate
10:8
understand 7:3
8:17 24:13 30:8
38:20 39:12 41:13
42:1 54:18 109:19
understanding
48:7 50:14 97:7
97:18,22 106:6,14
106:15
underutilization
38:2,3,8,9 48:21
101:15
underutilized
72:13
undoable 69:13
unequally 87:20
Unfortunately
92:10
Uniform 21:1,3
49:1 50:1,9
unique 85:21
Unit 3:15
UNITED 1:1
universe 56:4
University 9:3 10:3
10:10,13 11:14
unknowability 43:8
unknowable 42:16
88:15 89:2
unknown 88:8,15
89:2
unnamed 90:19
94:15
unpersuasive 60:12
unpub 40:3
unpublished 40:4
unquote 82:6
updated 8:20
updating 8:22
upwards 81:12
Urban 30:13
use 14:8 73:3,7,16
81:7 84:5 85:4
86:15,22 91:18

92:3,9 93:19 94:4
103:8 110:12,15
uses 39:4 40:4
80:20 99:17,18
usually 102:20
utilization 12:15
13:10 21:8 37:11
38:7 42:15 46:20
69:12 72:10 89:17
92:16,17,22 93:3
93:10,20 94:2,7
95:6 100:13
104:21 105:4,5,18
U.S 40:22 41:1,2

_____

V

v 5:10
vacation 24:16
Vaglica 1:21 2:19
112:2
vague 60:19
vagueness 48:4
varied 103:2
variety 60:4
various 12:16
25:18,19 32:4
54:3 84:20 93:8
104:16
vary 53:8,11
101:10
versus 23:8 24:19
26:11,14 28:6
45:8
view 82:1,6
Virginia 59:16 63:8
virtually 12:13
57:21
vs 1:5

_____

W

Wainwright 20:7
33:1 35:15 36:20
37:18 38:21 48:8
78:13 80:18 92:3
96:7
Wainwright's

17:21 35:20 37:3
44:17 49:5,12,21
50:8 70:1 78:16
84:11 97:13,17
wait 7:7
waived 110:20
want 5:16 7:10 42:9
82:13,15,22 91:20
96:17 102:1
107:16 109:15
110:4
wanted 75:19
Washington 1:12
2:16 3:17 30:16
wasn't 68:9 72:11
way 13:20 18:13
39:8 40:5 45:10
55:17 62:17 63:22
65:22 74:3 80:1
80:16 81:13 85:9
89:21 100:6 107:6
108:8
ways 17:2 46:17
weeks 40:19
weight 76:22 77:2
went 18:5 106:2
107:16
Wessel 16:20
Western 47:9 66:3
we'll 16:12 45:14
59:14 66:10 80:6
we're 29:8 56:4
83:14 86:11 96:17
101:22 108:21
we've 26:19,20
50:10 64:17 84:21
white 38:16,21 54:5
56:1 105:6 109:17
109:20
wildly 101:10
willing 16:7 53:21
58:1 60:22 61:9
62:16 74:22 90:17
91:6,7 92:13
Wilson 44:15,20
45:1 49:7,14



50:12 73:19
**window** 42:15
**winning** 88:19
**witness** 5:4 7:21
  24:3 40:9 60:3
  112:4,6,9
**witnesses** 62:5
**woman** 25:1
**women** 38:15,17,21
  39:7 104:19 105:6
  109:17,20
**won** 57:1 63:5
**word** 8:16 48:15
  80:20 85:4 86:6
**work** 12:6,8 13:7
  15:10 16:17 17:6
  17:10 18:1,4 19:7
  19:12,16 20:15,18
  20:21 21:1,5 22:1
  25:19 27:18 30:4
  30:11 31:2,6,9,13
  44:20 45:11 47:11
  50:2,20 51:2 52:9
  54:16,22 59:7
  61:1,2 70:20 73:1
  74:22 75:19,22
  78:21 91:2 102:19
  103:4,8 104:5
**worked** 12:3 15:22
  16:17,19 25:13
  30:8 31:7,11,14
  32:22 44:22 51:16
  51:20,21,21 52:1
  52:4,8 56:13,16
  59:10 61:3 66:14
  66:17
**working** 12:22
  15:15 31:22 43:4
**works** 35:12 50:18
**worth** 40:13,18
  41:3,18,19 42:6
  42:18 43:2,7 76:7
  106:7,21
**wouldn't** 32:10
  33:11 82:22 92:11
**writing** 10:21

**written** 20:13 23:20
  26:5 89:4
**wrong** 63:11 90:1
**wrote** 89:21
**W-E-S-S-E-L**
  16:21

---
**X**

**X** 1:3,9 4:7 83:2
  93:5

---
**Y**

**yeah** 13:15 18:3
  26:2 33:19 39:16
  59:14 65:7,10
  66:5 79:18 82:16
**year** 23:9 27:4
  31:15 47:12 101:7
  101:8 107:5,5
**years** 6:19 10:15
  28:5 41:8,9,16
  50:2 60:20 70:21
  91:13 101:6,7,11
  103:11,12,13
  107:13

---
**$**

**$1** 74:20
**$10** 74:21 76:16
**$100,000** 76:17
**$250,000** 106:3,8
  106:17
**$6.5** 96:11
**$750,000** 40:19
  42:6 106:4,13,15

---
**1**

**1** 1:6 4:10 7:17,19
  33:12
**1.23** 41:4
**1.32** 41:5,7 42:10
  42:18 43:19
  106:22
**10,000** 81:11 82:10
  82:15
**10:07** 2:8

**100** 32:9,10 33:5
  83:10
**102** 4:5
**107** 38:14
**109** 4:4
**11:08** 59:3
**11:19** 59:3
**1100** 3:16
**112** 1:6
**12-CV-744** 1:5
**12:05** 95:19
**12:28** 95:19
**12:47** 110:21
**1233** 2:14
**132788** 1:22
**14** 112:22
**15** 38:7
**18** 38:12,13
**19** 40:12,12
**191** 40:3
**1983** 9:5
**1989** 20:12
**1990** 20:11 30:6
**1993** 19:1
**1994** 17:16 19:1
**1997** 10:7
**1998** 24:11 27:5
  100:19

---
**2**

**2** 8:11
**20** 37:10,10 38:6
  43:12 95:21
**20th** 2:14
**2000** 15:2 31:15,21
  32:8 41:10,17
**2001** 21:4
**20036** 2:16
**2004** 63:9
**2007** 41:17,22
**2008** 23:10 26:13
  81:10
**2009** 21:4
**2010** 26:9 71:14
**2011** 41:6,10,22
**2013** 1:13 2:7

**2016** 112:22
**202** 3:18
**20530** 3:17
**210** 3:10
**21212** 6:3
**22** 44:14,14
**23** 51:13
**25** 37:12
**25.5** 44:2
**250** 41:14
**28** 56:12

---
**3**

**3,561** 81:9
**300** 2:15
**31** 59:6
**316** 6:2
**37** 78:9

---
**4**

**4** 1:13 2:7 97:5
**40** 80:6 84:11 99:9
  99:9
**40-page** 71:1,10
**41** 87:15
**45** 88:6 99:11,12
**49** 8:9 12:1

---
**5**

**5** 4:4 39:9,15
**500** 3:8

---
**6**

**6.5** 97:6
**616-0219** 3:18
**64** 96:14

---
**7**

**7** 4:10
**7,700** 110:2
**733-8191** 3:10
**745** 3:7
**750** 41:16 43:19
  106:19,21
**750,000** 41:7 42:11
  42:18

**78212-3154** 3:9

---
**8**

**8(a)** 20:9 29:1,3,14
  29:20,21 34:6
  40:17,18 41:11,14
  41:18 43:3 44:1,9
  44:11 50:14,22
  51:5,10 56:5
  80:16 81:1,16,17
  83:6,10,13,16
  84:1,1,17 89:12
  89:17 97:4,8,19
  98:1,2,12,17,18
  98:19,21 99:1,2,5
  99:14 100:3,10
  105:6,9,13,22
  106:4,6,18 107:3
  109:18
**8(m)** 109:21
**80** 38:4 94:10,13
**83** 30:3
**85** 30:13
**89** 30:14

---
**9**

**9** 8:12
**95** 17:16
**96** 30:4
**98** 15:2



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
ROTHE DEVELOPMENT, INC.,                      )
                                              )
            Plaintiff,                        )
                                              )
v.                                            )      Civil Action No. 1:12-cv-00744-KBJ
                                              )
DEPARTMENT OF DEFENSE                         )
                                              )
and                                           )
                                              )
SMALL BUSINESS ADMINISTRATION,                )
                                              )
            Defendants.                       )
_____)

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF
## <u>PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE</u>

# EXHIBIT H: SULLIVAN CV

John Charles Sullivan, Esq.

316 B East Melrose

Baltimore, MD 21212

**Disparity study activity with local governments**
- I have worked with the following governments to produce disparity studies consistent with constitutional principles and to design race neutral alternatives to racial preferences in public contracting:
  Nashville, TN Metro Area (1996–2000)
  City of St. Petersburg, Florida (1998-2000)
  Portland, Oregon (1994–1995)
  State of Texas, Comptroller's Office (1994 –1995)
  Albuquerque, New Mexico (1993–1994)

**Research and Writing**
- Associate Director of the Project on Civil Rights and Public Contracts, at the University of Maryland Baltimore County. The Project contains one of the largest publicly accessible collections of disparity studies, legal opinions, and research articles on minority and women business enterprise programs in the country. Published in newspapers, magazines, law reviews, policy and other scholarly journals; see Addendum for published articles.  I have appeared before Congressional sub-committee detailing flaws of the federal disparity study.

**Educational Policy**
- Legal consultant for the U.S. Department of Education, Office of Civil Rights, 2002-05. Assigned to find ways to increase diversity in college and professional schools without using racial or gender preferences. Met with numerous university officials to discuss their admissions and diversity policies.

**<u>Education</u>**
University of Maryland Law School, Baltimore, MD
J.D., 1983
Loyola College, Baltimore, MD
B.A., 1976

49

## ADDENDUM – PUBLICATIONS,  LECTURES AND TEACHING EXPERIENCE

### Scholarly Articles

"Gross Presumptions: Determining Group Eligibility for Federal Procurement Preferences," (with George LaNoue) *Santa Clara Law Review*, Vol. 41, No. 1 (Winter 2000)

"Deconstructing the Affirmative Action Categories" (with George La Noue) *American Behavioral Scientist*, Volume 41, No. 7 (April 1998).

Reprinted in John Skrenntny, ed. Color Lines: Affirmative Action, Immigration and Civil Rights Options for America, University of Chicago Press, 2001.

"The Future of Florida's Preferential Public Contracting," appearing in A Report to the People of Florida About Three Aspects of Civil Rights and Florida's Governments, The Florida Public Policy Institute, 2001.

"Race Neutral Programs in Public Contracting," (with George LaNoue) *Public Administration Review*, Vol. 55, No. 4, July/August 1995.

"Presumptions for Preferences: The Small Business Administration=s Decisions on Groups Entitled to Affirmative Action," (with George LaNoue) *Journal of Policy History*, Volume 6, No. 4, Fall 1994.

"But for Discrimination how many Minority Businesses Would there Be?" (With George LaNoue) *Columbia Human Rights Law Review*, Winter1992.

### Major Articles

"Surprise Results when City Ends Preferences in Contracting," *The Philadelphia Inquirer*, October 31, 2011.

"Men Need Not Apply," *The Washington Times*, August 2, 2011, reprinted in the Jamaican Times, August 3, 2011.

"The Price of Discrimination," (with George LaNoue) *The Weekly Standard*, December 27, 2004.

"The Road's End for Racial Preferences in Public Contracting?" (With George LaNoue) *Constructor Magazine,* January 2001.

50

"Color Them Colorblind," *The Weekly Standard*, May 29, 2000.

"Contract Preferences beyond Their Time," *The Washington Times*, January 16, 2000.

"More Preferences for Minority Businesses," *The Wall Street Journal*, August 24, 1998.

"Defining Minorities can be Odd Business," *The Baltimore Sun*, March 8, 1998.

"The Slow Demise of Affirmative Action," *The Rocky Mountain News*, June 17, 1996.

"For a Multi-Racial Identity," *The Christian Science Monitor*," March 11, 1996.

"Immigration and African Americans," *The Social Contract*, summer 1995.

"A Case against Affirmative Action," *Fayetteville Observer Times*, February 28, 1994."

"Are Homosexuals Owed Affirmative Action?" *Providence Bulletin-Journal*, January 16, 1994.

"Businesses Use Women as Fronts," *Greensboro News & Record*, October 3, 1993.

"Immigration has Unique Cost for African Americans," *Milwaukee Star*, August 26, 1993.

"Immigration's Effect on Poor Blacks," *Chicago Tribune*, June 18, 1993.

"Golden Moments in Pigtown," *The* Baltimore *Sun*, September 15, 1992.

"The Will to Win Divides a Class," *The* Baltimore *Sun*, December 15, 1990.

Book reviews for *The Daily Record*, 1990-1991.


**Major Public Lectures or Conference Presentations**

"The Current Landscape of T-21," American Road Builders and Transportation Association, April 2003.

"Immigration and Affirmative Action," National Carrying Capacity Issues Conference, June 1993.

51

**Congressional Testimony**

Testimony before the House Subcommittee on the Judiciary, July 1998 – subject: the federal Benchmark disparity study.

**Teaching Experience**

Adjunct professor of constitutional law and civil rights law, University of Maryland Baltimore County, fall semester 2009.

Adjunct professor of constitutional law, UMBC, spring semester 2001, fall semester 2004.

Adjunct professor of constitutional law, UMBC, (co-taught) spring semester 2000.

**Disparity Study Litigation**

Hispanic Chamber of Commerce v. Milwaukee, 2011-present.

Associated General Contractors, San Diego Chapter v. California Department of Transportation, 2009-present

South Florida Chapter of the American General Contractors **v.** Broward County, 2009

GEOD v. New Jersey Transit, 2004 –2011

Mechanical Contractors v. Memphis Shelby County, 2004

ABC v. Memphis City Schools, 2003

Sherbrooke v.MnDOT, 2002

Gross Seed v. NDOT, 2002

GEOD v. State of New Jersey, 2000

Hershel Gill v. Metropolitan Dade County, 2000

Kornhaas v. State of Oklahoma, 2000

Kossman v. State of Texas, 2000

52

BAGC v. Chicago, 1999

BAGC v. Cook County, 1999

Rothe v. DOD, 1999-2008

Ohio Contractors Association v. Cincinnati, 1998

Scott v. Jackson, 1998

Concrete Works v. Denver, 1998

Buddie v. Cuyahoga Community College, 1997

Houston Contractors Association v. Houston Metro, 1997

Prior Tire v. Atlanta School Board, 1996

Engineering Contractors Association of South Florida v. Metropolitan Dade County, 1995

McCrossan v. Cook, 1996

Buddie v. City of Cleveland, 1995

AGC v. Columbus, 1995

AGC v. Phoenix, 1995

Dynalantic v. Department of Defense, 1995-present

Contractors Association of Eastern Pennsylvania v. Philadelphia, 1994

North Shore v. New York, 1994

Halmar v. New York, 1994

Seabury Construction Corp. v. Department of Environmental Protection, 1994

Capelletti v. Dade County, 1992

53

**Expert Witness**

Ohio Contractors Association v. Cincinnati, 1998.

Indiana Department of Transportation v. Slusser's Green Thumb, 2008.

Associated General Contractors of America, San Diego Chapter v, California Department of Transportation, 2009 – ongoing.

Kevcon, Inc. v. United States, 2010.

Rothe v. Department of Defense and Small Business Administration, 2012-ongoing.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ROTHE DEVELOPMENT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 1:12-cv-00744-KBJ |
| | ) |
| DEPARTMENT OF DEFENSE | ) |
| | ) |
| and | ) |
| | ) |
| SMALL BUSINESS ADMINISTRATION, | ) |
| | ) |
| Defendants. | ) |

_____)

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF
## PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE

# EXHIBIT I: *Associated Gen. Contractors of America v. California Dept. of Transportation et al.*, No. 2:09-cv-01622, Dkt No. 96, Mar. 18, 2011

Case 1:12-cv-00744-KBJ   Document 46-11   Filed 01/31/14   Page 2 of 6
USCA Case #15-5176   Document #1575652   Filed 03/18/2015   Page 471 of 814
Case 2:09-cv-01622-JAM-GGH   Document 96   Filed 03/18/11   Page 1 of 5

1   BINGHAM MCCUTCHEN LLP
    BREE HANN (SBN 215695)
2   *bree.hann@bingham.com*
    SUJAL J. SHAH (SBN 215230)
3   *sujal.shah@bingham.com*
    SAMANTHA REARDON CARTER (SBN 240068)
4   *samantha.carter@bingham.com*
    CARLOS PATRICIO MINO (SBN 247022)
5   *carlos.mino@bingham.com*
    Three Embarcadero Center
6   San Francisco, CA  94111-4067, U.S.A.
    Telephone:  415.393.2000
7   Facsimile:  415.393.2286

8   LAWYERS' COMMITTEE FOR CIVIL RIGHTS
    OREN SELLSTROM (SBN 161074)
9   131 Steuart Street, Suite 400
    San Francisco, CA  94105
10  Telephone:  (415) 543-9697
    Facsimile:  (415) 543-0296
11  Email:  osellstrom@lccr.com

12  [*Additional counsel listed on signature pages.*]

13  Attorneys for Defendant-Intervenors
    Coalition for Economic Equity and National Association
14  for the Advancement of Colored People,
    San Diego Chapter

15                  UNITED STATES DISTRICT COURT

16                  EASTERN DISTRICT OF CALIFORNIA

17                     SACRAMENTO DIVISION

18

19  ASSOCIATED GENERAL CONTRACTORS          No. 2:09-cv-01622-JAM-GGH
    OF AMERICA, SAN DIEGO CHAPTER, INC.,
20  a nonprofit California corporation,     **JOINT STIPULATION AND
                                            [PROPOSED] ORDER TO STRIKE
21             Plaintiff,                    EVIDENCE OF PLAINTIFF'S
          v.                                 EXPERT JOHN SULLIVAN FROM
22                                           PLAINTIFF'S MOTION FOR
    CALIFORNIA DEPARTMENT OF                 SUMMARY JUDGMENT AND
23  TRANSPORTATION, et al.,                  CONTINUE HEARING OF
                                             DEFENDANT-INTERVENORS'
24             Defendants,                   MOTION TO EXCLUDE THE
                                             TESTIMONY AND OPINIONS OF
25  COALITION FOR ECONOMIC EQUITY and        PLAINTIFF'S EXPERT JOHN
    NATIONAL ASSOCIATION FOR THE             SULLIVAN**
26  ADVANCEMENT OF COLORED PEOPLE,
    SAN DIEGO CHAPTER,
                                            Judge:      Hon. John A. Mendez
27             Defendant-Intervenors.

28

                                    1                Case No. 2:09-cv-01622-JAM-GGH

1          COMES NOW Plaintiff Associated General Contractors of America, San Diego

2    Chapter, Inc.; Defendants California Department of Transportation, Cindy McKim (in her

3    official capacity as Director of Caltrans), and Olivia Fonseca (individually, and in her official

4    capacity as Deputy Director of Caltrans); and Defendant-Intervenors Coalition for Economic

5    Equity and National Association for the Advancement of Colored People, San Diego Chapter

6    (collectively the "Parties").  The Parties state as follows:

7          WHEREAS the Parties' cross-motions for summary judgment, filed on January

8    25 and 26, 2011, are currently before this Court.  Hearing on these motions has been set for

9    March 23, 2011 at 9:30 a.m., in Courtroom 6.

10          WHEREAS Defendant-Intervenors' Motion to Exclude the Testimony and

11   Opinions of Plaintiff's Expert John Sullivan ("Motion to Exclude") (Dkt. No. 47), filed on

12   January 26, 2011, is currently before this Court.  Hearing on this motion has been set for March

13   23, 2011 at 9:30 a.m., in Courtroom 6.

14          WHEREAS Defendants joined in Defendant-Intervenors' Motion to Exclude

15   (Dkt. No. 68) on February 7, 2011.

16          WHEREAS Defendant-Intervenors are willing to postpone hearing on their

17   Motion to Exclude until after the cross-motions for summary judgment are decided, if Plaintiff

18   withdraws any reliance on and reference to Mr. Sullivan, his opinions, and his expert report

19   (including but not limited to Exhibit N to the Declaration of Ralph W. Kasarda in Support of

20   Plaintiff's Motion) from Plaintiff's Motion for Summary Judgment or, In the Alternative,

21   Summary Adjudication.

22          WHEREAS Plaintiff contends it did not intend for any citation to Mr. Sullivan's

23   report in Plaintiff's Motion for Summary Judgment or, In the Alternative, Summary

24   Adjudication or Statement of Undisputed Material Facts (Dkt. No. 44) to be construed as reliance

25   on said report.  Plaintiff contends that any citation to Mr. Sullivan's report in its Motion was part

26   of the cumulative evidence used to support a fact.

27          WHEREAS the parties believe that postponing the hearing on Defendant-

28   Intervenors' Motion to Exclude the Testimony and Opinions of Plaintiff's Expert John Sullivan

Case 1:12-cv-00744-KBJ   Document 46-11   Filed 01/31/14   Page 4 of 6

USCA Case #15-5158 Document #1577652 Filed 10/13/2015 Page 473 of 814
Case 2:09-cv-01622-JAM-GGH   Document 96   Filed 03/18/11   Page 3 of 5

1   will further judicial economy.

2                   NOW THEREFORE, the Parties stipulate by and through their counsel of record,

3   and respectfully request that the Court approve, that:

4                   1. Plaintiff withdraws any reliance on and reference to Mr. Sullivan, his opinions,

5   and his expert report from Plaintiff's Motion for Summary Judgment or, In the Alternative,

6   Summary Adjudication.  Any such citations or reliance should be stricken and no longer be part

7   of the case record.

8                   2. Plaintiff withdraws Exhibit N of the Declaration of Ralph W. Kasarda in

9   Support of Plaintiff's Motion for Summary Judgment or, In the Alternative, Summary

10  Adjudication, which contained copies of excerpts from John Sullivan's Expert Report.  Exhibit N

11  shall be stricken and no longer be part of the case record.

12                  3. Defendant-Intervenors continue the hearing on their Motion to Exclude the

13  Testimony and Opinions of Plaintiff's Expert John Sullivan until the date and time this Court

14  sets for hearing pre-trial motions in this matter.

15

16                  Jointly stipulated this 18th day of March 2011.

17

18  DATED:  March 18, 2011

19                                              By: _____ /s/ Ralph W. Kasarda _____

20                                                      Ralph W. Kasarda

21                                              Attorneys for Plaintiff

22                                              SHARON L. BROWNE (SBN 119246)
                                                RALPH W. KASARDA (SBN 205286)
23                                              JOSHUA P. THOMPSON (SBN 250955)
                                                ADAM R. POMEROY (SBN 272517)

24                                              Pacific Legal Foundation

25

26  DATED:  March 18, 2011

27                                              By: _____ /s/ Scott Emblidge _____

28                                                      G. Scott Emblidge

                                        3                       Case No. 2:09-cv-01622-JAM-GGH

STIPULATION AND [PROPOSED] ORDER TO STRIKE JOHN SULLIVAN FROM PLAINTIFF'S
SUMMARY JUDGMENT MOTION AND CONTINUE HEARING ON MOTION TO STRIKE

A000466

1

2                                              Attorneys for Defendants

3                                              RONALD W. BEALS
                                               THOMAS C. FELLENZ
4                                              KATHRYN T. PAPALIA (SBN 173472)
                                               State of California Legal Department
5
                                               MARA E. ROSALES (SBN 104844)
6                                              BENJAMIN SCHNAYERSON (SBN 257857)
7                                              Rosales Law Partners LLP

8                                              G. SCOTT EMBLIDGE (SBN 121613)
                                               RACHEL J. SATER (SBN 147976)
9                                              Moscone, Emblidge & Quadra LLP

10

11   DATED:  March 18, 2011

12                                             By: _____/s/ Carlos P. Mino_____
13                                                          Carlos P. Mino

14

15                                             Attorneys for Defendant-Intervenors

16                                             BREE HANN (SBN 215695)
                                               SUJAL J. SHAH (SBN 215230)
17                                             SAMANTHA CARTER (SBN 240068)
                                               CARLOS P. MIÑO (SBN 247022)
                                               Bingham McCutchen LLP
18
                                               OREN SELLSTROM (SBN 161074)
19                                             Lawyers' Committee for Civil Rights

20                                             EVA JEFFERSON PATERSON (SBN 67081)
21                                             SARA JACKSON (SBN 251915)
                                               FABIAN RENTERIA (SBN 268028)
22                                             Equal Justice Society

23                                             JORY C. STEELE (SBN 206944)
24                                             American Civil Liberties Union Foundation of
                                               Northern California
25

26

27

28

                                  4                      Case No. 2:09-cv-01622-JAM-GGH
─────────────────────────────────────────────────────────────
STIPULATION AND [PROPOSED] ORDER TO STRIKE JOHN SULLIVAN FROM PLAINTIFF'S
SUMMARY JUDGMENT MOTION AND CONTINUE HEARING ON MOTION TO STRIKE

A000467

1

2        IT IS SO ORDERED, this _____ day of _____, 2011.

3

4                                          _____
                                           John A. Mendez
5                                          United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION AND [PROPOSED] ORDER TO STRIKE JOHN SULLIVAN FROM PLAINTIFF'S
SUMMARY JUDGMENT MOTION AND CONTINUE HEARING ON MOTION TO STRIKE

A000468

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
ROTHE DEVELOPMENT, INC.,                  )
                                          )
            Plaintiff,                    )
                                          )
v.                                        )        Civil Action No. 1:12-cv-00744-KBJ
                                          )
DEPARTMENT OF DEFENSE                     )
                                          )
and                                       )
                                          )
SMALL BUSINESS ADMINISTRATION,            )
                                          )
            Defendants.                   )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF
PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE**

# EXHIBIT J: Excerpt of Kevcon, Inc. v. United States Expert Report of John Sullivan, November, 2009

Case 1:02-cv-00623-MBV Document 43-12 Filed 01/30/09 Page 2 of 14
USCA Case #05-5106 Document #1537663 Filed 01/28/15 Page 477 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/26/11 Page 2 of 14

## PRELIMINARY EXPERT REPORT OF JOHN C. SULLIVAN
## REGARDING THE SEVEN NERA DISPARITY STUDIES

### I. INTRODUCTION

My name is John C. Sullivan, and I am an attorney in private practice and currently the Associate Director of the Project on Civil Rights and Public Contracting at the University of Maryland-Baltimore County. A short biography and c.v. stating my qualifications appears at the end of this report.

I have been asked to review seven disparity studies; specifically, to examine whether these studies meet the standards for availability and capacity set out by the Federal Circuit last year in *Rothe Development Corporation v. Department of Defense*, 545 F.3d 1023 (Fed. Cir. 2008) (*Rothe VII*). It is my conclusion these studies do not satisfy *Rothe VII.*

The seven studies are "Race, Sex and Business Enterprise: Evidence from the Commonwealth of Massachusetts: Volume I"; "Race, Sex, and Business Enterprise: from the State of Washington"; "Race, Sex, and Business Enterprise: Evidence from Denver, Colorado"; "Race, Sex, and Business Enterprise: Evidence from the State of Maryland (Final Report)"; "Race, Sex and Business Enterprise: Evidence from the State of Minnesota"; "Disadvantaged Business Enterprise Availability Study" [Missouri DOT]; "Race, Sex, and Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area."

Four of the studies were prepared for state Departments of Transportation (Washington state; Maryland; Minnesota; Missouri). One was prepared for a city/county (Denver). One was done for a housing finance agency (Massachusetts). One study was performed for a state toll highway authority (Illinois). For two of the studies (the

Case 1:12-cv-00675-MBJ Document 47-12 Filed 01/20/09 Page 2 of 14
USCA Case #05-5106 Document #1577652 Filed 01/28/11 Page 478 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/28/11 Page 5 of 14

Massachusetts Housing Finance Agency and the Illinois State Toll Highway Authority) only an executive summary of fewer than 20 pages is in the Defendant's Appendix.

None of the seven studies attempted to cover an area larger than a state. The 8(a) program, in contrast, is national in scope. The Federal Circuit's observation in *Rothe VII* seems equally applicable here: "We would be hesitant to conclude even from methodologically unimpeachable disparity studies of one state, two counties, and three cities that there is a 'nation-wide pattern or practice of discrimination in public and private contracting…'" *Rothe VII*, 545 F.3d at 1046.

All the studies were completed by NERA, National Economic Research Associates, economic consultants in Austin, Texas. The completion dates of the studies are within a two year period, from November 2004 to November 2006. Their methodologies, with regard to availability and capacity, are very consistent – and flawed. These NERA studies are not "Methodologically unimpeachable disparity studies."

## II. STANDARDS ESTABLISHED BY THE FEDERAL CIRCUIT IN *ROTHE VII*

The disparity study industry has its genesis in a single sentence of a Supreme Court ruling, *City of Richmond v. Croson*, 488 U.S. 469, 509 (1989): "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." The percentage of those qualified, willing and able contractors is the measurement of availability; capacity is a facet of availability, focusing on the third of the *Croson* terms, "able."

Case 1:09-cv-00625-MBH   Document 43-12   Filed 01/30/09   Page 4 of 14

USCA Case #05-5106622 JAM-GGH   Document #1577653   Filed 01/28/11   Page 4 of 14 of 814
Case 2:09-cv-01622-JAM-GGH   Document 47-12   Filed 01/28/11   Page 4 of 14

In *Rothe VII*, the Federal Circuit examined six studies at length and found the studies did not satisfy the qualified, willing and able language, what the circuit called the "touchstone" of *Croson*. 545 F.3d at 1042. The circuit was "even more troubled, however, by the failure of five of the studies to account sufficiently for potential differences in size, or *relative capacity* [emphasis in original], of the businesses included in those studies." *Id.* at 1042-1043. None of the studies took "account of the relative size of the *businesses* themselves." *Id.* at 1043 (emphasis in original). **These seven NERA studies suffer from this same defect, a failure to account for the relative capacity of different firms**.

Availability

In all seven studies, NERA begins its availability computations with data from Dun & Bradstreet. This data is a snapshot in time, one quarter of one year. In the Massachusetts study, for example, the time frame of the data is the third quarter of 2005. (Mass. study, p. 4) NERA describes the Dun & Bradstreet data as a "comprehensive database of U.S. Businesses." (Maryland study, p. 69) It may be; however, the Dun & Bradstreet data provide no measure of the qualifications of the firms in the database to do the kind of work that the departments of transportations and the housing finance agency, and Denver, and the toll road authority actually contract for. Nor is this database limited to those firms with at least some interest in public contracting *(Croson's* "willing.")

The Federal Circuit in *Rothe VII* singled out as particularly flawed the disparity studies performed for Cincinnati and Virginia. These studies opted for a headcount approach to availability, a mistake NERA has replicated. The Circuit's criticism leveled at the Virginia study is equally true of the NERA studies. The Virginia study assumed

Case 1:02-cv-00726-MBH Document 137-2 Filed 01/30/09 Page 5 of 14
USCA Case #05-5106 Document #1577653 Filed 01/28/15 Page 480 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/26/11 Page 6 of 14

"all firms in the relevant market area are ready, willing and able…" *Rothe VII*, 545 F.3d at 1042.

The entire purpose of *Croson*'s "qualified, willing and able" language is to winnow the number of firms down to those who are actually available to contract with the government. All firms are not available for public contracting. NERA's D&B-driven availability methodology is a simple headcount. As a consequence of this crippling methodological flaw, the number of firms NERA considered available is fantastically high: according to the Maryland disparity study, there are 172, 000 firms (Maryland study, pp. 76-77) qualified, willing and able to complete public construction contracts for Maryland DOT. According to the Denver study, for construction alone the number of firms supposedly qualified, willing and able to do Denver public contracting exceeds 32,000. The numbers of truly available firms must be far less.

The NERA studies acknowledged that D&B data did "not sufficiently identify all businesses owned by minorities or women." (Maryland study, p. 70) To address this problem the studies collected directories of MBEs from a number of sources, such as the Northwest Native American Business Development Center (Washington state study, p. 11; the Minnesota Indian Owned Business directory (Minn. study, p. 10); and the St. Louis Black Pages (Missouri study, p. 25). Obviously, merely being on a list maintained by these advocacy organizations is no guarantee the business is capable of performing public construction work.

<u>Capacity</u>

Capacity must be measured because, as the Federal Circuit pointed out, quoting the Eleventh Circuit: "bigger firms have a bigger chance to win bigger contracts." *Rothe*

Case 1:12-cv-00625-MBJ Document 43-12 Filed 01/30/09 Page 5 of 14
USCA Case #15-5062 Document #1577053 Filed 01/28/15 Page 481 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/26/11 Page 6 of 14

*VII*, 545 F.3d at 1043, quoting *Engineering Contractors Association v. Dade County*, 122

F.3d 895, 917 (11th Cir.1997). At pages 1044-1045 the Federal Circuit also refers to a

quote by Justice Scalia, who dissented from a denial of *certiorar*i by saying: "Firms that

are large and more experienced in performing big jobs will more success in

obtaining government contracts…" *Concrete Works of Colorado v. Denver*, 540 U.S.

1027, 1032 (2003). This was the same outcome that both the Federal Circuit and DoD's

expert in Rothe concluded was not adequately controlled for in *Rothe VII*. 545 F.3d at

1043. NERA makes the same error and mistakenly treats every firm as equally likely to

get all public contracts, even the biggest contracts.

### III. THE DISCONNECT BETWEEN FIRMS NERA CONSIDERED AVAILABLE AND 8(A) FIRMS

Overlooking for a moment the failure of the NERA studies to properly address

availability and capacity, it is worth noting that the firms these studies considered

available would often not be available for the 8(a) program.

One reason for this disconnect is that the 8(a) program has a much lower

monetary cap for firm owners than do most other federal preferential programs, such as

DOT Disadvantaged Business Enterprises (DBEs) and SBA Section 8(d) Small

Disadvantaged Businesses (SDBs) . In the 8(a) program, only individuals with wealth of

$250,000 or less (excluding house and value of business) are initially eligible. 13 C.F.R.

124.104(c)(2). In the four state transportation programs examined in the NERA studies

(Maryland, Minnesota, Washington and Missouri), the personal wealth ceiling for

federally funded DOT contracts is three times that, $750,000. It is quite possible that

firms eligible – and at least theoretically available -- for these DOT programs would be

excluded from the 8(a) program. The owners of the firms deemed available by the NERA

Case 1:02-cv-00625-MBJV Document 13712 Filed 11/20/09 Page 6 of 14
USCA Case #05-5106622 Document #1577653 Filed 01/28/15 Page 7 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/26/11 Page 7 of 14

studies for the DOT programs could well have wealth of more than $250,000 but less than $750,000, making them ineligible for 8(a). A firm ineligible for a program is not available for that program.

Another disconnect between 8(a) and the programs covered by the NERA studies is shown by the availability of one specific group, white women. In the Denver study white women form about two-thirds of the available professional service firms (Denver Study, p. 71). In the Illinois State Toll Highway Authority study approximately two-thirds of DBE construction firms are owned by white women (Illinois study, p.3). White women consistently represent a very large portion of the firms seen as available in the NERA studies. But unlike racial groups, white women are not presumptively eligible for 8(a) through a presumption of social disadvantage. This means the availability computations and percentages in the NERA studies are too disconnected from the 8(a) program to be of much relevance to the program at issue in this case.

## IV. WHAT NERA SHOULD HAVE DONE

### Availability

For prime contracts a far better way to compute availability than D&B data is to look at those firms which have actually bid and how often those firms bid and on what size contracts. Unless a firm is bidding it is not truly available for most prime contracts. For subcontracts, the frequency of quotes from approved subcontractors offers a far better availability source.

### Capacity

In *Rothe VII* the Federal Circuit sets out in clear language how the NERA studies should have "accounted for size." The studies "could have employed regression analysis

to determine whether there was a statistically significant correlation between the size of a firm and the share of contract dollars awarded to it." *Rothe VII*, 545 F.3d at 1044. NERA did perform regression analysis, but much of that was irrelevant to capacity—for example, the Washington state study concluded that minorities and women form disproportionally fewer businesses than white males. (Washington state study, tables 44-48). Even where the regressions could arguably be designed to address capacity, regression analysis cannot shed any light on which individual firms have been discriminated against. The regressions deal with groups, not individual firms.

| Study | Pages In Availability Section of NERA Study |
|---|---|
| MINNESOTA DOT | 9-16 |
| MASSACHUSETTS HOUSING FINANCE AGENCY | 3-5 |
| MARYLAND DOT | 69-106 |
| WASHINGTON DOT | 9-17 |
| DENVER | 53-80 |
| ILLINOIS TOLL ROAD | 2-3 |
| MISSOURI DOT | 22-60 |

It is my conclusion the seven NERA studies fail to meet the availability and capacity standards of *Rothe VII*.

John Sullivan
November 19, 2009

- 7 -

11/19/2009 08:30 14106479826 SFLNY PAGE 09/09
Case 1:02-cv-00123-MBJV Document 43712 Filed 01/30/09 Page 9 of 14
USCA Case #05-5106 Document #1577052 Filed 01/28/15 Page 484 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/28/11 Page 9 of 14

RATE OF PAYMENT

I am being paid $185 per hour for my time.

Case 1:09-cv-00625-KEW Document 43-12 Filed 11/20/09 Page 9 of 14
USCA Case: 05-5-016622-DAM-GGH Document #: 57653 Filed 01/8/2015 Page 485 of 814
Case 2:05-cv-01622-JAM-GGH Document 47-12 Filed 01/26/11 Page 10 of 14

**John Charles Sullivan, Esq.**                                                November 2009

113 Regester Avenue
Baltimore, MD 21212
410/206-3602 (cell)
jcharlessullivan@yahoo.com

## Education

University of Maryland Law School, 1983

Loyola College, 1976

## Scholarly Articles

-Gross Presumptions: Determining Group Eligibility for Federal Procurement Preferences,@ (with George La Noue) *Santa Clara Law Review*, Vol. 41, No. 1 (Winter 2000)

-Deconstructing the Affirmative Action Categories@ (with George La Noue) *American Behavioral Scientist*, Volume 41, No. 7 (April 1998).

Reprinted in John Skrenntny, ed. Color Lines: Affirmative Action, Immigration and Civil Rights Options for America, University of Chicago Press, 2001.

-The Future of Florida=s Preferential Public Contracting,@ appearing in A Report to the People of Florida About Three Aspects of Civil Rights and Florida=s Governments, The Florida Public Policy Institute, 2001.

-Race Neutral Programs in Public Contracting,@ (with George La Noue) *Public Administration Review*, Vol. 55, No. 4, July/August 1995.

-Presumptions for Preferences: The Small Business Administration=s Decisions on Groups Entitled to Affirmative Action,@ (with George La Noue) *Journal of Policy History*, Volume 6, No. 4, Fall 1994.

-But for Discrimination how many Minority Businesses Would there Be?@ (With George La Noue) *Columbia Human Rights Law Review*, Winter 1992.

## Major Articles

-The Road's End for Racial Preferences in Public Contracting (With George La Noue) *Constructor Magazine,* January 2001.

J. Sullivan c.v. (Nov. 2009)                         - 1 -

-Color Them Colorblind, *The Weekly Standard*, May 29, 2000.

-Contract Preferences beyond Their Time, *The Washington Times*, January 16, 2000.

-More Preferences for Minority Businesses, *The Wall Street Journal*, August 24, 1998.

-Defining Minorities can be Odd Business, *The Baltimore Sun*, March 8, 1998.

Book reviews for *The Daily Record*, 1990.

## On Line Articles

-No Compelling Interest, (with Roger Clegg) *National Review Online*, May 25, 2001.

-Racial Spoils in Federal Contracting, (with Roger Clegg) *National Review Online*, October 20. 2000.

-The Judiciary at Risk, (with Roger Clegg) *National Review Online*, October 13, 2000.

-Race Preferences Aren't the Answer, *National Review Online*, August 16. 2000.

## Major Public Lectures or Conference Presentations

-"The Current Landscape of T-21," American Road Builders and Transportation Association, April 2003.

-Appearance before subcommittee of the House Judiciary Committee (C-Span) July 1998.

-Immigration and Affirmative Action, National Carrying Capacity Issues Conference, June 1993.

## Professional Activity

Albuquerque, New Mexico
 Consultant on Disparity Study, 1993-94

Nashville Metro
 Work with consultant on disparity study, 1996-2000

Portland, Oregon

J. Sullivan c.v. (Nov. 2009)  - 2 -

Case 1:09-cv-00623-MBV  Document 43712  Filed 11/30/09  Page 12 of 14
USCA Case #05-5166  Document #557653  Filed 01/26/11  Page 487 of 814
Case 2:05-cv-01622-JAM-GGH  Document 47-12  Filed 01/26/11  Page 12 of 14

Consultant on Disparity Study, 1994-95

City of St. Petersburg, Florida, 1998-2000

    Work with consultant on disparity study

State of Texas, Comptroller's Office
    Consultant on Disparity Study, 1994-95

U.S. Department of Education, Office of Civil Rights, 2002-05.


Project on Civil Rights and Public Contracting at the University of Maryland-Baltimore County
    Associate Director

## Disparity Study Litigation Participation

South Florida Chapter of the American General Contractors **v.** Broward County, 2007 - present

GEOD v. New Jersey Transit, 2004 –present

Mechanical Contractors v. Memphis Shelby County, 2004

ABC v. Memphis City Schools, 2003

Sherbrooke v.MnDOT, 2002

Gross Seed v. NDOT, 2002

GEOD v. State of New Jersey, 2000

Hershell Gill v. Metropolitan Dade County, 2000

BAGC v. Chicago, 1999

BAGC v. Cook County, 1999

Rothe v. DOD, 1999-present

Ohio Contractors Association v. Cincinnati, 1998 (expert witness)

Scott v. Jackson, 1998

J. Sullivan c.v. (Nov. 2009)       - 3 -

Case 1:09-cv-00625-MBW Document 43-12 Filed 11/20/09 Page 13 of 14
USCA Case 05-5016622-JAM-CEH Document 47-12 Filed 01/26/11 Page 13 of 14
Case 2:05-cv-01622-JAM-CEH Document 47-12 Filed 01/26/11 Page 13 of 14

<u>Concrete Works v. Denver</u>, 1998

<u>North Shore v. New York</u>, 1998

<u>Buddie v. Cuyahoga Community College</u>, 1997

<u>Houston Contractors Association v. Houston Metro</u>, 1997

<u>Prior Tire v. Atlanta School Board</u>, 1996

<u>Engineering Contractors Association of South Florida v. Metropolitan Dade County</u>, 1995

<u>Buddie v. City of Cleveland</u>, 1995

<u>AGC v. Columbus</u>, 1995

<u>AGC v. Phoenix</u>, 1995

<u>Contractors Association of Eastern Pennsylvania v. Philadelphia</u>, 1994

<u>Halmar v. New York</u>, 1994

<u>Capelletti v. Dade County</u>, 1992


**Disparity Study Experience**

"A Minority Business Enterprise Disparity Study: A Report Prepared for the City of St. Petersburg [Florida] City Council," Policy Research Consultants, 1999 – assisted consultant George LaNoue in a variety of tasks.

**Teaching Experience**

Adjunct professor of constitutional law, fall semester 2009.

Adjunct professor of constitutional law, spring semester 2001, fall semester 2004.

Adjunct professor of constitutional law, (co-taught) spring semester 2000.


**Congressional testimony**

Case 1:09-cv-00625-MBH Document 45-12 Filed 11/20/09 Page 14 of 14
USCA Case #05-5176 Document #577653 Filed 01/26/15 Page 14 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-12 Filed 01/26/11 Page 14 of 14

House Subcommittee on the Constitution, July 1998. Subject – federal Benchmark disparity study disparity study.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
ROTHE DEVELOPMENT, INC.,                      )
                                              )
                Plaintiff,                    )
                                              )
v.                                            )     Civil Action No. 1:12-cv-00744-KBJ
                                              )
DEPARTMENT OF DEFENSE                         )
                                              )
and                                           )
                                              )
SMALL BUSINESS ADMINISTRATION,                )
                                              )
                Defendants.                   )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF
<u>PLAINTIFF'S EXPERT JOHN CHARLES SULLIVAN, ESQUIRE</u>**


**EXHIBIT K: Excerpt of Transcript of Preliminary Injunction
Hearing in *Kevcon Inc. v. United States*, No. 09-625C, Nov. 30, 2009,
Dkt No. 41**

USCA Case #15-5106 Document #1577653 Filed 10/13/2015 Page 491 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-10 Filed 01/26/11 Page 2 of 10

UNITED STATES
COURT OF FEDERAL CLAIMS

---

```
KEVCON, INC.,                     )
                                  )
              Plaintiff,          )
                                  )
v.                                )   Docket No.:  09-625C
                                  )
UNITED STATES,                    )
                                  )
              Defendant.          )
```

Pages:   1 through 67

Place:   Washington, D.C.

Date:    November 30, 2009

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

Case 1:09-cv-00625-MBJ Document 46-13 Filed 01/09/14 Page 2 of 60
USCA Case #05-5106 Document #1577652 Filed 01/28/15 Page 492 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-10 Filed 01/28/11 Page 3 of 10

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

KEVCON, INC.,                    )
                                 )
               Plaintiff,        )
                                 )
v.                               )   Docket No.:  09-625C
                                 )
UNITED STATES,                   )
                                 )
               Defendant.        )

                         Courtroom 6
                         National Courts Building
                         717 Madison Place, N.W.
                         Washington, D.C.

                         Monday,
                         November 30, 2009

        The parties met, pursuant to notice of the

Court, at 11:22 a.m.

        BEFORE:  HONORABLE MARY ELLEN COSTER WILLIAMS
                 Judge

        APPEARANCES:

        For the Plaintiff:

        WILLIAM L. BRUCKNER, Esquire
        DAVID BARTON, Esquire  (Via Telephone)
        Bruckner and Walker
        4550 Kearny Villa Road, Suite 209
        San Diego, California  92123
        (858) 565-9300

        For the Defendant:

        RICHARD P. SCHROEDER, Esquire
        SAMEER P. YERAWADEKAR, Esquire
        ANDREW BRANIFF, Esquire
        U.S. Department of Justice
        1100 L Street, N.W.
        Washington, D.C.  20530
        (202) 305-7788


            Heritage Reporting Corporation
                 (202) 628-4888

A000485

APPEARANCES:  (Cont'd)

<u>Also Present</u>:

DAVID A. FISHMAN, Esquire
U.S. Small Business Administration
409 Third Street, S.W.
Washington, D.C.  20416
(202) 205-6861

RICHARD G. WELSH, Esquire
Naval Facilities Engineering Command
Washington Navy Yard
1322 Patterson Avenue, S.E.  Suite 1000
Washington, D.C.  20374
(202) 685-9121

A000486

Case 1:09-cv-00625-MBC Document 46-13 Filed 12/31/09 Page 5 of 80
USCA Case #15-5106 Document #1577652 Filed 01/28/2015 Page 494 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-10 Filed 01/26/11 Page 5 of 10

3

P R O C E E D I N G S

(11:22 a.m.)

THE COURT:  Good morning, counsel.

This is a hearing on Plaintiff's application for a preliminary injunction in the matter of <u>Kevcon, Inc. v. United States</u>, No. 09-625C.

I'm Judge Williams.  Let me ask counsel to identify themselves for the record.

MR. BRUCKNER:  Good morning, Your Honor. William Bruckner for the Plaintiff, Kevcon.

THE COURT:  Good morning, Mr. Bruckner.  And I understand we have your co-counsel with us by telephone.

MR. BARTON:  This is David Barton, co-counsel for Kevcon.

THE COURT:  Welcome, Mr. Barton.

MR. BARTON:  Thank you.

MR. SCHROEDER:  Good morning.  Richard Schroeder, Department of Justice, for the government.

THE COURT:  Good morning, Mr. Schroeder.

MR. SCHROEDER:  Good morning.

MR. YERAWADEKAR:  Sameer Yerawadekar for Department of Justice, also for Defendant.

THE COURT:  Good morning, Mr. Yerawadekar.

MR. FISHMAN:  David Fishman with the Small

Heritage Reporting Corporation
(202) 628-4888

Case 1:09-cv-00625-WBC Document 46 Filed 01/30/14 Page 5 of 60
USCA Case #15-5106 Document #1577652 Filed 01/28/16 Page 495 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-16 Filed 04/26/11 Page 6 of 10

1    Business Administration, Your Honor.

2              THE COURT:  Good morning, Mr. Fishman.

3              MR. FISHMAN:  Thank you.

4              MR. WELSH:  Richard Welsh, Naval Facilities

5    Engineering Command.

6              THE COURT:  Good morning, Mr. Welsh.

7              MR. BRANIFF:  Andrew Braniff, Department of

8    Justice.

9              THE COURT:  And good morning, Mr. Braniff.

10             All right.  I see we have some folks in the

11   audience.  This hearing is open to the public.

12   Nothing is under seal.  Any objections to the

13   observers?

14             MR. SCHROEDER:  No, Your Honor.

15             MR. BRUCKNER:  No, Your Honor.

16             THE COURT:  All right, Mr. Bruckner.

17             MR. BRUCKNER:  Yes, Your Honor.

18             THE COURT:  It is your motion.

19             MR. BRUCKNER:  Okay.  Good morning again,

20   Your Honor.  William Bruckner for the Plaintiff,

21   Kevcon, Inc.  May it please the Court.

22             THE COURT:  Thank you for traveling here

23   today.

24             MR. BRUCKNER:  I won't say it was enjoyable.

25   Coming in in the rain this morning was not.  The case

A000488

Case 1:09-cv-00625-JEB Document 46-13 Filed 12/31/09 Page 7 of 68
USCA Case #15-5176 Document #1577653 Filed 01/28/2015 Page 496 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-10 Filed 01/26/11 Page 7 of 10

1    has been very adequately briefed, and so I'm going to

2    just make a few points.  Obviously the Court may have

3    questions.  I'll make my points brief and hopefully

4    focus on the Defendant's objections.

5             THE COURT:  At the outset, Mr. Bruckner, for

6    the record, I would like you to articulate precisely

7    the scope of the preliminary injunction that you are

8    seeking.

9             MR. BRUCKNER:  Your Honor, the scope of the

10   preliminary injunction is to enjoin the Department of

11   Defense from awarding, from issuing solicitations,

12   awarding contracts on the basis of 8(a) preferences.

13   Therefore, any contract that is awarded under 637 by

14   the Department of Defense is what we are here today to

15   ask you to issue a preliminary injunction.

16            THE COURT:  Pending what?  A preliminary

17   injunction is by its nature preliminary.

18            MR. BRUCKNER:  Well, pending an argument on

19   the merits, which will be in May.

20            THE COURT:  Pending an argument on the

21   merits?

22            MR. BRUCKNER:  Pending a decision on the

23   merits.

24            THE COURT:  Pending the Court's ruling on

25   the merits, which is anticipated in May.

Case 1:02-cv-00647-MBJW DCocument 44-13 Filed 12/09/094 Page 58 of 68
USCA Case #05-5106 Document #1577652 Filed 04/28/15 Page 497 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-10 Filed 01/28/11 Page 8 of 10

57

1   told them that they intended to continue to do 8(a)

2   contracts with the implicit implication that those

3   8(a) contracts would apply to Kevcon.  And that again

4   is specific enough.

5           But again, I don't want to get sidetracked

6   from that issue because the two real issues here are

7   there are no statistics to support the statute and the

8   specific harm at issue here is the unconstitutionality

9   of the 8(a) contract and its impact on Kevcon.  Any

10  questions?  That's all I have.

11          THE COURT:  Thank you, Mr. Barton.  Anything

12  further?

13          MR. BRUCKNER:  No, Your Honor.

14          MR. SCHROEDER:  No, Your Honor.

15          THE COURT:  Very well.  Please be seated.

16  The Court is prepared to rule.  Let's take the

17  preliminary motions first.

18          The Court denies the Plaintiff's motion to

19  strike the government's appendix, recognizing that at

20  this stage it is preliminary and the objections appear

21  to go to the weight of the materials.

22          Secondly, the Court strikes the affidavit of

23  Mr. Sullivan again at this stage of the proceedings

24  because the Court will not accept a legal opinion from

25  an expert, expert though he is.  I read his

Heritage Reporting Corporation
(202) 628-4888

1    credentials.  He has quite an interesting and

2    excellent background.  However, the law is very well

3    settled under the Federal Rules of Evidence, as Judge

4    Christine Miller recognized in Stobie Creek quite

5    recently.  I quote, "Expert testimony that testifies

6    about what the law is or directs the finder of fact

7    how to apply law to facts does not 'assist the trier

8    of fact to understand the evidence or to determine a

9    fact in issue' within the contemplation of Federal

10   Rule of Evidence 702.  Expert testimony that amounts

11   to an opinion of law is especially disfavored."

12        The Court in Stobie Creek goes on to quote

13   the Tenth Circuit in Spect, but I note that our

14   Circuit, the Court of Appeals for the Federal Circuit,

15   has equally reiterated this point very firmly in Mola

16   Development Corporation in Footnote 6, that's 516 F.3d

17   at 1379, Note 6, as well of course as in the Rumsfeld

18   case, Rumsfeld v. United Technologies, 315 F.3d 1361,

19   1369, and that's from 2003.

20        That is not to say that the Court might not

21   accept expert testimony of any kind.  The Court has

22   not yet seen the government's full evidence on the

23   constitutionality of the 8(a) program.  As Mr.

24   Schroeder aptly stated, the record is necessarily

25   preliminary at this juncture, and I take it from that

Heritage Reporting Corporation
(202) 628-4888

Case 1:09-cv-00625-KBJ Document 46-13 Filed 12/09/14 Page 60 of 68
USCA Case #15-5176 Document #1577053 Filed 01/26/15 Page 499 of 814
Case 2:09-cv-01622-JAM-GGH Document 47-10 Filed 01/26/15 Page 10 of 10

59

1    representation that the government intends to offer

2    additional studies or evidence.

3         If the government does and those studies

4    involve data and statistics, the Court would welcome

5    assistance from an expert in the area of statistics to

6    understand how to interpret those studies.  That is

7    proper expert testimony in a case like this and would

8    be in the Court's opinion at this point in time at

9    least helpful.

10         Turning now to the motion for a preliminary

11    injunction, the Court makes no finding at this point

12    in time on the likelihood of success as to the

13    constitutional issue.  We must wait for a later day to

14    do that when the government has provided its full

15    evidence.  However, the Court is skeptical of the

16    likelihood of success for an injunction as to the

17    standing of this Plaintiff at this point in time to

18    challenge the broad array of any potential DoD action

19    involving the 8(a) program.

20         We do not know what those potential

21    procurement actions are, be they solicitations,

22    presolicitations, contract awards, and in this Court's

23    view, that would be overly broad relief, calling into

24    question the ability of this Plaintiff to succeed on

25    its claim for such relief.  It's simply too broad and

Heritage Reporting Corporation
(202) 628-4888

**A000492**

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 500 of 814

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| ROTHE DEVELOPMENT, INC., | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 12-CV-744-KBJ |
|  | ) |
| DEPARTMENT OF DEFENSE and | ) |
| SMALL BUSINESS ADMINISTRATION | ) |
| Defendants. | ) |

_____)

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h), Plaintiff ROTHE

DEVELOPMENT, INC. files this, its Motion for Summary Judgment, and states:

1.      The term "socially disadvantaged individuals" in Section 8(a) of the Small

Business Act, 15 U.S.C. § 637(a), is a racial classification. The statute defines socially

disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice

or cultural bias because of their identity as a member of a group without regard to their

individual qualities." *Id.* § 637(a)(5) ("the definition"). The statute also contains a

presumption that all individuals who are members of certain racial groups are socially

disadvantaged. *Id.* § 631(f) ("the presumption"). In addition to the racial groups

presumed socially disadvantaged under the statutory presumption, the Small Business

Administration has purported to designate additional racial groups as socially

disadvantaged. Under the statute, benefits flow from the status conferred by the definition

and presumption, through a statutory goal to award a certain percentage of prime- and

sub-contracts to socially disadvantaged small business concerns.  *Id.* §§ § 637(a)(1)(D)

(restricted competition on the basis of the definition and presumption) & 644(g)(1) ("the

goal"). The definition, the presumption, and the goal, taken together, comprise the "racial classification of section 8(a)" ("section 8(a)'s racial classification" or the "statutory racial classification") that denies ROTHE an equal footing to bid on Defendants' contracts and which ROTHE challenges as facially unconstitutional in this action, under the equal protection component of the due process clause. U.S. CONST. Amend. V.

2.      ROTHE has standing to bring a facial challenge to this statutory racial classification. *See* Doc #1-1 Affidavit of Dale Patenaude (incorporated by reference).

3.      The racial classification of section 8(a) is facially unconstitutional because:

a. The Defendants cannot produce evidence that shows "the most exact connection between justification and classification," required by strict scrutiny; i.e., Defendants cannot show a relevant causal relationship between their alleged evidence and the racial classification of section 8(a), whether in terms of a "compelling interest" to enact the racial classification or "narrow tailoring" of its scope. Moreover, there is no causal relationship between the racial classification and any remedy for alleged identified discrimination;

b. Defendants cannot produce "a strong basis in evidence" to demonstrate the racial classification of section 8(a) is supported by a compelling interest, i.e., that it is supported by probative evidence that satisfies strict scrutiny; and

c. It is an unconstitutional delegation of Congressional power to the Executive branch under U.S. CONST. Art. I § 1. Accordingly, the presumption in 15 U.S.C. § 631(f) is inoperative.

4.      All of the foregoing issues are questions of law. There are no genuine issues of material fact, and ROTHE is entitled to judgment as a matter of law. By this motion,

ROTHE moves for final summary judgment on each of the foregoing issues, and for the declaratory and injunctive relief requested in its complaint (Doc #1).

5.      No record, evidence, or expert report need be filed prior to moving for summary judgment.

        a.      A proper plaintiff challenging governmental use of a statutory racial classification can state a prima facie case simply by pointing to the statute and having standing, i.e., showing that he or she was treated "unequally because of his or her race." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 229-230 (1995). Thereupon, the burden of sustaining the constitutionality of the statutory racial classification passes to Defendants, which bear the burden of producing evidence that the classification is remedying "identified discrimination" and that Congress "had a strong basis in evidence" to conclude that remedial action was necessary. *Shaw v. Hunt*, 517 U.S. 899, 909-910 (1996) (internal quotation marks omitted); *Rothe Development Corp. v. Department of Defense*, 545 F.3d 1023, 1036 (Fed. Cir. 2008) (*Rothe VII*) ("the government first bears a burden to produce strong evidence supporting the legislature's decision to employ race-conscious action.").

        b.      Defendants will likely produce their alleged evidence when filing its Cross-Motion and Response to this motion. The Court will evaluate Defendants' alleged evidence against Defendants' burden of production under strict scrutiny, in light of the arguments made by ROTHE in its moving papers here and in its Response/Reply, and in light of whatever arguments the Defendants make in their Cross-Motion/Response and in their Reply. *Rothe VII*, 545 F.3d at 1036; *see also* Minute Order of Feb. 12, 2014 (setting summary judgment briefing schedule).

c.    It is unnecessary for ROTHE to specifically reference any of Defendants' alleged evidence in order to bring a motion of this kind.  Fed R. Civ. P. 56(c)(1)(B) ("a party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . showing . . . that an adverse party cannot produce admissible evidence to support the fact."); *Rothe VII*, 545 F.3d at 1040-41 (holding that "of the same general character as the objections articulated by Justice O'Connor to the statistical evidence offered by the government in *Croson*" are sufficient to trigger government's burden of production under strict scrutiny).

d.    Only if Defendants meet their burden of production (which is denied) in a cross-motion or response to this motion is ROTHE's ultimate burden of persuasion triggered, such that rebuttals to Defendants' alleged evidence, rebuttals to Defendants' expert reports (if any), and discussion of the specific evidence offered by Defendants would be in order.  *Rothe VII*, 545 F.3d at 1036. By this motion, ROTHE maintains that the Defendants cannot meet their burden of production as a matter of law. In its Response/Reply, ROTHE will rebut whatever alleged evidence and arguments to the contrary Defendants present in their Cross-Motion/Response, to show that Defendants still have not met their burden of production as a matter of law.

6.    The grounds and authority in support of Plaintiff's Motion for Summary Judgment are more fully set forth in the accompanying Memorandum of Points and Authorities, and Statement of Undisputed Facts. A Proposed Order is attached hereto.

CONCLUSION AND RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Plaintiff ROTHE DEVELOPMENT, INC.

requests that the Court GRANT its Motion for Summary Judgment, and issue an order to:

(A) ADJUDGE, DECREE, AND DECLARE that the racial classification of section

8(a) violates the equal protection component of the due process clause of the Fifth

Amendment, U.S. CONST. Amend. V, and violates U.S. CONST. Art. I § 1, and

HOLD the racial classification of section 8(a) to be FACIALLY

UNCONSTITUTIONAL; and

(B) PERMANENTLY ENJOIN the use of the racial classification of section 8(a) to

deny ROTHE equal footing in bidding on Defendants' contracts, and SET ASIDE

the racial classification of section 8(a) as facially unconstitutional; and

(C) award Plaintiff such further relief as is equitable and just.


Dated May 15, 2014                          Respectfully submitted,

                                            /s/ David F. Barton
                                            David F. Barton
                                            District Court Bar No. TX0096
                                            Texas Bar No. 01853300
                                            **GARDNER LAW**
                                            745 E. Mulberry Avenue, Suite 500
                                            San Antonio, Texas 78212-3149
                                            Telephone: (210) 733-8191
                                            Telecopier: (210) 733-5538
                                            Email: dfbarton@gardner.sa.com

## CERTIFICATE OF SERVICE

       This is to certify that a true and correct copy of the foregoing and all attachments and exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure, on this 15th day of May, 2014, to the following persons:

Andrew G. Braniff                                *VIA E-FILING*
Patricia L. Stasco
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
-and-
Barbara A. Schwabauer                           *VIA E-FILING*
United States Department of Justice
Civil Rights Division, Employment Litigation Section
601 D Street, NW
PHB Room 4017
Washington, D.C. 20579
*Attorneys for Defendants*

<div align="right">

/s/ David F. Barton
David F. Barton

</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
ROTHE DEVELOPMENT, INC.,                   )
   Plaintiff,                            )
)
v.                                         ) Civil Action No. 12-CV-744-KBJ
)
DEPARTMENT OF DEFENSE                       )
and SMALL BUSINESS ADMINISTRATION          )
)
   Defendants.                           )
_____)

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 7(h), Plaintiff ROTHE DEVELOPMENT, INC. ("ROTHE") files this, its statement of material facts as to which it contends there is no genuine issue, and states:

1.     SBA's 8(a) program was established through an amendment to the Small Business Act on October 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as amended at 15 U.S.C. § 637 (2006)).[1]

2.     The stated purposes of the 8(a) program include "promot[ing] the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals" and "clarify[ing] and expand[ing] the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2) (2012).

---

[1]     All citations to the United States Code are to the 2012 code edition.

3.      The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(a)(5).

4.      "Economically disadvantaged individuals are those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities . . . ." and are thus deemed a subset of the socially disadvantaged. *Id.* § 637(a)(6)(A).

5.      According to the statute, "[t]he [g]overnment-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." *Id.* § 644(g)(1).

6.      The statute provides:

> It shall be the duty of the [Small Business] Administration and it is hereby empowered, whenever it determines such action is necessary or appropriate—
>
> (A) to enter into contracts with the United States Government and any department, agency, or officer thereof having procurement powers . . . . In any case in which the Administration certifies to any officer of the Government having procurement powers that the Administration is competent and responsible to perform any specific Government procurement contract to be let by any such officer, such officer shall be authorized in his discretion to let such procurement contract to the Administration upon such terms and conditions as may be agreed upon between the Administration and the procurement officer. . . . ;
> (B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns . . . . ;
> (C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individuals . . . .

*Id.* § 637(a)(1)(A)-(C).

7.      The statute then provides that "[a] contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible [p]rogram [p]articipants" if certain criteria are met. *Id*. § 637(a)(1)(D).

8.      "Eligible program participants" are those eligible to receive contracts under § 637(a). *Id*. § 636(j)(10).

9.      The only "small business concerns" eligible to receive 8(a) contracts are:

> (1)      those small business concerns that are "socially and economically disadvantaged," *id*. § 637(a)(1)(B), meaning those more than "51% owned by one or more socially and economically disadvantaged individuals," *id*. § 637(a)(4)(i)(I); or

> (2)      those outright "owned and controlled by socially and economically disadvantaged individuals." *Id*. § 637(a)(1)(C).

10.     The definition of the term "socially disadvantaged" contains a racial classification. *Id*. § 637(a)(5) (defining socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities.").

11.     The statute also contains an additional racial classification in a presumption that all individuals who are members of certain racial groups are socially disadvantaged. *Id*. § 631(f)(1) ("such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans . . . Asian Pacific Americans . . . and other minorities").[2]

12.     In addition to the racial groups presumed socially disadvantaged under the statutory presumption, the Small Business Administration has purported to designate additional racial groups as socially disadvantaged. 13 C.F.R. 124.103(b).

---

[2]      ROTHE does not challenge the classifications "Indian tribes" and "Native Hawaiian Organizations" in this action. Doc #1 at 5 n.2.

13.     Under the statute, benefits flow from the status conferred by the definition and presumption, through a statutory goal to award a certain percentage of prime- and sub-contracts to socially disadvantaged small business concerns.   *Id.* §§ § 637(a)(1)(D) & 644(g)(1).

14.     The definition, the presumption, and the goal, taken together, comprise the "racial classification of section 8(a)" ("section 8(a)'s racial classification" or the "statutory racial classification") that denies ROTHE an equal footing to bid on Defendants' contracts and which ROTHE challenges as facially unconstitutional in this action.

15.     ROTHE has been injured by this designation and any other(s) SBA has made, which prevents ROTHE from bidding on an equal footing with members of the designated racial group(s).

16.     The facts that establish Rothe's standing are those set forth in the Affidavit of ROTHE Vice President and corporate representative Dale Patenaude and attachments 1-5 thereto, Doc #1-1 and cited and incorporated herein by reference.

17.     Section 8(a)'s racial classification denies ROTHE the equal protection of the laws to the extent it prevents ROTHE from competing for Defendants contracts on an equal footing with members of racial groups that receive benefits under the racial classification. Aff. of Patenaude at 2.

18.     The denial of equal protection includes the exclusion of ROTHE from contracting opportunities that ROTHE would otherwise, but is not permitted to compete for, because it cannot participate in and has no desire to participate in the section 8(a) program and thus is not a beneficiary of section 8(a)'s racial classification. *Id.* at 2 & 5.

19.     The denial of equal protection includes the purported designation of additional racial groups as socially disadvantaged by the SBA, which prevents ROTHE from bidding on an equal footing with members of those designated racial group(s). *Id*. at 2.

20.     The unconstitutional delegation of authority to SBA to designate additional racial groups as socially disadvantaged is also an independent injury to ROTHE, insofar as it confers *any* competitive benefits on the racial groups designated by SBA—regardless of whether those benefits, conferred through section 8(a)'s racial classification, are themselves unconstitutional as a denial of equal protection. *Id*. at 2.

21.     ROTHE is a small business concern that satisfies the applicable SBA size requirements for its industry with respect to net worth and number of employees. *Id*. at 3.

22.     ROTHE bids on small business contracts in its area of expertise, nationwide, including contracts with DoD. *Id*. at 3-4.

23.     In terms of bid frequency, ROTHE has historically and will continue to bid annually on approximately $100 million of contracts in its area of expertise, in order to yield approximately $10 million of annual gross income. *Id*. at 3.

24.     Approximately 85-90% of ROTHE's annual gross income is derived from contracts with DoD. *Id*. at 4.

25.     Defendants have let numerous contracts in ROTHE's area of expertise that have been set aside under section 8(a) using the racial classification, and the number and dollar value of those contracts is increasing relative to contracts not set aside under section 8(a). *Id*. at 4-5.

26.     Data from the federal government's own procurement data system cited in the Affidavit of Dale Patenaude demonstrates that section 8(a)'s racial classification has

foreclosed a not insignificant portion of ROTHE's potential business opportunities. *Id*. at 5-6.

27.     Defendants have not stopped letting and are likely to continue to let contracts involving ROTHE's area of expertise that are set aside under section 8(a) using the racial classification. *Id*. at 4 & 6.

28.     Thus, sometime in the near future ROTHE will want to bid on another government contract that pertains to its area of expertise that Defendants will have set aside under section 8(a) using the racial classification. *Id*. at 4 & 6.

29.     ROTHE is able and ready to bid on contracts and a discriminatory statutory racial classification prevents it from doing so on an equal basis. *Id*. at 6.

30.     ROTHE would otherwise, but is not permitted to compete for such contracts against small businesses that benefit from the section 8(a)'s racial classification when the contracts are set aside. *Id*. at 5.

31.     If Defendants are not enjoined, they will continue to violate ROTHE's Constitutional rights.

32.     Defendants here cannot show a relevant causal relationship between their alleged evidence and the racial classification of section 8(a), whether in terms of a "compelling interest" to enact the racial classification or "narrow tailoring" of its scope.

33.     There is no causal relationship between the statutory racial classification and any remedy for alleged discrimination.

34.     There is no evidence that Defendants were discriminating in the selection of their own prime contractors, or that their prime contract awardees were discriminating against subcontractors.

35.     Defendants invoke essentially three alleged causal relationships to defend the facial constitutionality of section 8(a)'s racial classification.

36.     First, Defendants allege that alleged discrimination in the award of prime and sub-contracts (as opposed to generalized societal discrimination) elsewhere in the nationwide marketplace was limiting the pool of qualified, willing, and able minority firms to bid on federal prime contracts.[3]

37.     Second, Defendants allege that federal prime contract awardees, when selecting subcontractors, encountered a pool of qualified, willing, and able minority subcontractors that was limited in the same manner, for the same reason.[4]

38.     Third, to show the statute was narrowly tailored, Defendants allege that there was a causal relationship between the statutory racial classification and a remedy for the alleged discrimination, so that by setting aside a certain percentage of prime or sub-contracts using the racial classification, the alleged discrimination would be remedied.[5]

39.     The foregoing alleged causal relationships between the Defendants' alleged evidence and the statutory racial classification are nonexistent or insufficient as a matter of law.

---

[3]     *Dynalantic v. DoD*, No. 95-cv-2301 (D.D.C.), Doc #239 at 25 (Defendants' supplemental brief alleging "pervasive and persistent effects of racial discrimination which still hinder minority-owned businesses' ability to compete on an equal-opportunity basis both in government contracting and in the economy as a whole.") and Doc #241 at 4 (Defendants' supplemental reply, alleging "a number of interrelated problems, all rooted in racial discrimination and its continuing effects, that cut across industry lines and unfairly impede the development of minority-owned small businesses and their ability to contract with the federal government.").

[4]     *Id*.

[5]     *Dynalantic v. DoD*, No. 95-cv-2301 (D.D.C.), Doc #239 at 25 (characterizing the award of contracts set aside pursuant to section 8(a)'s racial classification as "[t]he primary bulwark" against "such discrimination and its continuing effects.").

40.     Defendants allege/infer discrimination in local and state[6] prime- and sub-contracting where disparity studies have been conducted.

41.     The statistics in the disparity studies cited by Defendants lack probative value and thus cannot support the inference.

42.     Defendants do not and never have possessed probative data that would support such an inference throughout the entire scope of section 8(a)'s racial classification.

43.     Defendants unconstitutionally extrapolate their inference to all local and state prime- and sub-contracting nationwide.

44.     There is no evidence that Defendants' local and state disparity studies have any connection to any Congressional finding(s) with respect to section 8(a)'s racial classification.

45.     When enacting section 8(a)'s racial classification, and during any reauthorization (which is denied), Congress failed to make a quantitative, prefatory identification of discrimination to be corrected, where and by what degree, and for what races.

46.     It is impossible to determine what lingering effects exist, where and to what degree, and what races are still disadvantaged by them, and it is also impossible to tailor a remedy for such effects, even if there ever have been any and the absence of which is apparent due to a lack of such evidence.

47.     There is no evidence or insufficient evidence that the local and state disparity studies cited by Defendants properly measure availability or capacity.

---

[6]     In using the phrase "local and state" and throughout, ROTHE makes no distinction between public and private contracting, and includes both. In using the term "locality" or "localities," ROTHE includes both the local and state areas with disparity studies cited by Defendants.

48.   No inference can be drawn from the disparity studies collectively, because the studies lack a common analytical baseline. They use different types of data, different industry definitions, and compare different things.

49.   The definitions of markets and industry sectors in the studies are too general and inconsistent, lumping different industries together in some studies while splitting them apart in others.

50.   The 2006 Denver disparity study[7] uses the old Standard Industrial Classification (SIC) code system.

51.   The 2006 Denver disparity study includes the category SIC 1799 Special Trade Contractors, n.e.c. (not elsewhere classified) under the industry group "Professional Services."[8]

52.   SIC 1799 corresponds to four separate industries under the 2007 North American Industry Classification System (NAICS).[9]

53.   The 2008 State of Alaska disparity study,[10] in turn, includes each of these four NAICS industries that SIC 1799 corresponds to under a different industry group, "Construction,"[11] instead of "Professional Services."

---

[7]      NERA Economic Consulting, Denver Study (May 5, 2006) (ROTHE 024774).
[8]      Denver Study at 60 (Table 4.2) (ROTHE 024843).
[9]      The corresponding NAICS codes are 238320 (Painting and Wall Covering Contractors), 238150 (Glass and Glazing Contractors), 562910 (Remediation Services), 238990 (All Other Special Trade Contractors). http://www.census.gov/eos/www/naics/concordances/concordances.html  (last   visited May 9, 2014) (providing tables for the conversion of 1987 SIC to 2002 NAICS and 2002 NAICS to 2007 NAICS).
[10]     D. Wilson Consulting Group, LLC, Alaska Study (Jun. 6, 2008) (ROTHE 013677).
[11]     Alaska Study at Page 5-2 (ROTHE 013790).

54.     Defendants make a second level inference or extrapolation, from those few state and local contracting markets and sectors with alleged significant statistical disparities, to infer discrimination nationwide, including in those state and local contracting markets and sectors where there is contrary evidence or no evidence of discrimination at all.

55.     The benchmarks or federal availability data necessary to complete Defendants' first and second alleged causal relationships do not exist.

56.     There is no statistical evidence showing the effects on Defendants' procurement from the causal relationships they allege.

57.     Nor is there even any anecdotal evidence that would suggest that participation *in Defendants' procurement programs specifically* was being adversely affected in the manner Defendants allege.

58.     There is no causal relationship, whatsoever, between the statutory racial classification and a remedy for the alleged discrimination, such that by setting aside a certain percentage of prime or sub-contracts using the racial classification, the alleged discrimination would be remedied.

59.     The alleged remedial effect of section 8(a)'s racial classification is speculative and entirely random, which renders it nonexistent.

60.     Section 8(a)'s racial classifications, first enacted in 1978, lack any measurable record evidence of remedial progress addressing lingering effects with any relevance to Defendants.

61.     There is also no statutory duty or mechanism, and no identified data source in the original enactments, for Defendants to narrowly and flexibly tailor its use of the statutory racial classification in response to actual marketplace conditions.

62.     Congress had no valid statistical yardstick or benchmark to compare to in the original enactments, and still doesn't.

63.     Nor do any of the current regulations supply a statistical mechanism or benchmark.

64.     Congress still cannot quantify the alleged lingering effects of Defendants' alleged "passive participation" in discrimination;

65.     Nor can Congress measure the remedial impact of applying section 8(a)'s racial classifications to Defendants' section 8(a) contracts;

66.     There is no feedback mechanism to update or narrowly tailor the statute and Defendants' use of its programs over time.

67.     Congress has never held hearings specifically intended to reauthorize section 8(a)'s racial classifications or made findings regarding whether section 8(a)'s racial classifications were supported by strong statistical evidence.

68.     Further, Congress made no finding that, if justified, the preferences in the statute and implementing regulations should be in the same equal proportion for every race or member of a racial group.

69.     The statutory racial classification's numerical goal for Defendants is completely arbitrary and has no relationship to local and state data, nor could it.

70.     Defendants have never once presented, and existing evidence does not provide, a statement of the amount of preference each minority group was entitled to from Defendants, where, and in what industries.

71.     Because the alleged causal relationships are not supported by a strong basis in evidence, section 8(a)'s racial classification is unconstitutional racial balancing.

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 517 of 814

72.     Section 8(a)'s racial classification purports to authorize the Executive to classify members of groups by race without regard to their individual qualities.

73.     Further, Congress purported to authorize the inclusion of unspecified "other minorities" designated by the Small Business Administration as presumptively subject to section 8(a)'s racial classifications. 15 U.S.C. § 631(f)(1); *see also* 13 C.F.R. § 124.103(b) ("Subcontinent Asian American").

74.     A presumption that a racial group deemed socially disadvantaged by the Executive is in fact socially disadvantaged for purposes of section 8(a)'s racial classification presumes that the power to create racial classifications can be (or has been) validly delegated.

Dated May 15, 2014                              Respectfully submitted,

                                                /s/ David F. Barton
                                                David F. Barton
                                                District Court Bar No. TX0096
                                                Texas Bar No. 01853300
                                                **GARDNER LAW**
                                                745 E. Mulberry Avenue, Suite 500
                                                San Antonio, Texas 78212-3149
                                                Telephone: (210) 733-8191
                                                Telecopier: (210) 733-5538
                                                Email: dfbarton@gardner.sa.com

## **CERTIFICATE OF SERVICE**

   This is to certify that a true and correct copy of the foregoing and all attachments and exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure, on this 15th day of May, 2014, to the following persons:

Andrew G. Braniff               *VIA E-FILING*
Patricia L. Stasco
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
-and-
Barbara A. Schwabauer             *VIA E-FILING*
United States Department of Justice
Civil Rights Division, Employment Litigation Section
601 D Street, NW
PHB Room 4017
Washington, D.C. 20579
*Attorneys for Defendants*


              /s/ David F. Barton
              David F. Barton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| ROTHE DEVELOPMENT, INC., | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-CV-744-KBJ |
| | ) |
| DEPARTMENT OF DEFENSE | ) |
| and SMALL BUSINESS ADMINISTRATION | ) |
|    Defendants. | ) |

_____)


**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

David F. Barton
District Court Bar No. TX0096
Texas Bar No. 01853300
**GARDNER LAW**
745 E. Mulberry Avenue, Suite 500
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
Email: dfb@tglf.com

May 15, 2014

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................................................2

TABLE OF AUTHORITIES ....................................................................4

SUMMARY OF THE ARGUMENT ........................................................6

ARGUMENT ...........................................................................................8

I.  SECTION 8(a)'s RACIAL CLASSIFICATION ................................ 8

II.  STANDARD OF REVIEW: STRICT SCRUTINY DEFINES THE BURDENS OF
PROOF AND THE SUMMARY JUDGMENT RULE APPLIES TO THOSE
BURDENS ........................................................................................ 9

III. THERE IS NO CONNECTION BETWEEN THE ALLEGED EVIDENCE OF
JUSTIFICATION AND SECTION 8(a)'s RACIAL CLASSIFICATION ............... 12

   A.  *The Three Alleged Cause-Effect Relationships*................................. 12

   B.  *The First and Second Alleged Causal Relationships Are Not Supported by a
   Strong Basis in Evidence* ........................................................... 13

      1.  The alleged statistical evidence that is post-enactment evidence is irrelevant
      and not probative of discrimination at all. ....................................... 15

      2.  The alleged statistical evidence is not probative of discrimination in the
      localities it is drawn from, much less all local and state contracting or
      Defendants' own contracting. ......................................................... 20
         a.  No connection to Congressional findings for section 8(a)'s racial
         classification ........................................................................ 20
         b.  No proper measure of availability or capacity ........................... 21
         c.  No collective inference that can be drawn from the alleged statistical
         evidence ............................................................................... 27
         d.  The alleged statistical evidence lacks probative value as a result of the
         defects cited above ................................................................. 29

      3.  Defendants rely on an unconstitutional extrapolation to infer effects on their
      own contracting from alleged discrimination in local and state contracting. . 30
         a.  The extrapolation is unconstitutional....................................... 30
         b.  The extrapolation inverts the burden of proof and subverts the strict
         scrutiny standard of review ....................................................... 32

      4.  The benchmarks or federal availability data necessary to complete the first
      and second alleged causal relationships do not exist. ........................... 34

   *C.  The Third Alleged Causal Relationship Is Not Supported by a Strong Basis in
       Evidence* ........................................................................................................ 35

   *D.  Because the Alleged Causal Relationships Are Not Supported by a Strong Basis in
       Evidence, Section 8(a)'s Racial Classification is Unconstitutional Racial
       Balancing, for Which There is No Compelling Interest* ........................................ 39

IV.  CONGRESS CANNOT DELEGATE ITS AUTHORITY TO ENACT  RACIAL
     CLASSIFICATIONS TO THE EXECUTIVE BRANCH ......................................... .40

   *A.  Section 8(a)'s Racial Classification Purports to Delegate the Authority to Enact
       Racial Classifications in Two Ways* ...................................................................... 40

   *B.  The Constitution Forbids Such Delegations and Renders them Inoperative* ........ 41

V.  CONCLUSION ............................................................................................................45

CERTIFICATE OF SERVICE ........................................................................................46

<u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

\* *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995)....................................................

.........................................................................9-12, 15-16, 18, 19, 30, 41, 42, 45

*Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) ............................ 19

\* *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ...............................................

................................................................................ 14, 20, 24, 30, 32, 36-39

*Concrete Works of Colorado v. City and County of Denver,* 36 F.3d 1513 (10th Cir.

1994) ............................................................................................... 19

*Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990 (3d

Cir. 1993) ......................................................................................... 19

*Coral Construction Co. v. King County*, 941 F.2d 910 (9th Cir. 1991) ........................... 19

*Dynalantic Corp. v. Department of Defense*, 885 F.Supp.2d 237 (D.D.C. 2012) ............ 20

*Engineering Contractors Ass'n of South Florida v. Metropolitan Dade County*, 122 F.3d

895 (11th Cir. 1997)............................................................................. 19

*Fullilove v. Klutznick,* 448 U.S. 448 (1980) ...................................................... 16

*Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50 (2d Cir. 1992) 19

*Hopwood v. State of Texas*, 78 F. 3d 932 (5th Cir. 1996)....................................... 30

*Humphrey v. Baker*, 848 F. 2d 211 (D.C. Cir. 1988)......................................... 41-42

*Morton v. Mancari*, 417 U.S. 535 (1974) ...................................................... 41

*Northwest Austin Mun. Utility Dist. v. Holder,* 129 S.Ct. 2504 (2009)......................... 16

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) ........................................... 42

\* *Parents Involved in Community Schools v. Seattle School Dist. No. 1*,

551 U.S. 701 (2008)...................................................... 10, 17, 26-27, 39, 40

*Rothe Development Corp. v. Department of Defense*, 262 F.3d 1306 (Fed. Cir. 2001).......

.......................................................................................43-44

\* *Rothe Development Corp. v. Department of Defense*, 545 F.3d 1023

(Fed. Cir. 2008).................................................. 10-12, 14, 20, 21, 24-30, 32, 34-35, 43

*Shaw v. Hunt*, 517 U.S. 899 (1996) ............................................ 10, 15, 18, 19, 27, 33, 43

*Shelby County. v. Holder,* 679 F.3d 848 (D.C. Cir. 2012)................................... 16

*Shelby County. v. Holder,* 133 S.Ct. 2612 (2013).......................................... 16

*W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206 (5th Cir. 1999) .................. 28-29

\* *Whitman v. American Trucking Ass'n*, 531 U.S. 457 (2001) ..................................... 41, 44

*Wygant v. Jackson Bd. of Education*, 476 U.S. 267 (1986) ....................................... 15, 36

<u>Statutes, Regulations, and Rules</u>

U.S. CONST. Art I § 1 ............................................................................................ 11

U.S. CONST. Amend. V ............................................................................................ 6

15 U.S.C. § 631(f)(1) ........................................................................................ 8, 10

15 U.S.C. § 636(j)(10) ............................................................................................ 9

15 U.S.C. § 637(a)(1) .............................................................................................. 9

15 U.S.C. § 637(a)(4) .............................................................................................. 9

15 U.S.C. § 637(a)(5) ................................................................................... 8, 40, 41

15 U.S.C. § 644(g)(1) .............................................................................................. 9

13 C.F.R. § 124.103(b) ..................................................................................... 8, 40

13 C.F.R. §124.103(d) ........................................................................................... 32

Fed. R. Civ. P. 56(a) ............................................................................................. 11

Fed. R. Civ. P. 56(c)(1)(B) ................................................................................... 11

Fed. R. Evid. 401 .................................................................................................. 15

Fed. R. Evid. 402 .................................................................................................. 15

D.D.C. LCvR 7(h) ................................................................................................. 6

Authorities on which we chiefly rely are marked with asterisks.

Pursuant to Local Rule 7.1(h), Plaintiff, ROTHE DEVELOPMENT, INC. ("ROTHE") files this, its Memorandum of Points and Authorities, and states as follows:

<div align="center">SUMMARY OF THE ARGUMENT</div>

Section 8(a)'s racial classification consists of a statutory definition, presumption, and goal. It denies ROTHE equal protection under U.S. CONST. Amend. V.

When enacting a statutory racial classification, Congress must specifically identify discrimination to be remedied with strong, probative evidence and make the "most exact" connection between that evidence and the statutory racial classification.

Here, Congress did not specifically identify discrimination to be remedied with strong, probative evidence. Thus, Defendants cannot prove the three cause-effect relationships they allege to be Congress' justification for section 8(a)'s racial classification. The statistics in the disparity studies cited by Defendants lack probative value because they are unconnected to any Congressional findings for section 8(a)'s racial classification, do not properly measure availability or capacity, and prevent any collective inference. Due to each of these defects, the statistical results of the studies are not probative evidence of disparity or discrimination.

Nor did Congress make any connection between its alleged evidence and the statutory racial classification it enacted. Defendants cannot extrapolate this non-probative evidence to all local and state prime- and sub-contracting nationwide. Similarly, to bridge the final causal gap to their own federal procurement programs requires benchmark data that Defendants once attempted to collect but never credibly possessed and do not possess now.

In addition, the lack of benchmarks makes it impossible to determine whether the contracting goal contained in section 8(a)'s racial classification bears any relationship to the "share of contracts minorities would receive in the absence of discrimination."

Because of these defects, section 8(a)'s racial classification is unconstitutional racial balancing, for which there is no compelling interest, and for which narrow tailoring is impossible.  It is plainly and clearly impossible to narrowly tailor a federal government procurement preference program for anyone or any industry based upon the record here, or any similarly concocted record, as the government has disingenuously and futilely attempted for the past 16 years.   If section 8(a)'s racial classification cannot—and it cannot—be so narrowly tailored, then it must be held unconstitutional and enjoined.

Finally, the statutory definition and presumption in section 8(a)'s racial classification lack any intelligible principle to limit the Executive's discretion in deciding whether racial, ethnic or cultural bias has occurred or even what constitutes a racial, ethnic, or cultural group. A delegation of authority to racially classify can never be constitutional because the evidence justifying a racial classification must be before Congress at the time of enactment.

Each of the constitutional defects in section 8(a)'s racial classification, any one of which is sufficient to invalidate and permanently enjoin the entire racial classification, implicate the Judiciary's duty to enforce the law to compel Congress to cure what the Executive cannot. The structure of section 8(a)'s racial classification itself prevents it from functioning as a remedy for the discrimination that the Executive alleges. Instead, the lack of any causal relationship or statutory feedback mechanism between the Executive's alleged post-enactment evidence and section 8(a)'s racial classification

makes the alleged remedial effect of the racial classification random, wholly unaccountable, and ultimately non-remedial with respect to any alleged discrimination. Only Congress, not the Executive, can cure these defects. A proper exercise of Judicial power, granting ROTHE's motion for summary judgment, is the first step in that process.

ARGUMENT

## I. SECTION 8(a)'s RACIAL CLASSIFICATION

SBA's 8(a) program was established through an amendment to the Small Business Act on October 24, 1978, Pub. L. No. 95-507, § 202, 92 Stat. 1757, 1761 (codified as amended at 15 U.S.C. § 637 (2012)).[1]

The 8(a) statute's definition of the term "socially disadvantaged" contains a racial classification. It defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). The statute also contains an additional racial classification in a presumption that all individuals who are members of certain racial groups are socially disadvantaged. *Id*. § 631(f)(1).[2]

Under the statute, benefits flow from the status conferred by the definition and presumption, through a statutory duty and goal to award a certain percentage of prime-

---

[1]    All citations to the United States Code are to the 2012 code edition.

[2]    In addition to the racial groups presumed socially disadvantaged under the statutory presumption, the Small Business Administration has purported to designate additional racial groups as socially disadvantaged. 13 C.F.R. § 124.103(b). *See* discussion, *infra*, Part IV.

and sub-contracts to socially disadvantaged small business concerns via competition restricted to those concerns. *Id.* §§ 637(a)(1)(A)-(C) (duty); 637(a)(1)(D) (restricted competition) & 644(g)(1) (goal).[3]

The definition, the presumption, and the goal, taken together, comprise "section 8(a)'s racial classification" (also referred to herein as the "racial classification of section 8(a)" or the "statutory racial classification"), which, as set out above, is used to qualify firms and to exclude non-8(a) firms from bidding. Section 8(a)'s racial classification denies ROTHE an equal footing to bid on Defendants' contracts and is therefore facially unconstitutional.

## II. STANDARD OF REVIEW:
### STRICT SCRUTINY DEFINES THE BURDENS OF PRODUCTION AND PROOF AND THE SUMMARY JUDGMENT RULE APPLIES TO THOSE BURDENS

A. *Strict Scrutiny Applies*

It is undisputed that the section 8(a) statute contains the racial classification identified above, and therefore that statutory racial classification is subject to judicial review under strict scrutiny. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 226 (1995) (*Adarand*).

---

[3]     "Eligible program participants" are those eligible to receive contracts under 15 U.S.C. § 637(a). *Id.* § 636(j)(10). Thus, the only "small business concerns" eligible to receive 8(a) contracts are:

    (1)      those small business concerns that are "socially and economically disadvantaged," *id.* § 637(a)(1)(B), meaning those more than "51% owned by one or more socially and economically disadvantaged individuals," *id.* § 637(a)(4)(i)(I); or

    (2)      those outright "owned and controlled by socially and economically disadvantaged individuals." *Id.* § 637(a)(1)(C).

*B.  Under Strict Scrutiny, Racial Classifications Are Presumptively Unconstitutional*

Under strict scrutiny, statutory racial classifications are presumptively unconstitutional and unworthy of deference. *Adarand*, 515 U.S. at 223-224; *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 744 (2008) (*Parents Involved*) ("Such deference is fundamentally at odds with our equal protection jurisprudence.").

*C.  Strict Scrutiny Defines the Burdens of Production and Proof in a Facial Challenge to a Statutory Racial Classification*

To survive a facial challenge under strict scrutiny, section 8(a)'s racial classification "must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235.

Defendants "first bea[r] a burden to produce strong evidence supporting the legislature's decision to employ race-conscious action." *Rothe Development Corp. v. Department of Defense*, 545 F.3d 1023, 1036 (Fed. Cir. 2008) (*Rothe VII*); *Shaw v. Hunt*, 517 U.S. 899, 909-910 (1996).  When enacting statutory racial classifications, Congress must first "identify [the] discrimination [to be remedied], public or private, with some specificity." *Rothe VII*, 545 F.3d at 1036. Congress must then articulate "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236. Further, Congress must narrowly tailor the statutory racial classification with "strong evidence" showing, among other things, "the relationship of the stated numerical goals to the relevant labor market." *Id*.

### D. The Summary Judgment Rule Applies to Burdens of Production and Proof as Allocated by Strict Scrutiny

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." ROTHE may make this showing "by . . . showing . . . the presence or absence of a genuine dispute." Fed R. Civ. P. 56(c)(1)(B).

### E. The Standard of Review Applied to This Case

With respect to section 8(a)'s racial classification, Congress did not "identify [the] discrimination [to be remedied], public or private, with some specificity," nor articulate "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Rothe VII*, 545 F.3d at 1036; *Adarand*, 515 U.S. at 236. The Constitution bars Congress from delegating those Legislative duties to the Executive or Judicial branches. U.S. CONST. Art. 1 § 1. Nor did Congress narrowly tailor section 8(a)'s racial classification, which applies across the board in equal measure, for all preferred races, in all markets and sectors.

Thus, as a matter of law, Defendants cannot meet their burden of production under strict scrutiny's evidentiary requirements. Because Defendants cannot meet their burden of production under strict scrutiny's evidentiary requirements, they cannot establish the presence of a genuine dispute and ROTHE is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) & 56(c)(1)(B). Therefore, the Court shall grant summary judgment. *Id*.

### F. Rothe Does Not Bear a "No Set of Circumstances" Burden Under Strict Scrutiny

The proposition that "to win a facial challenge, a challenger must establish that no set of circumstances exists under which the Act would be valid," is "of limited relevance

here, at most describing a conclusion that could result from the application of the strict scrutiny test." *Rothe VII*, 545 F.3d at 1032. ROTHE denies any such burden. Regardless, section 8(a)'s racial classification is still facially unconstitutional under all circumstances if the Court finds that any one of the causal relationships discussed herein is missing from Defendants' evidence.

### III. THERE IS NO CONNECTION BETWEEN THE ALLEGED EVIDENCE OF JUSTIFICATION AND SECTION 8(a)'s RACIAL CLASSIFICATION

Strict scrutiny requires "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236. Because there is no causal relationship or an insufficient causal relationship between the alleged evidence and section 8(a)'s racial classification, section 8(a)'s racial classification is facially unconstitutional. *Id*.

A.  *The Three Alleged Cause-Effect Relationships*

Defendants' primary causal connection problem is that none of the alleged evidence is probative or sufficiently probative of the causal relationships they are trying to prove. *Rothe VII*, 545 F.3d at 1040 & 1045.

Given that Defendants do not have evidence of their own direct discrimination or discrimination by their prime contract awardees,[4] Defendants allege the "most exact connection" required by *Adarand* by invoking the following three alleged causal

---

[4]     *Rothe VII*, 545 F.3d at 1048 (noting that "neither the district court in its opinion, nor DOD on appeal, cited to a single instance of alleged discrimination by DOD in the course of awarding a prime contract, nor to a single instance of alleged discrimination by a private contractor identified as the recipient of a prime defense contract. This lacuna is quite significant.").

relationships, which they have long referred to by various terms, such as "passive discrimination" or "passive financing" or "a remedy for lingering effects":

(1) First, that alleged discrimination in the award of prime and sub-contracts (as opposed to generalized societal discrimination or race neutral factors) elsewhere in the nationwide marketplace was limiting the pool of qualified, willing, and able minority firms to bid on federal prime contracts.[5]

(2) Second, that federal prime contract awardees, when selecting subcontractors, encountered a pool of qualified, willing, and able minority subcontractors that was limited in the same manner, for the same reason.[6]

(3) Third, that there was a causal relationship between the statutory racial classification and a remedy for the alleged discrimination, so that by setting aside a certain percentage of prime or sub-contracts using the statutory racial classification, the alleged discrimination would be remedied.[7]

## B. The First and Second Alleged Causal Relationships Are Not Supported by a Strong Basis in Evidence

To establish the first and second alleged causal relationships, *supra* (that the pool of qualified, willing, and able minority firms has been limited for federal procurement by

---

[5]     *Dynalantic v. DoD*, No. 95-cv-2301 (D.D.C.), Doc. #239 at 25 (alleging "pervasive and persistent effects of racial discrimination which still hinder minority-owned businesses' ability to compete on an equal-opportunity basis both in government contracting and in the economy as a whole.") and Doc. #241 at 4 (alleging "a number of interrelated problems, all rooted in racial discrimination and its continuing effects, that cut across industry lines and unfairly impede the development of minority-owned small businesses and their ability to contract with the federal government.").

[6]     *Id*.

[7]     *Dynalantic v. DoD*, No. 95-cv-2301 (D.D.C.), Doc. #239 at 25 (characterizing the award of contracts set aside pursuant to section 8(a)'s racial classification as "[t]he primary bulwark" against "such discrimination and its continuing effects.").

discrimination elsewhere in the nationwide marketplace, which, in itself, is a constitutionally flawed benchmark), Defendants rely on the following dicta from *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) (*Croson*) to infer discrimination in local and state[8] prime- and sub-contracting where disparity studies have been conducted:

> Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.

*Croson*, 488 U.S. at 509 (emphasis added).  Notably, the defining term therein is the specific level of government engaged in procurement, i.e., the "locality" in *Croson*, and not some undefined collective of ever-shifting unrelated localities cherry-picked by the Executive branch to form an alleged back drop, which cannot provide a basis for a narrowly tailored remedy.

Regardless, however, the statistics in the disparity studies cited by Defendants lack probative value[9] and thus cannot support the inference. Nevertheless, Defendants extrapolate their inference to all local and state prime- and sub-contracting nationwide. To bridge the final causal gap to their own federal procurement programs requires benchmark data that Defendants once attempted to collect but never credibly possessed

---

[8]    In using the phrase "local and state" and throughout, ROTHE makes no distinction between public and private contracting, and includes both. In using the term "locality" or "localities," ROTHE includes both the local and state areas with disparity studies cited by Defendants.

[9]    All of Defendants' other statistical evidence besides the local and state disparity studies also lacks probative value for the reasons stated in *Rothe VII*. 545 F.3d at 1047-48 ("We conclude that the remaining statistics cited by members of Congress in the floor speeches quoted by the district court cannot serve as the foundation of a "strong basis in evidence," because they are not sufficiently probative of nationwide discrimination against the range of minority groups afforded a presumption [in the statutory racial classification]. Nor are the statistics quoted by the district court from the three SBA reports sufficient, because they do not account for firm size or qualifications.").

and do not possess now. For all of these reasons, Defendants' first and second alleged causal relationships are not supported by a strong basis in the evidence, and the statutory racial classification is unconstitutional.

1.  The alleged statistical evidence that is post-enactment evidence is irrelevant and not probative of discrimination at all.

    To the extent Defendants' evidence was never placed before or considered by Congress prior to the enactment of section 8(a)'s racial classification, which occurred in 1978,[10] it is irrelevant as a matter of United States Constitutional law, and therefore must be disregarded and held inadmissible under Federal Rules of Evidence 401 and 402. The Supreme Court case law compelling this result includes the following:

> *The institution that makes the racial distinction* must have had a "strong basis in evidence" to conclude that remedial action was necessary, "*before* it embarks on an affirmative action program."

*Shaw v. Hunt*, 517 U.S. 899, 910 (emphasis in original), *quoting Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986).

> [T]he *legislature* must have had a strong basis in evidence to support [the] justification before it implements the [racial] classification.

*Shaw v. Hunt*, 517 U.S. 899, 908 n. 4 (1996) (emphasis added).

> "*Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the Court should not uphold this kind of statute.*" . . . "Racial classifications are simply too pernicious to permit any but the most exact connection

---

[10]     Section 8(a)'s racial classifications have never truly been reauthorized. The Defendants instead resort to relying on evidence submitted to Congress prior to reauthorization of other sections of the Small Business Act, and in some cases even prior to or in association with the reauthorization of *other statutes*, like TEA-21, which authorizes the U.S. Department of Transportation's Disadvantaged Business Enterprise (DBE) program. These other statutes are structured, by their enabling statutes, to operate significantly differently from section 8(a)'s racial classification, which creates conflict between section 8(a)'s racial classification and those other statutes that cannot be reconciled to support Defendants' reliance on those other statutes here.

between justification and classification" . . . These passages make a persuasive case for requiring strict scrutiny of *congressional* racial classifications.

*Adarand v. Pena*, 515 U.S. 200, 229 (1995) (emphasis added), *quoting with approval*

Justice Stevens' dissent in *Fullilove v. Klutznick*, 448 U.S. 448, 537 & 545 (1980).

> . . . [W]e agree with Justice Stevens that, "[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification *be clearly identified* and unquestionably legitimate," and that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification."

*Adarand v. Pena*, 515 U.S. 200, 229 (1995) (emphasis added), *again quoting with approval* Justice Stevens' dissent in *Fullilove*.

Analogously, in the voting rights context, the law is that a statutory remedy for identified discrimination is constitutional only if its "disparate geographic coverage is sufficiently related to the problem that it targets." *Northwest Austin Mun. Utility Dist. v. Holder*, 129 S. Ct. 2504, 2512 (2009). The Supreme Court has placed that definitional responsibility on the shoulders of Congress alone. *Shelby County v. Holder*, 133 S. Ct. 2612, 2631 (2013). The *Shelby County* case reversed and clearly rejected the approval of post-enactment evidence by the D.C. Circuit Court of Appeals. *See Shelby County v. Holder*, 679 F.3d 848, 877-878 (D.C. Cir. 2012) (overreaching to consider additional cases of alleged discrimination in expert report that was completed after statute was reauthorized and that was not included in legislative record) and *id*. at 880 ("we consider all probative record evidence of recent discrimination"), *rev'd* 133 S. Ct. 2612 (2013).

Defendants do not acknowledge this controlling precedent because the record before Congress cannot support the outcome they seek in this case—thus, Defendants'

deficient attempt to create out of whole cloth the post-enactment evidence of its experts' irrelevant reports and other post-enactment documents to correct a practically-speaking non-existent Congressional record and to discriminate one citizen against another.

Here, the outcome-oriented position the Executive urges on the Judiciary is a direct attack on the Constitutional separation of powers. The Executive seeks to enlist the assistance of the Judiciary in order to make an end run around the cursory, deficient record that Congress considered, to allow for a perpetual moving target of post-enactment evidence selected and created by the Executive itself. That displaces Congress' constitutional responsibilities and makes Congress unaccountable. It also perpetually obfuscates the statutory racial classification from meaningful Judicial review because the Executive's moving target of post-enactment evidence has no Congressionally approved benchmark.

Defendants' blithe assertion elsewhere in the record that "post-enactment evidence allows *Congress and the court* to determine whether there continues to be a compelling interest" is utterly false, because there is no Congressionally approved benchmark for the Congress or the court to compare the Executive's post-enactment evidence to. *Cf*. Doc #48 at 11 (emphasis added). Rather, when post-enactment evidence is considered, the Judiciary abdicates and elevates the Executive over itself and Congress, making impermissible deference to the Executive an almost a *fait accompli*. *See Parents Involved*, 551 U.S. at 745 ("Such deference is fundamentally at odds with our equal protection jurisprudence.").

Defendants' use of post-enactment evidence to address narrow tailoring is also unlawful, because it is simply another back door to the consideration of evidence that was

never before Congress. *Cf.* Doc #48 at 12. When it enacted section 8(a)'s racial classification, Congress was required to narrowly tailor the statute to the evidence before it. *Shaw*, 517 U.S. at 915 ("Where, as here, we assume avoidance of § 2 liability to be a compelling state interest, we think that *the racial classification would have to realize that goal*; *the legislative action must, at a minimum*, remedy the anticipated violation or achieve compliance to *be narrowly tailored*."). Defendants have to know and had to have known this since the implementation of the 8(a) program and throughout the program's continued existence, even after the Supreme Court held in *Adarand* in 1995 that strict scrutiny's evidentiary requirements would apply. Any argument contrary to the foregoing knowledge is disingenuous on all levels.

Indeed, the Supreme Court in *Shaw* directly rejected the argument that Executive actors could narrowly tailor a Legislative act with post-enactment evidence. *Shaw*, 517 U.S. at 917 (rejecting argument that legislative redistricting act is narrowly tailored "as long as racially polarized voting exists where the district is ultimately drawn" even if that is not the same location as the data that served as a "strong basis in evidence" and "compelling interest" for the redistricting act at the time of enactment.). The statute, on its face, cannot and does not become more or less narrowly tailored based on fluctuations in post-enactment evidence that the Executive collects solely for the purpose of defending litigation or any other purpose. Defendants do not, and have not ever purported to tailor section 8(a)'s racial classification on the basis of such post-enactment evidence, and, for good reason, since it is not possible to either justify or narrowly tailor a program by relying upon evidence which never existed at the time of program enactment. ROTHE implores the Court to not permit them to do so now, in this litigation.

Defendants are left, then, to rely on lower court cases that yield to the Supreme Court precedent cited above, and therefore cannot prevent the exclusion of their alleged evidence.

Cases cited by Defendants that predate the Supreme Court's 1995 and 1996 decisions in *Adarand* and *Shaw* can be rejected out of hand. *Cf. Concrete Works of Colorado, Inc. v. City and County of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992); *Coral Const. Co. v. King County*, 941 F.2d 910, 920 (9th Cir. 1991); *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 1004 (3d Cir. 1993).

Similarly, *Engineering Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County*, 122 F.3d 895, 911-912 (11th Cir. 1997) and *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1166 (10th Cir. 2000) both rely solely on circuit precedent that predates *Adarand* and *Shaw*.  More importantly, the Tenth Circuit's decision in *Slater* expressly states that the plaintiff in that case waived the objection. *Slater*, 228 F.3d 1147, 1173 n.14 ("the amici do not, and presumably cannot, cite the portion of the record where Adarand objected on that ground to the introduction of the studies via [post-enactment evidence]."). The Eleventh Circuit, for its part, was completely oblivious to and simply failed to acknowledge the foreclosure of post-enactment evidence by the Supreme Court's then-recent decisions in *Adarand* and *Shaw*. Instead, the Eleventh Circuit cited solely to the pre-1995 circuit precedent that *Adarand* and *Shaw* displaced. *Engineering Contractors,* 122 F.3d at 911.

That leaves only one other post-enactment evidence case that stands alone in contrast to the Supreme Court and Federal Circuit precedent that ROTHE has cited here. That case, of course, is *Dynalantic Corp. v. Department of Defense*, 885 F.Supp.2d 237, 258 (D.D.C. 2012). The *Dynalantic* decision, which relies only on cases that ROTHE has distinguished above, and provides no further analysis. It too, can be rejected, for the same reasons as the others discussed above, and all of Defendants' post-enactment evidence should be similarly rejected.

2.   The alleged statistical evidence is not probative of discrimination in the localities it is drawn from, much less all local and state contracting or Defendants' own contracting.

The statistics in the disparity studies cited by Defendants lack probative value because they are unconnected to any Congressional findings for section 8(a)'s racial classification, do not properly measure availability or capacity, and prevent any collective inference. Due to each of these defects, the statistical results of the studies are not probative evidence of disparity or discrimination. *Rothe VII*, 545 F.3d at 1045.

a.   No connection to Congressional findings for section 8(a)'s racial classification.

First, there is no evidence that the local and state disparity studies cited by Defendants have any connection to any Congressional finding(s) with respect to section 8(a)'s racial classification. *Rothe VII*, 545 F.3d at 1039-1040 ("Beyond their mere mention, there is no indication that these studies were debated or reviewed by members of Congress. . ."); *Croson*, 488 U.S. at 509 ("Proper findings . . . are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects.") (referring to "how many minority enterprises are present" in the relevant market; "the level of their participation" in the procurement program in question; and "evidence that

qualified minority contractors have been passed over" for contracts or subcontracts, "either as a group or in any individual case."). The Court cannot "defer to Representatives . . . about the studies' probative value." *Rothe VII*, 545 F.3d at 1047 ("We cannot merely recite statements made by members of Congress alleging a finding of discriminatory effects and the need to address those effects. . .").

Congress failed to make a quantitative, prefatory identification of discrimination to be corrected, where and by what degree, and for what races. Rather, it has continued to act randomly and without reevaluation of or reference to the full scope of section 8(a)'s racial classification. When Congress fails in this manner, it is impossible to determine what lingering effects exist, where and to what degree, and what races are still disadvantaged by them, and it is also impossible to tailor a remedy for such effects. *Id.*; *see also Rothe VII*, 545 F.3d at 1038 ("we are hesitant to conclude that the mere mention of a statistical study in a speech on the floor of the House of Representatives or the Senate is sufficient to put the study "before Congress" for purposes of Congress' obligation to amass a "strong basis in evidence" for race-conscious action").

All of these failures foreclose any possible relationship between the alleged evidence of discrimination and the statutory racial classification Congress enacted, particularly its remedial goal. *See* discussion, *infra*, Part III.C.

b.  No proper measure of availability or capacity.

Second, there is no evidence or insufficient evidence as a matter of law that the local and state disparity studies cited by Defendants properly measure availability or capacity.

ROTHE's expert witness John C. Sullivan, under questioning by Defendants' counsel in his deposition, gave a succinct summary of what a disparity study must compare and measure. ROTHE urges the following summation of the requirements of a valid disparity study be applied here as a matter of law, even if Mr. Sullivan is excluded from testifying as an expert in this case:

> Q.   Okay.  Let us design a study.  If you were going to start from the beginning, what would be the first step you would take to design a disparity study?
>
> A.   The heart of any well done disparity study is availability.  So, I would start and focus my efforts on that, which firms are qualified, willing and able for the public contracting that this unnamed jurisdiction is going to need.
>
> Q.   And let's look at each one of those individually.  How would you determine qualified?
>
> A.   Qualifications are those qualifications insisted on by the government. For example, if you're going to hire a plumber to work in a public school, he needs a plumbing license.  Even if you have an interest in plumbing, if you don't have that license, you're not qualified.
>
> Q.  How would you define willing?
>
> A.   Willing is showing an interest in public contracting, and that's typically accomplished by registering with the government in some capacity.
>
> Q.  And how would you show able?
>
> A.   Able is your capability of doing a contract.  Do you have the necessary equipment? Does the contract ask for a certain number of years of experience?   Does the contract insist on a certain level of prequalification, that sort of thing.
>
> Q.   Earlier you said one method that you could approximate this availability would be to use a bidders' list?
>
> A.  Yes.  When I say bidders' list, I want to be specific because that term is often misused. When I say bidders' list, I mean firms that have actually bid.

Q.   Are there any disparity studies that are used in the Wainwright report that only use the firms that have actually bid to define their availability?

A.   No.

Q.   So, based on that, you would say all of the studies there were deficient?

A.   Now, some do use bidding, but that's just one of the sources. Unfortunately, they go outside and take in all this other stuff that I wouldn't necessarily consider meeting the standard of qualified, willing and able, but, based on that one issue, yes, they are all deficient.

Q.   How would you then go about defining utilization?

A.   Utilization is both the easiest and the hardest part of any disparity study.  It's easiest in the sense it's simply the dollars that are awarded. Conceptually, it's the easiest.  Reality is every company will tell you that they pour most of their time into getting utilization data because the records are never as good as they should be.

Q.   And would you do anything with that utilization number?  How would you manipulate it?

A.   I don't believe it needs to be manipulated.  It is a number.  It's an X. This is the amount of dollars which have been awarded.  Now, it would then need to be assigned, the share of that would need to be assigned to the various groups.

Q.   And would you apply any adjustments to the utilization number?

A.   Not unless it seemed that they were necessary.  Sometimes there's a difference between the dollars as they are awarded and the dollars as they are ultimately spent.  Sometimes subcontractors don't get the dollars that the records would lead you to believe they do.  So, if that's a problem in your jurisdiction, you need to get the actual awards.

Q.   And then you would use that availability number and the utilization number to create a disparity index?

A.   Yes, a disparity ratio, sure.

Q.   And how would you do that?

A.   It is availability divided by utilization. So, what that means is you need to have percentages. With a particular group, let's use Hispanics to make the issue, what was their availability?  What share of the availability did they have over their share of the utilization?  And that will give you a fraction.

Q.   If this methodology was followed and the disparity index were below 80, could you draw any conclusions from that?

A.   If it were followed properly and the disparity index were below 80 and there was a sufficient size, there were enough contracts in our unnamed jurisdiction, I think you could draw a conclusion from that surely.

Q.   What conclusion would you draw?

A.   Again, if it was done properly, you would look and see that a particular group was not getting what you would expect them to get.  Your next step then becomes asking the question why.

Transcript of Deposition of John C. Sullivan (Nov. 4, 2013) at 90-94, attached hereto as

**Exhibit 1** and incorporated herein by reference.

The Defendants' disparity studies deviate from the requirements listed above and lack probative value as a result. The Defendants' disparity studies rely on impermissible factors that have the effect of decreasing alleged utilization of minority firms (the numerator) and increasing alleged availability (the denominator), thus decreasing the alleged disparity index (the lower the index the greater the disparity).

Disparity studies must measure availability in terms of "qualified minority contractors willing, and able to perform a particular service" and compare that number to "the number of such contractors actually engaged by the locality or the locality's prime contractors," in order to determine whether "an inference of discriminatory exclusion could arise." *Croson*, 488 U.S. at 509; *Rothe VII*, 545 F.3d at 1041-42. Disparity studies are insufficient and lack strong probative value if they "erroneously includ[e] any

minority-owned firm that was deemed willing or potentially willing and able, without regard to whether that firm was qualified" in the availability analysis. *Rothe VII*, 545 F.3d at 1042.

The disparity studies held "insufficient to form the statistical core of the strong basis in evidence required to uphold the statute" in *Rothe VII* improperly "measured the availability of minority-owned businesses—i.e., the denominator in a disparity ratio—by the percentage of firms in the market owned by minorities, instead of by the percentage of total marketplace capacity those firms could provide." *Rothe VII*, 545 F.3d at 1043 & 1045. The six studies from *Rothe VII* are included among Defendants' studies here, which suffer from the same defect.

Defendants refuse to accept *Rothe VII*'s availability and capacity (capability) analysis as the law, arguing that alleged lingering effects of discrimination reduce availability (by reducing the number of qualified firms) and reduce capacity. *Dynalantic v. DoD*, No. 95-cv-2301 (D.D.C.), Doc. #239 at 9-11. This remarkably incorrect legal position is directly contrary to Defendants' own expert in the *Rothe* case, whose testimony the Federal Circuit quoted approvingly:

> [T]he crucial question in disparity studies is to develop a credible methodology to estimate this benchmark share of contracts minorities would receive in the absence of discrimination . . .The touchstone for measuring the benchmark is to determine whether the firm is ready, willing, and able to do business with the government.

*Rothe VII*, 545 F.3d at 1042 (testimony of Ian Ayres).

By arguing that availability and capacity should not be controlled for among the firms in the studies, however, Defendants allege that any rejection of a minority firm on the basis of qualification or capacity (both legitimate, nondiscriminatory reasons), or any

inability of a minority firm to overcome a race neutral barrier to market entry,[11] is due to discrimination within local and state contracting, i.e., discrimination *in the actual award of local and state prime- and sub-contracts*. *Dynalantic v. DoD*, No. 95-cv-2301 (D.D.C.), Doc. #239 at 9-11. Defendants incorrectly presume that the relative qualification and capacity of firms should mirror each racial group's relative share of the total *number of firms*, rather than the total qualified firms or total capacity in that industry, and Defendants ascribe all causation to discrimination if there is any statistically significant disparity to the contrary. Again, Defendants' own expert disagrees, as the Federal Circuit noted:

> According to Professor Ayres. . . . a true "capacity" methodology . . . "calculates in dollar terms the capacity of qualified firms to do business with the government" and uses as a benchmark for each industry the minority-owned businesses' "share of the industry's total capacity."

*Rothe VII*, 545 F.3d at 1044 n.13.

Defendants thus fail to control for or distinguish between alleged discrimination within local and state contracting itself and outside societal discrimination factors (or other nondiscriminatory reasons) that may impact a firm's ability to obtain qualifications or build capacity. As to the former, no probative causal relationship exists between the alleged discrimination and section 8(a)'s racial classification, due to the defects in the disparity studies. The latter, societal discrimination, cannot be constitutionally remedied with the type of statutory racial classification in this case. *Parents Involved*, 551 U.S. at 731 ("Societal discrimination, without more, is too amorphous a basis for imposing a

---

[11]     The studies relied upon by Defendants do not analyze whether government regulation itself has created, on a race neutral basis, the alleged barriers to market entry, and whether such alleged barriers disproportionately impact minority firms, perhaps because it would undermine the entire premise behind section 8(a)'s racial classification.

racially classified remedy"); *Shaw*, 517 U.S. at 909-10 ("an effort to alleviate the effects of societal discrimination is not a compelling interest.").

If the proper comparison is not made in the availability analysis, a regression analysis to filter out non-social factors and control for differences in firm size is necessary. *Rothe VII*, 545 F.3d at 1043 & 1045. The local and state disparity studies cited by Defendants here do not make the relevant comparison stated in *Rothe VII*, and do not contain a regression analysis, or both. The problem with relying on regression analysis, however, is that where, as here, the Defendants' disparity studies aggregate data into highly generalized categories of contracting in which those highly generalized categories vary from study to study in statistically significant ways, it can never pinpoint causation. It can never tell where in the public contracting process discrimination, if it is allegedly occurring, is happening.  And, if you don't know the cause, you cannot know or craft a constitutionally compliant remedy.

     c.  No collective inference that can be drawn from the alleged statistical evidence.

Third, no inference can be drawn from the disparity studies collectively, because the studies lack a common analytical baseline. They use different types of data, different industry definitions, and compare different things.

The definitions of markets and industry sectors in the studies are too general and inconsistent, lumping different industries together in some studies while splitting them apart in others. Even though Defendants maintain that the presence or absence of a statistically significant disparity in any particular market or sector is irrelevant, when it comes time to draw a collective inference from the data (which is required under the

causal relationships Defendants propose), these differences and inconsistencies make it impossible to do so.

By one of literally hundreds of examples, the 2006 Denver disparity study[12] uses the old Standard Industrial Classification (SIC) code system, and includes the category SIC 1799 Special Trade Contractors, n.e.c. (not elsewhere classified) under the industry group "Professional Services."[13] Yet SIC 1799 corresponds to four separate industries under the 2007 North American Industry Classification System (NAICS).[14] The 2008 State of Alaska disparity study,[15] in turn, includes each of these four NAICS industries under the industry group "Construction,"[16] instead of "Professional Services." No collective inference can be drawn when the same industries are placed in different industry groups in different studies throughout Defendants' alleged evidence.

The inability to draw a collective inference goes to the heart of why the evidence alleged to support section 8(a)'s racial classification is insufficient as a matter of law, because:

> As the Fifth Circuit has explained, there is no "precise mathematical formula to assess the quantum of evidence that rises to the *Croson* 'strong basis in evidence' benchmark." *W.H. Scott Constr. Co.* [*v. City of Jackson*], 199 F.3d [206,] 218 n. 11 [(5th Cir. 1999)]. Rather, "[t]he sufficiency of a [legislature's] findings of discrimination in a local

---

[12]    NERA Economic Consulting, Denver Study (May 5, 2006) (ROTHE 024774).

[13]    Denver Study at 60 (Table 4.2) (ROTHE 024843).

[14]    The corresponding NAICS codes are 238320 (Painting and Wall Covering Contractors), 238150 (Glass and Glazing Contractors), 562910 (Remediation Services), 238990 (All Other Special Trade Contractors). http://www.census.gov/eos/www/naics/concordances/concordances.html (last visited May 9, 2014) (providing tables for the conversion of 1987 SIC to 2002 NAICS and 2002 NAICS to 2007 NAICS).

[15]    D. Wilson Consulting Group, LLC, Alaska Study (Jun. 6, 2008) (ROTHE 013677).

[16]    Alaska Study at Page 5-2 (ROTHE 013790).

industry," or for that matter in a state-wide or nationwide industry, "must be evaluated on a case-by-case basis." *Id.*

*Rothe VII*, 545 F.3d at 1049. But the sufficiency of Defendants' alleged evidence, and whether it supports Defendants' alleged collective inference of discrimination in local and state contracting, cannot be evaluated in terms of a nationwide industry, or even nationwide industry groups, because the disparity studies themselves do not consistently define such things, much less offer a means of weighing results between different studies.

This is why, even if the disparity studies themselves did show statistically significant disparity by a preponderance of probative evidence, which the ones here do not, nothing is gained, for the purpose of evaluating section 8(a)'s racial classification, by shifting that burden back and forth between Defendants and ROTHE. A "disparity study arms race" between the parties with local and state disparity studies would be completely irrelevant. In a nation as vast as the United States of America, either party will be able to cherry pick examples that fit its arguments. However, the Defendants have the burden to justify a nationwide statutory racial classification through its entire scope. The constitutionality of section 8(a)'s racial classification does not turn on whether, having amassed equal numbers of offsetting statistically significant disparities and non-disparities, one of the parties produces one last disparity or non-disparity for professional services contracts in public relations for less than $25,000 in Reno that tips the balance.

d.  The alleged statistical evidence lacks probative value as a result of the defects cited above.

Because there is no evidence or insufficient probative evidence of statistically significant disparities in local and state contracting, no inference of discriminatory exclusion in local and state contracting can arise, and because no such inference arises,

there is no connection between the statistical results of the studies and discriminatory effects on Defendants' own contracting. *Rothe VII*, 545 F.3d at 1045; *see also Croson*, 488 U.S. at 509. When timely, probative evidence of identified discrimination is missing, any claim of lingering effects is "grossly speculative," *Hopwood v. State of Texas*, 78 F.3d 932, 954 n.46 (5th Cir. 1996). Nor does it matter whether Defendants produce some disparity studies that are probative, if they cannot also establish the "most exact" causal connection between those studies and section 8(a)'s racial classification throughout its entire scope, which they cannot.

3.  Defendants rely on an unconstitutional extrapolation to infer effects on their own contracting from alleged discrimination in local and state contracting.

a.   The extrapolation is unconstitutional

The most fundamental problem is that Defendants make a second-level inference or extrapolation, from those few state and local contracting markets and sectors they have alleged significant statistical disparities in, to infer discrimination nationwide, including in those state and local contracting markets and sectors where there is contrary evidence or no evidence of discrimination at all. That second-level inference or extrapolation is unconstitutional because it "does little to define the scope of any injury to minority contractors . . . or the necessary remedy [and] could justify a preference of any size or duration." *Croson*, 488 U.S. at 505 ("[W]e have never approved the extrapolation of discrimination in one jurisdiction from the experience of another."). Any holding to the contrary would conflict with—and must yield to—*Adarand*'s requirement for "the most exact connection between [the alleged evidence of] justification and [the statutory racial] classification." *Adarand*, 515 U.S. at 236.

As a practical matter, the extrapolation is impossible to make from the Defendants' local and state data. *See* discussion, *supra*, Part III.B.2.c. The extrapolation also leaves the source and existence of alleged discrimination undefined, which makes narrow tailoring impossible.

Based on this unconstitutional extrapolation, Defendants purport to justify a statutory racial classification that provides preference in equal measure for all of the classified races, nationwide. Accordingly, Defendants allege that every statistically significant disparity in local and state prime- and sub-contract awards is due to discrimination or the lingering effects thereof. Every prime contract award by Defendants is presumed to passively finance discrimination against all races, and all of Defendants' prime contract awardees are presumed to discriminate or to have discriminated against subcontractors of all races, in equal measure, nationwide, under this sweeping inference.

There is no way to determine whether a statistically significant disparity for a given race, or in a given market or sector, or in the award of prime- versus sub-contracts, or based on a given set of data inputs, is any more important than a non-disparity or lack of evidence for another. All that is certain is that the ignored contrary evidence and lack of evidence preponderates and establishes that Congress did not have a strong basis in the evidence to enact section 8(a)'s racial classification.

The second-level inference that all local and state project owners are discriminating in the award of prime contracts is absurd and unsupported. Equally absurd and unsupported is the second-level inference that all local and state prime contractors are discriminating against subcontractors. Such speculation of discrimination from the scant disparities is limitless and exceeds even the scope of Defendants' own procurement.

Moreover, the speculation that local and state prime- and sub-contractors are an acceptable proxy for Defendants' own prime- and sub-contractors is itself dubious. *Rothe VII*, 545 F.3d at 1049 ("we are skeptical that this bare likelihood would be sufficient to establish DoD's "passive participation" in discrimination within the meaning of *Croson*").

> b.   The extrapolation inverts the burden of proof and subverts the strict scrutiny standard of review

Defendants rely on unconstitutional second-level extrapolations to avoid their burden of proof under strict scrutiny to produce evidence that the alleged inferences of discrimination were supported throughout their entire nationwide scope.

The scale of the repeated "if any one (or some), then the whole" extrapolations relied upon by Defendants[17] leaves ROTHE in awe of the unconstitutionality, and those extrapolations are employed to support a chain of inferences that transports the factfinder from:

(1)   disparity in any one race, market, or sector, to all;

(2)   anecdotal statements by any one member of any one race in any one market or sector, to all;

(3)   the assumption of a causal link (entirely speculative given the alleged evidence) between any one disparity and any one anecdotal statement, to all;

(4)   mention of a disparity study in a floor statement by any one member of Congress, to all members;

---

[17]      This is, ironically, the same limitless standard used by the SBA to permit groups not already designated by Congress as presumptively socially disadvantaged to acquire that presumption upon mere allegations by any one member of that group. 13 C.F.R. §124.103(d). When SBA purports to exercise such authority, it is also unconstitutional for the reasons explained *infra*, Part IV.

(5)       consideration of an anecdotal statement for one statute at one point in time, to all statutes, forever;

(6)       Congressional testimony or political statement by any one member of Congress on any one program or provision of any one bill, to all members for all bills for all time (as a finding to support any racial classification, no less);

(7)       a single remedial use of a racial classification allegedly supported by identified discrimination and a strong basis in the evidence, to all uses for all time of that racial classification, regardless of whether they are remedial and regardless of injury to plaintiff.

Perversely under the Defendants' unlawful approach, the Executive, not Congress, winds up identifying discrimination nationwide by inference for all markets, industrial sectors, and races where there was in fact contrary evidence or no evidence of a statistically significant disparity at all. Indeed, the less evidence of disparity, the more vague and inadequate the record, the greater the scope of the inference necessary, the greater the speculation required, and the greater the ability of the Executive to do Congress's work for it, while arriving at its own politically preferred "nationwide" finding. *See discussion*, *infra*, Part IV.

The Supreme Court has held repeatedly that that "the *legislature* must have had a strong basis in evidence to support [the] justification *before* it implements the [racial] classification." *Shaw*, 517 U.S. at 908 n. 4 (emphasis added); *see also* cases cited *supra*, Part III.B.1 (barring post-enactment evidence). When Congress and the Executive fake the causal link, it is the Judiciary's duty not to fake strict scrutiny under the guise of comity or deference. Congress' ignorance of all contrary evidence, including no

evidence, is neither conclusive nor sufficient as a matter of law to infer discrimination nationwide from some alleged evidence of statistically significant disparity in local and state contracting. If it were, ROTHE would have to rebut the mere existence of any such disparity in local and state contracting, regardless of its cause, which is a rational basis standard, not strict scrutiny.

4.   The benchmarks or federal availability data necessary to complete the first and second alleged causal relationships do not exist.

The end of the causal chain in Defendants' first two alleged causal relationships is an alleged negative effect on the number of minority firms available to bid on Defendants' federal prime- and sub-contracts. But without data from Defendants' own procurement programs, an analysis of such effects cannot even begin. Such data cannot be ignored simply because it is allegedly impacted by the discrimination that Defendants assert. The analysis must include the actual participation levels, if for no other reason than to compare with what the estimated participation levels would be in the absence of the alleged discrimination and determine the alleged effects. Moreover, actual prime- and sub-contract award data is a necessary input to measure and estimate utilization.

As the Federal Circuit explained in 2008, Defendants once attempted to collect this data, but it is now stale, and they do not have it now:

> [T]he district court found that "the data contained in . . . the [1998 Department of Commerce] Benchmark Study is stale for purposes of strict scrutiny review of the 2006 Reauthorization" . . . DOD does not challenge this finding on appeal . . .so we will not consider the . . . the Department of Commerce Benchmark Study.
> . . .
> Without solid benchmarks for the minority groups covered by the statute, we simply cannot determine whether Section 1207's five percent goal is reasonably related to the capacity of firms owned by members of those minority groups—i.e., whether that goal is comparable to the "share of contracts minorities would receive in the absence of discrimination." Such

> benchmarks might have been available here, had the Department of Commerce made good on its 1999 intention to "develop new benchmarks and utilization estimates every three years." But Commerce did not do so.

*Rothe VII*, 545 F.3d at 1037 & 1049-50 (internal citations omitted). Consequently, there is no statistical evidence showing the effects on Defendants' procurement from the causal relationships they allege.

Nor is there even any anecdotal evidence that would suggest that participation *in Defendants' procurement programs specifically* was being adversely affected in the manner Defendants allege. *See Rothe VII*, 545 F.3d at 1048 (describing such omission as "significant.").

Without actual data or anecdotal evidence from the Defendants' own procurement programs, the last link in the Defendants' causal chain is also missing. Since such alleged effects comprise the alleged compelling interest for section 8(a)'s racial classification, there is no strong basis in evidence for a compelling interest based on either of the first two alleged causal relationships.

## C. The Third Alleged Causal Relationship Is Not Supported by a Strong Basis in Evidence

The lack of benchmarks makes it impossible to determine whether the contracting goal contained in section 8(a)'s racial classification bears any relationship to the "share of contracts minorities would receive in the absence of discrimination." *Rothe VII*, 545 F.3d at 1049-50. This means that there is no causal relationship, whatsoever, between the statutory racial classification and a remedy for the alleged discrimination, such that by setting aside a certain percentage of prime or sub-contracts using the racial classification,

the alleged discrimination would be remedied. In other words, the remedial effect of section 8(a)'s racial classification is speculative and entirely random.

While the lack of probative evidence makes this issue impossible to analyze in Defendants' favor, there are independent reasons why this issue renders section 8(a)'s racial classification unconstitutional.

In particular, the Supreme Court has held that a plaintiff's demonstration that a racial classification is "keyed to a . . . goal that itself has no relation to the remedy" is sufficient to show unconstitutionality. *Wygant v. Jackson Bd. of Education*, 476 U.S. 267, 294 (1986) (plurality) (O'Connor, J.).

There is no connection between the award of an 8(a) contract and a remedy for statistically identified discrimination, except by sheer chance. There is also no statutory duty or mechanism, and no identified data source in the original enactments, for Defendants to narrowly and flexibly tailor the use of the statutory racial classification in response to actual marketplace conditions (including in their own procurement programs).

Congress had no valid statistical yardstick to compare to in the original enactment, and still doesn't. Nor do any of the current regulations supply such a mechanism. Because Congress did not "identify discrimination" for any of the races classified in the statute with strong statistical evidence that satisfies strict scrutiny, "it is almost impossible to assess whether [the statute] is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way." *Croson*, 488 U.S., at 507.

In other words, Congress still cannot quantify the alleged lingering effects of Defendants' alleged "passive participation" in discrimination; nor can Congress measure the remedial impact of applying section 8(a)'s racial classifications to Defendants' section 8(a) contracts; thus, there is no feedback mechanism to update to narrowly tailor the statute and Defendants' use of its programs over time.[18] This shows that Congress and Defendants do not care what that evidence is or whether the statutory racial classification is successfully remedying discrimination, which is the strongest possible evidence that it is "in fact motivated by . . . simple racial politics" and unconstitutional. *Croson*, 488 U.S. at 493.

Congress has never made such comparisons because it has never held hearings or made findings regarding section 8(a)'s racial classifications that were supported by strong statistical evidence. A racial classification cannot be flexible or limited in duration if its continued operation is divorced from any connection to relevant data.

Further, Congress made no finding that, if justified, the preferences in the statute and implementing regulations should be in the same equal proportion for every race or member of a racial group.

Section 8(a) takes this approach to its illogical extreme: no matter what the market or industry sector, no matter what the data in the market or industry sector, the *same* preferential treatment is extended to *all* of the presumed socially disadvantaged

---

[18]    Even if there were a functioning provision to tailor preference dispensation by industry and geographic market, which is denied, that would not excuse the gross speculation inherent in Defendants' unlawful position that Congress should be permitted to extrapolate from a few industries and markets to all industries and markets nationwide when it comes to demonstrating a compelling interest. Defendants' unconstitutional extrapolation leaves the source and existence of alleged discrimination undefined, which makes narrow tailoring impossible.

races when the racial classifications operate to set aside a solicitation or for any other purpose.

Defendants have never once presented, and are unable to provide here, a statement of the amount of preference each minority group was entitled to from Defendants, where, and in what industries. There is nothing but gross speculation in support of an arbitrary goal, which is always the result when Congress fails to identify discrimination in accord with strict scrutiny.

As in *Croson*, the statutory racial classification's numerical goal has no relationship to the local and state data, nor could it. *Croson*, 488 U.S. at 508 ("Under [this] scheme, a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race. We think it obvious that such a program is not narrowly tailored to remedy the effects of prior discrimination.").

On a record comprised of local and state data, Congress and Defendants can take credit for random reductions of disparity in the nation-at-large they had nothing to do with, while avoiding any accountability for a lack of measurable, remedial progress in Defendants' own procurement programs. That is a monumental fraud, surpassed only by allowing section 8(a)'s racial classification to remain in effect.

D. *Because the Alleged Causal Relationships Are Not Supported by a Strong Basis in Evidence, Section 8(a)'s Racial Classification is Unconstitutional Racial Balancing, for Which There is No Compelling Interest*

The lack of strong evidentiary support for Defendants' alleged causal relationships precludes any inference of discrimination, leaving only alleged scattered disparities as the only evidence.[19]

A failure by Defendants to racially counterbalance numeric disparities in the award of local and state prime contracts—or to require its prime contract awardees to racially counterbalance numeric disparities in the award of local and state subcontracts—is not "passive participation" amounting to a constitutional violation. *Parents Involved*, 551 U.S. at 721 ("the Constitution is not violated by racial imbalance . . . without more"). A remedy to counterbalance mere disparities is not derived from identification of discrimination, and lacks the necessary evidence of constitutional violation to support a racial classification. *Id.*

Nonetheless, Defendants assert that section 8(a)'s racial classification is justified in its entirety to racially counterbalance statistically significant disparities in the award of *some* prime- and sub-contracts in the nationwide marketplace. *Cf. Croson*, 488 U.S. at 507 (the "assumption that minorities will choose a particular trade in lockstep proportion to their representation in the . . . population" is "completely unrealistic").

According to Defendants, the Executive can disburse funds through a racial preference in a procurement program nationwide so long as Congress identifies any statistically significant disparity in local or state contracting that could purportedly be

---

[19]     The anecdotal statements in the disparity studies were not given under oath and have not been subjected to cross-examination or critical analysis in a judicial forum, which is necessary, considering the paucity of other evidence here. Moreover, in many cases it is the study author, rather than the speaker, that alleges or infers discrimination.

countered by passing out federal money via race-based methods.  Defendants will assert this interest in racial balancing until statistical balance results in the award of prime- and sub-contracts nationwide, rendering section 8(a)'s racial classification permanent so long as there is some evidence of disparity somewhere.

This is nothing more than the federal government balancing, dollar for dollar, what it erroneously perceives (due to flawed data) as the market. Such racial balancing has been and always will be unconstitutional. *Parents Involved*, 551 U.S. at 730-731 ("racial balancing has no logical stopping point," and is "patently unconstitutional").

## IV. CONGRESS CANNOT DELEGATE ITS AUTHORITY TO ENACT RACIAL CLASSIFICATIONS TO THE EXECUTIVE BRANCH

### A.  *Section 8(a)'s Racial Classification Purports to Delegate the Authority to Enact Racial Classifications in Two Ways*

The 8(a) statute's definition of the term "socially disadvantaged," 15 U.S.C. § 637(a)(5), purports to authorize the Executive to classify members of groups by race "who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id*.

The 8(a) statute's presumption also purports to authorize the Executive to designate additional racial groups as socially disadvantaged. 15 U.S.C. § 631(f)(1). Currently, "Black Americans, Hispanic Americans, Native Americans . . . Asian Pacific Americans . . . and other minorities" designated by the Small Business Administration[20] are presumed socially disadvantaged. *Id*.[21]

---

[20]    In 1982, the Small Business Administration determined by regulation that "Asian Indian Americans," now known as "Subcontinent Asian Americans" are a presumptively socially disadvantaged group. 13 C.F.R. §124.103(b). ROTHE has been injured by this

*B. The Constitution Forbids Such Delegations and Renders them Inoperative*

> In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency. Article I, § 1, of the Constitution vests all legislative Powers herein granted . . . in a Congress of the United States. This text permits no delegation of those powers, and so we repeatedly have said that when Congress confers decisionmaking authority upon agencies Congress must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform. . . .Whether the statute delegates legislative power is a question for the courts.

*Whitman v. American Trucking Ass'n*, 531 U.S. 457, 472-473 (2001) (internal citations omitted).

The 8(a) statute's definition (15 U.S.C. § 637(a)(5)) and presumption (15 U.S.C. § 631(f)(1)) do not provide the requisite "intelligible principle." Rather, they provide no basis to even begin to define what constitutes a "racial," "ethnic," or "other minority" group—nor should our laws ever contain such a definition—much less determine how all of the members of such groups had "been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member." *See* 15 U.S.C. § 637(a)(5) (stating that definitional requirement). Given the volatile subject matter, the definition is utterly extravagant in its lack of standards. *See Adarand*, 515 U.S. at 223-224 ("distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality"); *Humphrey v. Baker*, 848 F. 2d 211, 217 (D.C. Cir. 1988) (noting that "only the most extravagant

---

designation and any other(s) SBA has made, which prevents ROTHE from bidding on an equal footing with members of the designated racial group(s).

[21]      "Indian tribes" and "Native Hawaiian Organizations" by law are not "racial" groups, and therefore are not part of section 8(a)'s racial classification. *Morton v. Mancari*, 417 U.S. 535 (1974). ROTHE does not challenge the "Indian tribes" and "Native Hawaiian Organizations" classifications.

delegations of authority, those providing no standards to constrain administrative discretion, have been condemned by the Supreme Court as unconstitutional.").

In *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935), the Supreme Court struck down a Congressional delegation allowing the President to prohibit interstate and foreign commerce of petroleum that had been produced in violation of state law. The Court found the delegation unconstitutional because it provided no limits to the President's discretion when deciding under what circumstances or conditions such commerce would be prohibited, nor did it require him to make any factual determinations or to outline the conditions that called for prohibition. *Id*. at 418.

The purported delegation to the SBA of the power to racially classify suffers from the same defects. It confers unlimited discretion to decide whether racial or ethnic prejudice or cultural bias has occurred with respect to a given group just as the delegation in *Panama Refining* conferred unlimited discretion on the President[22] to decide whether a state law had been violated. Nor does the delegation here require any factual findings.

Indeed, the bigger problem here is that the promulgation of a racial classification by the Executive pursuant to such an open-ended delegation can never satisfy the

---

[22]     The infamous Japanese-American internment orders of World War II were the product of an Executive Order 9066 purporting to exercise delegated authority pursuant to a facially neutral, generally applicable statute. Unlike section 8(a)'s racial classification, the statute relied upon by Executive Order 9066 did not actually contain or delegate any authority to make racial classifications. Yet the Supreme Court in *Adarand* suggested that even as an exercise of maximum Executive authority under Article II, the internment orders would be unconstitutional today. 515 U.S. at 275 (Ginsburg, J. dissenting) ("A *Korematsu* -type classification, as I read the opinions in this case, will never again survive scrutiny: Such a classification, history and precedent instruct, properly ranks as prohibited."). Because the naked exercise of Executive authority to classify by race would be unconstitutional today under Article II, it follows that there is no room for the express delegation of that same discretion in section 8(a)'s racial classification.

Constitutional requirements of strict scrutiny, which require that the evidence in support of the racial classification be placed before Congress at the time of enactment. *Shaw*, 517 U.S. at 908 n. 4 ("the *legislature* must have had a strong basis in evidence to support [the] justification before it implements the [racial] classification.") (emphasis added); *Rothe Development Corp. v. Department of Defense*, 262 F.3d 1306, 1327 (Fed. Cir. 2001) (*Rothe III*) ("The quantum of evidence that is ultimately necessary to uphold racial classifications must have actually been before the legislature"); *Rothe VII,* 545 F.3d at 1039 ("For evidence to be relevant in the strict scrutiny analysis, it must be proven to have been before Congress"); see also cases cited *supra*, Part III.B.1. (barring post-enactment evidence). Properly understood, Congress lacks the authority to delegate those powers at all.

The Supreme Court and Circuit Court precedent cited by ROTHE leaves no doubt that an open-ended delegation of authority to enact racial classifications is unconstitutional, precisely because there is no evidence before Congress at the time of the purported delegation that could support a racial classification for any group the Executive branch might subsequently determine is presumptively disadvantaged. *Rothe III*, 262 F.3d at 1326 ("Circuit courts have consistently held that, absent a showing that a legislature had some evidence of discrimination before it when it enacted a racial classification, the program would be unconstitutional"); *Id*. at 1327 ("[A] racial classification cannot withstand strict scrutiny based upon speculation about what 'may have motivated' the legislature.   To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification"); *Id*. at 1328 ("Requiring a "strong basis in evidence" before the

legislature enacts or reauthorizes a racial classification is essential for verifying that a program is truly "remedial" in design").

Abdication of legislative responsibility is not delegation. The Constitutional safeguards of strict scrutiny, inherent in a properly documented legislative process that squarely and expressly addresses the racial classifications being authorized, are subverted when a Court must guess what Congress meant by "other minorities" or "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities"—for whom, and for how long, and to what degree, etc. "The very choice of which portion of the power to exercise . . . would itself be an exercise of the forbidden legislative authority." *Whitman*, 531 U.S. at 473 (opinion of the Court); *see also id.* at 487 (Thomas, J. concurring) ("there are cases in which the principle is intelligible and yet the significance of the delegated decision is simply too great for the decision to be called anything other than 'legislative' ").

For the reasons stated above, the racial classification of section 8(a) is a facially unconstitutional delegation of Congressional power to the Executive. And for that reason, the presumption in 15 U.S.C. § 631(f)(1) that any "other minorities" designated by the Executive fall within the racial classification of section 8(a) is inoperative.

<center>V. CONCLUSION AND RELIEF REQUESTED</center>

If one accepts Defendants' illogic, that Congress has a compelling interest in counterbalancing local statistical disparities by sheer chance, then strict scrutiny will inevitably be evaded by a chain of breathtaking rational basis extrapolations and an assumed conclusion of discrimination matching the scope of those extrapolations. The extrapolations will leave the source and existence of alleged discrimination undefined,

which will make narrow tailoring impossible. The scope of the extrapolations will be whatever a given Executive agency or district judge feels is necessary to justify a reasonable, yet wholly speculative probability of remedial effect, which will inevitably be nationwide. The effect of the statute will be indeterminable, but though the data may shift for any number of reasons, the scope of the extrapolations will remain the same, rendering the statute perpetual, absent exact numeric proportionality.

If, on the other hand, we are serious about requiring "the most exact connection between justification and [racial] classification," *Adarand III*, 515 U.S. at 229, then Defendants' continued use of section 8(a)'s racial classification to deny ROTHE equal footing must end.

WHEREFORE, PREMISES CONSIDERED, Plaintiff ROTHE DEVELOPMENT, INC. requests that the Court GRANT Plaintiff's Motion for Summary Judgment and award Plaintiff such further relief as is equitable and just.

Respectfully submitted,

/s/ David F. Barton_____
David F. Barton
District Court Bar No. TX0096
Texas State Bar No. 01853300
GARDNER LAW
745 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Telephone:  (210) 733-8191
Telecopier:  (210) 733-5538
E-Mail:  dfb@tglf.com

ATTORNEY FOR
ROTHE DEVELOPMENT, INC.

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing and all attachments and exhibits (if any) was served in accordance with the Federal Rules of Civil Procedure, on this 15th day of May, 2014, to the following persons:

Andrew G. Braniff                                          *VIA E-FILING*
Patricia L. Stasco
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Ave. NW
PHB Room 4030
Washington, D.C. 20044-4403
-and-
Barbara A. Schwabauer                                     *VIA E-FILING*
United States Department of Justice
Civil Rights Division, Employment Litigation Section
601 D Street, NW
PHB Room 4017
Washington, D.C. 20579
*Attorneys for Defendants*

/s/ David F. Barton
David F. Barton

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ROTHE DEVELOPMENT, INC.,            )
  Plaintiff,                        )
                                    )
v.                                  ) Civil Action No. 12-CV-744-KBJ
                                    )
DEPARTMENT OF DEFENSE and            )
SMALL BUSINESS ADMINISTRATION        )
  Defendants.                       )
_____)

**EXHIBIT 1**
to ROTHE DEVELOPMENT, INC. Memorandum in Support
of Motion for Summary Judgment

Transcript of Deposition of John C. Sullivan (Nov. 4, 2013) at 90-94

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------X
ROTHE DEVELOPMENT, INC.,          :
                                  :
          Plaintiff               :   Civil Action No:
                                  :   12-CV-744
          -vs-                    :
                                  :   Pages 1 - 112
DEPARTMENT OF DEFENSE and         :
SMALL BUSINESS                    :
ADMINISTRATION,                   :
                                  :
          Defendant               :
------------------------------X


          Deposition of John C. Sullivan

               Washington, D.C.

          Monday, November 4, 2013


Reported by:  Kathleen M. Vaglica, RMR

Job No:  132788



Page 2

```
 1
 2
 3
 4
 5
 6
 7                    Monday, November 4, 2013
 8                    (10:07 a.m.)
 9
10     Deposition of John C. Sullivan, held at the offices
11     of:
12
13         The Center for Individual Rights
14         1233 20th Street, N.W.
15         Suite 300
16         Washington, D.C.  20036
17
18
19     Pursuant to notice, before Kathleen M. Vaglica, RMR,
20     a Notary Public in and for the District of Columbia.
21
22
```

Page 4

```
 1                    CONTENTS
 2
 3     EXAMINATION OF JOHN C. SULLIVAN          PAGE
 4     BY MR. BRANIFF                    5, 109
 5     BY MR. BARTON                     102
 6
 7                  E X H I B I T S
 8     NUMBER                         PAGE
 9
10     1      Expert Report                 7
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3
 4     COUNSEL FOR PLAINTIFF
 5        DAVID F. BARTON, ESQUIRE
 6        Gardner Law
 7        745 E. Mulberry Avenue
 8        Suite 500
 9        San Antonio, TX  78212-3154
10        (210) 733-8191
11
12     COUNSEL FOR DEFENDANTS
13        ANDREW G. BRANIFF, ESQUIRE
14        Department of Justice
15        Civil Division, Classification Unit
16        1100 L Street, N.W.
17        Washington, D.C.  20530
18        (202) 616-0219
19
20     ALSO PRESENT
21        DAVID FISHMAN, ESQUIRE, SBA
22
```

Page 5

```
 1              P R O C E E D I N G S
 2        Thereupon,
 3              John C. Sullivan,
 4     a witness, called for examination by counsel for the
 5     Defendants and, after having been sworn by the
 6     notary, was examined and testified as follows:
 7          EXAMINATION BY COUNSEL FOR THE DEFENDANTS
 8     BY MR. BRANIFF:
 9        Q.  For the record, this is the deposition of
10     John Sullivan in the case of Rothe v Department of
11     Defense, et al.  It's in the District Court for the
12     District of Columbia.  This deposition is being
13     taken pursuant to the Federal Rules of Civil
14     Procedure.  Objections except as to form and
15     privilege are reserved.  And, Counsel, at this time,
16     do you want to reserve your signature to review the
17     deposition after it's taken?
18          MR. BARTON:  Sure.
19     BY MR. BRANIFF:
20        Q.  Now, Mr. Sullivan, could you state your
21     whole name for the record?
22        A.  Sure.  My name is John Charles Sullivan.
```



Page 90

11    Q.  Okay.  Let us design a study.  If you were
12  going to start from the beginning, what would be the
13  first step you would take to design a disparity
14  study?
15    A.  The heart of any well done disparity study
16  is availability.  So, I would start and focus my
17  efforts on that, which firms are qualified, willing
18  and able for the public contracting that this
19  unnamed jurisdiction is going to need.
20    Q.  And let's look at each one of those
21  individually.  How would you determine qualified?
22    A.  Qualifications are those qualifications

Page 91

1  insisted on by the government.  For example, if
2  you're going to hire a plumber to work in a public
3  school, he needs a plumbing license.  Even if you
4  have an interest in plumbing, if you don't have that
5  license, you're not qualified.
6    Q.  How would you define willing?
7    A.  Willing is showing an interest in public
8  contracting, and that's typically accomplished by
9  registering with the government in some capacity.
10    Q.  And how would you show able?
11    A.  Able is your capability of doing a
12  contract.  Do you have the necessary equipment?
13  Does the contract ask for a certain number of years
14  of experience?  Does the contract insist on a
15  certain level of prequalification, that sort of
16  thing.
17    Q.  Earlier you said one method that you could
18  approximate this availability would be to use a
19  bidders' list?
20    A.  Yes.  When I say bidders' list, I want to
21  be specific because that term is often misused.
22  When I say bidders' list, I mean firms that have

Page 92

1  actually bid.
2    Q.  Are there any disparity studies that are
3  used in the Wainwright report that only use the
4  firms that have actually bid to define their
5  availability?
6    A.  No.
7    Q.  So, based on that, you would say all of
8  the studies there were deficient?
9    A.  Now, some do use bidding, but that's just
10  one of the sources.  Unfortunately, they go outside
11  and take in all this other stuff that I wouldn't
12  necessarily consider meeting the standard of
13  qualified, willing and able, but, based on that one
14  issue, yes, they are all deficient.
15    Q.  How would you then go about defining
16  utilization?
17    A.  Utilization is both the easiest and the
18  hardest part of any disparity study.  It's easiest
19  in the sense it's simply the dollars that are
20  awarded.  Conceptually, it's the easiest.  Reality
21  is every company will tell you that they pour most
22  of their time into getting utilization data because

Page 93

1  the records are never as good as they should be.
2    Q.  And would you do anything with that
3  utilization number?  How would you manipulate it?
4    A.  I don't believe it needs to be
5  manipulated.  It is a number.  It's an X.  This is
6  the amount of dollars which have been awarded.  Now,
7  it would then need to be assigned, the share of that
8  would need to be assigned to the various groups.
9    Q.  And would you apply any adjustments to the
10  utilization number?
11    A.  Not unless it seemed that they were
12  necessary.  Sometimes there's a difference between
13  the dollars as they are awarded and the dollars as
14  they are ultimately spent.  Sometimes subcontractors
15  don't get the dollars that the records would lead
16  you to believe they do.  So, if that's a problem in
17  your jurisdiction, you need to get the actual
18  awards.
19    Q.  And then you would use that availability
20  number and the utilization number to create a
21  disparity index?
22    A.  Yes, a disparity ratio, sure.

Page 94

```
 1        Q.  And how would you do that?
 2        A.  It is availability divided by utilization.
 3  So, what that means is you need to have percentages.
 4  With a particular group, let's use Hispanics to make
 5  the issue, what was their availability?  What share
 6  of the availability did they have over their share
 7  of the utilization?  And that will give you a
 8  fraction.
 9        Q.  If this methodology was followed and the
10  disparity index were below 80, could you draw any
11  conclusions from that?
12        A.  If it were followed properly and the
13  disparity index were below 80 and there was a
14  sufficient size, there were enough contracts in our
15  unnamed jurisdiction, I think you could draw a
16  conclusion from that surely.
17        Q.  What conclusion would you draw?
18        A.  Again, if it was done properly, you would
19  look and see that a particular group was not getting
20  what you would expect them to get.  Your next step
21  then becomes asking the question why.
22
```

Page 95

```
 1
```



**MAGNA**
LEGAL SERVICES

1    ACKNOWLEDGMENT OF DEPONENT

2        I, *JOHN SULLIVAN*

3    hereby certify that I have read the
     foregoing pages, 1 - PGS, and that the

4    same is a correct transcription of the
     answers given by me to the questions

5    therein propounded, except for the
     corrections or changes in form or

6    substance, if any, noted in the attached
     Errata Sheet.

7

8    *John Sullivan*    *NOV. 27, 2013*
     WITNESS NAME          DATE

9

10
     Subscribed and sworn

11   to before me this
     _____ day of ____ ___ _____, 20 ___.

12
     My commission expires:___ ___ _____

13

14   _____
     Notary Public

15

16

17

18

19

20

21

22

**MAGNA**
LEGAL SERVICES

```
1        - - - - - -
             E R R A T A
2        - - - - - -

3
```

| 4 PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|--------|------|-------------|-----------|--------|
| 5  41 | 4 | 1.23 | 1.32 | The amount is wrong. It should be $1.32 million |
| 6 | | | | |
| 7  60 | 2 | Gouth, G-O-U-T-H | Gough, G-O-U-G-H | The last name of the lawyer is misspelled |
| 8 | | | | |
| 9  66 | 12 | Brown | Browne | Spelling of name |
| 10 | | | | |
| 11  83 | 20 | goal standard | gold standard | Word change |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
ROTHE DEVELOPMENT, INC.,                 )
                                                        )
            Plaintiff,                              )
                                                        )
v.                                                      )     Civil Action No. 1:12-cv-00744-KBJ
                                                        )
DEPARTMENT OF DEFENSE                    )
                                                        )
and                                                    )
                                                        )
SMALL BUSINESS ADMINISTRATION,      )
                                                        )
            Defendants.                           )
_____)

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h), Defendants Small Business

Administration ("SBA") and Department of Defense ("DOD"), by their undersigned

attorneys, hereby move for summary judgment in their favor in the above-captioned

case on the grounds that there is no genuine issue of material fact.  Defendants also

respond to the Plaintiff's Motion for Summary Judgment (Dkt. No. 55).  Plaintiff has not

demonstrated that SBA's minority business development program ("8(a) Program") is

facially unconstitutional under the Fifth Amendment or under the constitutional

nondelegation doctrine.  As set forth in detail in Defendants' memorandum of points

and authorities in support of its motion and response, Defendants are entitled to

judgment as a matter of law.

Date:  June 16, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
Senior Trial Attorney
BARBARA SCHWABAUER
Trial Attorney
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

USCA Case #15-5176      Document #1577653      Filed: 10/13/2015      Page 574 of 814

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants' Cross Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment was served upon the following attorney of record for Plaintiff via the Court's Electronic Case Filing (ECF) system on June 16, 2014:

> David F. Barton
> Gardner Law
> 745 East Mulberry Avenue
> Suite 500
> San Antonio, Texas  78212

> /s/Andrew G. Braniff
> Andrew G. Braniff
> Senior Trial Attorney
> U.S. Department of Justice
> Civil Rights Division, Employment Litigation Section
> 950 Pennsylvania Avenue, NW
> Patrick Henry Building, Room 4030
> Washington, D.C.  20530
> Telephone:  202.514.9229
> Facsimile:  202.514.1005
> Andrew.Braniff@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                   )

ROTHE DEVELOPMENT, INC.,       )
                                   )

          Plaintiff,         )
                                   )

v.                              )    Civil Action No. 1:12-cv-00744-KBJ
                                   )

DEPARTMENT OF DEFENSE      )
                                   )

and                            )
                                 )

SMALL BUSINESS ADMINISTRATION, )
                                 )

         Defendants.     )
_____)

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.     Summary of the Operation of the Section 8(a) Business Development
       Program.................................................................................................3

       A.     Eligibility Requirements for the 8(a) Program ................................5

              1.     Social Disadvantage ...............................................................5

              2.     Economic Disadvantage ........................................................7

              3.     Good Character .......................................................................8

              4.     Potential For Success .............................................................9

       B.     Participation in the 8(a) Program ....................................................9

              1.     8(a) Contract Assistance........................................................9

              2.     Limits on Contract Assistance .............................................11

              3.     Monitoring Program Participants ........................................ 12

              4.     Ending Participation in the 8(a) Program............................ 13

              5.     8(a) Program Reporting Mechanisms.................................. 14

II.    Legal Standard ........................................................................................ 14

       A.  Rothe Must Meet the High Standard of a Federal Challenge............... 16

       B.     Rothe's Expert Reports do not Raise Genuine Issues of Material
              Fact.................................................................................................. 17

       C.  Deference is Owed to Congress's Fact Finding. ..................................... 19

       D.     The Court May Consider Post-Enactment Evidence in Determining
              Both the Strong Basis in Evidence and the Narrow Tailoring of
              the 8(a) Program............................................................................. 19

       E.     Rothe's Challenge is Limited to the Presumption of Social
              Disadvantage and Prime Contracting................................................22

i

III.    The 8(a) Program is Facially Constitutional ................................ 24

    A.    Remedying Race Discrimination is a Well-Recognized Compelling
          Interest for Congressional Action. .................................................... 24

    B.  Race-Conscious Action Was and Remains Necessary ......................... 25

          1.    Congress had a Strong Basis in Evidence When It Created
                the 8(a) Program .................................................................. 25

                a.    Congress had a strong basis in evidence prior to the
                      1978 Enactment of the 8(a) Program. ....................... 25

                b.    Congressional evidence leading up to the amendment
                      of the 8(a) Program in 1988 showed the continued
                      need for the 8(a) Program.  ...................................... 33

          2.    Current Congressional Evidence Provides a Strong Basis in
                Evidence For a Race-Conscious Remedy in Federal
                Procurement ........................................................................ 38

                a.    Congressional evidence shows that minorities from
                      businesses at disproportionately low rates and their
                      business earn less than similar businesses owned by
                      whites ....................................................................... 39

                b.    Congressional evidence shows that minorities are
                      limited in their ability to start and grow businesses
                      because they disproportionately lack access to
                      capital. ..................................................................... 41

                c.    Congressional evidence includes numerous studies
                      showing disparities between the availability and
                      utilization of minority-owned businesses in public
                      contracting. .............................................................. 45

                d.    Congressional evidence includes anecdotal accounts
                      detailing the discriminatory barriers faced by
                      minority business owners .......................................... 47

          3.    Federal Defendants' Expert Reports Show the Continuing
                Need For the 8(a) Program ................................................... 51

                a.    Dr. Wainwright's review of over 100 disparity studies
                      show the continuing need for the 8(a) Program ....... 51

A000570

b.      Plaintiff and *amici* have not raised an issue of
        material facts with respect to Dr. Wainwright's
        conclusions. ................................................................ 59

c.      Dr. Rubinovitz's report shows consistent, statistically
        significant underutilization of minority-owned
        businesses in federal prime contracting  ................. 64

C.  The 8(a) Program is Narrowly Tailored.  ............................................... 68

    1.  Congress Considered the Efficacy of
        Race-Neutral Alternatives.  ..................................................... 69

    2.  The 8(a) Program's Goal Is Flexible............................................ 71

    3.  The Requirements for Participation in the 8(a) Program
        Ensure That It Is Neither Over- nor Under-Inclusive.......... 72

    4.  The Program Is Designed to Limit Its Impact on Third
        Parties .................................................................................. 73

    5.  The 8(a) Program Has Appropriate Time Limits ..................... 77

IV.   The 8(a) Program Does Not Violate the Nondelegation Doctorine. .......... 78

V.    Conclusion.................................................................................................. 82

iii

# TABLE OF AUTHORITIES

**Cases:**

*Adarand Constructors, Inc. v. Peña,* 515 U.S. 200 (1995) ...................................... passim

*Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147 (10th Cir. 2000) ...................... 19, 71

*AGC v. Caltrans,* No. 09-01622 (E.D. Cal.) ................................................................ 52, 62

*Air Transport Ass'n of America, Inc. v. U.S. Dep't of Transp.,* 613 F.3d 206 (D.C. Cir. 2011) ........................................................................................................... 17

*Bilbo Freight Lines, Inc. v. Don Morales,* No. H-93-3808 (S.D. Tex.) ............................ 52

*Cellco Partnership v. FCC,* 700 F.3d 534 (D.C. Cir. 2012) ............................................. 16

*CFPB and United States v. Nat'l City Bank,* 2:13-cv-01817-CB (W.D.Pa 2013) .............. 43

*City of Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989) ............................................. 24

*Concrete Works of Colo., Inc. v. Denver,* 36 F.3d 1513 (10th Cir. 1994) ............... passim

*Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia,* 6 F.3d 990 (3d Cir. 1993) ............. 20, 21

*Coral Constr. Co. v. King County,* 941 F.2d 910 (9th Cir. 1991) ................................. 20, 21

*Daniel Webster v. Fulton Cnty.,* No. 1:96-CV-2399 (N.D. Ga.) ...................................... 52

*DynaLantic v. Dep't of Defense,* 885 F. Supp. 2d 237 (D.D.C. 2012) .................... passim

*Engineering Contractors Ass'n of S. Fla. v. Metro. Dade County,* 122 F.3d 895 (11th Cir. 1997) ....................................................................................................... 19,21, 52

*Fisher v. University of Texas at Austin,* 133 S.Ct. 2411 (2013) ........................... 15, 17, 69

*Fullilove v. Klutznick,* 448 U.S. 448 (1980) ..................................................................... 38

*Geyer Signal, Inc. v. Minn Dep't of Transp.,* (D. Minn. Mar. 31, 2014) ........................... 17

*Gorden v. Holder,* 721 F.3d 638 (D.C. Cir. 2013) ........................................................... 16

*Greene v. Dalton,* 164 F.3d 671 (D.C. Cir. 1999) ........................................................... 19

*Grutter v. Bollinger,* 539 U.S. 306 (2003) ....................................................................... 69

iv

*H.B. Rowe v. Tippett,* 615 F.3d 233 (4th Cir. 2010) ...............................................17, 53, 62

*Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, et al.,* 981 F.2d 50
  (2d Cir. 1992) ...........................................................................................................20, 22

*Humphrey v. Baker,* 848 F.2d 211 (D.C. Cir. 1988) ........................................................ 81

*Kevcon v. U.S.,* No. 09-625C (Fed. Cl.) ........................................................................... 52

*Michigan Gambling Opposition v. Kempthorne,* 525 F.3d 23 (D.C. Cir. 2009) ............ 80

*Midwest Fence Corp. v. Dep't. of Transp., et al.,* 2014 WL 322059
  (N.D. Ill., January 28 2014) ......................................................................................... 52

*Mistretta v. United States,* 488 U.S. 361, 373 (1989) ..................................................... 82

*Monell v. Dep't of Soc Servs.,* 436 U.S. 658 (1978) ........................................................ 33

*N. Contracting v. Illinois,* 473 F.3d 715 (7th Cir. 2007)................................................ passim

*Seven-Sky v. Holder,* 661 F.3d 1 (D.C. Cir. 2011) ...........................................................17

*Shaw v. Hunt,* 517 U.S. 899 (1996)..................................................................................20

*Shelby County, Ala. v. Holder,* 679 F.3d 848 (D.C. Cir. 2012) .......................................17

*Sherbrooke Turf v. Minn. Dep't of Transp.,* 345 F.3d 964 (8th Cir. 2003)........... passim

*Sherely v. Sebelius,* 644 F.3d 388 (D.C. Cir. 2011).........................................................17

*Turner Broad. Sys., Inc. v. FCC,* 520 U.S. 180 (1997) .................................................. 19

*United States v. Bank Of Am.,* No. 3:12-CV-605, (W.D.N.C. 2013).................................42

*United States v. Chevy Chase Bank,* No. 1:13 CV 1214 (E.D. Va 2013)...........................42

*United States v. Comty State Bank,* No. 2:13-CV-10142 -TLL-CEB(E.D. Mich 2013)....42

*United States v. Countrywide Fin. Corp.,* No. CV11-10540 (C.D. Cal. 2011) .................42

*United States v. GFI Mortg. Bankers, Inc.,* No. 12 CV 2502 (S.D.N.Y. 2012)................42

*United States v. Luther Burbank Sav.,* No. CV 12-7809 (C.D. Cal 2012).......................42

*United States v. Paradise,* 480 U.S. 149 (1987) ............................................................69

v

*United States v. Plaza Home Mortg.,* No. 3:13-CV-02327-H-RBB (S.D. Cal. 2013).......43

*United States v. Salerno,* 481 U.S. 739 (1987)....................................................16

*United States v. Southport Bank,* No. 2:13-CV-01086 (E.D. Wis. 2013)........................43

*United States v. SunTrust Mortg., Inc.,* No. 3:12-CV-397 (E.D. Va. 2012) ....................43

*United States v. Virginia,* 518 U.S. 515 (1996) ................................................17

*United States v. Wells Fargo Bank,* No. 1:12-cv-01150(D.D.C. 2012) ...........................43

*W. States Paving Co. v. Wash. State Dep't of Transp.,* 407 F.3d 983
   (9th Cir. 2005)............................................................................17

*Whitman v. Am Trucking Ass'n,* 531 U.S. 457 (2001)........................................79

*Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267 (1986).................................15, 22

**Statutes:**

15 U.S.C. § 631 ......................................................................... passim

15 U.S.C. § 636.......................................................................... passim

15 U.S.C. § 637.......................................................................... passim

15 U.S.C. § 644............................................................................. 6

**Rules:**

Fed. R. Civ. P. 56(a).......................................................................14

**Regulations:**

13 C.F.R. § 124.1...........................................................................4

13 C.F.R. § 124.101.........................................................................5

13 C.F.R § 124.103 .............................................................5-7, 23, 72-73, 81

13 C.F.R. § 124.104 ...............................................................8, 72-73

**A000574**

13 C.F.R. § 124.105 ..................................................................................... 5

13 C.F.R. § 124.107 ..................................................................................... 9

13 C.F.R. § 124.108 ..........................................................................9, 13, 77

13 C.F.R. §§ 124.112 ............................................................... 4, 13, 77-78

13 C.F.R. § 124.2 ..................................................................... 4, 9 , 13, 77

13 C.F.R. § 124.301 ................................................................................ 4,13

13 C.F.R. § 124.302 .......................................................................... 14, 78

13 C.F.R. § 124.303 ................................................................................ 14

13 C.F.R. § 124.402 .......................................................................... 4, 12

13 C.F.R. § 124.403 ................................................................................. 4

13 C.F.R. § 124.404 ................................................................................. 9

13 C.F.R. § 124.501 .............................................................................. 10

13 C.F.R. § 124.504 ......................................................................... 12, 73

13 C.F.R. § 124.506 .............................................................................. 10

13 C.F.R. § 124.509 .................................................................. 4, 11-13, 77

13 C.F.R. § 124.517 .............................................................................. 13

13 C.F.R. § 124.519 .............................................................................. 11

## Legislative Materials:

S. Rep. No. 95-1070 (1978) ...............................................26-27, 30-33

S. Rep. No. 100-394 (1988) ............................................................38

H.R. Rep. No. 92-1615 (1972) .......................................................27

H.R. Rep. No. 92-1626 (1972) .......................................................28

H.R. Rep. No. 94-468 (1975) ........................................................28

A000575

H.R. Rep. No. 94-840 (1976) ....................................................................30-31

H.R. Rep. No. 94-1791 (1977) ....................................................................... 31

H.R. Rep. No. 95-949 (1978) ......................................................................... 26

H.R. Rep. No. 95-1714 (1978) ..................................................................31-33

H.R. Rep. No. 96-998 (1980) ......................................................................... 34

H.R. Rep. No. 97-956 (1982) ...................................................................26, 35

H.R. Rep. No. 98-1086 (1984) ....................................................................... 35

H.R. Rep. No. 99-332 (1985) ......................................................................... 36

H.R. Rep. No. 100-460 (1987) ................................................................... 36-48

118 Cong. Rec. 21810 (1972) ........................................................................ 28

124 Cong. Rec. 34097 (1978) ........................................................................ 33

124 Cong. Rec. 35408 (1978) ........................................................................ 33

159 Cong. Rec. S4981-82 (daily ed. June 2013).................................... 38-39, 45

**Congressional Hearings:**

*Small Business Administration's 8(a) Subcontracting Program--Minority Enterprise:*
   Hearing Before the Subcommittee on Government Procurement of the Select
   Commission on Small Business, 92d Congress (1971).............................................26, 28

*Small Business Legislation-1975:* Hearing Before the Subcommittee on
   Small Business of the S. Commission on Banking, Housing, and Urban Affairs,
   94th Congress (1975) ..................................................................................... 27, 29

*Investigation into the 8(a) Program of the Small Business Administration:*
   Hearings Before the Subcommittee on Federal Spending Practices and Open
   Government of the S. Committee on Government Affairs,
   95 Congress (1979) ...........................................................................................30

*Small and Minority Business in the Decade of the 1980s (Part I):* Hearings
   Before the H. Committee on Small Business, 97th Congress (1981) .............................34

*Small and Disadvantaged Business Participation in Military Construction Programs:*

Hearing Before the Military Installations and Facilities Subcommittee of the
H. Committee on Armed Services 99th Congress (1986) ................................................ 35

*Minority Business Development Program Reform Act of 1987:*
Hearings Before the S. Committee on Small Business,
100th Congress (1988) ................................................................................................... 36-37

*The Minority Business Development Agency:  Enhancing the Prospects for Success:*
Hearing Before the Subcommittee on Commerce, Trade, and Consumer Protection
of the H. Commission on Energy and Commerce, 111 Congress (2009) ........... 39-40, 45

*How Information Policy Affects the Competitive Viability of Small and Disadvantaged
Business in Federal Contracting:*  Hearing Before the Subcommittee on Info Policy,
Census, and National of the H. Committee on Oversight and Government Reform,
110 Congress (2008) ....................................................................... 40-41, 46-48, 50-51

*Minority Entrepreneurship:  Assessing the Effectiveness of SBA's Programs for the
Minority Business Community:*  Hearing Before the S. Committee on Small Business
and Entrepreneurship, 110 Cong. (2007) .................................................... 40-41, 48-49

*Assessing Access:  Obstacles and Opportunities for Minority Small Business Owners
in Today's Capital Markets:*  Hearing before S. Committee on Small Business
Entrepreneurship, 111th Congress (2012) ................................................................. 41-44

*Closing the Gap:  Exploring Minority Access to Capital and Contracting
Opportunities:*  Hearing Before the S. Committee on Small Business and
Entrepreneurship, 11th Congress (2011) ................................................................. 42, 44

*The DOT's Disadvantaged Business Enterprise Program:*  Hearing Before the H.
Committee on Transportation and Infrastructure, 111th Congress (2009) ............. 45-50

*Access to Federal Contracts:  How to Level the Playing Field:*  Hearing Before the S.
Committee on Small Business and Entrepreneurship, 110th Congress (2007) ............. 47

*Field Hearing in Queens, New York:  Underserved Small Business Community:
Providing Access to Federal Programs:*  Hearing Before the Subcommittee on
Contracting and Workforce of the H. Committee on Small Business,
113 Congress (2014) .................................................................................................... 49-50

**Miscellaneous:**

Partnership Agreement Between the U.S. Small Business Administration and the U.S.
Department of Defense (Sept. 27, 2012), available at
http://www.acq.osd.mil/osbp/docs/DOD-sba-8a-partnership-agreement-20121031.pdf.
.......................................................................................................................................... 10

ix

**A000577**

SBA Office of Bus. Dev., 8(a) Program 2010 Annual Report to Congress, at 17 (2010),
*available at*
http://www.sba.gov/sites/default/files/Final_FY_2010_408_Report_4-29-11.pdf. ........7

SBA Office of Bus. Dev., 8(a) Program 2012 Annual Report to Congress at 18 (2012),
*available at*
http://www.sba.gov/sites/default/files/files/FY12_408_report.pdf. .............................7

Small Business Goaling Report Fiscal Year 2012 (Mar. 19, 2013), *available at*
https://www.fpds.gov/downloads/top_requests/FPDSNG_SB_Goaling_FY_2012.pdf.5

x

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
ROTHE DEVELOPMENT, INC.,                            )
                                                    )
                    Plaintiff,                      )
                                                    )
v.                                                  )        Civil Action No. 1:12-cv-00744-KBJ
                                                    )
DEPARTMENT OF DEFENSE                               )
                                                    )
and                                                 )
                                                    )
SMALL BUSINESS ADMINISTRATION,                      )
                                                    )
                    Defendants.                     )
_____)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants the Small Business Administration ("SBA") and Department of

Defense ("DOD") (collectively as "Federal Defendants" or "Defendants") move this

Court for summary judgment on Plaintiff Rothe Development Corporation's ("Plaintiff"

or "Rothe") claim that SBA's minority business development program ("the 8(a)

program") is facially unconstitutional under the Fifth Amendment and violates the

nondelegation doctrine.  The 8(a) program assists businesses owned by socially and

economically disadvantaged individuals—who are usually, but not always, racial and

ethnic minorities.  The 8(a) program is a modest program that accounts for less than 4%

of all federal prime contracting dollars.  While small in relative dollar amount, the

support and access to contracts that the 8(a) program provides is critical to its

participants and helps ensure that federal dollars are not spent in a manner that

1

supports discrimination or its lingering effects.  The 8(a) program is facially

constitutional and does not violate the nondelegation doctrine; thus Federal Defendants

should be granted summary judgment.

Plaintiff Rothe is a woman-owned small business that operates in the computer

services industry.  Dkt. No. 1-1 at 2-3.  Rothe is also a certified HUBZone business[1] and

is one of several related businesses owned by the same individuals.  Dkt. No. 1-1 at

Appendix 1.  Plaintiff's various businesses have been awarded in excess of $25 million in

Federal Government contracts since 2008.  App. J, Declaration of Janice Lisa Romney

at Table 1. Included in this number are $7 million in HUBZone set-aside contracts.  *Id.*

Rothe's facial challenge is identical to that brought and rejected in *DynaLantic v.*

*Dep't of Defense,* 885 F. Supp. 2d 237 (D.D.C. 2012), and fails for the same reasons.  In

that case, Judge Sullivan found that the Defendants stated a compelling government

interest in "breaking down barriers to minority business development created by

discrimination and its lingering effects," including exclusion from government

contracting, and that the government may seek to "remediate either public

discrimination or private discrimination in which the government has been a passive

participant." *Id.* at 252, 270 (quotations and citations omitted).  The court further

concluded that the government demonstrated a "strong basis in evidence to support its

conclusion that remedial action was necessary to remedy that discrimination."  *Id.* at

279.  In particular, the government presented significant and extensive evidence

---

[1] To qualify as a HUBZone business, a business must be (1) small; (2) 51% owned and
controlled by U.S. citizens; (3) have its principal office in a "Historically Underutilized Business
Zone"; and (4) at least 35% of its employees must reside in a HUBZone.  As a women-owned and
HUBZone business, Rothe is entitled to participate in SBA programs that set-aside contracts for
women-owned businesses and for businesses that operate in HUBZones.  Rothe has not
challenged the contract set-aside programs for either of these groups.

demonstrating discriminatory barriers to minority business formation; discriminatory barriers to minority business development; and that, "even when minority businesses are qualified and eligible to perform contracts in both the public and private sectors, they are awarded these contracts far less often than their similarly-situated non-minority counterparts." *Id.*

The court concluded that the 8(a) program was narrowly tailored to meet the government's interest. *Id.* at 291. The court found that Congress adopted the 8(a) program "only after long experience showed that race-neutral alternatives were inadequate to combat the effects of racial discrimination against minority-owned businesses." *Id.* at 285. The court determined that the 8(a) program contained features that made it flexible in granting race-conscious relief and was of limited duration. *Id.* at 285-288. Finally, the court decided that the 8(a) program was particularly designed to minimize the burden on non-minority firms. *Id.* at 290. The 8(a) program challenged by Rothe is identical in all relevant aspects to that challenged in *DynaLantic*. Rothe has offered no new law or facts that lend themselves to a different result; thus summary judgment should be granted to the Federal Defendants.

## I.     Summary of the Operation of the Section 8(a) Business Development Program

The Small Business Act creates the aspirational goal of the Federal Government spending at least 5% of its prime and subcontracting dollars with businesses owned by socially and economically disadvantaged individuals. 15 U.S.C. § 644(g)(1)(iv). Prime contracting through the 8(a) program is one of the methods that the Federal Government uses to try to meet this goal. Importantly, the 5% goal is not a mandate;

there is no consequence for the government failing to meet the goal and no reward for exceeding it.  App. A, Declaration of Calvin Jenkins at 2.

The 8(a) program assists small businesses owned and controlled by socially and economically disadvantaged individuals so that they may compete on an equal basis in the American economy. 15 U.S.C. § 631(f)(2); 13 C.F.R. § 124.1.[2]  Through the 8(a) program, the SBA provides contract, financial, technical, and management assistance to help eligible small businesses gain a foothold in federal government contracting and become more competitive in the marketplace.  *See* 15 U.S.C. § 631(f)(2); 13 C.F.R. §§ 124.1, 124.404.  The SBA monitors and evaluates 8(a) program participants regularly to ensure they are maintaining their eligibility and progressing in the program.  *See, e.g.,* 13 C.F.R. §§ 124.112, 124.402, 124.403, 124.509.  A business may only stay in the 8(a) program for a maximum of nine years; the business must leave earlier if it substantially achieves the objectives set forth in its business plan or if it fails to maintain its eligibility for the program.  13 C.F.R. §§ 124.2, 124.301-303.  According to the Federal Procurement Data System, only 4% of the $404 billion that the United States spent in small business eligible procurement actions was spent through the 8(a) program in Fiscal Year 2012.[3]  Small Business Goaling Report Fiscal Year 2012 (Mar. 19, 2013),

---

[2]  The regulations for the 8(a) program were revised in February 2011.  76 Fed. Reg. 8222-64 (Feb. 11, 2011).

[3]  In comparison, the United States spent $19 billion (5%) in small business eligible procurement actions with Veteran-Owned Small Businesses, $17 billion (4%) with Woman-Owned Small Businesses, and $8 billion (2%) with Certified HUBZone small businesses in Fiscal Year 2012.

4

*available at*

https://www.fpds.gov/downloads/top_requests/FPDSNG_SB_Goaling_FY_2012.pdf.[4]

### A.  Eligibility Requirements for the 8(a) Program

Eligibility for the 8(a) program is limited to small businesses[5] that are at least 51% unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of the United States, and which demonstrate a potential for success in competing in the private sector.  13 C.F.R. §§ 124.101, 124.105; *see* 15 U.S.C. § 637(a)(4), (7)(A).

#### 1.  Social Disadvantage

Under the 8(a) program, socially disadvantaged individuals are "those who have been subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups . . . without regard to their individual qualities" and due to "circumstances beyond their control." 13 C.F.R. § 124.103(a); *see* 15 U.S.C. § 637(a)(5).  Members of certain designated groups, including Black Americans, Hispanic Americans, Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians), Asian Pacific Americans, and Subcontinent Asian Americans, are entitled to a rebuttable presumption of social disadvantage under the 8(a) program.[6]  13 C.F.R. §

---

[4]  All online documents in PDF format and Congressional evidence cited herein are included as a courtesy for the Court and opposing counsel in PDF format on a disc filed with the Court as Appendix B.  A duplicate version of this brief with hyperlinks to these documents and Congressional evidence is also included on Appendix B so that the Court and opposing counsel may have easier access to this public information.

[5]  "Small business" is defined in accordance with SBA regulations set forth in SBA's Small Business Size Regulations, 13 C.F.R. pt. 121; 13 C.F.R. § 124.102.

[6]  Asian Pacific Americans include Persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan,

5

124.103(b)(1).  However, this presumption of social disadvantage may be overcome with "credible evidence to the contrary."[7]  13 C.F.R. § 124.103(b)(3).  An individual may be required to show that he has held himself out, and is currently identified by others, as a member of the designated group in order to be entitled to the presumption.  13 C.F.R. §124.103(b)(2).

Representatives of an identifiable group whose members believe that the group has suffered chronic racial or ethnic prejudice or cultural bias may petition the SBA to be included as a presumptively socially disadvantaged group under the 8(a) program.[8]  13 C.F.R. § 124.103(d)(1).  Asian Pacific Americans and Subcontinent Asian Americans were designated as groups presumed to be socially disadvantaged by petition to the SBA.  *See* 44 Fed. Reg. 31,055 (May 30, 1979); 44 Fed. Reg. 42,832 (July 20, 1979); 47 Fed. Reg. 36,743 (Aug. 23, 1982).  Congress subsequently codified the SBA's inclusion of Asian Pacific Americans as a socially disadvantaged group in 1980 by amendment to the Small Business Act.  Pub. L. No. 96-302, § 118, 94 Stat. 833 (1980).

---

Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tualu, or Nauru.  13 C.F.R. § 124.103(b)(1).  Subcontinent Asian Americans include persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal.  *Id.*

Rothe does not challenge the classification as it pertains to Indian Tribes and Native Hawaiian Organizations.  Dkt. No. 1 at 5 n.2.

[7] Anyone may report such evidence to the SBA.  13 C.F.R. § 124.103(b)(3).

[8] The SBA's determinations are subject to notice and comment rulemaking procedures.  13 C.F.R. § 124(d)(4).

Finally, individuals who are not members of a presumptively socially disadvantaged group can satisfy the eligibility requirements for the 8(a) program by demonstrating individual social disadvantage by a preponderance of the evidence. 13 C.F.R. § 124.103(c)(1).  Evidence of individual social disadvantage must include: (1) one objective distinguishing feature that has contributed to social disadvantage (for example, race, ethnic origin, or long-term residence in an environment isolated from mainstream American society); (2) personal experiences of substantial and chronic social disadvantage in American society; and (3) negative impact on entry into or advancement in the business world because of the disadvantage.  13 C.F.R. § 124.103(c)(2).  In evaluating the third factor, the SBA considers the individual's education, employment, and business history to see if the totality of the circumstances shows disadvantage in the business world.  13 C.F.R. § 124.103(c)(2)(iii).  Between 9-15 percent[9] of firms participating in the 8(a) program have demonstrated their eligibility by providing evidence of individual social disadvantage.  *See* SBA Office of Bus. Dev., 8(a) Program 2012 Annual Report to Congress at 18 (2012), *available at* http://www.sba.gov/sites/default/files/files/FY12_408_report.pdf [hereinafter SBA 2012 8(a) Report]; SBA Office of Bus. Dev., 8(a) Program 2010 Annual Report to Congress, at 17 (2010), *available at* http://www.sba.gov/sites/default/files/Final_FY_2010_408_Report_4-29-11.pdf [hereinafter SBA 2010 8(a) Report].

### 2.  Economic Disadvantage

---

[9]   These figures represent firms in the 8(a) program owned and controlled by individuals with racial or ethnic backgrounds not subject to the presumption of social disadvantage.

Regardless of how social disadvantage is established, to be eligible for the 8(a) program, a socially disadvantaged individual must meet the standard for economic disadvantage as well.  An economically disadvantaged individual is one whose "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged."  13 C.F.R. § 124.104(a); *see* 15 U.S.C. § 637(a)(6)(A).  A socially disadvantaged individual claiming economic disadvantage must submit a narrative statement describing the economic disadvantage and provide detailed personal financial information.  13 C.F.R. § 124.104(b).

In evaluating economic disadvantage, the SBA considers the individual's income for the past three years, their personal net worth, and the fair market value of all their assets.  13 C.F.R. § 124.104(c).  An individual's average adjusted gross income generally must be less than $250,000 over the three years preceding his application for initial 8(a) program eligibility and remain under $350,000 on average over the three preceding years for continued eligibility.  13 C.F.R. § 124.104(c)(3).  An individual's net worth must be less than $250,000 for initial 8(a) program eligibility and must remain less than $750,000 after admission to the program for continued 8(a) program eligibility.  13 C.F.R. § 124.104(c)(2). Finally, the fair market value of an individual's assets must not exceed $4 million for initial 8(a) program eligibility and must not exceed $6 million for continued eligibility after admission to the 8(a) program.  13 C.F.R. § 124.104(c)(4).[10]

---

[10]  Ownership in the 8(a) business and equity in the primary personal residence are included for purposes of valuing assets but not for calculating net worth. 13. C.F.R. § 124.104(c)(2); *see* 15 U.S.C. § 637(a)(6)(E).

8

### 3.  Good Character

In addition to being socially and economically disadvantaged, individuals who own and control businesses applying for the 8(a) program must possess good character. 13 C.F.R. § 124.108.  In evaluating good character, SBA considers a variety of factors, including criminal conduct, violations of SBA regulations, the debarment or suspension from government contracting, the presence of high-level employees or stakeholders who lack business integrity, and the knowing submission of false information to the SBA.  *Id.*

### 4.  Potential for Success

Finally, the applicant business must possess "reasonable prospects for success in competing in the private sector" to be eligible for the 8(a) program.  15 U.S.C. § 637(a)(7)(A); 13 C.F.R. § 124.107.  To make this showing, an applicant business generally "must be in business in its primary industry classification for at least two full years immediately prior to the date of its [8(a) program] application."[11]  13 C.F.R. § 124.107.  In assessing potential for success, the SBA also considers access to credit and capital, the technical and managerial experience of managers, the operational history of the applicant business, contract performance, and the possession of any requisite licenses for the industry.  13 C.F.R. § 124.107(c)-(e).

### B.  Participation in the 8(a) Program

Once admitted to the 8(a) program, a participant receives a program term of nine years.  15 U.S.C. § 636(j)(10)(C)(i); 13 C.F.R. § 124.2.  Participation in the 8(a) program is divided into a developmental stage and a transitional stage.  13 C.F.R. § 124.404(a);

---

[11]  A business may also seek a waiver from the two year requirement if it meets certain standards.  13 C.F.R. § 124.107(b).

9

*see* 15 U.S.C. § 636(j)(12)-(14).  Because the 8(a) program's focus is business development, as the participant moves through the program it must show greater ability to win contracts outside of the 8(a) program.

### 1.  8(a) Contract Assistance

Under Section 8(a) of the Small Business Act, the SBA is authorized to enter into all types of contracts with other Federal agencies and to subcontract performance of these contracts to qualified 8(a) program participants.  13 C.F.R. § 124.501(a); *see* 15 U.S.C. § 637(a)(1).[12]  Contracts awarded through the 8(a) program may either be sole-source awards or awards based on competition among 8(a) program participants.  13 C.F.R. § 124.501(b).  Generally, 8(a) contracts must be competed among eligible program participants if the anticipated award price of the contract, including options, will exceed $6.5 million for manufacturing contracts and $4 million for all other contracts.  13 C.F.R. § 124.506.  Contracts with anticipated award prices below these dollar amounts may be awarded on a sole-source basis.[13]  *See* 15 U.S.C. § 637(a)(16)(A); 13 C.F.R. § 124.506.  Importantly, participation in the 8(a) program does not guarantee that a participant will receive any 8(a) contracts.  13 C.F.R. § 124.501(c).

---

[12]  Where appropriate, the SBA may also delegate this contract execution function to specific federal agencies for their procuring activities.  13 C.F.R. § 124.501(a).  *See, e.g.*, Partnership Agreement Between the U.S. Small Business Administration and the U.S. Department of Defense (Sept. 27, 2012), *available at* http://www.acq.osd.mil/osbp/docs/DOD-sba-8a-partnership-agreement-20121031.pdf.

[13]  A contract with an anticipated award price above the applicable threshold amount may be awarded on a sole-source basis where there is not a reasonable expectation that at least two eligible program participants will submit offers at fair market price and the eligible participant is capable of performing the contract at a fair price.  124 C.F.R. § 124.506(d).

10

8(a) firms are also eligible to participate in the 8(a) Business Development Mentor-Protégé Program. *See* 13 C.F.R. § 124.520. The Mentor-Protégé program teams 8(a) firms with successful firms to enhance the capability of 8(a) firms to be competitive and achieve entrepreneurial success through technical and management assistance. *Id.* Mentors can enter into joint-venture arrangements with protégés to compete for, and perform on, certain federal government contracts. *Id.*

Finally, 8(a) participants are offered specialized business training, counseling, marketing assistance, and high-level executive development by the SBA and its resource partners. *See* 13 C.F.R. § 124.704. 8(a) firms are also eligible for assistance in obtaining access to surplus government property and supplies, SBA-guaranteed loans, and bonding assistance. *See* 13 C.F.R. §§ 124.405, 124.703.

## 2. Limits on Contract Assistance

A number of limitations are placed on the contract assistance available through the 8(a) program. First, program participants generally[14] are not permitted to receive additional sole-source contract awards if they have already received a certain combined total of competitive and sole-source contracts through participation in the 8(a) program.[15] 13 C.F.R. § 124.519(a); *see* 15 U.S.C. § 636(j)(10)(I)(iii)(V). Second, a

---

[14] Program participants that are owned by an Indian Tribe, Native Hawaiian Organization (NHO), or ANC can continue to receive additional sole-source contracts even if they have reached the applicable limits. 124 C.F.R. § 124.509.

[15] For participants with a primary North Atlantic Industrial Classification Code System ("NAICS") code based on their number of employees, the limit is $100 million. 13 C.F.R. § 124.519(a)(2). For participants with a primary NAICS code based on their revenues, the limit is the lesser of $100 million or five times the size standard corresponding to its primary NAICS code. 13 C.F.R. § 124.519(a)(1). SBA does not consider 8(a) contracts awarded under $100,000 in calculating these limits. 13 C.F.R. § 124.519(a)(3).

11

program participant in the transitional stage of the program is ineligible to receive additional sole-source contract awards if it fails to meet targets set by SBA for non-8(a) business activity.  13 C.F.R. § 124.509.  In order to ensure that program participants do not develop an unreasonable reliance on 8(a) contracts, participants in both stages of the 8(a) program must make substantial and sustained efforts to attain targeted dollar levels for non-8(a) revenue established in their business plan.  *Id.*  During the transitional stage, a program participant must reach certain targets of non-8(a) contract revenue, which increase over time in the program, and SBA monitors the participants' compliance with these targets.  13 C.F.R. § 124.509(b).  If a program participant fails to meet these targets, it will be ineligible to receive additional sole-source contracts, unless it corrects the situation or receives a waiver from SBA.  13 C.F.R § 124.509(d)-(e).

Finally, the regulations provide that SBA will not accept a procurement for an 8(a) award where it has made a written determination that such award would have an adverse impact on an individual small business, a group of small businesses, or other small business programs.  13 C.F.R. § 124.504(c).  The adverse impact concept is designed to protect small business concerns that are performing government contracts awarded outside the 8(a) program.  *Id.*

### 3.  Monitoring Program Participants

SBA conducts annual reviews of program participants to assess their progress in business development throughout the course of the 8(a) program and to verify their continued eligibility for the 8(a) program.  Program participants are required to develop a comprehensive business plan setting forth their business targets, objectives, and goals, which SBA reviews annually.  13 C.F.R. §§ 124.402-403; *see* 15 U.S.C. § 636(j)(10)(D).

12

In addition, as described above, SBA monitors participants' compliance with their targets for non-8(a) revenue on an annual basis. 13 C.F.R. § 124.509(c). Program participants are also required to certify annually that they continue to meet the program eligibility requirements and provide financial and other information to allow the SBA to verify the participant's continued eligibility. 13 C.F.R. §§ 124.112, 124.601-602; *see* 15 U.S.C. § 637(a)(4)(C), (6)(B), (12)(A), (20). Finally, anyone may provide information to the SBA disputing the eligibility of 8(a) program participants. 13 C.F.R. §§ 124.112(c), 124.517(e).

### 4.  Ending Participation in the 8(a) Program

A program participant automatically exits the 8(a) program after nine years. 13 C.F.R. § 124.302. Once a business concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) program, neither the concern nor that individual will be eligible again. 13 C.F.R. § 124.108(b); *see* 15 U.S.C. § 636(j)(11)(B)-(C). A program participant must maintain its program eligibility throughout its participation in the 8(a) program and must inform SBA of any changes that would adversely affect its program eligibility. 13 C.F.R. § 124.2.

A program participant may also leave the program by voluntary withdrawal or voluntary early graduation, early graduation, graduation, or termination. 13 C.F.R. § 124.301; *see* 15 U.S.C. § 636(j)(10)(C), (E), (H). For example, SBA will graduate a program participant early if it has substantially achieved the targets, objectives, and goals set forth in its business plan and has demonstrated the ability to compete in the marketplace without assistance under the program or if one or more of the disadvantaged owners upon whom its eligibility is based is no longer economically

13

disadvantaged.  13 C.F.R. § 124.302(a)(1)-(2).  Additionally, SBA may terminate a program participant from the 8(a) program before the expiration of the nine-year term for good cause, including for the submission of false information to the SBA.[16]  13 C.F.R. § 124.303(a).

### 5.  8(a) Program Reporting Mechanisms

Congress regularly receives information regarding the status of the 8(a) program. The Small Business Act requires the SBA to submit to Congress an annual assessment of the 8(a) program.  15 U.S.C. § 636(j)(16)(B).  *See, e.g.,* SBA 2012 8(a) Report; SBA 2010 8(a) Report.  In addition, the Small Business Act requires the President to submit annually to Congress a Report on Small Business and Competition, including information pertaining to small businesses owned and controlled by socially and economically disadvantaged individuals.  15 U.S.C. § 631b.

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the court found in *DynaLantic,* there is no factual dispute regarding the compelling interesting, the strong basis in evidence, and the

---

[16]  Between October 1, 2007 and September 30, 2010, SBA terminated 1,206 firms from the 8(a) program and graduated 27 firms prior to the expiration of their program term.  *See* SBA 2010 8(a) Report at 16.  An additional 649 firms voluntarily withdrew from the program.  *Id.*  During the same period, 1,677 firms completed their nine-year term in the 8(a) program.  *Id.*  In Fiscal Year 2011, SBA terminated 151 firms from the program and graduated 14 firms prior to the expiration of their term, 160 firms withdrew from the program, and 705 firms completed the nine-year program term.  *See* SBA 2012 8(a) Report at 17.

14

narrow tailoring of the 8(a) program, and thus, this Court should grant summary judgment to the Defendants.

The Federal Defendants agree that the presumption of social disadvantage in the Small Business Act is race-conscious and is subject to strict scrutiny.  In defending a race-conscious program under strict scrutiny, the Federal Defendants have the burden of articulating the compelling interest for the program and demonstrating a "strong basis in evidence supporting its conclusion that race-based remedial action was necessary to further that interest." *DynaLantic*, 885 F. Supp. 2d at 250 (citing *Sherbrooke Turf v. Minn. Dep't of Transp.*, 345 F.3d 964, 969 (8th Cir. 2003)) (quotation omitted).  In establishing the strong basis in evidence, the Federal Defendants may use both statistical and anecdotal evidence, but the Federal Defendants do not have to "conclusively" prove "the existence of racial discrimination in the past or present." *Id.* (citing *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 292 (1986) (O'Connor, J., concurring)); *Concrete Works of Colo., Inc. v. City and Cnty. of Denver*, 321 F.3d 950, 958 (10th Cir. 2003)).  Finally, the Federal Defendants must show that the program is narrowly tailored to match that interest.  Although the Federal Defendants must come forward with proof supporting the program, in the end the Plaintiff bears the burden of demonstrating "the unconstitutionality of an affirmative action program." *Id.* at 251 (quotations and citations omitted).  In analyzing programs under strict scrutiny, the Supreme Court has cautioned both that strict scrutiny should not be feeble and that it also need not be fatal. *Fisher v. Univ. of Texas at Austin,* 133 S.Ct. 2411, 2421 (2013); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995).

Plaintiff and *amici* attempt to avoid the impact of *DynaLantic* and summary judgment by disputing five fundamental legal considerations:  (1) the applicability of the *Salerno* standard; (2) the use of Rothe's expert reports; (3) the deference owed to Congressional fact-finding; (4) the relevance of post-enactment evidence; and (5) the limitation of Rothe's challenge to the presumption in the 8(a) program and prime contracting.  Each is addressed below.

### A.  Rothe Must Meet the High Standard of a Facial Challenge.

Rothe seeks an order that the "racial classification of section 8(a) of the Small Business Act… is facially unconstitutional."  Dkt. No. 1 ¶ 1.  It further states that it "is not required to and does not seek to enjoin any specific solicitation or contract or pursue any as-applied challenge.  It brings *solely a facial constitutional challenge* in this action."  *Id.* ¶ 5 (emphasis added).  Rothe must clear a very high hurdle.  To succeed, Rothe must prove there are *no circumstances* under which the 8(a) program may be constitutionally applied; it is insufficient for Rothe to claim that the 8(a) program might be applied in an unconstitutional manner.  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Rather than address this legal standard, Rothe and *amici* Mountain States Legal Foundation ("MSLF") urge this Court to "just say no" to applying *Salerno*.  Dkt. No. 56 at 12 ("Rothe denies any such burden.").  Neither Rothe nor MSLF acknowledges that this Circuit has consistently followed *Salerno* in facial challenges.  *See, e.g., Gorden v. Holder,* 721 F.3d 638, 654 (D.C. Cir. 2013); *Cellco P'ship v. FCC*, 700 F.3d 534, 549

16

(D.C. Cir. 2012); *Shelby Cnty., Ala. v. Holder*, 679 F.3d 848, 882 (D.C. Cir. 2012)[17];

*Seven-Sky v. Holder*, 661 F.3d 1, 14 (D.C. Cir. 2011); *Sherely v. Sebelius*, 644 F.3d 388,

397 (D.C. Cir. 2011); *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d

206, 213 (D.C. Cir. 2011).  Equally important, the *Salerno* standard continues to be

applied in cases involving the equal protection clause.  *See, e.g., Geyer Signal, Inc. v.

Minn. Dep't of Transp.*, CIV. 11-321 JRT/LIB, 2014 WL 1309092 (D. Minn. Mar. 31,

2014), *appeal docketed*, No. 14-2025 (8th Cir. May 5, 2014); *DynaLantic,* 885 F. Supp.

2d at 250; *H.B. Rowe v. Tippett,* 615 F.3d 233, 243 (4th Cir. 2010); *W. States Paving

Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005); *Sherbrooke Turf

v. Minn. Dep't of Transp.*, 345 F.3d 964, 971 (8th Cir. 2003).  Faced with essentially the

same argument in *DynaLantic,* Judge Sullivan stated "[t]his Court is bound by Circuit

precedent; accordingly, the *Salerno* test applies."  *DynaLantic*, 885 F. Supp. 2d at 250.

There is no reason for this case to reach a different conclusion.

 In addition to being legally required, the *Salerno* standard provides an important

protection to third parties in facial challenges.  Plaintiff is trying to invalidate an entire

government program—a program that has assisted tens of thousands of minority-owned

businesses to compete on equal footing in government contracting.  Rothe seeks to

---

[17] Contrary to MSLF's claim, the Supreme Court in *Shelby County* described the County's claim as a facial one:  "Shelby County's claim is that the coverage formula here is unconstitutional in all its applications." 113 S. Ct. 2612, 2629-30 (2013).  The Court agreed and struck down the use of the formula as the basis for covering jurisdictions for preclearance.  *Id.* at 2631.  MSLF also misunderstands how *Salerno* applies in this case.  Defendants are not advocating that the "no set of circumstances" doctrine apply to the determination of compelling interest as MSLF suggests was argued in *US v. Virginia,* 518 U.S. 515 (1996) and *Fisher v. Univ. of Texas at Austin*, 133 S.Ct. 2411 (2013).  Dkt. No. 59-1 at 11-12.  Rather, for this case, *Salerno* applies to the determination of the strong basis in evidence and narrow tailoring.

17

strike down the program even in industries where Plaintiff has never worked and will never work.  In order for Plaintiff to receive such extraordinarily broad relief, Plaintiff should have to show that the program is so deficient that it cannot be applied in a constitutional manner in any circumstance.  A lesser standard would allow Plaintiff to attack an entire government program based solely on its alleged limited effect on Plaintiff without regard to whether the remainder of the program causes Plaintiff any harm.

### B.  Rothe's Expert Reports do not Raise Genuine Issues of Material Fact.

For the purposes of this summary judgment motion, the Court should not consider the "evidence" supplied by Plaintiff's experts.   Plaintiff's experts are unqualified, use unaccepted and unsupported methodology, and reach unscientific conclusions; thus, their reports cannot raise genuine issues of material fact.  *See* Dkt. Nos. 44, 46, 51.  For example, Plaintiff's expert John Sullivan is a lawyer with minimal experience in conducting disparity studies.  Dkt. No. 46 at 11-12.  His suggested method of conducting such studies has never been approved by a court.  Dkt. No. 46 at 9-10.  And, his expert report is replete with errors.  *Id.* at 14-19.  Plaintiff's other expert, Dale Patenaude, is the Vice-President of Rothe and is married to the President of the company.  Dkt. No. 1-1 at 1-2.  Mr. Patenaude attempted to respond to one of Federal Defendants' expert reports which contained regression analyses that calculated the odds ratios of similar minority and non-minority businesses winning federal prime contracts. *See, infra* at Part III.B.3.c.  Mr. Patenaude has never conducted a regression analysis and parts of his report are copied directly from Wikipedia.  Dkt. No. 44-1 at 8-11; *see also* App. K, *Rubinovitz Reply*.  In effect, Plaintiff's experts' reports are the "expert"

18

equivalent of self-serving affidavits that contain conclusory allegations and no

supporting facts—this type of evidence cannot defeat a summary judgment motion.  *See,*

*e.g., Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999) ("Although, as a rule,

statements made by the party opposing a motion for summary judgment must be

accepted as true for the purpose of ruling on that motion, some statements are so

conclusory as to come within an exception to that rule.").

### C.  Deference is Owed to Congress's Fact Finding.

In reviewing the evidence supporting the 8(a) program, "Congress's fact-finding

process is generally entitled to a presumption of regularity and deferential review."

*DynaLantic,* 885 F. Supp. 2d at 251.  While courts "must take a hard look" at what

Congress considered to determine whether sufficient evidence exists, federal courts do

not measure the substantiality of Congress's interests by requiring Congress to prove its

interest in a *de novo* trial.  *See Sherbrooke*, 345 F.3d at 970.  Instead, federal courts give

deference to Congressional fact finding.  *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S.

180, 195-196 (1997).  In fact, in other cases challenging affirmative action contracting

programs, courts have taken judicial notice of the content of Congressional hearings and

testimony.  *See, e.g., Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1168 n.12

(10th Cir. 2000).

### D.  The Court May Consider Post-Enactment Evidence in Determining Both the Strong Basis in Evidence and the Narrow Tailoring of the 8(a) Program.

Courts regularly rely upon post-enactment evidence in evaluating the

constitutionality of ongoing minority-owned business programs.  *See, e.g., Adarand*,

228 F.3d at 1166; *Eng'g Contractors Ass'n of S. Fla. v. Metro. Dade Cnty.*, 122 F.3d 895,

19

911-912 (11th Cir. 1997); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1004 (3d Cir. 1993); *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992); *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 920-21 (9th Cir. 1991); *DynaLantic Corp. v. Dep't of Defense*, 885 F. Supp. 2d 237, 258-58 (D.D.C. 2012).  In *DynaLantic*, Judge Sullivan noted that while the Supreme Court has held that the government "'must have had a strong basis in evidence to conclude that remedial action is necessary *before* it embarks on an affirmative action program' . . . nearly every circuit to consider this question has held that reviewing courts may also consider post-enactment evidence."  885 F. Supp. 2d at 257 (quoting *Shaw v. Hunt*, 517 U.S. 899, 910 (1996)).[18]  *See also Concrete Works of Colo., Inc. v. Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994) (finding that "the strong weight of authority endorses the admissibility of post-enactment evidence to determine whether an affirmative action contract program" complies with the Constitution).  Following this rule, Judge Sullivan considered post-enactment evidence in finding the 8(a) program facially constitutional in *DynaLantic*.  *See* 885 F. Supp. 2d at 259-270, 279-80.[19]

---

[18]  To the extent this Court agrees with the Plaintiff that the standard set forth in *Shaw v. Hunt* completely precludes the consideration of post-enactment evidence, *see* Dkt. No. 56 at 15-16, the Court in *DynaLantic* found, that "the evidence before Congress when it enacted Section 8(a) satisfies the government's initial burden to demonstrate a compelling interest.  Specifically, the Court finds that Congress had a strong basis in evidence to conclude that action was necessary to remediate discrimination against minority business enterprises when it enacted Section 8(a)."  885 F. Supp. 2d at 273.

[19]  *Shelby County v. Holder* does not change this analysis.  133 S. Ct 2612 (2013). In *Shelby County,* the Supreme Court struck down the formula in the Voting Rights Act used to select jurisdictions for the preclearance requirement.  The Court found that Congress had not relied on the evidence it collected; rather, it knew which jurisdictions it wanted to cover and reverse-engineered the formula to meet that goal.  *Id.* at 2629.

20

Courts have found post-enactment evidence relevant to the constitutional inquiry for a number of different reasons, all of which are present in the instant case. In some instances, the relevance of post-enactment evidence hinges on the historical context of the challenged program and the legislature's intent to continue to consider the need for the program after its enactment. *See id.* at 257-58. For example, post-enactment evidence is relevant to assessing the constitutionality of the 8(a) program because the statute specifically "contemplates that Congress will review the 8(a) program on a continuing basis." *Id.* at 258 (noting requirements for annual reporting to Congress regarding the 8(a) program by the Small Business Administration and the President). *See also Adarand*, 228 F.3d at 1166 (considering post-enactment evidence prepared by Congress specifically to review its minority-owned business programs in response to the Supreme Court's decision in *Adarand v. Peña*, 515 U.S. 200 (1995)). Other courts have recognized the relevance of post-enactment evidence due to the impossible position of government actors simultaneously faced with the risk of liability by failing to act and the risk of liability by acting prematurely. *See, e.g., Coral Constr. Co.*, 941 F.2d at 921; *Contractors Ass'n of E. Pa.*, 6 F.3d at 1004.

In some cases, courts have found the consideration of post-enactment evidence relevant where plaintiffs seek injunctive relief, which is necessarily forward looking and implicates the current and continuing need for the challenged program. *See, e.g., Contractors Ass'n of E. Pa.*, 6 F.3d at 1004; *Eng'g Contractors Ass'n*, 122 F.3d at 911; *Concrete Works*, 36 F.3d at 1521. The consideration of post-enactment evidence in such cases is consistent with the constitutional inquiry because "'[a] violation of federal statutory or constitutional requirements does not arise with the making of a finding; it

21

**A000599**

arises when the wrong is committed.'" *Eng'g Contractors Ass'n*, 122 F.3d at 911

(quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 289 (1986) (O'Connor, J.,

concurring)).  If the evidence gathered after the enactment of a challenged minority-

owned business program demonstrates that the federal government "remains a 'passive

participant' in a system of racial exclusion . . . there is no justification for invalidating . . .

voluntary efforts to dismantle that exclusionary system, at least to the extent those

efforts are narrowly tailored to accomplishment of that goal," particularly where, as

here, a permanent injunction is sought to enjoin operation of the entire program.  *Id.*

Furthermore, when courts review the constitutionality of minority-owned business

programs, they routinely review any implementing regulations or other "interpretative

limitations" created by the enforcement of the program, which by necessity arise after

the statute is enacted.  *See Harrison & Burrowes*, 981 F.2d at 60; *see also DynaLantic*,

885 F. Supp. 2d at 245-46, 285-86 (considering the regulatory framework of the 8(a)

program in assessing its constitutionality).  For these reasons, this Court may properly

consider post-enactment evidence in evaluating the current constitutionality of the 8(a)

program.

### E.  Rothe's Challenge is Limited to the Presumption of Social Disadvantage and Prime Contracting.

In its complaint and its Motion for Summary Judgment, Rothe raises the novel

argument that the statutory definition of "social disadvantaged individuals" is a racial

classification subject to strict scrutiny.   See Dkt. No. 1 ¶ 21; Dkt. No. 56 at 8.  Not so.

Under 15 U.S.C. § 637(a)(5), "socially disadvantaged individuals are those who have

been subjected to racial or ethnic prejudice or cultural bias because of their identity as a

member of a group without regard to their individual qualities."  The mere fact that

22

racial prejudice *can* be a reason for social disadvantage does not mean that the provision requires strict scrutiny.  This provision makes no distinctions among races—individuals of any race may utilize the definition of social disadvantage to seek admittance to the 8(a) program.  See 13 C.F.R. § 124.103(c)(2)(ii) (allowing individuals to demonstrate social disadvantage by showing "one objective distinguishing feature, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from mainstream American society, or other similar causes not common to individuals who are not socially disadvantaged").  Moreover, Rothe has not provided any evidence that this provision functions to assist one racial group over another or that Rothe has been harmed by individuals being allowed to enter the 8(a) program through this mechanism.

Finally, in its Motion for Summary Judgment, Rothe makes multiple references to subcontracting and appears to be challenging subcontracting to small disadvantaged businesses that is counted towards the 5% aspirational overall government goal.  Nothing in Rothe's complaint mentions subcontracting, and none of the allegations in the complaint or in the affidavit accompanying the complaint show that Rothe has standing to challenge subcontracting.  Even if Rothe did have standing, Rothe's complaint challenges the 8(a) program, which is a solely a prime contracting program, not a subcontracting program.  Therefore, subcontracting is not at issue in this case, and the Court lacks jurisdiction to consider Rothe's assertions, raised for the first time in its summary judgment motion, regarding subcontracting.[20]

---

[20]  The Federal Government does have a subcontracting program (the 8(d) program) that seeks to expand opportunities for multiple small business categories—including women-owned small businesses and HUBZone businesses like Rothe—by

### III.   The 8(a) Program is Facially Constitutional.

#### A.   Remedying Race Discrimination is a Well-Recognized Compelling Interest for Congressional Action.

The 8(a) program assists minority-owned small businesses due to the barriers these businesses face because of discrimination and its lingering effects.  Eliminating race-based discrimination and its effects remains one of the Nation's great challenges, and it is beyond doubt that remedying this discrimination is a compelling governmental interest.  As the Supreme Court has held, "[i]t is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989); *DynaLantic*, 885 F. Supp. 2d at 251-252.  Thus, the government can act to ensure it does not "become a passive participant in a system of racial exclusion."  *Croson*, 488 at 492; *see also DynaLantic*, 885 F. Supp. 2d at 252.

Like the plaintiff in *DynaLantic*, Rothe incorrectly claims that Congress created the 8(a) program to achieve some type of racial balance in federal contracting.  Dkt No.

---

encouraging prime contractors to use different types of small businesses as subcontractors.  15 U.S.C. § 637(d).  Although firms that participate in the 8(a) program are automatically "small disadvantaged businesses" ("SDBs") for purposes of the 8(d) program, prime contractors *cannot* set aside subcontracts exclusively for 8(a) firms or SDBs, nor are they required to have an 8(a) goal in their subcontracting plans.  *See* FAR 19.702.  Rothe has not alleged, nor demonstrated, any harm that it has suffered as a potential subcontractor due to the 8(d) Subcontracting program.  Nor could it.  Rothe participates on equal footing with SDBs in the subcontracting program as a women-owned small business and a HUBZone business.

Nor has Rothe alleged, or demonstrated, any harm that it has suffered as a prime contractor required to seek out SDBs as potential subcontractors.  Nor could it.  The subcontracting program does not require small businesses like Rothe to submit subcontracting plans when bidding for contracts.  *See* FAR 19.702.

56 at 39; *DynaLantic*, 885 F. Supp. 2d at 252.  However, as detailed in *DynaLantic*, the 8(a) program is specifically designed to help businesses that are owned by individuals who are both socially and economically disadvantaged—the 8(a) program is not limited to minorities, nor are all minority-owned businesses able to participate in the program. As the court stated in *DynaLantic,* "the Section 8(a) program's structure convincingly confirms its remedial purpose." *Id.*

### B. Race-Conscious Action Was and Remains Necessary.

#### 1. Congress had a Strong Basis in Evidence When It Created the 8(a) Program.

Prior to enacting a race-conscious program, Congress must have a strong basis in evidence that the use of race is needed.  Federal Defendants have already shown that Congress had a strong basis in evidence that a race-conscious remedy was necessary prior to the enactment of the 8(a) program in 1978, Pub. L. No. 95-507, 92 Stat. 1760 (1978), and prior to its substantial amendment in 1988, Pub. L. No. 100-656, 102 Stat. 3853 (1988).  Judge Sullivan concluded in *DynaLantic*, "Congress had a strong basis in evidence to conclude that action was necessary to remediate discrimination against minority business enterprises when it enacted Section 8(a)."  885 F. Supp. 2d at 272. Judge Sullivan based his conclusion on the fact that "Congress examined extensive evidence before enacting [the 8(a) program] through hearings, reports, raw data, statistical studies, and witness testimony."  *Id.* at 273.  Rothe has not presented any new evidence to challenge this conclusion.

##### a. Congress had a strong basis in evidence prior to the 1978 Enactment of the 8(a) Program.

A000603

The Federal Government's attempts to assist minority entrepreneurs began in 1967 as the result of the 1967 Report of the Commission on Civil Disorders, commonly called the Kerner Commission.  S. Rep. No. 95-1070, at 14 (1978); H.R. Rep. No. 97-956, at 2 (1982).  The Commission found that disadvantaged individuals did not play a substantial role in America's free enterprise system, particularly with respect to small business ownership and community redevelopment and recommended that the federal government "take steps to increase the level of business ownership by minorities so that they would have a better opportunity to materially share in the competitive free enterprise [system]."  S. Rep. No. 95-1070, at 14.  As a result, beginning in 1968, the SBA used its then existing Section 8(a) authority, by administrative regulation, to channel federal procurement contracts to "socially or economically disadvantaged persons."  *Id.* at 13.  Until the enactment of Pub. L. No. 95-507 in 1978, Congress did not extend legislative control over the activities of the 8(a) program, except through appropriations. H.R. Rep. No. 95-949, at 4 (1978).

Prior to the legislative enactment of the 8(a) program in 1978, Congress repeatedly explored the unique problems facing minority business owners resulting from discrimination.  In 1971, the Senate Select Committee on Small Business heard testimony about the challenges facing minority business owners, including information about discriminatory bonding rates for minority businesses.  *See SBA's 8(a) Subcontracting Program—Minority Enterprise:  Hearing Before the Subcomm. on Gov't Procurement of the Select Comm. on Small Bus.*, 92d Cong. at 28-29 (1971) [hereinafter *8(a) Subcontracting Program*] (statement of Ray Dones, president, Nat'l Ass'n of Minority Contractors).  The Committee also heard testimony that government

A000604

agencies were often identifying limited types of contracts for minority-owned businesses on the basis of stereotypes that the minority business community could only handle janitorial or ground maintenance projects. *Id.* at 164 (statement of Jerry Hutton, representative, Office of Minority Business Enterprise). *See also* S. Rep. No. 95-1070, at 11 (noting the overabundance of non-professional, and particularly janitorial, services firms in the 8(a) program).

The 1972 Report of the Subcommittee on Minority Small Business Enterprise of the House Select Committee on Small Business noted that racial ethnic and prejudice have "presented almost insurmountable obstacles to business development" that pose a "unique dilemma" for minority small businesses compared to the problems facing minority and non-minority small businesses alike. H.R. Rep. No. 92-1615, at 18-19 (1972). The SBA Administrator echoed this concern in 1975 stating "[t]he problems that affect the 95 percent sector of the economy identified as small business strike the 4 percent of the 95 percent sector known as minority small business with even more devastating force." *Small Business Legislation-1975: Hearing Before the Subcomm. on Small Bus. of the S. Comm. on Banking, Housing, and Urban Affairs*, 94th Cong. 24 (1975) [hereinafter *Small Business Legislation*] (statement of Thomas S. Kleppe, Administrator, Small Business Administration). The two most serious problems for minority entrepreneurs emphasized in the report were the lack of access to capital often caused by discrimination in the banking industry and the lack of business experience often caused by discrimination that limited minority entrepreneurs access to opportunities. H.R. Rep. No. 92-1615, at 3-4. Further, the report highlighted the disparity revealed in a Census report that while minorities comprised about 17 percent

A000605

of the total U.S. population in 1969, they owned only 4.3 percent of U.S. businesses and collected only 0.7 percent of the total receipts reported for all U.S. businesses. *Id.* at 3. *See also 8(a) Subcontracting Program* at 255-434.

In a subsequent report, the House Committee on Small Business noted the unique obstacles faced by minority businesses, including the lack of access to capital and the lack of business experience. H.R. Rep. No. 92-1626, at 200-201 (1972). The report identified two of the causes of these problems as "past social standards which linger as characteristics of minorities as a group" and the relegation of minorities to the "labor force" rather than managerial positions in which they could gain technical and business experience. *Id.* At the same time, the Senate also heard concerns regarding the lack of capital available to minority businesses. *See* 118 Cong. Rec. 21,810 (1972) (statement of Sen. Humphrey) ("The central problem confronting minority small businesses is . . . undercapitalization.").

In its 1975 report on hearings conducted regarding minority enterprise and allied problems of small business, the Subcommittee on SBA Oversight and Minority Enterprise of the House Committee on Small Business again emphasized troubling statistics for minority businesses. H.R. Rep. No. 94-468, at 1-2 (1975). Specifically, the Subcommittee cited statistics showing that minorities comprised about 16 percent of the U.S. population, but owned only 3 percent of all businesses in the U.S., which ultimately collected only 0.65 percent of the revenues of all U.S. businesses. *Id.* at 2. In light of this disparity, the Subcommittee was particularly concerned that "these statistics [were] not the result of random chance," but rather "the effects of past inequities stemming from racial prejudice [which] have not remained in the past." *Id.* at 1-2. The

28

Subcommittee stated that "Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system" and as a result, "remedial programs designed to uplift those socially or economically disadvantaged persons to a level where they may effectively participate in the business mainstream" are necessary to right this situation.  *Id.* at 2 (footnote omitted).  While it "hoped that some day remedial programs will be unnecessary and that all people will have the same economic opportunities," the Subcommittee concluded that "until that time remedial action must be considered as necessary and proper accommodation for our Nation's socially or economically disadvantaged persons."  *Id.* at 2.

The Subcommittee also took "full notice as evidence for its consideration" additional materials that were before Congress regarding the barriers encountered by minorities businesses in government contracting, including a May 1975 report prepared by the U.S. Commission on Civil Rights.  *Id.* at 11.  The report included "statistical data" and "other qualitative data gathered from a broad swath of federal and state government agencies."  *DynaLantic*, 885 F. Supp. 2d at 254.  "Among the major difficulties confronting minority businesses [identified in the report] were deficiencies in working capital, inability to meet bonding requirements, disabilities caused by an inadequate 'track record,' lack of awareness of bidding opportunities, unfamiliarity with bidding procedures, preselection before the formal advertising process, and the exercise of discretion by government procurement officers to disfavor minority-owned businesses."  *Id.* at 254 (citing U.S. Comm'n on Civil Rights, *Minorities and Women as Government Contractors*, at 16- 28, 86-88 (1975) [hereinafter *CCR Report*]).  *See also Small Business Legislation* at 24 ("[Minority firms] are younger, have smaller financial

reserves, less stable markets, and less seasoned management than majority firms.")
(statement of Thomas S. Kleppe, Administrator, Small Business Administration).  The
report also revealed that "the percentage of contracting dollars awarded to women and
minority firms at the state and local level—less than seven tenths of one percent" did not
reflect the extensive government contracting opportunities available and that "one
reason for the disparity was discrimination."  885 F. Supp. 2d at 254-55 (citing *CCR
Report* at 122, 125, 127).

In a 1976 report, the Subcommittee continued to explore the challenges facing
minority contractors.  *See* H.R. Rep. No. 94-840, at 4-6, 17-18 (1976).  The report
summarized testimony about the disparate treatment of minority contractors who were
either forced to pay higher premium rates for or were precluded altogether from
obtaining surety bonds necessary for being awarded contracts.  *Id.* at 4, 6, 18.  *See also*
S. Rep. No. 95-1070, at 10 (discussing challenges of obtaining surety bonds for minority
businesses).  The Senate heard similar testimony about the challenge of obtaining surety
bonds faced by minority contractors during hearings held in 1977-1978.  *See, e.g.,
Investigation into the 8(a) Program of the Small Business Administration:  Hearings
Before the Subcomm. on Fed. Spending Practices and Open Gov't of the S. Comm. on
Gov't Affairs*, 95 Cong. 414-15 (1979) (statement of Frank Carpenter, Director, Office of
Minority Business Enterprises).  In addition to the discrimination faced by minority
contractors seeking surety bonds, Representative Parren J. Mitchell testified separately
at these Senate hearings about efforts by white-owned firms performing prime contracts
to prevent minority contractors from receiving subcontracts.  *Id.* at 273-74.

In assessing challenges like these, the Subcommittee on SBA Oversight and Minority Enterprise of the House Committee on Small Business found that "the very basic problem disclosed by the testimony is that, over the years, there has developed a business system which has traditionally excluded measurable minority participation . . . [and] because of past overt social and economic discrimination is presently operating in effect to perpetuate these past inequities." H.R. Rep. No. 94-840, at 17. As a result, "minority contractors are attempting to 'break-into' . . . a system, with which they are empirically unfamiliar and which is historically unfamiliar with them." *Id.* at 18. In 1977, the House Committee on Small Business issued a report summarizing its activities over the previous two years and reiterated the findings of the Subcommittee on SBA Oversight and Minority Enterprise regarding the challenges faced by minority contractors identified in its 1975 and 1976 reports. H.R. Rep No. 94-1791, at 124, 182 (1977).

Congress turned toward providing a legislative basis for the 8(a) program in 1978. *See* S. Rep. No. 95-1070 (1978); H.R. Rep. No. 95-1714 (1978). In its report on the bill to codify the 8(a) program, the Senate Committee on Small Business incorporated findings from reports of the General Accounting Office and from executive and legislative branch investigations that the 8(a) program had "fallen far short of its goal to develop strong and growing disadvantaged small businesses," and that "[o]ne of the underlying reasons for the failure of this effort is that the program has no legislative basis." S. Rep. No. 95-1070, at 14.

The report also recognized "the pattern of social and economic discrimination that continues to deprive racial and ethnic minorities, and others, of the opportunity to

A000609

participate fully in the free enterprise system." *Id.* at 14, 16 ("[M]inority small businesses have had an especially difficult time in fully participating in the economic system."). The report concluded that "Congress finds that there is a concentration of ownership and control of productive capital in the U.S. economy, and that certain groups, therefore, have limited opportunities for small business ownership and own and control little productive capital." *Id.* at 24. To address these concerns, the purpose of the bill was to provide the needed legislative basis for the 8(a) program and to establish the policy goal of developing businesses owned by socially and economically disadvantaged persons "rather than the mere awarding of 8(a) contracts." *Id.* at 2-3, 14. The Senate report further explained that the bill was "designed to foster business ownership by socially and economically disadvantaged persons and to promote the viability of businesses run by such persons by providing contract, financial, technical and management assistance." *Id.* at 14.

> The final version Pub. L. No. 95-507 incorporated the findings that
>
> (B) many . . . persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control;
>
> (C) that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans and other minorities.

Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978). The Conference Report explained that "in many, but not all, cases status as a minority can be directly and unequivocally correlated with social disadvantagement and this condition exists regardless of the individual, personal qualities of that minority person." H.R. Rep. No. 95-1714, at 21. As

the floor manager of the House bill[21]  Representative Addabbo emphasized, "groups such as black Americans, Hispanic Americans, and Native Americans, have been and continue to be discriminated against and that this discrimination has led to the social disadvantage of persons identified by society as member of those groups."  124 Cong. Rec. 34,097 (1978).  Similarly, Senator Nunn, who managed the bill in the Senate, pointed out that "[b]ecause of present and past discrimination many minorities have suffered social disadvantagement."  124 Cong. Rec. 35,408 (1978).

Importantly, the Conference Report on the bill expressed the Conferees' intention that the statutory authority given to the SBA "will be used solely for economic and business development and not merely to channel contracts at a random pace to a preconceived group of eligibles for the sake of social or political goals."  H.R. Rep. No. 95-1714, at 22-23.  Although it was "expected that . . . the majority of qualifying firms will be those owned and operated by racial and ethnic minorities," the 8(a) program was designed to "be open to any business owned by persons who meet the socially and economically disadvantaged test," S. Rep. No. 95-1070, at 15; *see also* H.R. Rep. No. 95-1714, at 22 (recognizing participation in the 8(a) program by "other Americans [who] suffer from social disadvantagement because of cultural bias" although "the primary beneficiaries . . . will be minorities").

> **b.  Congressional evidence leading up to the amendment of the 8(a) Program in 1988 showed the continued need for the 8(a) Program.**

---

[21]   The Supreme Court often accords the views of a bill's floor managers particular weight in determining legislative intent.  *See generally United States v. Enmons*, 410 U.S. 396, 405 n.14 (1973); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 686-87 (1978).

In the decade between the enactment and the amendment of the 8(a) program in 1988,[22] Congress continued to examine the unique barriers faced by minority businesses as a result of discrimination.  In hearings held in 1981, the House Committee on Small Business heard extensive testimony about the effects of discrimination on minority small businesses, including "covert and outright discrimination directed at disadvantaged and minority business people by majority companies, financial institutions, and government at every level."  *Small and Minority Business in the Decade of the 1980s (Part 1):  Hearings Before the H. Comm. on Small Bus.*, 97th Cong. 106 (1981).  The testimony revealed that "racism and other barriers . . . have placed a heavier burden on the development and maturity of minority businesses" as compared to their majority counterparts.  *Id.* at 4 (statement of Rep. Mitchell).  The testimony described numerous obstacles for minority businesses, including discrimination by suppliers, lack of accessibility to adequate financing and capital, exclusionary business networks, lack of technical skills, racism in the business community, and discrimination in opportunities that prevent minority businesses from developing better management skills.  *Id.* at 26, 33-34, 221, 240-41, 277.

---

[22]  In 1980, Congress also amended the 8(a) program to specifically include Asian Pacific Americans as a presumptive socially disadvantaged group.  Pub. L. No. 96-302, 94 Stat. 833 (1980).  In its report on the proposed amendments to the Small Business Act, the House Committee on Small Business noted that the amendment was intended to "demonstrate congressional approval" for the SBA's prior decision to include Asian-Pacific Americans as a socially disadvantaged group "after the agency conducted a detailed administrative review of the issue."  H.R. Rep. No. 96-998 at 2-3 (1980).  *See also* 44 Fed. Reg. 31055 (May 30, 1979) (notice and request for comment); 44 Fed. Reg. 42832 (July 20, 1979) (final rule).  Congress amended the 8(a) program in 1986 to include Indian tribes, Pub. L. 99-272, § 18105, 100 Stat. 370, and again in 1988 to include Native Hawaiian Organizations, Pub. L. No. 101-656, § 207, 102 Stat. 3861 (1988), as amended by Pub. L. No. 101-37, § 6, 103 Stat. 72 (1989).

Similarly, in a 1982 report regarding the minority business development efforts of the SBA, the House Committee on Small Business further addressed the "*unique* problems confronting potential and existing minority entrepreneurs." H.R. Rep. No. 97-956, at 25 (1982) (emphasis in the original). The testimony summarized in the report indicated that "the unusually low business participation rate in the minority community, to a large extent, results from the lingering effects of discrimination . . . [which] have imbedded themselves as imperfections in the free market system." *Id.* at 25. As a result, minority businesses often face a "low asset base . . . compared to their majority counterparts," a lack of information and expertise to allow them to operate on equal footing in the free market, and decisions "based on stereotype images rather than reality." *Id.* at 1, 25.

During the mid-1980s, Congress also examined the difficulties discrimination created for  minority contractors with respect to procurements in DOD.  In its report on the bill for DOD Appropriations in 1985, the House Committee on Appropriations noted that "only about 1.9 percent of the Defense Department's procurements [were] awarded to small socially and economically disadvantaged businesses." H.R. Rep. No. 98-1086, at 101 (1984).  The House Armed Services Committee heard testimony about the exclusion of minorities from DOD contracting due to the effects of discrimination during hearings held in 1985. *See Small and Disadvantaged Business Participation in Military Construction Programs:  Hearing Before the Military Installations and Facilities Subcomm. of the H. Comm. on Armed Srvs.*, 99th Cong. (1986).  The testimony revealed difficulties faced by minority architects seeking Defense Department contracts, *id.* at 214-218 (statement of Marshall E. Purnell, President, National

35

Organization of Minority Architects); the failure of prime contractors to subcontract

with minority businesses in good faith, *id.* at 232-35 (statement of Ralph C. Thomas III,

Executive Director, National Association of Minority Contractors); and the difficulties

encountered by minority contractors seeking to gain expertise to contract with the

government, *id.* at 253 (statement of Rep. Ronald V. Dellums).  In a 1985 report, the

House Committee on Appropriations recognized that one of the reasons socially and

economically disadvantaged businesses lack the necessary experience and capability to

contract with DOD is due to the exclusion of these businesses "in the 'early'

development of major Defense systems."  H.R. Rep. No. 99-332, at 140 (1985).

Congress also expressed its ongoing concern with statistical disparities indicating

the presence of discriminatory barriers to minority business formation, development,

and success.  *DynaLantic*, 885 F. Supp. 2d at 256-57.  In 1987, the House Committee on

Small Business reported that "only six percent of all firms [were] owned by minorities;

less than two percent of minorities own businesses" while over six percent of

nonminorities own businesses; and "the average receipts per minority firm [were] less

than 10 percent the average receipts of all businesses."  H.R. Rep. No. 100-460, at 18

(1987).  In hearings before the Senate Committee on Small Business, Senator Sasser

similarly noted that minorities were less likely to own a small business with only "1.8

percent of the minority population own[ing] a business in 1982 compared with 6.4

percent of all business owners" and that "minority firms are smaller than nonminority

businesses with lower sales and fewer employees."  *Minority Business Dev. Prog.*

*Reform Act of 1987: Hearings Before the S. Comm. on Small Business*, 100th Cong. 16

(1988) [hereinafter *MBDP Reform Act*].  Federal procurement data available to

36

Congress also indicated that "[s]mall businesses owned and controlled by socially and economically disadvantaged individuals (most of whom are minority) receive a disproportionately small share of Federal purchases."  H.R. Rep. No. 100-460, at 18. While total prime contracts in fiscal year 1986 were valued at nearly $185 billion, "minority business received only $5 billion in prime contracts, or about 2.7% of the prime contract dollars."  *Id.*  As was the case prior to the enactment of the 8(a) program, the House report concluded that these disparities in minority business development and federal procurement were "not the result of random chance."  *Id.*  The reference to ruling out chance demonstrates that Congress recognized that the differences it saw reflected discrimination and its lingering effects.

Following these extensive findings, Congress passed substantial amendments to the 8(a) program in 1988 in order to focus the program "on its original statutory objective . . . to boost minority ownership of small businesses that can compete in a competitive market."  *MBDP Reform Act* at 18 (statement of Sen. Sasser).  These amendments provided the basic statutory design for the 8(a) program in its current form, including the two-stage program with an eligibility term limit, requirements for competition among 8(a) firms, and the requirement to obtain non-8(a) contracts.  Pub. L. No. 100-656, 102 Stat. 3853 (1988).

The Senate report on the 1988 amendments noted that the 8(a) program "has historically been the primary vehicle for guiding federal procurement decisions towards economically disadvantaged minority-owned businesses," which has served the "critical and complementary purposes" of "lending an element of fairness to the distribution of taxpayer-financed federal procurement contracts" and "creating opportunities for

minority-owned businesses to overcome their historic disadvantages" to compete successfully in the economy.  S. Rep. No. 100-394, at 1 (1988).  The report further recognized that "long-term advantages to our society . . . accrue from fulfillment of this second purpose."  *Id.*  Similarly, the House report identified the 8(a) program as "the most significant effort to redress the effects of discrimination on entrepreneurial endeavors" with the goal of helping "a broad class of socially and economically disadvantaged individuals compete in the mainstream of the American economy."  H.R. Rep. No. 100-460, at 16.

### 2. Current Congressional Evidence Provides a Strong Basis in Evidence for a Race-Conscious Remedy in Federal Government Procurement.

Evidence more recently before Congress continues to demonstrate that minorities face discriminatory barriers to business formation and development, providing a strong basis for the compelling interest supporting the 8(a) program.  *See* 159 Cong. Rec. S4981-82 (daily ed. June 21, 2013) (statement of Sen. Landrieu, Chairwoman, S. Comm. on Small Bus.) (compiling list of more than 40 Congressional hearings between 2006-2013 addressing the problems of minority small businesses).[23]

---

[23]  This Court may consider evidence before Congress regarding the effects of discrimination on minority businesses that was offered in support of other statutes and minority business programs.  *See Fullilove v. Klutznick*, 448 U.S. 448, 463-68, 478 (1980), *overruled on other grounds, Adarand Constructors v. Peña*, 515 U.S. 200 (1995).  The Supreme Court in *Fullilove* noted that the "legislative objectives" of the challenged program "must be considered against the background of ongoing efforts directed toward deliverance of the century-old promise of equality of economic opportunity."  *Id.* at 463.  In its review of the challenged program, the *Fullilove* court considered evidence before Congress relating to the 8(a) program, which deals with federal procurement, along with evidence before Congress relating to the challenged program, which dealt with federally-funded state and local construction contracts.  *Id.* at 463-67, 478.  "Against this backdrop of legislative and administrative programs," the Court concluded it was "inconceivable that Members of both Houses were not fully

38

Through hearings, disparity studies, academic research, and individual testimony,

Congress has gathered more than sufficient evidence to determine that race-conscious

action remains necessary in federal contracting so that the federal government is not a

participant in reinforcing and extending private sector discrimination and its lingering

effects.  The information presented to Congress includes evidence regarding stark

differences in business formation and success for minorities, difficulties faced by

minorities in obtaining credit and capital because of discrimination, state and local

disparity studies showing widespread underutilization of minority-owned businesses in

comparison with their availability, and anecdotal evidence of discrimination against

minorities.

> **a.  Congressional evidence shows that minorities form businesses at disproportionately low rates, and their businesses earn less than similar businesses owned by whites.**

Since the authorization of the 8(a) program, Congress has repeatedly gathered

evidence that shows that minority-owned businesses continue to occupy a

disproportionately small share of the U.S. economy as compared to white-owned

businesses.  Minorities "open small businesses at lower rates, and when they are able to

open businesses, they earn less than their white counterparts."  159 Cong. Rec. S4981

(daily ed. June 21, 2013) (statement of Sen. Landrieu).  In 2009, Congress heard

evidence regarding the disproportionately low level of business receipts generated by

minority-owned businesses, which "underscores the opportunity gap that still exists in

the U.S. economy."  *The Minority Business Development Agency: Enhancing the*

---

aware of the objectives [of the challenged program] and of the reasons prompting its

enactment."  *Id.* at 467.

*Prospects for Success: Hearing Before the Subcomm. on Commerce, Trade, and Consumer Prot. of the H. Comm. on Energy and Commerce*, 111 Cong. 9 (2009) [hereinafter *Minority Business Development Agency*] (statement of David Hinson, National Director, Minority Business Development Agency (MDBA)).  Statistics showed that while "[m]ore than 18 percent of all U.S. nonpublicly traded firms are minority-owned . . . these firms represent only 7.5 percent of the total gross receipts generated by all U.S. businesses."  *Id.*

Testimony before Congress in 2007 and 2008 also showed "adverse [and] very large disparities" for minority-owned businesses:

> African Americans comprise 12.7 percent of the population, but were only 5.3 percent of all U.S. businesses, and earned only 1 percent of business receipts. Hispanics and Latinos comprise 13.4 percent of the population, but were only 7 percent of all businesses, and earned only 2.5 percent of business receipts . . . . Asians and Pacific Islanders comprise 5 percent of businesses yet earned only 3.8 percent of the receipts. Native Americans comprise 0.9 percent of businesses, but earn only 0.3 percent of receipts.

*How Information Policy Affects the Competitive Viability of Small and Disadvantaged Business in Federal Contracting: Hearing Before the Subcomm. on Info. Policy, Census, and Nat'l Archives of the H. Comm. on Oversight and Gov't Reform*, 110 Cong. 19 (2008) [hereinafter *Information Policy*] (statement of Jon Wainwright, Vice President, NERA Economic Consulting); *Minority Entrepreneurship: Assessing the Effectiveness of SBA's Programs for the Minority Business Community: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 110th Cong. 26 (2007) [hereinafter *Minority Entrepreneurship*] (statement of Jon Wainwright, Vice President, NERA Economic Consulting).  These disparities "are also statistically significant, meaning that they are unlikely to have resulted from chance alone."  *Information Policy*

at 19-20 (statement of Jon Wainwright, Vice President, NERA Economic Consulting);

*Minority Entrepreneurship* at 26-27 (statement of Jon Wainwright, Vice President,

NERA Economic Consulting).  The testimony explained that even when "comparisons

were made between similarly situated business owners, the disparities facing minorities

. . . tend to remain adverse, large, and statistically significant" and as a result, these

disparities are likely to "result primarily from discrimination."  *Information Policy* at

20, 25-26; *Minority Entrepreneurship* at 27, 31-32.

> **b. Congressional evidence shows that minorities are
> limited in their ability to start and grow businesses
> because they disproportionately lack access to capital.**

Additional evidence before Congress has demonstrated that discrimination limits

the access of minority entrepreneurs to the capital necessary to start and develop

businesses.  In 2010, Congress heard testimony from Dr. Robert Fairlie, a Professor of

Economics at the University of California, Santa Cruz, who conducted a study regarding

disparities in capital access between minority- and non-minority-owned businesses.

*Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in*

*Today's Capital Markets: Hearing before S. Comm. on Small Bus. and*

*Entrepreneurship*, 111th Cong. 170-71 (2012) [hereinafter *Assessing Access*].  Dr.

Fairlie's study described the chronic lack of wealth in minority communities which has

impeded the ability of minorities to open their own businesses:

> [H]alf of all African-American families have less than $5,500 in total
> wealth, and half of all Latino families have less than $8,000. These levels
> of wealth are one-eleventh to one-sixteenth the levels of wealth held by
> non-minorities ($87,000). These disparities in wealth are also
> substantially larger than disparities in income. African-American and
> Latino income levels are 60 to 70 percent of non-minority levels.

41

*Assessing Access* at 175.  In a subsequent hearing, Dr. Fairlie testified about
similar wealth disparities, including that "more than 20 percent of Latino and 20
percent of African American families do not have a bank account" compared to
three percent of white families.  *Closing the Gap: Exploring Minority Access to
Capital and Contracting Opportunities: Hearing Before the S. Comm. on Small
Bus. and Entrepreneurship*, 111th Cong. 39-40 (2011) [hereinafter *Closing the
Gap*].  Ultimately, Dr. Fairlie concluded that "[t]hese low levels of wealth among
minorities translate into fewer startups and undercapitalized businesses because
an entrepreneur's wealth is often invested directly in the business or used as
collateral to obtain business loans."  *Assessing Access* at 175.

     In addition, Dr. Fairlie testified that minorities have lower levels of home
ownership and home equity than non-minorities.  *Closing the Gap* at 39-40.
Small business owners frequently rely on their homes as "collateral and home
equity loans provide relatively low-cost financing."  *Assessing Access* at 25.  As
demonstrated in recent Department of Justice cases, discrimination limits
minorities' access to this common method of financing a business.  In the last five
years, the Department of Justice has brought and settled numerous cases alleging
that national mortgage lenders discriminated against minorities seeking loans to
buy homes.[24]  In these cases, minorities were more likely to receive higher cost or

---

[24] *See, e.g., United States v. Bank of Am.,* No. 3:12-CV-605, (W.D.N.C. 2013)
($370 Million); *United States v. Chevy Chase Bank*, No. 1:13 CV 1214 (E.D. Va. 2013)
($2.85 Million); *United States v. Cmty. State Bank*, No. 2:13-cv-10142-TLL-CEB (E.D.
Mich. 2013) ($660 Million); *United States v. Countrywide Fin. Corp.*, No. CV11-10540
(C.D. Cal. 2011) ($335 Million); *United States v. GFI Mortg. Bankers, Inc.*, No. 12 CV
2502 (S.D.N.Y. 2012) ($3.5 Million in compensation to borrowers and $55,000 civil
penalty); *United States v. Luther Burbank Sav.*, No. CV12-7809 (C.D. Cal. 2012) ($370

42

sub-prime loans despite their qualifications.  As a result, minorities "likely paid

tens of thousands of dollars more" for loans "while being subject to additional

penalties and an increased risk of credit problems, default, and foreclosure."  U.S.

Department of Justice Civil Rights Division Accomplishments 2009-2012,

*available at*

http://www.justice.gov/crt/publications/accomplishments/index.html#_Expan

ding_Opportunity_At.  Because of this documented discrimination in lending,

minority small business owners and would-be small business owners cannot

access a critical source of capital.

　　While the lack of wealth in minority communities makes access to credit

essential to the creation and growth of minority-owned businesses, Dr. Fairlie's

study demonstrated to Congress that discriminatory lending practices make it

less likely that minority businesses will receive the loans they need as compared

to non-minority businesses, and even when minority businesses do receive them,

their loans are smaller and have higher interest rates than those afforded to non-

minority businesses.  *Assessing Access* at 175-76.  Dr. Fairlie concluded that

> [M]inority firms are twice as likely to be denied a loan application and are
> twice as likely to not apply for a loan because of a fear of rejection.
> Minority firms that do obtain loans pay one and half percentage points
> higher interest rates on those loans than non-minority firms. *These
> disparities do not disappear even after controlling for the age, experience
> and education of the owner, and the creditworthiness, size, industry, age*

---

Million); *United States v. Plaza Home Mortg.*, No. 3:13-cv-02327-H-RBB (S.D. Cal.
2013) ($3 Million); *United States v. Southport Bank*, No. 2:13-cv-01086 (E.D.Wis.
2013) ($687 Million); *United States v. SunTrust Mortg., Inc.*, No. 3:12-cv-397 (E.D. Va.
2012) ($21 Million); *United States v. Wells Fargo Bank*, No. 1:12-cv-01150 (D.D.C.
2012) ($184.3 Million); *CFPB and United States v. Nat'l City Bank*, No. 2:13-cv-01817-
CB (W.D.Pa. 2013) ($35 Million).

A000621

*and location of the firm, which is consistent with the existence of lending discrimination.*

*Assessing Access* at 176 (emphasis added).  *See also Closing the Gap* at 40-41.  Dr. Fairlie found significant disparities suggesting the presence of discriminatory lending practices:

- The denial rate for minority-owned firms with less than $500,000 in annual revenues is 41.9% compared to 16% for non-minority-owned firms.
- The denial rate for minority-owned firms with more than $500,000 in annual revenues is 14.9% compared to 8.4% for non-minority-owned firms . . . .
- The average loan size for a minority-owned firm with less than $500,000 in annual revenues is just over $9,000 while the average loan amount for a non-minority-owned firm of the same size is more than $20,000.
- [F]or firms with annual revenues exceeding $500,000— the average loan amount for a minority-owned firm is approximately $150,000 compared to more than $310,000 for a non-minority-owned firm.
- [I]nterest rates for minority-owned firms with gross revenues less than $500,000 exceed 9% while non-minority-owned firms of the same size are often able to secure interest rates at less than 7% . . . .

*Assessing Access* at 67-68 (included in statement of David Hinson, National Director, MBDA).  Not only did Dr. Fairlie's report reveal differences in lending, it also showed that minority-owned businesses receive smaller equity investments than non-minority businesses when controlling for firm size:

- The average equity investment in a minority-owned firm earning more than $500,000 just exceeds $7,000; yet for a non-minority-owned firm, the average investment is more than $19,000.

*Assessing Access* at 68 (included in statement of David Hinson, National Director, MBDA).  As a result, "minority-owned businesses have substantially lower levels of financial capital invested in their businesses." *Assessing Access* at 176.

44

### c. Congressional evidence includes numerous studies showing disparities between the availability and utilization of minority-owned businesses in public contracting.

Even where minority businesses are available to compete in the marketplace, disparity studies before Congress demonstrate that these businesses are significantly underutilized in public contracting.  As explained to Congress in a hearing regarding the Department of Transportation's ("DOT") program for disadvantaged businesses, including small minority-owned businesses,

> Disparity studies...provid[e] important statistical evidence of the presence and effects of discrimination in the marketplace. These studies paint an indelible picture of a nationwide problem not limited to any particular minority group or any region of the Country.

*The DOT's Disadvantaged Business Enterprise Program: Hearing Before the H. Comm. on Transp. and Infrastructure*, 111th Cong. 8 (2009) [hereinafter *DOT's DBE Program*] (statement of Joel Szabat, Acting Assistant Secretary for Transportation Policy at DOT).  During the hearing, 24 disparity studies documenting evidence from different states were submitted for the record. *DOT's DBE Program* at 398-99.  *See also Minority Business Development Agency* at 26-29 (statement of David Hinson, National Director, MDBA) (listing 49 state and local government disparity studies before Congress); 159 Cong. Rec. S4982 (daily ed. June 21, 2013) (statement of Sen. Landrieu) (listing 25 disparity studies from 16 states and the District of Columbia before Congress).

These studies and others like them before Congress show that minority-owned businesses "throughout the nation continue to face large disparities in almost every business enterprise activity that can be quantified."  *DOT's DBE*

*Program* at 326 (statement of Jon Wainwright, Vice President, NERA Economic Consulting).  Dr. Wainwright's view is shared by other researchers who have testified before Congress.  Anthony Brown a senior associate at MGT of America testified "[o]ur company, MGT, does disparity studies all across this country from the west coast to the east coast and the south.  The under-utilization of minority- and women-owned businesses and the under-utilization of all segments of that community is seen.  It is not geographical in nature.  It is across the nation." *Information Policy* at 85.  Similarly, the Airport Minority Advisory Council ("AMAC") stated "AMAC has submitted twenty disparity studies . . . demonstrat[ing] the astounding pervasiveness of discrimination against . . . minorities in the aviation industry, as well as every industry sector (e.g., professional services, heavy construction, etc.) with which airports and other transportation agencies conduct business." *DOT's DBE Program* at 289-90.  As a Department of Transportation official concluded, "while there are some differences among state and local jurisdictions, the picture is one of consistent underutilization" of the minority-owned businesses served by disadvantaged business programs like the 8(a) program, which is "powerful evidence of discrimination." *DOT's DBE Program* at 312 (statement of Joel Szabat, Acting Assistant Secretary for Transportation Policy at DOT).  Senator Landrieu, Chairwoman of the Senate Small Business Committee, concurred:  "As the studies show, minority- and women-owned businesses are routinely and disproportionately underutilized in public contracting."  159 Cong. Rec. S4981 (daily ed. June 21, 2013).

46

### d. Congressional evidence includes anecdotal accounts detailing the discriminatory barriers faced by minority business owners.

In addition to the extensive quantitative evidence before Congress regarding the challenges that discrimination has posed for minority-owned businesses, Congress heard ample testimony of accounts of discriminatory barriers faced by minority business owners.  For example, as it did prior to the enactment of the 8(a) program, Congress has heard extensive testimony about the difficulties minorities face in obtaining surety bonds.  Randy McRae of Central Prince Georges CDC testified that "bonding has been a cruel Catch-22 for [DBEs].  These struggling firms either can't afford a bond or can't persuade bonding companies to guarantee their performance.  But without a bond, they can't bid on many jobs in the public or private sector, limiting their growth." *Access to Federal Contracts:  How to Level the Playing Field Before the S. Comm. on Small Bus. and Entrepreneurship*, 110th Cong. 132 (2007).  Likewise, Wayne Frazier, Sr., President of Maryland-Washington Minority Contractors Association stated, "[s]mall businesses dealing with the Federal Government cannot get surety bonding.  Again, no financing, no bonding, no contract, no award, no way to compete." *Id.* at 48.  Congressional testimony has also included anecdotal evidence that prime contractors set unnecessarily high requirements for bonding that have the effect of excluding minority contractors from submitting bids because they are usually unable to secure sufficient levels of bonding.  *See, e.g.*, *Information Policy* at 62, 67 (statement of Anthony Robinson, President, Minority Business Enterprise Legal Defense and Education Fund), 92 (statement of Anthony Brown, Senior Associate, MGT); *DOT's DBE Program* at 311 (statement of Joel Szabat, Acting Assistant Secretary for Transportation

47

Policy at DOT) (noting "prime contractors often imposed higher bonding or insurance requirements than the state required, blocking them from participation").

Congress also heard repeated testimony regarding the exclusion of minorities from formal and informal business networks, which inhibits their ability to obtain information regarding business opportunities and access to decision-makers. The testimony has described the exclusion of minorities from "good old boy networks," *Information Policy* at 62, 67 (statement of Anthony Robinson, President, Minority Business Enterprise Legal Defense and Education Fund), the lack of access to the informal network of communications and relationships, *DOT's DBE Program* at 9, 312 (statement of Joel Szabat, Acting Assistant Secretary for Transportation Policy at DOT) (citing anecdotal examples), and the hardship of breaking into business networks, *Minority Entrepreneurship* at 46 (letter from Bobby Henderson). As Gilbert Aranza, the Hispanic CEO of a minority-owned business, explained, "[t]hese business networks are essential to success, but minorities are often shut out . . . I wish I could report that the Good Ol' Boy Network no longer exists, but I am afraid I run up against it all the time." *DOT's DBE Program* at 16, 208.

Congress also heard testimony regarding racial discrimination by suppliers, including charging minority businesses higher prices than non-minority businesses, which can affect the ability of minority businesses to compete on bids. *See Information Policy* at 62, 68 (statement of Anthony Robinson, President, Minority Business Enterprise Legal Defense and Education Fund). For example, Chuck Covington, the African-American president and CEO of a minority-owned business, testified before Congress that a supplier had quoted him a price on tires 50% higher than the price

48

quoted to a similar white business owner.  *DOT's DBE Program* at 11-12, 217-18.  When

he disguised his voice and called the supplier back, Mr. Covington was quoted the same

price as the white business owner.  *Id.*  Additionally, Mr. Robinson related the story of a

non-minority supplier who refused to match a price quote erroneously faxed to an

African-American mechanical contractor that was intended for the contractor's non-

minority competitor.  *Minority Entrepreneurship* at 36, 39.

Minority business owners testified to Congress that they experienced overt racial

animus and racial stereotyping from prime contractors and other business contacts.  For

instance, Mr. Robinson informed Congress of an African-American business owner who

was told by a potential business partner that he "[doesn't] like doing business with you

people."  *Minority Entrepreneurship* at 39.  Mr. Aranza further testified that he had

been mistaken for a waiter and was subjected to racist jokes at a professional club and

that he also received dismissive treatment from a distributor.  *DOT's DBE Program* at

17, 208-210.  Don O'Bannon, Chair of the Airport Minority Advisory Council shared

anecdotes from minority contractors who encountered racial slurs, demeaning

comments, and stereotypes.  *DOT's DBE Program* at 39, 292-294.  In addition,

Congress has heard testimony about discriminatory practices by prime contractors who

use minority-owned businesses to get lower prices from non-minority subcontractors, or

even to win prime contracts, with no intention of ever actually giving the minority-

owned businesses any work.  *See, e.g.*, *Field Hearing in Queens, New York:*

*Underserved Small Business Community:  Providing Access to Federal Programs:*

*Hearing Before the Subcomm. on Contracting and Workforce of the H. Comm. on*

*Small Bus.*, 113 Cong. 5, 35 (2014).  For example, Bill Imada, Chairman of ACE, testified

49

that his own firm was used in the bidding process as a subcontractor to bolster the prime contractor's chance of winning a contract, but was discarded when the project actually started. *Id.* Similar testimony noted that bid shopping is "not uncommon when a prime contractor seeks to replace a low-bidding minority contractor with a favored non-minority contractor." *Information Policy* at 62, 68 (statement of Anthony Robinson, President, Minority Business Enterprise Legal Defense and Education Fund). DOT has received complaints about this practice from minority subcontractors who are replaced after the prime contractor wins the contract, even though part of the prime contractor's success was based on its commitment to use the minority-owned business. *DOT's DBE Program* at 313 (statement of Joel Szabat, Acting Assistant Secretary for Transportation Policy at DOT).

Synthesizing "surveys and in person interviews with hundreds" of minority and non-minority businesses, Dr. Wainwright testified before Congress that "the results are strikingly similar across the country":

> In general, minorities . . . reported that they still encounter significant barriers to doing business in the public and private sector market places, as both prime contracts and subcontractors. They often suffer from stereotypes about a suspected lack of competence and are subject to higher performance standards than similar nonminority men. They also encounter discrimination in obtaining loans and surety bonds; receiving fair price quotes from suppliers; working with trade unions; obtaining public and private sector prime contracts and subcontracts; and being paid promptly."

*Information Policy* at 28; *see also DOT's DBE Program* at 331. Further, there is "general agreement" that without affirmative remedies, minority-owned small businesses "receive few, if any, opportunities on Government contracts" rendering the "continued operation of programs such as 8(a) . . . essential to [the]

<div align="center">50</div>

survival" of minority-owned businesses.  *Information Policy* at 20 (statement of

Jon Wainwright, VP, NERA Economic Consulting).  Taken together, the

significant statistical findings of disparities and these anecdotal accounts of

discrimination before Congress continue to demonstrate the strong basis in

evidence that the race-conscious provisions of the 8(a) program are necessary.

### 3.  Federal Defendants' Expert Reports Show the Continuing Need for the 8(a) Program.

#### a.  Dr. Wainwright's review of over 100 disparity studies shows the continuing need for the 8(a) program.

In addition to the broad Congressional evidence demonstrating the strong basis

in evidence and continuing need for the 8(a) program, Federal Defendants have

retained Dr. Jon Wainwright to conduct a review of relevant disparity studies.  Dr.

Wainwright is a Senior Vice President of NERA Economic Consulting and the principal

researcher on more than 30 studies regarding business discrimination.  App. C, CV of

Dr. Wainwright.  He has a Ph.D. in economics from the University of Texas.  Id.

Notably, Dr. Wainwright's methodology for conducting disparity studies is well tested,

and courts in several jurisdictions have accepted it.  *See, e.g., Concrete Works of*

*Colorado, Inc. v. City and Cnty. of Denver*, 321 F.3d 950 (10th Cir. 2003) (upholding a

race-conscious contracting program based in part on Dr. Wainwright's NERA study); *N.*

*Contracting, Inc. v. Illinois*, 473 F.3d 715 (7th Cir. 2007) (upholding a race-based

contracting program based in part on Dr. Wainwright's NERA study).  Indeed, in

*Concrete Works*, the Tenth Circuit engaged in a lengthy explanation of the methodology

used by Dr. Wainwright and described that method as "sophisticated."  321 F.3d at 966.

In the end, the Tenth Circuit concluded that Dr. Wainwright's study supported a race-

conscious contracting program and that the program was constitutional. *Concrete Works,* 321 F.3d at 978.[25]

In his report submitted in this matter, Dr. Wainwright reviewed the results of 107 disparity studies, most of which were submitted to Congress.  These disparity studies cover 142 public contracting entities in 35 states encompassing 89% of the national population.  App. D, *Wainwright Report* at 10, 20.  Generally, disparity studies gather utilization data from public contracting entities and compare that data to the availability of minority-owned businesses.  A properly done disparity study accounts for the geographic region, the industries involved, the amounts spent, and the availability of minority- and non-minority-owned businesses.  *Id.* at 3-9.  Different experts conducted the studies reviewed by Dr. Wainwright in his report; thus the methodologies vary.  The results, however, do not.  Overwhelmingly, the studies found that in public prime contracting, minority-owned businesses were underutilized compared to their availability in prime public contracting.  *Id.* at 21, 25-35 (Table 5) (reporting the

---

[25] Dr. Wainwright has been accepted as an expert in several cases involving disparity studies.  *Midwest Fence Corp. v. Dep't. of Transp.,* No. 10 C 5627, 2014 WL 322059, *7 (N.D. Ill. January 28, 2014); *N. Contracting, Inc., v. Illinois*, No. 00 C 4515 (N.D. Ill.); *Daniel Webster v. Fulton Cnty.*, No. 1:96-CV-2399 (N.D. Ga.); *Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 00-CV-1026(JMRRLE) (D. Minn.); *AGC v. Caltrans*, No. 09-01622 (E.D. Cal.); *Kevcon v. U.S.,* No. 09-625C (Fed. Cl.); *Eng'g Contractors Ass'n v. Metro. Dade Cnty.*, No. 94-1848-CIV-Ryskamp (S.D. Fl.); and *Bilbo Freight Lines, Inc., v. Dan Morales*, No. H-93-3808 (S.D. Tex.).

52

disparity indexes[26] from the studies); 36-54 (highlighting findings from the studies by industry and geographic region).[27]  For example, Dr. Wainwright determined that:

- In construction, 119 of 142 disparity indexes (84 percent) fall at or below 80,[28] and 125 of 142 (88 percent), are less than 100.

- In CPS [Construction Related Profession Services], 90 of 114 disparity indexes (79 percent) fall at or below 80, and 100 of 114 (88 percent), are less than 100.

- In OPS [Other Professional Services], 61 of 76 disparity indexes (80 percent) fall at or below 80, and 65 of 76 (86 percent), are less than 100.

- Combined together, 270 of 332 disparity indexes (81 percent) fall at or below 80, and 290 of 332 (87 percent) are less than 100.

Id. at 36.[29]

Dr. Wainwright performed the same calculations using only studies that had been submitted to Congress at the time of his report, dividing the studies by type of governmental entity, and dividing the studies by the developer.  The pattern of his results did not change.  The overwhelming majority of disparity indexes fell at or below

---

[26] Disparity indexes compare availability of minority-owned businesses to their utilization.

[27] Rothe is not challenging the program as applied to a specific contract or industry; thus data pertaining to Rothe's industry is not necessary.  Federal Defendants note, however, that Dr. Wainwright's Table 5 of disparity studies and his narrative discussing underutilization includes underutilization in the NAICS codes in which Rothe contracts (541).  The industries are also included in CPS and OPS.

[28] "Generally, courts consider a disparity index lower than 80 as an indication of discrimination." *H.B. Rowe v. Tippett,* 615 F.3d 233, 243-44 (4th Cir. 2010).

[29] As Dr. Wainwright notes in his report, many public contracting entities have minority business programs that assist minority-owned businesses to get public contracts.  Thus, when a report does not show a disparity, it may well be because the entity in question has an effective contracting program.  *Id.* at 55.

80 or were less than 100. *Id.* at 36-38. Dr. Wainwright also went through the disparity studies on a state by state basis to show the pattern of underutilization. *Id.* at 37-54. For example, Dr. Wainwright found:

In Arizona:

- Although almost 12 percent of available construction businesses were estimated to be Minority Business Enterprises ("MBEs")[30], the City of Phoenix awarded less than 3 percent of prime construction contract dollars to MBEs.

- Although over 14 percent of available CPS businesses were estimated to be MBEs, the Arizona DOT awarded only 5 percent of prime CPS contract dollars to MBEs. *Id.* at p. 39-40.

In California:

- Although over 8 percent of available construction businesses were estimated to be MBEs, the California DOT awarded only slightly more than 2 percent of state funded prime construction contract dollars to MBEs.

- Although almost 10.5 percent of available construction businesses were estimated to be MBEs, the California DOT awarded only about 5.5 percent of federally funded prime construction contract dollars to MBEs.

- Although almost 17 percent of available CPS businesses were estimated to be MBEs, the California DOT awarded only 3.5 percent of federally-funded prime CPS contract dollars to MBEs.

- Although almost 38 percent of available construction businesses were estimated to be MBEs, Alameda County awarded only 16 percent of prime construction contract dollars to MBEs.

- Although 40 percent of available CPS businesses were estimated to be MBEs, Alameda County awarded less than 11 percent of prime CPS contract dollars to MBEs.

---

[30] The studies analyzed by Dr. Wainwright used the term "Minority Business Enterprise" rather than "Small Disadvantaged Business". As Dr. Wainwright explained, the definitions are very similar. *See* App. E, *Wainwright Reply* at 14-15.

54

- Although almost 34 percent of available OPS businesses were estimated to be MBEs, Alameda County awarded only 12 percent of prime OPS contract dollars to MBEs. *Id.* at 40-41.

In Illinois:

- Although almost 6.5 percent of available construction businesses were estimated to be MBEs, the Illinois Tollway awarded less than one-tenth of 1 percent of prime construction contract dollars to MBEs.

- Although 10 percent of available CPS businesses were estimated to be MBEs, the Illinois Tollway awarded less than 5.5 percent of prime CPS contract dollars to MBEs.

- Although almost 27 percent of available CPS businesses were estimated to be MBEs, the Illinois DOT awarded only 14 percent of prime CPS contract dollars to MBEs. *Id.* at 43-44.

In Nevada:

- Although over 11 percent of available construction businesses were estimated to be MBEs, the Nevada DOT awarded less than 2 percent of federally-funded prime construction contract dollars to MBEs.

- Although over 6 percent of available CPS businesses were estimated to be MBEs, the Nevada DOT awarded less than three-tenths of 1 percent of federally-funded prime CPS contract dollars to MBEs.

- Although almost 10 percent of available CPS businesses were estimated to be MBEs, the Nevada DOT awarded less than 1.5 percent of state-funded prime CPS contract dollars to MBEs. *Id.* at 48.

In New York:

- Although 14 percent of available construction businesses were estimated to be MBEs, the State of New York awarded less than 2 percent of prime construction contract dollars to MBEs.

- Although over 13 percent of available CPS businesses were estimated to be MBEs, the State of New York awarded less than 7 percent of prime CPS contract dollars to MBEs.

- Although almost 20 percent of available OPS businesses were estimated to be MBEs, the State of New York awarded less than 6 percent of prime OPS contract dollars to MBEs. The OPS statistics here

55

refer specifically to the plaintiff's lines of work in information technology services and facilities support services. *Id.* at 49.

In North Carolina:

- Although almost 15 percent of available OPS businesses were estimated to be MBEs, the City of Durham and Durham County awarded less than 4.5 percent of prime OPS contract dollars to MBEs.

- Although 6 percent of available construction businesses were estimated to be MBEs during the 1999-2003 period, the North Carolina DOT awarded less than 1.5 percent of prime construction contract dollars to MBEs. By 2004-2008, availability was estimated to be about 4 percent, and prime awards to MBEs were less than 1 percent.

- Although almost 9 percent of available CPS businesses were estimated to be MBEs during the 1999-2003 period, the North Carolina DOT awarded less than 1.5 percent of prime CPS contract dollars to MBEs. *Id.* at 49.

In Pennsylvania:

- Although over 8 percent of available construction businesses were estimated to be MBEs, the State of Pennsylvania awarded only 1.5 percent of prime construction contract dollars to MBEs.

- Although over 18 percent of available CPS businesses were estimated to be MBEs, the State of Pennsylvania awarded less than 6 percent of prime CPS contract dollars to MBEs. *Id.* at 51.

In Texas:

- Although 43 percent of available construction businesses were estimated to be MBEs, the City of Dallas awarded less than 11 percent of prime construction contract dollars to MBEs.

- Although 42 percent of available CPS businesses were estimated to be MBEs, the City of Dallas awarded less than 13.5 percent of prime CPS contract dollars to MBEs.

- Although almost 39 percent of available OPS businesses were estimated to be MBEs, the City of Dallas awarded only 5 percent of prime OPS contract dollars to MBEs. *Id.* at 52.

In Virginia:

56

- Although almost 2 percent of available construction businesses were estimated to be MBEs in the 1998-2002 period, the Commonwealth of Virginia awarded only three-tenths of 1 percent of prime construction contract dollars to MBEs. By the 2006-2009 period, availability had increased to almost 7.5 percent, but prime construction contract dollars awarded to MBEs were still less than 1.5 percent.

- Although almost 4 percent of available CPS businesses were estimated to be MBEs in the 1998-2002 period, the Commonwealth of Virginia awarded less than one-tenth of 1 percent of prime CPS contract dollars to MBEs. By the 2006-2009 period, availability had increased to almost 10 percent, but prime CPS contract dollars awarded to MBEs were still less than five-tenths of 1 percent.

- Although almost 13 percent of available OPS businesses were estimated to be MBEs in the 2006-2009 period, the Commonwealth of Virginia awarded only about 2 percent of prime OPS contract dollars to MBEs. *Id.* at 54.

In his rebuttal report, Dr. Wainwright found significant overlap between the most common industries in federal contracting and the industries used in a selection of the disparity studies he reviewed. App. E, *Wainwright Reply* at 2. To determine this, Dr. Wainwright ranked NAICS codes based on the amount the federal government spent within them and how much the studied jurisdictions spent within them. *Id.* at 3-4. He then conducted a statistical comparison between the rankings to see if there was a correlation between federal procurement and procurement in the studies. *Id.* He found that the spending patterns correlated to a statistically significant degree. In other words, what the federal government purchased matched what was purchased in the disparity study jurisdictions. *Id.* Thus, the statistics from the state and local disparity studies are very relevant to this litigation as they show underutilization in the same industries used by the federal government.

57

Dr. Wainwright's report also reviewed Census data regarding minority business formation and earnings.  He found that minorities were significantly underrepresented among business owners:

- Although Blacks comprised 14.0 percent of the population, they accounted for only 7.3 percent of the businesses.

- Although Hispanics comprised 16.3 percent of the population, they accounted for only 8.6 percent of the businesses.

- Although American Indians and Alaska Natives comprised 2.0 percent of the population, they accounted for only 0.9 percent of the businesses.

- Asians and Pacific Islanders comprised 6.2 percent of the population and accounted for only 6.0 percent of the businesses.

App. D, *Wainwright Report* at 56.[31]  Additionally, he looked at earnings of minority-owned businesses and found large, statistically significant differences between the business population and their earnings:

- Although Blacks comprised 7.3 percent of all U.S. businesses, they earned only 1.25 percent of sales and receipts.

- Although Hispanics comprised 8.6 percent of all businesses, they earned only 3.2 percent of sales and receipts.

- Although American Indians and Alaska Natives comprised 0.9 percent of all businesses, they earned only 0.31 percent of sales and receipts.

- Although Asians and Pacific Islanders comprised 6.0 percent of all businesses, they earned only 4.7 percent of sales and receipts.

*Id.*

---

[31]  Dr. Wainwright examined this data by state and industry, and his results remained consistent. *Id.* at 57-58, Appendices A and B.

A000636

Finally, Dr. Wainwright described the regression[32] analyses he and other experts have conducted that show statistically significant differences in loan denial rates and business formation rates among minorities.  These studies found that minorities were statistically significantly more likely to be denied a commercial loan, even when their balance sheet and credit worthiness was similar to that of a white applicant.  *Id.* at 61. Furthermore, Dr. Wainwright and other researchers have found large, statistically significant differences in business formation and earnings rates among minorities and non-minorities, even when numerous factors are held constant.[33]  *Id.*

### b.  Plaintiff and *amici* have not raised an issue of material fact with respect to Dr. Wainwright's conclusions.

Rather than address Dr. Wainwright's calculations or conclusions, Rothe and *amici* Pacific Legal Foundation ("PLF") claim that this Court should disregard all of the disparity studies considered by Congress, Judge Sullivan, and Dr. Wainwright.  Rothe and PLF both claim that the disparity studies should be ignored because the studies do not use the methodology that Rothe and PLF claim is necessary.  Because the methodology used by these studies does not match the one for which they advocate, Rothe and PLF argue that the underutilization numbers are not real.  Tellingly, the plaintiff in *DynaLantic* criticized the disparity studies submitted in that case—

---

[32]  A regression analysis is statistical technique allowing the comparison in a data set between two related variables, such as business formation and minority status, while holding other factors, such as geographic location, constant.  *See* App. D, *Wainwright Report* at 64 n. 69.

[33]  The factors included: educational achievement, labor market experience, marital status, locational mobility, number of workers in the family, number of children, immigrant status, disability status, veteran status, interest and dividend income, labor market attachment, industry, geographic location, and local labor market variables such as the unemployment rate, population growth rate, government employment rate, and per capita income.

59

specifically the ones conducted by Dr. Wainwright—for the same reasons.  Judge

Sullivan dismissed the plaintiff's allegations because, exactly like Rothe and PLF, the

plaintiff in *DynaLantic* failed to show "the disparities shown in those studies are

eliminated when there is a control for firm capacity" as they would define it.

*DynaLantic*, 885 F. Supp. 2d at 277.  Rothe and PLF's "unfocused" challenge with

respect to these disparity studies is inadequate to defeat summary judgment.  *See, e.g.,*

*Adarand,* 228 F.3d at 1174 n.14.

        First, as a preliminary matter, PLF appears to argue that in order for the 8(a)

program to function in a specific locality, the government must have a study in that

locality.  Dkt. No. 61 at 8.  While this may be true for a local government, it is not true

for Congress.  As the Eighth Circuit explained, "[w]hen the program is federal, the

inquiry is (at least usually) national in scope.  If Congress or the federal agency acted for

a proper purpose and with a strong basis in the evidence, the program has the requisite

compelling government interest nationwide, even if the evidence did not come from or

apply to every State or locale in the Nation."  *Sherbrooke,* 345 F.3d at 970; *accord N.*

*Contracting v. Illinois*, 473 F.3d 715, 721 (2007).  Further, PLF's argument ignores that

Rothe itself does not bid only on contracts near its physical location.  Dkt. No. 1-1at 4.

        Second, as a review of the disparity studies considered by Dr. Wainwright shows,

different developers have different methods of determining capacity.  For example,

NERA, the author of 20 of the 107 studies examined in the Dr. Wainwright's report, uses

a custom census to determine the availability of small disadvantaged businesses

("SDBs") in the relevant geographic marketplace.  App. D, *Wainwright Report* at 8, 11-

16 Table 1.  The custom census approach employs a seven-step analysis that includes

examining both the relevant product market and the comparative public spending in that market.  *Id.*  The resulting database of both minority- and non-minority-owned companies is then used to create a dollar-weighted average of the underlying industry availability numbers, with larger weights applied to industries with relatively more spending and lower weights applied to industries with relatively less spending.  *Id.*; s*ee also* App. L at  3-11, ROTHE068601-68609 (describing the method of determining availability for the State of Maryland's disparity study); App. L, at 12-19,  ROTHE068122-68128 (describing the method of determining availability for the State of New York's disparity study).  Courts have relied on NERA disparity studies in *Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950 (10th Cir. 2003) and *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715 (7th Cir. 2007).

In contrast, BBC Research and Consulting, author of 14 of the examined studies, applied a more limited measure of availability in its disparity measurement.  App. D, *Wainwright Report* at 8, 11-16 Table 1.  The BBC reports state upfront that the availability measurement it uses should not be considered "an exhaustive list of every minority-, woman- and majority-owned firm that could participation in [Georgia Department of Transportation] contracts."  Georgia Department of Transportation Disparity Study, BBC Research and Consulting, Executive Summary at 5 (2011), (ROTHE056562), App. L at 2.   Instead of the custom census approach used by NERA, BBC identified local contractors and conducted phone interviews with contractors.  The interviews verified whether the contractors were interested and qualified in a specific type of local government work, whether they had bid or performed work of that type, and could perform in that geographic region and time.  *Id.*  Despite this limited

availability measure, BBC found that substantially fewer dollars were spent with minority and women owned firms than what one would expect based on their availability. *Id.* at Executive Summary at 5-10 (2011) (ROTHE0565064). When examining state contracts the study found statistically significant underrepresentation in all racial groups. *Id.* The Ninth Circuit recently endorsed BBC's methodology of conducting a disparity study. *AGC v. Cal. Dep't of Transp.* 713 F.3d 1187, 1196-97 (9th Cir. 2013).

Other studies used a variety of different methods for determining availability. Some disparity studies used internal agency lists of contractors and subcontractors, such as certified MBE directories, bidders' lists, prequalified contractor lists, licensed contractor lists, planholder lists, or lists of winning bidders or sub-bidders. *See, e.g.*, Minnesota Department of Transportation Disparity Study, MGT Inc. at Chapter 3-2 (2009), App. L at 1; *H.B. Rowe v. Tippett,* 615 F.3d 233, 244-246 (4th Cir. 2010) (relying on an MGT disparity study to approve the North Carolina DBE program). Other studies use "bidders' lists with adjustments" or "custom census approach with adjustments," as described by Dr. Wainwright. App. D, *Wainwright Report* at 6. Both of these methods are similar to the methods described above, but include various attempts to refine the data. *Id.*

Although these measures differ and some are more constrained than others, the overall nationwide picture shows repeated underutilization. As Dr. Wainwright noted, the numbers in these studies are remarkably consistent despite the "studies having been undertaken by different consultants, using differing methods, at different points in time,

with different budgets, and for a wide variety of state and local government agencies in a wide variety of geographic locations." *Id.* at 36.

Third, Rothe and PLF's criticisms ignore that a business's capacity is not static. Rather, businesses can and do ramp up or down depending on the market. As Dr. Wainwright explained:

> Firms can grow quickly when demand increases and shrink quickly when demand decreases. Therefore, focusing on the capacity of businesses in terms of employment, revenue, bonding capacity, pieces of equipment, and so forth, is wrong as a matter of economics and can potentially obscure the existence of discrimination.

App. D, *Wainwright Report* at 61.

Fourth, Rothe and PLF's claims ignore that the disparity studies use the same method to locate minority-owned businesses as they do to locate non-minority-owned businesses. Thus, if the number of minority-owned businesses were inflated, then the number of non-minority-owned businesses would likewise be inflated. *See* App. E, *Wainwright Reply* at 10. Because availability is expressed as a percentage of the overall marketplace—e.g., minority-owned businesses represent 25% of businesses in the locality capable of performing a specific task—the proportion remains the same regardless of the method of determining the proportion.

Finally, Rothe's arguments against all of the disparity studies are based on Mr. Sullivan's expert report. Dkt. No. 56 at 22-24. But this so-called expert has never been the principal author of a disparity study and can point to only one study that actually meets his standards. Dkt. No. 46 at 12, 19. Mr. Sullivan did not attempt to calculate his own disparity ratios using his definition, and indeed, he only looked at the data included in *two* of the 107 disparity studies. *Id.* at 17. Rothe's reliance on Mr. Sullivan's

63

testimony is tantamount to a plaintiff citing its own version of the facts with no

corroboration.  Such self-serving evidence cannot defeat a motion for summary

judgment.

> ### c. Dr. Rubinovitz's report shows consistent, statistically significant underutilization of minority-owned businesses in federal prime contracting.

Dr. Robert Rubinovitz conducted regression analyses comparing the likelihood of

minority-owned businesses winning federal prime contracts when compared to

businesses of similar size in the same industry.[34]  He found consistent, statistically

significant underutilization of small, minority-owned businesses in federal prime

contracting.  Dr. Rubinovitz is the Deputy Chief Economist at the U.S. Department of

Commerce.  App. F, CV of Dr. Rubinovitz.  Dr. Rubinovitz's analyses show that small

minority-owned businesses were statistically significantly less likely to win a

government contract in Fiscal Year 2012 in the vast majority of industries, including the

ones in which Plaintiff contracts.[35]

---

[34]  Federal Defendants did not submit a report like Dr. Rubinovitz's in *DynaLantic.*

[35]  Dr. Rubinovitz's report provides additional evidence of the compelling interest for the 8(a) program, in the context of a facial challenge. Such industry-by-industry evidence of discrimination is not required to show a strong basis in evidence to respond to an as-applied challenge to the 8(a) program in a specific industry.  *But see DynaLantic,* 885 F. Supp. 2d at 280-81.  As the Federal Defendants argued in *DynaLantic,* the 8(a) program is not aimed at specific industry, nor does it attempt to raise the amount of contracting with minority-owned businesses in a specific industry. Rather, the 8(a) program is a business development program, aimed at addressing the barriers faced by small, minority-owned businesses across industries and the nation.  As such, the program need not show industry specific information to establish a compelling interest for an as-applied challenge.  The Court need not decide this issue because Rothe brought only a facial challenge.

64

For his study, Dr. Rubinovitz determined which firms were interested in contracting with the federal government based on their registering with the Systems for Award Management ("SAM"), which is a requirement for being a federal contractor. App. G, *Rubinovitz Report* at 3.  SAM data includes information regarding the firm such as the industry NAICS code in which the company works, the date the business started, the average number of employees, annual receipts, the legal type of organization used by the business, small disadvantaged business ("SDB")[36] status, minority-ownership status, and women-ownership status.  *Id.* at 4.  Dr. Rubinovitz also obtained data from SBA to determine the size standards for "small businesses" in various NAICS codes and to determine which businesses were in the 8(a) program.  *Id.* at 5.  He then conducted rigorous regression analyses designed to control for factors other than race that might contribute to differences in the success of minority-owned firms in winning contracts as compared to non-minority-owned firms.  *Id. See also*, App. K, *Rubinovitz Reply*.

Specifically, Dr. Rubinovitz's regression analyses controlled for the industry in which the firm did business based on three digit NAICS codes, business age, business size (in terms of both average number of employees and annual receipts), business form, and security clearance, and compared the likelihood of minority-owned businesses receiving a federal contract verses similar businesses.  *Id.* at 14, Table 3.  Dr. Rubinovitz expressed the outcome in odds ratios—the odds that a minority-owned business would receive a contract when compared to a similar business.  *Id.*  For this calculation, if the two businesses had an equal chance, the ratio should be one (1).  *Id.*  In addition to

---

[36]  Small Disadvantaged Businesses ("SDBs") are small businesses owned by socially and economically disadvantaged individuals.  The majority of SDBs are owned by minorities.  App. G, *Rubinovitz Report* at Table 1.  Businesses in the 8(a) program are a subset of SDBs.

calculating the ratio, Dr. Rubinovitz determined if the ratio was statistically significant:

that is whether one could say with confidence that the calculated ratio is actually

different from one (1). *Id.*

Dr. Rubinovitz conducted three calculations, each with a slightly different

definition of what constitutes a minority-owned business.[37]  Regardless of the definition,

the pattern of his results remained constant:  in the vast majority of industries,

minority-owned businesses were less likely to win a federal contract, usually to a

statistically significant degree.  In fact, there were no NAICS codes where minority-

owned businesses were statistically significantly more likely to win a contract.  *Id.* at 10.

First, Dr. Rubinovitz evaluated the likelihood of non-8(a) minority-owned SDBs

winning a contract compared to other small businesses.  App. H, *Rubinovitz*

*Supplemental Report*.  According to Dr. Rubinovitz:

> non-8(a) minority owned SDBs are statistically significantly less likely to
> win a contract in industries accounting for 94% of all contract actions, 93%
> of all dollars awarded, and in which 92.2% of non-minority owned SDBs
> are registered.  There is no industry where non-8(a) minority owned SDBs
> have a statistically significant advantage in terms of winning a contract
> from the federal government.

*Id.*

Dr. Rubinovitz calculated the odds ratios by three digit NAICS code.[38]  As shown

in his Table 3 Alt, overall non-8(a) minority-owned SDBs were 35% less likely to win a

---

[37]  Dr. Rubinovitz examined contracting outcomes for minority-owned non-8(a)
SDBs, non-8(a) SDBs, and small minority owned businesses (including 8(a) businesses).

[38]  Dr. Rubinovitz's used three digit NAICS codes in order to increase the
reliability of his report.  As discussed by Dr. Rubinovitz, using the three digit NAICS
code "balances the need to have sufficient data in each industry grouping and the
recognition that many firms can switch production within the broader three-digit
category."  *See* App. G, *Rubinovitz Report* at 3.

66

prime contract than similar businesses.[39]  Table 5 Alt shows that, for example, in NAICS code 115 non-8(a) minority-owned businesses were 33% less likely to win a prime contract than firms that were of similar age, size (in terms of both average number of employees and annual receipts), business form, and security clearance status.  App. H, *Rubinovitz Supplemental Report*.

Dr. Rubinovitz conducted the same analysis but this time he compared all non-8(a) SDBs (not just those owned by minorities)[40] to all other similar small businesses. App. G, *Rubinovitz Report* at 15, Table 4.  As shown in Table 4 of his Report, "in virtually every industry the odds of non-8(a) SDBs [winning a contract] are lower, all else equal, than other firms."  *Id.*  Finally, in Table 4(a), Dr. Rubinovitz contrasted the likelihood of a small minority-owned firm (SDB, 8(a), or small minority-owned firms that do not identify as being an SDB or are not part of the 8(a) program) winning a contract compared to similar businesses.  *Id.* at Table 4(a).  Again, he found that minority-owned firms were less likely to win contracts in the vast majority of industries where the federal government lets contracts and spends money and where most minority-owned businesses are available.[41]  *Id.*  Critically, this data shows

---

[39]  The odds ratio was .651. 1-.651 is approximately 35.

[40]  Table 1 of Dr. Rubinovitz's Report shows the breakdown of SDBs by ownership characteristics.  App. G, *Rubinovitz Report* at Table 1.

[41]  Rothe is not making as-applied challenge to a specific contract or industry; thus data pertaining to Rothe's industry is not necessary.  Federal Defendants note, however, that regardless of the definition of minority-owned business used, Dr. Rubinovitz found a statistically significant underutilization of minority-owned businesses in the three digit NAICS code in which Rothe contracts (541 and 561).  App. G, *Rubinovitz Report* at Table 5, p. 21(odds ratio for non 8(a)-SDBs .644 in 541 and .700 in 561; odds ratio for small minority-owned businesses .645 in 541 and .679 in

67

underutilization even when controlling for factors such as industry, business size, business age, and business form.[42]

In its Motion for Summary Judgment, Rothe simply fails to even mention Dr. Rubinovitz's study let alone rebut it.  Indeed, Rothe cannot.[43]  On the contrary, Rothe claims that evidence of underutilization in federal prime contracting that controls for business size is necessary.  In fact, Dr. Rubinovitz's study provides that information. Dr. Rubinovitz's study underscores the continuing need for the 8(a) program using contract data from Fiscal Year 2012.  Further, as explained *infra* Part III.C.4, the fact that Dr. Rubinovitz's report finds consistent, recent, statistically significant underutilization in the vast majority of industries —and never finds statistically significant overutilization— shows that the 8(a) program is also narrowly tailored.

### C.  The 8(a) Program is Narrowly Tailored.

Plaintiff has not raised any genuine issue of material fact regarding the narrow tailoring of the 8(a) program.  Courts consider multiple factors to determine if a race-conscious program is narrowly tailored; the court in *DynaLantic* reviewed all of these factors and concluded that the 8(a) program was facially narrowly tailored.  The court considered the efficacy of race neutral alternatives; flexibility, including any

---

561); Table 5a Alt (odds ratio for non-8(a) minority-owned SDBs .449 in 541 and .493 in 561).  All of the ratios were statistically significant.

[42]  As Dr. Wainwright points out, controlling for factors such as business size and age can be seen as controlling for factors that are tainted by discrimination.  App. D, *Wainwright Report* at 6.

[43]  Rothe has attempted to respond to Dr. Rubinovitz's study with a report from the Vice President of Rothe; for the reasons stated in the Federal Defendant's *Daubert* motion, that Report must be excluded.  *See* App. K, *Rubinovitz Reply.*

68

requirements to meet a goal and the goal's relation to the relevant labor market; the

over- or under-inclusiveness of the program; the duration of the program; and the

impact of the program on third parties. *DynaLantic*, 885 F. Supp. 2d at 283 (citing

*United States v. Paradise,* 480 U.S. 149, 171, 187, (1987) (plurality and concurring

opinions) (other citations omitted)).  Because it has brought a facial challenge, Rothe

must show in the narrow tailoring context that the 8(a) program is so deficient that it

cannot be narrowly tailored in any set of circumstances.[44]   *Id.*

### 1. Congress Considered the Efficacy of Race-Neutral Alternatives.

Congress tried numerous race-neutral measures prior to enacting the 8(a)

program.  As Judge Sullivan found in *DynaLantic*, "Congress adopted a race-conscious

contracting preference for the Section 8(a) program only after long experience showed

that race-neutral alternatives were inadequate to combat the effects of racial

discrimination against minority-owned businesses." *DynaLantic*, 885 F. Supp. 2d at

283-84.  For twenty-five years prior to incorporating a race-conscious component into

the 8(a) program, "Congress attempted to use race-neutral means to foster and assist

minority owned businesses . . . and these race neutral measures failed to remedy the

effects of discrimination on minority small business owners." *Id.* at 284.

---

[44]   After *DynaLantic*, the Supreme Court decided *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411 (2013).  This decision does not change the narrow tailoring analysis.  Governmental entities have always had to show that they considered race-neutral methods before trying race-conscious ones.  In *Fisher*, rather than examine the alternatives, the lower courts assumed that the University had adopted a race-conscious program in good faith and deferred to the University.  Id. at 2420-21.  The Federal Defendants seek no such deference here.  And, even after *Fisher,* governmental entities are not required to exhaust "every conceivable race-neutral alternative" before taking race-conscious action.  *DynaLantic*, 885 F. Supp. 2d at 283 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)).

These efforts began with the Small Business Act of 1953, which authorized various programs to "aid, counsel, assist, and protect . . . the interests of small-business concerns" and "insure that a fair proportion of the total purchases and contracts for supplies and services for the government be placed with small-business enterprises." Pub. L. No. 83-163, § 202, 67 Stat. 282 (1953).  The Act contained no reference to race until the 1978 amendments codifying the 8(a) program. *See* Pub. L. No. 95-507, §§ 201, 211, 92 Stat. 1760, 1767 (1978).  Between 1953 and 1978, Congress utilized numerous race-neutral measures including:  (1) the creation of a surety bond guarantee program, Pub. L. No. 91-609, 84 Stat. 1813 (1970), *codified at* 15 U.S.C. §§ 694a and b; (2) the creation of a new class of small business investment companies to provide debt and equity capital to socially and economically disadvantaged individuals, Pub. L. No. 92-595, 86 Stat. 1314 (1972); (3) increased authority for the SBA to assist small businesses, particularly those owned by low-income individuals or located in areas of high unemployment, Pub. L. No. 93-386, 88 Stat. 742 (1974); (4) additional financial assistance for small businesses, Pub. L. No. 94-305, 90 Stat. 663 (1976); and (5) improved disaster assistance, see Pub. L. No. 95-89, 91 Stat. 553 (1977).  *See DynaLantic*, 885 F. Supp. 2d at 284.  However, the evidence before Congress at the time it codified the 8(a) program in 1978, set forth *supra* Part III.B.1, demonstrated "continuing discriminatory barriers to minority businesses notwithstanding all of the race-neutral measures it had already enacted." *DynaLantic*, 885 F. Supp. 2d at 284.  As the Tenth Circuit found in reviewing DOT's DBE program, "[t]he long history of discrimination in, and affecting the public construction procurement market—despite the efforts dating back at least to the enactment in 1958 [sic] of the SBA [Small Business

70

Act] to employ race-neutral measures . . . justifies race-conscious action." *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1178 (10th Cir. 2000).

Significantly, in addition to the 8(a) program, Congress has authorized multiple race-neutral measures aimed at assisting all small businesses. *See, e.g.,* 15 U.S.C. § 631(a) (stating policy to aid small businesses). These efforts include mechanisms to increase access to capital and credit, and other forms of assistance for *all* small businesses. 15 U.S.C. §§ 636(a) (providing loans to small businesses), 644(a), (i), (j) (providing small business set-asides), 648(a) (providing small business development centers). Given the continued barriers faced by minority-owned businesses, see *supra* Parts III.B.2-3, these race-neutral means remain insufficient.

### 2. The 8(a) Program's Goal Is Flexible.

The 8(a) program itself contains no goals and no requirement that the federal government or any agency contract with a certain number of 8(a) firms. The Small Business Act does contain an overall goal of spending 5% of federal prime and subcontracting dollars with businesses owned by socially and economically disadvantaged individuals. 15 U.S.C. § 644(g). Prime contracting through the 8(a) program is one way in which the federal government meets this goal. Importantly, this 5% goal is aspirational only. In finding for the government on this aspect of narrow tailoring, Judge Sullivan contrasted the 8(a) program with the program at issue in *Croson*; he noted that unlike the "rigid racial quota system . . . invalidated in *Croson* . . . [which] is the hallmark of an inflexible affirmative action program," the 8(a) program "contains no quota at all; it provides for aspirational goals and imposes no penalties for

failing to meet them." *DynaLantic*, 885 F. Supp. 2d at 285 (quotations and citations omitted).

Narrow tailoring also requires that any goal accurately reflect the relevant market.  As stated above, the 8(a) program itself contains no goal.  Given that the 5% goal in the Act is used neither as a floor nor as a ceiling for minority participation in contracting, the program's goal, such as it is, is sufficiently flexible for narrow tailoring.

### 3.  The Requirements for Participation in the 8(a) Program Ensure That It Is Neither Over- nor Under-Inclusive.

Regulations limit the 8(a) program to those who are truly socially and economically disadvantaged and create a mechanism for individuals who are not covered by the presumption to enter the program.  These features serve to narrowly tailor the 8(a) program by maintaining the program's focus on the *disadvantaged* status of program applicants and participants and not merely their *racial* status.

First, to guard against over-inclusiveness, the presumption that a minority applicant is socially disadvantaged may be overcome if the SBA is presented with "credible evidence to the contrary," which anyone may report to the SBA.  13 C.F.R. § 124.103(b)(3).  Second, the race-conscious presumption of social disadvantage, by itself, is not sufficient for participation in the 8(a) program—applicants must also "establish economic disadvantage under the standards contained in the regulations,[45] including the submission of a narrative statement describing his or her economic disadvantage and personal financial information." 885 F. Supp. 2d at 285-86; 13 C.F.R. § 124.104(b).  Third, the socially and economically disadvantaged individual must own a small business.  As a result, the 8(a) program "does not provide that every member of a

---

[45] *See supra* Part I.A.2 (describing standards for economic disadvantage).

minority group is disadvantaged" and thus, is entitled to receive the benefits of the 8(a) program. 885 F. Supp. 2d at 286. Rather, "race is made relevant in the program, but is not a determinative factor." *Id.* at 286-87. As Judge Sullivan stated, courts have found race-based presumptions like the one contained in the 8(a) program constitutional when "the presumption was rebuttable" and the program "contained an individualized economic component as well." *DynaLantic*, 885 F. Supp. 2d at 285 (citations omitted).

The 8(a) program guards against under-inclusiveness by permitting non-minority individuals who are socially and economically disadvantaged to participate in the program. *See* 13 C.F.R. §§ 124.103(c)(1), 124.104(a). Individuals who are not presumptively socially disadvantaged can satisfy the eligibility requirements for the 8(a) program by demonstrating individual social disadvantage by a preponderance of the evidence. 13 C.F.R. § 124.103(c)(1). Between 9-15 percent of firms participating in the 8(a) program have demonstrated their eligibility by providing evidence of individual social disadvantage. *See* SBA 2012 8(a) Report at 18; SBA 2010 8(a) Report at 17.

### 4. The Program Is Designed to Limit its Impact on Third Parties.

The 8(a) program is designed "to mitigate the adverse impact on firms outside the program." 885 F. Supp. 2d at 290. Under the regulations, SBA "will not accept a procurement for an award as an 8(a) contract if it determines that acceptance of the procurement would have an adverse impact on small businesses operating outside the Section 8(a) program."[46] *Id.* at 286; *see also* 13 C.F.R. § 124.504(c). The Court in

---

[46] For example, if a study like Dr. Rubinovitz's showed statistically significant over-utilization of SDBs in a specific NAICs code, SBA could use that information to decide not to use the 8(a) program for a specific contract in that code.

73

*DynaLantic* found this element of the 8(a) program particularly "noteworthy" given "the already non-mandatory nature of the program." *Id.* (quotations and citations omitted).

As an analysis of the money spent by the federal government shows, the 8(a) program has a very limited impact on non-minority-owned small businesses both generally and in the NAICS codes in which Plaintiff operates. Plaintiff does not and cannot raise an issue of material fact as to the fact that the vast majority of federal contracts and contracting dollars are open to bids by all small businesses.

On average in all NAICS codes over the last four years, the Federal government has obligated close to 4% of all small business eligible dollars to firms in the 8(a) program. See App. I, Declaration of Denise Hoban at 2, Rows 1 & 5. In other words, since 2009 the federal government has purchased just over $2.05 trillion worth of goods and services, and $1.97 trillion of that has been spent outside of the 8(a) program. Given that 96% of government spending occurs outside of the 8(a) program, the program cannot be viewed as causing an undue burden on third parties.

Between Fiscal Years 2008-2013, DOD has consistently only set-aside approximately 15% of contract actions worth 12% of obligated contract dollars into the 8(a) program in the five NAICS codes in which Plaintiff claims to perform the majority of its contracting. *Id.* at 3, Rows 7-11. DOD routinely conducts approximately 30,000 contract actions comprising approximately $16 billion annually in the 541511, 541512, 541513,541519 and 561210 NAICS codes. *Id* at 3, Rows 7 & 9. Only approximately 5,000 of these actions worth approximately $2 billion occur in 8(a) program set-aside contracts annually. *Id.* at 3, Rows 11 & 13.

A000652

In Fiscal Year 2013, only 15% of contract actions worth 12% of all DOD contract dollars were obligated by DOD in 8(a) set-aside contracts in Plaintiff's NAICS codes. *Id.* at 3, Rows 7 & 11.  In other words, 88% of all contract dollars obligated by DOD in the five NAICS codes in which Plaintiff operates, or approximately $13 billion, were not awarded through the 8(a) program. *Id.* Moreover in those five categories, DOD routinely exceeds 50% of contract actions and 35% of all obligations in those categories spent with small businesses. *Id* at 3, Rows 7 & 9 and p. 4, Rows 2 & 4.  In 2013, for example, almost 37% of all obligation, or $6 billion was split among small businesses in these categories. *Id.*

The SBA reports similar results for all federal government spending.  Only 13% of all contract actions, representing between 8% and 9% of all federal government obligations in these categories were spent with 8(a) companies. *Id.* at 3, Rows 6-10. In 2013, the federal government spent over $45 billion in these NAICS codes, with less than $4 billion obligated to 8(a) companies. *Id.* at 3, Rows 6 & 10.  In other words, last year, Plaintiff could have competed for almost $42 billion in these NAICs codes. *Id.*

The Federal Procurement Data System data for Fiscal Year 2012 also show significant government contracting with WOSB and HUBZone firms like Plaintiff.  For example, the DOD routinely contracts in excess of 11% of all contract actions in Plaintiff's NAICS codes with WOSB firms like Plaintiff and in excess of 6% of all contract obligations with HUBZone businesses. *Id.* at 4, Rows 5-10. The federal government as a whole routinely exceeds 15% of all contract actions with WOSBs in these NAICs codes representing almost $3 billion. *Id.* The HUBZone results are similar.  Indeed, in 2013

75

**A000653**

the federal government obligated almost 7% of all contract actions worth almost a billion dollars with HUBZone firms.  *Id*. at 4, Rows 11-13 & p. 5, Row 1.

Finally, Dr. Rubinovitz's three different definitions of minority-owned businesses demonstrate that the 8(a) program does not create an undue burden.   First, he looked at federal contracting for non-8(a) minority-owned SDBs.  App. H, *Rubinovitz Supplemental Report* at Table 4Alt and 5Alt.  These are the minority-owned businesses that potentially would be helped by the 8(a) program if it they met its economic requirements.  His results show statistically significantly lower odds of these businesses winning a contract when compared to similar businesses and no industries where these businesses have a statistically significantly greater chance of winning a contract. Second, he looked at the contracting odds for non-8(a) SDBs.  App. G, *Rubinovitz Report* at Table 4 and 5 (results for non-8(a) SDB).  These are all the small businesses that would be helped by the 8(a) program if they met its economic requirements: in other words, it includes those who would get into the program through the presumption and by proving social disadvantage.  Again, his results show statistically significantly lower odds of these businesses winning a contract when compared to similar businesses and no industries where these businesses have a statistically significantly greater chance of winning a contract.  Finally, he looked at the results for all small minority-owned businesses—including 8(a) businesses.  His results show statistically significantly lower odds of these businesses winning a contract when compared to similar non-minority owned businesses and no industries where these businesses have a statistically significantly greater chance of winning a contract.  *Id*. at Tables 4A and 5 (results for minority-owned).  This last measure shows that while the 8(a) program provides access

A000654

to contracts for a certain group of SDBs, it does not do so in a manner that creates an undue burden on non-minority owned businesses.  *See also supra* at Part III.B.3.c. Thus, the 8(a) program is limited to industries where there is a need for it, which, in turn, limits the burden on third parties.

### 5.   The 8(a) Program Has Appropriate Time Limits.

The 8(a) program places strict time limits on participation and is regularly reviewed by Congress and the SBA.  First, 8(a) program participation is limited to nine (9) years.  5 U.S.C. § 636(j)(10)(C)(i); 13 C.F.R. § 124.2.  This time frame gives an individual "a reasonable opportunity" to "overcome its disadvantaged status."  885 F. Supp. 2d at 287.  In addition, program participation is further limited to one-time eligibility—"once a business or disadvantaged individual has participated in the 8(a) program, neither the business nor that individual will be eligible again."  *Id.*; *see also* 13 C.F.R. § 124.108(b); 15 U.S.C. § 636(j)(11)(B)-(C).

Second, the 8(a) program requires a participant to exit early if it "overcomes its disadvantage" prior to the end of its term in the program.  *See* 885 F. Supp. 2d at 287. Program participants must demonstrate their eligibility throughout the program term by submitting an annual certification and other information to SBA regarding the eligibility requirements, which enables the SBA to verify continued eligibility and to monitor its participants' "performance and progress in business development."  *Id.*; *see also* 13 C.F.R. §§ 124.112, 124.509(c), 124.601-602; 15 U.S.C. § 637(a)(4)(C), (6)(B), (12)(A), (20).  If a program participant "has substantially achieved the targets, objectives, and goals set forth in its business plan and has demonstrated the ability to compete in the marketplace without assistance," then the SBA will graduate the

77

participant from the program early. *Id.*; 13 C.F.R. § 124.302(a)(1). SBA will also graduate a program participant early "if one or more of the disadvantaged owners upon whom its eligibility is based is no longer economically disadvantaged." 13 C.F.R. § 124.302(a)(2). In addition, if the SBA receives "specific and credible information" alleging that a participant no longer meets the eligibility requirements, the SBA reviews the participant's eligibility for continued participation in the program. 885 F. Supp. 2d at 287; *see also* 13 C.F.R. § 124.112(c); 15 U.S.C. §§ 636(j)(10)(J)(I), 637(a)(6)(C).

Third, SBA is required by law to report to Congress on the 8(a) program and its other small business contracting on an annual basis. As a result, Congress regularly receives reports regarding the 8(a) program from the SBA, and, to the extent that Congress disagrees with the direction of the program or SBA's actions, Congress has ample opportunity to act. Finally, SBA regularly reviews the program and updates its regulations.

To be sure, the 8(a) program does not require reauthorization or have a sunset provision; the lack of those features, however, does not mean the 8(a) program fails narrow tailoring. The 8(a) program is a business development program, not an industry focused one. For that reason, the time limit focuses on the participants, not on the program. *See DynaLantic*, 885 F. Supp. 2d at 287 (finding the 8(a) program focuses "on the specific social and economic circumstances of individual firms and their owners [and] not merely their minority status;" thus the program is appropriately time limited).

## IV. The 8(a) Program Does Not Violate the Nondelegation Doctrine.

Plaintiff argues that Congress violated the nondelegation doctrine by authorizing the SBA (1) to determine whether an individual is "socially disadvantaged" such that

they "have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," 15 U.S.C. § 637(a)(5); and (2) to designate additional groups as socially disadvantaged, 15 U.S.C. § 631(f)(1).  To succeed, Plaintiff must prove that the Congress failed to provide an "intelligible principle" for SBA to make these determinations. Plaintiff cannot meet this burden, nor can it raise any genuine issues of material fact regarding this claim. Significantly, the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," which is exemplified by the fact that "in the history of the Court [it] has found the requisite 'intelligible principle' lacking in only two statutes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 474-75 (2001).

When it conferred both decision-making authorities upon SBA, Congress provided SBA with "an intelligible principle" by which the agency was "directed to conform," as is required by constitutional nondelegation doctrine.  *See id.* at 472 (citations omitted).  In fact, the two challenged provisions themselves contain information to guide SBA's decisionmaking pursuant to its delegated authority to support the business development of socially and economically disadvantaged businesses.  15 U.S.C. § 637(a).  The language in 15 U.S.C. § 637(a)(5) sets forth the definition of "socially disadvantaged individuals" to assist SBA in identifying appropriate program participants.  Similarly, the language in 15 U.S.C. § 631(f)(1) states the findings made by Congress in enacting the 8(a) program and expresses the policy behind the program, both of which serve to guide SBA in its  implementation of the 8(a) program.

As the D.C. Circuit has noted, "a delegation need not be tested in isolation as the statutory language may derive content from the purpose of the Act, its factual background, and the statutory context." *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30 (D.C. Cir. 2009) (quotations and citations omitted). Plaintiff contends that the delegated authority does not contain an intelligible principle because it "provides no basis to define 'racial,' 'ethnic,' or 'other minority' group—nor should our laws contain such a definition."[47]  Dkt. No. 56 at 41.  Plaintiff is wrong.  The statutory context provides an intelligible principle to guide SBA by listing specific examples of such groups who face the prejudice intended to be addressed by the statute, including "Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, [and] Native Hawaiian Organizations."  15 U.S.C. § 631(f)(1)(C).  Congress provided additional guidance by identifying these groups as ones "that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control."  15 U.S.C. § 631(f)(1)(B).  Certainly, this statutory context provides far more guidance to SBA than the intelligible principles the Supreme Court has found adequate in statutes merely "authorizing regulation in the public interest" or "in a way that is fair and equitable."  *Michigan Gambling*, 525 F. 3d at 31 (citations omitted); *see also Whitman*, 531 U.S. at 474.

Plaintiff also argues that there is no intelligible principle "to determine how *all* of the members of such groups had 'been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member.'"  Dkt. No. 56 at 41 (emphasis added). However, SBA is not required to make a determination that *all* members of these groups

---

[47]  By Plaintiff's logic, Congress could not even take the action it prescribes to cure the alleged defect.  Regardless, no such remedy is necessary.

A000658

have been subjected to such prejudice or cultural bias.  The statute delegates to SBA the authority to make a determination whether an *individual* is "socially disadvantaged" because they have been "subject to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  15 U.S.C. 637(a)(5) (emphasis added).  Similarly, in SBA's identification of other minority groups that are presumptively socially disadvantaged, the statute does not demand that SBA find that *all* members of the group are socially disadvantaged.  15 U.S.C. § 631(f)(1). For these reasons, the presumption of social disadvantage is rebuttable—it recognizes that *not all* members of minority groups may be socially disadvantaged.  13 C.F.R § 124.103(b).

Rothe's claim that Congress has conferred "unlimited discretion to decide whether racial or ethnic prejudice or cultural bias has occurred with respect to a given group," Dkt. No. 56 at 42, is equally unavailing.  The SBA's authority to designate groups is guided by the examples of such groups, 15 U.S.C. § 631(f)(1)(C), which Congress has found have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control, 15 U.S.C. § 631(f)(1)(B), and by the purpose of the act to promote the business development of small businesses owned by socially and economically disadvantaged individuals, 15 U.S.C. § 631(f)(2)(A).  Thus, the challenged delegation is not among the small group of "only the most extravagant delegations of authority, those providing *no standards* to constrain administrative discretion, [which] have been condemned by the Supreme Court as unconstitutional." *Humphrey v. Baker*, 848 F.2d 211, 217 (D.C. Cir. 1988) (emphasis added). Furthermore, the Supreme Court has "upheld, again without deviation, Congress' ability

81

to delegate power under broad standards." *Mistretta v. United States*, 488 U.S. 361, 373 (1989).  Even in "sweeping regulatory schemes," the Supreme Court has "never demanded . . . that statutes provide a determinate criterion for saying how much of the regulated harm is too much . . . [or] how imminent was too imminent, or how necessary was necessary enough."  *Whitman*, 531 U.S. at 475.

Finally, Plaintiff erroneously attempts to introduce a strict scrutiny standard into the constitutional nondelegation doctrine.  Dkt. No. 56 at 42-44.  Strict scrutiny applies only to Plaintiff's facial challenge to the race-conscious presumption in the 8(a) program.  Plaintiff's mistake here is epitomized by its misplaced reliance on Justice Ginsburg's dissent in *Adarand*, 515 U.S. 200, to support its theory.  Contrary to Plaintiff's assertion, Justice Ginsburg made clear that an invidious racial classification, like the one at issue in *Korematsu*, would never survive strict scrutiny, but made absolutely no representation as to whether it would violate the Court's precedent regarding constitutional nondelegation doctrine.  515 U.S. at 275 (Ginsburg, J., dissenting).

## V.   Conclusion

The 8(a) program is facially constitutional and Congress's directions to SBA to implement the program do not violate the nondelegation clause.  For the forgoing reasons, Federal Defendants move this Court to grant summary judgment to SBA and DOD and deny Plaintiff's motion for summary judgment.

Date:  June 16, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

82

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
Senior Trial Attorney
BARBARA SCHWABAUER
Trial Attorney
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

83

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____ )
                                          )
ROTHE DEVELOPMENT, INC.,                  )
                                          )
                   Plaintiff,             )
                                          )
v.                                        )   Civil Action No. 1:12-cv-00744-KBJ
                                          )
DEPARTMENT OF DEFENSE                     )
                                          )
and                                       )
                                          )
SMALL BUSINESS ADMINISTRATION,            )
                                          )
                   Defendants.            )
_____ )

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AND RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Defendants, by their undersigned attorneys and pursuant to Local Rule  7(h),

hereby submit the following response to Plaintiff's Statement of Facts ( "Pl. SoF").

Where, as here, the parties have submitted cross-motions for summary

judgment, the court must rule on each side's motion "on an individual and separate

basis, determining in each case whether a judgment may be entered in accordance with

Fed. R. Civ. P. 56." *Spears v. Nationwide Mut. Ins. Co.*, 254 F. Supp. 2d 144, 152

(D.D.C. 2003) (quotation omitted).  Thus, "[t]he fact that cross-motions for summary

judgment are pending does not preclude a finding that genuine issues of material fact

exist, as each party concedes that there are no material facts at issue only for the

purposes of its own motion."  *Id.*; *see American Bankers Ins. Group, Inc. v. Bd. of*

*Governors*, 3 F. Supp. 2d 37, 40 (D.D.C. 1998).  On the other hand, the existence of a

non-material factual dispute or a mere scintilla of evidence in support of one side's

position is not sufficient to defeat the opposing side's summary judgment motion.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 251-52 (1986).

Defendants submit that the respective cross-motions in the instant case present

no genuinely disputed material facts that would preclude the use of summary judgment

to resolve this case.  Defendants do not, however, agree with all of the assertions

contained in Plaintiff's statement of facts, or that all such assertions are material to the

resolution of the case.  In particular, Defendants do not agree with Plaintiff's opinions,

arguments and conclusions of law (including arguments and legal conclusions presented

as facts) or Plaintiff's characterizations of the evidence, except to the extent actually

supported by facts of record or facts that are appropriate subjects of judicial notice.

Subject to the foregoing, Defendants hereby present their undisputed material

facts and respond to Plaintiff's statement of facts, using the same paragraph numbering

and abbreviations contained therein.

### I.      Defendants' Undisputed Material Facts

1.  Plaintiff Rothe is a woman-owned small business that operates in the
    computer services industry.  Dkt. No. 1-1 at 2-3.

2.  Rothe is also a certified HUBZone business, and is one of several related
    businesses owned by the same individuals.  App. J, Declaration of Janice Lisa
    Romney at Table 1; Dkt. No. 1-1 at Appendix 1.

3.  Plaintiff's various businesses have been awarded in excess of $25 million in
    Federal Government contracts since 2008.  App. J, Declaration of Janice Lisa
    Romney at Table 1.  Included in this number are $7 million in HUBzone set-
    aside contracts.  *Id.*

A000663

4.  As a women-owned and HUBZone business, Rothe is entitled to participate in
    SBA programs that set-aside contracts for women-owned businesses and for
    businesses that operate in HUBZones.

5.  The goal created by the Small Business Act, 15 U.S.C. § 644(g)(1)(iv),  of
    spending at least 5% of the Federal Government's prime and subcontracting
    dollars with businesses owned by socially and economically disadvantaged
    individuals is aspirational only.  App. A, Declaration of Calvin Jenkins at 2.

6.  Only 4% of the $404 billion that the United States spent in small business
    eligible procurement actions were spent through the 8(a) program in Fiscal
    Year 2012.  Small Business Goaling Report Fiscal Year 2012 (Mar. 19, 2013),
    *available at*
    https://www.fpds.gov/downloads/top_requests/FPDSNG_SB_Goaling_FY_
    2012.pdf.

7.  The United States spent $19 billion (5%) in small business eligible
    procurement actions with Veteran-Owned Small Businesses, $17 billion (4%)
    with Woman-Owned Small Businesses, and $8 billion (2%) with Certified
    HUBZone small businesses in Fiscal Year 2012.  Small Business Goaling
    Report Fiscal Year 2012 (Mar. 19, 2013), *available at*
    https://www.fpds.gov/downloads/top_requests/FPDSNG_SB_Goaling_FY_
    2012.pdf.

8.  Between 9-15 percent of firms participating in the 8(a) program have
    demonstrated their eligibility by providing evidence of individual social
    disadvantage.  SBA Office of Bus. Dev., 8(a) Program 2010 & 2012 Annual
    Report to Congress at 18 (2012), at 17 (2010), *available at*

3

http://www.sba.gov/sites/default/files/files/FY12_408_report.pdf;

http://www.sba.gov/sites/default/files/Final_FY_2010_408_Report_4-29-11.pdf.

9.  Rothe is making solely a facial challenge to the 8(a) program; it does not make any as-applied claims regarding an industry or a contract.

10. For his expert report in this case, Dr. Wainwright reviewed the results of 107 disparity studies, most of which were submitted to Congress.  These disparity studies cover 142 public contracting entities in 35 states encompassing 89% of the national population.  App. D, *Wainwright Report* at 10, 20.

11. Dr. Wainwright has analyzed each disparity study individually, extracting from each study specific data which he then compiled for his report.  App. D, *Wainwright Report* at 21-22.  In each report he extracted for prime contracting:

• the percentage utilization of [Minority Business Enterprises ("MBEs")]  in construction spending,
• the percentage availability of MBEs for construction spending,
• the percentage utilization of MBEs in [Construction Professional Services ("CPS")] spending,
• the percentage availability of MBEs for CPS spending,
• the percentage utilization of MBEs in [Other Professional Services ("OPS")] spending, and
• the percentage availability of MBEs for OPS spending.

Following this data extraction, Dr. Wainwright carried out certain additional calculations in order to present the information in his report consistently.  *Id.* at fn. 34.  This data was then analyzed to draw conclusions concerning the state of minority contracting nationwide.  *Id.* at 22.

A000665

12. The results of Dr. Wainwright's review of these disparity studies are accurately reported in Dr. Wainwright's report for this case in Table 5 of his report and pages 36-54.  App. D, *Wainwright Report* at 21, 25-35, 36-54.

13. Dr. Wainwright conducted a statistical comparison of contracting in the federal government and in a selection of disparity studies and found a statistically significant overlap between the most common industries in federal contracting and the industries used in a selection of the disparity studies he reviewed.  App. E, *Wainwright Reply* at 3-4.

14. Dr. Wainwright used Census data to calculate minority business formation and earnings.  The results of his calculations are accurately represented on page 56 of his report.  App. D, *Wainwright Report* at 56.

15. Dr. Robert Rubinovitz conducted regression analyses that controlled for the industry in which the firm did business based on three digit NAICS codes, business age, business size (in terms of both average number of employees and annual receipts), business form, and security clearance, and compared the likelihood of minority-owned businesses receiving a federal contract verses similar non-minority-owned businesses.  App. G, *Rubinovitz Report* at 10.

16. Tables 3, 4, 4A, 5, 3Alt, 4Alt, and 5Alt from Dr. Rubinovitz's report and supplemental report accurately reflect the results of his regression analyses.  App. G, *Rubinovitz Report* at Tables 3, 4, 4A, 5; App. H, *Rubinovitz Supplemental Report* at Tables 3Alt, 4Alt, 5Alt.

17. Dr. Rubinovitz's study shows that non-8(a) SDBs, small minority-owned businesses, and non-8(a) minority-owned SDBs were statistically significantly

less likely to win a federal contract in the vast majority of NAICS codes.  App. G, *Rubinovitz Report* at Tables 4, 4A, 5; App. H, *Rubinovitz Supplemental Report* at Tables 4Alt, 5Alt.

18. Dr. Rubinovitz study found no NAICS codes where non-8(a) SDBs, small minority-owned businesses, or non-8(a) minority-owned SDBs were statistically significantly more likely to win a contract.  App. G, *Rubinovitz Report* at Tables 4, 4A, 5; App. H, *Rubinovitz Supplemental Report* at Tables 4Alt, 5Alt.

19. On average in all NAICS codes over the last four years, the Federal government has obligated close to 4% of all small business eligible dollars to firms in the Section 8(a) program.  App. I, Declaration of Denise Hoban at 2, Rows 1 & 5.

20. Since 2009 the federal government has purchased just over $2.05 trillion worth of goods and services, and $1.97 trillion of that has been spent outside of the 8(a) program.  *Id.*

21. Between Fiscal Years 2008-2013, DOD has consistently only set-aside approximately 15% of contract actions worth 12% of obligated contract dollars into the 8(a) program in the five NAICS codes in which Plaintiff claims to perform the majority of its contracting.  *Id.* at 3, Rows 7 – 11.

22. DOD routinely conducts approximately 30,000 contract actions comprising approximately $16 billion annually in the 541511, 541512, 541513,541519 and 561210 NAICS codes.   Only approximately 5,000 of these actions worth approximately $2 billion occur in 8(a) program set-aside contracts annually.  *Id.* at 3, Rows 7 & 9.

6

**A000667**

23. In Fiscal Year 2013, only 15% of contract actions worth 12% of all DOD contract dollars were obligated by DOD in 8(a) set-aside contracts in Plaintiff's NAICS codes. *Id.* at 3, Rows 7 & 11.

24. Only 13% of all contract actions, representing between 8% and 9% of all federal government obligations in NAICS codes 541511, 541512, 541513, 541519 and 561210 were spent with 8(a) companies. *Id.* at 3, Rows 6 -10.

25. In 2013, the federal government spent over $45 billion in these NAICS codes, with less than $4 billion obligated to 8(a) companies. *Id.* at 3, Rows 6 & 10.

26. DOD routinely contracts in excess of 11% of all contract actions in Plaintiff's NAICS codes with WOSB firms like Plaintiff and in excess of 6% of all contract obligations with HUBZone businesses. *Id.* at 4, Rows 5-10.

27. The federal government as a whole routinely exceeds 15% of all contract actions with WOSBs in these NAICs codes representing almost $3 billion. *Id.*

28. In 2013 the federal government obligated almost 7% of all contract actions worth almost a billion dollars with HUBZone firms. *Id.* at 4, Rows 11-13, & p. 5, Row 1.

## II.    Defendants' Responses to Plaintiff's Undisputed Material Facts

**Paragraph 1**: Admit.

**Paragraph 2:** Admit.

**Paragraph 3:** Admit. The Small Business Act also finds that "many such persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." 15 U.S.C. § 631(f)(1)(B).

7

**Paragraph 4:** Admit except to clarify that the use of the word "subset" does not appear in the Small Business Act. 15 U.S.C. § 637(a).

**Paragraph 5:** Admit.  The Small Business Act also establishes the following goals for other business entities:

> (i)     The Government wide goal for participation by small business concerns shall be established at not less than 23 percent of the total value of all prime contract awards for each fiscal year.

> (ii)    The Government wide goal for participation by small business concerns owned and controlled by service-disabled veterans shall be established at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year.

> (iii)   The Government wide goal for participation by qualified HUBZone small business concerns shall be established at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year.

> (iv)    The Government wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

> (v)     The Government wide goal for participation by small business concerns owned and controlled by women shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.

15 U.S.C. § 644(g).

**Paragraph 6:** Admit.

**Paragraph 7:** Admit except to add that the criteria included in the statute specifically are:

> (I)     there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and

> (II)    the anticipated award price of the contract (including options) will exceed $5,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and

8

**A000669**

$3,000,000 (including options) in the case of all other contract opportunities.

15 U.S.C. § 637(a)(1)(D)(i).

**Paragraph 8:** Admit.

**Paragraph 9:** Admit, except to add that the Small Business Act imposes other limitations on eligible program participants including that the entity may only be allowed continued participation and eligibility in the 8(a) program for a period of time which is the greater of:

> (I)    9 years less the number of years since the award of its first contract pursuant to section 8(a); or
>
> (II)   its original fixed program participation term (plus any extension thereof) assigned prior to the effective date of this paragraph plus eighteen months.

15 U.S.C. § 636(j)(10).

**Paragraph 10:** Deny.  The Small Business Act's definition of social disadvantage is not, in and of itself, a racial classification.  The Act defines those who are socially disadvantaged as those who have suffered "racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities."  15 U.S.C. § 637(a)(5).  Although race is one element, individuals may establish social disadvantage by demonstrating:

> At least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from the mainstream of American society, or other similar causes not common to individuals who are not socially disadvantaged.

13 C.F.R. 124.103(c)(2)(ii).  Indeed, approximately, 9 to 15 percent of firms participating in 8(a) program have demonstrated their eligibility by providing evidence of social disadvantage.  *See* SBA Office of Bus. Dev., 8(a) Program 2010

& 2012 Annual Report to Congress at 18 (2012), at 17 (2010), available at

http://www.sba.gov/sites/default/files/files/FY12_408_report.pdf

**Paragraph 11:** Admit that SBA regulations list 37 groups that SBA believes are subgroups of the 5 groups (*i.e.*, Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and Subcontinent Asian Americans) whose members are deemed presumptively disadvantaged. *See* 13 C.F.R. § 124.103(b)(1). This presumption is rebuttable. *See* 13 C.F.R. § 124.103(b)(3) ("The presumption of social disadvantage may be overcome with credible evidence to the contrary. Individuals possessing or knowing of such evidence should submit the information in writing to the Associate Administrator for 8(a) BD (AA/8(a)BD) for consideration.")

Defendants also concur with Plaintiff that the classifications in the Small Business Act that give the presumption of social disadvantage to Indian tribes, Native Americans and Native Hawaiian Organizations are not racial classifications and thus are not subject to this challenge. *See Morton v. Mancari*, 417 U.S. 535 (1974).

**Paragraph 12:** Admit, except to the legal argument that the Small Business Administration ("SBA") has "purported" to designate additional racial groups as presumptively disadvantaged.

**Paragraph 13:** Admit that those in the 8(a) program receive certain benefits. Deny as to the benefits flowing from the goal, as the goal is completely aspirational.  Further, in addition to small and disadvantaged owned businesses, the Small Business Act seeks to expand business opportunities to other types of businesses including WOSB and HUBZone businesses like Plaintiff.  Through the

A000671

Act the SBA also provides financial, technical, and management assistance to help eligible small businesses gain a foothold in federal government contracting and become more competitive in the marketplace.  *See* 15 U.S.C. § 631(f)(2); 13 C.F.R. §§ 124.1, 124.404.

**Paragraph 14:** Deny. Plaintiff is not eligible for only the race-conscious presumption of social disadvantage under the Small Business Act.  Plaintiff could qualify as socially disadvantaged on equal footing  with any other small business owner by demonstrating evidence of individual social disadvantage including: (1) one objective distinguishing feature that has contributed to social disadvantage (for example, race, ethnic origin, or long-term residence in an environment isolated from mainstream American society); (2) personal experiences of substantial and chronic social disadvantage in American society; and (3) negative impact on entry into or advancement in the business world because of the disadvantage.  13 C.F.R. § 124.103(c)(2).  The only element of the statute that is race-conscious is the presumption of social disadvantage.

**Paragraph 15: Deny.**  Defendants admit that Plaintiff only has standing to challenge the constitutionality of the 8(a) program because Plaintiff is unable to compete for Department of Defense contracts that are reserved for 8(a) program participants that receive a race-conscious presumption of social disadvantage for which Plaintiff cannot qualify.  *See, e.g., Dynalantic Corp. v Dep't of Defense*, 115 F.3d 1012, 1014 (D.C. Cir. 1997).  SBAs other designations, including those that provide contracting assistance for women-owned and HUBZone firms, have not injured Plaintiff.  In addition, the 8(a) program regulations contain specific provisions designed to limit the impact that the program may have on an individual small business, a group of small businesses located

in a particular geographic location, or other small business programs.  *See* 13 C.F.R. § 124.504.

**Paragraph 16:** Admit**.**

**Paragraph 17:** Deny. Plaintiff has not been denied equal protection of the laws because the 8(a) program is facially constitutional.

**Paragraph 18:** Admit that Plaintiff is not a beneficiary of the race-conscious presumptions of social disadvantage in the 8(a) program.  Deny that Plaintiff's lack of desire to participate in the 8(a) program would confer standing to challenge the 8(a) program.  To the best of Defendants' knowledge, information, and belief, neither Plaintiff nor any of its owners has ever applied for admission to the 8(a) program and so there has never been an official determination as to whether or not Plaintiff could participate in that program.  Under applicable SBA regulations "[a]ny concern or any individual on behalf of a business has the right to apply for 8(a) BD program participation whether or not there is an appearance of eligibility."  13 C.F.R. § 124.201. Plaintiff would also need to establish individual economic disadvantage under the standards set forth in 13 C.F.R. § 124.104, which apply to all applicants for admission to the 8(a) program. Only wealthy individuals are automatically excluded from program participation.  *See* 13 C.F.R. § 124.104(c)(2).

**Paragraph 19:** Admit that subsequent to the initial passage of the Small Business Act, Asian Pacific Americans and Subcontinent Asian Americans were designated as groups presumed to be socially disadvantaged by petition to the SBA.  *See* 44 Fed. Reg. 31055 (May 30, 1979); 44 Fed. Reg. 42832 (July 20, 1979); 47 Fed. Reg. 36743 (Aug. 23, 1982). Deny that SBA "purported" to add these additional groups and that the addition of these groups violates the Equal Protection Clause.  Congress codified the SBA's inclusion of

Asian Pacific Americans as a socially disadvantaged group in 1980 by amendment to the Small Business Act. Pub. L. No. 96-302, § 118, 94 Stat. 833 (1980). Admit that this presumption does not apply to Plaintiff.

**Paragraph 20:** Deny that the designation of additional groups for inclusion in the 8(a) program was an unconstitutional delegation by Congress. Deny that this is an additional injury to Plaintiff.

**Paragraph 21:** Admit.

**Paragraph 22:** Admit.

**Paragraph 23:** Admit that Plaintiff bids on, and is awarded, small business contracts with the Federal Government; however Defendants do not possess information, and thus cannot admit, the number or nature of the bids made by Plaintiff. Admit also that Plaintiff bids on, and is awarded, contracts set-aside for small businesses and HUBZone businesses. App. J, Declaration of Janice Lisa Romney at Table 1. Plaintiff's various businesses have been awarded in excess of $25 million in Federal Government contracts since 2008. *Id.* Included in this number are $7 million in HUBzone set-aside contracts. *Id.*

**Paragraph 24:** Defendants lack knowledge or information sufficient to admit or deny.

**Paragraph 25:** Deny. Between Fiscal Years 2009-2013, Defendant DOD has consistently set-aside approximately 15% of contract actions worth 12% of obligated contract dollars into the 8(a) program in the five North American Industrial Codes (NAICS) codes where Plaintiff claims to perform the majority of its contracting. *See,* App. I, Declaration of Denise Hoban at 3, Rows 7-10. DOD routinely conducts approximately 30,000 contract actions comprising approximately $16 billion annually in the 541511, 541512, 541513, 541519 and 561210 NAICS codes. *Id.* at 3, Rows 7 & 9.

A000674

Only approximately 5,000 of these actions worth approximately $2 billion occur in 8(a) program set-aside contracts. *Id.* at 3, Rows 11 & 13. In Fiscal Year 2013 only 15% of contract actions worth 12% of all DOD contract dollars were obligated by DOD in 8(a) set-aside contracts in these NAICS codes. *Id.* at 3, Rows 7 & 11. In those five categories, DOD routinely awards over 50% of contract actions and 35% of all obligations to small businesses like Plaintiff. *Id.* at 3, Row 7 & 9. & p. 4, Row 2 & 4. In 2013, for example, almost 37% of all obligation, or $6 billion was split among small businesses in these categories. *Id.*

The SBA reports similar results for all federal government spending. Only 13% of all contract actions, representing between 8% and 9% of all federal government obligations in these categories were spent with 8(a) companies. *Id.* at 3, Rows 6 -10. In 2013, the federal government spent over $45 billion in these NAICS codes, with less than $4 billion obligated to 8(a) companies. *Id.* at 3, Rows 6 & 10.

Defendants also deny Plaintiffs claim that obligations to the 8 (a) program in Plaintiff's NAICS codes are increasing. The federal government procurement data has been remarkably consistent since 2009 at $3.9 billion dollars annually obligated in these codes. *Id.* at 3, Row 10.

**Paragraph 26:** Deny. The Federal Procurement Data System ("FPDS") data demonstrates the opposite of Plaintiffs claims. Including the above data, which show that routinely only 8% of all federal government obligations in these NAICS codes are obligated to 8(a) firms, the FPDS data also show significant government contracting with WOSB and HUBZone firms like Plaintiff.

In these NAICS codes, DOD routinely contracts in excess of 11% of all contract actions with WOSB firms like Plaintiff worth in excess of 6% of all contract obligations.

A000675

*Id.* at 4, Rows 5-10.  The federal government as a whole routinely exceeds 15% of all contract actions with WOSBs in these NAICs codes representing almost $3 billion.  *Id.* The HUBZOne results are similar.  Indeed, in 2013 the federal government obligated almost 7% of all contract actions in these NAICS codes worth almost a billion dollars with HUBZone firms.  *Id.* at 4, Rows 11-13 & p. 5, Row 1.

**Paragraph 27:** Admit.  Defendants will continue to use the 8(a) program in these NAICS codes.

**Paragraph 28:**  Admit that Plaintiff's business operates in NAICS codes where Defendants will use the 8(a) program.

**Paragraph 29:** Deny that the Section 8(a) program is a "discriminatory statutory racial program." The 8(a) program serves the compelling government interest in "breaking down barriers to minority business development created by discrimination and its lingering effects," including exclusion from government contracting.  *See DynaLantic v. Dep't of Defense,* (885 F. Supp. 2d 237 (D.D.C. 2012)).   Admit that Plaintiff's business operates in NAICS codes where Defendants will use the 8(a) program.

**Paragraph 30:** Admit that Plaintiff is not currently a participant in the 8(a) program. Deny that Plaintiff could be a participant in the program as Defendants are unaware whether Plaintiff or any of its owners has ever applied for admission to the 8(a) program and so there has never been any official determination as to whether or not Plaintiff could participate in that program.

**Paragraph 31:** Deny.

**Paragraph 32:** Deny.  In addition to evidence in Congressional hearings and reports, Defendants have presented as uncontroverted evidence of Dr. Robert Rubinovitz's and

Dr. Jon Wainwright's expert reports showing consistent and statistically significant underutilization of small, minority-owned businesses in public sector contracting, minority business development, and federal prime contracting.  *See* App. D, *Wainwright Report* at 3; App. G, *Rubinovitz Report* at 2.  Dr. Wainwright examined over 100 disparity studies conducted in jurisdictions throughout the nation and determined that, almost without fail, minority-owned businesses were underutilized in prime public contracting compared to their availability in prime public contracting.  *See* App. D, *Wainwright Report* at 21, 25-35 (Table 5).  Dr. Wainwright also examined the earnings of minority-owned businesses and found large, statistically significant differences between the business population and their earnings for all racial groups. *See id.* at 56.

Dr. Rubinovitz examined federal contracting at the three digit NAICS code level and determined that in the vast majority of industries, minority-owned businesses were less likely to win a federal contract, usually to a statistically significant degree.  *See* App. G, *Rubinovitz Report* at Tables 3, 4, 4A, 5; App. H, *Rubinovitz Supplemental Report* at Tables 3Alt, 4Alt, 5Alt.  In fact, there were no NAICS codes where minority-owned businesses were statistically significantly more likely to win a contract.  *Id.*

**Paragraph 33:**  Deny.  Upon passage of the law that created the 8(a) program Congress made specific findings as to the racial minorities that are presumed social disadvantage.  Pub. L. No. 95-507 incorporated the findings that

> (B) many . . . persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control;

> (C) that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans and other minorities.

16

Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).

**Paragraph 34:** Deny.  In addition to the evidence presented in Dr. Rubinovitz's report, Congress has received evidence of discrimination faced by government contractors.  For example, in 1981, the House Committee on Small Business heard extensive testimony about the effects of discrimination on minority small businesses, including "covert and outright discrimination directed at disadvantaged and minority business people by majority companies, financial institutions, and government at every level." *Small and Minority Business in the Decade of the 1980s (Part 1)*:  Hearings Before the H. Comm. on Small Bus., 97th Cong. 106 (1981).

**Paragraph 35:** Deny. Defendants have marshaled more than three arguments to defend the facial constitutionality of the 8(a) program.

**Paragraph 36:** Admit that Defendants raised this argument in *DynaLantic v. Dep't of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012) and these lingering effects of discrimination continue today.

**Paragraph 37:** Admit that Defendants raised this argument in *DynaLantic v. Dep't of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012) and these lingering effects of discrimination continue today.

**Paragraph 38:** Admit that Defendants raised this argument in *DynaLantic v. Dep't of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012) and these lingering effects of discrimination continue today.

**Paragraph 39:** Deny.  *See DynaLantic v. Dep't of Defense*, 885 F. Supp. 2d 237 (D.D.C. 2012) (finding the 8(a) program constitutional).

**Paragraph 40:** Admit that Defendants and Congress have received evidence from over a hundred disparity studies that demonstrate, overwhelmingly, that minority contractors are underutilized in public contracting.  *See* App. D, *Wainwright Report* at 21, 25-35 (Table 5).

**Paragraph 41:** Deny.  Courts have consistently used the evidence presented in state and local disparity studies to uphold the constitutionality of race-conscious federal contracting programs.  *See, e.g., DynaLantic v. Dep't of Defense,* 885 F. Supp. 2d 237 (D.D.C. 2012) (finding the 8(a) program constitutional); *Geyer v. Minnesota Dept. of Trans.,* 2014 WL 1309092 (D. Minn. 2014) (upholding the constitutionality of the federal transportation contracting program), *appeal docketed*, No. 14-2025 (8th Cir. May 5, 2014).  App. E, *Wainwright Reply* at 5.

**Paragraph 42:** Deny. Defendants' brief which includes a summary of available Congressional and expert evidence establishes a compelling interest for the 8(a) program.

**Paragraph 43:** Deny.  Defendants have presented evidence of the lingering effects of discrimination in federal contracting.  First, Dr. Wainwright performed a correlation analysis and found a substantial correlation between the industries examined in the disparity studies and federal procurement.  Dr Wainwright specifically found when examining four specific studies that:

> rank correlation tests at the three-digit NAICS level show a strong degree of correlation between the types of goods and services procured by the federal government and those of all four state and local governments. In the case of New York, the Spearman correlation coefficient was 63 percent. For Maryland it was 54 percent. For Broward County and the City of Minneapolis it was 62 percent and 56 percent, respectively. In all four cases, the corresponding probability that there was, in fact, no correlation between the two rankings was less than 0.0002 percent.

A000679

App. E, *Wainwright Reply* at 5. Defendants have also demonstrated through Dr.
Rubinovitz's report that in the vast majority of industries, minority-owned businesses
were less likely to win a federal contract, usually to a statistically significant degree.
App. G, *Rubinovitz Report* at Tables 4, 4A, 5; App. H, *Rubinovitz Supplemental Report*
at Tables 4Alt and 5Alt.

**Paragraph 44:** Deny. The evidence recently before Congress continues to
demonstrate that minorities face discriminatory barriers to business formation and
development, providing a strong basis for the compelling interest supporting the 8(a)
program. *See* 159 Cong. Rec. S4981-82 (daily ed. June 21, 2013) (statement of Sen.
Landrieu) (compiling a list of more than 40 Congressional hearings between 2006-2013
addressing the problems of minority small businesses). Through hearings, disparity
studies, academic research, and individual testimony, Congress has gathered more than
sufficient evidence to determine that race-conscious action remains necessary in federal
contracting so that the federal government is not a participant in discrimination and its
lingering effects. *See also The Minority Business Development Agency: Enhancing the
Prospects for Success: Hearing Before the Subcomm. on Commerce, Trade, and
Consumer Prot. of the H. Comm. on Energy and Commerce*, 111 Cong. 26-29 (2009)
(statement of David Hinson, National Director, MDBA) (listing 49 state and local
government disparity studies before Congress); 159 Cong. Rec. S4982 (daily ed. June 21,
2013) (statement of Sen. Landrieu) (listing 25 disparity studies from 16 states and the
District of Columbia before Congress).

**Paragraph 45:** Deny. Congress examined the available evidence of discrimination and
its lingering effects when enacting the 8(a) program. The Conference report
accompanying the bill explains that "in many, but not all, cases status as a minority can

be directly and unequivocally correlated with social disadvantagement and this condition exists regardless of the individual, personal qualities of that minority person." H.R. Rep. No. 95-1714 at 21.  As the floor manager of the House bill, Representative Addabbo, emphasized, "groups such as black Americans, Hispanic Americans, and Native Americans, have been and continue to be discriminated against and that this discrimination has led to the social disadvantage of persons identified by society as member of those groups."  124 Cong. Rec. 34097 (1978).

**Paragraph 46:** Deny.  *See, e.g., DynaLantic v. Dep't of Defense,* 885 F. Supp. 2d 237 (D.D.C. 2012) (finding the 8(a) program constitutional).

**Paragraph 47:** Deny.  There are multiple different measures of availability and capacity used in disparity studies.  Although these measures differ, the overall nationwide picture shows repeated underutilization.  Dr. Wainwright has examined over 100 studies and concluded that the disparity numbers in these studies are remarkably consistent despite the "studies having been undertaken by different consultants, using differing methods, at different points in time, with different budgets, and for a wide variety of state and local government agencies in a wide variety of geographic locations." App. D, *Wainwright Report* at 36.

**Paragraph 48:** Deny.  Dr. Wainwright has analyzed each disparity study individually, extracting from each study specific data which he then compiled for his report.  *See* App. D, *Wainwright Report* at 21.  In each report he extracted for prime contracting:

> • the percentage utilization of [Minority Business Enterprises ("MBEs")]  in construction spending,
> • the percentage availability of MBEs for construction spending,
> • the percentage utilization of MBEs in [Construction Professional Services ("CPS")] spending,
> • the percentage availability of MBEs for CPS spending,

20

• the percentage utilization of MBEs in [Other Professional Services ("OPS")] spending, and
• the percentage availability of MBEs for OPS spending.

*Id.* at 21-22.  Following this data extraction, Dr. Wainwright carried out certain additional calculations in order to present the information in his report consistently.  *Id.* at fn. 34.  This data was then analyzed to draw conclusions concerning the state of minority contracting nationwide.  *Id.* at 22.

**Paragraph 49:** Deny.  Dr. Wainwright's report not only examines data that accurately correlates with federal procurement, *see infra at* Paragraph 43, it also accurately analyzes the specific industries in which Plaintiff operates.  Dr. Wainwright's report establishes that five of the six industries in which the Plaintiff does business are included in the disparity indexes that were presented for 63 of the disparity studies listed in Wainwright's Table 1, and that Plaintiff's sixth industry is included in the disparity indexes that were presented for 86 of those studies.  *See* App. E, *Wainwright Reply* at 8.

**Paragraph 50:** Admit.

**Paragraph 51:** Admit.

**Paragraph 52:** Deny. SIC 1799 could refer to as many as twelve different six digit NAICS codes including both professional services and construction related services:

- 236220        Commercial and Institutional Building Construction
- 237990        Other Heavy and Civil Engineering Construction
- 238150        Glass and Glazing Contractors
- 238190        Other Foundation, Structure, and Building Exterior Contractors
- 238290        Other Building Equipment Contractors
- 238320        Painting and Wall Covering Contractors

21

**A000682**

- •   238350   Finish Carpentry Contractors

- •   238390   Other Building Finishing Contractors

- •   238910   Site Preparation Contractors

- •   238990   All Other Specialty Trade Contractors

- •   561790   Other Services to Buildings and Dwellings

- •   562910   Remediation Services

*See* NAICS Concordances at Census.gov, *available at*

http://www.census.gov/eos/www/naics/concordances/concordances.html

**Paragraph 53:** Admit that the State of Alaska study does not categorize its services identically to other disparity studies.

**Paragraph 54:** Deny.  Due to the correlation discussed in Paragraph 43, results from state and local disparity studies may be used to examine nationwide contracting trends.

**Paragraph 55:** Deny. Defendants have produced Dr. Rubinovitz's expert report to provide the Court with accurate information on the success rates of minority contractors in federal prime contracting as discussed in Paragraph 32.

**Paragraph 56:** Deny.  Defendants have produced Dr. Rubinovitz's expert report to provide the Court with accurate information on the success rates of minority contractors in federal prime contracting as discussed in Paragraph 32.

**Paragraph 57:** Deny.  In addition to the extensive quantitative evidence before Congress regarding the barriers that discrimination has created for minority-owned businesses, Congress heard ample anecdotal accounts of discriminatory barriers faced by minority business owners.  *See e.g., Access to Federal Contracts:  How to Level the Playing Field: Hearing Before the S. Comm. on Small Bus. and Entrepreneurship*, 110th Cong. 48, 132 (2007);  *How Information Policy Affects the Competitive Viability*

22

*of Small and Disadvantaged Business in Federal Contracting: Hearing Before the Subcomm. on Info. Policy, Census, and Nat'l Archives of the H. Comm. on Oversight and Gov't Reform,* 110 Cong. 62, 67-68 (2008);  *The DOT's Disadvantaged Business Enterprise Program: Hearing Before the H. Comm. on Transp. and Infrastructure*, 111th Cong. 9, 16, 208, 311-312 (2009).

**Paragraph 58:** Deny. Defendants brief has a longer response to this legal argument, but Defendants note here that "[i]t is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989).

**Paragraph 59:** Deny.  Congress had a strong basis in evidence that a race-conscious remedy was necessary to ensure that the federal government not "become a passive participant in a system of racial exclusion" prior to the enactment of the 8(a) program in 1978, Pub. L. No. 95-507, 92 Stat. 1760 (1978), and prior to its substantial amendment in 1988, Pub. L. No. 100-656, 102 Stat. 3853 (1988).

**Paragraph 60:** Deny. This is a legal argument.

**Paragraph 61:** Deny. This is a legal argument.

**Paragraph 62:** Deny.  Congress examined statistical evidence of federal government procurement prior to the authorization of the original act as well as its reauthorization in 1987.  In 1987, the House Committee on Small Business reported that "only six percent of all firms [were] owned by minorities; less than two percent of minorities own businesses" compared to six percent of nonminorities; and "the average receipts per minority firm [were] less than 10 percent the average receipts of all businesses."  H.R. Rep. No. 100-460 at 18 (1987).  In hearings before the Senate Committee on Small

A000684

Business, Senator Sasser similarly noted that minorities were less likely to own a small business with only "1.8 percent of the minority population own[ing] a business in 1982 compared with 6.4 percent of all business owners" and that "minority firms are smaller than nonminority businesses with lower sales and fewer employees."  *Minority Business Dev. Prog. Reform Act of 1987:  Hearings Before the S. Comm. on Small Business*, 100th Cong. 16 (1988).  Federal procurement data available to Congress also indicated that "[s]mall business owned and controlled by socially and economically disadvantaged individuals (most of whom are minority) receive a disproportionately small share of Federal purchases." H.R. Rep. No. 100-460 at 18 (1987).   While total prime contracts in fiscal 1986 were valued at nearly $185 billion, "minority business received only $5 billion in prime contracts, or about 2.7% of the prime contract dollars."  *Id.*

**Paragraph 63:** Admit that the 8(a) program does not have a specific statistical mechanism or benchmark that activates or deactivates the program as a whole; the lack of those features, however, does not mean the 8(a) program fails narrow tailoring.  The 8(a) program is a business development program, not an industry focused one.  For that reason, the participation limits in the 8(a) program, including requiring participants to prove economic disadvantage and limiting participation to nine years, focus on the participants, not on the program.

**Paragraph 64:** Deny. This is a legal argument.

**Paragraph 65:** Deny. This is a legal argument.

**Paragraph 66:** Deny.  The SBA monitors and evaluates 8(a) program participants regularly to ensure they are maintaining their eligibility and progressing in the program.  *See e.g.,* 13 C.F.R. §§ 124.112, 124.402, 124.403, 124.509.  In addition, Congress regularly receives information regarding the status of the 8(a) program.  The Small

A000685

Business Act requires the SBA to submit to Congress an annual assessment of the Section 8(a) program.  15 U.S.C. § 636(j)(16)(B).  *See, e.g.,* Small Business Administration 8(a) Program 2010 Annual Report to Congress (SBA Office of Bus. Dev. 2010).  Further, the Small Business Act requires the President to submit annually to Congress a Report on Small Business and Competition, including information pertaining to small businesses owned and controlled by socially and economically disadvantaged individuals.  15 U.S.C. § 631b.

Moreover, since the authorization of the 8(a) program, Congress has repeatedly gathered evidence that shows that minority-owned businesses continue to occupy a disproportionately small share of the U.S. economy as compared to white-owned businesses.  Minorities "open small businesses at lower rates, and when they are able to open businesses, they earn less than their white counterparts."  159 Cong. Rec. S4981 (daily ed. June 21, 2013) (statement of Sen. Landrieu).  In 2009, Congress heard evidence regarding the disproportionately low level of business receipts generated by minority-owned businesses, which "underscores the opportunity gap that still exists in the U.S. economy."  *The Minority Business Development Agency: Enhancing the Prospects for Success: Hearing Before the Subcomm. on Commerce, Trade, and Consumer Protection of the H. Comm. on Energy and Commerce*, 111 Cong. 9 (2009)

**Paragraph 67:** Deny.  Following several hearings, Congress passed substantial amendments to the 8(a) program in 1988 in order to focus the 8(a) program "on its original statutory objective . . . to boost minority ownership of small businesses that can compete in a competitive market."  *Minority Business Dev. Prog. Reform Act of 1987: Hearings Before the S. Comm. on Small Business*, 100th Cong. 18 (1988) (statement of Sen. Sasser).  These amendments provided the basic statutory design for the 8(a)

25

program in its current form, including the two-stage program with an eligibility term limit, requirements for competition among 8(a) firms, and the requirement to obtain non-8(a) contracts.  Pub. L. No. 100-656, 102 Stat. 3853 (1988).

The Senate report on the 1988 amendments noted that the 8(a) program "has historically been the primary vehicle for guiding federal procurement decisions towards economically disadvantaged minority-owned businesses," which has served the "critical and complementary purposes" of "lending an element of fairness to the distribution of taxpayer-financed federal procurement contracts" and "creating opportunities for minority-owned businesses to overcome their historic disadvantages" to compete successfully in the economy.  S. Rep. No. 100-394 at 1 (1988).  The report further recognized that "long-term advantages to our society . . . accrue from fulfillment of this second purpose."  *Id.*  Similarly, the House report identified the 8(a) program as "the most significant effort to redress the effects of discrimination on entrepreneurial endeavors" with the goal of helping "a broad class of socially and economically disadvantaged individuals compete in the mainstream of the American economy."  H.R. Rep. No. 100-460 at 16 (1987).

**Paragraph 68:** Admit that the Small Business Act does not create different aspirational contracting percentage goals for members of different racial groups, and consequently, Congress made no findings that the preferences in the statute should be different or the same for different racial groups.  The history of the 8(a) program and Congress's consistent fact gathering since that time has shown a need for the program nationwide.  As the national law maker, Congress must act on a national level.

**Paragraph 69:** Deny.  The 8(a) program itself does not have a statutory goal.  Given that the 5% goal in the Act is used neither as a floor nor as a ceiling for minority

A000687

participation in contracting, the program's goal, such as it is, is sufficiently flexible for narrow tailoring.

**Paragraph 70:** Admit that the Small Business Act does not create different aspirational contracting percentage goals for members of different racial groups or different industries, and consequently, Defendants have not presented findings that the goal in the statute should be different or the same for different racial groups and different industries.

**Paragraph 71:** Deny. This is a legal argument.

**Paragraph 72:** Deny. Individuals cannot participate in the 8(a) program solely on the basis of the racial presumption of social disadvantage.  They must also be evaluated individually to determine whether they are economically disadvantaged.  15 U.S.C. § 637(a)(6)(A).  As Judge Sullivan found in *DynaLantic*, "race is made relevant in the program, but is not a determinative factor."  885 F. Supp. 2d at 286-87.

**Paragraph 73:** Deny.  Asian Pacific Americans and Subcontinent Asian Americans were designated as groups presumed to be socially disadvantaged by petition to the SBA. *See* 44 Fed. Reg. 31055 (May 30, 1979); 44 Fed. Reg. 42832 (July 20, 1979); 47 Fed. Reg. 36743 (Aug. 23, 1982).  Congress subsequently codified the SBA's inclusion of Asian Pacific Americans as a socially disadvantaged group in 1980 by amendment to the Small Business Act.  Pub. L. No. 96-302, § 118, 94 Stat. 833 (1980).

**Paragraph 74:** Deny.  SBA's authority to designate groups is guided by the examples of such groups, 15 U.S.C. § 631(f)(1)(C), which Congress has found have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control, 15 U.S.C. § 631(f)(1)(B), and by the purpose of the Act to promote the business

A000688

development of small businesses owned by socially and economically disadvantaged individuals, 15 U.S.C. § 631(f)(2)(A).

Date:  June 16, 2014

Respectfully submitted,

DELORA L. KENNEBREW, Chief
SHARYN A. TEJANI, Deputy Chief

/s/ Andrew G. Braniff
ANDREW G. BRANIFF
Senior Trial Attorney
BARBARA SCHWABAUER
Trial Attorney
United States Department of Justice
Civil Rights Division, Employment Litigation Section
950 Pennsylvania Avenue, NW
Patrick Henry Building, Room 4030
Washington, D.C.  20530
Telephone:  202.514.9229
Facsimile:  202.514.1005
Andrew.Braniff@usdoj.gov

DANIEL F. VAN HORN
Chief, Civil Division
United States Attorney's Office
Room E-4816
555 Fourth Street, N.W.
Washington, D.C.  20530

Attorneys for Defendants

OF COUNSEL:
ERIC S. BENDERSON
DAVID A. FISHMAN
Office of General Counsel
U.S. Small Business Administration

ROBERT EASTON
Office of the Deputy General Counsel
Department of Defense

A000689

A000690

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
ROTHE DEVELOPMENT, INC.,                  )
                                          )
                Plaintiff,        )
                                          )
v.                                        )      Civil Action No. 1:12-cv-00744-KBJ
                                          )
DEPARTMENT OF DEFENSE                     )
                                          )
and                                       )
                                          )
SMALL BUSINESS ADMINISTRATION,            )
                                          )
                Defendants.       )
_____)


## ORDER

      Pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h) and upon consideration of the

pleadings of Defendants Department of Defense and Small Business Administration, by

their undersigned attorneys,

**THE COURTH HEREBY:**

      **GRANTS** the Defendants' Cross-Motion for Summary Judgment in the above-

captioned case on the grounds that there is no genuine issue of material fact and

Defendants are entitled to judgment as a matter of law that SBA's 8(a) Program is

facially constitutional under the Fifth Amendment and constitutional

nondelegation doctrine;  and

      **DENIES** the Plaintiff's Motion for Summary Judgment; and

      **DISMISSES** this action.

**IT IS SO ORDERED.**

Dated this _____ day of _____, 2014.

**BY THE COURT:**

_____
The Honorable Ketanji Brown Jackson
Judge of the U.S. District Court for the District of Columbia

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
ROTHE DEVELOPMENT, INC.,                )
)
        Plaintiff,                )
)
v.                                      )     Civil Action No. 1:12-cv-00744-KBJ
)
DEPARTMENT OF DEFENSE                    )
)
and                                     )
)
SMALL BUSINESS ADMINISTRATION,          )
)
        Defendants.                )
_____)

## DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## APPENDIX A:  DECLARATION OF CALVIN JENKINS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROTHE DEVELOPMENT, INC., )
)
Plaintiff, )
)
v. ) Civil Action No. 1:12-cv-0744-KBJ
)
DEPARTMENT OF DEFENSE )
)
and )
)
SMALL BUSINESS ADMINISTRATION, )
)
Defendants. )

## DECLARATION OF CALVIN JENKINS

I, Calvin Jenkins, under penalty of perjury, declare as follows:

1. I am the Deputy Associate Administrator "DAA" for the Small Business Administration's "SBA" Office of Government Contracting & Business Development, located at 409 Third Street, SW, Washington, DC 20416.

2. As the DAA, I am responsible for overseeing the day to day administration of the SBA's government contracting and business development programs, including the Offices of Procurement Policy, HUBZone, Government Contracting, and Business Development (8(a) Program).

3. I also oversee the SBA's negotiation and compliance with procurement goals throughout the Federal Government.  Specifically, the Small Business Act creates an aspirational goal for the Federal Government, seeking to have it spend at least 5% of its prime contract and subcontracting dollars with businesses owned by socially and economically disadvantaged individuals.  15 U.S.C. § 644(g)(1)(iv).  Prime contracting through the 8(a) program is one of the

methods that the Federal Government uses to try to meet this goal. Importantly, the 5% goal for contracting dollars with businesses owned and controlled by socially and economically disadvantaged businesses is not a mandate; in fact, there is no penalty for failing to meet the goal.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Calvin Jenkins

June 12, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
ROTHE DEVELOPMENT, INC.,                )
                                        )
             Plaintiff,                 )
                                        )
v.                                      )        Civil Action No. 1:12-cv-00744-KBJ
                                        )
DEPARTMENT OF DEFENSE                   )
                                        )
and                                     )
                                        )
SMALL BUSINESS ADMINISTRATION,          )
                                        )
             Defendants.                )
_____)

**DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


**APPENDIX B:  DISC CONTAINING COPY OF CONGRESSIONAL
EVIDENCE AND HYPERLINKED VERSION OF BRIEF**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
ROTHE DEVELOPMENT, INC.,                         )
                                                )
            Plaintiff,                           )
                                                )
v.                                               )     Civil Action No. 1:12-cv-00744-KBJ
                                                )
DEPARTMENT OF DEFENSE                            )
                                                )
and                                              )
                                                )
SMALL BUSINESS ADMINISTRATION,                   )
                                                )
            Defendants.                          )
_____)

## DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## APPENDIX C:  CV OF DR. WAINWRIGHT

# NERA
Economic Consulting

**Jon Wainwright**
Senior Vice President

National Economic Research Associates, Inc.
Barton Creek Plaza Building II, Suite 330
3801 S Capital of Texas Highway
Austin, Texas 78704
+1 512 371 8995  Fax +1 512 371 9612
jon.wainwright@nera.com
www.nera.com

# JON WAINWRIGHT
## SENIOR VICE PRESIDENT

NERA Senior Vice President Dr. Jon Wainwright holds a Ph.D. in economics from the University of Texas at Austin. His primary areas of interest are labor economics and industrial organization. He is a specialist in analyzing the effects of discrimination on minorities, women, and persons over 40, and has testified in federal and state courts, state legislatures, and before the United States Congress on these issues. At NERA, he directs and conducts economic and statistical studies of discrimination for attorneys, corporations, governments and non-profit organizations. He also directs and conducts research and provides clients with advice on adverse impact and economic damage matters arising from their hiring, performance assessment, compensation, promotion, termination, or contracting activities.

Dr. Wainwright joined NERA in 1995. Currently, he directs research activities relating to affirmative action litigation and regulatory compliance, directs studies of statistical liability and economic damages used in employment litigation, and has also conducted research relating to antitrust litigation, patent disputes, and other matters. Dr. Wainwright has extensive experience collecting, manipulating and analyzing large and complex statistical databases. He has worked extensively with socioeconomic and demographic data produced by the Census Bureau and other official statistical agencies, including the 5 percent and 1 percent Public Use Microdata Files from the decennial census, the five-year Economic Censuses, and the Current Population Survey Merged Outgoing Rotation Group files. He is an expert with both Windows and Apple operating systems and applications and with statistical analysis software including STATA, SAS, and SPSS.

Prior to joining NERA, Dr. Wainwright was an associate professor at the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin and headed his own economic consulting firm. In those capacities he conducted studies in labor economics and regulatory compliance for both public and private sector clients.

Jon Wainwright

## Education

**University of Texas at Austin**
Ph.D., economics

**Colorado State University**
B.S., economics

## Professional Experience

**NERA Economic Consulting, Austin and Chicago**

2011-present    Senior Vice President

2004–2011    Vice President

2003–2004    Senior Consultant

1998–2003    Consultant

1995-1998    Special Consultant
Principal investigator on matters involving discrimination, economic damages, statistical liability, and class certification in employment discrimination, wrongful termination, contracting discrimination and related cases. Develops and analyzes complex databases of business, employee and other characteristics from hardcopy and computer files in order to model decision-making processes under challenge. Prepares expert reports and provides oral and written testimony on these matters.

Selected clients include ADP, City of Austin, BP Amoco, City of Baltimore, Brinks, Carrier Corp., Broward County (Fl.), Chicago Metra, City of Chicago, City of Cleveland, Computer Sciences Corporation, Cook County (Il.), Del Global Technologies, Dell Computer, City and County of Denver, Dillard's Department Stores, Equitable Insurance, Gingiss Formalwear, Hamilton Sundstrand, Hawai'i DOT, Hoffman-La Roche, Inc., Home Depot, City of Houston, Illinois Attorney General, Illinois DOT, IBM, City of Jacksonville, Landry's Restaurants, Los Angeles Metro, State of Maryland, Maryland DOT, State of Massachusetts, State of New York, City of Memphis, Memphis International Airport, Merck, Microsoft, City of Minneapolis, State of Minnesota, Minnesota DOT, Missouri DOT, Motorola, Pennzoil, Pratt & Whitney, Prudential Insurance, Puget Sound Transit, Raytheon Corp., St. Louis Metro, Salt Lake City International Airport, City and County of San Francisco, SBC-Ameritech, Schlumberger, Sikorsky, Southeastern Pennsylvania Transportation Authority, Texas Utilities Electric Co., Transportation Research Board of the National Academy of Sciences, Unisys, United States Department of Justice, United Technologies Corporation, Varian Associates, Visa, Washington DOT.

Jon Wainwright

**Wainwright & Co. Economic Consultants, Austin**

1992–1998    President
Directed litigation projects on employment discrimination and minority and female business discrimination. Directed research on regulatory issues in the child care industry. Developed and analyzed complex databases concerning contracting, purchasing, and firm characteristics from hardcopy and computer files.

Selected clients in Texas included the Texas Attorney General, Department of Protective and Regulatory Services, University of Texas, Houston Metropolitan Transit Authority, Corpus Christi Regional Transportation Authority, and former U.S. Secretary of Labor F. Ray Marshall. Selected clients outside Texas included National Economic Research Associates, Inc., Los Angeles County Metropolitan Transit Authority, Metropolitan Dade County, Florida, Fulton County, Georgia, and State of Minnesota.

**LBJ School of Public Affairs, University of Texas at Austin**

1992–1998    Research Associate Professor
Directed research on contracting and employment activities in state and local government. Clients included the Texas Comptroller of Public Accounts, Texas State Legislature, Texas DOT, the Texas General Services Commission, City of Corpus Christi, and the Ford Foundation.

1990–1992    Social Science Research Associate
Staff economist for Professor Ray Marshall, Audre and Bernard Rapoport Centennial Professor of Economics and Public Affairs and former U.S. Secretary of Labor. Conducted economic and policy research on employment, contracting, education, trade, and other topics. Conducted supporting research for labor-management arbitrations in the pharmaceutical industry and the U.S. Postal Service.

**Brimmer & Company, Inc., Washington, DC**

1990–1993    Staff Economist
Served as staff economist for business disparity studies in Atlanta, Miami and St. Louis directed by former Federal Reserve Board Governor Andrew Brimmer. Developed and analyzed statistical evidence of minority and female business availability and disparity.

**Bureau of Labor Statistics, U.S. Department of Labor, Washington, DC**

1989    Economic Analyst
Mass Layoff Statistics Program. Developed computer software to automate aspects of the program's data collection process.

**Department of Economics, University of Texas at Austin**

1988–1990    Assistant Instructor
Developed and taught undergraduate courses in macroeconomics and microeconomics.

## Honors and Professional Activities

Member, American Economic Association

Associate Member, American Bar Association, Section of Labor and Employment Law

Associate Member, American Bar Association, Section of Public Contract Law

## Selected Speeches, Presentations, and Reports

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Cleveland*, prepared for the City of Cleveland, December 2012.

*And We Are Not Saved: Empirical Evidence of Disparate Treatment Impacting Minority- and Women-Owned Businesses*, prepared for the American Contract Compliance Association (ACCA) 26th Annual National Training Institute, August 2012.

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Missouri*, prepared for the Missouri Department of Transportation, June 2012.

*The State of Minority- and Women-Owned Business Enterprise in Construction: Evidence from Houston*, prepared for the City of Houston, April 2012.

*Getting Your House in Order: Workforce Reviews and Statistical Audits*, presentation to Vinson & Elkins LLP, Labor & Employment Practice, Houston, Texas, January 2012.

*Conducting Employment Audits Thoroughly and Ethically*, California Employment Law Update 2011, Practising Law Institute, November 2011.

*Designing Defensible Disparity Studies*, prepared for the American Contract Compliance Association (ACCA) 25th Annual National Training Institute, August 2011.

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Maryland*, prepared for the Maryland Department of Transportation, February 2011.

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Minneapolis*, prepared for the City of Minneapolis, Minnesota, October 2010.

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Hawai'i*, prepared for the Hawai'i Department of Transportation, October 2010.

*The State of Minority- and Woman-Owned Business Enterprise: Evidence from Broward County*, prepared for Broward County, Florida, September 2010.

*The State of Minority- and Women-Owned Business Enterprise: Evidence from Northeast Ohio*, prepared for the Northeast Ohio Regional Sewer District, August 2010.

*The National Model Disparity Study Project: Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program*, prepared for the 39th Annual National Meeting & Training Conference for the Conference of Minority Transportation Officials (COMTO), July 2010.

*The Status of Minority- and Women-Owned Business Enterprises Relevant To Construction Activity In and Around Cook County, Illinois*, prepared for Cook County, Illinois, June 2010.

*The State of Minority- and Woman-Owned Business Enterprise: Evidence from New York*, prepared for the New York State Department of Economic Development, April 2010.

*The National Model Disparity Study Project: Designing a Legally Defensible Disparity Study and Request for Proposals*, prepared for the American Contract Compliance Association (ACCA) 23rd Annual Training Institute, September 2009.

*The National Model Disparity Study Project: Designing a Legally Defensible Disparity Study and Request for Proposals*, prepared for the Southern Transportation Civil Rights Training Symposium, September 2009.

*Race, Sex, and Business Enterprise: Evidence from Augusta, Georgia*, prepared for Augusta-Richmond County, Georgia, September 2009.

*Race, Sex, and Business Enterprise: Evidence from the State of Utah*, prepared for the Salt Lake City Department of Airports, May 2009.

*Race, Sex, and Business Enterprise: Evidence from Memphis, Tennessee*, prepared for the Memphis-Shelby County Airport Authority, December 2008.

*The National Model Disparity Study Project: Designing a Legally Defensible Disparity Study and Request for Proposals*, prepared for the American Contract Compliance Association (ACCA) 22nd Annual Training Institute, August 2008.

*The Personal Net Worth Standard: How Much is Enough?*, prepared for the American Contract Compliance Association (ACCA) 22nd Annual Training Institute, August 2008.

*Race, Sex, and Business Enterprise: Evidence from Baltimore, Maryland*, prepared for the City of Baltimore, September 2007.

*Conducting Legally Defensible Disparity Studies*, prepared for the American Contract Compliance Association (ACCA) 21st Annual Training Institute, September 2007.

*Conducting Legally Defensible Disparity Studies*, prepared for the Conference of Minority Transportation Officials (COMTO) National Meeting & Training Conference, June 2007.

*Conducting Legally Defensible Disparity Studies*, prepared for the Federal Highway Administration Transpo '07 Civil Rights Symposium, June 2007.

Jon Wainwright

*Race, Sex, and Business Enterprise: Evidence from the Commonwealth of Massachusetts, Vol. I*, prepared for the Massachusetts Housing Finance Agency, November 2006.

*Race, Sex, and Business Enterprise: Evidence from the Commonwealth of Massachusetts, Vol. II*, prepared for the Division of Capital Asset Management, November 2006.

*Top Ten Reasons Why Contracting Affirmative Action Programs are Defeated in Court*, prepared for the American Contract Compliance Association (ACCA) 20th Annual Training Institute, September 2006.

*Top Ten Reasons Why Contracting Affirmative Action Programs are Defeated in Court*, prepared for the Conference of Minority Transportation Officials (COMTO) National Meeting & Training Conference, July 2006.

*Race, Sex, and Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area*, prepared for the Illinois State Toll Highway Authority, June 2006.

*Race, Sex, and Business Enterprise: Evidence from Denver, Colorado*, prepared for the City and County of Denver, May 2006.

*Race, Sex, and Business Enterprise: Evidence from the State of Maryland*, prepared for the Maryland Department of Transportation, March 2006.

*An analysis of the impact of affirmative action programs in the construction industry* (with David G. Blanchflower), prepared for the National Bureau of Economic Research (NBER) Entrepreneurship Group Meeting, March 2006.

*The State of Minority- and Women-Owned Business Enterprises in the Austin, Texas Construction Economy* (with Colette Holt & Associates and Anchondo Research Management & Strategies), prepared for the City of Austin, March 2006.

*Race, Sex, and Business Enterprise: Evidence from the State of Washington*, prepared for the Washington Department of Transportation, October 2005.

*Problems and Pitfalls Studying Contracting Affirmative Action Programs*, prepared for the American Contract Compliance Association (ACCA) 19th Annual Training Institute, September 2005.

*Race, Sex, and Business Enterprise: Evidence from the St. Louis Metropolitan Statistical Area*, prepared for the Bi-State Development Agency (Metro), March 2005.

*Disadvantaged Business Enterprise Availability Study*, prepared for the Missouri Department of Transportation, November 2004.

## Selected Publications

(with Andrew R. Livingston and Louisa Holzschuher) "Conducting employment audits thoroughly and ethically," in *California Employment Law Update 2011*, Timothy J. Long (Chair), New York, NY: Practising Law Institute, pp. 241-254, 2011.

(with Colette Holt) "The Limited Impact of *Rothe VII* on M/W/DBE Programs," *Contract Management Magazine*, 2010.

(with Colette Holt), *Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program*, Transportation Research Board of the National Academies, NCHRP Report, Issue No. 644, 2010.

(with Colette Holt) "*Western States Paving Company v. Washington State Department of Transportation*: Ninth Circuit Upholds Federal Disadvantaged Business Enterprise Program for Transportation Contracts But Strikes Down State's Implementation of Program Regulations," American Bar Association, Section of Antitrust Law, *The Transportation Antitrust Update*, No. 16 (Spring), 2007.

(with Colette Holt) "Court of Appeals Upholds Illinois Department of Transportation's DBE Program," working paper, 2007.

(with Colette Holt) "Meeting the Western States Challenge: Setting Disadvantaged Business, Enterprise Goals on USDOT Contracts," *Small Business Exchange*, Vol. 22, No. 18, 2006.

(with David G. Blancfhlower) "An Analysis of the Impact of Affirmative Action Programs on Self-Employment in the Construction Industry," National Bureau of Economic Research, Working Paper Series, No. 11793, 2005.

"NERA Economists' Role in *Northern Contracting, Inc. v. Illinois Department of Transportation*, 2005 U.S. Dist. LEXIS 19868," NERA Economic Consulting, 2005.

"NERA Economists' Role in *Builders Association of Greater Chicago v. City of Chicago et al.*, 298 F.Supp.2d 725 (2003)." NERA Economic Consulting, 2004.

"NERA Economists' Role in *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation* and *Gross Seed Co. v. Nebraska Department of Roads* 345 F.3d 964 (8th Cir. 2003)." NERA Economic Consulting, 2004.

(with Corbett Anderson, Gina M. Chang, Theresa Van Vuren, Janet M. Hogan, Robert T. Fries, Michael J. Sciotti and Stephen W. Skrainka) Report of the Equal Pay Act Subcommittee of the ABA Section of Labor and Employment Law Federal Labor Standards Legislation Committee. 2004.

"NERA Economists' Role in *Concrete Works of Colorado, Inc. v. City and County of Denver* (10th Cir. 2003)." NERA Economic Consulting. 2003.

(with Corbett Anderson, Allen S. Kinzer and Lisa L. Sutton) Report of the Equal Pay Act Subcommittee of the ABA Section of Labor and Employment Law Federal Labor Standards Legislation Committee. 2003.

*Racial discrimination and minority business enterprise: Evidence from the 1990 census.* Studies in Entrepreneurship Series. New York and London: Garland Publishing. 2000.

## Testimony in Judicial, Legislative, and Regulatory Proceedings

Maryland House of Delegates, Committee on Health and Government Operations and the Maryland Senate, Committee on Education, Health & Environmental Affairs, March 2-3, 2011. On the results of NERA's disparity study for the State of Maryland, and in support of implementing legislation for the corresponding State MBE Program.

United States Senate, Committee on Small Business and Entrepreneurship, Roundtable Hearing on "Small Business Contracting: Ensuring Opportunities for America's Small Businesses," September 24, 2009, Washington, D.C. On the subject of "Evidence of Discrimination Impacting Minority-Owned and Women-Owned Businesses."

United States House, Committee on Transportation and Infrastructure, Hearing on "The Department of Transportation's Disadvantaged Business Enterprise Programs," March 26, 2009, Washington, D.C. On the subject of "Challenges Faced by Disadvantaged Business Enterprises in the Transportation Sector."

Circuit Court of Cook County, Illinois in the matter of *Jeffrey N. Moeller v. Del Global Technologies Corp., Del Medical Imaging Corp., and Walter Schneider*, No. 02 1. 8194 (County Department – Law Division) for the defendants, concerning estimated economic losses resulting from alleged wrongful termination, employer defamation and employer retaliation.

United States House, Subcommittee on Information Policy, Census, and National Archives of the Committee on Government Oversight and Reform, Hearing on "How Information Policy Affects Small and Disadvantaged Businesses in Federal Contracting," September 24, 2008, Washington, D.C. On the subject of "How Information Policy Affects Competitive Viability in Minority Contracting."

United States Senate, Committee on Small Business and Entrepreneurship, Hearing on "Business Start-up Hurdles in Underserved Communities: Access to Venture Capital and Entrepreneurship Training," September 11, 2008, Washington, D.C. On the subject of "Discrimination Facing Small Minority-Owned and Women-Owned Businesses in Commercial Credit Markets."

United States Senate, Committee on Small Business and Entrepreneurship, Hearing on "Minority Entrepreneurship: Assessing the Effectiveness of SBA's Programs for the Minority Business Community," May 22, 2007, Washington, D.C. On the subject of "The Current State of Minority-Owned and Women-Owned Business Enterprises in the United States."

Federal District Court (Chicago) in the matter of *Northern Contracting, Inc., v. State of Illinois, Illinois Department Of Transportation, et al.*, No. 00 C 4515 (N.D. Il., E. Div.) for the defendants, concerning statistical evidence of minority and female business enterprise availability and disparity.

Federal District Court (Atlanta) in the matter of *Daniel Webster, et al. v. Fulton County, et al.*, 1:96-CV-2399 (N.D. Ga.) for the defendants, concerning statistical evidence of minority and female business enterprise discrimination.

Federal District Court (Miami) in the matter of *Engineering Contractors Association v. Metropolitan Dade County*, 94-1848-CIV-Ryskamp (S.D. Fl.) for the defendant, concerning statistical evidence of minority and female business enterprise discrimination.

Federal District Court (Houston) in the matter of *Bilbo Freight Lines, Inc., et al. v. Dan Morales, et al.*, H-93-3808 (S.D. Tx.) for the defendant, concerning statistical evidence of discrimination in public contracting.

## Testimony by Deposition, Declaration, or Affidavit

*Rothe Development, Inc. v. Department of Defense and Small Business Administration*, United States District Court for the District of Columbia, Civil Action No. 12-CV-744, Report of Defendant's Expert.

*Geyer Signal, Inc. and Kevin Kissell v. Minnesota Department of Transportation, Thomas K. Sorel in his capacity as the Minnesota Commissioner of Transportation, and Mary Prescott in her capacity as Acting Director of the Office of Civil Rights*, United States District Court for the District of Minnesota, Case No. 0:11-cv-00321-JRT, Report of Defendant Intervenor's Expert.

*Associated General Contractors of America, San Diego Chapter, Inc., Plaintiff v. California Department of Transportation, Randell Iwasaki, Defendants, Coalition for Economic Equity and National Association for the Advancement of Colored People, San Diego Chapter, Defendant-Intervenors*, United States District Court, Eastern District of California, No. 2:09-CV-01622-JAM-GGH, Report of Intervenors' Expert and Deposition Testimony.

*Kevcon, Inc. v. The United States*, No. 09 625C (United States Court of Federal Claims) for defendant, concerning the constitutionality of the government's Small Business Administration 8(a) minority business set-aside program.

*Thomas N. Janusz v. Keystone Illinois, Inc., et al.*, No. 03 L 008543 (Circuit Court of Cook County, Illinois) for the defendants, concerning estimated economic losses resulting from alleged wrongful termination and employer defamation.

*Utility Contractors Association of North Florida, Inc. v. City of Jacksonville*, Civil Action No. 3:02-CV-137-J-32-TEM (M.D. Fl., J. Div.) for the defendants, concerning statistical evidence of minority and female business enterprise availability and disparity.

*Patricia K. Crye v. Rohmax USA, Inc.* Cause no. 2001-32337 (District Court, Harris County Texas, 295th Judicial District) for the defendants, concerning statistical evidence of sex discrimination in employee discipline.

*Craig Coleman, Ted Edwards, et al. v. BP Amoco Corp., Amoco Corp., et al.* C.A. #G-00-222 (U.S. District Court, Southern District of Texas, Galveston Division) for the defendants, concerning statistical evidence of discrimination under ERISA statutes.

*Sherbrooke Turf, Inc. vs. Minnesota Dept. of Transportation, et al.* OO-CV-1026 (D. Mn.) for the defendants, concerning statistical evidence of minority and female business enterprise availability.

*Equal Employment Opportunity Commission v. Amoco Chemical Company, Inc. and BP Amoco Corp.* H-99-1414 (S.D. Tx.) for the defendants, concerning statistical evidence of liability resulting from alleged age discrimination in hiring.

*Carrell R. Scammahorn and Jerry L. Hope v. Schlumberger Ltd., et al.* 98-4005-JPG (E.D. Il.) for the defendants, concerning estimated economic losses resulting from alleged wrongful termination due to age discrimination.

*Daniel Webster, et al. v. Fulton County, et al.*, 1:96-CV-2399 (N.D. Ga.) for the defendants, concerning statistical evidence of discrimination in public contracting.

*Engineering Contractors Association v. Metropolitan Dade County*, 94-1848-CIV-Ryskamp (S.D. Fl.) for the defendant, concerning statistical evidence of discrimination in public contracting.

*Acevedo Cordero, et al. v. Cordero Santiago, et al.*, CIV 89-986-RLA (D. P.R.) for the plaintiffs, concerning employment discrimination by a public entity during a mass layoff.

*Bilbo Freight Lines, Inc., et al. v. Dan Morales, et al,.* H-93-3808 (S.D. Tx.) for the defendant, concerning statistical evidence of discrimination in public contracting.

March 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                              )
ROTHE DEVELOPMENT, INC.,                )
                                                              )
             Plaintiff,                                  )
                                                              )
v.                                                            )          Civil Action No. 1:12-cv-00744-KBJ
                                                              )
DEPARTMENT OF DEFENSE                    )
                                                              )
and                                                          )
                                                              )
SMALL BUSINESS ADMINISTRATION,      )
                                                              )
             Defendants.                              )
_____)

**<u>DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

**APPENDIX D:  WAINWRIGHT REPORT**

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Rothe Development, Inc., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 12-CV-744 |
| | ) | |
| | ) | |
| Department of Defense and | ) | |
| Small Business Administration | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**REPORT OF DEFENDANT'S EXPERT**

Jon Wainwright, Ph.D.
Senior Vice President
NERA Economic Consulting
3801 South Capital of Texas Highway, Suite 330
Austin, Texas 78704
jon.wainwright@nera.com
512.371.8995

March 8, 2013

# CONTENTS

I.   Introduction ........................................................................................................ 1

  A.   Qualifications ............................................................................................... 1

  B.   Minorities Have Been Historically and Consistently Disadvantaged in Business Enterprise Activity ..................................................................... 2

II.   Overview of Disparity Study Methods ............................................................ 3

  A.   Determination of Relevant Geographic Market Area ................................. 4

  B.   Determination of Relevant Product Market ............................................... 4

  C.   Estimation of MBE Availability ................................................................. 5

  D.   Estimation of Agency MBE Utilization ..................................................... 7

  E.   Estimation of Agency Disparities Between MBE Utilization and Availability ................... 7

  F.   Determination of Economy-Wide Disparity Analyses for the Relevant Markets ............... 8

  G.   Collection of Anecdotal Evidence ............................................................. 9

III.   Studies Conducted Since 2000 Show Large Disparities Against Minority-Owned Businesses ........................................................................................ 9

  A.   Studies Conducted Since 2000 Have Broad Coverage by Government Type, Industry, and Geography ........................................................... 9

  B.   There is Strong Evidence of Business Disparities in Recent Disparity Studies ............... 20

  C.   There is Strong Evidence of Disparities Consistent with Discrimination Throughout the U.S. in the Private Sector ...................................... 55

  1.   There is Strong Evidence of Disparities Between Utilization and Availability in the Survey of Business Owners ................................. 56

  2.   The Effects of Discrimination on Entrepreneurial Success ................... 58

  3.   There is Strong Evidence of Disparities Consistent with Discrimination in Minority Business Formation Rates and Business Owner Earnings ................ 63

  4.   There is Strong Evidence of Disparities Consistent with Discrimination in Minority Business Formation Rates and Business Owner Earnings in the Information Technology Services and Facilities Management Industries ................ 82

  5.   There is Strong Evidence of Credit Discrimination Against MBEs from the Survey of Small Business Finances ................................. 87

IV.   Conclusions ................................................................................................ 91

V.    References .................................................................................................... 92

VI.   Appendix A .................................................................................................. 95

VII.  Appendix B .................................................................................................. 125

# TABLES

Table 1. Selected Disparity and Availability Studies Performed in the United States Since 2000. ................................................................................................................... 11

Table 2. Specific Industry Activities Included in Construction and Construction-Related Professional Services (CPS) ........................................................ 18

Table 3. Specific Industry Activities for Plaintiff ....................................................... 19

Table 4. Regions, Divisions, and States Represented by Disparity Studies in Table 1. .............. 20

Table 5. MBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Since 2000 ................................................................................................ 24

Table 6. Summary Statistics Showing Prevalence of Disparities in the 2007 SBO (Tables A.1 to A.15). ........................................................................................................ 57

Table 7. Summary Statistics Showing Prevalence of Disparities in the 2002 SBO (Tables B.1 to B.15) ....................................................................................................... 58

Table 8. Actual and Potential Minority Business Formation Rates, All Industries, Selected Disparity Studies from Table 1. ........................................................... 65

Table 9. Actual and Potential Minority Business Formation Rates, Construction and CPS Industries, Selected Disparity Studies from Table 1 .................................................. 68

Table 10. Actual and Potential Minority Business Formation Rates, Other Services and Goods Industries, Selected Disparity Studies from Table 1 ................................................ 71

Table 11. Minority Business Owner Earnings Disparities, All Industries, Selected Disparity Studies from Table 1 ............................................................................ 74

Table 12. Minority Business Owner Earnings Disparities, Construction and CPS Industries, Selected Disparity Studies from Table 1. ........................................... 77

Table 13. Minority Business Owner Earnings Disparities, Other Services and Goods Industries, Selected Disparity Studies from Table 1. ........................................... 80

Table 14. Actual and Potential Minority Business Formation Rates, Information Technology Services and Administrative and Other Support  Services. ................................................ 84

Table 15. Minority Business Owner Earnings Disparities, Information Technology Services and Administrative and Other Support  Services. ............................................... 86

Table 14. Excess Loan Denial Rates–Nine Jurisdictions ............................................... 90

Table 15. Excess Cost of Credit–Nine Jurisdictions .................................................... 90

Table A.1. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Blacks, All Industries, 2007 .................................................................. 95

Table A.2. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Hispanics, All Industries, 2007 ............................................................. 97

Table A.3. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Asians, All Industries, 2007 .................................................................. 99

Table A.4. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, American Indians and Alaska Natives, All Industries, 2007 .............. 101

Table A.5. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, All Industries, 2007 ............ 103

Table A.6. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Blacks, Construction, 2007 .................................................................. 105

Table A.7. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Hispanics, Construction, 2007 ............................................................. 107

Table A.8. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Asians, Construction, 2007 .................................................................. 109

Table A.9. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, American Indians and Alaska Natives, Construction, 2007 ............... 111

Table A.10. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, Construction, 2007 ............. 113

Table A.11. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Blacks, Professional, Scientific and Technical Services, 2007 .......... 115

Table A.12. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Hispanics, Professional, Scientific and Technical Services, 2007 ..... 117

Table A.13. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Asians, Professional, Scientific and Technical Services, 2007 .......... 119

Table A.14. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, American Indians and Alaska Natives, Professional, Scientific and Technical Services, 2007 ............................................................................................. 121

Table A.15. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, Professional, Scientific and Technical Services, 2007 ............................................................................................. 123

Table B.1. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Blacks, All Industries, 2002 ................................................................. 125

Table B.2. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Hispanics, All Industries, 2002 ............................................................ 127

Table B.3. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Asians, All Industries, 2002 ................................................................. 129

Table B.4. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, American Indians and Alaska Natives, All Industries, 2002 .............. 131

Table B.5. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, All Industries, 2002 ............ 133

Table B.6. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Blacks, Construction, 2002 ................................................................. 135

Table B.7. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Hispanics, Construction, 2002 ............................................................ 137

Table B.8. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Asians, Construction, 2002 ................................................................. 139

Table B.9. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, American Indians and Alaska Natives, Construction, 2002 ............... 141

Table B.10. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, Construction, 2002 ............. 143

Table B.11. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Blacks, Professional, Scientific and Technical Services, 2002 .......... 145

Table B.12. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Hispanics, Professional, Scientific and Technical Services, 2002 ..... 147

Table B.13. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Asians, Professional, Scientific and Technical Services, 2002 .......... 149

Table B.14. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, American Indians and Alaska Natives, Professional, Scientific and Technical Services, 2002 .............................................................................................. 151

Table B.15. Percentage of Firms and Sales and Corresponding Disparity Indexes, All Firms and Employer Firms, Native Hawaiians and Pacific Islanders, Professional, Scientific and Technical Services, 2002 .............................................................................................. 153

# I.    Introduction

I am Jon Wainwright, Senior Vice President with NERA Economic Consulting in Chicago, Illinois and Austin, Texas. NERA is a national and international economic consulting firm dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. I hold a Ph.D. in economics and have worked with NERA since 1995.

I have been asked to review the Minority-Owned Business Enterprise (MBE) disparity and availability studies submitted to Congress as well as other related studies and statistical materials. These disparity and availability studies were conducted by myself and by others, and examine statistical evidence of MBE participation in public sector and private sector contracting and procurement activity, MBE representation in the relevant business population, and explanations for the disparities observed between these factors. They also include qualitative, or anecdotal, accounts from both MBEs and non-MBEs regarding these disparities. Taken as a whole, my conclusion is that these materials contain significant evidence of large and adverse disparities facing minority business enterprises. Moreover, I find that these disparities cannot be explained solely by differences between the minority and non-minority businesses in factors untainted by the effects of discrimination. Therefore, they are consistent with the presence of discrimination and its lingering effects in the small business contracting environment. When I also include the smaller number of studies in the record that have not yet been submitted to Congress, I reach the same general conclusions.

## A.    Qualifications

I hold a Ph.D. in economics from the University of Texas at Austin. My graduate curriculum included advanced courses in statistics, econometrics and labor economics, among others. Prior to joining NERA, I was a Research Associate Professor at the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin and also headed my own economic consulting firm. I am a member of the American Economic Association and an associate member of the American Bar Association Sections on Public Contract Law and Labor and Employment Law.

At NERA, I conduct economic and statistical studies of discrimination for attorneys, corporations, governments and non-profit organizations. I also conduct research and advise clients on adverse impact and economic damage issues arising from contracting activities, hiring, termination, performance assessment, compensation, and promotion. I have extensive experience producing, processing, and analyzing large and complex statistical databases. I have worked extensively with public sector contracting and purchasing data, as well as with the socioeconomic and demographic data produced by the Census Bureau and other official statistical agencies, including the Public Use Microdata Samples from the decennial census and the American Community Survey, the five-year Economic Censuses, and the Current Population Survey.

I have conducted economic and statistical research and assisted in litigation concerning the use of affirmative action in public contracting activities since the 1989 *Croson* decision.[1] Since

---

[1]  *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

2004, I have directed NERA's national affirmative action consulting practice. In that capacity, I have served as the project director and principal investigator for more than 30 studies of business discrimination, and prior to that time as principal or co-principal investigator on approximately a dozen additional business discrimination studies. I have authored two peer-reviewed monographs and several articles and white papers on this and related subjects, including *Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program*, published in 2010 by the *Transportation Research Board* of the *National Academy of Sciences*. I have been repeatedly qualified as an expert witness in both federal and state courts and have testified in these and related matters on 15 occasions, and have testified before the United States Congress on these matters on five occasions.

My current curriculum vitae, including my publications and a listing of all trial testimony I have given in the last ten years, is attached to this report as Exhibit A. The source material relied on in reaching my findings and conclusions are noted below in the body of my report.

## B.   Minorities Have Been Historically and Consistently Disadvantaged in Business Enterprise Activity

As other researchers have noted, and as demonstrated in the studies, reports, and other testimony submitted to Congress, minorities have been historically and consistently disadvantaged by the effects of discrimination in business enterprise.[2] Despite progress in some areas, these disadvantages persist.[3]

Blacks, for example, comprise 14.0 percent of the general population, 12.0 percent of the civilian labor force, 11.2 percent of total employment, and 12.5 percent of total money income. However, Blacks own only 7.3 percent of the nation's businesses, and those businesses earn a mere 1.25 percent of all business sales and receipts.[4]

For Hispanics the situation is similar; they represent almost 16.3 percent of the general population, 15.8 percent of the civilian labor force, 15.4 percent of total employment, and 11.3 percent of total money income. However, Hispanics own only 8.6 percent of the nation's businesses, and those businesses earn only 3.2 percent of all business sales and receipts.

For American Indians and Alaska Natives, the trend is similar. This group comprises approximately 2.0 percent of the general population, but only 0.9 percent of the business population and earn only 0.31 percent of business sales and receipts.

---

[2]  *See, e.g.*, U.S. Department of Commerce (2006); Lowrey (2007); Marshall (2000); Lowrey (2007).

[3]  *See,* generally, United States Small Business Administration (2010).

[4]  General population statistics are from the U.S. Census Bureau (2012); civilian labor force and total employment figures are from Bureau of Labor Statistics (2012a, 2012b); total money income statistics are from U.S. Census Bureau (2010a); business enterprise statistics are from the 2007 *Survey of Business Owners*, U.S. Census Bureau (2011a). Publicly-owned companies have been excluded from all of the calculations in this report that use *Survey of Business Owners* statistics.

Asians and Pacific Islanders might appear to be an exception; they represent 6.2 percent of the general population, 5.2 percent of the civilian labor force, 5.4 percent of total employment, 4.0 percent of total money income, and own 6.0 percent the nation's businesses. However, similar to other minority groups, their share of business sales and receipts, at only 4.7 percent, is substantially lower than their proportional representation in the business population.

Even when restricted to just firms with paid employees, the disparities between minorities and non-minorities are very large. In 2007, for every dollar in sales and receipts earned by non-minority male-owned employers, Asian and Pacific Islander  and Native American employers earned 44 cents, Hispanic employers earned 42 cents, and Blacks earned 35 cents.[5] These disparities have actually worsened in recent years. According to Lowrey, in the 2002 business census data, "[o]n average, for every dollar that a non-minority male-owned firm made, Pacific Islander-owned firms made about 59 cents, Hispanic-, Native American-, and Asian-owned firms made 56 cents, and Black-owned businesses made 43 cents."[6]

The overwhelming majority of businesses (78 percent) have less than 10 employees, and only a small fraction (0.13 percent) have more than 500. Minority-owned firms are over-represented in the former category and under-represented in the latter. For the largest firms in 2007, 0.14 percent of non-minority-owned firms had 500 or more employees, compared to 0.04 percent of Asian and Pacific Islander-owned firms, 0.07 percent of Hispanic-owned firms, 0.04 percent of Native American-owned firms, and 0.10 percent of Black-owned firms.[7]

Even those minorities who manage against the odds to start their own businesses must compete in a business enterprise system that has long been dominated by non-minority-owned firms.[8] The advantages enjoyed by non-minorities in this context are borne out in the statistics—in a recent pair of studies of employer business closure rates using data from the 2002 business census and the 2002-2006 *County Business Patterns* data, Lowrey documented that existing Black-owned, Hispanic-owned, and Asian and Pacific Islander-owned businesses across a wide variety of industry groups suffered substantially higher closure rates than did their non-minority counterparts.[9]

## II.    Overview of Disparity Study Methods

Before proceeding to a summary of the evidence in the record of minority business discrimination, it is helpful to provide a brief overview of what disparity studies are and the types of evidence they typically contain. Below, I describe the key elements included in my own disparity studies and explain their importance in the context of strict scrutiny. Many of these

---

[5]  U.S. Census Bureau (2011a). The 2007 data, released in 2011, are the most recent available.

[6]  Lowrey (2007), p. 1.

[7]  U.S. Census Bureau (2011b, 2011c).

[8]  *See, e.g.*, Wainwright (2000), pp. 17-22, and the studies cited therein.

[9]  Lowrey (2010), pp. 20-21. The comparison was between non-publicly held establishments that were in business in 2002 but had closed by 2006 versus all non-publicly held establishments in business in 2002.

elements are found in other consultants' studies as well.[10] The key elements of a disparity study include:

- Determining the appropriate geographic and product market area;

- Developing availability and utilization estimates;

- Estimating public entity contracting disparities;

- Estimating economy-wide disparities; and

- Collecting anecdotal evidence in order to check for consistency with statistical findings.

## A.   Determination of Relevant Geographic Market Area

The relevant geographic market area for each disparity study identifies those vendor locations that account for approximately 75 percent or more of contract and subcontract[11] dollar expenditures in the project database for the study period.[12] Firms in these locations should be included for analysis in the disparity study. Each study contains a section describing how the government entity's contract and subcontract data were used to make this determination and showing the results.

Location is determined by linking the zip code of the contractor or subcontractor to the associated state and county. For multi-establishment firms, location does not have to be defined as the headquarters of the firm. If the firm has established a local presence, it is appropriate to use that address for purposes of market area determination.

## B.   Determination of Relevant Product Market

Two contracting categories regularly examined in disparity studies are Construction and Construction-related Professional Services (CPS).[13] Other Professional Services, General Services, and Commodities, Supplies, and Equipment are frequently examined as well.

The relevant product market is comprised of those detailed industries that collectively account for at least 75 percent of relevant contract and subcontract dollar expenditures for the time period being examined in the disparity study. Firms in these industries should be included for analysis in the study. The amounts accounted for by each industry are listed by dollars and also as a percentage of overall spending. The percentage distribution by industry is used elsewhere in the

---

[10] These are discussed in more detail in Wainwright and Holt (2010, 29–53).

[11] By "subcontract" I intend to include subcontractors, subconsultants, suppliers, and truckers, and in general, any firm that is paid by the prime contractor or vendor to provide goods or services.

[12] The project database should include a representative sample of prime contracts and purchases, and associated subcontracting, subconsulting, and supplier activity, during the time period under study.

[13] Sometimes also referred to as "architecture & engineering," "design," "pre-construction," or just "consulting."

study to calculate overall MBE availability as a dollar-weighted average of detailed industry level MBE availability.

Detailed industry affiliation is determined by the consultant assigning a four-, five-, and/or six-digit NAICS code, as appropriate, to each establishment in the project database.[14] For firms whose work qualifies under more than one NAICS code, the assignment is made based on the firm's primary code unless there is enough information available to allocate the firm's work by dollars across multiple industries.[15]

The use of NAICS codes is recommended even if public agencies use systems other than NAICS (such as Construction Specification Institute codes, National Institute of Government Purchasing codes, or other internal work code systems) to classify contract and subcontract work. This is because the data necessary to implement industry-level availability estimates are classified according to NAICS (*i.e.*, Dun & Bradstreet data).

## C.    Estimation of MBE Availability

MBE availability is a statistic expressing the percentage of businesses in a relevant geographic and product market that are owned by minorities.

To estimate availability, I use a "custom census" designed to provide an accurate calculation of the current availability of MBEs in the relevant market.[16] Other consultants have employed different methods for measuring availability, including the use of vendor lists, bidder lists, and other types of Census data. A variety of approaches to measuring availability are reflected in the disparity studies identified in Table 1.

The custom census approach employs a seven-step analysis that: (1) creates a database of representative public contracts, (2) identifies the appropriate geographic market for the entity's contracting activity, (3) identifies the appropriate product market for the entity's contracting activity, (4) counts all businesses in those relevant markets, (5) identifies listed minority-owned businesses in the relevant markets, (6) verifies the ownership status of listed minority-owned businesses, and (7) verifies the ownership status of all other businesses. This method results in an overall MBE availability number that is a dollar-weighted average of all of the underlying industry availability numbers, with larger weights applied to industries with relatively more spending and lower weights applied to industries with relatively less spending. The availability figure can also be sub-divided by race, ethnicity, and gender group, where required.[17]

---

[14] NAICS stands for North American Industry Classification System and has been the standard system of industrial classification for the United States since it replaced the Standard Industrial Classification (SIC) system in 1997.

[15] If the client's contract data contain enough descriptive information about the nature of the work being performed, then this may be possible. Otherwise, the allocation among codes is arbitrary.

[16] *See*, *e.g.*, *Northern Contracting, Inc. v. Illinois Department of Transportation*, 473 F.3d 715, 723 (7th Cir. 2007) ("*Northern Contracting III*"); *Sherbrooke*, 345 F.3d at 973; and *Concrete Works of Colorado, Inc. v. City and County of Denver*, 321 F.3d 950, 966 (10th Cir. 2003), *cert. denied*, 540 U.S. 1027 (2003) (*Concrete Works IV*) (custom census was "more sophisticated" than earlier studies using Census data and bidders lists).

[17] *See* Wainwright and Holt (2010, 33-44) for an extended discussion of the custom census approach.

In addition to the custom census, another relatively common approach is to use internal agency lists of contractors and subcontractors, such as certified MBE directories, bidders lists, prequalified contractor lists, licensed contractor lists, planholder lists, or lists of winning bidders or sub-bidders. Internal lists are sometimes supplemented with lists gathered from other sources. I refer to this as the "bidders list approach."

A variation on the bidders list approach is also sometimes used. I refer to this approach as the "bidders list approach with adjustments." This method seeks to test whether firms with lower revenues won fewer contracts and subcontracts while firms with higher revenues won more. This method is implemented by surveying an agency's bidders in order to collect data on revenues and then comparing that data to existing data on contract and subcontract awards and eliminating from the availability count the firms that have not previously won awards at or above certain dollar thresholds.

It is worth noting that the studies employing this type of "capacity" adjustment have not found a statistically significant relationship between revenues and contract awards.[18] In part, the data did not fit because firms of given revenue sizes won a variety of contracts and subcontracts both large and small.[19] Despite finding little or no empirical support for the hypothesized relationship between revenue size and propensity to win contract and subcontract awards, some of the consultants employing this approach eliminate firms from their availability calculations if they had revenue levels lower than those of survey respondents that had actually won agency contracts or subcontracts. In my view, this results in an unjustified downward adjustment in these studies' availability estimates.

Another method of estimating availability I refer to as the "custom census approach with adjustments." As with the "bidders list with adjustments" approach, the "custom census with adjustments" approach is biased downward. It reduces the availability percentage by controlling for factors that are likely to be directly affected by the presence of discrimination in the relevant markets. My view is that whether firms have worked or attempted to work on agency projects, whether firms have been awarded prime contracts or subcontracts, or the size of those contracts should not be used to limit the MBE availability measure. Not only is this a problem in its own right, but also it may hide the existence of discrimination because a downward bias in availability can lead to a conclusion of no significant disparity when, in fact, a disparity exists. Firm revenues, employment size, or other metrics, can be influenced by the presence of

---

[18] *See, e.g.*, the 2001 study by MGT of America, Inc. for the Colorado Department of Transportation, ROTHE019855, at 2-12 through 2-16, and the 2004 study by MGT for the North Carolina Department of Transportation, ROTHE034043, at 4-96. Moreover, none of these studies describes why a firm's revenue is appropriately construed as a race--neutral explanatory variable. The difficulties involved in using variables such as revenue, which can be impacted by discrimination, to explain success or failure in the award of contracts or subcontracts is discussed in more detail below in Section III.C.2, "Effects of Discrimination on Entrepreneurial Success."

[19] *See Concrete Works IV*, 321 F.3d at 981 ("At trial, Denver introduced evidence that the median number of employees of all construction firms in the Denver MSA is three and presented testimony that even firms with few permanent employees can perform large, public contracts by hiring additional employees or subcontractors and renting equipment. Additionally, the district court found that 'most firms have few full-time permanent employees and must grow or shrink their performance capacity according to the volume of business they are doing'").

discrimination in the relevant markets, and cause availability or disparity statistics to mask the continuing effects of discrimination.

## D.    Estimation of Agency MBE Utilization

MBE utilization is a statistic showing the fraction of public contracting and procurement dollars in a particular market that are spent with MBEs.

The project database assembled for a disparity study will typically detail several years of recent contract and subcontract activity for both MBEs and non-MBEs. Utilization statistics—that is, the percentage of contract dollars spent with MBEs—can be calculated along a variety of dimensions, including by race and ethnicity, by time period, and by major procurement category.

Many studies conduct separate utilization analyses for prime contracts versus subcontracts, as well as for both types of contracting combined, which often provides the fullest picture of MBE participation relative to an agency's spending. If the project database has been coded by NAICS, utilization statistics can also be produced for detailed industry categories. In a typical study, utilization statistics are then combined with availability measures to determine disparity indexes or ratios.

## E.    Estimation of Agency Disparities Between MBE Utilization and Availability

A disparity analysis of public spending is simply a comparison of MBE utilization to MBE availability in various categories of contracting relevant to a given agency. The preceding discussions of market definition, availability measurement, and utilization statistics are therefore all relevant to the concept of a disparity analysis. Testing the results for substantive significance and statistical significance, respectively, helps to determine if the observed disparities are large and whether they could have arisen due to random chance alone.

In and of itself, conducting a disparity analysis on contracts that have been subject to race-conscious contracting requirements may not reveal much about the impact of discrimination, since the intent of such remedial efforts is to reduce or eliminate disparities. If the analytical focus is strictly on contracts that were subject to such requirements, then cases where disparities are absent (*i.e.*, where MBE participation is found to meet or exceeded estimates of MBE availability) may mislead policy makers or courts to conclude that discrimination is also absent, when in fact they may simply reflect the impact of the public agency's successful remedial efforts.

Several courts have recognized this paradox. For example, the plaintiffs in *Concrete Works* argued that "overutilization" on projects subject to race-conscious contracting requirements indicated an absence of discrimination. The Tenth Circuit rejected this argument, concluding that the more pertinent inquiry should focus on MBE participation where race-conscious goals were absent.[20] Ideally, therefore, part of the disparity analysis should focus on activities that were

---

[20] *Concrete Works IV*, 321 F.3d at 984-88; *see also Western States*, 407 F.3d at 992; *Northern Contracting, Inc. v. Illinois Department of Transportation*, 2005 U.S. Dist. LEXIS 19868, *37-38 (Sept. 8, 2005) ("*Northern*

generally *not* subject to race-conscious contracting requirements. This might include the agency's own prime contract activity, its contracts without MBE subcontracting goals, outcomes from public agencies in similar markets without such requirements, or MBE activity in the private sector of the surrounding economy where such requirements are largely absent. When the outcomes from activities that were subject to race-conscious requirements can be contrasted with those from activities that were not, either at the contract-level, agency-level, or economy-wide, it is easier to determine if the results are consistent with the presence of business discrimination.

## F.   Determination of Economy-Wide Disparity Analyses for the Relevant Markets

Since measuring disparities in the presence of race-conscious requirements can obscure the presence of discrimination, some disparity studies include a variety of statistical analyses that assess how minorities fare in other aspects of business enterprise activity in order to determine if an agency is passively participating in an industry sector impacted by discrimination. By "passive participation" I mean that, if the larger market within which a public agency does business is infected with discrimination, by continuing to hire and pay firms from that larger market without taking any remedial action, the agency may thereby reinforce the effects of any existing discrimination.

Evidence of economy-wide discrimination in disparity studies can take several forms. For example:

- Regression analyses comparing business formation rates between minorities and similarly situated non-minority males in the relevant markets, using the Census Bureau's *Public Use Microdata Sample* from the decennial census (PUMS) and its *Public Use Microdata Sample* from the *American Community Survey* (ACS PUMS).

- Regression analyses comparing the earnings of minority business owners to those of similarly situated non-minority male business owners in the relevant markets, using the PUMS or ACS PUMS.

- Regression analyses comparing denial rates on commercial loans between minority and similarly-situated non-minority male business owners, using data from the *Survey of Small Business Finances* produced by the Federal Reserve Board and the Small Business Administration.

- Disparity indexes comparing market share of revenues to market share of business population between minority and non-minority businesses, using data from the Census Bureau's *Survey of Business Owners* (SBO).

---

*Contracting II"); and *Hershell Gill Consulting Engineers, Inc. v. Miami-Dade County, Florida*, 333 F.Supp.2d 1305, 1318 (S.D. Fla. 2004) ("[The court] will keep the potential effect of the MWBE programs in mind when analyzing the evidence presented by the County").

## G.  Collection of Anecdotal Evidence

Anecdotal evidence consists of personal accounts from business owners, MBE and non-MBE alike, concerning the barriers, challenges, and successes they experience in the market place.

Anecdotal evidence is an important part of a disparity study to augment statistical analyses. Anecdotal evidence can be collected in a variety of formats including mail surveys, individual interviews, group interviews or focus groups, and public hearings. All of these approaches can and have produced qualitative evidence of barriers to full and fair participation by MBEs in the public contracting process. Some disparity studies often employ multiple approaches to gathering this type of evidence, *e.g.,* mail surveys and focus groups or personal interviews.

Studies typically gather evidence from MBEs as well as non-MBEs and try to explore the extent to which barriers reported by anecdotal sources are the result of discrimination rather than the usual challenges facing all businesses related to developing markets, finding suppliers, managing cash flow, *etc*. Special emphasis is often placed on the experiences of MBEs that desire to obtain prime contracts and subcontracts as a measure of continuing barriers to full participation in the market. Studies typically strive to have a wide enough variety of interviewees, survey participants, *etc*., to ensure participation from MBEs and non-MBE and from major procurement categories.

## III.  Studies Conducted Since 2000 Show Large Disparities Against Minority-Owned Businesses

## A.  Studies Conducted Since 2000 Have Broad Coverage by Government Type, Industry, and Geography

Since the U.S. Supreme Court decision in *City of Richmond v. J.A. Croson Co.,*[21] the disparities facing minority business owners in the United States have been documented in more than 300 studies and related research reports.[22] Since 2000 alone, more than 100 such studies have been conducted, most of which have already been submitted to Congress.[23]

Additionally, there is a large amount of evidentiary material concerning minority business enterprise discrimination developed prior to 2000 that exists in the Congressional record. The Tenth Circuit Court of Appeals in its 2000 decision in *Adarand Constructors v. Slater* provided a useful summary of this evidence.[24]

---

[21] 488 U.S. 469 (1989).

[22] Wainwright and Holt (2010, 12, n. 41).

[23] *See* United States Small Business Administration (2010). *See also Kevcon, Inc. v. The United States*, Defendant's Expert Report, Bates ROTHE041702-041794.

[24] *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1167-1175 (10th Cir. 2000) ("*Adarand VII*") (discussing evidence before Congress of discrimination against minorities in the construction industry in enacting the Disadvantaged Business Enterprise Program for federal-aid transportation contracts, Publ. No. 100-17, 101 Stat. 132 (1987), Publ. No. 102-240, 105 Stat. 1914 (1991) and Publ. No. 105-178, 112 Stat. 107 (1998), and the

Table 1, below, documents 107 recent studies of minority business enterprise, examining procurement for 142 different public entities and/or funding sources. These studies span 35 different states that collectively include over 89 percent of the general population of the U.S.[25] All but 32 of these studies have been submitted to Congress. Those that have not are marked with an asterisk (*). Of the 107 studies in Table 1, 21 were conducted under my direction and supervision. Over the course of these studies, I have personally examined and analyzed tens of billions of dollars worth of public sector spending across tens of thousands of contracts and subcontracts. The balance of the studies in Table 1 represents an even larger number of contracts and public procurement dollars.

---

implementing regulations at 49 C.F.R. 26 (1999)); *see also* "The Appendix – The Compelling Interest for Affirmative Action in Federal Procurement," 61. Fed. Reg. 26050-26052 and nn. 12-21 (1996); *see also* Enchautegui, et al. (1997).

[25] U.S. Census Bureau (2011d).

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 17 of 160

Table 1. Selected Disparity and Availability Studies Performed in the United States Since 2000.

| State | Subdivision | Authors | Type of Study | Year Completed | Bates Start | Bates End |
|-------|-------------|---------|---------------|----------------|-------------|-----------|
| AL | City of Birmingham | Pendleton, Friedberg, Wilson & Hennessey, P.C. | Disparity | 2007 | 018000 | 018444 |
| AK | Department of Transportation and Public Facilities | D. Wilson Consulting Group, LLC | Disparity | 2007 | 013677 | 013910 |
| AZ | Arizona Department of Transportation | MGT of America, Inc. | Disparity | 2009 | 027877 | 028316 |
| AZ | City of Phoenix | MGT of America, Inc. | Disparity | 2005 | 018445 | 018755 |
| AZ | City of Tucson | D. Wilson Consulting Group, LLC | Disparity | 2008 | 028317 | 028628 |
| AZ | Pima County | D. Wilson Consulting Group, LLC | Disparity | 2008 | 028629 | 028801 |
| CA | Alameda County | Mason Tillman Associates, Ltd. | Disparity | 2004 | 018779 | 019147 |
| CA | Bay Area Rapid Transit (BART) | Mason Tillman Associates, Ltd. | Disparity | 2009 | 028802 | 029117 |
| CA | California Department of Transportation | BBC Research & Consulting | Disparity | 2007 | 019148 | 019686 |
| CA* | City of Oakland and Oakland Redevelopment Agency | Mason Tillman Associates, Ltd. | Disparity | 2007 | 073295 | 073536 |
| CA | Los Angeles County Metropolitan Transportation Authority | BBC Research & Consulting | Disparity | 2010 | 058434 | 059204 |
| CA | Metrolink - Southern California Regional Rail Authority | BBC Research & Consulting | Disparity | 2009 | 052079 | 052834 |
| CA | Orange County Transportation Authority | BBC Research & Consulting | Disparity | 2010 | 053592 | 054352 |
| CA | San Diego Association of Governments | BBC Research & Consulting | Disparity | 2010 | 054353 | 055102 |
| CA | San Diego Metropolitan Transit System | BBC Research & Consulting | Disparity | 2010 | 052835 | 053591 |
| CA | San Mateo County Transit District | CRA International | Disparity | 2008 | 019698 | 019884 |
| CO | City and County of Denver, Denver International Airport | NERA | Disparity | 2006 | 011083 | 011351 |
| CO | Colorado Department of Transportation | MGT of America, Inc. | Disparity | 2001 | 019885 | 019942 |
| CO | Colorado Department of Transportation | D. Wilson Consulting Group, LLC | Disparity | 2009 | 029325 | 029557 |
| CT* | Metropolitan District Commission | M3C | Disparity | 2009 | 056184 | 056551 |

11

A000724

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 18 of 160

| State | Subdivision | Authors | Type of Study | Year Completed | Bates Start | Bates End |
|---|---|---|---|---|---|---|
| FL | Broward County | MGT of America, Inc. | Disparity | 2001 | 011675 | 012038 |
| FL | Broward County | NERA | Disparity | 2010 | 066606 | 067020 |
| FL* | City of Tallahassee | MGT of America, Inc. | Disparity | 2004 | 064182 | 064468 |
| FL | City of Tampa and Hillsborough County Aviation Authority | Mason Tillman Associates, Ltd. | Disparity | 2006 | 020307 | 020590 |
| FL* | Leon County | MGT of America, Inc. | Disparity | 2009 | 071721 | 071935 |
| FL* | School District of Hillsborough County | Mason Tillman Associates, Ltd. | Disparity | 2007 | 061067 | 061236 |
| GA | City of Albany; Dougherty County; Dougherty County School System; Albany Water, Gas & Light Commission | BBC Research & Consulting | Disparity | 2008 | 020591 | 020929 |
| GA | City of Atlanta | Griffin & Strong | Disparity | 2006 | 072660 | 072816 |
| GA | Consolidated Government of Augusta-Richmond County | NERA | Disparity | 2009 | 029715 | 030037 |
| GA* | Georgia Department of Transportation | Boston Research Group, Inc. | Disparity | 2005 | 072369 | 072659 |
| GA* | Georgia Department of Transportation | BBC Research & Consulting | Disparity | 2012 | 056552 | 057068 |
| HI | Hawai'i Department of Transportation | NERA | Disparity | 2010 | 066171 | 066605 |
| ID | Idaho Transportation Department | BBC Research & Consulting | Disparity | 2007 | 013927 | 014442 |
| IL* | Illinois Department of Transportation | Mason Tillman Associates, Ltd. | Disparity | 2011 | 051365 | 051733 |
| IL | Illinois State Toll Highway Authority | NERA | Disparity | 2006 | 061237 | 061365 |
| IN | Indiana Department of Administration, Indiana DOT, Ball State Univ., Indiana State Univ., Indiana Univ., Ivy Tech Comm. College, Purdue Univ., Univ. of Southern Indiana, Vincennes Univ. | BBC Research & Consulting | Disparity | 2010 | 069405 | 070504 |
| IA | City of Davenport | Mason Tillman Associates, Ltd. | Disparity | 2009 | 021048 | 021290 |
| KS*, MO* | City of Kansas City; Kansas City School District, MO; Wyandotte County, KS; Kansas City Area Transit Authority | Mason Tillman Associates, Ltd. | Disparity | 2006 | 063175 | 063470 |
| KY* | State of Kentucky | Griffin & Strong | Disparity | 2000 | 030803 | 030998 |
| MD | City of Baltimore | MGT of America, Inc. | Disparity | 2000 | 062068 | 062372 |
| MD | City of Baltimore | NERA | Disparity | 2007 | 031316 | 031663 |
| MD | State of Maryland | NERA | Disparity | 2006 | 062373 | 062695 |

12

A000725

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 19 of 160

13

| State | Subdivision | Authors | Type of Study | Year Completed | Bates Start | Bates End |
|-------|-------------|---------|---------------|----------------|-------------|-----------|
| MD | State of Maryland | NERA | Disparity | 2011 | 068503 | 069107 |
| MD | Washington Suburban Sanitary Commission | BBC Research & Consulting | Disparity | 2005 | 038852 | 039049 |
| MD | Washington Suburban Sanitary Commission | Mason Tillman Associates, Ltd. | Disparity | 2011 | 058034 | 058433 |
| MA* | City of Boston | Mason Tillman Associates, Ltd. | Disparity | 2003 | 061366 | 061501 |
| MA* | Division of Capital Asset Management | NERA | Disparity | 2006 | 061502 | 061782 |
| MA | Massachusetts Housing Finance Agency | NERA | Disparity | 2006 | 061783 | 062067 |
| MN | City of Minneapolis | NERA | Disparity | 2010 | 069108 | 069404 |
| MN | City of St. Paul and the St. Paul Housing Authority | MGT of America, Inc. | Disparity | 2008 | 021968 | 022705 |
| MN* | Metropolitan Airports Commission | MGT of America, Inc. | Disparity | 2009 | 050765 | 051017 |
| MN* | Metropolitan Council | MGT of America, Inc. | Disparity | 2009 | 050232 | 050480 |
| MN* | Metropolitan Mosquito Control District | MGT of America, Inc. | Disparity | 2009 | 073900 | 074139 |
| MN* | Metropolitan Sports Facilities Commission | MGT of America, Inc. | Disparity | 2009 | 074140 | 074378 |
| MN* | Minnesota Department of Administration | MGT of America, Inc. | Disparity | 2009 | 050481 | 050764 |
| MN | Minnesota Department of Transportation | NERA | Availability | 2005 | 014443 | 014554 |
| MN* | Minnesota Department of Transportation | MGT of America, Inc. | Disparity | 2009 | 050000 | 050231 |
| MO | Bi-State Development Agency (St. Louis Metro) | NERA | Disparity | 2005 | 031949 | 032139 |
| MO* | City of St. Louis, The St. Louis Housing Authority, The Metropolitan St. Louis Sewer District | MGT of America, Inc. | Disparity | 2001 | 062696 | 063174 |
| MO* | Missouri Department of Transportation | NERA | Disparity | 2012 | 071946 | 072345 |
| MT | Montana Department of Transportation | D. Wilson Consulting Group, LLC | Disparity | 2009 | 032140 | 032427 |
| NV | Nevada Department of Transportation | BBC Research & Consulting | Disparity | 2007 | 014635 | 015042 |

14

| State | Subdivision | Authors | Type of Study | Year Completed | Bates Start | Bates End |
|-------|-------------|---------|---------------|----------------|-------------|-----------|
| NJ | State of New Jersey | Mason Tillman Associates, Ltd. | Disparity | 2005 | 032428 | 032815 |
| NJ | State of New Jersey | Mason Tillman Associates, Ltd. | Disparity | 2006 | 032816 | 033005 |
| NY | City of New York | Mason Tillman Associates, Ltd. | Disparity | 2005 | 015043 | 015336 |
| NY | State of New York | NERA | Disparity | 2010 | 068035 | 068502 |
| NC* | City of Charlotte | MGT of America, Inc. | Disparity | 2003 | tbd | tbd[26] |
| NC | City of Charlotte | MGT of America, Inc. | Disparity | 2011 | 071250 | 071720 |
| NC* | City of Durham and Durham County | Mason Tillman Associates, Ltd. | Disparity | 2000 | 063471 | 063626 |
| NC | Durham County | Griffin & Strong | Disparity | 2007 | 063627 | 063797 |
| NC | North Carolina Department of Transportation | MGT of America, Inc. | Disparity | 2004 | 034043 | 034464 |
| NC | North Carolina Department of Transportation | EuQuant | Disparity | 2009 | 023010 | 023033 |
| OH* | City of Cincinnati | Griffin & Strong | Disparity | 2002 | 063798 | 063906 |
| OH* | City of Cleveland and Greater Cleveland RTA | Mason Tillman Associates, Ltd. | Disparity | 2003 | 074379 | 074897 |
| OH | City of Dayton | MGT of America, Inc. | Disparity | 2008 | 015337 | 015743 |
| OH | Northeast Ohio Regional Sewer District | NERA | Disparity | 2010 | 067021 | 067391 |
| OK | City of Tulsa | MGT of America, Inc. | Disparity | 2010 | 067652 | 068034 |
| OK | Oklahoma Department of Transportation | BBC Research & Consulting | Disparity | 2010 | 055103 | 055888 |
| OR* | City of Portland | BBC Research & Consulting | Disparity | 2011 | 057261 | 058033 |
| OR | Oregon Department of Transportation | MGT of America, Inc. | Disparity | 2007 | 015744 | 016158 |
| OR | Oregon Department of Transportation | MGT of America, Inc. | Disparity | 2011 | 073537 | 073899 |
| OR | Port of Portland | MGT of America, Inc. | Disparity | 2009 | 067392 | 067651 |
| OR* | Portland Development Commission | BBC Research & Consulting | Disparity | 2011 | 070505 | 071249 |
| PA | State of Pennsylvania | Mason Tillman Associates, Ltd. | Disparity | 2007 | 034582 | 035045 |
| SC | City of Columbia | MGT of America, Inc. | Disparity | 2006 | 035151 | 035988 |
| TN | City of Memphis | Griffin & Strong | Disparity | 2010 | 063907 | 064181 |

[26] The Bates numbers for these documents will be provided to Plaintiff as soon as they are available.

| State | Subdivision | Authors | Type of Study | Year Completed | Bates Start | Bates End |
|-------|-------------|---------|---------------|----------------|-------------|-----------|
| TN | Consolidated Government of Nashville and Davidson County | Griffin & Strong | Disparity | 2004 | 035989 | 036205 |
| TN | Memphis International Airport | NERA | Disparity | 2008 | 036251 | 036583 |
| TN | Nashville International Airport | Griffin & Strong | Disparity | 2007 | 010860 | 011082 |
| TN | Tennessee Department of Transportation | Mason Tillman Associates, Ltd. | Disparity | 2007 | 036600 | 036779 |
| TX | City of Austin | NERA | Disparity | 2008 | 017080 | 017374 |
| TX | City of Dallas | Mason Tillman Associates, Ltd. | Disparity | 2002 | 037008 | 037259 |
| TX* | City of Fort Worth; City of Arlington; DFW Airport; Fort Worth Independent School District; Fort Worth Transportation Authority; North Texas Tollway Authority | Mason Tillman Associates, Ltd. | Disparity | 2010 | 064469 | 065241 |
| TX | City of Houston | Mason Tillman Associates, Ltd. | Disparity | 2006 | 036780 | 036963 |
| TX | City of Houston | NERA | Disparity | 2012 | 055889 | 056183 |
| TX | City of San Antonio, Alamo Regional Mobility Authority, Brooks Development Authority, CPS Energy, Edwards Aquifer Authority, Port Authority of San Antonio, San Antonio Housing Authority, San Antonio Water System, University Health System | MGT of America, Inc. | Disparity | 2009 | 023544 | 024210 |
| TX* | Dallas Area Rapid Transit Authority (DART) | Mason Tillman Associates, Ltd. | Disparity | 2003 | 065438 | 065666 |
| TX | San Antonio Water System | MGT of America, Inc. | Disparity | 2009 | 023544 | 024210 |
| TX | State of Texas | MGT of America, Inc. | Disparity | 2010 | 037260 | 037988 |
| TX* | State of Texas | Mason Tillman Associates, Ltd. | Disparity | 2007 | 065667 | 066082 |
| UT | Salt Lake City International Airport | NERA | Disparity | 2009 | 037989 | 038365 |
| VA | Commonwealth of Virginia | MGT of America, Inc. | Disparity | 2004 | 038366 | 038851 |
| VA | Commonwealth of Virginia | MGT of America, Inc. | Disparity | 2010 | 060413 | 060666 |
| VA* | Virginia DOT | MGT of America, Inc. | Disparity | 2004 | 066083 | 066170 |
| WA | Washington Department of Transportation | NERA | Availability | 2005 | 016159 | 016269 |
| WI | City of Milwaukee | Mason Tillman Associates, | Disparity | 2007 | 039050 | 039255 |

| State | Subdivision | Authors | Type of Study | Year Completed | Bates Start | Bates End |
|-------|-------------|---------|---------------|----------------|-------------|-----------|
| | | Ltd. | | | | |
| WI | City of Milwaukee | D. Wilson Consulting Group, LLC | Disparity | 2010 | 057069 | 057260 |

NOTE: Except for those 32 marked with an asterisk (*), all of the studies in Table 1 have been submitted to Congress.

All of the disparity studies in Table 1 examine minority-owned business enterprises. Typically, MBEs include businesses owned by Blacks, Hispanics, Asians and Pacific Islanders, and Native Americans. "African American" or "Black" refers to persons having origins in any of the Black racial groups of Africa; "Hispanic" or "Latino" refers to persons of Mexican, Puerto Rican, Cuban, Dominican, Central or South American, or other Spanish or Portuguese culture or origin, regardless of race; "Asian" or "Asian and Pacific Islander" refers to persons whose origins are from Japan, China, Taiwan, Korea, Burma (Myanmar), Vietnam, Laos, Cambodia (Kampuchea), Thailand, Malaysia, Indonesia, the Philippines, Brunei, Samoa, Guam, the U.S. Trust Territories of the Pacific Islands (Republic of Palau), the Commonwealth of the Northern Marianas Islands, Macao, Fiji, Tonga, Kiribati, Juvalu, Nauru, Federated States of Micronesia, Hong Kong, India, Pakistan, Bangladesh, Bhutan, the Maldives Islands, Nepal or Sri Lanka; "Native American" or "American Indian or Alaska Native" refers to persons who are American Indians, Eskimos, Aleuts, or Native Hawaiians.[27] "White" or "non-minority" means person who are not Hispanic or Latino having origins in Europe, North Africa, or the Middle East.[28]

A wide variety of government types are represented as well in these disparity studies. Some encompass the entire state (*i.e.*, Indiana, Kentucky, Maryland, Minnesota, New Jersey, New York, Pennsylvania, Texas, and Virginia), others are for single state agencies (*i.e.*, Department of Transportation studies in Alaska, Arizona, California, Colorado, Georgia, Hawaii, Idaho, Illinois, Maryland, Minnesota, Missouri, Montana, Nevada, North Carolina, Oklahoma, Oregon, Tennessee, Texas, Virginia, and Washington, and the Division of Capital Asset Management and the Housing Finance Agency in Massachusetts), others are for cities (*i.e.*, Atlanta, Albany, Arlington, Augusta, Austin, Baltimore, Birmingham, Boston, Charlotte, Cincinnati, Cleveland, Columbia, Dallas, Davenport, Dayton, Denver, Durham, Fort Worth, Houston, Kansas City, Memphis, Milwaukee, Minneapolis, Nashville, New York, Oakland, Phoenix, Portland, San Antonio, St. Louis, St. Paul, Tallahassee, Tampa, Tucson, and Tulsa), others cover counties (*i.e.*, Alameda, CA; Broward, FL; Cuyahoga, OH; Davidson, TN; Dougherty, GA; Durham, NC; Leon, FL; Pima, AZ; Richmond, GA; Wyandotte, KS), and still more a variety of special districts including transit agencies, airports, school districts, public utilities, and housing authorities.

All of the 107 studies identified in Table 1 include contracts and procurements for public works in construction, an important focus of the SBA 8(a) Program.[29] Contracts in the construction-related professional services sector (CPS), which includes the plaintiff's line of work in equipment testing and calibration,[30] are included in 86 of the studies. Table 2 shows the types of construction and CPS industries that have been covered by these disparity studies.

---

[27] *See* 49 C.F.R. §26.5. Native Hawaiians are classified as Native American by the U.S. Department of Transportation for purposes of the Disadvantaged Business Enterprise (DBE) Program. However, they are included in the Asian and Pacific Islander category by most other agencies, including the Census Bureau (*see* fn. 28).

[28] Federal Register, Vol. 62, No. 210, pp. 57872-58790 (October 30, 1997), at 58789.

[29] Construction prime contractors and subcontractors also purchase a variety of supplies and materials (*e.g.*, steel, concrete, asphalt), as well as trucking services.

[30] See http://www.rothe.com/er_service.htm.

**Table 2. Specific Industry Activities Included in Construction and Construction-Related Professional Services (CPS)**

| NAICS | Industry Description |
|---|---|
| **23** | **Construction** |
| **2361** | **Residential Building Construction** |
| 236115 | New Single-Family Housing Construction |
| 236116 | New Multifamily Housing Construction |
| 236118 | Residential Remodelers |
| **2362** | **Nonresidential Building Construction** |
| 23621 | Industrial Building Construction |
| 23622 | Commercial and Institutional Building Construction |
| **237** | **Heavy and Civil Engineering Construction** |
| 2371 | Utility System Construction |
| 23711 | Water and Sewer Line and Related Structures Construction |
| 23713 | Power and Communication Line and Related Structures Construction |
| 2373 | Highway, Street, and Bridge Construction |
| 2379 | Other Heavy and Civil Engineering Construction |
| **238** | **Specialty Trade Contractors** |
| **2381** | **Foundation, Structure, and Building Exterior Contractors** |
| 23811 | Poured Concrete Foundation and Structure Contractors |
| 23812 | Structural Steel and Precast Concrete Contractors |
| 23813 | Framing Contractors |
| 23814 | Masonry Contractors |
| 23815 | Glass and Glazing Contractors |
| 23816 | Roofing Contractors |
| 23817 | Siding Contractors |
| 23819 | Other Foundation, Structure, and Building Exterior Contractors |
| **2382** | **Building Equipment Contractors** |
| 23821 | Electrical Contractors and Other Wiring Installation Contractors |
| 23822 | Plumbing, Heating, and Air-Conditioning Contractors |
| 23829 | Other Building Equipment Contractors |
| **2383** | **Building Finishing Contractors** |
| 23831 | Drywall and Insulation Contractors |
| 23832 | Painting and Wall Covering Contractors |
| 23833 | Flooring Contractors |
| 23834 | Tile and Terrazzo Contractors |
| 23835 | Finish Carpentry Contractors |
| 23839 | Other Building Finishing Contractors |
| **2389** | **Other Specialty Trade Contractors** |
| 23891 | Site Preparation Contractors |
| 23899 | All Other Specialty Trade Contractors |
| **5413** | **Architectural, Engineering, and Other Construction Related Services** |
| 54131 | Architectural Services |
| 54132 | Landscape Architectural Services |
| 54133 | Engineering Services |
| 54134 | Drafting Services |
| 54135 | Building Inspection Services |
| 54136 | Geophysical Surveying and Mapping Services |
| 54137 | Surveying and Mapping (except Geophysical) Services |
| 54138 | Testing Laboratories (including Equipment Calibration and Testing) |

A000731

18

Additionally, many of the disparity studies in Table 1 encompass public contracting and purchasing activities in sectors other than construction and CPS, reflecting the fact that government agencies, and their prime contractors and vendors, purchase goods and services from practically every major industry sector, including agriculture, mining, utilities, transportation, wholesale trade, retail trade, finance and insurance, real estate, professional and technical services, administrative and support services, waste management services, educational services, health care and social assistance services, food services, and others. NERA's 2011 disparity study for the State of Maryland, for example, included 530 distinct industries.[31]

Of the 107 studies identified in Table 1, 63 include contracts and procurements for Other Professional Services (OPS), which includes the plaintiff's lines of work in Information Technology and facilities support services. Table 3 shows the industries involved in the plaintiff's other lines of work.

**Table 3. Specific Industry Activities for Plaintiff[32]**

| NAICS | Industry Description |
|---|---|
| **5413** | **Architectural, Engineering, and Other Construction Related Services** |
| 54138 | Testing Laboratories (including Equipment Calibration and Testing) |
| **5415** | **Computer Systems Design and Related Services** |
| 541511 | Custom Computer Programming Services |
| 541512 | Computer Systems Design Services |
| 541513 | Computer Facilities Management Services |
| 541519 | Other Computer Related Services |
| **5612** | **Facilities Support Services** |
| 561210 | Facilities Support Services |

In addition to covering construction, CPS, OPS, and other industries, the 107 studies in Table 1 span the country geographically. The Census Bureau divides the country into four regions and nine divisions. The four regions are: Northeast, Midwest, South, and West, and the nine divisions are New England, Middle Atlantic, East North Central, West North Central, South Atlantic, East South Central, West South Central, Mountain, and Pacific. As shown in Table 4, these studies and the evidence within them represent all four Census Regions and all nine Census Divisions.

---

[31] *See* ROTHE068503 at p. 59. However, public sector spending is not typically distributed evenly among industries. In the State of Maryland's case, 134 industries (25 percent) accounted for 95 percent of all spending over the study period.

[32] See Affidavit of Dale Patenaude, p. 3.

**Table 4. Regions, Divisions, and States Represented by Disparity Studies in Table 1.**

| Geographic Location | Studies | Geographic Location | Studies |
|---|---|---|---|
| **I. Northeast Region** | | **III. South Region, cont'd** | |
| *A. New England Division* | | *A. South Atlantic Division, cont'd* | |
| 1. Connecticut | X* | 6. North Carolina | X |
| 2. Maine | | 7. South Carolina | X |
| 3. Massachusetts | X | 8. Virginia | X |
| 4. New Hampshire | | 9. West Virginia | |
| 5. Rhode Island | | *B. East South Central Division* | |
| 6. Vermont | | 1. Alabama | X |
| *B. Middle Atlantic Division* | | 2. Kentucky | X |
| 1. New Jersey | X | 3. Mississippi | |
| 2. New York | X | 4. Tennessee | X |
| 3. Pennsylvania | X | *C. West South Central Division* | |
| **II. Midwest Region** | | 1. Arkansas | |
| *A. East North Central Division* | | 2. Louisiana | |
| 1. Illinois | X | 3. Texas | X |
| 2. Indiana | X | 4. Oklahoma | X |
| 3. Michigan | | **IV. West Region** | |
| 4. Ohio | X | *A. Mountain Division* | |
| 5. Wisconsin | X | 1. Arizona | X |
| *B. West North Central Division* | | 2. Colorado | X |
| 1. Iowa | X | 3. Idaho | X |
| 2. Kansas | X | 4. Montana | X |
| 3. Minnesota | X | 5. Nevada | X |
| 4. Missouri | X | 6. New Mexico | |
| 5. Nebraska | | 7. Utah | X |
| 6. North Dakota | | 8. Wyoming | |
| 7. South Dakota | | *B. Pacific Division* | |
| **III. South Region** | | 1. Alaska | X |
| *A. South Atlantic Division* | | 2. California | X |
| 1. Delaware | | 3. Hawaii | X |
| 2. District of Columbia | | 4. Oregon | X |
| 3. Florida | X | 5. Washington | X |
| 4. Georgia | X | | |
| 5. Maryland | X | | |

Note: An asterisk (*) indicates that the study from this state is included in my report but not yet submitted to Congress.


## B.      There is Strong Evidence of Business Disparities in Recent Disparity Studies

In preparing this report, I reviewed all of the studies identified in Table 1. Typically, these studies include an Executive Summary, a review of existing case law pertaining to MBEs, a review of the government agency's purchasing and contracting policies as they pertain to MBEs, a chapter that estimates the availability of MBEs, a chapter that estimates the utilization of MBEs, a chapter that compares availability and utilization to assess disparities in public contracts, and a chapter detailing anecdotal evidence. Many of these disparity studies also include one or more chapters detailing evidence of disparities and discrimination in the wider

market area, referred to as "economy-wide" or "private-sector" analyses, from the market area within which the government agency under study operates.

The studies listed in Table 1 were prepared by different consultants, for different government entities, in different areas of the country, with differing levels of resources. They examine different periods of time and use a variety of methods for assessing utilization, availability, and disparity, and for gathering anecdotal information.[33] Nevertheless, broad similarities in the findings of these studies emerge despite their differences. Foremost among these is the widespread finding of substantial underutilization of MBEs throughout the United States, in the construction sector, the CPS sector, the OPS sector, and in other industries.

To begin to see this, Table 5 presents some of the specific statistical findings from the studies listed in Table 1. As discussed in the previous section, one function of a disparity study is to gather information on a government agency's prime contracting and subcontracting activity during the time period under study. Since the focus of the SBA 8(a) program is on prime contracting, I have focused my review of the studies in Table 1 on this area of government spending.[34] When I refer to MBE utilization or spending below, I am referring to spending with MBEs as prime contractors or vendors. I do not include spending with MBEs as subcontractors, sub-consultants, or suppliers.[35]

I reviewed each study's findings concerning:

- the percentage utilization of MBEs in construction spending,

- the percentage availability of MBEs for construction spending,

- the percentage utilization of MBEs in CPS spending,

- the percentage availability of MBEs for CPS spending,

- the percentage utilization of MBEs in OPS spending, and

---

[33] A detailed discussion of the differences in methods employed by different consultants is provided in Wainwright and Holt (2010), pp. 29-53.

[34] Depending on how any given study's statistics were presented, I had to carry out certain additional calculations in order to present the information in Table 5 consistently. For example, a study might show the total number of prime contract dollars accruing to MBEs in a given procurement category in one table, and the total number of overall dollars in that category in another table. Calculating MBE prime contract utilization, therefore required dividing the figure in the first table by the figure in the second table. These figures, in turn, might then be combined with relevant availability figures from one or more other tables to form the resulting disparity index. The final column in Table 5 identifies the specific pages referred to within each study.

[35] Participants in the Section 8(a) program can receive sole-source contracts, up to an annual ceiling of $4 million for goods and services and $6.5 million for manufacturing. The disparity studies examined for this report included a wide range of contract sizes. For the 21 NERA studies in Table 1, for example, the median size in construction was $2.2m. For CPS, the median was $1.1m, and for contracts in the same lines of work as the plaintiff (information technology services and facilities management services), the median was $300,000.

- the percentage availability of MBEs for OPS spending.[36]

Altogether, 107 disparity studies from Table 1 appear in Table 5, 75 of which have been submitted to Congress.[37] Several appear more than once since they provided statistical evidence in more than one usable category. For example, the 2010 study by BBC Research & Consulting for the State of Indiana appears twice since it included usable statistics for more than one group of government agencies in Indiana that participated in that study; and the 2005 NERA study for the Minnesota DOT appears twice because it distinguished federally-funded contracts from state-funded contracts.[38]

Columns (1) and (2) in Table 5 identify the state and political subdivision(s) for which each disparity study was performed. Column (12) indicates the time period examined in the study. Column (13) indicates the starting Bates number (preceded by "ROTHE") and column (14) indicates the document-specific page range where I found the statistical data cited in columns (3) through (11).

The utilization statistics for construction, CPS, and OPS appear in columns (3), (6), and (9), respectively. For the 2010 Commonwealth of Virginia study, for example, these utilization statistics indicate that MBE's earned 1.46 percent of Virginia's construction contracts dollars, 0.46 percent of its CPS contract dollars, and 2.22 percent of its OPS dollars during the 2006-2009 study period.

The availability statistics for construction, CPS, and OPS appear in columns (4), (7), and (10), respectively. Continuing with Virginia as an example, these availability statistics indicate that MBE's made up 7.48 percent of Virginia's construction market, 9.95 percent of its CPS market, and 13.13 percent of its OPS market during the study period.

Finally, columns (5) for construction, column (8) for CPS, and column (11) for OPS show the resulting disparity index, which is formed by dividing the respective MBE utilization percentage by its associated MBE availability percentage, and multiplying the result by 100. A disparity index of 100 or more indicates that MBEs are being utilized at or above their estimated availability level. A disparity index of less than 100 indicates that MBEs are being utilized below their estimated availability level. A disparity index of 80 or lower is commonly taken as a strong indicator that discrimination is adversely affecting MBEs.[39]

---

[36] For the 21 NERA studies identified in Table 1 and included in Table 5, the OPS utilization, availability, and disparity statistics, are restricted specifically to the plaintiff's lines of work in information technology services and facilities management services.

[37] As with Table 1, those studies in the record but not yet submitted to Congress are marked with an asterisk (*).

[38] The disparity studies examined included a wide range of prime contract sizes. For the 21 NERA studies in Table 1, for example, the median contract size in construction was $2.2m. For CPS, the median was $1.1m, and for contracts in the same lines of work as the plaintiff, the median was $300,000.

[39] Although not the same as statistical significance, the "four-fifths rule" says that a disparity index of less than or equal to 80 (on a scale of zero to 100, zero being perfect disparity and 100 being perfect parity), because it is large, or "substantively" significant, indicates the presence of discrimination. *See* 29 C.F.R. § 1607.4(d).

For example, in the Virginia study, when the construction utilization percentage of 1.46 is divided by the availability percentage of 7.48, the quotient is 0.1955. Multiplying this figure by 100, yields a disparity index of 19.55.[40] For CPS, the Virginia figures show that dividing the utilization percentage of 0.46 by the availability percentage of 9.95, and multiplying the result by 100 yields a disparity index of 4.66. Similarly for OPS, dividing the utilization percentage of 2.22 by the availability percentage of 13.13, and multiplying the result by 100 yields a disparity index of 16.88. If MBEs in Virginia's construction, CPS, or OPS markets were being utilized at rates comparable to their availability in the relevant business population, all three of these indexes would approach 100.

---

[40] Due to rounding, the disparity indexes shown in Table 5 may differ slightly from the quotient arrived at by dividing the availability figure into the utilization figure.

**Table 5. MBE Utilization, Availability, and Disparity: Selected Studies Performed in the U.S. Since 2000.**

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| AL | City of Birmingham | 10.00 | 18.80 | 53.19 | 10.10 | 16.30 | 61.96 | 13.90 | 16.60 | 83.73 | 1990-2005 | 018000 | 186-188 |
| AK | Department of Transportation and Public Facilities | 2.63 | 12.50 | 21.04 | | | | 15.82 | 26.09 | 60.64 | 2002-2006 | 013677 | 4-11, 5-10 |
| AZ | Arizona Department of Transportation | 0.00 | 6.14 | 0.00 | 5.12 | 14.32 | 35.76 | 4.60 | 6.02 | 76.37 | 2002-2007 | 027877 | 4-47 |
| AZ | City of Phoenix | 2.63 | 11.61 | 22.62 | | | | | | | 2000-2004 | 018445 | 4-17, 4-33 |
| AZ | City of Tucson | 7.99 | 0.80 | 998.53 | | | | 11.27 | 6.96 | 161.92 | 2002-2006 | 028317 | 4-9, 5-10, 5-13 |
| AZ | Pima County | 2.18 | 1.14 | 191.75 | 12.37 | 10.64 | 116.25 | 9.51 | 0.95 | 1001.03 | 2002-2006 | 028629 | 4-9, 5-13, 5-16 |
| CA | Alameda County | 16.17 | 37.64 | 42.97 | 10.53 | 40.28 | 26.14 | 12.03 | 33.84 | 35.54 | 2000-2003 | 018779 | 7-4, 7-7, 7-10 |
| CA | Bay Area Rapid Transit (BART) | 10.77 | 27.96 | 38.53 | | | | 7.75 | 15.63 | 49.57 | 2002-2007 | 028802 | 4-8, 4-16, 7-20, 7-22 |
| CA | California Department of Transportation (Federal Funds) | 2.33 | 8.20 | 28.40 | 3.55 | 16.90 | 20.98 | | | | 2002-2006 | 019148 | E-30, E-33 |
| CA | California Department of Transportation (State Funds) | 5.64 | 10.40 | 54.26 | 0.00 | 17.00 | 0.00 | | | | 2002-2006 | 019148 | E-71, E-73 |
| CA* | City of Oakland And Oakland Redevelopment Agency | 32.01 | 46.05 | 69.52 | 22.62 | 29.62 | 76.38 | 9.97 | 24.97 | 39.91 | 2002-2005 | 073295 | 4-6, 4-8, 4-10, 7-22, 7-24, 7-26 |
| CA | Los Angeles County Metropolitan Transportation Authority (Federal Funds) | 4.12 | 5.41 | 76.04 | 4.68 | 14.53 | 32.24 | 9.54 | | | 2003-2007 | 058434 | E-14, E-15, E-23, E-24 |
| CA | Los Angeles County Metropolitan Transportation Authority (Local Funds) | 5.39 | 13.90 | 38.77 | 4.30 | 16.00 | 26.89 | 5.30 | | | 2003-2007 | 058434 | E-16, E-25 |
| CA | Metrolink - Southern California Regional Rail Authority (Federal Funds) | 3.60 | 5.16 | 69.78 | 63.74 | 12.69 | 502.13 | 0.00 | | | 2003-2007 | 052079 | E-14, E-15, E-23, E-24 |

24

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 31 of 160

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|-------|-------------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------------|------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| CA | Metrolink - Southern California Regional Rail Authority (Local Funds) | 0.09 | 19.30 | 0.45 | 2.13 | 22.90 | 9.31 | 7.08 | | | 2003-2007 | 052079 | E-16, E-25 |
| CA | Orange County Transportation Authority (Federal Funds) | 10.33 | 10.50 | 98.34 | 12.26 | 16.87 | 72.67 | 0.00 | | | 2003-2007 | 053592 | E-14, E-15, E-23, E-24 |
| CA | Orange County Transportation Authority (Local Funds) | 23.65 | 19.60 | 120.68 | 22.88 | 21.00 | 108.94 | 25.20 | | | 2003-2007 | 053592 | E-16, E-25 |
| CA | San Diego Association of Governments (Federal Funds) | 6.30 | 13.85 | 45.47 | 24.15 | 11.69 | 206.52 | 68.19 | | | 2003-2007 | 054353 | E-14, E-15, E-23, E-24 |
| CA | San Diego Association of Governments (Local Funds) | 0.00 | 18.80 | 0.00 | 16.37 | 16.20 | 101.04 | 28.30 | | | 2003-2007 | 054353 | E-16, E-25 |
| CA | San Diego Metropolitan Transit System (Federal Funds) | 16.35 | 21.73 | 75.27 | 0.18 | 17.27 | 1.04 | 21.90 | | | 2003-2007 | 052835 | E-14, E-15, E-23, E-24 |
| CA | San Diego Metropolitan Transit System (Local Funds) | 22.63 | 25.60 | 88.41 | 0.00 | 18.70 | 0.00 | 26.45 | | | 2003-2007 | 052835 | E-16, E-25 |
| CA | San Mateo County Transit District | 0.70 | 15.60 | 4.49 | | | | 2.90 | 16.40 | 17.68 | 2002 | 019698 | 38, 104 |
| CO | City and County of Denver, Denver International Airport | 1.53 | 9.12 | 16.75 | 4.38 | 4.72 | 92.83 | | | | 2000-2005 | 011083 | 190, plus unpub data |
| CO | Colorado Department of Transportation | 2.23 | 8.32 | 26.80 | 1.13 | 4.69 | 24.09 | | | | 1996-2000 | 019885 | 3-18, 3-19 |
| CO | Colorado Department of Transportation | 3.08 | 12.94 | 23.82 | 14.64 | 15.30 | 95.71 | | | | 2002-2007 | 029325 | 4-5, 5-8, 6-6 |
| CT* | Metropolitan District Commission | 15.79 | 9.38 | 168.36 | 3.25 | 18.87 | 17.23 | 3.80 | 4.76 | 79.73 | 2005-2008 | 056184 | IV-84, 87, 91; V-112, 114, 116, 119, 121, 123, 126, 128, 130 |
| FL | Broward County | 15.79 | 31.91 | 49.47 | 4.10 | 29.50 | 13.88 | 0.81 | 31.95 | 2.54 | 1991-1999 | 011675 | 4-18, 4-31, 4-40, 5-7, 5-13, 5-19 |
| FL | Broward County | 4.63 | 13.36 | 34.68 | 7.25 | 13.97 | 51.88 | 4.23 | 16.77 | 25.23 | 2005-2009 | 066606 | 284, and unpub data |

A000738

25

26

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| FL* | City of Tallahassee | 11.16 | 24.31 | 45.90 | | 35.05 | 19.11 | 0.38 | 30.55 | 1.25 | 1996-2000 | 064182 | 4-13, 4-19; 4-27, 4-33 |
| FL | City of Tampa and Hillsborough County Aviation Authority | 13.56 | 32.94 | 41.16 | 6.70 | 14.89 | 68.43 | 1.24 | 28.90 | 4.29 | 2001-2004 | 020307 | 6-5, 6-8, 6-11 |
| FL* | Leon County Board of County Commissioners | 3.46 | 10.27 | 33.66 | 10.19 | 30.29 | 76.03 | 4.05 | 9.09 | 44.53 | 2004-2008 | 071721 | 4-10, 4-13, 4-14, 4-16, 4-17, 4-19 |
| FL* | School District of Hillsborough County | 1.65 | 33.10 | 4.99 | 23.03 | | | 4.40 | 28.76 | 15.28 | 2001-2004 | 061067 | 2-5, 2-7, 2-9, 5-21, 5-23 |
| GA | City of Albany; et al. | 6.57 | 10.10 | 65.03 | | | | 11.39 | 6.70 | 170.07 | 2004-2007 | 020591 | E-3; E-14 |
| GA | City of Atlanta (City) | 12.07 | 26.89 | 44.88 | 19.42 | 23.91 | 81.22 | 13.22 | 10.90 | 121.27 | 2001-2005 | 072660 | Vol. I, 19, 21, 30, 46, 49 |
| GA | City of Atlanta (Airport, local funds) | 18.41 | 26.89 | 68.47 | 23.83 | 23.91 | 99.68 | 30.70 | 10.90 | 281.57 | 2001-2005 | 072660 | Vol. I, 19, 21, 70, 71, 73, 75, 76 |
| GA | City of Atlanta (Airport, federal funds) | 9.85 | 26.89 | 36.64 | | | | | | | 2001-2005 | 072660 | Vol. I, 19, 83, 84 |
| GA | City of Atlanta (Watershed Management) | 6.04 | 26.89 | 22.47 | 5.58 | 23.91 | 23.34 | 0.00 | 10.90 | 0.00 | 2001-2005 | 072660 | Vol. I, 19, 21, 88, 89, 91, 93 |
| GA | Consolidated Government of Augusta-Richmond County | 0.38 | 19.13 | 1.97 | 19.94 | 22.60 | 88.24 | 0.00 | 53.56 | 0.00 | 2003-2007 | 029715 | 225, plus unpub data |
| GA | Georgia Department of Transportation | 0.69 | 4.59 | 15.04 | | | | | | | 1999-2004 | 072369 | 111, 119, 123 |
| GA* | Georgia Department of Transportation (State funds) | 0.44 | 17.60 | 2.48 | 6.59 | 19.30 | 34.15 | | | | 2009-2011 | 056552 | K-16, K-19 |
| GA* | Georgia Department of Transportation (Federal funds) | 0.34 | 16.30 | 2.10 | 2.94 | 18.20 | 16.18 | | | | 2009-2011 | 056552 | K-15, K-18 |
| HI | Hawai'i Department of Transportation | 15.59 | 49.12 | 31.74 | 38.42 | 46.35 | 82.88 | | | | 2003-2008 | 066171 | 327, and unpub data |

| State (1) | Subdivision (2) | U-CON (3) | A-CON (4) | D-CON (5) | U-CPS (6) | A-CPS (7) | D-CPS (8) | U-OPS (9) | A-OPS (10) | D-OPS (11) | Years (12) | Bates Start (13) | Page Spec. (14) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ID | Idaho Transportation Department | 0.70 | 2.60 | 26.81 | 0.93 | 4.80 | 19.34 | | | | 2002-2006 | 013927 | E-14, E-23 |
| IL* | Illinois Department of Transportation | 0.00 | 26.14 | 0.00 | 14.09 | 26.58 | 53.02 | | | | 2006-2009 | 051365 | 4-8, 4-10, 7-15, 7-17 |
| IL | Illinois State Toll Highway Authority | 0.03 | 6.29 | 0.42 | 5.40 | 10.03 | 53.80 | | | | 2000-2005 | 061237 | 3, plus unpub data |
| IN | Indiana Department of Administration, et al. (IDOA & INDOT) | 1.58 | 1.80 | 87.51 | | | | 2.55 | 7.30 | 34.90 | 2006-2009 | 069405 | O-7; O-8 |
| IN | Indiana Department of Administration, et al. (State Educational Institutions) | 0.81 | 8.00 | 10.11 | | | | 5.25 | 9.50 | 55.26 | 2006-2009 | 069405 | M-7 |
| IA | City of Davenport | 0.00 | 15.66 | 0.00 | | | | 1.95 | 15.28 | 12.76 | 2003-2007 | 201048 | 4-7, 4-9, 7-18, 7-20 |
| KS*, MO | City of Kansas City; Kansas City School District, MO, et al. (Kansas City School District) | 23.16 | 15.45 | 149.88 | 1.89 | 17.26 | 10.94 | 7.61 | 11.11 | 68.48 | 2002-2004 | 063331 | 3-5, 3-7, 3-9, 6-19, 6-21, 6-23 |
| KS*, MO | City of Kansas City; Kansas City School District, MO, et al. (Kansas City) | 7.19 | 15.45 | 46.51 | 10.09 | 17.26 | 58.48 | 5.44 | 11.11 | 48.94 | 2002-2004 | 063175 | 3-5, 3-7, 3-9, 6-21, 6-23, 6-25 |
| KY | State of Kentucky | 1.20 | 1.83 | 65.75 | 0.17 | 2.64 | 6.40 | 1.10 | 2.64 | 41.48 | 1995-1999 | 30803 | 37, 41, 42, 43, 44, 46 |
| MD* | City of Baltimore | 2.74 | 11.96 | 22.96 | 7.45 | 9.84 | 75.68 | | | | 1990-1998 | 062068 | 4-17, 4-25, 4-29, 4-33 |
| MD | City of Baltimore | 9.21 | 10.97 | 84.00 | 6.93 | 14.92 | 46.48 | 22.05 | 25.60 | 86.14 | 2000-2005 | 031316 | 217, plus unpub data; Other is services |

A000740

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| MD | State of Maryland | 0.79 | 11.75 | 6.76 | 8.14 | 16.26 | 50.04 | 7.79 | 43.42 | 17.94 | 2000-2005 | 062373 | 206, plus unpub data; Other is IT |
| MD | State of Maryland | 0.56 | 18.99 | 2.96 | 2.73 | 25.78 | 10.59 | 6.55 | 32.25 | 20.32 | 2005-2009 | 068503 | 326, and unpub data; Other is IT |
| MD | Washington Suburban Sanitary Commission | 10.92 | 9.20 | 118.74 | 14.03 | 26.20 | 53.55 | 17.52 | 28.90 | 60.61 | 1999-2004 | 038852 | II-17, III-21, IV-31 |
| MD | Washington Suburban Sanitary Commission | 21.24 | 58.90 | 36.07 | 8.90 | 48.82 | 18.23 | 14.48 | 51.51 | 28.12 | 2003-2009 | 058034 | 1-15, 1-17, 1-19, 4-21, 4-23, 4-25 |
| MA* | City of Boston | 1.81 | 15.20 | 11.90 | 3.87 | 25.01 | 15.48 | 57.56 | 15.61 | 368.74 | 1999-2001 | 061366 | 2-4, 2-6, 2-8, 4-22, 4-24, 4-26 |
| MA* | Division of Capital Asset Management | 1.50 | 3.43 | 43.87 | 6.05 | 4.63 | 130.76 | | | | 1999-2004 | 061502 | 199, and unpub data |
| MA | Massachusetts Housing Finance Agency | 0.88 | 3.59 | 24.49 | | | | | | | 2000-2004 | 061783 | 5, plus unpub data |
| MN | City of Minneapolis | 1.02 | 8.78 | 11.60 | 5.17 | 7.95 | 65.01 | 5.05 | 15.01 | 33.62 | 2003-2007 | 069108 | 233, and unpub; Other is services |
| MN | City of St. Paul and the St. Paul Housing Authority (City of St. Paul) | 8.52 | 3.29 | 258.65 | 1.13 | 3.95 | 28.56 | 0.67 | 2.50 | 26.65 | 2002-2006 | 021968 | 4-21, 4-28, 4-42, 4-43, 4-56, 4-71 |
| MN | City of St. Paul and the St. Paul Housing Authority (St. Paul Housing Authority) | 2.11 | 6.56 | 32.17 | | | | | | | 2002-2006 | 021968 | 6-6, 6-18 |
| MN* | Metropolitan Airports Commission | 0.24 | 5.11 | 4.65 | 0.00 | 25.00 | 0.00 | 0.07 | 1.61 | 4.57 | 2004-2007 | 050765 | 3-8, 3-12, 3-14, 3-15, 3-16, 3-17 |

28

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 35 of 160

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| MN* | Metropolitan Council | 0.11 | 1.96 | 5.82 | 0.06 | 3.08 | 1.96 | 0.08 | 1.32 | 6.10 | 2003-2007 | 050232 | 3-8, 3-13, 3-14, 3-16, 3-18 |
| MN* | Metropolitan Mosquito Control District | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.81 | 13.33 | 13.60 | 2002-2007 | 073900 | 3-8, 3-9, 3-10, 3-11, 3-12, 3-13 |
| MN* | Metropolitan Sports Facilities Commission | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 1.12 | 3.36 | 2002-2007 | 074140 | 3-8, 3-9, 3-10, 3-11, 3-12, 3-13 |
| MN* | Minnesota Department of Administration | 0.86 | 0.81 | 105.97 | | | | 1.60 | 0.48 | 332.64 | 2002-2007 | 050481 | 3-8, 3-14, 3-15, 3-16 |
| MN | Minnesota Department of Transportation (Federal funds) | 0.02 | 3.89 | 0.55 | | | | | | | 2000-2004 | 014443 | 69, 70 |
| MN | Minnesota Department of Transportation (State funds) | 0.03 | 3.89 | 0.79 | | | | | | | 2000-2004 | 014443 | 69, 73 |
| MN* | Minnesota Department of Transportation | 0.10 | 2.39 | 4.19 | | | | | | | 2002-2007 | 050000 | 3-7, 3-12 |
| MO | Bi-State Development Agency (St. Louis Metro) | 0.04 | 5.75 | 0.64 | 2.26 | 7.49 | 30.11 | | | | 1997-2003 | 031949 | 154 plus unpub data |
| MO* | City of St. Louis, The St. Louis Housing Authority, The Metropolitan St. Louis Sewer District (City of St. Louis) | 5.09 | 9.24 | 55.03 | 14.00 | 14.58 | 96.03 | 4.93 | 5.39 | 91.55 | 1995-1999 | 062696 | Ex. p. 2, Ex. p. 7, Ex. p. 9, Ex. p. 12, Ex. p. 14, Ex. p. 17 |
| MO* | City of St. Louis, The St. Louis Housing Authority, The Metropolitan St. Louis Sewer District (Sewer District) | 1.08 | 9.24 | 11.64 | 9.13 | 14.58 | 62.62 | 0.32 | 5.42 | 5.99 | 1995-1999 | 062696 | Ex. p. 84, Ex. p. 89, Ex. p. 91, Ex. p. 94, Ex. p. 96, Ex. p. 99 |
| MO* | Missouri Department of Transportation (Federal funds) | 0.37 | 4.53 | 8.17 | 0.42 | 6.46 | 6.58 | | | | 2005-2009 | 071946 | 217, and unpub |
| MO* | Missouri Department of Transportation (State funds) | 0.38 | 4.41 | 8.69 | 1.64 | 6.48 | 25.24 | | | | 2005-2009 | 071946 | 223, and unpub |
| MT | Montana Department of Transportation | 1.08 | 0.89 | 121.39 | 0.24 | 2.22 | 10.90 | | | | 2000-2006 | 032140 | 4-6, 5-18, 5-29 |

29

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 36 of 160

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|-------|-------------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------------|------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| NV | Nevada Department of Transportation (Federal funds) | 1.76 | 11.20 | 15.69 | 0.27 | 6.30 | 4.36 | | | | 2000-2006 | 014635 | E-14, E-23 |
| NV | Nevada Department of Transportation (State funds) | 5.14 | 8.20 | 62.64 | 1.31 | 9.80 | 13.40 | | | | 2000-2006 | 014635 | E-41, E-50 |
| NJ | State of New Jersey | 7.04 | 15.26 | 46.12 | 9.94 | 17.36 | 57.24 | | | | 2000-2002 | 032428 | 1-7, 1-9, 4-16, 4-18 |
| NJ | State of New Jersey | 5.99 | 17.40 | 34.43 | 7.37 | 18.15 | 40.58 | | | | 2003-2004 | 032816 | 2-7, 2-9, 5-18, 5-20 |
| NY | City of New York | 7.27 | 46.58 | 15.60 | 4.83 | 38.19 | 12.64 | 3.16 | 25.62 | 12.35 | 1997-2002 | 015043 | 3-7, 3-9, 3-11, 6-22, 6-24, 6-26 |
| NY | State of New York | 1.71 | 14.34 | 11.94 | 6.75 | 13.21 | 51.08 | 5.66 | 19.58 | 28.90 | 2004-2008 | 068035 | 292, and unpub; Other is services |
| NC* | City of Charlotte | 8.12 | 6.33 | 128.21 | 4.30 | 7.52 | 57.12 | 8.69 | 11.54 | 75.31 | 1998-2002 | tbd | p. 4-127, p. 4-128 |
| NC | City of Charlotte | 6.83 | 19.40 | 35.20 | 6.58 | 5.87 | 112.10 | 5.88 | 5.87 | 100.09 | 2005-2010 | 071250 | 3-16, 3-19, 3-20, 3-23, 3-24, 3-28 |
| NC* | City of Durham and Durham County | 5.81 | 22.53 | 25.79 | | | | 4.41 | 14.47 | 30.50 | 1996-1999 | 063471 | 3-4, 3-8, 5-9, 5-13 |
| NC | Durham County | 0.00 | 3.51 | 20.97 | 6.98 | 5.51 | 126.74 | | | | 2001-2005 | 063627 | 76, 82, 83, 85, 86 |
| NC | North Carolina Department of Transportation (Divisionally let) | 1.25 | 5.96 | 0.00 | | | | | | | 1999-2003 | 034043 | 4-16, 4-26 |
| NC | North Carolina Department of Transportation (Centrally let, state funded) | 0.00 | 4.49 | 0.00 | 8.40 | 8.94 | 93.96 | | | | 1999-2003 | 034043 | 4-52, 4-70, 4-76, 4-90 |
| NC | North Carolina Department of Transportation (Centrally let, federally funded) | 0.00 | 4.49 | 0.00 | 1.41 | 8.94 | 15.73 | | | | 1999-2003 | 034043 | 4-52, 4-70, 4-84, 4-90 |
| NC | North Carolina Department of Transportation | 0.87 | 4.11 | 21.26 | | | | | | | 2004-2008 | 023010 | 90, 138 |
| OH* | City of Cincinnati | 11.43 | 7.54 | 151.55 | 5.41 | 4.96 | 109.00 | | | | 1995-2001 | 063798 | 39, 44, 49 |

30

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 37 of 160

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| OH* | City of Cleveland, et al. (City of Cleveland) | 13.34 | 31.97 | 41.74 | 7.56 | 28.50 | 26.52 | 1.30 | 18.61 | 7.00 | 1999-2000 | 074379 | 2-4, 2-6, 2-8, 2-13, 2-15, 2-17, 4-23, 4-25, 4-27 |
| OH* | City of Cleveland, et al. (Greater Cleveland RTA) | 6.12 | 31.97 | 19.13 | 21.09 | 28.50 | 73.99 | 4.11 | 18.61 | 22.11 | 1998-2000 | 074783 | 2-3, 2-4, 2-5, 4-22, 4-23 |
| OH | City of Dayton | 3.31 | 22.58 | 14.64 | 0.56 | 15.20 | 3.68 | 0.39 | 17.77 | 2.19 | 2001-2006 | 015337 | 4-11, 4-19, 4-24, 4-28, 4-30, 4-34 |
| OH | Northeast Ohio Regional Sewer District | 0.35 | 5.54 | 6.28 | 5.80 | 6.28 | 92.39 | 6.58 | 6.47 | 101.65 | 2004-2008 | 067021 | 263, and unpub; Other is services |
| OK | City of Tulsa | 40.91 | 8.58 | 476.94 | 13.15 | 10.13 | 129.89 | 5.80 | 6.00 | 96.62 | 2002-2008 | 067652 | 4-8, 4-14, 4-15, 4-22, 4-24, 4-28 |
| OK | Oklahoma Department of Transportation (Federal funds) | 2.53 | 3.10 | 81.74 | 2.05 | 16.30 | 12.60 | | | | 2004-2009 | 055103 | K-15, K-18 |
| OK | Oklahoma Department of Transportation (State funds) | 10.37 | 6.30 | 164.63 | 3.63 | 16.90 | 21.45 | | | | 2004-2009 | 055103 | K-16, K-19 |
| OR* | City of Portland | 0.29 | 0.70 | 41.37 | 23.59 | 7.1 | 332.20 | | | | 2004-2009 | 057261 | L-6, M-3 |
| OR | Oregon Department of Transportation | 2.51 | 6.07 | 41.38 | 2.11 | 14.21 | 14.85 | | | | 2000-2007 | 015744 | 4-12, 4-25, 4-111, 4-123 |
| OR* | Oregon Department of Transportation | 4.59 | 5.83 | 78.87 | 1.66 | 17.87 | 9.27 | 0.00 | 4.82 | 0.00 | 2007-2010 | 073537 | 4-13, 4-21, 4-26, 4-36, 4-41, 4-50 |
| OR | Port of Portland | 0.35 | 5.75 | 6.03 | 2.85 | 12.17 | 23.42 | 1.97 | 7.11 | 27.64 | 2002-2007 | 067392 | 4-11, 4-15, 4-19, 4-23, 4-25, 4-26 |
| OR* | Portland Development Commission | 0.48 | 1.54 | 31.19 | 4.19 | 5.06 | 82.84 | | | | 2004-2009 | 070505 | L-3, L-6; M-3, M-9 |

31

| State (1) | Subdivision (2) | U-CON (3) | A-CON (4) | D-CON (5) | U-CPS (6) | A-CPS (7) | D-CPS (8) | U-OPS (9) | A-OPS (10) | D-OPS (11) | Years (12) | Bates Start (13) | Page Spec. (14) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PA | State of Pennsylvania | 1.51 | 8.32 | 18.21 | 5.91 | 18.45 | 32.02 | | | | 2003-2005 | 034582 | 4-5, 4-7, 7-14, 7-16 |
| SC | City of Columbia | 0.77 | 21.38 | 3.62 | 16.02 | 14.81 | 108.13 | 7.69 | 4.82 | 159.45 | 2002-2005 | 035151 | 4-10, 4-16, 4-20, 4-25, 4-28, 4-34 |
| TN | City of Memphis | 8.35 | 15.46 | 53.98 | 10.61 | 21.85 | 48.58 | 3.09 | 12.62 | 24.46 | 2002-2007 | 063907 | 112, 113, 123, 124, 125 |
| TN | Consolidated Government of Nashville and Davidson County (Metro Purchasing) | 0.00 | 4.17 | 0.00 | 0.00 | 1.14 | 0.00 | | | | 1999-2003 | 035989 | 57, 65, 68 |
| TN | Consolidated Government of Nashville and Davidson County (Metro Nashville Public Schools) | 0.00 | 3.66 | 0.00 | 3.30 | 6.58 | 50.15 | | | | 1999-2003 | 035989 | 58, 98, 100 |
| TN | Consolidated Government of Nashville and Davidson County (Nashville Electric Services) | 8.09 | 6.41 | 126.21 | 10.80 | 10.00 | 107.96 | | | | 1999-2003 | 035989 | 59, 94, 96 |
| TN | Consolidated Government of Nashville and Davidson County (Metro Nashville Airport Authority) | 12.00 | 8.30 | 144.55 | 0.18 | 3.16 | 5.75 | | | | 1999-2003 | 035989 | 60, 76, 79 |
| TN | Consolidated Government of Nashville and Davidson County (Metro Development and Housing Authority) | 7.19 | 9.70 | 74.12 | 21.99 | 6.07 | 362.28 | | | | 1999-2003 | 035989 | 61, 85, 88 |
| TN | Consolidated Government of Nashville and Davidson County (Metro Transit Authority) | 0.00 | 0.00 | 0.00 | 0.00 | 9.09 | 0.00 | | | | 1999-2003 | 035989 | 62, 107, 108 |
| TN | Memphis International Airport | 0.71 | 13.19 | 5.40 | 0.17 | 20.73 | 0.80 | 0.00 | 31.05 | 0.00 | 1999-2005 | 036251 | 229 plus unpub data; Other is services |
| TN | Nashville International Airport | 0.02 | 6.45 | 0.38 | 0.75 | 3.48 | 21.42 | | | | 2003-2006 | 010860 | 36, 39, 47, 49 |
| TN | Tennessee Department of Transportation | 5.94 | 21.02 | 28.27 | 2.00 | 18.71 | 10.68 | | | | 2000-2005 | 036600 | 1-13, 1-15, 2-10, 2-12, 4-5, 4-9 |

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| TX | City of Austin | 8.69 | 13.85 | 62.76 | 8.96 | 15.77 | 56.80 | | | | 2002-2006 | 017080 | 205 plus unpub data |
| TX | City of Dallas | 10.71 | 42.94 | 24.94 | 13.29 | 41.87 | 31.75 | 5.00 | 38.87 | 12.87 | 1997-2000 | 037008 | 3-3, 3-4, 3-5, 5-19, 5-20, 5-21 |
| TX* | City of Fort Worth; et al. (City of Arlington) | 0.94 | 47.52 | 1.97 | 8.49 | 35.73 | 23.77 | 19.86 | 36.79 | 53.99 | 2002-2007 | 064469 | 2-9, 2-11, 2-13, 5-24, 5-26, 5-28 |
| TX* | City of Fort Worth; et al. (City of Fort Worth) | 3.14 | 47.52 | 6.62 | 7.81 | 35.73 | 21.85 | 5.52 | 36.79 | 14.99 | 2002-2007 | 064644 | 2-9, 2-11, 2-13, 5-26, 5-28, 5-30 |
| TX* | City of Fort Worth; et al. (DFW Airport) | 21.32 | 47.52 | 44.87 | 18.45 | 35.73 | 51.62 | 10.80 | 36.79 | 29.35 | 2002-2007 | 064841 | 2-9, 2-11, 2-13, 5-26, 5-28, 5-30 |
| TX* | City of Fort Worth; et al. (Ft. Worth Independent School District) | 17.66 | 47.52 | 37.17 | 18.45 | 35.73 | 51.64 | 5.23 | 36.79 | 14.21 | 2002-2007 | 065047 | 2-9, 2-11, 2-13, 5-26, 5-28, 5-30 |
| TX* | City of Fort Worth; et al. (North Texas Tollway) | 0.26 | 45.80 | 0.56 | 1.94 | 35.61 | 5.44 | 6.09 | 35.45 | 17.19 | 2003-2007 | 065241 | 2-9, 2-11, 2-13, 5-26, 5-28, 5-30 |
| TX | City of Houston | 7.46 | 38.55 | 19.36 | 25.61 | 37.76 | 67.81 | 12.90 | 26.41 | 48.85 | 2003-2006 | 036780 | 3-6, 3-8, 3-10, 6-20, 6-22, 6-24 |
| TX* | City of Houston | 5.43 | 23.39 | 23.21 | | | | | | | 2005-2010 | 055889 | 191, and unpub |
| TX | City of San Antonio, et al. | 22.64 | 26.00 | 87.08 | 10.48 | 22.67 | 46.22 | 11.38 | 19.58 | 58.13 | 2004-2007 | 023544 | 3-9, 3-16, 3-18, 3-23, 3-24, 3-29 |
| TX* | Dallas Area Rapid Transit Authority (DART) | 11.32 | 50.15 | 22.57 | 2.92 | 40.45 | 7.21 | 22.41 | 40.45 | 55.41 | 1996-2001 | 065438 | 3-5, 3-7, 3-9, 6-22, 6-24 |

A000746

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| TX* | San Antonio Water System | 19.90 | 11.34 | 175.38 | 15.04 | 27.08 | 55.52 | 15.40 | 31.51 | 48.87 | 2002-2006 | 023544 | 3-7, 3-12, 3-13, 3-18, 3-19, 3-24 |
| TX | State of Texas (Texas DOT) | 1.38 | 6.95 | 19.92 | | | | 10.57 | 28.39 | 37.23 | 2006-2008 | 037260 | 4-15, 4-19, 4-23 |
| TX | State of Texas (State Agencies) | 8.66 | 13.80 | 62.72 | | | | 3.91 | 28.39 | 13.78 | 2006-2008 | 037260 | 4-15, 4-21, 4-22, 4-23 |
| TX | State of Texas (State Universities) | 3.97 | 13.80 | 28.78 | | | | 5.99 | 28.39 | 21.10 | 2006-2008 | 037260 | 4-16, 4-21, 4-22, 4-23 |
| TX | State of Texas (Medical Institutions) | 2.98 | 13.80 | 21.63 | | | | 6.24 | 28.39 | 22.00 | 2006-2008 | 037260 | 4-16, 4-21, 4-22, 4-23 |
| TX* | State of Texas | 3.60 | 37.99 | 9.47 | 12.78 | 38.05 | 33.59 | 2.95 | 23.14 | 12.73 | 2002-2005 | 065667 | 3-8, 3-10, 3-12, 6-21, 6-23, 6-25 |
| UT | Salt Lake City International Airport | 0.16 | 4.96 | 3.15 | 0.27 | 5.07 | 5.34 | | | | 2001-2006 | 037989 | 257, plus unpub data |
| VA | Commonwealth of Virginia | 0.32 | 1.71 | 19.05 | 0.07 | 3.84 | 1.87 | 0.58 | 0.87 | 67.06 | 1998-2002 | 038366 | 4-16, 4-27, 4-32, 4-41, 4-44, 4-57 |
| VA | Commonwealth of Virginia | 1.46 | 7.48 | 19.55 | 0.46 | 9.95 | 4.66 | 2.22 | 13.13 | 16.88 | 2006-2009 | 060413 | 4-10, 4-12, 4-14, 4-26, 4-27 |
| VA* | Virginia DOT (Federal funds) | 0.81 | 2.34 | 34.70 | 0.00 | 5.88 | 0.00 | | | | 1998-2002 | 066083 | 11, 18, 22, 29 |
| VA* | Virginia DOT (State funds) | 1.06 | 2.34 | 45.42 | 1.79 | 5.88 | 30.41 | | | | 1998-2002 | 066083 | 34, 41, 45, 52 |
| WA | Washington Department of Transportation (Federal funds) | 1.07 | 7.16 | 14.94 | 2.53 | 5.59 | 45.26 | | | | 1999-2003 | 016159 | 63, 64, 70 |
| WA | Washington Department of Transportation (State funds) | 0.41 | 7.16 | 5.73 | 1.14 | 5.59 | 20.39 | | | | 1999-2003 | 016159 | 63, 67, 73 |
| WI | City of Milwaukee | 2.91 | 33.77 | 8.63 | | | | 13.11 | 17.63 | 74.36 | 2005 | 039050 | 5-11, 5-13, 6-5, 6-7 |

34

Case 1:12-cv-00744-KBJ   Document 65-7   Filed 06/16/14   Page 41 of 160

| State | Subdivision | U-CON | A-CON | D-CON | U-CPS | A-CPS | D-CPS | U-OPS | A-OPS | D-OPS | Years | Bates Start | Page Spec. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) | (12) | (13) | (14) |
| WI | City of Milwaukee | 10.24 | 1.49 | 688.51 | | | | 3.82 | 1.44 | 265.20 | 2005-2008 | 057069 | 4-7, 5-2, 5-3 |

Notes: (1) All of the studies in Table 4 have been submitted to Congress, except for those 10 marked with an asterisk (*). (2) Disparity indexes of 80 or lower are highlighted in **boldface** type. Disparity indexes of 100 or lower are highlighted in **boldface italic** type.

**A000748**

35

The vast majority of the disparity studies presented in Table 5 identified large adverse disparities affecting MBEs in construction, CPS, and OPS.[41] Considering just the studies that have been submitted to Congress, there are 225 disparity indexes summarized in Table 5. Of these, 100 are from the construction sector, 77 are from the CPS sector, and 48 are from the OPS.[42]

- In construction, 83 of 100 disparity indexes (83 percent) fall at or below 80, and 89 of 100 (89 percent), are less than 100.

- In CPS, 58 of 77 disparity indexes (75 percent) fall at or below 80, and 66 of 77 (86 percent), are less than 100.

- In OPS, 36 of 48 disparity indexes (74 percent) fall at or below 80, and 39 of 48 (81 percent), are less than 100.

- Combined together, 177 of 225 disparity indexes (79 percent) fall at or below 80, and 194 of 225 (86 percent) are less than 100.

When the additional studies that are in the record, but not yet submitted to Congress, are included, the results are very similar. There are 206 disparity indexes altogether—127 for the construction sector and 79 for the CRS sector.

- In construction, 119 of 142 disparity indexes (84 percent) fall at or below 80, and 125 of 142 (88 percent), are less than 100.

- In CPS, 90 of 114 disparity indexes (79 percent) fall at or below 80, and 100 of 114 (88 percent), are less than 100.

- In OPS, 61 of 76 disparity indexes (80 percent) fall at or below 80, and 65 of 76 (86 percent), are less than 100.

- Combined together, 270 of 332 disparity indexes (81 percent) fall at or below 80, and 290 of 332 (87 percent) are less than 100.

Notably, the general consistency of these results appears despite these studies having been undertaken by different consultants, using differing methods, at different points in time, with different budgets, and for a wide variety of state and local government agencies in a wide variety of geographic locations.

- Of the 52 statewide or state agency (including state DOTs) construction disparity indexes in Table 5, 47 (90 percent) are less than or equal to 80 and 49 (94 percent) are less than or equal to 100.

---

[41] In Table 5, disparity indexes of 80 or lower are highlighted in boldface type, while disparity indexes above 80 but still less than 100 (which would indicate parity with non-MBEs) are highlighted in boldface italicized type.

[42] As I will discuss further below, several of the disparity indices from the OPS sector are specifically from information technology services, one of the sectors in which the plaintiff operates.

- Of the 37 statewide CPS disparity indexes, 33 (89 percent) are less than or equal to 80 and 36 (97 percent) are less than or equal to 100.

- Of the 17 statewide OPS disparity indexes, 16 (94 percent) are less than or equal to 80 and 16 (94 percent) are less than or equal to 100.

- Of the 49 city or county construction disparity indexes, 40 (82 percent) are less than or equal to 80 and 42 (86 percent) are less than or equal to 100.

- Of the 39 city or county CPS disparity indexes, 28 (72 percent) are less than or equal to 80 and 32 (82 percent) are less than or equal to 100.

- Of the 39 city or county OPS disparity indexes, 27 (69 percent) are less than or equal to 80 and 30 (77 percent) are less than or equal to 100.

- Of the 41 special district (*e.g.*, transit agencies, airports, housing authorities, school districts) construction disparity indexes, 32 (78 percent) are less than or equal to 80 and 34 (83 percent) are less than or equal to 100.

- Of the 38 special district CPS disparity indexes, 29 (76 percent) are less than or equal to 80 and 32 (84 percent) are less than or equal to 100.

- Of the 20 special district OPS disparity indexes, 18 (90 percent) are less than or equal to 80 and 19 (95 percent) are less than or equal to 100.

Eleven different consultants produced the studies in Table 5. However, 84 percent of these studies were produced by just four of these firms: BBC Research & Consulting, Mason Tillman Associates, MGT of America, and NERA Economic Consulting.

- Of the 25 construction disparity indexes estimated by BBC Research & Consulting, 18 (72 percent) are less than or equal to 80 and 22 (88 percent) are less than or equal to 100.

- Of the 22 CPS disparity indexes from BBC in Table 4, 16 (73 percent) are less than or equal to 80 and 17 (77 percent) are less than or equal to 100.

- Of the 4 OPS disparity indexes from BBC in Table 4, 3 (75 percent) are less than or equal to 80 and 3 (75 percent) are less than or equal to 100.

- Of the 29 construction disparity indexes estimated by Mason Tillman Associates, 28 (97 percent) are less than or equal to 80 and 28 (97 percent) are less than or equal to 100.

- Of the 25 CPS disparity indexes estimated by Mason Tillman, 25 (100 percent) are less than or equal to 80 and 25 (100 percent) are less than or equal to 100.

- Of the 24 OPS disparity indexes estimated by Mason Tillman, 23 (96 percent) are less than or equal to 80 and 23 (96 percent) are less than or equal to 100.

- Of the 38 construction disparity indexes estimated by MGT of America, 32 (84 percent) are less than or equal to 80 and 33 (87 percent) are less than or equal to 100.

- Of the 28 CPS disparity indexes estimated by MGT, 23 (82 percent) are less than or equal to 80 and 25 (89 percent) are less than or equal to 100.

- Of the 27 OPS disparity indexes estimated by MGT, 22 (81 percent) are less than or equal to 80 and 24 (89 percent) are less than or equal to 100.

- Of the 24 construction disparity indexes estimated by NERA Economic Consulting, 23 (96 percent) are less than or equal to 80 and 24 (100 percent) are less than or equal to 100.

- Of the 20 CPS disparity indexes estimated by NERA, 15 (75 percent) are less than or equal to 80 and 19 (95 percent) are less than or equal to 100.

- Of the 9 OPS disparity indexes estimated by NERA, 7 (78 percent) are less than or equal to 80 and 8 (89 percent) are less than or equal to 100. Moreover, all of the NERA-estimated OPS disparity indexes presented in Table 5 are restricted to the information technology and facilities management industries—those industries within which the plaintiff operates.

- Of the 26 construction disparity indexes estimated by the balance of consulting firms, 18 (69 percent) are less than or equal to 80 and 18 (69 percent) are less than or equal to 100.

- Of the 19 CPS disparity indexes estimated by the balance of consulting firms, 11 (58 percent) are less than or equal to 80 and 14 (74 percent) are less than or equal to 100.

- Of the 12 OPS disparity indexes estimated by the balance of consulting firms, 6 (50 percent) are less than or equal to 80 and 7 (58 percent) are less than or equal to 100.

Some specific results from Table 5 are recounted below, focusing on cases where, although positive levels of MBE availability were estimated, the resulting disparity indexes fell far below even the 80 percent threshold:[43]

- Not a single dollar of construction prime contracts went to MBEs from the Arizona Department of Transportation between 2002-2007, the San Diego Association of Governments between 2003-2007, the Illinois Department of Transportation between 2006-2009, the City of Davenport (IA) between 2003-2007, Durham County (NC) between 2001-2005, the North Carolina Department of Transportation (DOT) between 1999-2003, the Consolidated Government of Nashville and Davidson County between

---

[43] To be sure, Table 5 also includes instances where MBE utilization met or even exceeded the corresponding estimate of MBE availability. However, these cases are a small fraction of those observed overall—just 17 out of 142 cases in construction (12 percent), 14 out of 114 cases in CPS (12 percent), and 11 out of 76 cases in OPS (14 percent).

1999-2003, or the Metro Nashville Public Schools between 1999-2003. In all of these cases, positive levels of MBE availability were estimated.

• Not a single dollar of CPS prime contracts went to MBEs from the California Department of Transportation (state funds) between 2002-2006, the San Diego Metropolitan Transit System between 2003-2007, the (Minneapolis) Metropolitan Airports Commission between 2003-2007, the Consolidated Government of Nashville and Davidson County between 1999-2003, or the Virginia DOT (federal funds) between 1998-2002. In all of these cases, positive levels of MBE availability were estimated.

• Not a single dollar of OPS prime contracts went to MBEs from the City of Atlanta Watershed Management Division between 2001-2005, the Oregon DOT between 2007-2010, the Consolidated Government of Augusta-Richmond County (GA) between 2003-2007, or the Memphis International Airport between 1999-2005.[44] The OPS contracts for Augusta-Richmond County and the Memphis International Airport refer specifically to the plaintiff's lines of work in information technology services and facilities support services.

• In Alabama:

  o Although almost 19 percent of available construction businesses were estimated to be MBEs, the City of Birmingham awarded only 10 percent of prime construction contract dollars to MBEs.

  o Although over 16 percent of available CPS businesses were estimated to be MBEs, the City of Birmingham awarded only about 10 percent of prime CPS contract dollars to MBEs.

• In Alaska:

  o Although 12.5 percent of available construction businesses were estimated to be MBEs, the Alaska DOT awarded less than 3 percent of prime construction contract dollars to MBEs.

  o Although 26 percent of available OPS businesses were estimated to be MBEs, the Alaska DOT awarded less than 16 percent of prime OPS contract dollars to MBEs.

• In Arizona:

  o Although almost 12 percent of available construction businesses were estimated to be MBEs, the City of Phoenix awarded less than 3 percent of prime construction contract dollars to MBEs.

---

[44] OPS contracts for Augusta-Richmond County and the Memphis International Airport were restricted to information technology and facilities management services.

- o Although over 14 percent of available CPS businesses were estimated to be MBEs, the Arizona DOT awarded only 5 percent of prime CPS contract dollars to MBEs.

- In California:

  - o Although almost 38 percent of available construction businesses were estimated to be MBEs, Alameda County awarded only 16 percent of prime construction contract dollars to MBEs.

  - o Although 40 percent of available CPS businesses were estimated to be MBEs, Alameda County awarded less than 11 percent of prime CPS contract dollars to MBEs.

  - o Although almost 34 percent of available OPS businesses were estimated to be MBEs, Alameda County awarded only 12 percent of prime OPS contract dollars to MBEs.

  - o Although almost 28 percent of available construction businesses were estimated to be MBEs, the San Francisco Bay Area Rapid Transit awarded less than 11 percent of prime construction contract dollars to MBEs.

  - o Although about 15.5 percent of available OPS businesses were estimated to be MBEs, the San Francisco Bay Area Rapid Transit awarded less than 8 percent of prime OPS contract dollars to MBEs.

  - o Although about 25 percent of available OPS businesses were estimated to be MBEs, the City of Oakland and the Oakland Redevelopment Agency awarded only 10 percent of prime OPS contract dollars to MBEs.

  - o Although over 8 percent of available construction businesses were estimated to be MBEs, the California DOT awarded only slightly more than 2 percent of state-funded prime construction contract dollars to MBEs.

  - o Although almost 10.5 percent of available construction businesses were estimated to be MBEs, the California DOT awarded only about 5.5 percent of federally-funded prime construction contract dollars to MBEs.

  - o Although almost 17 percent of available CPS businesses were estimated to be MBEs, the California DOT awarded only 3.5 percent of federally-funded prime CPS contract dollars to MBEs.

  - o Although almost 14 percent of available construction businesses were estimated to be MBEs, the Los Angeles County Metropolitan Transportation Authority awarded less than 5.5 percent of locally-funded prime construction contract dollars to MBEs.

- o Although almost 15 percent of available CPS businesses were estimated to be MBEs, the Los Angeles County Metropolitan Transportation Authority awarded less than 5 percent of federally-funded prime CPS contract dollars to MBEs.

- o Although 16 percent of available CPS businesses were estimated to be MBEs, the Los Angeles County Metropolitan Transportation Authority awarded only about 4 percent of locally-funded prime CPS contract dollars to MBEs.

- o Although over 19 percent of available construction businesses were estimated to be MBEs, the Southern California Regional Rail Authority awarded less than one-tenth of 1 percent of prime construction contract dollars to MBEs.

- o Although almost 23 percent of available CPS businesses were estimated to be MBEs, the Southern California Regional Rail Authority awarded only about 2 percent of prime CPS contract dollars to MBEs.

- o Although almost 14 percent of available construction businesses were estimated to be MBEs, the San Diego Association of Governments awarded just over 6 percent of prime construction contract dollars to MBEs.

- o Although over 17 percent of available CPS businesses were estimated to be MBEs, the San Diego Metropolitan Transit System awarded less than two-tenths of 1 percent of prime CPS contract dollars to MBEs.

- o Although almost 16 percent of available construction businesses were estimated to be MBEs, the San Mateo County Transit District awarded just seven-tenths of 1 percent of prime construction contract dollars to MBEs.

- o Although over 16 percent of available OPS businesses were estimated to be MBEs, the San Mateo County Transit District awarded less than 3 percent of prime OPS contract dollars to MBEs.

- In Colorado:

  - o Although over 9 percent of available construction businesses were estimated to be MBEs, the City of Denver awarded only 1.5 percent of prime construction contract dollars to MBEs.

  - o Although over 8 percent of available construction businesses were estimated to be MBEs during the 1996-2000 period, the Colorado DOT awarded only about 2 percent of prime construction contract dollars to MBEs. By the 2002-2007 period, MBE availability had grown to almost 13 percent, prime construction contract dollars awarded to MBEs by Colorado DOT grew to only 3 percent.

  - o Although almost 5 percent of available CPS businesses were estimated to be MBEs during the 1996-2000 period, the Colorado DOT awarded only about 1 percent of prime CPS contract dollars to MBEs.

- In Connecticut:

  o Although almost 19 percent of available CPS businesses were estimated to be MBEs, the Metropolitan District Commission (Hartford) awarded just over 3 percent of prime CPS contract dollars to MBEs.

- In Florida:

  o Although over 13 percent of available construction businesses were estimated to be MBEs, Broward County awarded just over 4.5 percent of prime construction contract dollars to MBEs.

  o Although almost 14 percent of available CPS businesses were estimated to be MBEs, Broward County awarded only about 7 percent of prime CPS contract dollars to MBEs.

  o Although almost 17 percent of available OPS businesses were estimated to be MBEs, Broward County awarded only about 4 percent of prime OPS contract dollars to MBEs. The OPS statistics here refer specifically to the plaintiff's lines of work in information technology services and facilities support services.

  o Although 24 percent of available construction businesses were estimated to be MBEs, the City of Tallahassee awarded only about 11 percent of prime construction contract dollars to MBEs.

  o Although almost 31 percent of available OPS businesses were estimated to be MBEs, the City of Tallahassee awarded less than four-tenths of 1 percent of prime OPS contract dollars to MBEs.

  o Although over 10 percent of available construction businesses were estimated to be MBEs, Leon County awarded less than 3.5 percent of prime construction contract dollars to MBEs.

  o Although 9 percent of available OPS businesses were estimated to be MBEs, Leon County awarded only 4 percent of prime OPS contract dollars to MBEs.

  o Although 29 percent of available OPS businesses were estimated to be MBEs, the City of Tampa and the Hillsborough County Aviation Authority awarded only about 1 percent of prime OPS contract dollars to MBEs, and the Hillsborough County School District awarded only about 4.5 percent.

- In Georgia:

  o Although almost 27 percent of available construction businesses were estimated to be MBEs, the City of Atlanta awarded just 12 percent of prime construction contract dollars to MBEs, the City's airport awarded less than 10 percent, and the City's Watershed Management Division awarded only 6 percent.

- o Although almost 24 percent of available CPS businesses were estimated to be MBEs, the City of Atlanta's Watershed Management Division awarded only about 5.5 percent of prime CPS contract dollars to MBEs.

- o Although 19 percent of available construction businesses were estimated to be MBEs, the Government of Augusta-Richmond County awarded less than four-tenths of 1 percent of prime construction contract dollars to MBEs.

- o Although over 16 percent of available construction businesses were estimated to be MBEs, the Georgia DOT awarded less than four-tenths of 1 percent of federally-funded prime construction contract dollars to MBEs.

- o Although almost 18 percent of available construction businesses were estimated to be MBEs, the Georgia DOT awarded only about four-tenths of 1 percent of state-funded prime construction contract dollars to MBEs.

- o Although over 18 percent of available CPS businesses were estimated to be MBEs, the Georgia DOT awarded only less than 3 percent of federally-funded prime construction CPS dollars to MBEs.

- o Although over 19 percent of available CPS businesses were estimated to be MBEs, the Georgia DOT awarded only less than 7 percent of state-funded prime construction CPS dollars to MBEs.

- In Hawaii:

  - o Although 49 percent of available construction businesses were estimated to be MBEs, the Hawaii DOT awarded less than 16 percent of prime construction contract dollars to MBEs.

- In Idaho:

  - o Although more than 2.5 percent of available construction businesses were estimated to be MBEs, the Idaho Transportation Department awarded only seven-tenths of 1 percent of prime construction contract dollars to MBEs.

  - o Although almost 5 percent of available CPS businesses were estimated to be MBEs, the Idaho Transportation Department awarded less than 1 percent of prime CPS contract dollars to MBEs.

- In Illinois:

  - o Although almost 6.5 percent of available construction businesses were estimated to be MBEs, the Illinois Tollway awarded less than one-tenth of 1 percent of prime construction contract dollars to MBEs.

- o Although 10 percent of available CPS businesses were estimated to be MBEs, the Illinois Tollway awarded less than 5.5 percent of prime CPS contract dollars to MBEs.

- o Although almost 27 percent of available CPS businesses were estimated to be MBEs, the Illinois DOT awarded only 14 percent of prime CPS contract dollars to MBEs.

- In Indiana:

  - o Although 8 percent of available construction businesses were estimated to be MBEs, the Indiana Department of Administration and the Indiana DOT awarded only eight-tenths of 1 percent of prime construction contract dollars to MBEs.

  - o Although over 7 percent of available OPS businesses were estimated to be MBEs, the Indiana Department of Administration and the Indiana DOT awarded only 2.5 percent of prime OPS contract dollars to MBEs.

  - o Although 9.5 percent of available OPS businesses were estimated to be MBEs, the Indiana State Educational Institutions awarded less than 5.5 percent of prime OPS contract dollars to MBEs.

- In Iowa:

  - o Although over 15 percent of available OPS businesses were estimated to be MBEs, the City of Davenport awarded less than 2 percent of prime OPS contract dollars to MBEs.

- In Kentucky:

  - o Although almost 2 percent of available construction businesses were estimated to be MBEs, the State of Kentucky awarded only slightly more than 1 percent of prime construction contract dollars to MBEs.

  - o Although almost 3 percent of available CPS businesses were estimated to be MBEs, the State of Kentucky awarded less than two-tenths of 1 percent of prime CPS contract dollars to MBEs.

  - o Although more than 2.5 percent of available OPS businesses were estimated to be MBEs, the State of Kentucky awarded only about 1 percent of prime OPS contract dollars to MBEs.

- In Maryland:

  - o Although 12 percent of available construction businesses were estimated to be MBEs, the City of Baltimore awarded less than 3 percent of prime construction contract dollars to MBEs.

o  Although almost 15 percent of available CPS businesses were estimated to be MBEs, the City of Baltimore awarded less than 7 percent of prime CPS contract dollars to MBEs.

o  Although almost 12 percent of available construction businesses were estimated to be MBEs during the 2000-2005 period, the State of Maryland awarded less than eight-tenths of 1 percent of prime construction contract dollars to MBEs. By the 2005-2009 period, MBE availability had grown to 19 percent, but prime construction contract dollars awarded to MBEs by Maryland fell to less than six-tenths of 1 percent.

o  Although over 16 percent of available CPS businesses were estimated to be MBEs during the 2000-2005 period, the State of Maryland awarded only 8 percent of prime CPS contract dollars to MBEs. By the 2005-2009 period, MBE availability had grown to 26 percent, but prime CPS contract dollars awarded to MBEs fell to less than 3 percent.

o  Although over 43 percent of available OPS businesses were estimated to be MBEs during the 2000-2005 period, the State of Maryland awarded less than 8 percent of prime CPS contract dollars to MBEs. By the 2005-2009 period, MBE availability was estimated to be  over 32 percent, but prime OPS contract dollars awarded to MBEs were less than 7 percent. The OPS statistics here refer specifically to the plaintiff's lines of work in information technology services and facilities support services.

o  Although over 26 percent of available CPS businesses were estimated to be MBEs, the Washington Suburban Sanitary Commission awarded only 14 percent of prime CPS contract dollars to MBEs.

o  Although almost 29 percent of available OPS businesses were estimated to be MBEs, the Washington Suburban Sanitary Commission awarded only 17.5 percent of prime OPS contract dollars to MBEs.

• In Massachusetts:

o  Although 15 percent of available construction businesses were estimated to be MBEs, the City of Boston awarded less than 2 percent of prime construction contract dollars to MBEs.

o  Although 25 percent of available CPS businesses were estimated to be MBEs, the City of Boston awarded less than 4 percent of prime CPS contract dollars to MBEs.

o  Although almost 3.5 percent of available construction businesses were estimated to be MBEs, the State Division of Capital Asset Management awarded only 1.5 percent of prime construction contract dollars to MBEs.

- In Minnesota:

  - Although almost 9 percent of available construction businesses were estimated to be MBEs, the City of Minneapolis awarded only 1 percent of prime construction contract dollars to MBEs.

  - Although almost 8 percent of available CPS businesses were estimated to be MBEs, the City of Minneapolis awarded only about 5 percent of prime CPS dollars to MBEs.

  - Although 15 percent of available OPS businesses were estimated to be MBEs, the City of Minneapolis awarded only 5 percent of prime OPS dollars to MBEs. The OPS statistics here refer specifically to the plaintiff's lines of work in information technology services and facilities support services.

  - Although almost 7 percent of available construction businesses were estimated to be MBEs, the St. Paul Housing Authority awarded only about 2 percent of prime construction contract dollars to MBEs.

  - Although almost 4 percent of available CPS businesses were estimated to be MBEs, the City of St. Paul awarded only about 1 percent of prime CPS contract dollars to MBEs.

  - Although 2.5 percent of available OPS businesses were estimated to be MBEs, the City of St. Paul awarded less than seven-tenths of 1 percent of prime OPS contract dollars to MBEs.

  - Although over 5 percent of available construction businesses were estimated to be MBEs, the Minneapolis Metropolitan Airports Commission awarded less than three-tenths of 1 percent of prime construction contract dollars to MBEs.

  - Although almost 2 percent of available OPS businesses were estimated to be MBEs, the Minneapolis Metropolitan Airports Commission awarded less than one-tenth of 1 percent of prime OPS contract dollars to MBEs.

  - Although just under 4 percent of available construction businesses were estimated to be MBEs during the 2000-2004 period, the Minnesota DOT awarded less than one-tenth of 1 percent of prime construction contract dollars to MBEs. By the 2002-2007 period, MBE availability was estimated to be just under 2.5 percent, and prime construction contract dollars awarded to MBEs were just one-tenth of 1 percent.

- In Missouri:

  - Although over 15 percent of available construction businesses were estimated to be MBEs, Kansas City awarded only about 7 percent of prime construction contract dollars to MBEs.

o Although over 17 percent of available CPS businesses were estimated to be MBEs, Kansas City awarded only 10 percent of prime CPS contract dollars to MBEs and the Kansas City School District awarded less than 2 percent.

o Although 11 percent of available OPS businesses were estimated to be MBEs, Kansas City awarded less than 5.5 percent of prime OPS contract dollars to MBEs.

o Although almost 6 percent of available construction businesses were estimated to be MBEs, St. Louis Metro awarded less than one-tenth of 1 percent of prime construction contract dollars to MBEs.

o Although 7.5 percent of available CPS businesses were estimated to be MBEs, St. Louis Metro awarded only about 2 percent of prime CPS contract dollars to MBEs.

o Although over 9 percent of available construction businesses were estimated to be MBEs, the City of St. Louis awarded only 5 percent of prime construction contract dollars to MBEs, and the Metropolitan St. Louis Sewer District awarded only 1 percent.

o Although almost 15 percent of available CPS businesses were estimated to be MBEs, the Metropolitan St. Louis Sewer District awarded only 9 percent of prime CPS contract dollars to MBEs.

o Although almost 5.5 percent of available OPS businesses were estimated to be MBEs, the Metropolitan St. Louis Sewer District awarded less than four-tenths of 1 percent of prime OPS contract dollars to MBEs.

o Although about 4.5 percent of available construction businesses were estimated to be MBEs, the Missouri DOT awarded less than four-tenths of 1 percent of prime construction contract dollars to MBEs.

o Although about 6.5 percent of available CPS businesses were estimated to be MBEs, the Missouri DOT awarded less than one-half of 1 percent of federally-funded prime CPS contract dollars to MBEs and less than 2 percent of state-funded dollars.

• In Montana:

o Although over 2 percent of available CPS businesses were estimated to be MBEs, the Montana DOT awarded only about two-tenths of one percent of prime CPS contract dollars to MBEs.

**A000760**

- In Nevada:

  o Although over 8 percent of available construction businesses were estimated to be MBEs, the Nevada DOT awarded only about 5 percent of state-funded prime construction contract dollars to MBEs.

  o Although over 11 percent of available construction businesses were estimated to be MBEs, the Nevada DOT awarded less than 2 percent of federally-funded prime construction contract dollars to MBEs.

  o Although over 6 percent of available CPS businesses were estimated to be MBEs, the Nevada DOT awarded less than three-tenths of 1 percent of federally-funded prime CPS contract dollars to MBEs.

  o Although almost 10 percent of available CPS businesses were estimated to be MBEs, the Nevada DOT awarded less than 1.5 percent of state-funded prime CPS contract dollars to MBEs.

- In New Jersey:

  o Although 15 percent of available construction businesses were estimated to be MBEs during the 2000-2002 period, the State of New Jersey awarded only 7 percent of prime construction contract dollars to MBEs. During the 2003-2004 period, availability was estimated at about 17.5 percent, but only 6 percent of prime construction contract dollars were awarded to MBEs.

  o Although over 17 percent of available CPS businesses were estimated to be MBEs during the 2000-2002 period, the State of New Jersey awarded less than 10 percent of prime CPS contract dollars to MBEs. During the 2003-2004 period, availability was estimated at 18 percent, but only about 7.5 percent of prime CPS contract dollars were awarded to MBEs.

- In New York:

  o Although almost 47 percent of available construction businesses were estimated to be MBEs, New York City awarded only about 7 percent of prime construction contract dollars to MBEs.

  o Although over 38 percent of available CPS businesses were estimated to be MBEs, New York City awarded less than 5 percent of prime CPS contract dollars to MBEs.

  o Although almost 26 percent of available OPS businesses were estimated to be MBEs, New York City awarded only about 3 percent of prime OPS contract dollars to MBEs.

- o Although 14 percent of available construction businesses were estimated to be MBEs, the State of New York awarded less than 2 percent of prime construction contract dollars to MBEs.

- o Although over 13 percent of available CPS businesses were estimated to be MBEs, the State of New York awarded less than 7 percent of prime CPS contract dollars to MBEs.

- o Although almost 20 percent of available OPS businesses were estimated to be MBEs, the State of New York awarded less than 6 percent of prime OPS contract dollars to MBEs. The OPS statistics here refer specifically to the plaintiff's lines of work in information technology services and facilities support services.

- In North Carolina:

  - o Although over 19 percent of available construction businesses were estimated to be MBEs, the City of Charlotte awarded less than 7 percent of prime construction contract dollars to MBEs.

  - o Although 7.5 percent of available CPS businesses were estimated to be MBEs, the City of Charlotte awarded less than 4.5 percent of prime CPS contract dollars to MBEs.

  - o Although over 22 percent of available construction businesses were estimated to be MBEs, the City of Durham and Durham County awarded less than 6 percent of prime construction contract dollars to MBEs.

  - o Although almost 15 percent of available OPS businesses were estimated to be MBEs, the City of Durham and Durham County awarded less than 4.5 percent of prime OPS contract dollars to MBEs.

  - o Although 6 percent of available construction businesses were estimated to be MBEs during the 1999-2003 period, the North Carolina DOT awarded less than 1.5 percent of prime construction contract dollars to MBEs. By 2004-2008, availability was estimated to be about 4 percent, and prime awards to MBEs were less than 1 percent.

  - o Although almost 9 percent of available CPS businesses were estimated to be MBEs during the 1999-2003 period, the North Carolina DOT awarded less than 1.5 percent of prime CPS contract dollars to MBEs.

- In Ohio:

  - o Although 32 percent of available construction businesses were estimated to be MBEs, the City of Cleveland awarded only 13 percent of prime construction contract dollars to MBEs and the Greater Cleveland Regional Transit Authority awarded just 6 percent.

- o  Although almost 29 percent of available CPS businesses were estimated to be MBEs, the City of Cleveland awarded only 7.5 percent of prime CPS contract dollars to MBEs.

- o  Although almost 19 percent of available OPS businesses were estimated to be MBEs, the City of Cleveland awarded less than 1.5 percent of prime OPS contract dollars to MBEs and the Greater Cleveland Regional Transit Authority awarded only about 4 percent.

- o  Although almost 23 percent of available construction businesses were estimated to be MBEs, the City of Dayton awarded only about 3 percent of prime construction contract dollars to MBEs.

- o  Although over 15 percent of available CPS businesses were estimated to be MBEs, the City of Dayton awarded less than six-tenths of 1 percent of prime CPS contract dollars to MBEs.

- o  Although almost 18 percent of available OPS businesses were estimated to be MBEs, the City of Dayton awarded less than four-tenths of 1 percent of prime OPS contract dollars to MBEs.

- In Oklahoma:

  - o  Although 16 percent of available CPS businesses were estimated to be MBEs, the Oklahoma DOT awarded only 2 percent of federally-funded prime CPS contract dollars to MBEs.

  - o  Although almost 17 percent of available CPS businesses were estimated to be MBEs, the Oklahoma DOT awarded less than 4 percent of state-funded prime CPS contract dollars to MBEs.

- In Oregon:

  - o  Although 6 percent of available construction businesses were estimated to be MBEs, the Oregon DOT awarded only 2.5 percent of federally-funded prime construction contract dollars to MBEs.

  - o  Although over 14 percent of available CPS businesses were estimated to be MBEs, the Oregon DOT awarded only 2 percent of federally-funded prime CPS contract dollars to MBEs.

  - o  Although just under 6 percent of available construction businesses were estimated to be MBEs, the Port of Portland awarded less than four-tenths of 1 percent of prime construction contract dollars to MBEs.

  - o  Although over 12 percent of available CPS businesses were estimated to be MBEs, the Port of Portland awarded less than 3 percent of prime CPS contract dollars to MBEs.

- o  Although over 7 percent of available OPS businesses were estimated to be MBEs, the Port of Portland awarded less than 2 percent of prime OPS contract dollars to MBEs.

- In Pennsylvania:

  - o  Although over 8 percent of available construction businesses were estimated to be MBEs, the State of Pennsylvania awarded only 1.5 percent of prime construction contract dollars to MBEs.

  - o  Although over 18 percent of available CPS businesses were estimated to be MBEs, the State of Pennsylvania awarded less than 6 percent of prime CPS contract dollars to MBEs.

- In South Carolina:

  - o  Although 21 percent of available construction businesses were estimated to be MBEs, the City of Columbia awarded less than eight-tenths of 1 percent of prime construction contract dollars to MBEs.

- In Tennessee:

  - o  Although over 15 percent of available construction businesses were estimated to be MBEs, the City of Memphis awarded only about 8 percent of prime construction contract dollars to MBEs.

  - o  Although almost 22 percent of available CPS businesses were estimated to be MBEs, the City of Memphis awarded less than 11 percent of prime CPS contract dollars to MBEs.

  - o  Although almost 13 percent of available OPS businesses were estimated to be MBEs, the City of Memphis awarded only about 3 percent of prime OPS contract dollars to MBEs.

  - o  Although 13 percent of available construction businesses were estimated to be MBEs, the Memphis International Airport awarded only seven-tenths of 1 percent of prime construction contract dollars to MBEs.

  - o  Although 21 percent of available CPS businesses were estimated to be MBEs, the Memphis International Airport awarded less than two-tenths of 1 percent of prime CPS contract dollars to MBEs.

  - o  Although 6 percent of available construction businesses were estimated to be MBEs, the Nashville International Airport awarded less than one-tenth of 1 percent of prime construction contract dollars to MBEs.

  - o  Although over 3 percent of available CPS businesses were estimated to be MBEs during the 1999-2003 period, the Nashville International Airport awarded less

than two-tenths of 1 percent of prime CPS contract dollars to MBEs. During the 2003-2006 period, availability was estimated to be 3.5 percent, but less than eight-tenths of 1 percent of prime CPS contract dollars were awarded to MBEs.

o   Although about 6.5 percent of available CPS businesses were estimated to be MBEs, the Metro Nashville Public Schools awarded less than 3.5 percent of prime CPS contract dollars to MBEs.

o   Although 21 percent of available construction businesses were estimated to be MBEs, the Tennessee DOT awarded less than 6 percent of prime construction contract dollars to MBEs.

o   Although almost 19 percent of available CPS businesses were estimated to be MBEs, the Tennessee DOT awarded only 2 percent of prime CPS contract dollars to MBEs.

- In Texas:

   o   Although 14 percent of available construction businesses were estimated to be MBEs, the City of Austin awarded less than 9 percent of prime construction contract dollars to MBEs.

   o   Although almost 16 percent of available CPS businesses were estimated to be MBEs, the City of Austin awarded less than 9 percent of prime CPS contract dollars to MBEs.

   o   Although 43 percent of available construction businesses were estimated to be MBEs, the City of Dallas awarded less than 11 percent of prime construction contract dollars to MBEs.

   o   Although 42 percent of available CPS businesses were estimated to be MBEs, the City of Dallas awarded less than 13.5 percent of prime CPS contract dollars to MBEs.

   o   Although almost 39 percent of available OPS businesses were estimated to be MBEs, the City of Dallas awarded only 5 percent of prime OPS contract dollars to MBEs.

   o   Although over 47 percent of available construction businesses were estimated to be MBEs, the City of Arlington awarded less than 1 percent of prime construction contract dollars to MBEs, the City of Fort Worth about 3 percent, the DFW International Airport about 21 percent, the Fort Worth Independent School District about 18 percent, and the North Texas Tollway less than three-tenths of 1 percent.

   o   Although almost 36 percent of available CPS businesses were estimated to be MBEs, the City of Arlington awarded only 8.5 percent of prime CPS contract dollars to MBEs, the City of Fort Worth less than 8 percent, the DFW

International Airport about 18.5 percent, the Fort Worth Independent School District about 18.5 percent, and the North Texas Tollway less than 2 percent.

o   Although almost 37 percent of available OPS businesses were estimated to be MBEs, the City of Arlington awarded less than 20 percent of prime OPS contract dollars to MBEs, the City of Fort Worth only about 5.5 percent, the DFW International Airport less than 11 percent, the Fort Worth Independent School District only about 5 percent, and the North Texas Tollway only about 6 percent.

o   Although 23 percent of available CPS businesses were estimated to be MBEs, the City of San Antonio awarded only about 10.5 percent of prime CPS contract dollars to MBEs.

o   Although almost 20 percent of available OPS businesses were estimated to be MBEs, the City of San Antonio awarded only about 11.5 percent of prime OPS contract dollars to MBEs.

o   Although 27 percent of available CPS businesses were estimated to be MBEs, the San Antonio Water System awarded only 15 percent of prime CPS contract dollars to MBEs.

o   Although almost 32 percent of available OPS businesses were estimated to be MBEs, the San Antonio Water System awarded only 15.5 percent of prime OPS contract dollars to MBEs.

o   Although 23 percent of available construction businesses were estimated to be MBEs, the City of Houston awarded only about 5.5 percent of prime construction contract dollars to MBEs.

o   Although 7 percent of available construction businesses were estimated to be MBEs, the Texas DOT awarded less than 1.5 percent of prime construction contract dollars to MBEs.

o   Although over 28 percent of available OPS businesses were estimated to be MBEs, the Texas DOT awarded only about 10.5 percent of prime OPS contract dollars to MBEs.

o   Although almost 14 percent of available construction businesses were estimated to be MBEs, other Texas State agencies awarded less than 9 percent of prime construction contract dollars to MBEs, state universities less than 4 percent, and state medical institutions less than 3 percent.

o   Although over 28 percent of available OPS businesses were estimated to be MBEs, other Texas State agencies awarded less than 4 percent of prime OPS contract dollars to MBEs, state universities less than 6 percent, and state medical institutions only about 6 percent.

- In Utah:

  - Although 5 percent of available construction businesses were estimated to be MBEs, the Salt Lake City International Airport awarded less than two-tenths of once percent of prime construction contract dollars to MBEs.

  - Although 5 percent of available CPS businesses were estimated to be MBEs, the Salt Lake City International Airport awarded less than three-tenths of 1 percent of prime CPS contract dollars to MBEs.

- In Virginia:

  - Although almost 2 percent of available construction businesses were estimated to be MBEs in the 1998-2002 period, the Commonwealth of Virginia awarded only three-tenths of 1 percent of prime construction contract dollars to MBEs. By the 2006-2009 period, availability had increased to almost 7.5 percent, but prime construction contract dollars awarded to MBEs were still less than 1.5 percent.

  - Although almost 4 percent of available CPS businesses were estimated to be MBEs in the 1998-2002 period, the Commonwealth of Virginia awarded less than one-tenth of 1 percent of prime CPS contract dollars to MBEs. By the 2006-2009 period, availability had increased to almost 10 percent, but prime CPS contract dollars awarded to MBEs were still less than five-tenths of 1 percent.

  - Although almost 13 percent of available OPS businesses were estimated to be MBEs in the 2006-2009 period, the Commonwealth of Virginia awarded only about 2 percent of prime OPS contract dollars to MBEs.

  - Although over 2 percent of available construction businesses were estimated to be MBEs, the Virginia DOT awarded only about 1 percent of prime construction contract dollars to MBEs.

  - Although almost 6 percent of available CPS businesses were estimated to be MBEs, the Virginia DOT awarded less than 2 percent of prime CPS contract dollars to MBEs.

- In Washington:

  - Although 7 percent of available construction businesses were estimated to be MBEs, the Washington State DOT awarded only 1 percent of federally-funded prime construction contract dollars and only four-tenths of 1 percent of state-funded prime construction contract dollars to MBEs.

  - Although about 5.5 percent of available CPS businesses were estimated to be MBEs, the Washington State DOT awarded only 2.5 percent of federally-funded prime CPS contract dollars and only about 1 percent of state-funded prime CPS contract dollars to MBEs.

- In Wisconsin:

    - Although almost 34 percent of available construction businesses were estimated to be MBEs, the City of Milwaukee awarded less than 3 percent of prime construction contract dollars to MBEs.

In addition to evidence regarding disparities in public contracting, almost every study presented in Table 5 also included anecdotal evidence of discrimination impacting MBEs. This evidence was collected through a variety of methods, including personal interviews, public hearings, and surveys.[45]

Furthermore, many of these studies included statistical evidence of disparities in the surrounding private sector of a given public jurisdiction—disparities in minority business formation rates, disparities in business owner earnings, and disparities in access to commercial loans and capital. As mentioned earlier, this type of evidence is important since it helps explain why the large and adverse disparities observed for MBEs in Table 5 are more likely explained by discrimination than by other, non-discriminatory, factors. It is to this evidence that I turn next.

## C.      There is Strong Evidence of Disparities Consistent with Discrimination Throughout the U.S. in the Private Sector

As noted above in Section II.F, even the small number of instances in Table 5 where the disparity index exceeds 100 should not be construed as a lack of evidence of discrimination. This is because the public contracting statistics in question are impacted by the presence, in most instances, of a race-conscious contracting policy. Such policies impact prime contracting and subcontracting activity, not only as a result of participation goals and related demand-side procedures, but also as a result of technical assistance, bonding assistance, financial assistance, contract unbundling, small business set-asides, and other supply-side activities designed to promote the participation of MBEs in public contracting.

Given this, many studies also examine the evidence concerning how MBEs and their owners fare in the private sector, that is, economy-wide, where race- and gender-conscious contracting programs are relatively rare. Indeed a key rationale for the advent of public sector programs was public entities' need to avoid becoming passive participants in economy-wide private sector discrimination. Another reason for examining economy-wide evidence is to help understand that the effects of discrimination are likely to impede the development of MBEs, through, for example, barriers in accessing credit and capital.

There are several publicly available data sources that studies have used to test how MBEs and their owners fare in the absence of affirmative efforts to include them in contracting activity. These include the Census Bureau's SBO, PUMS, and ACS PUMS, as well as the *Survey of Small Business Finances*, produced jointly by the Federal Reserve Board and the SBA.

---

[45] *See also, e.g., Kevcon, Inc. v. The United States*, Defendants Expert Report, ROTHE041702; U.S. Small Business Administration (2010), Aparicio (2009), Asian American Justice Center (2008), Lau (2009), Quon (2008), U.S. Congress (2007), (2008), (2009a), (2009b), and (2009c).

Below, I present evidence from each of these data sources. This evidence summarizes many of the studies I have conducted while at NERA as well as several congressional testimonies I have given. Similar evidence is found in other consultants' disparity studies as well.[46]

## 1.    There is Strong Evidence of Disparities Between Utilization and Availability in the Survey of Business Owners

One important source of study data is the Census Bureau's *Survey of Business Owners* (SBO), performed every five years. The most recent data available from SBO is for 2007 and was released in 2011. According to these results, there are substantial disparities between the share of minorities in the general population and their share of the business population. Specifically:[47]

- Although Blacks comprised 14.0 percent of the population, they accounted for only 7.3 percent of the businesses.

- Although Hispanics comprised 16.3 percent of the population, they accounted for only 8.6 percent of the businesses.

- Although American Indians and Alaska Natives comprised 2.0 percent of the population, they accounted for only 0.9 percent of the businesses.

- Asians and Pacific Islanders comprised 6.2 percent of the population and accounted for only 6.0 percent of the businesses.

Moreover, the share of business sales and receipts accruing to minorities is far lower than their respective shares of the business population.

- Although Blacks comprised 7.3 percent of all U.S. businesses, they earned only 1.25 percent of sales and receipts.

- Although Hispanics comprised 8.6 percent of all businesses, they earned only 3.2 percent of sales and receipts.

- Although American Indians and Alaska Natives comprised 0.9 percent of all businesses, they earned only 0.31 percent of sales and receipts.

- Although Asians and Pacific Islanders comprised 6.0 percent of all businesses, they earned only 4.7 percent of sales and receipts.

These disparities between the size of the MBE population and its share of sales and receipts are very large. They are also statistically significant, meaning they are unlikely to result from chance alone.

---

[46] See, *e.g.,* certain of the studies in Table 1 by Griffin & Strong, CRA Consulting, BBC Research & Consulting, and MGT of America, Inc.

[47] U.S. Census Bureau (2011a).

While the exact proportions vary, large and statistically significant disparities are observed in the U.S. as a whole, in all 50 states and the District of Columbia, for all minority groups—Blacks, Hispanics, Asians and Pacific Islanders, and Native Americans. These disparities are found in the construction sector, the professional and technical services sector (which includes CPS and OPS), and in the economy as a whole.

The disparities observed in the 2007 SBO are documented below in Appendix A, Tables A.1 through A.15. Similar data from the 2002 SBO is presented in Appendix B, Tables B.1 through B.15. Similar findings from current and past SBO reports appear in a number of the disparity studies identified in Table 1, including my own.

The most noticeable aspect of the statistics presented in Tables A.1 through A.15 is how many of the disparity indexes are large, adverse, and statistically significant.[48] This is true for Blacks, Hispanics, Asians and Pacific Islanders, and Native Americans. It is true in the construction sector, in the professional and technical services sector, and when considering all industries combined. It is true in all 50 states and the District of Columbia. While there is certainly variation by race, industry, and geography, as with the studies recounted in Table 5, the similarities strongly outweigh the differences. Table 6 provides a summary of the findings of disparity from the 2007 SBO for Tables A.1 through A.15.

**Table 6. Summary Statistics Showing Prevalence of Disparities in the 2007 SBO (Tables A.1 to A.15).**

| Table Number | Industry | Number of Disparity Indexes in Table | Race Group | Fraction of Disparity Indexes Less than or Equal to 80 | Fraction of Disparity Indexes Less than or Equal to 100 | Fraction of Disparity Indexes That Are Statistically Significant |
|---|---|---|---|---|---|---|
| A.1 | All Industries | 96 | Black | 93% | 97% | 90% |
| A.6 | Construction | 84 | Black | 85% | 90% | 82% |
| A.11 | Professional Services | 92 | Black | 76% | 88% | 73% |
| A.2 | All Industries | 101 | Hispanic | 82% | 90% | 86% |
| A.7 | Construction | 95 | Hispanic | 87% | 93% | 78% |
| A.12 | Professional Services | 97 | Hispanic | 65% | 75% | 57% |
| A.3 | All Industries | 104 | Asian | 75% | 96% | 80% |
| A.8 | Construction | 84 | Asian | 71% | 77% | 54% |
| A.13 | Professional Services | 100 | Asian | 15% | 28% | 32% |
| A.5 | All Industries | 71 | NHPI | 86% | 93% | 72% |
| A.10 | Construction | 33 | NHPI | 73% | 79% | 58% |
| A.15 | Professional Services | 31 | NHPI | 52% | 58% | 39% |
| A.4 | All Industries | 94 | AIAN | 91% | 98% | 82% |
| A.9 | Construction | 74 | AIAN | 73% | 85% | 54% |
| A.14 | Professional Services | 79 | AIAN | 68% | 80% | 43% |

Source and Note: Tables A.1 through A.15, below. "NHPI" stands for Native Hawaiians and Other Pacific Islanders, and "AIAN" stands for American Indians and Alaska Natives.

---

[48] With the SBO data, I measure statistical significance here using the "two standard deviation" or "5%" level of significance typically used in disparate impact litigation in employment and related areas.

Table 7 provides a similar summary for Tables B.1 through B.15 from the 2002 SBO survey. While the 2007 disparity statistics remain large, adverse, and statistically significant in the vast majority of categories, a comparison of Table 6 with Table 7 shows less disparity in most categories in 2007 compared with 2002.

**Table 7. Summary Statistics Showing Prevalence of Disparities in the 2002 SBO (Tables B.1 to B.15).**

| Table Num-ber | Industry | Number of Disparity Indexes in Table | Race Group | Fraction of Disparity Indexes Less than or Equal to 80 | Fraction of Disparity Indexes Less than or Equal to 100 | Fraction of Disparity Indexes That Are Statistically Significant |
|---|---|---|---|---|---|---|
| B.1 | All Industries | 100 | Black | 98% | 100% | 98% |
| B.6 | Construction | 69 | Black | 86% | 88% | 72% |
| B.11 | Professional Services | 86 | Black | 94% | 98% | 80% |
| B.2 | All Industries | 102 | Hispanic | 100% | 100% | 100% |
| B.7 | Construction | 85 | Hispanic | 88% | 91% | 81% |
| B.12 | Professional Services | 84 | Hispanic | 93% | 94% | 74% |
| B.3 | All Industries | 102 | Asian | 100% | 100% | 100% |
| B.8 | Construction | 58 | Asian | 74% | 90% | 53% |
| B.13 | Professional Services | 88 | Asian | 64% | 77% | 51% |
| B.5 | All Industries | 48 | NHPI | 100% | 100% | 96% |
| B.10 | Construction | 10 | NHPI | 70% | 80% | 50% |
| B.15 | Professional Services | 13 | NHPI | 92% | 92% | 85% |
| B.4 | All Industries | 96 | AIAN | 99% | 99% | 98% |
| B.9 | Construction | 74 | AIAN | 81% | 91% | 64% |
| B.14 | Professional Services | 71 | AIAN | 90% | 92% | 76% |

Source and Note: Tables B.1 through B.15, below. "NHPI" stands for Native Hawaiians and Other Pacific Islanders, and "AIAN" stands for American Indians and Alaska Natives.

## 2.    The Effects of Discrimination on Entrepreneurial Success

Large and adverse statistical disparities between minority-owned businesses and non-minority male-owned businesses, such as those shown above in Table 5 and below in Appendix A and Appendix B, have been documented in numerous studies and reports since the *Croson* decision, including those submitted to Congress.[49] Business outcomes, however, can be influenced by multiple factors, and disparity studies often test the likelihood that discrimination, rather than other non-discriminatory factors, is an important contributing factor to observed gross disparities.

One way that the linkage between statistical disparities and discrimination has been established is through the introduction of anecdotal or qualitative evidence. If the thrust of such anecdotal evidence is consistent with the statistical disparities observed, then the case for the linkage is

---

[49] In addition to Table 1, *see* the sources cited in footnotes 23 and 24.

strengthened accordingly. There are a vast number of anecdotal accounts of discrimination that have been submitted to Congress.[50]

Another way that the linkage between statistical disparities and discrimination has been established is to consider the size of the observed disparities. That is, the larger the disparity, the less likely it is that non-discriminatory factors can account for the entire difference. It is this straightforward observation that underpins the Equal Employment Opportunity Commission's longstanding "four-fifths rule" for triggering employment discrimination investigations.[51]

Many of the studies submitted to Congress have shown that various factors, such as firm age, size, bonding levels, *etc.*, are lower for minority-owned than for similarly situated non-minority male-owned firms. If discrimination has limited the access of MBEs to the tools needed to perform successfully as prime contractors and subcontractors, Congress rightly considers those effects in determining the need for race-conscious relief. At the least, these factors should not be used to limit the reach of the remedy for the discrimination that limits MBEs' ability to compete.

In his September 2008 testimony before Congress, Dr. Thomas Boston, author of two of the disparity studies that appear in Tables 1 and 4 (Georgia DOT and North Carolina DOT), noted:

> [T]here remains a tremendous disparity in the relative capacity and scale of minority owned businesses in comparison to businesses owned by whites. For example, minority groups comprise 32% of the US population but own just 11.6% of all US businesses with employees and earn only about 5% of US business revenue. Further, the average revenue of each business is about one half that of the average revenue of businesses owned by whites. The global nature of the world's economy is forcing upon small and minority-owned businesses the need to increase scale and capacity to compete successfully. Globalization has forced major corporations to reduce the number of firms they use in their supply chain. This means that each supplier must have a larger capacity. Likewise, there continues to be a persistent problem of government organizations bundling contracts. This makes it more difficult for small and minority businesses to gain access; unless they have scale and capacity.

> To achieve greater capacity minority businesses must move to the next level. Most often this requires external capital. Yet numerous studies have documented the racially discriminatory barriers minority firms encounter when pursuing debt and equity funding. Ken Cavalluzzo (1999) analyzed credit applications, loan denials and interest rates paid across gender, race and ethnic characteristics of the small business owners. He gathered data on businesses that applied for credit and those that did not apply because they felt their application would have been turned down. He found large unexplained differences in denial rates between Black and White male owned companies that could only be attributed to discrimination. Susan Coleman (2004) examined access to the capital for women and minority owned small firms and found that after controlling for differences in human capital characteristics of owners, minorities were significantly less likely to be

---

[50] *See, e.g.*, those items cited above at fn. 45.

[51] *See* fn. 39, *supra*.

approved for loan requests and they were also significantly less likely to apply for loans because they assumed they would be denied. Karlyn Mitchell and Douglas Pearce (2005) found that Black and Hispanic firms are significantly less likely to receive bank loans than are white business owners.[52]

Further to Dr. Boston's point,[53] suppose that race and gender discrimination was ingrained in the nation's construction market. As a result, few if any minority construction employees ever receive an opportunity to gain managerial experience in the business; any minorities who do manage to start construction firms are denied the opportunity to work as subcontractors for non-minority male prime contractors; and non-minority male prime contractors place pressure on unions not to work with minority firms and on bonding companies and banks to prevent minority-owned construction firms from securing needed credit and capital. In this hypothetical example, discrimination has essentially prevented the emergence of a minority construction industry with any "capacity" whatsoever. Excluding firms from the determination of availability based on their capacity in such a discriminatory market would preclude the government from doing anything to rectify the continuing support of such a system with public dollars. There is no recognition that discrimination has prevented the emergence of "qualified, willing and able" minority firms. Without such firms, there can be no statistical disparity, and without a statistical disparity there can be no remedy.[54]

Moreover, in dynamic business environments, and especially in the construction sector, "qualifications" such as past experience, financial status, bonding capacity, *etc.*, can be obtained relatively easily. It is well known that small construction companies can expand rapidly as needs arise by hiring workers and renting equipment. Many general contractors subcontract the majority of a project.[55] Subcontracting is one important source of this elasticity, as has been noted by several academic studies. In their study of construction labor markets, Bourdon and Levitt, for example, observed that:

> One of the unique aspects of the construction industry is the prevalence of subcontracting. Construction projects are undertaken by a multitude of firms assembled for brief periods of time on a site then disbanded. General contractors can undertake projects of considerable scale without large amounts of direct labor or fixed capital; subcontractors can start with one or two employees and bid only on particularly highly specialized contracts.[56]

Eccles also noted the importance of subcontracting in construction.[57] He found that subcontracting could be explained as a response to uncertainty and complexity. He also found

---

[52] *See* ROTHE10787.

[53] *See also* U.S. Department of Commerce, Minority Business Development Agency, *Characteristics of Minority Businesses and Entrepreneurs, An Analysis of the 2002 Survey of Business Owners* (2008).

[54] *See* Wainwright and Holt (2010), pp. 65-67.

[55] Indeed, the plaintiff has done a significant portion of its business with the federal government as a subcontractor to companies such as Raytheon, Lockheed Martin, and RSI . *See* www.rothe.com.

[56] Bourdon and Levitt (1980).

[57] Eccles (1981).

that the larger the project, the more subcontracting took place, and also that the more extensive the market was, the more subcontracting took place. Dowall and Barone draw a similar conclusion regarding the use of subcontractors.[58]

Academic studies have also found that, absent discrimination, entry into the construction industry is not difficult. Bourdon and Levitt attribute this to subcontracting opportunities.[59] Eccles observes that entry is easy based on the large number of small firms and that capital requirements for fixed assets are small.[60] Gould, who followed the careers of six construction contractors, also demonstrates ease of entry.[61] He also notes that there is movement between small and large firms not only via subcontracting, but also by experienced staff at larger firms leaving to form smaller new firms. Dowall and Barone, based on a survey of construction firms, note that there is "considerable diversification into other types of construction activities."[62]

Construction and many other markets are dynamic, facing boom and bust periods. In response, the capacity and qualifications of firms can be highly elastic. Firms can grow quickly when demand increases and shrink quickly when demand decreases. Therefore, focusing on the capacity of businesses in terms of employment, revenue, bonding capacity, pieces of equipment, and so forth, is wrong as a matter of economics and can potentially obscure the existence of discrimination. To see this, consider using revenue as the measure of qualifications. Revenues simply measure the value of contracts that firms are receiving. If minority-owned businesses are subject to market discrimination, their revenues will be smaller than non-minority male-owned businesses because they will be less successful at obtaining work. Using revenues as a measure of MBE availability in contracting is like using pay as a measure of qualifications in an equal-pay case. Revenues, like pay, measure the extent to which a firm has succeeded in the market—it does not measure the ability to succeed.

Further, once a disparity study has demonstrated a disparate impact, the traditional rebuttal would be to show that the gross disparities diminish substantially in size or statistical significance (or both) once other influential factors that are *unlikely to be correlated with discrimination* have been accounted for.[63] As I have already noted, however, most of the other factors are themselves strongly correlated with discrimination. This may help explain why in those cases where the experts for parties opposing race-conscious contracting programs have had

---

[58] Dowall and Barone (1993).

[59] Bourdon and Levitt (1980).

[60] Eccles (1981).

[61] Gould (1980).

[62] Dowall and Barone (1993).

[63] Connolly, et al. (2001), Chs. 2-3. In the present context, factors that are uncorrelated with discrimination are referred to as *exogenous* variables. Factors that are correlated with discrimination are referred to as *endogenous* variables. Only exogenous variables should be included as explanatory factors in a statistical model testing for disparities.

the opportunity to counter defendants' disparity studies with their own studies regarding capacity and qualifications, they have failed to do so.[64]

Finally, even in cases where qualification-type factors have been controlled for in statistical analyses, results consistent with business discrimination are often still observed. For example, in many of NERA's disparity studies, we demonstrated that large and statistically significant differences in commercial loan denial rates between minority and non-minority firms were evident even when detailed balance sheet and creditworthiness measures were held constant. Similarly, I and other economists have used the various PUMS and ACS PUMS data from the Census Bureau to examine whether disparities in business formation and business owner earnings between MBEs and non-MBEs remain large and statistically significant even after controlling for other factors available in the data including educational achievement, labor market experience, marital status, locational mobility, number of workers in the family, number of children, immigrant status, disability status, veteran status, interest and dividend income, labor market attachment, industry, geographic location, and local labor market variables such as the unemployment rate, population growth rate, government employment rate, and per capita income.[65]

For these reasons, it is improper to exclude firms based on the outcomes of discrimination, that is, based on the current capacity of MBEs to perform particular contracts. Noted labor economist and former U.S. Secretary of Labor Ray Marshall, in partnership with former Federal Reserve Board Governor Andrew Brimmer, conducted one of the first post-*Croson* disparity studies for the City of Atlanta in 1990. Marshall summarizes well the arguments against using the outcomes of discrimination to measure capacity:[66]

> The problem of establishing statistical proof of whether or not minority contractors are "qualified, willing and able" is particularly challenging. *Croson* provides limited guidance on this question…. Unfortunately, this lack of guidance has made it possible for courts and opponents of [race-conscious contracting] programs to argue that the failure to produce perfect statistical evidence—*i.e.*, timely and highly specific, and methodologies that control for everything except discrimination—invalidates these programs despite the fact that the most reliable statistics and the most appropriate methodologies confirm the persistence of discrimination. Our evidence for Atlanta suggests that even highly qualified black contractors are disadvantaged relative to similarly situated white contractors. … It also is hard to know how to define the qualifications of businesses in dynamic markets where expertise can be purchased in the open market and where "virtual" companies are increasingly common. Once contractors are able to obtain contracts, they usually are able to expand their capacity.

---

[64] I am not aware of any instance where plaintiffs have introduced their own disparity study to counter that submitted by a defendant. See, *e.g.*, *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, at 246-47 (4th Cir. 2010) (acknowledging that plaintiff's expert George La Noue could not provide any statistical evidence to rebut that submitted by the State).

[65] *See*, *e.g.*, Wainwright (2000), 85-135. *See also* all of the NERA studies cited in Table 1, as well as selected studies from Griffin & Strong, CRA Consulting, BBC Research & Consulting, and MGT of America, Inc.

[66] Marshall (2002), 81-82.

In a dynamic business environment, it would be difficult to argue, as some critics have, that qualifications are determined mainly by size. … Moreover, as the Tenth Circuit Court of Appeals observed in *Adarand VII*, there is no credible evidence that minority contractors who have been hired under [race-conscious contracting] programs have lacked adequate qualifications.

Nevertheless, analyses of available data for business owners that enable personal characteristics and other factors to be controlled for [generate results that are] compatible with racial exclusion. There therefore is no credible evidence that the large disparities in the utilization of minority contractors can be explained by the lack of qualifications or the unwillingness to contract. Indeed, strong historical, anecdotal and survey evidence … demonstrates that minority contractors are more willing than white males to contract with governmental entities, even though they recognize that public contracting is less desirable than the mainstream private sector, where their opportunities are greatly restricted. The greater participation of minorities is compatible with the concept of "crowding" …. This is all the more reason not to use participation in these sectors as a measure of discrimination and why broader market areas are more appropriate.

### 3.     There is Strong Evidence of Disparities Consistent with Discrimination in Minority Business Formation Rates and Business Owner Earnings

It is fair to ask whether the disparities documented in the SBO data or in Table 5 result primarily from discrimination, either past, present or both, or whether they result from other, potentially non-discriminatory, factors. Many disparity studies[67] have put such questions to the test using the PUMS or ACS PUMS. The advantage of these data sources is that they allow us to examine racial disparities while holding other, potentially non-discriminatory, factors constant, such as industry, geography, education, and age.[68]

Like the SBO, these data sources typically show large and statistically significant disparities between the percentage of minorities who choose to form businesses and the percentage of comparable non-minority males who do the same. Such disparities are observed for the nation as a whole and throughout the states, and in the economy as a whole as well as across different industry sectors, including construction, CPS, OPS, and, as we shall see in the next section, in the specific industries within which the plaintiff operates.

In my own studies,[69] I have found that even when other non-discriminatory attributes are held constant using the statistical technique of regression analysis,[70] the disparities in business

---

[67] In addition to the NERA studies cited in Table 1, *see also* certain of the studies by Griffin & Strong, CRA Consulting, BBC Research & Consulting, and MGT of America, Inc.

[68] I have also tested the hypothesis, with similar results, including additional factors such as marital and family status, immigration status, ability to speak English, military service and veteran status, disability status, and asset levels. *See* Wainwright (2000).

[69] All of the disparity studies represented in Tables 8–13 have been submitted to Congress with the exception of the 2012 studies for the City of Houston and the Missouri DOT and the 2010 study for the State of Massachusetts. All of these studies also appear in Table 5.

formation rates between Blacks, Hispanics, Asians and Pacific Islanders, and Native Americans, on the one hand, and their non-minority male counterparts, on the other, tend to remain large, adverse, and statistically significant.

As shown below in Table 8, which includes all industries, out of the 90 cases included, 68 show statistically significant disparities against MBEs of less than or equal to 80 (76 percent), and 84 show statistically significant disparities against MBEs of less than 100 (93 percent).

The experiment is repeated in Table 9 for business formation rates in construction and CPS. Out of the 90 cases included in Table 9, 79 show statistically significant disparities against MBEs of less than or equal to 80 (88 percent), and 82 show statistically significant disparities against MBEs of less than 100 (91 percent).

Table 10 provides comparable results for business formation rates in goods and other services industries. Out of the 90 cases included in Table 10, 70 show statistically significant disparities against MBEs of less than or equal to 80 (78 percent), and 80 show statistically significant disparities against MBEs of less than 100 (89 percent).

Even for those minority entrepreneurs who manage against the odds to form their own businesses, their earnings from those businesses tend to lag far behind their non-minority male counterparts. As shown below in Table 11, out of the 90 cases examined, 89 exhibited statistically significantly lower earnings for minority business owners (99 percent). Minority business owner earnings across all industries average 23 percent lower than their non-minority male counterparts, again even when other non-discriminatory attributes are held constant.

Table 12 repeats the experiment for construction and CPS. Out of the 90 cases examined, 86 exhibited statistically significantly lower earnings for minority business owners (96 percent). Minority business owner earnings in construction and CPS are, on average, 22 percent lower than their non-minority male counterparts.

Finally, Table 13 provides comparable results for business owner earnings in goods and other services industries. Out of the 90 cases examined, 88 exhibited statistically significantly lower earnings for minority business owners (98 percent). Minority business owner earnings in these industries are, on average, 24 percent lower than their non-minority male counterparts.

In conclusion, the evidence gathered from the PUMS and ACS PUMS data, as documented below in Tables 8-13 and in other consultants' disparity studies as well, strongly suggests that business discrimination is the primary explanation for the disparities observed in Appendix Tables A.1 through B.15 and in Table 5.

---

[70] Regression analysis is a type of statistical analysis that examines the correlation between two variables ("regression") or three or more variables ("multiple regression" or "multivariate regression") in a mathematical model by determining the line of best fit through a series of data points. In simpler terms, regression analysis is a statistical technique allowing the comparison between certain business outcomes, such as business formation, business earnings, or loan denials, and minority status, while holding other, potentially non-discriminatory factors, such as geographic location, industry affiliation, education, age, or balance sheets, constant.

**Table 8. Actual and Potential Minority Business Formation Rates, All Industries, Selected Disparity Studies from Table 1.**

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Minneapolis-St. Paul, MN MSA (†)* | | | |
| Black | 4.7 | 8.9 | 52.5 |
| Hispanic | 5.9 | 9.1 | 64.9 |
| Asian | 7.2 | 9.0 | 80.1 |
| Native American | 2.2 | 4.9 | 45.1 |
| MBE | 5.7 | 7.8 | 73.0 |
| *Minnesota* | | | |
| Black | 3.2 | 10.1 | 31.7 |
| Hispanic | 4.1 | 10.1 | 40.6 |
| Asian | 4.9 | 9.1 | 53.8 |
| Native American | 5.1 | 11.6 | 44.0 |
| MBE | 4.0 | 9.9 | 40.9 |
| *Augusta-Richmond County, GA-SC* | | | |
| Black | 3.5 | 8.0 | 43.8 |
| Hispanic | 9.1 | 14.2 | 64.1 |
| Asian | 18.8 | 20.3 | 92.6 |
| Native American | 6.4 | 9.8 | 65.3 |
| MBE | 5.1 | 8.8 | 58.3 |
| *Austin, TX MSA* | | | |
| Black | 4.7 | 9.4 | 50.0 |
| Hispanic | 6.4 | 10.0 | 64.0 |
| Asian | 6.7 | 8.3 | 80.7 |
| Native American | 6.9 | 10.2 | 67.6 |
| MBE | 6.4 | 10.1 | 62.8 |
| *Chicago, IL MSA* | | | |
| Black | 4.9 | 9.4 | 52.1 |
| Hispanic | 4.0 | 7.5 | 53.3 |
| Asian | 9.0 | 10.5 | 85.7 |
| Native American | 5.7 | 9.1 | 62.6 |
| MBE | 5.3 | 8.4 | 63.1 |
| *Cleveland, OH MSA (†)* | | | |
| Black | 4.6 | 8.8 | 52.5 |
| Hispanic | 6.6 | 7.1 | 92.9 |
| Asian | 9.8 | 8.6 | n/a |
| Native American | 8.0 | 10.7 | 74.7 |
| MBE | 5.6 | 9.0 | 62.2 |
| *Denver, CO MSA* | | | |
| Black | 6.1 | 10.6 | 57.5 |
| Hispanic | 4.4 | 7.9 | 55.7 |
| Asian | 10.9 | 12.4 | 87.9 |
| Native American | 4.7 | 8.1 | 58.0 |
| MBE | 5.7 | 9.3 | 60.9 |

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Hawaii (†)* | | | |
| Black | 6.7 | 10.9 | 61.3 |
| Hispanic | 11.7 | 14.9 | 78.6 |
| Asian | 10.8 | 15.7 | 68.8 |
| Native American | 6.3 | 13.5 | 46.7 |
| MBE | 10.4 | 15.7 | 66.2 |
| *Houston, TX MSA (†)* | | | |
| Black | 6.1 | 7.5 | 81.3 |
| Hispanic | 9.8 | 9.9 | 99.0 |
| Asian | 10.6 | 10.6 | n/a |
| Native American | 15.1 | 9.3 | n/a |
| MBE | 9.0 | 9.6 | 93.5 |
| *Maryland-DC-N. VA* | | | |
| Black | 5.2 | 8.1 | 64.2 |
| Hispanic | 7.2 | 8.8 | 81.8 |
| Asian | 11.2 | 10.2 | n/a |
| Native American | 5.1 | 8.5 | 60.0 |
| MBE | 7.0 | 9.0 | 76.9 |
| *Maryland-DC-N. VA (†)* | | | |
| Black | 5.0 | 9.2 | 54.2 |
| Hispanic | 8.0 | 12.3 | 64.9 |
| Asian | 10.3 | 12.1 | 85.1 |
| Native American | 10.8 | 13.5 | 80.0 |
| MBE | 7.5 | 11.6 | 64.4 |
| *Massachusetts* | | | |
| Black | 4.0 | 8.5 | 47.1 |
| Hispanic | 4.4 | 7.9 | 55.7 |
| Asian | 5.6 | 8.9 | 62.9 |
| Native American | 9.1 | 12.5 | 72.8 |
| MBE | 5.0 | 8.7 | 58.0 |
| *Memphis, TN-MS-AR MSA* | | | |
| Black | 5.3 | 6.3 | 84.1 |
| Hispanic | 10.7 | 8.5 | n/a |
| Asian | 6.5 | 8.1 | 80.2 |
| Native American | 6.5 | 9.8 | 66.3 |
| MBE | 5.7 | 8.0 | 71.1 |
| *Miami-Ft. Lauderdale, FL (†)* | | | |
| Black | 4.8 | 9.0 | 53.2 |
| Hispanic | 6.2 | 9.4 | 65.8 |
| Asian | 9.0 | 10.8 | 83.4 |
| Native American | 8.2 | 10.9 | 75.1 |
| MBE | 6.3 | 9.7 | 64.9 |

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Missouri (††)* | | | |
| Black | 4.2 | 8.2 | 51.2 |
| Hispanic | 7.2 | 9.3 | 77.3 |
| Asian | 10.9 | 9.6 | n/a |
| Native American | 7.0 | 9.7 | 72.0 |
| MBE | 6.1 | 8.9 | 68.5 |
| *New York (†)* | | | |
| Black | 5.4 | 10.2 | 52.8 |
| Hispanic | 8.7 | 11.9 | 73.0 |
| Asian | 10.6 | 12.0 | 88.3 |
| Native American | 8.7 | 11.4 | 76.2 |
| MBE | 8.0 | 12.1 | 65.9 |
| *Utah* | | | |
| Black | 4.8 | 9.3 | 51.6 |
| Hispanic | 4.1 | 9.2 | 44.6 |
| Asian | 8.0 | 10.2 | 78.4 |
| Native American | 4.6 | 10.0 | 46.0 |
| MBE | 5.1 | 8.7 | 58.1 |
| *Washington State* | | | |
| Black | 5.7 | 10.4 | 54.8 |
| Hispanic | 5.9 | 11.4 | 51.8 |
| Asian | 9.3 | 9.8 | 94.9 |
| Native American | 8.0 | 11.3 | 70.8 |
| MBE | 7.4 | 10.4 | 71.8 |

Notes: Universe is all private sector labor force participants between age 16 and 64. All results are statistically significant at a 5 percent level or better. The figure in column (1) is the average self-employment rate weighted using population-based person weights. The figure in column (2) is derived by inflating the figure in column (1) according to the corresponding coefficient from the business formation regression analysis, which is derived holding constant industry, geography, education, and age. The coefficient represents the percentage point probability difference in business formation rates between a given group and non-minority males, evaluated at the mean business ownership rate for the estimation sample. Column (3) is column (1) divided by column (2), before rounding. "n/a" indicates no adverse disparity was observed. If there is parity in the relevant market, then the Disparity Index will equal 100, because the expected business formation rate (that is, the business formation rate that would be observed in a non-discriminatory market) will be equivalent to the actual business formation rate. In cases where adverse disparities are present in the relevant market, the Disparity Index will be less than 100, because expected business formation rates will exceed actual business formation rates. "MSA" stands for Metropolitan Statistical Area. Source: 2000 Decennial Census Five Percent PUMS, unless otherwise indicated. (†): Source is 2006-2008 ACS PUMS. (††): Source is 2006-2010 ACS PUMS.

**Table 9. Actual and Potential Minority Business Formation Rates, Construction and CPS Industries, Selected Disparity Studies from Table 1.**

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Minneapolis-St. Paul, MN MSA (†)* | | | |
| Black | 0.0 | 9.2 | 0.0 |
| Hispanic | 20.0 | 27.8 | 71.9 |
| Asian | 10.5 | 16.7 | 62.9 |
| Native American | 0.0 | 7.9 | 0.0 |
| MBE | 15.1 | 23.1 | 65.4 |
| *Minnesota* | | | |
| Black | 4.6 | 14.3 | 32.2 |
| Hispanic | 11.5 | 19.1 | 60.2 |
| Asian | 16.1 | 21.8 | 73.9 |
| Native American | 6.5 | 14.5 | 44.8 |
| MBE | 10.7 | 18.7 | 57.3 |
| *Augusta-Richmond County, GA-SC* | | | |
| Black | 6.9 | 16.6 | 41.6 |
| Hispanic | 36.7 | 50.7 | 72.4 |
| Asian | 0.0 | 5.7 | 0.0 |
| Native American | 0.0 | 8.0 | 0.0 |
| MBE | 10.9 | 24.4 | 44.5 |
| *Austin, TX MSA* | | | |
| Black | 17.7 | 27.4 | 64.6 |
| Hispanic | 10.8 | 18.4 | 58.7 |
| Asian | 18.6 | 24.2 | 76.9 |
| Native American | 39.3 | 46.9 | 83.8 |
| MBE | 11.5 | 19.4 | 59.2 |
| *Chicago, IL MSA* | | | |
| Black | 20.2 | 16.0 | n/a |
| Hispanic | 10.5 | 18.1 | 58.0 |
| Asian | 9.9 | 15.6 | 63.5 |
| Native American | 8.0 | 16.0 | 50.0 |
| MBE | 12.6 | 16.5 | 76.8 |
| *Cleveland, OH MSA (†)* | | | |
| Black | 21.0 | 30.2 | 69.5 |
| Hispanic | 39.2 | 17.8 | n/a |
| Asian | 10.1 | 16.3 | 61.9 |
| Native American | 50.7 | 58.6 | 86.5 |
| MBE | 22.3 | 30.3 | 73.6 |
| *Denver, CO MSA* | | | |
| Black | 30.3 | 23.4 | n/a |
| Hispanic | 7.3 | 19.8 | 36.9 |
| Asian | 12.4 | 18.1 | 68.5 |
| Native American | 3.3 | 11.3 | 29.2 |
| MBE | 9.2 | 17.1 | 53.7 |

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Hawaii (†)* | | | |
| Black | 29.6 | 38.8 | 76.3 |
| Hispanic | 23.4 | 31.2 | 75.0 |
| Asian | 11.8 | 28.7 | 41.2 |
| Native American | 12.9 | 34.5 | 37.4 |
| MBE | 15.3 | 32.0 | 47.8 |
| *Houston, TX MSA (†)* | | | |
| Black | 12.1 | 21.2 | 57.0 |
| Hispanic | 15.9 | 14.3 | n/a |
| Asian | 14.2 | 20.2 | 70.3 |
| Native American | 19.6 | 27.5 | 71.3 |
| MBE | 15.5 | 13.9 | n/a |
| *Maryland-DC-N. VA* | | | |
| Black | 11.3 | 21.1 | 53.6 |
| Hispanic | 7.1 | 14.7 | 48.3 |
| Asian | 16.8 | 14.6 | n/a |
| Native American | 7.2 | 15.2 | 47.4 |
| MBE | 10.3 | 18.3 | 56.3 |
| *Maryland-DC-N. VA (†)* | | | |
| Black | 22.2 | 31.4 | 70.7 |
| Hispanic | 12.3 | 24.0 | 51.2 |
| Asian | 13.4 | 19.6 | 68.4 |
| Native American | 14.2 | 22.1 | 64.3 |
| MBE | 13.3 | 24.1 | 55.2 |
| *Massachusetts* | | | |
| Black | 14.0 | 23.7 | 59.1 |
| Hispanic | 14.9 | 22.5 | 66.2 |
| Asian | 21.0 | 26.7 | 78.7 |
| Native American | 23.8 | 31.8 | 74.8 |
| MBE | 18.4 | 26.4 | 69.7 |
| *Memphis, TN-MS-AR MSA* | | | |
| Black | 14.6 | 24.3 | 60.1 |
| Hispanic | 12.6 | 20.2 | 62.4 |
| Asian | 0.0 | 5.6 | 0.0 |
| Native American | 28.8 | 36.4 | 79.1 |
| MBE | 13.4 | 21.3 | 62.9 |
| *Miami-Ft. Lauderdale, FL (†)* | | | |
| Black | 0.0 | 9.2 | 0.0 |
| Hispanic | 19.1 | 26.9 | 71.0 |
| Asian | 10.0 | 16.2 | 61.7 |
| Native American | 0.0 | 7.9 | 0.0 |
| MBE | 16.0 | 24.0 | 66.9 |

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Missouri (††)* | | | |
| Black | 21.5 | 30.3 | 71.0 |
| Hispanic | 12.1 | 19.2 | 63.0 |
| Asian | 21.9 | 10.0 | n/a |
| Native American | 27.6 | 22.2 | n/a |
| MBE | 18.1 | 20.5 | 88.4 |
| *New York (†)* | | | |
| Black | 16.6 | 25.8 | 64.4 |
| Hispanic | 14.6 | 22.4 | 65.2 |
| Asian | 17.7 | 24.0 | 73.7 |
| Native American | 18.1 | 26.0 | 69.6 |
| MBE | 15.4 | 23.4 | 65.9 |
| *Utah* | | | |
| Black | 15.9 | 25.7 | 61.9 |
| Hispanic | 6.4 | 20.4 | 31.4 |
| Asian | 8.9 | 14.6 | 61.0 |
| Native American | 5.7 | 13.6 | 41.9 |
| MBE | 7.0 | 20.6 | 34.2 |
| *Washington State* | | | |
| Black | 5.5 | 25.5 | 21.6 |
| Hispanic | 10.5 | 18.1 | 58.0 |
| Asian | 13.4 | 19.0 | 70.5 |
| Native American | 13.3 | 20.9 | 63.6 |
| MBE | 10.7 | 18.7 | 57.5 |

Notes and Sources: See Table 8.

**Table 10. Actual and Potential Minority Business Formation Rates, Other Services and Goods Industries, Selected Disparity Studies from Table 1.**

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Minneapolis-St. Paul, MN MSA (†)* | | | |
| Black | 4.8 | 10.1 | 47.3 |
| Hispanic | 4.5 | 7.5 | 60.1 |
| Asian | 7.2 | 9.9 | 72.6 |
| Native American | 2.3 | 5.1 | 44.7 |
| MBE | 5.2 | 6.7 | 77.7 |
| *Minnesota* | | | |
| Black | 3.2 | 9.4 | 34.0 |
| Hispanic | 3.6 | 9.3 | 39.0 |
| Asian | 4.8 | 8.8 | 54.2 |
| Native American | 4.9 | 10.7 | 46.1 |
| MBE | 4.0 | 9.5 | 42.7 |
| *Augusta-Richmond County, GA-SC* | | | |
| Black | 3.4 | 7.5 | 44.8 |
| Hispanic | 5.8 | 9.0 | 64.7 |
| Asian | 20.1 | 21.4 | 93.7 |
| Native American | 7.0 | 10.0 | 70.0 |
| MBE | 4.8 | 8.1 | 58.9 |
| *Austin, TX MSA* | | | |
| Black | 4.2 | 8.5 | 49.5 |
| Hispanic | 5.6 | 7.4 | 75.3 |
| Asian | 6.5 | 7.9 | 81.9 |
| Native American | 3.6 | 6.6 | 54.9 |
| MBE | 5.7 | 7.9 | 71.7 |
| *Chicago, IL MSA* | | | |
| Black | 4.4 | 7.8 | 55.7 |
| Hispanic | 3.5 | 6.6 | 52.3 |
| Asian | 8.9 | 10.3 | 86.9 |
| Native American | 5.4 | 8.4 | 64.3 |
| MBE | 4.9 | 8.2 | 59.7 |
| *Cleveland, OH MSA (†)* | | | |
| Black | 4.0 | 7.4 | 53.9 |
| Hispanic | 4.9 | 7.9 | 62.0 |
| Asian | 9.8 | 8.8 | n/a |
| Native American | 6.7 | 9.4 | 70.1 |
| MBE | 4.9 | 7.9 | 62.1 |
| *Denver, CO MSA* | | | |
| Black | 5.0 | 9.1 | 54.5 |
| Hispanic | 3.8 | 8.3 | 45.5 |
| Asian | 10.8 | 10.4 | n/a |
| Native American | 4.9 | 7.9 | 62.0 |
| MBE | 5.2 | 8.5 | 60.9 |

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Hawaii (†)* | | | |
| Black | 5.3 | 10.6 | 49.8 |
| Hispanic | 9.4 | 12.4 | 75.8 |
| Asian | 10.7 | 17.1 | 62.5 |
| Native American | 4.7 | 13.0 | 36.0 |
| MBE | 9.8 | 14.3 | 68.4 |
| *Houston, TX MSA (†)* | | | |
| Black | 5.7 | 7.3 | 78.2 |
| Hispanic | 8.2 | 7.2 | n/a |
| Asian | 10.3 | 9.2 | n/a |
| Native American | 14.5 | 8.0 | n/a |
| MBE | 7.8 | 8.9 | 87.7 |
| *Maryland-DC-N. VA* | | | |
| Black | 4.8 | 7.6 | 63.2 |
| Hispanic | 7.2 | 7.8 | 92.1 |
| Asian | 10.9 | 10.1 | n/a |
| Native American | 4.8 | 7.8 | 61.3 |
| MBE | 6.6 | 8.5 | 77.9 |
| *Maryland-DC-N. VA (†)* | | | |
| Black | 4.2 | 9.5 | 44.4 |
| Hispanic | 6.9 | 11.1 | 62.3 |
| Asian | 10.1 | 12.8 | 79.0 |
| Native American | 10.2 | 13.0 | 78.4 |
| MBE | 6.6 | 10.1 | 65.5 |
| *Massachusetts* | | | |
| Black | 3.6 | 7.8 | 46.5 |
| Hispanic | 4.0 | 7.2 | 55.8 |
| Asian | 5.1 | 8.0 | 63.5 |
| Native American | 7.2 | 5.7 | n/a |
| MBE | 4.5 | 7.8 | 57.5 |
| *Memphis, TN-MS-AR MSA* | | | |
| Black | 4.9 | 4.9 | n/a |
| Hispanic | 10.0 | 6.0 | n/a |
| Asian | 6.7 | 8.1 | 82.4 |
| Native American | 0.0 | 3.0 | 0.0 |
| MBE | 5.3 | 6.5 | 80.2 |
| *Miami-Ft. Lauderdale, FL (†)* | | | |
| Black | 4.9 | 10.2 | 48.0 |
| Hispanic | 5.1 | 8.2 | 62.2 |
| Asian | 9.0 | 11.7 | 76.9 |
| Native American | 8.2 | 11.0 | 74.5 |
| MBE | 5.8 | 7.5 | 77.0 |

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Missouri (††)* | | | |
| Black | 3.6 | 8.7 | 41.0 |
| Hispanic | 6.6 | 9.6 | 68.7 |
| Asian | 10.6 | 9.6 | n/a |
| Native American | 4.7 | 7.6 | 61.8 |
| MBE | 5.4 | 8.2 | 77.9 |
| *New York (†)* | | | |
| Black | 4.8 | 10.1 | 47.6 |
| Hispanic | 7.7 | 10.8 | 71.2 |
| Asian | 10.3 | 12.0 | 85.8 |
| Native American | 7.4 | 10.2 | 72.5 |
| MBE | 7.2 | 10.2 | 70.6 |
| *Utah* | | | |
| Black | 4.0 | 8.1 | 48.9 |
| Hispanic | 3.7 | 6.9 | 54.1 |
| Asian | 6.9 | 8.3 | 83.7 |
| Native American | 4.4 | 7.4 | 59.4 |
| MBE | 4.8 | 8.1 | 59.2 |
| *Washington State* | | | |
| Black | 5.7 | 8.3 | 69.0 |
| Hispanic | 5.6 | 10.8 | 51.5 |
| Asian | 9.1 | 9.6 | 94.8 |
| Native American | 7.4 | 10.4 | 71.6 |
| MBE | 7.2 | 10.0 | 72.5 |

Notes and Sources: See Table 8.

**Table 11. Minority Business Owner Earnings Disparities, All Industries, Selected Disparity Studies from Table 1.**

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Minneapolis-St. Paul, MN MSA (†)* | |
| Black | -40.0 |
| Hispanic | -23.1 |
| Asian | -9.3 |
| Native American | -35.8 |
| MBE | -26.8 |
| *Minnesota* | |
| Black | -28.0 |
| Hispanic | -18.7 |
| Asian | -3.5 |
| Native American | -38.0 |
| MBE | -26.1 |
| *Augusta-Richmond County, GA-SC* | |
| Black | -27.9 |
| Hispanic | -18.6 |
| Asian | -3.5 |
| Native American | -38.0 |
| MBE | -19.9 |
| *Austin, TX MSA* | |
| Black | -30.0 |
| Hispanic | -19.0 |
| Asian | -4.1 |
| Native American | -38.4 |
| MBE | -20.9 |
| *Chicago, IL MSA* | |
| Black | -28.4 |
| Hispanic | -19.0 |
| Asian | n/a |
| Native American | -38.1 |
| MBE | -20.3 |
| *Cleveland, OH MSA (†)* | |
| Black | -40.0 |
| Hispanic | -23.0 |
| Asian | -9.3 |
| Native American | -35.8 |
| MBE | -26.7 |
| *Denver, CO MSA* | |
| Black | -28.0 |
| Hispanic | -18.7 |
| Asian | -3.6 |
| Native American | -38.0 |
| MBE | -3.5 |

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Hawaii (†)* | |
| Black | -40.0 |
| Hispanic | -23.0 |
| Asian | -28.5 |
| Native American | -82.3 |
| MBE | -26.7 |
| *Houston, TX MSA (†)* | |
| Black | -40.1 |
| Hispanic | -23.2 |
| Asian | -9.5 |
| Native American | -35.8 |
| MBE | -26.8 |
| *Maryland-DC-N. VA* | |
| Black | -27.9 |
| Hispanic | -18.8 |
| Asian | -3.8 |
| Native American | -38.0 |
| MBE | -19.9 |
| *Maryland-DC-N. VA (†)* | |
| Black | -40.0 |
| Hispanic | -23.0 |
| Asian | -9.3 |
| Native American | -35.8 |
| MBE | -26.7 |
| *Massachusetts* | |
| Black | -28.0 |
| Hispanic | -18.7 |
| Asian | -3.5 |
| Native American | -38.0 |
| MBE | -19.9 |
| *Memphis, TN-AR-MS MSA* | |
| Black | -30.1 |
| Hispanic | -19.0 |
| Asian | -4.1 |
| Native American | -38.4 |
| MBE | -21.0 |
| *Miami-Ft. Lauderdale, FL MSA (†)* | |
| Black | -40.0 |
| Hispanic | -23.1 |
| Asian | -9.3 |
| Native American | -35.8 |
| MBE | -26.8 |

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Missouri (††)* | |
| Black | -39.0 |
| Hispanic | -22.5 |
| Asian | -10.3 |
| Native American | -38.7 |
| MBE | -26.4 |
| *New York (†)* | |
| Black | -40.1 |
| Hispanic | -32.2 |
| Asian | -9.3 |
| Native American | -35.8 |
| MBE | -26.9 |
| *Utah* | |
| Black | -28.0 |
| Hispanic | -18.7 |
| Asian | -3.5 |
| Native American | -38.0 |
| MBE | -19.9 |
| *Washington State* | |
| Black | -30.0 |
| Hispanic | -19.0 |
| Asian | -4.1 |
| Native American | -38.4 |
| MBE | -21.2 |

Notes: Universe is all persons in the private sector between age 16 and 64 with positive annual business earnings. The reported number is the percentage difference in annual business earnings between a given group and non-minority males, holding constant industry, geography, education, and age. All results are statistically significant at a 5 percent level or better. "n/a" indicates no adverse disparity was observed. Source: 2000 Decennial Census Five Percent PUMS, unless otherwise indicated. (†): Source is 2006-2008 ACS PUMS. (††): Source is 2006-2010 ACS PUMS.

**Table 12. Minority Business Owner Earnings Disparities, Construction and CPS Industries, Selected Disparity Studies from Table 1.**

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Minneapolis-St. Paul, MN MSA (†)* | |
| Black | -43.2 |
| Hispanic | -15.9 |
| Asian | -17.3 |
| Native American | -31.2 |
| MBE | -24.3 |
| *Minnesota* | |
| Black | -29.0 |
| Hispanic | -14.5 |
| Asian | -5.6 |
| Native American | -36.7 |
| MBE | -18.4 |
| *Augusta-Richmond County, GA-SC* | |
| Black | -28.8 |
| Hispanic | -14.3 |
| Asian | -5.5 |
| Native American | -36.8 |
| MBE | -18.5 |
| *Austin, TX MSA* | |
| Black | -33.8 |
| Hispanic | n/a |
| Asian | -6.9 |
| Native American | -35.3 |
| MBE | -20.0 |
| *Chicago, IL MSA* | |
| Black | -29.2 |
| Hispanic | -14.7 |
| Asian | -5.7 |
| Native American | -36.8 |
| MBE | -18.7 |
| *Cleveland, OH MSA (†)* | |
| Black | -43.3 |
| Hispanic | -15.9 |
| Asian | -17.3 |
| Native American | -31.9 |
| MBE | -24.3 |
| *Denver, CO MSA* | |
| Black | -29.0 |
| Hispanic | n/a |
| Asian | -5.7 |
| Native American | -36.8 |
| MBE | n/a |

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Hawaii (†)* | |
| Black | -43..2 |
| Hispanic | -15.9 |
| Asian | -15.3 |
| Native American | -31.2 |
| MBE | -24.0 |
| *Houston, TX MSA (†)* | |
| Black | -43.3 |
| Hispanic | -16.0 |
| Asian | -17.5 |
| Native American | -31.2 |
| MBE | -24.8 |
| *Maryland-DC-N. VA* | |
| Black | -28.8 |
| Hispanic | -14.6 |
| Asian | -6.0 |
| Native American | -36.7 |
| MBE | -18.6 |
| *Maryland-DC-N. VA (†)* | |
| Black | -43.2 |
| Hispanic | -15.9 |
| Asian | -17.3 |
| Native American | -31.2 |
| MBE | -24.5 |
| *Massachusetts* | |
| Black | -29.0 |
| Hispanic | -14.4 |
| Asian | -5.5 |
| Native American | -36.7 |
| MBE | -18.4 |
| *Memphis, TN-AR-MS MSA* | |
| Black | -34.0 |
| Hispanic | -14.8 |
| Asian | -6.9 |
| Native American | -35.4 |
| MBE | -19.7 |
| *Miami-Ft. Lauderdale, FL MSA (†)* | |
| Black | -43.2 |
| Hispanic | -15.9 |
| Asian | -17.3 |
| Native American | -31.2 |
| MBE | -24.3 |

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Missouri (††)* | |
| Black | -41.6 |
| Hispanic | -17.4 |
| Asian | -16.5 |
| Native American | n/a |
| MBE | -24.2 |
| *New York (†)* | |
| Black | -43.4 |
| Hispanic | -14.3 |
| Asian | -13.5 |
| Native American | -31.1 |
| MBE | -35.6 |
| *Utah* | |
| Black | -29.0 |
| Hispanic | -14.5 |
| Asian | -5.6 |
| Native American | -36.7 |
| MBE | -18.5 |
| *Washington State* | |
| Black | -33.8 |
| Hispanic | -14.7 |
| Asian | -6.9 |
| Native American | -35.4 |
| MBE | -20.2 |

Notes and Sources: See Table 11.

**Table 13. Minority Business Owner Earnings Disparities, Other Services and Goods Industries, Selected Disparity Studies from Table 1.**

| Race, Location | Business Earnings Deficit (%) |
|---|:---:|
| | (1) |
| *Minneapolis-St. Paul, MN MSA (†)* | |
| Black | -39.7 |
| Hispanic | -25.1 |
| Asian | -8.9 |
| Native American | -36.8 |
| MBE | -27.4 |
| *Minnesota* | |
| Black | -31.5 |
| Hispanic | -23.1 |
| Asian | -5.7 |
| Native American | -42.0 |
| MBE | -23.3 |
| *Augusta-Richmond County, GA-SC* | |
| Black | -27.5 |
| Hispanic | -19.5 |
| Asian | -3.3 |
| Native American | -38.4 |
| MBE | -19.9 |
| *Austin, TX MSA* | |
| Black | -29.3 |
| Hispanic | -38.6 |
| Asian | -3.7 |
| Native American | -39.0 |
| MBE | -20.9 |
| *Chicago, IL MSA* | |
| Black | -27.6 |
| Hispanic | -20.1 |
| Asian | n/a |
| Native American | -37.9 |
| MBE | -20.4 |
| *Cleveland, OH MSA (†)* | |
| Black | -39.7 |
| Hispanic | -25.0 |
| Asian | -8.7 |
| Native American | -36.9 |
| MBE | -27.2 |
| *Denver, CO MSA* | |
| Black | -27.7 |
| Hispanic | -19.6 |
| Asian | -3.4 |
| Native American | -38.1 |
| MBE | -20.0 |

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Hawaii (†)* | |
| Black | -39.6 |
| Hispanic | -25.0 |
| Asian | -30.3 |
| Native American | -37.8 |
| MBE | -27.2 |
| *Houston, TX MSA (†)* | |
| Black | -39.4 |
| Hispanic | -25.2 |
| Asian | -8.5 |
| Native American | -37.1 |
| MBE | -27.2 |
| *Maryland-DC-N. VA* | |
| Black | -26.7 |
| Hispanic | -19.8 |
| Asian | -3.8 |
| Native American | -38.4 |
| MBE | -19.9 |
| *Maryland-DC-N. VA (†)* | |
| Black | -43.5 |
| Hispanic | -29.6 |
| Asian | -12.0 |
| Native American | -40.1 |
| MBE | -27.2 |
| *Massachusetts* | |
| Black | -27.5 |
| Hispanic | -19.7 |
| Asian | -3.1 |
| Native American | -38.4 |
| MBE | -20.0 |
| *Memphis, TN-AR-MS MSA* | |
| Black | -29.5 |
| Hispanic | -19.8 |
| Asian | -3.7 |
| Native American | -39.0 |
| MBE | -21.0 |
| *Miami-Ft. Lauderdale, FL MSA (†)* | |
| Black | -39.6 |
| Hispanic | -25.1 |
| Asian | -8.7 |
| Native American | -37.0 |
| MBE | -27.3 |

| Race, Location | Business Earnings Deficit (%) |
|---|---|
| | (1) |
| *Missouri (††)* | |
| Black | -38.9 |
| Hispanic | -24.1 |
| Asian | n/a |
| Native American | -51.0 |
| MBE | -26.9 |
| *New York (†)* | |
| Black | -42.7 |
| Hispanic | -28.9 |
| Asian | -13.1 |
| Native American | -44.2 |
| MBE | -27.6 |
| *Utah* | |
| Black | -27.5 |
| Hispanic | -19.5 |
| Asian | -3.3 |
| Native American | -38.4 |
| MBE | -19.9 |
| *Washington State* | |
| Black | -29.2 |
| Hispanic | -20.0 |
| Asian | -4.0 |
| Native American | -39.0 |
| MBE | -21.1 |

Notes and Sources: See Table 11.

### 4.  There is Strong Evidence of Disparities Consistent with Discrimination in Minority Business Formation Rates and Business Owner Earnings in the Information Technology Services and Facilities Management Industries

In this section, I repeat the statistical analyses of minority business formation and minority business owner earnings for the information technology services and facilities management services industries, which the plaintiff identifies as being their primary lines of work.[71]

For this analysis, I relied on the recently released ACS PUMS for 2007-2011,[72] supplemented with the previously released ACS PUMS data for 2005-2006. I restricted the observations in the dataset I prepared to those with a Census industry code of 7380 ("Computer Systems Design and Related Services"), corresponding to NAICS industry group 5415 ("Computer Systems Design

---

[71] As noted above, although not mentioned in Mr. Patenaude's affidavit, another significant line of work for the plaintiff, judging from their website, appears to be equipment calibration and testing, which is included in the CPS sector. See fn. 30, above, and the accompanying discussion.

[72] The data were released in December 2012.

and Related Services"), and Census industry code of 7780 ("Other administrative and other support services"), corresponding to NAICS sub-sector 561 ("Administrative and support services"), which includes NAICS industry group 5612 ("Facilities Support Services")".

## a.    Business Formation Analysis

To assess the extent of business formation disparities in the plaintiff's lines of work, I ran three sets of regression analyses. In the first analysis, the only independent variables included in the analysis were indicators for race and sex. Such a model yields the raw differences in business formation rates between minorities and non-minority males, holding nothing else constant. These are reported below in Table 14, under the heading "Regression Model A."[73]

The results for Model A show that large, adverse, and statistically significant disparities in business formation rates are observed in the plaintiff's lines of work in recent years for all minority groups with the exception of Native Americans.[74]

- For Blacks, the observed self-employment rate is 8.33 percent and the model predicts that it would be 7.1 percentage points higher—15.47 percent—if Blacks faced the same market outcomes as non-minority males. This yields a disparity index of 53.9.

- For Hispanics, the observed self-employment rate is 9.92 percent and the model predicts that it would be 4.5 percentage points higher—14.42 percent—if Hispanics had faced the same market outcomes as non-minority males. This yields a disparity index of 68.8.

- For Asians, the observed self-employment rate is 6.87 percent and the model predicts that it would be 8.1 percentage points higher—14.97 percent—if Asians faced the same market outcomes as non-minority males. This yields a disparity index of 45.9.

- For minorities as a group, the observed self-employment rate is 8.19 percent and the model predicts that it would be 7.4 percentage points higher—15.57 percent—if minorities faced the same market outcomes as non-minority males. This yields a disparity index of 52.6.

In Model B, I add several indicators of qualifications and capacity to the regression equation, including educational attainment, state of residence, and the age (which is a proxy for labor market experience). The results for Model B show that large, adverse, and statistically significant disparities in business formation rates remain even when we compare individuals that are similarly-situated in terms of their educational attainments, their geographic location, and their labor market experience.

---

[73] Except as noted, all the results discussed below were statistically significant.

[74] The results for Native Americans are not statistically significant in any of the models. The number of observations in the dataset for Native Americans is very small compared with those for Blacks, Hispanics, Asians, and non-minority males.

- For Blacks, model B still predicts a self-employment rate that would be 6.0 percentage points higher—14.37 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 58.0.

- For Hispanics, model B still predicts a self-employment rate that would be 4.0 percentage points higher—14.37 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 71.3.

- For Asians, model B still predicts a self-employment rate that would be 7.2 percentage points higher—14.06 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 48.9.

- For minorities as a group, model B still predicts a self-employment rate that would be 6.3 percentage points higher—14.52 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 56.4.

- In Model C, I include numerous additional factors in the regression equation, including the dollar value of interest and dividend income from the prior year, whether the person is married with their spouse present, whether they lived in the same house one year prior (non-movers), the number of workers in their family, the number of children present in the household, whether their home is owned free and clear, their home's property value (zero for renters), whether they are foreign born, whether they speak English well, and whether they are a veteran. I also include four variables measuring local macroeconomic conditions by state—the general population level, the unemployment rate, the number of full-time government employees, and per capita personal income.[75]

The results for Model C show:

- For Blacks, model C predicts a self-employment rate that would be 5.7 percentage points higher—14.07 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 59.2.

- For Hispanics, model C predicts a self-employment rate that would be 3.77 percentage points higher—13.69 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 72.4.

- For Asians, model C predicts a self-employment rate that would be 6.81 percentage points higher—13.68 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 50.2.

- For minorities as a group, model C predicts a self-employment rate that would be 5.61 percentage points higher—13.80 percent—if they faced the same market outcomes as non-minority males, yielding a disparity index of 59.4.

---

[75] Interest and dividend income and per capita personal income are included in the model in their logarithmic forms.

**Table 14. Actual and Potential Minority Business Formation Rates, Information Technology Services and Administrative and Other Support  Services.**

| Race, Location | Business Formation Rate (%) | Expected Business Formation Rate (%) | Disparity Index |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Regression Model A* | | | |
| Black | 8.33 | 15.47 | 53.9 |
| Hispanic | 9.92 | 14.42 | 68.8 |
| Asian | 6.87 | 14.97 | 45.9 |
| Native American | 11.73 | 11.87 | 98.8 |
| MBE | 8.19 | 15.57 | 52.6 |
| *Regression Model B* | | | |
| Black | 8.33 | 14.37 | 58.0 |
| Hispanic | 9.92 | 13.91 | 71.3 |
| Asian | 6.87 | 14.06 | 48.9 |
| Native American | 11.73 | 11.93 | 98.3 |
| MBE | 8.19 | 14.52 | 56.4 |
| *Regression Model C* | | | |
| Black | 8.33 | 14.07 | 59.2 |
| Hispanic | 9.92 | 13.69 | 72.4 |
| Asian | 6.87 | 13.68 | 50.2 |
| Native American | 11.73 | 11.60 | 101.2 |
| MBE | 8.19 | 13.80 | 59.4 |

Notes: Universe is all private sector labor force participants between age 16 and 64. All results are statistically significant at a 5 percent level or better. The figure in column (1) is the average self-employment rate weighted using population-based person weights. The figure in column (2) is derived by inflating the figure in column (1) according to the corresponding coefficient from the business formation regression analysis, which is derived holding constant the variables described regression model A, B, or C. The coefficient represents the percentage point probability difference in business formation rates between a given group and non-minority males, evaluated at the mean business ownership rate for the estimation sample. Column (3) is column (1) divided by column (2), before rounding. If there is parity in the relevant market, then the Disparity Index will equal 100, because the expected business formation rate (that is, the business formation rate that would be observed in a non-discriminatory market) will be equivalent to the actual business formation rate. In cases where adverse disparities are present in the relevant market, the Disparity Index will be less than 100, because expected business formation rates will exceed actual business formation rates. Source: ACS PUMS, 2005-2011.

Despite the inclusion of numerous additional controls, large, adverse, and statistically significant disparities in business formation rates persist between minorities and non-minority males in the lines of work in which the plaintiff operates.

## b.     Business Owner Earnings Analysis

Next, I examined deficits in business owner earnings between minorities and non-minority males in the plaintiff's lines of work using the same framework as above. Model A included only the race and sex indicators, thus showing the raw disparities in earnings between the groups. Model B included our standard set of controls, which include educational attainment, geographic location, and labor market experience, or age. Finally, Model C includes all the controls in

Model B plus interest and dividend income, marital status, non-mover status, number of workers, number of children, home ownership and property value, nativity, English proficiency, veteran status, and four local macroeconomic indicators.

For Model A, the results show a 47.4 percent earnings gap between Black business owners and non-minority male business owners. For Hispanics, the gap is 16.0 percent. For Native Americans, the gap is 56.7 percent. For minorities as a group, the gap is 20.8 percent. For Asians, no gap was observed.[76]

When the first set of controls is added, in Model B, we find that the business owner earnings deficits observed for Blacks, Hispanics, and Native Americans fall only slightly, to 46.1 percent, 16.8 percent, and 51.0 percent, respectively. Moreover, Model B shows a substantial gap for Asians as well, of 9.4 percent.[77] This result indicates that Asians, on average, actually have more of the attributes that contribute positively to business owner earnings[78]—education for example—than do non-minority males, and yet the market does not remunerate Asians for these attributes as strongly as it does non-minority males. As a result, the business owner earnings gap for minorities as a group is actually larger in Model B—23.5 percent—than in Model A.

Table 15. Minority Business Owner Earnings Disparities, Information Technology Services and Administrative and Other Support Services.

| Race, Location | Business Earnings Deficit (%) |
|---|---|
|  | (1) |
| *Regression Model A* |  |
| Black | -47.4 |
| Hispanic | -16.0 |
| Asian | 0.0 |
| Native American | -56.7 |
| MBE | -20.8 |
| *Regression Model B* |  |
| Black | -46.1 |
| Hispanic | -16.8 |
| Asian | -9.4 |
| Native American | -51.0 |
| MBE | -23.5 |
| *Regression Model C* |  |
| Black | -41.7 |
| Hispanic | -16.6 |
| Asian | -15.7 |
| Native American | -45.3 |
| MBE | -26.7 |

Source: ACS PUMS, 2005-2011, and calculations by the author.

---

[76] The Asian result was not statistically significant.

[77] The coefficient for Asians in Model B is still not statistically significant, but it is close, with a p-value of .119. The cutoff for significance is a p-value of .05.

[78] And/or less of the attributes that contribute negatively.

Finally, in Model C, I include the complete set of control variables. Once again, the results show only slight decreases in the gap for Blacks, Hispanics, and Native Americans, compared to Model B, and once again actually show a large increase in the gap for Asians.[79] The resulting gap for minorities as a group—at 26.7 percent— is also larger in Model C compared to Model B.

In addition to the analyses just discussed, we also ran comparable analyses on the annual earnings of wage and salary workers—as opposed to business owners—in the plaintiff's lines of work. Though not reported here, the results look very similar to those in Table 15—large, adverse, and statistically significant deficits were observed for Blacks, Hispanics, Asians, Native Americans, and for minorities as a group.[80]

In conclusion, when we examine the status of MBEs compared to non-MBEs in the lines of work within which the plaintiff operates, the results look very similar to what we observe elsewhere in the economy—in construction, in CPS, in OPS, and in other industries. Even when compared to non-minority males that are similarly situated in terms of educational qualifications, labor market experience, assets, and other factors, minorities still tend to have lower business formation rates, lower wages, and lower entrepreneurial earnings than non-minority males. These results are consistent with the effects of discrimination in these industries.

## 5.    There is Strong Evidence of Credit Discrimination Against MBEs from the Survey of Small Business Finances

A frequently noted manifestation of business discrimination is denial of access to credit. Disproportionate difficulty accessing commercial capital and credit is among the primary concerns voiced by minority entrepreneurs.[81] If such credit discrimination exists, not only would it hamper the ability of minority entrepreneurs to succeed, it could also prevent them from starting their own businesses in the first place. Both phenomena would be consistent with the

---

[79] The coefficient for Asians in Model C is statistically significant.

[80] In the wage and salary regressions, however, there is also a statistically significant adverse gap for Asians in Model A as well as in Models B and C.

[81] *See, e.g., The Department of Transportation's Disadvantaged Business Enterprise Programs: Hearing Before the H. Comm. on Transportation and Infrastructure,* 111th Cong. (2009); *Doing Business with the Government: The Record and Goals for Small, Minority and Disadvantaged Businesses: Hearing Before the H. Comm. On Transportation and Infrastructure,* 111th Cong. (2009); *Diversity in the Financial Services Sector: Hearing Before the H. Subcomm. on Oversight and Investigations of the H. Comm. on Financial Services,* 110th Cong. (2008); *Landrieu Statement at Minority Entrepreneurship: Evaluating Small Business Resources and Programs: Hearing Before the S. Comm. on Small Business and Entrepreneurship,* 111th Cong. (2009); *Federal Contracting: Removing Hurdles for Minority-Owned Small Businesses: Hearing Before the H. Subcomm. on Government Management, Organization, and Procurement of the H. Comm. on Oversight and Government Reform,* 110th Cong. (2007); *Minority Entrepreneurship:  Assessing the Effectiveness of SBA's Programs for the Minority Business Community: Hearing Before the S. Comm. on Small Business and Entrepreneurship,* 110th Cong. (2007); *Reauthorization of Small Business Administration Financing and Entrepreneurial Development Programs: Hearing Before the S. Comm. on Small Business and Entrepreneurship,* 109th Cong. (2006); *Full Committee Hearing on the State of the SBA's Entrepreneurial Development Programs and Their Role in Promoting an Economic Recovery: Hearing Before the H. Comm. on Small Business,* 111th Cong. (2009); 152 Cong Rec S10302; S. Rep. 111-2.

patterns of disparity observed above in Table 5 and Tables 8-13 and below in Appendix Tables A.1 through B.15.

Several disparity studies in Table 1 have used the *National Survey of Small Business Finances* (SSBF), a joint effort of the Federal Reserve Board and the Small Business Administration, to test for the presence of discrimination in the small business credit market during the 1993 to 2003 period.[82] These surveys are based on a large representative sample of firms with fewer than 500 employees.[83] Several other disparity studies have also examined this evidence.

The SSBF data provide qualitative and quantitative evidence consistent with the presence of discrimination against MBEs in the credit market for small businesses. Using the SSBF, I find that after controlling for a large number of financial and other characteristics of the firms, Black-owned firms, Hispanic-owned firms, and to a lesser extent other minority-owned firms are substantially and statistically significantly more likely to be denied credit than are non-minority-owned firms. The principal findings from the SSBF, documented in a number of the studies and other reports submitted to Congress, are as follows:[84]

- A larger proportion of minority-owned firms than non-minority-owned firms report that credit market conditions are a serious concern.

- A larger share of minority-owned firms than non-minority-owned firms believes that the availability of credit is the most important issue likely to confront them in the upcoming year.

- Minority-owned firms were more likely to report that they did not apply for a loan over the preceding three years because they feared the loan would be denied.

- When minority-owned firms did apply for a loan, their loan requests were substantially more likely to be denied than non-minorities, even when differences like firm size and credit history are accounted for.

- When minority-owned firms did receive a loan, they were often obligated to pay higher interest rates on the loans than was true of comparable non-minority-owned firms.

- There is no evidence that discrimination in the market for credit is significantly different in different regions of the country or in the construction industries than it is in the nation or the economy as a whole.

---

[82] The most recent wave of the SSBF, from 2003, was made available by the Federal Reserve Board in 2007. The Federal Reserve Board then cancelled all future surveys in this series, ostensibly for financial reasons. *See* Robb (2010).

[83] The 1993 and 1998 surveys deliberately oversampled minority-owned and women-owned firms but the 2003 survey unfortunately did not. The 2003 survey took other steps, however, to increase the likelihood that minority-owned and women-owned firms were captured in the sampling frame. For more details, *see* National Opinion Research Center (2005).

[84] *See, e.g.*, *Kevcon, Inc. v. The United States*, Defendant's Expert Report, (ROTHE041702-041794), and studies and hearings cited in Table 1 and at fn. 81.

- There is no evidence that the level of discrimination in the market for credit has diminished between 1993 and 2003, the most recent year for which data are available.

The SSBF was designed to produce estimates for the U.S. as a whole and for nine multi-state census divisions. As a check on the findings above, and in order to produce results for specific states and metropolitan areas, I have in the past conducted my own surveys—closely following the SSBF survey instrument—to supplement to national SSBF.

I conducted these state and local credit market surveys on nine occasions between 1999 and 2007. Locations included the Chicago metropolitan area (1999), the State of Maryland (2000), the Jacksonville, Florida metropolitan area (2002), the Baltimore-Washington, DC metropolitan area (2003), the St. Louis metropolitan area (2004), the Denver metropolitan area (2005), the State of Maryland (2005), the State of Massachusetts (2005), and the Memphis, TN-MS-AR metropolitan area (2007). The Chicago, Jacksonville, Baltimore, St. Louis, and Denver surveys focused on construction and construction-related industries, while the two Maryland surveys, the Massachusetts surveys, and the Memphis survey included other services and goods as well.[85] These results have all been submitted to Congress.

In Table 14 below, I have combined the results of these nine surveys together in a consistent format and re-estimated the basic loan denial regression model on this larger file. These results are remarkably similar to results seen in the national SSBF. For example, loan denial probabilities for Black-owned firms compared to non-minority male-owned firms are about 29 percentage points higher—even when assets, liabilities, creditworthiness measures such as bankruptcies, judgments, and delinquencies, and other firm and owner characteristics, are held constant.

These surveys found statistically significant loan denial disparities for Hispanic-owned firms as well. Denial rates were about 18-24 percentage points higher for Hispanic-owned firms than for their non-minority male-owned counterparts.[86]

---

[85] The Chicago, Maryland I, and Jacksonville survey questionnaires followed the format of the 1993 SSBF, while our Baltimore, St. Louis, Denver, Maryland II, Massachusetts, and Memphis surveys followed the format of the 1998 SSBF questionnaire.

[86] Statistically significant loan denial disparities were also observed for Native American-owned firms when considering applications over the prior three years (about 19 percentage points higher), but not for the most recent application. The results for Asians were not statistically significant.

Table 14. Excess Loan Denial Rates–Nine Jurisdictions

| Race/Gender | Most Recent Application (%) | Last Three Years (%) |
|---|---|---|
| | (1) | (2) |
| Black | 28.9 | 29.3 |
| Hispanic | 17.8 | 24.4 |
| Asian and Pacific Islander | 4.2 | 0.3 |
| Native American | 8.7 | 18.8 |

Source: NERA Credit Market Surveys, 1999-2007.

Finally, as shown in Table 15, I modeled the rate of interest charged, conditional upon receiving loan approval, using NERA's nine-jurisdiction dataset. Once again, the results are similar to what is observed in the national SSBF. The results for Blacks were statistically significant and indicate that they pay approximately 1.7 percentage points more, on average, for their business credit than do non-minority males, declining slightly to 1.5 percentage points when creditworthiness and other firm and owner controls are accounted for. The result for Asians was also significant when considering the most recent loan application, but not when considering all applications over the prior three years.[87]

Table 15. Excess Cost of Credit–Nine Jurisdictions

| Race/Gender | Most Recent Application (Int. Rate % Points) | Last Three Years (Int. Rate % Points) |
|---|---|---|
| | (1) | (2) |
| Black | 1.683 | 1.491 |
| Hispanic | 0.820 | 0.895 |
| Asian and Pacific Islander | 1.221 | 0.789 |
| Native American | 1.241 | 1.008 |

Source: NERA Credit Market Surveys, 1999-2007.

On the basis of the foregoing, I conclude that the evidence of credit discrimination collected throughout the nation between 1999-2007, and in other studies submitted to Congress,[88] is entirely consistent with the results obtained using the national SSBF data from the 1993-2003 SSBF files.

---

[87] The results for Hispanics and Native Americans were not statistically significant.

[88] *See* U.S. Small Business Administration (2010).

## IV.   Conclusions

I was asked to review the MBE disparity studies submitted to Congress as well as other related studies and data sources. These disparity studies were conducted by myself and by others and examined statistical evidence of MBE participation in public sector contracting and procurement activity, MBE representation in the relevant business populations, and explanations for the disparities observed between these factors. Many of these studies also examined private sector or economy-wide evidence of disparities business formation rates, business owner earnings, and commercial loan denials. Almost all of these studies also included qualitative, or anecdotal, accounts from both MBEs and non-MBEs concerning these disparities.

After reviewing this material, I conclude that the studies submitted to Congress, taken as a whole, provide strong evidence of large, adverse, and often statistically significant disparities between minority participation in business enterprise activity and the availability of those businesses. Based upon the studies as well as upon the additional analyses I conducted for this report, I further conclude that these disparities are not explained solely, or even largely, by differences in factors other than race and sex that are untainted by discrimination, and that these disparities therefore are consistent with the presence discrimination in the business market. I find this to be the case in construction markets, construction-related professional services markets, and other professional services markets, including those in which the plaintiff operates. When I also include the smaller number of studies in the record that have not yet been submitted to Congress, I reach the same general conclusions.

Jon Wainwright, Ph.D.

March 8, 2013

This report is subject to revision upon access to additional data or testimony.

My rate for work done on this matter is $425 per hour. My qualifications are documented above in Section I and in my curriculum vitae, which is attached as Exhibit A. At this time I have not prepared any exhibits that I expect to use as summary of or support for my positions other than those contained herein. I may prepare such exhibits in the future as part of the trial preparation process.

## V.    References

Aparicio, Ana. 2009. *Hispanic-Owned Business Enterprises in the Construction Industry of Greater Chicago: Responses and Personal Perspectives.* For the City of Chicago M/WBE Program.

Asian American Justice Center. 2008. *Equal Access: Unlocking Government Doors for Asian Americans: Public Contracting Laws and Policies.*

Bourdon, Clinton C. and Raymond E. Levitt. 1980. *Union and open-shop construction, compensation, work practices, and labor markets.* Lexington Books: Lexington, Massachusetts.

Bureau of Labor Statistics. 2012a. Employment status of the civilian population by race, sex, and age. <http://www.bls.gov/news.release/empsit.t02.htm> . Viewed November 18, 2012.

Bureau of Labor Statistics. 2012b. Employment status of the Hispanic population by sex and age. <http://www.bls.gov/news.release/empsit.t03.htm> . Viewed November 18, 2012.

Cavalluzzo, K. S., L. C. Cavalluzzo, and J. Wolken (1999), "Competition, Small Business Financing, and Discrimination, Evidence from a New Survey," unpublished manuscript, Georgetown University, February.

Coleman, Susan. 2004. Access to Development Capital for Women and Minority Owned Small Firms: Does Educational Attainment Have an Impact? *Journal of Developmental Entrepreneurship.* Vol. 9, No. 2.

Connolly, Walter B., Jr., and David W. Peterson, and Michael J. Connolly. 2001. *Use of Statistics in Equal Employment Opportunity Litigation (Release 16)*, New York: Law Journal Press.

Dowall, David E. and Lawrence C. Barone. 1993. "Improving Construction Industry Performance: Issues and Opportunities," U.C. Berkeley, prepared for the United Nations Industrial Development Organization, May.

Eccles, Robert G. 1981. "Bureaucratic versus Craft Administration: The Relationship of Market Structure to the Construction Firm." *Administrative Science Quarterly.* 26.

Enchautegui, Maria E., Michael Fix, Pamela Loprest, Sarah von der Lippe, and Douglas Wissoker. 1996. *Do minority-owned businesses get a fair share of government contracts?* Washington, D.C.: The Urban Institute.

Gould, Frederick Elliot. 1980. "Investigation in Construction Entrepreneurship," Masters Thesis, MIT, May.

Lau, Yvonne M. 2009. *Profiles on Asian Americans in Construction—A Study for the City of Chicago M/WBE Sunset Project.* For the City of Chicago M/WBE Program.

Lowrey, Ying. 2007. "Minorities in Business: A Demographic Review of Minority Business Ownership," *SBA Small Business Research Summary*, No. 298. April.

Lowrey, Ying. 2010. "Race/Ethnicity and Establishment Dynamics, 2002-2006," *SBA Office of Advocacy*. November.

Marshall, Ray. 2002. "The economics of discrimination as applied to business development," in Horowitz, Irving Louis, ed., *Eli Ginzberg: The Economist as a Public Intellectual*. New Brunswick, NJ: Transaction Publishers, 67-106.

Mitchell, Karlyn and Douglas K. Pearce. 2005. "Availability of Financing to Small Firms Using the Survey of Small Business Finances." SBA Office of Advocacy, under Contract Number SBAHQ-03-Q-0016.

Quon, Myron. 2008. "Discrimination Against Asian American Business Enterprises: The Continuing Need for Affirmative Action in Public Contracting," *Asian American Policy Review* 41.

Robb, Alicia. 2010. "Beyond the Late, Lamented Survey of Small Business Finances," *Newsletter of the Association of Public Data Users*, 33, no. 2, March/April.

U.S. Census Bureau. 2010a. "Income Distribution to $250,000 or More for Households: 2009," Current Population Survey, 2010 Annual Social and Economics Supplement. <http://www.census.gov/hhes/www/cpstables/032009/rdcall/1_000.htm>. Viewed November 18, 2012.

U.S. Census Bureau. 2011a. "SB0700CSA01 - Statistics for All U.S. Firms by Industry, Gender, Ethnicity, and Race for the U.S., States, Metro Areas, Counties, and Places: 2007. Washington, D.C.: U.S. Census Bureau.

U.S. Census Bureau. 2011b. "SB0700CSA10 - Statistics for All U.S. Firms With Paid Employees by Industry, Ethnicity, and Employment Size of Firm for the U.S. and States: 2007. Washington, D.C.: U.S. Census Bureau.

U.S. Census Bureau. 2011c. "SB0700CSA11 - Statistics for All U.S. Firms With Paid Employees by Industry, Race, and Employment Size of Firm for the U.S. and States: 2007. Washington, D.C.: U.S. Census Bureau.

U.S. Census Bureau. 2011d. "Cumulative Estimates of Resident Population Change for the United States, Regions, States, and Puerto Rico and Region and State Rankings: April 1, 2010 to July 1, 2011 (NST-EST2011-02)." <http://www.census.gov/popest/data/state/totals/2011/tables/NST-EST2011-02.xls>. Viewed November 26, 2012.

U.S. Census Bureau. 2012. "Annual Estimates of the Resident Population by Sex, Race, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2011 (NC-EST2011-03)." <http://www.census.gov/popest/data/national/asrh/2011/tables/NC-EST2011-03.xls>.     Viewed November 18, 2012.

U.S. Congress. 2007. *Access to Federal Contracts: How to Level the Playing Field,* 110th Cong. (October 29), Serial No. 110-373.

U.S. Congress. 2008. *Business Start-Up Hurdles in Underserved Communities: Access to Venture Capital and Entrepreneurship Training*, Hearing Before the Committee on Small Business and Entrepreneurship (Sept. 11).

U.S. Congress. 2009a. *DOT's Disadvantaged Business Enterprises Programs Before the H. Comm. on Transportation and Infrastructure*, 111th Cong. (March 26), Serial No. 111-1.

U.S. Congress. 2009b. *The Federal Aviation Administration Reauthorization Act of 2009*: Hearing Before the H. Subcomm. on Aviation of the H. Comm. on Transportation and Infrastructure, 111th Cong. (February 11), Serial No. 111-8.

U.S. Congress. 2009c. *Infrastructure Investment: Ensuring an Effective Economic Recovery Program:* Hearing Before the H. Comm. on Transportation and Infrastructure, 111th Cong. (January 22), Serial No. 111-2.

U.S. Department of Commerce, Minority Business Development Agency. 2006. *The State of Minority Business Enterprises: An Overview of the 2002 Survey of Business Owners*. Washington, D.C.: Minority Business Development Agency.

U.S. Small Business Administration. 2010. "Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses" report submitted to the U.S. Senate Committee on Small Business and Entrepreneurship (June 2). Submitted to Congress: "Assessing Access: Obstacles and Opportunities for Minority Small Business Owners in Today's Capital Markets," U.S. Senate Committee on Small Business and Entrepreneurship, supplementing the testimony provided by Mr. Grady Hedgespeth, Director of Financial Assistance, Office of Capital Access, SBA,  April 15, 2010. "Minority Contracting: Opportunities and Challenges for Current and Future Minority-Owned Businesses," U.S. House Committee on Oversight and Government Reform, Subcommittee on Government Management, Organization, and Procurement, supplementing the testimony of David Hinson, National Director, Minority Business Development Agency, U.S. Department of Commerce, September 22, 2010.

Wainwright, Jon and Colette Holt. 2010. *Guidelines for Conducting a Disparity and Availability Study for the Federal DBE Program*. National Cooperative Highway Research Program Report 644. Washington, D.C.: Transportation Research Board.